IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GIGI KAI ZI CHAN,<br><br>Plaintiff,<br><br>v.<br><br>WELLINGTON MANAGEMENT COMPANY LLP and CHARLES ARGYLE<br><br>Defendants. | DEMAND FOR JURY TRIAL |

## COMPLAINT

In early 2014, Wellington Management Company, LLP ("Wellington") recruited Gigi Kai Zi Chan ("Ms. Chan") to work as a Portfolio Manager in its Global Equity Portfolio Management Group.  Ms. Chan—a citizen of the United Kingdom, of Chinese descent, then living in the United States—was wary of joining an investment management firm dominated by white males.  Wellington, however, allayed these fears with assurances that it valued differences and diversity as part of its collaboration process, and with promises that Ms. Chan would be afforded professional opportunities commensurate with her skill and experience.  Believing this to be true, Ms. Chan agreed to move half-a-world away to accept a job based in Wellington's Hong Kong office.

But the assurances and promises that lured Ms. Chan from the United States to Hong Kong proved false.  Almost immediately upon joining the firm, Ms. Chan found that Wellington was infected with a sexist and racist culture.  The firm largely ascribed to the motto "boys will be boys"—with managers regularly engaging in sexual banter and other derogatory behavior.  Hostility towards ethnic minorities—particularly Chinese—was also openly expressed.  Indeed,

one Partner disclosed to Ms. Chan that she (Ms. Chan) had been hired by Wellington because

Ms. Chan was "Chinese, but not too Chinese."

Ms. Chan's complaints about this sexist and racist culture only made matters worse.  She

was demeaned, ostracized and deprived of critical professional support.  As Ms. Chan's direct

supervisor, Charles Argyle, angrily stated when Ms. Chan insisted on being treated fairly: "In

this firm, you do not demand anything."  And so Ms. Chan suffered.  She lost sleep, she lost

weight, and she lost three pregnancies.  And eventually she was fired.

Ms. Chan brings this action to recover the significant harm that she has suffered as a

result of this tortious and unlawful conduct.

### Parties and Jurisdiction

1.      Plaintiff is a female of Chinese descent, and a citizen of the United Kingdom.

She currently resides in France.

2.      Wellington is a limited liability partnership organized under the laws of Delaware

with principal offices located at One Financial Center, Boston, Massachusetts.

3.      Charles Argyle is a Wellington partner who, upon information and belief, resides

in the Commonwealth of Massachusetts.  At all times relevant to this action, Argyle served as

leader of Wellington's Global Equity Portfolio Management Group.

4.      As one or more of Wellington's partners are citizens of the Commonwealth of

Massachusetts, Wellington is deemed a Massachusetts citizen for purposes of determining

diversity of citizenship.

5.      The Court has jurisdiction over the subject matter of this dispute pursuant to 28

U.S.C. §§1332(a) and 1332(c)(1). All parties are diverse: the plaintiff is a citizen of the United

Kingdom residing outside of the United States and the defendants are citizens of Massachusetts. The matter in controversy exceeds $75,000.

6.      The Court has personal jurisdiction over the defendants pursuant to M.G.L. c. 223A, § 2 and venue is proper in this district under 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims occurred in the Commonwealth of Massachusetts and all of the defendants reside within this District.

7.      Ms. Chan timely filed a charge of discrimination (the "Charge") with the Massachusetts Commission Against Discrimination ("MCAD") on all claims asserted herein under M.G.L. c. 151B on July 9, 2018, and properly removed the Charge from the MCAD before filing this Complaint.

## Facts

### *Ms. Chan Joins Wellington*

8.      Wellington is an investment management firm headquartered in Boston, Massachusetts with over one trillion dollars of assets under management.

9.      In early 2014, Wellington recruited Ms. Chan to work as a Portfolio Manager in its Global Equity Portfolio Management Group ("GEPM").

10.     GEPM is responsible for the vast majority of Wellington's equity investments.

11.     Ms. Chan was living in the United States at the time of her recruitment by Wellington, and she attended numerous in-person interviews at Wellington's Boston headquarters.

12.     During the recruitment process Ms. Chan was particularly interested in learning about Wellington's approach to diversity and inclusiveness, and whether she would be judged based upon her merit as opposed to her gender or ethnicity.

13.     By this time in Ms. Chan's career, she had already developed a strong track record of success as a Portfolio Manager.  Among her many noteworthy achievements, Ms. Chan had successfully launched and managed the Threadneedle China Opportunities Fund ("TCO Fund").  Under Ms. Chan's leadership the TCO Fund ranked top decile with 5% annualized outperformance versus its benchmark index, an accomplishment that helped win the prestigious Lipper Fund Award for "Best Fund over 3 years - Equity China."

14.     Eager to have someone with Ms. Chan's credentials join its ranks, Wellington convinced Ms. Chan that it was the perfect place for her to continue her career.  Among other things, Wellington represented itself as a collegial firm that valued differences and diversity as part of their collaboration process.  Ms. Chan was further assured that integrity and trust was at the heart of everything Wellington does, and that she would be afforded opportunities commensurate with her skill and experience.

15.     Wellington's various representations and assurances induced Ms. Chan to forego another employment opportunity as a Portfolio Manager in the United States.  Notably, that opportunity would have been more advantageous to Ms. Chan in various respects, including compensation and title.

16.     Ms. Chan received an employment offer from Wellington in April 2014. Although the position was to be based in Wellington's Hong Kong office, Wellington explained to Ms. Chan that she would have a direct reporting line to the Boston headquarters, and that she would be expected to travel to Boston frequently.

17.     This was consistent with the operating structure that had been described to Ms. Chan during the interview process.  Specifically, Wellington identified its various affiliates as "offices" and represented to Ms. Chan that they all operated with Wellington as a single

integrated entity.  According to Wellington, virtually all corporate decision-making for the various Wellington "offices" was exercised from Wellington's Boston headquarters.

18.     This was also consistent with the offer letter that Wellington provided to Ms. Chan, a copy of which is attached as Exhibit A (the "Offer").  Although the Offer purported to be from Wellington's Hong Kong affiliate—Wellington Global Investment Management LTD—it explicitly stated that Ms. Chan would also be obligated to "perform duties or services not only for the [Hong Kong affiliate] but also for Wellington Management Co., LLP and any of its affiliated entities."

19.     The Offer stated that Ms. Chan would "report directly to Charles Argyle."

20.     Ms. Chan's observations during the course of her employment further confirmed that Wellington and its affiliates operated as a single integrated entity.  Indeed, the Hong Kong "office" was incapable of conducting any type of business—marketing, executing trades, etc.— without significant involvement and support from Wellington's headquarters in Boston.

21.     After Ms. Chan accepted Wellington's offer of employment, she moved to Hong Kong.  However, she continued to report directly to Wellington's Boston office, and traveled to Boston frequently.

### *"I would call it racism"*

22.     Almost immediately upon joining the firm, Ms. Chan found that Wellington was infected with a sexist and racist culture.  The firm largely ascribed to the motto "boys will be boys"—with managers regularly engaging in sexual banter and other derogatory behavior.

23.     At one particularly raucous office party, for example, female employees were compelled to dance on a mirrored dance floor while wearing dresses.

24.     Hostility towards China and people of Chinese descent was also openly expressed.  The prevailing view of many people at Wellington, as summarized by one Partner, was that "China is full of crap."

25.     This view even extended to Wellington's clients, with one Partner (also of Chinese descent) commenting to Ms. Chan: "Many people at Wellington actually laughed at what the Chinese institutional investors want."  He then agreed with Ms Chan's assessment that "when you discriminate one type of client against another type of client, well actually I would call it racism."

26.     Ms. Chan experienced Wellington's sexist and racist culture first-hand.

27.     Among other things, Ms. Chan was subjected to unwelcome touching and other conduct of a sexual nature.

28.     Ms. Chan was also singled out for being of Chinese descent, with one Partner telling Ms. Chan that she (Ms. Chan) had been hired because she was "Chinese, but not too Chinese."

29.     The behavior made Ms. Chan feel increasingly uncomfortable and demeaned at work and work-related events.

*"In this firm, you do not demand anything"*

30.     While Ms. Chan initially tolerated much of this behavior, she was compelled to speak up when it appeared that Wellington's sexism and racism were negatively impacting her career.

31.     For example, during a "progress meeting" with her business manager on September 14, 2015, Ms. Chan complained that she was not being given responsibilities and opportunities commensurate with her skill and experience.  In doing so, Ms. Chan made clear

that she was concerned that this unfair treatment was related to her sex and national original.  In particular, Ms. Chan summarized these concerns by stating: "I just feel like I am at a party where I am not welcome."

32.     Shortly thereafter, Ms. Chan was required to appear before a so-called "Process & Philosophy Panel" as a pre-requisite for launching her own fund.  Upon information and belief, Wellington has never required any of its experienced male fund managers to do the same.  Moreover, much of the feedback that Ms. Chan received from the panelists was inappropriate and hostile.  One male panelist, a Partner, even criticized Ms. Chan's appearance by stating "you look ridiculous."

33.     So Ms. Chan complained again, including directly to Wellington's three Managing Partners—Jean Hynes, Philip Perelmuter and Brendan Swords.

34.     During Ms. Chan's conversations with Wellington's Managing Partners, two of which occurred in Boston, Ms. Chan specifically identified her experience at the "Process & Philosophy Panel" as emblematic of the treatment she had been receiving at Wellington.  In particular, Ms. Chan stated that she would not have been treated that way if she "were a male."

35.     While many at Wellington were at least polite in listening to Ms. Chan's complaints about the discriminatory treatment to which she was being subjected, Charles Argyle took a very different tact.  When Ms. Chan told Mr. Argyle, her direct supervisor and the Partner in charge of GEPM, about the discriminatory treatment and stated that she demanded to be treated fairly, he reacted angrily by stating "In this firm, you do not demand anything."

36.     Ms. Chan was stunned.  Over time, this toxic environment at Wellington took a toll on her health.  Ms. Chan had difficulty sleeping.  She lost a significant amount of weight.  Ms. Chan even suffered three miscarriages.

***"Are you sure you can run a fund while pregnant?"***

37.     Despite all of this, Ms. Chan continued to work diligently towards launching her fund.  In May 2016, she met with Wellington's Marketing and Sales teams to prepare for upcoming meetings with potential investors.  Initially, the feedback she received was very positive.  In particular, one member of the Sales team described Ms. Chan's presentation as "so amazing."

38.     But things quickly changed.  At the end of May, Ms. Chan began informing her colleagues that she was pregnant.  Wellington responded by suddenly canceling a marketing trip that Ms. Chan had planned to begin on June 20th.

39.     When Ms. Chan inquired as to the reason for the sudden cancelation, she was told it was because the Sales team believed Ms. Chan lacked adequate "presentation skills."

40.     This excuse made no sense.  Ms. Chan had always excelled at presenting to investors, and had been extremely successful in doing so prior to joining Wellington.  Moreover, Ms. Chan's presentation to the Wellington Sales team had just recently been described as "so amazing."

41.     Ms. Chan raised the issue with her team leader—Greg Mattiko, a Partner based in its London office.  Mr. Mattiko told Ms. Chan that he had discussed the matter with Mr. Swords and that "cancellation of the business trip was office politics."  Indeed, Mr. Mattiko stressed that Ms. Chan should ignore any feedback provided by Wellington's Sales team because "[i]t's complete bullshit."

42.     While these "office politics" were being played, another Partner—Alex Qian— was in discussions with a large Chinese client that was expressing interest in launching a fund that Ms. Chan was uniquely positioned to manage.

43.     In September 2016, Mr. Qian met with the client and presented—to use his words—Ms. Chan's "past investment success."  According to Mr. Qian, the meeting resulted in the client deciding to hire Wellington, subject to formal approval by its investment committee.

44.     Mr. Qian credited Ms. Chan with this success, writing "Well done, Gigi!"

45.     Despite her role in creating this opportunity, Ms. Chan was thereafter shut out of the project.  This appears to be have been due, at least in part, to a concern among Wellington's Partners that Ms. Chan's ability to manage money would be negatively impacted by her pregnancy.

46.     Indeed, upon learning that Ms. Chan was pregnant, one Partner bluntly said to her, "Are you sure you can run a fund while pregnant?  I remember what my wife was like when she had our children."  That same Partner later confirmed to Ms. Chan that the fund "would have been [hers]" if she had not been pregnant.

### *"Commitment"*

47.     Ms. Chan was later told by Greg Mattiko that Charles Argyle had blocked the fund because of his concern with Ms. Chan's "commitment" to the firm.

48.     Notably, this echoed an extremely distressing interaction Ms. Chan had with Mr. Argyle in November 2016, shortly before she started her maternity leave.

49.     During this incident, Mr. Argyle berated Ms. Chan for more than an hour, stating that he was "disappointed with the continual discontent you seem to have working here."  He further cited this "discontent" as the reason why Ms. Chan was not being supported in her efforts to market her fund, stating "why should we go out and market something" if the fund manager is "very clear about how unhappy they are at this firm and we're not actually convinced whether she will still be here in six months."

50.     This was a very difficult conversation for Ms. Chan, as she was almost eight months pregnant and felt that Mr. Argyle was trying to bully her into quitting.

51.     Nonetheless, Ms. Chan made clear that to Mr. Argyle that the alleged "discontent" stemmed from the discriminatory treatment she had suffered.  Specifically, Ms. Chan told him that "just because I'm female, just because I'm Chinese, doesn't mean that people can talk down to me.  That's what I have said.  Every single time."

52.     Rather than address these concerns, however, Mr. Argyle told Ms. Chan that she should simply leave the company if she was unhappy.  Specifically, he stated "If you're as unhappy as you seem to be, I don't understand why you're here."

53.     Ms. Chan refused to quit, and instead returned to work on April 10, 2017.

### *"Underperformance"*

54.     There were significant complications during Ms. Chan's delivery of her child, and she almost died giving birth.  Nonetheless, Ms. Chan returned to Wellington committed to prove that she was one of the top money managers at the firm, and to provide value in whatever way she could for Wellington's clients.

55.     And she did.  For example, Ms. Chan provided valuable insight and assistance to other investors at Wellington—discussing companies, market-trends, and otherwise sharing her insights and analysis with her colleagues.  Ms. Chan also worked proactively to correct significant deficiencies in Wellington's processes in the area of trading.  In particular, Ms. Chan sought to address a lack of trading protocol, later confirmed by a Partner, that had recently caused a trade error Ms. Chan believed disadvantaged investors in the Wellington China Growth Fund she was managing.

56.     On September 12, 2017, Wellington terminated Ms. Chan's employment.

57.     At the time of her termination in September 2017, Ms. Chan's fund was #1 year to date among the 27 public China funds available on Bloomberg (including First State, Blackrock, Fidelity, JPM, UBS, Value Partners to name a few big names).

58.     The reason given by Wellington for Ms. Chan's termination was "underperformance."

59.     The reason given for Ms. Chan's termination is false.  Ms. Chan did not underperform, and Wellington's assertion to the contrary is a mere pretext for discrimination and retaliation.

60.     Upon information and belief, Mr. Argyle, acting alone or in concert with others, caused Wellington to terminate Ms. Chan's employment in retaliation for her repeated opposition to discriminatory treatment.

## COUNT I
### Discrimination Based on Gender
### (Against Wellington)

61.     Ms. Chan realleges and incorporates Paragraphs 1 through 59 above as if fully set forth herein.

62.     Through the conduct alleged above, Wellington has discriminated against Ms. Chan in the terms, conditions and privileges of her employment on the basis of gender in violation of Massachusetts and Hong Kong law.

63.     As a direct and proximate result thereof, Ms. Chan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and other financial losses and emotional distress damages.

## COUNT II
### Discrimination Based on Race/National Origin
### (Against Wellington)

64.     Ms. Chan realleges and incorporates Paragraphs 1 through 63 above as if fully set forth herein.

65.     Through the conduct alleged above, Wellington has discriminated against Ms. Chan in the terms, conditions and privileges of her employment on the basis of race/national origin in violation of Massachusetts and Hong Kong law.

66.     As a direct and proximate result thereof, Ms. Chan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and other financial losses and emotional distress damages.

## COUNT III
### Discrimination Based on Disability/Pregnancy
### (Against Wellington)

67.     Ms. Chan realleges and incorporates Paragraphs 1 through 66 above as if fully set forth herein.

68.     Through the conduct alleged above, Wellington has discriminated against Ms. Chan in the terms, conditions and privileges of her employment on the basis of disability/pregnancy in violation of Massachusetts and Hong Kong law.

69.     As a direct and proximate result thereof, Ms. Chan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and other financial losses and emotional distress damages.

## COUNT IV
## Retaliation
## (Against Wellington)

70.     Ms. Chan realleges and incorporates Paragraphs 1 through 69 above as if fully set forth herein.

71.     Through the conduct alleged above, Wellington has unlawfully retaliated against Ms. Chan in violation of Massachusetts and Hong Kong law.

72.     As a direct and proximate result thereof, Ms. Chan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and other financial losses and emotional distress damages.

## COUNT V
## Tortious Interference
## (Against Wellington)

73.     Ms. Chan realleges and incorporates Paragraphs 1 through 72 above as if fully set forth herein.

74.     To the extent that Wellington is not deemed to be Ms. Chan's employer, Wellington was aware of Ms. Chan's advantageous employment relationship with Wellington Global Investment Management LTD and interfered with that relationship by causing Wellington Global Investment Management LTD to terminate Ms. Chan's employment.

75.     Wellington caused the termination of Ms. Chan's employment maliciously, for improper motives and/or means, including retaliation for Ms. Chan's repeated opposition to discrimination based upon her gender and race/national origin.

76.     As a direct and proximate result thereof, Ms. Chan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and other financial losses and emotional distress damages.

## COUNT VI
### Tortious Interference
#### (Against Argyle)

77.     Ms. Chan realleges and incorporates Paragraphs 1 through 76 above as if fully set forth herein.

78.     Argyle was aware of Ms. Chan's advantageous employment relationship(s) with Wellington and/or Wellington Global Investment Management LTD and interfered with Ms. Chan's advantageous relationship(s) by, upon information and belief, causing the termination of Ms. Chan's employment.

79.     Upon information and belief, Mr. Argyle caused the termination of Ms. Chan's employment maliciously, for improper motives and/or through improper means, including retaliation for Ms. Chan's repeated opposition to discrimination based upon her gender and race/national origin.

80.     As a direct and proximate result thereof, Ms. Chan has suffered and continues to suffer damages, including, but not limited to, loss of compensation and benefits, and other financial losses and emotional distress damages.

**WHEREFORE**, Ms. Chan respectfully requests that this Court:

1.   Enter judgment in Ms. Chan's favor on all counts;

2.   Award Ms. Chan monetary damages, including for emotional distress, with interest;

3.   Award Ms. Chan punitive damages;

4.   Award Ms. Chan her attorneys' fees and costs; and

5.   Order such further relief as the Court deems just and proper.

15

## DEMAND FOR JURY TRIAL

Plaintiff Gigi Kai Zi Chan hereby demands a trial by jury on all Counts that are so triable.

*/s/ Patrick J. Hannon*

Barbara A. Robb (BBO #639976)
Patrick J. Hannon (BBO #664958)
Lucia A. Passanisi (BBO #691189)
Hartley Michon Robb, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
(617) 723-8000
brobb@hartleymichonrobb.com
phannon@hartleymichonrobb.com
lpassanisi@hartleymichonrobb.com
Attorneys for Plaintiff

Dated:  July 24, 2019

15