**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| |
|---|
| GIGI KAI ZI CHAN,<br>                    Plaintiff,<br><br>v.<br><br>WELLINGTON    MANAGEMENT    COMPANY<br>LLP and CHARLES ARGYLE,<br>                    Defendants. |

Civil Action No. 19-cv-11605-WGY

**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Wellington Management Company LLP ("WMC" or the "Firm") and Charles

Argyle, submit this Memorandum of Law in Support of Their Motion for Summary Judgment

pursuant to Fed. R. Civ. P. 56 on all counts of the Complaint ("Complaint").

**PRELIMINARY STATEMENT**

Plaintiff Gigi Kai Zi Chan claims that WMC[1] unlawfully terminated her employment in

September 2017, on account of her gender, national origin, pregnancy and in retaliation for

allegedly engaging in protected activity.  However, the undisputed facts establish that Plaintiff's

failure to succeed at Wellington was never about her gender or other protected class status.  Rather,

what ultimately caused the breakdown in the employment relationship was Plaintiff's fixation on

what she claimed to have been Wellington's "broken promise" to give her the responsibilities of a

portfolio manager -- a position for which she had interviewed but not been hired -- and her refusal

---

[1] Plaintiff alleges that WMC, an affiliate of her employer Wellington Management Hong Kong
(formerly known as Wellington Global Investment Management Ltd.) ("WHMK"), was also her
employer under theories of single and/or joint employment.  Without conceding this, but assuming
Plaintiff's allegations to be true for the purposes of summary judgment, WMC hereafter refers to
WMHK and WMC collectively as "Wellington."

to commit to improving her overall job performance and attitude.   Ultimately, Plaintiff and Wellington reached a stalemate.   After years of trying to help Plaintiff to be successful – including seeding and launching a fund for her to manage – Wellington finally conceded defeat in its continued investment in Plaintiff's career.   Having provided Plaintiff with ample notice and opportunities to improve, Wellington terminated her employment.

In this lawsuit, Plaintiff attempts to recast her entire employment experience at Wellington as discriminatory.   However, at the heart of this lawsuit lies Plaintiff's dissatisfaction with the equity research analyst role she had accepted at Wellington and her refusal to commit even to try to improve her job performance or attitude.

## <u>PROCEDURAL HISTORY</u>

On July 9, 2018, Plaintiff filed an administrative charge with the Massachusetts Commission Against Discrimination ("MCAD") alleging that Wellington had terminated her employment in violation of M.G.L. c. 151B.   Plaintiff thereafter filed this lawsuit against Wellington and Mr. Argyle on July 24, 2019, alleging discriminatory discharge[2] in violation of M.G.L. c. 151B[3] against Wellington and tortious interference against Mr. Argyle and Wellington. Written and oral discovery substantially completed in November 2021, during which Wellington produced thousands of pages of emails and Plaintiff deposed seven of Wellington's current and former employees.   A jury trial is scheduled for October 2021.

---

[2] The only adverse job action within the meaning of M.G.L. c. 151B to which Plaintiff was ever subjected and/or that occurred within the applicable limitations period of 300 days, was the termination of her employment on September 12, 2017.   <u>See</u> M.G.L. c. 151B, § 9.

[3] Although Plaintiff purports to plead her claims under both Massachusetts and Hong Kong law, the parties have stipulated to application of Massachusetts law to the Complaint.

## SUMMARY OF FACTUAL BACKGROUND

The undisputed material facts, supported by admissible evidence, are set forth in full in Defendants' Rule 56.1 Statement of Undisputed Material Facts ("SOF"), which are incorporated herein.  This record establish that Defendants are entitled to judgment as a matter of law on each Count of the Complaint.

In 2013, Plaintiff interviewed unsuccessfully for a portfolio manager role at Wellington. (SOF ¶¶ 8-15).  However, the Firm was sufficiently impressed with Plaintiff to later offer her an equity research analyst role in 2014 in Hong Kong, reporting to Charles Argyle, Director, Global Equity Portfolio Management ("GEPM"). (SOF ¶¶ 16-17).   Mr. Argyle, who was in Boston, had minimal contact with Plaintiff. (SOF ¶ 24). Tom Baxter, Associate Director, GEPM, located in Hong Kong, had the most day-to-day interactions with Plaintiff. (SOF ¶ 25).  Plaintiff was assigned to the Emerging Markets ("EMO") team led by portfolio manager Greg Mattiko. (SOF ¶ 22).  As an equity research analyst, Plaintiff's responsibilities were to research and recommend equities for Mr. Mattiko, as portfolio manager of EMO, to buy and sell.  (SOF ¶ 23).

A "mixed picture" developed concerning Plaintiff's employment, including her presentation style and communication skills, her level of engagement and collaboration and the quality and quantity of her contributions to the EMO team and to the broader investment dialogue at Wellington. (SOF ¶ 26).   Perhaps most concerning in Wellington's feedback intensive environment was Plaintiff's unwillingness to accept constructive criticism.  (Id.).

Despite having accepted an equity research analyst role, Plaintiff was adamant about her desire to take on portfolio management responsibilities.  (SOF ¶ 27).  Although entirely absent from her offer letter, Plaintiff claims that she had been promised such responsibilities in the pre-hire process.  (SOF ¶ 21).  In 2015, hoping to eliminate Plaintiff's distraction and increase her engagement at the Firm, Mr. Argyle supported the launch and seeding of the China Growth fund

for Plaintiff to manage. (SOF ¶¶ 29, 44-45). Unfortunately, Plaintiff's attitude, level of engagement and contributions thereafter remained poor. She seemed aggrieved and dissatisfied, complaining about perceived slights such as the size of the fund, the lack of client access, etc. (SOF ¶¶ 52-58). Plaintiff openly discussed opportunities she had to work elsewhere, prompting Wellington and Mr. Argyle to question her commitment to the Firm. (SOF ¶¶ 52, 57).

By November 2016, with Plaintiff's peer feedback ranking her amongst the lowest of more than 100 investors in GEPM and no discernible improvement, Mr. Argyle delivered a clear message to Plaintiff in her year-end review meeting (which Plaintiff secretly recorded). (SOF ¶¶ 60-66). Mr. Argyle told Plaintiff that things were going "very" poorly. He told her she had a final opportunity to turn things around. (SOF ¶ 67). Plaintiff took no accountability, shifting the blame on Wellington and its alleged broken business promise. (SOF ¶¶ 69-71). Mr. Argyle thereafter sent Plaintiff an email identifying the specific areas in which Plaintiff's performance was lacking and directed her to acknowledge and respond to the feedback. (SOF ¶¶ 74-76). Plaintiff never even sent a reply email. (SOF ¶¶ 77-78).

Upon Plaintiff's return from a maternity leave in April 2017, there was no demonstrable change or improvement. (SOF ¶¶ 81-82). Instead, in a May 31, 2017 meeting with Mr. Mattiko, which Plaintiff also secretly recorded, she remained entrenched in her grievances over alleged broken business promises, and stated that the onus was on Wellington – not her – to change. (SOF ¶¶ 83-88). They had reached a fork in the road. (Id.). Plaintiff remained terminally dissatisfied and, in Mr. Argyle's judgment, was not making sufficient impact at the Firm to justify her continued employment. Mr. Argyle, once Plaintiff's biggest supporter, had to admit defeat. Thus, in June 2017, he made the decision to terminate Plaintiff's employment, effective September 2017. (SOF ¶¶ 89-92). There is no evidence that Plaintiff's gender, national origin, and past pregnancy

or Plaintiff's alleged past protected activity were considerations in that decision.  Nor is there

evidence that Mr. Argyle, who at all times was acting in his capacity as a manager, acted with

malice or otherwise tortiously interfered in Plaintiff's relationship with Wellington.

## LEGAL ARGUMENT

### I.   STANDARD OF REVIEW

The role of summary judgment is to pierce the pleadings and assess the proof so as to

determine whether there is a genuine need for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317,

323-24 (1986).  Summary judgment is proper if there is "no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue

is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party.  Foss

v. Marvic, 424 F. Supp. 3d 158, 160 (D. Mass. 2019) (emphasis added).  The mere existence of

some alleged factual dispute will not defeat a properly supported summary judgment motion.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-252 (1986) (citations omitted).  The non-

moving party must "affirmatively point to specific facts that demonstrate the existence of an

authentic dispute."  Melanson v. Browning-Ferris Indus., 281 F.3d 272, 276 (1st Cir. 2002).   A

party resisting summary judgment may not rely on hearsay or on conjectural or "unsupported

statements of belief."  Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d

1, 5 (1st Cir. 2000).  Rather, the plaintiff must "affirmatively point to specific facts that demonstrate

the existence of an authentic dispute."   Melanson, 281 F.3d at 276) (quoting McCarthy v.

Northwest Airlines, 56 F.3d 313, 315 (1st Cir. 1995)).  In an employment discrimination case, a

plaintiff cannot avoid summary judgment merely by speculating that her treatment by her employer

was based on impermissible considerations.  See Dorman v. Norton Co., 64 Mass. App. Ct. 1, 10

(2005).

## II.   WELLINGTON IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S GENDER, PREGNANCY AND NATIONAL ORIGIN DISCRIMINATION CLAIMS

### A.   Wellington Has Met its Burden to Proffer Legitimate, Nondiscriminatory Reasons for Terminating Plaintiff's Employment

In Counts I, II and III of the Complaint, Plaintiff claims that Wellington terminated her employment in September 2017 on account of her gender, her national origin and her past pregnancy.  Assuming for the purposes of summary judgment that Plaintiff can satisfy her burden of stating a prima facie case of discrimination, she cannot raise a triable issue of fact that Wellington's legitimate, non-discriminatory reasons for her termination were false.

An employer can rebut any inference of discrimination by offering lawful reasons for taking adverse action.  Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000).   An employer's burden in offering a legitimate, nondiscriminatory reason is "not meant to be onerous." Yee v. Massachusetts State Police, 481 Mass. 290, 302 (2019). Indeed, even if the reason given for a decision are "unsound," "arbitrary," "unwise," or "even absurd," the employer has fulfilled its obligation.  Matthews v. Ocean Spray Cranberries, 426 Mass. 122, 128 (1997).

Wellington has easily met its burden of production on summary judgment. As set forth more fully in it Rule 56.1 Statement, over the course of Plaintiff's employment, Mr. Argyle had received feedback from a number of different sources regarding Plaintiff's poor job performance and had reached similar conclusions based on his own observations.  (SOF ¶¶ 26-88).   After consulting with Human Resources, Mr. Argyle shared his serious concerns with Plaintiff during their year-end review meeting in November 2016 and in a follow-up email.  (SOF ¶¶ 60-76).  He told Plaintiff that things were going very poorly, but assured her that it was not too late to turn things around.  (SOF ¶ 67).  However, Mr. Argyle put Plaintiff on notice that if she did not do so, they would be having a very different discussion in mid-2017. (SOF ¶ 72).  Mr. Argyle directed

Plaintiff to acknowledge and respond to the oral and written feedback.  (SOF ¶ 76).  Yet, Plaintiff never did.  (SOF ¶ 77).  And, more than six months later, in a meeting with Mr. Mattiko, Plaintiff still took no accountability and remained entrenched in her grievances about alleged broken business promises.  ((SOF ¶¶ 83-88)).  Mr. Argyle concluded the situation was futile and reached the decision to terminate Plaintiff's employment.  (SOF ¶¶ 89-92).

**B.**      **Plaintiff Cannot Establish that Wellington's Proffered Reason for Terminating her Employment was a Mere Pretext for Unlawful Gender, National Origin and/or Pregnancy Discrimination**

Having met its burden of establishing a legitimate, non-discriminatory reason, the burden shifts to Plaintiff to prove that Wellington's articulated reason was not the real reason, but a mere pretext.  Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 397 (2016).  Plaintiff cannot offer any competent evidence to put Wellington's legitimate, non-discriminatory reason for terminating her employment in doubt to defeat summary judgment.

Plaintiff cannot raise a triable issue of fact by claiming that Wellington's decision to terminate her employment was arbitrary or unfair.  See Weber, 434 Mass. at 778 ("not every unfair termination…constitutes unlawful employment discrimination in violation of G.L. c. 151B. Membership in a protected class without more is insufficient to make the difference").  Simply put, Chapter 151B "does not grant relief to a plaintiff who has been [treated] unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision."  Matthews, 426 Mass. at 127.

Plaintiff alleges in the Complaint that the China Growth fund was performing well (Compl. ¶57) and that she provided valuable insight and assistance to her colleagues and identified deficiencies in Wellington's trading protocols.  (Compl. ¶55).  But Wellington has not offered the fund's performance as a reason for her termination.  Thus, this claim is a red herring.  Rather, it

was Plaintiff's poor attitude, lack of collaboration and contributions and her unwillingness to accept feedback (including ignoring Mr. Argyle's directive to respond to his email), that led to the decision to terminate.

Nor can Plaintiff raise a triable issue of fact by relying upon her opinion of her performance. Courts focus not on the employee's perception of her performance, but "on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." Robinson v. Town of Marshfield, 950 F.3d 21, 25 (1st Cir. 2020) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991). Here, Plaintiff has failed to present any evidence to suggest that Mr. Argyle did not sincerely believe that Plaintiff was not meeting Wellington's overall performance expectations. See Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 48-49 (1st Cir. 2019) (explaining that, "when faced with employment decisions that lack a clear discriminatory motive, '[c]ourts may not sit as super personnel departments, assessing the merits —or even the rationality — of employers' nondiscriminatory business decisions").

### 1. Plaintiff can offer no evidence of discriminatory animus based on her gender or national origin.

Any effort by Plaintiff to rely upon alleged evidence of discriminatory animus to satisfy her burden of proving pretext would be unavailing. Mr. Argyle's treatment of Plaintiff during her employment belies any claim that Wellington manufactured false reasons to mask unlawful discrimination. For example:

- Mr. Argyle participated and supported Plaintiff's hire in 2014. (SOF ¶¶ 16-17).

- In 2013, Mr. Argyle elected to install Bo Meunier -- a female of Chinese national origin – as the "centerpiece" of Wellington's China equities strategy. (SOF ¶ 14).

- Mr. Argyle used his internal capital to locate seed money and to help push through the launch of the China Growth fund for Plaintiff to manage. (SOF ¶ 29).

- Mr. Argyle gave Plaintiff honest feedback in an effort to help her to succeed and even provided her a road map for doing so.  (SOF ¶¶ 42-43, 62-76).

Plaintiff also cannot avoid summary judgment by citing to favorable treatment of similarly-situated comparators because there are no such comparators.  A proper comparator must be "similarly situated in all relevant respects." Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997); see Matthews, 426 Mass. at 130 ("The plaintiff must identify other employees to whom he is similarly situated in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations.") (Internal quotation marks and citations omitted);  see also Caputy v. Quad/Graphics, Inc., C.A. No. 14-14159-FDS, 2016 U.S. Dist. LEXIS 166745, at *13 (D. Mass. Dec. 2, 2016) ("Clearly, an employee with an average rating of 3.2 out of 5 is not similarly situated in all relevant aspects to those with average ratings of 4.0 [and above].");  Smith v. Stratus Computer, 40 F.3d 11, 17 (1st Cir. 1994) (finding the plaintiff, whose supervisor was dissatisfied with her performance, was not similarly situated to others where there was no evidence that their supervisors were dissatisfied with their performance).

Nor can Plaintiff rely on a handful of comments she claims suggest discriminatory animus. Plaintiff does not claim (nor could she) that decision-maker Mr. Argyle (or Messrs. Baxter, or Mattiko for that matter) ever made any discriminatory remarks.  She also fails to claim that any alleged remarks of colleagues over the course of her employment were, in any way, connected to the termination decision.  See Dávila v. Corporación de Puerto Rico para la Difusión Pública, 498 F.3d 9, 16-17 (1st Cir. 2007) (holding that "[w]hen assessing a claim of pretext in an employment discrimination case, a court's focus is necessarily on the motivations and perceptions of the decisionmaker").  At most, even if true, they are irrelevant stray remarks.  See Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) ("[S]tray workplace remarks, as well as statements made either by non-decision makers or by decision makers not involved in the decisional process,

normally are insufficient, standing alone, to establish . . . requisite discriminatory animus.")
(Internal quotation marks and citations omitted).

Plaintiff is also unable to show that certain alleged treatment is attributable to her gender
and/or national origin.  For example, she claims that Wellington did not sufficiently value her prior
experience; that it did not provide her with portfolio management responsibilities soon enough;
that the China Growth fund was underfunded; that a colleague once pushed past her to get to their
shared assistant and/or once backed her into a corner while they spoke; that a marketing trip was
cancelled; that she was not given sufficient client access; and that she was subjected to
disrespectful treatment at an internal Philosophy & Process panel.    However, Plaintiff's
speculation that any of this alleged treatment was owing to her gender and/or national origin is just
that – speculation.  Speculation is not evidence sufficient to defeat summary judgment.  See
Henderson v. Massachusetts Bay Transp. Auth., 977 F.3d 20, 29 (1st Cir. 2020) ("In opposing
summary judgment, the plaintiff bears the burden of producing evidence sufficient to rebut
defendant's arguments but cannot rely on 'conclusory allegations, improbable inferences . . . or
rank speculation' . . . Similarly, the plaintiff's 'subjective belief of discrimination is not sufficient
to withstand summary judgment.'") (citations omitted).  Moreover, any such alleged treatment was
removed in time and unrelated to any decision to terminate her employment and is, thus,
inadequate to raise an inference of discriminatory animus.  Gonzalez, 304 F.3d at 69.

Finally, Plaintiff alleges she was subjected to "unwelcome touching and other conduct of
a sexual nature." (Compl. ¶27). However, the only "facts" Plaintiff offers are: (1) she attended a
retirement party with a mirrored dance floor; (2) in January 2015, a colleague asked her to go to a
"prostitute bar";[4] and (3) in January 2015, Mr. Mattiko briefly put his hand on the small of her

---

[4] Plaintiff was with her husband, who saw nothing inappropriate at the bar. (SOF ¶ 101).

back.[5]  Even if these alleged off-site, isolated incidents occurred,[6] they are far removed in time from the termination decision and do not involve the decision-maker.  As such, they do not serve to create a jury question on pretext nor are they relevant for any purpose in this lawsuit.  See Malloch v. Town of Hanover, No. 08-cv-10412-LTS, 2011 U.S. Dist. LEXIS 11997, at *7 (D. Mass. Feb. 7, 2011) (stating that discrimination laws do not establish a "civility code"); see also Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010).

### 2.  Plaintiff has offered no evidence of animus based on pregnancy.

Plaintiff similarly cannot adduce evidence of discriminatory animus based on her pregnancy.  Plaintiff may try to rely upon the timing of the termination decision (10 months after she disclosed her pregnancy and two months after her return from maternity leave). (SOF ¶¶ 53, 77, 94).  However, the "mere fact that one event followed another is not sufficient to make out a causal link."  Mole v. Univ. of Mass., 442 Mass. 582, 592, 814 N.E.2d 329 (2004) (quoting MacCormack v. Boston Edison Co., 423 Mass. 652, 662 n.11 (1996)); see also Megivern v. Glacier Hills, Inc., 519 F. App'x 385, 398 (6th Cir. 2013) ("Temporal proximity alone cannot prove pretext, but it can be used as indirect evidence to support a claim of pretext. . . . [However, even where] timing is suspect[,] . . . this evidence must be accompanied by other, independent evidence of pretext for [the plaintiff] to succeed.").  Here, Plaintiff's refusal to comply with Mr. Argyle's directive that she respond to his legitimate performance concerns and the absence of any demonstrative improvement were clearly intervening causes for her termination.  See Brisk v.

---

[5] Plaintiff and Mr. Mattiko worked together for more than three years.  Plaintiff does not claim any other instances in which Mr. Mattiko was allegedly inappropriate nor that he showed romantic interest in Plaintiff. (SOF ¶¶ 102-03).

[6] Plaintiff never complained about these alleged incidents orally or in writing.  (SOF ¶ 100).

Shoreline Found., Inc., 654 F. App'x 415, 417 (11th Cir. 2016) (holding that temporal proximity of four months was "tenuous and there was an intervening cause of poor work performance").

Moreover, documented concerns regarding Plaintiff's job performance predate Plaintiff's early August 2016 pregnancy disclosure.  Forde v. Beth Israel Med. Ctr., 546 F. Supp. 2d (S.D.N.Y. 2008) ("[i]n light of the well-documented evidence of . . . dissatisfaction with [plaintiff's] performance long before her announcement she was pregnant, a trier of fact could not reasonably find from the timing and sequence of events that the reason for [her] dismissal" more than a year later was pretextual).  In addition, Plaintiff herself was openly dissatisfied with Wellington before her pregnancy.  ((SOF ¶ 26, 35-37, 52)).  There is, thus, no reasonable basis upon which to infer that the progression of substantially similar performance feedback and continued mutual dissatisfaction was in any way related to pregnancy.  See Weightman v. Bank of N.Y. Mellon Corp., 772 F. Supp. 2d 693, 709 (W.D. Pa. 2011) (holding the plaintiff's claims for pregnancy discrimination were "not supported" where "issues raised in her performance reviews and the problems with her flexible work arrangement predated her pregnancy"); Megivern, 519 F. App'x at 398 (finding the plaintiff had "not shown that she was singled out for adverse treatment [because of her pregnancy]" where she acknowledged "that she had trouble completing her assessments . . . months prior to the announcement of her pregnancy").

After ignoring Mr. Argyle's performance email for over six months, by the time of her late May 2017 meeting with Mr. Mattiko, Plaintiff remained entrenched in negativity, still insisting on the same quid pro quo -- she would change only if Wellington acceded to her demands.  Plaintiff's past pregnancy did not shield her from the consequences of her sustained poor performance and recalcitrance.  See Gauthier v. Sunhealth Specialty Servs., 555 F. Supp. 2d 227, 236 (D. Mass.

2008) ("[T]he law does not require that employers tolerate poor performance . . . in an employee simply because she is pregnant.").

Plaintiff also claims that a colleague once asked whether she could run her fund while pregnant. In fact, Plaintiff appears to mischaracterize an email from her colleague who offered support during her maternity leave. (SOF ¶ 101). Moreover, even if made, this is an irrelevant stray remark. See Gonzalez, 304 F.3d at 69.

Plaintiff may also try to claim that concerns about her "commitment" to the Firm were owing to her pregnancy. However, such concerns arose well before she disclosed her pregnancy. For example, by Spring 2016, colleagues questioned Plaintiff's commitment to Wellington due to her mentions of receiving headhunter calls. (SOF ¶¶ 47-52). Moreover, in late May 2017, after listening to Plaintiff's list of grievances (none of which involved discrimination), Mr. Mattiko asked Plaintiff if she wanted to remain at Wellington. Plaintiff did not commit, stating instead that she had "choices." (SOF ¶¶ 83-87). There is, thus, no reasonable basis upon which to infer that Wellington's uncertainties about Plaintiff's commitment level were in any way prompted by her pregnancy.[7]

Based on the undisputed facts supported by competent evidence, summary judgment should enter on Counts I, II and III of the Complaint.

---

[7] To the extent Plaintiff tries to rely upon Wellington's failure to pursue any potential client opportunities, including the so-called "Minsheng Fund", as "evidence" of pregnancy discrimination, it is another red herring. First, her only basis for claiming that is the timing of her pregnancy disclosure. (SOF ¶ 106) See supra pp. 11-12 (timing alone is inadequate). Second, Wellington was already quite concerned with Plaintiff's level of Plaintiff's performance of her analyst job duties and had doubts regarding her commitment to the firm, so providing her with any new, unrelated responsibilities was never under serious consideration. (SOF ¶ 107). Finally, the notion that these opportunities would ever have come to fruition regardless of Plaintiff's pregnancy is entirely speculative. (SOF ¶ 108).

III.   **WELLINGTON IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM**

A.   **Plaintiff Has Failed to Present Evidence Tending to Establish a Causal Connection Between Any Alleged Protected Activity and the Termination of Her Employment**

To establish a *prima facie* case of retaliation under G.L. c. 151B, Plaintiff must demonstrate that: (1) she engaged in "protected conduct," (2) she suffered some adverse action, and (3) "a causal connection existed between the protected conduct and the adverse action." Mole, 442 Mass. at 591-92. The plaintiff must present "competent evidence that . . . a retaliatory motive played a part in the adverse employment actions alleged." Alvarado v. Donahoe, 687 F.3d 453, 459 (1st Cir. 2012); see Lewis v. Gillette Co., 22 F.3d 22, 24 (1st Cir. 1994) (affirming summary judgment on G.L. c. 151B retaliation claim). Here, Plaintiff cannot establish any nexus between her termination and any alleged protected activity.

Plaintiff has identified every instance of purported "protected activity" she alleges that she engaged in at Wellington. (SOF ¶¶ 102-103). Even accepting her claims as true on summary judgment, this list dispels, rather than supports, her retaliation claim. There is a two and a half year gap between her first alleged instance of protected activity in December 2014, and the decision to terminate her employment in June 2017. (SOF ¶¶ 92, 103). Moreover, after Plaintiff claims to have shared concerns of alleged discrimination directly with Mr. Argyle in late 2015, Mr. Argyle continued with his support of the China Growth fund and she remained employed for almost two more years. (SOF ¶¶ 41-92).

Plaintiff may attempt to collapse this chronology by focusing on one passing statement she made about being an Asian female during her November 2, 2016 year-end meeting with Mr. Argyle. (SOF ¶ 104). First, this is not sufficiently close in time to the June 2017 termination decision to establish a causal connection. See Walker v. City of Holyoke, 523 F. Supp. 2d 86, 112

(D. Mass. 2007) (explaining "a mere temporal relationship, unless extremely close, is not enough to withstand summary judgment absent any other evidence of pretext," and that "for timing alone to suffice as evidence of a causal link, it must be 'unusually suggestive,' as with a mere two days between notice of complaint and firing") (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)); Murray v. Warren Pumps, LLC, 821 F.3d 77, 88 (1st Cir. 2016) (holding that isolated complaints that occurred six months before adverse action were "too remote in time from the adverse employment action to establish a retaliation nexus") (citing Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004)); Holloway v. Thompson Island Outward Bound Educ. Ctr., 492 F. Supp. 2d 20, 25-26 (D. Mass. 2007) (finding "loose temporal proximity" between a complaint of discrimination and an employee's termination "separated by some three to four months" was not "competent evidence suggesting a causal link").

Moreover, before Plaintiff shoe-horned one passing comment into their 70-minute discussion, Mr. Argyle had already consulted with Human Resources and had warned her that she had just "one more opportunity … to do a turnaround with respect to [her] attitude of how [she deals] with [her] colleagues of all levels, engage in the investment dialogue." (SOF ¶¶ 62-72). ). See Fournier v. Massachusetts, 2020 U.S. Dist. LEXIS 203913, at *36 (D. Mass. Nov. 2, 2020) (holding the plaintiff "failed to show causality" where she "suffered from documented performance problems predating her protected conduct"). Mr. Argyle's tone, tenor and message remained unchanged after her passing reference to her protected class status. (SOF ¶ 104). Mr. Argyle closed the discussion consistent with his opening – Plaintiff was on thin ice and absent marked improvement, her future at Wellington was uncertain. (SOF ¶¶ 62-72). Thereafter, Plaintiff's inexplicable failure to comply with Mr. Argyle's directive to respond to his feedback

(in words or action) helped to sealed her fate.  (SOF ¶¶ 76-77).  This – not a passing reference to her being an Asian female – led to her termination.

Plaintiff also cannot avoid summary judgment by blurring her day-to-day "complaints" about the myriad things with which she was dissatisfied and protected "complaints" about discrimination.  See Tian v. Aspen Tech., Inc., 53 F. Supp. 3d 345, 369-70 (D. Mass. 2014) (holding that plaintiff's complaints about the company's "unreasonable" hiring process, about a "misunderstanding" with a coworker, about her "unjustified" performance improvement plan, and about "unfair" treatment by another superior, was not protected conduct largely because she had failed to "[characterize] the challenged behavior as unlawful or discriminatory").  Indeed, while Plaintiff may have garnered the reputation of a "complainer," the record (including thousands of emails produced by Wellington) is notably silent on anyone at Wellington ever referencing any of Plaintiff's alleged complaints of workplace discrimination or any negative reactions thereto.

**B.**   **Plaintiff Cannot Establish That Wellington's Articulated Reasons for its Actions Constitute Pretexts for Unlawful Retaliation**

Even if Plaintiff could establish a *prima facie* case of retaliation, Wellington has met its burden to proffer its "legitimate, non-retaliatory reasons for the discharge."  Higgins v. New Balance Ath. Shoe, Inc., 194 F.3d 252, 262 (1st Cir. 1999).  Wellington articulated its legitimate, non-discriminatory reason above, supra, pp. 6-7.  Having satisfied its burden, Plaintiff must then "adduce some significantly probative evidence showing both that the proffered reason is pretextual and that a retaliatory animus sparked [the] dismissal." Id.  Again, as discussed above, Plaintiff has failed to adduce evidence tending to establish that this was a false reason.  Supra, pp. XX to XX.  These arguments apply equally to Plaintiff's claims of retaliation and warrant entry of summary judgment on Count IV of the Complaint.

**III.**   **SUMMARY JUDGMENT SHOULD ENTER ON PLAINTIFF'S INTERFERENCE CLAIM AGAINST MR. ARGYLE**

In Count VI, Plaintiff claims that Mr. Argyle tortiously interfered with her employment relationship with Wellington.   However, Plaintiff cannot raise evidence to establish that Mr. Argyle caused the breaking of Plaintiff's employment relationship with Wellington or that he acted with "actual malice." Thus, Mr. Argyle is entitled to summary judgment on Count VI.

**A.**   **Mr. Argyle Did Not Cause The Breaking Of Plaintiff's Relationship With Wellington**

Plaintiff is also unable to show that Mr. Argyle caused the breaking of her employment relationship with Wellington.   An essential element of a claim for tortious interference is that the defendant "caused one or more parties to [the contract at issue] to 'break' (i.e. breach) it[.]" Psy-Ed v. Klein, 459 Mass. 697, 717 (2011); see also Sklar v. BIDMC, 59 Mass. App. Ct. 550, 554 (2003).   As discussed above, Plaintiff's employment eventually terminated because she failed to heed increasingly serious performance feedback that immediate improvement was required in order to succeed at Wellington.   If anything, Mr. Argyle (whom Plaintiff acknowledges acted in his corporate capacity (SOF ¶ 92)) provided Plaintiff with the roadmap for success at Wellington. Yet, Plaintiff opted to continue down her path of self-destruction.   It was Plaintiff's own recalcitrance that led to the break in her employment relationship with Wellington – not Mr. Argyle.

**B.**   **Plaintiff Cannot Show Mr. Argyle Acted With Actual Malice**

Plaintiff's also cannot meet her burden to show that any of the actions taken by Mr. Argyle, made in his capacity as a manager at Wellington, were done with "actual malice."   To prevail on her claim, Plaintiff must show that Mr. Argyle's alleged interference was both intentional and done with improper means or motive. See Sklar, 59 Mass. App. Ct. at 554.   As the Supreme Judicial Court has stated, "[o]ur cases have consistently held . . . that a heightened standard is necessary to

17

protect the freedom of corporate officers in certain circumstances." Blackstone v. Cashman, 448

Mass. 255, 265 (2007).  This heightened standard has been further explained as follows:

> Where the [d]efendant is a supervisor . . . the plaintiff must show, for the purposes
> of the third element, that the improper motive or means rose to the level of "actual
> malice" and was the "controlling factor" in the defendant's interference. . . . "actual
> malice," in turn, is determined by the defendant's state of mind – namely, whether
> the defendant had a "'spiteful, malignant purpose, unrelated to the legitimate
> corporate interest' of the employer," or put differently, was personally hostile or
> harbored ill will toward the plaintiff.

Sklar, 59 Mass. Appt. Ct. at 554 (citations and footnote omitted).  Plaintiff bears the burden to

prove "actual malice." Blackstone, 448 Mass. at 261, n.10.

Summary judgment is appropriate in tortious interference claims against a supervisor

when, as here, "the record contains insufficient facts tending to show actual malice."  Alba v.

Sampson, 44 Mass. App. Ct. 311, 314, 316-17 (1998) (granting summary judgment for defendant

despite evidence that the supervisor had directed profanities at, made derogatory comments about

-- and was uncivil toward -- the plaintiff).  There is simply no record evidence in this case sufficient

to warrant an inference that Mr. Argyle's actions contained the necessary improper motive to

establish a claim of tortious interference.  Mr. Argyle's actions were at all times professional,

consistent and focused on trying to help Plaintiff to be successful despite the chorus of voices

expressing growing dissatisfaction, including supporting the launch of the China Growth fund.

There is also no evidence that Mr. Argyle took any steps unrelated to Wellington's legitimate

interest in ensuring that Plaintiff satisfactorily performed the duties of her position.  See

Blackstone, 448 Mass. at 263 (confirming definition of "actual malice" as a "spiteful, malignant

purpose, unrelated to the legitimate corporate interest") (emphasis added); Boothby v. Texon, Inc.,

414 Mass. 468, 487-88 (1993) (affirming dismissal of claim for intentional interference against

supervisor, and holding that plaintiff's testimony that his supervisor was angry at him, had poor

"people skills," and had created low morale by recommending that older employees be fired, was insufficient to raise issue of actual malice).[8]

Accordingly, Mr. Argyle is entitled to summary judgment on Count VI of the Complaint.

## IV.   SUMMARY JUDGMENT SHOULD ENTER ON PLAINTIFF'S INTERFERENCE CLAIM AGAINST WMC

In Count V, Plaintiff purports to plead in the alternative that even if WMC was not Plaintiff's employer, WMC tortiously interfered with Plaintiff's employment relationship with WMHK.   If, as Plaintiff claims, she enjoyed a co-employment relationship with WMC and WMHK, she cannot prevail on her claim of tortious interference against WMC. See Appley v. Locke, 396 Mass. 540, 543 (1986) (tortious interference with advantageous relations claim against defendant could not succeed because defendant could not "be liable for 'interference' in its own affairs "); Hunneman Real Estate Corp. v. Norwood Realty, Inc., 54 Mass. App. Ct. 416, 425 (2002) (plaintiff could not also claim shareholders tortiously interfered with the plaintiff's relationship with brokerage because shareholders could not interfere with their own affairs); Canney v. City of Chelsea, 925 F. Supp. 58, 70 (D. Mass. 1996)); see also Wells v. Skynet Digital, LLC, 2015 U.S. Dist. LEXIS 91481, *13 (D. Idaho July 13, 2015) ("[I]f the Court finds Alternburg is a single or joint employer with Skynet, a tortious interference claim can probably not be sustained as Alternburg cannot interfere with his own contract.").

If  WMC was not Plaintiff's employer, her claim of tortious interference against WMC still fails as a matter of law.  In terminating Plaintiff's employment, WMC acted through decision-

---

[8] In addition, Plaintiff cannot show actual malice by relying on her claims of discrimination and retaliation against Wellington because, as described above, the record evidence does not support those underlying claims. See Brunner v. Stone & Webster Eng'g Corp., 413 Mass. 698, 705-06 (1992) (plaintiff's failure to establish unlawful discrimination by company disposed of plaintiff's claim against supervisor for tortious interference).

maker Mr. Argyle.  Thus, just as Plaintiff cannot state a cause of action for tortious interference

against Mr. Argyle, for the reasons set forth supra. at pp. 16-18, Plaintiff similarly cannot state

such a claim against WMC.  Thus, summary judgment is warranted for Wellington on Count VI.

## **CONCLUSION**

For the reasons set forth above, Defendants Wellington Management Company LLP and

Charles Argyle respectfully request that this Court enter summary judgment in their favor and

against Plaintiff on Counts I through VI of the Complaint and on Defendants' Fifth Affirmative

Defense.

Respectfully Submitted,

Defendants,

WELLINGTON    MANAGEMENT    COMPANY
LLP and CHARLES ARGYLE,

By their attorneys,


*/s/ Stephen T. Paterniti*
Stephen T. Paterniti, BBO# 564860
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, Massachusetts  02116
TELE: (617) 367-0025
FACSIMILE: (617) 367-2155


Beverly Garofalo
Admitted *Pro Hac Vice*
JACKSON LEWIS P.C.
90 State House Square
Hartford, Connecticut 06109
TELE:  (860) 331-1535
FACSIMILE:  (860) 247-1330

## <u>CERTIFICATE OF SERVICE</u>

This hereby certifies that on February 22, 2021, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Stephen T. Paterniti*
Jackson Lewis, PC

4844-2329-2637, v. 1