**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

GIGI KAI ZI CHAN,

                Plaintiff,

v.

WELLINGTON MANAGEMENT COMPANY
LLP and CHARLES ARGYLE,

                Defendants.

Civil Action No. 19-cv-11605-WGY

### DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendants Wellington Management Company ("WMC") and Charles Argyle, hereby submit their Statement of Material Facts Not in Dispute in Support of their Motion for Summary Judgment.

**Wellington Rejects Plaintiff for a Portfolio Manager Position, but Hires her as an Equity Research Analyst**

1.      WMC is a private, independent investment management firm with client assets under management totaling over $1 trillion. The Firm serves as investment advisor to over 2,200 institutions in over 60 countries. (Declaration of Henry Philip ("Philip Dec.") ¶ 4, attached hereto as **Exhibit A**).

2.      Wellington Management Hong Kong Ltd. ("WMHK"), the entity that ultimately employed Plaintiff, is an affiliate of WMC located in Hong Kong. WMHK's investment

1

professionals manage assets for institutional clients both regionally and globally, and conduct research that is used by portfolio managers and analysts across Wellington Management locations. (Philip Dec. ¶ 5).[1]

3.　Wellington owes a fiduciary duty to its institutional clients.  (Philip Dec. ¶ 6).

4.　Wellington has a feedback intensive culture, which includes a peer feedback process where colleagues and peers provide feedback on each other.  (Philip Dec. ¶ 7); Deposition of Thomas Baxter (Baxter Dep.) at 125, 134, attached hereto as **Exhibit B**).

5.　Wellington expects its employees to embrace its ethos of "client, firm, self." (Philip Dec. ¶ 8).

6.　Wellington is committed to equal employment opportunity and maintains a comprehensive Policy Against Harassment and Discrimination with a user-friendly complaint procedure. (Philip Dec. ¶ 9 and Exh. 1 thereto; Deposition Transcript of Gigi Chan dated October 7, 2020 (Pl. Dep. II) at 142-43, attached hereto as **Exhibit C**).

7.　Plaintiff is a female of Chinese descent and a citizen of the United Kingdom.  (Dkt. No. 1, Plaintiff's Complaint (Compl.), ¶ 1).

8.　In 2013, Plaintiff interviewed for a China equity portfolio manager position with Wellington Global Equity Portfolio Management ("GEPM") group.  (Deposition Transcript of Gigi Chan dated October 6, 2020 (Pl. Dep. I) at 160-61, attached hereto as **Exhibit D**); Baxter Dep. 39.

---

[1] Plaintiff alleges that WMC, an affiliate of WMHK, was also her employer under theories of single and/or joint employment.  Without conceding this, but assuming Plaintiff's allegations to be true for the purposes of summary judgment, WMC hereafter refers to WMHK and WMC collectively as "Wellington."

9.      Charles Argyle was then Director of GEPM.  Mr. Argyle's primary responsibilities included ensuring that WMC and its affiliates had the appropriate investment talent within GEPM and to maximize the odds of success of the investment professionals, which, in turn, would lead to successful outcomes for WMC's clients.  (Deposition Transcript of Charles Argyle (Argyle Dep.), at 62-63, attached hereto as **Exhibit E**).

10.     Thomas Baxter, then an associate Director of GEPM based in Hong Kong, had responsibility for GEPM professionals in Asia and reported to Mr. Argyle. (Argyle Dep. 64; Baxter Dep. 12, 16).

11.     At the time, Plaintiff was working as a fund manager at Columbia Threadneedle Investments ("Threadneedle").  She had been hired in October 2000, initially as an analyst trainee fund manager, and became a fund manager in 2004. (Pl. Dep. I, 71-72; Plaintiff Gigi Kai Zi Chan's Answers and Objections to Defendant Wellington Management Company LLP's First Set of Interrogatories, No. 3, attached hereto as **Exhibit F**; Declaration of Deborah Lombardo ("Lombardo Dec.") ¶¶ 4-5 and Exhs. 1-2 thereto, attached hereto as **Exhibit G**).

12.     The primary responsibilities of an equity portfolio manager at Wellington include managing an equity portfolio, or equity portfolios, for Wellington's institutional clients, using his or her own approach.  A portfolio manager is expected to use his or her own research ideas or those of others at the Firm, including equity research analysts. (Philip Dec. ¶ 11).

13.     In the judgment of Charles Argyle, then Director, GEPM, and others who interviewed Plaintiff, she was not a strong candidate for that role.  (Argyle Dep. 67, 70).

        a.      In Mr. Argyle's judgment, Plaintiff's presentation skills and articulation during the interview "were not particularly strong."  (Argyle Dep. 67).  He expressed that

Plaintiff was "a little short in experience for the China team leader role." (Philip Dec. ¶ 12 and Exh. 2 thereto)

      b.    Mr. Baxter opined that Plaintiff was "quite green as a PM despite the six-year track record (they start them early at Threadneedle as junior/apprentice PMs)." (Id.) To Mr. Baxter's knowledge, Threadneedle "had a structure that seemed unlike Wellington's in the sense that [Plaintiff's] years of experience as an analyst before being a portfolio manager were unusually short." (Baxter Dep. 54). Moreover, Mr. Baxter did not find Plaintiff's discussion of her investing philosophy and her investing process as being "robust enough to withstand the scrutiny that our client base would have." (Baxter Dep. 54). In sum, Mr. Baxter did not believe Plaintiff had the "full package" of skills to be a portfolio manager at Wellington at that time. (Baxter Dep. 71). He observed Plaintiff to be "more of a number two." (Philip Dec. ¶ 12 and Exh. 2 thereto; Baxter Dep. 53).

      c.    Henry Philip, then Regional Human Resources Director, similarly understood that at Threadneedle the role of fund manager was given early in someone's career. In his opinion, Plaintiff's experience was perhaps "a step below what we were looking for in terms of a stand-alone portfolio manager without the infrastructure that [Plaintiff] may have had at Threadneedle." (Deposition Transcript of Henry Philip (Philip Dep.), at 46-48, attached hereto as **Exhibit H**).

      d.    Mr. Philip suggested she would be better served starting as a team analyst. (Philip Dec. ¶ 12 and Exh. 2 thereto)

14.    Rather than hiring any of the 10-20 candidates for the China equity portfolio manager position, Mr. Argyle ultimately selected Bo Meunier, a Chinese woman who was already working for Wellington in Hong Kong as an equity research analyst who had taken on some

portfolio management responsibilities, to be the "centerpiece" of Wellington's China equities strategy going forward. (Baxter Dep. 50; Henry Dep. 49; Argyle Dep. 49-50).

15.     Wellington ceased its external search to fill the China equity portfolio manager position.  (Argyle Dep. 50).

16.     Although Wellington did not select Plaintiff for the portfolio manager position, it was sufficiently impressed with her qualifications to consider her for a different role.  (Argyle Dep. 70, 73; Baxter Dep. 53).

17.     In 2014, Plaintiff applied and interviewed for the Hong Kong-based position of equity research analyst at Wellington.  (Pl. Dep I, 196-97; Philip Dec. ¶ 13 and Exh. 3 thereto). This was an "opportunistic" potential hire insofar as Wellington did not have a specific position open.  (Baxter Dep. 64-65).

18.     Plaintiff's employment at Threadneedle had come to an abrupt end in October 2013, after she was placed on suspension pending investigation for "insubordination."  (Pl. Dep. I, 101-102, 104-106, 110-11, 115; Lombardo Dec. ¶ 10 and Exh. 6.  Plaintiff did not disclose the Threadneedle investigation in response to a direct question on her application for employment with Wellington, which asked whether she had ever been subjected to an investigation for misconduct or malpractice in her business activities.  (Pl. Dep. I, 106-107, 197, 199, 231-233; Philip Dec. ¶ 13 and Exh. 3 thereto).

19.     As Plaintiff admits, Wellington offered Plaintiff the Hong Kong-based position of position of equity research analyst in GEPM.  (Pl. Dep. I, 213, 216; Baxter Dep. 64-65).

20.     After negotiating for higher compensation, Plaintiff accepted Wellington's offer for the position of equity research analyst within GEPM annual salary and bonus opportunities of over

$650,000 USD.  (Philip Dec. ¶ 14). The terms were memorialized in an offer letter.  (Philip Dec. ¶ 15 and Exh. 4 thereto).

21.     The offer letter made no mention of a current or future portfolio manager position or responsibilities.  (Philip Dec. ¶ 15 and Exh. 4 thereto).

22.     Upon hire, Plaintiff was assigned to the Emerging Markets Opportunities ("EMO") team led by portfolio manager Greg Mattiko.  (Pl. Dep. I, 213, 216).  Philip Fan was also a research analyst on the EMO team.  (Pl. Dep. I, 223).

23.     As an equity research analyst, Plaintiff's responsibilities were to research and recommend equities for EMO to buy and sell.  (Pl. Dep. I, 222, 240-41; Philip Dec. ¶ 11).

24.     Mr. Argyle, who was located in Boston, technically was Plaintiff's "manager," however, he did not supervise Plaintiff on a day-to-day basis and communicated with her just a few times a year.  (Argyle Dep. 26-27, 87-88; Pl. Dep. I, 87-88).

25.     The GEPM manager with whom Plaintiff interacted most regularly was Mr. Baxter. (Pl. Dep. I, 233-34).

26.     A "mixed picture" developed concerning Plaintiff's overall job performance. (Baxter Dep. 93):

      a.     Wellington's primary concerns did not involve Plaintiff's technical investment knowledge of capabilities.  (Argyle Dep. 100-101)

      b.     In Mr. Baxter's judgment, Plaintiff had "some significant shortcomings," including around her "scattered" presentation style, her level of engagement and her impact on the EMO team.  (Baxter Dep. 93-95, 100-103).

      c.     In Mr. Argyle's judgment, Plaintiff was struggling with integration and engagement.  (Argyle Dep. 91-93).  Mr. Argyle understood that the quality of Plaintiff's

analysis of securities and stocks was good, but that "the quantity, the flow, the output and the engagement . . . left room for improvement." (Argyle Dep. 100-101) Plaintiff was not particularly active in or contributing to the investment dialogue" at the Firm. (Argyle Dep. 93).

   d. Mr. Mattiko was initially satisfied with Plaintiff's performance and contributions to the EMO team, but it "deteriorated" over time in terms of the "quality and quantity of contribution" to the team. (Deposition of Greg Mattiko ("Mattiko Dep.") at 36, 50 attached hereto as **Exhibit I**). He felt he had to initiate most investment discussions with Plaintiff. There was a period of time when it was "very obvious" Plaintiff was not engaging. (Mattiko Dep. 42).

   e. Plaintiff's "attitude generally towards feedback and towards self-improvement" was also of "significant concern." (Baxter Dep. 96). In Mr. Baxter's opinion, Plaintiff "took personal offense at efforts to provide constructive feedback and to help her become better," which was contrary to the "growth mindset" required to be a successful investor at Wellington. (Baxter Dep. 96).

**Despite Plaintiff's Challenges, Mr. Argyle Supports the Launch and Seeding of the China Growth Fund for Plaintiff to Manage**

   27. While Plaintiff did not seem to embrace her equity research analyst role, she was clear on one thing – she wanted the responsibilities of a portfolio manager.[2] Just months into her

---

[2] Plaintiff claims that at the time of hire Henry Phillip, then Managing Director and Regional HR Director, "said something along the lines of – that [she] would be looking to manage money a few months in." Although Wellington accepts that as true for purposes of summary judgment, Mr. Philip recalls telling Plaintiff that if she did a good job and worked collaboratively, ultimately she could have the opportunity to manage money at Wellington. (Philip Dep. 58-59)

analyst job, Plaintiff identified putting her "portfolio management skills to good use" as one of two goals for the following calendar year. (Pl. Dep. I, 217-19; Philip Dec. ¶ 16 and Exh. 5 thereto).

28.     Mr. Argyle, in turn, recalls the tenor of conversations with Plaintiff were that she was an experienced fund manager and should have the opportunity to "launch a fund" at Wellington. (Argyle Dep. 93-95).

29.     Mr. Argyle felt that Plaintiff could have more impact on the EMO team, but that she was distracted by the desire to launch a fund. (Argyle Dep. 93-94). Hoping to eliminate distraction, and help Plaintiff to assimilate, in 2015 Mr. Argyle supported the launch of the China Growth fund for Plaintiff to manage. (Argyle Dep. 91-94; Baxter Dep. 188). Mr. Argyle believed it was "an opportunity to try and help [Plaintiff] be more successful in integrating with the broader dialogue and debate of the firm and she was struggling with that." (Argyle Dep. 92).

30.     However, Mr. Baxter did not always share Mr. Argyle's optimism. For example, in a percipient October 2015 email to Mr. Argyle, Mr. Baxter expressed "very strong doubts whether we can turn [Plaintiff] around" (because of her predisposition to pushback on feedback) and stated that his interest in "creatively looking for seed money" for a fund for Plaintiff to manage was "waning." (Baxter Dep. 185-87; Philip Dec. ¶ 34 and Exh. 21 thereto).

31.     Leading up to the launch of the China Growth fund, Mr. Argyle tried to manage Plaintiff's expectations by explaining that it would be a lengthy process. Plaintiff understood. (Pl. Dep. II, 19).

32.     To prepare for taking on portfolio management responsibilities, Plaintiff first managed a "paper" (i.e., mock) portfolio. (Pl. Dep. II, 23-24).

33.     Then, in September 2015, Plaintiff made an internal presentation on her investment philosophy and process for a potential China Growth strategy to the Asia Pacific Philosophy and Process ("P&P") panel.  (Pl. Dep. I, 241-43).

34.     The P&P panel provides investors in Asia of all experience levels with an opportunity to present their philosophy and process to a panel of other Wellington investors assembled to provide feedback.  (Baxter Dep. 85-86; 152-53).

35.     Plaintiff did not object to presenting at the P&P panel, but was unhappy with the critical feedback she received there.  (Pl. Dep II, 10; Pl. Dep. I, 260-66).

36.     After the P&P panel, Plaintiff drafted an email to Mr. Argyle dated October 7, 2015 (which she did not ultimately send), in which she likened it to a "kangaroo court."  (Pl. Dep. II, 13-14; Philip Dec. ¶ 17 and Exh. 6 thereto).  She described some of the feedback as "fairly patronizing" and felt it "missed the point."  In the unsent email, Plaintiff denigrated the "people and culture in [Hong Kong]" as not being "on par" with the rest of Wellington and commented that "insecure people will sometimes behave unprofessionally and disrespectfully to others to bolster their own self confidence."  Plaintiff also wrote in her draft email that "there are plenty of firms who can raise money off my track record and where I can put my skills to better use . . . If there are misunderstandings that cannot be reconciled then it is better for us not to waste each other's time any longer."  (Id.).

37.     In the unsent email, Plaintiff demanded a "real and proper role" as a "fund manager of a China fund, seeded with full support of the firm to grow it." (Id.)

38.     Plaintiff's email is devoid of claims that she viewed anything about the panel or the feedback she received as owing to her gender or national origin. Rather, Plaintiff remained focused on perceived business slights and focus on becoming a portfolio manager.  (Id.)

**Plaintiff Continues to Struggle in Important Areas, Including Accepting Feedback**

39.     On December 8, 2015, Mr. Baxter summarized peer feedback Plaintiff had received as part of the annual review process. He informed Plaintiff that there was "room for improvement" on collaboration and "nearly universal and strikingly consistent" constructive feedback relating to Plaintiff's "communication."  He explained that when it comes time to pitch a China Growth fund, "clear and succinct communication" would be "even more important."  (Pl. Dep. II, 21-22; Philip Dec. ¶ 18 and Exh. 7 thereto).

40.     In the email, Mr. Baxter discussed Wellington's "feedback intensive" culture, yet observed that Plaintiff at times seems "resistant or closed to feedback." (Id.)

41.     In Mr. Baxter's judgment, Plaintiff was on a "performance watch" by year-end 2015.  (Baxter Dep. 168-69).

42.     By December 2015, Mr. Argyle understood Plaintiff's contribution to the EMO team to be lacking.    (Argyle Dep. 99).

43.     Accordingly, during their December 2015 year-end meeting, Mr. Argyle stressed to Plaintiff that, with the impending launch of the China Growth fund, maintaining focus on her primary responsibilities as an analyst for EMO would be "critically important." (Argyle Dep. 146-147).

**Plaintiff Fails to Impress Wellington's Global Relationship Group**

44.     By January 2016, with Mr. Argyle's backing, Wellington formally approved the China Growth fund for Plaintiff to manage.  (Pl. Dep. I, 240).

45.     Mr. Argyle also expended his own internal capital to locate $1 million of "internally sourced" money to start the fund (which Plaintiff thought was "low").  The China Growth fund officially launched in July 2016.  (Argyle Dep. 126; Pl. Dep. II, 25- 27).

46.     Plaintiff's focus turned to marketing the China Growth fund to Wellington's sophisticated institutional clients and prospects.  However, before she could do so, Plaintiff understood that she needed to "sell" herself and her fund approach to Wellington's Global Relationship Group ("GRG"), which managed Wellington's relationships with its institutional clients and prospects.  (Pl. Dep. II 28-29; Argyle Dep. 176).

47.     Thus, in the Spring of 2016, Plaintiff conducted internal presentations to multiple individuals within GRG.  Plaintiff admits the feedback was "not particularly good."  However, she thought it was "good enough." (Pl. Dep. II, 29-31, 34, 36).

48.     Andria Weil, a GRG relationship manager, informed Elizabeth Hogbin, a product manager who was working with Plaintiff on the China Growth fund, that Plaintiff "absolutely" was "not ready for client/consultant meetings" and that "a lot of work" was needed.  Based on a "quick poll," Ms. Weil reported it was "[u]nlikely that any of us would take her on the road if she presented like that to a client/consultant." (Pl. Dep. II, 33; Philip Dec. ¶ 19 and Exh. 8 thereto).

49.     On June 8, 2016, Ms. Hogbin sent an email to Messrs. Argyle and Baxter, explaining that GRG was "unable to schedule any marketing meetings" for the China Growth fund, citing:  (1) limited demand "for China strategies from our client base at this point in time; and  (2) GRG's perception that Plaintiff's presentation skills needed polishing."  (Pl. Dep. II 35-37; Philip Dec. ¶ 20 and Exh. 9 thereto).

50.     GRG declined to move forward with a marketing trip that Plaintiff was planning to take.  (Pl. Dep. II, 31, 37).

51.     In a follow-up email, Ms. Hogbin relayed to Messrs. Argyle and Baxter that she had tried to provide Plaintiff with guidance for a follow-up presentation, but that it "seemed difficult for [Plaintiff] to absorb at this moment in time" and she was "slightly in denial about her

presentation skills." Ms. Hogbin had explained to Plaintiff that "it is very normal not to have meetings this early in your track record/Wellington tenure but that seemed frustrating to her as well." (Pl. Dep. II 36-38; 116; Philip Dec. ¶ 20 and Exh. 9 thereto).

52.    Ms. Weil shared with Ms. Hogbin that she was "skittish to put [Plaintiff] in front of clients" because Plaintiff had conveyed that she was "taking lots of headhunter calls" and that "people were calling her regularly to ask her to take over other funds." (Pl. Dep. II 39-40; Philip Dec. ¶ 21 and Exh. 10 thereto). She stated that she was "reluctant to put a portfolio manager in front of clients/prospects/consultants that might leave." (Id.)

53.    Plaintiff informed Mr. Mattiko she was pregnant on or about August 3, 2016. (Deposition of Greg Mattiko ("Mattiko Dep. II"), 194-95 attached hereto as **Exhibit J**; Philip Dec. ¶ 22 and Exh. 11 thereto).

**Plaintiff Remains Dissatisfied and Unengaged**

54.    On August 26, 2016, Cheryl Duckworth, the senior-most manager on the investment platform in the Asia Pacific at the time, sent an email to Messrs. Argyle and Baxter describing a one on one meeting that she had with Plaintiff, stating that Plaintiff's "time at Wellington is challenged due to her attitude." (Philip Dec. ¶ 23 and Exh. 12 thereto).

55.    Ms. Duckworth reported that during the meeting Plaintiff had provided an "unfortunate list of complaints, exasperation with services and nothing really that good" prompting Ms. Duckworth to conclude that Plaintiff still had a "big chip on her shoulders." (Pl. Dep. II, 46-47; Philip Dec. ¶ 23 and Exh. 12 thereto).

56.    On September 1, 2016, Mr. Mattiko provided Mr. Argyle with his annual peer feedback on Plaintiff, including his observation that Plaintiff's "attitude or pessimism prevents her from integrating into the Wellington culture" and that "unless she makes a 180 degree change and

accepts the firm for what it is she will continue to be dissatisfied."  (Philip Dec. ¶ 24 and Exh. 13 thereto).

57.    On October 19, 2016, Mr. Baxter wrote to Mr. Argyle that he was "finding it more and more difficult to see how [Plaintiff] can make it here."  He had found the tone of a recent email Plaintiff had sent to colleagues to be "needlessly confrontational."  Mr. Baxter expressed remorse that he had not picked up on "this sort of attitude in the interview process."  (Pl. Dep. II, 51-52; Philip Dec. ¶ 25 and Exh. 14 thereto).

58.    Plaintiff acknowledges that by late 2016, she may have become "disillusioned" at Wellington because of her frustrations with the launch and marketing of the China Growth fund. (Pl. Dep. II, 60).

59.    Yet, Plaintiff gave herself the highest rating available -- "5- An exceptional year" – on her 2016 self-review.  (Pl. Dep. II, 53-54; Philip Dec. ¶ 26 and Exh. 15 thereto).

**Plaintiff Rated Among the Lowest of 100 Investment Professionals By Her Colleagues in GEPM**

60.    Plaintiff's feedback from a broad swath of her peers painted a very different picture of Plaintiff's year – rating her amongst the lowest of more than 100 investment professionals within GEPM.  Specifically, out of 114 investment professionals reviewed in GEPM, Plaintiff ranked 110th in collaboration, 95th on depth of knowledge, 111th on idea generation, and 109th on money making.  (Philip Dec. ¶¶ 27-28 and Exh. 16 thereto).

61.    The message that Mr. Argyle and Mr. Baxter intended to convey at Plaintiff's 2016 year-end meeting was "a very targeted one about certain things that needed to improve or else her long-term career at Wellington was in jeopardy."  (Baxter Dep. 170).

62.    After consulting with Human Resources, Mr. Argyle planned to issue this direct message to Plaintiff during their year-end meeting.  (Argyle Dep. 178-79; Baxter Dep. 170).

63.     Plaintiff met with Mr. Argyle and Mr. Baxter in Hong Kong on November 2, 2016. (Pl. Dep. II, 69-70).

64.     Plaintiff secretly recorded this discussion on her cell phone without notifying Mr. Argyle or Mr. Baxter.  (Pl. Dep. II, 69-70).

65.     Although Plaintiff claims in her Complaint that Mr. Argyle "berated [her] for more than an hour," her surreptitious recording proves otherwise.  (Compl., ¶ 49).

66.     Mr. Argyle spoke about Plaintiff's performance and need for improvement for a mere 17 minutes during their approximately 70-minute meeting and exhibited patience, while Plaintiff spoke for the majority of the substantive portion of the meeting, at times raising her voice and exhibiting anger.  (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

67.     Mr. Argyle conveyed to Plaintiff the seriousness of her situation at Wellington, including candidly telling her that things "really" were not going well.  He reviewed the disappointing feedback and scores from Plaintiff's peers.  Mr. Argyle discussed Plaintiff's poor attitude, lack of engagement, lack of collaboration, her obvious discontent in being at Wellington as well as her lack of contribution to the EMO team and to the larger investment dialogue across the Firm.  With respect to the Plaintiff's complaints about the Spring marketing trip and lack of client access, Mr. Argyle explained that GRG has hundreds of investment opportunities to present to Wellington's institutional clients, and rhetorically asked why GRG would present to its clients an investor who was obviously so unhappy and might not remain at Wellington long term. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

68.     Yet, through it all, Mr. Argyle delivered an optimistic message.  He assured Plaintiff that her situation at Wellington could be reversed, but only if she adopted a new attitude

of collaboration and engagement.  However, he warned her that she had <u>just one final opportunity</u>. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

69.     Despite the peer feedback and Mr. Argyle's sober assessment, Plaintiff recited her laundry list of dissatisfactions with Wellington, including her view that the Firm had broken a "promise" that she would be managing a fund shortly after hire.  She criticized Wellington's resources and administration and derided the $1M of seed money Mr. Argyle had personally helped to source as "much below expectations."  (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

70.     At no point during the meeting did Plaintiff take any ownership or otherwise commit to improvement.  Instead, Plaintiff expressed that it was hard to change when she felt that her expectations (about the alleged business promise at hire) had been disappointed. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

71.     Plaintiff proposed a <u>quid pro quo</u> -- her attitude and collaboration might change <u>if</u> she were to be given what she claims to have expected regarding managing money and client access.  (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

72.     In closing, Mr. Argyle warned Plaintiff that unless she turned things around upon her return from an upcoming maternity leave, they would be having a "very different discussion" the following year. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

73.     Mr. Argyle felt Wellington had reached a "fork in the road" with Plaintiff.  While Mr. Argyle wanted Plaintiff to succeed, in his view, she had to "take steps to be successful."  In Mr. Argyle's view, "[t]he ball was in her court."  (Argyle Dep. 172; 179).

74.     Mr. Argyle reiterated his expectations in a November 22, 2016 email after the meeting in which he acknowledged Plaintiff's strengths, but repeated his concern with her "broad performance" and the "lack of meaningful progress in some areas" since their 2015 year-end

discussion.   (Pl. Dep. II, 67-68, 70; 76; Philip Dec. ¶ 29 and Exh. 17 thereto).  Specifically, supported with examples, Mr. Argyle summarized concerns with:

> (1)  Plaintiff's failure to embrace the firm's ethos of Client, Firm, Self;
>
> (2)  Plaintiff's level of contribution to the EMO team, cautioning that it was "imperative" that she "act fully in support of the EMO team";
>
> (3)  Plaintiff's lack of broad contribution to the firm's investment dialogue; and
>
> (4)  Plaintiff's interactions with colleagues who found it a challenge to work with her.
>
> (Id.)

75.     In the email, Mr. Argyle directed Plaintiff that her "short to medium term imperative" was to respond to the feedback that he had shared during their meeting and in the follow-up email, and expressed his fervent hope that Plaintiff would "embrace" it.  (Id.)

76.     In closing, Mr. Argyle reiterated that he looked "forward to receiving [her] reply and acknowledgement."  (Id.)

**Plaintiff Willfully Ignores Mr. Argyle's Directive, and Instead Demands Wellington Make Good on its Alleged Broken Business Promise**

77.     Contrary to Mr. Argyle's express directive, Plaintiff did not respond to his email in the weeks before she left on paid maternity leave in mid-December 2016 or at any time upon her return in mid-April 2017.  (Pl. Dep. II, 76).

78.     Mr. Argyle viewed Plaintiff's failure to respond as the equivalent of Plaintiff giving him the "middle finger."  (Argyle Dep. 171-72).

79.     In Mr. Argyle's view, "[t]he ball was in her court."  (Argyle Dep. 172; 179).

80.     Mr. Philip met with Plaintiff in Hong Kong in May 2017,[3]  to see if she "would respond in some manner to the feedback and the direction that [Mr. Argyle] had given her in his conversation and subsequent email…"  (Philip Dep. 89, 90, 93-95). She did not. (Id.)

81.     Mr. Mattiko informed Mr. Argyle via email on May 2, 2017, that "not much had changed." (Pl. Dep. II, 81-82; Philip Dec. ¶ 30 and Exh. 18 thereto). Plaintiff had "not increased her contribution to the EMO team at all" and seemed "solely focused on her China Growth portfolio."  (Id.)  Mr. Mattiko expressed to Mr. Argyle that Plaintiff still had not acknowledged the "issues" they had "spelled out to her last year nor is doing anything to rectify the deficiencies." (Id.)

82.     Nevertheless, Mr. Argyle was still open to the idea of Plaintiff remaining with Wellington as long as she provided a "genuine response" to the feedback provided to her. (Philip Dec. ¶ 31 and Exh. 20 thereto).

83.     Mr. Mattiko then met with Plaintiff in Hong Kong on or about May 31, 2017, in an effort to get everyone on the same page.  Mr. Mattiko wanted to understand how Plaintiff felt about working at Wellington, and to convey Wellington's desire that Plaintiff acknowledge or change the way she was going about doing things. (Mattiko Dep. 105-106).

84.     Plaintiff secretly recorded her meeting with Mr. Mattiko. (Pl. Dep. II, 80).

85.     Just as Plaintiff had done in her meeting with Mr. Argyle six months earlier, Plaintiff again discussed Wellington's so-called "broken" business promises and stated that Wellington bore the "onus" to acknowledge and make good on these alleged promises before she would change.  (Lombardo Dec. ¶¶ 8-9 and Exhs. 4-5 thereto).

---

[3] After Mr. Baxter's recent transition to a different role, with respect to certain investors in Asia, Mr. Philip temporarily took on some management duties. (Philip Aff. ¶ X).

86.     Mr. Mattiko explained they were in a "holding pattern" due to Plaintiff's lack of trust in the Firm, which Plaintiff called a "load of crap."  (Id.)

87.     When Mr. Mattiko asked Plaintiff if she even wanted to build a career at Wellington, Plaintiff did not commit, instead replying that she had "choices."  She reiterated that Wellington needed to make good on the business promises she alleged were made to her, including additional access to clients. (Id.)

88.     Mr. Mattiko declared they had reached a "stalemate." He closed the meeting by telling Plaintiff he would deliver her message to management. (Id.)

**Mr. Argyle Makes the Decision to Terminate Plaintiff's Employment**

89.     In early June 2017, Messrs. Argyle, Philip and Matiko met and discussed next steps with Plaintiff.  In their judgment, Plaintiff still was not meeting Wellington's expectations for an equity research analyst -- including supporting the EMO team and sharing and collaborating more broadly across the organization.  Because of her unwillingness to accept constructive feedback, they thought it unlikely the situation would improve.  (Mattiko Dep. 92-99, 107; Philip Dep. 113-115; Argyle Dep. 80-81).

90.     Plaintiff cannot identify any concrete actions she took to improve in the critical areas Mr. Argyle had identified.  (Pl. Dep. II, 78, 80).

91.     As a steward of GEPM's resources, Mr. Argyle concluded he could no longer justify Plaintiff's continued employment at Wellington at approximately $750,000 annually.  (Argyle Dep. 80-81, 165, 183-84; Philip Dec. ¶ 15 and Exh. 4 thereto).

92.     Consequently, in June 2017, Mr. Argyle made the decision to terminate Plaintiff's employment.  (Argyle Dep. 183-84; Philip Dec. ¶ 35 and Exh. 22 thereto.)  Plaintiff admits that Mr. Argyle acted in his corporate capacity at all relevant time.  (Pl. Dep. II, 12-17).

93.    Mr. Baxter, who had moved to a different role, did not play a role in the termination decision.  (Baxter Dep. 32, 217).

94.    Plaintiff was notified of her termination in September 2017, after numerous failed attempts to get her to meet with Mr. Philip.  (Pl. Dep. II, 84).

95.    Wellington did not replace Plaintiff's role as equity research analyst on the EMO team.  (Argyle Dep. 147-49; Mattiko Dep. 25).

96.    The China Growth fund closed shortly after Plaintiff's departure from Wellington. (Philip Dec. ¶ 32).

**Wellington Did Not Pursue Some Client Opportunities Prior to Termination**

97.    Plaintiff alleges a colleague supported her in pitching an opportunity to a client interested in launching a fund for a Chinese client that Plaintiff would be well-positioned to manage.  (Compl., ¶¶ 42-44; Pl. Dep. II, 132).

98.    In Mr. Argyle's judgment, Plaintiff was already struggling to balance her "day-to-day" responsibilities.  Providing her with new responsibilities at that juncture would not have been a "rationale business decision" and "made no sense."  For those reasons and because of Plaintiff's statements about headhunters pursuing her, Mr. Argyle felt it would not be consistent with his fiduciary duties to pursue new opportunities with investors.  (Argyle Dep. 162-63; 167-69).

**Plaintiff Was Aware of Wellington's Policies Prohibiting Harassment and Discrimination**

99.    Plaintiff understood that she should report issues of concern relating to harassment and discrimination.  (Pl. Dep. II, 144).

100.    Plaintiff never made a written complaint of discrimination, retaliation or inappropriate touching or inappropriate comments of a sexual or racist nature during her employment at Wellington.  (Pl. Dep. II, 145-46).  She never made a verbal complaint about

inappropriate touching.  (Pl. Dep. II, 145).  Plaintiff never contacted any of the individuals identified in Wellington's Policy Against Harassment and Discrimination, including the Chief Human Resources Officer, the Director of Human Resources, the Regional Human Resources Director or any of the assigned Human Resources relationship managers.  (Pl. Dep. II, 146-47).

**Plaintiff Claims in her Complaint that she was Subjected to Inappropriate Statements and Conduct**

101.  Plaintiff contends that she experienced the following inappropriate comments or conduct during her more than three-year tenure at Wellington.

    a.  Plaintiff does not know if the 2014 retirement party that she attended in London, which she alleges had a mirrored dance floor, was sponsored by Wellington. (Compl. ¶ 23; Pl. Dep II, 123-24).

    b.  In October 2014, a male colleague "barged in" between herself and their shared assistant and in March 2015, physically baked Plaintiff up against a wall during a disagreement over an investment.  (Pl. Dep. II, 134-37).

    c.  In January 2015, a colleague said that "China is full of crap" in the context of a discussion about picking stocks.  (Pl. Dep. II, 125).

    d.  Mr. Mattiko once put his hand on Plaintiff's lower back at a bar on a business trip. (Pl. Dep. II, 127-28).

    e.  In 2015, a male colleague asked Plaintiff, who was with her husband, to go to what Plaintiff referred to as a "prostitute bar." She went with her husband.  (Pl. Dep. II, 129)  Plaintiff's husband does not recall anything offensive or improper transpiring at the bar.  (Deposition of Maxence Vinot ("Vinot Dep.") 116, attached hereto as **Exhibit K**).

    f.  A partner once told her that she had been hired because she was Chinese 'but not too Chinese." (Pl. Dep. II, 131).

    g.  A colleague once asked if she could run a fund while pregnant and said that he had remembered what his wife was like when pregnant. (Pl. Dep. II, 133; Philip Dec. ¶ 33 and Exh. 20 thereto) (October 19, 2016 email from Alex Qian to Plaintiff stating "I appreciate that you are fine to continue keeping an eye on the portfolio while on maternity leave.  In my personal experience as a father of two boys, my wife was totally consumed by the baby in several months after birth.  I will completely understand if your priority becomes 'Baby, Client, Firm, Self.'").

**Plaintiff's "Evidence" of Alleged Protected Activity**

102.    In response to Interrogatory No. 7 in Plaintiff Gigi Kai Zi Chan's Answers and Objections to Defendant Wellington Management Company LLP's First Set of Interrogatories, Plaintiff listed all instances in which she allegedly complained of discrimination or retaliation and included all relevant details of any alleged conversation. (Lombardo Dec. ¶ 4 and Exh. 1 thereto).

103.    As set forth in her response to Interrogatory No. 7, Plaintiff asserts she first engaged in protected activity just months after her hire in December 2014, when she allegedly told Mr. Mattiko that investors spoke to her like she was "junior" because she was female and Asian.  She then claims that she continued to raise periodic concerns about her treatment at Wellington to various people, each time allegedly attributing it to her gender and national origin, including in March and June 2015, and multiple times in each of September, October, November and December of 2015.  Plaintiff also claims to have informed Mr. Argyle in October 2015, that "feedback she had received during the P&P panel, particularly one colleague's comments, was disrespectful and inappropriate."  She claims that she repeated those concerns to Mr. Argyle in December 2015, and also shared that the purported "delay" in the launch of the China Growth fund was because she was female and Asian.  Plaintiff also claims that in June 2016, she told Mr. Argyle that GRG's decision to cancel the client marketing trip was disrespectful and that she could not see anyone else treated that way.  Plaintiff claims to have continued to complain to others about alleged mistreatment along the same lines through the latter half of 2016 and during her November 2, 2016 meeting with Mr. Argyle. (Id.)

104.    Some 38 minutes into her secretly recorded conversation with Mr. Argyle and Mr. Baxter on November 2, 2016, Plaintiff stated that she should not be "patronized" and that "[j]ust because I look young, I'm a female, I'm Chinese, doesn't mean people can talk down to me.  That's

what I've said every single time."  The meeting then carried on for an additional 31 minutes without Plaintiff again mentioning her protected class status or alleged discrimination.  (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

105.    During her tenure at Wellington, Plaintiff made no other complaints than those listed in response to Interrogatory No. 7.  (Pl. Dep. II, 148-49).

106.    Plaintiff's only basis for claiming pregnancy discrimination is the timing of her pregnancy disclosure and her termination.

107.    At the time Plaintiff disclosed her pregnancy, Wellington was already quite concerned with Plaintiff's level of Plaintiff's performance of her analyst job duties and had doubts regarding her commitment to the firm, so providing her with any new, unrelated responsibilities was never under serious consideration.  (Argyle Dep., 162-169)

108.    It is entirely speculative whether the Minsheng fund opportunity would ever have come to fruition. (Argyle Dep., 162-3, 166)

Respectfully Submitted,

Defendants,

WELLINGTON   MANAGEMENT   COMPANY
LLP and CHARLES ARGYLE,

By their attorneys,

*/s/ Stephen T. Paterniti*
Stephen T. Paterniti, BBO# 564860
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, Massachusetts  02116
TELE: (617) 367-0025
FACSIMILE: (617) 367-2155

Beverly Garofalo
Admitted *Pro Hac Vice*
JACKSON LEWIS P.C.
90 State House Square
Hartford, Connecticut 06109
TELE:  (860) 331-1535
FACSIMILE:  (860) 247-1330

## <u>CERTIFICATE OF SERVICE</u>

This hereby certifies that on February 22, 2021, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Stephen T. Paterniti*
Jackson Lewis, PC

4811-0913-8653, v. 1