**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GIGI KAI ZI CHAN,<br><br>    Plaintiff,<br><br>v.<br><br>WELLINGTON MANAGEMENT COMPANY LLP and CHARLES ARGYLE,<br><br>    Defendants. | Civil Action No. 19-cv-11605-WGY |

## <u>DECLARATION OF HENRY PHILIP</u>

I, Henry Philip, am competent to testify to the matters contained in this Declaration.  This Declaration is based upon my personal knowledge and review of business records and is under oath.

1.  I am over the age of 18 and believe in the obligation of an oath.

2.  I am currently employed by Wellington Management Company ("WMC") as Managing Director & Director of Talent Acquisition.

3.  I began working for WMC in October 2007 as a Talent Acquisition Manager.  I promoted to Managing Director and Regional HR Director in January 2011. In January 2016, I was promoted again to Managing Director and Associate Director, Investments (Asia).

4.  WMC is a private, independent investment management firm with client assets under management totaling over $1 trillion. The Firm serves as investment advisor to over 2,200 institutions in over 60 countries.

5.  Wellington Management Hong Kong Ltd. ("WMHK"), the entity that ultimately employed Plaintiff, is an affiliate of WMC located in Hong Kong.  WMHK's investment professionals manage assets for institutional clients both regionally and globally, and conduct

research that is used by portfolio managers and analysts across Wellington Management locations.

6. Wellington owes a fiduciary duty to its institutional clients.

7. Wellington has a feedback intensive culture, which includes a peer feedback process where colleagues and peers provide feedback on each other.

8. Wellington expects its employees to embrace its ethos of "client, firm, self."

9. A true and accurate copy of Wellington's December 2016 Policy Against Discrimination or Harassment and September 2014 Harassment Policy is attached as Exhibit 1.

10. I am familiar with Gigi Chan. I was involved in her hiring in a human resources capacity in 2014, as I held the position of Regional Human Resources Director covering the Asia Pacific region at that time, which included Wellington Management Hong Kong where she worked. Thereafter, I was generally familiar with Ms. Chan's employment circumstances through the time of her separation from employment in September 2017.

11. The primary responsibilities an equity research analyst are to research and recommend equities to buy and sell. The primary responsibilities of a portfolio manager at Wellington include managing an equity portfolio, or equity portfolios, for Wellington's institutional clients, using his or her own approach. A portfolio manager is expected to use his or her own research ideas or those of others at the Firm, including equity research analysts.

12. A true and accurate copy of Interview Feedback Summary for Plaintiff's 2013 and 2014 interviews is attached as Exhibit 2.

13. A true and accurate copy of Plaintiff's employment application is attached as Exhibit 3.

14.     After negotiating for higher compensation, Plaintiff accepted Wellington's offer for the position of equity research analyst within GEPM with an annual salary and bonus opportunity of $5,050,000 HK (approximately $650,000 USD).

15.     A true and accurate copy the April 8, 2014 offer letter that Plaintiff signed on April 10, 2014 is attached as Exhibit 4.

16.     A true and accurate copy of Plaintiff's 2014 Self-Evaluation is attached as Exhibit 5.

17.     A true and accurate copy of an October 7, 2015 email that Plaintiff emailed to herself is attached as Exhibit 6.

18.     A true and accurate copy of a December 8, 2015 email From Thomas Baxter to Plaintiff is attached as Exhibit 7.

19.     A true and accurate copy of a May 31, 2016 email from Elizabeth Hogbin to Thomas Baxter is attached as Exhibit 8.

20.     A true and accurate copy of a June 10, 2016 email from Elizabeth Hogbin to Thomas Baxter is attached as Exhibit 9.

21.     A true and accurate copy of a June 21, 2016 email from Elizabeth Hogbin to various Wellington individuals is attached as Exhibit 10.

22.     A true and accurate copy of an August 3, 2016 email from Gregory Mattiko to Charles Argyle and Terrence Burgess is attached as Exhibit 11.

23.     A true and accurate copy of an August 26, 2016 email from Cheryl Duckworth to various individuals at Wellington is attached as Exhibit 12.

24.     A true and accurate copy of a September 1, 2016 email from Gregory Mattiko to Charles Argyle is attached as Exhibit 13.

25.     A true and accurate copy of an October 19, 2016 email from Thomas Baxter to Charles Argyle is attached as Exhibit 14.

26.     A true and accurate copy of Plaintiff's 2016 Self-Evaluation is attached as Exhibit 15.

27.     Out of 114 investment professionals reviewed in GEPM, Plaintiff ranked 110th in collaboration, 95th on depth of knowledge, 111th on idea generation, and 109th on money making in 2016.

28.     A true and accurate copy of the 2016 summary of peer feedback for Gigi Chan is attached as Exhibit 16.

29.     A true and accurate copy of a November 22, 2016 email from Charles Argyle to Plaintiff is attached as Exhibit 17.

30.     A true and accurate copy of May 3, 2017 email between Gregory Mattiko and Charles Argyle is attached as Exhibit 18.

31.     A true and accurate copy of May 4, 2017 email between Charles Argyle and me is attached as Exhibit 19.

32.     The China Growth fund closed shortly after Plaintiff's departure from Wellington.

33.     A true and accurate copy of an October 19, 2016 email between Alex Qian and Plaintiff is attached as Exhibit 20.

34.     A true and accurate copy of an October 15, 2015 email from Thomas Baxter to Charles Argyle is attached as Exhibit 21.

35.     A true and accurate copy of a June 9, 2017 email from me to Karen Tang is attached as Exhibit 22.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of February, 2021.

*Henry Philip*

Henry Philip

## <u>CERTIFICATE OF SERVICE</u>

This hereby certifies that on this 22nd day of February 2021, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<u>/s/ *Benjamin Davis*</u>
Jackson Lewis P.C.

4813-4555-5933, v. 5

# Exhibit 1

Chan 35

10/7/20     S.Roy

# Policy against Harassment and Discrimination (Global)

**WELLINGTON MANAGEMENT®**

| | |
|---|---|
| **POLICY SCOPE:** | All Employees |
| **POLICY STATEMENT:** | Harassing or discriminatory conduct is unacceptable at Wellington Management. Such conduct is inconsistent with Wellington's commitment to creating a fair and respectful work environment for all employees.<br><br>Each member of the organization is responsible for conducting themselves in a manner consistent with this policy whether in Wellington's offices or in any work-related setting outside our offices such as business trips, office outings, parties, and business-related social events.<br><br>In addition, Wellington complies with all applicable laws governing harassment and discrimination in employment in every location in which the firm has offices. Supplemental policies in accordance with applicable local requirements may apply. |
| **PROTECTED CHARACTERISTICS:** | Protected characteristics refer to an individual's race, color, sex, sexual orientation, gender identity, gender expression, religion, creed, national origin, age, ancestry, disability (physical or mental), medical condition, citizenship, marital status, pregnancy, veteran or military status, genetic information or any other characteristic protected by applicable law. |
| **HARASSMENT:** | Harassment is any conduct, subtle or overt, verbal or physical, in or out of the workplace, which has the intent or effect of unreasonably interfering with an individual's job performance or which creates an intimidating, hostile or offensive work environment.<br><br>Harassment, which can take many forms, may include the following:<br><br>• Telling jokes which explicitly or implicitly belittle an individual on the basis of any protected characteristic;<br><br>• Making verbal, written or physical innuendoes, or subjecting others to obscenity or offensive language that explicitly or implicitly belittle an individual on the basis of any protected characteristic; |

- Verbal, written or physical conduct of a sexual nature including, without limitation, conduct that expressly or implicitly constitutes a sexual advance or a request for sexual acts or favors;

- Using submission to or rejection of verbal or physical conduct of a sexual nature as a basis for any employment decision or a condition of an employee's continued employment;

- Taking or failing to take any personnel action in reprisal for a member of the organization's rejecting or reporting such conduct;

- Failing to take appropriate action in response to a member of the organization's reporting such conduct (e.g., failing to escalate issues for investigation);

- Creating an intimidating, hostile, humiliating or offensive work environment by means of verbal or physical conduct of a harassing nature.

**DISCRIMINATION:**  Discrimination refers to adverse employment actions (such as refusal to hire, termination, or demotion) taken against an individual on the basis of any protected characteristic, as opposed to individual merit or objective business grounds.

**VOICING CONCERNS:**  Any member of the organization who believes that he or she has been subjected to or witnessed harassing or discriminatory conduct (whether by a manager, colleague, or visitor) is encouraged to seek assistance and resolution of the issue. Concerns may be raised (either verbally or in writing) through an employee's management, or directly to any of the following individuals:

- The firm's Director of Human Resources, Fatima Penrose, at 1-617-790-7503
- Your Regional HR Director
- Your assigned HR Relationship Manager
- The firm's Employee Relations team, Tama Donovan, at 1-617-951-5073, or Larry Spidle, at 1-617-790-7668
- The firm's General Counsel, Cindy Clarke, at 1-617- 790-7426
- A member of the Executive Committee

Any concern reported will be reviewed and addressed in a timely manner following procedures designed to address any misconduct, preserve as much confidentiality as possible,  prevent retaliation against the person bringing the complaint and against anyone who assists in the review or investigation, and to provide fair treatment of the person accused of harassment. The firm expects all employees to cooperate in any review or investigation of workplace conduct, including conduct in violation of this policy.

CONFIDENTIAL

| **RETALIATION:** | Any discrimination or adverse action, such as intimidation, threats or coercion, taken against a member of the organization because he or she complains of harassment or discrimination or assists in an investigation of any allegation of harassment or discrimination is prohibited. |
| --- | --- |
| **CONSEQUENCES OF VIOLATION OF THIS POLICY:** | If Wellington determines that an employee has violated this policy, appropriate disciplinary action will be taken against the offending individual up to and including termination.<br><br>Disciplinary action also may result in the event that Wellington determines that an employee has knowingly provided false information regarding an allegation of harassment or discrimination, or has refused to cooperate in an investigation. |

## Questions?

Any questions regarding this policy should be directed to Human Resources.

CONFIDENTIAL

**HR POLICIES**

# Harassment Policy (Global)

WELLINGTON
MANAGEMENT®

| **POLICY SCOPE:** | All Employees |
|---|---|
| **POLICY STATEMENT:** | Harassment of any kind is unacceptable behavior at the Wellington Management organization. It is unlawful and inconsistent with the commitment to excellence that characterizes our activities. The Wellington Management organization is committed to creating an environment in which every individual can work without being harassed. Harassment may, therefore, lead to sanctions up to and including termination of association with the organization. |

Harassment is any conduct, subtle and not-so-subtle, verbal or physical, in or out of the workplace, which has the intent or effect of unreasonably interfering with an individual's performance at the Wellington Management organization or which creates an intimidating, hostile or offensive work environment. It can be engaged in or experienced by both men and women.

Each member of management is responsible for creating an atmosphere free of discrimination and harassment, sexual or otherwise. Members of the organization are warned against making unwelcome sexual advances toward anyone, including co-workers, visitors and business acquaintances.

Harassment, which can take many forms, may include the following:

- Telling jokes which explicitly or implicitly belittle an individual's sex, race, color, religion, sexual orientation, handicap or disability, national origin, ancestry or age;

- Making verbal or physical innuendoes that explicitly or implicitly belittle an individual's sex, race, creed, color, religion, sexual orientation, handicap or disability, national origin, ancestry, marital, veteran or citizenship status, age or other protected characteristic;

- Verbal or physical conduct of a sexual nature including, without limitation, conduct that expressly or implicitly constitutes a sexual advance or a request for sexual acts or favors;

- Using submission to or rejection of verbal or physical conduct of a

LAST REVIEW DATE: SEPTEMBER 2014                                   INTERNAL USE ONLY
PLEASE NOTE: HR Policies may change from time to time. Visit HR Connect for the most up-to-date policies.

CONFIDENTIAL                                                                DEF 00030030

sexual nature as a basis for any employment decision or a condition of an employee's continued employment;

- Taking or failing to take any personnel action in reprisal for a member of the organization's rejecting or reporting such conduct;

- Failing to take appropriate action in response to a member of the organization's reporting such conduct (e.g., failing to investigate charges);

- Creating an intimidating, hostile, humiliating or offensive work environment by means of verbal or physical conduct of a harassing nature;

- Subjecting others to obscenity or offensive language;

- Obscenity.

This kind of behavior is unacceptable at Wellington Management and in any work-related setting outside our offices such as business trips, office outings, parties and business-related social events.

In addition, Wellington Management complies with all applicable state and local laws governing harassment in employment in every location in which the firm has offices. Supplemental policies in accordance with applicable local requirements may apply.

| | |
|---|---|
| **COMPLAINT PROCEDURES** | Any member of the organization, who believes that he or she has been subjected to harassment, whether by a manager, colleague, or visitor, is encouraged to seek assistance and resolution of the complaint. The incident should be reported to at least one of the following:<br><br>- The firm's Chief Human Resources Officer, Barbara Amone, at 1-617-289-3891<br>- Your Regional HR Director<br>- Your assigned HR Relationship Manager<br>- The firm's Employee Relations representatives, Tama Donovan, at 1-617-951-5073, or Larry Spidle, at 1-617-790-7668<br>- The firm's General Counsel, Cindy Clarke, at 1-617- 790-7426<br>- A member of the Executive Committee.<br><br>He or she will ensure that an appropriate investigation of the complaint is conducted following procedures designed to provide as much confidentiality as possible and to prevent retaliation against the person bringing the complaint and against anyone who assists in the investigation, and to ensure fair treatment of the person accused of harassment. |
| **CONSEQUENCES OF VIOLATION OF THIS POLICY** | If the Wellington Management organization determines that an employee has violated this policy, appropriate disciplinary action will be taken against the offending individual up to and including termination.<br><br>Any discrimination or adverse action, such as intimidation, threats or coercion, taken against a member of the organization because he or she complains of harassment or assists in an investigation of any allegation of harassment will also result in disciplinary action, up to and including |

termination of employment.

| **CONSEQUENCES OF PROVIDING FALSE INFORMATION** | The Wellington Management organization prohibits any form of retaliation against an employee for filing a bona fide complaint under this policy or for assisting in a complaint investigation. However, if after investigating any complaint of harassment or unlawful discrimination, the Wellington Management organization determines that an employee has knowingly provided false information regarding the complaint, disciplinary action may be taken against the individual who filed the complaint or who gave the false information. |

## Questions?

Any questions regarding this policy should be directed to Human Resources.

CONFIDENTIAL                                    DEF 00030032

# Exhibit 2

## Interview Feedback Summary

| Candidate's Name | Job Title | Requisition Number |
|---|---|---|
| Gigi Chan | Exploratory Candidate | 710461 |

| Interview Date | Interviewer | Please provide your comments on this candidate's skills/qualifications, as well as your recommendation for continuing the interview process. | Hiring Recommendation | Interview Type |
|---|---|---|---|---|
| 03/07/14 | Nicolas Choumenkovitch | I liked her personality, she is outgoing which I think is a plus for foreign office. And her liberal arts background is also a plus in my opinion and different from all the more narrow specialization we see out of Asia. I did not have time to go to deeply into her analytical skills but as she seems to have an investment philosophy and to look at cash generation (not revenue growth) as a metric to follow. Only concerns she talks a lot but does she listen | Continue | In Person |
| 03/07/14 | Michael Carmen | Somewhat mixed. She has some great experience and appears to be focused on stocks but she had a difficult time articulating her views. I came away uncertain if she would be additive to our Asian research or whether she would be a great fit. | Continue | In Person |
| 03/07/14 | Gregory Mattiko | I knew Gigi from the time when she was at Threadneedle in London. We shared some company meetings together and I got to know her a bit. I was impressed with her back in those days, and my opinion has not changed since interviewing her. I think she is a good fit for wellington on a few levels. First, she has a very strong and positive attitude. She has an extrovert personality, is opinionated, yet has a great sense of humor. I think she would be a great colleague to work with in this regard. Second, she is a differentiated stock picker. She is not someone who is easily influenced by the market, rather someone who has the confidence and conviction to build a view even if it is contrary to the market opinion. She has built a great amount of experience in good and bad times. She launched her funds as the market was peaking, just before the GFC, and was able to navigate through that period and come out well on the other side. I do not know her process or depth of knowledge well, but I have had enough exposure to her to know that it is good. My only reservation might be that if she were in the wrong | Continue | In Person |
| | | | | |

DEF 00002577

| Date | Name | Comments | Decision | Format |
|---|---|---|---|---|
| 03/07/14 | Erin Murphy | position she might end up getting bored/frustrated though she claims not to. I was impressed with Gigi. She could articulate her investment edge, and she had a very compelling view on how to contextualize investments given the macro/country backdrop. She has great energy! The downside to that energy is that she is a little all over the place and her answers tended to be long winded. However, I think she could be a positive addition to the office in HK. Possibly a fit with one of our global or EM teams. She seemed genuinely open to reverting to covering Asia more broadly, rather than focusing specifically on China as she has in her recent role. | Continue | In Person |
| 03/07/14 | Jean-Marc Berteaux | I was pleasantly surprised with Gigi. She has a very quick mind, and is able to make broad links and comparisons accross companies, industries, sectors, and cultures. I see her more as a PM than a team analyst, but I can also see her starting out on a team. She has a longer term view on how to invest, which would probably continue to be sucessful on a chinese or pan-asian product. While she is very lively, she can come across as a bit disorganized, but I think that would be a perfect foil for some of the very solid, focused investors we already have in region. She would certainly draw them out for discussions. | Continue | In Person |
| 03/07/14 | Steven Angeli | Great background, smart, and seems like a good cultural fit. But she couldn't communicate what made her a differentiated investor. Overall, I found her communication to be very animated and long-winded. On the one hand she said she was a long term investor, but it seems her China fund turnover was mostly over 100% during her tenure. | Do Not Continue | In Person |
| 03/25/14 | Ian Link | Awaiting feedback... | Continue | In Person |
| 03/26/14 | Bo Meunier | Awaiting feedback... | | In Person |
| 03/27/14 | Anita Killian | She did a good job in a stressful situation. I agreed with her on her stock conclusions. I think she would be a good cultural fit. I couldn't believe she got married only 3 days ago and still managed to pull this off. Clearly, she is interested in us. I like that she has all the requisite language skills, lots of experience, loyalty to her employer.... I say we hire her! | Continue | Panel |
| 03/27/14 | Kenneth Abrams | Hire GiGi. first i think she would be a great cultural fit. very friendly, great | Continue | Panel |

Confidential

DEF 00002578

| | | | | |
|---|---|---|---|---|
| 03/27/14 | | english (obviously) and stayed at one firm her entire career. On top of that she did the prep on the roundtable THE DAY AFTER HER WEDDING. I mean realy, i thought the quality of the written work was superb. she was great on ENN her stock, thorough, had all the facts right, new what the drivers were. Understood the strategic issues, market position and corporate governance issue. I was very impressed with her work on CP ALL, to have no knowledge and come up with a three page report, that was skeptical, against the consensus and hit very key drivers... I left the meeting wanting to short the stock, great background and insight for me on their lousy corporate governance. clearly she was nervous in the meeting and the answers to direct questions could have been briefer and sharper. but i have done 40 or 50 of these round tables and i think that infrequent participants underestimate the incredible pressure this puts on interviewees, to face 4 Wellington Partners, so all things equal it was an 8.5 to 9 out of 10. i would hire her tomorrow | | |
| 03/27/14 | Niraj Bhagwat | Verbal Feedback: Solid thesis on both stocks, but came across as nervous. Didn't answer my question directly. Reasonable investment insight, but I would suggest meeting more people. | Continue | Panel |
| 03/27/14 | Steven Richter | Awaiting feedback... | Continue | Panel |
| 03/27/14 | Ray Helfer | I focused my discussion with Gigi Chan on the business aspects of Wellington across Asia Pacific as well as addressed her questions on interaction between regional clients and our regional investment team. She was also quite interested in how we think about talent development in Asia for both investors and client facing colleagues. I found Ms. Chan to be very thoughtful and, perhaps based on so many interviews, quite informed on our firm. She came across as high energy, very focused on investment content and collaboration. While all of this was good, it was clear to me that we need to give more clarity to Ms. Chan around the time between joining Wellington and officially being a team analyst for a specific team. Her questions on this were not compensation related. She is interested in things such as: How will her impact be evaluated? By whom will she be evaluated? Who would champion her integration to the firm? What is the process of actually joining a team? What investment recommendation impact can she have between now and then? Tom and I discussed this a bit this afternoon. In | Continue | In Person |

| Date | Name | Comments | | |
|---|---|---|---|---|
| 01/27/13 | Thomas Baxter | summary, I felt she was sold on the firm, but not quite on the job, at least not the starting phase. Ray | | |
| | | I had a mixed reaction overall to Gigi. She's a growth investor, looking for long term structural growth companies (Tencent, AAC). She does a lot of her own primary research, and said she recently completed a research trip in China and has now visited each and every province in the country. She was at her best talking about some of the insights she gains from research travel (e.g. grass roots comments that help her gauge the rate of change in the political/regulatory situation). She was at her worst when trying to identify/define her edge as a PM. I think she has potential as an analyst but ultimately is quite green as a PM despite the 6 year track record (they start them early at Threadneedle as junior/apprentice PMs). I think she'd need more seasoning to have credibility as a PM and team leader here. I view her as more of a number 2. | Continue | In Person |
| 01/29/13 | Henry Philip | Gigi is a strong candidate - arrange to meet Charles and Tom. She comes across as quite 'young' in her approach, so I am not clear as to whether she would have the gravitas we would look for in a standalone PM. Ultimately I think she will be successful, but I wonder whether she would be better served starting as a Team Analyst... | Continue | In Person |

DEF 00002580

# Exhibit 3

**Wellington Global Management Ltd**
32F, One Exchange Square
Central
Hong Kong

*An Equal Opportunity Employer*  It is the policy of Wellington Global Management Ltd to provide equal employment opportunity to all qualified persons without regard to race, age, color, sex, sexual orientation, religion, national origin, ancestry, handicap, veteran or marital status.

APPLICATION FOR EMPLOYMENT *(Please Print All Sections)*

Position(s) Applied For: _EQUITY RESEARCH ANALYST_     Date of Application: _JAN 13_

Type of Position Applied For: ☑ Full Time   ☐ Part Time   ☐ Internship   ☐ Temporary

PERSONAL INFORMATION

Name: _MS_          _CHAN_          _GIGI_          _KAI ZI_
       Title (Mr., Mrs., Ms.)   Surname           First Name      Middle

I.D. Card Number: _K856328 (4)_

Address: _A3, 101F, GREAT GEORGE BLDG, 27 PATERSON ST,_ ( _1_ ) _917 420 3137_

E-mail address: _gkzchan @ gmail.com_  _CAUSEWAY BAY, HK_  Telephone

All previous surnames: _____ Date of Birth: _17·8·78_

FORMER ADDRESSES:

If you have lived at the above address for less than six years, please list all previous addresses during that period.

(_01/16_) to (_10/13_): _146 EMERALD HILL #02-10, SINGAPORE 229430_

(_09/06_) to (_12/11_): _58A AMWELL STREET, LONDON EC1R 1XS, UK_

(__/__) to (__/__): _____

(__/__) to (__/__): _____

(__/__) to (__/__): _____

(__/__) to (__/__): _____

What is your citizenship? _UK & HK SAR_

Are there any restrictions or limitations on your right to employment in Hong Kong? If yes, please explain.  ☐ Yes ☑ No
*(We may require a copy of your passport or other document evidencing your permission to work in Hong Kong.)*

How did you hear about this position? (advertisement, agency, employee, web site, etc.): _BROKER INTRODUCTION_

Do you see yourself as having a disability which might impact your ability to do the job for which you are applying?  If yes, please explain.
☐ Yes ☑ No _____



████████████████████████

## EDUCATION

Please list your educational background, starting with your most recent qualification through secondary school.

| Name & Location of School | Dates of Attendance | Exams Taken | Exam Results | Degree Received |
|---|---|---|---|---|
| ST. HILDA'S COLLEGE, OXFORD UNIVERSITY | 96 - 99 | PPE | 2·1 | BA & MA |
| COLLEGE OF LAW, LONDON | 99 - 00 | PGDL | COMMENDATION | PGDL |

## LANGUAGE ABILITIES

Are you fluent in any foreign languages that would assist Wellington Management in its efforts to globalize the firm?
If yes, please list the language(s) and check off your level of ability with each:

Language (1) MANDARIN    Speak ☑    Read ☑    Write ☑    Translate ☑

Language (2) CANTONESE    Speak ☑    Read ☑    Write ☑    Translate ☑

Language (3) FRENCH    Speak ☑    Read ☑    Write ☑    Translate ☐

Language (4) _____    Speak ☐    Read ☐    Write ☐    Translate ☐

## PROFESSIONAL QUALIFICATIONS

Please list all professional qualifications:

| Description | Date Obtained | Name of Governing Body |
|---|---|---|
| CFA | MAR 04 | CFA INSTITUTE |
| IMC (UK) | DEC 00 | CFA (UK). |
| MAS M5 | SEP 11 | MAS |
| MAS M8 | JAN 12 | MAS |

As per the Securities and Futures Commission (SFC), please address the following points:

1. Were you previously or are you currently registered with the SFC?    ☑ Yes    ☐ No

   If yes, please provide your registration number. DON'T KNOW

2. Are you subject to a competency determination at your current position?    ☑ Yes    ☐ No

   If yes, have you been deemed threshold competent? YES

## EMPLOYMENT HISTORY

Please list all employment for the past 10 years including part-time. You may include verifiable volunteer work. *If you were employed through an employment agency, please include the agency contact details. Please attach additional pages, as necessary.*

Present or Last Employer: THREADNEEDLE INVESTMENTS    Telephone: (65) 6309 1088

Nature of Business: ASSET MANAGEMENT    Position Held: FUND MANAGER

Address: 3 KILLINEY ROAD #07-07, SINGAPORE    Supervisor: VANESSA DONEHAN & RAYMUNDO YU

Specific Duties: FUND MANAGER

Reason for Leaving: FIANCÉ RELOCATING    Salary: 620,000 USD TOTAL. INCL BONUS

Employed from: OCT 00 to OCT 13
                mo/yr        mo/yr

Is/was employer regulated by a regulatory body? ☑ Yes ☐ No  If yes, please note the name of the regulatory body: FCA, MAS

CONFIDENTIAL

███████████████████

## EMPLOYMENT HISTORY *(continued)*

May we contact your past employers? ❑ Yes ❑ No

Previous Employer: _____ Telephone: _(_____)_____

Nature of Business: _____ Position Held: _____

Address: _____ Supervisor: _____

Specific Duties: _____

Reason for Leaving: _____ Salary: _____

Employed from: _____ to _____
                      mo/yr                          mo/yr
Is/was employer regulated by a regulatory body? ❑ Yes ❑ No   If yes, please note the name of the regulatory body: _____
_____

Previous Employer: _____ Telephone: _(_____)_____

Nature of Business: _____ Position Held: _____

Address: _____ Supervisor: _____

Specific Duties: _____

Reason for Leaving: _____ Salary: _____

Employed from: _____ to _____
                      mo/yr                          mo/yr
Is/was employer regulated by a regulatory body? ❑ Yes ❑ No   If yes, please note the name of the regulatory body: _____
_____

Previous Employer: _____ Telephone: _(_____)_____

Nature of Business: _____ Position Held: _____

Address: _____ Supervisor: _____

Specific Duties: _____

Reason for Leaving: _____ Salary: _____

Employed from: _____ to _____
                      mo/yr                          mo/yr
Is/was employer regulated by a regulatory body? ❑ Yes ❑ No   If yes, please note the name of the regulatory body: _____

Please comment on any periods of time that are unaccounted for or any gaps in employment history.
_____
_____
_____

## FITNESS AND PROPRIETY

| | | | | |
|---|---|---|---|---|
| 1. | a. | Have you ever been convicted of any offence involving fraud, theft, false accounting or other dishonesty or an offence (whether or not in Hong Kong) relating to companies, building societies, industrial and provident societies, credit unions, friendly societies, insurance, banking or other financial services, insolvency, consumer credit or consumer protection, money laundering, market manipulations or insider dealing? | ❑ Yes | ☑ No |
| | b. | Are you the subject of any current criminal proceedings? | ❑ Yes | ☑ No |
| 2. | | Have you any convictions for any offences other than those listed in 1 above which are not spent, whether or not in Hong Kong (excluding traffic offences unless these resulted in a ban from driving or involved driving without insurance)? | ❑ Yes | ☑ No |
| 3. | a. | Are you, or have you ever been, the subject of any civil proceedings, arbitration or litigation, including proceedings that may lead to a court judgment or other judgment debts, in Hong Kong or elsewhere? | ❑ Yes | ☑ No |
| | b. | Are you aware of any intention to begin such proceedings against you in the future? | ❑ Yes | ☑ No |

CONFIDENTIAL

FITNESS AND PROPRIETY *(continued)*

| | | | |
|---|---|---|---|
| 4. | Do you have any judgment debts made under a court order still outstanding, whether in full or in part? | ☐ Yes | ☑ No |
| 5. | Have you ever failed to satisfy any such judgment debts within one year of the making of the order? | ☐ Yes | ☑ No |
| 6. a. | Are you, or have you ever been, the subject of any bankruptcy proceedings, or proceedings for the sequestration of your estate? | ☐ Yes | ☑ No |
| b. | Have you ever entered into a deed of arrangement or an individual voluntary arrangement or other agreement in favour of your creditors, or are you doing so? | ☐ Yes | ☑ No |
| 7. | Do you have any outstanding financial obligations arising from regulated activities, which you have conducted in the past, whether in the Hong Kong or overseas? (In the case of advisers, this will include any outstanding liabilities arising from commissions paid for the sale of packaged products that have lapsed.) | ☐ Yes | ☑ No |
| 8. | Have you ever been found guilty of conducting any unauthorised regulated activities or been investigated for possible conduct of unauthorised regulated activities? | ☐ Yes | ☑ No |
| 9. | Are you, or have you ever been, the subject of an investigation into allegations of misconduct or malpractice in connection with any business activity? | ☐ Yes | ☑ No |
| 10. | Have you ever, either in the Hong Kong, or elsewhere – | | |
| a. | been refused entry to, or been dismissed or requested to resign from, any profession, vocation, office or employment, or from any fiduciary office or position of trust, whether or not remunerated? | ☐ Yes | ☑ No |
| b. | been refused, restricted in, or had suspended, the right to carry on any trade, business or profession for which specific licence, authorisation, registration, membership or other permission is required? | ☐ Yes | ☑ No |
| c. | been disqualified by a court from acting as a director of a company or from acting in a management capacity or conducting the affairs of any company, partnership or unincorporated association? | ☐ Yes | ☑ No |
| 11. | In respect of activities regulated by the SFC or any other regulatory body, have you, or has any company, partnership or unincorporated association of which you are or have been a controller, director, senior manager, partner or company secretary, during your association with that entity and for a period of three years after you ceased to be associated with it, ever – | | |
| a. | been refused, had revoked, restricted or terminated, any licence, authorisation, registration, notification, membership or other permission granted by any such body? | ☐ Yes | ☑ No |
| b. | been criticised, censured, disciplined, suspended, expelled, fined, or been the subject of any other disciplinary or intervention action by any such body? | ☐ Yes | ☑ No |
| c. | resigned whilst under investigation by, or been required to resign from, any such body? | ☐ Yes | ☑ No |
| d. | decided, after making an application for any licence, authorisation, registration, notification, membership or other permission granted by any such body, not to proceed with it? | ☐ Yes | ☑ No |
| e. | been the subject of any civil action which has resulted in a finding against you or it by a court? | ☐ Yes | ☑ No |
| 12. | Has any company, partnership, or unincorporated association of which you are or have been a controller, director, senior manager, partner, or company secretary, in Hong Kong or elsewhere, at any time during your involvement or within one year of such an involvement – | | |
| a. | been put into liquidation, wound up, ceased trading, had a receiver or administrator appointed or entered into any voluntary arrangement with its creditors? | ☐ Yes | ☑ No |
| b. | been adjudged by a court liable for any fraud, misfeasance, wrongful trading or other misconduct? | ☐ Yes | ☑ No |
| c. | been investigated or been involved in an investigation by an inspector appointed under companies or any other legislation, or required to produce documents to the government, or any other authority, under any such legislation? | ☐ Yes | ☑ No |
| d. | been convicted of any criminal offence, censured, disciplined or publicly criticised, by any inquiry, or any governmental or statutory authority or any other regulatory body (other than as already indicated under 11(b) above)? | ☐ Yes | ☑ No |
| 13. | Are you aware of any business interests, employment obligations, or any other situations which may conflict with the performance of the controlled functions for which approval is now sought? | ☐ Yes | ☑ No |
| 14. | Have you ever been convicted of, or dismissed or suspended from employment for drug or alcohol abuses, or other abusive acts? | ☐ Yes | ☑ No |
| 15. | Have you ever been dismissed, or asked to resign and resigned, from employment or a position of trust, fiduciary appointment or similar? | ☐ Yes | ☑ No |
| 16. | Have you ever been untruthful in any dealings with any regulatory body, or unwilling to comply with such body's regulatory requirements or with other legal, regulatory and professional obligations and ethical standards? | ☐ Yes | ☑ No |

**FITNESS AND PROPRIETY** *(continued)*

If you have answered yes to any of the above questions, please provide additional details below. *(Please attach additional pages, as necessary.)*

**READ CAREFULLY BEFORE SIGNING**

☑ By checking this box, I certify that all statements made by me on this application are true and complete to the best of my knowledge and that I have withheld nothing which, if disclosed, would affect this application unfavorably. I understand that any false statement or misrepresentation of this application may be grounds for the withdrawal of an offer or, if employment has commenced, summary dismissal.

Type Name: **GIGI KAI ZI CHAN**          Date: **10 · 4 · 14**

☑ By checking this box, I authorize my previous employers, schools and other educational institutions attended by me, professional bodies of which I was or am a member and persons named by me as referees to supply to Wellington Global Management Ltd information needed to verify the statements made by me on this application and/or to comply with applicable legal and regulatory requirements in relation to my proposed employment with Wellington Global Management Ltd. I understand and accept that Wellington Global Management Ltd will undertake checks with third parties to verify the statements made by me on this application.

I also understand and accept that, once a decision has been made that on all other grounds I should be offered employment with Wellington Global Management Ltd, Wellington Global Management Ltd may ask third parties for information about me in order

to establish my fitness and propriety and that this may include enquiries of Courts and other public bodies and of credit reference agencies. I consent to the disclosure of personal information about me to third parties so far as may be necessary for the purposes

of such verification and/or vetting and/or to comply with applicable legal and regulatory requirements, including in particular the requirements of the Securities and Futures Commission. I agree that Wellington Global Management Ltd, Wellington Management Company, llp and my previous employers shall not be held liable in any respect if a job offer is not made, is withdrawn, or my employment is terminated because of false statements, omissions or answers made by me on this application.

Type Name: **GIGI KAI ZI CHAN**          Date: **10 · 4 · 14**

I hereby acknowledge and consent to the above terms.

Signed: *[signature]*          Date: **10 · 4 · 14**

**WELLINGTON** ®
MANAGEMENT

*Effective 1/07*

CONFIDENTIAL

CHAN_04279

# Exhibit 4

**WELLINGTON GLOBAL INVESTMENT MANAGEMENT LTD**
32F, One Exchange Square, Central, Hong Kong

**T** +852.2846.6000 I **F** +852.2846.6001 (MAIN) I **F** +852.2846.6066 (CLIENT SERVICE)
www.wellington.com

WELLINGTON
MANAGEMENT®

8 April 2014

Gigi Chan
45 W 60th Street, Apartment 23C
New York, NY 10023
USA

Dear Gigi,

It is with great pleasure that I write to confirm our offer to you of employment as an Equity Research Analyst in our Global Equity Portfolio Management Group at Wellington Global Investment Management Ltd (the "Company"). In this role, you will report to Charles Argyle.  This offer of employment shall be on the following terms and conditions:

1
Date of Commencement
Your employment with the Company will begin on a date to be confirmed and will continue until terminated in accordance with paragraph 13 below. This offer is contingent upon successfully obtaining and maintaining all necessary entry visa and work permit.

The first three months of your employment shall be considered a probationary period. Upon successful completion of this probationary period, you will be appointed as a permanent employee of the Company.

2
Title and Duties
You shall be employed as an Equity Research Analyst in our Global Equity Portfolio Management Group and will report directly to Charles Argyle.  Your officership title will be Director of Wellington Global Investment Management Company Limited.

You will perform all acts, duties and obligations and comply with such orders as may be designated by the Company and which are reasonably consistent with your job title. The Company may require you to undertake the duties of another position, either in addition to or instead of the above duties, it being understood that you will not be required to perform duties, which are not reasonably within your capabilities.

The Company may require you (as part of your duties of employment) to perform duties or services not only for the Company but also for Wellington Management Co., LLP and any of its affiliated entities ("Associated Companies") where such duties or services are of a similar status to or consistent with your position with the Company.

3
Place of Work
Your place of work is the Company's premises located at 32F, One Exchange Square, Central, Hong Kong. However you may be required to work at any other premises, which the Company currently has or may later acquire in Hong Kong. You may also be required to travel within Hong Kong and abroad for the performance of your duties.

CONFIDENTIAL

CHAN_04381

Gigi Chan
8 April 2014

---

4

Hours of Work
Your normal working hours will be from 8:30 a.m. to 5:30 p.m., Monday through Friday, with an hour break for lunch. However, the Company reserves the right to change your start and finish times and the days upon which you work. You may also be required to work additional hours by way of overtime either as and when requested to do so by the Company or when the proper performance of your work so requires. You will not be entitled to be paid extra remuneration for any such additional hours worked in excess of your basic weekly hours. Sunday is your designated rest day. Any other days off shall not be considered rest days and may be appointed as alternative statutory holidays or substituted rest days at the Company's discretion.

5

Remuneration, Expenses and Deductions
Your annual basic salary is HKD1,950,000. Basic salary will be paid for the current month on or around the 15th day of each month over a 12 month period.  Your salary will be reviewed at the end of 2014, in a manner consistent with the Company salary adjustment policy.  Thereafter, your salary will be reviewed every twelve months.  At these review dates, your salary may be adjusted after due consideration has been given to your performance during the preceding twelve months.

Wellington will pay you a bonus for 2014 in the amount of HK$3,100,000, inclusive of any awards made to you from incentive compensation pools established by the firm. The bonus may come from a variety of sources and may be paid on a variety of dates from December 15, 2014 through and including March 15, 2015. This bonus amount is intended to represent a full 12-month bonus covering the period January 1, 2014 through December 31, 2014 and will not be pro-rated based on your start date.  All bonuses, incentives and guarantees require that you be actively employed at the time they are paid.

We will use that amount as a guideline in considering your bonus for 2015 and any subsequent years.

You will be paid or reimbursed for any reasonable expenses properly incurred by you while performing your duties on behalf of the Company, subject to your producing receipts in respect of such expenses when requested by the Company, and subject to your compliance with the Company's rules and policies relating to expenses.

6

Relocation
To assist you with your relocation to Hong Kong, Wellington Management has retained Cartus Relocation, a premier global relocation services company, to manage your relocation needs.  Please find the attached "Global Relocation Renter Policy" outlining the details of your package.  Your Cartus Relocation Consultant will contact you to review the relocation process, discuss the benefits available to you, and to answer any questions regarding the program.  Should you have any questions regarding the relocation program, please contact Larissa Carter at +1-617-790-7638.

7

Housing
To help offset housing costs in Hong Kong, the Company may provide you with a monthly subsidy under the Housing Subsidy Program guidelines.  The monthly housing subsidy will be reviewed on an annual basis, and may be modified or eliminated at the Company's sole discretion.

8

Holidays
In addition to the Public holidays normally applicable in Hong Kong, you are also entitled to 25 days of paid Annual Leave that accrues pro rata throughout each calendar year. Holidays can only be taken at times agreed in advance with the Company. Holidays taken by you will first be applied against the annual leave to which you are entitled

2

CHAN_04382

Gigi Chan
8 April 2014

under the Employment Ordinance of Hong Kong. Any entitlement to holidays remaining at the end of any calendar year shall lapse.

9

Benefits

The Company will provide a comprehensive benefits package, which will include medical coverage and dental coverage for you and your eligible dependents. You are also entitled to life insurance, accidental death and dismemberment insurance, long term disability insurance and business travel accident insurance under the Company's policy, subject to its terms and conditions. You will be enrolled in the Company's provident fund scheme subject to its terms and conditions.

The Company reserves the right to terminate or substitute other scheme(s) for such scheme(s) or amend the scale of benefits of such scheme(s) including the level of benefits. If any scheme provider (including but not limited to any insurance company) refuses for any reason (whether based on its own interpretation of the terms of the insurance policy or otherwise) to provide any benefits to you, the Company shall not be liable to provide any such benefits itself or any compensation in lieu thereof.

Please refer to the attached Benefits Handbook, as the same may be amended from time to time.

10

Company Policies

The Company is an equal opportunity employer and does not permit any discrimination or harassment which is unlawful in Hong Kong. The Company complies with its statutory obligations regarding the personal data of its employees.

11

Policies and Procedures; Code of Ethics

You must at all times comply with the Policies and Procedures of the Company as from time to time in effect. The Policies and Procedures of the Company are incorporated into and form part of the terms and conditions of this agreement.

Employees of Wellington Management Company, LLP and its affiliated entities, are required to comply with the provisions of the Code of Ethics of the Wellington Management organization. Under the Code of Ethics, all employees of the Company and Associated Companies regardless of their role or department are considered to be "access persons" and are subject to restrictions on personal securities transactions upon joining the Wellington Management Organization. The Code is an indication of the importance we place on our fiduciary responsibility to our clients, and compliance with the Code is a condition of employment.

The Code puts significant restrictions on the personal trading activity of Wellington employees, their spouses and others in their household, which make it difficult to trade most commonly traded securities, regardless of the size of the transaction. These restrictions will apply to all accounts over which you, your spouse or others in your household have investment discretion. A copy of this Code is enclosed for your reference. Please feel free to contact Monica Sung at 852-2846-6020 to answer any questions you might have about its impact on the management of your personal financial affairs.

12

Exclusivity of Service

You are required to devote your full time, attention and abilities to your job duties during working hours, and to act in the best interests of the Company and its Associated Companies at all times. You must not, without the written consent of the Company, in any way directly or indirectly (i) be engaged or employed in, or (ii) concerned with (in any capacity whatsoever) or (iii) provide services to, any other business or organization where this is, or is likely to

3

CHAN_04383

Gigi Chan
8 April 2014

be, in conflict with the interests of the Company or its Associated Companies or where this may adversely affect the efficient discharge of your duties. However this does not preclude your holding up to (5%) of any class of securities in any company, which is quoted on a recognized Stock Exchange.

13

Receipt of Payments and Benefits from Third Parties

Subject to any written regulations issued by the Company which may be applicable, neither you nor any member of your family, nor any company or business entity in which you or they have an interest, shall receive or obtain directly or indirectly any payment, discount, rebate, commission or other benefit from third parties in respect of any business transacted (whether or not by you) by or on behalf of the Company or any Associated Company and if you, any member of your family or any company or business entity in which you or they have an interest, directly or indirectly obtain any such payment, discount, rebate, commission or other benefit you will forthwith account to the Company or the relevant Associated Company for the amount received or the value of the benefit so obtained.

14

Confidential Information

Except in the proper performance of your duties, you will not, either during your employment or at any time afterwards, use or communicate to any person, and during your employment you will use your best endeavors to prevent the disclosure of, any information of a confidential nature concerning the business of the Company, its affiliates, or any organization with which the Company has a contractual relationship, or of any person having dealings with it and which comes to your knowledge during the course of your employment. After the termination of your employment, this restriction will cease to apply to any information, which is in or comes into the public domain, other than by reason of any default on your part.

15

Termination of Employment

During your probationary period, your employment may be terminated by either party on not less than seven days' written notice or payment of salary in lieu thereof. Upon completion of your probationary period, either party may terminate your employment on not less than one month's written notice or payment of salary in lieu thereof. The Company reserves the right to terminate your employment without any notice if it has reasonable grounds to believe you are guilty of gross misconduct, persistent unpunctuality, neglect of duty, material breach of any of the terms of your employment or on any other ground within section 9 of the Employment Ordinance of Hong Kong. The Company reserves the right to require you not to attend at work and/or not to undertake all or any of your duties of employment during any period of notice (whether given by you or the Company), provided always that the Company shall continue to pay your salary and contractual benefits whilst you remain employed by the Company. On termination of your employment, you must immediately return to the Company in accordance with its instructions all equipment, correspondence, records, specifications, software, disks, models, notes, reports and other documents and any copies thereof and any other property belonging to the Company or its Associated Companies (including but not limited to the Company car, keys, credit cards, equipment and passes) which are in your possession or under your control. You must, if so required by the Company, confirm in writing that you have complied with your obligations under this paragraph.  Finally, please be aware that as an employee you must also sign and return the enclosed Confidentiality and Intellectual Property Agreement with this letter.

16

Warranty and Undertaking

You represent and warrant that you are not subject to any agreement, arrangement, contract, understanding, court order or otherwise, which in any way directly or indirectly restricts or prohibits you from fully performing the duties of your employment, or any of them, in accordance with the terms and conditions of this letter.

17
Definitions

4

CHAN_04384

Gigi Chan
8 April 2014

For the purpose of this letter, the following words and expressions shall have the meanings set out below: "Company" and "Associated Company" shall include the successors in title and assigns of the Company and Associated Company. "Hong Kong" means the Hong Kong Special Administrative Region of the People's Republic of China. Terms defined in Section 2 of the Companies Ordinance shall in this letter have the meanings ascribed to them in that section.

18
Miscellaneous
This letter cancels and is in substitution for all previous letters of engagement, agreements and arrangements whether oral or in writing relating to the subject matter hereof between the Company and yourself, all of which shall be deemed to have been terminated by mutual consent. This letter is the entire agreement between you and the Company of the terms upon which you are employed. The various provisions and sub-provisions of this letter are severable and if any provision or subprovision or identifiable part thereof is held to be invalid or unenforceable by any court of competent jurisdiction then such invalidity or unenforceability will not affect the validity or enforceability of the remaining provisions or sub-provisions or identifiable parts thereof in this letter. This agreement is governed by and construed in accordance with Hong Kong laws, and you and the Company submit to the nonexclusive jurisdiction of the Hong Kong courts and Labour Tribunal. Paragraph headings are inserted for convenience only and will not affect the construction of this letter.

Please indicate your agreement with these terms and conditions of employment by signing both copies of this letter and return the top copy to Human Resources.

Sincerely,

Ray Helfer
Managing Director

I agree with the terms and conditions of my employment with the Company as set out or referred to above.

Agreed and accepted as of the _10_ day of _APRIL_, _2014_:

Gigi Chan

CONFIDENTIAL

CHAN_04385

EMPLOYEE CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

In consideration of my employment or continued employment by Wellington Global Investment Management Ltd ("WGIM"), and for other good and valuable consideration, I agree as follows:

1

For purposes of this Agreement, the following definitions apply:

a.  "Confidential Information" means any Wellington Management information that is not generally known, including (without limitation) any information relating to Wellington Management's business and services.  For example, Confidential Information includes information about:

> (i) information systems, methods, software, models and databases developed, adapted or used by Wellington Management,
> (ii) investment mandates and products developed or adapted by Wellington Management,
> (iii) Wellington Management's prospects, clients and vendors, including their business plans, identities and contact details,
> (iv) portfolio holdings and transactions executed in client portfolios, and
> (v) Wellington Management's financial results as well as business, marketing and strategic plans.

b.  "Intellectual Property" means any invention (whether patentable or not within the meaning of the Patents Ordinance or other applicable legislation) relating to or capable of being used in the business of Wellington Management; any trade secrets, service marks, discoveries, improvements, developments, designs, and database software (in object or source code form); any manuals, literary, artistic or other works (whether registrable or not and whether a copyright work or not); and any processes, concepts and ideas conceived, developed or reduced to practice by me during my employment with WGIM that:

> (i) relate in any way to the business or services of Wellington Management,
> (ii) result from any work performed by me or others for Wellington Management, or
> (iii) make use of the Confidential Information or of facilities or equipment of Wellington Management,

whether done by me alone or with others, during or after normal business hours, or on or off Wellington Management premises.

c.  "Wellington Management" means Wellington Management Company, LLP and any of its subsidiaries or affiliates, including WGIM.

2

All Confidential Information or Intellectual Property that I create or have access to during the course of my employment with WGIM is and shall remain the sole and exclusive property of WGIM.

3

I will not, directly or indirectly, use or disclose any Confidential Information, except as required for the proper performance of my duties for WGIM or as required by applicable law.  On a best efforts basis, I will preserve the confidentiality and secrecy of such information.

CONFIDENTIAL                                                                                    CHAN_04386

EMPLOYEE CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

4

Except as required for the proper performance of my duties for WGIM, I will not copy or transmit any Confidential Information or remove from Wellington Management's premises any media containing Confidential Information. At the time my employment terminates, or at any time as requested by WGIM, I will return to WGIM or any affiliate all media containing Confidential Information which I may then have.

5

I hereby assign to WGIM all rights, title and interest in and to all Intellectual Property that exists now or that I may create during my employment. I agree to assign any such rights, title and interest to any third party as may be directed by WGIM. All Confidential Information or Intellectual Property that I create during my employment with WGIM shall be owned exclusively by WGIM.

I waive in favor of WGIM all rights granted by the Copyright Ordinance in connection with my authorship of any copyright works in the course of my employment with WGIM, including without limitation any moral rights and any right to claim an additional payment with respect to use or exploitation of those works. I agree that my wages are full compensation for my services and all present and future uses of copyright works made by me in the course of my employment. I will not make any claims against WGIM or any affiliate with respect to those copyright works.

If I make any inventions that do not belong to WGIM or an affiliate under the Patents Ordinance, I will immediately exclusively license or assign to WGIM my rights in relation to such inventions and will deliver to WGIM all documents and other materials relating to them.

6

I will not disclose to WGIM or any affiliate or use during my employment any confidential or proprietary information belonging to a former employer, another person or myself, without the prior written agreement of WGIM.

7

I acknowledge that this Agreement is not a contract of employment. I acknowledge that this Agreement does not require WGIM to retain my services for a fixed period of time, or in any way restrict the right of WGIM to terminate my employment.

8

Paragraphs 2, 3, 4 and 5 of this Agreement shall survive the termination of my employment with WGIM.

9

This Agreement will be governed by and construed in accordance with the laws of Hong Kong, without regard to its conflicts of law principles. I hereby consent to the exclusive jurisdiction of the courts in Hong Kong.

CONFIDENTIAL

CHAN_04387

EMPLOYEE CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

10

This Agreement constitutes the entire agreement between the parties on the subject matter herein, and is binding on each party's successors, heirs and assigns. This Agreement may only be amended by a written document signed by both parties. If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect, this will not affect the other provisions of the Agreement, which will be interpreted so as to be enforceable to the maximum extent permitted by law.

Signature: _____

Print name: _____GIGI CHAN_____ Date: _10 . 4 . 14_

Accepted and agreed: Wellington Global Investment Management Ltd

By: _____

FOR USE IN HONG KONG AND BEIJING OFFICES ONLY. LAST AMENDED 10 MAY 2013.

3

CONFIDENTIAL

CHAN_04388

# Exhibit 5

| From: | Chan, Gigi [GChan@wellington.com] |
|---|---|
| Sent: | Tuesday, October 21, 2014 2:55:18 PM |
| To: | GM - GEPM Business Management |
| Subject: | Self-review |

**Your accomplishments, contributions and shortfalls in 2014â€"specifically YTD through September-end (please use specific examples wherever possible):**

In the 4 months since I joined I have contributed to discussions where I feel I can add value. This includes contributions in EMM, MM and Investorpalooza as well as smaller discussions among colleagues via emails as well as in person. I feel that I am making some headway in forming relationships and maintaining dialogues with colleagues across different teams and locations. On the marketing front I have participated in client meetings, trips and social events.

**Relevant performance and attribution information, such as sector or stock contribution. Ideally, you should work with your team leader(s) to coordinate/calculate and agree on the portfolio attribution information you share:**

Considering I only joined 4 months ago, it is difficult to calculate my exact contribution. Within my team I have worked on several existing holdings to help reassess the investment thesis and/or build conviction levels. This includes 21Vianet after the scandal broke, Daphne, CRE and other China consumer staples names. I have also worked on new buy recommendations. This includes Sound Global, Qihoo, Skyworth and VIPshop -which the team just bought.

**A discussion of those stocks you helped get into others' portfolios outside of your own teamâ€™s:**

Outside of the team I have been working on thematic ideas and new ideas with people such Santiago (on thematic ideas), Bo (on Chinese stocks), Juanjuan (on the Chinese environmental related companies) and followed up on EMM ideas with John Boselli and other investors.

**Your goals for 2015, particularly the things on which you want to improve, and how we can best help you:**

My goals for 2015 are two fold:

1. Making more impact on portfolios: specifically communicating my views on thematic ideas as well as stock recommendations within my team as well as to a wider audience throughout the firm. Travelling more with other investors and to different offices will help me connect with more colleagues and understand their interests.

2. Putting my portfolio management skills to good use. I am most comfortable with the China and the Asia space where I successfully ran portfolios for more than 9 years. I am adding to my knowledge base on EM corporates, building on my experience of having travelled there extensively on a personal basis. I am currently thinking how to best achieve my skills and knowledge in terms of product to launch. In the meantime, I will be setting up paper portfolios to try out my ideas. I would appreciate the opportunity and support to brainstorm and develop this with other teams and colleagues wherever it is possible.

Confidential

# Exhibit 6

| **From:** | Chan, Gigi <GChan@wellington.com> | |
|---|---|---|
| **Sent:** | Wednesday, October 7, 2015 6:56 AM | Chan 20 |
| **To:** | gkzchan@gmail.com | 10/7/20     S.Roy |
| **Subject:** | Hi Charles, | |

Hi Charles,
I wanted to talk to you about an incident which occurred a couple of weeks ago which I found unacceptable, which Greg or others may or may not have spoken to you about.

I had an Asian process and philosophy session and several things were wrong with it:
1. The fact that it happened at all - my understanding is that they are for young investors to help them find their feet - I am a fully fledged PM with a decade of experience managing money - longer than some others who were giving advice on the panel. Still, I agreed to participate to help let others understand my p+p.
2. Misunderstanding of the participants of the task at hand. The spirit of it was supposed to be to help people develop their investment thinking - instead a lot of the feedback was marketing based - could be construed as constructive criticism but not relevant. Also a few of the participants were fairly patronising - they failed to listen to what I was saying and kept insisting on something that missed the point - ie why I should not underperform in a down market. Differences in opinion were dressed up as advice as to how I should manage money more like themselves.
3. The fact that I was unable to respond to feedback. This works where the feedback is constructive - but let me read you some examples of some of the feedback that was given.
- if I were you - have you ever watched yourself present in a video?
- you put in too many words before your point, like, I suppose - which makes your points...not very effective
- do you really expect clients to give you money on the basis of these few sentences?
- I mean, you just say what every single growth manager says...saying you do it better than anyone else is just not convincing...unless you plan on having a good track record.
The effect was that of a kangaroo court.

I understand that this p+p works well in Boston and London. Where participants adhere to the spirit of it, I believe it is a good and useful thing.

But that is precisely what this incident has illustrated. The people and culture in HK are not on par with that of elsewhere in Wellington, and this process was open to abuse.

I understand that insecure people will sometimes behave unprofessionally and disrespectfully to others to bolster their own self confidence.

What I find unacceptable is that the system within which I work is one which tolerates such behaviour. One that does not ensure that I work in a respectful work environment.

I joined Wellington on 2 assumptions:
1. Wellington's Asia/China is sub scale and that Wellington was serious about growing it now
2. It is a meritocracy which is alpha focused and there is a culture of respect.

This was what I was led to believe prior to joining, having predominantly spoken to people from Boston and London.
My daily reality of it has been completely different.
What I have experienced since joining makes me doubt these assumptions.

What am I missing here? Why did you hire me?

The market in Asia is liquid and focuses on who can make money - there are plenty of firms who can raise

CHAN_06154

money off my track record and where I can put my skills to better use - managing money, leadership, marketing - etc.

If there are misunderstandings that cannot be reconciled then it is better for us not to waste each other's time any longer.

If you want me to be a change agent, then you need to give me power to effect changes.

At the very least, I need for you to ensure that:
1. Nothing like this ever happens again and
2. I have a real and proper role commensurate to my skillset and achievements to date - a fund manager of a China fund, seeded and with full support of the firm to grow it.

CONFIDENTIAL

# Exhibit 7

| From: | Baxter, Thomas W. [twbaxter@wellington.com] |
| Sent: | Tuesday, December 08, 2015 10:46:02 AM |
| To: | Chan, Gigi |
| CC: | Argyle, Charles |
| BCC: | Philip, Henry |
| Subject: | Follow up from YE discussion |

Hi Gigi,

After each year end meeting I try to send a brief note summarizing the feedback that we received throughout the process, including some representative quotes from the peer survey.

The main message is that you have a lot of support here. I have lots of company in wanting to help you succeed here. Here are a few things other investors are saying: "Very pleased she has joined the firm; adds depth in China." "Enthusiastic . . .brings new perspective, deep knowledge and experience in China." "Helpful in pushing me to think about angles I had not previously." "Thinks about longer term strategic questions, e.g. ecommerce in China." "Gigi is a creative thinker who does a great job analyzing sector trends and long term themes." Generally other investors here view you as a differentiated investor and a money maker who invests with conviction. On collaboration there's room for improvement. One theme I heard a few times was regarding responsiveness. "Wish she could be more approachable via emails" was one quote, and I heard directly from a few other folks with similar comments. Not always easy when traveling of course, but even dashing off a simple email reply like "sorry, on the road this week, let me collect my thoughts and get back to you" or something like that would go a long way towards changing this perception that some investors have.

The other consistent area of constructive feedback for you relates to communication. I do need to stress that this feedback is nearly universal and strikingly consistent. "When Gigi shares her ideas, her thoughts can sometimes seem disorganized, and I wonder if she can try to work on tightening up her communication a bit." People have approached me on this topic often in multiple contexts: EMM, client-facing interactions, one on one idea sharing discussions, etc. Your energy and passion is clearly a strength, but you often get in your own way when communicating verbally in a way that requires the audience to work very hard to hear the content. I know we had organized a couple sessions with Scott Clark to address some of these tendencies. As you spend more time pitching China Growth, clear and succinct communication will be even more important. We can certainly organize more training sessions in 2016, however the coaching is only going to be effective if you open yourself up to the feedback and embrace the opportunity to improve yourself in this area. At times you have come off as resistant or closed off to feedback. Wellington is a feedback-intensive environment. Not all of the feedback you will hear will be on point, some of it won't resonate. And it is always in the hands of the feedback recipient to do what they will with it. But we have found that investors who open themselves up to feedback, hear people out, and actively embrace the opportunity to learn from others' observations of them are the ones who thrive here. We all have areas of strength and weakness and every one of us can get better.

Lots on the plate for 2016: getting China Growth off the ground, continuing to contribute to EMO, communicating more of your investment ideas and insights broadly to #Investors and in EMM/MM.

Hope you have a great holiday.  Please let me know if you have any questions.

Best,
Tom

# Exhibit 8

| | |
|---|---|
| **From:** | Hogbin, Elizabeth A [EAHogbin@wellington.com] |
| **Sent:** | Tuesday, May 31, 2016 11:53:28 AM |
| **To:** | Baxter, Thomas W. |
| **Subject:** | FW: We should definitely find time to talk but I'm flat out starting at 11am (my time) |

Confidential feedback from our GRG session today...have put time on your calendar to discuss.  Kind regards, Liz

**From:** Weil, Andria H.
**Sent:** Tuesday, May 31, 2016 2:20 PM
**To:** Hogbin, Elizabeth A
**Subject:** We should definitely find time to talk but I'm flat out starting at 11am (my time)

She is absolutely not ready for client/consultant meetings.  I have lots of feedback but first and foremost she needs to stop reading the pages to her audience.  The information she is conveying should not be written on the page but should bring to life the words that are the page.  She is the portfolio manager and the consultant or client needs to buy her. Her unique insight, passion for China, passion for investing.

I asked her about a stock that wasn't her example because I actually wanted to hear her talk about a stock, her interactions with management, what she finds unique enough to be one of 30 in her portfolio.   I'm sure you know all of this.

Quick poll: Unlikely that any of us would take her on the road if she presented like that to a client/consultant.  Happy to help if I can but there is a lot of work needed on this one.

Andria

Andria H Weil
Managing Director
Wellington Management
280 Congress Street, Boston, Massachusetts 02210 USA
Phone: (617) 790-7106
Fax: (617) 204-7106
Email: ahweil@wellington.com

Advisory services offered through Wellington Management Company, llp.
Securities offered through Wellington Management Advisers, Inc.,
an SEC-Registered Broker/Dealer, Member FINRA and SIPC®.
Wellington Management Advisers, Inc. is an affiliate of Wellington Management Company, llp and Wellington Trust Company, na.
Not FDIC Insured – No Bank Guarantee – May Lose Value.

WMCInternal

DEF 00027766

# Exhibit 9

Chan 23

10/7/20   S. Roy

| | |
|---|---|
| **From:** | Hogbin, Elizabeth A [EAHogbin@wellington.com] |
| **Sent:** | Friday, June 10, 2016 10:06:14 AM |
| **To:** | Baxter, Thomas W. |
| **Subject:** | RE: Update on Gigi |

Thanks Tom!  Have a good weekend

**From:** Baxter, Thomas W.
**Sent:** Friday, June 10, 2016 2:31 PM
**To:** Hogbin, Elizabeth A; Argyle, Charles
**Subject:** RE: Update on Gigi

Thanks Liz, that was a difficult conversation I know.  I will seek her out at Palooza to follow up.

**From:** Hogbin, Elizabeth A
**Sent:** Friday, June 10, 2016 8:17 AM
**To:** Argyle, Charles; Baxter, Thomas W.
**Subject:** RE: Update on Gigi

Just an update after speaking with Gigi today (yesterday was a holiday in HK).  She is frustrated regarding not getting meetings and slightly in denial about her presentation skills.  She believes that she didn't appropriately understand the briefs of these internal conversations ("I thought they wanted to know what my product was rather than how I would present it") and has been criticised for responding to feedback e.g. Product Messaging Panel told her to "speak more to the page" so then she read verbatim a few of the pages and now is being criticised.

I tried to give her the guidance below about creating success for next week's meeting but it seemed difficult for her to absorb at this moment in time.

I also mentioned that is very normal not to have meetings this early in your track record/Wellington tenure but that seemed frustrating to her as well.

She then "had to go."

Sorry not to report better news.

**From:** Hogbin, Elizabeth A
**Sent:** Wednesday, June 08, 2016 11:44 AM
**To:** Argyle, Charles; Baxter, Thomas W.
**Subject:** Update on Gigi

Both

Just want to let you know that I am planning to speak with Gigi tomorrow to let her know that we have been unable to schedule any marketing meetings in the US or London/EMEA in June for China Growth.  I expect she will be upset/surprised.  I plan to convey that the reason for not being able to get marketing meetings is twofold:
   1) Limited demand for China strategies from our client base at this point in time, given the negative headlines etc.
   2) GRG perception that her presentation skills need some polishing before they are comfortable taking her on the road

As you may be aware, Gigi had Rogen presentation training this week.  As previously scheduled, she is going to have a "Round 2 Dry Run" in Boston with key GRG folks (Morse, Weil, Tubman, Synnestvedt) on Wednesday of Investorpalooza week.  Greg Mattiko and I are going to be there. [Charles: in case you have not heard, Round 1 Dry Run went poorly

DEF 00003417

from a presentation skills/inspiring confidence in GRG perspective].

I plan to give her this advice about the Round 2 meeting (please chime in if you feel otherwise):

- Pretend that this is a 1-1 prospect meeting rather than anything else
- Try to relax/get in a ready state of mind beforehand – I have a TED talk on this that Erin Murphy suggested that I will forward her
- Start the meeting by acknowledging that her last presentation did not go as well as she had hoped and thanking the group for their time
- State that she is thinking about approaching this meeting as she would a 1-1 prospect meeting, trying to make it conversational and encourage questions

Any thoughts, guidance or advice you have would be extremely welcome!

Kind regards, Liz

DEF 00003418

# Exhibit 10

| | |
|---|---|
| **From:** | Hogbin, Elizabeth A [EAHogbin@wellington.com] |
| **Sent:** | Tuesday, June 21, 2016 3:29:30 AM |
| **To:** | Tubman, Andrew Z.; Synnestvedt, Jared A.; Weil, Andria H. |
| **CC:** | Morse, Amy G. |
| **Subject:** | RE: Catch up: Jed/Liz |

Thanks all.  This is very helpful feedback and I will work with Charles Argyle and Tom Baxter to make sure we follow up on it, especially the comments on headhunter calls.

One factual point I wanted to make sure to clarify: the 220bp of annualised alpha is NET, so it's more like **340bp of annualised gross alpha** (100bp mgmt. fee + op expenses).  Not to take away from your overall point regarding total return but just wanted to make sure this was understood.

Thanks again for taking the time to convey this helpful feedback.

Kind regards, Liz

**From:** Tubman, Andrew Z.
**Sent:** Tuesday, June 21, 2016 2:32 AM
**To:** Synnestvedt, Jared A.; Weil, Andria H.; Hogbin, Elizabeth A
**Cc:** Morse, Amy G.
**Subject:** RE: Catch up: Jed/Liz

Yes, thanks very much Andria and very well said.

I agree with the points below and might add a few additional thoughts, although perhaps not so eloquently:

- On paper, the strategy should really appeal to clients given the concentration, characteristics, local on the ground investor, native to the area, language skills, experience, and extensive travel and company knowledge, etc - all very impressive and should be especially of interest to those in the E&F channel which may find China/the opportunity set of most interest.  I have spent time with and like Gigi and think she is a talented investor with a great long term opportunity ahead of her and us at the firm.  I think our clients will as well in time.
- Completely agree that we should stop leading with track record as client are buying the people, not the track record (we heard it today with HHC on JVR).  They really want to understand Gigi as an investor and as a person - Greg, does this fantastically well.
- Also, on the track record - unless I am not remembering correctly, I think we need to stop stressing the relative performance.  Yes, 220 bps is impressive alpha and top decile - I also get it and would be proud of it, but I think we may have a differing client base that her prior find which I understand was predominately the Global Wealth channel.  As we know, clients int the E&F Channel are looking for strong total return and - as Greg states - looking to double their money in 4 years on a stock by stock basis.  In my view, 200 bps over the index (100 after fees as many clients focus on net performance ) today will likely not generate an investment in China given the increased risks, etc.  We need to tilt the discussion to total return and how we are going to find stocks that double, or something along those lines, etc as opposed to relative results.
- Picked up on the headhunter calls as well....puzzling to me.  Aside from GRG shelf space, in my view it's not good for our clients given the potential turnover to their portfolios or the firm to be representing ourselves in that manner.  That said, I think turnover/changing firms is more prevalent and talked about in Asia, but just an anecdotal view.
- On the idea of shelf space, and I am a big proponent of China, in the US E&F Channel, where this could be a good opportunity - we may have some shelf space challenges.  With a 20% overlap to EMO, a 50% overlap to EMO China names , and given our penetration with EMO/canvassing our clients it could be tricky to engage them on China Growth.  That being said, over the long-run I think we will see continued and growing

opportunity set with those interested in dedicated China investments.

Hope that helps and thanks again Andria starting the discussion.

Andrew
WMCInternal

---

**From:** Synnestvedt, Jared A.
**Sent:** Monday, June 20, 2016 1:05:33 PM
**To:** Weil, Andria H.; Hogbin, Elizabeth A
**Cc:** Tubman, Andrew Z.; Morse, Amy G.
**Subject:** RE: Catch up: Jed/Liz

Helpful Andria.

Liz,
We picked up on the headhunter comment in our meeting as well.  In a firm with shelf space challenges, it is really hard to convince GRG to spend the time if it thinks it is not a long term strategy.  I would be hard pressed to suggest a full on swing knowing that it is top of mind for her.....

Jed

---

**From:** Weil, Andria H.
**Sent:** Monday, June 20, 2016 12:57 PM
**To:** Hogbin, Elizabeth A
**Cc:** Tubman, Andrew Z.; Morse, Amy G.; Synnestvedt, Jared A.
**Subject:** Re: Catch up: Jed/Liz

Liz,

Thanks for the email.  As I brought Gigi with us to Cqmbridge, I thought I'd share with this group my impressions from that meeting in addition to my feedback from our session together.

I thought that Gigi did a nice job at Cambridge in general.  She was calmer and better able to go with the flow of the conversation, presenting herself well including her specific strengths/way of thinking to the broader group.  I believe she answered Dorota's questions and it was helpful to have her there so that Dorota and others could meet her.  In general it was a good way to further the support of EMO.

All that said, she needs to stop leading with her track record.  The reality is that Wellington wouldn't have hired her if she wasn't accomplished.  EVERYONE at Wellington is accomplished.  She was top decile, I get it, but Cambridge will *assume* that we wouldn't hire someone who isn't talented.

She was asked if there was any other stock where they disagree.  It would have been helpful for her to say one other than Daphne and to be specific.  Greg was certainly overly honest in his discussions with the Managing Partners.  She could have taken a page from that.

As for our meeting together, she left me with the perception that she is taking lots of head hunter calls.  She cited a number of times that people were calling her regularly to ask her to take over other funds.  That makes me skittish to put her in front of clients.  I had enough headaches with Rick Wurster leaving that I am reluctant to put a PM in front of clients/prospects/consultants that might leave.

I also find her difficult to get to know.  She needs to be a little vulnerable, admit she's not great at everything, accept criticism gracefully.  It's hard, especially for an accomplished woman to do this.  I understand that issue but it's a really important life lesson and she will be more successful within Wellington and with institutional clients if she can do this.

Confidential

DEF 00006376

She needs to use stock specific examples to build her story.  What she has gotten right and wrong.

The main point I was trying to get across is institutional buyers don't buy track records, they buy people they trust. You build trust by being a little vulnerable, honest, direct and humble. You answer their questions directly with few words but tangible examples to bring to life your answers.  It's really hard but that's how you build a really big, stable book with our clients.

Andria

On Jun 20, 2016, at 1:57 PM, Hogbin, Elizabeth A <EAHogbin@wellington.com> wrote:

> From: Hogbin, Elizabeth A
> Sent: Monday, June 20, 2016 8:44 AM
> To: Synnestvedt, Jared A.
> Subject: Catch up: Jed/Liz
>
> Jed
> Good to see you last week and thanks again for taking the time with Gigi.  If you are able to solicit
> input from Andrew, Andria, Amy (or forward them our meeting invite) that would be great, as
> would be helpful to have collective take on where Gigi is in terms of presentation skills and areas
> for improvement.
> Look forward to speaking on Friday.
> Cheers, Liz
>
>
> -----Original Appointment-----
> From: Hogbin, Elizabeth A
> Sent: Friday, June 17, 2016 10:59 AM
> To: Hogbin, Elizabeth A; Synnestvedt, Jared A.
> Subject: Catch up: Jed/Liz
> When: Friday, June 24, 2016 3:30 PM-4:00 PM (UTC) Dublin, Edinburgh, Lisbon, London.
> Where: Liz to call Jed on 65638
>
>
> <meeting.ics>

Confidential                                                                              DEF 00006377

# Exhibit 11

| | |
|---|---|
| **From:** | Mattiko, Gregory A. [GAMattiko@wellington.com] |
| **Sent:** | Wednesday, August 03, 2016 9:42:55 AM |
| **To:** | Argyle, Charles; Burgess, Terrence M. |
| **Subject:** | Fwd: RE: |

FYI - this was to inform me that she is pregnant.

Begin forwarded message:

> **From:** "Chan, Gigi" <GChan@wellington.com>
> **Date:** August 1, 2016 at 9:13:25 AM GMT+2
> **To:** "Mattiko, Gregory A." <GAMattiko@wellington.com>
> **Subject: RE:**
>
> Oh my!  Sure – 5-6pm HK time is fine!  I forgot you were on holiday already – I promise the call will be v quick!
>
> ---
>
> **From:** Mattiko, Gregory A.
> **Sent:** Monday, August 01, 2016 3:12 PM
> **To:** Chan, Gigi
> **Subject:** Re:
>
> Sure.  Driving a carload of people across Germany the next couple of hours.   Does 5 or 6 your time work?
>
> On Aug 1, 2016, at 8:50 AM, Chan, Gigi <GChan@wellington.com> wrote:
>
> > hey Greg, are you around for a quick chat today?

Confidential                                          DEF 00009205

# Exhibit 12

| **From:** | Duckworth, Cheryl M. [cmduckworth@wellington.com] |
|-----------|----------------------------------------------------|
| **Sent:** | Friday, August 26, 2016 7:30:43 AM |
| **To:** | Baxter, Thomas W.; Philip, Henry; Argyle, Charles |
| **CC:** | Scordato, Christine A. |
| **Subject:** | Gigi meeting |

Just a bit of an update. Nothing surprising but I continue to think her time at Wellington is challenged due to her attitude

I had asked her to lunch but she had declined so we caught up for 30 min instead. I never acknowledged she was pregnant and she didn't offer so that topic wasn't discussed which was a shame bc I think I could helpful but I don't know her well and not my place to intrude on personal issues.

I kept the conversation to her new fund, her coverage, working as analyst and PM, etc. it was an unfortunate list of complaints, exasperation with services and nothing really that good. She wasn't unpleasant but clearly feels under appreciated, still

1) Her fund took forever to launch, was promised it when she arrived and now can't make all the decisions she wants bc she can't buy Pnotes. Says can't get any clarity on when. At Thread needle it was never an issue, etc. I just listened and this went on for a good 5 min. I said I'm not aware of how it works, didn't promise I could make it change but would raise it. She did compliment some GIAs and the HK investors which was nice to hear.
2) We don't do a good job of covering A share and it should be done in conjunction with the other Chinese companies. I agreed with her but stated it was a matter of impact and trying to balance adding coverage with how much we can purchase. Obviously not an answer she liked and she said it was useless to cover just the big cap and not the rest. I said we were working on it and mentioned the interns. I certainly appreciate her view but she has a way of making it a list of complaints and not a constructive conversation. 3) Lastly, I asked how the dual role is going and she reminded me that this is what she has done before and it was actually harder prior to having her fund

She didn't lay the complaints out like this and the conversation was much longer but I fear the big chip on her shoulder is still there. I'll continue to touch base with her

Tom, not sure how receptive she'll be to the coverage of her fund while on maternity leave conversation.


Cheryl Duckworth

DEF 00019361

# Exhibit 13

| From: | Mattiko, Gregory A. [GAMattiko@wellington.com] |
|---|---|
| Sent: | Thursday, September 01, 2016 2:38:40 AM |
| To: | Argyle, Charles |
| Subject: | A preview for you |

Hi Charles.

Hope you are well.Â  I was a good boy and came in early this morning to do my dozens of 360 reviews.Â  Obviously, I had to do one for Gigi.Â  Wanted to give you a preview of what I wrote:

*"Despite Gigi's leading understanding of all things related to the China market, she finds integrating into the Wellington culture difficult.Â  I used to be of the opinion this had to do with issues relating to the HK office, but now I am convinced that it has more to do with the lens through which Gigi views the firm and I believe the world in general.Â  Gigi, for some reason, believes that Wellington and the people who work here do not want her to succeed.Â  This attitude or pessimism prevents her from integrating into the Wellington culture.Â  I fear that unless she makes a 180 degree change and accepts the firm for what it is she will continue to be dissatisfied.Â  This is really unfortunate because Gigi herself is a very pleasant person and I enjoy working with her.Â  I also am convinced that she will add value for our clients.Â  But if her view of Wellington does not shift I don't know how long she will either be willing to say or will be tolerated by others."*

I'm telling you this because I am off to Russia and China this evening for a while and it is fresh on my mind.Â  I also wanted to give you a few updates of Gigi-related conversations I have had.

- ℜ•  Jun Oh requested to speak with Tom and I earlier this week. He was disturbed/annoyed at the way Gigi treats him in the last several months.Â  He wanted to know from me if I knew what was behind this.Â  I said all I know is the run-in she had with him over a year ago at the now famous philosophy & process meeting.Â  He thinks her attitude towards him (scowling, ignoring, etc.) is disruptive and unprofessional.Â  I agreed with him.
- ℜ•  I had a chat with Gigi to find out her plan during maternity leave and I asked her how things have been going lately.Â  Perhaps I am too optimistic or just plain naÃ¯ve, but I thought just maybe since she has her fund and some assets that she might flash a hint of optimism about the future.Â Â  I was completely wrong. Â She still bangs on about how slow Wellington moves, that she doesn't have access products yet, that GRG is ignoring her, that her efforts are only benefitting Bo, etc., etc.Â  As is often the case it was quite an emotional discussion for her.
- ℜ•  I then had a catch up with the new HR person, Karen.Â  Of course the subject of Gigi came up. Â We discussed strategy to help improve the situation.Â  She said she has been in contact with you.Â Â  I offered to help in whatever way I can.
- ℜ•  I had a catch up with Ray Helfer yesterday.Â  He too was asking about the Gigi situation.Â  We discussed it at some length.Â  He was kind enough to offer (as head of the office) to have a heart to heart with her about how she is being perceived and the danger of continuing to go down the path she is on.Â Â  He only suggested this because he was unsure if you were going to be in HK in the coming months and we both thought it would be only fair to her to get this message before she goes off on maternity leave (early December apparently).

I think no matter what happens we are in a holding pattern until she comes back from maternity leave which I estimate to be mid-March. Â You and I should also discuss what happens to her China growth strategy under various scenarios.Â  I have a few ideas in this regard.

Hate to dump this stuff in your lap (yet again) I just wanted to keep you up to date on where we are.Â  I think there is no urgency here, but we might as well start having some dialogue about how we want to progress.

Greg

Confidential                                                                                   DEF 00001774

# Exhibit 14

| | |
|---|---|
| **From:** | Baxter, Thomas W. [twbaxter@wellington.com] |
| **Sent:** | Wednesday, October 19, 2016 6:15:24 AM |
| **To:** | Argyle, Charles |
| **Subject:** | FW: Heads-up for another potential HK Connect advisory opportunity |

Hi Charles –

For what it's worth, I'm finding it more and more difficult to see how Gigi can make it here.  Are you also struck by tone of this short note below?  To me it's needlessly confrontational and presumes a certain level of second-rate-ness on our behalf.  Or maybe just my behalf . . . whatever . . . But do you think I'm more or less eager to offer up helpful suggestions in the future after being on the receiving end of this note?

I'm sorry I missed this one.  I truly don't recall any inklings of this sort of attitude in the interview process, and I'm a little dismayed that this is where we've come to.

Tom

**From:** Chan, Gigi
**Sent:** Wednesday, October 19, 2016 2:37 PM
**To:** Baxter, Thomas W.
**Cc:** Qian, Feng (Alex); Hogbin, Elizabeth A
**Subject:** RE: Heads-up for another potential HK Connect advisory opportunity

Tom, I am afraid my friend is not a consultant.  He is the managing partner of a USD1bn fund and does not have time to share (again) their arrangement with someone he does not know.  I have already shared the arrangement they use (Bloomberg reconciliation module as well as post-trade processing solution "Omgeo") with Alex and Liz.  We need to do our own homework, not just ask someone else.  Besides, every fund set up is different.  I hope you understand.

**From:** Baxter, Thomas W.
**Sent:** Wednesday, October 19, 2016 2:02 PM
**To:** Hogbin, Elizabeth A; Qian, Feng (Alex); Chan, Gigi
**Cc:** Yim, Sally; Fan, Cayla Liang; Yeong, Brian; Hardy, Rebecca
**Subject:** RE: Heads-up for another potential HK Connect advisory opportunity

Agreed, the more control we have over trading, the better the outcome for the end investor clients.  If possible, as we progress on these discussions with  [ Redacte ]  I'd suggest we try to connect Gigi's industry contact with Cedric Pouillart and see if the arrangement they use would be logistically feasible for us.

**From:** Hogbin, Elizabeth A
**Sent:** Tuesday, October 18, 2016 3:24 PM
**To:** Qian, Feng (Alex); Chan, Gigi
**Cc:** Baxter, Thomas W.; Yim, Sally; Fan, Cayla Liang; Yeong, Brian; Hardy, Rebecca
**Subject:** RE: Heads-up for another potential HK Connect advisory opportunity

Alex

Thanks for your email.  I would be happy for others to weigh in (Tom?) but I do think if we could arrange something similar to what is outlined in red below, that would be an improvement as it would give us control over trade execution and also the audit trail for performance.

Adding Rebecca Hardy as well.

Kind regards, Liz

---

**From:** Qian, Feng (Alex)
**Sent:** Tuesday, October 18, 2016 8:14 AM
**To:** Hogbin, Elizabeth A; Chan, Gigi
**Cc:** Baxter, Thomas W.; Yim, Sally; Fan, Cayla Liang; Yeong, Brian
**Subject:** RE: Heads-up for another potential HK Connect advisory opportunity

Hi Liz,

Gigi and I discussed briefly earlier today on this opportunity. I wanted to follow up with you on the trading arrangement as highlighted in red below. It seems that, while the client assets never leave China onshore, the offshore advisor does have a direct access to the portfolio and is able "execute" the trades from offshore. Is that something we want to explore further? Would that be compatible with how we are set up broadly as a firm?

I'd appreciate your further thoughts. Thanks,

Alex

---

**From:** Hogbin, Elizabeth A
**Sent:** Monday, October 17, 2016 4:31 PM
**To:** Qian, Feng (Alex); Chan, Gigi
**Cc:** Baxter, Thomas W.; Yim, Sally; Fan, Cayla Liang; Yeong, Brian
**Subject:** RE: Heads-up for another potential HK Connect advisory opportunity

Alex

Good to hear that [ **Redacte** ] is visiting the office.

Gigi, Brian and I are working toward a model portfolio and guidelines by end of day Wednesday.  Gigi is assuming that the Shenzhen Stock Connect will be up and running at portfolio inception – please shout if you disagree.

More broadly, would you set up a meeting perhaps end of this week/early next to bring the group up to speed on your conversations with [ **Redacte** ] especially regarding stop loss (could we have higher than 15%?) and performance fee (Gigi has an industry contact that advises mainland clients on stock picks but retains the ability for its trading desk to execute the trades and also audit the performance trail).

I have had our performance fee team in Boston review the proposed performance fee language – I will forward their comments and questions separately to you.

Kind regards, Liz

---

**From:** Qian, Feng (Alex)
**Sent:** Saturday, October 15, 2016 9:59 AM
**To:** Hogbin, Elizabeth A; Chan, Gigi
**Cc:** Baxter, Thomas W.; Yim, Sally; Fan, Cayla Liang
**Subject:** RE: Heads-up for another potential HK Connect advisory opportunity

Gigi,

[ **Redacted** ]. I'll reach out to you and others later for preparations. Thanks,

Alex

**From:** Hogbin, Elizabeth A
**Sent:** Friday, October 14, 2016 6:38 PM
**To:** Qian, Feng (Alex); Chan, Gigi
**Cc:** Baxter, Thomas W.; Yim, Sally; Fan, Cayla Liang
**Subject:** RE: Heads-up for another potential HK Connect advisory opportunity

Thanks for the update – good progress!

---

**From:** Qian, Feng (Alex)
**Sent:** Friday, October 14, 2016 5:36 AM
**To:** Chan, Gigi; Hogbin, Elizabeth A
**Cc:** Baxter, Thomas W.; Yim, Sally; Fan, Cayla Liang
**Subject:** Heads-up for another potential HK Connect advisory opportunity

Hi Gigi/Liz,

I spoke with China Pacific this morning to revive the earlier discussion about a potential mandate in relation to the latest development of the Stock Connect Program (see attached notes for earlier discussion). They have showed interest to continue to explore this opportunity with us, which I expect to be structured in a similar way as the   **Redacted**
**Redacted**

As a follow-up, I'll send over our China Growth strategy generic book for their initial review, to be followed with a phone conversation next week. I'll report progress from here.

Thanks and let me know if any questions.

Best regards,

Alex
wmcinternal

# Exhibit 15



# Chan, Gigi Kai Zi

Equity Research Analyst

Manager: Charles Argyle

Evaluated By:  Gigi Kai Zi Chan (Terminated)

# 2016 Annual Review: GEPM Self Review

Organization: Global Equity Portfolio Management ()
(inactive)

Location: Hong Kong

09/19/2016 - 09/19/2016

## Performance Summary

### Employee Overall Evaluation

Rating:         5 - An exceptional year

## Performance Summary

**Briefly describe your role, highlighting any changes from last year.**

#### Employee Evaluation

Response:    The main change has been adding the role of portfolio manager of the Wellington China Growth Fund which was launched end Jul-2016.

## Impact & Skill

**Describe the IMPACT achieved this year. Consider specific accomplishments against goals, deliverables, feedback received and overall impact to clients, the firm and your team. Please provide a balanced view including what went well and what didn't go well this year.**

#### Employee Evaluation

Response:    It took me two years of hard work to launch the Wellington China Growth Fund, despite joining the firm with a seven year top decile track record.  I had to overcome internal resistance and procedural complexity in the process of approval, seeding and launch of the fund.  I worked on customized product launches for Chinese clients helping with business development in China.  I continued to offer clear investment views to the EMO team as well as firm-wide.  I supported the EMO team as well as the rest of the firm in client marketing efforts leading to positive feedback from clients.

**If you lead a team, what did you do to attract, develop, and motivate members of your team this year? Please provide a balanced view including what went well and what didn't go well.**

#### Employee Evaluation

Response:    N/A

## Culture & Behavior

**Describe your impact on the CULTURE this year. Consider collaboration, contribution to the firm's culture, mentoring, committee involvement, diversity & inclusion, globalization and giving/receiving feedback. Please provide a balanced view including what went well and what didn't go well this year.**

Employee Evaluation

**Response:** I always share and discuss my views on stocks and markets and clearly communicate them even when others strongly disagree.  I have shared my experience with the macro team on their EM Themes portfolio.  Within the HK office I have always been on hand for junior members who often come to me for guidance.  I have worked to incorporate feedback wherever possible, in particular on marketing 'the Wellington way', even when pieces of feedback from various people have (often) been contradictory.

## Personal Development

### Comment on progress made this year on your own personal development goals.

Employee Evaluation

**Response:** This past year has been very frustrating for the amount of effort required in such a large firm (such as Wellington) to push through the launch of a new fund which was agreed prior to me joining.  There has been resistance and delays every step of the way.  Not a single client meeting was set up in Boston and London despite all the hard work that went into preparing marketing materials.  Allegedly some were set up and then cancelled and I was only notified one week before my scheduled departure.  Work done by other teams to support the fund launch was often inaccurate or untimely and required checking and pushing on my part which wasted a lot of time and effort on my part.  As a result my personal goals of being able to effectively generate alpha and raise assets for the firm have not progressed much despite all the effort I have made and the quality of the output – ie model portfolio significantly outperforming index and peers.

### What 2-3 specific behaviors/skills would help to improve your performance in the future? Include specific ideas to incorporate into your development plan.

Employee Evaluation

**Response:** 1.   Be more discerning in the feedback that I should take on board
2.   Network more to learn how to overcome organizational inertia

### What additional support do you need from your manager, or others, to help you succeed?

Employee Evaluation

**Response:** 1. Support from top management down to the sales force to meet Wellington clients and raise AUM for the Wellington China Growth Fund.
2. Firm commitment from top management and key investors that Wellington cares about China and Chinese clients.

DEF 00029141

# Exhibit 16

# GEPM 2016 Period-Over-Period Peer Review Reports

Chan, Gigi Kai Zi
Equity Research Analyst

Period-Over-Period Summary ( Adj Normalized Scores )

Top — 10  20  40  20  10 — Bottom



| | 2014 | 2015 | 2016 |
|---|---|---|---|
| Collaboration | 7.67 | 7.23 | 6.38 |
| Depth of Knowledge | 8.50 | 7.80 | 7.45 |
| Idea Generation | 8.50 | 7.88 | 6.38 |
| Money Making | | 8.17 | 6.00 |

**Score Trend (All I/P scores)** — Collaboration, Depth of Knowledge, Idea Generation, Money Making — Average vs Period (2014, 2015, 2016)

**Score Distribution (All I/P scores)** — # Votes vs score (1–10) — Collaboration, Depth of Knowledge, Idea Generation, Money Making

### GIR Votes on Skill

| | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| Avg Score for GEPM | 0.00 | -0.05 | 0.11 | 0.23 |
| Avg Score for Peers | 0.22 | | | |
| Total GEPM Count | 92 | 101 | 95 | 100 |
| Total Peer Count | | | | |
| #Votes | | | | |

| | 2014 Skill Depth | 2014 Skill Ideas | 2014 Skill Money | 2015 Skill Depth | 2015 Skill Ideas | 2015 Skill Money | 2016 Skill Depth | 2016 Skill Ideas | 2016 Skill Money |
|---|---|---|---|---|---|---|---|---|---|
| Avg Score for GEPM | 0.21 | 0.18 | 0.33 | 0.10 | 0.10 | 0.07 | 0.12 | 0.05 | 0.11 |
| Avg Score for Peers | 0.22 | -0.07 | -0.01 | 0.03 | -0.01 | -0.20 | 0.08 | -0.09 | -0.17 |
| Total GEPM Count | 83 | 70 | 55 | 89 | 80 | 69 | 96 | 88 | 79 |
| Total Peer Count | 41 | 35 | 24 | 50 | 45 | 39 | 50 | 46 | 42 |
| #Votes | 2 | 2 | | 2 | 1 | 1 | 1 | 1 | 1 |

### All Investor Votes on Skill

| | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| Avg Score for GEPM | 0.05 | 0.04 | 0.12 | 0.20 |
| Avg Score for Peers | 0.35 | | | |
| Rank (GEPM) | 109 | 116 | 120 | 118 |
| Total GEPM Count | 112 | 112 | 112 | 112 |
| Rank (Peers) | 55 | | | |
| Total Peer Count | 55 | | | |
| #Votes | 2 | | | |

| | 2014 Skill Depth | 2014 Skill Ideas | 2014 Skill Money | 2015 Skill Depth | 2015 Skill Ideas | 2015 Skill Money | 2016 Skill Depth | 2016 Skill Ideas | 2016 Skill Money |
|---|---|---|---|---|---|---|---|---|---|
| Individual Score | 0.37 | 0.16 | 0.19 | 0.15 | 0.37 | 0.45 | -0.20 | 0.88 | 0.74 |
| Avg Score for GEPM | 0.35 | -0.03 | -0.04 | 0.30 | 0.08 | 0.10 | 0.35 | 0.15 | 0.20 |
| Avg Score for Peers | | 0.25 | | 0.24 | -0.04 | -0.12 | 0.36 | 0.01 | -0.05 |
| Rank (GEPM) | 112 | 112 | 112 | 72 | 24 | 25 | 95 | 111 | 109 |
| Total GEPM Count | | | | 112 | 112 | 112 | 114 | 114 | 114 |
| Rank (Peers) | 55 | 55 | 55 | 36 | 8 | 3 | 51 | 59 | 57 |
| Total Peer Count | 59 | 59 | 59 | 59 | 59 | 59 | 61 | 61 | 61 |
| #Votes | 2 | 2 | | 10 | 8 | 6 | 11 | 8 | 8 |

### All Investor Votes on Collaboration

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Individual Score | 0.11 | 0.15 | 0.21 | 0.19 | 0.11 | 0.01 | 0.88 |
| Avg Score for GEPM | 0.33 | | | | 0.36 | 0.31 | 0.31 |
| Avg Score for Peers | | | | | 0.33 | 0.25 | 0.31 |
| Rank (GEPM) | 86 | | | | 86 | 87 | 110 |
| Total GEPM Count | 114 | 118 | 120 | 118 | 114 | 112 | 114 |
| Rank (Peers) | 42 | | | | 42 | 45 | 59 |
| Total Peer Count | 57 | 59 | | | 57 | 59 | 61 |
| #Votes | 3 | | | | 3 | 13 | 13 |

### Top 5 Votes

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Individual | | | | | 3 | 5 | 2 |
| GEPM Average | 2.57 | 2.38 | 3.70 | 3.97 | 3.98 | 4.17 | 4.31 |
| Peer Average | | | | | 4.63 | 4.56 | 4.62 |

DEF 00029032

Chan, Gigi Kai Zi
Equity Research Analyst

Page 2

# GEPM 2016 Period-Over-Period Peer Review Reports

## Period-Over-Period Summary ( Raw Scores )

Top ▮ 10  20  40  20  10 ▮ Bottom

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Collaboration | 7.67 | 7.23 | 6.38 |
| Depth of Knowledge | 8.50 | 7.80 | 7.45 |
| Idea Generation | 8.50 | 7.88 | 6.38 |
| Money Making |  | 8.17 | 6.00 |



Score Trend (All I/P scores) — Idea Generation, Money Making, Collaboration, Depth of Knowledge; Period 2014–2016; Average axis 5–10.

Score Distribution (All I/P scores) — Idea Generation, Money Making, Collaboration, Depth of Knowledge; # Votes axis 0–5; score axis 1–10.

### GIR Votes on Skill

|  | 2010 | 2011 | 2012 | 2013 | 2014 Skill Depth | 2014 Skill Ideas | 2014 Skill Money | 2015 Skill Depth | 2015 Skill Ideas | 2015 Skill Money | 2016 Skill Depth | 2016 Skill Ideas | 2016 Skill Money |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Individual Score | 7.23 | 7.18 | 7.44 | 7.83 |  |  |  | 7.50 |  |  | 7.00 |  | 7.00 |
| Avg Score for GEPM |  |  |  |  | 7.96 | 7.73 | 7.77 | 7.66 | 7.22 | 7.35 | 7.64 | 7.22 | 7.26 |
| Avg Score for Peers |  |  |  |  | 8.00 | 7.49 | 7.33 | 7.59 | 7.05 | 7.04 | 7.61 | 7.04 | 6.85 |
| Rank (GEPM) | 107 | 114 | 118 | 114 | 110 | 109 | 100 | 58 | 108 | 105 | 111 | 110 | 109 |
| Total GEPM Count |  |  |  |  |  |  |  | 109 |  |  |  |  |  |
| Rank (Peers) |  |  |  |  | 54 | 53 | 49 | 30 | 1 | 55 | 16 | 30 | 26 |
| Total Peer Count |  |  |  |  |  |  |  | 58 | 59 |  | 61 | 60 | 60 |
| #Votes |  |  |  |  |  |  |  | 2 | 1 | 1 | 1 | 1 | 1 |

### All Investor Votes on Skill

|  | 2010 | 2011 | 2012 | 2013 | 2014 Skill Depth | 2014 Skill Ideas | 2014 Skill Money | 2015 Skill Depth | 2015 Skill Ideas | 2015 Skill Money | 2016 Skill Depth | 2016 Skill Ideas | 2016 Skill Money |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Individual Score | 7.46 | 7.40 | 7.56 | 7.87 | 8.50 | 8.50 |  | 7.80 | 7.88 | 8.17 | 7.45 | 6.38 | 6.00 |
| Avg Score for GEPM |  |  |  |  | 8.16 | 7.81 | 7.84 | 7.99 | 7.42 | 7.47 | 8.04 | 7.48 | 7.56 |
| Avg Score for Peers |  |  |  |  | 8.09 | 7.57 | 7.50 | 7.94 | 7.25 | 7.14 | 8.08 | 7.33 | 7.22 |
| Rank (GEPM) | 109 | 119 | 120 | 118 | 35 | 17 | 113 | 72 | 30 | 23 | 94 | 107 | 110 |
| Total GEPM Count |  |  |  |  | 114 | 114 | 114 | 112 | 112 | 112 | 114 | 114 | 114 |
| Rank (Peers) |  |  |  |  | 19 | 4 | 56 | 35 | 1 | 4 | 11 | 57 | 57 |
| Total Peer Count | 57 |  |  |  | 57 | 57 | 57 | 59 | 59 | 59 | 61 | 61 | 61 |
| #Votes |  |  |  |  | 2 | 2 |  | 10 | 8 | 6 | 11 | 8 | 8 |

### All Investor Votes on Collaboration

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Individual Score | 7.47 | 7.61 | 7.66 | 7.77 | 7.67 | 7.23 | 6.68 |
| Avg Score for GEPM |  |  |  |  | 8.11 | 7.85 | 7.95 |
| Avg Score for Peers |  |  |  |  | 8.09 | 7.85 | 7.97 |
| Rank (GEPM) | 109 | 119 | 120 | 118 | 99 | 98 | 111 |
| Total GEPM Count |  |  |  |  | 114 | 112 | 114 |
| Rank (Peers) |  |  |  |  | 49 | 51 | 60 |
| Total Peer Count | 57 |  |  |  | 57 | 59 | 61 |
| #Votes |  |  |  |  | 3 | 13 | 13 |

### Top 5 Votes

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Individual |  |  |  |  |  | 5 | 2 |
| GEPM Average | 2.57 | 2.38 | 3.70 | 3.97 | 3.98 | 4.17 | 4.31 |
| Peer Average | 4.63 |  |  |  | 4.63 | 4.56 | 4.62 |

CONFIDENTIAL

DEF 00029033

Chan, Gigi Kai Zi
Equity Research Analyst

## GEPM 2016 Period-Over-Period Peer Review Reports

**Year-Over-Year List of Beneficiaries (Voters)** - who selected individual in their Top 5 Contributors list

| 2011 Beneficiaries | 2012 Beneficiaries | 2013 Beneficiaries | 2014 Beneficiaries | 2015 Beneficiaries | 2016 Beneficiaries |
|---|---|---|---|---|---|
| | | | | Jhun, Jong U | Chen, Ben |
| | | | | Kwak, Yunhee | Rice, Jamie F |
| | | | | Pan, Yaroslav A | |
| | | | | Rice, Jamie F | |
| | | | | Trojan, Vera M | |

**Members who think you make them better**

**Team Member Name**

**Members who think you can add significant value going forward**

**Team Member Name**

CONFIDENTIAL

DEF 00029034

Chan, Gigi Kai Zi
Equity Research Analyst

## GEPM 2016 Period-Over-Period Peer Review Reports

### Voter History

| 2011 Voters | 2012 Voters | 2013 Voters | 2014 Voters | 2015 Voters | 2016 Voters |
|---|---|---|---|---|---|
| | | | Fan, Philip | Cavey, Paul | Boselli, John A |
| | | | Mattiko, Gregory A. | Chong, Lee Keen | Cavey, Paul |
| | | | Millan, Santiago | Fan, Philip F | Chen, Ben |
| | | | | Kwak, Yunhee | Fan, Philip F |
| | | | | Mattiko, Gregory A | Hogbin, Elizabeth A |
| | | | | Millan, Santiago | Jhun, Jong U |
| | | | | Mordy, James N | Mattiko, Gregory A |
| | | | | Palmisano, David J | Meunier, Bo Z |
| | | | | Pan, Yaroslav A | Millan, Santiago |
| | | | | Pannell, Saul J | Palmisano, David J |
| | | | | Parker, Jawan S | Pannell, Saul J |
| | | | | Patodia, Yashvardhan Narayan | Rice, Jamie F |
| | | | | Stilwell, Tara C | Stilwell, Tara C |
| | | | | Thors, Elizabeth C | Wong, Tommy Chi Wai |

Page 5

Chan, Gigi Kai Zi
Equity Research Analyst

## GEPM 2016 Period-Over-Period Peer Review Reports

Voter History by Peer Groups

Chan, Gigi Kai Zi
Equity Research Analyst

## GEPM 2016 Period-Over-Period Peer Review Reports

| | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | | | | 2015 | | | | 2016 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Collab | Skill | Collab | Skill | Collab | Skill | Collab | Skill | Collab | Skill-D | Skill-I | Skill-MM | Collab | Skill-D | Skill-I | Skill-MM | Collab | Skill-D | Skill-I | Skill-MM |
| Pan | | | | | | | | | | | | | 8 | 8 | 7 | 8 | | | | |

DEF 00029037

Chan, Gigi Kai Zi
Equity Research Analyst

## GEPM 2016 Period-Over-Period Peer Review Reports

### Voter History by Location

Top / Bottom
10 — 20 — 40 — 20 — 10

| | 2014 Collab | 2014 Skill-D | 2014 Skill-I | 2015 Collab | 2015 Skill-D | 2015 Skill-I | 2015 Skill-MM | 2016 Collab | 2016 Skill-D | 2016 Skill-I | 2016 Skill-MM |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Boston** | | | | | | | | | | | |
| Boselli | | | | | | | | 1 | 3 | 1 | 1 |
| Palmisano | | | | 7 | 7 | 7 | | 3 | | | |
| Pan | | | | 8 | 8 | 7 | 8 | 10 | 6 | | 3 |
| Pannell | | | | 9 | | | 9 | | | 9 | 9 |
| Rice | | | | | | | | 8 | 9 | 9 | 9 |
| Thors | | | | 5 | | | | | | | |
| **Hong Kong** | | | | | | | | | | | |
| Cavey | | | | 8 | 8 | | | | | | |
| Chen | | | | | | | | 9 | 8 | 6 | |
| Jhun | | | | | | | | 5 | 8 | 10 | 9 |
| Meunier | | | | | | | | 6 | 7 | | |
| Millan | 9 | 8 | 9 | 8 | 8 | 7 | | 8 | 6 | 6 | 6 |
| Wong | | | | | | | | 8 | 8 | 7 | 7 |
| **London** | | | | | | | | | | | |
| Fan | 7 | | | 8 | 7 | 7 | | 5 | 3 | 5 | 7 |
| Hogbin | | | | | | | | 3 | 10 | 9 | 7 |
| Mattiko | 7 | 9 | 8 | 6 | 9 | 8 | 8 | 6 | 10 | 7 | 6 |
| Stilwell | | | | 8 | | | | | 5 | | |
| **Radnor** | | | | | | | | | | | |
| Mordy | | | | 4 | | | | | | | |
| **Singapore** | | | | | | | | | | | |
| Chong | | | | 5 | 7 | 7 | 7 | 7 | | | |
| Kwak | | | | 8 | 9 | 10 | | | | | 10 |

2010  2011  2012  2013  2014  2015  2016

**Chan, Gigi Kai Zi**
Equity Research Analyst

## GEPM 2016 Period-Over-Period Peer Review Reports

|  | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | | | | 2015 | | | | 2016 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Collab | Skill | Collab | Skill | Collab | Skill | Collab | Skill | Collab | Skill-D | Skill-I | Skill-MM | Collab | Skill-D | Skill-I | Skill-MM | Collab | Skill-D | Skill-I | Skill-MM |
| Parker |  |  |  |  |  |  |  |  |  |  |  |  | 8 | 8 | 10 |  |  |  |  |  |
| Patodia |  |  |  |  |  |  |  |  |  |  |  |  | 7 | 7 |  |  |  |  |  |  |

CONFIDENTIAL

DEF 00029039

Chan, Gigi Kai Zi
Equity Research Analyst

Page 9'

# GEPM 2016 Period-Over-Period Peer Review Reports

## Voters' Scores and Comments (2015)

### Boselli, John A

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 2 - Not very | 3 | -3.31 | 1 | -3.80 | 1 | -3.25 | 1 | -3.82 |

How have they added value? No value add as she does not communicate.

How can they be more effective?

What could they do differently?

### Cavey, Paul

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 4 - Very | 9 | 1.00 | 6 | -1.86 | | | 9 | 1.00 |

How have they added value? It is very helpful that I am exposed to micro trends in China as well as macro, and Gigi is a great source of information, both because she has a lot of knowledge, and because she is willing to share her thoughts. More generally, I really like being part of the investor group in Hong Kong, and Gigi's character is one factor that helps that group work so well together.

How can they be more effective?

What could they do differently?

### Chen, Ben

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 4 - Very | 8 | 0.00 | 6 | | | | 9 | 1.00 |

How have they added value? great experience/sounding board

How can they be more effective? more pushback

What could they do differently?

CONFIDENTIAL

DEF 00029040

Chan, Gigi Kai Zi
Equity Research Analyst

**GEPM 2016 Period-Over-Period Peer Review Reports**

## Fan, Philip F

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 4 - Very | 8 | 0.00 | 5 | -1.29 | 7 | -1.00 | 5 | -1.69 |

How have they added value?   Gigi and I interact once a month on average in one form or other. Her deep knowledge in Chinese stocks is appreciated. I often find her analytical perspective unique and I learn a great deal from our stock discussion. Working out of different offices, most of our communication/collaboration is through emails and phone calls. Her emails are useful with strong stock analysis and opinions. She is engaging during phone conversations and her thoughts on stocks are often additive to the discussions. Specific stocks Gigi has significant contribution YTD: Cosmo Lady, VIPShop, Fu Shou Yuan.

How can they be more effective?   - can take more initiatives to share thoughts/meeting notes on stocks she knows EMO holds, She has great ideas and insights, the team and the firm can all benefit from them. - speak up more often at EMM/MM - can be more proactive in making contact

What could they do differently?

## Hogbin, Elizabeth A

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 4 - Very | 10 | 2.00 | 9 | 1.00 | 7 | -0.47 | 3 | -0.71 |

How have they added value?   Xinyi Solar - top 15 alpha contributor to EMO portfolio last 12 months

How can they be more effective?   Assume people are trying to help you; make it easier to schedule meetings with you/know when you are available

What could they do differently?

## Jhun, Jong U

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 2 - Not very | 8 | 0.00 | 10 | 1.72 | 9 | 1.00 | 5 | -0.24 |

How have they added value?   learn a lot from gigi on Chinese names

How can they be more effective?

What could they do differently?

Chan, Gigi Kai Zi
Equity Research Analyst

# GEPM 2016 Period-Over-Period Peer Review Reports

**Mattiko, Gregory A**

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 5 - Critical | 10 | 1.89 | 7 | -0.13 | 6 | -0.91 | 6 | -1.51 |

How have they added value?

A few of Gigi's stock ideas have performed poorly in the previous year, namely VIPshop and Cosmo Lady. Others have performed better e.g. Xinyi Solar. Gigi one of the best understanding of Chinese companies of all the people at Wellington and I would say her knowledge is on par or better than Bos. Therefore, Gigi's biggest contribution has been when she shares her insight and knowledge about the team.

How can they be more effective?

Despite Gigi's leading understanding of all things related to the China market, she finds integrating into the Wellington culture difficult. I used to be of the opinion this had to do with issues relating to the HK office, but now I am convinced that it has more to do with the lens through which Gigi views the firm and I believe the world in general. Gigi, for some reason, believes that Wellington and the people who work here do not want her to succeed. This attitude or pessimism prevents her from integrating into the Wellington culture. I fear that unless she makes a 180 degree change and accepts the firm for what it is she will continue to dissatisfied. This is really unfortunate because Gigi herself is a very pleasant person and I enjoy working with her. I also am convinced that she will add value for our clients. But if her view of Wellington does not shift how long she will either be willing to say or will be tolerated by others.

What could they do differently?

**Meunier, Bo Z**

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| - | 7 | -1.00 | 6 | -1.79 | 6 | -1.79 | 6 | -1.85 |

How have they added value?

How can they be more effective?

What could they do differently?

**Millan, Santiago**

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 5 - Critical | 6 | -1.61 | 6 | -1.79 | 6 | -1.79 | 8 | 0.00 |

How have they added value?

How can they be more effective?

What could they do differently?

DEF 00029042

Chan, Gigi Kai Zi
Equity Research Analyst

## GEPM 2016 Period-Over-Period Peer Review Reports

### Palmisano, David J

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 3 - Somewhat | | | | | | | 3 | -2.03 |

How have they added value? I haven't heard much from Gigi this year

How can they be more effective?

What could they do differently?

### Pannell, Saul J

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 3 - Somewhat | 6 | -0.93 | 9 | 0.70 | 3 | -1.13 | 10 | 0.92 |

How have they added value?

How can they be more effective?

What could they do differently?

### Rice, Jamie F

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| Relevancy | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| 5 - Critical | 9 | 0.76 | 9 | 0.70 | 9 | 0.82 | 8 | 0.58 |

How have they added value?

How can they be more effective?

What could they do differently?

Chan, Gigi Kai Zi
Equity Research Analyst

# GEPM 2016 Period-Over-Period Peer Review Reports

**Stilwell, Tara C**

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| Relevancy | | | | | | | 5 | -1.54 |
| 3 - Somewhat | | | | | | | | |

How have they added value?  Gigi has an interesting perspective to offer on Chinese companies, and I always appreciate hearing her point of view.

How can they be more effective?  It would be great if Gigi were more willing to engage in the Wellington culture. She seems unwilling to collaborate in the EMM, which would be a great way for her to build cross border relationships as well as to create for herself a support network. Being unwilling to collaborate, Gigi creates the impression that she does not appreciate being part of the Wellington platform.

What could they do differently?

**Wong, Tommy Chi Wai**

| | Skill - Depth | | Skill - Ideas | | Skill - Money Making | | Collaboration | |
|---|---|---|---|---|---|---|---|---|
| | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score | Raw Score | Adj Norm Score |
| Relevancy | 8 | 0.00 | 7 | -0.93 | 7 | -0.42 | 8 | 0.00 |
| 4 - Very | | | | | | | | |

How have they added value?  Differentiated thoughts about stocks in HK/China.

How can they be more effective?  More frequent discussions on specific stocks.

What could they do differently?

DEF 00029044

# Exhibit 17

| | |
|---|---|
| **From:** | Argyle, Charles [cargyle@wellington.com] |
| **Sent:** | Tuesday, November 22, 2016 3:55:50 PM |
| **To:** | Chan, Gigi |
| **Subject:** | Follow up from November 2 conversation in Hong Kong |

Gigi:

I wanted to follow up on our in-person conversation on November 2nd when I was in Hong Kong, during which I shared feedback on a number of key performance areas, in particular highlighting the need for meaningful improvement.  While we recognize your deep knowledge of Chinese stocks and differentiated analytical perspective, we have concerns with where your broad performance currently stands and the lack of meaningful progress in some areas since our conversations last December in Boston.

- It is broadly perceived that <u>you have not embraced in the firm's ethos of Client, Firm, Self</u>, and that instead you put yourself first in most situations. Personally, this was this most evident then when talking to me a year ago when you even began a sentence with the phrase "I demand..."  But the impression is that it permeates your expectations with respect to everything such as marketing, back office and management in general.  I respect that assimilating to a new firm's cultural values can take time, but by now there are no excuses for not understanding the best way to conduct oneself**.** There needs to be a shift in attitude from "What can Wellington do for Gigi" to instead "what can Gigi do for Wellington and our clients".

- Greg is <u>disappointed with your contribution to the EMO team.</u>  Despite spending a substantial amount of time seeing companies, we see a lack of proactivity on your part to reach out with new ideas or provide much written commentary about your views on companies (including ones that are already owned).  For example, Greg highlights one period earlier in the year where there were several weeks of silence before he eventually had to reach out to you.  It appears unambiguous that your number one priority is your own portfolio and if Greg wants your help then he needs to ask for it.  Again, this runs against the firms values of "client, firm, self" and is not how a team should operate.  We have many examples of team members launching  new investment approaches and managing to remain integral contributors on other approaches.  Going forward, it is imperative that you act fully in support of the EMO team.  If this is not compatible with your PM responsibilities on China Growth then the latter will need to be closed.  We expect that you can take immediate action on this feedback to improve your engagement and impact on the EMO team.

- <u>Your broad contribution to the firm's investment dialogue has also been lacking,</u> and your contributions to #ILP, #Investors and in the Morning Meetings are sparse. I shared with you the data from the peer review feedback that we collect each year: quantitative feedback is provided for collaboration, idea generation, depth and money making, and your ranks out of 114 were 110, 95, 111, and 109.  Combined you ranked 112 out of 114.  I share with you some representative  qualitative feedback quotes verbatim,: "No value added as she does not communicate"; "Gigi should assume people are trying to help her"; "needs to be more proactive in making contact";  "believes that Wellington and the people who work here do not want her to succeed"; "pessimism prevents her from integrating into the Wellington culture"; "unwilling to collaborate"; "Gigi creates the impression that she does not appreciate being part of the Wellington platform".  You frequently remind us of your extensive investment experience, and we expect it be a lot more evident in our broad dialogue and debate.

- <u>Your colleagues find you challenging to work with.</u> This was not a pre-conceived  perception before you joined the firm and there is an expectation for you to take ownership for this. There is a tendency for you to get frustrated when things do not go the way you expect them to go. There is resistance to feedback and difficulty putting setbacks behind you. You have the power to turn this perception around by assuming some humility and being willing to collaborate, which is critical if you are going to be successful here.  You are aware by now of the emphasis Wellington places on collaboration, and this applies to the business side too.

In our conversation it was very disappointing to hear that you didn't acknowledge that any of the above areas were your responsibility. In fact, your rationale for much of the commentary above was that it was very difficult to focus on your day-to-day responsibilities on the EMO team, let alone broader collaboration, as you had to personally take of numerous issues with respect to the launch of the China Growth portfolio. I have seen many portfolios launched at Wellington during my time here, and I find it difficult to see this argument.

You also referenced the that the exasperation that underlies some of the behavior above is a function of miscommunication with regards to career expectations. Your offer letter was very clear that you were joining the firm as an Equity Research Analyst and there seems to be no supporting evidence of a conversation with you committing definitively to a portfolio manager role in your first couple of years here. I am confident that even if the potential for such a role was discussed then it was in the context of you succeeding fully in the analyst role you were hired in to, which we have yet to see.

To set expectations going forward, we should be clear that in all likelihood there will be minimal asset growth in China Growth for the next 3 years, and it should be viewed as an incubation portfolio. This is no different than the expectations I would set for any portfolio manager at the inception of a new portfolio approach, and it should be highlighted that this will not in and of itself be a hindrance to career progression within Wellington. Wellington is clear in having long-term orientation, but this necessitates that employees need to be long-term as well.

The short to medium term imperative is to respond to the feedback shared in person on November 2nd and in writing above, and my hope and expectation is that you will embrace this, especially the requirement to have more impact on the EMO team and to adopt a more positive collaborative attitude in general. If there is no sustained improvement in this respect then we will need to have a more difficult conversation later next year.

As we also discussed, I would encourage you to use the next few months to embrace the new changes in your life as well as to embrace this feedback with a positive and forward-looking mindset and attitude. Greg and I have been your supporters over the past two years, but we have not seen the same level of commitment to either the firm or the EMO team on your part, as outlined above.

I look forward to receiving your reply and acknowledgement.


Regards,
Charles

# Exhibit 18

| **From:** | Argyle, Charles [cargyle@wellington.com] |
| **Sent:** | Wednesday, May 03, 2017 7:12:32 AM |
| **To:** | Mattiko, Gregory A. |
| **Subject:** | RE: Gigi |

Thanks for the update Greg. I agree with your sentiment that we need to see signs of a course correction sooner rather than later, especially as it has been a few weeks, and apologize for not being more on top of this.

Let's plan to speak when you are back from Latam. Are you in HK next week?

---

**From:** Mattiko, Gregory A.
**Sent:** Tuesday, May 02, 2017 6:40 AM
**To:** Argyle, Charles
**Subject:** Gigi

Charles,

Just a quick note. Finally got a chance to have a chat with Gigi. It was brief.

I asked her how she was doing now that she has been back a few weeks. She mentioned that she is still having trouble getting a reliable minder for her daughter while she is at work.

She seemed generally in decent spirits, and had no complaints. Her portfolio performance has been good recently.

She has not increased her contribution to the EMO team at all, and seems solely focused on her China Growth portfolio.

Alex Qian called the other day and mentioned that the client that was interested in her strategy before her maternity leave was still interested in her status. I told him that you or I would get back to him within a few weeks with more color. He is not in a hurry.

In summary, I don't think that much has changed. There has been no indication from her to me that she acknowledges the issues you and I spelled out to her last year nor is doing anything to rectify deficiencies. I think we both agree that given the past issues we need to see a willingness to improve firm/team contribution which we have not yet seen. I am off to Latin America on investment travel and back in a little over a week. Upon my return I am willing to ask her more directly if she intends on responding in some way to our review from last year.

Willing to speak with you in more detail if you wish whenever you like.

Greg

DEF 00021922

# Exhibit 19

| From: | Philip, Henry [HPhilip@wellington.com] |
|---|---|
| Sent: | Thursday, May 04, 2017 8:18:18 PM |
| To: | Argyle, Charles |
| CC: | Baxter, Thomas W.; Puritz, Adam T. |
| Subject: | RE: GRG |

Thanks Charles. I think it makes sense for me to join the call with you and Greg. We can then discuss the most appropriate next steps. As mentioned. I am in Hong Kong the week of 22 May and can quite happily sit down with her and get an idea of where her head is at. In the meantime I will speak to Alex and let him know our thoughts.

**From:** Argyle, Charles
**Sent:** Thursday, May 04, 2017 7:56 PM
**To:** Philip, Henry
**Cc:** Baxter, Thomas W.; Puritz, Adam T.
**Subject:** RE: GRG

I think some combination of Greg, me and you needs to sit down with her (in person or via VC) and ascertain where her head is at.  As mentioned I am hoping to discuss next steps with Greg next week – perhaps you should join the call too.

Realistically, I doubt there is a long term home for her on the EMO team, other than the vaguest of affiliations perhaps. Greg deserves clarity here (from her and us) so he can move on one way or the other.

Then the key questions with respect to Gigi become:
Are we willing to put that disappointment aside?  I could get there
If so, are we confident enough that there has been a genuine response to the other areas of feedback identified in the November meeting (and subsequent email) to back her if we proceed on a stand alone basis with China Growth (and related)?  I have no idea...this is key
Is the investment acumen there?  I think so, yes.

With respect to speaking to Alex's prospects, if they are truly just exploratory conversations at this stage, then why not. We know she can be effective in these settings, and I think the more we do to make her feel part of the firm, then the higher the odds of a successful outcome.  But if/when we are at a finals stage we unambiguously need more clarity on the second bullet above.  But interested in your views.

Charles

(Copying Adam too.)

**From:** Philip, Henry
**Sent:** Thursday, May 04, 2017 1:33 AM
**To:** Argyle, Charles
**Cc:** Baxter, Thomas W.
**Subject:** GRG

Charles,

This topic has come up a couple of times recently and is obviously quite sensitive. There have been a couple of occasions recently whereby Gigi's strategy has been of potential interest to prospects. Alex came to me the other day on this, and Tom again on a separate opportunity today. I don't think that they are necessarily definitive mandates at this time, but they could develop into specific opportunities in due course. How do we feel about having prospects engage with her at this stage?

Happy to discuss further offline.

Henry

Confidential

# Exhibit 20

| | |
|---|---|
| **From:** | Chan, Gigi [GChan@wellington.com] |
| **Sent:** | Wednesday, October 19, 2016 10:36:46 AM |
| **To:** | Qian, Feng (Alex) |
| **Subject:** | RE: Stop loss and back up PM |

Hi Alex,

I just read your email.  Thank you for your concerns but I am very well supported.  I may have not been through the process of giving birth, but I do know what managing money involves.  I have successfully managed money since 2004 in addition to doing a lot of other things.

Best,
Gigi

---

**From:** Qian, Feng (Alex)
**Sent:** Wednesday, October 19, 2016 12:01 AM
**To:** Chan, Gigi
**Subject:** Re: Stop loss and back up PM

Thanks, Gigi. Really appreciate your insights on these important issues. I will definitely keep them in mind in subsequent external and internal communications. The back-up PM question will ultimately be determined by GEPM. But I appreciate that you are fine to continue keeping an eye on the portfolio while on maternity leave. In my personal experience as a father of two boys, my wife was totally consumed by the baby in several months after birth. I will completely understand if your priority becomes "Baby, Client, Firm, Self".

On Oct 18, 2016, at 11:27 PM, Chan, Gigi <GChan@wellington.com> wrote:

> Alex,
>
> I had few thoughts on the portfolio wide stop-loss and the back-up PM.
>
> You mentioned that the portfolio wide stop-loss was expected by A-share clients.  While they may request it, it is meaningless.  They are already protected by the market single stock rule where a stock is suspended as soon as it moves more than -10% intraday.  So a portfolio which owns A-shares only would never be able to trigger a >-10% portfolio wide stop-loss (unless it breaches its investment parameters which may be the reason why such portfolio wide stop loss exists for domestic investors).
>
> Should we see a worse-case scenario than 2008, my view is that clients would probably be looking to redeem anyway whether a portfolio wide daily stop loss exists or not - not so much because of the daily volatility but more because such daily move would be within or at the end of a bear market where the fund may have lost more than 10% over days/weeks or months.  As such I reiterate that a portfolio wide stop-loss would not be advisable as it crystallise losses at a time which is usually a buying opportunity.  However, I am not overly concerned by its existence should the client insist on having it.
>
> Regarding a named back-up PM, Greg would be the best choice from many points of view (client, Wellington and the fund).  He is an experienced PM, based in HK.  He is the investor who know my views on stocks best as well as the way I manage portfolios.   Finally, he has already agreed to keep an eye on things while I am on maternity.  In any case, I intend to run the portfolio no less than if I were traveling on holidays.
>
> Best,
> Gigi

Confidential

# Exhibit 21

Baxter 3
10/16/20    S. Roy

| | |
|---|---|
| **From:** | Baxter, Thomas W. [twbaxter@wellington.com] |
| **Sent:** | Thursday, October 15, 2015 6:49:05 AM |
| **To:** | Argyle, Charles |
| **Subject:** | Quick update |

I'm on holiday next week.  For once it seems mid-term break is coming at a time that doesn't conflict with a YE deadline.  Hope that means I'll be able to relax and surf better than last year.  A few things to catch you up on from this week:

- I had a lengthy convo with Gigi, mostly listening.  She's sort of on a war footing these days, and I have very strong doubts whether we can turn her around.  She feels "attacked" and "belittled" and "disrespected" and believes that Jun, Bo and Steve feel threatened by her.  She gave as examples the Jun P&P commentary and a brief episode where she was huddling with April Wong on trip logistics and Steve Richter interrupted with an admin task for April to do for him.  Would having her run a portfolio mollify these feelings?  On some level yes.  But on a deeper level the picture I'm forming is of someone who does not have a growth mindset (despite the growth investment philosophy).  I tried to remind her that one of the reasons she chose to join us was the opportunity to work with other investors and make herself a better investor through that interaction.  That was met with only a vague acknowledgement.  The entire conversation can be summed up by our final exchange where I said something along the lines of "the P&P feedback was directed at you so naturally your reaction to it is the most germane.  But I was in the room too and I've worked with Jun for a long time.  I can't speak for him but I believe that his comments feel meant to be constructive and to make you better" to which she said, "That's exactly my point.  If that's him trying to be constructive, than it's clear that he disrespects me."  There's a lot more, but my enthusiasm to creatively look for China Growth seed funding is waning.  I'll let the waves wash over me next week in Sri Lanka and hope to come back with a fresh perspective on this one.



Tom

Confidential                                                                                    DEF 00028528

# Exhibit 22

| | |
|---|---|
| **From:** | Donovan, Tama [CTDonovan@wellington.com] |
| **Sent:** | Friday, June 23, 2017 7:36:59 AM |
| **To:** | Szeto-Law, Yee T. |
| **Subject:** | RE: Private & Confidential - Employee Relations |

Thank you Yee – and have a great weekend. Tama

**From:** Szeto-Law, Yee T.
**Sent:** Friday, June 23, 2017 2:01 AM
**To:** Argyle, Charles; Scordato, Christine A.; Philip, Henry; Tang, Karen
**Cc:** Donovan, Tama; Lim, Belinda
**Subject:** RE: Private & Confidential - Employee Relations
**Sensitivity:** Confidential

Hi All,

Thanks to those that have provided additional materials. Just a quick update for the group - we have submitted everything to external legal counsel and are awaiting their input.
Note though that this may not appear until first week of July.

Thanks, Yee

**From:** Argyle, Charles
**Sent:** Friday, June 23, 2017 12:47 AM
**To:** Scordato, Christine A.; Philip, Henry; Tang, Karen
**Cc:** Szeto-Law, Yee T.; Donovan, Tama; Lim, Belinda
**Subject:** RE: Private & Confidential - Employee Relations
**Sensitivity:** Confidential

I would not bet on that.  I still want to complete this process as soon as prudently possible.

**From:** Scordato, Christine A.
**Sent:** Thursday, June 22, 2017 9:08 AM
**To:** Argyle, Charles; Philip, Henry; Tang, Karen
**Cc:** Szeto-Law, Yee T.; Donovan, Tama; Lim, Belinda
**Subject:** RE: Private & Confidential - Employee Relations
**Sensitivity:** Confidential

If she is looking already, do we want to hold off a little bit on the conversation in the hope that she lands an offer?

Christine
WMCInternal

**From:** Argyle, Charles
**Sent:** Thursday, June 22, 2017 7:55 AM
**To:** Philip, Henry; Tang, Karen
**Cc:** Szeto-Law, Yee T.; Scordato, Christine A.; Donovan, Tama; Lim, Belinda
**Subject:** RE: Private & Confidential - Employee Relations
**Sensitivity:** Confidential

Two other facts here that may or may not be relevant.

DEF 00007568

(1) Gigi's performance on China Growth trails the benchmark by 6% over the past 11 months.  This is the one aspect of her role that is unambiguously measurable, and she has abandoned all else for.  A poor start.

(2) Anecdotally, I was speaking to someone earlier this week who has heard a couple of times from the sell side in HK that (i) Gigi is looking; and (ii) her commentary about Wellington is rather negative.

---

**From:** Philip, Henry
**Sent:** Tuesday, June 20, 2017 4:26 AM
**To:** Tang, Karen; Argyle, Charles
**Cc:** Szeto-Law, Yee T.; Scordato, Christine A.; Donovan, Tama; Lim, Belinda
**Subject:** RE: Private & Confidential - Employee Relations
**Sensitivity:** Confidential

I have updated the document as requested. See attached.

I have also attached everything that we have on Gigi that relates to her performance reviews with Tom. This is everything with the exception of the email that Charles sent in November 2016. I believe that you already have a copy of that, so didn't think it necessary to include it.

Let me know where you think we can go from here.

Henry

---

**From:** Tang, Karen
**Sent:** Wednesday, June 14, 2017 12:29 PM
**To:** Philip, Henry; Argyle, Charles
**Cc:** Szeto-Law, Yee T.; Scordato, Christine A.; Donovan, Tama; Lim, Belinda
**Subject:** RE: Private & Confidential - Employee Relations
**Sensitivity:** Confidential

(+ Charles, Christine, Yee, Tama and Belinda).

Thanks Henry for your reply and apologies for the delay.

**Redacted**

DEF 00007569

> **Redacted**

Team – please feel free to chime in if I've missed anything here.
Lastly, as I will be heading out on maternity leave in very imminent future, I will be leaving in the capable hands of my HR colleagues copied here to guide you.

Thank you all and best of luck
Karen

wmcinternal

**From:** Philip, Henry
**Sent:** Friday, June 09, 2017 12:10 AM
**To:** Tang, Karen
**Subject:** RE: Private & Confidential - Employee Relations
**Sensitivity:** Confidential

Hi Karen,

As per the note below, we met this morning. A final decision was reached on Gigi and it was agreed that we want to move on. Ideally we would like to have her exit the firm before Adam gets to Hong Kong. In other words, we would prefer this to be over sooner rather than later. I know the optics are tricky and will need to be handled appropriately, so look to your guidance as to how we can get ourselves there in as timely a fashion as possible (whilst protecting the firm).

Happy to chat further if you need any additional detail.

Hope all is well.

Henry

**From:** Tang, Karen
**Sent:** Thursday, June 01, 2017 7:57 PM
**To:** Argyle, Charles
**Cc:** Scordato, Christine A.; Szeto-Law, Yee T.; Philip, Henry
**Subject:** Re: Private & Confidential - Employee Relations
**Sensitivity:** Confidential

Thanks Charles. I think this approach makes sense and we look forward to partnering with you and Henry to get to the best possible outcome.

On 1 Jun 2017, at 21:40, Argyle, Charles <cargyle@wellington.com> wrote:

> Thanks Karen. Yes, we are taking advantage of everyone being in the same place at the same time next week to make a final decision (or not) in person. If HR wants to be in that discussion too, then I am fine with that, but my baseline assumption is that Henry and I will be working closely with you once we know definitively that we are heading down this path. We will definitely appreciate your input and expertise.
>
> Thanks again
>
> Charles

**From:** Tang, Karen
**Sent:** Thursday, June 01, 2017 4:51 AM
**To:** Scordato, Christine A.
**Cc:** Argyle, Charles; Szeto-Law, Yee T.
**Subject:** Private & Confidential - Employee Relations
**Sensitivity:** Confidential

Hi Christine, thanks for your email.

Yee and I spoke with Greg and Henry today to get up to speed on the recent conversations they had with Gigi. In summary, she remains resolute that the issue is with Wellington not upholding verbal promises she claims were made to her and delivering through on making her a portfolio manager and providing her with the resources and support she needs to be successful. She does not feel the need to respond to the written performance feedback that Charles clearly delivered to her in Nov 2016 because she does not agree with it and she believes the issue is with Wellington not her.

Our advice is to Greg and Henry is to continue to document any discussions, issues, performance observations and continue to operate business as usual in the interim.

I understand there is a plan to discuss next week in Boston with Charles, Greg, Henry and Adam on the way forward. Given the history and background of Gigi, I would like to set up a call amongst HR & ER to discuss the best path to termination in a manner that protects the firm the most.

Christine – I will set up a call for you, me, Yee and Tama later next week to catch up.

Many thanks,
Karen

**From:** Scordato, Christine A.
**Sent:** Thursday, June 01, 2017 6:36 AM
**To:** Tang, Karen
**Cc:** Argyle, Charles
**Subject:** Employee Relations

Hi Karen,

In a meeting with Charles today, he let me know that he and Greg had a conversation about Gigi.  She is not responding to the feedback she received in any way evident to Greg.  Greg will be in Boston next week and they will revisit one more time but he is leaning towards termination.

Best,

C

Christine
WMC Internal

DEF 00007571