# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 19-cv-11605-WGY

---

Gigi Kai Zi Chan,

Plaintiff,

v.

Wellington Management Company LLP
and Charles Argyle,

Defendants.

---

Deposition of Thomas Baxter

Friday, October 16, 2020

via Zoom Meeting

7:08 a.m. - 3:13 p.m.

---- Sharon Roy, RPR ----

Magna Legal Services
866-624-6221
www.MagnaLS.com



A P P E A R A N C E S:

Representing the Plaintiff:
Patrick J. Hannon, Esq.
Hartley Michon Robb, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
617.447.2819
phannon@hartleymichonrobb.com

Representing the Defendants:
Stephen T. Paterniti, Esq.
Jackson Lewis P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
617.367.0025 (Fax) 617.367.2155
stephen.paterniti@jacksonlewis.com

Also present via Zoom Meeting:
Sara Martin

I N D E X

| EXAMINATION | PAGE |
| --- | --- |
| By Mr. Hannon | 4, 226 |
| By Mr. Paterniti | 221 |

EXHIBITS: PAGE:

1: 10/6/15 email chain (Bates DEF00027771) ..... 180
2: Email chain re: British Airways (Bates DEF00027933) ........................ 182
3: 10/15/15 email to Charles Argyle from Thomas Baxter (DEF00028528) ................ 185
4: 6/8/16 and 6/10/16 email re: Update on Gigi (Bates DEF00004461) ........................ 199
5: 11/15/16 email re: Gigi & China Growth FYI (Bates DEF00010071) ........................ 205
6: 9/29/14 email to Henry Philip from Christine Scordato (Bates DEF000010282) ..... 207
7: 12/8/15 email to Gigi Chan from Thomas Baxter (Bates DEF000011357) ................ 208
8: Email chain re: Follow-up from November 22 conversation in Hong Kong (Bates DEF00011390-92) ..................... 211
9: Email chain between Thomas Baxter and Alex Qian re: China Growth (Bates DEF00020394) ... 218

(Exhibits marked and returned to Atty Hannon)

-*-

---

P R O C E E D I N G S

7:08 a.m.

---

TOM BAXTER, Deponent, having first been duly sworn by the Notary Public, deposes and states as follows:

* * * * *

EXAMINATION CONDUCTED
BY MR. HANNON:

Q. Good morning, Mr. Baxter. My name is Patrick Hannon. I'm an attorney representing Gigi Chan. Have you ever had the pleasure of sitting for a deposition before?

A. This is my first.

Q. Okay. Just to kind of go over a little bit of the process, since everything that you and I say is being taken down by the stenographer, it's important that we not speak at the same time. So if you can try to do your best to make sure that I'm done asking my question before you answer it, I'll try to make sure you're done with your answer before I ask my next question. Sound good?

A. Okay.

Q. For similar reasons, it's important that all of your answers be spoken. So if at some point you shake your head or nod in response to a question, I'll just prompt you to speak your answer. Sound good?

A. Makes sense.

Q. Excellent.

MR. PATERNITI: Patrick, before you jump in, I don't remember that we did this in the last deposition, but, you know, I guess my proposal would be that the stipulations that we agreed to with Gigi Chan's deposition apply to all depositions, that the standard, you know, all objections except as to form reserved and motions to strike reserved; read and sign, 30 days or some other time frame that we agree to.

MR. HANNON: Agreed.

MR. PATERNITI: Excellent.

BY MR. HANNON:

Q. Mr. Baxter, where are you physically located today?

A. I'm in London.



Q. At the time that you -- or just before you terminated your employment with Wellington Hong Kong Limited, what was your position?
A. So I was -- I forget what the title was called, but basically business management for the global relationships group in APAC.
Q. And was there a particular acronym you used for the global relationship group?
A. It was referred to as GRG.
Q. And what were your duties and responsibilities as business manager for GRG?
A. Sure. So I helped the head of Asia PAC/GRG with measuring the effectiveness of our business, so, assets and flows and new clients, lost clients, that sort of thing. I also managed several relationship panelists, so these would be the more junior in-house but yet client-facing team that would talk to our clients.
Q. Any other duties and responsibilities in your role as business manager for GRG?
A. I also had some responsibilities that were more at the enterprise level, so within Hong Kong, served on some committees and working groups, that sort of thing.

Q. For how long were you in that role?
A. I believe it was 18 months to two years, something like that.
Q. While you were business manager for GRG, to whom did you report?
A. Ray Helfer.
Q. What was Ray Helfer's title during that time period?
A. So he was -- he basically ran GRG functions in Asia Pac. I don't recall the specific title.
But towards the end, Scott Geary replaced Ray as head of Asia Pac/GRG, so there was a window of time in the last several months where I was reporting to Scott Geary.
Q. Prior to being business manager for GRG, how were you employed at Wellington?
A. So I had a title of associate director of global equity and portfolio management at Wellington Management Hong Kong Limited, so whatever that date would have been prior to starting the GRG responsibilities, I had that title for a number of years.
Q. I'm sorry, what was that title again?

A. Associate director of global equity and portfolio management. And we can refer to it as GEPM going forward.
Q. So you were associate director of GEPM up until when?
A. Up until I started that role with GRG. So there was a couple months where I was doing both roles, so there was some overlap. So it's not clear to me when, you know, HR officially changed my title in the system, but there was a window of time in sort of the end of 2016 where I was carrying sort of a hybrid responsibility.
Q. Who did you report to as associate director of GEPM?
A. Charles Argyle.
Q. And was Mr. Argyle the director of GEPM?
A. I believe that was his title, yes.
Q. Did you have any individuals who reported to you as associate director of GEPM?
A. Yes.
Q. Focusing on the time period just before you surrendered the duties and responsibilities of that role, can you tell me approximately how many individuals you had reporting to you?

A. I couldn't tell you exactly. It was in the neighborhood of 15 or 20.
Q. And were those individuals all with the same title or were those individuals with different roles?
A. There were multiple roles represented in those people.
Q. Could you just walk me through what different kinds of roles were encompassed within your direct reports at that period of time?
A. Sure. Portfolio managers, equity research analysts, equity research associates, and then I believe I had possibly one sort of global industry research associate.
Q. With respect to the title you just provided, was there sort of a clear pecking order in terms of those titles in terms of did equity research associates move up to analysts and analysts hoped to someday become portfolio managers?
MR. PATERNITI: Objection. Go ahead and answer, Tom.
A. A research associate is a junior role relative to an analyst.
Q. Okay. And would it be the typical



progression that the associate would move up to become an analyst?
A. With rare exceptions that they're aspired to become analysts at the research associate level, yes.
Q. Okay. And with respect to the 15 to 20 approximate direct reports you had at this time, where were they geographically located?
A. Sure. They were across multiple offices; there was a few in the Tokyo office, a few in the Singapore office, a few in the Hong Kong office, and a small number, two or three, I'm thinking, I'm not sure that were based in Boston.
Q. Do you recall who the individuals were that were based in Boston that reported directly to you?
A. Greg Pool, Tim Egan, Mina Koide. I believe there were parts of the global IR team and parts of the GEPM team that were Boston based.
Q. Mr. Pool, what was his role?
A. He was a portfolio manager.
Q. And Mr. Egan, what was his role?
A. He was a research analyst.
Q. I think I heard you mention a Ms. Koide?

Did I say that correctly?
A. Koide? Yeah, it's hard to pronounce.
Q. That individual, what was her role?
A. She's a portfolio manager.
Q. And the Boston based individuals who reported directly to you, were they all within GEPM?
A. Yes.
Q. Do you know who employed those Boston-based individuals who reported to you?
A. I believe they would have been employed by the U.S. entity.
Q. So we've been talking about your role as associate director of GEPM just before you surrendered those responsibilities. Did your duties and responsibilities as associate director of GEPM, did those change during the years that you held that position?
A. Those roles are always changing, right, the people are coming and going, it's not a static team that you're working with.
Q. Sure. But sort of putting aside the sort of comings and goings of different individuals, did the essential nature of your duties and responsibilities stay the same during the period of

time that you held the title of associate director of GEPM?
A. Generally, yes.
Q. And during that time, did you manage individuals in Tokyo, Singapore, Hong Kong, and Boston?
A. Yes.
Q. Did you have any kind of set schedule in terms of how frequently you would travel to the various offices in which your direct reports sat?
A. Not a rigid schedule, no. But generally I would try to get to each office multiple times per year.
Q. And you yourself, while you held the role of associate director of GEPM, were you based out of the Hong Kong office throughout that time?
A. Yes, that's right.
Q. Just to follow up a little bit about the reporting structure. While you had the role, or rather the title of associate director of GEPM, was there any kind of reporting relationship between the analysts in GEPM and the portfolio managers?
MR. PATERNITI: Objection. Go ahead.
A. Not reporting relationship, no.

Q. Okay. Did portfolio managers have any kind of supervisory responsibilities with respect to analysts?
A. Can you define what you mean by supervisory responsibilities?
Q. Well, were portfolio managers empowered, essentially, to assign analysts tasks?
A. Yes, portfolio managers would generally direct the work of analysts that were part of their team.
Q. And were analysts expected to follow those directions?
A. Yes.
Q. What was your role at Wellington prior to serving as associate director of GEPM?
A. So I was business manager of GEPM prior to that. I don't recall exactly when the title changed, perhaps somewhere in 2013, but that's a guess. But the role was substantially similar just with a different title. That was from January 2012.
Q. And while you were business manager at GEPM, to whom did you report?
A. To Charles Argyle for some of it and to Brendan Swords for some of it. There was a period



A. He was director for GRG and Asia-Pacific. He also had a role as managing director Wellington Management Hong Kong. So it was that aspect of his role that Adam Puritz would have been taking when he moved to Wellington Management Hong Kong; he became the managing director of the office. Basically the office head.
Q. Okay. And when Mr. Helfer moved to the UK, did he surrender his duties and responsibilities with respect to GRG?
A. I believe so.
Q. And who assumed those responsibilities?
A. Scott Geary.
Q. And then when Scott Geary took on those duties and responsibilities, you were reporting to Mr. Geary?
A. Yes.
Q. In that position as business manager for GRG, did you have any direct reports in that role?
A. Yes.
Q. Approximately how many?
A. Fifteen, approximately.
Q. And were they spread out across various offices in the Asia-Pacific region?

A. Yes, they were spread across Hong Kong, Singapore, Tokyo, and Sydney.
Q. I think I heard you say earlier that there was a period of time where you were kind of doing two jobs at the same time; you'd started to take on the GRG responsibilities but were still also fulfilling the GEPM responsibilities; did I hear that correctly?
A. Yes.
Q. And what was the reason for that kind of overlap?
A. Right. So, I don't recall exactly the date, but Adam Puritz had not yet arrived in his new role in Hong Kong, but the organizational changes within GRG had already happened, and so there was, yeah, a need for me to try to have a hybrid role to support multiple functions for a certain period of time.
Q. Who is Henry Philip?
A. He was a colleague of mine during -- I mean, yeah, he was -- I believe he's still employed with Wellington Management. I'm not sure, but I believe he is.
Q. And during the time that you were kind of

covering both the GEPM responsibilities you were transitioning out of and the GRG role you were transitioning into, was Mr. Philip assisting you at all?
A. So he was based in Singapore, in the Singapore office, and he was, I believe, head of HR for Asia-Pac. I don't exactly know the title. But in that role I would have worked with him.
Q. Now, you're familiar with Gigi Chan; is that right?
A. Yes.
Q. And you're familiar with the fact that Ms. Chan's employment with Wellington -- and, again, Mr. Paterniti has a standing objection in terms of who I mean by "Wellington" -- but you're aware that at some point in time her employment was terminated; is that right?
A. Yes.
Q. At the time that her employment was terminated, what was the status of your role then?
MR. PATERNITI: Objection.
Go ahead.
A. I was business manager of GRG APAC.
Q. So, by that point in time, you'd already

transitioned completely out of the GEPM role?
A. Yes.
Q. Were you familiar with the fact that Ms. Chan went on maternity leave at the end of 2016?
A. I don't recall the specific timing, but I was aware that, yes, she took a maternity leave.
Q. At the time that her maternity leave started, were you -- had you already surrendered all of your GEPM responsibilities or were you still in that kind of transition phase you've described?
MR. PATERNITI: Objection.
A. I don't specifically recall. I do remember her going out on leave.
Q. Was she reporting to you at the time she went out on leave?
A. I don't recall specifically.
Q. Okay. Fair to say, though, that by the time she came back from leave, that she was no longer reporting to you then?
A. That's right.
(Sara Martin now joined)
BY MR. HANNON:
Q. Let me back up a second. And just to sort of state the obvious, Ms. Chan was one of the



communication with Charles Argyle?
A. I sent an email when I learned that he was withdrawing from the partnership, and he emailed me back, so that was a few months ago.
Q. But prior to that --
A. That was to do with his withdrawal looking to do with this deposition.
Q. Prior to that email exchange, when was the last time that you had communicated in any form with Mr. Argyle?
A. It was probably around the time I was leaving the Wellington Management-Hong Kong. So, probably towards the end of 2018, guessing.
Q. Between the time that you left Wellington Management-Hong Kong and today's deposition, besides the attorneys you referenced, have you spoken with anyone else concerning Gigi Chan?
A. I spoke to my wife about doing deposition prep and getting home late today. There was one more lawyer at Wellington, Belinda Lynn, who, just in the context of being a friend of mine, we had lunch together in Hong Kong. I think she might have --
MR. PATERNITI: Don't reveal any

conversations, attorney-client privilege about the case, or the claims.
BY MR. HANNON:
Q. Anybody else?
A. No.
Q. How did you first come to learn of Gigi Chan?
A. She was a candidate for a role that we had open back in 2013 context. I don't recall exactly when.
Q. What was the role?
A. We were looking for a portfolio manager for China equities.
Q. And this was within GEPM?
A. Yes.
Q. How did you come to identify the need for hiring a portfolio manager for China equities?
MR. PATERNITI: Objection.
Go ahead, Tom.
A. China was a big market, we felt there was some commercial interest in our client base and investment approach based in Chinese equities.
Q. And what was the process by which it was decided to go out and try to fill this role?

A. I don't recall the exact decision-making process. There was broad agreement amongst a number of people within GEPM who were setting priorities for positions that we would be looking to hire in the future, and at some point China equities floated high enough on that list that we formalized a search process for that position.
Q. You indicated that there were several people involved in those considerations. Who?
MR. PATERNITI: Objection.
A. Typically the broader management team. So, the head of GEPM, the business manager, associate directors, and -- and usually in concert with HR.
Q. Back at the time of when the decision was made to search for this PM role you've been talking about, were there any kind of periodic meetings of the individuals that served in the sort of management structure of GEPM?
A. There was a standing weekly meeting.
Q. And who would attend the standing weekly meeting?
A. The individuals, it would certainly change over time, it was not a static group over the

period of time that I was in a position to be in those meetings. But if you're talking about 2013, thereabouts: Charles Argyle, myself, Brendan Swords was involved at some point, but at some point he was not involved. And then there were other members that, again, I don't recall the exact dates of when they would have come and gone, but people like Erin Murphy, Terry Burgess, and Christine Scordato from HR, typically.
Q. What was the purpose of these weekly meetings?
A. General catch-up, touch base, information sharing.
Q. How would these be conducted in terms of were they by phone, video?
A. Typically by video. I would join in the evenings from Hong Kong.
Q. Was there any particular agenda created for these weekly meetings?
A. Nothing formal. Occasionally people would send around a few topics by email to discuss.
Q. Who would lead the meeting?
A. Typically the head of global equities would lead the meeting, so Charles Argyle would be



she came in, I don't recall.
Q. Do you recall generally how many candidates were considered for the China PM role we've been talking about?
A. I don't.
Q. Do you recall generally how many individuals you interviewed for the China PM role that we've been talking about?
A. It would have been -- I can give you a guess of a range, but I don't recall the number.
Q. What's your best estimate?
A. Between 10 and 20.
Q. And was there sort of a process in terms of after the sort of moving candidates on to kind of the next stage of the evaluation?
A. I believe in those days, the shorthand was sort of "continued to not continue." So as someone seeing the person in the early round, you would say whether you think we should continue the process and have that person meet other people. So, I believe that's the shorthand we used.
Q. And was there generally a certain number of stages in terms of there would be the sort of initial round, continue/not continue, and then there

would be a second round of continue/not continue?
A. That's typical, yeah; there would be multiple rounds like that.
Q. Was there generally a number of rounds that you would go through in a hiring decision such as this?
A. It would vary depending upon the search. But it would be typical for people to have done multiple rounds at each round, meeting multiple individuals.
Q. And in terms of focusing specifically on hiring a PM into GEPM, what -- would those interviews just be focused on people within GEPM or was there a general practice of trying to get people from outside of that group?
MR. PATERNITI: Objection.
Go ahead.
A. Generally speaking, we would have a broader group of people involved in the interview process.
Q. And would that be broader geographically as well or broad in what sense?
A. Yes, by -- broad by function, broad by role within function, broad by geography, typically

someone would see a range of individuals.
Q. So, respect to the China PM role, Ms. Chan was identified as a potential candidate, correct?
A. Yes.
Q. With respect to the first round of interviews she went through, do you recall if you interviewed her as part of that round?
A. I recall having been -- yeah, early in that process, an interviewer.
Q. Do you recall anything about that interview?
A. I don't have a very clear recollection. I definitely remember meeting her, but I couldn't tell you whether it was by phone or by video or in person.
Q. Okay. Can you recall anything about what was discussed during the course of the interview?
A. So, yeah, we typically would have discussed her background experience and I would have asked some specific questions about individual stocks; I couldn't tell you exactly what stocks we talked about.
Q. Okay. Putting aside what your normal

practice would have been, do you actually recall what you and Ms. Chan discussed during the interview?
A. I don't specifically recall the topics that we covered.
Q. Do you recall any impressions or opinions that you formed based upon the interview?
A. Yes. In my opinion, she probably was not at the level of experience to be considered a portfolio manager at Wellington, but I had a feeling that she could have been someone who could join the firm at an analyst level.
Q. Now, before you interviewed Ms. Chan, you had -- actually, strike that.
What led you to form the -- actually, strike that again.
Let me ask a follow-up question first. Besides that Ms. Chan was not at the level of experience to be a portfolio manager at Wellington but could potentially join as an analyst, do you recall any other opinions or impressions that you formed either during the course of or as a result of your interview with Ms. Chan?
A. I had the impression that she was very



high energy and quite outgoing.
Q. Anything else?
A. No. Those were my impressions.
Q. What led you to believe that Ms. Chan did not have the level of experience to be a portfolio manager at Wellington?
A. I'd reviewed her CV before meeting with her and had knowledge that her employer was ... um, had a structure that seemed unlike Wellington's in the sense that her years of experience as an analyst before being a portfolio manager were unusually short.
Q. Anything else that led you to form the opinion that Ms. Chan did not have the level of experience to be a portfolio manager at Wellington?
A. Just the impression from the conversation that we had around her ability to describe her investing philosophy and her investing process didn't -- it didn't strike me as being robust enough to withstand the scrutiny that our client base would have.
Q. Anything else?
A. Those were my impressions.
Q. Do you recall anything that Ms. Chan said

that led you to believe that her philosophy was not robust enough?
A. I don't recall the specifics of the conversation.
Q. And with respect to Ms. Chan's curriculum vitae, or vitae, if you prefer, I think I heard you say that you had thought that she had started serving as a portfolio manager unusually soon in her career at her prior employer; is that right?
MR. PATERNITI: Objection.
Go ahead.
A. Yes.
Q. How about the duration of time she had served as a portfolio manager at her prior employer, was that consistent with the level of experience that you believe would be required to serve as a portfolio manager at Wellington?
A. I believe she had something like six years of experience as a portfolio manager at Threadneedle.
Q. Did you believe six years of portfolio managing experience was insufficient to serve as a portfolio manager at Wellington?
MR. PATERNITI: Objection.

A. I think it depends on the role, I think it depends on the type of structure that you're working within.
Q. Did you ask during the course of the interview of Ms. Chan what the structure and role was that comprised her duties as a portfolio manager at her prior employer?
A. I don't recall.
Q. Do you recall anything she said about that?
MR. PATERNITI: Objection.
A. No.
Q. Prior to your interview of Ms. Chan for this portfolio manager role, had you received any feedback from any other interviewers about their impressions of Ms. Chan?
A. I don't recall. I believe I would have been early in the process.
Q. Okay. And in terms of the impressions that you formed from your interview, to whom did you convey those, if anyone?
A. I would have conveyed those to HR, put those in the system.
Q. And when you say "the system," was there

some kind of an application that was being used at that time where interviewers could provide their feedback?
A. At some point the firm began using Workday, I'm not sure if that was the system that was in place at that time, but, yeah, there would have been some database of feedback that was -- you would enter your feedback into.
Q. But aside from just putting your feedback into the system, do you recall if you had any discussions with anyone in terms of sharing your views of your interview with Ms. Chan?
A. I don't specifically recall.
Q. Do you recall any discussions you had with anyone about their views of Ms. Chan based upon their interviews of her?
A. I don't remember those conversations.
Q. What do you recall about how Ms. Chan's candidacy progressed subsequent to your interview?
MR. PATERNITI: Objection. Is this the 2013 China equity PM candidacy?
MR. HANNON: Yes, this is the interview we've just been talking about.
A. Yeah, I don't recall the specifics of any



Q. And at the time this conversation took place with Ms. Chan, were you actively searching for any analyst roles?
A. I don't recall. It's possible we had positions for analysts that were open throughout the department, but roles that specifically called for Asia equity expertise, I don't believe so, but I don't remember.
Q. So you have this phone conversation with Ms. Chan. What happens next?
A. Again, as I mentioned, I believe that we organized to have further conversations with other Wellington management personnel, I believe, based in Boston at that point.
Q. Do you recall who?
A. I believe Christine Scordato would have been someone, but I don't recall exactly.
Q. And Ms. Scordato, she was the global head of HR for Wellington; is that right?
A. No, she was HR relationship manager supporting the equities teams.
Q. When you say "equities teams," what are you referring to?
A. GEPM, also Global Industries Research,

which was another separate department but also was focused on equities research.
Q. Any other groups that comprise the equities team?
A. That's an offhand description, it's not a formal sort of structural construct; it's just the two groups in my mind that are focused on equities investing.
Q. Understood. During the 2013/2014 time frame, was Ms. Scordato generally involved in the hiring process for investment professionals in GEPM?
A. She was generally involved, yeah.
Q. And where did Ms. Scordato sit geographically during that time?
A. She was based in Boston.
Q. All right. So, you speak to Ms. Chan. You think she may have spoken with some folks in Boston. What do you recall in terms of happening next in the process that ultimately led to Ms. Chan being hired?
A. I can't give you a chronology of events, but generally speaking, she met with everybody either by phone or in person with a number of people; there was a favorable impression being

formed about this individual. And I believe at some point she had gone back to Hong Kong for some period of time and we were able to schedule a series of interviews there as well.
And this is all under the umbrella of an opportunistic potential talent to hire.
Q. And when you say an opportunistic potential to hire, am I right that there wasn't a specific role you were speaking to Ms. Chan about at that time?
A. That's correct. And that would be typical of Wellington and other firms like it to do that sort of thing, to sort of meet opportunistically with, you know, talented people out in the marketplace. Because the -- yeah, the chances of a role opening up at some point is always there, so you'd always want to make sure you're in touch with people in the marketplace.
Q. And at some point in time was a decision made to offer Ms. Chan a position?
A. Yes.
Q. And how did that come about?
A. Again, so there was this sort of ground swell of support for hiring her with her skill set

as somebody that was willing to work in Hong Kong, China-speaking, well traveled, and there was some work we had done to identify a potential role for her on one of our teams. Wellington was a new team based -- GPM was a team-based organization at that point.
So, in time, we were able to create a role on the emerging markets opportunities team and worked with -- had a conversation with Greg Mattiko about opening that position.
Q. When you say "we," who are you referring to?
A. Myself, Charles Argyle would be primarily involved in that. Possibly Terry Burgess. I don't exactly recall the timing, but Terry would have been someone in a similar role to meet but based in Wellington Management International in London where Greg was based at the time.
Q. Was it your understanding at the time that Mr. Mattiko reported to Mr. Burgess?
A. Yeah, I don't recall the exact window of time, but if Terry were in London during those years, then it would be my understanding that Mr. Mattiko would have reported to him, yes.



Q. You mentioned a moment ago that Wellington at the time within GEPM was team based. What did you mean by that?
A. Typically portfolio managers at Wellington at that time worked in a team construct, so, the specific organizations would vary but a typical team had a lead portfolio manager and some number of analysts -- one, two, five, six -- and that team collectively would do research and come up with investing ideas based on a particular opportunity set for that team.
So, in Greg's case it was emerging market stocks and, in somebody else's case it might be small cap stock, in somebody else's case it might be U.S. hard cap stocks, that sort of thing.
Q. And would analysts typically be assigned to only one team or would analysts oftentimes be assigned to multiple teams?
A. Typically you're assigned to one team, but given the collaborative nature of the investment organization at a firm like Wellington, it would not be unusual for analysts from different teams to talk with each other and share ideas.
Q. And just in terms of the sort of

geographical breakdown, so, when Ms. Chan was brought to Wellington, she was hired as an analyst working on Mr. Mattiko's team; is that right?
A. Yes.
Q. But, Mr. Mattiko, as a portfolio manager, he was reporting up through the -- the GEPM reporting structure through London; is that right?
A. I believe so. I'm not sure.
Q. Okay. Well, was -- would it be typical for -- you would have an analyst reporting up through one geographical reporting structure at GEPM and a portfolio manager who is reporting up through another geographical reporting structure?
A. So there were -- of the 25 or so teams, there were a few that were geographically disbursed. And so, in some cases, if someone who was employed by an entity in one city would report up to someone who also was employed in that city and somebody else on the same team would report up within their entity. So that it's -- I think you said typical; it wasn't typical, but there were a number of cases where that was the case.
Q. When Ms. Chan was hired, was there any consideration given to what her reporting structure

should be in terms of whether she should report to you versus reporting to the same person that Mr. Mattiko was reporting to?
MR. PATERNITI: Objection.
Go ahead.
A. I don't recall those conversations, no.
Q. You mentioned a little while before this phone call that sort of spurred the second round of discussions with Ms. Chan. Subsequent to that phone call, can you recall any other communications you had with her as part of this hiring process?
A. No.
Q. Do you recall any additional opinions or impressions that you formed of Ms. Chan during the second round of hiring considerations?
A. I recall having conversations with her about compensation expectations and that sort of thing; this was sort of towards the end of this process before she was hired.
Q. Anything else you can recall?
A. She had mentioned that she was also speaking with another potential employer.
Q. Anything else you can recall?
A. I recall that our offer to her was -- we

increased it based on what she was telling us about the other employer, what their willingness to pay was.
Q. Anything else you recall?
A. Yeah, I think she mentioned it was a Chinese-based organization, but I don't recall who this other firm was. Or if she -- she may not have even mentioned it.
Q. Anything else you recall?
A. No. That's the nature of those conversations.
Q. Apart from the content of the communications, do you recall any additional impressions or opinions that you formed of Ms. Chan prior to her hiring besides what you've already described?
A. Can you be more specific as to what -- impressions?
Q. Well, anything in terms of her demeanor, her attitude, her abilities; any additional impressions or opinions you formed of her.
A. Well, I guess, you know, the impressions I formed I had been forming for -- I guess going back to the previous round of interviews. So I



guess I had a picture of her as someone who was outgoing and charismatic and I thought would -- I hoped would make a good analyst at Wellington.

I also recall just having discussions about some logistical things about her wedding reception or something and then her wanting to be in London for some period of time because there was a reception in France. So there were some logistical discussions that we had along the way as well that went to her initially working from Wellington Management International, which is the London based companies, for some period of time; I forget exactly how long. So that was the -- those were the kind of conversations we were having back in those days.

Q. Okay. You mentioned that you formed the opinion that she would be a good analyst. Did you have any impression or opinion as to whether or not Ms. Chan might also someday come to be a good portfolio manager at Wellington?

MR. PATERNITI: Objection.

Go ahead.

A. So, my opinion of her skill set was that it was not a complete skill set for a PM at Wellington Management and I felt she could benefit

from having more experience at the firm as an analyst, building that credibility with her peers and colleagues. I also felt as if her ability to communicate her investing style was not at the level of a typical Wellington portfolio manager. It's a broad range of skills that's required to be a portfolio manager, it's not just researching and investing skills, it's also communication skills, it's also the ability to market ones self and the ability to market the firm, and also the leadership qualities to be able to draw upon a broad range of resources, talking with other analysts, that sort of thing. And so I felt as if she did not have the full package of skills to be a portfolio manager at that time.

Q. Did you expect that she would develop those skills at Wellington?

MR. PATERNITI: Objection.

Go ahead.

A. I would hope that any analyst that we would have hired, whether it's there or even my job here, if we brought in somebody at an analyst level, most people who are good analysts have aspirations to be portfolio managers, you expect that, you hope

to see that. I view part of my job at Wellington as to try to coach people to meet their aspirations.

Q. But my question, sir, is if you thought at the time that you hired Ms. Chan that she was going to be able to acquire the skills necessary to be a successful portfolio manager at Wellington. Did you?

A. I thought she had potential.

Q. What did you tell Ms. Chan about her potential opportunity of becoming a portfolio manager at Wellington?

MR. PATERNITI: Objection.

A. Can you be more specific?

Q. More specific in what way?

A. There was a sort of general concept around the -- is there a specific conversation that you're referring to?

Q. Well, I think you said before that you can only specifically recall the telephone conversation, right?

A. Right.

Q. Okay. But there were subsequent communications?

MR. PATERNITI: Throughout her

employment? Or are you saying prior to hire?

MR. HANNON: This is all prior to hire.

A. So, yeah, we -- I know there were conversations. To the extent to which I was directly involved in them, I don't recall.

Q. Okay. Do you recall, and again focusing on this sort of second set of employment discussions with Ms. Chan spurred on by that phone call you mentioned, up until the time of her hiring do you recall any communications you had with Ms. Chan considering the prospect of her becoming a portfolio manager at Wellington?

MR. PATERNITI: Objection.

Go ahead, Tom.

A. No, I don't specifically recall those discussions.

Q. Who was involved in making the decision to hire Ms. Chan at Wellington?

A. Multiple people. So, myself, Charles Argyle, Greg Mattiko. It involved -- it probably included Christine Scordato from an HR perspective, Henry Philip from an HR perspective. It would be typical of these type of positions that it would be



multiple points of view reflected.
Q. Anyone else that you can think of?
A. Terry Burgess, probably.
Q. Anyone else?
A. I'd just be guessing at that point.
Q. Who had the final decision-making authority to hire Ms. Chan?
A. The ultimate decision making would rest with the head of the department, so Charles Argyle would have had the final sort of yes/no.
Q. All right. So, do you recall when Ms. Chan started working for Wellington?
A. I don't recall the exact date. As I mentioned, I believe her first day was in the London office.
Q. What was your cadence in terms of interacting with Ms. Chan; was it on a daily basis, weekly, monthly?
A. Well, I was based in Hong Kong and the first -- I recall the first several weeks, if not a couple of months, she was mostly in Europe, again partly for business reasons to get to know Greg Mattiko and partly for personal reasons around her wedding reception and other personal arrangements

she had with moving to France.
Q. And during that time period that she was in London, were you checking in with her periodically or were you somewhat of a hands-off manager, so to speak?
A. Yeah, it would have been more hands off, more periodic.
Q. Did you have any sort of cadence in terms of checking in with Mr. Mattiko to see how she was doing?
A. On an ad hoc basis we would discuss.
Q. Did Mr. Mattiko have any other members of his team that reported to you?
A. Not that reported to me, no.
Q. And had you and Mr. Mattiko previously worked together at all?
A. So I knew Greg, I had interviewed him, we had spent a couple of hours together as he was in the middle/late stages of joining or being hired at the firm. But we didn't have a formal, you know, line manager relationship at any time.
Q. So besides having interacted with Mr. Mattiko as part of his hiring process, had you otherwise had any occasions to interact with him

professionally at Wellington?
A. Only through large group sessions, early morning meeting. That sort of thing.
Q. You mentioned you had interviewed Mr. Mattiko. When had that been?
A. I don't recall exactly when he was hired, but we both happened to be in Boston at the same time and so I interviewed him at that point. And I remember I sat with him, I took him to the morning meeting in Boston and we sat together for that.
Q. And Mr. Mattiko, what role was he interviewing for?
A. He was interviewing for a portfolio manager position for emerging markets.
Q. Do you recall what your impression was of Mr. Mattiko as a result of your interview with him?
A. Yeah, I felt he was very experienced, very confident. He had worked with a very large team at JP Morgan that managed, I don't exactly recall, but it was in the tens of billions of dollars of emerging markets assets, and so he had a strong reputation with clients as well as just in the business.
Q. You couldn't assess his reputation of

clients during his interview, could you?
A. During the interview itself, I don't believe we talked about his clients, but in the discussions around his candidacy it was a topic of discussion.
Q. But just focusing on your interview with Mr. Mattiko, what opinions did you draw from that?
A. Right, that he was -- well, I knew he was older than me based on his CV and his years at university, education and that sort of thing. He had a long experience with JP Morgan, and he had a very clear articulation of how he was going to invest.
Q. Anything else you can recall?
A. He actually was quite eager. I remember he went to the morning meeting and he was -- I recall him eager to join the conversation. So he was very engaged with the investment dialogue with Wellington.
Q. Anything else you recall, any opinions or impressions you formed as a result of your interview with Mr. Mattiko?
A. That's all I can recall from that long ago.



Q. When you interviewed Mr. Mattiko, do you know how long he had been serving as a portfolio manager?
A. I don't recall. I mean, I'm sure it was written on his CV but I don't recall exactly.
Q. Do you recall generally?
A. Generally he had been at, I think, JP Morgan for quite a long time and had been running portfolios for a handful of years with them.
Q. When you say "a handful," what do you mean?
A. Five years, plus or minus, I'm guessing.
Q. And did you view that as sufficient experience for a portfolio manager at Wellington?
MR. PATERNITI: Objection.
A. My impression from our overall conversation was that he was a solid candidate for a portfolio manager.
Q. But you didn't view the fact that he'd only been serving as a portfolio manager for approximately five years or so as being an impediment to him serving as a portfolio manager at Wellington; is that fair to say?
MR. PATERNITI: Objection.

A. I made a holistic opinion based on CV, our discussion, things he articulated surrounding his approach, et cetera.
Q. So, back to Ms. Chan. So she's hired as an analyst at Wellington, she starts in London. At some point she comes to Hong Kong; is that right?
A. Yes.
Q. Do you have a sense of how long after her start date it was that she came to Hong Kong?
A. I don't specifically recall. It was a matter of a couple months, I think.
Q. And when she came to Hong Kong, do you recall how many investors were working in that office at that time?
A. Around 20, but that's a guess. I can't tell you exact number.
Q. Did those investors -- and some of those investors were in GEPM, right?
A. Right.
Q. And some were in GRG?
A. Well, GRG's not an investment function.
Q. Okay.
A. Some of them were in global industry research, GIR would be the other ... Some were in

trading, some were in fixed income.
Q. How many of the investors at that time in the Hong Kong office were in GEPM?
A. I don't exactly know. It would have been around eight or ten; that's a guess.
Q. And how many of them were portfolio managers?
A. Perhaps two or three.
Q. So there was Bo Meunier, right?
A. Yes.
Q. And who else in the Hong Kong office at that time was a portfolio manager within GEPM?
A. Jun Oh.
Q. Anyone else you can think of?
A. Not that I can think of within GEPM.
Q. For how long had Jun Oh been serving as a portfolio manager as of that time?
A. Maybe -- I'm guessing for eight years, nine years; along those lines. I don't know exactly.
Q. And when Jun Oh joined Wellington, did he join as a portfolio manager or some other role?
A. He joined as an analyst. In fact, he technically was a summer intern as an MBA student

and then joined as an analyst upon graduating his business degree.
Q. And do you know when Mr. Oh took on portfolio manager responsibilities?
A. I think it would have been around the time he moved to Tokyo, so I'm guessing in the neighborhood of 2005 or thereabouts. But I don't remember exactly.
Q. Did you say, when he moved to Tokyo?
A. Yes.
Q. When did Mr. Oh move to Hong Kong?
A. I actually do remember this because it was around the Fukashima earthquake. So was that around 2011 or 2010? But whenever that was, it's around the time that he moved.
Q. When did you start managing Mr. Oh?
A. It was upon arriving in Hong Kong, so, early 2012.
Q. And when you started managing Mr. Oh, did he still have any analyst responsibilities?
A. He's a member of the team, so he's a part of the global contrarian team, and in that role he would have been an Asian markets specialist and so, on the global portfolios that were managed by Greg



Pool, Jun would have played a role of analyst feeding ideas into those portfolios. So, yeah, it was a hybrid portfolio manager/analyst role.
Q. And when you began managing Mr. Oh, do you recall if he -- how many people he had on his team? And by "his team" I mean supporting him in his capacity as a portfolio manager.
A. When I first moved to Hong Kong, I believe he had one person who was based in Hong Kong supporting his portfolio management activities. But over time, that individual left the firm and we hired two other people. But -- so it depends on the time frame you're referring to.
Q. Sure. The person who was supporting Mr. Oh when you first got to Hong Kong, was that a man or a woman?
A. It was a man.
Q. And then you indicated that after that gentleman left, that sometime thereafter there were two people that were assigned to support Mr. Oh; is that right?
A. Yes.
Q. And what was the sex of those individuals?

A. They're both men.
Q. And during your time managing Mr. Oh, did he continue to be supported by those two men?
A. Yes.
Q. Did Mr. Oh ever have any women working to support his work as a portfolio manager?
MR. PATERNITI: Objection.
Go ahead, Tom.
A. So, he had a -- we actually shared an administrative assistant, and -- but then he had a small team of those two individuals.
Q. Okay. Putting aside the administrative assistant in terms of investment professionals assigned to support Mr. Oh in his capacity as a portfolio manager, it was just men; is that right?
A. That's right.
Q. Did Mr. Oh have any say in terms of selecting or identifying the investment professionals that supported him in his role as portfolio manager?
A. Yes.
Q. And what kind of say did he have?
A. So, it's typical of portfolio managers at Wellington who are hiring for their team that they

would have a seat at the table around who is hired, right? It's just ... So, yeah, they would, interviewing and assessing talents and all those things.
Q. During the time that you managed Mr. Oh, did anyone -- did any females ever complain about how they were treated by Mr. Oh?
A. So Gigi Chan was the only person that approached me about that.
Q. And when did Ms. Chan first approach you about that?
MR. PATERNITI: Objection.
Go ahead.
A. I don't exactly know the date of when that was.
Q. Can you describe for us what the context was?
A. It was subsequent to an internal meeting where Gigi was discussing her philosophy and process to a panel of colleagues.
Q. And what was Ms. Chan's complaint to you?
A. I don't recall the exact wording, but she was -- she expressed concern that he was rude and talked down to her.

Q. Do you recall anything else about the substance of Ms. Chan's complaint concerning Mr. Oh?
A. How do you mean?
Q. Well, besides that she complained that he was rude and talked down to her, do you recall anything else that she said?
A. Not -- I don't recall specific words or comments. The general sense of the conversation was around that.
Q. Okay. Did she specify what he had said that she thought was rude?
A. I don't recall exactly what she -- what specific things that he had said that were a trigger. It was more his manner of providing feedback at that session that I referenced.
Q. Now, were you present for that session you referenced?
A. I was, yes.
Q. Were you physically present or were you observing through some kind of remote means?
A. I was physically present. There were participants that were remoting in to that meeting but there was a few of us physically present in Hong Kong.



Q. So, besides yourself, who else was in the Hong Kong office?
A. Jun Oh, Ray Helfer, myself, and Gigi presenting.
Q. And do you know who was remote?
A. I know Cheryl Duckworth was remote. I can't recall -- I believe Anita Killian and the other people that would have potentially been involved were Jawan Parker and Niraj Bhagwat, but I don't remember whether they were on or not.
Q. Okay. Anyone else?
A. No, not that I can recall.
Q. When Ms. Chan complained to you that she believed that Mr. Oh had been rude and talked down to her, what was your reaction?
A. So, I expressed that I understood that she had taken his comments that way. I also reflected to her that it was Jun's general demeanor to be very direct with people and that she shouldn't take it personally.
Q. Did you think that Ms. Chan had reacted unreasonably to Mr. Oh's comments?
A. "Unreasonable" might not be the right word. I felt she overreacted to his direct form of

giving feedback.
Q. Do you recall what Mr. Oh said?
A. I don't recall the specific words that he had used.
Q. Do you recall if he told Ms. Chan that she had looked ridiculous?
A. I don't recall him saying that.
Q. Would you view a statement such as that as being appropriate feedback in a forum such as the panel that you've been describing?
A. No, I would not describe that as appropriate.
Q. Did Ms. Chan express to you that she had concerns that Mr. Oh would not have -- let me ask the question again.
Did Ms. Chan express to you that she believed Mr. Oh would not have treated her that way if she were male?
A. I don't recall her making that accusation.
Q. Okay. Is it possible she made it and you don't recall or do you believe she never said that?
A. Yeah, the latter; I believe she never said that.

Q. And why do you believe that?
A. That's the sort of statement that would be more memorable than a general discussion about feeling the feedback was harsh.
Q. So this communication we've been talking about in which Ms. Chan complained to you about Mr. Oh, where did this take place?
A. Where did our conversation take place?
Q. Yes.
A. I don't specifically recall. It would have been in the Hong Kong office in some conference room, but I don't have a recollection of it.
Q. And besides yourself and Ms. Chan, was anyone else present?
A. I don't recall. I don't believe so.
Q. How long did the conversation last?
A. I have no recollection.
Q. How long after the group session with Mr. Oh and others was it that Ms. Chan complained to you?
A. I don't know.
Q. Do you know if it was the same day, the next day, the next week, the next month?
A. A matter of days, but whether it's the

next day or the same day, I don't recall.
Q. Okay. And between the time when the conduct occurred and when Ms. Chan complained about it, had you spoken with anyone else about what had transpired at the meeting?
A. I had a conversation with Cheryl Duckworth.
Q. Besides the conversation with Ms. Duckworth, had you communicated with anyone else concerning what had transpired at the meeting?
A. I don't have a specific recollection of other conversation.
Q. How did your conversation with Ms. Duckworth on the subject come about?
A. That she had written an email about the meeting sort of subsequent to the meeting.
Q. Okay. And what do you recall about that email?
A. I recall that she had -- she had felt the feedback that Jun was giving was not sort of aligned with the typical nature of those conversations. Typically we would be discussing the substance of the individual's investing philosophy and process, and Jun's comments were also inclusive of



presentation style.
Q. What else, if anything, did Ms. Duckworth express to you about that meeting?
A. That's what I recall.
Q. And how did you respond to Ms. Duckworth?
A. I believe I had a conversation with her on the phone. I don't recall the specifics of it.
Q. Do you recall anything about the conversation on the phone?
A. Generally my impression was that, while I agreed with her that the primary purpose of the meeting was to discuss substance of investment philosophy, that I had also been having conversations with Gigi about her presentation style and presentation skills, and so it was, you know, an interesting data point for me to assess her overall performance.
Q. So you disagreed with Ms. Duckworth?
A. I think we had a difference of opinion on the nature of those comments on the meeting.
Q. Prior to the meeting, had you and Mr. Oh talked at all about Ms. Chan?
A. Not that I recall.
Q. So, you -- back up. So the meeting takes

place, you have the conversation with Ms. Duckworth, you have the conversation with Ms. Chan. Did you do anything in response to the complaint that Ms. Chan provided to you about Mr. Oh's comments?
A. I did have a conversation with Jun Oh as well.
Q. And when did that conversation take place?
A. I don't know exactly. Within days of the other conversations.
Q. Besides speaking to Mr. Oh, did you do anything else in response to Ms. Chan's complaint?
A. Nothing that was specific to that -- that specific conversation.
Q. Well, did you bring it to anyone else's attention within Wellington?
A. I don't recall.
Q. Why did you speak to Mr. Oh?
A. I was acknowledging to him that his comment had caused his colleague to feel uncomfortable, and so I felt it was important to have that conversation.
Q. What did you say to him?
A. I don't recall what we discussed.

Q. Do you recall generally?
A. The general gist would have been, you know, these sessions are mostly meant to be critiquing someone's investing philosophy and process. Your comments were also talking about style. So, I think at future meetings, let's stick to the philosophy process; it was that nature of the conversation.
Q. Did you also tell Mr. Oh that his comments had made Ms. Chan feel uncomfortable?
A. Yeah, I expect I would have said that as an opening to have the conversation.
Q. What was Mr. Oh's reaction?
A. I don't have a specific recollection of how he responded.
Q. Subsequent to your conversation with Mr. Oh, did you do anything else in follow up to Ms. Chan's complaint?
A. Not that I recall.
Q. As of the time of this meeting we've been talking about, and just so we're clear, that was -- would that be referred to as a process and philosophy panel?
A. Philosophy and process panel.

Q. Okay.
A. We can call it P&P. That's fine, too.
Q. As of the time of this P&P meeting with Ms. Chan, what was your understanding of the satisfactoriness of Ms. Chan's work performance at Wellington?
MR. PATERNITI: Objection.
A. Yeah, that's -- can you be more specific about that?
Q. How was she doing performance-wise, to your knowledge, as of the time of this P&P meeting?
A. There was a mixed picture at that point, in my mind.
Q. Okay. And what was comprised of this mix?
A. So, my initial impressions of her being high potential, high energy, which are differentiated, I think are generally growth-oriented investor, those things had remained, and so there was, I felt, potential. But I think she had some significant shortcomings at that point. One was just around her presentation style. She's quite wordy and used a lot of filler words -- "um," "like," that sort of thing, when she communicated,



which was distracting and I thought took away from the ability of other investors to get conviction of what she was saying with her investment recommendations.

I also felt her engagement with the firm was very spotty. So, she would go long stretches of time without engaging in, you know, investor dialogue with her peers in things like the morning meeting or when she would not reach out directly with Greg Mattiko for weeks at a time.

So there were some signs that her level of commitment to the firm and to the way it expected analysts to contribute was -- there was a disconnect that was becoming evident at that point.

Q. In terms of the significant shortcomings that you said you had concerns about as of the time of this P&P meeting, you mentioned one being her presentation style, right?

MR. PATERNITI: Objection.

Go ahead, Tom.

A. I believe her presentation skills required significant work, yes.

Q. Okay. So that was one of the concerns that you had with respect to her performance as of

the P&P meeting?

A. I had had that impression for a while, and that particular P&P session, yeah, solidified that notion in my mind that it continued to be a source of -- continued to be an area that required work.

Q. Okay. And as of the P&P meeting, in addition to presentation style, you also had some concerns with Ms. Chan's engagement?

A. Right. Around that time, as I mentioned, it was becoming evident that her consistency of engagement with the investment process at the firm and on her team was spotty.

Q. Okay. Aside from presentation style and engagement, had you had any other concerns regarding Ms. Chan's work performance as of the time of this P&P meeting?

A. Yeah, just in regards to her overall impact on Greg Mattiko's portfolio, that's -- and, as an analyst, that's your -- it's the way by which you're most directly measured, right, your portfolio impact. And my recollection was that her impact was not that high; in other words, not that many companies relative to someone of her experience

level in those companies, the performance of the stocks were mixed.

Q. So beside presentation style, engagement level, impact on Mr. Mattiko's portfolio, any other concerns you had with respect to Ms. Chan's work performance as of the time of this P&P meeting?

A. Yeah, so her attitude generally towards feedback and towards self improvement was a significant marker and a significant concern for me.

She, in my opinion, took personal offense at efforts to provide constructive feedback and to help her become better. And in my experience, sort of a growth mindset and the ability to get better from the feedback received from other people was a clear marker for someone who could be successful as an investor over a long period of time.

Q. Okay. Aside from presentation style, engagement, impact on Mr. Mattiko's portfolio, and an attitude towards feedback and self improvement, any other concerns you had with respect to Ms. Chan's work performance as of the time of this P&P panel?

A. That generally covers it.

Q. So nothing else you can think of right

now?

A. Nothing else comes to mind right now.

MR. PATERNITI: Patrick, when you have a moment, I think we've been going for quite a while.

MR. HANNON: Yeah, now's a fine time to take a break.

MR. PATERNITI: Thank you.

(Off the record, 9:59 a.m.)

(Back on record, 10:20 a.m.)

BY MR. HANNON:

Q. Mr. Baxter, at some point did Greg Mattiko relocate to Hong Kong?

A. Yes.

Q. When was that?

A. I don't exactly recall.

Q. Do you recall what your role was at the time that Mr. Mattiko relocated?

A. I know he took my seat, so I think I was in that period where I was either transitioning to GRG or had just transitioned.

Q. When you say he took your seat, you mean that literally; he took your office?

A. Literally the desk I was sitting at,



yeah, it was his, became his when he moved.
Q. Okay. Whose office did you take?
A. I moved to the GRG section of the office.
Q. So GRG was on a separate floor or something like that?
A. Same floor but just the other side of the floor.
Q. Okay. How did Mr. Mattiko's relocation come about?
A. I wasn't involved in the exact conversations. I can give you a sense that it was to do with emerging markets where, you know, much of the market cap for emerging markets was -- had Asia over time, and so Asia represented like two-thirds or three-quarters of the overall (indiscernible) of emerging markets, so there's a trend in the business to have emerging market PMs based in Asia more so than they were previously.
Q. But did I hear you correctly that you weren't involved in that decision to have Mr. Mattiko relocate?
A. No.
Q. No, you were not?
A. No, I was not. Right.

Q. When Mr. Mattiko relocated to Hong Kong, to whom did he report?
A. I don't know.
Q. Fair to say it wasn't you?
A. It was not me.
Q. Okay. So, going back to where we left off before our most recent break, I had asked you about your concerns in Ms. Chan's performance as of the time of the P&P meeting and I just want to talk about those concerns you listed.
One, you mentioned presentation style. When had you first become concerned with Ms. Chan's presentation style?
A. There's no specific point in time, but it was early in her tenure at the firm that it was clear to me that she could benefit from some training.
Q. And I think you mentioned earlier in your answer that part of what concerned you about her presentation style was her use of words like "um" and "ah" to kind of fill dead air; is that right?
A. That's right.
Q. What, if anything else, concerned you with respect to Ms. Chan's presentation style as of

the time of the P&P meeting?
A. The word I use is scattered, so sort of all over the place in the sense that it was -- she would go off on tangents and she would go off on topics or some topics that weren't the main topic, and so it was very hard to follow. And again, the use of filler words and the inability to stay focused I thought were two skills that could theoretically be trained or improved by professional coaching.
Q. What other skills?
MR. PATERNITI: Objection.
A. Sorry, can you be more specific about what ...
Q. Sure. I'm just trying to get an exhaustive list, to the extent that you recall, of what the concerns were you had with Ms. Chan's presentation style as of the time of this P&P meeting. And you've talked about the use of filler words, you've talked about the sort of scattered nature of what she's talking about. Were there any other specific attributes of her presentation style that had given you cause for concern?
MR. PATERNITI: Objection.

Go ahead, Tom.
A. Just, again, the rambling, disjointed nature of her commentary I felt was -- the fact it was hard to follow made it also hard to, from an investment context, to buy into the content of her investment conversations. So it was -- it was just distracting, overall distracting.
Q. Was there anything else about her presentation style that had given you concern as of the time of the P&P meeting?
A. No, I think that characterizes it.
Q. In what context had you had the opportunity to observe Ms. Chan's presentation style prior to the P&P meeting?
A. I had witnessed her in the morning meeting and the early morning meeting on multiple occasions. And we had had more than one conversation as well where I'd observed that. And certainly the P&P session itself was, in my mind, an example of these presentation skills shortcomings.
Q. Any other context in which you had the opportunity to observe Ms. Chan's presentation style prior to the P&P meeting?
A. Again, I don't recall the timing of the



P&P meeting relative to these other interactions, but I also had seen her over the course of when we worked at the same firm I saw her present to clients on a couple of occasions.
Q. Any other context in which you had the opportunity to observe Ms. Chan's presentation style prior to the P&P meeting?
A. No, those would be it.
Q. What were the occasions in which you had seen her present to clients?
A. There were a couple -- again, my recollection of the relative timing compared to the P&P session, I can't confirm whether these were all before, but there was an Asia client forum that we had done where a number of clients from around the world, mainly U.S., were in Hong Kong, and there were a number of sessions that investors had presented. I had attended a session where Greg and Gigi co-presented on the topic of -- I think it was something to do with investing in Asia and the experiences of dealing with fraudulent companies, that sort of thing.
Q. Any other client presentations that you had had the opportunity to observe Ms. Chan make



that might have occurred prior to the P&P meeting?
A. Most of them were -- occurred subsequent to it, when I was in my GRG role later on.
Q. Okay. With respect to the Asia client forum you referenced a few moments ago, what do you recall about Ms. Chan's presentation on that occasion?
A. Again, it was a group presentation, Greg and she had presented together; there was maybe 50 audience members. It was very scattered, it was -- she was very high energy but, um, almost to the point of being hyper and had a very difficult time to reign in her thoughts. So she tended to go on and on and on, to the point where it was uncomfortable to the audience and myself as an audience member. And Greg, in comparison, was much more concise in his delivery of his sections of the presentation.
Q. Do you recall any other observations you made with respect to Ms. Chan's presentation style during this forum session?
A. No.
Q. Did you provide Ms. Chan any feedback with respect to what you saw of her presentation?



MR. PATERNITI: Objection. At any time?
MR. HANNON: Of this particular presentation, yeah.
A. I have no specific recollection of whether I did or didn't.
Q. Did you talk to anyone else about your reaction to Ms. Chan's presentation at this Asian client forum?
A. There were others in the room. It was notable, so there were discussions about; I can't recall the specifics of them.
Q. Okay. When you say there were others in the room, do you mean other management folks from Wellington?
A. Yes, exactly. So other individuals who were not -- again, the session was for clients but there were other colleagues there.
Q. Okay. And who were the colleagues that were there?
A. I don't recall specifically who. It would typically have been GRG people.
Q. How about Greg Mattiko, did you ever express to Mr. Mattiko your concerns about Ms.



Chan's presentation at this Asian client forum?
A. I don't recall a specific conversation about that.
Q. Do you recall generally?
A. I recall generally he shared my concerns about her presentation skills.
Q. With respect to this specific presentation?
A. With respect to that presentation as well as generally.
Q. And how did you know he had concerns about that particular presentation?
A. Again, I don't recall the specifics of the conversation, but that was -- I have recollection of having had a shared experience about that presentation.
Q. Was that presentation recorded, do you know?
A. It was -- I don't exactly know. It could have been. Because I believe -- at least we simulcast it in a separate room within the office. Whether it was recorded for posterity, I don't know. It was filmed, though.
Q. You mentioned another context in which



at some point subsequent to that. It's not clear to me that that subsequent session ever took place, I'm not sure, but -- and it's -- it's not something that I recall specifically. I remember generally that she was resistant to the follow-up session and so, therefore, it may or may not have happened.
Q. What did you observe that led you to conclude that Ms. Chan was resistant to the follow-up session?
A. Again, I just don't recall whether that happened or not. And I recall that HR was trying to follow up on it, the dates were never quite working; there was definitely a back and forth around was it going to happen and not being sure it was going to happen.
Q. Okay. So besides the scheduling issues, was there anything else that you observed that led you to conclude that Ms. Chan was resistant about having a follow-up session?
A. It's my recollection that HR was conveying that it was her resistance to commit to dates and commit to the follow-up session that was causing the scheduling problems, so it was -- it was -- what came back to me, as the manager, was

that there was resistance to follow-up.
Q. And that came to you from HR?
A. Right. Because HR would coordinate the third-party external training sessions.
Q. And who within HR was that information being provided to you by?
A. I don't recall.
Q. Did you ever talk to Ms. Chan about her view of the training session with Mr. Clark?
A. I don't recall.
Q. Did you ever talk to Mr. Clark about it?
A. I don't remember.
Q. Did you ever talk to anyone else about what had transpired at Ms. Chan's training session with Mr. Clark?
A. So, I would have had conversations with HR, and I don't specifically recall, but I would imagine I would have talked to Charles Argyll as well about it.
Q. Okay. Do you recall what, if anything, you communicated to Mr. Argyle concerning Ms. Chan's training with Mr. Clark?
A. No, I can't remember.
Q. While we're on the subject, you mentioned

earlier, in terms of the performance concerns you had with respect to Ms. Chan as of the P&P meeting, you had identified attitude towards feedback and self-improvement. Do you recall that?
A. Yes.
Q. Was your observation with respect to this training from Mr. Clark, was that one of the things that caused you to have a concern about Ms. Chan's attitude toward feedback and self-improvement?
A. Yes.
Q. As of the time of the P&P meeting, had you made any other observations that had caused you concern with respect to her attitude toward feedback and self-improvement?
A. Again, it's hard for me to put things in time context. I don't know. I don't think so.
Q. You also identified Ms. Chan's engagement as being an area of concern that you had as of the P&P panel. What had you observed as of that time with respect to her engagement that caused you concern?
A. Again, whether these comments are all exactly prior to the P&P session or subsequent to it, I can't recall the specific time frame. But

things I'd observed -- again, all analysts travel and all analysts spend time out of the office, but she was out of the office significantly more than the average analyst, in my observation.
And then I did receive some feedback from Greg Mattiko at some point, again, whether it was prior to or subsequent to the P&P session I don't know, where he expressed frustration that she would go weeks and weeks without reaching out to him. Again, he was based in London, she was based in Hong Kong, and they were on the same team yet the conversation was only ever one way for extended periods of time.
Q. Anything else?
A. Those are my impressions.
Q. Anything else you can recall in terms of the observations that led you to have concerns about her engagement?
A. Not that I recall.
Q. With respect to Ms. Chan being out of the office, did you know where she was?
A. Typically not.
Q. Did you ask her?
A. Like checking up on her? No, that's not



Page 122

A. I can't specifically recall which session which individual was brought up, but I can infer from the nature of the conversation that we'd had over time that everyone that would have been reporting to me would have come up at some point.

Q. As of the P&P meeting, what was -- what was your view of Ms. Chan's performance as an investor?

A. I think we talked about this in the previous session. Generally, in my mind there was -- it was a mixed bag. I thought -- and I always find the positives in people. I thought she was a differentiated investor, growth investor, which was, you know, a skill set that we were trying to cultivate at the firm, as a growth investor in Asia. The other investors we had in Asia, were other styles, right, quality investors or contrarian investors. But I had those concerns, which I'd referenced earlier, around her abilities to communicate, her abilities to connect with other investors including members of her team. And yes, so it was, overall, a mixed picture in my mind.

Q. You had also identified as one of your areas of concern as of the P&P meeting Ms. Chan's

Page 123

impact on Mr. Mattiko's portfolio. What, if anything, had you observed as of that time that caused you that concern?

A. So that concern would stem from having looked at portfolio attribution reports. Again, at this point in time, I don't specifically recall which stocks that were referenced in those reports and what the exact degree of performance variation they were causing for Greg, but, you know, around that time, my general sense was that she wasn't hitting out of the park, right, she wasn't adding a lot of value through the investment ideas that she was contributing.

Q. And what data would you have relied upon to form that opinion?

A. Again, I would have relied upon portfolio attribution reports that are run systematically, right, based on the holdings of the portfolio and the performance of those holdings over time. And again, you can attribute individual holdings in a portfolio to the analyst who would have recommended that the PM buy that stock. So that's the nature of the reports we would be looking at. But, again, at this point in time I couldn't recall exactly what

Page 124

those reports were saying and what the numbers were.

Q. Okay. As of the timing of the P&P meeting we've talked about, had you spoken to Mr. Mattiko to get his sense in terms of whether or not Ms. Chan was -- was adding sufficient impact to his portfolio?

MR. PATERNITI: Objection.

A. I don't recall.

Q. And with respect to the attribution reports, were those something that were run on a periodic basis or was that something you would need to go into the system and look at?

A. So, we would do a systematic deep-dive on those reports at the -- as part of the year-end process, but they're also available ad hoc at any time if I or anyone else wanted to look at them.

Q. And when you say the year-end process, would that be the calendar year-end process?

A. I'm sorry, that's referring to the sort of feedback process for individuals. And, at Wellington, that process was sort of from the middle of August until -- bonuses were paid in the middle of December, and so in that window of time there's a lot of gathering of feedback in assessing those

Page 125

portfolio performance and that sort of -- it's an attempt to assess the year-end bonus of the employees.

Q. And what was your role in that process?

A. Right, so I would have been assessing the performance of the direct reports in GEPM that I would work with.

Q. And in terms of assessing those performance, one of the things you would do is you would look at these attribution reports, right?

A. That's one of many elements of the process.

Q. What are the other elements of the process?

A. Sure. There's a peer feedback process. You are might call it a 360-degree review, right, where colleagues and peers provide feedback on each other. It's a combination of qualitative inputs, descriptions of how they think they're doing as well as scores on a ten-point scale on a couple of attributes, so we've got a peer feedback score, we have an employee self review so each individual would write up their own self review. We'd have all these reports that are generated, attribution

MAGNA LEGAL SERVICES

Page 134

review process.

Q. How would it be determined who would be solicited to provide feedback on which individual?

MR. PATERNITI: Objection.

A. So, it was a free and open forum. So, any individual could go on there and give feedback for anybody else.

Q. Okay. In addition to that free and open forum, was there also an effort to solicit feedback from particular individuals?

A. Yeah, generally you would make an attempt that everybody participate.

Q. But am I right that you wouldn't -- that -- well, were employees expected to rank and provide feedback on every single person that they had worked with at Wellington in the past year?

MR. PATERNITI: Objection.

A. So you used the word "rank." This was not a ranking tool. Typically individuals that worked closely with other individuals would provide feedback on them. If they did not work closely with that person, they would typically not provide feedback.

Q. But is that what employees were asked to

Page 135

do, which was to provide feedback on anyone they had worked closely with in the past year?

A. Generally speaking, that's the guidance that is given, to please provide feedback on those people that you worked closely with whose work that you know, et cetera.

Q. And in terms of -- strike that.

That peer feedback was ultimately turned into a ranking; is that right?

A. No. Again, this was not a holistic ranking of, you know, one through a hundred of everybody. Because it was a multifactored, very nuanced process. As I mentioned, there were two variables which that feedback tool was able to gather numerical feedback on, and so on those two attributes we would typically rank people within GEPM on those attributes.

Q. And what were those attributes?

A. To the best of my recollection, one was a score on basically how strong of an investor you thought somebody was. And the second measure was the degree to which this person was a strong collaborator. So, how well did they share what they know.

Page 136

Q. And in terms of scoring that feedback, was -- did the number of entries provided for a particular person play a role in what their ultimate score was? So by that I mean --

MR. PATERNITI: Objection.

BY MR. HANNON:

Q. -- if you have a person who has a very, very high score but they only have one person who's provided feedback on them, is that taken into account in terms of scoring them compared to a person who might have a slightly lower score but who has received feedback from more individuals?

MR. PATERNITI: Objection.

A. So there's a quality and breadth element to the scores, so, yes. So there's -- when attempting to measure impact, you're also measuring how many other investors someone is having an impact with. And so, yeah, there's a measure of a score and then a measure of how many scores you're getting.

Q. Do you know what that formula was that sort of derived the ultimate score for that individual?

A. I don't remember. I don't know how to

Page 137

calculate it.

Q. Was that done by somebody at Wellington or was that just sort of computed automatically by the system?

MR. PATERNITI: Objection.

Go ahead, if you know.

A. Yeah, I remember seeing an output of it on the spreadsheet; I don't know how those systems were generated or if it was done offline.

Q. And that peer review feedback process that we've been describing, when would that typically start each year?

A. Late summer people are asked to start the process. So, end of August, early September, that sort of thing; I don't recall exactly when. It varied year to year.

Q. And then was there a period when that peer reviewed feedback process closed in terms of people had to have their feedback in by a certain deadline?

A. There was a deadline, yeah; it was within a few weeks after the system kicked off.

Q. And then just to close the loop on these, these portfolio attribution reports we spoke about a

MAGNA LEGAL SERVICES

had. I'm just asking in general if you had any criticisms or concerns of Ms. Meunier's performance as a portfolio manager during the period of time that she reported to you.

A. I can't recall any specific criticisms or concerns I would have raised with her.

Q. Again, I'm not asking about things you actually raised with her. I'm asking more generally if there were any criticisms or concerns that you had with respect to Ms. Meunier's performance as a portfolio manager during the time that she reported to you.

A. None that I can think of.

Q. The process and philos -- I'm sorry, the P&P panel that we've talked about, how did that come about?

A. Going way back, there was a fixed income portfolio manager called Jim Valone who felt very strongly that it was important for a portfolio manager to be able to express their investing philosophy and process at a very high level. He was an influential guy, it got traction, and over time the idea of having portfolio managers and then other investors as well, analysts and other investors as

well, having them spend time to think about and construct and then communicate their philosophy and process was a useful thing to help them be a better investor and help them to communicate with clients and help them to communicate also with their peers and colleagues.

Q. So was there some sort of formal process developed within Wellington in terms of when investors would go through this P&P panel?

MR. PATERNITI: Objection.

A. No, it was, again, the beginnings were quite organic. I don't recall the exact timing or specifics, but the first panel was convened I think in Boston with, again, the panel being senior investors and, again, it was set up as a feedback forum for other investors to -- again, to test their philosophy and process with their peers, get feedback, you know, hone their process over time based on that feedback. It was designed with that sort of growth mindset and skill development through feedback idea in mind.

Q. Okay. So that's how it was designed. How was it implemented?

A. So very much along those lines. You

know, the group in Boston had a semi regular cadence, they met every -- I'm guessing, every couple of months sort of thing, it wasn't a particularly -- like it wasn't formally scheduled. I think early participants in these events were volunteers, they just wanted to get some feedback from other people.

And then after, I don't know, a year or so, it has -- it was seen as a successful enterprise, people were getting good feedback, they were improving their process based on that feedback. And so, at some point in time the firm expanded it and they created a forum in, I believe, London and then this -- we created this forum in Asia-Pac.

Q. Did Mr. Oh go through a P&P panel?

A. I don't believe he presented, but I'm not sure.

Q. Did Ms. Meunier?

A. I don't recall.

Q. Did every analyst who became a portfolio manager go through the P&P panel?

A. No.

Q. Why not?

A. Well, again, it wasn't a formal meeting,

it wasn't a prerequisite to anything, it had no formal authority or decision making. Again, it was a forum for growth and self-improvement and learning through feedback. So it was not a regimented scheduling of, you know, of every person at a certain career stage.

Q. Okay. So then how did it come to be that Ms. Chan presented at a P&P panel?

A. So again, it was deemed a successful forum for providing feedback and for helping investors hone their process. I think the -- either several senior PMs had gone through this and had refined their process. There were a number of analysts who had gone through the forum to refine their process, so we just found it successful. And so I believe I would have encountered Gigi to write up her philosophy and process and present to the forum to get feedback.

Q. So it was your idea to have her present at the P&P panel?

A. I certainly was supportive of it. Whether it was driven solely by me, I don't recall. I doubt it. It probably would have been more of a collective decision. But, yeah, fair to say that



people were encouraged to participate.
Q. Okay. I'm not asking if people were encouraged to participate. I'm trying to find the sort of genesis of Ms. Chan's involvement in this P&P panel. And you indicated that you were supportive of it. Do you know who originally had the suggestion?
MR. PATERNITI: Objection.
Go ahead.
A. I don't.
Q. Had you previously supported someone engaging in a P&P panel?
A. Yes. Again, I don't recall at what point Gigi went in front of this panel versus the other people, but yeah, it was anybody that volunteered to present, I was supportive of.
Q. Did Ms. Chan volunteer?
A. I don't know. I mean, she would have been encouraged as other folks would have been encouraged.
Q. So you're not sure if she volunteered versus was told to do it?
A. Yeah, I mean, nobody would have been required to do it. It's -- like I say, it was not a

formal process with authority to make any kind of decisions.
Q. And how was the composition of the panel to whom Ms. Chan presented in her P&P meeting, how was that decided?
A. Right. So she presented to the Asia-Pac P&P, so, mainly just for logistical reasons the participants of the panel were all based in Asia-Pac. Part of the reason that the Asia-Pac P&P panel was impaneled was that, you know, having a single panel that was based not in your time zone was providing challenging scheduling issues. So, we gathered together a half dozen or so very senior people who had good experience in terms of either crafting and/or communicating and/or being able to parse out, you know, an investor's philosophy and process. So basically a panel of people that -- whose feedback would be valuable and valid.
Q. Who picked the members of the panel?
A. It's -- I don't exactly. It wasn't like one person picked them, it was a collaboration of, you know, people submitting ideas and discussing.
Q. Okay. So who were the individuals that made that decision collaboratively?

A. I couldn't tell you exactly who. I was involved, Charles Argyll was involved, Cheryl Duckworth was involved. Other senior people that would have been involved in the other P&P panels were probably involved. Erin Murphy was. I believe my counterpart on point for the one in Boston. But, yeah, I can't recall the exact moment in time where a list of names was generated, but it would have been a series of conversations amongst multiple people over some period of time.
Q. Okay. And when did this APAC P&P panel come into existence?
MR. PATERNITI: Objection.
A. I don't know exactly when.
Q. Had there been an APAC P&P panel meeting before Ms. Chan's presentation?
A. I believe that there were others before her; I don't exactly recall how many. But I don't believe she was the first.
Q. And what do you recall about how the subject of going through the P&P panel was first raised with Ms. Chan?
A. I don't have a specific recollection of how it was raised.

Q. Were you the one that raised it with her?
A. I probably was, but, again, I don't recall having that specific conversation.
Q. And at the time that you raised it with her, had you spoken to anyone else or otherwise communicated with anyone else about whether or not to suggest to Ms. Chan that she engage in the process?
MR. PATERNITI: Objection.
Go ahead.
A. Not that I specifically recall.
Q. In the run-up to Ms. Chan's presentation at the P&P panel, did you have any communications with the members of the panel about, you know, specific things to look for with respect to Ms. Chan?
A. No, I don't recall. If you're asking did I prep the panel with ... I don't recall doing that.
Q. Okay. And just so we're clear, but in terms of prep, I mean, you know, share with them any of your thoughts or observations regarding her strengths or weaknesses; had you done any of that in advance of the P&P panel meeting?
A. No.



Q. And the meeting, how long did it last?
A. I don't exactly know. I think they were scheduled for an hour.
Q. And did you take any notes?
A. So, typically an investor's P&P is meant to be a succinct document like on one sheet of paper. We would have sent that around to people in advance of the meeting, so I -- my practice would have been to have that piece of paper in front of me as the presenter was speaking and then jot notes down to be able to give feedback later on in the session.
Q. Okay. Do you recall anything about the one-pager that Ms. Chan had circulated in advance of her P&P meeting?
A. No, I don't recall the specifics of it. No.
Q. Do you recall any reaction you had to it in terms of if it was good, bad, so forth?
A. I don't, no. No, I don't recall having a reaction that I shared.
Q. And besides the -- what we've discussed with respect to Mr. Oh at the process -- the P&P meeting with Ms. Chan, do you recall anything else

about what was said or what transpired in the course of that meeting?
A. Yeah, I remember fragments of Gigi's presentation. I remember her getting some pushback on how she articulated her growth-investing philosophy. There was some challenging feedback around that from investors who themselves would favor more of a value investing style. I recall her answering those questions well about how she was -- how she defined growth and what she looked for. I think she even said something along the lines of: Yeah, I'm trying to invest for what I think the benchmark should look like in the future, as one mnemonic to think about growth investing.
But I also recall the presentation style as well as of her talk.
Q. Anything else you can recall about what transpired at that meeting?
A. The other specific recollection I have is she received a comment about how she worked with analysts, or how she would as a portfolio manager work with analysts, and I recall she made some very offhand, very flippant comment about, you know, if she's investing in a pharmaceuticals company and

they have -- there's a lot of science involved with the drugs they're creating, that she very offhandedly said that, well, I don't know about all these fancy words and all the drug science, I just rely on the healthcare team to tell me what's what. Which I felt was, you know, a weak moment in her presentation.
Q. Anything else you can recall?
A. As we discussed earlier, I recall Jun Oh making a comment about her presentation style, and I recall there was some back-and-forth about -- about her style of presenting.
Q. Anything else you can recall?
A. Those are my recollections.
Q. What do you recall about the back-and-forth concerning her style of presenting?
A. I think there was -- I think it was Cheryl Duckworth who suggested that, you know, the panel's time is better spent talking about the substance of her philosophy and process. And I recall Ray Helfer saying, well, yes, but it's also important to communicate well, otherwise the substance is not going to come through. So there was -- there was that level of, you know, feedback

and back and forth.
Q. Do you recall anything else about the back-and-forth concerning that topic?
A. I have recollection of Gigi sort of not taking that back-and-forth very well. She just sort of had a -- you can sort of see that she was becoming -- I wouldn't call it upset, but it just struck me as being angry over the whole, the whole nature of the fact that she was sitting there taking feedback from a group of individuals.
Q. Isn't that why she had gone there, to get feedback?
A. Exactly. Right. So that it -- it surprised and disappointed me that she was not taking on board the feedback, that she seemed to be offended by it and resistant to learning from it.
Q. What did you actually observe from Ms. Chan that caused you to believe that she was offended by the feedback and resistant to it?
A. I recall facial expressions that gave me the indication that she was closing herself off from the feedback.
Q. Anything else?
A. Yeah, that -- that's the picture that's



Page 162

in my mind.
Q. Anything else?
A. No.
Q. Am I right that, after this P&P panel, Ms. Chan complained about it to your boss?
MR. PATERNITI: Objection.
A. I don't know, I don't recall about that.
Q. Do you recall having a conversation with Charles Argyll about Ms. Chan's complaints about what occurred at the P&P panel?
A. I don't have a recollection of that specifically.
Q. Generally?
A. I mean, there are a number of conversations, as we discussed earlier; I had a conversation with Cheryl and Gigi. Would it surprise me that she had a conversation with Charles? It would not surprise me. But I was not in that conversation, so I don't know if it transpired.
Q. But I'm asking now about any conversation you had with Mr. Argyle concerning complaints that Ms. Chan had raised directly with him. Do you recall discussing that subject with him at all?

Page 163

A. No.
Q. So, subsequent to Ms. Chan -- actually, strike that.
Let me close the loop here on this P&P panel. In the process of these P&P panels, would there be some kind of end product in terms of a writeup that would be done when the meeting was concluded?
A. It wasn't a formal committee meeting, there were no minutes taken, that sort of thing, but typically you would circle back with the presenter and, you know, compile the aggregated feedback so that they could have that as a takeaway.
Q. And how would you typically aggregate that feedback?
A. I don't recall. It would be somebody writing an email based on what had happened, I'm guessing, but I don't recall exactly or specifically what transpired there.
Q. Okay. And who was responsible for aggregating the feedback from the P&P panel that Ms. Chan engaged in?
MR. PATERNITI: Objection.
A. Again, it was not a formal meeting with

Page 164

minutes that somebody was responsible for in that sense. But, yeah, I don't recall specifically but I would have guessed that someone, probably me, would have done that.
Q. Probably you, is that what you said?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. But you don't recall if you ever actually did that in this instance?
A. I don't recall, no.
Q. Do you recall having a -- strike that.
Do you recall if there was ever a follow-up meeting with Ms. Chan to talk about the comments that had been provided in aggregate?
A. So I recall there being subsequent conversations that she and I had; I don't recall specifically whether one of them was entirely based on the aggregate feedback versus the discussion we had earlier about the specific feedback from Jun Oh.
Q. So, after Ms. Chan complained to you about Jun Oh subsequent to the P&P panel meeting, was that the end of the discussion concerning that issue?

Page 165

MR. PATERNITI: Objection.
A. I don't ... I don't know.
Q. Did you observe any changes to Ms. Chan's demeanor subsequent to that P&P meeting?
A. Over a period of time, I -- in my mind it's not directly connected to prior to the meeting/ subsequent to the meeting, but, I mean, over a period of time I recall her demeanor around the office becoming very cold.
Q. Besides becoming cold, did you observe any other changes in Ms. Chan's demeanor?
A. That's how I would describe it, as cold. Standoffish is another word.
Q. Did you ever address this change in demeanor with Ms. Chan?
A. I don't recall a specific conversation.
Q. Anything generally?
A. Yeah, not that I recall.
Q. Did you observe any changes to Ms. Chan's work performance subsequent to the P&P meeting?
A. I don't recall that meeting being a particular inflection point for the work performance, you know, based observations.
Q. Okay. Well, you walked through earlier a

MAGNA LEGAL SERVICES

list of performance concerns that you thought you had before the P&P meeting. Can you think of any performance concerns that came to light subsequent to the meeting?

MR. PATERNITI: Objection. Asked and answered.

A. From my way of thinking, there was nothing about that meeting that was an inflection point for any observed changes in behavior or performance.

Q. Sure, I'm not asking you if it was an inflection point. I'm just trying to get a sense of if you observed anything subsequent to that in terms of new performance concerns that hadn't existed prior.

MR. PATERNITI: Objection. Asked and answered.

A. No.

MR. HANNON: Okay. Let's go off the record for a moment.

(Off the record, 12:16 p.m.)

(Back on record, 12:47 p.m.)

BY MR. HANNON:

Q. Mr. Baxter, you mentioned before about a

year-end process relative to performance review. Do you recall doing that year-end performance review process with Ms. Chan at the end of 2014?

A. I don't specifically recall but I know it happened because I would have done that with everybody.

Q. Do you have any recollection of what you learned during that review process?

A. 2014, would have been, what, her first fraction of a year, so, the main takeaways would have been largely, you know, potential -- some positives, some negatives; again, I don't recall the specifics but it was a balanced positive review, I think.

Q. You mentioned before that as part of the process you would, at least sometimes, seek -- I think what you referred to as targeted feedback. Do you recall who, if anyone, you sought specific feedback from with respect to Ms. Chan's review for 2014?

A. No, I don't recall specifically.

Q. Turning to 2015, what do you recall about your review of Ms. Chan's performance for that year?

A. Yeah. Again, I recall being a bit more

pointed on some presentation skills issues that would have surfaced during that year. I don't recall the exact messaging that I would have put in that review.

Q. With respect to soliciting targeted feedback, do you recall from whom you received targeted feedback in connection with Ms. Chan's 2015 review?

A. No, I don't recall.

Q. In conducting Ms. Chan's 2015 review, would it be fair to say that you found her work performance satisfactory that year?

MR. PATERNITI: Objection.

If you remember, go ahead.

A. Yeah, I don't recall the -- we wouldn't use terms like "satisfactory," but was she on a performance sort of, you know, watch. At that point, I don't believe so.

Q. So you indicated you wouldn't use terms like "satisfactory." What kind of terms would you use in terms of assessing an employee's overall performance?

A. It typically wouldn't be terms -- like I say, in those days we didn't really score people on

any kind of ranking or criteria.

Q. But you just used a phrase, I think, a moment ago, "performance watch." What did you mean by that?

A. I'm trying to find the term. It varied from time to time and wasn't consistently followed, but there's certainly -- you would occasionally have people that would be given a harsh message around their performance and there would be specific things that they would be asked to prove. So I would not have had her in that category in 2015, I don't believe.

Q. Okay. Let's turn to 2016. What do you recall about your review of Ms. Chan's performance for that year?

MR. PATERNITI: Objection.

A. The 2016 review was a joint review with myself and Charles Argyll.

Q. When you say it was a joint review, the process that you described earlier in terms of gathering data and all of that, was that jointly performed by you and Mr. Argyle?

A. In any year with every person there was some level of joint review along those lines between



Page 170

the associate director and the head. But in this particular case, I was referring to the fact that the year-end review meeting, the in-person sitdown was with three parties in the room: So Gigi, Charles, and myself.

Q. And why was that?

A. Well, it had already been announced, it was already clear that I was in this transition period, moving to the GRG role, and so therefore would not have been on point for follow-up in the coming year for the individuals under my review. And in the case of Gigi Chan, her year-end review message was a very targeted one about certain things that needed to improve or else her long-term career at Wellington was in jeopardy. And so, with that level of messaging, Charles wanted to be the one to deliver it himself and not, you know, some associate director who was not going to be around for any future follow-up.

Q. So, in terms of that review process, do you recall from whom, if anyone, you had sought targeted feedback?

A. I don't recall.

MR. PATERNITI: Objection.

Page 171

BY MR. HANNON:

Q. Fair to say that one of the individuals you did receive feedback from in connection with the 2016 review was Greg Mattiko?

MR. PATERNITI: Objection.

A. As team leader, he would have certainly been involved. I don't recall the specific delivery of that feedback.

Q. Okay. Do you recall anybody else besides Greg Mattiko providing any specific feedback relative to Ms. Chan's 2016 performance?

A. I don't recall individual pieces of feedback.

Q. You mentioned before that one of the things you would do in connection with a performance review was to look at the attribution reports. Did I hear that correctly?

A. Right.

Q. And what, if anything, do you recall about Ms. Chan's attribution reports for 2016?

MR. PATERNITI: Objection.

Go ahead.

A. Again, my recall is not of a nature that allows me to recall the numbers or the names. I

Page 172

just reiterate the comment I made earlier about, in general, as I sit here today my sense was that her level of contribution to emerging market opportunities portfolio was not high or not strong.

Q. But do you recall where you obtained that sense from?

A. No, I can't tell you exactly where that sense comes from.

Q. And then you indicated there was a -- there was a meeting with Ms. Chan, yourself, and Mr. Argyle in which Ms. Chan was informed of the sort of performance assessment for 2016; is that right?

MR. PATERNITI: Objection.

A. That's right.

Q. Where did that meeting take place?

A. It took place in Hong Kong.

Q. Do you recall how long it lasted?

A. Not precisely, no.

Q. What do you recall about that meeting?

A. Right. So, I recall it was in the conference room, the three of us were present. I recall Charles taking the lead on delivering his feedback. I recall Gigi's demeanor being

Page 173

extraordinarily cold throughout; icy, I would describe it as.

I remember one particular instance -- I didn't speak much, but I remember Gigi had complained about the firm not allowing her access to clients, and I had referenced that I had been in a number of meetings that she had attended with Greg Mattiko, meeting with clients, and so I tried to refute that point. That's the bulk of it.

I mean, Charles had a number of talking points. He went through those talking points. She was resistant to the feedback. I'd mentioned the bit about the client-facing opportunities. The tone was quite cold in the room. Those are my recollections.

Q. What observations did you make that led you to conclude that Ms. Chan's demeanor was icy?

A. It literally felt cold in the room. It was quite an unusual experience for me as a professional. I had been in dozens of such meetings in my career and had never witnessed that level of just sort of an icy stare directed at, you know, one's boss, effectively, right, because Charles was head of the department so he's the big boss at that



Page 174

point.

So again, I apologize for the descriptive term, but it was just more of a feeling than a specific, you know, memory or a specific gesture.

Q. During the course of that conversation, did Ms. Chan voice any concern that she had been treated differently at Wellington as a result of her race or sex?

A. I don't recall.

Q. Do you recall Ms. Chan saying: "Just because I'm female, just because I'm Chinese, doesn't mean the people can talk down at me"?

A. I don't recall her saying those words.

Q. Would that be something you would have remembered?

A. I don't recall her saying that.

Q. Prior to this year-end 2016 review, had Ms. Chan ever made to you any comments or complaints that she was being treated differently as a result of her sex?

A. Not that I recall.

Q. Prior to this year-end 2016 review meeting, had Ms. Chan ever made any comments or complaints to you that she felt she had been treated

Page 175

differently at Wellington because of her race?

A. No, I can't recall that.

Q. What do you recall Ms. Chan saying during the course of this year-end 2016 performance review meeting?

A. I specifically recall the -- her contention that she was not given the opportunity just to meet with clients. Because as I mentioned before, that was one area that I specifically responded with my personal knowledge of having been in those meetings.

The rest of my memories of that interaction were more just the feeling and the temperature in the room, that sort of thing.

Q. So you can't recall anything else that she said?

A. Again, a defensive tone and sort of a cold and sort of combative sort of front that she was putting up; that was the takeaway for me.

Q. And based upon that takeaway, how did you feel about Ms. Chan coming out of that meeting?

A. So, I came out of that meeting with a pessimism that things were going to improve.

Q. What kind of improvement were you looking

Page 176

for?

A. So, in a word I would say engagement, right, and so that would encompass collaboration with team, collaboration with other investors in the firm, engagement with other peers and professionals and line management who were delivering feedback. And the sense that I got walking out of that room was that she was determined to be disengaged, and to me that felt as if the odds of there being a long-term constructive work relationship between her and Wellington was diminishing.

Q. Did you and Mr. Argyle have any discussions about Gigi subsequent to the meeting you just talked about?

A. Yes, we would have met afterwards.

Q. And what if anything do you recall about those discussions?

A. Nothing specific.

Q. Anything generally?

A. Generally, I think the -- you know, again, I don't recall the specific conversation, but in general we would have discussed how it, you know, had not been a constructive meeting.

Q. Did Mr. Argyle share your pessimism?

Page 177

MR. PATERNITI: Objection.

A. Yeah, I don't know what his sentiments were coming out of that.

Q. Did he not share his sentiments with you?

A. Yeah, probably not in so many words. I'm giving you what's in my head now. I don't think he would have been conveying what was in his head at that time.

Q. I'm sorry, you don't think he would have been conveying what was in his head at that time?

A. Right. I don't recall that he would have had that nature of conversation with me.

Q. Why not?

A. I don't know. We were pretty drained after this.

Q. Besides Mr. Argyle, did you ever discuss this year-end meeting you had with Ms. Chan with anybody else?

A. I don't know.

Q. Did you ever have any communication with Mr. Philip, Henry Philip, regarding this year-end conversation with Ms. Chan?

A. Not that I recall.

Q. Do you recall ever communicating with

MAGNA LEGAL SERVICES

page: "I can give you some background of that session at our 2 p.m. meeting." Do you see that there?

A. Yes.

Q. Okay. Do you have any recollection of what you and Mr. Argyle discussed at the 2 p.m. meeting?

A. No.

Q. I'm going to show you another document here.

MR. HANNON: And I'll share this in the chat for your purposes, Steve, one moment.

BY MR. HANNON:

Q. 27933.

A. Got it.

Q. All right. So, Mr. Baxter, I'm showing you what's Bates stamped DEF00027933, we're going to call this Exhibit 2, and I can scroll down and let you review the whole document and I'll ask you a couple questions about it, okay?

A. Sure.

(Document to be marked as Exhibit 2)

Q. Are you ready to scroll?

A. Go ahead and scroll.

Okay.

Okay.

Okay.

Okay.

Okay.

Okay.

Q. And that, mercifully, is the end of that document. So, just going back up to the top here -- I first want to ask you about the -- strike that.

So, am I right there is an email here being forwarded first to -- first from Mr. Philip to you and from you to Mr. Baxter. Do you see that?

A. Me to Mr. Argyle.

Q. I'm sorry. Correct. From you to Mr. Argyle, correct?

A. Yes.

Q. And the message that is being forwarded, this concerns a complaint that Ms. Chan had raised with British Airways; is that right?

A. That's what I understand, yes.

Q. And in the subject line of her complaint, Ms. Chan had noted bullying, racism and sexism. Do you see that?

A. I see that.

Q. Now, Mr. Philip -- yeah, Mr. Philip had forwarded this to you on August 12, 2015; is that right?

A. That's what it says here, yes.

Q. And you forwarded it to Mr. Argyle October 8, 2015; is that right?

A. Okay.

Q. Had you made Mr. Argyle aware of this issue prior to October 8, 2015?

A. It looks like I previously discussed it at least the prior day, based on the text in my email.

Q. But prior to October of 2015, had you and Mr. Argyle had any discussion about Ms. Chan's complaints about bullying, racism and sexism to British Airways?

MR. PATERNITI: Objection.

A. Not that I recall.

Q. But fair to say that in your meeting with Mr. Argyle on October 7, 2015, the subject of Ms. Chan's complaints to British Airways about bullying, racism and sexism had come up; is that right?

MR. PATERNITI: Objection.

A. I don't recall. It seems that way from

this document.

Q. Can you tell me how it came up?

MR. PATERNITI: Objection.

A. I don't remember.

Q. Can you tell me why it came up?

A. I don't know.

Q. Do you know if it came up because her complaints regarding her treatment by British Airways were similar to the complaints that she was raising regarding Mr. Ho's treatment of her at the P&P panel?

MR. PATERNITI: Objection.

A. I don't know.

Q. I'm going to show you another document, sir. First I'll share it with Mr. Paterniti.

Mr. Baxter, I'm now showing you what's been Bates stamped DEF00028528, and this one's a lot shorter than the last one but I'll give you a few moments to review it and I'll ask you questions.

(Document to be marked as Exhibit 3)

A. Okay, thanks.

Okay.

Okay.

Q. So, directing you back up to the top

MAGNA LEGAL SERVICES

here, this is an email from you to Mr. Argyle on October 15, 2015; is that right?
A. Yes.
Q. And in the first bullet, you reference: "I had a lengthy convo with Gigi, mostly listening." Do you see that?
A. Okay.
Q. Do you know if that's the same conversation we spoke about earlier in which you spoke to her about Mr. Oh's comments?
A. I don't know.
Q. In the next sentence you write: "She's sort of on a war footing these days, and I have very strong doubts whether we can turn her around." Do you see that?
A. Yes.
Q. What did you mean by "she's sort of on a war footing these days"?
A. That refers to her approach to receiving feedback.
Q. And when you say "her approach to receiving feedback," are you referring to the P&P panel?
A. Just generally. It sounds to me like I

was referring to just a predisposition to pushback and -- and contradict the feedback that's inbound to her.
Q. Well, you write "these days." Would you agree that you were referring to some change in Ms. Chan that had occurred?
MR. PATERNITI: Objection.
A. I think it's just referring to that period of time.
Q. Scrolling down in the message, you recount here Ms. Chan saying to you: "That's exactly my point. If that's him trying to be constructive, then it's clear that he disrespects me." Do you see that?
A. Yes.
Q. And that's Ms. Chan referring to the comment that Mr. Oh had made at the P&P meeting?
A. Right.
Q. And then you write: "There's a lot more, but my enthusiasm to creatively look for China Growth seed funding is waning." Do you see that?
A. Yes.
Q. What is this reference to "creatively look for China Growth seed funding"?

A. The China Growth is the name of the -- a portfolio that she was about to manage or was -- I don't know the exact stage of when that portfolio was up and running or just, you know, a portfolio in concept. But seed funding is when you're talking to external clients and you want sort of that initial external client that provided, you know, a chunk of money to manage. And creatively look for that funding is, again, using internal influence to, you know, speak with sales and marketing people to drum up support to find that funding.
Q. At some point in time did you creatively look for a China Growth seed funding?
A. These are colloquial terms, this is an email, it's not a job description of mine, but there was a period of time where I was more supportive of helping to launch a strategy with external money that Gigi would manage.
Q. Okay. And when was that period?
A. Yeah. At some point prior to this period.
Q. Okay. And had you actually done anything in furtherance of finding that seed funding?
A. Like -- done something, like specific

actions taken?
Q. Sure.
A. I mean, being supportive and looking for ways to, you know, get her in front of clients and different audiences; we referenced previously about client forum that she presented in front of several dozen clients. So, yeah, there were ways that I was actively supportive of her having an external presence.
Q. And was that in an effort to help identify seed funding for the China Growth portfolio?
A. Yes, it's all part of being supportive to get a new investment approach off the ground.
Q. Had you had any dialogue internal at Wellington in furtherance of finding some seed funding for the China Growth portfolio?
MR. PATERNITI: Objection.
A. Yeah, I don't recall specific conversations. It's -- the process is more organic, it's not as mechanical as you might think.
Q. So you're not sure if you'd had any such discussions?
MR. PATERNITI: Objection.

MAGNA LEGAL SERVICES

A. I don't specifically recall meetings that were solely focused with that particular goal in mind, but there were many discussions and events we would have that were intended to give her a profile with our internal salespeople.

Q. Prior to the P&P panel that Ms. Chan attended, had you and Mr. Argyle had any discussions about launching the China Growth portfolio?

A. Yeah, I don't know, again, the timing of discussions relative to that particular P&P session, I don't know the timing of things. But we would have had conversations over time about China Growth as a concept and potentially as a portfolio.

Q. But you can't recall when those conversations took place?

A. That's right.

Q. Was the P&P panel that Ms. Chan attended, was that part of the process for her to hopefully launch the China Growth portfolio?

A. No.

Q. Was at some point seed funding identified for the China Growth portfolio?

A. I believe at some point the fund was launched with seed funding that was internally

sourced.

Q. Subsequent to this email here that we're looking at marked as Exhibit 2, do you know if you did anything to look for China Growth seed funding?

A. So again, I guess conceptually -- again, the terms can be used in different ways, but as you mentioned, as I agreed, ultimately there was internal seed funding so the -- some entity within the firm, I think our Luxembourg-based use of fund division came up with a million dollars to be able to create seeding for that portfolio such that it would be a live track record. So that's -- so the fund was seeded. But that -- there's still the process of trying to find external clients to invest, you know, real money into it. And so I guess those are two different processes that you can follow.

Q. Sure. With respect to the process that resulted in the internal funding, were you involved in that?

A. Yes, at some level I was involved in that.

Q. I'm sorry, what did you say?

A. At some level I was involved in that.

Q. What was your level of involvement?

A. It was just general support.

Q. What do you mean by general support?

A. It's not a decision to be made by someone in my position to say that the firm or the Luxembourg fund entity should invest a million dollars in this fund or that fund. It was a committee or other process that would have made that ultimate decision. But, you know, if I, as the proposed fund managers -- my manager were not supportive, it wouldn't get done. So, again, on some level I would have either been supportive or not supportive for that to go ahead.

Q. Okay. Had you played any role in identifying the potential source of internal seed funding?

A. So, to the best my recollection, there was like some sort of incubation pool of funds that was available for this sort of, you know, prospective fund launch, and there was a committee of people who had the ultimate decision as to which different investment ideas got that seed funding.

Q. Okay.

A. And I was not on that committee.

Q. But someone had to go and ask for it, right?

MR. PATERNITI: Objection.

A. I don't exactly recall how that worked. There was a list of proposals and at some point this would have been on it and at some point it would have been approved.

Q. My question, sir, is just if someone had to make the request. Did someone have to make the request?

A. I don't recall how that mechanically works. It was through the chain of requesting and decision making; I don't recall how that works.

Q. Okay. Did you make a request for that funding?

A. I don't know.

Q. Just finishing up here on the exhibit that's still on your screen, after noting how your enthusiasm to creatively look for China Growth seed funding is waning, you write in the next sentence: "I'll let the waves wash over me next week in Sri Lanka and hope to come back with a fresh perspective on this one." Do you see that?

A. Yes.

MAGNA LEGAL SERVICES

Q. And that was a reference to your upcoming vacation?
A. That's right.
Q. When you returned from vacation, had your perspective on this issue changed?
A. I don't recall.
Q. So we've been talking about the seed funding and you've indicated you're not sure how that came -- how that process evolved. How about just the launch of the fund in general; was there -- was there some process by which there was some recommendation given or some request made for authority to have Ms. Chan start China Growth fund?
A. I don't remember the mechanics of how that all comes together.
Q. Do you know when it occurred?
A. No, I don't know the timing of it.
Q. Were you supportive of Ms. Chan starting her China Growth fund?
A. Yes. Ultimately I was supportive of it.
Q. Why?
A. I felt China is an important market; I felt that the portfolios that the firm was offering for China equities were focused on different styles

of investing. And Gigi's growth style was differentiated. And in the same way as in the U.S., a firm like Wellington or T. Rowe price would have multiple U.S. equity funds with different investing styles, my belief was that China was a big enough market that a firm like Wellington should have multiple funds of multiple different styles in a market of that size.
Q. Any other reasons?
A. I guess ultimately I was hopeful that by creating a portfolio for her to manage, we could untap some of the potential that I had initially seen in Gigi in our initial interviews when I had recommended that I thought she was a good analyst.
Q. Any other reasons?
A. No.
Q. Subsequent to Ms. Gigi launching her China Growth fund, do you recall if -- let me back up.
So, Ms. Chan, she started her China Growth fund with the internal seed funding you mentioned; is that right?
A. That's my recollection.
Q. Okay. And so once the fund was up and

running with that -- with that seed money, was she permitted to go and try to find additional investors to invest in her fund?
A. So the way you phrased that doesn't resonate with how the firm would operate. There's no -- in the sense of having permission or not is not how things would play out.
Q. How would things play out in that regard?
A. Typically for a new fund launch such as that where the target market was institutional clients, you would typically start a portfolio with a small amount of seed cap; I think, to the best of my recollection, it was a million U.S. dollars that was put into this portfolio when it was launched. And then it would build a track record over a period of time.
So, again, typically an institution would want to see a three-year track record to allow them to gain some level of conviction that that portfolio had strong performance and therefore give them some sense that the future performance might also be good. So typically the process would be, put in a small amount of seed money and then you watch and wait and the PM builds a track record and then

future conversations with prospective institutional clients come later.
Q. And was that Wellington's plan with respect to the China Growth fund?
A. With respect to -- yes, that fund and other funds that would be launched in a similar way it's a process and it plays out over -- typically it plays out over a number of years.
Q. Am I right that if Ms. Chan had identified an institutional investor who was interested in investing in the China Growth fund immediately, that that would have been okay with Wellington?
A. So it would be the firm's practice to opportunistically, um -- yeah, if there were clients or what we call prospects -- an investor is not yet a client, but it might be -- if a prospect was interested in a fund with a short track record, yeah, if it's an enterprise, you'd certainly entertain a conversation about taking on that organization as a client.
Q. But Ms. Chan wouldn't have unilateral authority to take on the institution as a client; is that right?



Q. I direct your attention to this line here I'm pointing at that reads: "She mentioned something about a possible road show with Alex for" -- and there's a redacted name. And you write in parenthesis: "I will follow up with Alex on that on my end; we should absolutely not be committing to anything like that." Do you see that?
A. Yes.
Q. Okay. Would this be one of the business opportunities from Alex you were referring to earlier?
A. I believe so.
Q. And why was it that you believed that "we should absolutely not be committing to anything like that"?
A. To the best of my recollection, there was discussion of her doing a road show while on maternity leave, which we would certainly not have encouraged.
Q. Why not?
A. Because when you're on maternity leave, you're meant to be on maternity leave, not working.
Q. But why wouldn't Ms. Chan be able to make that choice?

A. It's my understanding that's not how we would have handled maternity leave.
Q. Did you tell that to Ms. Chan during this meeting?
A. I don't recall.
Q. Why would you follow up with the issue of Alex as opposed to discussing it with Ms. Chan?
A. I don't know.
Q. You then go on to write: "What was extremely atypical was the chill that was in the room." Do you see that sentence there?
A. Yes.
Q. And you go on you say "It was palpable and very unpleasant. I have had difficult conversations before and the message itself today wasn't challenging or unexpected and the whole thing was over in ten minutes. But this was as uncomfortable a ten minute stretch as I've had as a manager." Do you see that?
A. Yes.
Q. What made it so uncomfortable?
A. So, Gigi's demeanor and expression was, I found, uncomfortable, sort of the cold stare. It was -- it was -- it was unusual. There's no way to

-- I mean, it was very -- it was more an emotional reaction than it was, you know, a rash of any particular words having been spoken, but it was ... I recall having felt uncomfortable.
Q. What in your mind constitutes a cold stare?
MR. PATERNITI: Objection.
A. You know, when you see it, it's ...
Q. Can you describe it for me?
A. I can't describe it beyond what I've tried to convey.
Q. Besides Ms. Chan's cold stare, was there anything else about her demeanor or expression that made you uncomfortable?
A. No.
Q. Was that the last time that you met with Ms. Chan?
A. I can't recall any meeting subsequent to that.
(Pause)
Q. How did you find out that Ms. Chan's employment with Wellington was being terminated?
A. I don't recall.
Q. Did you learn she was being fired before

it actually took place?
A. I believe I found out after the fact.
Q. When the decision was made to terminate her, did anyone consult with you for your opinion?
MR. PATERNITI: Objection.
Go ahead.
A. Not that I recall specifically.
Q. Can you recall any discussions you had with Greg Mattiko concerning the advisability of terminating Ms. Chan's employment?
A. No.
Q. How about Mr. Philip?
A. No.
Q. How about Mr. Argyle?
A. No.
Q. In connection with Ms. Chan taking maternity leave, do you recall there being any concern about how there would be a backup arrangement?
A. I recall --
MR. PATERNITI: Objection.
Go ahead.
A. -- some discussions about that and I don't recall exactly where those conversations



REPORTER'S CERTIFICATE

I, SHARON R. ROY, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was properly identified and put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 3rd day of November, 2020.

Sharon Roy

SHARON R. ROY, RPR
Notary Public
My commission expires: July 18, 2025

PLEASE NOTE:

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.



WITNESS: Thomas Baxter
CASE: Chan v. Wellington Management, Argyle.

SIGNATURE PAGE/ERRATA SHEET

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|---|---|---|
| 7 | 3 | ~~activities~~ equities |
| 10 | 16 | ~~panelists~~ analysts |
| 11 | 19 | ~~and~~ e |
| 12 | 1 | ~~and~~ e |
| 14 | 18 | ~~IR~~ contrarian |
| 14 | 19 | ~~GEPM~~ Japan |
| 20 | 14 | ~~Volare~~ Vilari |
| 22 | 1 | ~~Hong Kong~~ |
| 25 | 1 | ~~until~~ in |
| 30 | 1 | ~~and~~ in |
| 38 | 7 | ~~looking~~ nothing |
| 38 | 20 | ~~Lynn~~ Lim |
| 50 | 17 | ~~to~~ or |

I have read the transcript of my deposition taken October 16, 2020. Except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed under the pains and penalties of perjury:

[signature] Date 6 Jan 2021

Deponent, Thomas Baxter

MAGNA
LEGAL SERVICES

WITNESS: Thomas Baxter

CASE: Chan v. Wellington Management, Argyle.

SIGNATURE PAGE/ERRATA SHEET

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|---|---|---|
| 58 | 23 | ~~home~~ Hong Kong |
| 65 | 4 | ~~new a~~ |
| 65 | 5 | ~~GPM~~ GEPM |
| 65 | 16 | ~~meet~~ me |
| 66 | 15 | ~~hard~~ large |
| 70 | 12 | ~~companies~~ company |
| 96 | 1 | ~~those companies,~~ the portfolios; |
| 115 | 18 | ~~Argyll~~ Argyle |
| 127 | 20 | ~~as~~ and |
| 133 | 20 | ~~wasn't~~ was |
| 140 | 20 | ~~in~~ an |
| 146 | 2 | ~~Argyll~~ Argyle |
| 153 | 16 | ~~encountered~~ encouraged |

I have read the transcript of my deposition taken October 16, 2020. Except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed under the pains and penalties of perjury:

[signature]

Deponent, Thomas Baxter Date 6 Jan 2021

MAGNA
LEGAL SERVICES

WITNESS: Thomas Baxter
CASE: Chan v. Wellington Management, Argyle.

SIGNATURE PAGE/ERRATA SHEET

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
| --- | --- | --- |
| 156 | 2 | ~~Argytt~~ Argyle |
| 162 | 9 | ~~Argytt~~ Argyle |
| 169 | 18 | ~~Argytt~~ Argyle |
| 185 | 10 | ~~Ho~~ Oh |
| 191 | 9 | ~~use of~~ offshore |
| 195 | 3 | ~~price~~ Price |
| 203 | 3 | ~~our~~ a |
| 207 | 15 | ~~industries~~ industry |
| | | |
| | | |
| | | |
| | | |
| | | |

I have read the transcript of my deposition taken October 16, 2020. Except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signed under the pains and penalties of perjury:

[signature] Date 6 Jan 2021

Deponent, Thomas Baxter

MAGNA