**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GIGI KAI ZI CHAN,<br><br>            Plaintiff,<br><br>v.<br><br>WELLINGTON MANAGEMENT COMPANY LLP and CHARLES ARGYLE,<br><br>            Defendants. | Civil Action No. 19-cv-11605-WGY |

## <u>DECLARATION OF DEBORAH LOMBARDO</u>

I, Deborah Lombardo, am competent to testify to the matters contained in this Declaration. This Declaration is based upon my personal knowledge and review of business records and is under oath.

1.      I am over the age of 18 and believe in the obligation of an oath.

2.      I am currently employed by Jackson Lewis PC as a paralegal, located in the Hartford, CT office.

3.      As part of my duties and responsibilities at Jackson Lewis PC, I have done work on the instant case, *Chan v. Wellington Management Company LLP and Charles Argyle*, 19-cv-11605-WGY.

4.      A true and accurate copy of Plaintiff's interrogatory responses as received by Defendants in discovery are attached as <u>Exhibit 1</u>.

5.      Included in my work on this matter, I was responsible preparing audio recordings produced by Plaintiff for transcription by the court reporter service.

6.      A true and accurate copy of the November 2, 2016 audio recording of Charles Argyle and Thomas Baxter as produced by Plaintiff to Defendants in discovery is attached as Exhibit 2.

7.      A true and accurate copy of the transcript of the November 2, 2016 audio recording of Charles Argyle and Thomas Baxter is attached as Exhibit 3.

8.      A true and accurate copy of the May 31, 2017 audio recording of Greg Mattiko as produced by Plaintiff to Defendants in discovery is attached as Exhibit 4.

9.      A true and accurate copy of the transcript of the May 31, 2017 audio recording of Greg Mattiko is attached as Exhibit 5.

10.      A true and accurate copy of the ██████████████████████████████ ████████████ as produced pursuant to record subpoena to Defendants in discovery is attached as Exhibit 6.

11.      A true and accurate copy of Plaintiff's resume as produced by Plaintiff to Defendants in discovery is attached as Exhibit 7.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of February, 2021.

*Deborah Lombardo*
Deborah Lombardo

## <u>CERTIFICATE OF SERVICE</u>

This hereby certifies that on this 22nd day of February 2021, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


/s/ *Benjamin Davis*
Jackson Lewis P.C.


4849-8349-4877, v. 1


4849-8349-4877, v. 1

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GIGI KAI ZI CHAN,

      Plaintiff,

         v.

WELLINGTON MANAGEMENT
COMPANY LLP and CHARLES ARGYLE,

      Defendants.

Civil Action No. 1:19-CV-11605-WGY

## PLAINTIFF GIGI KAI ZI CHAN'S ANSWERS AND OBJECTIONS TO DEFENDANT WELLINGTON MANAGEMENT COMPANY LLP'S FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 26 and 33, Plaintiff Gigi Kai Zi Chan ("Plaintiff") submits the following objections and answers to Defendant's Interrogatories. The following answers and objections are based on information reasonably available to Plaintiff as of the date of this response. Plaintiff reserves the right, consistent with the applicable Rules, to revise, amend, correct, supplement, modify, or clarify her objections and answers to the Interrogatories as appropriate.

## RESPONSES

### INTERROGATORY NO: 1:

Please state Plaintiff's name; address; date of birth; place of birth; marital status (including spouse's name and date of marriage if applicable); number, ages and names of children.

**Objection:** Plaintiff objects to this request insofar as it seeks information such as her children's names that is not relevant to any party's claims or defenses, as, to that extent, it exceeds the scope of discovery permitted under Fed. R. Civ. P. 26.

**EXHIBIT**

No. 6  10/6/2020

exhibitsticker.com

**Answer:**   Subject to and without waiving the foregoing objections, Plaintiff responds that Plaintiff's name is Gigi Kai Zi Chan. Her address is 375 Route des Prades, 12130 St Geniez d'Olt, France. Her date of birth is 17 August 1978 and her place of birth is Hong Kong. Plaintiff is married to Maxence Vinot, and their date of marriage is 12 August 2014. Plaintiff has two children, whose ages are 1 year, and 3 years.

**INTERROGATORY NO: 2:**

Identify each and every license, degree or certificate Plaintiff has received, and identify each and every educational institution Plaintiff attended, and state the dates of attendance, whether Plaintiff received a degree or certificate therefrom, and the nature and the date of the degree or certificate, if applicable.

**Objection**:   Plaintiff objects to this interrogatory on the grounds that it is overly broad and that the burden imposed by this interrogatory is not proportional to the needs of the case, and therefore, it exceeds the scope of discovery permitted under Fed. R. Civ. P. 26, particularly to the extent it contains no temporal limitation and fails to define or limit the request for "every license, degree, or certificate" to credentials relevant to Plaintiff's career in finance.

**Answer:**   Subject to and without waiving the foregoing objections, Plaintiff identifies the following substantial summary of her education and professional credentialing since the age of 18.

Plaintiff attended St. Hilda's College, Oxford University from October 1996 to June 1999 and obtained a Bachelor of Arts in Philosophy, Politics and Economics in 1999 and a Master of Arts in Philosophy, Politics and Economics in 2010. Plaintiff attended The University of Law (formerly The College of Law) from September 1999 to June 2000 and obtained a Postgraduate Diploma in Law in 2001. Plaintiff was awarded Chartered Financial Analyst (CFA) charterholder in 2004 (3 exams passed on 25 Jan 2001). Plaintiff has been awarded the following professional licensing ('Approved

2

Person' to perform controlled function CF30 (Customer function) from the Financial Conduct

Authority (United Kingdom) issued on 25 February 2008, Module 5 from the Monetary

Authority of Singapore (Singapore) issued on 31 January 2012, Type 1 (Dealing in Securities)

from the Securities & Futures Commission (Hong Kong) issued on 7 May 2012 and Type 9

(Asset Management) from the Securities & Futures Commission (Hong Kong) on 5 August

2015.

### INTERROGATORY NO: 3:

Identify each and every employer by whom Plaintiff has been employed, other than WMHK, including each employer's last known address and telephone number, and identify each period of employment, self-employment, consulting, or other business/independent contractor relationship. For each such period of self-employment, consulting or other business relationship, state:

(a)  The date(s) of each such employment, self-employment, consulting, or other business relationship, and Plaintiff's job titles and the duties performed by Plaintiff for each employer or in self-employment, consulting, or other business relationship;

(b) Plaintiff's rate or rates of pay during each of the above positions, or consulting, or other business relationship including identification of any raise or raises in pay in connection with any of the positions, with the dates thereof; and a description of any employee benefits Plaintiff received in connection with each employment, self-employment, consulting, or other business relationship; and any other compensation or remuneration received by Plaintiff in connection with each employment, self-employment, consulting, or other business relationship;

(c) The reason for the termination or conclusion of each employment, self-employment, consulting, or other business relationship, including but not limited to a statement of whether the severance of such employment was voluntary or involuntary; and identify each and every document upon which Plaintiff relied in answering, or which relates in any way to the information requested in this interrogatory; and

(d) The name(s) of each supervisor or manager of Plaintiff in each position.

**Objection**:      Plaintiff objects to this interrogatory on the grounds it seeks information that is

not relevant to any party's claims or defenses, is overly broad and the burden imposed by this

interrogatory is not proportional to the needs of the case, and therefore, it exceeds the scope of

discovery permitted under Fed. R. Civ. P. 26, particularly to the extent it contains no temporal

limitation, seeks information that is already within Defendants' possession, and seeks

3

identification of "each and every document upon which Plaintiff relied in answering." Plaintiff

further objects to this interrogatory to the extent that it seeks Privileged Information.

**Answer:**        Subject to and without waiving the foregoing objections, Plaintiff provides the

following information with respect to employers other than WMHK and Wellington

Management Company LLP, since the completion of her post-secondary education.

| **Information Requested** | **Answers** |
| --- | --- |
| | |
| Employer: | Columbia Threadneedle Investments |
| Address and Telephone Number | 78 Cannon St, London EC4N 6AG, UK |
| Dates of Employment | October 30, 2000 until October 10, 2013 |
| Job Titles and Duties | 1. Title: Fund Manager (March 2004-October 2013)<br>2. Title: Trainee Fund Manager (October 2000-February 2004) |
| Rates of Pay (annual unless otherwise stated) | 1. April 2013 to October 2013:  Basic salary SGD250,000, Housing allowance SGD6,000 per month (cash)<br>2. April 2012 to March 2013:  Basic salary SGD250,000, Housing allowance SGD6,000 per month (cash), Profit share SGD267,500 (cash), Ameriprise restricted Stock Units SGD43,750, Threadneedle Fund Deferral SGD43,750<br>3. April 2011 to March 2012 (Singapore based from October 2011 onwards):  Basic salary: GBP105,000 increased to SGD250,000 from October 2011 onwards, Housing allowance SGD6,000 per month (cash), Profit share GBP328,812 (cash), Equity Incentive plans SGD60,000<br>4. April 2010 to March 2011:  Basic salary GBP90,000, Profit share GBP100,000 (cash), Equity Incentive Plan GBP100,000<br>5. April 2009 to March 2010:  Basic salary GBP85,000, Profit share GBP80,000 (cash), Equity Incentive Plan GBP22,497<br>6. April 2008 to March 2009:  Basic salary GBP85,000, Profit share GBP60,000 (cash), Equity Incentive Plan: GBP17,820<br>7. April 2007 to March 2008:  Basic salary GBP77,500, Cash incentive award GBP225,000, Crescendo Fund Remuneration GBP10,000 (cash), Equity Participation Plan GBP74,251 |

| | |
|---|---|
| | 8. April 2006 to March 2007:  Basic salary GBP72,500 increased to GBP77,500 from November 2006 onwards, Corporate Bonus GBP190,584 (cash), Equity Incentive Plan GBP62,895 |
| | 9. April 2005 to March 2006:  Basic salary GBP55,000 increased to GBP65,000 from October 2005 onwards, Corporate bonus GBP90,194 (cash), Equity Incentive Plan GBP29,756 |
| | 10. April 2004 to March 2005:  Basic salary GBP44,000 increased to GBP50,000 from November 2004 onwards, Corporate Bonus GBP27,075, Equity Incentive Plan  GBP8,935 |
| | 11. April 2003 to March 2004:  Basic salary GBP34,000 increased to GBP40,000 from November 2003 onwards, Bonus GBP13,120 (cash) |
| | 12. April 2002 to March 2003:  Basic salary GBP31,000, Bonus GBP6,200 (cash) |
| | 13. April 2001 to March 2002:  Basic salary GBP25,000 increased to GBP27,500 from May 2001 onwards, Bonus GBP5,800 (cash) |
| | 14. October 2000 to March 2001:  Basic salary GBP25,000, Bonus GBP1,500 (cash) |
| Benefits (annual unless stated otherwise) | 1. October 2011 to September 2013:  CPF equivalent (17% of basic salary or SGD42,500 paid in cash), Healthcare scheme |
| | 2. October 2000 until September 2010:  UK defined benefits and CPF equivalent, Healthcare scheme |

## INTERROGATORY NO: 4:

For each position Plaintiff held while employed by WMHK, state the job titles and dates of each job; the salaries or compensation plans for each job; and, the name of Plaintiff's supervisor or immediate superior in each position.

**Objection:**    Plaintiff objects to this interrogatory to the extent it seeks information concerning

her employment with WMHK and Wellington Management Company LLP, as such information

is already within Defendants' possession and, therefore, the interrogatory imposes an undue

burden.

**Answer:**    Subject to and without waiving the foregoing objection, Plaintiff answers that

during the time she was employed by WMHK, her only other employer was Wellington

Management Company LLP.

### **INTERROGATORY NO: 5:**

State whether Plaintiff has ever applied for unemployment compensation benefits, workers' compensation benefits, income replacement benefits, disability benefits, social security, supplemental security income, any other benefit of a similar nature to the preceding list regardless of nomenclature, or benefits under any policy of insurance. If the answer is in the affirmative, identify the governmental agency(ies) or department(s), company(ies) or entities to whom such application was made; state the date of the application; the disposition of the application; the amount of the benefit paid, if any; and identify each and every document related to any such application and the disposition thereof.

**Objection**:     Plaintiff objects to this interrogatory on the grounds that it is overly broad and

vague, that it seeks irrelevant information, and that the burden imposed by this interrogatory is

not proportional to the needs of the case, particularly as it contains no temporal limitation; does

not define "benefit of a similar nature"; and refers to "any policy of insurance" without limiting

such policies to forms of insurance given in the employment context or for the purpose of

replacing income; and seeks identification of "each and every document" that is "related to"

certain applications for benefits; and therefore, it exceeds the scope of discovery permitted under

Fed. R. Civ. P. 26. Plaintiff further objects to this interrogatory to the extent it seeks Privileged

Information.

**Answer:**     Subject to and without waiving the foregoing objections, to the best of her

knowledge and recollection, Plaintiff has never applied for unemployment compensation

benefits, workers' compensation benefits, income replacement benefits, disability benefits, social

security, supplemental security income, any other benefit of a similar nature to the preceding list

regardless of nomenclature, or benefits under any policy of insurance on account of lost

employment.

### INTERROGATORY NO: 6:

If Plaintiff currently is receiving any disability, social security or supplemental security security benefits or any similar benefits regardless of nomenclature, state: the regularity with with which payments are made; the amount of such payments; the name and address of the entity the entity making such payment; and the name and address of any health care provider who completed medical documentation or certifications, which were provided to any such entity.

**Objection**:     Plaintiff objects to this interrogatory on the grounds that it is vague in its use of

the phrase "any similar benefits."

**Answer**:     Subject to and without waiving the foregoing objections, Plaintiff states that she is

not receiving short-term disability benefits or long-term disability benefits. Plaintiff states that

she is not receiving Social Security Disability Insurance Benefits or Supplemental Security

Income from the Social Security Administration of the United States, nor is she receiving any

benefits which she believes to constitute "similar benefits," based on her understanding of that

term.

### INTERROGATORY NO: 7:

If Plaintiff made any statement(s) in any form to any person regarding any of the events or happenings referred to in the Complaint, state the name and address of the person(s) to whom such statements were made, the names and addresses of the persons presently having custody of such statements or having heard such statements, the date each was given, and the content of each statement.

**Objection:**     Plaintiff objects to this interrogatory on the grounds that it is vague insofar as it

does not define the terms "statement" or "happenings." Plaintiff further objects to this

interrogatory on the grounds it seeks information that is not relevant to any party's claims or

defenses, is overly broad and the burden imposed by this interrogatory is not proportional to the

needs of this case, particularly to the extent it is not limited to the "events or happenings referred

to in the Complaint" that are in dispute. Plaintiff further objects to this interrogatory to the extent

it seeks Privileged Information.

**Answer:**     Subject to and without waiving the foregoing objections, Plaintiff identifies the

7

following list of the oral and written statements that, to the best of Plaintiff's present knowledge and recollection, she recalls having made to other persons at Wellington in which she alleged or complained of incidents of discriminatory or retaliatory behavior towards her. The personal addresses of the recipients listed below are unknown to Plaintiff.

1. On December 16, 2014, Plaintiff orally stated to Greg Mattiko words to the following effect: "Things have not been easy. Colleagues are hostile. Investors have talked to me like a junior person because as an Asian woman I look young. I think there has been some misunderstanding. When I joined I was told by Henry Philip that there would be a fund to run within six to twelve months. It has already been six months and it does not seem it will happen."

2. On or about March 24, 2015, Plaintiff orally stated to Greg Mattiko that colleagues continued to be disrespectful. When asked for examples, Plaintiff gave the following: that Dan Maguire's comment ("China is full of crap") was racist and belittling of her experience; that Steve Richter physically backing her up against the wall was intimidating for her as a woman.

3. On June 3, 2015, Plaintiff orally stated to Tom Baxter that the environment at Wellington in Hong Kong was hostile. Plaintiff also stated that she believed Mr. Baxter had not introduced her in the same manner as the firm was doing with new employees (sent via emails to all employees of Wellington). She added that Mr. Baxter did not mention her past achievements and credentials even though it was highlighted for new employees more junior than Plaintiff.

4. On September 14, 2015, Plaintiff orally stated to Tom Baxter that her experience at the firm had not been that of a collaborative culture, contrary to what had been

8

described during the hiring process.  She mentioned incidents including Dan Maguire's racist and belittling comment "China is full of crap" and Steve Richter's physical intimidation. Plaintiff complained that she was not being given responsibilities and opportunities commensurate with her skill and experience because, as an Asian female, she was assumed to be junior.  Plaintiff concluded with the following statement: "I feel like I am at a party where I'm not welcomed".

5.  On September 22, 2015, Plaintiff orally stated to Greg Mattiko and Philip Fan that following her recent presentation at the Process and Philosophy Panel, she received inappropriate and hostile feedback.  Plaintiff added that Jun Oh even criticized her appearance by saying words to the effect of "you look ridiculous".  Plaintiff told Mr. Mattiko and Mr. Fan that, she believed she would not have been spoken to like that if she had been a male.  On discovering from Mr. Mattiko that he had never been required to face the same Panel prior to launching his fund, Plaintiff queried as to why she had to and not others.

6.  On or about October 7, 2015, Plaintiff emailed Charles Argyle to request a call to complain about what happened during the Process and Philosophy Panel.  During the call, Plaintiff orally stated to Mr. Argyle the feedback she received was disrespectful, in particular Jun Oh's comments.

7.  On October 12, 2015, during a call initiated by Cheryl Duckworth, Plaintiff orally stated that Mr. Oh's comments at the Philosophy and Process Panel were disrespectful and inappropriate for any forum.

8.  On October 14, 2015, during a meeting to discuss the launch of the China fund, in response to Tom Baxter's insistence that Jun Oh was only trying to be constructive,

9

Plaintiff orally stated that it was clear that Mr. Oh's comments were meant to be disrespectful and belittling, and in fact, this was representative of her experience at Wellington. She added that she would not have been spoken to like that if she had been a male. When pushed for further examples of disrespectful behavior, Plaintiff reported that as recently as two days prior, Steve Richter had pushed her out of the way to speak to their shared assistant, and that this also would not have happened if Plaintiff had been a male.

9. On or about November 26, 2015, at a lunch requested by Erin Murphy, in response to Ms. Murphy's insistence that Jun Oh was only trying to be constructive, Plaintiff orally stated that it was clear that Mr. Oh's comments were meant to be disrespectful and that she would not have been spoken to like that if she had been a male.

10. On or about November 27, 2015, in response to Greg Mattiko's insistence that Jun Oh was only trying to be constructive, Plaintiff orally stated that it was clear that Mr. Oh's comments were meant to be disrespectful and that she would not have been spoken to like that if she had been a male. Plaintiff further added that she was sick and tired of people in the firm trying to cover up for Mr. Oh. Plaintiff also queried as to why Mr. Oh received preferential treatment in the launch of his China Fund.

11. On or about December 2, 2015, Plaintiff complained to Jean Hynes that she had faced disrespectful and hostile treatment since joining Wellington, most notably at the Process and Philosophy Panel. She stated that Jun Oh even criticized her appearance, saying words to the effect of "you look ridiculous". She rhetorically asked Hynes whether she thought she would have been spoken to like that if she had been a male. Plaintiff questioned as to why launching a fund was more onerous for her than for her

10

male colleagues with a similar level of experience, citing as an example the Process and Philosophy Panel which, she had been told, was a pre-requisite for her to launch a fund, but not for others.  Plaintiff stated that she believed this treatment was due to her being an Asian female and assumed to be junior.

12. On or about December 4, 2015, Plaintiff complained to Brendan Swords that she had faced disrespectful and hostile treatment since joining Wellington, most notably at the Process and Philosophy Panel.  She stated that Jun Oh even criticized her appearance, saying words to the effect of "you look ridiculous".  She stated that she didn't think she would have been spoken to like that if she had been a male.  She questioned as to why launching a fund was more onerous for her than for her male colleagues with a similar level of experience, citing as an example the Process and Philosophy Panel which she had been told was a pre-requisite for her to launch a fund, but not for others.  Plaintiff stated that she believed this treatment was due to her being an Asian female and assumed to be junior.

13. On December 4, 2015, Plaintiff orally complained to Charles Argyle about the delay she was facing in her fund launch, in particular when compared with Jun Oh's China fund launch.  Also, Plaintiff questioned as to why her fund launch was more onerous than those of Greg Mattiko and Dirk Enderlein.  Furthermore, Plaintiff cited as an example the Process and Philosophy Panel, which Tom Baxter had told her was a pre-requisite to launching her own fund, even though Wellington had never required any of its experienced male fund managers to do the same.  Plaintiff stated her belief that she had been treated differently because she was an Asian female and assumed to be junior. Plaintiff further stated that she had received disrespectful treatment.  When

11

pressed by Mr. Argyle to give examples of such, Plaintiff cited the following
incidents: Jun Oh speaking to her in a belittling manner at the Process and Philosophy
Panel; then, Steve Richter's aggressive behaviors on two occasions; and, as recently
as the day before, Nilesh Undavia's astonishment that Plaintiff could be in a position
to be a Portfolio Manager and launch a fund.  Further, Plaintiff stated to Mr Argyle "I
demand to be treated with respect."

14. On December 22, 2015, Plaintiff orally stated to Greg Mattiko that, during a meeting
    on 4 December 2015, Charles Argyle's attitude had been patronizing, and he had
    made discriminatory comments to the effect of Plaintiff's portfolio management
    experience being worth less than other Portfolio Managers in the firm. Plaintiff also
    complained that during a meeting on or about 3 December 2015 Kenny Abrams
    spoke down to her, telling her not to rise above her station.  Plaintiff further stated
    that it smacked of tokenism when Mr. Abrams told her that there could only be one
    "China person" in the firm and that person was Bo Meunier, whereas the same does
    not hold for other countries or regions.

15. On December 29, 2015, Plaintiff complained to Phil Perulmuter that she had faced
    disrespectful and hostile treatment since joining Wellington, most notably at the
    Process and Philosophy Panel.  She stated that Jun Oh even criticized her appearance,
    saying words to the effect of "you look ridiculous".  She stated that she didn't think
    she would have been spoken to like that if she had been a male.  She questioned as to
    why launching a fund was more onerous for her than for her male colleagues with a
    similar level of experience, citing as an example the Process and Philosophy Panel
    which she had been told was a pre-requisite for her to launch a fund, but not for

12

others.  Plaintiff stated that she believed this treatment was due to her being an Asian female and assumed to be junior.

16. On March 3, 2016, in response to Ray Helfer urging Plaintiff to be patient, Plaintiff stated that it was not easy to be "patient" when people were treating her with disrespect, and that she would not have been treated in this manner if she were not a Chinese female.

17. On June 14, 2016, Plaintiff orally stated to Charles Argyle that the reasons GRG gave to cancel the marketing meetings did not make sense.  She added that the last minute nature of the decision showed a lack of respect to Plaintiff and that she could not see anyone else in the firm being treated in this manner.

18. On 14 June 14, 2016, in response to Greg Mattiko describing the feedback from GRG as "complete bullshit", Plaintiff orally stated words to the effect that she "just can't see this happening to someone who is not an Asian female".

19. On or about October 5, 2016, in recounting a conversation with Tom Baxter a few days prior, Plaintiff told Greg Mattiko that senior management said what 'the Chinese client' wanted was "ridiculous".  Plaintiff orally stated to Mr. Mattiko that it did not seem as though Wellington applied its motto 'client, firm, self' equally to all clients, and the disrespect shown to 'the Chinese client' amounted to racism.

20. On October 19, 2016, in response to Kenny Abrams comparing Plaintiff's career profile to that of Greg Mattiko, Dirk Enderlein, and Niraj Bhagwat, Plaintiff orally stated that there were significant differences between her experience in launching a fund and theirs.

21. On November 2, 2016, in response to Charles Argyle claiming that Plaintiff had been saying for the last two years, "Look at me, I'm a superstar", Plaintiff stated to Mr. Argyle that in fact, what she had been saying was that she should not be treated as though she had no experience at all, and that "Just because I'm female, just because I'm Chinese, doesn't mean that people can talk down at me. That's what I've said. Every single time."

22. On or about May 26, 2017, in response to Henry Philip asking Plaintiff's thoughts about the conversation she had with Mr. Argyle on 2 Nov 2016, Plaintiff stated that her thoughts had not changed.

23. On May 31, 2017, in response to Greg Mattiko implying that Plaintiff was asking Wellington to "bend over backwards" to get her book to grow, Plaintiff orally stated that all she wanted was "some demonstration that there could be a roadshow, or some marketing access" and that two minutes at the end of a meeting did not constitute access, as Tom Baxter had claimed earlier.  Further, Plaintiff complained about Charles Argyle's intimidating behavior during their meeting on 2 November 2016, stating "I don't think any message needs to be shouted at let alone I was eight months pregnant".

24. On July 25, 2017, after reporting a trading error that negatively impacted client assets, Plaintiff orally stated to Greg Mattiko that she was not being taken seriously, and that "the conversation could have been a lot shorter if there was no attempt to cover up."

25. On August 31, 2017, Plaintiff orally stated to Alex Qian that she "call it racism" when Wellington discriminate against one type of client in favor of another type of client.

14

Plaintiff further answers that discovery is ongoing, and that she reserves the right to supplement,

revise, or otherwise amend this answer as discovery proceeds.

### INTERROGATORY NO: 8:

Identify each and every person whom Plaintiff may call as a witness at a trial of this matter and the nature of the testimony to be elicited.

**Objection**:   Plaintiff objects to this interrogatory on the grounds that it is overly broad and it

exceeds the scope of discovery under Fed. R. Civ. P. 26.

**Answer**:   Subject to and without waiving the foregoing objection, Plaintiff refers to the

persons identified in Plaintiff's Initial Disclosures.

Plaintiff further answers that discovery is ongoing, and that she reserves the right to supplement,

revise or otherwise amend this answer as discovery proceeds.

### INTERROGATORY NO: 9:

Identify each and every person whom Plaintiff or a representative thereof has contacted or interviewed in connection with this matter, but whom Plaintiff does not intend to call as a witness at a trial of this matter.

**Objection:**   Plaintiff objects to this interrogatory on the grounds that it seeks Privileged

Information.

### INTERROGATORY NO: 10:

Identify each expert witness whom Plaintiff intends to call at a trial of this matter and, for each such expert witness, please provide the following information: his or her name, residential address and business address; the subject matter on which the expert is expected to testify; the substance of the facts and opinions to which the expert is expected to testify; a summary of the grounds for each such opinion; and all such other information required by Fed. R. Civ. P. 26.

**Objection**:   Plaintiff objects to this interrogatory as premature and to the extent it seeks to

impose discovery obligations beyond those required under the Federal Rules of Civil Procedure.

No decisions have yet been made with regard to trial or to expert witnesses; Plaintiff will

disclose the identities of any expert witnesses that she intends to call at trial of this matter and

any other information required to be disclosed concerning the expert witness(es) and his/her/their

testimony in accordance with all applicable rules and court orders.

### INTERROGATORY NO: 11:

Identify each and every individual Plaintiff believes has knowledge of any facts
pertaining to the allegations in the Complaint and give a detailed description of the facts that
Plaintiff believes are possessed by each such person.

**Objection:**     Plaintiff objects to this interrogatory on the grounds that it is overly broad and

that the burden imposed by this interrogatory is not proportional to the needs of the case,

particularly to the extent it seeks information pertaining to facts or allegations in the Complaint

that are not in dispute, and as such, it exceeds the scope of discovery permitted under Fed. R.

Civ. P. 26. Plaintiff further objects to this interrogatory to the extent it seeks Privileged

Information.

**Answer:**     Subject to and without waiving the foregoing objection, Plaintiff refers

Defendants to the persons identified in the parties' respective Initial Disclosures.

Plaintiff further answers that discovery is ongoing, and that she reserves the right to supplement,

revise or otherwise amend this answer as discovery proceeds.

### INTERROGATORY NO: 12:

Describe in complete detail each item of damage, including amounts, for which Plaintiff
intends to seek recovery at trial, the manner in which such amount has been calculated, and the
specific basis and support for said amount.

**Objection**:     Plaintiff objects to this interrogatory to the extent it seeks Privileged Information.

**Answer:**     Subject to and without waiving the foregoing objection, Plaintiff states that she

seeks an award of back pay, front pay, compensatory damages (including for emotional distress),

punitive damages, attorney's fees, interest and costs. The calculation of Plaintiff's damages is

dependent upon discovery that has not yet been conducted and/or completed, and will be the

subject of expert testimony, which will be disclosed in accordance with the scheduling order

16

entered in this matter.

## INTERROGATORY NO: 13:

State whether Plaintiff has made any efforts to seek new employment or to enter into any business, independent contractor or consulting relationship with any person or entity since September 2017. If so, state:

- (a) The name and address of each potential employment, person, or entity, to which Plaintiff made application, including the date of each such application and the position for which application was made;
- (b) The name and address of any employment agency, career counselor or other employment recruiter with whom Plaintiff had contact, including, in addition, the date such contact was made and the nature of the contact;
- (c) Describe in complete detail any other efforts Plaintiff made, which are not identified in response to the preceding subparagraph of this interrogatory, to obtain employment or to enter into any business, independent contractor or consulting relationship; and
- (d) Identify each and every document reflecting or relating to Plaintiff's efforts to seek new employment, or to enter into any business, independent contractor or consulting relationship.

**Objection:**     Plaintiff objects to this interrogatory to the extent that it is overly broad and that

the burden imposed by this interrogatory is not proportional to the needs of this case, exceeding

the scope of discovery under Fed. R. Civ. P. 26, particularly insofar as subpart (d) seeks

identification of cumulative and redundant documents and information that is not relevant to any

fact in material dispute.

**Answer:**     Subject to and without waiving the foregoing objections, Plaintiff has made

reasonably diligent efforts to obtain comparable employment. These efforts have included

monitoring movement of China PMs among peer group using a combination of network,

financial websites (eg, Bloomberg, Morningstar, Citywire) and asset management company

websites to identify potential employment opportunities. Plaintiff also communicated with

numerous recruiters to identify potential comparable employment opportunities. At present,

Plaintiff recalls communicating with the following recruiting firms:

    Capital Access
    DAMAC Group
    DMO Group

17

Egon Zehnder
Eymieu Partners
Global Sage
Heidrick and Struggles
Lascaux Partners
Lawbrook
Novo Partners
Phaidon International
RGF Search
Russell Reynolds
Sapphire Partners
Spencer Stuart
SSK Consulting
Stanton Chase
Tardis

The following table identifies the specific opportunities for which Plaintiff can presently recall

formally applying:

| Potential Employer | Date of Application | Position Sought |
|---|---|---|
| Vontobel | June 23, 2020 | Head of Asian Equities |
| Principal Finance | June 23, 2020 | China Portfolio Manager |
| Schroders | June 17, 2020 | Portfolio Manager, Deputy Head of Asia ex-Japan |
| Kuwait Investment Company | March 24, 2020 | China Equity Portfolio Manager |
| Blackrock | March 14, 2020 | China Equity Portfolio Manager |
| Alliance Bernstein | March 14, 2020 | Portfolio Manager, Head of China |
| EGF Asset Management | May 6, 2019 | Portfolio Manager, Greater China |
| Carmignac | November 22, 2018 | Pan Asia Portfolio Manager / Head of Emerging Market |
| Franklin Templeton | November 11, 2018 | Portfolio Manager, Head of China |

Plaintiff further answers that discovery is ongoing, and that she reserves the right to supplement,

revise or otherwise amend this answer as discovery proceeds.

## INTERROGATORY NO: 14:

State whether Plaintiff has previously instituted litigation or administrative charges (such as claims at the Equal Employment Opportunity Commission or the Massachusetts Commission Against Discrimination or any other U.S. or foreign agency, court, or tribunal) against any company, state, municipality or any other organization by which she was or had been employed or applied for employment. If the answer is in the affirmative, state the date each suit or administrative action was commenced; the name and address of the agency or other forum in which it was commenced; the substance of each such complaint; the name and address of any attorney who represented Plaintiff in that proceeding; the outcome or present status of each matter; and identify each and every document upon which Plaintiff relied in answering or which in any way relates to the information requested in this interrogatory.

**Answer:**     Plaintiff states that except with regard to this case, she has not previously

instituted litigation or administrative charges against any employer.

## INTERROGATORY NO: 15:

If Plaintiff contends that she was unable to work at any time from her separation of employment with WMHK to the present due to any mental or physical condition, state the condition which prevented Plaintiff from working; the period of time she could not work; the name and address of any physician or other healthcare provider who treated her during that period.

**Answer**:     Plaintiff answers that she gave birth to her second child on September 20, 2019.

Had she been employed at the time, Plaintiff likely would have taken a maternity leave of some

duration, depending upon the specific role and its requirements. Plaintiff's healthcare providers

in connection with the birth are as follows:

| Treating Healthcare Providers: | Hospital Antoine-Beclere AP-HP |
|---|---|
| Address of Healthcare Provider | 157 Rue de la Porte de Trivaux, 92140 Clamart, France |
| Healthcare Provider | Pr Alexandra Benachi, Gynecologist/Obstetrician, Chief of Department |

Plaintiff further answers that discovery is ongoing, and that she reserves the right to supplement,

revise or otherwise amend this answer as discovery proceeds.

**INTERROGATORY NO: 16:**

Identify each and every physician, psychiatrist, psychologist, social worker or other healthcare provider whom Plaintiff visited, consulted or from whom Plaintiff received treatment relative to any physical, mental or emotional condition Plaintiff alleges Defendants caused. For each physician or other healthcare provider identified, state his or her address; his or her occupation; his or the area of specialization, if any; the date plaintiff first consulted that person or entity; the condition for which treatment was sought; the diagnosis that was rendered; the nature of the treatment rendered; and whether Plaintiff is presently receiving treatment or consultation from such person or entity.

**Objection:**  Plaintiff objects to this interrogatory on the grounds that it is vague, confusing,

and unintelligible to the extent it seeks information relating to the undefined term "condition[s]"

and modifies such term using the confusing phrase "Plaintiff alleges Defendants caused"; such

phrases do not correspond in any precise manner to the allegations in the Complaint concerning,

*inter alia*, the "conditions" of pregnancy, or miscarriages, childbirth, or emotional distress.

Plaintiff further objects to this interrogatory to the extent it calls for her to give an expert medical

opinion as to the etiology or cause of her symptoms or "conditions" as she understands that term,

as Plaintiff is not a medical expert. Plaintiff further objects to this request to the extent that it is

overly broad and that the burden imposed by this request is not proportional to the needs of the

case, insofar as it seeks information concerning "conditions" for which Plaintiff does not seek to

recover, because to that extent, it exceeds the scope of discovery permitted under Fed. R. Civ. P.

26. Plaintiff further objects to this request to the extent that it seeks Privileged Information.

**Answer:**  Subject to and without waiving the foregoing objections, Plaintiff states that she is

not a medical expert and cannot give an expert opinion as to the cause or etiology of her

symptoms or "conditions" as she understands that term; nevertheless, Plaintiff identifies the

following responsive information based on the symptoms, events, and "conditions" (as she

understands that term) to which she believes Defendants' unlawful conduct may have

contributed.

20

| Treating Healthcare Providers: | Dr. Michelle Tsui | Dr. Brigitte Salama |
|---|---|---|
| Address of Healthcare Provider | Premier Medical Centre, Suite 718-733 Central Building, 1 Pedder Street, Central, Hong Kong | 3 Avenue du President Wilson, 75116 Paris, France |
| Occupation of Healthcare Provider | Doctor | Doctor |
| Specialization of Healthcare Provider | Gynecologist / Obstetrician | Gynecologist / Obstetrician |
| Date Treatment Was Sought | November 16, 2015 November 20, 2015 | November 27, 2015 |
| Diagnosis Rendered | Silent miscarriage 1st trimester miscarriage for medical evaluation | Miscarriage |
| Treatment Rendered | Misoprol prescribed for medical management of miscarriage (ie to expel fetus) | Cytotec (to treat postpartum bleeding due to poor contraction of uterus) and pelvic ultrasound to verify uterus is empty |
| Whether Plaintiff is Presently Receiving Treatment or Consultation | No | No |

**INTERROGATORY NO. 17:**

Identify each and every physician, psychiatrist, psychologist, social worker or other healthcare provider whom Plaintiff visited, consulted or from whom Plaintiff received treatment relative to any physical, mental or emotional condition Plaintiff suffered at any time from January 1, 2014 to the present, not identified in response to Interrogatory Nos. 15 and 16. For each physician or other healthcare provider identified, state his or her address; his or her occupation; his or her area of specialization, if any; the date Plaintiff first consulted that person or entity; the condition for which treatment was sought; the nature of the treatment rendered; the diagnosis that was rendered; and whether Plaintiff is presently receiving treatment or consultation from such person or entity.

**Objection**:    Plaintiff objects to this interrogatory on the grounds that it seeks information that

is, by definition, not relevant to any claim or defense in this matter, and as such exceeds the

scope of discovery under Fed. R. Civ. P. 26. Plaintiff further objects to this interrogatory on the

grounds that it seeks Privileged Information.

**INTERROGATORY NO. 18:**

Please describe all Internet social media sites such as *Facebook*, *Twitter*, and that Plaintiff has or had an account with from January 1, 2014 to date, including Plaintiff's user name, html address of main page, approximate frequency of postings, and approximate date range Plaintiff had the account.

**Objection**:     Plaintiff objects to this interrogatory on the grounds that it is vague insofar as it does not define the ambiguous term "Internet social media sites." Plaintiff further objects to this interrogatory on the grounds that it is overly broad, and the burden imposed by this interrogatory is not proportional to the needs of this case; therefore, it exceeds the scope of discovery under Fed. R. Civ. P. 26, particularly to the extent it seeks Plaintiff's "frequency of postings."

**Answer**:     Subject to and without waiving the objections set forth above, Plaintiff identifies the following "Internet social media sites," to the best of her understanding of that term, with which she has an account:

| Site | Main Page URL | Approximate Date Range Plaintiff Had the Account |
|------|---------------|--------------------------------------------------|
| LinkedIn | https://www.linkedin.com/in/gigi-chan-7628a/?originalSubdomain=hk | From 2008 to present |

**INTERROGATORY NO. 19:**

Please list all e-mail addresses that Plaintiff has or had since January 1, 2014 to date.

**Answer**:     Plaintiff identifies the following email addresses:  gkzchan@gmail and hotgeeg@hotmail.com

Signed and sworn under the pains and penalties of perjury this __24th__ day of September 2020.

_____
Gigi Kai Zi Chan

23

As to objections:

*/s/ Patrick J. Hannon*
Patrick J. Hannon (BBO# 664958)
Hartley Michon Robb, LLP
155 Seaport Blvd., 2nd Floor
Boston, MA 02210
P: (617) 723-8000
F: (617) 447-2800
phannon@hartleymichonrobb.com

## CERTIFICATE OF SERVICE

I, Patrick J. Hannon, counsel for Plaintiff, Gigi Kai Zi Chan, hereby certify that on September 24, 2020, I caused a copy of the within document to be served by email upon counsel of record.

*/s/ Patrick J. Hannon*
Patrick J. Hannon

# Exhibit 2

November 2, 2016 Audio Recording of Charles Argyle and Thomas Baxter

# Exhibit 3

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 1:19-CV-11605-WGY

- - -

GIGI KAI ZI CHAN,                    :
                                     :
            Plaintiff,               :
                                     :
      v.                             :
                                     :
WELLINGTON MANAGEMENT COMPANY:
LLP and CHARLES ARGYLE,              :
                                     :
            Defendants.              :


- - -

AUDIO TRANSCRIPTION

- - -


Audio transcription of
conversation between GIGI CHAN, CHARLES
ARGYLE, and TOM BAXTER held on November
2, 2016.  The following was transcribed
from a file entitled "GC vs W_Recording
20161102, Charles Argyle (& Tom Baxter)."


- - -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 2

1           - - -
2           MS. CHAN:  Sorry.  I had a
3    bit of spillage.
4           MR. ARGYLE:  That's all
5    right.
6           MS. CHAN:  (Indiscernible.)
7           MR. ARGYLE:
8    (Indiscernible.)
9           MS. CHAN:  I think it's that
10   one that's furthest away.
11          MR. ARGYLE:  I also asked
12   Tom to come just for continuity's
13   sake because (indiscernible) the
14   last three days.
15          MS. CHAN:  That one.  Hi.
16          MR. BAXTER:  The PSATs had a
17   lot of math questions
18   (indiscernible).
19          MR. ARGYLE:  Oh, maths?
20          MR. BAXTER:  (Indiscernible)
21   about the school though.  The math
22   (indiscernible) rigorous enough
23   we're finding out.
24          MS. CHAN:  What's that?

Page 3

1           MR. BAXTER:  PSAT is like a
2    practice SAT.  It's the college
3    entrance exam in the US.
4           MS. CHAN:  Right.
5           MR. ARGYLE:  It's hell on
6    Earth.  It's not -- not -- it's
7    just a format.  Imagine A-levels
8    and the whole country taking one
9    multiple-choice test for three
10   hours.  (Indiscernible.)  But
11   fortunately they say they heavily
12   weight the --
13          MR. BAXTER:  The grade.
14          MR. ARGYLE:  -- your
15   grade -- your in-class grades.
16          MS. CHAN:  Right.
17          MR. ARGYLE:  Unlike, you
18   know, obviously A-levels are
19   A-levels (indiscernible).
20          MS. CHAN:  Yeah.
21          MR. ARGYLE:  A-levels are
22   A-levels.
23          So I want to catch up.  I
24   haven't seen you for a long time.

Page 4

1           MS. CHAN:  Yes.
2           MR. ARGYLE:  Since Investor
3    Palooza --
4           MS. CHAN:  Yes.
5           MR. ARGYLE:  -- I think.  So
6    congratulations.  I didn't
7    (indiscernible) Investor Palooza.
8           MS. CHAN:  Oh, yeah.  Thank
9    you.
10          MR. ARGYLE:  So I think what
11   I am trying accomplish today is, I
12   want to talk about backup plans --
13          MS. CHAN:  Yeah.
14          MR. ARGYLE:  -- for when
15   you're out --
16          MS. CHAN:  Yeah.
17          MR. ARGYLE:  -- which I
18   believe is early to mid-December.
19          MS. CHAN:  Yeah.  Probably
20   from mid-December onwards.
21          MR. ARGYLE:  Okay.
22          MS. CHAN:  Yeah.
23          MR. ARGYLE:  And then also I
24   wanted to share some of the

Page 5

1    feedback we've -- we've received
2    kind of --
3           MS. CHAN:  Okay.
4           MR. ARGYLE:  -- as part of
5    the -- as part of the year-end
6    process, and more broadly as well
7    because I think that's an
8    important thing to talk about.
9           MS. CHAN:  Yeah.
10          MR. ARGYLE:  Just, well, I'm
11   here face-to-face.
12          MS. CHAN:  Yup.
13          MR. ARGYLE:  Tom may chip
14   in.
15          So -- so just to -- just
16   want to make sure we're all on the
17   same page with respect to
18   maternity leave.  So it's 14 weeks
19   of paid leave.
20          MS. CHAN:  Yup.
21          MR. ARGYLE:  Legally, we
22   cannot and will not expect you to
23   work during those 14 weeks at all.
24          MS. CHAN:  Yup.



Page 6

1          MR. ARGYLE:  We would
2     like -- I'd like to know your
3     thoughts with respect to backup,
4     especially for China Growth
5     because that exists today.
6          MS. CHAN:  Yup.
7          MR. ARGYLE:  And let's start
8     there.
9          MS. CHAN:  Okay.  I -- when
10    you say illegally I cannot -- you
11    mean that I cannot --
12         MR. ARGYLE:  No.  I said
13    legally we -- we cannot require
14    you to work --
15         MS. CHAN:  Oh, no, no, no.
16         MR. ARGYLE:  -- on your
17    maternity leave.
18         MS. CHAN:  Sure.  So -- but,
19    you know, I'm happy to put on
20    trades and stuff.  I don't think
21    that would be particularly
22    onerous.  I've been on a
23    sabbatical before and managing a
24    fund.  In fact, I was out of

Page 7

1     e-mail range in the Bolivian
2     Amazon for a week so, you know,
3     that --
4          MR. ARGYLE:  Um-hm.
5          MS. CHAN:  -- posed an
6     enormous amount of problems.  So
7     particularly kind of with Hong
8     Kong being so small, I think
9     it'll -- you know, what I'm happy
10    to do is just, you know, react to
11    any news and -- and I can work
12    from home and -- and just trade
13    and do that and keep an eye on
14    things.
15         I think realistically -- I
16    mean, because -- you know, if --
17    if there had to be a named
18    backup -- I don't know -- I mean,
19    you know, Greg probably sort of
20    knows --
21         MR. ARGYLE:  Um-hm.
22         MS. CHAN:  -- the way I
23    think the most.  I -- I wouldn't
24    imagine it requiring sort of that

Page 8

1     much, you know, real backing up.
2     It's just if there was a real,
3     real, real emergency.  But as I
4     said, kind of, you know, in this
5     day and age, like, robot
6     technology's good.  I -- I
7     don't --
8          MR. ARGYLE:  Yeah.
9          MS. CHAN:  -- think it would
10    be a matter for them.  I mean,
11    obviously, I haven't had a baby
12    before so -- everyone says it
13    changes and stuff -- but I have
14    managed money since 2004.  So, you
15    know, I do know what fund
16    management entails even if I don't
17    know what having a baby entails.
18    So, you know, I think -- I think
19    it's -- it's doable would be my
20    (indiscernible).
21         MR. BAXTER:  (Indiscernible)
22    Greg would be, you know, the
23    somebody (indiscernible) --
24         MS. CHAN:  Sure.

Page 9

1          MR. BAXTER:  -- when you're
2     away.
3          MS. CHAN:  Yeah.
4          MR. BAXTER:  If Greg is that
5     person.
6          MS. CHAN:  Yeah.  No.  Which
7     I understand.  I think it's just,
8     you know, a combination of, you
9     know, he knows how I think --
10         MR. ARGYLE:  Um-hm.
11         MS. CHAN:  -- you know, he's
12    got some common holdings, you
13    know, and that -- you know, he --
14    you know, he's licensed to trade
15    and --
16         MR. BAXTER:  Um-hm.
17         MR. ARGYLE:  Yeah.
18         MS. CHAN:  -- et cetera, so,
19    you know, from a practicality
20    standpoint -- and he himself said,
21    you know, if anything kind of
22    needed to be sort of looked over
23    while I'm gone, he had offered
24    so...



Page 10

1    MR. ARGYLE:  So that's fine.
2  I think -- so I actually don't
3  disagree that, you know, you might
4  be fully capable of -- of
5  fulfilling the entirety of PM
6  responsibilities from, you know,
7  home with a new family and
8  everything, which is very
9  exciting.  I think the other --
10  you know, obviously, the point of
11  having a -- it's good to have a
12  named backup --
13    MS. CHAN:  Yup, yup.
14    MR. ARGYLE:  -- should you
15  decide that --
16    MS. CHAN:  Yup.
17    MR. ARGYLE:  -- it's not
18  evolving how you expected it to
19  evolve or, frankly, you know, you
20  just want to use this opportunity
21  to -- to, you know, spend time
22  with your -- with your new -- even
23  more time with your new baby.  And
24  so it's good to have that cleared

Page 11

1  up anyway.
2    MS. CHAN:  Yeah.
3    MR. ARGYLE:  I do -- will
4  probably have to -- but we would
5  definitely have to put something
6  in writing --
7    MS. CHAN:  Yes.
8    MR. ARGYLE:  -- just to
9  clear -- just so, you know, we're
10  all on the same page.
11    MS. CHAN:  Yup.
12    MR. ARGYLE:  You know,
13  I'm -- I -- I don't have concerns,
14  but we can't -- I want to be very
15  clear.  We can't ask you to be --
16    MS. CHAN:  Yup.
17    MR. ARGYLE:  -- to, you
18  know --
19    MS. CHAN:  Oh, yup, yup.
20    MR. ARGYLE:  -- fulfill the
21  PM responsibilities when you're
22  out.
23    MS. CHAN:  Yeah.
24    MR. ARGYLE:  And -- and

Page 12

1  we're more than happy to come up
2  with alternative plans --
3    MS. CHAN:  Yup, yup.
4    MR. ARGYLE:  -- if that's
5  what you wish, or if that's what
6  you wish --
7    MS. CHAN:  Yeah.
8    MR. ARGYLE:  -- three weeks
9  in, six weeks in, ten weeks in.
10  So...
11    MS. CHAN:  Yup.  Well, it
12  being only 14 weeks, that's not
13  that much time for me to change my
14  mind, to be perfectly honest
15  but -- so, you know, it's --
16  that's the plan and, you know,
17  it's -- it's -- if I leave a short
18  amount of time --
19    MR. ARGYLE:  There will be
20  moments where it's going very
21  fast.
22    MS. CHAN:  I'm sure.  I'm
23  sure.
24    MR. ARGYLE:  I do -- I do --

Page 13

1    MS. CHAN:  I'm sure.
2    MR. ARGYLE:  We -- we have
3  not -- we've both, you know, both
4  been parents.  (Indiscernible)
5  seems to go very slow, if I
6  remember those first three months
7  correctly.
8    But -- but anyway, you know,
9  I think the most -- you know, it's
10  an important -- well, it's really
11  up to you how you feel but --
12    MS. CHAN:  Yup.
13    MR. ARGYLE:  -- you know,
14  it's a -- it's a special moment in
15  your life so --
16    MS. CHAN:  Yup.
17    MR. ARGYLE:  -- we don't
18  want to be --
19    MS. CHAN:  Yup.  And I
20  think -- I mean, to be honest,
21  compared to my old work, it's
22  actually -- there's actually less
23  need for backup because, you know,
24  it's dealing with flows.  And



Page 14

1  there's -- I see no flows, so, you
2  know, it's not something that kind
3  of has to be dealt with on a daily
4  basis or whatever it is --
5      MR. ARGYLE:  Um-hm.
6      MS. CHAN:  -- in terms of --
7  you know, it's just really
8  reacting to news and kind of
9  making decisions but not, you
10  know, kind of client-imposed flows
11  and deadlines that have to kind of
12  happen straightaway.  For that
13  reason, we always had a named
14  backup from the word go, but --
15  but, you know, and there was kind
16  of a policy as to kind of doing
17  programs whatever it is.  But I
18  think it's actually much simpler
19  as it's set up as it is so...
20      MR. ARGYLE:  Great.  So
21  we'll probably -- so I just want
22  to -- I would -- look out for me
23  confirming that --
24      MS. CHAN:  Yeah, yeah.

Page 15

1      MR. ARGYLE:  -- in writing
2  at some point just to make sure
3  we're all on the same page.
4      MS. CHAN:  Yup.
5      MR. ARGYLE:  So the other
6  thing I wanted to do is just
7  provide really this opportunity to
8  give you some feedback.
9      MS. CHAN:  Um-hm.
10      MR. ARGYLE:  You know, I --
11  honestly, I'm just gonna be honest
12  with you here.  I read --
13      MS. CHAN:  Yeah.
14      MR. ARGYLE:  I read the
15  feedback on you from various
16  peers --
17      MS. CHAN:  Yeah.
18      MR. ARGYLE:  -- around the
19  firm.  And it -- it was
20  disappointing.  I'll -- I'll get
21  into more detail.  There were
22  certain areas that were -- that
23  were positive.  I think your
24  knowledge of the Chinese capital

Page 16

1  markets and Chinese stocks --
2      MS. CHAN:  Um-hm.
3      MR. ARGYLE:  -- is broadly
4  not disputed.  I've got to have
5  some winners and losers in every
6  single year, right?
7      MS. CHAN:  Um-hm.
8      MR. ARGYLE:  But still
9  your -- the way in which you
10  choose to engage with your fellow
11  professionals in various roles is
12  frankly disappointing --
13      MS. CHAN:  Um-hm.
14      MR. ARGYLE:  -- and
15  pervasive in the -- in the
16  feedback, and sometimes not
17  engaging.  So, you know, being
18  disengaged in -- in various forums
19  and -- yeah.  Just -- let me just
20  paint the picture, you know, very
21  quickly in this peer-reviewed
22  feedback we do.
23      So there's 114 investment
24  professionals in GPM.  We ask, you

Page 17

1  know -- and this is just one tile
2  in the mosaic.  But we ask for
3  feedback in collaboration, depth,
4  idea generation, and money-making,
5  and -- and you rank, out of 114,
6  110th in collaboration, 95th on
7  depth, 111th on idea generation,
8  and 109th with respect to
9  money-making, which is obviously
10  disappointing.
11      But more disappointing for
12  me is -- is just the continual
13  discontent you seem to have
14  working here with the colleagues
15  you work with on a -- on a regular
16  basis, with the flows, and -- and
17  we're really worried about that
18  and whether -- and the
19  sustainability of that.  And, you
20  know, I know you -- you are --
21  you -- and you -- and you state
22  articulately in your self-review
23  how frustrated you are.
24      MS. CHAN:  Um-hm.



Page 18

1   MR. ARGYLE:  But GRG have
2   literally hundreds of different
3   investment approaches to go out
4   and market.  The feedback they
5   give to me is:  Why should we
6   market something where we're not
7   actually convinced -- where the PM
8   is very clear how unhappy they are
9   at this firm, and we're not
10  actually convinced whether she'll
11  be here in six months.
12      MS. CHAN:  Um...
13      MR. ARGYLE:  So I'm
14  asking --
15      MS. CHAN:  No, no.  And --
16  and I think -- I think, you know,
17  this is kind of -- I think the
18  picture that you're painting is
19  quite anachronistic because, you
20  know, I am -- you know, going into
21  the launch process and going into
22  the marketing process, you know,
23  there was -- I was 100 percent
24  constructive.  I was not

Page 19

1   dissatisfied -- well, I was -- you
2   know, I realize that as well, of
3   course, and all of my energies
4   went into -- went into, you know,
5   full steam ahead.  Whatever GRG
6   demanded I took onboard.  I was
7   constructive.  And I tried as best
8   as I could to meet their demands
9   in order to -- to get marketed.
10      Now, it's very easy to say
11  afterwards, you know, them having
12  kind of -- me having been given so
13  much conflicting feedback and --
14  or, you know, conflicting goals
15  and aims or -- I mean, you know,
16  to be honest, that marketing trip
17  was completely -- you know, before
18  then, there was no element of
19  discontent.  But, you know, after
20  that -- to GRG.  Whatever I had
21  said to you, you know, I'm
22  professional.  I kept everything
23  professional.
24      My aim was to launch the

Page 20

1   fund and to get it marketed.  All
2   of the feedback about kind of
3   taking on, you know, how to sell
4   Wellington, you know,
5   everything -- you know, I sold
6   this product before.  But of
7   course the new part was how to
8   integrate it into the platform,
9   how to make it easier for GRG to
10  sell, how to -- how to talk more
11  happily about collaboration, all
12  of those things -- there was a lot
13  of feedback on that.  All of those
14  things I kept onboard -- I took
15  onboard.  Whatever processes, you
16  know, I delivered everything kind
17  of ahead of time.  I was doing a
18  lot of stuff myself.
19      And, you know, when you've
20  put in so much effort and when
21  people just disrespect the time
22  and the work that you've put in
23  and a week before a trip is
24  scheduled just to cancel it

Page 21

1   without adequate explanation, I
2   think that is cause for discontent
3   afterwards.
4       Now, it's very easy to say
5   afterwards when the discontent
6   happened, Oh, you know, how do we
7   know she's gonna stay?
8       Well, actually, ahead of it,
9   there was absolutely -- you know,
10  whatever I had said to you I had
11  kept between us.  I had never said
12  anything to anybody else about not
13  being happy about anything.  It
14  was -- I was completely focused.
15      So, you know, I think it's
16  very easy for people to -- for
17  everyone to turn -- you know,
18  say -- not take responsibility
19  for -- for -- you know, to be
20  honest, I didn't think it was
21  handled very professionally.
22      So yes, I am unhappy.  And
23  yes, afterwards I'm unhappy.  But,
24  you know, I will definitely

MAGNA
LEGAL SERVICES

Page 22

```
 1    emphasize that -- that when --
 2    when people -- you know, when
 3    you're working together with
 4    somebody, with other people, they
 5    have to be up-front about what the
 6    steps are, what's realistic,
 7    what's achievable, what the
 8    possible outcomes are.  If I've
 9    been kept in the dark on any of
10    those, it's hard for me to work
11    together with changing goalposts,
12    unclear goals.
13            MR. ARGYLE:  Gigi, I
14    remember a year ago -- or 11
15    months ago to be precise --
16    talking to you about, We will get
17    the fund launched.  And I put a
18    lot of capital into that, right?
19    Not dollar capital but personal
20    capital.  Right?  I have --
21    actually -- there was -- there was
22    another fund that wasn't launched
23    because your fund was launched.
24    Right?  There's only so many funds
```

Page 23

```
 1    we can launch every single --
 2    every year.  All right?  So that
 3    was my decision and I take
 4    responsibility for that.
 5            But I -- 11 months ago I was
 6    very clear with you that once
 7    funds are launched here, it can
 8    take a long time for the assets to
 9    come into the fund.
10            MS. CHAN:  I -- and -- and
11    11 months ago, if you remember, I
12    said I understand that it takes a
13    long time for assets to come in.
14    What I asked you then, and what
15    I've -- I kept on asking, was,
16    actually, it's not assets that I'm
17    asking for, it's access to
18    clients.  And the reason why it
19    takes so long to ramp up assets is
20    because it takes a long time to
21    ramp up trust with clients.  I
22    said that 11 months ago and I
23    still maintain that now.
24            And you -- and, you know,
```

Page 24

```
 1    and I was very clear about that.
 2    I am completely realistic about
 3    AUM.  However, I was not guided
 4    along after we saw each other and,
 5    you know, indeed, in the run-up to
 6    when there was supposed to be a
 7    marketing schedule that I was
 8    gonna end up with zero client
 9    meetings and to be told a week
10    before that I -- basically I have
11    to change my travel plans --
12    which, to be honest, even
13    regardless of whether there were
14    meetings or not, just as a matter
15    of professionalism and respect for
16    other people's time and energy,
17    people should be clear about kind
18    of like -- you know, how would you
19    feel if someone -- and, you know,
20    internal, of course, if -- you
21    know, it's sort of client-related,
22    but, you know, if it was just
23    internal, Oh, we decided to cancel
24    just a week in advance.
```

Page 25

```
 1            Now -- and, you know, again,
 2    before then, you know, everyone
 3    says afterwards, Oh, this is the
 4    Wellington way or whatever.  But,
 5    you know, I don't believe that it
 6    was clearly communicated to me
 7    before because otherwise I
 8    wouldn't have planned my travel
 9    schedule that way.  I wouldn't
10    have planned my life that way.
11            And, you know -- you know,
12    I'd like to see any sort of
13    e-mails or anything, you know,
14    that -- that would have, you know,
15    suggested that -- that that was an
16    outcome.  And it wasn't that way.
17            So, you know, I think
18    it's -- you know, it wasn't --
19    and -- and -- and yes, launch
20    happened with delays and also with
21    lots of operational issues
22    afterwards as well, which I had to
23    sort out, you know, but yeah, a
24    fund was launched.  But certainly,
```

MAGNA ▶
LEGAL SERVICES

Page 26

1  you know, the point about access
2  to clients, I have never once
3  asked for, you know, that for
4  magical AUM.  And I have always
5  emphasized how I -- I've done the
6  fundraising before.  I know how
7  long it takes.  It was always
8  about access.
9      And so it's just, you know,
10  the -- and I -- you know, I know,
11  yeah, Wellington's set up in
12  whatever way, but, you know,
13  someone somewhere is communicating
14  or not communicating with me or
15  someone somewhere is saying if
16  something is possible, then it's
17  not possible.  There's just been a
18  breakdown.
19      Now, you know, everyone says
20  it's not them.  You know, from my
21  point of view it's just -- what I
22  know is I've been -- I've been
23  told XYZ by these people, and then
24  goalposts get changed by some

Page 27

1  other people, and then, you know,
2  things don't happen.
3      So yes, I am definitely
4  upset about it now, but, you know,
5  that's a complete anachronism,
6  particularly from a GRG
7  standpoint, that I had shown any
8  unhappiness about it at all.
9  Because if I had been unhappy
10  about the way that GRG, you know,
11  was, you know, they wouldn't have
12  sort of -- you know, I mean, I was
13  working -- I was working at night,
14  I was working as being
15  (indiscernible) with myself, I was
16  doing, you know, a lot of -- you
17  know, because actually, a lot of
18  it had to be redone and, you know,
19  and stuff.  I was sending stuff,
20  chasing people, I was doing a lot
21  of it myself.  If -- if I was, you
22  know, sort of -- I definitely was
23  not disengaged then.
24      But I -- whatever's happened

Page 28

1  has definitely been extremely
2  disappointing for me and -- you
3  know, and -- you know,
4  realistically, if -- if people
5  aren't gonna treat me in an
6  up-front manner, if people aren't
7  gonna be clear with me, then it's
8  hard for me to -- to work -- to --
9  to work well with them and -- but
10  this has happened afterwards.
11      MR. ARGYLE:  So I'm just
12  gonna go through a whole lot of
13  feedback because I want to hit it,
14  and then we can come back to --
15      MS. CHAN:  Um-hm.
16      MR. ARGYLE:  -- individual
17  things.  All right?
18      MS. CHAN:  Yup.
19      MR. ARGYLE:  Gigi seems to
20  have an attitude of how can the
21  firm help me rather than how can I
22  help the firm.  Gigi does not have
23  the long-term orientation of
24  Wellington.

Page 29

1      You know, specific from
2  Greg:  I'm disappointed with her
3  contribution to the team.  Earlier
4  on this year I tested how long it
5  would be for Gigi to proactively
6  reach out to me about anything.
7  It was weeks before she reached
8  out to me on the EMO team.
9  Eventually I had to reach out to
10  her.  Her contribution to ILP
11  (indiscernible) investors in the
12  morning meeting are anemic.
13      People are coming to --
14  to -- people the whole time
15  saying:  What is the matter with
16  Gigi?  How come every time we come
17  to Hong Kong Gigi uses it as an
18  opportunity to complain?
19      I honestly think people
20  are -- are scared of you.  They
21  don't -- sometimes, you know,
22  it's -- it's -- why will we
23  provide the feedback if -- if we
24  will get debate back.  There's no



Page 30

1  gratefulness for the things that
2  have gone well, that have gone
3  as -- you know, as planned.  Not
4  everything does go to plan in this
5  business, but there's no
6  gratefulness for things that have
7  gone as well.  (Indiscernible.)
8  You know?
9      Global PM:  No value -- no
10  value added.  She does not -- she
11  just does not communicate.
12      GIA with high -- high
13  overlap with you:  Surprisingly
14  limited interaction with Gigi.  I
15  hope that she can learn to involve
16  GIAs more actively in her process.
17  Gigi needs to assume that people
18  are actually trying to help her.
19  She can take more initiatives to
20  share thoughts on the stocks she
21  knows.  She could -- Gigi believes
22  that Wellington and the people
23  here -- who work here do not want
24  her to succeed.

Page 31

1      Gigi is unwilling to
2  collaborate in EMM.  Gigi creates
3  the impression that she does not
4  appreciate being part of the
5  Wellington platform.
6      I didn't write any of this.
7      MS. CHAN:  I'm not
8  suggesting you did, Charles.
9      MR. ARGYLE:  No.  I know.  I
10  know.  I just want you to realize
11  that's, you know, the broad swath
12  of people who see you every day or
13  regularly don't -- that's --
14  that's a challenge for me as a --
15  as a -- as a -- you know, the
16  manager ultimately responsible for
17  GEPM.
18      MS. CHAN:  Um-hm.  I
19  don't -- you know, what I would
20  say is that it's been -- it's been
21  a really painful process launching
22  the fund.
23      MR. ARGYLE:  This -- a lot
24  of this --

Page 32

1      MS. CHAN:  And --
2      MR. ARGYLE:  -- is from
3  other investors.
4      MS. CHAN:  Of course.  A lot
5  of this is from other investors.
6      MR. ARGYLE:  A lot of this
7  is people -- people who know
8  nothing about launching a fund.
9      MS. CHAN:  Of course.  Of
10  course.  And so realistically,
11  first, a lot of my time has been
12  spent dealing with stuff which --
13  you know, to be honest, I thought
14  that resources were light where I
15  worked before.  It's not that
16  resources are light here, but I've
17  been picking up doing a quite a
18  lot of stuff that I'm supposed to
19  be getting support for, which I
20  end up doing myself.
21      Now, definitely, it's left
22  less time to do other stuff.  If
23  there was -- if I could -- you
24  know, I joined Wellington because

Page 33

1  I thought that, you know, Oh, you
2  don't have to do as much client
3  interaction.  You're focusing on
4  investing.  What I've discovered
5  since joining is that it's been
6  anything but.
7      I wish I was just focusing
8  on investing.  I wish I was just
9  thinking about stocks.  I'm doing
10  a lot of just even admin, which I
11  shouldn't be doing.  Okay?  So
12  already there's been a lot of -- a
13  lot of -- it's been draining on
14  time and resources.
15      Now, I think it's -- again,
16  it's not -- I think that's the
17  thing, is that people think, Oh,
18  well, you know, things have
19  gone -- things have really gone
20  right, like, you know, she should
21  be grateful for XYZ.  Like -- now,
22  you know, it's all to do with
23  expectations and reality, right,
24  because, you know, as I've



Page 34

1    joined -- and -- and, you know, it
2    was a fault in the guiding process
3    in my view because to join and be
4    told, Oh, yes, you know, you'll be
5    looking at managing your fund
6    right at 6 months to 12 months
7    down the --
8         MR. ARGYLE:  Where did that
9    come from?  Because that's not our
10   recollection at all.
11        MS. CHAN:  Well, that was
12   definitely said.  Okay?  Otherwise
13   I wouldn't have had that
14   expectation.  You know, there --
15   there was a whole swath of people
16   that I saw -- that was definitely
17   said.  I think it was Henry Philip
18   who said it.
19        MR. ARGYLE:  That you would
20   be managing a fund within --
21        MS. CHAN:  That you would be
22   looking at managing your fund 6 to
23   12 months.  Now, you know, I
24   arrive and then everyone says,

Page 35

1    Okay, that's not true.
2         You know, guess what.  I
3    made a decision on the basis of
4    things that I'm told.  Like, I
5    am -- I am in no position to judge
6    what information I -- I don't
7    know -- before I join, I don't
8    know Wellington.  I come and see
9    people.  People tell me stuff.
10   And on the basis of the
11   information that I'm told and --
12   and -- yeah, you know, I
13   cross-reference that with people
14   in the market -- I made a
15   decision.  I went from
16   (indiscernible) that paid less,
17   that was not immediately managing
18   money but with --
19        MR. ARGYLE:  You weren't
20   working, so you can't reference
21   this, having it pay less.
22        MS. CHAN:  No.  I had
23   another offer, another --
24        MR. ARGYLE:  Okay.

Page 36

1         MS. CHAN:  -- actual hard
2    offer that was paid more.
3         MR. ARGYLE:  Okay.
4         MS. CHAN:  Another hard
5    offer for a fund to manage.  And
6    another hard offer for setup that
7    was supported.  Now, I made the
8    decision to join Wellington on the
9    basis of the other things that I
10   was told.
11        Now -- so -- to -- you know,
12   I join and then immediately I'm
13   told, Okay, that -- you can
14   disregard that because that's
15   not -- that's not the way here,
16   that's not the way there, that's
17   not the way here.
18        Okay.  Well, you know, I
19   didn't realize I was gonna have to
20   do due diligence like I do due
21   diligence on a Chinese company.  I
22   took things that I was told at
23   face value because of what was
24   said about integrity, what was

Page 37

1    said about culture.  And, you
2    know, to arrive and then to have
3    everything -- a lot of things --
4    you know, be told that that's just
5    not the Wellington way, well
6    that's not the impression that's
7    given.
8         So I think -- you know, I
9    guess -- you know -- in future,
10   you know, for any your future
11   hiring, I would suggest that you
12   give a more realistic picture
13   of -- of what happens when you
14   join.
15        And so yes, I've arrived.  I
16   arrived and, you know, things
17   didn't happen, you know, according
18   to plan.  And not -- not just that
19   things didn't happen according to
20   plan, but that it's been a lot of
21   behavior that -- that wasn't
22   particularly professional
23   compounded with, you know, insults
24   or -- or whatever else.



Page 38

```
 1            You know, I -- I arrived and
 2   I'm sure that, you know, people
 3   are surprised by the way I am now
 4   because that wasn't how I was when
 5   I arrived.  I'm -- you know, I'm
 6   disillusioned because of
 7   everything that has happened.
 8   And, you know, we had a talk, you
 9   know, of how things can improve.
10            Now, you know, launching the
11   fund is one piece of that.  You
12   know, but there's so many more
13   other pieces.  I mean, you know,
14   imagine if -- you know, what would
15   you do if you had made a decision
16   on the basis of what you're told,
17   and then in the course of the next
18   two years you're just told that
19   actually none of that, you know,
20   is what's gonna happen?
21            Yeah.  Things don't go to
22   plan but I doubt you would be the
23   happiest --
24            MR. ARGYLE:  Well, that
```

Page 39

```
 1   isn't what you should have been
 2   told.  I'm not actually convinced
 3   that's what you were told.  It
 4   certainly wasn't -- wasn't within
 5   your offer letter which said
 6   you're very clearly equity
 7   research analyst and it certainly
 8   wasn't ever our expectations that
 9   that's what you would be doing.
10   So I think you've reached
11   portfolio management
12   responsibilities faster than we
13   would have expected when you were
14   hired.  All right?  But I can only
15   speak for myself and I wasn't in
16   every conversation with you.
17            MS. CHAN:  Then you -- you
18   know, then you need to be more
19   careful about what everybody else
20   says along the way.  You know, the
21   impression that was given to me
22   was that that was -- that the
23   reason why that was done was to
24   get used to things and to -- to
```

Page 40

```
 1   get used to, you know, the way
 2   Wellington is set up.  And then it
 3   was kind of -- it was 6 months --
 4   yeah.  It was 6 to 12 months.  And
 5   that was the impression that I was
 6   given.
 7            And as I said, you know,
 8   there's -- there's got to be some
 9   kind of duty of care of the
10   information that gets communicated
11   in the interview process.  And I
12   mean, you know -- and then
13   afterwards, you know, it's just
14   the excuse that's given --
15   Wellington's complicated, XYZ --
16   but at the end of the day it's
17   just been that expectations and
18   reality -- I mean, there's always
19   a mismatch, but the mismatch has
20   been -- has been huge.
21            Now, add on top of that, you
22   know, some of the stuff that we've
23   talked before about, you know,
24   the -- the less-than-professional
```

Page 41

```
 1   comments that I've received or
 2   behaviors, et cetera, you know,
 3   it -- if -- taking away that
 4   you -- you know, life would have
 5   been easier.  But add all of that
 6   on top it's -- you know, it's not
 7   been easy and it's not been
 8   pleasant.  So, you know --
 9            MR. ARGYLE:  But there's
10   still this overlying feedback that
11   it's -- it always seems to be
12   about what can Wellington do for
13   Gigi rather than what can Gigi do
14   for Wellington and ultimately for
15   our clients.
16            MS. CHAN:  I arrived and
17   I -- and -- and even up till six
18   months ago -- and I mean, even
19   now -- I've been working -- I
20   mean, I've been working with
21   (indiscernible) about the Chinese
22   clients or what we can do for the
23   Chinese clients.  You know,
24   it's -- it's not that I'm not
```

**MAGNA**
LEGAL SERVICES

Page 42

1  thinking about Wellington and what
2  to do for Wellington clients.
3  It's just that there's been --
4  I -- I don't think -- you know --
5  and -- and -- yeah -- my mindset
6  has been constructive about how
7  to -- how to create value for
8  clients.
9        But, you know, when -- when
10 there's been so much distraction
11 and so much drain on -- on time
12 and energy, it's very hard to be
13 thinking about hitting all of
14 those, Oh, yeah, collaborate.  Do
15 this.  Do that.  And, you know,
16 particularly sometimes -- I mean,
17 I -- I --
18        And -- and communication is
19 a two-way thing as well.  I'm not
20 saying that it's just one way, but
21 it's just -- you know, not all the
22 communication that I've received
23 has been, you know, that friendly
24 and -- and actually I don't -- you

Page 43

1  know, like, it's -- I don't
2  complain all the time, but if I'm
3  given sort of feedback always
4  about how grateful I should be,
5  I'm gonna be honest and say, Well,
6  you know, it's not -- it's not as
7  things seem.
8        Everyone's like, Oh, yeah.
9  You're so -- you're so -- just
10 count your lucky stars that
11 you're -- that -- well, like what
12 you just said just now.  Oh, you
13 know, you're so lucky to have
14 portfolio management so soon, so
15 quickly.
16       I mean, I -- if I had known
17 that this would have been the
18 case, I would not have chosen to
19 come here, to be perfectly honest.
20 Why would I -- why would I have
21 given up the chance to run a
22 billion-plus fund to -- to come
23 and -- and -- and be paid less
24 to -- to be expecting to run a

Page 44

1  portfolio in a few years in the
2  dim and distant future?  Why would
3  I have a 7th percentile public
4  track record --
5        MR. ARGYLE:  Oh, it's all
6  about you, right?
7        MS. CHAN:  No.  And --
8        MR. ARGYLE:  And I know --
9  and I know it gives you a life,
10 but --
11       MS. CHAN:  And you know
12 what?  You know -- and when I
13 joined, it wasn't about me.  It
14 was about how can I fit into this
15 organization.  But, you know, when
16 the organization, when I was
17 getting treated like somebody who
18 was -- who had had one year's
19 experience, when I was getting
20 treated, you know,
21 unprofessionally, all of these
22 things, then at some point I'm
23 gonna have to assert.
24       You know, it's -- and at the

Page 45

1  end of the day, it's not -- it's
2  about every single individual and
3  it's supposed to be about mutual
4  respect.  It's not supposed to be
5  about, you know, any one person.
6        But, you know, what I'm
7  saying to you is that there was
8  never any account taken of -- you
9  know, of anything that had been
10 said to me or expectations that
11 were said, et cetera.  And it was
12 just always like, Oh, you know,
13 this is the Wellington way.  Tough
14 luck.  Just get with the program.
15 Which, you know, given everything
16 that kind of I was led to believe
17 before I joined has been
18 disappointing.
19       Now, it's not that -- and --
20 and you're still proactively
21 working towards everything, you
22 know, but I think, you know, what
23 I would, you know, push back on
24 is -- as I say, it's just too easy

Page 46

1  for this anachronistic
2  interpretation of, Oh, you know --
3  yeah, you know, we're GRG.  We're
4  not gonna market her fund because
5  we don't know how long she's gonna
6  stay here.
7       Because, you know, up until
8  the point when -- when GRG -- you
9  know when people moved around
10  goalposts and just cancelled trips
11  or whatever and didn't communicate
12  clearly with complete full steam
13  ahead, complete, like, you know,
14  anything that GRG wanted, I -- I
15  was trying to provide for them.  I
16  was bending over backwards to be
17  able to accommodate them.  Now,
18  you know, that doesn't eat into
19  investment idea generation,
20  communication and all of this,
21  but, you know, if your efforts
22  aren't appreciated, then you're
23  not gonna be happy about it.
24       MR. ARGYLE:  But a lot -- in

Page 47

1  fact, nothing what I just read was
2  from GRG, right?
3       MS. CHAN:  Yes.  No.  So
4  I'm --
5       MR. ARGYLE:  So you're --
6  again, you're anchoring --
7       MS. CHAN:  Yes.
8       MR. ARGYLE:  -- what I
9  said ---
10       MS. CHAN:  No, no, no.
11  So --
12       MR. ARGYLE:  -- at the very
13  beginning -- there's a lot more
14  here and -- and I think what you
15  have to realize is actually,
16  whether you believe it or not,
17  right -- (indiscernible) will
18  believe it -- is that two of your
19  biggest supporters -- who would be
20  myself -- which you can choose to
21  believe -- and Greg -- which I
22  think you would believe -- are
23  really worried about your future
24  here.  All right?

Page 48

1       However much -- you know,
2  you -- however -- however much,
3  you know, you -- you think -- you
4  think you're the one in the right
5  and everything else has happened
6  to you rather than you -- you
7  know, and this feedback is all
8  unfair, we're really worried about
9  your future here.
10       MS. CHAN:  Then -- then help
11  me fix some of those issues.
12       MR. ARGYLE:  Well, what
13  we're trying to do is say that
14  some of the responsibility is
15  yours, and your -- your attitude
16  in how you deal with your
17  colleagues, your attitude with
18  respect to the firm, your -- the
19  perspective that comes across that
20  it is, you know, really what about
21  me.  Right?
22       Honestly, we're tired of
23  hearing about the seven-year track
24  record at Threadneedle.  You know?

Page 49

1  It's -- you're here.  All right?
2  Contribute to the board platform.
3  Contribute to EMO.  You know?  On
4  the rare occasions you speak to
5  Greg and Philip, they really
6  appreciate your input on stocks,
7  but as Greg said, sometimes it can
8  be weeks without you contributing.
9       It's --- we're trying to
10  help right now by giving you this
11  feedback by saying there is --
12  there is an opportunity -- one
13  more probably -- opportunity for
14  you to do a turnaround with
15  respect to your attitude with how
16  you deal with your colleagues at
17  all levels, with how you engage
18  and -- in the investment dialogue,
19  and I really think there's this,
20  you know, time when you can
21  actually literally -- you'll
22  have -- obviously, your focuses
23  will be -- will be on other
24  things, but when you come back you



Page 50

1  can literally say, You know what?
2  I'm gonna -- I'm gonna be -- I'm
3  gonna have a completely new
4  attitude to this place.
5      MS. CHAN:
6  (Indiscernible) --
7      MR. ARGYLE:  And honestly,
8  I'm here -- there -- there -- I --
9  I get feedback -- do you know what
10  my feedback is?  Charles, you are
11  completely losing the plot on Gigi
12  Chan.  You know what?  You should
13  just call it a day.
14      And I'm saying, No.  I'm
15  being stubborn.  I'm gonna try and
16  help this one be successful.
17  I'm -- I'm betting my -- you know,
18  that's -- that's honestly the
19  feedback I get.  So we're aligned
20  here.  But -- but when you say
21  help you be successful, I'm trying
22  to help you be successful.  But
23  you think the onus is totally on
24  us.  The onus -- there's a heavy

Page 51

1  onus on you here.
2      MS. CHAN:  I'm -- I didn't
3  say I think the onus was totally
4  on you, but I do think you did
5  promise that there would be at
6  least some access to clients.
7  And, you know, to say -- I mean,
8  it's just completely insulting to
9  say that, Oh, yeah, we don't care
10  about your seven-year track record
11  or we don't care about what you've
12  done before.
13      I mean, you've hired a --
14  you've hired a professional person
15  who's -- who's achieved what they
16  have achieved before.  Basically,
17  it's like, you know, We don't care
18  about any -- we don't care about
19  you is what you've just said.  We
20  don't care about anything that
21  you've achieved before.  We're
22  just gonna treat you like --
23      MR. ARGYLE:  No, Gigi.  For
24  the last two years you've said, I

Page 52

1  have got this tremendous
2  seven-year track record.  Look at
3  me.  I'm a superstar.  Basically,
4  that has --
5      MS. CHAN:  No.  I have -- I
6  haven't --
7      MR. ARGYLE:  That is how --
8      MS. CHAN:  No, no, no.
9      MR. ARGYLE:  That is the
10  perspective that has come across.
11      MS. CHAN:  No.  I have
12  said -- I have said -- I have -- I
13  have said I don't -- I should not
14  be treated like I have no
15  experience at all and I shouldn't
16  be getting patronized because I
17  have actually had a long
18  professional history and I've got
19  a seven-year track record.
20      Just because I'm -- I look
21  young, just because I'm female,
22  just because I'm Chinese doesn't
23  mean that people can talk down at
24  me.  That's what I said.  Every

Page 53

1  single time I've reacted.  I never
2  said any -- you know, I arrived.
3  I assumed that other people were
4  respectful.  When they weren't I
5  have pushed back because --
6  actually, you know what?  Even if
7  you don't have a long professional
8  history, people should be treated
9  with respect --
10      MR. ARGYLE:  Agreed.
11      MS. CHAN:  -- and people
12  should be treated professionally.
13      MR. ARGYLE:  Agreed.
14      MS. CHAN:  So the only
15  instances where I've had to say
16  I've got a seven-year track record
17  and I've been in -- my
18  professional history's been this
19  long is when I've -- when -- when
20  I've been treated badly.  And --
21  and -- you know -- yeah, yeah.
22  And -- and then, Oh, yeah, I'm
23  just complaining,
24  blah-blah-blah-blah-blah.  But,



1   you know, essentially, you know,
2   the problem happened when I joined
3   and I was given -- okay.  How
4   would you feel and what would you
5   do if you had made a decision
6   based on false promises?  And --
7   and what Wellington's telling me
8   is just lump it.  Now --
9       MR. ARGYLE:  No, no.  We're
10  not saying -- you can leave.  All
11  right?  You don't have to stay.
12  No one's making you stay here.
13  You've told me many, many times
14  how many other opportunities are
15  out there.  So no one is telling
16  you just lump it.  I've told
17  you -- in fact, a year ago I said,
18  If you're as unhappy as you seem
19  to be, I don't understand why
20  you're here.
21      MS. CHAN:  Because I'm
22  trying to make things work.  But,
23  you know, if I have to leave, then
24  at least, you know, it -- it

1   wouldn't make sense to not leave
2   on friendly terms.  I have -- the
3   reason why I'm talking to you --
4   I -- this is the point.  I am
5   engaging with you and I am trying
6   to make things improve.  And I --
7   I -- I don't believe you're
8   hearing me.
9       It's not that -- it's --
10  it's not at all that it's all
11  about me.  It's actually just
12  why -- why -- why has Wellington
13  decided to hire me with a big set
14  of skills and then -- and then
15  not -- well, A, not uphold your
16  end of the bargain, and, B, just
17  not let me utilize those skills.
18      And -- you know, it's
19  extremely hard when goalposts keep
20  changing.  I mean, you know,
21  it's -- yeah.  That feedback's
22  been on investors and -- I mean,
23  it's been -- the amount of time
24  that -- that I would have saved

1   not having to, you know -- you
2   know, all of that marketing stuff
3   which, you know, frankly, I mean,
4   there weren't any client meetings
5   anyways -- all of that time that
6   could have been saved could have
7   been used to do something else.
8   All of the delays.  All of the
9   pushing through.  All -- every --
10  all of that obviously has taken
11  away time and resources from being
12  engage -- being able to engage
13  with people.  It's a daily battle.
14      Just, you know, all the
15  obstacles that there's been.  I've
16  got a list the length of my arm of
17  the things that -- that were all
18  supposed to have been done but
19  that actually then I have to do
20  myself.  And -- and, you know, how
21  anybody is supposed to have any
22  extra time to think about not just
23  investments but all this
24  communication, you know,

1   everything, all this other stuff.
2       It's -- so -- and of course,
3   you know, everybody sees -- you
4   know, and that's the nature of
5   feedback.  Everybody sees it from
6   their perspective.  Oh, yeah.  I
7   was complaining.  You know, like,
8   she should be so grateful, you
9   know, we're so tired of hearing
10  XYZ.  But, you know, like, no one
11  in aggregate knows -- yeah, and
12  I'm trying to communicate to you
13  these were the things that I was
14  told prior to joining.
15      Not only that, but, you
16  know, as we've communicated
17  through time, you know, definitely
18  access to clients was something
19  that -- that was -- that you said
20  was possible.  And -- and then in
21  the interim that there had been
22  access but, you know, for whatever
23  reason doesn't happen.  Fine.
24  Make sure that that's

1    communicated.  I mean, it's just a
2    shambles.
3         So, you know, that's --
4    yeah.  All I'm -- all I'm saying
5    is I understand that that's the
6    feedback.  You know, I'm trying to
7    give you a picture and the
8    context.  And, you know, if --
9    if -- yeah.  And I actually am
10   doing a lot on my part, and yeah,
11   it's not things that investors
12   see, but it doesn't mean that I'm
13   not thinking about clients.  It
14   doesn't mean I'm not thinking
15   about how to help Wellington.  It
16   doesn't mean any of that.  But --
17   you know, and it takes -- and it
18   definitely takes away from -- from
19   time thinking about investments.
20   I wish it didn't.
21        MR. ARGYLE:  So you don't
22   think there's anything -- any way
23   you -- you would change your
24   attitude at all when you --

1         MS. CHAN:  Charles, it's
2    simple.  When -- when someone's --
3    when someone's motivated, when
4    someone's -- because, you know,
5    other people -- when, you know,
6    the firm that they work at had
7    been clear, had been transparent,
8    have been -- you know, I mean, a
9    partnership's two sides.  You
10   know, when -- when, you know,
11   promises have been lived up to,
12   then it's very easy to have a
13   great attitude and it's very easy
14   to come into work smiling every
15   day wanting to talk to everyone.
16   You know, when, you know, every
17   expectation that's been set has
18   been disappointed and continues to
19   be disappointed, then yeah,
20   it's -- it's hard to change.  And,
21   you know, change has to happen on
22   both sides.
23        Now, you know, since we last
24   talked, you know, we were talking

1    about how it's -- you know,
2    there's -- you know, you promised
3    some changes on the Wellington
4    side and, you know, I promised
5    some changes.  And it was supposed
6    to be that if -- if those things
7    happened, then those changes would
8    happen in step.
9         What I'm saying to you now
10   is that, you know, if anything,
11   things have gotten worse and --
12   and, you know, therefore, you
13   know, the changes that, you know,
14   on my side accordingly just, you
15   know -- because -- you know, just
16   disappointing and depressing.
17        But it's -- as I said, if
18   the changes can happen on the
19   Wellington side, I mean, it would
20   naturally change on my side.  You
21   know, it would naturally be not
22   feel frustrating to come into work
23   and deal with stuff.  It would
24   naturally not be disappointing if

1    I'm not disappointed that -- that
2    the expectations that were set are
3    not being met.  On both sides.
4         MR. ARGYLE:  Okay.  But just
5    to be clear -- and I look at the
6    feedback.  I see people in exactly
7    the same spot as you are launching
8    pools, getting new investment
9    products off the ground.  I see,
10   you know, women fairly distributed
11   across the feedback.  I see people
12   living in Asia -- working in Asia
13   fairly distributed across the
14   feedback.  In fact, unfairly
15   distributed across the feedback.
16   I -- to the top.  I see Asian
17   nationals distributed across the
18   feedback.  I see people of all
19   different experience levels
20   distributed across the feedback.
21   Right?
22        So the only thing that I'm
23   just totally and utterly confused
24   at is why, of all the people

Page 62

1    working at Wellington -- across
2    all asset classes, across all
3    investment approaches, across all
4    regions -- is China Growth causing
5    you so much -- causing you in
6    particular -- one broker in
7    particular on China Growth
8    compared to everything else, when
9    people are still managing to do
10   exactly what their day jobs are
11   and launch -- and collaborate
12   broadly with the firm and launch
13   new investment approaches and
14   frankly not get fussed about
15   managing whether it's a million
16   dollars in seed capital or
17   $5 million in seed capital because
18   we need a little bit more for
19   fixed income products or
20   whenever -- or whatever it might
21   be because they understand the
22   long-term picture.  And that's
23   the -- you know, so you -- so
24   your --

Page 63

1        MS. CHAN:  Oh, yeah.  No.
2    I -- I --
3        MR. ARGYLE:  -- your
4    argument makes total -- if someone
5    came in here and didn't understand
6    how the firm works and sat down
7    here, it might make sense in
8    isolation.  But relative to all
9    these other pools we're launching
10   across hundreds of -- well, across
11   multiple asset classes, it -- it
12   doesn't make sense that --
13       MS. CHAN:  Yeah.  And I --
14       MR. ARGYLE:  -- Greg Mattiko
15   was saying, I'm not getting any --
16   enough idea flow from her.
17       MS. CHAN:  Yeah.  I -- I
18   wish -- I wish I knew as well
19   why -- why this fund launch has
20   been so much more difficult
21   because it's definitely not what
22   other people have experienced.
23   I -- you know, I would like to
24   know as well.  I suspect it's

Page 64

1    working out Asia, it's -- you
2    know, the level of status
3    provision is great, but, you know,
4    people -- you know --
5        MR. ARGYLE:  We've launched
6    other pools out of Asia.  It's
7    not -- it's -- it's --
8        MS. CHAN:  Maybe so.  And --
9    but it has been -- it has been --
10   I mean, you know, to -- to
11   start -- to start products without
12   the ability to buy P-notes or
13   start -- you know, and then all
14   that --
15       MR. ARGYLE:  (Indiscernible)
16   done that.
17       MS. CHAN:  --
18   (indiscernible) all of this.  But,
19   you know, I mean --
20       MR. ARGYLE:  That's not our
21   fault that we can't buy P-notes,
22   right?
23       MS. CHAN:  Or the right
24   P-notes.  Or being able to have

Page 65

1    targeted the correct P-notes with
2    the right service provider that
3    doesn't have the additional cost
4    or -- I mean, it's just --
5    anyways.
6        MR. ARGYLE:  And it doesn't
7    take weeks and weeks of work for
8    you to figure that out, right?  It
9    shouldn't.  Was your investment
10   director affected?
11       MS. CHAN:  I don't know
12   where things have gone wrong, but
13   it hasn't been that smooth a
14   process with everything regarding
15   the launch.
16       MR. BAXTER:  One thing about
17   attitude is (indiscernible) that
18   run portfolios.  Like, just in
19   last month we've had four of
20   Greg's clients come in-house here.
21   They're in-person, in this room,
22   talking to clients.  I've had
23   several of them turn to me and
24   say, Tell me about China Growth.



Page 66

1 That's the client access.
2 That's -- these other PM teams
3 would have killed for that access.
4  MS. CHAN:  No.  It wasn't --
5 I haven't done several.  It's been
6 one.
7  MR. BAXTER:  Well, the
8 meeting was -- there's been four
9 meetings.
10  MS. CHAN:  And one -- and
11 one client has asked about China
12 Growth.
13  MR. BAXTER:  Right.  But
14 it's come up and it's clearly --
15  MS. CHAN:  Yeah.  It's
16 been -- that's been one.  And --
17 and, you know, the client
18 access -- you know -- I mean,
19 yeah.  There was a road show
20 scheduled and it was cancelled a
21 week beforehand.  I mean,
22 that's -- you know, that's the
23 kind -- you know -- you know,
24 dedicated client access.  And it

Page 67

1 was something certainly when we
2 last talked you said -- I said it
3 was not AUM that -- you know,
4 that -- it was -- it was client
5 access.  And you said that there
6 would be client access.  You can
7 say you didn't say it, like --
8  MR. ARGYLE:  I'm not saying
9 I didn't say it.
10  MS. CHAN:  -- whatever.
11 But, you know --
12  MR. ARGYLE:  I remember
13 exactly what I said.  I said -- I
14 said there could well be
15 opportunities for you to speak to
16 clients about China in general.
17 Don't hold your breath on China
18 Growth.  Because clients are
19 interested in China.  All right?
20 Actually, most of the -- most of
21 the conversations Bo [phonetic]
22 has had with clients going back a
23 year ago was about China broadly,
24 and the frustration was that

Page 68

1 actually very little of it was
2 about her specific investment
3 approaches.
4  Our clients -- what our
5 clients are interested in talking
6 about changes by the month, by the
7 quarter.  And there's very few
8 people at most of our clients,
9 right?  So they're very small
10 investment teams at most of our
11 institutional clients.  So we
12 can't predict what they're talking
13 about.
14  If China had been a topic
15 they were interested in talking to
16 in general -- talking about in
17 general, I'm sure they'd be
18 interested in talking to you.  But
19 clearly their interest changed and
20 evolved.
21  But there's still a massive
22 disconnect here which is that, you
23 know, you -- you don't seem to
24 appreciate the opportunity you

Page 69

1 have here at Wellington.  You
2 don't recognize that there is an
3 opportunity for you to effectively
4 reengage come the spring -- if
5 there is such a word here -- you
6 know, with your peers here, with a
7 different attitude, a more
8 positive attitude, rather than the
9 attitude that's perceived today.
10  And forget the GRG side.
11 Even the investment side.  We
12 actually -- you know, there's
13 plenty of people who are very
14 successful at Wellington with not
15 much in the way of assets.  So the
16 assets somehow will -- will come.
17 But far more important is, you
18 know, what is the attitude day to
19 day.  I need someone engaged in
20 the investment dialogue and -- and
21 do they really actually seem to
22 enjoy being part of this place.
23  MS. CHAN:  Would you enjoy
24 being part of somewhere that --



Page 70

```
1    that made promises that it doesn't
2    keep?  And what I'm trying to say
3    to you is, you know --
4         MR. ARGYLE:  Gigi --
5         MS. CHAN:  -- at least, you
6    know --
7         MR. ARGYLE:  Gigi, what I'm
8    hearing is:  Charles, it's all
9    Wellington's fault.  My attitude
10   is entirely Wellington's fault.
11   So -- and I want you to be crystal
12   clear about that, Charles.  That's
13   what I'm hearing and that's my
14   takeaway from this meeting.  And I
15   literally have to leave in three
16   minutes.
17        Is that my right takeaway
18   from this meeting?
19        MS. CHAN:  If -- if
20   Wellington feels that it bears no
21   responsibility for having given a
22   wrong set of expectations and if
23   Wellington thinks that it doesn't
24   have any responsibility to try
```

Page 71

```
1    and -- and come good with some of
2    the expectations that -- that it
3    set, I think that -- just the way,
4    you know, agreements are made,
5    if -- if one side is given false
6    expectations, then it is customary
7    to -- to ask that side to fix it.
8         It's not to say that I --
9    you know, I am -- if I wasn't
10   constructive, I would -- you know,
11   I wouldn't be trying to explain
12   this to you.  I am trying to
13   explain this to you.
14        I -- you know, just try and
15   put yourself in my shoes.  If you
16   had made a -- made -- it's an
17   important career decision and I
18   hadn't moved for 13 years before.
19   It was not one that I took
20   lightly.  There was an actual
21   alternative that I made -- you
22   know, that I -- that I decided to
23   forgo on this basis.  You know,
24   and Wellington's like, Oh, yeah,
```

Page 72

```
1    Tough shit.  Like, you know, that
2    you chose us, not them.
3         You know, completely take
4    that -- you know, and it's not
5    that I'm not being constructive
6    about trying to fix this.  I've
7    chosen it, you know, for what it's
8    worth.  But I mean, if Wellington
9    is the place that it says it is
10   then -- then -- and, you know,
11   Wellington's just done so little.
12   And, you know -- you know, within
13   Wellington, Oh, yeah, you know, of
14   course other people, you know,
15   like, don't (indiscernible) XYZ,
16   but that's not the impression that
17   was given and there was no way in
18   me knowing that that was the way
19   it worked.  And to always say,
20   Well, this is just the Wellington
21   way is just --
22        So I mean, you know, I had
23   asked for client access before
24   and, you know, I continued to ask
```

Page 73

```
1    for client access.  You know,
2    it's -- it's --
3         MR. ARGYLE:  Well, I'm going
4    to be very clear.  All right?  All
5    right?  So I know exactly what I
6    said to you because I've given
7    this speech about 50 times.
8    There's 54 portfolio managers.
9    Probably about half of them have
10   started -- worked with me having
11   to give this speech.  So about
12   20 -- right?  So I know for a fact
13   I would have said, At Wellington
14   we're gonna evaluate you on alpha,
15   not assets because that's
16   something Charles says and that's
17   something always Charles says.
18        MS. CHAN:  Yes.
19        MR. ARGYLE:  All right?
20   Okay?  So we're gonna evaluate on
21   alpha, not assets.  All right?
22   That's good to go.  We're also
23   gonna evaluate you as somebody who
24   is a -- a part of the emoji
```



Page 74

```
 1   [phonetic] market opportunities
 2   team for your impact in emoji
 3   market opportunities team.  And
 4   also we're gonna evaluate you in
 5   your impact on -- of your impact
 6   on the broad platform.  All right?
 7       So one of those is too soon
 8   to be meaningful, the alpha on
 9   China Growth.  The other two are
10   disappointing.  All right?  So
11   I'll be crystal clear about it.
12       Looking forward, just to set
13   expectations, all right, I
14   wouldn't have any expectations
15   about China Growth being anything
16   other than seed capital for the
17   next three years.  If you have --
18   if -- if there are -- if that's
19   disappointing to you, all right,
20   then that's -- I'm setting your
21   expectations now.  Okay?  And
22   that's nothing to do with --
23   that's just -- that's just the
24   reality of how things work in
```

Page 75

```
 1   institutional asset managing.
 2   We're -- we're not a retail asset
 3   manager.
 4       All right?  So that's -- you
 5   know, that's expectations going
 6   forward today.
 7       But I'm still disappointed
 8   that I'm not hearing any
 9   recognition from you that you
10   think you can improve your
11   attitude in engaging with your
12   peers and with those you work with
13   in all roles.  GRG, back office,
14   the investment side.  It just
15   doesn't seem to be there.
16       MS. CHAN:  Well, I've tried
17   very, very hard.  And as I said,
18   particularly, you know, the focus
19   had been on the GRG side.  I just
20   tried extremely hard on the GRG
21   side.  It's at the expense of some
22   of the other -- some of the other
23   aspects.
24       And -- and -- I mean, also
```

Page 76

```
 1   it's, you know, I don't think -- I
 2   mean, like, you know, back office
 3   (indiscernible) I mean, I've
 4   always been very responsive to
 5   anybody that I talk to.  I mean,
 6   I -- on the investment side, yeah,
 7   some of -- I mean, on the
 8   investment side it's not always
 9   that -- that -- you know, other
10   people on the -- there's not
11   always been, you know, that
12   friendly.  But, you know, I do
13   respond -- when I -- when I'm
14   asked, I do respond.  I'm
15   responsive and I have
16   participated --
17       MR. ARGYLE:  I gave you the
18   feedback.
19       MS. CHAN:  -- yes --
20       MR. ARGYLE:  I gave you the
21   feedback already.
22       MS. CHAN:  Yeah.
23       MR. ARGYLE:  All right?
24       MS. CHAN:  Yup.
```

Page 77

```
 1       MR. ARGYLE:  That's -- you
 2   know, there's no manipulation
 3   there.  That's just, you know,
 4   where it -- where it came out.
 5   It's really disappointing --
 6   irrespective of everything else,
 7   that's really, really
 8   disappointing, right?  And I
 9   would -- you know -- and -- and I
10   would advise you -- I -- that --
11   you know, you could be doing much
12   more for Greg.
13       MS. CHAN:  Yup.
14       MR. ARGYLE:  And both of
15   us -- both of us are hearing a lot
16   of What's up with Gigi?  What's
17   going on?  You know, all the time.
18   So I -- again, I'll just
19   reiterate.  I believe that, you
20   know -- I know you -- you know, I
21   don't know.  You give the
22   impression that -- that --
23       This is unconvincing to you,
24   but I actually want you to be
```



1 successful here. I have put my
2 chips on the table on Gigi. All
3 right? But my patience is -- is
4 wearing thin. All right? And I
5 think there is -- there is an
6 opportunity for us all to start
7 all over again with the
8 expectations I just laid out in
9 the spring. Or if you're really
10 this unhappy, find one of those
11 multiple other opportunities out
12 there that are gonna make you more
13 happy.
14       MS. CHAN: But then, you
15 know, please help. You know,
16 those -- those options are
17 definitely still there. But I am
18 asking for -- I mean, you know, to
19 be honest, you know, one million
20 seed capital, it's -- you know,
21 it's definitely much, much below
22 expectations.
23       I've run institutional money
24 before. It's not -- I didn't just

1 run retail money. I -- actually,
2 the bulk of the money I ran was
3 institutional. My -- the retail
4 fund that I ran was -- was like
5 maybe 15, 20 percent of the assets
6 that I managed. The bulk was
7 institutional. It's not that I'm
8 unfamiliar with markets. It's not
9 that I'm unfamiliar with the
10 seeding process, you know, at, you
11 know, other places. Yeah. One
12 million is a tiny amount.
13       Now, as I said, all I've --
14 all I'm asking is to be able to
15 access clients. You've hired --
16 you've hired a fund manager -- you
17 know, you're bored of hearing it,
18 but you have hired a fund manager
19 with a track record. If you want
20 that person to be able to
21 contribute to -- you know, then --
22 then just give me the ability to
23 be able to go and, you know, at
24 least build relationships with

1 clients so that assets can be
2 raised.
3       Of course it's not gonna be
4 overnight and of course it's gonna
5 take hard work. Now, it's -- it's
6 just if you don't let someone do
7 what they -- their job, do what
8 they're good at, then -- then it's
9 very -- it's -- it's very
10 demotivating. And that's all I've
11 asked. Just to be able to do the
12 job that -- that -- where I can
13 add value. And I can see so many
14 more ways that I can add value.
15 I -- you just --
16       MR. ARGYLE: Do you see your
17 value -- the value you can add
18 best is by being part of the
19 investment dialogue. And every
20 single day our GRG professionals
21 watch the early morning meeting.
22 And every single day our -- many
23 of our GRG professionals outside
24 the US listen -- watch the early

1 morning meeting. And everyone
2 gets the minutes of the early
3 morning meeting. And you're just
4 not present. So no one's going,
5 Wow. She sounds really good.
6 They're not saying She
7 (indiscernible) she doesn't know
8 what she's talking about because
9 you're not saying anything. All
10 right?
11       There's not -- right? There
12 are -- there are only so many
13 chits that our GRG professionals
14 get to spend with their clients
15 every day. We have 300 investment
16 approaches -- we do -- across
17 fixed income, asset allocation,
18 and equities. There's only so
19 many things that our GRG
20 professionals can bring to
21 clients.
22       MS. CHAN: Sure. And that's
23 why -- I mean, there's -- you
24 know, I'm still not that convinced



Page 82

1  that Wellington is that serious
2  about China, that -- you know, I
3  mean, there's 50 billion that
4  other firms have been able to
5  raise. You know, Wellington's
6  raised what of that amount?
7       MR. ARGYLE: Maybe -- so --
8  let's just face it. Maybe we're
9  just crap at raising money for
10  Chinese equities. Maybe we are.
11  I don't know if we are. You would
12  say we are.
13      MS. CHAN: Well, I guess the
14  numbers would say it, right? I
15  mean, it's not much compared to
16  other houses.
17      MR. ARGYLE: I have no idea
18  if it's in retail. I have no idea
19  if it's mainland. I have no idea
20  if you've got a shot. But --
21  but --
22      MS. CHAN: I mean, it's easy
23  talking (indiscernible) off the
24  back (indiscernible).

Page 83

1       MR. ARGYLE: But -- but --
2  again -- again, it's -- you don't
3  have to be here if you're that
4  unhappy, right?
5       MS. CHAN: Is that what
6  you're advising me?
7       MR. ARGYLE: What?
8       MS. CHAN: Is that what
9  you're advising me?
10      MR. ARGYLE: I'm advising --
11  I am saying unless you come back
12  with a different attitude with
13  engaging with all your
14  professionals here at Wellington
15  and actually saying, Hey, we're
16  all in this together through thick
17  and thin, you know, and I'm gonna
18  be actually grateful for the
19  things that go right rather than
20  hold people over the coals or --
21  or complain about everything that
22  goes wrong, then -- then there's
23  probably somewhere else that you
24  can be happier.

Page 84

1       MS. CHAN: Yeah. You know,
2  the key being we're in this
3  together. So -- you know, and --
4  and would you rather, you know,
5  that -- that I just don't speak up
6  about things that should be fixed
7  that aren't just directly related
8  to me but for the whole firm.
9       MR. ARGYLE: It's how you
10  speak up. All right? It's how
11  you speak up. It's not what --
12  that you do speak up or don't
13  speak up. It's how you speak up.
14  I've seen it here -- not very
15  often, but I have seen it here
16  where people have brought up very
17  valid concerns about how they've
18  decided to interact with their
19  colleagues around the firm has
20  meant that they have just been
21  unsuccessful and ultimately it
22  hasn't worked.
23      MS. CHAN: Well, I always
24  speak up in a respectful manner.

Page 85

1  I don't -- but if it's -- you
2  know, whether --
3       MR. ARGYLE: I think --
4       MS. CHAN: -- whether you
5  want to hear it or not --
6       MR. ARGYLE: -- some of the
7  feedback would be counter to that.
8       MS. CHAN: That I haven't
9  been respectful?
10      MR. ARGYLE: You know, I
11  think you think rather than, Hey,
12  here's -- here. I've identified a
13  problem. Let's try and all solve
14  it together and I'd love to be
15  part of that solution, it's pretty
16  much -- and I'm not quoting. All
17  right? But -- but it's a little
18  bit of, you know, Bozos here don't
19  have a clue what you're doing.
20      There are two -- you know,
21  both identified a problem. Both
22  are speaking up. But one is a
23  very different way of speaking up
24  than the other.



Page 86

1       MS. CHAN:  I have never said
2   the bozos here --
3       MR. ARGYLE:  No.  You've
4   never said the bozos here.  And I
5   said these aren't the exact words.
6       MS. CHAN:  Or anything -- or
7   anything along those lines.  I
8   will always try to engage
9   people -- you know, can -- can
10  anybody else look at this, can you
11  look at this.  But, you know, if
12  other people aren't taking
13  responsibility, then someone's got
14  to do something.  And I have --
15  but I've never -- I may have gone
16  away and done it myself, but I
17  have never given feedback about,
18  like --
19      MR. ARGYLE:  But honestly,
20  talking about other people taking
21  responsibility, it's really
22  important for you to take
23  responsibility for the way you
24  interact with the other

Page 87

1   professionals here.  And we're now
2   going round and round and round in
3   circles and right now it's -- it's
4   not going well.  Right?  It's
5   really, really not going well.
6       So if it's exactly the same
7   in the middle of next year or, you
8   know, not to precisely pinpoint
9   June 30th, but vaguely in the
10  middle of next year, this could
11  well, to your earlier question, be
12  a very different conversation.
13  Okay?
14      MS. CHAN:  Okay.
15      MR. ARGYLE:  Thank you for
16  your time.
17      MS. CHAN:  Thank you.
18      - - -
19      (End of audio file)
20      - - -
21
22
23
24

Page 88

1               CERTIFICATE
2
3
4       I HEREBY CERTIFY that the
5   foregoing was transcribed by me from an
6   audio file to the best of my ability.
7
8
9
        Cindy Parker
10      Dated:  January 20, 2021
11
12
13
14
15      (The foregoing certification
16  of this transcript does not apply to any
17  reproduction of the same by any means,
18  unless under the direct control and/or
19  supervision of the certifying reporter.)
20
21
22
23
24

Page 89

1               LAWYER'S NOTES
2   PAGE  LINE
3
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____



**A**

**ability** 64:12
79:22 88:6
**able** 46:17 56:12
64:24 79:14,20
79:23 80:11
82:4
**absolutely** 21:9
**access** 23:17 26:1
26:8 51:6 57:18
57:22 66:1,3,18
66:24 67:5,6
72:23 73:1
79:15
**accommodate**
46:17
**accomplish** 4:11
**account** 45:8
**achievable** 22:7
**achieved** 51:15
51:16,21
**ACTION** 1:2
**actively** 30:16
**actual** 36:1 71:20
**add** 40:21 41:5
80:13,14,17
**added** 30:10
**additional** 65:3
**adequate** 21:1
**admin** 33:10
**advance** 24:24
**advise** 77:10
**advising** 83:6,9
83:10
**age** 8:5
**aggregate** 57:11
**ago** 22:14,15 23:5
23:11,22 41:18
54:17 67:23
**Agreed** 53:10,13
**agreements** 71:4
**ahead** 19:5 20:17
21:8 46:13
**aim** 19:24
**aims** 19:15

**aligned** 50:19
**allocation** 81:17
**alpha** 73:14,21
74:8
**alternative** 12:2
71:21
**Amazon** 7:2
**amount** 7:6
12:18 55:23
79:12 82:6
**anachronism**
27:5
**anachronistic**
18:19 46:1
**analyst** 39:7
**anchoring** 47:6
**and/or** 88:18
**anemic** 29:12
**anybody** 21:12
56:21 76:5
86:10
**anyway** 11:1
13:8
**anyways** 56:5
65:5
**apply** 88:16
**appreciate** 31:4
49:6 68:24
**appreciated**
46:22
**approaches** 18:3
62:3,13 68:3
81:16
**areas** 15:22
**argument** 63:4
**Argyle** 1:7,17,20
2:4,7,11,19 3:5
3:14,17,21 4:2
4:5,10,14,17,21
4:23 5:4,10,13
5:21 6:1,7,12
6:16 7:4,21 8:8
9:10,17 10:1,14
10:17 11:3,8,12
11:17,20,24
12:4,8,19,24

13:2,13,17 14:5
14:20 15:1,5,10
15:14,18 16:3,8
16:14 18:1,13
22:13 28:11,16
28:19 31:9,23
32:2,6 34:8,19
35:19,24 36:3
38:24 41:9 44:5
44:8 46:24 47:5
47:8,12 48:12
50:7 51:23 52:7
52:9 53:10,13
54:9 58:21 61:4
63:3,14 64:5,15
64:20 65:6 67:8
67:12 70:4,7
73:3,19 76:17
76:20,23 77:1
77:14 80:16
82:7,17 83:1,7
83:10 84:9 85:3
85:6,10 86:3,19
87:15
**arm** 56:16
**arrive** 34:24 37:2
**arrived** 37:15,16
38:1,5 41:16
53:2
**articulately**
17:22
**Asia** 61:12,12
64:1,6
**Asian** 61:16
**asked** 2:11 23:14
26:3 66:11
72:23 76:14
80:11
**asking** 18:14
23:15,17 78:18
79:14
**aspects** 75:23
**assert** 44:23
**asset** 62:2 63:11
75:1,2 81:17
**assets** 23:8,13,16

23:19 69:15,16
73:15,21 79:5
80:1
**assume** 30:17
**assumed** 53:3
**attitude** 28:20
48:15,17 49:15
50:4 58:24
59:13 65:17
69:7,8,9,18
70:9 75:11
83:12
**audio** 1:12,15
87:19 88:6
**AUM** 24:3 26:4
67:3
**A-levels** 3:7,18
3:19,21,22

**B**

**B** 55:16
**baby** 8:11,17
10:23
**back** 28:14 29:24
45:23 49:24
53:5 67:22
75:13 76:2
82:24 83:11
**backing** 8:1
**backup** 4:12 6:3
7:18 10:12
13:23 14:14
**backwards** 46:16
**badly** 53:20
**bargain** 55:16
**based** 54:6
**basically** 24:10
51:16 52:3
**basis** 14:4 17:16
35:3,10 36:9
38:16 71:23
**battle** 56:13
**Baxter** 1:17,20
2:16,20 3:1,13
8:21 9:1,4,16
65:16 66:7,13

**bears** 70:20
**beginning** 47:13
**behavior** 37:21
**behaviors** 41:2
**believe** 4:18 25:5
45:16 47:16,18
47:21,22 55:7
77:19
**believes** 30:21
**bending** 46:16
**best** 19:7 80:18
88:6
**betting** 50:17
**big** 55:13
**biggest** 47:19
**billion** 82:3
**billion-plus**
43:22
**bit** 2:3 62:18
85:18
**blah-blah-blah...**
53:24
**Bo** 67:21
**board** 49:2
**Bolivian** 7:1
**bored** 79:17
**bozos** 85:18 86:2
86:4
**breakdown**
26:18
**breath** 67:17
**bring** 81:20
**broad** 31:11 74:6
**broadly** 5:6 16:3
62:12 67:23
**broker** 62:6
**brought** 84:16
**build** 79:24
**bulk** 79:2,6
**business** 30:5
**buy** 64:12,21

**C**

**call** 50:13
**cancel** 20:24
24:23



cancelled 46:10
  66:20
capable 10:4
capital 15:24
  22:18,19,20
  62:16,17 74:16
  78:20
care 40:9 51:9,11
  51:17,18,20
career 71:17
careful 39:19
case 43:18
catch 3:23
cause 21:2
causing 62:4,5
certain 15:22
certainly 25:24
  39:4,7 67:1
CERTIFICATE
  88:1
certification
  88:15
CERTIFY 88:4
certifying 88:19
cetera 9:18 41:2
  45:11
challenge 31:14
Chan 1:4,16 2:2
  2:6,9,15,24 3:4
  3:16,20 4:1,4,8
  4:13,16,19,22
  5:3,9,12,20,24
  6:6,9,15,18 7:5
  7:22 8:9,24 9:3
  9:6,11,18 10:13
  10:16 11:2,7,11
  11:16,19,23
  12:3,7,11,22
  13:1,12,16,19
  14:6,24 15:4,9
  15:13,17 16:2,7
  16:13 17:24
  18:12,15 23:10
  28:15,18 31:7
  31:18 32:1,4,9
  34:11,21 35:22

36:1,4 39:17
  41:16 44:7,11
  47:3,7,10 48:10
  50:5,12 51:2
  52:5,8,11 53:11
  53:14 54:21
  59:1 63:1,13,17
  64:8,17,23
  65:11 66:4,10
  66:15 67:10
  69:23 70:5,19
  73:18 75:16
  76:19,22,24
  77:13 78:14
  81:22 82:13,22
  83:5,8 84:1,23
  85:4,8 86:1,6
  87:14,17
chance 43:21
change 12:13
  24:11 58:23
  59:20,21 60:20
changed 26:24
  68:19
changes 8:13
  60:3,5,7,13,18
  68:6
changing 22:11
  55:20
Charles 1:7,16
  1:20 31:8 50:10
  59:1 70:8,12
  73:16,17
chasing 27:20
China 6:4 62:4,7
  65:24 66:11
  67:16,17,19,23
  68:14 74:9,15
  82:2
Chinese 15:24
  16:1 36:21
  41:21,23 52:22
  82:10
chip 5:13
chips 78:2
chits 81:13

choose 16:10
  47:20
chose 72:2
chosen 43:18
  72:7
Cindy 88:9
circles 87:3
CIVIL 1:2
classes 62:2
  63:11
clear 11:9,15
  18:8 23:6 24:1
  24:17 28:7 59:7
  61:5 70:12 73:4
  74:11
cleared 10:24
clearly 25:6 39:6
  46:12 66:14
  68:19
client 24:8 33:2
  56:4 66:1,11,17
  66:24 67:4,6
  72:23 73:1
clients 23:18,21
  26:2 41:15,22
  41:23 42:2,8
  51:6 57:18
  58:13 65:20,22
  67:16,18,22
  68:4,5,8,11
  79:15 80:1
  81:14,21
client-imposed
  14:10
client-related
  24:21
clue 85:19
coals 83:20
collaborate 31:2
  42:14 62:11
collaboration
  17:3,6 20:11
colleagues 17:14
  48:17 49:16
  84:19
college 3:2

combination 9:8
come 2:12 12:1
  23:9,13 28:14
  29:16,16 34:9
  35:8 43:19,22
  49:24 52:10
  59:14 60:22
  65:20 66:14
  69:4,16 71:1
  83:11
comes 48:19
coming 29:13
comments 41:1
common 9:12
communicate
  30:11 46:11
  57:12
communicated
  25:6 40:10
  57:16 58:1
communicating
  26:13,14
communication
  42:18,22 46:20
  56:24
company 1:7
  36:21
compared 13:21
  62:8 82:15
complain 29:18
  43:2 83:21
complaining
  53:23 57:7
complete 27:5
  46:12,13
completely 19:17
  21:14 24:2 50:3
  50:11 51:8 72:3
complicated
  40:15
compounded
  37:23
concerns 11:13
  84:17
confirming 14:23
conflicting 19:13

19:14
confused 61:23
congratulations
  4:6
constructive
  18:24 19:7 42:6
  71:10 72:5
context 58:8
continual 17:12
continued 72:24
continues 59:18
continuity's 2:12
contribute 49:2,3
  79:21
contributing
  49:8
contribution
  29:3,10
control 88:18
conversation
  1:16 39:16
  87:12
conversations
  67:21
convinced 18:7
  18:10 39:2
  81:24
correct 65:1
correctly 13:7
cost 65:3
count 43:10
counter 85:7
country 3:8
course 19:3 20:7
  24:20 32:4,9,10
  38:17 57:2
  72:14 80:3,4
COURT 1:1
crap 82:9
create 42:7
creates 31:2
cross-reference
  35:13
crystal 70:11
  74:11
culture 37:1



**customary** 71:6

---
**D**

**daily** 14:3 56:13
**dark** 22:9
**Dated** 88:10
**day** 8:5 31:12
  40:16 45:1
  50:13 59:15
  62:10 69:18,19
  80:20,22 81:15
**days** 2:14
**deadlines** 14:11
**deal** 48:16 49:16
  60:23
**dealing** 13:24
  32:12
**dealt** 14:3
**debate** 29:24
**decide** 10:15
**decided** 24:23
  55:13 71:22
  84:18
**decision** 23:3
  35:3,15 36:8
  38:15 54:5
  71:17
**decisions** 14:9
**dedicated** 66:24
**Defendants** 1:8
**definitely** 11:5
  21:24 27:3,22
  28:1 32:21
  34:12,16 57:17
  58:18 63:21
  78:17,21
**delays** 25:20 56:8
**delivered** 20:16
**demanded** 19:6
**demands** 19:8
**demotivating**
  80:10
**depressing** 60:16
**depth** 17:3,7
**detail** 15:21
**dialogue** 49:18

69:20 80:19
**different** 18:2
  61:19 69:7
  83:12 85:23
  87:12
**difficult** 63:20
**diligence** 36:20
  36:21
**dim** 44:2
**direct** 88:18
**directly** 84:7
**director** 65:10
**disagree** 10:3
**disappointed**
  29:2 59:18,19
  61:1 75:7
**disappointing**
  15:20 16:12
  17:10,11 28:2
  45:18 60:16,24
  74:10,19 77:5,8
**disconnect** 68:22
**discontent** 17:13
  19:19 21:2,5
**discovered** 33:4
**disengaged** 16:18
  27:23
**disillusioned**
  38:6
**disputed** 16:4
**disregard** 36:14
**disrespect** 20:21
**dissatisfied** 19:1
**distant** 44:2
**distraction** 42:10
**distributed** 61:10
  61:13,15,17,20
**DISTRICT** 1:1,1
**doable** 8:19
**doing** 14:16
  20:17 27:16,20
  32:17,20 33:9
  33:11 39:9
  58:10 77:11
  85:19
**dollar** 22:19

**dollars** 62:16
**doubt** 38:22
**drain** 42:11
**draining** 33:13
**due** 36:20,20
**duty** 40:9

---
**E**

**earlier** 29:3
  87:11
**early** 4:18 80:21
  80:24 81:2
**Earth** 3:6
**easier** 20:9 41:5
**easy** 19:10 21:4
  21:16 41:7
  45:24 59:12,13
  82:22
**eat** 46:18
**effectively** 69:3
**effort** 20:20
**efforts** 46:21
**element** 19:18
**emergency** 8:3
**EMM** 31:2
**EMO** 29:8 49:3
**emoji** 73:24 74:2
**emphasize** 22:1
**emphasized** 26:5
**energies** 19:3
**energy** 24:16
  42:12
**engage** 16:10
  49:17 56:12,12
  86:8
**engaged** 69:19
**engaging** 16:17
  55:5 75:11
  83:13
**enjoy** 69:22,23
**enormous** 7:6
**entails** 8:16,17
**entirely** 70:10
**entirety** 10:5
**entitled** 1:19
**entrance** 3:3

**equities** 81:18
  82:10
**equity** 39:6
**especially** 6:4
**essentially** 54:1
**et** 9:18 41:2
  45:11
**evaluate** 73:14
  73:20,23 74:4
**Eventually** 29:9
**everybody** 39:19
  57:3,5
**Everyone's** 43:8
**evolve** 10:19
**evolved** 68:20
**evolving** 10:18
**exact** 86:5
**exactly** 61:6
  62:10 67:13
  73:5 87:6
**exam** 3:3
**exciting** 10:9
**excuse** 40:14
**exists** 6:5
**expect** 5:22
**expectation**
  34:14 59:17
**expectations**
  33:23 39:8
  40:17 45:10
  61:2 70:22 71:2
  71:6 74:13,14
  74:21 75:5 78:8
  78:22
**expected** 10:18
  39:13
**expecting** 43:24
**expense** 75:21
**experience** 44:19
  52:15 61:19
**experienced**
  63:22
**explain** 71:11,13
**explanation** 21:1
**extra** 56:22
**extremely** 28:1

55:19 75:20
**eye** 7:13
**e-mail** 7:1
**e-mails** 25:13

---
**F**

**face** 36:23 82:8
**face-to-face** 5:11
**fact** 6:24 47:1
  54:17 61:14
  73:12
**fairly** 61:10,13
**false** 54:6 71:5
**family** 10:7
**far** 69:17
**fast** 12:21
**faster** 39:12
**fault** 34:2 64:21
  70:9,10
**feedback** 5:1
  15:8,15 16:16
  16:22 17:3 18:4
  19:13 20:2,13
  28:13 29:23
  41:10 43:3 48:7
  49:11 50:9,10
  50:19 57:5 58:6
  61:6,11,14,15
  61:18,20 76:18
  76:21 85:7
  86:17
**feedback's** 55:21
**feel** 13:11 24:19
  54:4 60:22
**feels** 70:20
**fellow** 16:10
**female** 52:21
**figure** 65:8
**file** 1:19 87:19
  88:6
**find** 78:10
**finding** 2:23
**fine** 10:1 57:23
**firm** 15:19 18:9
  28:21,22 48:18
  59:6 62:12 63:6



84:8,19
**firms** 82:4
**first** 13:6 32:11
**fit** 44:14
**fix** 48:11 71:7
72:6
**fixed** 62:19 81:17
84:6
**flow** 63:16
**flows** 13:24 14:1
14:10 17:16
**focus** 75:18
**focused** 21:14
**focuses** 49:22
**focusing** 33:3,7
**following** 1:18
**foregoing** 88:5
88:15
**forget** 69:10
**forgo** 71:23
**format** 3:7
**fortunately** 3:11
**forums** 16:18
**forward** 74:12
75:6
**four** 65:19 66:8
**frankly** 10:19
16:12 56:3
62:14
**friendly** 42:23
55:2 76:12
**frustrated** 17:23
**frustrating** 60:22
**frustration** 67:24
**fulfill** 11:20
**fulfilling** 10:5
**full** 19:5 46:12
**fully** 10:4
**fund** 6:24 8:15
20:1 22:17,22
22:23 23:9
25:24 31:22
32:8 34:5,20,22
36:5 38:11
43:22 46:4
63:19 79:4,16

79:18
**fundraising** 26:6
**funds** 22:24 23:7
**furthest** 2:10
**fussed** 62:14
**future** 37:9,10
44:2 47:23 48:9

—————
**G**

**GC** 1:19
**general** 67:16
68:16,17
**generation** 17:4
17:7 46:19
**GEPM** 31:17
**getting** 32:19
44:17,19 52:16
61:8 63:15
**GIA** 30:12
**GIAs** 30:16
**Gigi** 1:4,16 22:13
28:19,22 29:5
29:16,17 30:14
30:17,21 31:1,2
41:13,13 50:11
51:23 70:4,7
77:16 78:2
**give** 15:8 18:5
37:12 58:7
73:11 77:21
79:22
**given** 19:12 37:7
39:21 40:6,14
43:3,21 45:15
54:3 70:21 71:5
72:17 73:6
86:17
**gives** 44:9
**giving** 49:10
**Global** 30:9
**go** 13:5 14:14
18:3 28:12 30:4
38:21 73:22
79:23 83:19
**goalposts** 22:11
26:24 46:10

55:19
**goals** 19:14 22:12
**goes** 83:22
**going** 12:20
18:20,21 67:22
73:3 75:5 77:17
81:4 87:2,4,5
**gonna** 15:11 21:7
24:8 28:5,7,12
36:19 38:20
43:5 44:23 46:4
46:5,23 50:2,2
50:3,15 51:22
73:14,20,23
74:4 78:12 80:3
80:4 83:17
**good** 8:6 10:11
10:24 71:1
73:22 80:8 81:5
**gotten** 60:11
**GPM** 16:24
**grade** 3:13,15
**grades** 3:15
**grateful** 33:21
43:4 57:8 83:18
**gratefulness** 30:1
30:6
**great** 14:20 59:13
64:3
**Greg** 7:19 8:22
9:4 29:2 47:21
49:5,7 63:14
77:12
**Greg's** 65:20
**GRG** 18:1 19:5
19:20 20:9 27:6
27:10 46:3,8,14
47:2 69:10
75:13,19,20
80:20,23 81:13
81:19
**ground** 61:9
**Growth** 6:4 62:4
62:7 65:24
66:12 67:18
74:9,15

**guess** 35:2 37:9
82:13
**guided** 24:3
**guiding** 34:2

—————
**H**

**half** 73:9
**handled** 21:21
**happen** 14:12
27:2 37:17,19
38:20 57:23
59:21 60:8,18
**happened** 21:6
25:20 27:24
28:10 38:7 48:5
54:2 60:7
**happens** 37:13
**happier** 83:24
**happiest** 38:23
**happily** 20:11
**happy** 6:19 7:9
12:1 21:13
46:23 78:13
**hard** 22:10 28:8
36:1,4,6 42:12
55:19 59:20
75:17,20 80:5
**hear** 85:5
**hearing** 48:23
55:8 57:9 70:8
70:13 75:8
77:15 79:17
**heavily** 3:11
**heavy** 50:24
**held** 1:17
**hell** 3:5
**help** 28:21,22
30:18 48:10
49:10 50:16,21
50:22 58:15
78:15
**Henry** 34:17
**Hey** 83:15 85:11
**Hi** 2:15
**high** 30:12,12
**hire** 55:13

**hired** 39:14
51:13,14 79:15
79:16,18
**hiring** 37:11
**history** 52:18
53:8
**history's** 53:18
**hit** 28:13
**hitting** 42:13
**hold** 67:17 83:20
**holdings** 9:12
**home** 7:12 10:7
**honest** 12:14
13:20 15:11
19:16 21:20
24:12 32:13
43:5,19 78:19
**honestly** 15:11
29:19 48:22
50:7,18 86:19
**Hong** 7:7 29:17
**hope** 30:15
**hours** 3:10
**houses** 82:16
**huge** 40:20
**hundreds** 18:2
63:10

—————
**I**

**idea** 17:4,7 46:19
63:16 82:17,18
82:19
**identified** 85:12
85:21
**illegally** 6:10
**ILP** 29:10
**imagine** 3:7 7:24
38:14
**immediately**
35:17 36:12
**impact** 74:2,5,5
**important** 5:8
13:10 69:17
71:17 86:22
**impression** 31:3
37:6 39:21 40:5



72:16 77:22
**improve** 38:9
55:6 75:10
**income** 62:19
81:17
**indiscernible** 2:6
2:8,13,18,20,22
3:10,19 4:7
8:20,21,23 13:4
27:15 29:11
30:7 35:16
41:21 47:17
50:6 64:15,18
65:17 72:15
76:3 81:7 82:23
82:24
**individual** 28:16
45:2
**information** 35:6
35:11 40:10
**initiatives** 30:19
**input** 49:6
**instances** 53:15
**institutional**
68:11 75:1
78:23 79:3,7
**insulting** 51:8
**insults** 37:23
**integrate** 20:8
**integrity** 36:24
**interact** 84:18
86:24
**interaction** 30:14
33:3
**interest** 68:19
**interested** 67:19
68:5,15,18
**interim** 57:21
**internal** 24:20,23
**interpretation**
46:2
**interview** 40:11
**investing** 33:4,8
**investment** 16:23
18:3 46:19
49:18 61:8 62:3

62:13 65:9 68:2
68:10 69:11,20
75:14 76:6,8
80:19 81:15
**investments**
56:23 58:19
**Investor** 4:2,7
**investors** 29:11
32:3,5 55:22
58:11
**involve** 30:15
**in-class** 3:15
**in-house** 65:20
**in-person** 65:21
**irrespective** 77:6
**isolation** 63:8
**issues** 25:21
48:11
**it'll** 7:9

_____

### J

**January** 88:10
**job** 80:7,12
**jobs** 62:10
**join** 34:3 35:7
36:8,12 37:14
**joined** 32:24 34:1
44:13 45:17
54:2
**joining** 33:5
57:14
**judge** 35:5
**June** 87:9

_____

### K

**KAI** 1:4
**keep** 7:13 55:19
70:2
**kept** 19:22 20:14
21:11 22:9
23:15
**key** 84:2
**killed** 66:3
**kind** 5:2 7:7 8:4
9:21 14:2,8,10
14:11,15,16

18:17 19:12
20:2,16 24:17
40:3,9 45:16
66:23
**knew** 63:18
**know** 3:18 6:2,19
7:2,9,10,16,18
7:19 8:1,4,15
8:15,17,18,22
9:8,9,11,13,13
9:14,19,21 10:3
10:6,10,19,21
11:9,12,18
12:15,16 13:3,8
13:9,13,23 14:2
14:7,10,15
15:10 16:17,20
17:1,20,20
18:16,20,20,22
19:2,4,11,14,15
19:17,19,21
20:3,4,5,16,19
21:6,7,9,15,17
21:19,24 22:2
23:24 24:5,18
24:19,21,22
25:1,2,5,11,11
25:13,14,17,18
25:23 26:1,3,6
26:9,10,10,12
26:19,20,22
27:1,4,10,11,12
27:16,17,18,22
28:3,3 29:1,21
30:3,8 31:9,10
31:11,15,19
32:7,13,24 33:1
33:18,20,22,24
34:1,4,14,23
35:2,7,8,12
36:11,18 37:2,4
37:8,9,10,16,17
37:23 38:1,2,5
38:8,9,10,12,13
38:14,19 39:18
39:20 40:1,7,12

40:13,22,23
41:2,4,6,8,23
42:4,9,15,21,23
43:1,6,13 44:8
44:9,11,12,15
44:20,24 45:5,6
45:9,12,15,22
45:22,23 46:2,3
46:5,7,9,13,18
46:21 48:1,3,7
48:20,24 49:3
49:20 50:1,9,12
50:17 51:7,17
53:2,6,21 54:1
54:1,23,24
55:18,20 56:1,2
56:3,14,20,24
57:3,4,7,9,10
57:16,17,22
58:3,6,8,17
59:4,5,8,10,10
59:16,16,21,23
59:24 60:1,2,4
60:10,12,13,23
60:15,15,21
61:10 62:23
63:23,24 64:2,3
64:4,10,13,19
65:11 66:17,18
66:22,23,23
67:3,11 68:23
69:6,12,18 70:3
70:6 71:4,9,10
71:14,22,23
72:1,3,4,7,10
72:12,12,13,14
72:22,24 73:1,5
73:12 75:5,18
76:1,2,9,11,12
77:2,3,9,11,17
77:20,20,20,21
78:15,15,18,19
78:20 79:10,11
79:17,21,23
81:7,24 82:2,5
82:11 83:17

84:1,3,4 85:2
85:10,18,20
86:9,11 87:8
**knowing** 72:18
**knowledge** 15:24
**known** 43:16
**knows** 7:20 9:9
30:21 57:11
**Kong** 7:8 29:17

_____

### L

**laid** 78:8
**launch** 18:21
19:24 23:1
25:19 62:11,12
63:19 65:15
**launched** 22:17
22:22,23 23:7
25:24 64:5
**launching** 31:21
32:8 38:10 61:7
63:9
**LAWYER'S**
89:1
**learn** 30:15
**leave** 5:18,19
6:17 12:17
54:10,23 55:1
70:15
**led** 45:16
**left** 32:21
**LEGAL** 1:23
**legally** 5:21 6:13
**length** 56:16
**less-than-profe...**
40:24
**letter** 39:5
**let's** 6:7 82:8
85:13
**level** 64:2
**levels** 49:17
61:19
**licensed** 9:14
**life** 13:15 25:10
41:4 44:9
**light** 32:14,16



**lightly** 71:20
**limited** 30:14
**LINE** 89:2
**lines** 86:7
**list** 56:16
**listen** 80:24
**literally** 18:2
  49:21 50:1
  70:15
**little** 62:18 68:1
  72:11 85:17
**lived** 59:11
**living** 61:12
**LLP** 1:7
**long** 3:24 23:8,13
  23:19,20 26:7
  29:4 46:5 52:17
  53:7,19
**long-term** 28:23
  62:22
**look** 14:22 52:2
  52:20 61:5
  86:10,11
**looked** 9:22
**looking** 34:5,22
  74:12
**losers** 16:5
**losing** 50:11
**lot** 2:17 20:12,18
  22:18 27:16,17
  27:20 28:12
  31:23 32:4,6,11
  32:18 33:10,12
  33:13 37:3,20
  46:24 47:13
  58:10 77:15
**lots** 25:21
**love** 85:14
**luck** 45:14
**lucky** 43:10,13
**lump** 54:8,16

_____
**M**
**magical** 26:4
**MAGNA** 1:23
**mainland** 82:19

**maintain** 23:23
**making** 14:9
  54:12
**manage** 36:5
**managed** 8:14
  79:6
**management** 1:7
  8:16 39:11
  43:14
**manager** 31:16
  75:3 79:16,18
**managers** 73:8
**managing** 6:23
  34:5,20,22
  35:17 62:9,15
  75:1
**manipulation**
  77:2
**manner** 28:6
  84:24
**market** 18:4,6
  35:14 46:4 74:1
  74:3
**marketed** 19:9
  20:1
**marketing** 18:22
  19:16 24:7 56:2
**markets** 16:1
  79:8
**MASSACHUS...**
  1:1
**massive** 68:21
**maternity** 5:18
  6:17
**math** 2:17,21
**maths** 2:19
**matter** 8:10
  24:14 29:15
**Mattiko** 63:14
**mean** 6:11 7:16
  7:18 8:10 13:20
  19:15 27:12
  38:13 40:12,18
  41:18,20 42:16
  43:16 51:7,13
  52:23 55:20,22

56:3 58:1,12,14
  58:16 59:8
  60:19 64:10,19
  65:4 66:18,21
  72:8,22 75:24
  76:2,3,5,7
  78:18 81:23
  82:3,15,22
**meaningful** 74:8
**means** 88:17
**meant** 84:20
**meet** 19:8
**meeting** 29:12
  66:8 70:14,18
  80:21 81:1,3
**meetings** 24:9,14
  56:4 66:9
**met** 61:3
**middle** 87:7,10
**mid-December**
  4:18,20
**million** 62:15,17
  78:19 79:12
**mind** 12:14
**mindset** 42:5
**minutes** 70:16
  81:2
**mismatch** 40:19
  40:19
**moment** 13:14
**moments** 12:20
**money** 8:14
  35:18 78:23
  79:1,2 82:9
**money-making**
  17:4,9
**month** 65:19
  68:6
**months** 13:6
  18:11 22:15
  23:5,11,22 34:6
  34:6,23 40:3,4
  41:18
**morning** 29:12
  80:21 81:1,3
**mosaic** 17:2

**motivated** 59:3
**moved** 46:9
  71:18
**multiple** 63:11
  78:11
**multiple-choice**
  3:9
**mutual** 45:3

_____
**N**
**named** 7:17
  10:12 14:13
**nationals** 61:17
**naturally** 60:20
  60:21,24
**nature** 57:4
**need** 13:23 39:18
  62:18 69:19
**needed** 9:22
**needs** 30:17
**never** 21:11 26:2
  45:8 53:1 86:1
  86:4,15,17
**new** 10:7,22,23
  20:7 50:3 61:8
  62:13
**news** 7:11 14:8
**night** 27:13
**NOTES** 89:1
**November** 1:17
**numbers** 82:14

_____
**O**
**obstacles** 56:15
**obviously** 3:18
  8:11 10:10 17:9
  49:22 56:10
**occasions** 49:4
**offer** 35:23 36:2
  36:5,6 39:5
**offered** 9:23
**office** 75:13 76:2
**Oh** 2:19 4:8 6:15
  11:19 21:6
  24:23 25:3 33:1
  33:17 34:4

42:14 43:8,12
  44:5 45:12 46:2
  51:9 53:22 57:6
  63:1 71:24
  72:13
**okay** 4:21 5:3 6:9
  33:11 34:12
  35:1,24 36:3,13
  36:18 54:3 61:4
  73:20 74:21
  87:13,14
**old** 13:21
**onboard** 19:6
  20:14,15
**once** 23:6 26:2
**onerous** 6:22
**one's** 54:12 81:4
**onus** 50:23,24
  51:1,3
**onwards** 4:20
**operational**
  25:21
**opportunities**
  54:14 67:15
  74:1,3 78:11
**opportunity**
  10:20 15:7
  29:18 49:12,13
  68:24 69:3 78:6
**options** 78:16
**order** 19:9
**organization**
  44:15,16
**orientation** 28:23
**outcome** 25:16
**outcomes** 22:8
**outside** 80:23
**overlap** 30:13
**overlying** 41:10
**overnight** 80:4

_____
**P**
**page** 5:17 11:10
  15:3 89:2
**paid** 5:19 35:16
  36:2 43:23



**painful** 31:21
**paint** 16:20
**painting** 18:18
**Palooza** 4:3,7
**parents** 13:4
**Parker** 88:9
**part** 5:4,5 20:7
  31:4 58:10
  69:22,24 73:24
  80:18 85:15
**participated**
  76:16
**particular** 62:6,7
**particularly** 6:21
  7:7 27:6 37:22
  42:16 75:18
**partnership's**
  59:9
**patience** 78:3
**patronized** 52:16
**pay** 35:21
**peers** 15:16 69:6
  75:12
**peer-reviewed**
  16:21
**people** 20:21
  21:16 22:2,4
  24:17 26:23
  27:1,20 28:4,6
  29:13,14,19
  30:17,22 31:12
  32:7,7 33:17
  34:15 35:9,9,13
  38:2 46:9 52:23
  53:3,8,11 56:13
  59:5 61:6,11,18
  61:24 62:9
  63:22 64:4 68:8
  69:13 72:14
  76:10 83:20
  84:16 86:9,12
  86:20
**people's** 24:16
**perceived** 69:9
**percent** 18:23
  79:5

**percentile** 44:3
**perfectly** 12:14
  43:19
**person** 9:5 45:5
  51:14 79:20
**personal** 22:19
**perspective**
  48:19 52:10
  57:6
**pervasive** 16:15
**Philip** 34:17 49:5
**phonetic** 67:21
  74:1
**picking** 32:17
**picture** 16:20
  18:18 37:12
  58:7 62:22
**piece** 38:11
**pieces** 38:13
**pinpoint** 87:8
**place** 50:4 69:22
  72:9
**places** 79:11
**Plaintiff** 1:5
**plan** 12:16 30:4
  37:18,20 38:22
**planned** 25:8,10
  30:3
**plans** 4:12 12:2
  24:11
**platform** 20:8
  31:5 49:2 74:6
**pleasant** 41:8
**please** 78:15
**plenty** 69:13
**plot** 50:11
**PM** 10:5 11:21
  18:7 30:9 66:2
**point** 10:10 15:2
  26:1,21 44:22
  46:8 55:4
**policy** 14:16
**pools** 61:8 63:9
  64:6
**portfolio** 39:11
  43:14 44:1 73:8

**portfolios** 65:18
**posed** 7:5
**position** 35:5
**positive** 15:23
  69:8
**possible** 22:8
  26:16,17 57:20
**practicality** 9:19
**practice** 3:2
**precise** 22:15
**precisely** 87:8
**predict** 68:12
**present** 81:4
**pretty** 85:15
**prior** 57:14
**proactively** 29:5
  45:20
**probably** 4:19
  7:19 11:4 14:21
  49:13 73:9
  83:23
**problem** 54:2
  85:13,21
**problems** 7:6
**process** 5:6 18:21
  18:22 30:16
  31:21 34:2
  40:11 65:14
  79:10
**processes** 20:15
**product** 20:6
**products** 61:9
  62:19 64:11
**professional**
  19:22,23 37:22
  51:14 52:18
  53:7,18
**professionalism**
  24:15
**professionally**
  21:21 53:12
**professionals**
  16:11,24 80:20
  80:23 81:13,20
  83:14 87:1
**program** 45:14

**programs** 14:17
**promise** 51:5
**promised** 60:2,4
**promises** 54:6
  59:11 70:1
**provide** 15:7
  29:23 46:15
**provider** 65:2
**provision** 64:3
**PSAT** 3:1
**PSATs** 2:16
**public** 44:3
**push** 45:23
**pushed** 53:5
**pushing** 56:9
**put** 6:19 11:5
  20:20,22 22:17
  71:15 78:1
**P-notes** 64:12,21
  64:24 65:1

---
**Q**
---
**quarter** 68:7
**question** 87:11
**questions** 2:17
**quickly** 16:21
  43:15
**quite** 18:19 32:17
**quoting** 85:16

---
**R**
---
**raise** 82:5
**raised** 80:2 82:6
**raising** 82:9
**ramp** 23:19,21
**ran** 79:2,4
**range** 7:1
**rank** 17:5
**rare** 49:4
**reach** 29:6,9
**reached** 29:7
  39:10
**react** 7:10
**reacted** 53:1
**reacting** 14:8
**read** 15:12,14

  47:1
**real** 8:1,2,3,3
**realistic** 22:6
  24:2 37:12
**realistically** 7:15
  28:4 32:10
**reality** 33:23
  40:18 74:24
**realize** 19:2
  31:10 36:19
  47:15
**really** 13:10 14:7
  15:7 17:17
  31:21 33:19
  47:23 48:8,20
  49:5,19 69:21
  77:5,7,7 78:9
  81:5 86:21 87:5
  87:5
**reason** 14:13
  23:18 39:23
  55:3 57:23
**received** 5:1 41:1
  42:22
**recognition** 75:9
**recognize** 69:2
**recollection**
  34:10
**record** 44:4
  48:24 51:10
  52:2,19 53:16
  79:19
**redone** 27:18
**reengage** 69:4
**reference** 35:20
**regarding** 65:14
**regardless** 24:13
**regions** 62:4
**regular** 17:15
**regularly** 31:13
**reiterate** 77:19
**related** 84:7
**relationships**
  79:24
**relative** 63:8
**remember** 13:6



22:14 23:11 67:12
**reporter** 88:19
**reproduction** 88:17
**require** 6:13
**requiring** 7:24
**research** 39:7
**resources** 32:14 32:16 33:14 56:11
**respect** 5:17 6:3 17:8 24:15 45:4 48:18 49:15 53:9
**respectful** 53:4 84:24 85:9
**respond** 76:13,14
**responsibilities** 10:6 11:21 39:12
**responsibility** 21:18 23:4 48:14 70:21,24 86:13,21,23
**responsible** 31:16
**responsive** 76:4 76:15
**retail** 75:2 79:1,3 82:18
**right** 2:5 3:4,16 16:6 22:18,20 22:24 23:2 28:17 33:20,23 34:6 39:14 44:6 47:2,17,24 48:4 48:21 49:1,10 54:11 61:21 64:22,23 65:2,8 66:13 67:19 68:9 70:17 73:4 73:5,12,19,21 74:6,10,13,19 75:4 76:23 77:8 78:3,4 81:10,11

82:14 83:4,19 84:10 85:17 87:3,4
**rigorous** 2:22
**road** 66:19
**robot** 8:5
**roles** 16:11 75:13
**room** 65:21
**round** 87:2,2,2
**run** 43:21,24 65:18 78:23 79:1
**run-up** 24:5

—————
**S**
**sabbatical** 6:23
**sake** 2:13
**sat** 3:2 63:6
**saved** 55:24 56:6
**saw** 24:4 34:16
**saying** 26:15 29:15 42:20 45:7 49:11 50:14 54:10 58:4 60:9 63:15 67:8 81:6,9 83:11,15
**says** 8:12 25:3 26:19 34:24 39:20 72:9 73:16,17
**scared** 29:20
**schedule** 24:7 25:9
**scheduled** 20:24 66:20
**school** 2:21
**see** 14:1 25:12 31:12 35:8 58:12 61:6,9,11 61:16,18 80:13 80:16
**seed** 62:16,17 74:16 78:20
**seeding** 79:10
**seen** 3:24 84:14

84:15
**sees** 57:3,5
**self-review** 17:22
**sell** 20:3,10
**sending** 27:19
**sense** 55:1 63:7 63:12
**serious** 82:1
**service** 65:2
**SERVICES** 1:23
**set** 14:19 26:11 40:2 55:13 59:17 61:2 70:22 71:3 74:12
**setting** 74:20
**setup** 36:6
**seven-year** 48:23 51:10 52:2,19 53:16
**shambles** 58:2
**share** 4:24 30:20
**she'll** 18:10
**shit** 72:1
**shoes** 71:15
**short** 12:17
**shot** 82:20
**show** 66:19
**shown** 27:7
**side** 60:4,14,19 60:20 69:10,11 71:5,7 75:14,19 75:21 76:6,8
**sides** 59:9,22 61:3
**simple** 59:2
**simpler** 14:18
**single** 16:6 23:1 45:2 53:1 80:20 80:22
**six** 12:9 18:11 41:17
**skills** 55:14,17
**slow** 13:5
**small** 7:8 68:9
**smiling** 59:14

**smooth** 65:13
**sold** 20:5
**solution** 85:15
**solve** 85:13
**somebody** 8:23 22:4 44:17 73:23
**someone's** 59:2,3 59:4 86:13
**soon** 43:14 74:7
**Sorry** 2:2
**sort** 7:19,24 9:22 24:21 25:12,23 27:12,22 43:3
**sounds** 81:5
**speak** 39:15 49:4 67:15 84:5,10 84:11,12,13,13 84:24
**speaking** 85:22 85:23
**special** 13:14
**specific** 29:1 68:2
**speech** 73:7,11
**spend** 10:21 81:14
**spent** 32:12
**spillage** 2:3
**spot** 61:7
**spring** 69:4 78:9
**standpoint** 9:20 27:7
**stars** 43:10
**start** 6:7 64:11,11 64:13 78:6
**started** 73:10
**state** 17:21
**STATES** 1:1
**status** 64:2
**stay** 21:7 46:6 54:11,12
**steam** 19:5 46:12
**step** 60:8
**steps** 22:6
**stocks** 16:1 30:20 33:9 49:6

**straightaway** 14:12
**stubborn** 50:15
**stuff** 6:20 8:13 20:18 27:19,19 32:12,18,22 35:9 40:22 56:2 57:1 60:23
**succeed** 30:24
**successful** 50:16 50:21,22 69:14 78:1
**suggest** 37:11
**suggested** 25:15
**suggesting** 31:8
**superstar** 52:3
**supervision** 88:19
**support** 32:19
**supported** 36:7
**supporters** 47:19
**supposed** 24:6 32:18 45:3,4 56:18,21 60:5
**sure** 5:16 6:18 8:24 12:22,23 13:1 15:2 38:2 57:24 68:17 81:22
**surprised** 38:3
**Surprisingly** 30:13
**suspect** 63:24
**sustainability** 17:19
**swath** 31:11 34:15

—————
**T**
**table** 78:2
**take** 21:18 23:3,8 30:19 65:7 72:3 80:5 86:22
**takeaway** 70:14 70:17
**taken** 45:8 56:10



MAGNA
LEGAL SERVICES

takes 23:12,19,20
  26:7 58:17,18
talk 4:12 5:8
  20:10 38:8
  52:23 59:15
  76:5
talked 40:23
  59:24 67:2
talking 22:16
  55:3 59:24
  65:22 68:5,12
  68:15,16,18
  81:8 82:23
  86:20
targeted 65:1
team 29:3,8 74:2
  74:3
teams 66:2 68:10
technology's 8:6
tell 35:9 65:24
telling 54:7,15
ten 12:9
terms 14:6 55:2
test 3:9
tested 29:4
Thank 4:8 87:15
  87:17
they'd 68:17
thick 83:16
thin 78:4 83:17
thing 5:8 15:6
  33:17 42:19
  61:22 65:16
things 7:14 20:12
  20:14 27:2
  28:17 30:1,6
  33:18,19 35:4
  36:9,22 37:3,16
  37:19 38:9,21
  39:24 43:7
  44:22 49:24
  54:22 55:6
  56:17 57:13
  58:11 60:6,11
  65:12 74:24
  81:19 83:19

84:6
think 2:9 4:5,10
  5:7 6:20 7:8,15
  7:23 8:9,18,18
  9:7,9 10:2,9
  13:9,20 14:18
  15:23 18:16,16
  18:17 21:2,15
  21:20 25:17
  29:19 33:15,16
  33:17 34:17
  37:8 39:10 42:4
  45:22 47:14,22
  48:3,4 49:19
  50:23 51:3,4
  56:22 58:22
  71:3 75:10 76:1
  78:5 85:3,11,11
thinking 33:9
  42:1,13 58:13
  58:14,19
thinks 70:23
thought 32:13
  33:1
thoughts 6:3
  30:20
Threadneedle
  48:24
three 2:14 3:9
  12:8 13:6 70:15
  74:17
tile 17:1
till 41:17
time 3:24 10:21
  10:23 12:13,18
  20:17,21 23:8
  23:13,20 24:16
  29:14,16 32:11
  32:22 33:14
  42:11 43:2
  49:20 53:1
  55:23 56:5,11
  56:22 57:17
  58:19 77:17
  87:16
times 54:13 73:7

tiny 79:12
tired 48:22 57:9
today 4:11 6:5
  69:9 75:6
told 24:9 26:23
  34:4 35:4,11
  36:10,13,22
  37:4 38:16,18
  39:2,3 54:13,16
  57:14
Tom 1:17,20 2:12
  5:13
top 40:21 41:6
  61:16
topic 68:14
total 63:4
totally 50:23 51:3
  61:23
Tough 45:13
  72:1
track 44:4 48:23
  51:10 52:2,19
  53:16 79:19
trade 7:12 9:14
trades 6:20
transcribed 1:18
  88:5
transcript 88:16
transcription
  1:12,15
transparent 59:7
travel 24:11 25:8
treat 28:5 51:22
treated 44:17,20
  52:14 53:8,12
  53:20
tremendous 52:1
tried 19:7 75:16
  75:20
trip 19:16 20:23
trips 46:10
true 35:1
trust 23:21
try 50:15 70:24
  71:14 85:13
  86:8

trying 4:11 30:18
  46:15 48:13
  49:9 50:21
  54:22 55:5
  57:12 58:6 70:2
  71:11,12 72:6
turn 21:17 65:23
turnaround
  49:14
two 38:18 47:18
  51:24 59:9 74:9
  85:20
two-way 42:19

_____
U
ultimately 31:16
  41:14 84:21
Um 18:12
Um-hm 7:4,21
  9:10,16 14:5
  15:9 16:2,7,13
  17:24 28:15
  31:18
unclear 22:12
unconvincing
  77:23
understand 9:7
  23:12 54:19
  58:5 62:21 63:5
unfair 48:8
unfairly 61:14
unfamiliar 79:8
  79:9
unhappiness
  27:8
unhappy 18:8
  21:22,23 27:9
  54:18 78:10
  83:4
UNITED 1:1
unprofessionally
  44:21
unsuccessful
  84:21
unwilling 31:1
uphold 55:15

upset 27:4
up-front 22:5
  28:6
use 10:20
uses 29:17
utilize 55:17
utterly 61:23

_____
V
v 1:6
vaguely 87:9
valid 84:17
value 30:9,10
  36:23 42:7
  80:13,14,17,17
various 15:15
  16:11,18
view 26:21 34:3
vs 1:19

_____
W
want 3:23 4:12
  5:16 10:20
  11:14 13:18
  14:21 28:13
  30:23 31:10
  70:11 77:24
  79:19 85:5
wanted 4:24 15:6
  46:14
wanting 59:15
wasn't 22:22
  25:16,18 37:21
  38:4 39:4,4,8
  39:15 44:13
  66:4 71:9
watch 80:21,24
way 7:22 16:9
  25:4,9,10,16
  26:12 27:10
  36:15,16,17
  37:5 38:3 39:20
  40:1 42:20
  45:13 58:22
  69:15 71:3
  72:17,18,21



85:23 86:23
**ways** 80:14
**wearing** 78:4
**week** 7:2 20:23
24:9,24 66:21
**weeks** 5:18,23
12:8,9,9,12
29:7 49:8 65:7
65:7
**weight** 3:12
**Wellington** 1:7
20:4 25:4 28:24
30:22 31:5
32:24 35:8 36:8
37:5 40:2 41:12
41:14 42:1,2
45:13 55:12
58:15 60:3,19
62:1 69:1,14
70:20,23 72:8
72:13,20 73:13
82:1 83:14
**Wellington's**
26:11 40:15
54:7 70:9,10
71:24 72:11
82:5
**went** 19:4,4
35:15
**weren't** 35:19
53:4 56:4
**we'll** 14:21
**we're** 2:23 5:16
11:9 12:1 15:3
17:17 18:6,9
46:3,3 48:8,13
48:22 49:9
50:19 51:21
54:9 57:9 63:9
73:14,20,22
74:4 75:2,2
82:8 83:15 84:2
87:1
**we've** 5:1,1 13:3
40:22 57:16
64:5 65:19

**whatever's** 27:24
**winners** 16:5
**wish** 12:5,6 33:7
33:8 58:20
63:18,18
**women** 61:10
**word** 14:14 69:5
**words** 86:5
**work** 5:23 6:14
7:11 13:21
17:15 20:22
22:10 28:8,9
30:23 54:22
59:6,14 60:22
65:7 74:24
75:12 80:5
**worked** 32:15
72:19 73:10
84:22
**working** 17:14
22:3 27:13,13
27:14 35:20
41:19,20 45:21
61:12 62:1 64:1
**works** 63:6
**worried** 17:17
47:23 48:8
**worse** 60:11
**worth** 72:8
**wouldn't** 7:23
25:8,9 27:11
34:13 55:1
71:11 74:14
**Wow** 81:5
**write** 31:6
**writing** 11:6 15:1
**wrong** 65:12
70:22 83:22
**www.MagnaL...**
1:24
**W_Recording**
1:19

**X**

**XYZ** 26:23 33:21
40:15 57:10

72:15

**Y**

**yeah** 3:20 4:8,13
4:16,19,22 5:9
8:8 9:3,6,17
11:2,23 12:7
14:24,24 15:13
15:17 16:19
25:23 26:11
35:12 38:21
40:4 42:5,14
43:8 46:3 51:9
53:21,21,22
55:21 57:6,11
58:4,9,10 59:19
63:1,13,17
66:15,19 71:24
72:13 76:6,22
79:11 84:1
**year** 16:6 22:14
23:2 29:4 54:17
67:23 87:7,10
**years** 38:18 44:1
51:24 71:18
74:17
**year's** 44:18
**year-end** 5:5
**young** 52:21
**yup** 5:12,20,24
6:6 10:13,13,16
11:11,16,19,19
12:3,3,11 13:12
13:16,19 15:4
28:18 76:24
77:13

**Z**

**zero** 24:8
**ZI** 1:4

**$**

**$5** 62:17

**1**

**1:19-CV-11605...**

1:2
**100** 18:23
**109th** 17:8
**11** 22:14 23:5,11
23:22
**110th** 17:6
**111th** 17:7
**114** 16:23 17:5
**12** 34:6,23 40:4
**13** 71:18
**14** 5:18,23 12:12
**15** 79:5

**2**

**2** 1:18
**20** 73:12 79:5
88:10
**2004** 8:14
**2016** 1:18
**20161102** 1:20
**2021** 88:10

**3**

**30th** 87:9
**300** 81:15

**5**

**50** 73:7 82:3
**54** 73:8

**6**

**6** 34:6,22 40:3,4
**624-6221** 1:23

**7**

**7th** 44:3

**8**

**866** 1:23

**9**

**95th** 17:6



# Exhibit 4

## May 31, 2017 Audio Recording of Greg Mattiko

# Exhibit 5

```
           UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
        CIVIL ACTION NO. 1:19-CV-11605-WGY

                    -  -  -

GIGI KAI ZI CHAN,              :
                               :
             Plaintiff,        :
                               :
        v.                     :
                               :
WELLINGTON MANAGEMENT COMPANY: 
LLP and CHARLES ARGYLE,        :
                               :
             Defendants.       :
```

- - -

AUDIO TRANSCRIPTION

- - -

Audio transcription of conversation between GIGI CHAN and GREG MATTIKO held on May 31, 2017.  The following was transcribed from a file entitled "GC vs W_Recording 20170531, Greg Mattiko."

- - -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 2

```
1                - - -
2           MR. MATTIKO:  -- interaction
3    with kind of the rest of the
4    broader firm.
5           MS. CHAN:  Yup.
6           MR. MATTIKO:  And he asked
7    if I could -- you know, if we
8    could just have a chat, just kind
9    of see where -- how you're
10   thinking about these things.
11   Whether -- because I think that
12   what he was expecting was some
13   sort of -- kind of either reply or
14   some sort of -- some sort of -- I
15   don't know what the best way to
16   put it -- some -- some sort of
17   action plan as to, you know,
18   how -- because I think that if we
19   go back to the end of last year,
20   it's kind of -- your experience at
21   Wellington isn't -- isn't exactly
22   what you planned it out to be for
23   sure.
24           MS. CHAN:  Well, it wasn't
```

Page 3

```
1    exactly as described.  I think
2    that's the problem.
3           MR. MATTIKO:  Okay.
4           MS. CHAN:  It wasn't so much
5    that I had, you know, made plans
6    that it was gonna be a certain
7    way.
8           MR. MATTIKO:  Yeah.
9           MS. CHAN:  It was that I
10   joined Wellington --
11          MR. MATTIKO:
12   (Indiscernible).
13          MS. CHAN:  -- having been
14   told that it was a certain thing.
15          MR. MATTIKO:  Yeah.
16          MS. CHAN:  For example, the
17   fact that I was told that there
18   would be money to manage --
19          MR. MATTIKO:  Yeah.
20          MS. CHAN:  -- you know --
21   you know, 12 months in --
22          MR. MATTIKO:  Yeah.
23          MS. CHAN:  -- you know,
24   and -- yeah.  And it's
```

Page 4

```
1    disappointing having made the
2    decision and -- as I've explained
3    before -- which is that at the
4    time I had another offer --
5           MR. MATTIKO:  Yeah.
6           MS. CHAN:  -- which was to
7    run a billion --
8           MR. MATTIKO:  Yeah.
9           MS. CHAN:  -- and also which
10   was high-end monetary value.
11   And -- you know, and I had
12   informed Wellington this.  And on
13   account of what Wellington had
14   said --
15          MR. MATTIKO:  You took the
16   position.
17          MS. CHAN:  -- you know, I
18   took this position.
19          MR. MATTIKO:  Yeah.
20          MS. CHAN:  Now, Charles
21   said, Oh, but it wasn't written
22   down.
23          Now --
24          MR. MATTIKO:  Yeah.
```

Page 5

```
1           MS. CHAN:  -- I think, you
2    know, verbal contracts are also
3    binding --
4           MR. MATTIKO:  Yeah.
5           MS. CHAN:  -- and also
6    that's basically
7    misrepresentation.
8           MR. MATTIKO:  Yeah.
9           MS. CHAN:  And what I've
10   been told subsequently is just
11   tough shit.  Lump it.
12          MR. MATTIKO:  Yeah.
13          MS. CHAN:  And I don't think
14   that's acceptable.
15          MR. MATTIKO:  Yeah.
16          MS. CHAN:  And particularly
17   for a firm like Wellington
18   which -- and in this industry,
19   everything's about trust.
20          MR. MATTIKO:  Yeah.
21          MS. CHAN:  And so --
22          MR. MATTIKO:  Yeah.  Sure.
23          MS. CHAN:  So, you know, my
24   position is very much -- look.
```



Page 6

1   You know, all I'm asking for
2   really is for Wellington to make
3   good --
4       MR. MATTIKO:  Yeah.
5       MS. CHAN:  -- on what it
6   said --
7       MR. MATTIKO:  Yeah.
8       MS. CHAN:  -- and that's
9   all.
10      MR. MATTIKO:  Yeah.  So --
11  so -- all right.  But what if
12  Wellington doesn't?  So what if
13  Wellington -- and -- and I
14  don't -- I'm obviously not in
15  control of any of this stuff,
16  but -- so what -- do you know --
17  let me say it a different way.  So
18  Wellington just can't give you a
19  hundred million --
20      MS. CHAN:  Of course.
21      MR. MATTIKO:  -- dollars to
22  manage (indiscernible).
23      MS. CHAN:  Of course.  Of
24  course.  And therefore -- I think

Page 7

1   it was December 2015 now --
2       MR. MATTIKO:  Yeah.
3       MS. CHAN:  -- I had another
4   conversation with Charles --
5       MR. MATTIKO:  Yeah.
6       MS. CHAN:  -- where I was --
7   and -- and actually, I've been --
8   it's not just what I said to
9   Charles.  It's also what I've --
10      MR. MATTIKO:  Yeah.
11      MS. CHAN:  -- said to you
12  and everybody else, which is, Of
13  course I understand that -- that
14  Wellington cannot --
15      MR. MATTIKO:  Yeah.
16      MS. CHAN:  -- make AUM
17  materialize.
18      MR. MATTIKO:  Sure.
19      MS. CHAN:  But what I did
20  ask for --
21      MR. MATTIKO:  Yeah.
22      MS. CHAN:  -- and which
23  Charles did promise, was access to
24  clients.

Page 8

1       MR. MATTIKO:  Yeah.
2       MS. CHAN:  And, you know,
3   just at least being able to --
4       MR. MATTIKO:  Yeah.
5       MS. CHAN:  -- leverage off
6   the distribution platform --
7       MR. MATTIKO:  Yeah.
8       MS. CHAN:  -- you know,
9   which I think is fair.
10      MR. MATTIKO:  Yeah.
11      MS. CHAN:  That's all I'm
12  asking.  Now, you know, since
13  then, when I spoke to Charles just
14  before I went on maternity
15  leave --
16      MR. MATTIKO:  Yeah.
17      MS. CHAN:  -- what he said
18  was he never said that.
19      MR. MATTIKO:  Okay.
20      MS. CHAN:  Which is not
21  true.
22      MR. MATTIKO:  Okay.  Yeah.
23      MS. CHAN:  And also, you
24  know, that -- that, you know,

Page 9

1   don't expect that to happen.
2       MR. MATTIKO:  Yeah.
3       MS. CHAN:  Which, to be
4   honest, I -- I really don't think
5   I should have to accept --
6       MR. MATTIKO:  Yeah.
7       MS. CHAN:  -- broken
8   promises.
9       MR. MATTIKO:  Yeah.  Sure.
10      MS. CHAN:  And, you know, I
11  don't think it's that difficult
12  from Wellington's point of view to
13  offer access.
14      MR. MATTIKO:  Yeah.
15      MS. CHAN:  That's it.
16      MR. MATTIKO:  But if you --
17  if you think that your
18  relationship with Wellington is
19  less than optimal -- seen from
20  both ways, right?  So you've seen
21  maybe from your angle and seen
22  from Wellington's angle.  Would
23  you think though that -- so
24  Wellington, I think, is kind of in



Page 10

```
 1    a -- in a bit of a holding pattern
 2    at this point because if -- if
 3    the -- if you don't trust
 4    Wellington and Wellington's kind
 5    of -- is wondering what Gigi's
 6    thinking, then it's not gonna move
 7    forward very fast.
 8         MS. CHAN:  It's not that
 9    difficult for Wellington to come
10    good and for trust to be rebuilt.
11         MR. MATTIKO:  Okay.  So --
12    okay.  So -- but if -- if -- okay.
13    So you think that a hundred
14    percent of the onus is on
15    Wellington to come good even if
16    they question whether you're --
17    your commitment.
18         MS. CHAN:  Put it this way:
19    I joined and I was --
20         MR. MATTIKO:  Yeah.
21         MS. CHAN:  -- 100 percent
22    committed.
23         MR. MATTIKO:  Sure.
24         MS. CHAN:  And -- and
```

Page 11

```
 1    actually, all I've done since --
 2    and I have just repeated the same
 3    thing -- which is I'm just asking
 4    for the things which had been
 5    promised.  Now --
 6         MR. MATTIKO:  Okay.
 7         MS. CHAN:  -- I don't
 8    think -- I mean, the onus of
 9    someone who's broken a promise to
10    make good on the promise --
11         MR. MATTIKO:  Yeah.
12         MS. CHAN:  -- I don't see
13    how --
14         MR. MATTIKO:  Yeah.
15         MS. CHAN:  -- that can be on
16    me who relied --
17         MR. MATTIKO:  Understood.
18         MS. CHAN:  -- on a
19    promise --
20         MR. MATTIKO:  Yeah.
21         MS. CHAN:  -- to make
22    decisions.  And so -- yeah.  I
23    think there's a lot of, you know,
24    You shouldn't have relied on
```

Page 12

```
 1    Wellington.
 2         MR. MATTIKO:  Yeah.
 3         MS. CHAN:  You shouldn't
 4    have believed what Wellington told
 5    you.
 6         MR. MATTIKO:  Yeah.
 7         MS. CHAN:  Which I -- to be
 8    honest --
 9         MR. MATTIKO:  Yeah.
10         MS. CHAN:  -- I think is --
11    is a load of crap.  I mean, before
12    I joined --
13         MR. MATTIKO:  Yeah.
14         MS. CHAN:  -- there was no
15    way that I could have known that I
16    could have been told lies.
17         MR. MATTIKO:  Yeah.
18         MS. CHAN:  To -- I mean, you
19    know --
20         MR. MATTIKO:  Understood.
21    Yeah.
22         MS. CHAN:  Not to mince
23    words.  So --
24         MR. MATTIKO:  Yeah.
```

Page 13

```
 1         MS. CHAN:  I -- I mean, I --
 2    to -- to -- for Wellington to try
 3    to shift the onus to me I think is
 4    really not acting with integrity.
 5         MR. MATTIKO:  Yeah.  Yeah.
 6    But -- yeah.  Okay.  But I don't
 7    think Wellington is trying to
 8    shift the onus as much as it is,
 9    you know, trying to say that --
10    you know, the firm kind of
11    considers this a place where
12    people enjoy working and a place
13    where people want to work
14    together.  And -- and I think that
15    the perception is that if -- if
16    Wellington bends over backwards to
17    get your book to grow but you're
18    not happy here, that kind of
19    defeats the purpose.
20         MS. CHAN:  Put it this way:
21    This -- as -- as I said all
22    along --
23         MR. MATTIKO:  Would you
24    disagree with that?
```



Page 14

1    MS. CHAN:  No.  I -- put it
2  this way:  Bending over backwards,
3  it's -- I mean, is it really
4  bending over backwards --
5    MR. MATTIKO:  Well, it
6  hasn't happened.  It hasn't
7  happened yet.
8    MS. CHAN:  It hasn't
9  happened.
10    MR. MATTIKO:  It hasn't
11  happened yet.
12    MS. CHAN:  So -- yeah.
13  So --
14    MR. MATTIKO:  But -- but
15  it's not gonna happen, I think,
16  until -- until, you know, people
17  see eye to eye.
18    MS. CHAN:  Yes.  And people
19  seeing eye to eye requires an
20  acknowledgement of what has
21  happened.
22    MR. MATTIKO:  Transpired.
23  Yeah.
24    MS. CHAN:  What has

Page 15

1  transpired.
2    MR. MATTIKO:  Yeah.
3    MS. CHAN:  And then making
4  agreements as to how to move
5  forward.  Now, you know,
6  obviously, as I said, there's been
7  occasions when Wellington's broken
8  its promises.
9    MR. MATTIKO:  Yeah.
10    MS. CHAN:  You know, I am --
11  put it this way:  I -- I don't
12  think it's very difficult for
13  Wellington -- you know, you say
14  "bending over backwards."  I mean,
15  I'm not asking for -- I mean,
16  I'm -- like -- like -- you know,
17  Tom said, Oh, you did have access
18  because one of EMO's clients asked
19  for like two minutes, you know, at
20  the end of a meeting.  That's not
21  access.
22    MR. MATTIKO:  No.
23    MS. CHAN:  And to pretend
24  that's access --

Page 16

1    MR. MATTIKO:  Yeah.
2    MS. CHAN:  -- is ridiculous.
3    MR. MATTIKO:  Sure.
4    MS. CHAN:  And -- and all
5  I'm asking is to -- to -- for some
6  demonstration that there could be,
7  you know, a road show or a -- you
8  know --
9    MR. MATTIKO:  Yeah.
10    MS. CHAN:  -- some marketing
11  access.  I -- and -- you know,
12  I -- actually, I'm still being
13  constructive by --
14    MR. MATTIKO:  Yeah.
15    MS. CHAN:  -- insisting.
16    MR. MATTIKO:  Yeah.
17    MS. CHAN:  And it's not
18  bending over backwards.  It's not
19  difficult.
20    MR. MATTIKO:  Yeah.
21    MS. CHAN:  Now, sure, if --
22  if that cannot be achieved and if
23  we still cannot see eye to eye,
24  then, obviously, we have to

Page 17

1  consider next steps.
2    MR. MATTIKO:  Yeah.  Yeah.
3  Yeah.  But I guess it -- what --
4  then -- and I think everybody, I
5  guess, understands that to an
6  extent.  And I can reiterate it to
7  Charles, of course.  But I guess
8  the -- the bigger question is --
9  is people want to know do you
10  want -- do you want to work here.
11  Is this a place that you want to
12  build a career at.
13    MS. CHAN:  It's a dynamic
14  situation.
15    MR. MATTIKO:  Yeah.
16    MS. CHAN:  You know.  And --
17    MR. MATTIKO:  So you're
18  saying if -- if GRG gets behind
19  your product, then -- then it's --
20  it's a different situation.
21    MS. CHAN:  Of course.
22    MR. MATTIKO:  Okay.
23    MS. CHAN:  Of course.  And
24  from my point of view, you know, I



Page 18

1   can -- of course, you know, being
2   given excuses, you know, that --
3   and -- and, you know, I've got
4   choices, right?  I can --
5       MR. MATTIKO:  Yeah.
6       MS. CHAN:  -- insist and
7   still see if I can change things.
8       MR. MATTIKO:  Yeah.
9       MS. CHAN:  And that's where
10  I am now.
11      MR. MATTIKO:  Okay.
12      MS. CHAN:  Otherwise, I
13  wouldn't be talking to you and --
14      MR. MATTIKO:  Yeah.  Okay.
15      MS. CHAN:  -- otherwise you
16  would know about it --
17      MR. MATTIKO:  Well, it's
18  good that -- yeah.
19      MS. CHAN:  -- and, you know.
20      MR. MATTIKO:  Yeah.
21  Because -- and that's why I think
22  it's important to have this
23  conversation, because it seems
24  like a bit of a stalemate.  And --

Page 19

1   and that -- and that doesn't help
2   anybody, right?
3       MS. CHAN:  No, it doesn't.
4       MR. MATTIKO:  It doesn't --
5   and --
6       MS. CHAN:  And -- and, you
7   know, I think -- also, you know, I
8   would also highlight the way that
9   the message was delivered, which
10  basically was Charles shouting at
11  me.  And I don't think any
12  message --
13      MR. MATTIKO:  Yeah.
14      MS. CHAN:  -- needs to be
15  shouted at, let alone I was eight
16  months pregnant.
17      MR. MATTIKO:  Yeah.
18      MS. CHAN:  You know,
19  everybody can be reasonable if --
20      MR. MATTIKO:  Yeah.
21      MS. CHAN:  -- without
22  shouting.  Now --
23      MR. MATTIKO:  Yeah.
24      MS. CHAN:  -- I think -- you

Page 20

1   know, he was shouting and he
2   wanted me to agree with him --
3       MR. MATTIKO:  Yeah.
4       MS. CHAN:  -- by insisting
5   on his position.
6       MR. MATTIKO:  Yeah.
7       MS. CHAN:  The fact that his
8   position is untenable --
9       MR. MATTIKO:  Yeah.
10      MS. CHAN:  -- really I'm --
11  I'm talking about morally --
12      MR. MATTIKO:  Yeah.
13      MS. CHAN:  -- is -- is --
14      MR. MATTIKO:  Yeah.
15      MS. CHAN:  -- appeared to
16  have been secondary to what he was
17  trying to achieve.
18      MR. MATTIKO:  Yeah.
19      MS. CHAN:  You know, I'm --
20  all I'm doing is sticking by, you
21  know, the -- the right thing --
22      MR. MATTIKO:  Yeah.
23      MS. CHAN:  -- which is if --
24  if someone's promised something --

Page 21

1       MR. MATTIKO:  Yeah.
2       MS. CHAN:  -- it -- it
3   really is their responsibility to
4   make good on the promise, and it
5   isn't good enough to say Lump it.
6       MR. MATTIKO:  Yeah.
7       MS. CHAN:  And, you know,
8   so --
9       MR. MATTIKO:  Yeah.  Yeah.
10      MS. CHAN:  And, you know, I
11  do appreciate that, you know,
12  Wellington is -- is, you know, not
13  a monolith.  You know, there are
14  different parts.  But I do also
15  appreciate that there are things
16  that people can do to make things
17  happen.
18      MR. MATTIKO:  Yeah.
19      MS. CHAN:  Particularly
20  given that what I'm asking is not
21  about bending over backwards.
22      MR. MATTIKO:  Yeah.
23      MS. CHAN:  It -- you know,
24  for, like, an organization given



Page 22

1  Wellington's scale and --
2       MR. MATTIKO:  Yeah.
3       MS. CHAN:  -- size, that --
4  what I'm asking for is -- is
5  extremely easy to fulfill.
6       MR. MATTIKO:  Yeah.
7       MS. CHAN:  So, you know, I
8  continue to insist and, you
9  know -- yeah.  Sure.  If -- if,
10  you know, Wellington as a whole
11  then turns around and says This
12  just isn't possible --
13       MR. MATTIKO:  Yeah.
14       MS. CHAN:  -- then yes, I
15  would have to reconsider.
16       MR. MATTIKO:  Yeah.
17       MS. CHAN:  I mean, you know,
18  remember why I joined and -- and
19  some -- you know, both -- some --
20  some of the reasons why I chose to
21  join Wellington other than
22  somewhere else -- I mean, still
23  hold that it's a great
24  distribution platform.  It's just

Page 23

1  extremely disappointing that
2  having been promised access to
3  it --
4       MR. MATTIKO:  Yeah.
5       MS. CHAN:  -- you know,
6  that -- that I haven't got any
7  access to it.  So --
8       MR. MATTIKO:  All right.
9  So -- so let me just say this:  I
10  really enjoy working with you.
11  I -- I -- I want this to work out.
12  That's why -- that's why I had
13  this conversation.  I --
14       MS. CHAN:  Yup.
15       MR. MATTIKO:  And -- and I
16  just want to -- I -- and I want to
17  be able to be -- to help -- kind
18  of help everybody get on the same
19  page.
20       MS. CHAN:  Um-hm.
21       MR. MATTIKO:  Because it
22  obviously -- it -- you know, it
23  seems like not everybody's on the
24  same page.  I think --

Page 24

1       MS. CHAN:  Yeah.
2       MR. MATTIKO:  -- that
3  goes -- that goes without saying.
4       MS. CHAN:  Yeah.
5       MR. MATTIKO:  So I want
6  to -- I want to see this work.
7  I -- I just need to know though
8  that you want it -- that --
9  that -- that there isn't enough
10  bad blood there that it'll never
11  work.  Because then it just --
12  then it's futile, the whole thing.
13       MS. CHAN:  Sure.  And -- no.
14  As I said, you know, it is
15  dynamic, and --
16       MR. MATTIKO:  Yeah.
17       MS. CHAN:  -- it isn't --
18  you -- it isn't too late to do
19  anything.
20       MR. MATTIKO:  Yeah.
21       MS. CHAN:  But if nothing
22  happens from now --
23       MR. MATTIKO:  Yeah.
24       MS. CHAN:  -- then there

Page 25

1  would definitely be bad blood and,
2  you know, I mean --
3       MR. MATTIKO:  Yeah.
4       MS. CHAN:  And it's not --
5  and it's really not acceptable.
6       MR. MATTIKO:  Okay.  But
7  just so you know, from the other
8  side's perspective, there -- just
9  so -- you know, it seems like
10  you're waiting for something to
11  happen, they're waiting for
12  something to happen, and -- and
13  that's where kind of we're --
14  we're not kind of --
15       MS. CHAN:  Sure.
16       MR. MATTIKO:  Then that's --
17  that's just kind of the -- the
18  situation --
19       MS. CHAN:  Yeah.
20       MR. MATTIKO:  -- as it
21  stands now.  I don't want to --
22       MS. CHAN:  Yeah.  Obviously,
23  I understand.  And I tried my best
24  to make the other side



Page 26

1  understand --
2      MR. MATTIKO:  Yeah.
3      MS. CHAN:  -- which is --
4  when -- you know, when I get told
5  things like -- you know, like
6  tough shit or -- you know, or lump
7  it or --
8      MR. MATTIKO:  Yeah.
9      MS. CHAN:  Maybe not in
10 those words but --
11     MR. MATTIKO:  Yeah.
12     MS. CHAN:  -- you know,
13 basically that, that it is not
14 morally acceptable and --
15     MR. MATTIKO:  Yeah.
16     MS. CHAN:  -- and trust is
17 everything in this --
18     MR. MATTIKO:  Yeah.
19     MS. CHAN:  -- in this
20 industry.
21     MR. MATTIKO:  Sure.
22     MS. CHAN:  And Wellington
23 cannot pretend --
24     MR. MATTIKO:  Yeah.

Page 27

1      MS. CHAN:  -- that it acts
2  with integrity and all of this --
3      MR. MATTIKO:  Yeah.
4      MS. CHAN:  -- and treats its
5  employees like that -- like --
6  like this.  And --
7      MR. MATTIKO:  Yeah.
8      MS. CHAN:  And so, you
9  know -- and I think I'm -- you
10 know, I'm not gonna shift from
11 that position.
12     MR. MATTIKO:  Yeah.  Okay.
13     MS. CHAN:  You know, but I
14 have more than amply given
15 Wellington, you know, indications
16 of what it can do --
17     MR. MATTIKO:  Yeah.
18     MS. CHAN:  -- and they are
19 very easy fixes.  Now, I get told,
20 "I don't make this decision."  You
21 know --
22     MR. MATTIKO:  Yeah.
23     MS. CHAN:  I -- "It's not
24 me.  It's not me."

Page 28

1      MR. MATTIKO:  Yeah.
2      MS. CHAN:  You know, and
3  the -- you know, and no one's
4  taking responsibility.
5      MR. MATTIKO:  Yeah.
6      MS. CHAN:  And also, "Oh,
7  you know, I" -- you know, "Whoever
8  told you, like, you know, you
9  shouldn't have believed it."
10     But, you know, at the end of
11 the day, particularly before I
12 joined Wellington, you know, of
13 course I can only take what
14 Wellington employees say as I'm
15 making that decision.  I mean --
16     MR. MATTIKO:  Sure.
17     MS. CHAN:  -- you know,
18 people have a duty of care to be
19 careful --
20     MR. MATTIKO:  Yeah.
21     MS. CHAN:  -- about what
22 they say, and somebody has to take
23 responsibility and --
24     MR. MATTIKO:  Yeah.

Page 29

1      MS. CHAN:  -- and, you know,
2  whatever anybody says about it not
3  being their responsibility --
4      MR. MATTIKO:  Yeah.
5      MS. CHAN:  -- sometimes
6  things just do happen.
7      MR. MATTIKO:  Yeah.  Someone
8  could take ownership.  Yeah.
9      MS. CHAN:  Someone can take
10 ownership.
11     MR. MATTIKO:  Yeah.
12     MS. CHAN:  So that's all I'm
13 asking is --
14     MR. MATTIKO:  Okay.
15     MS. CHAN:  -- for someone to
16 take ownership and for things to,
17 you know, move forward.
18     Now, of course, as I said,
19 like, I'm not gonna be, you know,
20 saying after a year, Oh, you know,
21 AUM is still -- whatever.  Of
22 course, you know, as every PM
23 knows, that AUM -- it's their
24 responsibility to go and race.



Page 30

1   But --
2       MR. MATTIKO:  Yeah.  But you
3   need (indiscernible).
4       MS. CHAN:  -- you need the
5   access to clients.  You know,
6   so --
7       MR. MATTIKO:  Exactly.
8       MS. CHAN:  And so I think,
9   you know, it's as if, you know,
10  Charles has been talking to me
11  like some child, like you're --
12  you're not --
13      MR. MATTIKO:  No.
14      MS. CHAN:  -- gonna get
15  candies.  It's as if I haven't
16  done all of this --
17      MR. MATTIKO:  Yeah.
18      MS. CHAN:  -- before and as
19  if I don't know.  And, you know,
20  that's not particularly respectful
21  but --
22      MR. MATTIKO:  Yeah.
23      MS. CHAN:  -- you know, that
24  aside --

Page 31

1       MR. MATTIKO:  Yeah.
2       MS. CHAN:  -- you know, all
3   I'm asking for is -- are things
4   that are very -- you know, very
5   realistic and achievable.
6       MR. MATTIKO:  So -- so --
7   okay.  Just so I'm clear.  So if
8   we all kind of sat down in a room
9   and figured out a way that -- kind
10  of go forward, you're still --
11  you're still on board.
12      MS. CHAN:  Yeah.
13      MR. MATTIKO:  You're not --
14  okay.
15      MS. CHAN:  And -- I mean --
16  and also, let me, you know, give
17  you maybe an example.  So I was
18  talking to Alex about Yu, this
19  Chinese client, and apparently --
20      MR. MATTIKO:  Okay.
21      MS. CHAN:  -- they're still
22  actually --
23      MR. MATTIKO:  Yeah.
24      MS. CHAN:  -- finished.

Page 32

1       MR. MATTIKO:  Yeah.
2       MS. CHAN:  They're, you
3   know -- they started with
4   announcements.  But
5   (indiscernible) --
6       MR. MATTIKO:  Yeah.  I know
7   that.  Yeah.
8       MS. CHAN:  -- all of this.
9   Whatever.  You know, but then, you
10  know, it said, like, Oh, well, you
11  know -- you know, it depends on if
12  Charles approves because it's
13  advisory and it could be approved
14  as advisory.  And also apparently,
15  you know, kind of, Liz is
16  concerned about, you know, the
17  product's impact on your product.
18      I'm -- I'm just -- all I'm
19  saying is, you know, for example,
20  I mean, you can't ever launch any
21  product if -- you know, that
22  has --
23      MR. MATTIKO:  Yeah.
24      MS. CHAN:  -- any overlap --

Page 33

1       MR. MATTIKO:  Yeah.
2       MS. CHAN:  -- if that's the
3   case.  Now, it's -- for -- you
4   know, for example, it's just
5   things like that.  You know,
6   it's --
7       MR. MATTIKO:  Well, the --
8   the real backstory on that is
9   that -- that -- you know, in light
10  of, you know, what was going on at
11  the end of last year before you
12  left, there's still this -- this
13  kind of gap of understanding.  And
14  the -- and from -- from Charles's
15  side, they don't know -- because
16  there hasn't been a whole lot of
17  communication, they don't know
18  where -- where you stand.  And
19  they're not gonna push forward if
20  they don't know where you stand.
21      MS. CHAN:  Fine.
22      MR. MATTIKO:  And so that --
23  so that -- so -- and hopefully you
24  can understand that.  But -- but



Page 34

1  what -- whatever the reason for
2  that is, you know, we need to make
3  sure that there's an understanding
4  between everybody --
5      MS. CHAN:  Yup.
6      MR. MATTIKO:  -- so we can
7  kind of clear the decks and --
8      MS. CHAN:  Yup.
9      MR. MATTIKO:  -- and move
10 forward if that's what -- that's
11 what's everybody wants.
12     MS. CHAN:  Yup.
13     MR. MATTIKO:  All right.
14 All right.  Well, I think it's --
15 I need to ask you this stuff, you
16 know.
17     MS. CHAN:  Yeah.  No, no,
18 no.
19     MR. MATTIKO:  I -- I hate to
20 be the messenger, but
21 (indiscernible).
22     MS. CHAN:  Fair enough.  No,
23 no, no.  It's fair enough.  But,
24 you know, and --

Page 35

1      MR. MATTIKO:  And like I
2  said, I mean, I -- I enjoy working
3  with you and -- and I'm glad
4  you're here and, you know, I just
5  don't want to see it -- I don't
6  want to see you languish.  I don't
7  want to see things go bad.  And I
8  just want to make sure that if
9  there's a chance to work things
10 out, that we can -- that we can
11 work it out.
12     MS. CHAN:  Yeah.  And, you
13 know, I enjoy working with you.
14 And there are lots of people at
15 Wellington that I enjoy working
16 with.  So it's not --
17     MR. MATTIKO:  Yeah.
18     MS. CHAN:  You know, but --
19 you know, but, you know, I
20 don't -- I don't -- I really don't
21 think it's too much to -- to, you
22 know, just ask Wellington to make
23 good.
24     MR. MATTIKO:  Yeah.  Okay.

Page 36

1      MS. CHAN:  That -- that is
2  it.
3      MR. MATTIKO:  Yeah.  Okay.
4      MS. CHAN:  And I -- and, you
5  know, and I don't think -- I --
6  actually, I haven't got anything
7  additional to say --
8      MR. MATTIKO:  Yeah.
9      MS. CHAN:  -- to Charles I
10 haven't said before.
11     MR. MATTIKO:  Yeah.
12     MS. CHAN:  I said all of
13 those things -- I said those
14 things --
15     MR. MATTIKO:  Yeah.
16     MS. CHAN:  -- you know, as
17 soon as I realized that there was
18 a problem with things coming good
19 already I said those things.  Now,
20 actually, you know, it's not only
21 that the misrepresentation
22 happened before I joined.  Charles
23 then promised to, you know, give
24 me access -- you know, he then

Page 37

1  promised distribution access and
2  then afterwards said he never said
3  it.  So, you know --
4      MR. MATTIKO:  Yeah.
5      MS. CHAN:  -- which -- you
6  know, so --
7      MR. MATTIKO:  Yeah.  Yeah.
8  I hear you.  I got you.  I got
9  you.  I got you.  Okay.  So let
10 me -- so let me take this message
11 back --
12     MS. CHAN:  Um-hm.
13     MR. MATTIKO:  -- to the
14 management team, obviously, and --
15 and see if we can move things
16 forward.  Because it's crazy to be
17 in this kind of stalemate
18 position.  You --
19     MS. CHAN:  Yeah.
20     MR. MATTIKO:  You all right
21 with that?
22     MS. CHAN:  Yeah.  No, no,
23 no.  I'm absolutely fine with it.
24     MR. MATTIKO:  Okay.  Good.



Page 38

1    Because you don't want to be
2    sitting here and waiting and, you
3    know, things are -- things are
4    happening and (indiscernible).
5         MS. CHAN: No, no, no. I
6    don't at all. I don't at all.
7    You know, but equally, I don't
8    want to move forward if that just
9    means --
10        MR. MATTIKO: No.
11        MS. CHAN: -- you know, just
12   people just going --
13        MR. MATTIKO: More empty
14   promises. Yeah. I know.
15        MS. CHAN: -- You lump it
16   or -- or more empty promises or
17   any of that.
18        MR. MATTIKO: Understood.
19   Understood. Yeah. Okay. All
20   right. Leave it with me.
21        MS. CHAN: Thank you.
22        MR. MATTIKO: And if you
23   have any additional thoughts, let
24   me know.

Page 39

1         MS. CHAN: Yeah. I will.
2         MR. MATTIKO: Okay.
3         MS. CHAN: Okay. Thanks.
4         MR. MATTIKO: Thank you.
5    And for -- on a completely
6    separate note, if I have some
7    questions for the VIP chairman --
8         MS. CHAN: Oh, of course.
9    Yeah. Yeah.
10        MR. MATTIKO: -- can I give
11   them to you then?
12        MS. CHAN: Yes.
13        MR. MATTIKO: Yeah. I want
14   to be able to look the guy in the
15   eyes. Have you met him before?
16        MS. CHAN: Well, I met him
17   last trip, last time they ran
18   this, which was probably not quite
19   a year ago now.
20        MR. MATTIKO: I know he
21   was -- he -- he was pretty
22   accessible and open. You could
23   ask him pretty much anything.
24        MS. CHAN: Yeah. Yeah.

Page 40

1    Pretty much. I think -- I mean, I
2    think he's -- he's quite
3    frustrated by the way that he's
4    perceived by the capital markets,
5    which I guess --
6         MR. MATTIKO: Yeah.
7         MS. CHAN: -- you would be,
8    but he wouldn't sort of --
9         MR. MATTIKO:
10   (Indiscernible) one of the
11   questions is why did he only make
12   himself available through these
13   crazy channels?
14        MS. CHAN: I know.
15        MR. MATTIKO: Why is it?
16        MS. CHAN: That is really
17   (indiscernible). Because -- I
18   think because he thinks that the
19   (indiscernible) is doing a good
20   enough job.
21        MR. MATTIKO:
22   (Indiscernible.) Probably hasn't
23   looked at his share price.
24        MS. CHAN: Well -- no, no,

Page 41

1    no, no, no. I -- I think --
2    well -- but -- basically, his take
3    is that he thinks, Okay, I'm
4    running a business.
5         MR. MATTIKO: Yeah.
6         MS. CHAN: And he -- and,
7    you know, he basically is quite
8    confident that once the growth
9    deceleration stops, which he
10   thinks --
11        MR. MATTIKO: Yeah.
12        MS. CHAN: -- is -- was 2017
13   last year --
14        MR. MATTIKO: Yeah.
15        MS. CHAN: -- but he thinks
16   that --
17        MR. MATTIKO: The market
18   will -- yeah. He may be right.
19        MS. CHAN: -- the market
20   will appreciate it.
21        MR. MATTIKO: He may be
22   right.
23        MS. CHAN: So he -- he's --
24   basically, he's frustrated, but he



Page 42

1    says, like, I kind of don't care.
2    I can't run my business like that,
3    according to share price
4    (indiscernible), so I'm just gonna
5    carry on --
6        MR. MATTIKO:  Yeah.
7        MS. CHAN:  -- doing what I
8    do.
9        MR. MATTIKO:  Yeah.  Yeah.
10       MS. CHAN:  You know,
11   which --
12       MR. MATTIKO:  Yeah.  So, you
13   know, it might be, like, Are you
14   frustrated at all by the share
15   price?  If he said yes, then you
16   say, Well -- you know, because
17   your whole thing is communication.
18       MS. CHAN:  So -- well,
19   because also basically Millicent
20   (indiscernible) said that --
21   basically, that's what they said
22   to him internally is, like, what
23   he's done is basically he was
24   tweaking all the metrics because

Page 43

1    he was like, Well, you've got the
2    data, so you've got the power to
3    tweak the metrics.  But he's sort
4    of basically trying to optimize.
5        MR. MATTIKO:  Hm.
6        MS. CHAN:  But I guess that
7    comes across to people like he
8    doesn't know what he's doing or
9    that they're changing their mind
10   and doing (indiscernible).
11   Apparently, Millicent was saying
12   internally they've all said to
13   him, like, Have you finished
14   tweaking yet?
15       MR. MATTIKO:  Yeah.
16       MS. CHAN:  But he's
17   basically like, Look.  Why
18   wouldn't I tweak?  Because --
19       MR. MATTIKO:  Yeah.
20       MS. CHAN:  -- I want to --
21   like, I want to get the right
22   answer.
23       MR. MATTIKO:  Yeah.  Yeah.
24   Yeah.

Page 44

1        MS. CHAN:  I just don't want
2    to just -- so basically -- but I
3    guess that's what kind of
4    generates some of the kind of
5    misunderstanding and
6    miscommunication.  I do think
7    it's -- some of it is kind of
8    unfortunate.  Historically, you
9    know, as she said, like, they used
10   it way before anybody else.
11       MR. MATTIKO:  Yeah.
12       MS. CHAN:  So then they were
13   kind of -- and -- and whenever
14   anybody asked, they tried to be
15   obliging to -- and they disclosed
16   it and, you know, without
17   realizing that --
18       MR. MATTIKO:  Yeah.
19       MS. CHAN:  -- kind of in the
20   future that things are gonna come
21   back and bite them.  So I mean,
22   you know, I think --
23       MR. MATTIKO:  Did he ever
24   talk about -- did you ever ask him

Page 45

1    if he'd sell the business?  Or is
2    that just a ridiculous question?
3        MS. CHAN:  He -- no, no, no.
4    I think -- let me dig up my notes,
5    but I think they were -- you know
6    what?  I think he -- at the
7    time -- maybe it wasn't him.
8    Maybe it was the CFO talking.  But
9    it's been -- you know, that the
10   Tencent putting in a stake has
11   been something that's been kicking
12   about.
13       MR. MATTIKO:  Discussed.
14   Yeah.
15       MS. CHAN:  But I think the
16   bottleneck -- I think -- I don't
17   know if Pete would want to sell
18   the business.  I think they would
19   quite like to have Tencent have a
20   stake in them.  But the problem is
21   JD.  The problem's not on their
22   side.
23       MR. MATTIKO:  Yeah.
24       MS. CHAN:  The problem's on



Page 46

1  the JD side because Tencent -- I
2  was thinking JD -- and there's a
3  noncompete --
4      MR. MATTIKO:  Oh.
5      MS. CHAN:  -- which says
6  that Tencent can't complete.
7      MR. MATTIKO:  Oh.
8      MS. CHAN:  So if Tencent
9  buys a stake in it and that
10  triggers it -- so basically JD --
11      MR. MATTIKO:  And they don't
12  want JD to (indiscernible).
13      MS. CHAN:  No.
14  (Indiscernible) is actually more
15  open but they want (indiscernible)
16  valuation.  So they're like, Well,
17  we're open (indiscernible), but
18  also JD has to do it themselves
19  because JD -- and -- and so it's
20  all about the level at which it
21  should be done and also JD sort of
22  wanting to sort of monopolize the
23  Tencent relationship or -- but I
24  think they're actually quite open

Page 47

1  on the (indiscernible) side.
2  Not -- and it's not about selling
3  the business.  It's just thinking
4  like how can we benefit the
5  ecosystem, whatever, by making
6  strategic alliances.
7      MR. MATTIKO:  Yeah.
8      MS. CHAN:  So they are open
9  to the -- so they -- actually, I
10  think they even said that Why
11  didn't you guys talk to JD and get
12  them to, like --
13      MR. MATTIKO:  Oh, right?
14      MS. CHAN:  -- say yes.  But
15  because -- just that -- then that
16  can --
17      MR. MATTIKO:  Take care
18  of (indiscernible).
19      MS. CHAN:  -- all happen.
20      MR. MATTIKO:  It might be
21  interesting.  The other thing is
22  the cap (indiscernible)
23  allocation.  But I'll write a
24  couple of things down.

Page 48

1      MS. CHAN:  Cool, cool, cool.
2  Yeah.
3          - - -
4      (End of audio file)
5          - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 49

1          CERTIFICATE
2
3
4      I HEREBY CERTIFY that the
5  foregoing was transcribed by me from an
6  audio file to the best of my ability.
7
8
9
10  Cindy Parker
    Dated:  January 20, 2021
11
12
13
14
15      (The foregoing certification
16  of this transcript does not apply to any
17  reproduction of the same by any means,
18  unless under the direct control and/or
19  supervision of the certifying reporter.)
20
21
22
23
24



```
                                    Page 50
 1            LAWYER'S NOTES
 2     PAGE  LINE
 3     ____ ____  _____
 4     ____ ____  _____
 5     ____ ____  _____
 6     ____ ____  _____
 7     ____ ____  _____
 8     ____ ____  _____
 9     ____ ____  _____
10     ____ ____  _____
11     ____ ____  _____
12     ____ ____  _____
13     ____ ____  _____
14     ____ ____  _____
15     ____ ____  _____
16     ____ ____  _____
17     ____ ____  _____
18     ____ ____  _____
19     ____ ____  _____
20     ____ ____  _____
21     ____ ____  _____
22     ____ ____  _____
23     ____ ____  _____
24     ____ ____  _____
```



**A**

**ability** 49:6
**able** 8:3 23:17
  39:14
**absolutely** 37:23
**accept** 9:5
**acceptable** 5:14
  25:5 26:14
**access** 7:23 9:13
  15:17,21,24
  16:11 23:2,7
  30:5 36:24 37:1
**accessible** 39:22
**account** 4:13
**achievable** 31:5
**achieve** 20:17
**achieved** 16:22
**acknowledgem...**
  14:20
**acting** 13:4
**action** 1:2 2:17
**acts** 27:1
**additional** 36:7
  38:23
**advisory** 32:13
  32:14
**ago** 39:19
**agree** 20:2
**agreements** 15:4
**Alex** 31:18
**alliances** 47:6
**allocation** 47:23
**amply** 27:14
**and/or** 49:18
**angle** 9:21,22
**announcements**
  32:4
**answer** 43:22
**anybody** 19:2
  29:2 44:10,14
**apparently** 31:19
  32:14 43:11
**appeared** 20:15
**apply** 49:16
**appreciate** 21:11

21:15 41:20
**approved** 32:13
**approves** 32:12
**ARGYLE** 1:7
**aside** 30:24
**asked** 2:6 15:18
  44:14
**asking** 6:1 8:12
  11:3 15:15 16:5
  21:20 22:4
  29:13 31:3
**audio** 1:12,15
  48:4 49:6
**AUM** 7:16 29:21
  29:23
**available** 40:12

**B**

**back** 2:19 37:11
  44:21
**backstory** 33:8
**backwards** 13:16
  14:2,4 15:14
  16:18 21:21
**bad** 24:10 25:1
  35:7
**basically** 5:6
  19:10 26:13
  41:2,7,24 42:19
  42:21,23 43:4
  43:17 44:2
  46:10
**believed** 12:4
  28:9
**bending** 14:2,4
  15:14 16:18
  21:21
**bends** 13:16
**benefit** 47:4
**best** 2:15 25:23
  49:6
**bigger** 17:8
**billion** 4:7
**binding** 5:3
**bit** 10:1 18:24
**bite** 44:21

**blood** 24:10 25:1
**board** 31:11
**book** 13:17
**bottleneck** 45:16
**broader** 2:4
**broken** 9:7 11:9
  15:7
**build** 17:12
**business** 41:4
  42:2 45:1,18
  47:3
**buys** 46:9

**C**

**candies** 30:15
**cap** 47:22
**capital** 40:4
**care** 28:18 42:1
  47:17
**career** 17:12
**careful** 28:19
**carry** 42:5
**case** 33:3
**certain** 3:6,14
**CERTIFICATE**
  49:1
**certification**
  49:15
**CERTIFY** 49:4
**certifying** 49:19
**CFO** 45:8
**chairman** 39:7
**CHAN** 1:4,16 2:5
  2:24 3:4,9,13
  3:16,20,23 4:6
  4:9,17,20 5:1,5
  5:9,13,16,21,23
  6:5,8,20,23 7:3
  7:6,11,16,19,22
  8:2,5,8,11,17
  8:20,23 9:3,7
  9:10,15 10:8,18
  10:21,24 11:7
  11:12,15,18,21
  12:3,7,10,14,18
  12:22 13:1,20

14:1,8,12,18,24
  15:3,10,23 16:2
  16:4,10,15,17
  16:21 17:13,16
  17:21,23 18:6,9
  18:12,15,19
  19:3,6,14,18,21
  19:24 20:4,7,10
  20:13,15,19,23
  21:2,7,10,19,23
  22:3,7,14,17
  23:5,14,20 24:1
  24:4,13,17,21
  24:24 25:4,15
  25:19,22 26:3,9
  26:12,16,19,22
  27:1,4,8,13,18
  27:23 28:2,6,17
  28:21 29:1,5,9
  29:12,15 30:4,8
  30:14,18,23
  31:2,12,15,21
  31:24 32:2,8,24
  33:2,21 34:5,8
  34:12,17,22
  35:12,18 36:1,4
  36:9,12,16 37:5
  37:12,19,22
  38:5,11,15,21
  39:1,3,8,12,16
  39:24 40:7,14
  40:16,24 41:6
  41:12,15,19,23
  42:7,10,18 43:6
  43:16,20 44:1
  44:12,19 45:3
  45:15,24 46:5,8
  46:13 47:8,14
  47:19 48:1
**chance** 35:9
**change** 18:7
**changing** 43:9
**channels** 40:13
**Charles** 1:7 4:20
  7:4,9,23 8:13
  17:7 19:10

30:10 32:12
  36:9,22
**Charles's** 33:14
**chat** 2:8
**child** 30:11
**Chinese** 31:19
**choices** 18:4
**chose** 22:20
**Cindy** 49:9
**CIVIL** 1:2
**clear** 31:7 34:7
**client** 31:19
**clients** 7:24 15:18
  30:5
**come** 10:9,15
  44:20
**comes** 43:7
**coming** 36:18
**commitment**
  10:17
**committed** 10:22
**communication**
  33:17 42:17
**COMPANY** 1:7
**complete** 46:6
**completely** 39:5
**concerned** 32:16
**confident** 41:8
**consider** 17:1
**considers** 13:11
**constructive**
  16:13
**continue** 22:8
**contracts** 5:2
**control** 6:15
  49:18
**conversation**
  1:16 7:4 18:23
  23:13
**cool** 48:1,1,1
**couple** 47:24
**course** 6:20,23,24
  7:13 17:7,21,23
  18:1 28:13
  29:18,22 39:8
**COURT** 1:1



crap 12:11
crazy 37:16
   40:13
_____
**D**
data 43:2
Dated 49:10
day 28:11
deceleration 41:9
December 7:1
decision 4:2
   27:20 28:15
decisions 11:22
decks 34:7
defeats 13:19
Defendants 1:8
definitely 25:1
delivered 19:9
demonstration
   16:6
depends 32:11
described 3:1
different 6:17
   17:20 21:14
difficult 9:11
   10:9 15:12
   16:19
dig 45:4
direct 49:18
disagree 13:24
disappointing
   4:1 23:1
disclosed 44:15
Discussed 45:13
distribution 8:6
   22:24 37:1
DISTRICT 1:1,1
doing 20:20
   40:19 42:7 43:8
   43:10
dollars 6:21
duty 28:18
dynamic 17:13
   24:15
_____
**E**

easy 22:5 27:19
ecosystem 47:5
eight 19:15
either 2:13
EMO's 15:18
employees 27:5
   28:14
empty 38:13,16
enjoy 13:12
   23:10 35:2,13
   35:15
entitled 1:19
equally 38:7
everybody 7:12
   17:4 19:19
   23:18 34:4,11
everybody's
   23:23
everything's 5:19
exactly 2:21 3:1
   30:7
example 3:16
   31:17 32:19
   33:4
excuses 18:2
expect 9:1
expecting 2:12
experience 2:20
explained 4:2
extent 17:6
extremely 22:5
   23:1
eye 14:17,17,19
   14:19 16:23,23
eyes 39:15
_____
**F**
fact 3:17 20:7
fair 8:9 34:22,23
fast 10:7
figured 31:9
file 1:18 48:4
   49:6
fine 33:21 37:23
finished 31:24
   43:13

firm 2:4 5:17
   13:10
fixes 27:19
following 1:18
foregoing 49:5
   49:15
forward 10:7
   15:5 29:17
   31:10 33:19
   34:10 37:16
   38:8
frustrated 40:3
   41:24 42:14
fulfill 22:5
futile 24:12
future 44:20
_____
**G**
gap 33:13
GC 1:19
generates 44:4
GIGI 1:4,16
Gigi's 10:5
give 6:18 31:16
   36:23 39:10
given 18:2 21:20
   21:24 27:14
glad 35:3
go 2:19 29:24
   31:10 35:7
goes 24:3,3
going 33:10
   38:12
gonna 3:6 10:6
   14:15 27:10
   29:19 30:14
   33:19 42:4
   44:20
good 6:3 10:10
   10:15 11:10
   18:18 21:4,5
   35:23 36:18
   37:24 40:19
great 22:23
Greg 1:16,20
GRG 17:18

grow 13:17
growth 41:8
guess 17:3,5,7
   40:5 43:6 44:3
guy 39:14
guys 47:11
_____
**H**
happen 9:1 14:15
   21:17 25:11,12
   29:6 47:19
happened 14:6,7
   14:9,11,21
   36:22
happening 38:4
happens 24:22
happy 13:18
hate 34:19
hear 37:8
held 1:17
help 19:1 23:17
   23:18
highlight 19:8
high-end 4:10
Historically 44:8
Hm 43:5
hold 22:23
holding 10:1
honest 9:4 12:8
hopefully 33:23
hundred 6:19
   10:13
_____
**I**
impact 32:17
important 18:22
indications 27:15
indiscernible
   3:12 6:22 30:3
   32:5 34:21 38:4
   40:10,17,19,22
   42:4,20 43:10
   46:12,14,15,17
   47:1,18,22
industry 5:18
   26:20

informed 4:12
insist 18:6 22:8
insisting 16:15
   20:4
integrity 13:4
   27:2
interaction 2:2
interesting 47:21
internally 42:22
   43:12
it'll 24:10
_____
**J**
January 49:10
JD 45:21 46:1,2
   46:10,12,18,19
   46:21 47:11
job 40:20
join 22:21
joined 3:10 10:19
   12:12 22:18
   28:12 36:22
_____
**K**
KAI 1:4
kicking 45:11
kind 2:3,8,13,20
   9:24 10:4 13:10
   13:18 23:17
   25:13,14,17
   31:8,9 32:15
   33:13 34:7
   37:17 42:1 44:3
   44:4,7,13,19
know 2:7,15,17
   3:5,20,21,23
   4:11,17 5:2,23
   6:1,16 8:2,8,12
   8:24,24 9:10
   11:23 12:19
   13:9,10 14:16
   15:5,10,13,16
   15:19 16:7,8,11
   17:9,16,24 18:1
   18:2,3,16,19
   19:7,7,18 20:1



20:19,21 21:7
21:10,11,12,13
21:23 22:7,9,10
22:17,19 23:5
23:22 24:7,14
25:2,7,9 26:4,5
26:6,12 27:9,10
27:13,15,21
28:2,3,7,7,8,10
28:12,17 29:1
29:17,19,20,22
30:5,9,9,19,19
30:23 31:2,4,16
32:3,6,9,10,11
32:11,15,16,19
32:21 33:4,5,9
33:10,15,17,20
34:2,16,24 35:4
35:13,18,19,19
35:22 36:5,16
36:20,23,24
37:3,6 38:3,7
38:11,14,24
39:20 40:14
41:7 42:10,13
42:16 43:8 44:9
44:16,22 45:5,9
45:17
**known** 12:15
**knows** 29:23

**L**

**languish** 35:6
**late** 24:18
**launch** 32:20
**LAWYER'S**
 50:1
**leave** 8:15 38:20
**left** 33:12
**LEGAL** 1:23
**level** 46:20
**leverage** 8:5
**lies** 12:16
**light** 33:9
**LINE** 50:2
**Liz** 32:15

**LLP** 1:7
**load** 12:11
**look** 5:24 39:14
 43:17
**looked** 40:23
**lot** 11:23 33:16
**lots** 35:14
**lump** 5:11 21:5
 26:6 38:15

**M**

**MAGNA** 1:23
**making** 15:3
 28:15 47:5
**manage** 3:18
 6:22
**management** 1:7
 37:14
**market** 41:17,19
**marketing** 16:10
**markets** 40:4
**MASSACHUS...**
 1:1
**materialize** 7:17
**maternity** 8:14
**Mattiko** 1:17,20
 2:2,6 3:3,8,11
 3:15,19,22 4:5
 4:8,15,19,24
 5:4,8,12,15,20
 5:22 6:4,7,10
 6:21 7:2,5,10
 7:15,18,21 8:1
 8:4,7,10,16,19
 8:22 9:2,6,9,14
 9:16 10:11,20
 10:23 11:6,11
 11:14,17,20
 12:2,6,9,13,17
 12:20,24 13:5
 13:23 14:5,10
 14:14,22 15:2,9
 15:22 16:1,3,9
 16:14,16,20
 17:2,15,17,22
 18:5,8,11,14,17

18:20 19:4,13
19:17,20,23
20:3,6,9,12,14
20:18,22 21:1,6
21:9,18,22 22:2
22:6,13,16 23:4
23:8,15,21 24:2
24:5,16,20,23
25:3,6,16,20
26:2,8,11,15,18
26:21,24 27:3,7
27:12,17,22
28:1,5,16,20,24
29:4,7,11,14
30:2,7,13,17,22
31:1,6,13,20,23
32:1,6,23 33:1
33:7,22 34:6,9
34:13,19 35:1
35:17,24 36:3,8
36:11,15 37:4,7
37:13,20,24
38:10,13,18,22
39:2,4,10,13,20
40:6,9,15,21
41:5,11,14,17
41:21 42:6,9,12
43:5,15,19,23
44:11,18,23
45:13,23 46:4,7
46:11 47:7,13
47:17,20
**mean** 11:8 12:11
 12:18 13:1 14:3
 15:14,15 22:17
 22:22 25:2
 28:15 31:15
 32:20 35:2 40:1
 44:21
**means** 38:9 49:17
**meeting** 15:20
**message** 19:9,12
 37:10
**messenger** 34:20
**met** 39:15,16
**metrics** 42:24

43:3
**Millicent** 42:19
 43:11
**million** 6:19
**mince** 12:22
**mind** 43:9
**minutes** 15:19
**miscommunica...**
 44:6
**misrepresentat...**
 5:7 36:21
**misunderstand...**
 44:5
**monetary** 4:10
**money** 3:18
**monolith** 21:13
**monopolize**
 46:22
**months** 3:21
 19:16
**morally** 20:11
 26:14
**move** 10:6 15:4
 29:17 34:9
 37:15 38:8

**N**

**need** 24:7 30:3,4
 34:2,15
**needs** 19:14
**never** 8:18 24:10
 37:2
**noncompete** 46:3
**note** 39:6
**notes** 45:4 50:1

**O**

**obliging** 44:15
**obviously** 6:14
 15:6 16:24
 23:22 25:22
 37:14
**occasions** 15:7
**offer** 4:4 9:13
**Oh** 4:21 15:17
 28:6 29:20

32:10 39:8 46:4
46:7 47:13
**okay** 3:3 8:19,22
 10:11,12,12
 11:6 13:6 17:22
 18:11,14 25:6
 27:12 29:14
 31:7,14,20
 35:24 36:3 37:9
 37:24 38:19
 39:2,3 41:3
**once** 41:8
**one's** 28:3
**onus** 10:14 11:8
 13:3,8
**open** 39:22 46:15
 46:17,24 47:8
**optimal** 9:19
**optimize** 43:4
**organization**
 21:24
**overlap** 32:24
**ownership** 29:8
 29:10,16

**P**

**page** 23:19,24
 50:2
**Parker** 49:9
**particularly** 5:16
 21:19 28:11
 30:20
**parts** 21:14
**pattern** 10:1
**people** 13:12,13
 14:16,18 17:9
 21:16 28:18
 35:14 38:12
 43:7
**perceived** 40:4
**percent** 10:14,21
**perception** 13:15
**perspective** 25:8
**Pete** 45:17
**place** 13:11,12
 17:11



**Plaintiff** 1:5
**plan** 2:17
**planned** 2:22
**plans** 3:5
**platform** 8:6
  22:24
**PM** 29:22
**point** 9:12 10:2
  17:24
**position** 4:16,18
  5:24 20:5,8
  27:11 37:18
**possible** 22:12
**power** 43:2
**pregnant** 19:16
**pretend** 15:23
  26:23
**pretty** 39:21,23
  40:1
**price** 40:23 42:3
  42:15
**probably** 39:18
  40:22
**problem** 3:2
  36:18 45:20
**problem's** 45:21
  45:24
**product** 17:19
  32:17,21
**product's** 32:17
**promise** 7:23
  11:9,10,19 21:4
**promised** 11:5
  20:24 23:2
  36:23 37:1
**promises** 9:8
  15:8 38:14,16
**purpose** 13:19
**push** 33:19
**put** 2:16 10:18
  13:20 14:1
  15:11
**putting** 45:10

**Q**
**question** 10:16

17:8 45:2
**questions** 39:7
  40:11
**quite** 39:18 40:2
  41:7 45:19
  46:24

**R**
**race** 29:24
**ran** 39:17
**real** 33:8
**realistic** 31:5
**realized** 36:17
**realizing** 44:17
**really** 6:2 9:4
  13:4 14:3 20:10
  21:3 23:10 25:5
  35:20 40:16
**reason** 34:1
**reasonable** 19:19
**reasons** 22:20
**rebuilt** 10:10
**reconsider** 22:15
**reiterate** 17:6
**relationship** 9:18
  46:23
**relied** 11:16,24
**remember** 22:18
**repeated** 11:2
**reply** 2:13
**reporter** 49:19
**reproduction**
  49:17
**requires** 14:19
**respectful** 30:20
**responsibility**
  21:3 28:4,23
  29:3,24
**rest** 2:3
**ridiculous** 16:2
  45:2
**right** 6:11 9:20
  18:4 19:2 20:21
  23:8 34:13,14
  37:20 38:20
  41:18,22 43:21

47:13
**road** 16:7
**room** 31:8
**run** 4:7 42:2
**running** 41:4

**S**
**sat** 31:8
**saying** 17:18 24:3
  29:20 32:19
  43:11
**says** 22:11 29:2
  42:1 46:5
**scale** 22:1
**secondary** 20:16
**see** 2:9 11:12
  14:17 16:23
  18:7 24:6 35:5
  35:6,7 37:15
**seeing** 14:19
**seen** 9:19,20,21
**sell** 45:1,17
**selling** 47:2
**separate** 39:6
**SERVICES** 1:23
**share** 40:23 42:3
  42:14
**shift** 13:3,8 27:10
**shit** 5:11 26:6
**shouted** 19:15
**shouting** 19:10
  19:22 20:1
**show** 16:7
**side** 25:24 33:15
  45:22 46:1 47:1
**side's** 25:8
**sitting** 38:2
**situation** 17:14
  17:20 25:18
**size** 22:3
**somebody** 28:22
**someone's** 20:24
**soon** 36:17
**sort** 2:13,14,14
  2:16 40:8 43:3
  46:21,22

**spoke** 8:13
**stake** 45:10,20
  46:9
**stalemate** 18:24
  37:17
**stand** 33:18,20
**stands** 25:21
**started** 32:3
**STATES** 1:1
**steps** 17:1
**sticking** 20:20
**stops** 41:9
**strategic** 47:6
**stuff** 6:15 34:15
**subsequently**
  5:10
**supervision**
  49:19
**sure** 2:23 5:22
  7:18 9:9 10:23
  16:3,21 22:9
  24:13 25:15
  26:21 28:16
  34:3 35:8

**T**
**take** 28:13,22
  29:8,9,16 37:10
  41:2 47:17
**talk** 44:24 47:11
**talking** 18:13
  20:11 30:10
  31:18 45:8
**team** 37:14
**Tencent** 45:10,19
  46:1,6,8,23
**Thank** 38:21
  39:4
**Thanks** 39:3
**thing** 3:14 11:3
  20:21 24:12
  42:17 47:21
**things** 2:10 11:4
  18:7 21:15,16
  26:5 29:6,16
  31:3 33:5 35:7

35:9 36:13,14
  36:18,19 37:15
  38:3,3 44:20
  47:24
**think** 2:11,18 3:1
  5:1,13 6:24 8:9
  9:4,11,17,23,24
  10:13 11:8,23
  12:10 13:3,7,14
  14:15 15:12
  17:4 18:21 19:7
  19:11,24 23:24
  27:9 30:8 34:14
  35:21 36:5 40:1
  40:2,18 41:1
  44:6,22 45:4,5
  45:6,15,16,18
  46:24 47:10
**thinking** 2:10
  10:6 46:2 47:3
**thinks** 40:18 41:3
  41:10,15
**thoughts** 38:23
**time** 4:4 39:17
  45:7
**told** 3:14,17 5:10
  12:4,16 26:4
  27:19 28:8
**Tom** 15:17
**tough** 5:11 26:6
**transcribed** 1:18
  49:5
**transcript** 49:16
**transcription**
  1:12,15
**transpired** 14:22
  15:1
**treats** 27:4
**tried** 25:23 44:14
**triggers** 46:10
**trip** 39:17
**true** 8:21
**trust** 5:19 10:3
  10:10 26:16
**try** 13:2
**trying** 13:7,9



20:17 43:4
**turns** 22:11
**tweak** 43:3,18
**tweaking** 42:24
43:14
**two** 15:19

**U**

**Um-hm** 23:20
37:12
**understand** 7:13
25:23 26:1
33:24
**understanding**
33:13 34:3
**understands** 17:5
**Understood**
11:17 12:20
38:18,19
**unfortunate** 44:8
**UNITED** 1:1
**untenable** 20:8

**V**

**v** 1:6
**valuation** 46:16
**value** 4:10
**verbal** 5:2
**view** 9:12 17:24
**VIP** 39:7
**vs** 1:19

**W**

**waiting** 25:10,11
38:2
**want** 13:13 17:9
17:10,10,11
23:11,16,16
24:5,6,8 25:21
35:5,6,7,8 38:1
38:8 39:13
43:20,21 44:1
45:17 46:12,15
**wanted** 20:2
**wanting** 46:22
**wants** 34:11

**wasn't** 2:24 3:4
4:21 45:7
**way** 2:15 3:7 6:17
10:18 12:15
13:20 14:2
15:11 19:8 31:9
40:3 44:10
**ways** 9:20
**Wellington** 1:7
2:21 3:10 4:12
4:13 5:17 6:2
6:12,13,18 7:14
9:18,24 10:4,9
10:15 12:1,4
13:2,7,16 15:13
21:12 22:10,21
26:22 27:15
28:12,14 35:15
35:22
**Wellington's**
9:12,22 10:4
15:7 22:1
**went** 8:14
**we're** 25:13,14
46:17
**wondering** 10:5
**words** 12:23
26:10
**work** 13:13 17:10
23:11 24:6,11
35:9,11
**working** 13:12
23:10 35:2,13
35:15
**wouldn't** 18:13
40:8 43:18
**write** 47:23
**written** 4:21
**www.MagnaL...**
1:24
**W_Recording**
1:19

**Y**

**yeah** 3:8,15,19,22
3:24 4:5,8,19

4:24 5:4,8,12
5:15,20,22 6:4
6:7,10 7:2,5,10
7:15,21 8:1,4,7
8:10,16,22 9:2
9:6,9,14 10:20
11:11,14,20,22
12:2,6,9,13,17
12:21,24 13:5,5
13:6 14:12,23
15:2,9 16:1,9
16:14,16,20
17:2,2,3,15
18:5,8,14,18,20
19:13,17,20,23
20:3,6,9,12,14
20:18,22 21:1,6
21:9,9,18,22
22:2,6,9,13,16
23:4 24:1,4,16
24:20,23 25:3
25:19,22 26:2,8
26:11,15,18,24
27:3,7,12,17,22
28:1,5,20,24
29:4,7,8,11
30:2,17,22 31:1
31:12,23 32:1,6
32:7,23 33:1
34:17 35:12,17
35:24 36:3,8,11
36:15 37:4,7,7
37:19,22 38:14
38:19 39:1,9,9
39:13,24,24
40:6 41:5,11,14
41:18 42:6,9,9
42:12 43:15,19
43:23,23,24
44:11,18 45:14
45:23 47:7 48:2
**year** 2:19 29:20
33:11 39:19
41:13
**Yu** 31:18
**Yup** 2:5 23:14

34:5,8,12

**Z**

**ZI** 1:4

**1**

**1:19-CV-11605...**
1:2
**100** 10:21
**12** 3:21

**2**

**20** 49:10
**2015** 7:1
**2017** 1:17 41:12
**20170531** 1:19
**2021** 49:10

**3**

**31** 1:17

**6**

**624-6221** 1:23

**8**

**866** 1:23



MAGNA
LEGAL SERVICES

# Exhibit 6

# This exhibit has been withheld pending court action on motion to seal

# Exhibit 7

# GIGI KAI ZI CHAN

Tel: +852 9028 8119                                                               **UK & HK citizenship**
Email: gkzchan@gmail.com                                    The Broadville, 4D, 4 Broadwood Road, HK

## PROFESSIONAL EXPERIENCE

### WELLINGTON MANAGEMENT COMPANY

**2014 -**          **Portfolio Manager**                                                                        **Hong Kong**

> **EXHIBIT**
>
> **No. 8  10/6/2020**
>
> exhibitsticker.com

**Portfolio management**
- Relaunched the China Opportunities Fund
- No.2 on a USD3bn Emerging Market Fund

**Research:**  Developing Wellington China expertise internally and showcasing externally

**Business development**
- Marketing including presenting at Wellington client seminars and traveling with firm's top clients
- Currently developing a Pan Asia long-only portfolio for an existing client and a China absolute return portfolio for a prospective Chinese institution

### COLUMBIA THREADNEEDLE INVESTMENTS

**2000 - 2013**  **Portfolio Manager**                                                  **London/Singapore**

**Portfolio management**
- 9 years managing China & Asia ex-Japan mandates (USD1bn institutional and retail)
- Launched *Threadneedle China Opportunities Fund* in 2007.  Top decile performance in peer group and 5% annualized outperformance over the MSCI China since inception
- Winner of multiple Lipper Fund Awards for the *Greater China Equities* and *China Opportunities* funds
- Member of Threadneedle asset allocation, investment strategy and economics committees

**Research**
- Head of HK & China research as well as Asian consumer, telecom, energy and utilities research
- Voted as one of 'Asia's most astute buy-side analysts' in the UK (*The Asset*, 2003)

**Business development**
- Sold China and Asia funds to institutional and retail clients across the world
- Brand-building for Threadneedle through regular TV appearances (Bloomberg and CNBC) and press coverage (FT, WSJ, and Asian media)
- Opened Threadneedle's first overseas investment office in Singapore as part of its Asian expansion strategy

## EDUCATIONAL BACKGROUND & SKILLS

| | | |
|---|---|---|
| 2001 – 2003 | CFA Charterholder | |
| 1999 – 2000 | The College of Law, PgDL (Commendation) | London, UK |
| 1996 – 1999 | Oxford University, St Hilda's College, BA & MA (Hons) Politics, Philosophy & Economics | Oxford, UK |
| 1989 – 1996 | St Swithun's School, Scholar | Winchester, UK |

Languages:    Chinese (Cantonese & Mandarin) and English (native), French (fluent), Spanish and German (basic)

## INTERESTS

- Travelling:  Visited 83 countries (including all 33 provinces in China) across 5 continents
- Reading:  Both fiction and non-fiction, in particular from countries visited
- Sports:  Long distance running & hiking, team sports (lacrosse, netball & soccer - local leagues)

CONFIDENTIAL