# EXHIBIT H

Volume: I
Pages: 1 To 156
Exhibits: See Index

UNITED STATES DISTRICT COURT
For the District of Massachusetts
Civil Action No. 1:19-CV-11605-WGY

GIGI KAI ZI CHAN,
Plaintiff,

vs.

WELLINGTON MANAGEMENT COMPANY LLP
and CHARLES ARGYLE,
Defendants.

ZOOM VIDEO DEPOSITION OF HENRY PHILIP, a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Susan E. DiFraia, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, via Zoom Video, on October 14, 2020, commencing at 10:00 a.m.



APPEARANCES:
HARTLEY MICHON ROBB
155 Seaport Blvd
Boston, MA 02210
BY: Patrick J. Hannon, Esquire
Tel: 617.447.2819
E-Mail: Phannon@hartley@michonrobb.com
Attorney for the Plaintiff.

JACKSON LEWIS
75 Park Plaza
Boston, MA 02116
BY: Stephen T. Paterniti, Esquire
Tel: 617.367.0025
E-Mail: Spaterniti@jacksonlewis.com
Attorney for the Defendants.

* * * * *

E X A M I N A T I O N S

| Witness | | Page |
|---|---|---|
| HENRY PHILIP | | |
| DIRECT EXAMINATION | BY MR. HANNON | 4 |
| CROSS EXAMINATION | BY MR. PATERNITI | 149 |

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| 1 | E-mail to Argyle | 94 |
| 2 | E-mail to Baxter | 107 |
| 3 | E-mail to Karen Tang | 108 |
| 4 | E-mail to Argyle, Baxter & Puritz | 127 |
| 5 | E-mail chain | 133 |
| 6 | E-mail from Argyle | 138 |
| 7 | E-mail chain | 139 |
| 8 | E-mail | 142 |
| 9 | Document | 146 |

P R O C E E D I N G S

HENRY PHILIP

a witness called for examination by counsel for the Plaintiff, having been first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HANNON:

Q. Good morning, Mr. Philip. My name is Patrick Hannon, and I represent Gigi Kai Zi Chan in this matter.

Have you ever had the pleasure of sitting for a deposition before?

A. I have not. This is my first time.

Q. Okay. You are in for a treat. So just to kind of cover the process. Since everything that you and I say is taken down by the stenographer, it's important for you and I not to be speaking at the same time. So if you would wait for me to be done talking before you answer, that would be helpful, okay?

A. Yes, understood.

Q. And you, for similar reasons, it's important

that all of your answers be spoken, so if at some point in time you forget and you nod your head or shake your head in response, I'll just prompt you to actually say your answer; is that fair?

A. Yes, very fair, thank you.

Q. Good.

Mr. Philip, where are you physically located today?

A. I'm physically located in 75 Park Plaza, Boston.

Q. And is that your office or someone else's office?

A. It's the Jackson Lewis office.

Q. Okay. And there in the room -- is anyone there in the room with you today?

A. Yes, we have Steve Paterniti and Sara Martin.

Q. Okay. And what did you do to prepare for your deposition today?

MR. HANNON: I'm going to instruct you to go ahead and answer that but not reveal any communications you had with counsel.

A. So we had two preparation sessions with our



terms of her experience?
A. I think what we were looking for at that time was a franchise leader, someone who could really drive our China business.
Q. Okay. And what about Ms. Chan's experience led you to believe that she would be a step below that?
A. I think that at that time, knowing the organization she was at which is a company called Threadneedle, that the role of funds manager is given very early in someone's career at somewhere like for Threadneedle, and that she'd -- her experience at that time was perhaps a step below what I'd be -- what we were looking for in terms of a stand-alone portfolio manager without the infrastructure that perhaps she enjoyed at somewhere like Threadneedle.
Q. Any other reasons why you believed her experience would be a step below?
A. No.
Q. As of June of 2013 what experience did you have of -- in terms of Threadneedle and its internal processes?

A. So I think I had known Threadneedle as an organization since 2002 and being a British institution, understanding how their process works with regard to giving people the title of funds manager and so on and so forth. That, as I mentioned, happened pretty early in people's careers and it's very specific from the way Wellington would approach it.
Q. But how did you know that; what was the experience that gave you the opportunity to make that observation?
A. From talking to people in the market.
Q. Okay. Anything else?
A. No.
Q. Despite the fact that people took on the responsibility for managing money earlier on in their careers, did you have any consideration that once they reviewed that responsibility, that their experience from that point forward was somehow less significant than they would have received elsewhere?
MR. PATERNITI: Objection. Go ahead.
A. I don't think I said that they were given responsibility for managing money. I think

they were given responsibility in terms of title.
Q. (By Mr. Hannon) Okay. So your understanding was the Threadneedle people would take on the title but not necessarily the responsibility?
A. Exactly, or they'd be working very closely with a more experienced portfolio manager.
Q. And did you ask Ms. Chan about what her experience with Threadneedle had been?
A. I can't recall.
Q. Were there any individuals from Threadneedle that you interviewed prior to Ms. Chan?
MR. PATERNITI: In his whole career are you talking about or just for this position?
MR. HANNON: In his whole career.
A. Yes.
Q. (By Mr. Hannon) Any for position of portfolio manager?
A. Yes.
Q. And had you recommended hiring any of those individuals?
A. I can't recall.
Q. Subsequent to your interview of Ms. Chan for

the PM role at Wellington, did you have any further involvements in your application process?
A. For that particular role?
Q. Yes.
MR. PATERNITI: Objection. Go ahead.
A. I can't remember, as I sit here today, I'm afraid.
Q. (By Mr. Hannon) Okay. What was the typical hiring process for a role such as this back in the 2013 time frame?
A. We would map the market, identify individuals, bring them in for interview if they were interested. That first initial interview would be with me and then would we introduce them to Tom and Charles, and if they passed that bar then they would be interviewed with a far broader number of investors after making that decision.
Q. And after making your -- after, your interview would remain in the process or would that be the end?
A. I would remain in the process typically through until the offer was made. And then typically I



communicated to Ms. Chan besides what's written in some documents we may have seen?
A. Nothing over and above that.
Q. Do you recall any conversations you had with Ms. Chan around the time of her hire at Wellington concerning the future potential for her serving as a portfolio manager?
A. Not specific conversations.
Q. Any general conversations you can recall?
A. Only that it would have taken time for her to become a portfolio manager, but ultimately she was joining as a team analyst.
Q. So do you, as you sit here today, recall telling Ms. Chan that it was going to take time before becoming portfolio manager?
MR. PATERNITI: Objection.
A. Yes.
Q. (By Mr. Hannon) And what was the context in which you said that to her?
A. The context was that we wanted to make sure that she was aware that it would take time for her to work as a team analyst but ultimately if she did a good job and, you know, worked collaboratively with the team, that she would

ultimately have the opportunity to manage money.
Q. Mr. Philip, was this in a conversation where you expressed this to Ms. Chan?
A. Yes.
Q. Face-to-face, over the phone?
A. It would have been over the telephone.
Q. Was anyone else on the call?
A. No.
Q. Where were you when this call took place?
A. I don't recall.
Q. Do you recall what time of day it was?
A. No.
Q. Who called who?
A. Again, I don't remember. It was a long time ago.
Q. Was anything else discussed during the call?
A. Not that I can remember.
Q. Did you take any notes of the call?
A. No, I don't think so.
Q. And did this call take place before or after a -- an offer had been extended to Ms. Chan?
A. I would assume not. I think it would have taken place during the course of the offer, but

I can't recall specifically.
Q. At the time you just communicated this information to Ms. Chan that you just described about the potential opportunity to manage money at Wellington, with whom at Wellington had you discussed such a prospect?
MR. PATERNITI: Objection. Did you say had she discussed or had Henry discussed.
MR. HANNON: Mr. Philip discussed.
A. I would have heard that directly from Tom and Charles.
Q. (By Mr. Hannon) You say "would have," do you actually remember hearing that from either of them?
A. Yes, I do, yes.
Q. And tell us what you remember about that?
A. Only the parameters that we -- I can't remember the specific conversation. I do remember hearing it, that over time she would be joining as a team analyst and over time hopefully develop into a stand-alone portfolio manager but that it would take time.
Q. And was that a conversation with Mr. Baxter and

Mr. Argyle together?
A. I honestly can't remember.
Q. Okay. Did you hear the same thing from both of them in separate conversations?
MR. PATERNITI: Objection.
A. I can't remember.
Q. (By Mr. Hannon) Any discussion as to how much time it would take before Ms. Chan would have the opportunity to manage money?
A. No, but it's a question I've faced hundreds of times in terms of candidates and roles of how long before they could manage money. The question is how long of a piece of string it would take, what amount of time. It tends to happen later rather than sooner.
Q. For some candidates it happens sooner, though, right?
MR. PATERNITI: Objection.
A. Yes.
Q. (By Mr. Hannon) In your experience at Wellington were you aware of any advisers who were hired as analysts who became portfolio managers within the span of a year?
A. Not analysts that were hired or analysts that

getting feedback for a particular employee, would someone have to pick the peers who were going to be providing that feedback?
A. People would pick their peers but also individuals could volunteer opinions as well, and we seek guidance from our peers as to how someone was doing.
Q. So just to kind of break that up, so the individual investor who is being reviewed, they themselves are asked to pick peers from whom feedback would be solicited by Wellington?
A. Yes.
Q. And then people at Wellington could volunteer to provide feedback regarding one of their peers; is that right?
A. Yes, the expectations in the tool is that we want to gather a mosaic of feedback on individuals and allow us to essentially see how they're doing versus peers, so it's a -- it's a -- as I say, you probably hear this a lot, it's a mosaic.
Q. But one part of that mosaic is potentially feedback that some folks just sort of volunteer about one of their peers?

A. I would say yes, but everyone is encouraged to participate.
Q. Okay. And then is there also the option for managers to identify specific peers that they want to have provide feedback from an investor?
A. Yes, I believe so.
Q. And how does that work?
A. So you're asking -- so managers would ask about -- sorry, would you say the question again and I'll try to give a better answer.
Q. Let me ask it in a different way.
So for example, would a manager be able to select employees, A, B and C, I want you to provide feedback about Investor Z?
A. Yes.
Q. Were there any sort of policies or practices in terms of how managers should go back -- about soliciting that kind of feedback?
A. No specific policies that I can think of.
Q. Anything in general?
A. No, it could either be done in writing or by e-mail or in the peer feedback tool or anecdotal told currently in a conversation.
MR. HANNON: Now is a good time to break

for lunch.
MR. PATERNITI: Okay.
(Recess taken)
Q. (By Mr. Hannon) So Mr. Philip, you mentioned earlier that you had at least one conversation with Greg Matiko in 2017 concerning Ms. Chan's performance; is that correct?
A. Yes.
Q. Okay. When was the first such conversation you had with Mr. Matiko concerning that subject?
A. I believe it would have been in the first half of the year, perhaps May -- April, May of that year.
Q. Okay, okay. At the start of 2017 when you took over that -- Mr. Baxter ceased responsibilities, as we discussed earlier, Ms. Chan was on maternity leave?
A. Yes.
Q. Do you recall when she returned?
A. I believe she returned in early April of 2017.
Q. And how long after her return from maternity leave was it that you and Mr. Matiko had a talk about her performance?
A. It would have been in late May of that year.

Q. Okay. How did this discussion with Mr. Matiko come about?
A. I went to Hong Kong on a work trip. I had as part of that work trip a catchup meeting with Gigi, Ms. Chan, and following that conversation I wanted to provide Greg with an update.
Q. You wanted to provide Greg with an update?
A. Yes, following the discussion with Ms. Chan.
Q. So you travelled to Hong Kong with others as well as Ms. Chan?
A. Yes.
Q. And was this one of your regular every six weeks or so trips to Hong Kong?
A. Correct, yes.
Q. And was this your first trip to Hong Kong since Ms. Chan had returned from maternity level?
A. Yes, I believe so. I don't know definitively but it would be, yes.
Q. Can you recall any prior trips to Hong Kong taken between this meeting that you're describing and Ms. Chan's return from maternity leave?
A. New York City that I can recall definitively.
Q. And during the span of time which Ms. Chan had



returned from her leave and you took this trip to Hong Kong, can -- had you spoken to Ms. Chan at all?
A. No.
Q. During this time -- had you spoken to anyone else during this time period from the time she came back from maternity leave up until the trip to Hong Kong you referenced?
A. I can't remember.
Q. In your meeting with Ms. Chan while you were in Hong Kong, was that for any particular purpose?
A. I'm sorry. The meeting with Ms. Chan specifically?
Q. Yes.
A. No, I think two meetings to visit with her, one I wanted to make sure that we caught up while I was in town, while I was in Hong Kong; and secondly, I wanted to ask her about her reaction to the e-mail that Charles Argyle had sent her just prior to her maternity level.
Q. Prior to the meeting with Ms. Chan did you tell her you wanted to proceed discussing those topics with her?
A. No.

Q. So you just scheduled a time to meet with her?
A. Correct.
Q. And did you schedule that directly with her or through an assistant?
A. I believe my assistant would have scheduled with her assistant.
Q. As of the time that you're preparing for this meeting with Ms. Chan that you referenced, had anyone at Wellington informed you that Ms. Chan raised concerns that she was treated differently because of her gender?
MR. PATERNITI: Objection. Go ahead.
A. No.
Q. (By Mr. Hannon) As of the time before your meeting with Ms. Chan, had anyone at Wellington raised to you concerns that Ms. Chan felt she was being treated differently based on her race?
MR. PATERNITI: Objection.
A. No.
Q. (By Mr. Hannon) So the meeting with Ms. Chan, where did that take place?
A. In the office, in the Hong Kong office.
Q. Besides you and Ms. Chan, was anyone else

present?
A. No one else was present.
Q. Please tell me everything that occurred during the course of that meeting.
A. Sure. I was asking her how her family was having just returned from maternity leave. I think I even asked her a little bit about how fund performance was, and then after approximately ten or so minutes, I switched gears and asked her about the e-mail that she received from Charles and what her reaction was.
Q. With respect to your questioning about how her family was doing, what do you recall Ms. Chan saying about that subject?
A. I think she was -- it was a very pleasant conversation. She eventually returned to work at -- I don't recall exactly what she said, but I do remember it being a pleasant conversation.
Q. How about with respect to her fund performance, what do you recall of that subject being discussed?
A. Again, I can't recall specifics from the actual conversation. I do remember asking her the

question but I can't recall what she said, what I said in follow up to that.
Q. How about with respect to the subject of Mr. Argyle's e-mail, what do you recall being said with respect to that topic?
A. She said something along the lines, this is not necessarily verbatim but I remember she said she felt like there -- nothing more needed to be said, she said everything she needed to discuss the matter further, and pretty much end the conversation there.
Q. Did you ask her for her account as to what she told Mr. Argyle during that meeting?
A. I did not.
Q. I think you indicated that you subsequently had a talk with Mr. Matiko after your conversation with Ms. Chan?
A. I did.
Q. Why?
A. Because I wanted to make him aware of her reaction to the topic of the e-mail that Charles had sent.
Q. What did you tell Mr. Matiko?
A. Something along the lines of she didn't want to



engage in the conversation about that, she felt like that the matter was closed from her point of view.
Q. How did Mr. Matiko respond?
A. He said that he would like to try and have -- open a dialogue and have a conversation with her about the e-mail that Charles Argyle had sent.
Q. And what was your reaction to that?
A. I thought it was a good idea.
Q. I'm going to show you a document here. I'm now showing you what's Bates stamped DEF, 00000613.
MR. HANNON: And I'm going to mark this as Exhibit 1 for purposes of today's deposition.
(Document marked as Philip Exhibit 1 for identification)
Q. Okay. So my question is if you recognize this?
A. Sorry, could you repeat that.
Q. Yes, do you recognize this document?
A. I do.
Q. And what do you recognize it to be?
A. An update to Charles following the conversation that you and I just spoke about with Ms. Chan.

Q. Does this refresh your recollection as to whether or not you had spoken with -- with Mr. Argyle prior to speaking with Ms. Chan in late May?
A. Not specifically, no.
Q. Okay. Is this e-mail -- does this e-mail contain an accurate summary of your meeting with Ms. Chan?
A. Yes.
Q. Anything in here that you think is inaccurate?
A. No.
Q. If I could direct your attention to the last sentence. You write, "So not really the road to Damascus change that we were hoping for but not totally negative either."
Do you see that?
A. Yes.
Q. What did you mean by "road to Damascus change"?
A. I think I or we were certainly hoping that she would respond in some manner to the feedback and the direction that Charles had given her in his conversation and subsequent e-mail back prior to her maternity leave. And I think that that would be the -- the sort of the road to

Damascus change I was referring to.
The second piece is that she -- she didn't -- you know, it wasn't, you know, entirely that she shut me out or anything like that.
Q. I'm sorry. I didn't quite catch the end of your answer. Did you say it wasn't entirely that she shut you out?
A. Yes, and by that I mean that she was at least willing to engage in conversation with me, just unfortunate that when the topic was raised she shut it down very quickly.
Q. Well, she said, "I'm fine," right?
A. Yes.
Q. And that was in response to you asking her where her head was at?
A. Yes, I mean she said -- it was more than "I'm fine." It was -- and I guess I didn't relate that entirely in this e-mail, but I do distinctly remember her saying that -- you know, that she considered the matter closed from her perspective. As I say, it was pretty abrupt.
Q. What did you understand that to mean?

A. I inferred from that that she didn't want to engage on the topic.
Q. Did you ask her why she considered the matter closed?
A. No, I don't think I did.
Q. Did you consider the matter closed?
A. No.
Q. Did you tell her that?
A. I can't recall.
Q. Did you consider yourself Ms. Chan's boss at this time?
A. This was in the transition period. So while Tom had moved on to his new role and before Adam arrived, I was interim managing a group of people but it was I would say very much an interim measure.
Q. So is that no?
A. It was interim in terms of the management structure we had in place with Tom entering his new role and before Adam arrived that I was going to help out with a management perspective for any individuals that previously had local management.
Q. So you were just helping out?

recollection of his response.
Q. What happened next with respect to Chan?
A. Oh, can you be more specific in terms of what you mean.
Q. Sure.
So was there any subsequent follow up after you got this report back from Mr. Matiko concerning his discussion with Chan?
A. Yes, I think that one of us, and I can't remember who, made a decision that we should meet to talk about what we do next, where we go from here. And we were going to be together in the United States, so it made sense for us to meet then.
Q. And was there a particular subject you wanted to meet about?
A. I think we wanted to have a discussion with regard to Gigi and where we go from here.
Q. And when you say "where we go," was it being contemplated possibly terminating Ms. Chan's employment?
A. I think that was one avenue among the others.
Q. Prior to your face-to-face with Ms. Chan in late May of 2017, are you aware of any

consideration that had been given to terminating her employment?
MR. PATERNITI: Objection, go ahead.
A. No, I'm not aware of that.
Q. (By Mr. Hannon) Okay. Okay. Were you contemplating terminating Ms. Chan's employment when you met with her in late May of 2017?
A. No.
Q. I think you indicated that there was discussion about having a meeting about what to do next; did I hear that correctly?
A. Yes.
Q. And did that meeting take place?
A. Yes.
Q. And who was there?
A. Myself, Charles, Greg. I can't remember whether Adam attended or not but Adam Puritz might have been there, but I honestly can't remember.
Q. Where did this meeting take place?
A. In Boston.
Q. Were you in Boston for any particular time?
A. Yes, we have a bi-annual managing director and partner off site which takes place, the actual

off site itself is down in Newport, but a lot of people come for an extended period of time, so I was there for a couple of weeks at least.
Q. And this meeting with Mr. Argyle, Mr. Matiko and yourself and maybe Mr. Puritz, how long did it last for?
A. I can't remember definitively; probably half an hour.
Q. Was this inside Wellington's office in Boston?
A. Yes.
Q. Was this in a conference room or somebody's office?
A. I think it was Charles Argyle's office.
Q. And did you bring any materials to that meeting with you?
A. Not that I can recall.
Q. During the course of that meeting did anyone show you anything they reviewed?
A. Not that I can recall.
Q. Did you take any notes of that meeting?
A. No.
Q. Tell me everything that you can recall about that meeting.
A. The broad discussion was as to whether -- what

next steps we should take with Gigi. I can't remember specifics of the conversation other than the conclusion that I think we came to during the course of the conversation.
Q. So you can recall the conclusion that you came to?
A. I think we had agreed that we would move to terminate Gigi's employment with Wellington Management, Hong Kong.
Q. Besides recalling that being the conclusion of the conversation, do you recall anything else about what was said during the course of that discussion?
A. Not specifically or even generally.
Q. Did you believe you had the authority to terminate Ms. Chan's employment without Mr. Argyle's approval?
A. I think it would be entirely inappropriate for me to make that decision without Charles' approval.
Q. Why is that?
A. Because ultimately that decision would not rest with the associate director of equities, it would be with the overall head of function.



Q. And the overall head of function -- of Ms. Chan's function, that would be Charles Argyle?
A. Correct.
Q. So after that meeting, am I right that Ms. Chan's employment was not immediately terminated?
A. She was not immediately terminated.
Q. And in fact, it wasn't until several months later that she was terminated --
MR. PATERNITI: Objection. Go ahead.
A. Correct.
Q. (By Mr. Hannon) -- is that right?
Why the delay?
A. Self factors came into play there: Travel plans, for one, meaning that I was away for a significant part of June and July. Ms. Chan was then away for vacation for the majority of August, and we always want to be humanistic in these endeavors and try and have these conversations why -- in person and we were trying to find a time that was appropriate and in the best way possible for us to be able to have that dialogue with her in person, as I

mentioned, and that would only really present itself as an option in September.
MR. PATERNITI: Patrick, can I get access. Is there a way for me to have control of a copy of the document?
MR. HANNON: This is a pretty simple one. As we get to a longer one I'll send you a copy. Does that sound fair?
MR. PATERNITI: Sure. Yes, that's fine for the first two.
Q. (By Mr. Hannon) Sure. So Mr. Philip, I'm showing you a Bates stamp document, DEF, 00002639 which we'll mark as Exhibit 2 here today. And my question, whenever you're ready, is if you recognize it?
(Document marked as Philip Exhibit 2 for identification)
A. Yes, I do.
Q. And what do you recognize it to be?
A. An e-mail from me to Tom Baxter.
Q. And you see here in this e-mail you're asking him to send all of his midyear and year-end correspondence to Ms. Chan?
A. Correct.

Q. Now, am I right that by the time you sent this e-mail to Mr. Baxter, the decision to terminate Ms. Chan was already may?
A. I can't recall the date of the meeting in Boston, so I don't know whether it's before or after this.
Q. Okay. Mr. Philip, I'm showing you a documentation here Bates stamped DEF 00007568 and I'm going to call this Exhibit 3 for purposes of today. And I am going to give you control here of the screen so you can scroll and take a look at the documents at your leisure. So if you can take a look at that.
And my question is, whenever you're ready -- actually, just let me know when you're ready and I'll ask the first question.
(Document marked as Philip. Exhibit 3 for identification)
A. Okay. Ready for your question.
Q. I'm just going to take back that -- control here, control here and I want to direct your attention to the third page of the document. As you see here there's an e-mail from you to Karen Tang dated June 9, 2017, at 12:10 a.m.?

A. Yes.
Q. And you write the first two sentences, "We met this morning, a final decision was reached on Gigi and it was agreed that we want to move on."
Do you see that?
A. Yes.
Q. Okay. Is that referring to the meeting you described earlier concluding that Ms. Chan's employment would be terminated?
A. I believe so, yes.
Q. Okay.
MR. HANNON: So let me move back now to what we previously marked as Exhibit 2.
Q. (By Mr. Hannon) So looking back at Exhibit 2 on the e-mail date June 15, 2017, asking you to send midyear and year-end correspondence to Ms. Chan. So fair to say that you made your request to Mr. Baxter after your decision was made to terminate Ms. Chan's employment?
A. Yes.
Q. Why were you requesting this information from Mr. Baxter?
A. I just wanted to ensure that we all have the

MAGNA LEGAL SERVICES

documentation -- that I had all of the documentation that related to Gigi. It's a matter of course for us to ensure that we have that.
Q. Why did you want to have all the documentation?
A. Because some of the documentation, as you can see, has been in e-mail and such, and I just wanted to ensure that we had it all in one place.
Q. In connection with Ms. Chan's termination, had you been asked to provide any kind of information to Wellington's human resource function?
A. I'm sorry. Can you read that question back.
MR. PATERNITI: Objection.
(The reporter read back the record as requested.)
A. My answer is I can't recall if HR recommended anything document-wise.
Q. (By Mr. Hannon) Let's go back to Exhibit 3 which I will now show you on the screen again here and direct your attention to the second page of the e-mail chain. Do you see here an e-mail from yourself to Karen Tang and Charles

Argyle copying several other individuals?
A. Yes, I can see that.
Q. And this was an e-mail that you sent on June 20th, 2017?
A. Yes.
Q. And in the first sentence you write, "I have updated the document as requested."
Do you see that?
A. I do, yes.
Q. Can you tell me what documentation you're referring to there?
A. I can't exactly recall.
Q. Okay. Do you generally recall?
A. No, not generally.
Q. Okay. And then in the next paragraph you write, "I have also attached everything that we have on Gigi that relates to performance reviews with Tom. This is everything with the exception of the e-mail that Charles sent in November 2016. I believe you already have a copy of that, so I didn't think it necessary to include it."
Do you see that?
A. Yes.

Q. Does this refresh your recollection that you had been asked to provide information to human resources concerning Ms. Chan?
MR. PATERNITI: Objection.
A. I'm not sure whether this information was requested from HR or not, but it seems like I was responding to a request from someone. I can't scroll down.
Q. (By Mr. Hannon) I'll give you back control.
A. Yes, it's not clear to me where the request came from for this documentation.
Q. Okay. Can you tell me what you were asked to provide?
MR. PATERNITI: Objection.
A. As it says, "Everything that relates to Gigi's performance in terms of reviews."
Q. Did you have any understanding as to why you were being asked to provide that?
MR. PATERNITI: Objection.
A. Standard practice in any employee relations incident. We would want to compile the history of the relationship with the individual.
Q. (By Mr. Hannon) So subject to the decision to terminate Ms. Chan's employment, did you have

any discussions with either Mr. Argyle or Mr. Matiko surrounding how to communicate that decision to Chan?
A. Yes, I believe -- and I can't remember when it was, but we would have spoken about likely timing.
Q. And do you have a specific recollection of any of those discussions?
A. Not specifically. And generally that we wanted to do it in person, we wanted to do it as soon as we could.
Q. What was your reason for being in favor of terminating Ms. Chan's employment when you met with Mr. Argyle and Mr. Matiko?
A. I think that, you know, it was clear to me -- that it was clear to me that she was not responding to the fairly direct feedback that she had been given and that it was unlikely that was going to change and therefore it made sense to terminate the relationship.
Q. Any other reasons?
A. No.
Q. And in terms of your conclusion that she wasn't hearing or responding to any of the feedback

she had been given, am I right that that was based upon your conversation with Ms. Chan in late May and the subsequent information you got from Mr. Matiko about his talk with Ms. Chan? Is that correct?
MR. PATERNITI: Objection.
A. Yes.
Q. (By Mr. Hannon) Was there any other source of information you concluded and relied upon with respect to the fact that Ms. Chan was not responding to the feedback she had been given?
A. No, I just think that this was a pattern that I could see in terms of what we expected from a team analyst was not being met by Ms. Chan, and by that I mean as an ambassador at Wellington part of your responsibility is to be, one, support the team that you're working with; and number two, share and collaborate more broadly across the organization, and whether that's contributing to the morning meeting or the early morning meeting, whether it's contributing to the dialogue in sound investors a distribution list for investors or whether it's engaging with investors outside your team,

that's a key component we are looking for -- we would look for in a team analyst, and we weren't seeing that in Ms. Chan.
Q. Where were you looking?
A. Singapore.
Q. My question, sir, was: Where were you looking?
A. I'm sorry. I thought you meant located. What do you mean by "looking"?
Q. So where were you looking, Mr. Philip?
MR. PATERNITI: Objection.
A. Looking in terms of what? Give me a bit more guidance here.
Q. (By Mr. Hannon) You said that you weren't seeing all these things from Ms. Chan. Where were you looking?
A. So anecdotally you can see who's contributing in the early morning meeting, but more broadly from peer review feedback and so forth, you can see how someone is perceived and whether they are contributing to the broader investment dialogue, and by all three metrics, she was not.
Q. Now, had any peer review feedback been solicited since Ms. Chan had returned back from

maternity leave?
A. I don't know.
Q. As you sit here right now, can you say if that in any way influenced your decision that she hadn't been hearing or responding to the feedback that she had gotten before your maternity -- her maternity leave?
MR. PATERNITI: Objection.
A. Yes, I think that would be speculating. I wouldn't be able to tell you.
Q. (By Mr. Hannon) Okay. Prior to meeting with Mr. Matiko or Mr. Argyle in June of 2017 to decide what to do next with Ms. Chan, had you gone back and looked at her peer review feedback?
MR. PATERNITI: Objection.
A. I hadn't personally, no.
Q. (By Mr. Hannon) Did anyone indicate to you that they had?
MR. PATERNITI: Objection again. About the 2016 peer reviewed? I just want to be clear about that. Is that the question, Patrick, whether he went back and looked at the 2016 peer review

results?
MR. HANNON: No. Prior to the June 2016 meeting if he was then aware that someone else had gone back to her peer reviewed feedback to determine that she had in hearing or responding to the feedback she received prior to her maternity leave?
MR. PATERNITI: So my objection is to the form of the question. It sounds like you're assuming there was peer feedback that came in and was collected after she returned from her maternity leave, is that -- is that what you're asking?
MR. HANNON: I'm just asking if he was warned -- informed by somebody that they had gone back to look to peer reviewed feedback to try and determine whether or not Ms. Chan was hearing or responding to the feedback she had gotten prior to her maternity leave.
MR. PATERNITI: Okay. And we can take this off line, but I think that question

MAGNA LEGAL SERVICES

C E R T I F I C A T E

I, Susan E. DiFraia, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing transcript, Volume I, is a true and accurate transcription of my stenographic notes taken on October 14, 2020.

Susan DiFraia
_______________________

Susan E. DiFraia

Notary Public

My commission expires 10/14/2025

* * * * *



MAGNA LEGAL SERVICES

------
ERRATA
------

| PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|---|---|---|---|---|
| 7 | 18 | improvement | recruitment | Misquote |
| 13 | 20 | signs | science | Incorrect |
| 27 | 22 | Sandy | Sandhya | Incorrect name |
| 34 | 7 to 17 | This section doesn't appear to fit in flow of conversation ? | | |
| 43 | 24 | Bo Mun Are | Bo Meunier | Incorrect name |
| 89 | 23 | New York City | Nothing | Incorrect |

MAGNA LEGAL SERVICES

ACKNOWLEDGMENT OF DEPONENT

I, Henry Philip, do hereby certify that I have read the foregoing pages, 1 - PGS, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

______________________ 17 February 2021______
WITNESS NAME DATE

Subscribed and sworn to before me this _____ day of ______________, 20____.

My commission expires:______________

____________________________________
Notary Public