# EXHIBIT I

Volume:
Pages: 1-117
Exhibits: None

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

GIGI KAI ZI CHAN, )
Plaintiff, )
v. ) DOCKET NO.: 19-cv-11605
WELLINGTON MANAGEMENT )
COMPANY, LLP, and CHARLES )
ARGYLE, )
Defendants )
________________________________)

VIDEOCONFERENCE DEPOSITION OF GREG MATTIKO

THIS DEPOSITION TAKEN REMOTELY VIA ZOOM, ON WEDNESDAY, OCTOBER 21, 2020, COMMENCING AT 6:03 P.M.

REPORTED BY: Sharon G. Saalfield, LCR No. 147, MA CSR, RDR, CRR



APPEARANCES

For the Plaintiff (via Zoom):
HARTLEY MICHON ROBB, LLP
By: Patrick J. Hannon, Esq.
155 Seaport Boulevard, 2nd Floor
Boston, Massachusetts 02210
(617) 447-2819
phannon@hartleymichonrobb.com

For the Defendants (via Zoom):
JACKSON LEWIS, P.C.
By: Stephen T. Paterniti, Esq.
Sarah Walsh, Esq.
75 Park Plaza, Fourth Floor
Boston, Massachusetts 02116
(617) 367-0025
stephen.paterniti@jacksonlewis.com
sarah.walsh@jacksonlewis.com

Also present:
Sara Martin, Wellington Management Company
Camille Palladino-Duffy, RPR, LCR (to administer the oath)

STIPULATIONS

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under federal law.

Notice, filing, caption and all other formalities are waived. All objections, except as to form, are reserved and may be taken in court at time of trial.

It is further agreed that if the deposition is not signed within thirty (30) days after submission to counsel, the signature of the deponent is waived.

INDEX

| WITNESS | PAGE |
|---|---|
| Greg Mattiko | |
| By Mr. Hannon | 5 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|

(No exhibits were offered.)

Errata Sheet: 115

GREG MATTIKO,
having been duly sworn by Ms. Palladino-Duffy,
was deposed and testified as follows:

EXAMINATION

BY MR. HANNON:
Q. I'm not sure whether to say "good evening" or "good morning." I'll just say "hello," Mr. Mattiko.
A. Hi, there.
Q. My name is Patrick Hannon, as you know already. I represent Gigi Chan in this lawsuit. Where are you physically located right now?
A. I am in Wellington, Hong Kong, our office, IFC2, in Central.
Q. And is there anyone else in the room with you?
A. Not at all.
Q. Okay. Do you have any papers or notes with you?
A. I have a piece of paper here but it's blank.
Q. Okay. Have you ever had the pleasure of sitting for a deposition before?
A. I have not had the pleasure. This is my first time.
Q. Okay. You're in for a treat.
Since everything that you and I say is being taken down by the stenographer, it's important that we not speak at the same time, so if you could try to do your



Page 22

Q. Besides providing whatever feedback you did concerning the interview, were you asked your opinion in terms of whether or not to hire Ms. Chan?
A. I do not recall in that case being asked whether or not we should hire Ms. Chan.
Q. Do you recall conveying an opinion concerning that subject?
A. If I would have, it would have most likely been in that write-up immediately following the interview. I think the system has changed over the years, but generally, you're supposed to convey your view as to whether or not that person would be appropriate for a position or the position.
Q. When Ms. Chan was hired at Wellington, do you know what role she was hired into?
MR. PATERNITI: Objection. Go ahead.
THE WITNESS: So, my understanding was that she was hired as a analyst.
BY MR. HANNON:
Q. And are analysts at Wellington usually assigned to a team?
A. Usually, yes.
Q. Do you know if Ms. Chan was assigned to a team?
A. Ms. Chan was assigned to my team.

Page 23

Q. And was that true from the start of her employment at Wellington?
A. To the best of my understanding, yes.
Q. Prior to Ms. Chan being assigned to your team, had you been looking for additional analysts to join your team?
A. To the best of my recollection, no.
Q. Did you have any involvement in the decision to assign her as an analyst on your team?
A. I had involvement insofar as I agreed to have her as an analyst on my team.
Q. Was that really a choice you had, or was that, you know, essentially something you had to accept?
A. It was a hundred percent my choice. So the way Wellington works, it's my discretion of how I want to structure my team.
Q. And do you recall why you wanted Ms. Chan on your team?
A. I don't recall exactly, no.
Q. Do you recall generally?
A. Generally, I had a positive impression of her as an investor. And my team in -- I guess in a Wellington context was quite small, with just me and Phillip Fan, so I believed that I perceived her as a good investor, that she could add value to our investment process.
Q. You mentioned Mr. Fan. What was Mr. Fan's role at

Page 24

Wellington at the time that Ms. Chan was hired?
A. He was also an analyst and GEPM.
Q. And where did Mr. Fan reside geographically?
A. At the time he would have been in London.
Q. Did Mr. Fan at some point relocate?
A. He relocated to Hong Kong after I moved, probably a year or so after I relocated here.
Q. And just to take a snapshot of your team, at the time that you moved to Hong Kong, what were the different positions on your team at that time?
A. I was portfolio manager. At the time that I moved to Hong Kong?
Q. Yeah.
A. I would have been the portfolio manager, Phillip would have been an analyst, and Gigi would have been an analyst.
Q. And at some point did the team composition change?
A. When you say "at some point," what are you referring to?
Q. Well, obviously, at some point Ms. Chan was terminated, right?
A. Correct.
Q. So, at least up to the point of her termination, did your team composition remain yourself as portfolio manager, with Ms. Chan and Mr. Phillip as analysts?

Page 25

A. Correct, yes. And it's not Mr. Phillip. I don't know if we need to be technical. Phillip Fan. Mr. Fan.
Q. I'm sorry. Mr. Fan, yeah. Thank you for that clarification.
And subsequent to Ms. Chan's termination, did you add any analysts to your team?
A. I have not -- well, I've added a data scientist, who's not an analyst, per se. In other words, he does not get involved in the investment decision-making.
Q. So Ms. Chan was not replaced on your team; is that right?
A. That is correct.
Q. Why not?
A. Because I've never felt that we necessarily need another individual to do the job in a satisfactory manner for our clients.
Q. The data scientist you referenced, when was the data scientist added to your team?
A. He would have been added to our team probably about 18 months ago.
Q. How does a data scientist differ from an analyst?
A. So the data scientist reports to a relatively new division at Wellington called investment science, and Wellington has invested quite heavily in data and in what

we deem investment science. And this individual is tasked with effectively writing programs for us that harness the investment in data science for the firm. So this individual is not concerned with the fundamentals, per se, of any of the companies that we're looking at for inclusion in the portfolio; they are simply looking at the data and the, you know, the different streams of data, and tasked with understanding how Phillip and I would like to manipulate, or use, that data to hopefully come up with better investment conclusions.

Q. Going back to Ms. Chan's hiring. Now, when she was hired at Wellington, she was hired to be in Hong Kong; is that right?

MR. PATERNITI: Objection.

THE WITNESS: That was my understanding. Sorry, go ahead.

MR. PATERNITI: No, we're good.

BY MR. HANNON:

Q. Was there any discussion that you were involved with concerning whether she should be in Hong Kong versus elsewhere, such as London or Singapore or someplace else?

A. Not to my recollection, no.

Q. Did you have any role in deciding that she would -- she'd be located in Hong Kong?

A. Not at all, to my recollection, no.

Q. Now, you're aware that prior to joining Wellington, that Ms. Chan had worked as a portfolio manager; is that right?

MR. PATERNITI: Objection. Go ahead.

THE WITNESS: Oh, sorry. That was my understanding, yes.

BY MR. HANNON:

Q. And when Ms. Chan was assigned to your team, did you have any understanding as to whether or not Ms. Chan would also, at some point, be taking on the responsibilities of a portfolio manager?

A. I had no -- sorry. Could you repeat the question just so I answer it accurately?

Q. Sure thing. When Ms. Chan joined your team, did you have any understanding or expectation as to whether or not she would, at some point, also be taking on the responsibilities of a portfolio manager?

A. No.

Q. So with you being located in London, and Ms. Chan being located in Hong Kong, what was the sort of process by which you would either seek or obtain Ms. Chan's work in connection with your fund?

A. So the way it typically is done is through traditional

means of email, phone conversations, in-person meetings when either -- well, when both of us would be at the same location. We would also, you know, on occasion do investment travel together. So we would try and, you know, obviously communicate as much as possible through whatever means is effective.

Q. Did you have any kind of cadence in terms of how frequently you would sort of check in with Ms. Chan?

MR. PATERNITI: Objection. Go ahead.

THE WITNESS: There was no -- well, we would have had a scheduled regular team meeting, which I guess constitutes regular cadence, but the lion's share of the interaction would be more ad hoc in nature.

BY MR. HANNON:

Q. When you say "a team meeting," would that be your team, meaning yourself, Mr. Fan, and Ms. Chan?

A. Correct.

Q. And how frequently did you conduct team meetings during the course of Ms. Chan's employment at Wellington?

A. That's a good question. It would have depended. During the course of her employment, it would have depended whether we were at the same location or not.

So, as you're aware, we started out in different

locations. We ended up in the same location. So the scheduled team meetings would have been probably at least once a week, and there would have been probably times there would have been more. But the -- I guess it's important to point out that they -- these meetings didn't always take place as planned, and were dependent on any individual schedule at that particular time.

Q. Okay. And how long would these team meetings typically last?

A. I would say, on average, probably an hour.

Q. What would have been the purpose of these team meetings?

A. Pretty much exclusively to discuss investment.

Q. Anything else?

A. No other purpose, no.

Q. Did I understand your answer correctly that when you moved to Hong Kong, that the team meetings became more frequent with Ms. Chan?

A. No, not necessarily more frequent, as far as any scheduled team meeting. They would have been easier to conduct, obviously, is what I was trying to get at.

Q. Okay. And I think earlier you referenced investment travel as being a situation which you would communicate with Ms. Chan concerning investment opportunities; is



was something to advance or not?
A. I would have hoped so, yes.
Q. Did you ever tell her that?
A. I don't recall exactly, but I would have definitely said it at some point along the way, but I don't recall exactly when I would have told her.
Also, if I could add, just to be clear, the role of team leader is different than the role of her manager.
Q. What do you mean by that?
A. The -- she technically reports to a manager of investors who would typically communicate expectations.
Q. Okay. Did you not communicate expectations to Ms. Chan?
A. I did. I'm just saying that the more formal process was through the manager, but, of course, I also communicate expectation.
Q. And if you were dissatisfied with Ms. Chan's performance, would it be fair to say that you would have expressed that to her?
A. I would have typically, yes. But, once again, I stayed true to the way that Wellington Hong Kong is organized in the sense that I know that the feedback is generally supposed to run through her manager. So I would have typically focused most of the onus on communication

through her manager as opposed to her directly, because that's the way that we're organized.
Q. So you would express any dissatisfaction to Ms. Chan's manager?
A. Typically, yes.
Q. Okay. When you were in London, who was Ms. Chan's manager?
A. If I recall correctly, it would have probably been Tom Baxter.
Q. And what was your reporting relationship to Mr. Baxter?
A. He was a manager within GEPM. So, I did not report to him because I was located at WIML and he was located at Wellington Management Hong Kong, so I did not report to Tom Baxter when I was in London.
Q. Did you, at any point in time, express to -- let me ask a different question first.
During the course of Ms. Chan's employment at Wellington, were you satisfied with the contribution she provided to your team?
A. I'm sorry, could you repeat the question?
Q. Sure. During the time that Ms. Chan was on your team, were you satisfied with her work performance?
A. It changed over time. There were times when I was satisfied and times where I was dissatisfied.

Q. And I recognize this may be difficult, but could you identify for me what it was that you were satisfied with her performance?
A. I would say generally, early on, in the early days, and it deteriorated over time.
Q. How did it deteriorate?
A. It deteriorated through quality and quantity of contribution to the team, and the effort.
Q. Anything else?
A. That's just general, but for the most part, that's what we're looking for. We're looking for -- we're looking for how any one individual helps generate great client outcomes.
Q. But besides the quality and quantity of her contribution, was there anything else that you observed that led you to feel as though her performance was deteriorating?
A. Specific to my team? That was generally.
Q. Was there anything else?
A. There might have been, but I don't recall at this time.
Q. Okay. How did the quality of Ms. Chan's contributions change?
A. The quality changed -- and, once again, this is general. The quality changes kind of hand in hand with the frequency. So, if an individual is communicating with

the team less frequently, then the quality generally slides in the sense that you need to be on top of things in the sense that some situations require more frequent communication or more frequent observation. So, when the frequency or the quantity goes down, it typically goes hand in hand with the quality.
Q. So you're saying that there's a correlation between quality of contribution and frequency?
A. There can be, yes.
Q. Okay. Besides -- and do I understand you correctly that you're saying that the frequency of Ms. Chan's contributions to your team, it was reduced over time?
A. That was my perception, yes.
Q. Okay. Besides that reduction in frequency, was there anything else you observed in terms of a reduction in the quality of her contribution to your team?
A. I don't specifically recall anything now, but I may come up with something along the -- later. But, right now, you know -- and, once again, to be clear, I was talking in general terms.
Q. Sure. Okay. And when you say that the frequency went down, do you have a sense of what that reduction was?
A. You're asking me to quantify it?
Q. Do you have any way of quantifying it?



THE WITNESS: I, at one point, I recall -- so, my recollection is that most investment conversations that I would have with her, I would have to initiate myself, which was not normally the course of how things like that function. And the -- there was a period of time where it was becoming very obvious that she was not engaging, and I decided to wait and see how long it would be before she engaged with us as a team on investment dialogue. And I don't recall exactly when that was, but it was -- let's put it this way: It was obvious enough, to me, that the disengagement was taking place, that I took it upon myself to try and see just how long it would be before she engaged the team.

BY MR. HANNON:

Q. When you say "when she engaged the team," you mean she initiated contact with you or Mr. Fan?

A. Correct.

Q. And why did you decide to take that experiment?

A. Just to try and quantify, in my own mind, what Gigi's priorities were and how she felt about what she should be doing to contribute to the team.

Q. Why not just ask her?



A. Because I had asked her, I presume, in the past. And I also believed that, once again, the onus is on the analyst to proactively contribute. And I think most analysts would understand that.

Q. Did I hear you correctly that you presumed that you had asked Ms. Chan on a prior occasion about what her view was in terms of her priorities?

A. You're asking me whether I said that? I said that whether or not -- that I don't recall any specific discussions, but I guess what I'm trying to say is that I would have -- as we had in the previous conversation we had a while back, you know, we would have said that expectations set both by her manager, as well as, you know, a general understanding through various conversations on the team level. Once again, I respect that kind of delineation, so my expectations -- and maybe it's wrong to assume she knew my expectations, but I don't -- if you're asking specifically, I don't remember any specific conversations with her laying out exactly what the expectations were.

Q. Did you ever tell her that you wanted her to initiate contact with you?

A. Well, once again, it's generally assumed to be part of the job, first of all. But, to answer your question



specifically, I don't recall any specific conversation, but it would -- but I would be surprised if I hadn't at one point conveyed either that specifically, or something along those lines.

Q. But can you tell us when you did that?

A. No. I can't recall exactly when I would have done that, or whether I've done it once or multiple times.

Q. Can you tell us what Ms. Chan's reaction was when you conveyed that to her?

A. I don't remember the specific conversation.

Q. Am I right that you believe that the onus was on the analyst to initiate contact with you to discuss their investment ideas; is that right?

A. No. I think I said mostly the onus, or a part of the onus is on the analyst. There's no doubt that there is onus on the -- on every team member to initiate investment dialogue.

Q. Did you ever ask Ms. Chan why she was not initiating contact with you?

MR. PATERNITI: Objection. Asked and answered. Go ahead.

THE WITNESS: So, I don't recall a specific conversation of that nature, no.

BY MR. HANNON:



Q. Do you recall generally having that conversation with her?

A. Not that specific conversation. So -- I don't understand your question, necessarily. What does that mean?

Q. Well, you said you don't recall a specific conversation. I'm asking you more generally. Do you recall generally that you had a conversation with Ms. Chan in which you asked her why she was not initiating communication with you?

MR. PATERNITI: Again, object, and say go ahead and answer if you can.

THE WITNESS: And are you asking about a specific time frame, or just in general over any time in her career at Wellington?

MR. HANNON: At any point in time during her career at Wellington.

THE WITNESS: So, generally, I do not remember -- I don't know. It's hard to answer your question because -- so, I don't remember anything specific to saying to her, why don't you contribute more? Because, once again, I go back to the kind of chain of command and how that should be communicated to her.

BY MR. HANNON:

Q. Okay. Let's talk about that chain of command. When was that chain of command described to you?
A. Probably very soon after I was hired, or even before.
Q. And what were you specifically told about that chain of command?
A. That team analysts do not report to portfolio managers.
Q. Okay.
A. That when you have an analyst on your team, they report to the manager responsible for that particular analyst, and -- yeah.
Q. Anything else?
A. No.
Q. Were you told that it would be inappropriate for a portfolio manager to offer constructive criticism of the analyst's performance?
MR. PATERNITI: Objection.
THE WITNESS: I don't believe I was ever told that, no.
BY MR. HANNON:
Q. Did you believe that to be true?
MR. PATERNITI: Objection. Go ahead.
THE WITNESS: I believe -- yeah, I believe in respecting the organizational structure, and I understood how the feedback process worked.

BY MR. HANNON:
Q. Okay. So, just to understand what you mean by that, do you mean that you understood that it was inappropriate for you to provide constructive feedback to analysts on your team?
MR. PATERNITI: Objection. Go ahead.
THE WITNESS: I think inappropriate -- I wouldn't agree with "inappropriate." I think that it's -- it is better for it to function in the way that it was intended to function.
BY MR. HANNON:
Q. Why?
A. Because I believe in -- well, because if a process is put in place by the management of the organization, there has to be good reason that it's put in place. And if you -- if you deviate too much from that process, it undermines the trust in the organization, so I believe that it's important to stick to the way that it is organized.
Q. And your understanding of the organization was that it was not your role to provide constructive feedback to analysts on your team?
MR. PATERNITI: Objection. Go ahead.
THE WITNESS: I wouldn't say that. I would say -- I wouldn't say that, no.

BY MR. HANNON:
Q. Okay. Was it part of your role to provide constructive feedback to analysts on your team?
A. It is my role to provide constructive feedback through various channels. The primary channel is the way that we described through the Wellington organization. But in the process of trying to manage an effective team, there needs to be -- there needs to be some sort of kind of cohesion, and part of that cohesion is accomplished through dialogue and expectations, and so I think that there's room for both. But the primary means by which formal feedback is given is through the way that I described.
Q. A moment ago we were talking about in-person meetings with Ms. Chan after you moved to Hong Kong. Were there any instances when you were in Hong Kong and Ms. Chan was still employed at Wellington that Ms. Chan refused to meet with you to discuss investment matters?
A. What do you mean by "refused"?
Q. Well, in terms of you reached out to her asking to have a chat and she either -- and she declined?
A. I don't remember specific instances, but I'm sure that we had meetings kind of postponed and canceled over time, but I don't -- I don't remember any specific examples of

that, no.
Q. Did you recall that being a problem that you had with Ms. Chan, that she would improperly postpone or cancel meetings?
A. I don't remember it as being a specific problem that I had highlighted, no.
Q. When you say "had highlighted," you mean that you had noticed?
A. Noticed, and another -- yeah, had noticed and, once again, whether I would have -- whether I would have indicated that in my feedback to her manager.
Q. How frequently did you provide feedback to Ms. Chan's manager?
A. It would have been, at minimum, once a year, but probably more frequently on -- so, let's put it this way: Minimally, once a year, in a formal manner; more frequently on an informal manner.
Q. With respect to the informal feedback, was there any kind of particular cadence to that in terms of, you know, making an effort to connect once a month, or once a week, or anything like that?
A. No, I think that that would constitute more formal, so it was more opportunistic than that.
Q. And, so, did you, at some point, communicate to



Ms. Chan's manager that you believed that the quality and/or quantity of her contribution to your team was deteriorating?

MR. PATERNITI: Objection. Asked and answered. I'm sorry. I'm sorry, can you read the question back? I may not have heard it properly.

(Court reporter read back question.)

MR. PATERNITI: Withdraw my objection.

THE WITNESS: I don't recall specific feedback that I gave, but I would have -- yes, I would have communicated that to her manager at some point.

BY MR. HANNON:

Q. And did you recall when the first time that was?

A. No.

Q. Okay. And I think you indicated earlier that, at least initially, you were happy with Ms. Chan's contribution to your team; is that fair to say?

A. In the beginning, yes.

Q. Can you give us any estimate in terms of when that assessment began to change?

A. I couldn't pinpoint a specific time, but as is with these things all the time, or most of the time, I presume, it's not an overnight occurrence. It's just a general slide.

Q. Do you have any estimate as to when you first conveyed to Ms. Chan's manager that you had some issue with her work performance?

A. I don't recall specifically, no.

Q. Can you tell me if it was within the first year of her employment?

A. You know, I wouldn't know specifically. Sorry. I don't know exactly when it was, so I can't pin it down.

Q. Are you aware that at some point in time, Ms. Chan was involved in a philosophy and process panel?

A. I was made aware of it, yes.

Q. And if it's okay, I'm just going to refer to that as the P&P panel because I have a bad habit of switching the words "philosophy" and "process" back and forth, so --

A. That's all right. I do the same. Yeah. Do you mind if I -- I'm just going to grab my water real quick.

Q. Sure thing.

MR. PATERNITI: Do you want -- this P&P panel might be -- take a while, Patrick. Would it make sense to stop here for five minutes?

MR. HANNON: Yeah, sure. Now's perfectly fine.

MR. PATERNITI: Okay. Thanks so much.

(Recess taken.)

BY MR. HANNON:

Q. So, Mr. Mattiko, before the break, we were starting to talk about the P&P panel. How did you come to learn that Ms. Chan either was going to be or had been presenting to a P&P panel?

A. I don't recall exactly when I learned that. To the best of my recollection, it was after she had already done it, but it could have been before. I don't recall exactly.

Q. Okay. And whenever it was, do you recall anything that you learned at that time, besides the fact that she had presented to a panel?

A. Sorry, I don't understand the question.

Q. Let me ask it a bit differently.

At some point in time, did you learn how the P&P panel had gone?

MR. PATERNITI: Objection. Go ahead.

THE WITNESS: Yes.

BY MR. HANNON:

Q. Okay. And who did you learn that from, at least in the first instance?

A. To the best of my recollection, it was from Ms. Chan herself.

Q. And what do you recall hearing from Ms. Chan?

A. I recall that she was -- I guess you could classify it as

upset with how it had gone for her.

Q. Do you recall anything else about what she communicated to you concerning the P&P panel?

A. Sorry, but I don't understand the question again.

Q. Well, you indicated that you recall Ms. Chan indicating to you that she was upset with how it had gone for her. Did I hear that right?

A. Yes.

Q. Besides that, did she convey to you anything else about her experience at the P&P panel?

A. If I recall correctly, she did get into some specifics about why it upset her.

Q. And we'll talk about those specifics in a moment, but besides those specifics, is there anything else you could recall about what she told you about her experience at the P&P panel?

A. Not to my recollection, no.

Q. Okay. What was the context in which your communication with Ms. Chan about this subject took place?

A. I don't remember exactly. It would have either been just a routine one-on-one conversation I was having with her, or she -- I don't remember who reached out to who, and I don't remember exactly what the context was, but it was a one-on-one conversation of some nature.



BY MR. HANNON:
Q. Your pitching your strategy to Wellington clients.
A. Oh, for sure, yes. They would have definitely wanted to get to know me and what I was going to say before they put me in front of the clients, yes.
Q. Did you go through dry runs?
A. I don't remember specific instances, but I'd be surprised if I didn't.
Q. Did you receive any feedback concerning your presentation skills?
A. I think, insofar as if I did do these dry runs, that I would be very surprised if I didn't receive feedback.
Q. But you don't actually recall one way or the other?
A. Oh, I -- well, let's put it this way: I can pretty much assure you I received feedback. Do I remember specifically what that feedback was? No.
MR. HANNON: Steve, I'm about to launch into a new subject. Do you want to take five?
MR. PATERNITI: Sure.
MR. HANNON: Okay.
(Recess taken.)
BY MR. HANNON:
Q. How did you find out that Ms. Chan's employment was going to be terminated?

A. That's a good question. I don't remember specifically. I do remember being in a meeting with Charles Argyle and Henry Phillip in which we discussed this subject. When, specifically, I was informed that a decision had been made, I don't recall the how or when.
Q. The meeting you referenced with Mr. Argyle and Mr. Phillip, am I right that took place in Boston?
A. To the best of my recollection, yes.
Q. Was that in Mr. Argyle's office?
A. I believe it was in a meeting room, if I remember correctly.
Q. How long did the meeting last?
A. I don't remember specifically. Don't remember specifically, but if I had to estimate, it was anywhere between 30 and 60 minutes.
Q. Did you take any notes at that meeting?
A. Not that I remember, no.
Q. Did you observe anyone else taking notes?
A. Not that I remember, no.
Q. Besides yourself, Mr. Argyle, and Mr. Phillip, was anyone else present during the course of that meeting?
A. Not that I remember, no.
Q. Was anyone conferenced in via phone, or video, or anything like that, during the course of that meeting?

A. I do not believe so.
Q. Okay. Prior to that meeting, had you, yourself, formed an opinion as to whether or not Ms. Chan's employment should be terminated?
A. I was forming an opinion, yes.
Q. Okay. And what was your opinion prior to that meeting?
A. My opinion was, prior to that meeting, that it would be best for Gigi and best for Wellington if she no longer was working for Wellington Management Hong Kong.
Q. And did you express that opinion during this meeting with Mr. Argyle and Mr. Phillip?
A. I don't recall specifically, but I would -- it would probably be pretty safe to assume, yes, that I did express that opinion.
Q. And when you say that you believed it was best for Wellington that Ms. Chan no longer worked for Wellington Hong Kong, why did you believe that?
A. There's a number of reasons. You know, it's never one specific reason. The -- you know, if we had to create -- not create, but, you know, have a -- you know, a general view that is composable out of different elements, it would be that it just was not the right fit. And by "not the right fit," I mean that Gigi's expectations and her performance was not kind of up to what Wellington had

expected.
Q. Any other reasons why you thought it was best for Wellington for Ms. Chan's employment to terminate?
A. Not outside of that kind of general view, no.
Q. What led you to believe that Ms. Chan's performance was not up to expectations?
A. Well, there's a number of -- there's a number of reasons. And we can get into detail but I don't know how specific you want to get. But, from my perspective, there's, you know, my view as a team leader, and my view as a partner or employee of, you know, of the firm. So, my view as a team leader, I -- although I held in regard her ability to analyze securities, her means by which she chose to deploy those abilities was -- didn't meet the high standard that Wellington has because it's not -- I've always been told it's not good enough to be -- again, I've been told this from day one. It's not good enough to be a sufficient investor. Your expectations go well beyond that, and I believe that. And, so, in that area, it was deficient enough to warrant it.
The other aspect of that is the willingness to try to correct a problem. And, if the willingness to correct a problem is not there, then -- or is not evident, then it's only going to probably get worse.



Page 94

Q. Okay.
A. I don't know if that answers your question.
Q. Well, was there anything else that made you conclude that Ms. Chan's performance was not up to -- well, was such that you supported the termination of her employment?
A. Sorry, are you asking me about specific examples of how she was not performing?
Q. No. Let me just sort of back up a little bit and give you a running start.
So, I think you indicated that one issue concerning her performance that you thought warranted termination was that she did not have a willingness to try to correct things; is that fair to say?
A. That's fair to say, yes.
Q. Okay. And then, I think, with respect to performance, you said something about that the means by which she chose to deploy her abilities was not sufficient for Wellington; is that right?
A. Yeah. From my team or Wellington, yes. That's my opinion, yes.
Q. What do you mean by that, the means by which she chose to deploy her abilities?
A. Well, that has a lot to do with collaboration, collegiality. And, once again, you know, you can be a

Page 95

good investor, or even an adequate investor, and not contribute to the broader investment effort at the organization. So, it's my view that you -- if you're doing work and you're creating your own investment content, that your interaction with other Wellington investors not only makes you a better investor, it helps other investors form important views about securities that may impact other client accounts. So, it's part of the understanding that you -- you know, you're part of a larger effort. And over time, it was my observation and opinion that Gigi was not very interested in that aspect of the job.
Q. When you say "that aspect of the job," you mean collaborating with other investment professionals?
A. For the most part, amongst other things, yes.
Q. What are the other things?
A. Well, I mean, just in general, more of kind of a -- kind of a collegiality, and kind of that, in my mind -- and once again, this is all my opinion. In my mind, displaying the desire to be a part of the larger team.
Q. So, just going back to the performance issues that led you to believe that it was best for Wellington if Ms. Chan's employment was terminated, just so we have an exhaustive sort of list here.

Page 96

I understand one is that you viewed her as not having a willingness to try to connect -- try to correct problems; is that right?
MR. PATERNITI: Objection. Asked and answered. Go ahead.
THE WITNESS: I mean, willingness to try to correct. Is that related specifically to performance? Yes, I would say, yeah. I would agree, yes.
BY MR. HANNON:
Q. Okay. And then with respect to performance issues, you also identified Ms. Chan as not having an interest in being part of the larger team. I heard that right?
MR. PATERNITI: Objection. Go ahead.
THE WITNESS: I think it was -- yeah, I think I was more elaborate than that, or elaborated further than that. I mean, that is one element to that specific thread.
BY MR. HANNON:
Q. Okay. So that's one thread, right?
MR. PATERNITI: Objection.
THE WITNESS: Can you repeat the specific again?
BY MR. HANNON:

Page 97

Q. Sure, that Ms. Chan was -- did not display an interest in being part of a larger team at Wellington?
MR. PATERNITI: Objection.
THE WITNESS: Yeah, I think I said more that, yeah, that she was -- yeah, she didn't appear to, you know, want to contribute sufficiently to the larger team.
BY MR. HANNON:
Q. Okay. And then was there anything else about Ms. Chan's performance that led you to conclude that it would be best for Wellington if her employment was terminated?
A. Yeah. Once again, performance. I realize this is a "yes" or "no" question, so I would say yes, in general, the way that someone -- yeah. It's just general attitude, I guess, would be the -- would be the larger kind of -- and it's attitude towards, once again, the firm, attitude towards other colleagues, attitude towards, you know, perceived responsibilities.
So, I would say that, in an organization that is people-driven, attitude matters because it sets the tone in the workplace.
Q. Okay. So, in terms of categories of performance issues that led you to believe it would be best for Ms. Chan's employment at Wellington to come to an end, we have



willingness to try to correct things. We have the thread about displaying an interest in being part of a larger team. We have attitude. Any other categories of performance issues that led you to form that opinion?
A. Nothing specific at the moment. If I recall anything else, I'll let you know.
Q. In terms of your conclusion that Ms. Chan did not have a willingness to try to correct things, what led you to believe that?
MR. PATERNITI: Objection. Asked and answered. Go ahead.
THE WITNESS: I think if you go back to our kind of previous conversation about my perception of her willingness to react to feedback, I think that that answers a lot of the question there, that there was that pattern. As it specifically pertained to the latter part of her career, it was my understanding that, you know, that she -- that the firm highlighted the -- some of the ways in which they needed her to change. And, in one of my last conversations with her after that, it became obvious to me that she had little intention of making any of the changes that Wellington was interested in having her make.

BY MR. HANNON:
Q. What are the changes you're referring to?
A. I believe they were outlined in the memo that was sent to her.
Q. Okay. Do you recall what any of those changes were?
A. I recall that specifically, you know, there was the kind of client, firm, self-orientation, and you may or may not know, but that is a -- that is kind of a -- I guess a compass by which all Wellington employees are asked to orient themselves. In other words, prioritize the client first, the firm second, and self third. And I think that one of the observations was that she was not necessarily acting in a way that, you know, was true to that order, or true to that, so that was one of them.
In particular, the -- if I recall correctly, another issue which could have been somewhat related would have been her general contribution to the Emerging Markets Opportunities team, and that that was, as we described, over time, deteriorating. So, I think that that was -- that the acknowledgment and understanding that, you know, her -- the reason or her primary job was to be an analyst on the Emerging Markets Opportunities team, and that she was acting in a manner that was not consistent with that desire. Those -- if I remember correctly, and this is in

my mind, those were kind of the main concerns.
If I remember correctly, though, it was quite a detailed description of what was -- what we wanted her to acknowledge and digest, so I don't remember anything specifically beyond those kind of two main categories at this time.
Q. When Ms. Chan was on maternity leave, did you have any communication with her during that time?
A. Yeah, I offered to take her to lunch at one point.
Q. Besides that, any other communication you had with her while she was on leave?
A. I imagine -- because I know that she was still managing the China Growth Fund while on leave, so I would imagine there would have been some -- potentially some investment communication, but I don't remember anything specific.
Q. Did you have any expectation that Ms. Chan should be contributing to the EMO team while she was on maternity leave?
A. I never really thought about it.
Q. Okay. Did she contribute at all to the EMO team while she was on leave?
A. I can't remember specifically, no, because -- well, let's put it this way, to be more specific. I don't remember -- I can't put any kind of -- at this point,

sitting here, put any kind of contribution on a timeline that would be specific enough to know whether it was within maternity leave or not.
Q. Okay. All right. But, fair to say that you did not expect her to be contributing to the EMO team while on her leave to the same extent you expected contribution prior to her having her child; fair to say?
A. Once again, I don't recall me specifically having that thought. So, in retrospect, you know, was I more relaxed about -- you know, I mean, I would say, yeah, it's probably fair to say that I wanted to give her some breathing space, so I did not expect the level of contribution during maternity leave to be as much as it would have been otherwise.
Q. And when she came back, did you expect her to be immediately up and running at 100 percent up to speed, or did you expect it would take some time for her to get assimilated back in?
A. I'm not sure I understand what you mean by "up to speed." What does that mean?
Q. Well, in terms of, you know, getting back into a working rhythm, getting back into the markets, getting back into looking at opportunities and contributing in the same level you would have expected before she had her child.



A. So, it was my understanding that she was actively managing a strategy while she was in maternity leave, so she would have not missed much in the way of markets. So I wouldn't have managed -- imagined too much slippage in that context. The rhythm of coming into the office, of course, you know, because now she's a mother, right? She has additional responsibilities that she didn't have before. So, of course, I would expect that the experience would be different after she came back from a kind of a -- either just from a -- different in the sense that it -- an adjustment period would have to happen, yeah.
Q. And did you have any understanding as to how long that adjustment period might be?
A. I have no understanding. I mean, it's probably -- my understanding is that it would be different with every situation with every other individual. It depends.
Q. And when Ms. Chan did return from maternity, did you see any difference between the way she'd been contributing prior to her leave versus when she got back?
A. Let's put it this way: I didn't -- I certainly didn't see any increase, and I then still, when she came back, was of the view that it was not -- it did not meet expectations so it did not improve. Did it get worse?

Hard to say at this point. Don't know specifically.
Q. Why can't you say if it got worse?
A. Because I -- you know, I don't remember. I mean, these are questions about views I would have had several years ago in very specific time frames that I just don't -- I don't remember exactly where my mind was before she went on maternity leave as opposed to when she came back.
Q. When she came back from maternity, did you have any conversation with her then about your expectations in terms of how you wanted her to contribute to the EMO team?
A. I do not recall any specific conversations. But, once again, I'll remind you that I believe in the way that Wellington is structured insofar as that the primary feedback should be coming from her manager.
Q. Okay. But you and Ms. Chan, as of that time, I mean, you had a personal relationship, right?
A. I'm not sure what that means.
Q. Well, I mean, you had worked together for a period of years, right?
A. We did, yes. And I'm sure it's safe to say that we kind of got to, you know, understand each other better over the years, yeah.
Q. And --

A. But I'm not -- but in no way did we have a complete understanding of each other.
Q. Okay. And when Ms. Chan came back from maternity leave, if you were dissatisfied with her level of contribution, you had the kind of relationship with her where you could have been frank about that, couldn't you?
MR. PATERNITI: Objection. Go ahead.
THE WITNESS: I think if I wanted to, yeah.
BY MR. HANNON:
Q. Were you?
A. I don't recall any specific instances. And I don't know in what time frame you're referring to.
Q. The time frame is when she came back from maternity leave.
A. Immediately?
Q. Let's say between the time she came back and the time you had that meeting with Mr. Argyle and Mr. Phillip about terminating her employment. During that period of time, were you frank with Ms. Chan about your desire to have her increase her contribution to the EMO team?
A. Well, I don't remember a specific meeting in that sense. But I'll, once again, go back to emphasizing that I believe in the way that the feedback needs to be delivered the way that Wellington has chosen to do it. I

believe that that's the right way, so I am -- I don't want to -- I don't want to undermine that process by stepping out of my role, so I also feel that the onus is on the individual to be able to understand what the right thing is.
Q. So the answer to my question is no, you did not provide her that feedback?
A. I don't remember.
MR. PATERNITI: Objection.
THE WITNESS: Specifically -- I don't remember specifically providing her that feedback, except for that discussion that we had post her -- the discussion we had at some point where we talked about her reaction to the meeting and the memo that she was given, and at that point I would have definitely conveyed -- well, the meeting itself was an acknowledgment of my view that, you know, she needed to contribute more.
BY MR. HANNON:
Q. What meeting are you referring to?
A. So, it's the meeting which -- in which I attempted to understand from her how she felt about not only working at Wellington, but also how she felt about the explicit desires of Wellington for her to acknowledge or perhaps

change the way that she went about doing what she did.
Q. And it's your recollection that during that conversation you expressed to her your dissatisfaction with her contribution to the EMO team?
A. It's my testimony that I don't recall every word of that conversation, but most certainly it was implied in the conversation.
Q. Was it stated?
A. I don't remember exactly, but I know that it was stated in that particular memo, and, by connection, it therefore is implied.
Q. Did you ever consider suggesting to Ms. Chan ways in which she could improve her contribution to the EMO team?
A. Once again, I don't know which time frame you're referring to, but I'll answer that I don't recall any specific conversations with that specific content. But, once again, over the time that she was employed at Wellington, I'm reasonably sure that that message, or something along those lines, was conveyed.
Q. And what were the suggestions you conveyed?
A. I don't remember anything specific. If I don't remember specific conversations, I don't remember specifically what suggestions I would have conveyed.

Q. With respect to Ms. Chan's performance, you also mentioned her attitude as being an issue. What about Ms. Chan's attitude led you to believe that it'd be best for Wellington if her employment was terminated?
A. So, this is -- when we get into this, this is my opinion and just my view, but it was my view or my observation that over time, her level of trust was eroded to a point where she -- it would be very difficult for her to have the level of trusting interaction with her colleagues that would be conducive to moving our effort forward.
So, I think that her distrustful attitude got in her way, got in the way of her effectiveness in a big way. I think the attitude that we talked about as it pertains to the kind of deep-seated belief that Wellington investors did not adequately respect her previous investment experience, that that was getting in the way of her ability to perform her job.
And, yeah, that's -- and, you know, the -- I guess the third element of that would be -- and a lot of these are interrelated -- was, you know, my view that her orientation on that scale of client, firm, self was not what Fidelity -- back in my old years -- not what Wellington was looking for.
Q. We were talking about Ms. Chan's performance. You used

the term "collegiality." Did you ever have any dissatisfaction with the way that Ms. Chan interacted with you in terms of her collegiality towards you?
A. Not that I specifically remember with regards to me.
Q. And how about Mr. Fan? Did you ever observe anything about her interactions with Mr. Fan that you thought were not collegial?
A. I never witnessed anything specific that I could point to at this point with regards to Mr. Fan.
Q. Okay. How about with regards to any other individuals at Wellington?
A. So, yes. Definitely. Definitely. Now you're going to ask me specifics, or I'll let you ask me specifics.
Q. Okay. And who?
A. I witnessed -- so, I can't remember any specific instances that I'd like to kind of highlight right now, but it was just more kind of general feedback that I had heard over time with regards to just how she interacted with other individuals at the firm, investors, noninvestors included.
Q. And who did you hear this feedback from?
A. Like I said, I can't remember specifically who I heard it from.
Q. So just to be clear, you can't -- you can't tell us a

single person that you saw Ms. Chan interact with in a fashion that you viewed as not being collegial?
MR. PATERNITI: Objection. Go ahead.
THE WITNESS: I'm not willing to -- I don't know. I'm not strong enough in my conviction about specific names to name any specific names, no.
BY MR. HANNON:
Q. Okay. And you also can't name anyone who told you that they had perceived Ms. Chan as acting in a manner that was not collegial, correct?
A. Not at this time, but I may -- you know, first time I'm hearing these questions, so I may come up with some names at a later time. But, on the spot right now, no.
Q. Did you enjoy working with Ms. Chan?
A. I enjoyed working with Ms. Chan for the most part, yes.
Q. Were there any parts which you did not enjoy working with Ms. Chan?
A. So, as we discussed, when you reach the point of needing to change the situation, and with regards to Gigi, to remove her, that -- the lead-up to that is not enjoyable. And the -- so I did not enjoy the latter part of her career -- let's put it this way: I did not enjoy certain aspects of the latter part of her career at Wellington.
Q. And what were the aspects of the latter part of her



C E R T I F I C A T E

I, Sharon G. Saalfield, a Licensed Shorthand Reporter for the State of New Hampshire, Certified Shorthand Reporter for the Commonwealth of Massachusetts, Registered Diplomate Reporter and Certified Realtime Reporter, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes of the proceeding taken at the place and on the date hereinbefore set forth to the best of my skill and ability under the conditions present at the time.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this proceeding was taken, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

Sharon G. Saalfield,
NH Lic. No. 147, CSR, RDR, CRR