# EXHIBIT J

```
                                              Volume:  2
                                              Pages: 118-242
                                              Exhibits: None
```

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
GIGI KAI ZI CHAN,                 )
            Plaintiff,            )
v.                                )  DOCKET NO.: 19-cv-11605
WELLINGTON MANAGEMENT             )
COMPANY, LLP, and CHARLES         )
ARGYLE,                           )
            Defendants            )
_____   )
```

VIDEOCONFERENCE DEPOSITION OF GREG MATTIKO

THIS DEPOSITION TAKEN REMOTELY VIA ZOOM, ON THURSDAY, OCTOBER 22, 2020, COMMENCING AT 6:07 P.M.

REPORTED BY:  Sharon G. Saalfield, LCR No. 147, MA CSR, RDR, CRR



Page 119

## APPEARANCES

For the Plaintiff (via Zoom):
HARTLEY MICHON ROBB, LLP
By: Patrick J. Hannon, Esq.
155 Seaport Boulevard, 2nd Floor
Boston, Massachusetts 02210
(617) 447-2819
phannon@hartleymichonrobb.com

For the Defendants (via Zoom):
JACKSON LEWIS, P.C.
By: Stephen T. Paterniti, Esq.
Sarah Walsh, Esq.
75 Park Plaza, Fourth Floor
Boston, Massachusetts 02116
(617) 367-0025
stephen.paterniti@jacksonlewis.com
sarah.walsh@jacksonlewis.com

Also present:
Sara Martin, Wellington Management Company

Page 120

## STIPULATIONS

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed may be used for all purposes for which depositions are competent under federal law.

Notice, filing, caption and all other formalities are waived. All objections, except as to form, are reserved and may be taken in court at time of trial.

It is further agreed that if the deposition is not signed within thirty (30) days after submission to counsel, the signature of the deponent is waived.

Page 121

### INDEX

| WITNESS | PAGE |
|---|---|
| Greg Mattiko | |
| By Mr. Hannon | 123 |
| By Mr. Paterniti | 219 |
| By Mr. Hannon | 242 |

### EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | 5/02/17 email | 131 |
| 2 | 7/28/15 email thread | 137 |
| 3 | 6/01/17 email | 141 |
| 4 | 12/02/15 email | 145 |
| 5 | 10/31/16 email thread | 148 |
| 6 | 5/02/17 email | 161 |
| 7 | 5/31/17 email | 165 |
| 8 | 10/16/15 email | 172 |
| 9 | 10/13/15 email | 184 |
| 10 | 11/02/15 email thread | 185 |
| 11 | 10/24/15 email thread | 190 |
| 12 | 8/01/16 email thread | 194 |
| 13 | 11/27/15 email thread | 200 |
| 14 | 10/01/15 email thread | 207 |
| 15 | 11/08/16 email | 210 |

Page 122

### EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 16 | 4/06/14 email | 213 |
| 17 | 9/23/14 email thread | 214 |
| 18 | 9/01/16 email thread | 225 |
| 19 | 1/08/16 email thread | 226 |

Errata Sheet: 240



```
                                                 Page 191
 1         THE WITNESS:  October 25th.  Okay.  Okay.
 2      BY MR. HANNON:
 3   Q.  So, I want to look at the second email on this page.
 4      This is Mr. Argyle to you on October 25th, 2016.  And you
 5      see there in the bolded text in the middle of his
 6      message, he writes, "The current estimate for your March
 7      incentives pool is ▇▇▇▇▇▇▇ compared to ▇▇▇▇
 8      ▇▇▇▇ in September.  You allocated these as follows:
 9      Mattiko 70%; Fan 18%; Chan 11%; and Rice 1%."
10         Do you see that?
11   A.  I see that.
12   Q.  Okay.  So am I right that time between November of 2015
13      and October 25th of 2016, you had indeed increased
14      Ms. Chan's allocation of the incentive pool from 10
15      percent to 11 percent?
16   A.  It would appear that would be the case, yes.  I'm not
17      sure, though, that there were any other -- so let's go
18      through the dates again.  So, when the previous email was
19      referring to the June decision, which would have been the
20      September payment of 2016; is that correct?  The previous
21      email?
22   Q.  Let me see if I can share it.  I'm now showing you the
23      previous email which is Ms. Murphy's November 2nd, 2015,
24      email.
```

```
                                                 Page 192
 1   A.  2015.  So, that would have been -- so, there would have
 2      been a -- let's go to -- so, let's do it this way.  So,
 3      there would have been a payment in September of '15, and
 4      this is referring to the March incentive payment, so
 5      there would have been a September -- oh, wait.
 6         So, hang on.  This was in November for March.  Oh,
 7      okay.  Let me make sure everything's correct here.  So,
 8      this is -- the numbers on here refer to the June
 9      allocation of 2015.  There would have been a December
10      2015 and then a June 2016.
11         And then that next email you were talking -- we were
12      referring to was --
13   Q.  Yes, I'm now showing you Exhibit 11 here which includes
14      the email from Mr. Argyle to you on October 25th, 2016.
15   A.  Okay.  Yeah.  So there would have been two.  So, yeah,
16      this was -- let's go back to your question, now that I
17      have that all straight in my head.
18   Q.  Sure.  Am I right that between November 2015 and October
19      2016, you had increased Ms. Chan's allocation of the
20      incentive pool from 10 percent to 11 percent?
21   A.  I would agree that that compares those two periods,
22      yes.
23   Q.  Okay.  Why did you do that?
24   A.  I can't remember at this point.
```

```
                                                 Page 193
 1   Q.  Okay.  That bolded language I pointed you to, it also
 2      references that the current estimate for your March
 3      incentives pool is $1.16 million compared to ▇▇▇▇
 4      ▇▇▇▇ in September.  Do you see that?
 5   A.  I do.
 6   Q.  Okay.  So there's been -- well, strike that.
 7         Do you know what had caused the increase in the
 8      incentives pool from September to March?
 9   A.  It was either revenue or alpha; one of the two, or
10      both.
11   Q.  But you're not sure which was which?
12   A.  No.  I can't remember.  Could have been a combination of
13      the two.
14   Q.  And then your response to Mr. Argyle notes, "I'd imagine
15      that I might dilute Gigi more and pay a few other
16      people."  And you mention a number of names.  Do you see
17      that?
18   A.  I do.
19   Q.  Did you, subsequent to this email, make the decision to
20      reduce Ms. Chan's allocation in the incentives pool?
21   A.  I don't remember.
22   Q.  Okay.  As of October 2016, you knew Ms. Chan was
23      pregnant, right?
24   A.  I don't remember the timeline.
```

```
                                                 Page 194
 1   Q.  So you're not sure if you knew as of October 2016 that
 2      Ms. Chan was pregnant?
 3   A.  I'm not sure at this point.
 4         MR. HANNON:  I'm now going to show you DEF
 5      9205.  This will be Exhibit 12.
 6         (Exhibit 12 marked for identification.)
 7      BY MR. HANNON:
 8   Q.  And I'll start here at the bottom.  And let me know when
 9      you're ready and I'll scroll up.
10   A.  Okay.  Okay.
11   Q.  So, looking here -- we'll start at the bottom of the
12      email chain.  It's an email from Ms. Chan to you, August
13      1st, 2016, asking you if you're around for a quick chat.
14      Do you see that?
15   A.  I do.
16   Q.  Okay.  And then at the top of the page, that's an email
17      from you, two days later, to Mr. Argyle and Mr. Burgess.
18      Do you see that?
19   A.  I do.
20   Q.  And you're informing them that Ms. Chan's effort to reach
21      out to you for a chat was to inform you that she was
22      pregnant; is that right?
23   A.  That's what it says.
24   Q.  Okay.  Do you have any recollection of that chat in which
```



Page 195

1   Ms. Chan told you she was pregnant?
2   A.  I do not.
3   Q.  Had you had any knowledge or suspicion that Ms. Chan was
4       pregnant prior to her telling you?
5   A.  I don't remember ever having that knowledge or
6       suspicion.
7   Q.  Okay.  When you sent this email to Mr. Argyle and
8       Mr. Burgess, did you understand this to be the first time
9       that they'd be learning that she's pregnant?
10  A.  I don't recall what was going on in my head when I wrote
11      that, no.
12  Q.  Okay.  Did you have an understanding as to why you sent
13      this to Mr. Burgess in addition to Mr. Argyle?
14  A.  I do not know, no.
15  Q.  What was your reaction when you found out that Ms. Chan
16      was pregnant?
17  A.  I don't remember specifically.
18  Q.  I'll go back up to Exhibit 11 just for one moment here.
19      So, this is the email looking at -- talking about the
20      year-end incentive allocation; is that right?
21  A.  That's the one we looked at previously, yes.
22  Q.  Okay.  And directing you back to Mr. Argyle's email to
23      you.  He notes in his first paragraph, in a
24      parenthetical, that the March 2017 incentives are earned

Page 196

1       through 12/31/16.  Do you see that?
2   A.  I do see that.
3   Q.  Okay.  Do you know what that means?
4   A.  I do not know exactly what he's referring to, no.
5   Q.  Okay.  Was your understanding that the incentives being
6       paid to investors on the EMO team were for work performed
7       through year-end, even though it wasn't paid until
8       March?
9   A.  I think we might be mixing up incentives.  So, I think
10      that what might be happening here -- let me read it
11      again.  Bear with me a moment.
12          So, what I believe Mr. Argyle is referring to here
13      is that the -- there are a couple of different ways you
14      can get incentives at Wellington, one of which is the one
15      we kind of went through in reasonable detail regarding
16      the alpha and revenue on any one particular product.  But
17      there's also -- there's also the chance for year-end
18      corporate bonuses, which are decided by the MPs.  So,
19      this -- what he's referring to in this kind of first
20      paragraph is unclear to me which of those two he's
21      referring to.
22  Q.  Okay.  With respect to the corporate bonus, did you have
23      any role in determining how that got allocated?
24  A.  None whatsoever.

Page 197

1   Q.  Do you know if Ms. Chan actually got paid all of the
2       incentive compensation from the allocations that you
3       awarded her?
4   A.  I don't know.
5   Q.  Were you aware that a decision was made to hold back
6       payments of Ms. Chan's final batch of allocations --
7       rather, EMO incentive, in order to try to induce her to
8       sign a release of claims?
9           MR. PATERNITI:  Objection.
10          THE WITNESS:  I don't remember being aware, no.
11  BY MR. HANNON:
12  Q.  Are you familiar with the peer review process at
13      Wellington?
14  A.  I am familiar with it, yes.
15  Q.  And am I right there's a process by which feedback is
16      solicited from peers as part of the annual review of
17      investors?
18  A.  Yes, that's one element of it.  Yes.
19  Q.  Okay.  As team leader, did you have any particular role
20      in the peer review process at Wellington?
21  A.  I don't believe so.  I don't think so.
22  Q.  Okay.  But am I right you would provide written review
23      feedback for the members on your team; is that right?
24  A.  I would, but whether that's a -- so, there's different

Page 198

1       processes at Wellington.  So, I would, yes, provide
2       feedback; whether it's written or verbal, I don't
3       remember.  I would be asked or provide feedback generally
4       for team members, yes.  But there's also other -- there's
5       another process that is kind of more of a 360 feedback
6       process.
7   Q.  And what's your role in that 360 feedback process?
8           MR. PATERNITI:  Objection.
9           THE WITNESS:  Very limited as it pertains to my
10      team members.
11  BY MR. HANNON:
12  Q.  Okay.  So, what is your involvement in that process?
13          MR. PATERNITI:  Objection.  Go ahead.
14          THE WITNESS:  Nothing.  Nothing.
15  BY MR. HANNON:
16  Q.  Okay.  Well, just as an employee at Wellington, were you
17      asked to provide feedback as part of the 360 process?
18  A.  I'm trying to remember how exactly it works.  I seem to
19      recall, yes, when I'm giving feedback, the team members
20      probably would have been one of the people that I need to
21      give feedback on.  So, yes.
22  Q.  Okay.  Would you also give feedback on other portfolio
23      managers, for example?
24  A.  Yes.



```
 1                    C E R T I F I C A T E

 2              I, Sharon G. Saalfield, a Licensed Shorthand

 3      Reporter for the State of New Hampshire, Certified Shorthand

 4      Reporter for the Commonwealth of Massachusetts, Registered

 5      Diplomate Reporter and Certified Realtime Reporter, do hereby

 6      certify that the foregoing is a true and accurate transcript

 7      of my stenographic notes of the proceeding taken at the place

 8      and on the date hereinbefore set forth to the best of my skill

 9      and ability under the conditions present at the time.

10              I further certify that I am neither attorney or

11      counsel for, nor related to or employed by any of the parties

12      to the action in which this proceeding was taken, and further

13      that I am not a relative or employee of any attorney or

14      counsel employed in this case, nor am I financially interested

15      in this action.

16              The foregoing certification of this transcript does
        not apply to any reproduction of the same by any means unless
17      under the direct control and/or direction of the certifying
        reporter.
18

19                              Sharon
20                                G.
                                Saalfield
21

22                              _____
                                Sharon G. Saalfield,
23                              NH Lic. No. 147, CSR, RDR, CRR

24
```