**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GIGI KAI ZI CHAN<br><br>Plaintiff,<br><br>v.<br><br>WELLINGTON MANAGEMENT COMPANY LLP AND CHARLES ARGYLE,<br><br>Defendants. | Civil Action No. 19-cv-11605-WGY |

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The question presented is purely about motive. Defendants concede (at least for purposes of summary judgment) that Plaintiff's claims are governed by Massachusetts law. Defendants also concede that Plaintiff is a member of protected classes, and that she engaged in protected activity. Defendants further concede that Plaintiff can meet her prima facie burden under Massachusetts law with respect to her discrimination claims.

This bevy of concessions leaves one question: Why was Gigi Chan's employment terminated? Hoping to have this question answered in their favor, Defendants rely on a factual recitation that lacks context and often mischaracterizes the evidence. When viewed in the light most favorable to Ms. Chan, the record presents more than sufficient evidence from a which a reasonable jury could infer that Ms. Chan's employment was not terminated for the reasons stated by Defendants, and was instead the result of unlawful discrimination and retaliation. For that reason alone, summary judgment is not appropriate.

But even if the reasons given by Defendants for Ms. Chan's termination—such as her alleged "poor attitude" and "unwillingness to accept feedback"--were the real reasons, they are

so deeply intertwined with Ms. Chan's protected status that Defendants cannot be awarded judgment as a matter of law. In particular, a reasonable jury could conclude that Ms. Chan was perceived to have a "poor attitude" *because of* her reaction to the discriminatory conduct that she experienced. Likewise, a reasonable jury could conclude Ms. Chan was perceived to be "unwilling to accept feedback" *because of* her repeated complaints about discriminatory behavior. As a reasonable jury could properly conclude that Ms. Chan was terminated *because of* her protected status, Defendants are not entitled to judgment as a matter of law.

In sum, this not a case where the wheat can be easily separated from the chaff. The evidence presents genuine issues of material fact, and those disputes can only be appropriately resolved by a jury.

## FACTS[1]

Prior to joining Wellington, Ms. Chan enjoyed a successful career as a China Portfolio Manager at Columbia Threadneedle Investments ("Threadneedle"). Ms. Chan started at Threadneedle in October 2000 and was promoted to fund manager in 2004. In 2007, she launched the China Opportunities Fund, which she managed until her departure in 2013.

The China Opportunities Fund performed extremely well under Ms. Chan, significantly outperforming its index and ranking in the top tier of its peer group. But after seven years at the helm of the China Opportunities Fund, Ms. Chan opted to take a career break to follow her fiancé to New York and spend time planning for her upcoming wedding.

In January 2014, Ms. Chan inquired if there might be an opportunity available for her at Wellington. Ms. Chan had interviewed for a China PM (portfolio manager) role at Wellington in

---

[1] The facts are drawn directly from Plaintiff's Statement of Additional Material Facts, submitted herewith.

early 2013 and, although she had not been selected for that role, was attracted by Wellington's combination of a large distribution platform with little existing China business.

Mr. Baxter "ran the idea of being a team analyst" by Plaintiff "and she was very open to it." While analysts are typically more junior than portfolio managers, Wellington utilizes a dual structure that allows investors to work simultaneously as both team analysts and portfolio managers operating their own investment product. Ms. Chan was told that she could expect to be managing her own product "a few months in" to her employment at Wellington.

During the interview process, Ms. Chan also inquired extensively about how her progress and advancement as an investor would be judged at Wellington. In particular, she was interested in learning things like "How will her impact be evaluated?" "By whom will she be evaluated?" and "Who would champion her integration to the firm?" Satisfied by responses indicating that Wellington would judge her based on merit, Ms. Chan accepted the research analyst position.

Ms. Chan's first day of work in Wellington's Hong Kong office was May 21, 2014. She was assigned to support the Emerging Market Opportunities ("EMO") team led by Greg Mattiko. Ms. Chan and Mr. Mattiko had crossed paths while she was at Threadneedle and he held Ms. Chan in high regard for having a "very strong and positive attitude," and "built a great amount of experience in good and bad times."

Prior to Ms. Chan raising concerns about discrimination, there were no criticisms or concerns raised about her performance on the EMO team. In January 2015, for example, Plaintiff received a positive year-end review noting:

> [Mr. Mattiko] is very happy to have you on the team… He thinks you're a pleasure to work with and expects you'll continue to add lots of value to the team. You bring a fresh perspective to the team dialogue, and you've been very proactive with your ideas. You have a pragmatic approach to your investing and have adapted well to Greg's process.

Ms. Chan's solid start was further reflected in her peer review survey, where she ranked high in the areas of depth of knowledge (35th out of 114) and idea generation (17th out of 114).

In addition to her colleagues, Ms. Chan was also gaining positive recognition from clients. HHMI, a significant investor in EMO, expressed interest in a pan-Asia portfolio concept that Ms. Chan was developing. As of May 2015, Wellington claimed to be supportive of those efforts, telling HHMI that Wellington was "encouraging [Ms. Chan] to manage portfolios as she did before joining Wellington."

While Ms. Chan was achieving this initial success, she was also discovering the obstacles that Wellington's culture posed to a woman of Chinese descent. The culture at Wellington is dominated by men—white men in particular—and often infected with sexist and/or racist undertones. Ms. Chan experienced this personally on several occasions, including the following:

a. Shortly after starting at Wellington, a white male partner told Ms. Chan she had been hired because she was "Chinese but not too Chinese";

b. In January 2015, while Ms. Chan was out with a group of investors getting drinks, Mr. Matiko slid his hand down Ms. Chan's back to the top of her buttocks;

c. Another white male partner, Dan Maguire, told Ms. Chan in January 2015 that "China is full of crap";

d. That same month, another white male, subsequently elevated to partner, invited Ms. Chan to visit a prostitute bar; and

e. In February 2015, another white male partner became agitated and aggressive over a disagreement he had with Ms. Chan concerning a stock, to the extent that he stuck his face in Ms. Chan's face and she was physically forced back against the wall.

While this culture did not make it impossible for an Asian woman like Ms. Chan to succeed at Wellington, the road she would have to travel seemed longer and more arduous.

Ms. Chan complained to Mr. Mattiko about her experiences in December 2014 and again in March 2015. She also complained to Mr. Baxter on June 3, 2015 and September 14, 2015.

4

During the latter conversation, Ms. Chan told Mr. Baxter that her experience at the firm had not been that of a collaborative culture, contrary to what had been described during the hiring process. Ms. Chan further complained that she was not being given responsibilities and opportunities commensurate with her skill and experience because, as an Asian female, she was assumed to be junior. She concluded by saying "I feel like I am at a party where I'm not welcomed."

A few days later, on September 18, 2015, Ms. Chan participated in the Asian Process and Philosophy panel ("AP&P"). The AP&P was specifically intended for investors who had not yet managed a portfolio and, therefore, needed to "start to develop, refine and articulate a philosophy to better work with other investors, improve stock picking and build a foundation for managing money someday (or better support those who do)."[2]

During the course of the AP&P, Ms. Chan was subjected to belittling and disrespectful comments by Jun Oh, a male portfolio manager located in Wellington's Hong Kong office. Ms. Chan perceived Mr. Oh's comments—which included words to the effect of "you look ridiculous"—as reflecting discriminatory bias towards Ms. Chan as an Asian female.

On September 22, 2015, Ms. Chan complained to Mr. Mattiko and her colleague, Philip Fan, about Mr. Oh's inappropriate and hostile conduct. Among other things, Ms. Chan stated that Mr. Oh would not have spoken to her like that if she was a man.

Meanwhile, word of Ms. Chan's September 14th complaint to Mr. Baxter spread amongst Wellington's upper management. On September 28, 2015, Mr. Argyle sent an email to Wellington's Managing Partners—Brendan Swords, Jean Hynes and Phillip Perelmuter—

---

[2] Although Wellington had told Ms. Chan that participation in the AP&P was a prerequisite for launching a fund, she learned that this was not true, and that similarly situated male employees—including Mr. Mattiko--had not been required to engage in the process.

5

advising of Ms. Chan's "I feel as if I'm at a party where I'm not welcome" complaint. Notably, Argyle did not dispute the validity of Ms. Chan's complaint, but instead noted that "I have heard this before in GEPM though never so directly" and observed "we cannot take assimilation for granted." In that same email, Mr. Argyle reported that "[t]he good news is that all is going well on EMO" and advised that he would likely be seeking approval for Ms. Chan's China Growth fund in the next few months.

On October 1, 2015, Mr. Argyle received an email from Mr. Burgess, then the Associate Director of GEPM, informing him of the AP&P debacle, which Mr. Burgess identified as one of several issues making Ms. Chan "feel unwelcome here." According to Mr. Burgess, Mr. Mattiko did not want to "deal with what is becoming an HR/ personnel headache."

As the fallout from the AP&P panel continued, a steady stream of apologists sought to convince Ms. Chan that she had simply misconstrued Mr. Oh's comments. This included Mr. Baxter, Erin Murphy, and Greg Mattiko. In each instance, Ms. Chan maintained her view that Mr. Oh's comments were discriminatory, and that she would not have been treated that way if she were a man.

Ms. Chan's steadfast conviction soon began to draw the ire of those around her. Mr. Burgess and Mr. Argyle viewed the situation as a "red flag," raising concerns over Ms. Chan's resiliency, sense of entitlement and humility. Mr. Baxter had a similar negative reaction, confessing that his enthusiasm for supporting the launch of Ms. Chan's fund was "waning." Even Mr. Mattiko was "somewhere between irritated…, concerned and exacerbated," but most importantly he had "very little appetite for there being any drama on his team."

As a direct result of Ms. Chan's complaints about discrimination, many within Wellington came to form a negative opinion of Ms. Chan's "attitude" and attributed her

6

complaints to Ms. Chan being "resistant to feedback." Privately, however, there was some acknowledgement that "to come into Wellington as an investor, a female, in Asia that the odds are not stacked in Ms. Chan's favour necessarily and we have to have sympathy with how hard it must be for her to make it work at Wellington." Meanwhile, Ms. Chan lodged additional complaints to Wellington's three Managing Partners—Jean Hynes, Brendan Swords and Phil Perulmuter. In each instance, Ms. Chan made clear that she believed she was being subjected to discriminatory treatment.

Ms. Chan received another positive performance review from Mr. Baxter for 2015. Although Mr. Baxter's review asserted that he had received feedback concerning Ms. Chan's communication skills that was "nearly universal and strikingly consistent" the peer review feedback report for 2015 does not support that claim. Indeed, only one person suggested that Ms. Chan work on "tightening up her communication a bit."

Nonetheless, both Mr. Baxter's review and the peer review feedback confirm that Ms. Chan was expected to devote a significant portion of her time in 2016 to developing her China Growth Fund. Indeed, "getting China Growth off the ground" is the first item listed by Mr. Baxter in describing Ms. Chan's 2016 "plate." Mr. Mattiko likewise commented in the peer review that Ms. Chan needed to "promote herself better internally both to investors and GRG as she needs to start building a book of business of her own."

As part of the end of year process, Ms. Chan also met with Mr. Argyle. While Mr. Argyle testified that he does not recall the conversation, his planned talking points reflect that his primary aim was to dissuade Ms. Chan from continuing to complain about the treatment that she believed to be discriminatory.

The meeting took place on December 4, 2015. As she had previously, Ms. Chan told Mr. Argyle that she believed she was being treated differently because she was an Asian female and assumed to be junior. Ms. Chan also told Mr. Argyle "I demand to be treated with respect," to which Mr. Argyle responded "In this firm you don't demand anything." While Mr. Argyle refused to acknowledge the validity of Ms. Chan's complaints, he confirmed that development of her investment products—particularly China Growth—was a priority for the upcoming year and that Wellington would support her in those efforts.

Launching the China Growth fund required a significant amount of work from Ms. Chan during the first half of 2016. This included presentations to Wellington's Product Panel (January 2016), Wellington's Capital Commitment Committee (February 2016), the Board of Directors for Wellington's Hong Kong affiliate (March 2016), and Wellington's Product Marketing Panel (May 2016). These efforts were not undertaken merely for Ms. Chan's benefit, as Wellington's "business case" for launching China Growth was extremely compelling. Specifically:

a. "China equity is a large category, with $51.5B in assets under management…";

b. "Despite the size of the market and the category, Wellington Management Funds (Global) has no China strategies in its line-up today";

c. "Based on feedback from GRG, we believe there is demand for this strategy and that the strategy could play a part in showcasing Wellington's broader China platform"; and

d. "Gigi's strong track record managing an almost identical strategy at her previous firm should be compelling."

China Growth was eventually launched, but doing so proved to be a longer and more arduous task for Ms. Chan than what was experienced by similarly situated men. For example,

Mr. Oh first proposed his China Contrarian product on August 5, 2015, and was approved just three months later, without having to present to the AP&P. Likewise, Mr. Mattiko's fund was launched within just three to six months of his arrival at Wellington, without the prerequisite of a process and philosophy panel.

Overall, there appeared to be an inherent level of skepticism when it came to Ms. Chan's abilities and experience that caused Wellington to apply a higher degree of scrutiny to Ms. Chan than they did to her colleagues that were men and/or not Asian. This skepticism played out again in May and June of 2016, as Wellington prepared to market China Growth to its clients. Following a "dry run" session on May 31, 2016, Wellington's Boston-based GRG group opined that Ms. Chan was "absolutely not ready for client/consultant meetings." When Ms. Chan questioned whether GRG's concerns may be attributable to her misunderstanding the purpose and structure of the "dry run" session, it was assumed that Ms. Chan was simply "in denial about her presentation skills."

But Ms. Chan was not in denial. Prior to joining Wellington, Ms. Chan had spent years successfully marketing her China Opportunities fund, including through media interviews. Further, in her time at Wellington, Ms. Chan had developed a strong track record for successfully engaging with clients—so much so, that several had expressed interest in pursuing new investment products with Ms. Chan.

This disconnect[3] between GRG's perception of Ms. Chan's abilities and what she had actually demonstrated while working with Wellington's clients was duly noted by Wellington's Managing Partner, Jean Hynes. In a July 26, 2016 email to the other Managing Partners, Ms. Hynes wrote "When [Ms. Chan] presents internally, it is almost acrimonious. The irony is that

---

[3] Bo Munier, another Asian female investor at Wellington, also expressed dissatisfaction about her dealings with the Boston-based GRG team.

she is wonderful with [Mr. Mattiko's] clients and consultants." Ms. Hynes further noted "[Ms. Chan] thinks Wellington has not respected her and not given her a fair chance."[4] Mr. Argyle likewise observed that there was something askew about GRG's perception of Ms. Chan, noting in a June 27, 2016 email that GRG may have had an "over reaction" to a comment that Ms. Chan made about communications with head hunters.

Nonetheless, Ms. Chan did everything that was asked of her by GRG. When they gave her feedback, she incorporated it. When they asked her to work with a coach to improve her public speaking, she did so. And in GRG's own estimation, Ms. Chan showed improvement. But the opportunity to pitch China Growth to Wellington's clients never came.

As Wellington dragged its feet on allowing Ms. Chan to market China Growth to its client based, there continued to be strong interest from other clients and prospects to have Ms. Chan manage their money. For example, on September 20, 2016, Alex Qian—Head of GRG in China—reported that a large Chinese insurance company had tentatively decided to hire Wellington as their investment advisor because they "like[] our China Growth approach and Gigi's past investment success." He concluded "Well done, Gigi!" Likewise, HHMI continued to express interest in having Ms. Chan manage more of its money.

In early August, Ms. Chan informed Mr. Mattiko that she was pregnant. He promptly informed Mr. Argyle. Shortly thereafter, on August 8, 2016, a recently terminated Wellington Portfolio Manager, Mina Koide, filed a Charge of Discrimination against Wellington, Mr. Swords and Mr. Argyle. Ms. Koide, an Asian female, alleged that she had been discriminated against on the basis of her sex and race, and subsequently retaliated against when she raised

---

[4] Mr. Mattiko made a similar observation regarding client interactions in an October 31, 2016 email to Mr. Argyle. Among the three "positives" he identified for Ms. Chan, was that "she communicates well with clients."

those concerns to Mr. Swords and Mr. Argyle. Among the discriminatory acts alleged by Ms. Koide was denial of a "fair marketing opportunity" for her fund.

In October 2016, Mr. Argyle consulted with Wellington's HR function to prepare for a meeting with Ms. Chan. HR provided Mr. Argyle a detailed script to be used for his discussion, and advised him to have Mr. Mattiko assist with filling in the blanks "with lots of examples" of performance deficiencies. Following that advice, on October 31, 2016 Mr. Matiko provided Mr. Argyle "notes" identifying alleged performance deficiencies with respect to Ms. Chan, including that Ms. Chan's contribution to the EMO team was deficient.

Notably, Mr. Mattiko had never raised any such concerns with Ms. Chan. Nor is Ms. Chan's alleged lack of contribution to EMO mentioned in any of the peer reviews completed by Mr. Mattiko. Indeed, on September 1, 2016, Mr. Mattiko had written Mr. Argyle an email advising that he had completed his review of Ms. Chan's 2016 performance and sharing the following thoughts:

> Despite Gigi's leading understanding of all things related to the China market, she finds integrating into the Wellington culture difficult.  I used to be of the opinion this had to do with issues relating to the HK office, but now I am convinced that it has more to do with the lens through which Gigi views the firm and I believe the world in general.  Gigi, for some reason, believes that Wellington and the people who work here do not want her to succeed. This attitude or pessimism prevents her from integrating into the Wellington culture.  I fear that unless she makes a 180 degree change and accepts the firm for what it is she will continue to be dissatisfied. This is really unfortunate because Gigi herself is a very pleasant person and I enjoy working with her.  I also am convinced that she will add value for our clients. But if her view of Wellington does not shift I don't know how long she will either be willing to say or will be tolerated by others.

Nowhere in that email had Mr. Mattiko alleged that Ms. Chan was failing to appropriately contribute to EMO.

During his November 2, 2016 meeting with Ms. Chan, Mr. Argyle sought to convince Ms. Chan to adopt a more positive view of Wellington and its culture. To do so, he falsely

11

represented recent peer feedback concerning Ms. Chan's performance. When Ms. Chan attempted to respond to Mr. Argyle's comments, he interrupted her in a mocking and antagonistic tone, saying things such as:

    a.    "it always seems to be about what Wellington can do for Gigi"

    b.    "oh but it's all about you, right?"

    c.    "for the past two years you've said…look at me. I'm a superstar"

    d.    "if you're as unhappy as you seem to be, I don't understand why you're here"

As she had previously, Ms. Chan made clear that her dissatisfaction with Wellington and its culture was the result of discriminatory treatment she had experienced, which she noted included "disrespectful" treatment, "insults" and "less than professional comments." Referencing her past complaints of discrimination, Ms. Chan stated "Just because I look young, just because I'm female, just because I'm Chinese, doesn't mean that people can talk down at me. That's what I've said. Every single time." Mr. Argyle did not deny that assertion.

Despite Mr. Argyle's confrontational tone, Ms. Chan repeatedly expressed her desire to work cooperatively with Mr. Argyle, noting: "I am engaging with you and I am trying to make things work, but I don't believe you're hearing me."

Three weeks later, at the urging of HR, Mr. Argyle sent Ms. Chan a self-serving summary of their discussion. While the email directed Ms. Chan to "acknowledge" and "respond," she did not see it until she had started her maternity leave. Upon returning to work in April (after having almost died during delivery) Ms. Chan was understandably reluctant to again draw Mr. Argyles ire. Given the reaction that Ms. Chan had received from Mr. Argyle when she tried to "respond" to his criticism during their meeting, she thought it best to "respond" to Mr. Argyle by making diligent efforts to contribute to the EMO team, trying to improve her

participation in investor meetings and refraining from bringing up her past difficulties with Wellington and its culture.

During a May 31, 2017 meeting with Mr. Mattiko, however, he convinced her to reveal her current state of mind on Wellington and its culture. Ms. Chan answered honestly, noting that her view of Wellington had not changed, but that she thought the relationship was salvageable. At no point in this conversation did Mr. Mattiko ever express any dissatisfaction with Ms. Chan's contributions to the EMO team. In fact, the conversation concluded with an extensive discussion in which Ms. Chan provided her thoughts on an EMO investment.

Just days later, on June 9, 2017, Messrs. Argyle, Philip and Matiko met to decide Ms. Chan's fate. While none of them could recall at their depositions what was actually discussed, they agreed that the decision to terminate to Ms. Chan's employment was made at that meeting, and that it was made by Mr. Argyle.

**ARGUMENT**

**I.   WELLINGTON IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S GENDER, PREGNANCY AND NATIONAL ORIGIN DISCMINATION CLAIMS**

A.  Standard or Review

To survive summary judgment on her discrimination claims, Ms. Chan need not convince the Court that Wellington's actions were, in fact, motivated by any unlawful animus. "A defendant's motive is elusive and rarely is established by other than circumstantial evidence, therefore requiring a jury to weigh the credibility of conflicting explanations of the adverse hiring decision." Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 689 (2016). Accordingly, Ms. Chan's burden here is simply one of production; that is, to produce evidence from which a jury might permissibly infer after trial that one or more of the claimed unlawful motives was a

"determinative cause." Lipchitz v. Raytheon Co., 434 Mass. 493, 506 n.19 (2001). Importantly, "determinative cause" does not mean "only cause." Id. ("That a defendant's discriminatory intent, motive or state of mind is 'the determinative cause' does not imply the discriminatory animus was the only cause of that action."). Rather, causation is established if "the defendant's [unlawful] animus contributed significantly to that action, that it was a material and important ingredient in causing it to happen." Id.

In analyzing whether a plaintiff has met this burden, Massachusetts law employs the three stage McDonnell Douglas burden-shifting framework. As Wellington has conceded for purposes of summary judgment that Ms. Chan can satisfy her prima facie case, we start at the second stage, which requires the defendant to produce evidence of a legitimate, non-discriminatory reason for its action. While this showing is also not intended to be onerous, "an employer must not only give a lawful reason or reasons for its employment decision but also must produce credible evidence to show that the reason or reasons advanced were the real reasons." Scarlett v. City of Bos., 93 Mass. App. Ct. 593, 598 (2018) (quoting Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 138 (1976)).

If Wellington meets its burden, the burden of production shifts back to Ms. Chan in the third stage to "produce evidence that the employer's reasons are pretextual." Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 682–83 (2016). As Massachusetts is a "pretext only" jurisdiction, evidence of pretext provides a legally sufficient basis for a jury to infer discriminatory animus. Id. Importantly, this does not require evidence that all of the employer's reasons are false. Lipchitz, 434 Mass. at 506–07. If even just one of the employer's stated reasons could be found false, "the fact finder could infer that [the employer's] discriminatory animus was the determinative cause of the adverse employment decision." Id.

Despite these shifting burdens of production, "the burden of persuasion at summary judgment remains with the defendants, who, as the moving parties, have the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if they would not have the burden on an issue if the case were to go to trial." Bulwer, 473 Mass. at 682–83.

### B.  Disputed Issues of Material Fact Preclude Summary Judgment

While Wellington asserts that it terminated Ms. Chan's employment for legitimate non-discriminatory reasons, its papers are somewhat opaque as to what those reasons actually were. At pages 7 and 8 of its brief, Wellington asserts that Ms. Chan was terminated because of her alleged "poor attitude, lack of collaboration and contributions and her unwillingness to accept feedback." At page 9, it claims that Mr. Argyle "concluded the situation was futile." Wellington's statement of facts presents it differently, asserting that "As a steward of GEPM's resources, Mr. Argyle concluded he could no longer justify Plaintiff's continued employment at Wellington at approximately $750,000 annually." ¶ 91.

As noted above, Wellington's burden is not only to identify a non-discriminatory reason that it *could have* relied on to terminate Ms. Chan's termination, "but also must produce credible evidence to show that the reason or reasons advanced were the real reasons." Scarlett v. City of Bos., 93 Mass. App. Ct. 593, 598 (2018). While this is not meant to be an onerous burden, the somewhat muddled list of reasons offered by Wellington here seemingly falls short.

But even if Wellington met its burden, summary judgment must be denied because a reasonable jury could conclude that at least one of these reasons is false. For example, the claim that Mr. Argyle "could not justify" Ms. Chan's salary is belied by the fact that Wellington chose to keep her employed for three months before terminating her employment. If money were a

15

motivating factor, Wellington surely would have acted sooner to terminate Ms. Chan, rather than pay a quarter year's salary to someone who they had allegedly decided is not worth the money.

More importantly, however, there is ample evidence in the record for a jury to conclude that Wellington believed Ms. Chan was indeed worth the money. While Wellington now argues that it viewed Ms. Chan solely as an analyst, the evidence suggests that Wellington had high hopes for what Ms. Chan could achieve as a portfolio manager. In addition to China Growth, other opportunities were also presented where Wellington could have utilized Ms. Chan's skills profitably. Given this evidence, a reasonable juror could conclude that this reason is false.

Wellington's claim of "futility" also rings hollow. Although Wellington argues that Ms. Chan was intransigent, her May 2017 conversation with Mr. Mattiko proves otherwise. Indeed, Ms. Chan made clear that her relationship with Wellington was salvageable and that her feelings toward Wellington would likely greatly improve if she was afforded the client access that she had worked so hard to achieve. Notably, Wellington offers no evidence or argument as to why it refused to provide Ms. Chan that access, and opted instead to terminate her employment. Again, a jury could find "futility" to be a false reason.

The remaining reasons "poor attitude, lack of collaboration and contributions and her unwillingness to accept feedback" could also be found to be false by a reasonable jury. For attitude, a reasonable jury listening to the November 2016 and May 2017 recordings could readily conclude that there was nothing deficient with Ms. Chan's attitude, and that Wellington was simply trying to force Ms. Chan out or was hoping to break her spirit. The same goes for "unwillingness to accept feedback" which is belied by Ms. Chan's willingness to engage with Mr. Argyle and Mr. Mattiko and discuss how the problems affecting her relationship with Wellington might be fixed. Finally, a jury could readily conclude that Ms. Chan's alleged "lack

collaboration and contribution" was fabricated in the lead up to Mr. Argyle's November 2016 meeting, at the urging of Wellington's HR department and with assistance of Mr. Mattiko.

Again, because Massachusetts is a "pretext only" jurisdiction, a jury need only conclude that one of these reasons is false in order to allow for a permissible inference that Wellington terminated Ms. Chan's employment because of her membership in a protected class. Ms. Chan need not offer any evidence of actual animus based on her membership in a protected class. As the extensive factual record here provides ample evidence from which a jury could find pretext, summary judgment must be denied.

## II.     WELLINGTON IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM

The pretext analysis discussed above would also permit the jury to find in favor of Ms. Chan on her retaliation claim. While Wellington argues that there is no evidence to support an inference of retaliatory animus, that assertion lack merit. Besides temporal proximity (which is particularly evident when Ms. Chan's maternity leave is accounted for) a jury need look no further that Mr. Mattiko's 2016 peer review of Ms. Chan, which observed:

> Gigi, for some reason, believes that Wellington and the people who work here do not want her to succeed. This attitude or pessimism prevents her from integrating into the Wellington culture.

This observation, which was shared by many at Wellington, makes it readily apparent that Ms. Chan's protected activity played a significant role in Wellington's decision to terminate her employment. As such, a reasonable jury could find that retaliatory animus was a cause of her termination.

Further, as noted above, Wellington's alleged reasons for terminating Ms. Chan's employment are so intertwined with Ms. Chan's protected activity that a jury could find them retaliatory. For example, the evidence shows any perception that Ms. Chan had a "bad attitude"

17

is directly attributable to her complaints about discrimination. The same is true for Ms. Chan's alleged "unwillingness to accept feedback," which stems from her complaints about the discriminatory treatment at the AP&P panel. The claim of "futility" can also be traced to Ms. Chan's protected activity.

Under Massachusetts law, Ms. Chan need not prove that retaliation was the only cause of her termination. Rather, causation is established if "the defendant's [unlawful] animus contributed significantly to that action, that it was a material and important ingredient in causing it to happen." Id. On the rich factual record presented here, a jury could permissibly reach such a conclusion. Accordingly, summary judgment must be denied.

### III.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INTERFERENCE CLAIM

Summary judgment must also be denied on Ms. Chan's interference claims. First, it is well settled that unlawful discriminatory or retaliatory motive, which Ms. Chan demonstrates for the reasons described above, qualifies as a malicious purpose to sustain a claim for tortious interference. See, e.g., Comey v. Hill, 387 Mass. 11, 19 (1982) (intent to discriminate based on age). Second, neither Wellington nor Mr. Argyle can avoid liability by claiming that they did not "cause" Ms. Chan's termination. Mr. Argyle admits that he was the decision-maker, and there is no dispute that he was acting as Wellington's agent. Accordingly, a jury could reasonably conclude that both are liable for tortious interference.[5]

### CONCLUSION

For the reasons set forth, Ms. Chan respectfully reqeests that the motion for summary judgment be denied in its entirety.

---

[5] Wellington correctly observes in its brief that it can only be found liable on the tortious interference claim if it is found not to be Ms. Chan's employer.

GIGI KAI ZI CHAN

By her attorneys,

*/s/ Patrick J. Hannon*
Patrick J. Hannon (BBO #664958)
HARTLEY MICHON ROBB HANNON, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
Tel:  (617) 723-8000
phannon@hmrhlaw.com

## CERTIFICATE OF SERVICE

This hereby certifies that on March 31, 2021, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Patrick J. Hannon