UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GIGI KAI ZI CHAN,

      Plaintiff,

         v.

WELLINGTON MANAGEMENT
COMPANY LLP and CHARLES ARGYLE,

      Defendants.

Civil Action No. 1:19-CV-11605-WGY

## PLAINTIFF'S RESPONSIVE STATEMENT OF MATERIAL FACTS IN OPPOSITON TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Gigi Kai Zi Chan ("Ms. Chan") hereby submits her Responses to Defendants'

Rule 56.1 Statement of Material Facts, as well as her Statement of Additional Material Facts

requiring denial of Defendants' motion for summary judgement.[1]

### MS. CHAN'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1.      WMC is a private, independent investment management firm with client assets under

management totaling over $1 trillion. The Firm serves as investment advisor to over

2,200 institutions in over 60 countries. (Declaration of Henry Philip ("Philip Dec.") ¶

4, attached as Exhibit A).

Response: Undisputed.

---

[1] As the supporting materials submitted by Defendants have been designated as Exhibits A-K, materials submitted herewith are designated Exhibits L-U. Accordingly, citations to Exhibits A-K refer to the exhibits submitted by Defendants.

2.     Wellington Management Hong Kong Ltd. ("WMHK"), the entity that ultimately
       employed Plaintiff, is an affiliate of WMC located in Hong Kong. WMHK's
       investment professionals manage assets for institutional clients both regionally and
       globally, and conduct research that is used by portfolio managers and analysts across
       Wellington Management locations. (Philip Dec. ¶ 5).

Response: Undisputed.

3.     Wellington owes a fiduciary duty to its institutional clients. (Philip Dec. ¶ 6).

Response: Undisputed.

4.     Wellington has a feedback intensive culture, which includes a peer feedback process
       where colleagues and peers provide feedback on each other. (Philip Dec. ¶ 7);
       Deposition of Thomas Baxter (Baxter Dep.) at 125, 134, attached as Exhibit B).

Response: Undisputed.

5.     Wellington expects its employees to embrace its ethos of "client, firm, self." (Philip
       Dec. ¶ 8).

Response: Undisputed.

6.     Wellington is committed to equal employment opportunity and maintains a
       comprehensive Policy Against Harassment and Discrimination with a user-friendly
       complaint procedure. (Philip Dec. ¶ 9 and Exh. 1 thereto; Deposition Transcript of
       Gigi Chan dated October 7, 2020 (Pl. Dep. II) at 142-43, attached hereto as Exhibit
       C).

Response: Disputed as to the assertion that "Wellington is committed to equal employment
opportunity." [See Ms. Chan's Statement of Additional Facts ("SAF"), ¶ 63. Otherwise
undisputed.

7.   Plaintiff is a female of Chinese descent and a citizen of the United Kingdom. (Dkt. No. 1, Plaintiff's Complaint (Compl.), ¶ 1).

Response: Undisputed.

8.   In 2013, Plaintiff interviewed for a China equity portfolio manager position with Wellington Global Equity Portfolio Management ("GEPM") group. (Deposition Transcript of Gigi Chan dated October 6, 2020 (Pl. Dep. I) at 160-61, attached hereto as Exhibit D); Baxter Dep. 39.

Response: Undisputed.

9.   Charles Argyle was then Director of GEPM. Mr. Argyle's primary responsibilities included ensuring that WMC and its affiliates had the appropriate investment talent within GEPM and to maximize the odds of success of the investment professionals, which, in turn, would lead to successful outcomes for WMC's clients. (Deposition Transcript of Charles Argyle (Argyle Dep.), at 62-63, attached hereto as Exhibit E).

Response: Undisputed.

10.   Thomas Baxter, then an associate Director of GEPM based in Hong Kong, had responsibility for GEPM professionals in Asia and reported to Mr. Argyle. (Argyle Dep. 64; Baxter Dep. 12, 16).

Response: Undisputed.

11.     At the time, Plaintiff was working as a fund manager at Columbia Threadneedle
        Investments ("Threadneedle"). She had been hired in October 2000, initially as an
        analyst trainee fund manager, and became a fund manager in 2004. (Pl. Dep. I, 71-72;
        Plaintiff Gigi Kai Zi Chan's Answers and Objections to Defendant Wellington
        Management Company LLP's First Set of Interrogatories, No. 3, attached hereto as
        Exhibit F; Declaration of Deborah Lombardo ("Lombardo Dec.") ¶¶ 4-5 and Exhs. 1-
        2 thereto, attached hereto as Exhibit G).

Response: Undisputed.

12.     The primary responsibilities of an equity portfolio manager at Wellington include
        managing an equity portfolio, or equity portfolios, for Wellington's institutional
        clients, using his or her own approach. A portfolio manager is expected to use his or
        her own research ideas or those of others at the Firm, including equity research
        analysts. (Philip Dec. ¶ 11).

Response: Disputed in part, as it is common for investors at Wellington to have dual roles,
serving as both an equity portfolio manager and a research analyst for an approach run by
another portfolio manager. [See Deposition Transcript of Thomas Baxter, attached hereto as
Exhibit L ("Exhibit L"), at 45-46; Deposition Transcript of Charles Argyle, attached hereto as
Exhibit M ("Exhibit M"), at 76] Otherwise undisputed.

13.     In the judgment of Charles Argyle, then Director, GEPM, and others who interviewed
        Plaintiff, she was not a strong candidate for that role. (Argyle Dep. 67, 70).

Response: Disputed. [See Declaration of Patrick Hannon, attached hereto as Exhibit N
("Exhibit N"), Tab 1 at DEF29086].

a.  In Mr. Argyle's judgment, Plaintiff's presentation skills and articulation during the interview "were not particularly strong." (Argyle Dep. 67). He expressed that Plaintiff was "a little short in experience for the China team leader role." (Philip Dec. ¶ 12 and Exh. 2 thereto).

Response: Disputed as to the assertion that Mr. Argyle observed deficiencies in Plaintiff's "presentation skills and articulation during the interview," as no such observation was recorded in Mr. Argyle's written feedback. [Exhibit N, Tab 1 at DEF29085]. Undisputed that Mr. Argyle viewed Ms. Chan as too junior for the "China team leader" role.

b.  Mr. Baxter opined that Plaintiff was "quite green as a PM despite the six-year track record (they start them early at Threadneedle as junior/apprentice PMs)." (Id.) To Mr. Baxter's knowledge, Threadneedle "had a structure that seemed unlike Wellington's in the sense that [Plaintiff's] years of experience as an analyst before being a portfolio manager were unusually short." (Baxter Dep. 54). Moreover, Mr. Baxter did not find Plaintiff's discussion of her investing philosophy and her investing process as being "robust enough to withstand the scrutiny that our client base would have." (Baxter Dep. 54). In sum, Mr. Baxter did not believe Plaintiff had the "full package" of skills to be a portfolio manager at Wellington at that time. (Baxter Dep. 71). He observed Plaintiff to be "more of a number two." (Philip Dec. ¶ 12 and Exh. 2 thereto; Baxter Dep. 53).

Response: Undisputed.

c. Henry Philip, then Regional Human Resources Director, similarly understood that at Threadneedle the role of fund manager was given early in someone's career. In his opinion, Plaintiff's experience was perhaps "a step below what we were looking for in terms of a stand-alone portfolio manager without the infrastructure that [Plaintiff] may have had at Threadneedle." (Deposition Transcript of Henry Philip (Philip Dep.), at 46-48, attached hereto as Exhibit H).

Response: Disputed in part, as Mr. Philip's recorded interview feedback reflects that his concern was not with Ms. Chan's actual experience, but rather that "[s]he comes across quite 'young' in her approach, so I am not clear as to whether she would have the gravitas we would look for in a standalone PM." [Exhibit N, Tab 1 at DEF29086]

d. Mr. Philip suggested she would be better served starting as a team analyst. (Philip Dec. ¶ 12 and Exh. 2 thereto)

Response: Undisputed.

14. Rather than hiring any of the 10-20 candidates for the China equity portfolio manager position, Mr. Argyle ultimately selected Bo Meunier, a Chinese woman who was already working for Wellington in Hong Kong as an equity research analyst who had taken on some portfolio management responsibilities, to be the "centerpiece" of Wellington's China equities strategy going forward. (Baxter Dep. 50; Henry Dep. 49; Argyle Dep. 49-50).

Response: Disputed. Ms. Meunier had been serving as portfolio manager for the China Opportunities fund since 2008. [Exhibit M at 41-43]. Wellington finally gave Ms. Meunier the title of Portfolio Manager in or about January 2014, when concerns were raised that she might leave. [Exhibit N, Tab 2]. There was no meaningful change in Ms. Meunier's role [Exhibit M at

6

50-51] and Wellington continued to actively search for another Hong Kong based portfolio

manager. [Exhibit N, Tab 3]

15.     Wellington ceased its external search to fill the China equity portfolio manager

        position. (Argyle Dep. 50).

Response: Disputed. [Exhibit N, Tab 3]

16.     Although Wellington did not select Plaintiff for the portfolio manager position, it was

        sufficiently impressed with her qualifications to consider her for a different role.

        (Argyle Dep. 70, 73; Baxter Dep. 53).

Response: Undisputed.

17.     In 2014, Plaintiff applied and interviewed for the Hong Kong-based position of equity

        research analyst at Wellington. (Pl. Dep I, 196-97; Philip Dec. ¶ 13 and Exh. 3

        thereto). This was an "opportunistic" potential hire insofar as Wellington did not have

        a specific position open. (Baxter Dep. 64-65).

Response: Disputed in part. While the role would initially be limited to research analyst duties, it

was expected to "morph" into a role that included portfolio manager responsibilities. [Exhibit N,

Tab 4; SAF ¶¶ 9, 19]

18.     Plaintiff's employment at Threadneedle had come to an abrupt end in October 2013,

        after she was placed on suspension pending investigation for "insubordination." (Pl.

        Dep. I, 101-102, 104-106, 110-11, 115; Lombardo Dec. ¶ 10 and Exh. 6. Plaintiff did

        not disclose the Threadneedle investigation in response to a direct question on her

        application for employment with Wellington, which asked whether she had ever been

        subjected to an investigation for misconduct or malpractice in her business activities.

(Pl. Dep. I, 106-107, 197, 199, 231-233; Philip Dec. ¶ 13 and Exh. 3 thereto).

(Redacted pursuant to motion to seal)

Response: Disputed as to the assertion that Ms. Chan's employment with Threadneedle

ended "abruptly" [See Deposition Transcript of Gigi Chan, attached hereto as Exhibit O

("Exhibit O"), at 107] and the characterization of the application question as "direct."

[Exhibit O at 232]  Otherwise undisputed.

19.    As Plaintiff admits, Wellington offered Plaintiff the Hong Kong-based position of

position of equity research analyst in GEPM. (Pl. Dep. I, 213, 216; Baxter Dep. 64-

65).

Response: Undisputed.

20.    After negotiating for higher compensation, Plaintiff accepted Wellington's offer for

the position of equity research analyst within GEPM annual salary and bonus

opportunities of over $650,000 USD. (Philip Dec. ¶ 14). The terms were

memorialized in an offer letter. (Philip Dec. ¶ 15 and Exh. 4 thereto).

Response: Undisputed.

21.    The offer letter made no mention of a current or future portfolio manager position or

responsibilities. (Philip Dec. ¶ 15 and Exh. 4 thereto).

Response: Undisputed.

22.    Upon hire, Plaintiff was assigned to the Emerging Markets Opportunities ("EMO")

team led by portfolio manager Greg Mattiko. (Pl. Dep. I, 213, 216). Philip Fan was

also a research analyst on the EMO team. (Pl. Dep. I, 223).

Response: Undisputed.

23.     As an equity research analyst, Plaintiff's responsibilities were to research and recommend equities for EMO to buy and sell. (Pl. Dep. I, 222, 240-41; Philip Dec. ¶ 11).

Response: Disputed in part, as Ms. Chan's responsibilities also included developing other investment approaches for which she might serve as portfolio manager. [Exhibit N, Tab 5 at 11357; SAF ¶¶ 19, 43, 46].

24.     Mr. Argyle, who was located in Boston, technically was Plaintiff's "manager," however, he did not supervise Plaintiff on a day-to-day basis and communicated with her just a few times a year. (Argyle Dep. 26-27, 87-88; Pl. Dep. I, 87-88).

Response: Undisputed.

25.     The GEPM manager with whom Plaintiff interacted most regularly was Mr. Baxter. (Pl. Dep. I, 233-34).

Response: Undisputed.

26.     A "mixed picture" developed concerning Plaintiff's overall job performance. (Baxter Dep. 93):

Response: Undisputed that Ms. Chan's performance was viewed favorably prior to her protected activity, and that several people at Wellington viewed her differently after she engaged in protected activity. [See SAF ¶¶ 16-19, 24-75]

a.  Wellington's primary concerns did not involve Plaintiff's technical investment knowledge of capabilities. (Argyle Dep. 100-101)

Response: Disputed to the extent that Defendants suggest there were any concerns involving Plaintiff's technical investment knowledge or capabilities. [Exhibit N, Tab 15] Otherwise undisputed.

      b.  In Mr. Baxter's judgment, Plaintiff had "some significant shortcomings," including around her "scattered" presentation style, her level of engagement and her impact on the EMO team. (Baxter Dep. 93-95, 100-103).

<u>Response:</u> Undisputed that Mr. Baxter became critical of Ms. Chan's performance after she engaged in protected activity. [SAF ¶¶ 24-75] Disputed that these criticisms were valid. [SAF ¶¶ 37, 40, 41, 42]

      c.  In Mr. Argyle's judgment, Plaintiff was struggling with integration and engagement. (Argyle Dep. 91-93). Mr. Argyle understood that the quality of Plaintiff's analysis of securities and stocks was good, but that "the quantity, the flow, the output and the engagement . . . left room for improvement." (Argyle Dep. 100-101) Plaintiff was not particularly active in or contributing to the investment dialogue" at the Firm. (Argyle Dep. 93).

<u>Response:</u> Undisputed that Mr. Argyle became critical of Ms. Chan's performance after she engaged in protected activity. [SAF ¶¶ 24-75] Disputed that these criticisms were valid. [SAF ¶¶ 37, 40, 41, 42]

      d.  Mr. Mattiko was initially satisfied with Plaintiff's performance and contributions to the EMO team, but it "deteriorated" over time in terms of the "quality and quantity of contribution" to the team. (Deposition of Greg Mattiko ("Mattiko Dep.") at 36, 50 attached hereto as Exhibit I). He felt he had to initiate most investment discussions with Plaintiff. There was a period of time when it was "very obvious" Plaintiff was not engaging. (Mattiko Dep. 42).

Response: Undisputed that Mr. Mattiko became critical of Ms. Chan's performance after she engaged in protected activity. [SAF ¶¶ 24-75] Disputed that these criticisms were valid. [SAF ¶¶ 37, 40, 41, 42]

> e.  Plaintiff's "attitude generally towards feedback and towards self-improvement" was also of "significant concern." (Baxter Dep. 96). In Mr. Baxter's opinion, Plaintiff "took personal offense at efforts to provide constructive feedback and to help her become better," which was contrary to the "growth mindset" required to be a successful investor at Wellington. (Baxter Dep. 96).

Response: Undisputed that Mr. Baxter reacted negatively to Ms. Chan's protected activity, and expressed the conclusions quoted from his deposition testimony. [SAF ¶¶ 36, 37].  Disputed that those conclusions were accurate. [SAF ¶¶ 37, 40, 41, 42].

27.  While Plaintiff did not seem to embrace her equity research analyst role, she was clear on one thing – she wanted the responsibilities of a portfolio manager. Just months into her analyst job, Plaintiff identified putting her "portfolio management skills to good use" as one of two goals for the following calendar year. (Pl. Dep. I, 217-19; Philip Dec. ¶ 16 and Exh. 5 thereto).

Response: Disputed as to the assertion that "Plaintiff did not seem to embrace her equity research analyst role," as Ms. Chan's performance was viewed favorably prior to her protected activity. [SAF ¶¶ 16-19] Undisputed that Ms. Chan wanted portfolio manager responsibilities, and that working towards that goal was an expected part of the role she had been hired to perform. [SAF ¶¶ 9, 19]

28.     Mr. Argyle, in turn, recalls the tenor of conversations with Plaintiff were that she was an experienced fund manager and should have the opportunity to "launch a fund" at Wellington. (Argyle Dep. 93-95).

Response: Undisputed.

29.     Mr. Argyle felt that Plaintiff could have more impact on the EMO team, but that she was distracted by the desire to launch a fund. (Argyle Dep. 93-94). Hoping to eliminate distraction, and help Plaintiff to assimilate, in 2015 Mr. Argyle supported the launch of the China Growth fund for Plaintiff to manage. (Argyle Dep. 91-94; Baxter Dep. 188). Mr. Argyle believed it was "an opportunity to try and help [Plaintiff] be more successful in integrating with the broader dialogue and debate of the firm and she was struggling with that." (Argyle Dep. 92).

Response: Disputed. Mr. Argyle did not have any concern with Ms. Chan's contribution to EMO when he decided to support the launch of her fund in October 2015. [Exhibit N, Tab 6 at DEF10548]. Nor did Mr. Mattiko. [See Deposition Transcript of Gregory Mattiko, attached hereto as Exhibit P ("Exhibit P"), at 82]. Further, supporting China Growth's launch was not an empty gesture aimed at appeasing Ms. Chan, as her fund presented a significant business opportunity for Wellington [Exhibit N, Tab 7 at DEF4879] and Mr. Argyle found the prospect of making China Growth part of Wellington's "China Platform" highly appealing. [Exhibit N, Tab 8 at DEF13393]

30.     However, Mr. Baxter did not always share Mr. Argyle's optimism. For example, in a percipient October 2015 email to Mr. Argyle, Mr. Baxter expressed "very strong doubts whether we can turn [Plaintiff] around" (because of her predisposition to pushback on feedback) and stated that his interest in "creatively looking for seed

12

money" for a fund for Plaintiff to manage was "waning." (Baxter Dep. 185-87; Philip

Dec. ¶ 34 and Exh. 21 thereto).

Response: Disputed as to the assertion that Mr. Baxter's increasingly negative feelings toward

Ms. Chan were caused by any "predisposition to pushback on feedback," as it was Ms. Chan's

protected activity that drew Mr. Baxter's ire. [SAF ¶¶ 23, 24, 30, 35, 36]

31.    Leading up to the launch of the China Growth fund, Mr. Argyle tried to manage

Plaintiff's expectations by explaining that it would be a lengthy process. Plaintiff

understood. (Pl. Dep. II, 19).

Response: Disputed in part, as the discussion about "lengthy process" in the cited testimony

pertained to successfully raising capital from outside investors, not launching the fund.

32.    To prepare for taking on portfolio management responsibilities, Plaintiff first

managed a "paper" (i.e., mock) portfolio. (Pl. Dep. II, 23-24).

Response: Undisputed.

33.    Then, in September 2015, Plaintiff made an internal presentation on her investment

philosophy and process for a potential China Growth strategy to the Asia Pacific

Philosophy and Process ("P&P) panel. (Pl. Dep. I, 241-43).

Response: Undisputed.

34.    The P&P panel provides investors in Asia of all experience levels with an opportunity

to present their philosophy and process to a panel of other Wellington investors

assembled to provide feedback. (Baxter Dep. 85-86; 152-53).

Response: Disputed, as the "Asian Philosophy and Process group" was specifically intended for

investors who had not yet managed a portfolio and, therefore, needed to "start to develop, refine

and articulate a philosophy to better work with other investors, improve stock picking and build a foundation for managing money someday (or better support those who do)." [Exhibit N, Tab 9]

35.   Plaintiff did not object to presenting at the P&P panel, but was unhappy with the critical feedback she received there. (Pl. Dep II, 10; Pl. Dep. I, 260-66).

Response: Disputed as to the assertion that Ms. Chan was unhappy because she received "critical feedback." Ms. Chan was upset by the experience because she believed she was being subjected to unfair scrutiny and insults that would not be occurring if she were a man. [Exhibit G, Tab 1 at response to Int. 7]

36.   After the P&P panel, Plaintiff drafted an email to Mr. Argyle dated October 7, 2015 (which she did not ultimately send), in which she likened it to a "kangaroo court." (Pl. Dep. II, 13-14; Philip Dec. ¶ 17 and Exh. 6 thereto). She described some of the feedback as "fairly patronizing" and felt it "missed the point." In the unsent email, Plaintiff denigrated the "people and culture in [Hong Kong]" as not being "on par" with the rest of Wellington and commented that "insecure people will sometimes behave unprofessionally and disrespectfully to others to bolster their own self confidence." Plaintiff also wrote in her draft email that "there are plenty of firms who can raise money off my track record and where I can put my skills to better use . . . If there are misunderstandings that cannot be reconciled then it is better for us not to waste each other's time any longer." (Id.).

Response: Undisputed.

37.   In the unsent email, Plaintiff demanded a "real and proper role" as a "fund manager of a China fund, seeded with full support of the firm to grow it." (Id.)

Response: Undisputed.

38.    Plaintiff's email is devoid of claims that she viewed anything about the panel or the feedback she received as owing to her gender or national origin. Rather, Plaintiff remained focused on perceived business slights and focus on becoming a portfolio manager. (Id.)

Response: Disputed. While the draft email did not make specific reference to discrimination, it identified areas in which Ms. Chan believed her professional development was being stymied due to the discriminatory biases she had been complaining about for several months. [Exhibit N, Tab 10].

39.    On December 8, 2015, Mr. Baxter summarized peer feedback Plaintiff had received as part of the annual review process. He informed Plaintiff that there was "room for improvement" on collaboration and "nearly universal and strikingly consistent" constructive feedback relating to Plaintiff's "communication." He explained that when it comes time to pitch a China Growth fund, "clear and succinct communication" would be "even more important." (Pl. Dep. II, 21-22; Philip Dec. ¶ 18 and Exh. 7 thereto).

Response: Disputed as to the assertion that Mr. Baxter had received "nearly universal and strikingly consistent" constructive feedback relating to Plaintiff's "communication," as that statement is not supported by the peer review summary produced by Defendants in discovery. [Exhibit N, Tab 37; see also SAP ¶¶ 40-42]

40.    In the email, Mr. Baxter discussed Wellington's "feedback intensive" culture, yet observed that Plaintiff at times seems "resistant or closed to feedback." (Id.)

Response: Undisputed.

41.     In Mr. Baxter's judgment, Plaintiff was on a "performance watch" by year-end 2015. (Baxter Dep. 168-69).

Response: Disputed, as Mr. Baxter testified that Ms. Chan was not on a performance watch. [Exhibit L at 168-169]

42.     By December 2015, Mr. Argyle understood Plaintiff's contribution to the EMO team to be lacking. (Argyle Dep. 99).

Response: Disputed. The cited testimony does not support the assertion that Plaintiff's contribution was "lacking." Nor is there anything in the year-end feedback provided to Ms. Chan on December 8, 2015, that would suggest her contributions to the EMO team were lacking. [Exhibit N, Tab 5 at 11357]. Further, Mr. Argyle's email exchange with Mr. Mattiko on December 1, 2015 makes no mention of any such issue. [Exhibit N, Tab 11 at DEF10002]

43.     Accordingly, during their December 2015 year-end meeting, Mr. Argyle stressed to Plaintiff that, with the impending launch of the China Growth fund, maintaining focus on her primary responsibilities as an analyst for EMO would be "critically important." (Argyle Dep. 146-147).

Response: Disputed. The cited testimony does not provide admissible evidence in support of the assertion, as Mr. Argyle testified that he does not recall the conversation. [Exhibit M at 145-146]

44.     By January 2016, with Mr. Argyle's backing, Wellington formally approved the China Growth fund for Plaintiff to manage. (Pl. Dep. I, 240).

Response: Undisputed.

45.     Mr. Argyle also expended his own internal capital to locate $1 million of "internally sourced" money to start the fund (which Plaintiff thought was "low"). The China Growth fund officially launched in July 2016. (Argyle Dep. 126; Pl. Dep. II, 25- 27).

Response: Undisputed.

46.     Plaintiff's focus turned to marketing the China Growth fund to Wellington's
        sophisticated institutional clients and prospects. However, before she could do so,
        Plaintiff understood that she needed to "sell" herself and her fund approach to
        Wellington's Global Relationship Group ("GRG"), which managed Wellington's
        relationships with its institutional clients and prospects. (Pl. Dep. II 28-29; Argyle
        Dep. 176).

Response: Undisputed.

47.     Thus, in the Spring of 2016, Plaintiff conducted internal presentations to multiple
        individuals within GRG. Plaintiff admits the feedback was "not particularly good."
        However, she thought it was "good enough." (Pl. Dep. II, 29-31, 34, 36).

Response: Disputed in part, as it was Ms. Chan's presentation skills, not the feedback, that she
believed was "good enough for attending client visits." [Exhibit O at 31]

48.     Andria Weil, a GRG relationship manager, informed Elizabeth Hogbin, a product
        manager who was working with Plaintiff on the China Growth fund, that Plaintiff
        "absolutely" was "not ready for client/consultant meetings" and that "a lot of work"
        was needed. Based on a "quick poll," Ms. Weil reported it was "[u]nlikely that any of
        us would take her on the road if she presented like that to a client/consultant." (Pl.
        Dep. II, 33; Philip Dec. ¶ 19 and Exh. 8 thereto).

Response: Disputed as to the accuracy of Ms. Weil's purported observations, as the cited email is
inadmissible hearsay and therefore cannot be used to prove the truth of the matter asserted.
Further, Ms. Weil's purported observations are contradicted by other evidence confirming that

Ms. Chan had demonstrated a strong ability to present and otherwise interact with clients. [SAF ¶¶ 18, 52-54, 63]

49.     On June 8, 2016, Ms. Hogbin sent an email to Messrs. Argyle and Baxter, explaining that GRG was "unable to schedule any marketing meetings" for the China Growth fund, citing: (1) limited demand "for China strategies from our client base at this point in time; and (2) GRG's perception that Plaintiff's presentation skills needed polishing." (Pl. Dep. II 35-37; Philip Dec. ¶ 20 and Exh. 9 thereto).

Response: Undisputed.

50.     GRG declined to move forward with a marketing trip that Plaintiff was planning to take. (Pl. Dep. II, 31, 37).

Response: Undisputed.

51.     In a follow-up email, Ms. Hogbin relayed to Messrs. Argyle and Baxter that she had tried to provide Plaintiff with guidance for a follow-up presentation, but that it "seemed difficult for [Plaintiff] to absorb at this moment in time" and she was "slightly in denial about her presentation skills." Ms. Hogbin had explained to Plaintiff that "it is very normal not to have meetings this early in your track record/Wellington tenure but that seemed frustrating to her as well." (Pl. Dep. II 36-38; 116; Philip Dec. ¶ 20 and Exh. 9 thereto).

Response: Disputed as to the accuracy of Ms. Hogbin's observations concerning Ms. Chan, as the evidence confirms that Ms. Chan incorporated the feedback into her subsequent GRG presentation on June 15, 2016. [Exhibit N, Tab 12]

52.     Ms. Weil shared with Ms. Hogbin that she was "skittish to put [Plaintiff] in front of clients" because Plaintiff had conveyed that she was "taking lots of headhunter calls"

and that "people were calling her regularly to ask her to take over other funds." (Pl. Dep. II 39-40; Philip Dec. ¶ 21 and Exh. 10 thereto). She stated that she was "reluctant to put a portfolio manager in front of clients/prospects/consultants that might leave." (Id.)

Response: Disputed only to the extent that the assertion suggests that Ms. Chan meant to convey that she might leave. According to Mr. Argyle, this was apparently an "over reaction from GRG" as "the context was that [Ms. Chan] gets inbound calls from head hunters about taking over other funds and therefore there is presumably potential personnel turnover at other firms that [Wellington] could take advantage of." [Exhibit N, Tab 13 at DEF9667].

53.   Plaintiff informed Mr. Mattiko she was pregnant on or about August 3, 2016. (Deposition of Greg Mattiko ("Mattiko Dep. II"), 194-95 attached hereto as Exhibit J; Philip Dec. ¶ 22 and Exh. 11 thereto).

Response: Undisputed.

54.   On August 26, 2016, Cheryl Duckworth, the senior-most manager on the investment platform in the Asia Pacific at the time, sent an email to Messrs. Argyle and Baxter describing a one on one meeting that she had with Plaintiff, stating that Plaintiff's "time at Wellington is challenged due to her attitude." (Philip Dec. ¶ 23 and Exh. 12 thereto).

Response: Undisputed.

55.   Ms. Duckworth reported that during the meeting Plaintiff had provided an "unfortunate list of complaints, exasperation with services and nothing really that good" prompting Ms. Duckworth to conclude that Plaintiff still had a "big chip on her shoulders." (Pl. Dep. II, 46¬47; Philip Dec. ¶ 23 and Exh. 12 thereto).

Response: Disputed in part, as the cited email does not support the assertion that the referenced meeting caused Ms. Duckworth to conclude that Ms. Chan had a big chip on her shoulder. [Exhibit N, Tab 14]

56.     On September 1, 2016, Mr. Mattiko provided Mr. Argyle with his annual peer feedback on Plaintiff, including his observation that Plaintiff's "attitude or pessimism prevents her from integrating into the Wellington culture" and that "unless she makes a 180 degree change and accepts the firm for what it is she will continue to be dissatisfied." (Philip Dec. ¶ 24 and Exh. 13 thereto).

Response: Undisputed.

57.     On October 19, 2016, Mr. Baxter wrote to Mr. Argyle that he was "finding it more and more difficult to see how [Plaintiff] can make it here." He had found the tone of a recent email Plaintiff had sent to colleagues to be "needlessly confrontational." Mr. Baxter expressed remorse that he had not picked up on "this sort of attitude in the interview process." (Pl. Dep. II, 51-52; Philip Dec. ¶ 25 and Exh. 14 thereto).

Response: Undisputed.

58.     Plaintiff acknowledges that by late 2016, she may have become "disillusioned" at Wellington because of her frustrations with the launch and marketing of the China Growth fund. (Pl. Dep. II, 60).

Response: Disputed, as the cited testimony does not support the assertion.

59.     Yet, Plaintiff gave herself the highest rating available -- "5- An exceptional year" – on her 2016 self-review. (Pl. Dep. II, 53-54; Philip Dec. ¶ 26 and Exh. 15 thereto).

Response: Undisputed.

60.     Plaintiff's feedback from a broad swath of her peers painted a very different picture
        of Plaintiff's year – rating her amongst the lowest of more than 100 investment
        professionals within GEPM. Specifically, out of 114 investment professionals
        reviewed in GEPM, Plaintiff ranked 110th in collaboration, 95th on depth of
        knowledge, 111th on idea generation, and 109th on money making. (Philip Dec. ¶¶
        27-28 and Exh. 16 thereto).

Response: Disputed in part, as Ms. Chan's 2016 rankings were skewed by a Portfolio Manager

named John Boselli. [See Exhibit A (Declaration of Henry Philip), Tab 16 at DEF29038]

Although Mr. Boselli had minimal contact with Ms. Chan, he apparently advocated for Ms.

Chan's termination [Exhibit M at 115-116] and provided scores for Ms. Chan's 2016

performance—3, 1, 1—that Mr. Argyle recognized were clear outliers [Id. at 124].

61.     The message that Mr. Argyle and Mr. Baxter intended to convey at Plaintiff's 2016
        year-end meeting was "a very targeted one about certain things that needed to
        improve or else her long-term career at Wellington was in jeopardy." (Baxter Dep.
        170).

Response: Undisputed.

62.     After consulting with Human Resources, Mr. Argyle planned to issue this direct
        message to Plaintiff during their year-end meeting. (Argyle Dep. 178-79; Baxter Dep.
        170).

Response: Undisputed.

63.     Plaintiff met with Mr. Argyle and Mr. Baxter in Hong Kong on November 2, 2016.
        (Pl. Dep. II, 69-70).

Response: Undisputed.

64. Plaintiff secretly recorded this discussion on her cell phone without notifying Mr. Argyle or Mr. Baxter. (Pl. Dep. II, 69-70).

Response: Undisputed.

65. Although Plaintiff claims in her Complaint that Mr. Argyle "berated [her] for more than an hour," her surreptitious recording proves otherwise. (Compl., ¶ 49).

Response: Disputed. [See Exhibit G (Declaration of Deborah Lombardo), Tab 2]

66. Mr. Argyle spoke about Plaintiff's performance and need for improvement for a mere 17 minutes during their approximately 70-minute meeting and exhibited patience, while Plaintiff spoke for the majority of the substantive portion of the meeting, at times raising her voice and exhibiting anger. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

Response: Disputed. Mr. Argyle was antagonistic throughout the conversation, repeatedly interrupting Ms. Chan and mocking her explanations for why she felt disrespected and mistreated. [See Exhibit G; Tabs 2-3; SAF ¶¶ 43-45]

67. Mr. Argyle conveyed to Plaintiff the seriousness of her situation at Wellington, including candidly telling her that things "really" were not going well. He reviewed the disappointing feedback and scores from Plaintiff's peers. Mr. Argyle discussed Plaintiff's poor attitude, lack of engagement, lack of collaboration, her obvious discontent in being at Wellington as well as her lack of contribution to the EMO team and to the larger investment dialogue across the Firm. With respect to the Plaintiff's complaints about the Spring marketing trip and lack of client access, Mr. Argyle explained that GRG has hundreds of investment opportunities to present to Wellington's institutional clients, and rhetorically asked why GRG would present to

its clients an investor who was obviously so unhappy and might not remain at

Wellington long term. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

Response: Disputed as to the assertion that Mr. Argyle "reviewed the disappointing feedback and

scores from Plaintiff's peers," as Mr. Argyle's statements actually misrepresented the peer

feedback, which was generally positive aside from Mr. Boselli. [Exhibit A, Tab 16]

68.   Yet, through it all, Mr. Argyle delivered an optimistic message. He assured Plaintiff

that her situation at Wellington could be reversed, but only if she adopted a new

attitude of collaboration and engagement. However, he warned her that she had just

one final opportunity. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

Response: Disputed that Mr. Argyle "delivered an optimistic message," as the tone throughout

the meeting was antagonistic and mocking, seemingly aimed at either compelling Ms. Chan to

quit or to stop complaining about discriminatory treatment. [Exhibit G, Tabs 2-3]

69.   Despite the peer feedback and Mr. Argyle's sober assessment, Plaintiff recited her

laundry list of dissatisfactions with Wellington, including her view that the Firm had

broken a "promise" that she would be managing a fund shortly after hire. She

criticized Wellington's resources and administration and derided the $1M of seed

money Mr. Argyle had personally helped to source as "much below expectations."

(Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

Response: Disputed. Rather than recite a "laundry list of dissatisfactions," Ms. Chan candidly

responded to the issues raised by Mr. Argyle and assured him that "I'm trying to make things

work." [Exhibit G, Tab 3 at 54-55]

70.   At no point during the meeting did Plaintiff take any ownership or otherwise commit

to improvement. Instead, Plaintiff expressed that it was hard to change when she felt

that her expectations (about the alleged business promise at hire) had been

disappointed. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

Response: Disputed. With respect to GRG, for example, Ms. Chan described all of the feedback

that she took on board. With respect to change, Ms. Chan said "when every expectation that has

been set has been disappointed and continues to be disappointed, then yeah it's hard to change".

Every expectation includes her expectation that she would be treated with respect, which she also

mentioned in the meeting: "You know, I arrived, I assumed that other people would be

respectful.  When they weren't, I have pushed back, because…actually you know what, even if

you don't have a long professional history, people should be treated with respect." [Exhibit G,

Tab 3 at 18-21, 52-53, 59].

71.     Plaintiff proposed a quid pro quo -- her attitude and collaboration might change if she

were to be given what she claims to have expected regarding managing money and

client access. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

Response: Disputed. Ms. Chan was requesting respect and transparency, and noting that it would

be hard to change her view of Wellington without those two things. [Exhibit G, Tabs 2-3].

72.     In closing, Mr. Argyle warned Plaintiff that unless she turned things around upon her

return from an upcoming maternity leave, they would be having a "very different

discussion" the following year. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

Response: Undisputed.

73.     Mr. Argyle felt Wellington had reached a "fork in the road" with Plaintiff. While Mr.

Argyle wanted Plaintiff to succeed, in his view, she had to "take steps to be

successful." In Mr. Argyle's view, "[t]he ball was in her court." (Argyle Dep. 172;

179).

24

Response: Undisputed.

74.     Mr. Argyle reiterated his expectations in a November 22, 2016 email after the meeting in which he acknowledged Plaintiff's strengths, but repeated his concern with her "broad performance" and the "lack of meaningful progress in some areas" since their 2015 year-end discussion. (Pl. Dep. II, 67-68, 70; 76; Philip Dec. ¶ 29 and Exh. 17 thereto). Specifically, supported with examples, Mr. Argyle summarized concerns with:

  (1)     Plaintiff's failure to embrace the firm's ethos of Client, Firm, Self;

  (2)     Plaintiff's level of contribution to the EMO team, cautioning that it was "imperative" that she "act fully in support of the EMO team";

  (3)     Plaintiff's lack of broad contribution to the firm's investment dialogue; and

  (4)     Plaintiff's interactions with colleagues who found it a challenge to work with her.  (Id.)

Response: Disputed in part. The referenced email differs in both tone and substance from the November 2nd meeting [Compare Exhibit G, Tab 2, with Exhibit A, Tab 17], as it was drafted under the direction of Wellington's HR team. [See SAF ¶¶ 68-76]

75.     In the email, Mr. Argyle directed Plaintiff that her "short to medium term imperative" was to respond to the feedback that he had shared during their meeting and in the follow-up email, and expressed his fervent hope that Plaintiff would "embrace" it. (Id.)

Response: Undisputed.

76.     In closing, Mr. Argyle reiterated that he looked "forward to receiving [her] reply and acknowledgement." (Id.)

Response: Undisputed.

77.     Contrary to Mr. Argyle's express directive, Plaintiff did not respond to his email in the weeks before she left on paid maternity leave in mid-December 2016 or at any time upon her return in mid-April 2017. (Pl. Dep. II, 76).

Response: Disputed in part. Ms. Chan responded to Mr. Argyle's email in the manner that she thought was most appropriate and least likely to result in additional acts of retaliation—specifically, rather than defend herself against Mr. Argyle's accusations, and explain (again) that her discontent was simply a product of the discriminatory treatment she had faced, Ms. Chan kept quiet and committed herself to doing the best job she could on behalf of Wellington and its clients. [See Deposition Transcript of Gigi Chan, Volume II, attached hereto as Exhibit Q ("Exhibit Q"), at 77-83; Declaration of Gigi Chan, attached hereto as Exhibit R ("Exhibit R"), ¶ 22]

78.     Mr. Argyle viewed Plaintiff's failure to respond as the equivalent of Plaintiff giving him the "middle finger." (Argyle Dep. 171-72).

Response: Disputed, as Mr. Argyle wrote in a May 4 email that he had "no idea" whether "there has been a genuine response" by Ms. Chan to the feedback. [Exhibit N, Tab 17]

79.     In Mr. Argyle's view, "[t]he ball was in her court." (Argyle Dep. 172; 179).

Response: Undisputed.

80.     Mr. Philip met with Plaintiff in Hong Kong in May 2017, to see if she "would respond in some manner to the feedback and the direction that [Mr. Argyle] had given

her in his conversation and subsequent email..." (Philip Dep. 89, 90, 93-95). She did not. (Id.)

<u>Response:</u> Disputed in part, as Ms. Chan refrained from complaining about her past experiences and told Mr. Philip that she was "fine." [Exhibit N, Tab 18]

81.    Mr. Mattiko informed Mr. Argyle via email on May 2, 2017, that "not much had changed." (Pl. Dep. II, 81-82; Philip Dec. ¶ 30 and Exh. 18 thereto). Plaintiff had "not increased her contribution to the EMO team at all" and seemed "solely focused on her China Growth portfolio." (Id.) Mr. Mattiko expressed to Mr. Argyle that Plaintiff still had not acknowledged the "issues" they had "spelled out to her last year nor is doing anything to rectify the deficiencies." (Id.)

<u>Response:</u> Disputed as to the assertion that Plaintiff was not "rectifying the deficiencies" raised in the November 2, 2016 meeting, as Mr. Mattiko acknowledged in his email that Ms. Chan "seemed generally in decent spirits, and had no complaints." [Exhibit N, Tab 19 at DEF21922].

82.    Nevertheless, Mr. Argyle was still open to the idea of Plaintiff remaining with Wellington as long as she provided a "genuine response" to the feedback provided to her. (Philip Dec. ¶ 31 and Exh. 20 thereto).

<u>Response:</u> Undisputed.

83.    Mr. Mattiko then met with Plaintiff in Hong Kong on or about May 31, 2017, in an effort to get everyone on the same page. Mr. Mattiko wanted to understand how Plaintiff felt about working at Wellington, and to convey Wellington's desire that Plaintiff acknowledge or change the way she was going about doing things. (Mattiko Dep. 105-106).

Response: Disputed in part, as the recording reflects that Mr. Mattiko's only goal for the meeting was to get Ms. Chan to disclose whether there had been any change in how she felt about working at Wellington. [Exhibit G, Tabs 4-5]

    84.    Plaintiff secretly recorded her meeting with Mr. Mattiko. (Pl. Dep. II, 80).

Response: Undisputed.

    85.    Just as Plaintiff had done in her meeting with Mr. Argyle six months earlier, Plaintiff again discussed Wellington's so-called "broken" business promises and stated that Wellington bore the "onus" to acknowledge and make good on these alleged promises before she would change. (Lombardo Dec. ¶¶ 8-9 and Exhs. 4-5 thereto).

Response: Disputed. The tone and tenor of this meeting was extremely different from Ms. Chan's prior meeting with Mr. Argyle.  Mr. Mattiko presented himself as peacemaker, and coaxed Ms. Chan into opening up about her current level of job satisfaction. Aside from inquiring as to whether Ms. Chan is "happy here," Mattiko does not address any of the other alleged deficiencies addressed in the November 2 meeting. [Exhibit G, Tab 5 at 17]

    86.    Mr. Mattiko explained they were in a "holding pattern" due to Plaintiff's lack of trust in the Firm, which Plaintiff called a "load of crap." (Id.)

Response: Disputed as to Ms. Chan's use of the phrase "load of crap," which was not made in reference to the "holding pattern" comment, but instead the supposed view that Ms. Chan was wrong to rely on Wellington. [Exhibit G, Tab 5 at 11-12]

    87.    When Mr. Mattiko asked Plaintiff if she even wanted to build a career at Wellington, Plaintiff did not commit, instead replying that she had "choices." She reiterated that Wellington needed to make good on the business promises she alleged were made to her, including additional access to clients. (Id.)

28

Response: Undisputed.

88.  Mr. Mattiko declared they had reached a "stalemate." He closed the meeting by

telling Plaintiff he would deliver her message to management. (Id.)

Response: Disputed. Mr. Mattiko's use of the term "stalemate" was describing his perception of

the relationship between Wellington and Ms. Chan, not the conclusion of his conversation with

Ms. Chan. [Exhibit G, Tab 5 at 17-19, 36-37] Further, the "message" that Mr. Mattiko indicated

he would take back to management was that Ms. Chan believed her relationship with Wellington

was salvageable and "that there isn't enough bad blood there that it'll never work." [Exhibit G,

Tab 5 at. 24]

89.  In early June 2017, Messrs. Argyle, Philip and Matiko met and discussed next steps

with Plaintiff. In their judgment, Plaintiff still was not meeting Wellington's

expectations for an equity research analyst -- including supporting the EMO team and

sharing and collaborating more broadly across the organization. Because of her

unwillingness to accept constructive feedback, they thought it unlikely the situation

would improve. (Mattiko Dep. 92-99, 107; Philip Dep. 113¬115; Argyle Dep. 80-81).

Response: Undisputed that Messrs. Argyle, Philip and Matiko met on June 9th, 2017, to decide

Ms. Chan's fate. [Exhibit A, Tab 22 at DEF7570] Otherwise disputed. At deposition, none of the

participants could recall what was actually discussed at the meeting. [See Deposition Transcript

of Henry Philip, attached hereto as Exhibit S ("Exhibit S"), at 104-105; Exhibit M at 187;

Exhibit P at 113] As reflected in Mr. Argyle's May 4th email and the transcript of Mr. Mattiko's

May 31 meeting with Ms. Chan, Wellington's primary concern related to whether Ms. Chan

would adopt a more favorable view of Wellington and its culture. [Exhibit G, Tab 5 at 13, 17]

90.    Plaintiff cannot identify any concrete actions she took to improve in the critical areas
       Mr. Argyle had identified. (Pl. Dep. II, 78, 80).

Response: Disputed. [Exhibit Q at 78-79]

91.    As a steward of GEPM's resources, Mr. Argyle concluded he could no longer justify
       Plaintiff's continued employment at Wellington at approximately $750,000 annually.
       (Argyle Dep. 80-81, 165, 183-84; Philip Dec. ¶ 15 and Exh. 4 thereto).

Response: Disputed. The majority of Ms. Chan's compensation at Wellington consisted of

discretionary incentive pay. [Exhibit A, Tab 4 (Offer letter) p. 2] Further, there is no evidence

that Wellington found this amount prohibitive, and in fact Wellington waited three months from

the date the decision to terminate was made until it was actually implemented. [See SAF ¶ 82-

83] Moreover, had "justify[ing]" Ms. Chan's compensation been a concern, there were ample

opportunities presented for Wellington to generate additional revenue utilizing Ms. Chan's skills.

[See SAF ¶¶ 60-61]

92.    Consequently, in June 2017, Mr. Argyle made the decision to terminate Plaintiff's
       employment. (Argyle Dep. 183-84; Philip Dec. ¶ 35 and Exh. 22 thereto.) Plaintiff
       admits that Mr. Argyle acted in his corporate capacity at all relevant time. (Pl. Dep.
       II, 12-17).

Response: Disputed that the decision to terminate Ms. Chan's employment was a

"consequen[ce]" of Mr. Argyle being unable to justify Ms. Chan's salary. [See response to ¶ 91,

above.] Otherwise undisputed.

93.    Mr. Baxter, who had moved to a different role, did not play a role in the termination
       decision. (Baxter Dep. 32, 217).

Response: Undisputed.

94.     Plaintiff was notified of her termination in September 2017, after numerous failed attempts to get her to meet with Mr. Philip. (Pl. Dep. II, 84).

Response: Undisputed.

95.     Wellington did not replace Plaintiff's role as equity research analyst on the EMO team. (Argyle Dep. 147-49; Mattiko Dep. 25).

Response: Undisputed.

96.     The China Growth fund closed shortly after Plaintiff's departure from Wellington. (Philip Dec. ¶ 32).

Response: Undisputed.

97.     Plaintiff alleges a colleague supported her in pitching an opportunity to a client interested in launching a fund for a Chinese client that Plaintiff would be well-positioned to manage. (Compl., ¶¶ 42-44; Pl. Dep. II, 132).

Response: Undisputed.

98.     In Mr. Argyle's judgment, Plaintiff was already struggling to balance her "day-to-day" responsibilities. Providing her with new responsibilities at that juncture would not have been a "rationale business decision" and "made no sense." For those reasons and because of Plaintiff's statements about headhunters pursuing her, Mr. Argyle felt it would not be consistent with his fiduciary duties to pursue new opportunities with investors. (Argyle Dep. 162-63; 167-69).

Response: Disputed. Mr. Argyle quashed the opportunities because he knew Ms. Chan was unhappy based upon her protected activity, and therefore was concerned she might choose to leave. [See SAF ¶¶ 30-33, 36, 44-45, 49-53, 57-60] Mr. Argyle's concern that Ms. Chan may leave was not the result of her comments about headhunters, as Mr. Argyle understood "the

context was that [Ms. Chan] gets inbound calls from head hunters about taking over other funds and therefore there is presumably potential personnel turnover at other firms that [Wellington] could take advantage of." [Exhibit N, Tab 13 at DEF9667]

99.   Plaintiff understood that she should report issues of concern relating to harassment and discrimination. (Pl. Dep. II, 144).

Response: Undisputed.

100.   Plaintiff never made a written complaint of discrimination, retaliation or inappropriate touching or inappropriate comments of a sexual or racist nature during her employment at Wellington. (Pl. Dep. II, 145-46). She never made a verbal complaint about inappropriate touching. (Pl. Dep. II, 145). Plaintiff never contacted any of the individuals identified in Wellington's Policy Against Harassment and Discrimination, including the Chief Human Resources Officer, the Director of Human Resources, the Regional Human Resources Director or any of the assigned Human Resources relationship managers. (Pl. Dep. II, 146-47).

Response: Disputed as to the assertion that Ms. Chan did not complain to a person designated in Wellington's Policy, as the policy identifies "an employee's management" and "members of the Executive Committee" as appropriate persons to whom such concern can be brought, which is what Ms. Chan did. [Exhibit A, Tab 1 at DEF30028]

101.   Plaintiff contends that she experienced the following inappropriate comments or conduct during her more than three-year tenure at Wellington.

Response: Disputed to the extent that Defendants suggest these are the only incidents that Ms. Chan experienced. [See SAF ¶ 21]

    a.  Plaintiff does not know if the 2014 retirement party that she attended in London, which she alleges had a mirrored dance floor, was sponsored by Wellington. (Compl. ¶ 23; Pl. Dep II, 123-24).

<u>Response:</u> Undisputed.

    b.  In October 2014, a male colleague "barged in" between herself and their shared assistant and in March 2015, physically baked [sic] Plaintiff up against a wall during a disagreement over an investment. (Pl. Dep. II, 134-37).

<u>Response:</u> Undisputed.

    c.  In January 2015, a colleague said that "China is full of crap" in the context of a discussion about picking stocks. (Pl. Dep. II, 125).

<u>Response:</u> Undisputed.

    d.  Mr. Mattiko once put his hand on Plaintiff's lower back at a bar on a business trip. (Pl. Dep. II, 127-28).

<u>Response:</u> Disputed in part, as Ms. Chan described the touching as being on her "lower back at the top of my buttocks."

    e.  In 2015, a male colleague asked Plaintiff, who was with her husband, to go to what Plaintiff referred to as a "prostitute bar." She went with her husband. (Pl. Dep. II, 129) Plaintiff's husband does not recall anything offensive or improper transpiring at the bar. (Deposition of Maxence Vinot ("Vinot Dep.") 116, attached hereto as Exhibit K).

<u>Response:</u> Disputed in part, as Ms. Chan was not with her husband when the invitation was made but instead "got [him] to come along." [Exhibit Q at 129]

  f. A partner once told her that she had been hired because she was Chinese 'but not too Chinese." (Pl. Dep. II, 131).

<u>Response:</u> Undisputed.

  g. A colleague once asked if she could run a fund while pregnant and said that he had remembered what his wife was like when pregnant. (Pl. Dep. II, 133; Philip Dec. ¶ 33 and Exh. 20 thereto) (October 19, 2016 email from Alex Qian to Plaintiff stating "I appreciate that you are fine to continue keeping an eye on the portfolio while on maternity leave. In my personal experience as a father of two boys, my wife was totally consumed by the baby in several months after birth. I will completely understand if your priority becomes 'Baby, Client, Firm, Self.'").

<u>Response:</u> Undisputed.

102. In response to Interrogatory No. 7 in Plaintiff Gigi Kai Zi Chan's Answers and Objections to Defendant Wellington Management Company LLP's First Set of Interrogatories, Plaintiff listed all instances in which she allegedly complained of discrimination or retaliation and included all relevant details of any alleged conversation. (Exh. XX, Plaintiff's Answers to Defendants' First Set of Interrogatories, Interrogatory No. 7; Pl. Dep. II, 138, 141).

<u>Response:</u> Undisputed.

103. As set forth in her response to Interrogatory No. 7, Plaintiff asserts she first engaged in protected activity just months after her hire in December 2014, when she allegedly told Mr. Mattiko that investors spoke to her like she was "junior" because she was female and Asian. She then claims that she continued to raise periodic concerns about her treatment at Wellington to various people, each time allegedly attributing it to her

gender and national origin, including in March and June 2015, and multiple times in each of September, October, November and December of 2015. Plaintiff also claims to have informed Mr. Argyle in October 2015, that "feedback she had received during the P&P panel, particularly one colleague's comments, was disrespectful and inappropriate." She claims that she repeated those concerns to Mr. Argyle in December 2015, and also shared that the purported "delay" in the launch of the China Growth fund was because she was female and Asian. Plaintiff also claims that in June 2016, she told Mr. Argyle that GRG's decision to cancel the client marketing trip was disrespectful and that she could not see anyone else treated that way. Plaintiff claims to have continued to complain to others about alleged mistreatment along the same lines through the latter half of 2016 and during her November 2, 2016 meeting with Mr. Argyle. (Id.)

Response: Undisputed.

104.  Some 38 minutes into her secretly recorded conversation with Mr. Argyle and Mr. Baxter on November 2, 2016, Plaintiff stated that she should not be "patronized" and that "[j]ust because I look young, I'm a female, I'm Chinese, doesn't mean people can talk down to me. That's what I've said every single time." The meeting then carried on for an additional 31 minutes without Plaintiff again mentioning her protected class status or alleged discrimination. (Lombardo Dec. ¶¶ 6-7 and Exhs. 2-3 thereto).

Response: Disputed in part, as Ms. Chan made numerous other references to discrimination using terms like "insults," "disrespectful" treatment, and "unprofessional" behavior. [Exhibit G, Tab 3 at 20-21, 37, 40-41, 52-53]

105. During her tenure at Wellington, Plaintiff made no other complaints than those listed in response to Interrogatory No. 7. (Pl. Dep. II, 148-49).

Response: Undisputed.

106. Plaintiff's only basis for claiming pregnancy discrimination is the timing of her pregnancy disclosure and her termination.

Response: Disputed. [See Opposition Brief]

107. At the time Plaintiff disclosed her pregnancy, Wellington was already quite concerned with Plaintiff's level of Plaintiff's performance of her analyst job duties and had doubts regarding her commitment to the firm, so providing her with any new, unrelated responsibilities was never under serious consideration. (Argyle Dep., 162-169)

Response: Disputed, as all performance reviews conducted prior to Ms. Chan's pregnancy were positive, and the firm was in the process of committing to the launch and marketing of her new fund. [SAF ¶¶, 40-42, 46-48, 52, 54, 57-60]

108. It is entirely speculative whether the Minsheng fund opportunity would ever have come to fruition. (Argyle Dep., 162-3, 166)

Response: Disputed. [Exhibit N, Tab 20]


**MS. CHAN'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

1. Prior to joining Wellington, Ms. Chan enjoyed a successful career as a China Portfolio Manager at Columbia Threadneedle Investments ("Threadneedle"). [Exhibit O at 86, 169; Exhibit R, ¶ 2]

2. Ms. Chan started at Threadneedle in October 2000 and was promoted to fund manager in 2004. In 2007, she launched the China Opportunities Fund, which she managed until her departure in 2013. [Exhibit O at 71-72, 78; Exhibit R, ¶ 3]

3. The China Opportunities Fund performed extremely well under Ms. Chan, significantly outperforming its index and ranking in the top tier of its peer group. [Exhibit R, ¶ 4]

4. After seven years at the helm of the China Opportunities Fund, Ms. Chan opted to take a career break to follow her fiancé to New York and spend time planning for her upcoming wedding. [Exhibit O at 115-116, 120; Exhibit R, ¶ 5]

5. In January 2014, Ms. Chan reached out to Mr. Baxter to inquire if there might be an opportunity available for her at Wellington. [Exhibit N, Tab 21; Exhibit R, ¶ 6].

6. Ms Chan had interviewed for a China PM (portfolio manager) role at Wellington in early 2013. [Exhibit R, ¶ 6]

7. Although she had not been selected for that role, was attracted by Wellington's combination of a large distribution platform with little existing China business. [Exhibit R, ¶ 6]

8. Mr. Baxter "ran the idea of being a team analyst" by Plaintiff "and she was very open to it." [Exhibit N, Tab 22]

9. While analysts are typically more junior than portfolio managers, Wellington utilizes a dual structure that allows investors to work simultaneously as both team analysts and portfolio managers operating their own investment product. [Exhibit L at 45-46; Exhibit M at 76]

10. Mr. Philip told Ms. Chan that she could expect to be managing her own product within six to twelve months of joining Wellington. [Exhibit O at 182-183]

11. During the interview process, Ms. Chan also inquired extensively about how her progress and advancement as an investor would be judged at Wellington. In particular, she was interested in learning things like "How will her impact be evaluated?" "By whom will she be evaluated?" and "Who would champion her integration to the firm?" [Exhibit N, Tab 23 at 29084; Exhibit R, ¶ 7].

12. Satisfied by responses indicating that Wellington would judge her based on merit, Ms. Chan accepted the research analyst position.

13. Ms. Chan's first day of work in Wellington's Hong Kong office was May 21, 2014.

14. Initially, Ms. Chan was assigned to support the Emerging Market Opportunities ("EMO") team led by Greg Mattiko.

15. Ms. Chan and Mr. Mattiko had crossed paths while she was at Threadneedle and he held Ms. Chan in high regard for having a "very strong and positive attitude," and for having "built a great amount of experience in good and bad times." [Exhibit N, Tab 23 at 29083].

16. Prior to Ms. Chan raising concerns about discrimination, there were no criticisms or concerns raised about her performance on the EMO team.

17. In January 2015, Plaintiff received a positive year-end review. [Exhibit N, Tab 25]. Among other things, the review noted:

    a. "The main message is that you are off to a good start here"

    b. "Greg is very happy to have you on the team… He thinks you're a pleasure to work with and expects you'll continue to add lots of value to the team.  You bring a fresh perspective to the team dialogue, and you've been very proactive with

your ideas. You have a pragmatic approach to your investing and have adapted

well to Greg's process."

18. Ms. Chan's solid start was further reflected in her peer review survey, where she ranked

high in the areas of depth of knowledge (35th out of 114) and idea generation (17th out of

114). [Exhibit N, Tab 26].

19. In addition to her colleagues, Ms. Chan was also gaining positive recognition from

clients. HHMI, a significant investor in EMO, expressed interest in a pan-Asia portfolio

concept that Ms. Chan was developing. [Exhibit N, Tab 27].

20. As of May 2015, Wellington claimed to be supportive of those efforts, telling HHMI that

Wellington was "encouraging [Ms. Chan] to manage portfolios as she did before joining

Wellington." Id.

21. While Ms. Chan was achieving this initial success, she was also discovering the obstacles

that Wellington's culture posed to a woman of Chinese descent. [Exhibit R, ¶ 9]

22. The resulting culture with which Ms. Chan was forced to contend was dominated by

men—white men in particular—and often infected with sexist and/or racist undertones.

[Id.]

23. For example, Ms. Chan personal experienced the following:

    a. Shortly after starting at Wellington, a white male partner told Ms. Chan she had

       been hired because she was "Chinese but not too Chinese" [Exhibit R, ¶ 10];

    b. In January 2015, while Ms. Chan was out with a group of investors getting drinks,

       Mr. Matiko slid his hand down Ms. Chan's back to the top of her buttocks

       [Exhibit R, ¶ 10];

c. Another white male partner, Dan Maguire, told Ms. Chan in January 2015 that "China is full of crap" [Exhibit R, ¶ 10];

d. That same month, another white male, subsequently elevated to partner, invited Ms. Chan to visit a prostitute bar [Exhibit R, ¶ 10]; and

e. In February 2015, another white male partner became agitated and aggressive over a disagreement he had with Ms. Chan concerning a stock, to the extent that he stuck his face in Ms. Chan's face and she was physically forced back against the wall [Exhibit Q at 135-136; Exhibit R, ¶ 10].

24. While this culture did not make it impossible for an Asian woman like Ms. Chan to succeed at Wellington, the road she would have to travel seemed longer and more arduous.

25. Ms. Chan complained to Mr. Mattiko about her experiences in December 2014 and again in March 2015. She also complained to Mr. Baxter on June 3, 2015 and September 14, 2015. [Exhibit G, Tab 1 at response to Int. 7]

26. During the latter conversation, on September 14, 2015, Ms. Chan told Mr. Baxter that her experience at the firm had not been that of a collaborative culture, contrary to what had been described during the hiring process. Ms. Chan further complained that she was not being given responsibilities and opportunities commensurate with her skill and experience because, as an Asian female, she was assumed to be junior. She concluded by saying "I feel like I am at a party where I'm not welcome." [Exhibit G, Tab 1].

27. A few days later, on September 18, 2015, Ms. Chan participated in the Asian Process and Philosophy panel ("AP&P"). [Exhibit R, ¶ 13]  The AP&P was specifically intended for investors who had not yet managed a portfolio and, therefore, needed to "start to develop,

refine and articulate a philosophy to better work with other investors, improve stock picking and build a foundation for managing money someday (or better support those who do)." [Exhibit N, Tab 9].

28. During the course of the AP&P, Ms. Chan was subjected to belittling and disrespectful comments by Jun Oh, a male portfolio manager located in Wellington's Hong Kong office. [Exhibit Q at 109-111].

29. Ms. Chan perceived Mr. Oh's comments—which included words to the effect of "you look ridiculous"—as reflecting discriminatory bias towards Ms. Chan as an Asian female. [Exhibit O at 260-266; Exhibit Q at 109-112]

30. On September 22, 2015, Ms. Chan complained to Mr. Mattiko and her colleague, Philip Fan, about Mr. Oh's inappropriate and hostile conduct. Among other things, Ms. Chan stated that Mr. Oh would not have spoken to her like that if she was a man. [Exhibit G, Tab 1].

31. Although Wellington had told Ms. Chan that participation in the AP&P was a prerequisite for launching a fund, she learned that this was not true, and that similarly situated male employees—including Mr. Mattiko--had not been required to engage in the process. [Exhibit O at 242-243, 253]

32. Meanwhile, word of Ms. Chan's September 14th complaint to Mr. Baxter spread amongst Wellington's upper management.   On September 28, 2015, Mr. Argyle sent an email to Wellington's Managing Partner's—Brendan Swords, Jean Hynes and Phillip Perelmuter—advising of Ms. Chan's "I feel as if I'm at a party where I'm not welcome" complaint. [Exhibit N, Tab 29]

33. Argyle did not dispute the validity of Ms. Chan's complaint, but instead noted that "I have heard this before in GEPM though never so directly" and observed "we cannot take assimilation for granted." Id.

34. In that same email, Mr. Argyle reported that "[t]he good news is that all is going well on EMO" and advised that he would likely be seeking approval for Ms. Chan's China Growth fund in the next few months. Id.

35. On October 1, 2015, Mr. Argyle received an email from Mr. Burgess informing him of the AP&P debacle, which Mr. Burgess identified as one of several issues making Ms. Chan "feel unwelcome here." [Exhibit N, Tab 31].

36. According to Mr. Burgess, Mr. Mattiko did not want to "deal with what is becoming an HR/ personnel headache." Id.

37. As the fallout from the AP&P panel continued, a steady stream of apologists sought to convince Ms. Chan that she had simply misconstrued Mr. Oh's comments. [Exhibit G, Tab 1, pp. 9-11]. This included Mr. Baxter, Erin Murphy, and Greg Mattiko. In each instance, Ms. Chan maintained her view that Mr. Oh's comments were discriminatory, and that she would not have been treated that way if she were a man. Id.

38. Ms. Chan's steadfast conviction soon began to draw the ire of those around her. Mr. Burgess and Mr. Argyle viewed the situation as a "red flag," raising concerns over Ms. Chan's resiliency, sense of entitlement and humility. [Exhibit N, Tab 32] Mr. Baxter had a similar negative reaction, confessing that his enthusiasm for supporting the launch of Ms. Chan's fund was "waning." [Exhibit N, Tab 33]. Even Mr. Mattiko was "somewhere between irritated…, concerned and exacerbated," but most importantly he had "very little appetite for there being any drama on his team." [Exhibit N, Tab 34].

39. As a direct result of Ms. Chan's complaints about discrimination, many within Wellington came to form a negative opinion of Ms. Chan's "attitude" and attributed her complaints to Ms. Chan being "resistant to feed back." [See e.g., Exhibit N, Tabs 32-34]

40. Privately, however, there was some acknowledgement that "to come into Wellington as an investor, a female, in Asia that the odds are not stacked in Ms. Chan's favour necessarily and we have to have sympathy with how hard it must be for her to make it work at Wellington." [Exhibit N, Tab 35].

41. Meanwhile, Ms. Chan lodged additional complaints to Wellington's three Managing Partners—Jean Hynes, Brendan Swords and Phil Perulmuter. [Exhibit G, Tab 1]. In each instance, Ms. Chan made clear that she believed she was being subjected to discriminatory treatment.

42. Ms. Chan received another positive performance review from Mr. Baxter for 2015. [Exhibit N, Tab 5].

43. Although Mr. Baxter's review asserted that he had received feedback concerning Ms. Chan's communication skills that was "nearly universal and strikingly consistent" the peer review feedback report for 2015 does not support that claim. [Exhibit N, Tab 37]. Indeed, only one person suggested that Ms. Chan work on "tightening up her communication a bit." Id.

44. Nonetheless, both Mr. Baxter's review and the peer review feedback confirm that Ms. Chan was expected to devote a significant portion of her time in 2016 to developing her China Growth Fund. [Exhibit N, Tabs 5, 37] Indeed, "getting China Growth off the ground" is the first item listed by Mr. Baxter in describing Ms. Chan's 2016 "plate." Mr. Mattiko likewise commented in the peer review that Ms. Chan needed to "promote

herself better internally both to investors and GRG as she needs to start building a book of business of her own." Id.

45. As part of the end of year process, Ms. Chan also met with Mr. Argyle. While Mr. Argyle testified that he does not recall the conversation, his planned talking points reflect that his primary aim was to dissuade Ms. Chan from continuing to complain about the treatment that she believed to be discriminatory. [Exhibit N, Tab 8].

46. The meeting took place on December 4, 2015. [Exhibit G, Tab 1]. As she had previously, Ms. Chan told Mr. Argyle that she believed she was being treated differently because she was an Asian female and assumed to be junior. Ms. Chan also told Mr. Argyle "I demand to be treated with respect," to which Mr. Argyle responded "In this firm you don't demand anything." [Exhibit R, ¶ 14]

47. While Mr. Argyle refused to acknowledge the validity of Ms. Chan's complaints, he confirmed that development of her investment products—particularly China Growth— was a priority for the upcoming year and that Wellington would support her in those efforts. [Exhibit R, ¶ 15]

48. Launching the China Growth fund required a significant amount of work from Ms. Chan during the first half of 2016. This included presentations to Wellington's Product Panel (January 2016), Wellington's Capital Commitment Committee (February 2016), the Board of Directors for Wellington's Hong Kong affiliate (March 2016), and Wellington's Product Marketing Panel (May 2016). [Exhibit R, ¶ 16]

49. These efforts were not undertaken merely for Ms. Chan's benefit, as Wellington's "business case" for launching China Growth was extremely compelling. [Exhibit N, Tab 39]:

a. "China equity is a large category, with $51.5B in assets under management…";

b. "Despite the size of the market and the category, Wellington Management Funds (Global) has no China strategies in its line-up today";

c. "Based on feedback from GRG, we believe there is demand for this strategy and that the strategy could play a part in showcasing Wellington's broader China platform"; and

d. "Gigi's strong track record managing an almost identical strategy at her previous firm should be compelling."

50. China Growth was eventually launched, but doing so proved to be a longer and more arduous task for Ms. Chan than what was experienced by similarly situated men. For example, Mr. Oh first proposed his China Contrarian product on August 5, 2015 [Exhibit N, Tab 46], and was approved just three months later [Exhibit N, Tab 47], without having to present to the AP&P. Likewise, Mr. Mattiko's fund was launched within just three to six months of his arrival at Wellington, without the prerequisite of a philosophy and process panel. [Exhibit P at 84]

51. Overall, there appeared to be an inherent level of skepticism when it came to Ms. Chan's abilities and experience that caused Wellington to apply a higher degree of scrutiny to Ms. Chan than they did to her colleagues that were men and/or not Asian. [See SAF ¶¶ 22, 26-28, 30, 49]

52. This skepticism played out again in May and June of 2016, as Wellington prepared to market China Growth to its clients. Following a "dry run" session on May 31, 2016, Wellington's Boston-based GRG group opined that Ms. Chan was "absolutely not ready for client/consultant meetings." [Exhibit N, Tab 40].

53. When Ms. Chan questioned whether GRG's concerns may be attributable to her misunderstanding the purpose and structure of the "dry run" session, it was assumed that Ms. Chan was simply "in denial about her presentation skills." [Exhibit N, Tab 41]

54. But Ms. Chan was not in denial. Prior to joining Wellington, Ms. Chan had spent years successfully marketing her China Opportunities fund, including through media interviews. [Exhibit R, ¶ 17] Further, in her time at Wellington, Ms. Chan had developed a strong track record for successfully engaging with clients—so much so, that several had expressed interest in pursuing new investment products with Ms. Chan.

55. This disconnect between GRG's *perception* of Ms. Chan's abilities and what she had actually *demonstrated* while working with Wellington's clients was duly noted by Wellington's Managing Partner, Jean Hynes. [Exhibit N, Tab 42]. In a July 26, 2016 email to the other Managing Partners, Ms. Hynes wrote "When [Ms. Chan] presents internally, it is almost acrimonious. The irony is that she is wonderful with [Mr. Mattiko's] clients and consultants." Id. Ms. Hynes further noted "[Ms. Chan] thinks Wellington has not respected her and not given her a fair chance." [Id].

56. Mr. Mattiko made a similar observation regarding client interactions in an October 31, 2016 email to Mr. Argyle. [Exhibit N, Tab 15]. Among the three "positives" he identified for Ms. Chan, was that "she communicates well with clients." Id.

57. Further, Mr. Argyle observed first-hand that there was something askew about GRG's perception of Ms. Chan, noting in a June 27, 2016 that GRG may have had an "over reaction" to a comment that Ms. Chan made about communications with head hunters. [Exhibit N, Tab 44].

58. Bo Munier, another Asian female investor at Wellington, also expressed dissatisfaction about her dealings with the Boston-based GRG team. [See Deposition Transcript of Ray Helfer, attached hereto as Exhibit T ("Exhibit T"), at 107-108]

59. Nonetheless, Ms. Chan did everything that was asked of her by GRG. When they gave her feedback, she incorporated it. When they asked her to work with a coach to improve her public speaking, she did so. And in GRG's own estimation, Ms. Chan showed improvement. [Exhibit N, Tab 45; Exhibit R, ¶ 18].  But the opportunity to pitch China Growth to Wellington's clients never came. [Exhibit R, ¶ 19]

60. As Wellington dragged its feet on allowing Ms. Chan to market China Growth to its client based, there continued to be strong interest from other clients and prospects to have Ms. Chan manage their money.

61. For example, on September 20, 2016, Alex Qian—Head of GRG in China—reported that a large Chinese insurance company had tentatively decided to hire Wellington as their investment advisor because they "like[] our China Growth approach and Gigi's past investment success." [Exhibit N, Tab 43]. He concluded "Well done, Gigi!" Id.

62. Likewise, HHMI continued to express interest in having Ms. Chan manage more of its money. [Exhibit N, Tab 28 ("What's Gigi up to these days – the China product, or has she developed something pan-Asia?"); Exhibit N, Tab 38 ("I definitely want to visit with [Mr. Mattiko] at his new digs, and also touch base with Gigi and hear about her new effort"); Exhibit N, Tab 36 ("We want to make sure we have a couple hours for portfolio review with you, and an hour or so with Gigi discussing her new Asia-only effort.")]

63. In early August, Ms. Chan informed Mr. Mattiko that she was pregnant. [Exhibit A, Tab 11]. He promptly informed Mr. Argyle. Id.

64. On August 8, 2016 a recently terminated Wellington Portfolio Manager, Mina Koide, filed a Charge of Discrimination against Wellington, Mr. Swords and Mr. Argyle. [Exhibit U]  Ms. Koide, an Asian female, alleged that she had been discriminated against on the basis of her sex and race, and subsequently retaliated against when she raised those concerns to Mr. Swords and Mr. Argyle. Id. Among the discriminatory acts alleged by Ms. Koide was denial of a "fair marketing opportunity" for her fund.

65. On September 1, 2016, Mr. Mattiko wrote Mr. Argyle an email advising that he had completed his review of Ms. Chan's 2016 performance and sharing the following thoughts:

> Despite Gigi's leading understanding of all things related to the China market, she finds integrating into the Wellington culture difficult.  I used to be of the opinion this had to do with issues relating to the HK office, but now I am convinced that it has more to do with the lens through which Gigi views the firm and I believe the world in general.  Gigi, for some reason, believes that Wellington and the people who work here do not want her to succeed. This attitude or pessimism prevents her from integrating into the Wellington culture.  I fear that unless she makes a 180 degree change and accepts the firm for what it is she will continue to be dissatisfied. This is really unfortunate because Gigi herself is a very pleasant person and I enjoy working with her.  I also am convinced that she will add value for our clients. But if her view of Wellington does not shift I don't know how long she will either be willing to say or will be tolerated by others.

[Exhibit N, Tab 48]

66. Mr. Mattiko's email makes no mention of any alleged deficiencies in Ms. Chan's contributions to the EMO team. Id. Nor are any such deficiencies noted in his review of Ms. Chan's 2016 performance. [Exhibit A, Tab 16].  In fact, Mr. Mattiko's scoring of Ms. Chan for 2016 is comparable to the score he provided for 2015, including an identical score for "collaboration." Id.

67.  In October 2016, Mr. Argyle consulted with Wellington's HR function to prepare for a meeting with Ms. Chan. [Exhibit N, Tab 30]. HR provided Mr. Argyle a detailed script to

be used for his discussion, and advised him to have Mr. Mattiko assist with filling in the blanks "with lots of examples" of performance deficiencies. Id.

68. Following that advice, on October 31, 2016 Mr. Matiko provided Mr. Argyle "notes" identifying alleged performance deficiencies with respect to Ms. Chan. [Exhibit N, Tab 15].  Mr. Mattiko alleged that Ms. Chan's contribution to the EMO team is an area that needs improvement.

69.  During his November 2, 2016 meeting with Ms. Chan, Mr. Argyle sought to convince Ms. Chan to adopt a more positive view of Wellington and its culture.  [Exhibit G, Tab 3 at 29-30, 83]

70. To do so, he falsely represented recent peer feedback concerning Ms. Chan's performance. [Compare Exhibit G, Tab 3, and Exhibit A, Tab 16]

71. When Ms. Chan attempted to respond to Mr. Argyle's comments, he interrupted her in a mocking and antagonistic tone, saying things such as:

   a. "it always seems to be about what Wellington can do for Gigi" [Exhibit G, Tab 3 at 41]
   b. "oh but it's all about you, right?" [Exhibit G, Tab 3 at 44]
   c. "for the past two years you've said…look at me. I'm a superstar" [Exhibit G, Tab 3 at 51-52]
   d. "if you're as unhappy as you seem to be, I don't understand why you're here" [Exhibit G, Tab 3 at 54]

72. As she had previously, Ms. Chan made clear that her dissatisfaction with Wellington and its culture was the result of discriminatory treatment she had experienced, which she noted included "disrespectful" treatment, "insults" and "less than professional comments." [Exhibit G, Tab 3 at 20-21, 37, 40-41, 52-53]

73. Referencing her past complaints of discrimination, Ms. Chan stated "Just because I look young, just because I'm female, just because I'm Chinese, doesn't mean that people can talk down at me.  That's what I've said.  Every single time." [Exhibit G, Tab 3 at 52-53]

74. Mr. Argyle did not deny that assertion. [Exhibit G, Tab 3 at 52-53]

75. Despite Mr. Argyle's confrontational tone, Ms. Chan repeatedly expressed her desire to work cooperatively with Mr. Argyle, noting: "I am engaging with you and I am trying to make things work, but I don't believe you're hearing me." [Exhibit G, Tab 3 at 54-55]

76. Three weeks later, at the urging of HR, Mr. Argyle sent Ms. Chan a self-serving summary of their discussion. [Exhibit N, Tabs 24, 16]

77. While the email directed Ms. Chan to "acknowledge" and "respond," she did not see it until she had started her maternity leave. [Exhibit Q at 77-78; Exhibit R, ¶ 22]

78. Ms. Chan had a difficult delivery, and almost died giving birth. [Exhibit R, ¶ 20]

79. Ms. Chan returned to work on April 20, 2017. [Exhibit R, ¶ 21]

80. Given the reaction that Ms. Chan had received from Mr. Argyle when she tried to "respond" to his criticism during their meeting, she thought it best to "respond" to Mr. Argyle by making diligent efforts to contribute to the EMO team, trying to improve her participation in investor meetings and refraining from bringing up her past difficulties with Wellington and its culture. [Exhibit R, ¶ 22]

81. During a May 31, 2017 meeting with Mr. Mattiko, however, he convinced her to reveal her current state of mind on Wellington and its culture. [Exhibit G, Tab 5] Ms. Chan answered honestly, noting that her view of Wellington had not changed, but that she thought the relationship was salvageable. [Exhibit G, Tab 5]

82. At no point in this conversation did Mr. Mattiko ever express any dissatisfaction with Ms. Chan's contributions to the EMO team. [Exhibit G, Tab 5] In fact, the conversation concluded with an extensive discussion in which Ms. Chan provided her thoughts on an EMO investment. [Exhibit G, Tab 5 at 39-48]

83. Mr. Mattiko did admit, however, that Wellington was not moving forward with some of the potential fund management opportunities that were possibly available to Ms. Chan because the firm was unsure of her commitment. [Exhibit G, Tab 5 at 31-33 ("they're not gonna push forward if they don't know where you stand")]] Mr. Argyle made a similar admission at his deposition. [Exhibit M at 166-169]

84. Just days later, on June 9, 2017, Messrs. Argyle, Philip and Mattiko met to decide Ms. Chan's fate. Exhibit A, Tab 22 at DEF7570] While none of them could recall at their depositions what was actually discussed, they agreed that the decision to terminate Ms. Chan's employment was made at that meeting, and it was made by Mr. Argyle. [See Exhibit S at 104-105; Exhibit M at 187; Exhibit P at 113]

85. Despite deciding to terminate Ms. Chan on June 9, 2017, Wellington delayed implementing its decision until September. [Exhibit S at 106-07]

GIGI KAI ZI CHAN

By her attorneys,

*/s/ Patrick J. Hannon*
Patrick J. Hannon (BBO #664958)
HARTLEY MICHON ROBB HANNON, LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
Tel:  (617) 723-8000
phannon@hmrhlaw.com

## CERTIFICATE OF SERVICE

This hereby certifies that on April 1, 2021, this document, filed through the ECF

system, will be sent electronically to the registered participants as identified on the Notice

of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-

registered participants.

/s/ Patrick J. Hannon