Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


*********************************

GIGI KAI ZI CHAN,

                Plaintiff

vs.                    CA NO. 19-CV-11605-WGY

WELLINGTON MANAGEMENT COMPANY

LLP and CHARLES ARGYLE,


                Defendants


*********************************




                VIDEOTAPED DEPOSITION OF:

                  GIGI KAI ZI CHAN

                  (Taken Remotely)

                375 Route de Prades

                St. Geniez d'Olt, France

        October 6, 2020          9:07 a.m.


                  Darlene M. Coppola

              Registered Merit Reporter

            Certified Realtime Reporter



Page 2

1   APPEARANCES:

2   Representing the Plaintiff:

3   (Via Zoom)

4        HARTLEY MICHON ROBB, LLP

5        155 Seaport Boulevard

6        Boston, MA   02210

7        BY:   PATRICK J. HANNON, ESQUIRE

8        T 617.723.8000

9        E Phannon@hartleymichonrobb.com

10

11   Representing the Defendants:

12   (Via Zoom)

13        JACKSON LEWIS P.C.

14        75 Park Plaza

15        Fourth Floor

16        Boston, MA   02116

17        BY:   STEPHEN T. PATERNITI, ESQUIRE

18             SARAH WALSH, ESQUIRE

19             BEVERLY GAROFALO, ESQUIRE

20        T 617.367.0025

21        E stephen.paterniti@jacksonlewis.com

22        E sarah.walsh@jacksonlewis.com

23

24   (Continued on next page.)



Page 3

1    APPEARANCES (continued):

2    Also Present:

3    Sara Martin, Wellington Management Company

4    Gregory Mattiko

5    Kendra Dobson, Videographer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Page 4

```
 1                      INDEX
 2                   EXAMINATION
 3   Witness Name                                   Page
 4   GIGI KAI ZI CHAN
 5      Direct By Mr. Paterniti ........................... 7
 6
                      EXHIBITS
 7
     Exhibit          Description                   Page
 8
     No. 1            Housing Subsidy               28
 9
     No. 2            Threadneedle                  80
10                    organizational  chart
11   No. 3            Threadneedle suspension       101
                      letter dated September
12                    9, 2013
13   No. 4            Threadneedle Investment       109
                      Singapore (pte) Limited
14                    and Gigi Chan
                      Settlement Agreement
15
     No. 5            E-mail chain dated            126
16                    November 22, 2018,
                      Bates CHAN_04696 -
17                    CHAN_04698
18   No. 6            Plaintiff Gigi Kai Zi         137
                      Chan's Answers and
19                    Objections to Defendant
                      Wellington Management
20                    Company, LLP's First
                      Set of Interrogatories
21
     No. 7            LinkedIn Profile of           152
22                    Gigi Chan
23   No. 8            Resume of Gigi Kai Zi         152
                      Chan, Bates CHAN_05512
24
```



Page 5

```
 1                        EXHIBITS
 2    Exhibit          Description                    Page
 3    No. 9            E-mail dated February          161
                       26, 2013, Bates DEF
 4                     00016586
 5    No. 10           Interview feedback             173
                       summary, Bates DEF
 6                     00002577 - DEF 00002580
 7    No. 11           Email dated March 21,          189
                       2014, CHAN_05878
 8                     through 05880
 9    No. 12           Employment application         196
                       form, Bates CHAN_04281
10                     through CHAN_04286
11    No. 13           Wellington Global              197
                       Management application
12                     for employment, Bates
                       CHAN_04275 - CHAN_04279
13
      No. 14           Offer letter dated             200
14                     April 8, 2014, Bates
                       CHAN_04381 - 04388
15
      No. 15           E-mail dated October           212
16                     15, 2015, Bates
                       CHAN_01163
17
      No. 16           Memo dated June 12,            214
18                     2015
19    No. 17           E-mail dated October           216
                       21, 2014, Bates DEF
20                     00004039
21    No. 18           Self-Review of Gig             220
                       Chan, Bates DEF
22                     00013018
23    No. 19           E-mail dated September         225
                       25, 2015, Bates DEF
24                     00012683
```



Page 71

1          threatened suit against an employer?

2               A.    Not that I am aware of, no.

3               Q.    When is the last time your husband

4          worked for Tantallon?

5               A.    I don't recall exactly, but it was --

6               Q.    Do you know -- I'm sorry.  Go ahead.

7          I didn't -- I thought you were finished.

8               A.    No, you go on.

9               Q.    Do you know why he's no longer working

10         there, why -- strike that.

11                    Do you know why he stopped working

12         there?

13              A.    I believe he stopped working there

14         because the founder decided to downsize

15         operations.  That's my understanding.

16              Q.    Okay.  Tantallon -- at least he was --

17         your husband was based in Singapore when he

18         worked for them; is that right?

19              A.    Yes.

20              Q.    And was he living in Singapore?

21              A.    Yes.

22              Q.    Okay.  Threadneedle was your employer

23         starting in -- I think you said October 2000;

24         is that right?



Page 72

```
 1              A.    Yes.

 2              Q.    And the position that you were hired

 3        for was a trainee fund manager; is that right?

 4              A.    I don't remember the exact name of it,

 5        but yes.

 6              Q.    Would that be equivalent to an analyst

 7        at least in the -- in the Threadneedle

 8        parlance?

 9              A.    I remember my business card saying

10        analyst, so yes, I was -- I was hired as an

11        analyst trainee fund manager, yes.

12              Q.    And you worked in the UK for

13        Threadneedle until 2011, correct?

14              A.    Correct.

15              Q.    When were you first given the title of

16        fund manager at Threadneedle?

17              A.    In April 2004.

18              Q.    So you were no longer a trainee.  You

19        were actually referred to as a fund manager as

20        of April 2004, correct?

21              A.    Correct.

22              Q.    And that was the same year that you

23        became a chartered financial analyst?

24              A.    Correct.
```



Page 86

1              (Recess was taken from 8:57 a.m.

2               to 9:16 a.m.)

3

4              THE VIDEOGRAPHER:  We are back

5      on the record at 9:16 a.m.

6      BY MR. PATERNITI:

7      Q.   Ms. Chan, without telling me the

8      substance of any communications, during the

9      break, did you chat with your lawyer?

10     A.   Yes.

11     Q.   At Threadneedle, did you consider

12     yourself one of the top fund managers?

13     A.   I think my fund performed well and --

14     but there were lots of good fund managers at

15     Threadneedle, so I considered myself as a good

16     fund manager at Threadneedle.

17     Q.   As far as picking stocks, which -- in

18     essence, that's what a fund manager does,

19     right, make decisions about buying and selling

20     equities?

21              MR. HANNON:  Objection to form.

22     You may answer.

23     A.   Not only that, although that is

24     important.  So I would say no, that's not



Page 107

1          Q.    You don't know if it was Mark Burgess?

2          A.    I don't recall.

3          Q.    Were you interviewed as part of that

4     investigation?

5          A.    I believe so, yes.

6          Q.    Do you know what that -- what, if any,

7     conclusions were reached in that

8     investigation?

9          A.    No, I don't recall.

10         Q.    You separated from Threadneedle

11    approximately -- exactly one month after the

12    suspension letter, correct?

13         A.    Correct.

14         Q.    At what point did you retain a lawyer

15    relating to the suspension and termination of

16    your employment by Threadneedle?

17         A.    I don't recall precisely.

18         Q.    Was it as soon as you found out you

19    were suspended?

20         A.    It would have been near that time,

21    yes.

22         Q.    Why would you need a lawyer?

23         A.    To protect my rights.

24         Q.    What rights did you have at that



Page 115

```
 1        part of the negotiation, was it not?

 2            A.   Yes.

 3            Q.   The last page of the agreement, it's

 4        Schedule 4 and it's an agreed-upon press

 5        release, correct?

 6            A.   Correct.

 7            Q.   You negotiated that language with

 8        Threadneedle, correct?

 9            A.   Correct.

10            Q.   And the negotiated language was that

11        you decided to leave Threadneedle to take a

12        career break, correct?

13            A.   Correct.

14            Q.   But, in fact, prior to being

15        suspended, you had no intention of taking a

16        quote/unquote career break, correct?

17            A.   Incorrect.

18            Q.   So what were your plans prior to being

19        suspended about this career break?

20            A.   Prior to being suspended, my plans

21        were, indeed, to take a career break and

22        follow my husband, then fiance, to New York.

23            Q.   So you intended to leave Threadneedle

24        no matter what, is your testimony?
```



Page 116

1          A.    That is my testimony.

2          Q.    So for a fund manager, doesn't that

3    damage your career in terms of a track record?

4          A.    In the sense of there being a gap,

5    yes.

6          Q.    When did you notify Threadneedle of

7    your intent to take a career break?

8                MR. HANNON:  Objection to form.

9    You may answer.

10         A.    Unfortunately, I didn't have the

11   opportunity to.

12   BY MR. PATERNITI:

13         Q.    So, by coincidence, you were suspended

14   at about the same time you were thinking you

15   were going to take a career break; is that

16   your testimony?

17         A.    That is my testimony, yes.

18         Q.    Your husband had been in -- I'm sorry.

19               Where was your husband?  He was

20   located in the US?

21         A.    He moved to the US in October 2013.

22         Q.    Did Threadneedle have any US

23   operations?

24         A.    Columbia did and does, yes.



Page 169

1        in all of your discussions with folks,

2        investors and the -- sort of Wellington and

3        its affiliates -- you would refer to China Ops

4        Fund.  You never mentioned once that I have

5        seen this much larger AUM fund that you're now

6        testifying about.

7                      MR. HANNON:  Objection to form.

8        BY MR. PATERNITI:

9             Q.   Why -- why is it that you wouldn't

10       mention this much larger fund when you were

11       touting your experience and your

12       accomplishments?

13                      MR. HANNON:  Objection to form.

14       You may answer.

15            A.   Because the China Ops Fund has got a

16       public track record, which is verifiable and

17       very good.  The carve-out that I had been

18       managing, I was managing them only after

19       2000 and -- only from 2010.  Therefore, the

20       track record wasn't as long and, therefore,

21       not as representative.  And also, there was no

22       public track record for those assets.

23       BY MR. PATERNITI:

24            Q.   Okay.  So you compare yourself to Greg



Page 182

1          Q.    During the interview process, I
2     believe you are alleging that representations
3     were made to you about what you could expect
4     once hired; is that accurate?
5          A.    Correct.
6          Q.    In fact, you feel there were
7     misrepresentations made to you about what you
8     would be doing, correct?
9          A.    Correct.
10          Q.    Who is it that you claim made those
11     misrepresentations at the hiring stage?
12          A.    Henry Philip.
13          Q.    What did Henry Philip say to you at
14     the hiring stage in 2014 that constituted a
15     misrepresentation?
16          A.    He said something along the lines
17     of -- that I would be looking to manage money
18     a few months in.
19          Q.    Can you give me anymore context than
20     that phrase?  Do you remember anything more
21     about that conversation other than that
22     phrase?
23          A.    It was in the context of having to
24     focus on thinking about my investment process



Page 183

1         and philosophy even prior to -- even prior to

2         joining with view of managing money a few

3         months in.

4              Q.   "With a view towards managing money a

5         few months in," is that exactly the wording he

6         used?

7              A.   I forget the exact wording he used,

8         but that was the sense he was getting across

9         in that context.

10             Q.   Can you recall with any more

11        specificity the words he used that led you to

12        believe that you would be managing money

13        shortly after joining?

14             A.   Not at this moment.

15             Q.   Well, is there any other moment after

16        this that you're going to have a better memory

17        of that?

18                       MR. HANNON:   Objection to form.

19        You may answer.

20             A.   If there's anything that would jog my

21        memory, then that would help me remember more.

22        BY MR. PATERNITI:

23             Q.   Well, do you know if there's anything

24        that would help you jog your memory?



Page 232

```
 1          "Are you or have you ever been the subject of
 2          an investigation into allegations of
 3          misconduct or malpractice in connection with
 4          any business activity?"
 5                    And you answered, "No," correct?
 6          A.    Correct.
 7          Q.    At that time that you filled this out,
 8          you were obviously aware of the allegations of
 9          insubordination made while you were working at
10          Threadneedle, correct?
11          A.    Allegations of insubordination, yes.
12          I was aware of allegations of insubordination,
13          yes.
14          Q.    Isn't that information that you
15          believe Wellington Management Hong Kong was
16          entitled to know about in response to this
17          Question No. 9?
18          A.    It was not information that I thought
19          Wellington was asking me about in
20          Question No. 9.
21          Q.    Why did you think that?
22          A.    Because I don't think that allegations
23          of misconduct or malpractice is the same as
24          allegations of insubordination.
```



Page 242

1          philosophy and process panel that took place

2          in September of 2015, correct?

3               A.    Yes.

4               Q.    And you knew the purpose of the

5          philosophy and process panel?

6               A.    I thought I did, yes.

7               Q.    What did you think the purpose was?

8               A.    As it was communicated to me, the

9          purpose of me doing the process and philosophy

10         panel was that it was a prerequisite to

11         launching the China Growth Fund.

12              Q.    Well, was there any other purpose to

13         it other than it being a prerequisite to

14         launching the fund?

15              A.    I was told that otherwise normally it

16         was for young investors to help them find

17         their feet.

18              Q.    Who told you that?

19              A.    I -- as I recall, it was Tom Baxter.

20              Q.    Are you aware of anybody else who, as

21         of the time you presented the P&P panel, also

22         had presented to a P&P panel within Wellington

23         or any of its affiliates -- with Wellington

24         Management Hong Kong or any of its affiliates?



Page 243

```
 1          A.    At the time that I presented or

 2     afterwards?

 3          Q.    At any time.

 4          A.    Afterwards, I was told that in Asia

 5     that two analysts had presented to the process

 6     and philosophy panel, and that's all -- those

 7     are the two specific individuals that I'm

 8     aware of that had presented at such a panel.

 9          Q.    Were those analysts comparable to you

10     in terms of experience?

11          A.    I don't believe so, no.

12          Q.    Who were they?

13          A.    They were Naveen -- and I forget his

14     surname -- and Hero -- and I forget his

15     surname.

16          Q.    Were you insulted by the fact that you

17     had to present to the P&P panel?

18          A.    I was confused.

19          Q.    You found it unnecessary, didn't

20     you?

21          A.    I found -- no, I didn't find it

22     unnecessary.  I found it confusing.

23          Q.    Okay.  Is one of -- it seems one of

24     your allegations in this case is that you
```



Page 253

```
1          Q.   Other than being told by Tom Baxter

2     that this is for young investors to get their

3     feet, what else are you alleging you were told

4     by people relating to the P&P panels that led

5     you to conclude that you had -- you were

6     treated differently with regard to the

7     product -- with regard to the P&P panel than

8     others?

9          A.   Greg Mattiko told me that he was not

10    required to do a P&P panel as a prerequisite

11    to launching his fund.  Someone told me -- and

12    I believe it was Liz Hogben -- told me that

13    Dirk Enderlein had not been required to do a

14    process and philosophy panel for his fund.

15              And Cheryl Duckworth told me that the

16    only two people in Asia that had been required

17    to do the process and philosophy panel were

18    Naveen and Hero and neither of them have had

19    any portfolio management experience, and

20    that's all I can remember right now.

21         Q.   Did it -- did it insult you -- I'm

22    sorry.  Strike that.

23              Did you feel that you were viewed as a

24    "young investor"?
```



Page 260

```
 1                    MR. HANNON:  Steve, you have to
 2      let her finish her answer.
 3
 4                    (Parties speaking simultaneously.)
 5
 6      BY MR. PATERNITI:
 7           Q.   Ms. Chan, are you aware of anything
 8      that would reflect your recollection?
 9                    I'm not asking you to speculate if a
10      note exists.  I'm asking if you're aware of
11      any documentation that reflects your
12      recollection -- that would refresh your
13      recollection.
14           A.   I'm not -- I -- I don't recall at this
15      moment.
16           Q.   With regard to the P&P panel, it was
17      an upsetting experience for you, correct?
18           A.   Correct.
19           Q.   You were offended by a comment, in
20      particular, that another investor made by the
21      name of Jun Oh, correct?
22           A.   Comments that Jun Oh made, yes.
23           Q.   And the comments you've alleged is
24      that he said something to the effect of "you
```



Page 261

1          look ridiculous," correct?

2               A.   Correct.

3               Q.   And he was talking about your

4          presentation style, correct?

5               A.   I don't know.

6               Q.   Is it your testimony here that he

7          wasn't explaining to you that your arms are

8          waving around or, for whatever reason, you are

9          presenting in a way that doesn't instill

10         confidence?  Was that your understanding?

11              A.   I'm sorry.  You said is it my

12         understanding that he didn't make it clear

13         that it was because I was presenting in a way

14         that indicated mental instability?

15              Q.   No.  I didn't -- that's not close to

16         what I asked you.  I'll strike the question

17         and ask again, okay?

18                   Was it your understanding that Jun Oh

19         was commenting about -- or making a comment

20         about your presentation style when he said

21         words to the effect, "You look ridiculous"?

22              A.   It was -- I didn't understand it to be

23         referring to anything in particular.

24              Q.   You just thought he made a complete



Page 262

1     non sequitur about your personal appearance,

2     that you look ridiculous?

3                    MR. HANNON:  Objection to form.

4     You may answer.

5     BY MR. PATERNITI:

6          Q.   Is that your testimony?

7          A.   I think he was implying something

8     broader than just my presentation style.

9          Q.   What do you think he was implying

10    broader?

11         A.   That it was also to do with my general

12    appearance.

13         Q.   Upon what basis do you reach the

14    conclusion that he was implying something

15    broader?

16         A.   On the basis that he didn't specify

17    anything about my presentation style when he

18    made that comment.

19         Q.   I see.

20              Do you remember whether Jun Oh said

21    anything else other than "you look ridiculous"

22    or words to that effect?

23         A.   Do I remember anything else?  Yes.

24         Q.   What else did he say at the P&P panel



Page 263

1      to you?

2          A.   He said words to that effect of "do

3      you honestly believe that clients would hand

4      over their money on the basis of those few

5      sentences" and he also said something

6      along the lines of "you don't sound

7      convincing, unless you plan on having a great

8      track record."

9          Q.   Do you remember any -- either Mr. Oh

10     or anybody else on the philosophy and process

11     panel, on September 18 of 2015, saying, "Have

12     you ever watched yourself on video?"

13         A.   I don't recall right now.

14         Q.   Wasn't part of your complaint about

15     the philosophy and process style that you

16     understood it to be about the substance of

17     your philosophy and process, but that there

18     were comments made about your presentation

19     style instead?

20         A.   So I was -- are you saying -- are you

21     asking me if that was what I was unhappy

22     about, that --

23         Q.   Wasn't that -- wasn't that one of the

24     primary reasons that you were upset about it?



Page 264

1          A.    Not -- no.

2          Q.    So it didn't bother you at all if --

3     that somebody made comments to you about your

4     presentation style in the P&P panel?

5          A.    Sorry.  Your previous question was,

6     was that my primary reason for being upset,

7     and it was "no."

8               And then you said, was I upset at all

9     that they commented on my presentation style

10    instead of my investment process and

11    philosophy?

12              Did it upset me at all?  Is that your

13    question?

14         Q.    That's my question.

15         A.    I was more confused than upset.

16         Q.    So you -- when you came out of that,

17    is it your testimony that you were not upset

18    in any manner about comments relating to your

19    presentation style that were made in the

20    philosophy and process panel?

21                   MR. HANNON:  Objection to form.

22    You may answer.

23         A.    Is it my testimony that I was not

24    upset at all that I got --



Page 265

1      BY MR. PATERNITI:

2          Q.   Well, you keep saying you were

3      confused, but you -- were you confused?   Were

4      you upset?   Were you angry?   Were you

5      offended?

6              Tell me what your reaction was when

7      comments were made about your presentation

8      style at that philosophy and process panel.

9              Other than being confused, did you

10     have any other emotions attached to that?

11                 MR. HANNON:   Objection to form.

12     You may answer.

13         A.   Did I have any reaction to comments

14     about my presentation style?

15     BY MR. PATERNITI:

16         Q.   Correct.

17         A.   Not in and of itself, no.

18         Q.   I don't know what that means.

19              Can you -- can you explain what you

20     mean by "not in and of itself"?

21         A.   I was not upset by comments about my

22     presentation style.

23         Q.   Uh-huh.

24         A.   In fact, I remember constructive



1      comments about how I presented to clients.

2      What I was upset by was the disrespectful tone

3      and belittling content of Jun Oh's comments.

4           Q.   Were there any other comments that

5      were disrespectful and belittling other than

6      the "you look ridiculous" or words to that

7      effect?

8           A.   Yes.

9           Q.   What else did he say that you felt was

10     disrespectful and belittling?

11          A.   The comments that I told you he also

12     said --

13          Q.   Okay.

14          A.   -- which were --

15          Q.   You don't have to repeat it.  We can

16     move forward on it.  I don't want to repeat

17     it.

18               Any other comments that you haven't

19     mentioned that Jun Oh mentioned -- that Jun Oh

20     made that were belittling or disrespectful to

21     you in that panel that you haven't already

22     mentioned?

23          A.   Not that I recall right now.

24          Q.   And did anybody else make any other

