Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 19-cv-11605-WGY

_____

Gigi Kai Zi Chan,

                Plaintiff.

v.

Wellington Management Company LLP
and Charles Argyle,

                Defendants.

_____

VOLUME 2

Continued deposition of Gigi Kai Zi Chan

Wednesday, October 7, 2020

via Zoom Meeting

7:07 a.m. - 12:17 p.m.

---- Sharon Roy, RPR ----

Magna Legal Services

866-624-6221

www.MagnaLS.com

MAGNA
LEGAL SERVICES

```
 1    A P P E A R A N C E S:
 2
 3    Representing the Plaintiff:
 4    Patrick J. Hannon, Esq.
      Hartley Michon Robb, LLP
 5       155 Seaport Boulevard, 2nd Floor
         Boston, MA 02210
 6       617.447.2819
         phannon@hartleymichonrobb.com
 7
 8    Representing the Defendants:
 9    Stephen T. Paterniti, Esq.
         Beverly Garofalo, Esq.
10       Sarah Walsh, Esq.
         Jackson Lewis P.C.
11       75 Park Plaza, 4th Floor
         Boston, MA 02116
12       617.367.0025 (Fax) 617.367.2155
         stephen.paterniti@jacksonlewis.com
13
14
15    Also present via Zoom Meeting:
16    Sara Martin
17    Greg Mattiko
18    ------------
19    Kendra Dobson, Videographer
20
21
22
23
24
```


MAGNA LEGAL SERVICES

Page 3

1            I N D E X
2  --------------------------------------------------------
   EXAMINATION                                         PAGE
3  --------------------------------------------------------
4  By Mr. Paterniti                                       6
5
6
7
8
9  EXHIBITS:                                          PAGE:
10  20:  10/7/15 email to Charles from Gigi Chan ..... 12
11  21:  12/8/15 email to Gigi Chan from Tom Baxter .. 21
12  22:  5/31/16 email between Elizabeth Hogbin and
          Tom Baxter ................................. 32
13
    23:  6/10/16 email chain between Elizabeth Hogbin,
14       Tom Baxter, and Charles Argyle ............. 35
15  24:  6/20/16 and 6/21/16 email chain, Subject:
          Catch up: Jed/Liz .......................... 38
16
    25:  8/26/16 email to Tom Baxter, Henry Philip,
17       Charles Argyle from Cheryl Duckworth ........ 44
18  26:  9/1/16 email to Charles Argyle from Gregory
          Mattiko .................................... 47
19
    27:  10/14/16-10/19/16 email chain, Subject:
20       Heads-up for another potential HK Connect
         advisory opportunity ........................ 51
21
    28:  2016 Gigi Chan Self Review .................. 66
22
    29:  11/22/16 email to Gigi Chan from Charles
23       Argyle ...................................... 67
24



```
                                                                Page 4
 1    EXHIBITS (Cont'd):                                        PAGE:
 2
      30: February 2017 email chain between Gigi Chan
 3        and Tiffany Tan .............................. 71
 4    31: 5/2/17 and 5/3/17 email chain between
          Gregory Mattiko and Charles Argyle .......... 81
 5
      32: Plaintiff's Objections and Responses to
 6        Defendant's First Request for Production of
          Documents ................................... 86
 7
      33: MCAD Complaint ............................. 106
 8
      34: Complaint ................................... 108
 9
      35: Policy against Harassment and Discrimination
10        (Global) .................................... 142
11    36: Travel logs ................................. 151
12    37: Plaintiff's Rule 26 Initial Disclosures .... 156
13    38: 5.13.15 GC to GC re Dan Maguire ............ 158
14    39: 5.26.17 to Vinot re model portfolio ........ 160
15
16    (Exhibits marked and returned to Attorney Paterniti)
17
                               -*-
18
19
20
21
22
23
24
```



MAGNA LEGAL SERVICES

Page 5

```
 1   ------------------------------------------------------
 2                    P R O C E E D I N G S
 3                         7:07 a.m.
 4   ------------------------------------------------------
 5             THE VIDEOGRAPHER:  We are now on the
 6       record.  This begins Videotape No. 1 in the
 7       deposition of Gigi Kai Zi Chan in the matter
 8       of Gigi Kai Zi Chan versus Wellington
 9       Management Company, LLP and Charles Argyle
10       in the United States District Court for the
11       District of Massachusetts.
12             Today is Wednesday, October 7, 2020 and
13       the time is 7:07 a.m.  This deposition is being
14       taken by remote at the request of Jackson Lewis
15       PC.  The videographer is Kendra Dobson and the
16       court reporter is Sharon Roy, both of Magna
17       Legal Services.
18             Will counsel and all parties present
19       state their appearances and whom they
20       represent?
21             MR. PATERNITI:  Stephen Paterniti on
22        behalf of Defendants.
23             MR. HANNON:  Patrick Hannon on behalf
24       of Plaintiff.
```



Page 77

1  mandated leave that happened to coincide with that
2  time frame?
3      A.   I'm not sure I understand your question.
4      Q.   Yeah, so there was a -- there was a
5  period of time that you had for maternity leave, and
6  then there was an additional period of time after
7  that maternity leave that was some extra leave.  Do
8  you remember that?
9      A.   I thought I took some personal leave, but
10 I don't recall what the exact structure or leave
11 entitlements were at the time.  I don't recall now.
12     Q.   Fair enough.
13          During maternity leave, you had been
14 actively involved in managing China Growth fund,
15 correct?
16     A.   I don't recall.
17     Q.   During leave, did you think about what
18 Mr. Argyle had conveyed to you in the November 2
19 meeting and again in the November 22 email?
20     A.   During leave, did I think about it?
21     Q.   Mm-hmm.
22     A.   Yes.
23     Q.   You reviewed his November 22 email during
24 your leave?



1    A.    I only saw it during my leave, yes.
2    Q.    Upon your return to work in April, did
3    you continue to focus on China Growth fund?
4    A.    On my return to work, did I continue to
5    focus on China Growth fund?  Yes, as well as my
6    other responsibilities as team analyst on the EMO
7    team.
8    Q.    Is it your testimony that the level of
9    your collaboration efforts within the EMO team upon
10   your return from leave improved with Greg Mattiko
11   and Philip Fan?
12   A.    It's my testimony that I always tried my
13   best to collaborate on the EMO team both prior to my
14   maternity leave and after my maternity leave.
15   Q.    Okay.  Was there any difference in the
16   level of your collaboration and engagement with
17   Mr. Mattiko and Mr. Fan from before your maternity
18   leave and after your maternity leave?
19   A.    I tried hard before, and I think I tried
20   even harder when I came up, knowing that it had been
21   brought up as an issue.
22   Q.    I asked specifically whether there was an
23   increase in the level of your collaboration after
24   you returned from maternity leave.  Yes or no.



Page 79

```
 1             MR. HANNON:  Objection to form.  You
 2        may answer.
 3        A.    It was not something that I was tracking
 4   either before or after, so I have no way of
 5   accurately answering your question.
 6        Q.    Okay.  When you returned from maternity
 7   leave in April of 2017, did you improve your
 8   collaboration level more broadly across the
 9   Wellington investment platform?
10        A.    Again, I tried to, and I was not keeping
11   information as to the levels before or after, so
12   it's impossible for me to answer your question.
13        Q.    What did you do to try to improve your
14   collaboration efforts across the larger Wellington
15   investment platform upon return from maternity
16   leave?
17        A.    I tried to participate in more
18   conversations about stocks and I tried to increase
19   my written output where it was appropriate.
20        Q.    Written output.  Where would that be
21   located, in email or elsewhere?
22        A.    In email, most likely.
23        Q.    Is there any specific individuals outside
24   of the EMO team that you can recall making efforts
```



Page 80

1  to collaborate with on return from your maternity
2  leave?
3      A.   Not that I recall specifically right now,
4  no.
5      Q.   Now, upon return from your leave, you
6  still maintain that you were owed a response from
7  the -- about your belief that the job was
8  misrepresented to you, correct?
9      A.   No.
10     Q.   Did you believe that you were owed a
11 response from the firm about your desire to manage
12 money and have client access?
13     A.   No.
14     Q.   Do you recall speaking with Greg Mattiko
15 on or about May 31, 2017 in Hong Kong?
16     A.   Yes, I do recall.
17     Q.   That's one of the other recordings that
18 you've produced in this case, correct?
19     A.   Correct.
20     Q.   And in that meeting do you recall
21 indicating to him your desires regarding managing
22 money and client access and other issues that you
23 raised that you thought the firm owed you?
24     A.   I don't recall saying that the firm owed



Page 81

```
 1   me anything as such in those terms, no.
 2        Q.   On May 3, on or about May 3, in
 3   Hong Kong, do you recall speaking to Greg Mattiko?
 4        A.   May 3, which year?
 5        Q.   Of 2017.
 6        A.   No, I do not recall speaking to Greg
 7   Mattiko on that date.
 8        Q.   Do you have any reason to doubt that you
 9   would have spoken to him -- in that vicinity, again,
10   May, early May, first couple of days of May of 2017.
11   Do you have any reason to doubt you would have
12   spoken to him?
13        A.   Spoken to him about what?
14        Q.   Anything.
15        A.   About anything?
16        Q.   Yes.
17        A.   No, no reason to doubt that I would have
18   spoken to him about anything.
19        Q.   Okay.  I'm loading a document, Tab VV,
20   which we'll call Exhibit 31.
21             (Tab VV to be marked as Exhibit 31)
22             Exhibit 31 is an email chain between
23   Charles Argyle and Greg Mattiko dated May 2 and May
24   3.  Do you see that?
```



Page 82

1      A.    I'm sorry, May 2 and May 3.  Yes, I do
2  see that.
3      Q.    Okay.  Do you see on the fourth line down
4  where Greg says, "She has not increased her
5  contribution to the EMO team at all, and seems
6  solely focused on her China Growth portfolio"?  Did
7  I read that accurately?
8      A.    You've read that accurately, yes.
9      Q.    Do you agree or disagree with that
10  statement?
11      A.    I would disagree.
12      Q.    What specific increases to your
13  contribution to the EMO team did you make upon your
14  return from maternity leave?
15      A.    I don't recall precisely.
16      Q.    Or generally?
17      A.    Or generally.
18      Q.    You have no recollection of the increase
19  to your contribution, but you claim you made an
20  increased contribution to the EMO team upon your
21  return from maternity leave; is that right?
22      A.    That's right -- oh, no, hang on.  If you
23  could repeat your question, because I'm not sure if
24  I'm answering your question properly.



1    Q.   You have no -- you have no specific or
2  general memory of anything you did to increase your
3  contribution to the EMO team upon your return from
4  maternity leave.  Is that accurate?
5    A.   I have no -- I have -- I -- I remember
6  coming back from maternity leave and I remember
7  thinking, okay, let me try and contribute more, and
8  I remember talking, talking about stocks and writing
9  emails about stocks and making a more concerted
10 effort generally to increase my collaboration both
11 with the EMO time and firm wide.  Those are my
12 recollections.
13   Q.   So the emails regarding EMO collaboration
14 would be to Mattiko and Philip Fan?
15   A.   That's correct.
16   Q.   And emails outside of the EMO team,
17 again, I think I asked you this already, but do you
18 remember anyone specifically you would have emailed
19 to collaborate with or provide any insights relating
20 to stocks or any other information that you were
21 trying to add value more broadly to the investment
22 Wellington platform?
23   A.   You have asked that before, and my answer
24 remains, no, I don't recall specifically.



Page 109

1  the incidents supporting your claims in the case?
2       A.    Yes.
3       Q.    With regard to the P&P panel in September
4  of 2015, you've identified that as evidence
5  supporting your claims, correct?
6       A.    As evidence -- yes.
7       Q.    You believe Jun Oh was discriminating
8  against you in that P&P panel?
9       A.    Yes.
10      Q.    On what basis?
11            MR. HANNON:  Objection to form.  You
12       may answer.
13      A.    On the basis of the disrespectful
14 treatment that he subjected me to.
15      Q.    When you say he discriminated against
16 you, you understand that there are various bases of
17 discrimination, whether it be you've alleged gender,
18 you've alleged national origin.  You believe Mr. Oh
19 was discriminating against you on the basis that you
20 were Chinese?
21      A.    Hang on.  I don't think -- the question
22 before this question, I don't think I answered that
23 one correctly.  You said --
24      Q.    Hold on, hold on.  Your lawyer can go



Page 110

1  back and ask you and fix that.  I'm asking you
2  whether or not Mr. Oh -- you believe Mr. Oh
3  discriminated against you on the basis of your
4  national origin in the P&P panel.
5        MR. HANNON:  Ms. Chan, if there's
6     something you need to clarify in order to
7     answer that question, please feel free to do
8     so.
9     A.    Yes, because the previous question was on
10 what basis did I believe that Mr. Oh had
11 discriminated against me.  And if I clarify the
12 previous question, that might perhaps help also
13 answer this question.
14    Q.    I don't need the clarification.
15    A.    Fine.  Well, let me answer both of your
16 questions.
17    Q.    Let me stop you there.  This is my
18 deposition and I need to get through it and you're
19 holding me to a time frame.  My question is:  Do you
20 believe that Jun Oh discriminated against you on the
21 basis of your national origin in the P&P panel in
22 September of 2015?
23    A.    I believe Jun Oh discriminated against me
24 on the basis of being an Asian woman in September



Page 111

```
 1   2015.
 2        Q.    Okay.  And upon what basis do you believe
 3   he was discriminating against you other than the
 4   comment he made?
 5             MR. HANNON:  Objection to form.  You
 6        may answer.
 7   BY MR. PATERNITI:
 8        Q.    Actually, strike that.  Is there any
 9   other evidence supporting your allegation that
10   Jun Oh discriminated against you in the P&P panel
11   due to the fact that you're an Asian female other
12   than his comments in the P&P panel?
13        A.    Sorry, are you asking me if I have any
14   other evidence?
15        Q.    Correct.  I'm asking you if you have any
16   other evidence of that.
17        A.    His tone.
18        Q.    Is there any other evidence?
19        A.    The public manner in which he delivered
20   his message and his comments.
21        Q.    Is there any other evidence?
22        A.    The content and implications of his
23   comments.
24        Q.    Is there any other evidence?
```



Page 112

1    A.    The fact that people felt like they had
2    to apologize for his comments afterwards.
3    Q.    Is there any other evidence?
4    A.    That's all I can think of right now.
5    Q.    Okay.  The June 2016 marketing trip
6    cancellation is the next area of inquiry.  Do you
7    believe that that supports your claims of
8    discrimination or retaliation?
9          MR. HANNON:  Objection to form.  You
10         may answer.
11   A.    I believe that supports my claims of
12   retaliation.
13         And potentially discrimination.  Depends
14   on what evidence I see in discovery.
15   Q.    I see.  Who specifically are you alleging
16   discriminated against you in relation to the
17   cancellation of the June 2016 marketing trip?
18         MR. HANNON:  Objection to form.  You
19         may answer.
20   A.    As I said, I don't know right now.  I
21   would like to see more evidence in discovery.
22   Q.    Well, you saw the multiple emails from
23   GRG talking about their concerns about you and why
24   they wouldn't put you in front of their client.



Page 129

1    2015 to go to a prostitute bar.
2        Q.    Was he asking you to go or was he asking
3    you to give him directions?
4        A.    He was asking me to accompany him.
5        Q.    Okay.  Do you remember the context in
6    which that came up?
7        A.    In a context which he thought was funny.
8        Q.    Were you at a bar?
9        A.    I'm sorry, were we at a bar when that
10   happened?
11       Q.    Yeah.  Where were you when the comment
12   was made?
13       A.    Well, the comment was made during the
14   day, I think, and then I thought, perhaps, it was
15   meant to be a joke.  I went with him.  My -- I got
16   my husband to come along.  And while we were at the
17   bar, I took a photo that said "No solicitation."  I
18   thought, well, if it's a joke, I'll send it to
19   Michael Carmen, whom we had been on the trip with.
20   And Jamie Rice commented, "What did you do that
21   for?"  So I guess it wasn't really meant to be a
22   joke, this going to a prostitute bar.
23       Q.    What was the name of the bar that you --
24   I'm sorry, strike that.  So, you and your husband



Page 135

1  mentioned that "Steve Richter physically backing her
2  up against the wall was intimidating for her as a
3  woman."  Do you see where I read from?
4      A.   I do, yes.
5      Q.   Tell me, Steve Richter physically backing
6  you up against the wall, was that in the Hong Kong
7  office?
8      A.   Yes, it was.
9      Q.   When did that occur?
10     A.   I believe it occurred in February, so, a
11  month or so prior to that.
12     Q.   Were there any witnesses?
13     A.   Tom Baxter may have been there, I'm not
14  sure.
15     Q.   Where did it happen?
16     A.   It happened as we were leaving an EMM
17  meeting.
18     Q.   And when you say he physically backed you
19  up against the wall, are you suggesting that it was
20  intentional?
21     A.   Yes.
22     Q.   Explain what happened that made you feel
23  that he was intentionally physically backing you up
24  against the wall.



1    A.   What happened was that as we were leaving
2 the meeting, we continued to discuss a stock, and I
3 think it was VIP Shop, and he disagreed with my
4 opinion.  And as he was disagreeing, he was getting
5 more and more agitated and aggressive to the extent
6 that he stuck his face in my face and I had to step
7 backwards in my heels and I was against a wall and
8 he blocked my exit and I took steps backwards in
9 order to avoid his face touching mine as he was
10 pushing forward.
11   Q.   Okay.
12   A.   I don't believe that he could have done
13 that unintentionally, as he was speaking to me and
14 forcing me backwards.
15   Q.   Paragraph 8 is another statement that you
16 made, this time to Tom Baxter.  You claim that in
17 October 2014, where you say that, and I'll quote,
18 "as recently as two days prior, Steve Richter had
19 pushed her" -- pushed you, I guess -- "out of the
20 way to speak to your shared assistant, and that this
21 also would not have happened if Plaintiff had been a
22 male."  So, the shared assistant, was that April
23 Wong?
24   A.   That's correct.

