UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GIGI KAI ZI CHAN,<br><br>      Plaintiff,<br><br>      v.<br><br>WELLINGTON MANAGEMENT<br>COMPANY LLP and CHARLES ARGYLE<br><br>      Defendants. | C.A. NO.:  1:19-cv-11605 |

## **DECLARATION OF GIGI KAI ZI CHAN**

I, Gigi Kai Zi Chan, hereby depose and state under penalty of perjury:

1. I am over the age of 18 and am the Plaintiff this matter.

2. Prior to joining Wellington, I enjoyed a successful career as a China Portfolio Manager at Columbia Threadneedle Investments ("Threadneedle").

3. I started at Threadneedle in October 2000 and was promoted to fund manager in 2004. In 2007, I launched the China Opportunities Fund, which I managed until my departure in 2013.

4. The China Opportunities Fund performed extremely well under my management, significantly outperforming its index and ranking in the top tier of its peer group.

5. After seven years at the helm of the China Opportunities Fund, I opted to take a career break to follow my fiancé to New York and spend time planning for my upcoming wedding.

6. In January 2014, I reached out to Mr. Baxter to inquire if there might be an opportunity available for me at Wellington. I had interviewed for a China PM (portfolio manager)

role at Wellington in early 2013 and, although I had not been selected, was attracted by Wellington's combination of a large distribution platform with little existing China business.

7. During the interview process, I inquired extensively about how my performance would be judged by Wellington, as it was important to me that I join a firm where I would be judged based on merit.

8. Wellington assured me that I would, and my first day of work in Wellington's Hong Kong office was May 21, 2014.

9. Unfortunately, I soon came to discover that the firm was not only dominated by white men, but was also infected with a sexist and racist culture.

10. I experienced numerous incidents reflecting this culture, including the following:

    a. Shortly after starting at Wellington, a white male partner told me I had been hired because I was "Chinese but not too Chinese";

    b. In January 2015, while I was out with a group of investors getting drinks, another white male partner—Gregory Mattiko--slid his hand down my back to the top of my buttocks;

    c. Another white male partner, Dan Maguire, told me in January 2015 that "China is full of crap";

    d. That same month, another white male, subsequently elevated to partner, invited me to visit a prostitute bar; and

    e. In February 2015, another white male partner became agitated and aggressive over a disagreement we had concerning a stock, to the extent that he stuck his face in my face and I was physically forced back against the wall (Chan pp. 135-136).

11. Prior to complaining about these, and other discriminatory incidents that occurred during my employment, there were no criticisms or concerns raised about my work performance.

12. Further, while I understand that Mr. Mattiko now claims that my contributions to his EMO team were unsatisfactory, he never expressed any such dissatisfaction to me.

13. The Asian Process and Philosophy panel ("AP&P") I participated in occurred on September 18, 2015.

14. As noted in my interrogatory answers, I told Mr. Argyle during a December 4, 2015 meeting that "I demand to be treated with respect." Mr. Argyle responded "In this firm, you don't demand anything."

15. During that same meeting, Mr. Argyle confirmed that development of my investment products—particularly China Growth—was a priority for the upcoming year and that Wellington would support me in those efforts.

16. Launching the China Growth fund required a significant amount of work during the first half of 2016. This included presentations to Wellington's Product Panel (January 2016), Wellington's Capital Commitment[1] (February 2016), the Board of Directors for Wellington's Hong Kong affiliate (March 2016), and Wellington's Product Marketing Panel (May 2016).

17. Prior to joining Wellington, I had spent years successfully marketing the China Opportunities fund, including through media interviews.

18. Nonetheless, I did everything that was requested of me by Wellington's GRG, including incorporating feedback, working with a coach, and performing "dry run" presentations.

---

[1] I did not attend this particular presentation, but was required to assist in the preparation.

19. Despite all of these efforts, I was never afforded the opportunity to pitch the China Growth fund to Wellington's clients.

20. I gave birth to my first child on December 15, 2016. There were complications from which I almost died.

21. I returned to work on April 20, 2017.

22. I did not see Mr. Argyle's November 22nd email until after my maternity leave had started. Given the reaction I had received from Mr. Argyle when I tried to "respond" to his criticism during our November 2nd meeting, I thought it best to "respond" to Mr. Argyle by making diligent efforts to contribute to the EMO team, trying to improve my participation in investor meetings and refraining from bringing up my past difficulties with Wellington and its culture.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of March, 2021.

/s/ Gigi Kai Zi Chan<br>
Gigi Kai Zi Chan