**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
One Ashburton Place, Boston, MA 02108
Phone: (617) 994-6000 Fax: (617) 994-6024

---

MCAD DOCKET NUMBER: 16BEM02193           EEOC/HUD CHARGE NUMBER: 16C-2016-02118
FILING DATE: 08/08/16                    VIOLATION DATE: 03/24/16

---

Name of Aggrieved Person or Organization:
Mina Koide
[G.L. c. 4, § 7(26)(c) Privacy — redacted]

---

Named is the employer, labor organization, employment agency, or state/local government agency who discriminated against me:
Wellington Management Company, LLP
Wellington Management Group, LLP
Attn: Director of Human Resources
280 Congress Street
Boston, MA 02210
Primary Phone: (617)951-5000 ext. ____

Brendan Swords, CEO, Individually
Wellington Management Company, LLP
Wellington Management Group, LLP
Attn: Director of Human Resources
280 Congress Street
Boston, MA 02210
Primary Phone: (617)951-5000 ext. ____

Charles Argyle, VP, Individually
Wellington Management Company, LLP
Wellington Management Group, LLP
Attn: Director of Human Resources
280 Congress Street
Boston, MA 02210
Primary Phone: (617)951-5000 ext. ____

No. of Employees:        25+
Work Location:

---

Cause of Discrimination based on:
National Origin, Japanese; Age; Sex, Female; Race/Color, Asian or Pacific Islander; Retaliation.

---

**The particulars are:**
I, Mina Koide, the Complainant believe that I was discriminated against by Wellington Management Company, LLP, Brendan Swords, CEO, Individually, Charles Argyle, VP, Individually, on the basis of National Origin, Age, Sex, Race,/Color and Retaliation. This is in violation of M.G.L. 151B Section 4 Paragraph 1B, 1, 4, 4A, 5 and ADEA, Title VII.

See Attachment.

---

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein are true to the best of my knowledge.

_____
(Signature of Complainant)

MCAD Docket Number 16BEM02193, Complaint

| CHARGE OF DISCRIMINATION | ENTER CHARGE NUMBER |
|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement before completing this form. | ☐ FEPA <br> ☐ EEOC |

__Massachusetts Commission Against Discrimination__ and EEOC
State or Local Agency, if any

NAME (Indicate Mr., Ms., Mrs.,): Ms. MINA KOIDE

STREET ADDRESS / CITY, STATE AND ZIP CODE: MA 02199 [redacted]

HOME TELEPHONE: [redacted]
DATE OF BIRTH: [redacted]

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (if more than one list below.)

NAME: Wellington Management Company LLP / Wellington Management Group LLP
NUMBER OF EMPLOYEES, MEMBERS: 2,361
TELEPHONE: (617) 951-5000
STREET ADDRESS / CITY, STATE AND ZIP CODE: 280 Congress Street, Boston MA 02210-1024
COUNTY: U.S.A.

NAME: Brendan Swords, CEO / Charles Argyle, Vice Chairman
STREET ADDRESS / CITY, STATE AND ZIP CODE: (Same as Wellington)

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)):
☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN — Japanese
☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE:
EARLIEST: 10/13/2015
LATEST: 3/24/2016
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See attached. Joint MCAD/EEOC Submission.

RECEIVED AUG 8 2016

I want this charge filed with both the EEOC and the State or Local Agency, if any, I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

8/8/2016
Date

Mina Koide
Charging Party (Signature)

EEOC FORM 5 (REV. 3/01)

August 8, 2016

MCAD Boston Headquarters
One Ashburton Place, Suite 601
Boston, MA 02108



Dear Sir or Madam:

Please accept this submission as a complaint of discrimination on the basis of race, age, gender, ethnic and national origin, and a complaint of retaliation, against **Brendan Swords** and **Charles Argyle**, **Wellington Management Company LLP** ("WMC") and WMC's ultimate parent **Wellington Management Group LLP** ("WMG").  WMC and WMG are hereafter together referred to as "Wellington".  Mr. Swords is Chairman and CEO of Wellington, and Mr. Argyle is Vice Chairman and Director of Global Equity Portfolio Management of Wellington.  Mr. Swords and Mr. Argyle are both Partners at Wellington.

Wellington is headquartered in Boston (280 Congress Street, Boston MA, 02210-1024, Tel (617) 951-5000) and had approximately 2,361 employees as of December 2015.

I worked for 10 years at Wellington, without ever receiving any disciplinary warnings or being the subject of any disciplinary actions.  I submitted a written discrimination complaint to Mr. Swords on January 22, 2016.  On March 24, 2016, while Wellington was still engaged in what Mr. Swords referred to as an "independent review" of my discrimination complaint, I was fired abruptly, without warning, effective immediately.

As described in the accompanying document, Wellington stated that I was fired for "insubordination" and "disrespectful tone" in communications with colleagues.  However, Wellington refused to provide any examples of the allegedly offending statements, and mentioned only one communication, an email, that was allegedly "insubordinate" and "disrespectful".  The email that Wellington mentioned was one in which I was engaged in legally protected activity regarding my discrimination complaint and the discrimination and retaliation I was experiencing.

In the accompanying document, I discuss the events and background of the discrimination and retaliation I have suffered in violation of Massachusetts and Federal anti-discrimination laws and equal pay laws.

Thank you for your time.

Yours truly,

Mina Koide

[redacted — G.L. c. 4, §]

1

**SUMMARY OF EVENTS:**

I am a 56-year-old woman of Japanese race, ethnic origin and national origin. I am a member of multiple protected classes under Massachusetts and Federal anti-discrimination laws.

From March 13, 2006 until March 24, 2016, I was employed by Wellington, an investment adviser that manages investment funds. Initially, I was an Equity Analyst covering Japanese stocks. I was promoted to Managing Director in 2011. As I was promoted, I became a Portfolio Manager of an equity fund that invested in Japanese stocks. I received favorable year-end reviews during my 10 years at Wellington.

I was discriminated against on the basis of race, gender, national origin, ethnic origin, and age.

As an Equity Portfolio Manager, I managed approximately $166 million in the Japan Equity ("JE") fund for pension funds under the authority of the North Carolina Department of the State Treasurer ("North Carolina") as well as an account for Wellington employee retirement savings. Under my Portfolio Management, the JE fund outperformed the fund's benchmark, the MSCI Japan Index, in 1 year, 3 year, 5 year, and Inception-to-Date periods as of December 31, 2015[1] with better than the peer group Information Ratio[2]. I was told by Associate Director of Global Equity Portfolio Management ("GEPM") Thomas Baxter in my 2015 year-end review on December 7, 2015 that my performance was "solid"[3]. One month later, on January 7, 2016, Director of Equity Portfolio Management Charles Argyle told me that my "performance is fine" and that I was a "tremendous resource" to the firm[4]. With the above skill and substantial experience, I was fully **qualified** for the job.

Despite my qualifications and the positive feedback I received, I experienced **adverse work events**. Mr. Argyle, in collaboration with Mr. Baxter and Product Manager Hideo Ueki[5], undermined my marketing efforts[6] for the Japan Equity fund and denied fair marketing support for me on the Japan Equity fund.[3] Instead, Mr. Argyle promoted and rewarded individuals outside of my protected classes whose funds'

---

[1] *Performance Summary Alpha*, December 31, 2015.

[2] *Japan Monthly Product Report*, run date of December 14, 2015, from Aoi Nishiyama.

[3] 2015 Year-end Review Meeting between Thomas Baxter and Mina Koide, December 7, 2015

[4] Meeting between Charles Argyle and Mina Koide, January 7, 2016.

[5] Through his role as a Line Manager, Mr. Argyle has direct power over Product Managers such as Hideo Ueki. For example, while Mr. Ueki is Product Manager for several funds, the creation and operation of those funds require the approval of a Line Manager.

[6] On October 13, 2015, at a client meeting with Anthos Asset Management in Netherland where I was marketing my fund Japan Equity, Product Manager Hideo Ueki undermined my marketing effort by starting to market another Wellington Japan product, a "larger cap" version of Japan Value Realization (S-JVR or F-JVR) managed by Portfolio Manager Katsuhiro Iwai, right after I finished my presentation. Mr. Ueki continued to undermine my JE fund in subsequent internal meeting with marketing personnel in London on October 15, 2015, by calling JE a "Core" product, a term that Welling marketing personnel would understand as a harder to market product, while promoting Mr. Iwai's products, Japan Special Situations ("JSS") and various "Japan Value Realization" funds (including the mid-cap JVR, and "larger cap" Focused JVR or Select JVR ).

results I believe were misleadingly presented[7], which I believe was done in violation of Wellington policies, Wellington's own Code of Ethics which is on file with the Securities and Exchange Commission, and Federal and state security laws.

Mr. Argyle sought to **remove** me as a Portfolio Manager under the pretext of an "option"[8] and "idea"[8] of me seeking a job with the Macroeconomist group, so that it would force my client North Carolina to exit the Japan Equity fund that I managed in order to create advantageous conditions for Director of Investment Strategy and Risk Kent Stahl (a white European/American man who is younger than me) and Portfolio Manager Katsuhiro Iwai (a man who is younger than me). Mr. Argyle and Mr. Baxter also had a plan to **replace** me on Wellington's Japan Team (my business unit) with Yuichiro Soda, a man who is younger than me. As a new equity analyst, Mr. Soda was still participating in a training, and had much lesser qualifications than mine for analyzing and managing investments in Japanese stocks.

On January 22, 2016, I submitted to Wellington CEO Brendan Swords a detailed complaint regarding the discrimination I was suffering at Wellington on the basis of my race, gender, ethnic origin, national origin, and age. After Mr. Swords reviewed my discrimination complaint for 2 weeks, Mr. Swords asked me to meet with him regarding my discrimination complaint on February 5, 2016.

Mr. Swords, Wellington's CEO and ultimate decision-maker, consulted with, was advised by, and spoke with other Wellington personnel and members of Wellington "senior management"[9] (which I believe includes Vice Chairman Charles Argyle, a central subject of my discrimination complaint) prior to the February 5 meeting with me. During the meeting, I observed that Mr. Swords repeatedly referred to a document that appeared to be an extensively marked up and reformatted version of my written discrimination complaint. At the February 5 meeting, Mr. Swords judged my discrimination complaint invalid, and he repeated his judgment in writing on February 8 when he stated "As I told you then [February 5], the facts described in your email do not in and of themselves support your conclusion."

I believe the evidence demonstrates Wellington's coordinated effort to terminate my position as a Portfolio Manager in GEPM which would force North Carolina to exit the Japan Equity fund that I managed, and to move its investments capital into the funds managed by Equity Portfolio Manager Katsuhiro Iwai (a man who is younger than me) and Director of Investment Strategy and Risk Kent Stahl (a white, European/American man who is younger than me).

- **December 7, 2015**: Mina Koide 2015 Year-End Review with Associate Director of Global Equity Portfolio Management Thomas Baxter in which Mr. Baxter says that he and his supervisor, Vice

---

[7] See later in this document for detail on Wellington's retroactive change in the benchmarks used for the Japan Special Situations ("JSS") fund, which improved its 10 year relative performance record by 68.3% over the period 2002 – 2011 as a result of the retroactive change.

[8] Meeting between Charles Argyle and Mina Koide, January 7, 2016.

[9] Meeting between Tama Donovan and Mina Koide on February 23, 2016. Ms. Donovan stated that CEO Brendan Swords "involved" Wellington's "senior management" in the response to my January 22, 2016 discrimination complaint. Mr. Argyle is Vice Chairman. Mr. Argyle's Wellington biography states that **"Charles is also a member of the firm's senior management team . . ."**

3

Chairman Charles Argyle, believe that I should leave my Portfolio Manager job and seek a non-Portfolio Manager job in the Macroeconomist group.

- **December 15, 2015**: Mr. Baxter sends me an email, cc to Mr. Argyle, in which he repeated his and Mr. Argyle's "vision" that I should abandon my Portfolio Manager job and seek a non-Portfolio Manager job in the Macroeconomist group with the specific time span of transition and requirement such as communication to North Carolina.

- **December 17, 2015**: Director of Investment Strategy and Risk Kent Stahl's meeting with the Wellington client the North Carolina Office of State Treasurer ("North Carolina") at North Carolina's headquarter office[10] in which Mr. Stahl promoted two multi-manager global funds, Global Income Opportunities ("GIO") and Hedged Alpha Opportunities ("HAO") both managed by Mr. Stahl, to North Carolina. Mr. Stahl recommended that North Carolina withdraw its existing investment in Wellington's International Diversified Equity funds which Mr. Stahl did not manage.[10] North Carolina's existing Wellington investment mandate (Wellington's International Diversified Equity funds) included the Japan Equity fund that I managed. North Carolina was the sole unaffiliated investor in the Japan Equity fund, which meant that withdrawal of North Carolina from the Japan Equity fund would mean the elimination of the fund that I managed.

    Neither of the two global strategies recommended by Mr. Stahl, (GIO and HAO) included the JE fund that I managed. HAO includes Japan Alpha Opportunities (JAO) as underlying component"[11] and Mr. Iwai's Select Japan Value Realization, a "larger cap" version of Japan Value Realization ("JVR") fund, was approved as a "sleeve solution" of Mr. Stahl's multi-manager strategy, JAO.[12]

- **January 7, 2016**: Unscheduled meeting between Charles Argyle and Mina Koide. Mr. Argyle came by my office and proceeded to pressure more for 30 minutes to abandon my Portfolio Manager job and seek a non-Portfolio Manager job in the Macroeconomist group. Referring to my assignment on the North Carolina's account, Mr. Argyle stated "Kent [Stahl] could do Japan.", "[H]e [Mr. Stahl] could do Japan Opps" referring to Mr. Stahl's Japan Alpha Opportunities ("JAO") fund. When I asked Mr. Argyle if the "suggestion" that I abandon my Portfolio Manager job and seek a new job in the Macroeconomist group was Mr. Argyle's idea, Mr. Argyle responded "I don't remember where the idea came from."

Mr. Stahl's multi-manager funds such as GIO, HAO and JAO are part of CEO Brendan Sword's Strategic Solutions initiative targeting large institutional clients and prospective clients. Mr. Argyle's role as Vice Chairman reporting to Mr. Swords, member of the Strategic Relationship Advisory Committee,

---

[10] Elizabeth O'Hara email to several Wellington personnel, *North Carolina – Three Meetings, Good Dialog*, December 22, 2015.

[11] Wellington Memorandum: 4 Dec 2013 Product Panel Meeting Notes, New Product Working Group and Product Panel Review Sheet, August 18, 2015

[12] New Product Working Group and Product Panel Review Sheet, August 18 2015. Select Japan Value Realization was the name of the fund at the time in which the product, defined as a "larger cap" version of Japan Value Realization (JVR) fund, was reviewed by the Product Panel. The fund was called Focused Japan Value Realization when the product was marketed to Pension Fund Association of Japan on January 25, 2016

Line Manager for the JAO fund that Kent Stahl was marketing to North Carolina as a component of the HAO fund[13], and as Director of GEPM in control of Equity Portfolio Managers and Wellington's equity products, demonstrates that Mr. Argyle should have been well aware of Wellington's plan to target North Carolina as a new "Strategic" client by Mr. Stahl.

Consequently, Mr. Baxter's December 15, 2015 email to me, cc to Mr. Argyle, just two days before Mr. Stahl's marketing meeting with North Carolina on December 17, 2015, appears to have been sent in awareness of and in coordination with Mr. Stahl's recommendation to North Carolina to withdraw from the International funds which include the Japan Equity fund that I managed.

Furthermore, given Mr. Argyle's status as Vice Chairman and aide to Mr. Swords (especially in regard to client relationships and strategy), given Mr. Swords direct involvement in and detailed knowledge of his key Strategic Relationship and Solutions initiatives, given that Mr. Swords and his fellow Managing Partners received a briefing regarding me as part of my 2015 year-end review process, and given that "Wellington places an emphasis on the orderly transition of . . . portfolio management responsibility for client assets"[14], by the time of my February 5, 2016 meeting with Mr. Swords and Managing Partner Jean Hynes (if not before I submitted my January 22 discrimination complaint), it appears that **Mr. Swords should have been aware that Mr. Argyle was seeking to eliminate my job as Portfolio Manager, and Mr. Swords was making misleading statements when he claimed on February 5, 2016 and once again on February 8, 2016 that Mr. Argyle was not seeking to eliminate my job as Portfolio Manager.**

Following Mr. Swords stating and repeating his judgment against my discrimination complaint, Mr. Swords ordered two of his subordinates to conduct what he called an "independent review".

One of the employees charged with conducting an "independent review", Chief Compliance Officer Nancy Morris, was ordered to review materials which had previously been reviewed by Wellington's Legal and Compliance group. Ms. Morris and her supervisor, General Counsel Cynthia Clarke, are responsible for Wellington's Legal and Compliance group. Ms. Clarke exercised direct control over access to the report that Ms. Morris later wrote. Mr. Swords had ordered Ms. Morris, who is under Ms. Clarke's supervision, to review work for which Ms. Morris and Ms. Clarke were responsible.

The other employee charged with conducting an "independent review" was Tama Donovan, Wellington's Director of Global Employee Relations and Business Management. Ms. Donovan threatened to potentially have me fired (when I met with Ms. Donovan on February 23, 2016, Ms. Donovan confirmed that there was no written policy that justified her gratuitous threat[15]). Ms. Donovan allowed Charles Argyle, the central subject of January 22 discrimination complaint, to set certain terms and conditions of the "independent review". I objected in writing to Mr. Swords that both of these matters demonstrated that Ms. Donovan was not objective and her "review" was not an "independent review". Mr. Swords did

---

[13] New Product Working Group and Product Panel Review Sheet, April 10, 2013.

[14] Affidavit sworn by former Wellington CEO Duncan McFarland, May 20, 2008.

[15] During our February 23, 2016 meeting, Tama Donovan stated that her threat to potentially have me fired was "really was an attempt to convey our seriousness to do this investigation."

5

not respond to my initial objection regarding Ms. Donovan's threat to potentially have me fired. When I sent a second objection that also included my objection to Mr. Argyle setting certain terms and conditions of the "independent review", Mr. Swords responded to me. Mr. Swords directed me to meet with Ms. Donovan despite the threat to potentially have me fired and despite Ms. Donovan allowing Mr. Argyle to set certain terms and conditions of the "independent review". I followed Mr. Swords's order and met with Ms. Donovan on February 23, 2016.

On March 24, 2016, two months after I submitted my January 22 discrimination complaint to Mr. Swords, and while the "independent review" process that Mr. Swords had ordered was still ongoing, I was abruptly and without warning fired effective immediately by Chief Human Resources Officer Barbara Amone. Ms. Amone stated that my termination was a "leadership decision" and that I was fired for "insubordination and disrespectful tone" in a "series of communications" with Mr. Swords and other Wellington colleagues, but Ms. Amone refused to identify a single statement I had made that was allegedly "insubordinate" and "disrespectful" and who were the persons who made the "leadership" decision. From January 22, 2016 through my termination on March 24, my communication with Mr. Swords and his Wellington subordinates who were involved with the "independent review" that Mr. Swords ordered, directly pertained to my discrimination complaint, the retaliation I was subjected to, and my opposition to Wellington's illegal practices under Massachusetts and Federal anti-discrimination laws.

I received no disciplinary warnings and was never the subject of a disciplinary action at Wellington until I was fired without warning, effective immediately, on March 24, 2016. I was fired two months after I submitted a discrimination complaint to Wellington's CEO.

I believe there is a **direct link between my discrimination complaint and Wellington's illegal retaliatory firing of me** on March 24, 2016.

- Wellington illegally fired me while the "independent review" of my January 22 discrimination complaint that CEO Brendan Swords had ordered[16] was still ongoing.
- In my March 21, 2016 email to Mr. Swords, I asked about the "independent review" he had ordered in response to my discrimination complaint. Mr. Swords would not respond to my question "What is an 'independent review' independent of?" Mr. Swords did not explain or define "independent review".

**COMPLAINANT**

I, **Mina Koide**, am a 56-year-old woman of Japanese race, ethnic origin, and national origin. I am a member of multiple protected classes and a protected age group under Massachusetts and Federal anti-discrimination laws. I received a bachelor degree from Sophia University in Japan, a master degree in international public policy from School of Advanced International Studies at the Johns Hopkins

---

[16] Brendan Swords email to Mina Koide, cc to Jean Hynes, February 11, 2016.

University, and a master degree in business administration ("MBA") from The Wharton School at the University of Pennsylvania. I am a holder of the Chartered Financial Analyst ("CFA") designation.

I began my professional career in 1982 as an international news correspondent and network news anchor for Fuji Television in Japan. I began working as an Equity Analyst in the summer of 1998 while attending The Wharton School, and after graduating in 1999 I worked as an Equity Analyst analyzing Japanese companies and stocks. For the next 17 years, until March 24, 2016, I was employed as an Equity Analyst and Portfolio Manager of Japanese stocks.

From March 13, 2006 until March 24, 2016, I was employed by Wellington, an investment management firm. Initially, I was an Equity Analyst covering Japanese stocks, and then as I was promoted I became a Portfolio Manager of the Japan Equity fund, a fund that invested in Japanese stocks. I received pay raises, favorable year-end reviews throughout my 10 years at Wellington. I was promoted to Managing Director in 2011.

**RESPONDENTS**

**Wellington Management Company LLP** ("WMC") is an SEC-registered investment adviser that serves as investment adviser and manager to various investment funds.

**Wellington Management Group LLP** ("WMG") is described by WMC in its Form ADV filed with the Securities and Exchange Commission ("SEC") as "the ultimate parent of the Wellington Management organization". "Wellington Management organization" employees who hold the title of Partner are Partners in WMG. The committees mentioned within this joint MCAD/EEOC submission are committees of WMG. For example, the Managing Partners Committee, the Strategic Relationship Committee, and the Product Panel Committee, are committees of WMG.[17]

**WMC** and **WMG** are herein referred to together as "Wellington". Wellington was my employer.

**Brendan Swords**. Mr. Swords is the Chairman and CEO of Wellington. Mr. Swords is a Partner. Mr. Swords is one of the three Managing Partners on WMG's Managing Partner Committee. Mr. Swords is a member of several Wellington committees and Wellington affiliate boards.

**Charles Argyle**. Mr. Argyle is Vice Chairman and Director of Global Equity Portfolio Management for Wellington, and reports directly to Mr. Swords. Mr. Argyle is a Partner. Mr. Argyle is Director of Global Equity Portfolio Management ("GEPM"), which is the department in which I worked. Mr. Argyle is a member of Wellington's Strategic Relationship Advisory Committee. While I reported to Thomas Baxter who in turn reported to Mr. Argyle, Wellington referred to Mr. Argyle orally and in writing as my "manager", Mr. Argyle wrote year-end "Manager Reviews" of me, and Mr. Argyle together with one of the three Managing Partners met with me as part of the year-end review process in 2015. Mr. Argyle has

---

[17] *Wellington Management Group LLP Committees and Affiliate Boards,* March 2016.

7

worked closely with Mr. Swords for much of the time since 2003, reporting directly, and currently occupying the position (Director of GEPM) that Mr. Swords occupied before becoming CEO.

**Wellington's demographic breakdown** is heavily skewed towards white European/American men.

At the time I was fired from my Portfolio Manager job on March 24, 2016, approximately 41 of the approximately 52 Portfolio Managers in Wellington's Global Equity Portfolio Management ("GEPM") group were white men of European/American ethnic origin and national origin.

Of the 52 Portfolio Managements in GEPM, only 6 were women. I was the oldest of the 6 women. Of the 6 women, 4 were white and European/American, and 2 were not white. I was one of the 2 who were not white. I was the only Japanese female Portfolio Manager in GEPM.

Of the approximately 150 total Partners at Wellington as of mid-2015, 135 of the 150 Partners were white, 127 of the 150 Partners were male, and 135 of the 150 Partners are younger than me. Only 1 Partner was Japanese, and that Partner is a man who is younger than me.

**CLAIMS**

**DISCRIMINATION**

Wellington acted to the benefit of Wellington employees outside of my protected classes and who are younger than me, and to my detriment, by making what I believe are misleading statements and omitting material facts to present their funds more favorably[18] than they should be presented. I believe Wellington knowingly does this in violation of Wellington's own policies, Wellington's own Code of Ethics, Federal and state securities laws, and fiduciary duty. Wellington advantaged those individuals outside of my protected classes and who are younger than me, and disadvantaged me, with better compensation[19], supportive marketing, and favorable overall evaluation for promotion (including promotion to Partner).[20] While I complied with for their funds Wellington's own policies, Wellington's Code of Ethics, Federal and state securities laws, and fiduciary duty, Wellington disadvantaged me by undermining my marketing[6], denying me the same level of support for product development and marketing that other Portfolio Managers outside of my protected classes and younger than me were receiving[3].

Wellington supported other Wellington employees outside of my protected classes and who are younger than me with faster fund approvals, "incubation" and internal funding for their new funds[21], and applied "patient"[22] and "long-term" approach[23] for their existing funds. Wellington denied my opportunity to

---

[18] See below detail on Wellington's retroactive change in the benchmarks used for Japan Special Situations ("JSS") fund, which improved its 10 year performance record by 68.3% from 2002 to 2011.

[19] In addition to base salary, Wellington Portfolio Managers would receive a twice per year incentive bonus based on their fund's performance relative to its assigned benchmark, a corporate bonus, and a bonus from a Partner/Managing Director pool. The corporate bonus and bonus from the Partner/Managing Director pool is discretionary.

[20] Wellington's year-end review process, including compensation determination and promotion, for Portfolio Managers has significant direct and indirect dependence on benchmarks and success in fundraising (which can involve active support from Wellington or active undermining by Wellington). For example, how Wellington selects and changes benchmarks, and how Wellington allows Wellington funds without track records to market off the records of other Wellington funds with track records has a significant impact on compensation, future fundraising, and promotion. As is discussed in this joint MCAD/EEOC submission, in these areas, Wellington has acted to favor employees outside my protected classes and who are younger than me, and to disfavor me.
Wellington's year-end review process includes "peer review" ratings which are not required to be substantiated with verifiable data. As a result, the "peer review" process appears to be biased in favor of the majority demographic.

[21] Wellington gave "incubation" and fast track approval for funds with limited track records by individuals outside my protected class. The JAO fund, a multi-manager fund managed by Mr. Stahl and its component funds such as the Japan Contrarian Value ("JCV") fund managed by Jim Shakin and Japan Momentum Opportunity ("JMO") fund managed by Frank Teixeira were approved as "incubation/internal funding" with Line Manager approval from Director of Global Equity Portfolio Management Charles Argyle. Mr. Stahl was also a Product Panel member who approved those funds directly or indirectly managed by him as Portfolio Manager.

[22] In several internal Wellington meetings attended by Mina Koide, Brendan Swords emphasized Wellington's "patience' to nurture talent.

[23] "*Mission, Strategy, & Culture*", presentation by then President Brendan Swords in February 2014.

develop new products, and pressured me to give up my Portfolio Manager job within 2 years of marketing of my fund[24].

Wellington allowed other Wellington employees outside of my protected classes and who are younger than me to disregard Wellington policies, procedures, or practices[25], and fiduciary duty to advantage themselves and others outside my protected classes and who are younger than me while discriminating against me[26].

Wellington sought to eliminate my Portfolio Manager job under false pretext and replace me with a younger man with lesser qualification for the job.[27]

Wellington sought to eliminate me as the Portfolio Manager at North Carolina Department of the State Treasurer ("North Carolina") so that North Carolina would be forced to leave my product, to create advantageous conditions for other Wellington employees outside of my protected classes and who are younger than me to acquire North Carolina as their new client[28].

**RETALIATION**
In response to my discrimination complaint that I submitted to the CEO Brendan Swords on January 22, 2016:

---

[24] Reopening for marketing of JE fund in the fall 2014. First marketing meeting of JE fund with a new prospect client was October 2014.

[25] Wellington's clients, institutional investors, typically require three to five years of existing track records for funds in which they invest. Wellington has often complied with this industry practice by internally funding new products to build track records before pushing the products for marketing.

[26] With Kent Stahl as Portfolio Manager for several multi-manager funds and a member of the Product Panel, with Charles Argyle serving as Line Manager for multi-manager funds for which Mr. Stahl is Portfolio Manager, and with Mr. Argyle serving as Line Manager for several sleeve funds included in Mr. Stahl's multi-manager funds, Wellington had provided Mr. Argyle and Mr. Stahl with the practical authority to create and approve whatever funds they wanted to. Mr. Argyle and Mr. Stahl favored themselves (both white, European/American men who are younger than me) and other men who are younger than me, while disadvantaging me. Mr. Argyle and Mr. Stahl also in practice had the power to discriminate against me in favor of themselves and other younger men, which they did by seeking to force me out of my Portfolio Manager role for the Japan Equity fund.

[27] Email from Thomas Baxter to Mina Koide on March 21, 2016

[28] Elizabeth O'Hara email to several Wellington personnel, *North Carolina – Three Meetings, Good Dialog*, December 22, 2015. The mail described Kent Stahl's meeting with North Carolina on December 17, 2015 at the client's office. Mr. Stahl recommended North Carolina to withdraw from North Carolina's current Wellington mandate International Diversified Equity, for which Japan Equity under my management is a part, and invest instead in global multi-manager solutions that Mr. Stahl managed such as Global Income Opportunities, Hedged Alpha Opportunities. Japan Alpha Opportunities was approved as "underlying component" of Hedged Alpha Opportunities in April 2013 (See *4 Dec 2013 Product Panel meeting Notes*) and Select Japan Value Realization was approved in September 2015 as a "sleeve solution for Japan Alpha Opportunities" (See New Product Working Group and Product Panel Review Sheet, August 18, 2015)

10

Wellington retaliated against me with what Mr. Swords claimed was an "independent review", but was actually a pretext to coerce, intimidate, and threaten me, and interfere with my ability to exercise and enjoy my legal rights.[29&30].

Wellington retaliated against me by allowing other Wellington employees to exclude me from team activities including team calls[31].

Wellington retaliated against me by allowing other Wellington employees to exclude me from business related communication such as regarding hiring of a new team member[32].

Wellington retaliated against me by allowing other Wellington employees to exclude me from a meeting with Callan, a consultant to North Carolina, the client of the Japan Equity fund I managed[33].

Most prominently, Wellington retaliated against me by terminating my employment on March 24, 2016, without warning.[34]

**PRETEXT**
In the act of whitewashing its discrimination and retaliation against me, Wellington deployed the following pretexts that are contradicted by facts and evidence.

Wellington claimed that Mr. Argyle was "not terminating" my job as Portfolio manager. However, Mr. Argyle's subordinate Associate Director of GEPM Thomas Baxter discussed my transfer with specific time period and requirement such as communication to the client.

Wellington claimed that Mr. Argyle only mentioned transfer as an "idea" and "suggestion". However, Wellington's business managers may spend a year or more planning for team and portfolio manager transitions[35]. I believe evidence shows that Mr. Argyle sought to remove me as Portfolio Manager to

---

[29] See below for detail on CEO Brendan Swords "independent review". See email from Mr. Swords to Mina Koide, February 11, 2016.

[30] Meeting with Director of Global Employee Relations and Business Management Tama Donovan on February 23, 2016.

[31] Email from Megumi Hiruma to Tomoko Lehman, February 24, 2016. Email from Tomoko Lehman to Mina Koide, February 25, 2016.

[32] Email exchanged by Katsuhiro Iwai and Mina Koide, March 15, 2016.

[33] Email from Elizabeth O'Hara on March 17, 2016, email between Laura Howenstine and Mina Koide on March 21, 2016, and between Kristen Pribeck and Mina Koide, March 22, 2016.

[34] Meeting between Barbara Amone and Mina Koide, March 24, 2016.

[35] Former Wellington CEO Duncan McFarland stated that changing a Portfolio Manager is a carefully planned process. Mr. McFarland's statements demonstrate the pretext of Charles Argyle's and Brendan Swords's comments that Mr. Argyle was merely making a "suggestion" that I abandon my Portfolio Manager job.
As Mr. McFarland stated:
"Wellington places an emphasis on the orderly transition of responsibility at all levels in the Firm, but particularly on the orderly transition of portfolio management responsibility for client assets. The firm takes a number of steps

11

replace me with a younger man[36]. I believe that evidence also shows that Mr. Argyle sought to remove me as Portfolio Manager assigned to North Carolina Department of the State Treasurer ("North Carolina") to create an advantageous condition for other Wellington employees outside of my protected classes and who are younger than me[37]. I believe that both Mr. Argyle and Mr. Swords had knowledge of Wellington's plan involving North Carolina.[38]

In his effort to pressure me out of my Portfolio Manager job managing North Carolina assets, Mr. Argyle contended that leaving North Carolina in the middle of my assignment would not create a fiduciary problem since with my new role in the Macroeconomist group, I would be able to serve a larger number of Wellington's other clients besides North Carolina[39]. Mr. Argyle deployed a pretext, since I believe what Mr. Argyle stated is a violation of fiduciary duty. Fiduciary duty owed to North Carolina as an investor in the Japan Equity fund would not have been fulfilled by serving other Wellington clients instead. In fact, the fiduciary duty would have been violated under those circumstances.

Wellington claimed that such an internal transfer was a "common practice" at Wellington. However, I am not aware of any Portfolio Manager outside of my protected classes and who are younger than me, who were pressured to transfer to the Macroeconomist group. I am aware of several Portfolio Manager outside of my protected classes and who are younger than me who have been provided with fast track approval and "incubation" for their new funds, and ongoing patient long-term support for their funds.

Wellington's "independent review" was a pretext to whitewash Wellington's violation of Federal and Massachusetts anti-discrimination laws, and to coerce, threaten, and intimidate me. After CEO Brendan Swords received my January 22 discrimination complaint, Mr. Swords consulted with, was advised by and spoke to other Wellington senior officials and members of senior management, which I believe includes Mr. Argyle[9], a subject of my January 22 discrimination complaint. Mr. Swords, as the CEO and

---

to promote orderly transitions . . . The portfolio manager succession process at Wellington is a lengthy one that frequently can take a year or more."
Duncan McFarland Affidavit, May 20, 2008.

[36] Associate Director of GEPM Thomas Baxter's statement on Yuichiro Soda in meeting with me on December 7, 2015 and Mr. Baxter's email on Mr. Soda on March 21, 2016

[37] Elizabeth O'Hara email of December 22, 2015 regarding Kent Stahl's meeting with North Carolina on December 17, 2015 at the client's office. Mr. Stahl recommended North Carolina to withdraw from North Carolina's current Wellington mandate, International Diversified Equity, of which Japan Equity under my management was a part, and invest instead in global multi-manager solutions that Mr. Stahl managed such as Global Income Opportunities, Hedged Alpha Opportunities. Japan Alpha Opportunities was approved as "underlying component" of Hedged Alpha Opportunities in April 2013 (See *4 Dec 2013 Product Panel meeting Notes*) and Select Japan Value Realization was approved in September 2015 as a "sleeve solution for Japan Alpha Opportunities" (See New Product Working Group and Product Panel Review Sheet, August 18, 2015).

[38] Through Charles Argyle's role as Vice Chairman, member of the Strategic Relationship Advisory Committee, Line Manager for the Japan Alpha Opportunities fund that is a component of the Hedged Alpha Opportunities fund that Kent Stahl was marketing to North Carolina, and aide to Mr. Swords, and Mr. Swords's role as CEO whose written *Seven key initiatives for 2016* emphasizes increasing "Strategic relationships" with large institutional clients and prospective clients, both Mr. Swords and Mr. Argyle had the knowledge of Wellington's plan to target North Carolina as a new "Strategic" client by Mr. Stahl.

[39] Meeting between Charles Argyle and Mina Koide, January 7, 2016

12

the ultimate decision-maker at Wellington, judged my discrimination complaint as invalid three times including at the February 5, 2016 meeting and subsequent emails to me[40], then only after he had judged there was no discrimination, he called for what he claimed as an "independent review"[41].

Wellington's "independent review" was a pretext, since both of the Wellington employees assigned to conduct the review on my January 22 Complaint were subordinate to Mr. Swords and not unaffiliated, external reviewers[42].

Once the CEO, the ultimate authority and decision maker had reviewed my discrimination complaint for two weeks, consulted with Wellington personnel, and judged my claim as invalid, stating that there was no discrimination, it was a farcical pretext for him to claim that subordinates under his authority would conduct an "independent review".

Wellington's "independent review" was a pretext, since Wellington does not appear to have a written policy and set of procedures for discrimination investigations leaving room for CEO Brendan Swords to direct a whitewash of my discrimination complaint and to direct retaliation against me.[43]

Wellington's "independent review" was a pretext, since the part of the review that was conducted by Chief Compliance Officer Nancy Morris[44] was a self-approval of Wellington's marketing material which Wellington's Legal and Compliance group had already approved. Ms. Morris's review even justifies Wellington's "retroactive" benchmark change on Japan Special Situation (JSS) fund by stating that "relative performance did not allow its accomplishment" of improving its reported performance when in reality the benchmark change made a tremendous improvement to the JSS fund's reported performance by 68.4% for the 10 years from 2002 to 2011. Ms. Morris's review did not mention Wellington's Code of Ethics or fiduciary duty and the related Wellington maxim "client, firm, self"[45].

Wellington fired me on March 24, 2016 under the pretext of "insubordination" and "disrespectful" tone[46] to Mr. Swords and other senior officials in my email communication to them. However, Wellington did not give me any warning, any Wellington's policy or rules, nor any explanation as to what I allegedly did violated what alleged policy or rule of Wellington.

---

[40] Email from Brendan Swords to Mina Koide on February 8, 2016 and on February 11, 2016

[41] Email from Brendan Swords to Mina Koide on February 11, 2016.

[42] Director of Global Employee Relations and Business Management Tama Donovan and Chief Compliance Officer Nancy Morris were assigned by CEO Brendan Swords to review my January 22 Complaint.

[43] Throughout the period of January 22, 2016 – March 22, 2016, no one at Wellington was able or willing to cite to me specific written policies and procedures regarding Wellington's investigations of discrimination complaints, and no one provided me with a copy of such a written policy.

[44] March 23, 2016. My access to Ms. Morris' review was controlled by General Counsel Cynthia Clarke.

[45] Nancy Morris stated ". . .I have been encouraged by how Wellington Management truly lives up to its maxim 'client, firm, self' at Wellington Management Compliance and Risk Management Forum 2013.

[46] Meeting with Chief Human Resources Officer, Barbara Amone

Chief Human Resources Officer Barbara Amone made a vague reference to my e-mail communication with CEO Brendan Swords when she set up a meeting for my termination[47]. However, my e-mail communications with Mr. Swords and other Wellington personnel who were directly involved in the "independent review" that Mr. Swords ordered on my January 22 Complaint. I was engaging in protected activity.

My alleged "insubordination" and "disrespect" was a pretext, since Wellington has treated other employees outside my protected classes and younger than me very differently as regards disciplinary actions[48]. In documented situations involving employees outside of my protected classes who are younger than me, employees who engaged in multiple forms of serious misconduct including harassment, attacks on women and the vulnerable, and "insubordinate" and "disrespectful" conduct, Wellington gave the offending employees detailed oral warnings, written warnings, and specific explanations of the employees' wrongdoing. Wellington also provided the employees with coaching or referrals to coaching for improving their workplace conduct. Wellington let these individuals remain employed after receiving disciplinary action and warnings. In sharp contrast, I did not violate any Wellington's rule or policy, and Wellington terminated me, "effective immediately" and without any warning, for having engaged in legally protected activity.

My termination for "insubordination" and "disrespect" was a pretext. The Personnel Record that I requested and received from Wellington under Massachusetts General Laws Chapter 149 Section 52C lists me as "retired". I saw no mention of "insubordination" or "disrespect" in the copy of my Personnel Record that Wellington sent me. I saw no disciplinary actions or disciplinary warnings in the copy of my Personnel Record that Wellington sent me.

Wellington continued to engage in pretextual behavior after it fired me in retaliation on March 24, 2016 for submitting a discrimination complaint. I believe that the disposition of the Japan Equity fund was carried out in accordance to Wellington's plan, and was not based on North Carolina's informed consent.

Wellington continued to engage in pretextual behavior after my termination, since it did not notify investors for Wellington Trust Company CIF Japan, as part of Wellington Management Retirement Fund that I managed, that there was a change in Portfolio Manager for the Japan Equity fund. Through the liquidation of the fund in June 2016, the prospectus on the website still showed me as the Portfolio Manager.

Wellington continued to engage in pretextual behavior after my termination, since the Personnel Records that I requested on July 19, 2016 and received on July 27, Wellington failed to include my 2015 Manager Review document which Mr. Argyle and Mr. Baxter prepared for Wellington's three Managing Partners (of which Mr. Swords is one). My 2015 Manager Review was prepared by Mr. Argyle and Mr. Baxter shortly before they pressured me to abandon my Portfolio Manager job.

---

[47] Email from Barbara Amone to Mina Koide, March 22, 2016.
[48] Fixed Income Portfolio Manager John Keogh in December 2002 and Equity Portfolio Manager Minerva Butler in January 2004

**INVOLVEMENT OF RESPONDENT**

Wellington is responsible for the above discrimination and retaliation against me. I believe that CEO Brendan Swords and Vice Chairman Charles Argyle are also responsible for the discrimination and retaliation against me due to their direct actions and their respective managerial positions within Wellington.

Mr. Argyle was directly involved in seeking to terminate my job as Equity Portfolio Manager in order to replace with me with a younger man in my business unit. Mr. Argyle also tried to remove me as the Portfolio Manager for North Carolina Department of the State Treasurer ("North Carolina") to create an advantageous condition for Director of Investment Strategy and Risk Kent Stahl and Portfolio Manager Katsuhiro Iwai to acquire North Carolina as their client. As a member of the senior management, he also participated Wellington's retaliation against me including my termination.

Mr. Argyle held the position, influence, and control to advantage other Wellington's employees outside of my protected classes and who are younger than me.

Mr. Argyle's Wellington biography states that ". . . he acts as an aide to the chairman and CEO [Mr. Swords] with respect to external affairs of the organization, with a focus on representing our firm globally with clients, prospects [potential clients], and industry groups . . .".

Mr. Argyle is a member of several Wellington committees including the Strategic Relations Committee, which Wellington states is responsible for "[e]stablishing criteria to identify Strategic Relationships, which include Strategic Partners, Clients, Prospects, Consultants, and key Business Partners" and "Ongoing monitoring of our internal Strategic Relationship universe."[49]– Mr. Swords listed "Strategic relationships" as one of his "Seven key initiatives for 2016"[50].

Mr. Argyle is also a Line Manager. As a Line Manager, Mr. Argyle exercises authority over both Wellington employees who manage funds and the funds that those employees manage. "Line Manager Approval" is required for launch of new Wellington funds, as shown in Wellington's "New Product Working Group and Product Panel Review Sheet", a standardized Wellington form that must be submitted for new funds to be approved. As that standard Wellington form states regarding Line Manager Approval: "Indicate that the appropriate line manager has signed-off on the proposed product..."

---

[49] Michael Boudens memorandum, "Strategic Relationship Advisory Committee, November 20, 2015
[50] Brendan Swords, *"Seven key initiatives for 2016,* February 8, 2016"

15

In his role as Director of GEPM and Line Manager for funds, Mr. Argyle has direct power over Product Managers such as Hideo Ueki. For example, while Mr. Ueki is Product Manager for several funds[51], the creation and operation of those funds require the approval of the Line Manager[52]

Mr. Swords as CEO is the ultimate decision-maker for Wellington. He judged my discrimination complaint to be invalid, he exonerated Mr. Argyle over his discriminatory plan to remove me as Portfolio Manager of the Japan Equity fund, he ordered the pretextual "independent review", and he was the ultimate decision-maker for my termination in retaliation for having submitted a discrimination complaint.

## ADDITIONAL DISCRIMINATORY TREATMENT

What I believe are misleading statements and material omissions in Wellington marketing documents provide evidence of Wellington's advantaging of persons outside my protected classes and younger than me, and discriminating against me.

The Japan Special Situations ("JSS") fund, managed by Mr. Iwai from 2013, carries a historical performance record that I believe is misleadingly represented due to a retroactive[53] change in its benchmark (indexes with which the fund's performance was compared) made in 2011. Until 2011 and 2012, Wellington used a small company index, the Russell/Nomura Small Cap Value Index, as the benchmark for presenting and marketing the JSS fund. Due to the strong outperformance of Japanese small cap stocks which comprise the Russell/Nomura Small Cap Value Index, that small cap index outperformed the TOPIX by an average of 6.8% per year from 2002-2011, and 68.3% over the entirety of the period, Wellington retroactively changed the JSS fund's benchmark to the TOPIX. As a result of this change, JSS's performance was improved by **68.3% over the entirety of the 10 year period, from annual 2.0% under-performance to 4.8% annual out-performance for the 10 consecutive years**. Wellington's Legal and Compliance group approved this retroactive change, and Wellington no longer discloses the index change in later JSS marketing materials.

Under Mr. Iwai, the JSS fund still carries the retroactively inflated 10 year historical relative performance record as part of its 15 years record, and Mr. Iwai developed and marketed new funds off of the JSS fund's approach[54] and track record[55]. When Mr. Iwai marketed the FJVR fund, the "larger cap" version

---

[51] Wellington often refers to its funds as "products", as indicated by title "Product manager" (the "products" a Product Manager is involved with are funds) and the New Product Working Group and Product Panel which reviews proposed new funds.
[52] Wellington's standard form of its New Product Working Group and Product Panel Review Sheet contains a section called "Line Manager Approval" that states "Indicate that the appropriate line manager has signed-off on the proposed product..."
[53] Wellington Chief Compliance Officer Nancy Morris confirmed the retroactive change in JSS benchmark on her March 23, 2016 review in response to my January 22 Complaint while maintained that there was no violation. Ms. Morris's review only cites Wellington's internal process and own assessment as the bases for the change.
[54] JSS, JVR used the common "net cash" screen and there were many overlaps in the holdings.

16

of the JVR fund on January 25, 2016 to Pension Association of Japan ("PFA"), Mr. Iwai stated that "FJVR/JVR approach is created over JSS with 15 years of proven approach". However, 10 of the 15 years in the JSS fund track record that Mr. Iwai presented to PFA was inflated on a relative basis due to the retroactive benchmark changes of 68.3% on a cumulative 10-year basis and 6.8% on annual basis. It does not appear that the potential FJVR investor, Pension Fund Association of Japan, was told that the "15 years of proven approach" actually included 10 years that Wellington initially reported as underperforming the fund's then benchmark by an average of 2.0% per year. In her March report of her "independent review" findings, Chief Compliance Officer Nancy Morris confirmed that Wellington had approved the benchmark change at the time it was made, and she did not appear to find anything improper in how Wellington handled the retroactive change.

Mr. Stahl's multi-manager Japan Alpha Opportunity fund itself was a small-cap value driven approach particularly in its inception[56] in April 2013, and by using TOPIX Index as a benchmark, it benefited from the small cap outperformance in 2014 and 2015. However, it does not appear to have been disclosed that the fund's "Alpha" (as the fund's name indicates) appears to have been dependent on small cap outperformance of larger cap stocks rather than on Portfolio Manager stock selection skill.

The Wellington representations that I believe were misleading and that omitted material facts advantaged Mr. Stahl and Mr. Iwai and were used against me to their benefit, since Wellington sought to replace me at North Carolina with Mr. Stahl's Japan Alpha Opportunities ("JAO") fund (a component of the HAO fund for which Mr. Stahl is also Portfolio Manager). Mr. Iwai's "larger cap version of JVR"[57] fund was approved as a "sleeve solution" for the JAO fund by Wellington's Product Panel (of which Mr. Stahl was a member).

When Wellington's Product Panel approved new funds such as Japan Alpha Opportunities ("JAO"), Japan Contrarian Value ("JCV", Japan Momentum Opportunities ("JMO") and Select Japan Value Realization ("S-JVR"), Mr. Stahl was an interested party. Mr. Stahl was a member of the Product Panel as well as a Portfolio Manager seeking approval from the Panel for the JAO fund which he directly managed as Portfolio Manager, as well as his component funds, JCV, JMO and S-JVR.

Wellington's biography of Mr. Stahl states that Mr. Stahl serves as "risk advisor" to several of Wellington's "larger clients"[58]. When Mr. Stahl approached the North Carolina Office of State Treasurer and Brown Advisory, Mr. Stahl provided "risk" analysis but he was an interested party when approaching North Carolina as a "risk advisor", since he was promoting his own products which he managed as Portfolio Manager.

---

[55] As illustrated by a JVR fund presentation of July 23, 2015 and a JSS fund presentation on December 9, 2015, JVR fund presentations included a JSS fund historical performance page and JSS fund presentations contained information on JVR fund. In Wellington's Japan Equity Product Line-up presentation on March 13, 2015 JSS fund and JVR fund are introduced as "same philosophy, process, team."

[56] New Product Working Group and Product Panel Review Sheet, April 10, 2013 with a table comparing JAO to MSCI Japan.

[57] New Product Working Group and Product Panel Review Sheet, *Select Japan Value Realization*, August 18, 2015.

[58] Kent Stahl's Wellington biography.

Mr. Stahl serves on a number of Wellington's investment review committees, including as chairman of the Equity Review Group, as a member of the Fixed Income Review Group, and as the leader of the Equity Risk Advisory Council.[58] However, Mr. Stahl is an interested party in reviewing Wellington's investment products as he is the Portfolio Manager for many of Wellington's funds with combined assets of over $22 billion.[59]

---

[59] *Performance Summary Alpha*, December 31, 2015.