# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GIGI GAI ZI CHAN

        Defendant,

        v.

WELLINGTON MANAGEMENT
COMPANY LLP AND CHARLES
ARGYLE,

        Defendants.

Civil Action No. 19-cv-11605-WGY

## WELLINGTON MANAGEMENT COMPANY LLP AND CHARLES ARGYLE RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Defendants Wellington Management Company LLP and Charles Argyle ("Defendants" or "Wellington"), hereby provide the below responses to Plaintiff Gigi Kai Zi Chan's statement of additional undisputed facts in support of her opposition to summary judgment ("P. Facts") [Dkt. No. 68]:[1]

---

[1] Defendants are cognizant of the Court's requirement at the summary judgment stage to view all factual assertions in the light most favorable to Plaintiff, including all credibility determinations. Accordingly, Defendants' responses herein are asserted for the purpose of summary judgment only and do not constitute admissions by Defendants that any factual allegations asserted by Plaintiff are true or are not disputed for any other purpose.

Defendants also note that argument of counsel and subjective characterizations of evidence in ¶¶ 21, 22, 24, 28, 29, 30, 31, 32, 33, 35, 37, 38, 39, 45, 50, 51, 52, 53, 55, 60, 69, 71, 72, 75, 76, 81 and 85 of Plaintiff's statement of additional undisputed facts are not evidence and not proper for the statement of facts. See Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 315 (1st Cir. 2016) ("[U]nsupported, speculative assertions," and conclusory statements in an affidavit submitted in opposition to summary judgment do not create a genuine or a material fact sufficient to warrant proceeding to trial); see also Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 425 (1st Cir. 2017) (plaintiff "provides no detail and no support other than his subjective belief that he was being

1.     Prior to joining Wellington, Ms. Chan enjoyed a successful career as a China Portfolio Manager at Columbia Threadneedle Investments ("Threadneedle"). [Exhibit O at 86, 169; Exhibit R, ¶ 2]

**Response:**   Defendants dispute the statement. Plaintiff's employment at Threadneedle came to an abrupt end after Threadneedle placed her on suspension for "insubordination."  (Facts, ¶18).[2]

2.     Ms. Chan started at Threadneedle in October 2000 and was promoted to fund manager in 2004. In 2007, she launched the China Opportunities Fund, which she managed until her departure in 2013. [Exhibit O at 71-72, 78; Exhibit R, ¶ 3]

**Response:**  Defendants do not dispute this paragraph for the purpose of summary judgment.

3.     The China Opportunities Fund performed extremely well under Ms. Chan, significantly outperforming its index and ranking in the top tier of its peer group. [Exhibit R, ¶ 4]

**Response:**   Defendants do not dispute this paragraph for the purpose of summary judgment.

---

discriminated against by Costco"); Siupa v. Astra Tech, Inc., Civil Action No. 10-10525-LTS, 2013 U.S. Dist. LEXIS 128925, 2013 WL 4854031, at *7 (D. Mass. Sept. 10, 2013) (striking statements in the plaintiff's "affidavit regarding what is 'required by Massachusetts law,' and whether certain conduct amounts to 'sexual harassment'" on the grounds that a plaintiff "may not rely upon [his or] her own interpretation of the law or the legal conclusions [he or] she wishes the Court to draw from the facts at hand." (ellipses omitted).

[2] Defendants' statement of undisputed facts is cited herein as "Facts, ¶X"

4.     After seven years at the helm of the China Opportunities Fund, Ms. Chan opted to take a career break to follow her fiancé to New York and spend time planning for her upcoming wedding. [Exhibit O at 115-116, 120; Exhibit R, ¶ 5]

*Response*:  Defendants do not dispute this paragraph for the purpose of summary judgment. (<u>But</u> <u>see</u> Response to No. 1 above).

5.     In January 2014, Ms. Chan reached out to Mr. Baxter to inquire if there might be an opportunity available for her at Wellington. [Exhibit N, Tab 21; Exhibit R, ¶ 6].

*Response:*  Defendants do not dispute this paragraph for the purpose of summary judgment.

6.     Ms Chan had interviewed for a China PM (portfolio manager) role at Wellington in early 2013. [Exhibit R, ¶ 6]

*Response:*  Defendants do not dispute this paragraph for the purpose of summary judgment.[3]

7.     Although she had not been selected for that role, was attracted by Wellington's combination of a large distribution platform with little existing China business. [Exhibit R, ¶ 6]

---

[3] It should be noted that Bo Meunier, a Chinese female, was selected for the China PM role. Facts, ¶¶ 14-15. Plaintiff's dispute with this fact is not supported by the evidence. Plaintiff asserts that Wellington continued to search for a China PM, but the email she cites does not establish this fact. Responsive Statement of Material Facts ("P. Res. Facts") [Dkt. No. 67], ¶14. Rather, the email references an existing HK-based PM requisition. There is no reference in the email to that HK-based PM requisition being the same position or even related to the China PM role Ms. Meunier assumed.

*Response***:**  Defendants do not dispute this paragraph for the purpose of summary judgment only.

8.   Mr. Baxter "ran the idea of being a team analyst" by Defendant "and she was very open to it." [Exhibit N, Tab 22]

*Response:*  Defendants do not dispute this paragraph for the purpose of summary judgment.

9.   While analysts are typically more junior than portfolio managers, Wellington utilizes a dual structure that allows investors to work simultaneously as both team analysts and portfolio managers operating their own investment product. [Exhibit L at 45-46; Exhibit M at 76]

*Response:*  Defendants do not dispute that some investors work simultaneously as both team analysts and portfolio managers managing their own investment product, but dispute the statement that analysts are typically more junior than portfolio managers as this is not supported by the cited exhibits and thus should be disregarded.[4]

10.   Mr. Philip told Ms. Chan that she could expect to be managing her own product within six to twelve months of joining Wellington. [Exhibit O at 182-183]

*Response:*  Defendants do not dispute this paragraph for the purpose of summary judgment.  By way of further response, Defendants note that in the facts section of Plaintiff's opposition brief ("Opp. Br."), Plaintiff asserts inconsistently without citation that she could expect to be managing her own product "a few months in" to her employment at Wellington.  (See Opp. Br. At 3).

_____

[4] Pursuant to Rule 56.1, all undisputed facts asserted at summary judgment must be supported by citation to record evidence.

11.    During the interview process, Ms. Chan also inquired extensively about how her progress and advancement as an investor would be judged at Wellington. In particular, she was interested in learning things like "How will her impact be evaluated?" "By whom will she be evaluated?" and "Who would champion her integration to the firm?" [Exhibit N, Tab 23 at 29084; Exhibit R, ¶ 7].

*Response:*  Defendants do not dispute this paragraph for the purpose of summary judgment.

12.    Satisfied by responses indicating that Wellington would judge her based on merit, Ms. Chan accepted the research analyst position.

*Response:*  Plaintiff has not cited to supporting record evidence and thus this paragraph should be disregarded.

13.    Ms. Chan's first day of work in Wellington's Hong Kong office was May 21, 2014.

*Response:*  Plaintiff has not cited to supporting record evidence and thus this paragraph should be disregarded.

14.    Initially, Ms. Chan was assigned to support the Emerging Market Opportunities ("EMO") team led by Greg Mattiko.

*Response:*  Plaintiff has not cited to supporting record evidence and thus this paragraph should be disregarded.

15.    Ms. Chan and Mr. Mattiko had crossed paths while she was at Threadneedle and he held Ms. Chan in high regard for having a "very strong and positive attitude," and for having "built a great amount of experience in good and bad times." [Exhibit N, Tab 23 at 29083]

*Response:*  Defendants do not dispute this paragraph for the purpose of summary judgment.

16.   Prior to Ms. Chan raising concerns about discrimination, there were no criticisms or concerns raised about her performance on the EMO team.

*Response:*  Plaintiff has not cited to record evidence to support this paragraph and thus it should be disregarded.

17.   In January 2015, Defendants received a positive year-end review. [Exhibit N, Tab 25]. Among other things, the review noted:

a.   "The main message is that you are off to a good start here"

b.   "Greg is very happy to have you on the team... He thinks you're a pleasure to work with and expects you'll continue to add lots of value to the team. You bring a fresh perspective to the team dialogue, and you've been very proactive with your ideas.  You have a pragmatic approach to your investing and have adapted well to Greg's process.

*Response***:**  Defendants do not dispute that the 2014 year-end review covering the first nine months of Plaintiff's employment includes the quoted language.

18.   Ms. Chan's solid start was further reflected in her peer review survey, where she ranked high in the areas of depth of knowledge (35th out of 114) and idea generation (17th out of 114). [Exhibit N, Tab 26].

*Response***:**  Defendants do not dispute the peer review rankings covering the early months of Plaintiff's employment in Exhibit N, Tab 26.

19.   In addition to her colleagues, Ms. Chan was also gaining positive recognition from clients. HHMI, a significant investor in EMO, expressed interest in a pan-Asia portfolio concept that Ms. Chan was developing. [Exhibit N, Tab 27].

*Response***:**  Defendants do not dispute that the  email cited by Plaintiff dated May 19, 2015 states that a pan-Asia portfolio was "of interest" to HHMI but dispute that this

establishes that she was gaining recognition from "clients" as it is limited to a single client, HHMI.

20.     As of May 2015, Wellington claimed to be supportive of those efforts, telling HHMI that Wellington was "encouraging [Ms. Chan] to manage portfolios as she did before joining Wellington." Id.

**Response:** Defendants do not dispute that Plaintiff has properly quoted the cited email.

21.     While Ms. Chan was achieving this initial success, she was also discovering the obstacles that Wellington's culture posed to a woman of Chinese descent. [Exhibit R, ¶ 9]

**Response**:   Defendants dispute this paragraph as it contains argument and Plaintiff's opinion as stated in her Declaration without any record evidence to support it and thus it should be disregarded.[5]

22.     The resulting culture with which Ms. Chan was forced to contend was dominated by men—white men in particular—and often infected with sexist and/or racist undertones. [Id.]

**Response**: Defendants dispute this paragraph as it contains argument of counsel and opinion of Plaintiff as stated in her Declaration without any record evidence and thus it should be disregarded.

---

[5] See Quinones v. Buick, 436 F.3d 284, 291 (1st Cir. 2006) ("mere unsupported characterizations" in affidavit "was not evidence creating a triable issue"); see also Mendez-Aponte v. Bonilla, 645 F.3d 60, 68 (1st Cir. 2011) ("agree[ing] with the district court that the plaintiffs' . . . statement of contested material facts consist[s], in large part, of speculation and conclusory allegations for which the only evidentiary support is Méndez—Aponte's sworn affidavit, which itself contains conclusory allegations").

23.     For example, Ms. Chan personal experienced the following:

   a. Shortly after starting at Wellington, a white male partner told Ms. Chan
      she had been hired because she was "Chinese but not too Chinese"
      [Exhibit R, ¶ 10];

***Response***: Defendants do not dispute this statement for the purpose of summary

judgment.

   b. In January 2015, while Ms. Chan was out with a group of investors getting
      drinks, Mr. Matiko slid his hand down Ms. Chan's back to the top of her
      buttocks [Exhibit R, ¶ 10];

***Response***:  Defendants do not dispute this statement for purposes of summary

judgment only, however, do note that it is not entirely consistent with Plaintiff's

deposition testimony.  (Pl. Dep. 10/7/20 at 127 ("In January 2015, Greg Mattiko put his

hand on my lower back at the top of my buttocks at a bar.") ("emphasis added"), Facts,

¶101(d).

   c. Another white male partner, Dan Maguire, told Ms. Chan in January
      2015 that "China is full of crap" [Exhibit R, ¶ 10];

***Response***: Defendants do not dispute that the statement was made for the

purpose of summary judgment purposes.  But see P. Res. Facts. ¶101(c) (alleged

comment was made "in the context of a discussion about picking stocks").

   d. That same month, another white male, subsequently elevated to partner,
      invited Ms. Chan to visit a prostitute bar [Exhibit R, ¶ 10];

***Response***: Defendants do not dispute the statement for the purpose of summary

judgment.  But see P. Res. Facts, ¶101(e) (Plaintiff went with her "husband . . . [who]

does not recall anything offensive or improper transpiring at the bar.")

and

   e. In February 2015, another white male partner became agitated and
      aggressive over a disagreement he had with Ms. Chan concerning a
      stock, to the extent that he stuck his face in Ms. Chan's face and she was

physically forced back against the wall [Exhibit Q at 135-136; Exhibit R, ¶ 10].

**Response:** Defendants do not dispute this statement for the purpose of summary judgment.

24.     While this culture did not make it impossible for an Asian woman like Ms. Chan to succeed at Wellington, the road she would have to travel seemed longer and more arduous.

**Response:** Defendants dispute this paragraph as it is not supported by any record evidence and constitutes argument and thus it should be disregarded.

25.     Ms. Chan complained to Mr. Mattiko about her experiences in December 2014 and again in March 2015. She also complained to Mr. Baxter on June 3, 2015 and September 14, 2015. [Exhibit G, Tab 1 at response to Int. 7]

**Response:** Defendants do not dispute this paragraph for the purpose of summary judgment.

26.     During the latter conversation, on September 14, 2015, Ms. Chan told Mr. Baxter that her experience at the firm had not been that of a collaborative culture, contrary to what had been described during the hiring process. Ms. Chan further complained that she was not being given responsibilities and opportunities commensurate with her skill and experience because, as an Asian female, she was assumed to be junior. She concluded by saying "I feel like I am at a party where I'm not welcome." [Exhibit G, Tab 1].

**Response:** Defendants do not dispute this paragraph for the purpose of summary judgment.

27.     A few days later, on September 18, 2015, Ms. Chan participated in the Asian Process and Philosophy panel ("AP&P"). [Exhibit R, ¶ 13] The AP&P was specifically

intended for investors who had not yet managed a portfolio and, therefore, needed to "start to develop, refine and articulate a philosophy to better work with other investors, improve stock picking and build a foundation for managing money someday (or better support those who do)." [Exhibit N, Tab 9].

**Response:** Defendants do not dispute this paragraph for the purpose of summary judgment, but directs the Court to Exhibit N, Tab 9 ("the goal is to help investors not yet managing a portfolio to start to develop, refine and articulate a portfolio.").  Plaintiff was hired as an Equity Research Analyst and not yet managing a portfolio at Wellington.  (P. Resp. Facts ¶19-21, 45).

28.    During the course of the AP&P, Ms. Chan was subjected to belittling and disrespectful comments by Jun Oh, a male portfolio manager located in Wellington's Hong Kong office. [Exhibit Q at 109-111].

**Response:**  Defendants dispute Plaintiff's subjective characterization Mr. Oh's comments, but do not dispute her alleged perceptions of events.

29.    Ms. Chan perceived Mr. Oh's comments—which included words to the effect of "you look ridiculous"—as reflecting discriminatory bias towards Ms. Chan as an Asian female. [Exhibit O at 260-266; Exhibit Q at 109-112]

**Response:**  Defendants do not dispute this paragraph for the purpose of summary judgment.

30.    On September 22, 2015, Ms. Chan complained to Mr. Mattiko and her colleague, Philip Fan, about Mr. Oh's inappropriate and hostile conduct. Among other things, Ms. Chan stated that Mr. Oh would not have spoken to her like that if she was a man. [Exhibit G, Tab 1].

***Response:*** Defendants dispute Plaintiff's subjective characterization of events, but do not dispute her alleged perceptions of events.

31.    Although Wellington had told Ms. Chan that participation in the AP&P was a prerequisite for launching a fund, she learned that this was not true, and that similarly situated male employees—including Mr. Mattiko--had not been required to engage in the process. [Exhibit O at 242-243, 253]

***Response:***    Defendants do not dispute that Mr. Mattiko, who, unlike Plaintiff, Wellington hired as a Portfolio Manager in London not Asia, and worked in London at the time of the AP&P panel Plaintiff references (Mattiko Dep. I at 8, attached hereto as Exhibit V), did not present at the AP&P Panel. Defendants dispute the balance of the paragraph insofar as Plaintiff has offered no record evidence to support her assertion that she was "similarly-situated" to Mr. Mattiko and thus it should be disregarded.

32.    Meanwhile, word of Ms. Chan's September 14th complaint to Mr. Baxter spread amongst Wellington's upper management. On September 28, 2015, Mr. Argyle sent an email to Wellington's Managing Partner's—Brendan Swords, Jean Hynes and Phillip Perelmuter—advising of Ms. Chan's "I feel as if I'm at a party where I'm not welcome" complaint. [Exhibit N, Tab 29]

***Response:*** Defendants do not dispute that the cited email includes the quoted language."   Defendants do dispute Plaintiff's characterization concerning the alleged "spread[ing] of her alleged complaint to Mr. Baxter" as unsupported by the cited evidence, and thus it should be disregarded.

33.     Argyle did not dispute the validity of Ms. Chan's complaint, but instead noted that "I have heard this before in GEPM though never so directly" and observed "we cannot take assimilation for granted." Id.

*Response:*   Defendants do not dispute that the cited email includes the quoted language but do dispute Plaintiff's characterization of Mr. Argyle's response.

34.     In that same email, Mr. Argyle reported that "[t]he good news is that all is going well on EMO" and advised that he would likely be seeking approval for Ms. Chan's China Growth fund in the next few months. Id.

*Response:*   Defendants dispute this paragraph as Mr. Argyle testified that the quoted passage was what Plaintiff reported to him and not his own opinion.  (Argyle Depo. pp.133-134)

35.     On October 1, 2015, Mr. Argyle received an email from Mr. Burgess informing him of the AP&P debacle, which Mr. Burgess identified as one of several issues making Ms. Chan "feel unwelcome here." [Exhibit N, Tab 31].

*Response:*   Defendants dispute Plaintiff's characterization of the AP&P panel, but do not dispute this paragraph for the purpose of summary judgment.

36.     According to Mr. Burgess, Mr. Mattiko did not want to "deal with what is becoming an HR/personnel headache." Id.

*Response:*   Defendants do not dispute this paragraph for the purpose of summary judgment, but encourage the Court to review the quoted phrase in the context of the much longer email.

37.     As the fallout from the AP&P panel continued, a steady stream of apologists sought to convince Ms. Chan that she had simply misconstrued Mr. Oh's comments.

[Exhibit G, Tab 1, **pp.** 9-11]. This included Mr. Baxter, Erin Murphy, and Greg Mattiko. In each instance, Ms. Chan maintained her view that Mr. Oh's comments were discriminatory, and that she would not have been treated that way if she were a man. Id

    ***Response:***  Defendants do not dispute Plaintiff's claim that she complained to these individuals about the AP&P panel for the purpose of summary judgment, but dispute Plaintiff's subjective characterization of "fallout" from the AP&P panel and characterization of Mr. Baxter, Erin Murphy, and Greg Mattiko or unnamed others as "apologists," as this constitutes argument and should be disregarded.

    38.    Ms. Chan's steadfast conviction soon began to draw the ire of those around her. Mr. Burgess and Mr. Argyle viewed the situation as a "red flag," raising concerns over Ms. Chan's resiliency, sense of entitlement and humility. [Exhibit N, Tab 32] Mr. Baxter had a similar negative reaction, confessing that his enthusiasm for supporting the launch of Ms. Chan's fund was "waning." [Exhibit N, Tab 33]. Even Mr. Mattiko was "somewhere between irritated..., concerned and exacerbated," but most importantly he had "very little appetite for there being any drama on his team." [Exhibit N, Tab 34].

    ***Response:***  Defendants do not dispute this paragraph for the purpose of summary judgment other than Plaintiff's subjective characterization that Plaintiff's "steadfast conviction soon began to draw the ire of those around her" and suggesting a nexus between alleged protected activity and observations of Plaintiff's performance deficiencies as these constitute argument and should be disregarded.

    39.    As a direct result of Ms. Chan's complaints about discrimination, many within Wellington came to form a negative opinion of Ms. Chan's "attitude" and attributed

her complaints to Ms. Chan being "resistant to feed back." [See e.g., Exhibit N, Tabs 32-34]

   *Response:*  Defendants do not dispute this paragraph for the purpose of summary judgment, except dispute Plaintiff's subjective characterization that any negative opinions formed about Plaintiff's attitude were "[a]s a direct result of Ms. Chan's complaints about discrimination" as this constitutes argument and should be disregarded.

   40.   Privately, however, there was some acknowledgement that "to come into Wellington as an investor, a female, in Asia that the odds are not stacked in Ms. Chan's favour necessarily and we have to have sympathy with how hard it must be for her to make it work at Wellington." [Exhibit N, Tab 35].

   *Response:* Defendants do not dispute the language was included in an email but dispute that the quoted passage represents the perspective or opinions of anyone other than the speaker and encourage the Court to review the much longer email for context.

   41.   Meanwhile, Ms. Chan lodged additional complaints to Wellington's three Managing Partners—Jean Hynes, Brendan Swords and Phil Perulmuter. [Exhibit G, Tab 1]. In each instance, Ms. Chan made clear that she believed she was being subjected to discriminatory treatment.

   *Response:*  Defendants do not dispute that this paragraph for the purpose of summary judgment.

   42.   Ms. Chan received another positive performance review from Mr. Baxter for 2015. [Exhibit N, Tab 5].

**Response:**  Defendants do not dispute that Plaintiff's 2015 performance review included some positive comments but dispute the statement to the extent it implies there was no constructive criticism in the review, as set forth below by Plaintiff in Para. 43.[6]

43.    Although Mr. Baxter's review asserted that he had received feedback concerning Ms. Chan's communication skills that was "nearly universal and strikingly consistent" the peer review feedback report for 2015 does not support that claim. [Exhibit N, Tab 37]. Indeed, only one person suggested that Ms. Chan work on "tightening up her communication a bit." Id.

**Response:**  Defendants dispute this statement as there is no evidence that Mr. Baxter's feedback was derived solely from the annual peer review feedback report. In fact, in the December 8, 2015 email cited by Plaintiff, Mr. Baxter commented with regard to feedback on Plaintiff's communication issue that "[p]eople have approached me on this topic often in multiple contexts: [Early or Eurasia Morning Meeting], client facing interactions, one on one idea sharing discussions, etc." (Exhibit N, Tab 5)  In addition, comments in Plaintiff's 2015 peer feedback included "I wish she could be slightly more approachable via emails to discuss more ideas," "needs to find a way to record and distribute her ideas and thoughts on a more regular basis," and "needs to promote herself better internally."  The full comment regarding "tightening up her communication a bit" includes statements that "her thoughts can sometimes seem disorganized," "she should take 2 minutes every day to prepare in her mind how she would 'elevator pitch' these

---

[6] With regard to the assessment of Plaintiff's performance in 2015, Defendants withdraw their assertion in SOF ¶ 41 that Mr. Baxter stated that Plaintiff was on a performance watch at the end of 2015. This statement was asserted due to a mistaken reading of Mr. Baxter's testimony.

thoughts/ideas to colleagues" as "this could help her to do better in her [early morning meeting] comments, and it will probably help build her rapport with colleagues," and "I wonder if this disorganized thought process gets in the way of her analysis?" (Exhibit N, Tab 37)

44.     Nonetheless, both Mr. Baxter's review and the peer review feedback confirm that Ms. Chan was expected to devote a significant portion of her time in 2016 to developing her China Growth Fund. [Exhibit N, Tabs 5, 37] Indeed, "getting China Growth off the ground" is the first item listed by Mr. Baxter in describing Ms. Chan's 2016 "plate." Mr. Mattiko likewise commented in the peer review that Ms. Chan needed to "promote herself better internally both to investors and GRG as she needs to start building a book of business of her own." Id.

*Response:*  Defendants dispute the assertion that Plaintiff was expected to devote a "significant portion" of her time in 2016 to developing the China Growth Fund as unsupported by the cited evidence and thus it should be disregarded, but do not otherwise dispute this paragraph for the purpose of summary judgment.

45.     As part of the end of year process, Ms. Chan also met with Mr. Argyle. While Mr. Argyle testified that he does not recall the conversation, his planned talking points reflect that his primary aim was to dissuade Ms. Chan from continuing to complain about the treatment that she believed to be discriminatory. [Exhibit N, Tab 8].

*Response:*  Defendants do not dispute that the meeting occurred but dispute the assertion that Mr. Argyle testified that he does not recall the conversation due to lack of citation to any record evidence supporting it. In fact, Mr. Argyle testified to his recollection of this meeting. (Ex. E, at 89-90)   Defendants also dispute Plaintiff's characterization of

the evidence as "reflecting" Mr. Argyle's "primary aim was to dissuade Ms. Chan from continuing to complain about the treatment that she believed to be discriminatory," as this constitutes unsupported argument and thus should be disregarded.

46.     The meeting took place on December 4, 2015. [Exhibit G, Tab 1]. As she had previously, Ms. Chan told Mr. Argyle that she believed she was being treated differently because she was an Asian female and assumed to be junior. Ms. Chan also told Mr. Argyle "I demand to be treated with respect," to which Mr. Argyle responded "In this firm you don't demand anything." [Exhibit R, ¶ 14]

*Response:*  Defendants do not dispute that this paragraph accurately summarizes Plaintiff's interrogatory answer and Declaration and thus do not dispute it for the purpose of summary judgment.

47.     While Mr. Argyle refused to acknowledge the validity of Ms. Chan's complaints, he confirmed that development of her investment products—particularly China Growth—was a priority for the upcoming year and that Wellington would support her in those efforts. [Exhibit R, ¶ 15]

*Response:*  Defendants do not dispute that this paragraph accurately summarizes Plaintiff's interrogatory answer and Declaration and thus do not dispute it for the purpose of summary judgment.

48.     Launching the China Growth fund required a significant amount of work from Ms. Chan during the first half of 2016. This included presentations to Wellington's Product Panel (January 2016), Wellington's Capital Commitment Committee (February 2016), the Board of Directors for Wellington's Hong Kong affiliate (March 2016), and Wellington's Product Marketing Panel (May 2016). [Exhibit R, ¶ 16]

***Response:*** Defendants do not dispute this paragraph for the purpose of summary judgment.

49.     These efforts were not undertaken merely for Ms. Chan's benefit, as Wellington's "business case" for launching China Growth was extremely compelling. [Exhibit N, Tab 39]:

  a.   "China equity is a large category, with $51.5B in assets under management...";

  b.   "Despite the size of the market and the category, Wellington Management Funds (Global) has no China strategies in its line-up today";

  c.   "Based on feedback from GRG, we believe there is demand for this strategy and that the strategy could play a part in showcasing Wellington's broader China platform"; and

  d.   "Gigi's strong track record managing an almost identical strategy at her previous firm should be compelling."

***Response:*** Defendants do not dispute this paragraph for the purpose of summary judgment.

50.     China Growth was eventually launched, but doing so proved to be a longer and more arduous task for Ms. Chan than what was experienced by similarly situated men. For example, Mr. Oh first proposed his China Contrarian product on August 5, 2015 [Exhibit N, Tab 46], and was approved just three months later [Exhibit N, Tab 47], without having to present to the AP&P. Likewise, Mr. Mattiko's fund was launched within just three to six months of his arrival at Wellington, without the prerequisite of a philosophy and process panel. [Exhibit P at 84]

***Response:*** Defendants do not dispute that Wellington launched the China Growth Fund, but dispute Plaintiff's subjective and conclusory characterization of Mr. Oh and Mr. Mattiko as "similarly situated" to her. Plaintiff does not cite to any record evidence

establishing that either Messrs. Oh and Mattiko, or anyone else, was similarly situated to her, that Mr. Oh's "product" was launched three months after he proposed it, that Mr. Mattiko's fund was launched without the prerequisite of a philosophy and process panel, or that the new products were similarly situated in terms of launch process, requirements and time to launch. Further, Mr. Oh and Mr. Mattiko were portfolio managers, unlike Plaintiff whose position was an equity research analyst at the time China Growth Fund was launched. (Pl. Depo. I, 213-216; P. Facts ¶28)

51.     Overall, there appeared to be an inherent level of skepticism when it came to Ms. Chan's abilities and experience that caused Wellington to apply a higher degree of scrutiny to Ms. Chan than they did to her colleagues that were men and/or not Asian. [See SAF ¶¶ 22, 26-28, 30, 49]

*Response:*   Defendants dispute this paragraph because it contains conclusory argument not supported by the cited evidence and thus should be disregarded.

52.     This skepticism played out again in May and June of 2016, as Wellington prepared to market China Growth to its clients. Following a "dry run" session on May 31, 2016, Wellington's Boston-based GRG group opined that Ms. Chan was "absolutely not ready for client/consultant meetings." [Exhibit N, Tab 40].

*Response***:**  Defendants do not dispute the accuracy of the partial passage cited by Plaintiff that members of the GRG team found Plaintiff was not ready for client/consultant meetings to pitch her approach, but dispute Plaintiff's subjective and conclusory argument that this establishes an "inherent skepticism" when it came to Plaintiff's abilities and experience or any implication that perceptions about Plaintiff were based on any protected category. This conclusory argument should be disregarded

53.     When Ms. Chan questioned whether GRG's concerns may be attributable to her misunderstanding the purpose and structure of the "dry run" session, it was assumed that Ms. Chan was simply "in denial about her presentation skills." [Exhibit N, Tab 41]

*Response:*  Defendants dispute this paragraph because the cited evidence does not support the conclusory argument that it was simply "assumed" that she was in denial about her presentation skills and thus should be disregarded. In fact, the reverse is true – Ms. Hogbin offered her opinion that Plaintiff was in denial about her presentation skills after having witnessed Plaintiff's presentation and having received feedback from others who had as well, and after a discussion with Plaintiff in which Plaintiff failed to adequately acknowledge the feedback about her presentation skills. (Exhibit N, Tab 41)

54.     But Ms. Chan was not in denial. Prior to joining Wellington, Ms. Chan had spent years successfully marketing her China Opportunities fund, including through media interviews. [Exhibit R, ¶ 17] Further, in her time at Wellington, Ms. Chan had developed a strong track record for successfully engaging with clients—so much so, that several had expressed interest in pursuing new investment products with Ms. Chan.

*Response:*  Defendants dispute the implication that past media interviews establish any fact about her skills presenting to institutional investors or GRG's sincerely held impressions about same. Defendants also dispute Plaintiff's Plaintiff's subjective characterization that she had "developed a strong track record for successfully engaging with clients" and the assertion that several clients had expressed interest in pursuing new investment products with Plaintiff as there is no cited evidence to support this allegation and thus it should be disregarded.

55.     This disconnect between GRG's *perception* of Ms. Chan's abilities and what she had actually *demonstrated* while working with Wellington's clients was duly noted by Wellington's Managing Partner, Jean Hynes. [Exhibit N, Tab 42]. In a July 26, 2016 email to the other Managing Partners, Ms. Hynes wrote "When [Ms. Chan] presents internally, it is almost acrimonious. The irony is that she is wonderful with [Mr. Mattiko's] clients and consultants." Id. Ms. Hynes further noted "[Ms. Chan] thinks Wellington has not respected her and not given her a fair chance." [Id]

**Response:** Defendants do not dispute the accuracy of the quoted partial passage from Ms. Hynes' email, but dispute that the cited evidence establishes that the passage represents the impressions of Ms. Hynes and disputes Plaintiff's subjective characterization of a "disconnect" between GRG's perception of Plaintiff's abilities and what she actually demonstrated while working with clients, and dispute that Ms. Hynes' email supports Plaintiff's argument of a "disconnect."[7]

56.     Mr. Mattiko made a similar observation regarding client interactions in an October 31, 2016 email to Mr. Argyle. [Exhibit N, Tab 15]. Among the three "positives" he identified for Ms. Chan, was that "she communicates well with clients." Id.

**Response:**  Defendants do not dispute the allegations in this paragraph for the purpose of summary judgment.

57.     Further, Mr. Argyle observed first-hand that there was something askew about GRG's perception of Ms. Chan, noting in a June 27, 2016 that GRG may have had

---

[7] Plaintiff's argument creates a false comparison. Evidence of Plaintiff's one on one interaction with clients discussing stock picks does not establish any fact about her presentation skills when presenting to larger groups, marketing her approach, or about GRG's sincerely held impressions about same.

an "over reaction" to a comment that Ms. Chan made about communications with head hunters. [Exhibit N, Tab 44].

*Response:*  Defendants do not dispute that Mr. Argyle gave Plaintiff the benefit of the doubt pertaining to Plaintiff's comment to members of GRG that she was fielding calls from headhunters in his June 27, 2016 email, but dispute that the cited email reference to a single incident Mr. Argyle perceived as an "over-reaction" by GRG establishes that there was "something askew" more generally about GRG's perception of Plaintiff, particularly with regard to her presentation skills.

58.    Bo Munier, another Asian female investor at Wellington, also expressed dissatisfaction about her dealings with the Boston-based GRG team. [See Deposition Transcript of Ray Helfer, attached hereto as Exhibit T ("Exhibit T"), at 107-108]

*Response:*  Defendants dispute this statement as there is no evidence cited that Plaintiff expressed dissatisfaction with GRG and to the extent it intends to imply that Ms. Meunier complained of any discrimination. Mr. Helfer testified that Ms. Meunier, an Asian female, voiced frustration that GRG had set up meetings for her with clients who were not prepared to invest in China yet.  (Exhibit T at 107-108)

59.    Nonetheless, Ms. Chan did everything that was asked of her by GRG. When they gave her feedback, she incorporated it. When they asked her to work with a coach to improve her public speaking, she did so. And in GRG's own estimation, Ms. Chan showed improvement. [Exhibit N, Tab 45; Exhibit R, ¶ 18]. But the opportunity to pitch China Growth to Wellington's clients never came. [Exhibit R, ¶ 19]

*Response:*  Defendants do not dispute this paragraph accurately quotes Plaintiff's declaration for the purpose of summary judgment.

60.     As Wellington dragged its feet on allowing Ms. Chan to market China Growth to its client based, there continued to be strong interest from other clients and prospects to have Ms. Chan manage their money.

*Response:* Defendants dispute Plaintiff's subjective characterizations in this paragraph, made without citation to any record evidence. Defendants also dispute that there was strong interest from other clients and prospects to have Plaintiff manage their money. Other than the prospect identified below in Para. 61, Plaintiff cites to no evidence to support this assertion and thus it should be disregarded. Further, the Spring 2016 marketing trip did not proceed in part due to lack of client interest. (Ex. N, Tab 41)

61.     For example, on September 20, 2016, Alex Qian—Head of GRG in China— reported that a large Chinese insurance company had tentatively decided to hire Wellington as their investment advisor because they "like[] our China Growth approach and Gigi's past investment success." [Exhibit N, Tab 43]. He concluded "Well done, Gigi!" Id.

*Response:*  Defendants do not dispute the this paragraph for the purpose of summary judgment.

62.     Likewise, HHMI continued to express interest in having Ms. Chan manage more of its money. [Exhibit N, Tab 28 ("What's Gigi up to these days — the China product, or has she developed something pan-Asia?"); Exhibit N, Tab 38 ("I definitely want to visit with [Mr. Mattiko] at his new digs, and also touch base with Gigi and hear about her new effort"); Exhibit N, Tab 36 ("We want to make sure we have a couple hours for portfolio review with you, and an hour or so with Gigi discussing her new Asia-only effort.")]

*Response:*  Defendants do not dispute that HHMI was interested in learning about Plaintiff's investment approach, but dispute the assertion that HHMI expressed interest in

having Plaintiff manage any of its money as this is not established by the evidence cited and thus should be disregarded.

63.     In early August, Ms. Chan informed Mr. Mattiko that she was pregnant. [Exhibit A, Tab 11]. He promptly informed Mr. Argyle. Id.

*Response:*  Defendants do not dispute this paragraph for the purpose of summary judgment.

64.     On August 8, 2016 a recently terminated Wellington Portfolio Manager, Mina Koide, filed a Charge of Discrimination against Wellington, Mr. Swords and Mr. Argyle. [Exhibit U] Ms. Koide, an Asian female, alleged that she had been discriminated against on the basis of her sex and race, and subsequently retaliated against when she raised those concerns to Mr. Swords and Mr. Argyle. Id. Among the discriminatory acts alleged by Ms. Koide was denial of a "fair marketing opportunity" for her fund.

*Response:*  Defendants dispute that the MCAD charge alleged that Koide complained to Mr. Argyle, but otherwise do not dispute the allegations in this paragraph for the purpose of summary judgment.

65.     On September 1, 2016, Mr. Mattiko wrote Mr. Argyle an email advising that he had completed his review of Ms. Chan's 2016 performance and sharing the following thoughts:

> Despite Gigi's leading understanding of all things related to the China market, she finds integrating into the Wellington culture difficult. I used to be of the opinion this had to do with issues relating to the HK office, but now I am convinced that it has more to do with the lens through which Gigi views the firm and I believe the world in general. Gigi, for some reason, believes that Wellington and the people who work here do not want her to succeed. This attitude or pessimism prevents her from integrating into the Wellington culture. I fear that unless she makes a 180 degree change and accepts the firm for what it is she will continue to be dissatisfied. This is really unfortunate because Gigi herself is a very

pleasant person and I enjoy working with her. I also am convinced that she will add value for our clients. But if her view of Wellington does not shift I don't know how long she will either be willing to say or will be tolerated by others.

[Exhibit N, Tab 48]

**Response:**  Defendants do not dispute the allegations in this paragraph for the purpose of summary judgment.

66.    Mr. Mattiko's email makes no mention of any alleged deficiencies in Ms. Chan's contributions to the EMO team. Id. Nor are any such deficiencies noted in his review of Ms. Chan's 2016 performance. [Exhibit A, Tab 16]. In fact, Mr. Mattiko's scoring of Ms. Chan for 2016 is comparable to the score he provided for 2015, including an identical score for "collaboration." Id.

**Response:**  Defendants do not dispute this paragraph for the purpose of summary judgment but dispute Plaintiff's unsupported characterization that Mr. Mattiko's scoring of Plaintiff's collaboration does not indicate a deficiency.

67.    In October 2016, Mr. Argyle consulted with Wellington's HR function to prepare for a meeting with Ms. Chan. [Exhibit N, Tab 30]. HR provided Mr. Argyle a detailed script to be used for his discussion, and advised him to have Mr. Mattiko assist with filling in the blanks "with lots of examples" of performance deficiencies. Id.

**Response:**   Defendants do not dispute the allegations in this paragraph for the purpose of summary judgment.

68.    Following that advice, on October 31, 2016 Mr. Matiko provided Mr. Argyle "notes" identifying alleged performance deficiencies with respect to Ms. Chan. [Exhibit N, Tab 15]. Mr. Mattiko alleged that Ms. Chan's contribution to the EMO team is an area that needs improvement.

**Response** Defendants do not dispute the allegations in this paragraph for the purpose of summary judgment.

69.     During his November 2, 2016 meeting with Ms. Chan, Mr. Argyle sought to convince Ms. Chan to adopt a more positive view of Wellington and its culture. [Exhibit G, Tab 3 at 29-30, 83]

**Response:**  Defendants do not dispute the allegation in this paragraph that Mr. Argyle sought to have Plaintiff improve her negative attitude but dispute Plaintiff's characterization to the extent it implies that Mr. Argyle was referencing a racist or sexist culture.

70.     To do so, he falsely represented recent peer feedback concerning Ms. Chan's performance. [Compare Exhibit G, Tab 3, and Exhibit A, Tab 16]

**Response:** Defendants dispute that Mr. Argyle falsely represented peer feedback results, as it is not supported by the cited evidence. Plaintiff appears to be misreading the 2016 peer review feedback. Plaintiff's 2016 rankings,  as accurately recited by Mr. Argyle, are located in the rows entitled "Rank (GEPM)". (Ex. A, Tab 16 at DEF 29032).

71.     When Ms. Chan attempted to respond to Mr. Argyle's comments, he interrupted her in a mocking and antagonistic tone, saying things such as:

    a.   "it always seems to be about what Wellington can do for Gigi" [Exhibit G, Tab 3 at 41]

    b.   "oh but it's all about you, right?" [Exhibit G, Tab 3 at 44]

    c.   "for the past two years you've said...look at me. I'm a superstar" [Exhibit G, Tab 3 at 51-52]

    d.   "if you're as unhappy as you seem to be, I don't understand why you're here" [Exhibit G, Tab 3 at 54]

*Response:*   Defendants do not dispute the quoted partial passages, but dispute Plaintiff's characterization of Mr. Argyle's tone, and encourages the Court to listen to the audio recording of the November 2, 2016 meeting.

72.   As she had previously, Ms. Chan made clear that her dissatisfaction with Wellington and its culture was the result of discriminatory treatment she had experienced, which she noted included "disrespectful" treatment, "insults" and "less than professional comments." [Exhibit G, Tab 3 at 20-21, 37, 40-41, 52-53]

*Response:*   Defendants dispute Plaintiff's characterization that her complaints expressed in the November 2, 2016 meeting with Mr. Argyle pertained to discrimination. For example, Plaintiff stated as follows: ". . . when you've put in so much effort and when people just disrespect the time and the work that you've put in in a week before a trip is scheduled just to cancel it without adequate explanation, I think that is cause for discontent afterwards." (Exhibit G, Tab 3 at 20-21). Plaintiff also cites a partial passage out of context, a full review of which establishes that Plaintiff's dissatisfaction focused on alleged business misrepresentations at the hiring stage and broken business promises. (Plaintiff cites to pp. 37, 40-41 instead of to the entire passage at pp. 34-46; Exhibit G, Tab 5 at 6-11).

73.   Referencing her past complaints of discrimination, Ms. Chan stated "Just because I look young, just because I'm female, just because I'm Chinese, doesn't mean that people can talk down at me. That's what I've said. Every single time." [Exhibit G, Tab 3 at 52-53]

*Response:*   Defendants do not dispute the statement quoted but dispute that this statement establishes that Plaintiff was referencing past complaints of discrimination.

74.     Mr. Argyle did not deny that assertion. [Exhibit G, Tab 3 at 52-53]

**Response:**  Defendants dispute this statement to the extent it implies Mr. Argyle agreed that Plaintiff had been treated differently or comments had been made to her based on her gender or race.

75.     Despite Mr. Argyle's confrontational tone, Ms. Chan repeatedly expressed her desire to work cooperatively with Mr. Argyle, noting: "I am engaging with you and **I** am trying to make things work, but I don't believe you're hearing me." [Exhibit G, Tab 3 at 54-55]

**Response:**  Defendants do not dispute the partial passage as quoted by Plaintiff, but dispute Plaintiff's assertion that this establishes that she was "cooperative" in the meeting, dispute Plaintiff's characterization of the November 2, 2016 meeting and Mr. Argyle's tone, which can only be determined upon listening to the audio recording of the November 2, 2016 meeting.

76.     Three weeks later, at the urging of HR, Mr. Argyle sent Ms. Chan a self-serving summary of their discussion. [Exhibit N, Tabs 24, 16]

**Response:** Defendants do not dispute that Mr. Argyle sent Plaintiff the email on November 22, 2016 setting forth her deficiencies and a clear directive requiring her to respond. Defendants dispute the assertion that Plaintiff's characterization of Mr. Argyle's email as self-serving or at the urging of HR as these assertions are not supported by the record evidence cited and thus should be disregarded.

77.     While the email directed Ms. Chan to "acknowledge" and "respond," she did not see it until she had started her maternity leave. [Exhibit Q at 77-78; Exhibit R, ¶ 22]

**Response:** For the purpose of summary judgment, Defendants do not dispute the allegations in this paragraph that Plaintiff did not read an email from Mr. Argyle for approximately three weeks while she remained at work before her maternity leave commenced (from November 22, 2016 until approximately mid-December 2016). (Ex. C at 76)

78. Ms. Chan had a difficult delivery, and almost died giving birth. [Exhibit R, ¶ 20]

**Response:** Defendants do not dispute the allegations in this paragraph for the purpose of summary judgment.

79. Ms. Chan returned to work on April 20, 2017. [Exhibit R, ¶ 21]

**Response:** Defendants do not dispute the allegations in this paragraph for the purpose of summary judgment.

80. Given the reaction that Ms. Chan had received from Mr. Argyle when she tried to "respond" to his criticism during their meeting, she thought it best to "respond" to Mr. Argyle by making diligent efforts to contribute to the EMO team, trying to improve her participation in investor meetings and refraining from bringing up her past difficulties with Wellington and its culture. [Exhibit R, ¶ 22]

**Response:** Defendants do not dispute that Plaintiff chose not to respond to Mr. Argyle's November 22, 2016 email but dispute Plaintiff's subjective and conclusory statement that she engaged in "diligent efforts to contribute to the EMO team" which is not supported by record evidence and should be disregarded. Defendants also dispute any implication that Plaintiff was not provided an opportunity for a fulsome response during the November 2, 2016 meeting as demonstrated in the audio recording of that meeting.

81.    During a May 31, 2017 meeting with Mr. Mattiko, however, he convinced her to reveal her current state of mind on Wellington and its culture. [Exhibit G, Tab 5] Ms. Chan answered honestly, noting that her view of Wellington had not changed, but that she thought the relationship was salvageable. [Exhibit G, Tab 5]

*Response:*  Defendants do not dispute that Plaintiff did not reveal her current state of mind to Mr. Argyle despite his November 22, 2016 directive , and that she did speak honestly to Mr. Mattiko when she indicated that her view that Wellington had broken a business promise to her had not changed and thus she felt no need to respond to Mr. Argyle's November 22 email, and that she thought the relationship was salvageable if Wellington would fulfill its alleged business promise. Defendants dispute this paragraph to the extent Plaintiff implies that she was referencing discrimination, as a review of the audio recording of the May 31, 2017 meeting with Mr. Mattiko establishes that Plaintiff did not even mention discrimination, but rather was focused on her continued argument that Wellington had broken business promises (Exhibit G, Tab 5 at 6-11).

82.    At no point in this conversation did Mr. Mattiko ever express any dissatisfaction with Ms. Chan's contributions to the EMO team. [Exhibit G, Tab 5] In fact, the conversation concluded with an extensive discussion in which Ms. Chan provided her thoughts on an EMO investment. [Exhibit G, Tab 5 at 39-48]

*Response:*  Defendants dispute that Plaintiff and Mr. Mattiko's discussion about an investment pertained to an EMO investment or that the discussion was extensive as this is not supported by the record evidence, but otherwise do not dispute this paragraph for the purpose of summary judgment..

83.     Mr. Mattiko did admit, however, that Wellington was not moving forward with some of the potential fund management opportunities that were possibly available to Ms. Chan because the firm was unsure of her commitment. [Exhibit G, Tab 5 at 31-33 ("they're not gonna push forward if they don't know where you stand")] Mr. Argyle made a similar admission at his deposition. [Exhibit M at 166-169]

*Response*:   Defendants dispute the allegation that Mr. Argyle made a similar admission, as he provided a number of reasons for not pursuing discussions about potential opportunities (Exhibit M at 166-169), but otherwise do not dispute the allegations in this paragraph for the purpose of summary judgment.

84.     Just days later, on June 9, 2017, Messrs. Argyle, Philip and Mattiko met to decide Ms. Chan's fate. Exhibit A, Tab 22 at DEF7570] While none of them could recall at their depositions what was actually discussed, they agreed that the decision to terminate Ms. Chan's employment was made at that meeting, and it was made by Mr. Argyle. [See Exhibit S at 104-105; Exhibit M at 187; Exhibit P at 113]

*Response:*   Defendants dispute the assertion in this paragraph that Messrs. Argyle, Philip and Mattiko could recall what was actually discussed, but do not dispute that Mr. Argyle made the decision to terminate Plaintiff's employment at this meeting. (Ex. S at 104-105; Exhibit M at 187; Exhibit P at 113)

85.     Despite deciding to terminate Ms. Chan on June 9, 2017, Wellington delayed implementing its decision until September. [Exhibit S at 106-07]

*Response:*   Defendants do not dispute that Plaintiff was terminated from employment in September 2017.

Respectfully submitted,

Defendants,
WELLINGTON MANAGEMENT
COMPANY LLP and CHARLES
ARGYLE,

By their attorneys,


*/s/ Stephen T. Paterniti*
Stephen T. Paterniti, BBO# 564860
Jamie L. Kessler, BBO# 681867
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, Massachusetts  02116
TELE: (617) 367-0025
FACSIMILE: (617) 367-2155


Dated:  April  14, 2021

## CERTIFICATE OF SERVICE

This hereby certifies that on this 14th day of April 2021, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Stephen T. Paterniti*
Jackson Lewis P.C.

# Exhibit V

Page 1

Volume:

Pages:  1-117

Exhibits:  None

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


GIGI KAI ZI CHAN,                    )

               Plaintiff,       )

v.                                   )     DOCKET NO.: 19-cv-11605

WELLINGTON MANAGEMENT                )

COMPANY, LLP, and CHARLES            )

ARGYLE,                              )

               Defendants       )

_____)




VIDEOCONFERENCE DEPOSITION OF GREG MATTIKO


   THIS DEPOSITION TAKEN REMOTELY VIA ZOOM, ON WEDNESDAY,

OCTOBER 21, 2020, COMMENCING AT 6:03 P.M.




REPORTED BY:  Sharon G. Saalfield, LCR No. 147, MA CSR, RDR,

CRR



Page 8

1    A.    I am employed at Wellington Management Hong Kong as

2          portfolio manager.

3                  MR. PATERNITI:  Patrick, can I just jump in

4              here on the stipulations, that we have, I think,

5              previously agreed to?  To make sure the record's

6              clear, all objections, except as to form, and

7              motions to strike reserved, and the notary, waiving

8              the -- waiving the notary.

9                  MR. HANNON:  Agreed.

10                 MR. PATERNITI:  Thanks.

11   BY MR. HANNON:

12   Q.    And, Mr. Mattiko, for how long have you been employed at

13         Wellington Management Hong Kong?

14   A.    I started Wellington Management Hong Kong in 2016.  I

15         believe it was August.

16   Q.    And how were you employed prior to August of 2016?

17   A.    I was employed by WIML, Wellington Management London,

18         from 2012 until I relocated to Hong Kong in 2016.

19   Q.    And were you also a portfolio manager at Wellington

20         Management London?

21   A.    Same job.

22   Q.    How were you employed prior to 2012?

23   A.    Prior to 2012, I was employed by JPMorgan Asset

24         Management, and that would have been 2003 to 2012, in



```
 1                    C E R T I F I C A T E
 2            I, Sharon G. Saalfield, a Licensed Shorthand
 3    Reporter for the State of New Hampshire, Certified Shorthand
 4    Reporter for the Commonwealth of Massachusetts, Registered
 5    Diplomate Reporter and Certified Realtime Reporter, do hereby
 6    certify that the foregoing is a true and accurate transcript
 7    of my stenographic notes of the proceeding taken at the place
 8    and on the date hereinbefore set forth to the best of my skill
 9    and ability under the conditions present at the time.
10            I further certify that I am neither attorney or
11    counsel for, nor related to or employed by any of the parties
12    to the action in which this proceeding was taken, and further
13    that I am not a relative or employee of any attorney or
14    counsel employed in this case, nor am I financially interested
15    in this action.
16            The foregoing certification of this transcript does
      not apply to any reproduction of the same by any means unless
17    under the direct control and/or direction of the certifying
      reporter.
18
19                      Sharon
20                      G.
                        Saalfield
21
22
                        _____
23                      Sharon G. Saalfield,
                        NH Lic. No. 147, CSR, RDR, CRR
24
```