```
                 UNITED STATES DISTRICT COURT

                   DISTRICT OF MASSACHUSETTS

                                  No. 1:19-cv-11605-WGY


  GIGI KAI ZI CHAN,
            Plaintiff

  vs.


  WELLINGTON MANAGEMENT COMPANY, LLP, et al
            Defendants



                       *********



                  For Zoom Hearing Before:
                  Judge William G. Young


                     Summary Judgment


                  United States District Court
                  District of Massachusetts (Boston)
                  One Courthouse Way
                  Boston, Massachusetts 02210
                  Wednesday, May 5, 2021



                        *******



             REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
                 United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
                    bulldog@richromanow.com
```

```
 1                    A P P E A R A N C E S

 2


 3   PATRICK J. HANNON, ESQ.
        Hartley Michon Robb, LLP
 4      155 Seaport Boulevard
        Boston, MA 02210
 5      (617) 723-8000
        Email: phannon@hmrhlaw.com
 6      For Plaintiff


 7


 8   BEVERLY W. GAROFALO, ESQ.
        Jackson Lewis, P.C.
 9      75 Park Plaza, 4th Floor
        Boston, MA 02116
10      (617) 367-0025
        Email: Beverly.garofalo@jacksonlewis.com
11      For the defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            P R O C E E D I N G S
 2            (Begins, 2:00 p.m.)
 3            THE CLERK:  Civil Action 19-11605, Gigi Kai Zi
 4   Chan vs. Wellington Management Company, LLP, et al.  The
 5   Court is in session.
 6            THE COURT:  Good afternoon counsel.  This is a
 7   hearing held on our zoom platform.  Our host is one of
 8   my law clerks, Dan Hohler.  The proceedings are being
 9   taken down by our Official Court Reporter, Rick Romanow.
10   And I have other of my law clerks on the line.
11            Because this is an official proceeding of the
12   Court, it is open to the press and public.  I do not
13   inquire nor do I know whether any member of the press or
14   public are present, but if they are I must remind you to
15   keep your microphone muted and that the rules of court
16   remain in full force and effect, and that is there is no
17   streaming, taping, retransmission, or other rebroadcast
18   of these proceedings.
19            With that said, would counsel introduce themselves
20   starting with the plaintiff.
21            MR. HANNON:  Good afternoon, your Honor, this is
22   Patrick Hannon, counsel for the plaintiff.
23            THE COURT:  Good afternoon.
24            And for the defendants?
25            MS. GAROFALO:  Good afternoon, your Honor, my name
```

1  is Beverly Garofalo from Jackson Lewis representing
2  defendants Wellington Management Company, and Charles
3  Argyle, who is here with us today virtually.
4          THE COURT:  And you are all welcome.  Very well.
5          I have read the briefs in this case.  I've read
6  the briefs, there's an extensive record beyond the
7  briefs.  I believe I'm ready for oral argument.  Oral
8  argument should not, in the aggregate exceed -- well in
9  the aggregate per side, exceed 10 minutes per side.
10         So this is the defendants' motion.  I'll hear the
11 defense.
12         MS. GAROFALO:  Thank you, your Honor, and may it
13 please the Court.
14         The critical issue before the Court today is
15 whether Wellington has met its burden on summary
16 judgment to demonstrate the absence of a genuine issue
17 of material fact on pretext and we respectfully submit
18 that it has.
19         The few cases that plaintiff cites in passing in
20 his papers have something that this case does not, which
21 is evidence upon which a reasonable jury could find that
22 the employer manufactured a false reason.  For example,
23 um --
24         THE COURT:  You're right that that's the key
25 issue, but you've jumped to the conclusion.  This is

1    Massachusetts law, Massachusetts requires pretext only.
2    If I take all intendments in favor of the plaintiff,
3    don't you think it squeaks by?  Well I'm not expecting
4    you to say that it does, but I'm considering that
5    perhaps it squeaks by.
6         MS. GAROFALO:  Right, I totally understand and I'm
7    not surprised that that's your first question, your
8    Honor.
9         The cases that the plaintiff cites, which he cites
10   only in passing, or she cites only in passing, all have
11   something that this case doesn't, which is evidence of a
12   nature upon which a jury could find that the employer
13   had manufactured a false reason.
14        So, for example, some of the cases point to an
15   employer's inconsistent or changing or implausible
16   reasons for the termination, and here in the 56.1
17   statement and the supporting evidence Wellington has
18   drawn a straight line from critiques that were incurred
19   in plaintiff's initial interviews before her hire
20   straight through her peer feedback for 2016, which
21   placed her almost dead last among 114 investment
22   professionals, and continuing to the termination
23   decision.  In the record before the Court I counted more
24   than 25 different Wellington employees who gave feedback
25   around several prominent themes, plaintiff's

1  communication and her presentation style, her
2  unwillingness to listen and accept feedback, her lack of
3  collaboration, her lack of contribution, her poor
4  attitude.  Naturally when an employee does not heed
5  feedback and make changes, the consequences grow
6  greater.
7       On November 2nd, 2016, in an e-mail a couple weeks
8  later, Mr. Argyle told plaintiff exactly what she needed
9  to do to remain employed.  It was remarkably easy for an
10 employee earning three-quarters of a million dollars
11 annually.  "Respond to my e-mail.  Tell me you heard my
12 feedback."  Yet she wouldn't do that for a manager.
13      So in May 2017, both Mr. Henry -- Henry Philip and
14 Greg Mattiko did recognizance for the plaintiff to see
15 if she had heard Mr. Argyle's feedback and they got
16 nothing from her.  On the contrary, in plaintiff's
17 secretly-recorded May 31 meeting with Mr. Mattiko, she
18 made it abundantly clear that Mr. Argyle's frank
19 discussion and e-mail had not moved the needle at all.
20 How long must an employer stay on a Merry Go Round with
21 an employee who refuses to change?
22      Other factors in cases that were cited by
23 plaintiff that are not present here included the
24 presence of similarly-situated comparators.  There are
25 none here.  There are cases that involve a failure to

1    follow internal procedures.  That is not here.  There
2    are cases that cite discriminatory or stereotypical
3    remarks or conduct by the decision-maker -- or remarks
4    which are not present here.
5         THE COURT:  Well there's certainly a basis for her
6    making a complaint if you believe her allegations.
7         MS. GAROFALO:  Well, your Honor, she perceives
8    that certain things that happened to her in the course
9    of her employment were owing to her gender or national
10   origin or to her pregnancy.  But in responding to the
11   arguments that Wellington put forward in its moving
12   papers, the plaintiff has posited theories like
13   Mr. Argyle, you know, didn't truly believe that the
14   situation was futile or that a jury could find that
15   plaintiff had a hard -- a perfectly fine attitude or she
16   speculated that perhaps Mr. Mattiko or HR had given
17   false information, but that's not evidence, that's
18   conjecture, that's speculation.
19        In her surreply filed just yesterday the plaintiff
20   submitted that the quote-unquote "record as a whole"
21   supported the denial of summary judgment.  And this
22   doesn't meet the employee's burden of production on
23   summary judgment to point to specific evidence in the
24   record.
25        And I would submit that if you -- I understand,

1  your Honor, the record is large and I understand that
2  the thought might be "There's probably an issue of fact
3  in here somewhere," but really what we show, um, between
4  the evidence we submitted and actually the evidence that
5  the plaintiff submitted, it shows patience by
6  Wellington, there are thoughtful communications about
7  how to help support plaintiff to be successful.  The
8  communications reflect genuine confusion as to why
9  things were going so sideways for plaintiff while
10 maintaining hope that she could turn things around, they
11 saw the value.
12      But ultimately what is clear from the record is
13 that her dissatisfaction with Wellington came out of her
14 belief that Wellington had broken promises that it had
15 made to her at the time of hire.  And you don't have to
16 take my word for it, look at the e-mail that she wrote
17 on October 17th, 2015 in which she demanded a proper
18 role as a portfolio manager even though she was hired
19 into an analyst role.
20      And of course if you listen to those recordings
21 you'll hear over and over again, including in the May 31
22 one with Greg Mattiko, where she uses the words, "You
23 broke a promise."  This wasn't about discrimination,
24 that's not where her concerns weigh.
25      In terms of retaliation, as we have stated, the

1  plaintiff cannot make out even a prima facie case.  She
2  makes a passing reference to temporal proximity, but
3  offered no analysis, didn't cite to a single case, and
4  as we noted in our briefing, plaintiff first claims to
5  have engaged in protected activity just a few months
6  into her job in December of 2014, yet she didn't suffer
7  any adverse job action for more than 2 1/2 years after
8  that.
9       And while I'm conceding for purposes of summary
10 judgment, as we must, that she engaged in protected
11 activity, in her surreply she tried to clean this up by
12 pointing to one statement in her November 2nd meeting
13 where she says, "As an Asian female I should not be
14 talked down to" or words to that effect.
15      Uttering that one sentence -- uttering that one is
16 in a protected class is not a super power that shields
17 one from the consequences of their actions.  It's also
18 undisputed in the record that Mr. Argyle went to Human
19 Resources, he went into a meeting prepared to have a
20 very somber discussion with the plaintiff about her
21 performance and the urgent need to turn things around,
22 and then the plaintiff ignored Mr. Argyle's directive,
23 his simple directive to respond to his feedback at her
24 peril.
25      As in *Mesnick vs. General Electric*, the record,

1  when read in the whole, is more consistent with an
2  employer's longstanding desire to improve an employee's
3  behavior than with some sort of a vengeful
4  preoccupation.  And if she could state a prima facie
5  case, um, her claim still fails on pretext.
6      And then the last prong or the last claim here is
7  the tortious interference claim and Mr. Argyle and
8  Wellington are entitled to summary judgment on those
9  claims because plaintiff conceded in her opposition that
10 these are merely a recast of her discrimination claims.
11 And as the Supreme Judicial Court held in ***Verdrager vs.***
12 ***Mintz Levin*** in 2016, which is really on all fours with
13 this case, the Court --
14     THE COURT:  There has to be something more.  Yes,
15 she properly concedes that.  So insofar as she says
16 these are discrimination claims, they must fall.  But
17 she -- there is other evidence in this record of her,
18 um, being given less responsibility or having
19 responsibilities taken away from her, in essence that do
20 not depend on that.
21     Now of course she also concedes, as she must, that
22 for, um, the count against Wellington, a jury is going
23 to have to find that Wellington in fact is not the
24 employer.  I recognize that.
25     All right, let's hear from counsel for the

```
 1    plaintiff.
 2             MR. HANNON:  Yes, thank you, your Honor.
 3             I'm going to pick up where Ms. Garofalo left off
 4    with respect to the issue of causation with respect to
 5    the retaliation.
 6             Ms. Garofalo made the argument earlier that
 7    they've drawn this sort of straight line from criticisms
 8    made during the interview process up to the termination,
 9    but that's an argument on them in terms of that these
10    dots connect to this dot and that dot and so forth.  The
11    record evidence provides a number of different ways in
12    which the dots can be connected, and as we argue and is
13    set forth in our statement of material facts, there was
14    a very very clear shift here and that clear shift didn't
15    happen when Ms. Chan had difficulty making the
16    presentations, it didn't happen under some other
17    circumstances where she did her job poorly, it happened
18    when she complained because she thought she was being
19    discriminated against.  And looking at the record
20    evidence concerning her performance prior to those
21    complaints and how she was viewed within Wellington
22    after those complaints, there's very many different dots
23    which a finder of fact can draw to find that indeed she
24    was viewed differently because of those complaints.
25             And as you look at what Wellington is saying time
```

1    and time again leading up to this November 2016 meeting,
2    they're using terms like her "attitude," they're using
3    terms criticizing the way that she views Wellington and
4    the way that she views the world.  These are ambiguous
5    statements that can be viewed in different ways.
6         Wellington tries very hard to argue that what
7    Wellington means is her complaints about broken
8    promises, but a jury could likewise look at those words
9    that Wellington's using and see that what Wellington is
10   talking about is Ms. Chan's complaints in general, the
11   fact that she viewed Wellington's conduct as reflecting
12   a discriminatory practice and a discriminatory
13   atmosphere.  And you certainly see, in the lead-up to
14   her termination, that Wellington didn't want to be
15   perceived that way, that Wellington cared greatly that
16   the people who worked at Wellington wanted to work at
17   Wellington and believed in Wellington.  And looking at
18   the feedback from that November 2016 meeting, a
19   reasonable jury can certainly find that that is the
20   dominant theme that's being expressed in this case.
21        THE COURT:  Go to the first discrimination counts.
22   Where is the actual evidence of pretext here?  I mean it
23   is your burden to come forward with evidence that the
24   reasons they give, which are legitimate
25   nondiscriminatory reasons, that those reasons are in

```
 1    fact a pretext for something else.  Where is the
 2    evidence of that?
 3         MR. HANNON:  It starts with the reasons itself and
 4    notably Ms. Garofalo mentioned a number of potential
 5    reasons in her presentation today, some of which they
 6    don't even have in their papers as reasons.  So, for
 7    example, she argues today that Ms. Chan --
 8         THE COURT:  No, no, I'm asking you.  On this
 9    record where is the evidence, the actual evidence of
10    pretext?
11         MR. HANNON:  Well we can start with Tab 17 to, um,
12    to what we submitted as Exhibit N, which is an e-mail
13    written by Mr. Argyle in May of 2017.  And Mr. Argyle
14    sort of lays out in that e-mail, you know, the sort of
15    different issues with Ms. Chan, and one of the potential
16    issues that he notes is her lack of contribution to the
17    EMO team.  And Mr. Argyle writes in that e-mail that
18    that's something he can get beyond.
19         And he goes on in that e-mail to exclude the what
20    -- what the big question that remains in his mind is
21    whether or not there has been a sufficient change in
22    Ms. Chan's, you know, view of Wellington, um, that that
23    was really the issue.  That this wasn't about whether or
24    not she could justify her salary, which is one of the
25    pretextual arguments that they put forward, this wasn't
```

1   about whether or not she could contribute to the EMO
2   team, another pretextual argument that they put forward,
3   but it's about whether or not she would change her view
4   of Wellington.
5       Now there's a potential dispute here in terms of
6   whether or not that is a legitimate nondiscriminatory
7   reason, all right, it depends upon how you interpret it.
8   Wellington wants to interpret Ms. Chan's view of
9   Wellington as simply having broken promises, but a
10  reasonable factfinder can look at words like "attitude"
11  and, you know "view of the world," and look at those
12  things and recognize that what Wellington's talking
13  about there is Ms. Chan's view of Wellington as an
14  atmosphere of discriminatory conduct, and if that's what
15  Wellington meant, and a reasonable jury could conclude
16  that they did, that is not a legitimate
17  nondiscriminatory reason for termination.
18      THE COURT:  That's it?  What else is there?  What
19  else is there?
20      MR. HANNON:  Um, with respect to the issues of
21  pretext in terms of the -- just to kind of take them in
22  order of what they put forward, that they've argued that
23  again it has something to do with her contributions to
24  the EMO team.  Again Mr. -- Mr. Argyle's e-mail refutes
25  that.  Likewise in Ms. Chan's conversation with Mr. --

```
 1            THE COURT:  So it's the e-mail, that's it?
 2            MR. HANNON:  Um, that's the strongest, I think,
 3   temporally, right, because this e-mail is in early May
 4   2017, um, about a month, a month and a half before he
 5   makes the decision.  So in terms of getting the best
 6   snapshot of his frame of mind there, that's important.
 7            THE COURT:  What else?
 8            MR. HANNON:  But looking at -- so looking at
 9   justifications such as their argument that, um, that he
10   believed that he could not justify her salary, the
11   record is replete with various business opportunities
12   that were presented to Wellington where indeed they
13   could make money off of Ms. Chan or indeed they had
14   numerous clients that were interested in doing funds
15   with her and where in fact Wellington was holding her
16   back because they weren't sure about how she felt about
17   the firm and whether or not she was going to be a
18   long-term fit.
19            THE COURT:  And the evidence of that?
20            MR. HANNON:  I'm sorry?
21            THE COURT:  The evidence of that?
22            MR. HANNON:  So we have e-mails here regarding,
23   um, interest from a large institutional client, um,
24   HHMI.
25            THE COURT:  Where's the evidence that Wellington
```

```
 1   was holding her back?
 2           MR. HANNON:  So part of that we have, um, that's a
 3   -- that's an admission that was made to her by
 4   Mr. Mattiko in her May 2017 meeting, um, that in fact at
 5   least one of the opportunities that had been sort of
 6   dangled out there for her, that Mr. Argyle had put the
 7   kibosh on that because of his concern about her
 8   long-term commitment.  There's also testimony from
 9   Mr. Argyle that's in the record in which he also noted
10   that his concerns about Ms. Chan's long-term commitment
11   was likewise a reason why he was not pursuing
12   opportunities that were available.
13           THE COURT:  All right.
14           MR. HANNON:  And there's also reference to that in
15   the May 2017 e-mail I referenced earlier.  You know this
16   is not a case where you had someone who is doing a bad
17   job, um, this is a case that --
18           THE COURT:  There's a fair amount of evidence that
19   she wasn't doing a very good job.
20           MR. HANNON:  Um, it depends on how you define what
21   her job is, and Wellington works really really hard in
22   their papers to suggest that, you know, Ms. Chan's one
23   and only exclusive role was contributing to the EMO.
24   But that's not what the evidence actually shows, that's
25   not what a jury can actually find.
```

1        Very early on in her tenure, you know, Wellington
2   was interested in having her run -- Wellington is
3   interested in finding ways for her to, you know have her
4   own, quote, "have her own product," and she's succeeding
5   in that, and yet after she complains they hold her back.
6   After she complains, yes, they let her launch her fund,
7   but they don't give her client access.  And then they
8   have this meeting in November 2016 where she's told "You
9   know what?  You're not going to get client access until
10  we know that you've proven yourself as being committed
11  to Wellington."  And a jury can find that all of that
12  stems from the fact that she complains, she complained
13  again and again and again and again to the point they
14  simply got sick of it and they wanted her to stop, and
15  she refused to do so.
16       THE COURT:  All right, here's the order of the
17  Court.
18       The motion to dismiss Counts 5 and 6 is allowed --
19  not dismiss, summary judgment is allowed on Counts 5 and
20  6 insofar as, um, they are duplicative of the
21  discrimination counts since exclusivity is given to the
22  Massachusetts antidiscrimination statute.  Now to the
23  extent that there may be evidence of tortious
24  interference other than discrimination, summary judgment
25  is denied.  Counts 1 through 4 are likewise denied.  And

1    the case will stand for trial.
2            Let me say this.  This is an extremely thin case.
3    Don't for a moment think that by denying summary
4    judgment this Court thinks that this is a strong case.
5    It is not a strong case.  It is a weak case.  And I say
6    that simply because I think counsel on both sides should
7    assess the situation.  It properly -- given the
8    allegations -- given the evidence here, albeit it weak,
9    summary judgment is properly denied.
10           Now, when is this case on for trial?
11           MR. HANNON:  I think it's October.
12           THE COURT:  October.  All right.  Well that's the
13   order of the Court and we'll leave it on the running
14   trial list as it now stands.
15           Thank you very much.  We'll recess.
16           (Ends, 2:20 p.m.)

```
 1                  C E R T I F I C A T E
 2
 3
 4
 5       I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,
 6  do hereby certify that the foregoing record is a true
 7  and accurate transcription of my stenographic notes
 8  before Judge William G. Young, on Wednesday, May 5,
 9  2021, to the best of my skill and ability.
10
11
12
13
    /s/ Richard H. Romanow 05-19-21
14  _____
    RICHARD H. ROMANOW    Date
15
16
17
18
19
20
21
22
23
24
25
```