# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO: 18-3569E

|  |  |
|---|---|
| MINA KOIDE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WELLINGTON MANAGEMENT COMPANY LLP, | ) |
| WELLINGTON MANAGEMENT GROUP LLP, | ) |
| BRENDAN SWORDS, CHARLES ARGYLE, | ) |
| CYNTHIA CLARKE, and TAMA DONOVAN, | ) |
| | ) |
| Defendants | ) |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2018 NOV 15 P 1: 28
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

## COMPLAINT AND DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

The plaintiff Mina Koide, a former Portfolio Manager and Managing Director with Wellington

Management Company LLP and Wellington Management Group LLP (collectively, "Wellington"), files

this action against Wellington, her supervisor Charles Argyle, Chief Executive Officer Brendan Swords,

General Counsel Cynthia Clarke, and Director of Global Employee Relations Tama Donovan seeking

redress for his/her/its/their unlawful discrimination against her including in the disparate allocation of

marketing resources, disparate allocation of assets under management, denials of promotion and

professional development, and attempted transfer to a non-equivalent position on the basis of her gender,

age, race, and/or national origin. She seeks redress for the Defendants' failure to conduct an adequate

investigation. She also seeks redress for Defendants' retaliation against her for complaining about such

discrimination, which retaliation culminated in the termination of her employment. This case is brought

under the Massachusetts Fair Employment Practices Act, G.L. c. 151B §§ 4(1), 4(1B), 4(4), 4(4A), and 4(5).

## PARTIES

1.      Mina Koide ("Ms. Koide"), the plaintiff, is a resident of Boston, Suffolk County, Massachusetts. She is a woman of Japanese national origin and race. She was born on February 24, 1960.

2.      The defendant Wellington Management Company LLP (hereinafter "WM Company") is a foreign (Delaware) limited liability partnership. Its principal office is at 280 Congress St., Boston, Suffolk County, Massachusetts. Upon information and belief, WM Company employs over 2,000 employees.

3.      The defendant Wellington Management Group LLP (hereinafter "WM Group") is a registered domestic (Massachusetts) limited liability partnership. Its principal office is at 280 Congress St., Boston, Suffolk County, Massachusetts. Upon information and belief, employees of WM Company who hold the title of Partner own partnership interests in WM Group. Also upon information and belief, defendant WM Group is the ultimate parent of defendant WM Company. WM Group exercised management authority over the employees of WM Company, including Ms. Koide, at all times relevant hereto.

4.      The defendant Brendan Swords is a resident of Boston, Suffolk County, Massachusetts. Mr. Swords became Chairman of WM Company in 2015 and since approximately July 2014, Mr. Swords has served as Chief Executive Officer of WM Company. From approximately 2012 to 2014, Mr. Swords served as President of WM Company. Mr. Swords became one of WM Group's three Managing Partners in 2008 and has also held the position of Director of WM Company's Global Equity Portfolio Management ("GEPM") group and its predecessors. He exercised management authority over Ms. Koide at all times relevant hereto.

5.      The defendant Charles Argyle is a resident of Dover, Norfolk County, Massachusetts. Mr. Argyle is Vice Chairman of WM Company and currently serves as Director of its GEPM group. Mr. Argyle is also a partner of WM Group. Mr. Argyle is directly supervised by Mr. Swords and he exercised management authority over Ms. Koide at all times relevant hereto.

6.     The defendant Cynthia Clarke is a resident of Boston, Suffolk County, Massachusetts. Ms. Clarke is the General Counsel of WM Company and is directly supervised by Mr. Swords. She is also a partner of WM Group.

7.     The defendant Tama Donovan is a resident of Ipswich, Essex County, Massachusetts. Ms. Donovan is the Director of Global Employee Relations at WM Company.

## JURISDICTION AND VENUE

8.     On or about August 8, 2016, Ms. Koide filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination, asserting claims of unlawful discrimination and retaliation against defendants WM Company, WM Group, Mr. Swords and Mr. Argyle; and putting Ms. Clarke and Ms. Donovan on notice of her claims of discrimination.

9.     Ms. Koide has met all jurisdictional prerequisites to a civil action.

10.     This court has subject matter jurisdiction over this case based on the defendants' place of business/residence; the defendants' conduct in the Commonwealth, where the unlawful activities occurred; and Massachusetts Fair Employment Practices Act, G.L. c. 151B.

11.     Venue in this court is proper pursuant to G.L. c. 151B, § 9 ¶ 2.

## STATEMENT OF FACTS

### *About Wellington*

12.     Wellington is an investment management firm that offers to clients comprehensive investment management services that span nearly all segments of the global capital markets.

13.     Upon information and belief, as of the date of this filing, Wellington employs over 700 investment professionals in various capacities: among others, approximately 149 Portfolio Managers, 240 Analysts, 60 Traders, 47 Research Associates, 176 Investment Directors, portfolio analysts, and others; and 50 others who work in investment professional management.

14.     Upon information and belief, Wellington's Partner ranks are composed largely of white men of American and European national origin. Upon information and belief, as of mid-2015, of the approximately 150 Wellington employees holding the rank, privileges, and benefits of the title "Partner,"

3

approximately 135 were white and approximately 127 were male.  Upon information and belief, only one Partner was Japanese.

15.     The Portfolio Managers in Wellington's GEPM group are also largely white men of American and European national origin.  As of early 2016, of the approximately 52 Portfolio Managers in the GEPM group, approximately 41 were white men of American and European national origin.  Only six Portfolio Managers were women.

### *Ms. Koide's Employment At Wellington Through 2014*

16.     Ms. Koide began working for Wellington on or about March 13, 2006 as an Equity Analyst in its GEPM group and, more specifically, as a member of the Japan Team within GEPM.  In that capacity, Ms. Koide researched investment opportunities in Japanese companies in concert with other members of the Japan team.  She was supervised by Mr. Argyle and David Barnard, a Portfolio Manager, Partner, and Japan Team Leader.

17.     Ms. Koide is reliably informed and believes that in or about early 2010, Mr. Barnard expressed to Mr. Argyle (Mr. Barnard's supervisor) his desire that upon his retirement, Ms. Koide succeed him as Japan Team Leader and as Portfolio Manager of all of the investment approaches (*i.e.*, strategies) and client accounts that he managed for Wellington.  At that time, Ms. Koide was named co-Portfolio Manager with Mr. Barnard.

18.     On the basis of her solid work, Ms. Koide was promoted to the rank of Managing Director, the rank below Partner, in 2011.  She continued to serve as a co-Portfolio Manager on the Japan Team.

19.     In 2013, Mr. Barnard retired.   Rather than permitting Ms. Koide to serve as the sole Portfolio Manager of the Japan Team (and therefore as the Japan Team Leader), Mr. Swords and Mr. Argyle made Katsuhiro Iwai a co-Leader of the Japan Team with Ms. Koide, and divided Mr. Barnard's Japan Team investment approaches between Ms. Koide and Mr. Iwai, a younger and less experienced man.  Upon information and belief, this split was unique to Ms. Koide. It was highly unusual at Wellington that a team with less than one billion dollars of assets under management would have more than a single team leader.

20.    · By dividing Mr. Barnard's investment approaches and client accounts between Ms. Koide and Mr. Iwai, Mr. Swords and Mr. Argyle reduced the amount of Ms. Koide's assets under management, thereby limiting her compensation and prospects for promotion to Partner.  By making her co-Leader of the Japan Team, rather than its sole Leader and sole Portfolio Manager, Mr. Swords and Mr. Argyle also reduced Ms. Koide's visibility and negatively impacted her prospects for promotion to Partner.  In contrast, by these same actions Mr. Swords and Mr. Argyle greatly advanced the career of the younger and less experienced man (Mr. Iwai).

21.    On or about July 1, 2014, Mr. Swords was promoted to the role of CEO of Wellington.  Mr. Argyle replaced him as Director of the GEPM group.

22.    Shortly after Mr. Argyle became Director of the GEPM group, he began more aggressively to marginalize Ms. Koide and to favor her male colleagues.

23.    For instance, in the fall of 2014, and despite work performance that he acknowledged was both "solid" and "good," Mr. Argyle forced Ms. Koide to relinquish to Mr. Iwai another client account under her management.  Moving this account from Ms. Koide to Mr. Iwai further reduced Ms. Koide's assets under management, thereby further limiting her compensation and prospects for promotion to Partner.

24.    As a result of Mr. Swords' and Mr. Argyle's decisions to transfer client accounts and investment approaches from Ms. Koide's management to Mr. Iwai's management, by December 2014 Ms. Koide was left with only one external client: the North Carolina Department of State Treasurer and its affiliates (hereinafter together referred to as "North Carolina").  She managed the North Carolina account using her investment approach called Japan Equity.

### Ms. Koide's Employment At Wellington in 2015

25.    In 2015, Ms. Koide's employment at WM Company took a significant turn for the worse, as Mr. Argyle took additional action to marginalize Ms. Koide while simultaneously advancing her less experienced male colleagues, her less experienced younger colleagues, and/or her less experienced white colleagues.

26.     For example, in late summer 2015, Mr. Argyle approved Mr. Iwai's Focused Japan Value Realization approach as a "sleeve" – i.e., a Wellington investment approach that a multi-manager investment approach invests in – for Japan Alpha Opportunities, a "multi-manager strategies" investment approach spearheaded by Kent Stahl, a white man of American national origin who upon information and belief is younger than Ms. Koide and who serves as Wellington Director of Investment Strategy and Risk. As its name suggests, Japan Alpha Opportunities invested in several different investment approaches managed by Portfolio Managers who focused on Japanese stocks.  It directly competed for clients with Ms. Koide's Japan Equity investment approach.

27.     On October 13, 2015, Ms. Koide had a meeting in the Netherlands to market her Japan Equity investment approach to Anthos Asset Management (hereinafter "Anthos"), a potential new client.  Hideo Ueki, who served both as Product Manager for Ms. Koide's Japan Equity investment approach and for investment approaches managed by Mr. Iwai, accompanied Ms. Koide to her Anthos meeting.  During Ms. Koide's Japan Equity marketing meeting with Anthos, Mr. Ueki undermined Ms. Koide by promoting the Focused Japan Value Realization approach managed by Mr. Iwai, which approach directly competed with Ms. Koide's Japan Equity approach for new clients.  Upon information and belief, Wellington and Mr. Argyle permitted him to do so without reprisal.

28.     On October 15, 2015, Ms. Koide met with Wellington marketing personnel for the purpose of gaining their assistance in promoting her Japan Equity investment approach to potential new clients.  Mr. Ueki, who also was in attendance at that meeting, once again undermined Ms. Koide by promoting Mr. Iwai's investment approaches to the Wellington marketing personnel over Ms. Koide's Japan Equity investment approach.  Again, Ms. Koide is reliably informed and believes that Wellington and Mr. Argyle permitted him to do so without reprisal.

29.     Upon information and belief, also in or about October 2015, Mr. Argyle told Thomas Baxter, the Associate Director of GEPM who directly managed Ms. Koide, that he planned to remove Ms. Koide as a Portfolio Manager.

30.     Upon information and belief, in or about October or early November 2015, Mr. Baxter told Mr. Iwai and Hiroyoshi Ueno, a younger man and an Analyst on the Japan Team, that Ms. Koide would be leaving her Portfolio Manager job.  Mr. Baxter also told Mr. Iwai and Mr. Ueno that Ms. Koide's upcoming departure from her Portfolio Manager job was confidential and had to be kept secret even from Ms. Koide.

31.     Upon information and belief, in November 2015, Mr. Baxter told Mr. Ueki that Ms. Koide would be leaving her Portfolio Manager job and that senior management would be picking her replacement.

32.     During a year-end Manager Review meeting with Ms. Koide on or about December 7, 2015, despite Ms. Koide's qualitatively solid performance as Portfolio Manager of the Japan Equity investment approach, Mr. Baxter told her that Mr. Argyle wanted her to abandon her Portfolio Manager job and apply for a potential job as a Macroanalyst in the Multidisciplinary Research group.  Ms. Koide had no previous educational or professional background in macroeconomic analysis, the type of work that Macroanalysts perform.

33.     Upon first hearing of this "transfer," Ms. Koide was surprised, but requested a description of the Macroanalyst position from Mr. Baxter.  Mr. Baxter did not provide Ms. Koide with any specific information about this purported new role as a Macroanalyst.  Ms. Koide told Mr. Baxter that she was not interested in abandoning her role as a Portfolio Manager serving her client, North Carolina. This was because it would have resulted in a reduction in the terms and conditions of her employment.  Ms. Koide was co-Leader of the Japan Team; she would not have been a Team Leader of the Macroanalyst Team. As a Portfolio Manager, Ms. Koide generated Incentive Allocations (semi-annual cash bonuses) that she could pay to herself and/or to colleagues who had assisted her as a reward for good work; as a Macroanalyst, she would not generate Incentive Allocations.  As a Portfolio Manager, Ms. Koide had Portfolio Management authority over $166 million of external client assets; as a Macroanalyst, she would have no authority to manage any client assets and would merely be conducting macroeconomic research and analysis.  In addition, Ms. Koide viewed a Macroanalyst's career prospects to be far more limited than those of a Portfolio Manager.

7

34.    Nevertheless, in emails on December 14 and December 15, 2015, Mr. Baxter continued to pressure Ms. Koide to leave her Portfolio Manager job and seek a transfer from GEPM into the Multidisciplinary Research group. Mr. Baxter posited a quick time frame for Ms. Koide's departure from her Portfolio Manager job, and expressed the need to notify her North Carolina client as soon as possible of her impending departure.  Ms. Koide resisted his pressure.

35.    In further efforts to undermine Ms. Koide, on December 17, 2015, Mr. Stahl met with the North Carolina client and recommended that it withdraw its money from the Wellington investment program that included the account that Ms. Koide managed under her Japan Equity investment approach and instead invest in a Wellington investment program that included his own Japan Alpha Opportunities investment approach.  Upon information and belief, Mr. Argyle permitted him to do so without reprisal.

36.    On January 7, 2016, Mr. Argyle met with Ms. Koide to pressure her again to abandon her Portfolio Manager job and seek a job in the Multidisciplinary Research group.  When Ms. Koide again stated that she did not want to abandon her Portfolio Manager job given that there was no such request from her client, North Carolina, Mr. Argyle made it clear that Wellington did not need a request from North Carolina to replace her, stating "Kent [Stahl] could do Japan.  He could do [Japan] Alpha Opps [for North Carolina]" (or words to that effect).  He then threatened Ms. Koide's continued employment, stating that things could become "tricky" for Ms. Koide if she refused to take a Macroanalyst role.

37.    Then, on January 14, 2016, Mr. Baxter approved a freeze of marketing and marketing support for Ms. Koide's Japan Equity investment approach.  He never informed Ms. Koide; she only learned of the freeze after filing a charge of discrimination at the Massachusetts Commission Against Discrimination.

38.    To Ms. Koide's information and belief, Wellington freezes its marketing and marketing support for investment approaches only in three circumstances: the replacement or pending replacement of the Portfolio Manager of the investment approach;  the investment approach having raised the maximum amount of money that could be invested under the investment approach's strategy; and the investment approach undergoing a significant change in its strategy.  Since Ms. Koide's approach had ample capacity to accept new client accounts and was not undergoing a significant change in its strategy, there was no

8

reason to secretly freeze the marketing status of Ms. Koide's Japan Equity approach unless Wellington still planned to remove her as its Portfolio Manager.

39.     Although Ms. Koide remained as Portfolio Manager, Wellington did not ever lift the freeze on marketing and marketing support of her investment approach.

### *Ms. Koide's Complaint*

40.     By email dated January 22, 2016, Ms. Koide complained to Mr. Swords that she was concerned she was being discriminated against on the basis of gender, race, national origin, and age.  Ms. Koide complained that, among other things, Mr. Argyle was eliminating her Portfolio Manager job (but was not similarly seeking to eliminate the Portfolio Manager roles of her male peers).  She complained that he was seeking to replace her with men outside her protected classes to manage the North Carolina client account that she was managing.  She complained that men outside her protected classes who competed with her were advantaged over her by being allowed, without reprisal, to violate not just Wellington practices but also potentially securities laws when they used improper benchmarks for measuring the performance of their investment approaches and therefore made material misrepresentations about the performance of their investment approaches when marketing their investment approaches to Wellington clients and prospects. She also complained that Mr. Argyle and persons under his direct and indirect control undermined her marketing efforts in favor of the marketing efforts of men outside her protected classes; and that men outside her protected classes were given significant, patient, multi-year support in their investment approach marketing efforts, but such support was denied to her.  Ms. Koide's complaint to Mr. Swords constituted protected activity under Massachusetts' anti-discrimination law, G.L. c. 151B.

41.     Ms. Koide is informed and believes that upon receiving her complaint, Mr. Swords spoke with Wellington senior management, which includes Mr. Argyle, in his review of Ms. Koide's discrimination complaint – even though Ms. Koide specifically complained about his (Mr. Argyle's) actions.

42.     On February 5, 2016, Mr. Swords and Jean Hynes – like Mr. Swords one of WM Group's three Managing Partners – met with Ms. Koide regarding her January 22, 2016 discrimination complaint.  Mr. Swords stated that Ms. Koide's Portfolio Manager job was not being eliminated and that Mr. Argyle was

merely suggesting that she consider leaving her Portfolio Manager role for a potential Macroanalyst job. He addressed no other of Ms. Koide's concerns. He nevertheless then told Ms. Koide that he had concluded that Mr. Argyle and Wellington had not discriminated against her.

43.     On February 8, 2016, having already pronounced that he had concluded that there had been no discrimination against her, Mr. Swords told Ms. Koide that he would order an investigation into her concerns. That same day, Tama Donovan contacted Ms. Koide about Ms. Koide's complaint. Distressed by Mr. Swords's statement that he had already concluded that Ms. Koide had not been discriminated against and (as she had informed Mr. Swords) concerned that an investigation by Mr. Swords's subordinates would not be fair and independent, Ms. Koide did not immediately respond to Ms. Donovan.

44.     By email dated February 9, 2016, Ms. Koide again informed Mr. Swords that she was not seeking to meet with Wellington Human Resources personnel, as she believed they had a vested interest in exonerating Wellington and Mr. Argyle.  In making this statement, Ms. Koide was asserting concerns that Wellington was not conducting an adequate investigation, and she was therefore also engaging in protected activity.

45.     By email on February 11, 2016, Mr. Swords repeated his pronouncement that Ms. Koide had not been discriminated against, stating "[a]s I told you at the meeting and in my follow up email, in my opinion the facts described in your January 22nd email do not themselves compel the conclusions that you reached." Nevertheless, Mr. Swords asserted that he had ordered what he then called as "independent review" of certain parts of Ms. Koide's discrimination complaint, which review would be conducted by Ms. Donovan. Mr. Swords also asserted that he had ordered what he then called an "independent review" of other parts of Ms. Koide's discrimination complaint – specifically, that Wellington had permitted younger men outside Ms. Koide's protected classes to make, without reprisal, material misrepresentations to investors in marketing materials for various Japan investment approaches in violation of securities law, which misrepresentations financially benefitted the younger men outside her protected classes.  That review was to be conducted by Chief Compliance Officer Nancy Morris.

10

46.     Upon information and belief, prior to her assignment to the "independent review," Ms. Donovan had already given Mr. Swords "business advice" regarding Ms. Koide's discrimination complaint and had also already prejudged the matter, concluding even before the review began that Ms. Koide had not been discriminated against.

47.     By email dated February 12, 2016, Ms. Donovan threatened Ms. Koide's employment. Specifically, she stated, "If you do not make yourself available for an interview, I will have to turn this over to Barbara Amone for consideration of disciplinary action, up to and including termination of your employment." Ms. Donovan demanded that Ms. Koide attend a meeting on February 23, 2016 to discuss the matter.

48.     Given that both Ms. Donovan and Ms. Morris were subordinates of Mr. Swords, that, upon information and belief, Ms. Donovan had already advised Mr. Swords that she believed Ms. Koide had not been discriminated against, and that Mr. Swords had already pronounced there had been no discrimination, Ms. Koide was skeptical that a review conducted by Ms. Donovan and Ms. Morris would in fact be fair and independent.   On February 18, 2016, Ms. Koide informed Mr. Swords that Ms. Donovan had threatened her employment in retaliation for her expressing concerns about discrimination, and also asked Mr. Swords to explain how a review conducted by Ms. Donovan and Ms. Morris could be "independent" when they reported to him and he had already pronounced judgment that she had not been discriminated against.   In so doing, Ms. Koide again engaged in protected activity.   Neither Mr. Swords nor anyone else explained how a review conducted under such circumstances could be independent.

49.     Nevertheless, on February 23, 2016, Ms. Koide complied with Ms. Donovan's demand, attended the meeting at the scheduled time on the scheduled date, and fully participated in the interview.

50.     After Ms. Koide lodged her complaint with Mr. Swords, Mr. Iwai began cancelling the Japan Team's weekly conference calls.   In February and March 2016, all Japan Team calls but one (held on or about February 9) were cancelled.   On that February 9, 2016 call Mr. Ueki announced his withdrawal as Product Manager for Ms. Koide's Japan Equity investment approach

51.     As a result of these cancellations, Mr. Iwai kept relevant information about the Japanese market from Ms. Koide.  Upon information and belief, during this same time period, Mr. Iwai often met and spoke by phone with other, male Portfolio Managers from other investment teams in order to discuss the Japanese Market.  Mr. Iwai also declined to meet with or call Ms. Koide after she submitted her complaint.  Before then, Ms. Koide regularly met with the Japan Team members based in Tokyo, including Mr. Iwai, and shared company meetings with them.  Mr. Iwai failed and/or refused to meet with her on a single occasion during her trip to Japan from February 26 through March 11, 2016.  Again, Mr. Argyle allowed him to do so without reprisal.

52.     On February 22, 2016, in response to Mr. Swords' demand that if Ms. Koide "kn[e]w of any reason why [Ms. Donovan and Ms. Morris] would not be objective," she should bring the issue to his attention, Ms. Koide emailed Mr. Swords to complain about violations of her legal rights, including, but not limited to, Ms. Donovan's lack of objectivity.  Among the issues Ms. Koide complained about was that Ms. Donovan had already demonstrated a lack of objectivity by reaching out to Mr. Argyle to have him set terms and conditions for Ms. Donovan's "independent review" and that she had threatened to fire Ms. Koide.  Ms. Koide's statements to Mr. Swords about her concerns that Wellington was not conducting an adequate investigation also constituted protected activity.  Mr. Swords summarily rejected Ms. Koide's complaint about Ms. Donovan's lack of objectivity.  Instead, he instructed Ms. Koide to meet with Ms. Donovan.

53.     On February 23, 2016, Ms. Koide complied with Mr. Swords's instructions and met with Ms. Donovan.  At their meeting, Ms. Donovan was dismissive of Ms. Koide's concerns about discrimination, as though she had already prejudged the matter. When Ms. Koide attempted to refer to her January 22 complaint, Ms. Donovan told Ms. Koide that she was not interested in that complaint, and instead demanded that she tell the story "in your own words."  Ms. Koide felt threatened and intimidated by Ms. Donovan's tone and dismissiveness, perceiving that Ms. Donovan was attempting to limit or undermine her January 22, 2016 discrimination complaint and trying to get her to disavow or contradict her earlier statement.

12

54.     On March 7, 2016, approximately one week after Ms. Morris had purportedly finished her "independent review" and in response to Ms. Koide's request for a copy of same, Ms. Morris invoked Mr. Swords's authority, stating that she had performed her review under Mr. Swords's order and was therefore not able to provide Ms. Koide with a copy of her review. Ms. Morris's statement confirmed Ms. Koide's concerns that Mr. Swords' authority and position had impacted her supposedly "independent review."

55.     On March 14, 2016, Mr. Iwai informed Ms. Koide that Yuichiro Soda, a younger man, would be joining the Japan Team. Mr. Iwai admitted that he, Mr. Ueno, and Mr. Soda had a "series of meetings" that were "intermediated by Mr. Baxter" about Mr. Soda joining the Japan Team and that Ms. Koide, the co-Leader of the Japan Team, had been deliberately excluded from the decision process.

56.     Coincidentally, that same day a consulting firm that advises North Carolina about its investments visited Wellington's Boston headquarters and met with Portfolio Managers who managed North Carolina's assets. Ms. Koide, who managed the North Carolina account invested in the Japan Equity investment approach, was not told of the visit and was not asked to participate in any meetings. Ms. Koide did not learn of the visit until after it had occurred.

57.     On March 18, 2016, Cynthia Clarke, Wellington General Counsel, emailed Ms. Koide, stating that Mr. Swords had asked her (Ms. Clarke) to respond to Ms. Koide's question about the independence of the review into her (Koide's) complaint. Ms. Clarke quoted Ms. Koide's question, but did not answer it.

58.     Instead, Ms. Clarke claimed to describe how Mr. Swords responded to Ms. Koide's discrimination complaint. Ms. Clarke failed to mention, however, that Mr. Swords had conducted his own review of Ms. Koide's discrimination complaint, and also failed to mention that Mr. Swords's review had "involved senior management." Ms. Clarke failed to acknowledge that Mr. Swords had already pronounced his judgment against Ms. Koide's discrimination complaint prior to ordering the "independent review." Ms. Clarke also failed to acknowledge that the "independent review" was conducted by two of Mr. Swords's subordinates, and that one of the two subordinates, Ms. Donovan, had

13

already provided "business advice" to Mr. Swords about his own review and had allowed Mr. Argyle to set terms and conditions of Ms. Donovan's "independent review." Ms. Clarke also failed to acknowledge the fact that neither she nor Ms. Morris could legitimately conduct an independent review of the securities marketing and related disparate treatment issues, as both Ms. Clarke and Ms. Morris played roles in the securities marketing issues, and would therefore be reviewing their own actions.

59.    On March 23, 2016, Ms. Clarke permitted Ms. Koide to read Ms. Morris's "independent review" but declined to give her a copy of it. Upon reading the report, Ms. Koide observed that Ms. Morris's "independent review" contained material false statements and material misstatements regarding issues directly pertinent to the disparate treatment that Ms. Koide had suffered.

60.    For example, Ms. Koide's discrimination complaint on January 22, 2016 contained a claim that Mr. Iwai was allowed to violate Wellington policies by marketing new investment approaches using the track records of different, older, previously established investment approaches, potentially in violation of securities law. After conducting her "independent review," Ms. Morris falsely concluded that Mr. Iwai did not market new investment approaches using the track records of different, older previously established investment approaches. An email sent by Wellington Relationship Manager Hiromi Tanaka on January 27, 2016, however, contradicts this. In that email, Ms. Tanaka described Mr. Iwai's prospective client meeting with Pension Fund Association of Japan (hereinafter "PFA") during which Mr. Iwai marketed his new Focused Japan Value Realization (hereinafter "FJVR") investment approach and referred to two other investment approaches: the Japan Value Realization (hereinafter "JVR") investment approach and the Japan Special Situations (hereinafter "JSS") investment approach. Ms. Tanaka's January 27, 2016 email states that Mr. Iwai marketed the FJVR and JVR investment approaches together, and marketed them using the track record of the JSS investment approach. Ms. Tanaka wrote that Mr. Iwai told PFA that the "FJVR/JVR approach is created over JSS with 15 years of proven approach."

61.    On March 23, 2016, Ms. Donovan provided to Mr. Swords a summary of her investigation into Ms. Koide's discrimination complaint. This investigation was purportedly based on interviews with Mr. Argyle, Mr. Baxter, and Mr. Ueki, among others. Ms. Donovan's investigation explained that the Japan

14

Team members were all told of Ms. Koide's "transfer" before Ms. Koide was told; acknowledged the secret marketing freeze of Ms. Koide's accounts *after* Ms. Koide declined the Macroanalyst position; and summarily dismissed her claims of discriminatory allocation of marketing resources. Ms. Donovan concluded that Ms. Koide was not discriminated against, sent the results of her investigation to Mr. Swords (and not Ms. Koide), and purported to remind all employees of their policy prohibiting retaliation.

### *Retaliation*

62.     On March 24, 2016, the day after Ms. Donovan sent her report to Mr. Swords "exonerating" Wellington of any wrongdoing, Wellington Chief Human Resources Officer Barbara Amone and Manager of Employee Relations Lawrence Spidle met with Ms. Koide and informed her that she was fired effective immediately.

63.     Ms. Amone told Ms. Koide that she was being fired for "insubordination" and "disrespectful tone" in "a series of communications" with Mr. Swords and other Wellington colleagues. Ms. Amone refused to identify any specific allegedly improper statements Ms. Koide had made, however. She also refused to specifically identify any of the "colleagues" other than Mr. Swords to whom Ms. Koide had allegedly made improper statements.

64.     Mr. Spidle then escorted Ms. Koide back to her office to retrieve her personal belongings and then out of the building. Ms. Koide is not aware of any other employees who were escorted out of the office immediately upon being fired.

65.     Ms. Koide also is not aware of any other Wellington employees who were terminated effective immediately in a surprise meeting. Indeed, in sharp contrast with the lenient treatment of former Wellington Portfolio Manager Minerva Butler and current Portfolio Manager John Keogh when each was accused of engaging in misconduct in violation of the Wellington code of conduct (both Butler and Keogh were, upon information and belief, provided notice of the specific allegations against them and given an opportunity to respond and defend themselves), Ms. Koide received no warning in advance of her termination, received only a brief, vague, non-specific explanation of the reason for her termination from Ms. Amone, and was given no opportunity to respond and defend herself.

66.     Indeed, upon information and belief, Minerva Butler, former Wellington Portfolio Manager, engaged in misconduct over a period of more than three years while under Mr. Swords's supervision. Also upon information and belief, Mr. Swords issued to Ms. Butler multiple oral and written warnings for misconduct, including, but not limited to, being "insubordinate" and "disrespectful" to her superiors and for her unwillingness to collaborate with others, which misconduct resulted in her removal from two different investment teams. Despite Ms. Butler's repeated misconduct under Mr. Swords supervision, Wellington did not immediately fire her but instead offered Ms. Butler referrals to an "executive coach" to assist her in improving her workplace conduct.  Ms. Butler was only fired after more than three years of misconduct and repeated oral and written warnings from Mr. Swords.

67.     Upon information and belief, John Keogh, a current Wellington Portfolio Manager, similarly engaged in misconduct over an extended period of time, which included, but was not limited to, actions that "seem[ed] directed against women and the vulnerable," calling his black Hispanic administrative assistant a pig in both English and Spanish, making "[b]elittling and sarcastic remarks directed at women in front of a wide audience," "[i]nsulting remarks to others," and "[i]nappropriate ethnic jokes that have made people uncomfortable."  Upon information and belief, Mr. Spidle, the Manager of Employee Relations issued only a detailed oral and written warning to Mr. Keogh. In contrast to its treatment of Ms. Koide, Wellington did not fire Mr. Keogh for his misconduct.  Instead, and also in contrast to Wellington's treatment of Ms. Koide, Mr. Spidle offered to Mr. Keogh referrals to psychiatrists who assist employees in improving their workplace conduct.

68.     After Ms. Koide's termination on March 24, 2016, Mr. Iwai replaced Ms. Koide as Portfolio Manager of the North Carolina Diversified International Equity Portfolio – Japan, the external client account that Ms. Koide had managed. Mr. Iwai also replaced Ms. Koide as Portfolio Manager of WTC Japan Equity, a 401(k) investment fund for WM Company employees.

69.     On July 19, 2016, in accordance with her rights under M.G.L. Ch. 149 § 52C, Ms. Koide requested a complete copy of her Personnel Record from Wellington.

16

70.     In Ms. Koide's Personnel Record, there are no references to any alleged misconduct by her. There are no communications that Ms. Koide had with Mr. Swords or with any Wellington colleagues in 2016 in her Personnel Record. Ms. Koide's Personnel Record contains no references to her being terminated. The only two references in Ms. Koide's Personnel Record to her separation from Wellington state that she "retired."

## COUNT I
## UNLAWFUL DISCRIMINATION ON THE BASIS OF GENDER / SEX
## IN VIOLATION OF G.L. c. 151B
## (Against Defendants Wellington Management Company LLP, Wellington Management Group LLP, Swords and Argyle)

71.     Plaintiff adopts and incorporates all of the above allegations herein.

72.     Defendants discriminated against plaintiff on the basis of her gender by subjecting her to disparate treatment set out above.

73.     The actions of the defendants as set forth above constitute gender discrimination in violation of G.L. c. 151B § 4(1).

## COUNT II
## UNLAWFUL DISCRIMINATION ON THE BASIS OF RACE
## IN VIOLATION OF G.L. c. 151B
## (Against Defendants Wellington Management Company LLP, Wellington Management Group LLP, Swords and Argyle)

74.     Plaintiff adopts and incorporates all of the above allegations herein.

75.     By their actions described above, Defendants discriminated against plaintiff on the basis of her race by subjecting her to disparate treatment.

76.     The actions of the defendants as set forth above constitute race discrimination in violation of G.L. c. 151B § 4(1).

## COUNT III
## UNLAWFUL DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN
## IN VIOLATION OF G.L. c. 151B
## (Against Defendants Wellington Management Company LLP, Wellington Management Group LLP, Swords and Argyle)

77.     Plaintiff adopts and incorporates all of the above allegations herein.

78.     By their actions described above, Defendants discriminated against plaintiff on the basis of her national origin by subjecting her to disparate treatment.

79.     The actions of the defendants as set forth above constitute national origin discrimination in violation of G.L. c. 151B § 4(1).

**COUNT IV**
**UNLAWFUL DISCRIMINATION ON THE BASIS OF AGE**
**IN VIOLATION OF G.L. c. 151B**
**(Against Defendants Wellington Management Company LLP, Wellington Management Group LLP,**
**Swords and Argyle)**

80.     Plaintiff adopts and incorporates all of the above allegations herein.

81.     By their actions described above, Defendants discriminated against plaintiff on the basis of her age by subjecting her to disparate treatment compared to her younger colleagues.

82.     The actions of the defendants as set forth above constitute age discrimination in violation of G.L. c. 151B § 4(1B).

**COUNT V**
**UNLAWFUL RETALIATION IN VIOLATION OF G.L. c. 151B**
**(Against Defendants Wellington Management Company LLP, Wellington Management Group LLP,**
**Swords and Argyle)**

83.     Plaintiff adopts and incorporates all of the above allegations herein.

84.     Plaintiff engaged in protected activity by complaining about discrimination on the basis of her gender, race, national origin, and/or age.

85.     The actions of the defendants as set forth above constitute unlawful retaliation against plaintiff in in violation of G.L. c. 151B § 4(4).

**COUNT VI**
**UNLAWFUL INTERFERENCE IN VIOLATION OF G.L. c. 151B**
**(Against Defendants Swords, Argyle, Clarke and Donovan)**

86.     Plaintiff adopts and incorporates all of the above allegations herein.

87.     By their actions described above, defendants Swords, Argyle, Donovan and Clarke coerced, threatened, intimidated, and interfered with plaintiff's rights granted by G.L. c. 151B to employment free of unlawful discrimination and/or retaliation.

88.     The actions of defendants Swords, Argyle, Donovan and Clarke constitute a violation of G.L. c. 151B § 4(4A).

### COUNT VII
### AIDING AND ABETTING IN VIOLATION OF G.L. c. 151B
### (Against Defendants Swords, Argyle, Clarke and Donovan)

89.     Plaintiff adopts and incorporates all of the above allegations herein.

90.     By their actions described above, including but not limited to, ordering a sham investigation into plaintiff's discrimination claims, setting parameters for that investigation that ensured the company would be cleared of any wrongdoing, and abandoning the duty to provide an impartial investigation, defendants Swords, Argyle, Donovan and Clarke aided and abetted discrimination against plaintiff in violation of her rights under G.L. c. 151B § 4(5).

91.     The actions of the defendants Swords, Argyle, Donovan and Clarke as set forth above constitute unlawful actions against plaintiff in violation of G.L. c. 151B § 4(5).

### COUNT VIII
### FAILURE ADEQUATELY TO INVESTIGATE IN VIOLATION OF G.L. c. 151B
### (Against Defendants Wellington Management Company LLP, Wellington Management Group LLP, Swords, Clarke and Donovan)

92.     Plaintiff adopts and incorporates all of the above allegations herein.

93.     Defendants Wellington Management Company LLP, Wellington Management Group LLP, Swords, Donovan and Clarke had a legal obligation under G.L. c. 151B adequately to investigate plaintiff's complaints of discrimination and retaliation, and each was required to be prompt, thorough, and neither deferential to those accused of discrimination nor intimidating to plaintiff in an investigation.

94.     Defendants Wellington Management Company LLP, Wellington Management Group LLP, Swords, Clarke and Donovan each breached this obligation by failing to conduct an unbiased, thorough investigation.

95.     Defendants Wellington Management Company LLP, Wellington Management Group LLP, Swords, Clarke and Donovan further had a legal obligation under G.L. c. 151B to take steps reasonably calculated to eliminate or at least ameliorate the effects of discriminatory actions and to deter future discrimination and retaliation.

96.     Defendants Wellington Management Company LLP, Wellington Management Group LLP, Swords, Clarke and Donovan each breached this obligation by failing to take steps reasonably calculated to eliminate or at least ameliorate the effects of discriminatory actions and to deter future discrimination and retaliation.

97.     Defendants Wellington Management Company LLP, Wellington Management Group LLP, Swords, Clarke and Donovan failed or refused to take actions reasonably calculated to reduce or prevent future discrimination, instead engaging in numerous retaliatory actions toward plaintiff.

98.     The actions of the defendants as set forth above constitute unlawful actions against plaintiff in violation of G.L. c. 151B.


## **RELIEF REQUESTED**

WHEREFORE, the Plaintiff respectfully requests that this Court award her the following relief:

1.     Enter judgment in favor of Plaintiff against Defendants under Count I in the amount of all damages sustained by Plaintiff as a result of Defendants' violation G.L. c. 151B, including but not limited to back pay, front pay, lost benefits, consequential damages, emotional distress damages, reasonable attorney's fees, and litigation costs;

2.     Enter judgment in favor of Plaintiff against Defendants under Count II in the amount of all damages sustained by Plaintiff as a result of Defendants' violation G.L. c. 151B, including but not limited to back pay, front pay, lost benefits, consequential damages, emotional distress damages, reasonable attorney's fees, and litigation costs;

3.     Enter judgment in favor of Plaintiff against Defendants under Count III in the amount of all damages sustained by Plaintiff as a result of Defendants' violation G.L. c. 151B, including but not limited

to back pay, front pay, lost benefits, consequential damages, an amount of money which will fairly compensate her emotional and physical pain and suffering, reasonable attorney's fees, and litigation costs;

4.      Enter judgment in favor of Plaintiff against Defendants under Count IV in the amount of all damages sustained by Plaintiff as a result of Defendants' violation G.L. c. 151B, including but not limited to back pay, front pay, lost benefits consequential damages, an amount of money which will fairly compensate her emotional and physical pain and suffering, reasonable attorney's fees, and litigation costs;

5.      Enter judgment in favor of Plaintiff against Defendants under Count V in the amount of all damages sustained by Plaintiff as a result of Defendants' violation G.L. c. 151B, including but not limited to back pay, front pay, lost benefits, consequential damages, an amount of money which will fairly compensate her emotional and physical pain and suffering, reasonable attorney's fees, and litigation costs;

6.      Enter judgment in favor of Plaintiff against Defendants under Count VI in the amount of all damages sustained by Plaintiff as a result of Defendants' violation G.L. c. 151B, including but not limited to back pay, front pay, lost benefits, consequential damages, an amount of money which will fairly compensate her emotional and physical pain and suffering, reasonable attorney's fees, and litigation costs;

7.      Enter judgment in favor of Plaintiff against Defendants under Count VII in the amount of all damages sustained by Plaintiff as a result of Defendants' violation G.L. c. 151B, including but not limited to back pay, front pay, lost benefits, consequential damages, an amount of money which will fairly compensate her emotional and physical pain and suffering, reasonable attorney's fees, and litigation costs;

8.      Enter judgment in favor of Plaintiff against Defendants under Count VIII in the amount of all damages sustained by Plaintiff as a result of Defendants' violation G.L. c. 151B, including but not limited to back pay, front pay, lost benefits, consequential damages, an amount of money which will fairly compensate her emotional and physical pain and suffering, reasonable attorney's fees, and litigation costs;

9.      Award to the plaintiff an amount of money that will fairly compensate her for loss of reputation and loss of career opportunities caused by defendants' conduct;

10.     Award to the plaintiff punitive damages;

11.     Award to the plaintiff pre- and post-judgment interest as required by law; and

21

12.    Grant such other legal or equitable relief as may be deemed just and appropriate and which will make the Plaintiff whole.

### JURY DEMAND

Plaintiff requests a trial by jury on all claims so triable.

MINA KOIDE,
By her attorneys,

Patricia A. Washienko, BBO# 641615
pwashienko@fwlawboston.com
Marc D. Freiberger, BBO# 650377
mfreiberger@fwlawboston.com
FREIBERGER & WASHIENKO, LLC
211 Congress Street, Suite 720
Boston, MA  02110
p:  617.723.0008  f:  617.723.0009

Dated:   November 15th, 2018