## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GIGI KAI ZI CHAN

          Plaintiff,

          v.

WELLINGTON MANAGEMENT
COMPANY LLP AND CHARLES ARGYLE,

          Defendants.

Civil Action No. 19-cv-11605-WGY

## JOINT PRETRIAL MEMORANDUM

Now comes the Plaintiff Gigi Kai Zi Chan (hereinafter "Ms. Chan" or "Plaintiff") and

Defendants   Wellington   Management   Company   LLP[1]   and   Charles   Argyle[2]   (hereinafter

"Defendants") in the above referenced matter and provide their joint pretrial memorandum

pursuant to Local Rule 16.5.

(1)   **Concise Summary of Anticipated Evidence**

      (A)   Plaintiff

Ms. Chan began working for Wellington in May 2014, and was assigned to "report to

Charles Argyle." While her initial role was as a research analyst contributing to Wellington's

Emerging Markets Opportunity Fund run by Greg Mattiko, it was anticipated that she would

---

[1] Plaintiff's was employed by Wellington Management Hong Kong.  However, for purposes of this litigation only, Wellington Management Company LLP is not contesting co-employment.  The entities are referred to collectively as "Wellington".

[2] Mr. Argyle timely filed summary judgment as to Count 6 of the Complaint, which purported to plead a cause of action for tortious interference.  In its Order on summary judgment, the Court ruled: "As to Counts 5 and 6 the motions are allowed insofar as they are duplicative of discrimination counts, but to the extent there is evidence of tortious interference summary judgment is denied."  Mr. Argyle contends that there is no evidence of tortious interference and the claims against Mr. Argyle should be dismissed prior to trial, but he joins in this memorandum because as of the filing, he remains named as a Defendant on the docket.

develop one or more other strategies for which she would serve as portfolio manager. This sort of dual role is common at Wellington, which allows investors to work simultaneously as "team analysts" supporting another portfolio manager's product while also working as a "portfolio manager" operating their own investment product.

Ms. Chan quickly found that the culture at Wellington was dominated by men—white men in particular—and often infected with sexist and/or racist undertones. For example, white male Wellington partners told her she had been hired because she was "Chinese, but not too Chinese," and disparaged China as being "full of crap." Another white male partner stuck his face in hers and physically forced her against a wall during a disagreement about a stock. Despite these challenges, Ms. Chan's talent as an investor shone through, and she received positive performance feedback throughout the first year of her employment.

A major turning point came in September 2015 when Ms. Chan participated in an Asian Process and Philosophy Panel ("Asian P&P"). During the Asian P&P, Ms. Chan was subjected to belittling and disrespectful comments by Jun Oh, a male portfolio manager, which she felt reflected discriminatory bias towards her as an Asian female. Ms. Chan complained vociferously about her experience at the Asian P&P, stating that Mr. Oh would not have treated Ms. Chan like that if she were a man.

News of Ms. Chan's complaints quickly spread within Wellington. These complaints were viewed by many as a "red flag" reflecting negatively on Ms. Chan, despite some acknowledging privately that "to come into Wellington as an investor, a female, in Asia that the odds are not stacked in Ms. Chan's favour necessarily and we have to have sympathy with how hard it must be for her to make it work at Wellington." Ms. Chan reported her concerns about the Asian P&P and the discriminatory treatment to which she was subjected during a series of meetings with, among

others, Mr. Argyle and Wellington's top management (Mr. Argyle and Managing Partners Brendan Swords, Jean Hynes, and Philip Perelmuter).

Despite the backlash sparked by her complaints, Ms. Chan clearly had the talent needed to excel at Wellington. For example, over the course of the first half of 2016, she relaunched a China Growth Fund strategy that she had managed for years at her prior employer. Still, however, there appeared to be in inherent skepticism concerning Ms. Chan that slowed her progress. For example, following a "dry run" presentation in May 2016, Wellington's Boston-based GRG group allegedly opined that she was not ready for meetings with clients—an opinion that stood in stark contrast to the praise that Ms. Chan received for her client interaction on Mr. Mattiko's team. Indeed, as Wellington dragged its feet on giving Ms.  Chan access to clients to market her fund, Ms. Hynes noted the irony that Ms. Chan had been "wonderful" when interacting Mr. Mattiko's clients, even though it was "almost acrimonious" when she presented internally.

Ms. Chan was not the only Asian female suffering from such difficulties at this time. In August 2016, the same month Ms. Chan announced her pregnancy, an Asian female portfolio manager, Mina Koide, filed a Charge of Discrimination with the M.C.A.D. asserting that Wellington and her supervisor, Charles Argyle, had discriminated against her in favor of white men in terms of marketing resources, allocation of assets under management, professional development, and promotions, and that she had been fired in retaliation for complaining of discrimination to Mr. Swords.

Into the fall of 2016, Mr. Argyle began working with Wellington's HR to document alleged performance deficiencies with Ms. Chan. After receiving a script from HR, Mr. Argyle had a highly contentious meeting with Ms. Chan in November 2016 in which he criticized her in a mocking and antagonistic tone for complaining about the way she was being treated. Ms. Chan

3

replied that "Just because I look young, just because I'm female, just because I'm Chinese, doesn't mean that people can talk down at me. That's what I've said. Every single time."

Ms. Chan took maternity leave from December 2016 to April 2017. On May 31, 2017, Mr. Mattiko convinced her to share her state of mind regarding Wellington, and she replied that she felt the same as she had in November 2016. Ten days later, Mr. Mattiko, Mr. Argyle, and Mr. Henry Philip held a meeting where Mr. Argyle decided to terminate Ms. Chan's employment—a decision that was carried out September 12, 2017.

The evidence at trial will demonstrate that Wellington's purported non-discriminatory reasons for terminating Ms. Chan's employment are pretextual, and that unlawful animus was a determinative cause in her termination. Additionally, the evidence will show that Mr. Argyle's actions relative to Ms. Chan's termination constitute tortious interference.

As a direct and proximate result of her termination, Ms. Chan suffered harm, including lost compensation and benefits, lost earning capacity, reputational harm, and emotional distress. Ms. Chan also seeks an award of punitive damages.

    (B)   <u>Defendants</u>

Headquartered in Boston with offices around the world – Wellington is one of the world's largest privately held asset managers.  Wellington's institutional clients -- including pension plans, hospitals, universities, foundations, and non-profits -- invest in Wellington's financial products. Through skillful money management, Wellington helps millions of real people — educators and first responders working for a secure retirement, patients seeking care at hospitals, scholarship recipients attending universities and families relying on social programs.

In 2013, Plaintiff, a dual-citizen in Hong Kong and the United Kingdom, applied to be a China Equity Portfolio Manager position in Wellington's Global Equity Portfolio Management

("GEPM") group in Hong Kong.  At the time, Plaintiff was working as a fund manager at Columbia Threadneedle Investments ("Threadneedle").   Charles Argyle, then the Director of GEPM, Thomas Baxter, then Associate Director of GEPM and Henry Philip, then Regional Human Resources Director, concluded that she was not a strong candidate for the open position.  They asked if she would be interested in exploring a role as a research analyst, but she was not.

In early 2014, Plaintiff reached out to Wellington again about possible job opportunities. Wellington did not have an open position at the time.  However, Wellington ultimately created and offered Plaintiff an Equity Research Analyst role, which she accepted.

Plaintiff started her employment at Wellington in June 2014.   Plaintiff was initially assigned as an analyst on the Emerging Markets Opportunity ("EMO") team for which Greg Mattiko was Portfolio Manager.  As an Equity Research Analyst, Plaintiff's responsibilities were to research and recommend equities for the portfolio.

By 2015, Plaintiff began pressing Wellington to launch a fund for her to manage.  Although it was early in her career as an analyst at Wellington, she was quite insistent.  Concerned she would leave, Mr. Argyle supported the seeding and launch of the China Growth fund for Plaintiff to manage.

In September 2015, Plaintiff presented her investment philosophy and process to a group of Wellington investors at the Asian Philosophy and Process Panel.  Plaintiff was unhappy with some of the feedback she received and made her concerns widely known, but did not tie any alleged treatment to discrimination.  She also expressed increasing frustration with the time it was taking to launch the China Growth Fund.  Wellington, in turn, grew increasingly concerned about Plaintiff's open dissatisfaction at the company, her impatience, her lack of collaboration, lack of robust contribution to the investment dialogue or the EMO team.  Nonetheless, Wellington

continued to support Plaintiff in attempting to the launch of China Growth, which it seeded within internal capital and ultimately launched in or around August 2016.

In May 2016, Plaintiff presented her investment philosophy and process on China Growth to Wellington's Global Relationship Group ("GRG"). GRG manages Wellington's relationships with its institutional clients, prospects and consultants and acts as a "gatekeeper" of sorts with respect to those relationships. Plaintiff's first meeting with GRG went very poorly and it was determined that she "absolutely" was not ready to meet with clients. Rather than accepting the feedback, Plaintiff complained widely. Plaintiff also began claiming that Wellington had broken a promise to give her portfolio manager responsibilities within six to 12 months of her hire. No such promise had – or ever would have - been made to her.

By November 2016, with Plaintiff's peer feedback placing her at or close to the bottom of all investment professionals within GEPM, Mr. Argyle was prepared to deliver a clear message to Plaintiff about the need for immediate improvement and the consequences if she failed to do so. Unbeknownst to Mr. Argyle (and Mr. Baxter who was also in attendance), Plaintiff secretly recorded their 70-minute meeting on her cell phone. Mr. Argyle told Plaintiff that things were going "very" poorly, but that she still had the opportunity to turn things around. For her part, Plaintiff, who did most of the talking, complained relentlessly about a host of topics, including the so-called broken promise managing money, GRG's last-minute cancellation of a marketing trip, lack of client access and the lack of administrative support at Wellington.

Shortly thereafter, Mr. Argyle thereafter sent Plaintiff an email identifying the specific areas in which Plaintiff's performance was lacking and that it was imperative she acknowledge and embrace same. Plaintiff did not respond to Mr. Argyle's email in the approximately three

weeks before she left on paid maternity leave in mid-December 2016.  Nor did she respond upon her return on April 5, 2017.

Wellington saw was no meaningful change or improvement after she returned from leave. Instead, in a May 31, 2017 meeting with Mr. Mattiko, which Plaintiff also secretly recorded, she remained entrenched in the same grievances over alleged broken business promises and stated that the onus was on Wellington – not her – to change.  They had reached a fork in the road.  Mr. Argyle, once Plaintiff's biggest supporter, had to admit defeat. Thus, in June 2017, he made the decision to terminate Plaintiff's employment.  Wellington notified Plaintiff of the termination on or about September 11, 2017.

Plaintiff moved to France shortly after her termination.  She did not apply to a single position until November 2018.  Thereafter, Plaintiff engaged in a lackluster job search and has remained unemployed.

(2)    **Facts Established by Pleadings or by Stipulations or Admissions of Counsel**

1.    Wellington is a private, independent investment management firm with client assets under management totaling over $1 trillion. The Firm serves as investment advisor to over 2,200 institutions in over 60 countries.

2.    Wellington Management has more than 6 employees and is a covered employer under the Massachusetts Fair Employment Practices Act ("Chapter 151B").

3.    Wellington's investment professionals manage assets for institutional clients both regionally and globally, and conduct research that is used by portfolio managers and analysts across Wellington Management locations.

4.    Wellington owes a fiduciary duty to its institutional clients.

5.    Plaintiff is a female of Chinese descent and a citizen of the United Kingdom.

6.      In June 2014, Plaintiff commenced employment with Wellington in Hong Kong as an Equity Research Analyst in Wellington's Global Equities Portfolio Management group ("GEPM").

7.      Plaintiff was initially assigned to the Emerging Markets Opportunities ("EMO") team led by portfolio manager Greg Mattiko. Philip Fan was also a research analyst on the EMO team.

8.      Plaintiff informed Mr. Mattiko she was pregnant on or about August 3, 2016.

9.      Plaintiff met with Mr. Argyle and Mr. Baxter in Hong Kong on November 2, 2016, to deliver year-end feedback.

10.     Mr. Argyle sent an email to Plaintiff on November 22, 2016 as a follow-up to the November 2, 2016 meeting with Plaintiff.

11.     Mr. Mattiko then met with Plaintiff in Hong Kong on or about May 31, 2017.

12.     Plaintiff was notified of her termination on September 12, 2017.

(3)    **Contested Issues of Fact**

1.  Whether Plaintiff ever engaged in protected activity while at Wellington.

2.  Whether Plaintiff was terminated on account of her gender, race, national origin, or pregnancy, or for having allegedly engaged in protected activity.

3.  Whether Charles Argyle unlawfully interfered with Plaintiff's advantageous business relationship with Wellington Management.[3]

(4)    **Any Jurisdictional Questions**

None.

**(5)    Any Questions Raised by Pending Motions**

---

[3] See fn 2, *supra*.  Should the Court dismiss Charles Argyle from this case, paragraph (3) is moot.

None.

## (6)   Issues of Law, Including Evidentiary Questions, Together with Supporting Authority

### A.  Plaintiff:

Plaintiff anticipates filing motions *in limine* on two issues: (1) the admissibility of Defendants' purported mitigation expert and (2) admissibility of certain evidence concerning Plaintiff's prior employment. Plaintiff has not yet determined whether she will be filing motions *in limine* with respect to Defendants' rebuttal experts, as those reports were just produced (by agreement) this past Friday. The parties have agreed that any motion *in limine* with respect to Defendants' rebuttal experts shall be filed by September 29, 2021.

### B.  Defendants:

Defendants anticipate filing the following motions:

- Defendant's Motion *In Limine* To Preclude From Evidence The Stray Remarks Of Any Person Who Was Not A Decisionmaker With Respect To Plaintiff's Termination

- Defendant's Motion *In Limine* To Preclude Evidence Of Compensation Of Any Wellington Employee Other Than Plaintiff

- Defendants' Motion *In Limine* To Preclude Plaintiff's Expert, Frank Carr, From Testifying

- Defendants' Motion *In Limine* To Preclude Testimony of Mina Koide or Any Evidence Regarding Her Claims

- Defendants' Motion *In Limine* To Exclude Testimony That Plaintiff Experienced Emotional Distress Related To Her Employment At Wellington Prior To Her Termination

- Defendants' Motion *In Limine* To Exclude Testimony About Miscarriages Plaintiff Claims Were Causally Related To Her Employment At Wellington

- Defendants' Motion *In Limine* To Preclude Comparison Evidence of Non-similarly Situated Wellington Employees

In addition to the above, with respect to the only claim against Charles Argyle – tortious interference in Count 6 - the Court held as follows on summary judgment: "As to Counts 5 and 6 the motions are allowed insofar as they are duplicative of discrimination counts, but to the extent there is evidence of tortious interference summary judgment is denied."  See Dkt. No. 77. To date, Plaintiff has not offered any additional evidence of acts or omissions of Mr. Argyle that is not entirely duplicative of her discrimination counts and, as such, judgment should enter in favor of Mr. Argyle as a matter of law and he should be dismissed from the case. In light of the fact that Wellington is not contesting the allegation that it was Plaintiff's employer for the limited purpose of this litigation, Count 5 cannot proceed.

**(7)    Any Requested Amendments to the Pleadings**

Defendants previously sought to amend its Answer to Plaintiff's Amended Complaint (Doc. No. 59) to add the after-acquired evidence defense, which the Court denied.  Defendants may seek leave to amend the pleadings to add this defense based on the evidence submitted at trial. Plaintiff opposes any such amendment.

**(8)    Any Additional Matters to Aid in the Disposition of the Action**

Defendants request permission from the Court to allow virtual witness testimony for two of its potential witnesses who reside overseas:  Tom Baxter (England) and Bo Meunier and Cavan Mok (Hong Kong).

**(9)    The Probable Length of the Trial**

The parties estimate that it will take approximately 15 business days (9 am – 1 pm) to try this case.

**(10)** **The Names, Addresses and Telephone Numbers of Witnesses, and Purpose of Testimony**

(A)    Plaintiff

| No. | Name | Address | Purpose |
|-----|------|---------|---------|
| 1. | **Charles Argyle** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 2. | **Brendan Swords** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 3. | **Mina Koide** | c/o Patricia A. Washienko, Esq., Freiberger & Washienko, LLC | Factual |
| 4. | **Gigi Chan** | c/o Patrick J. Hannon, Hartley Michon Robb Hannon LLP. | Factual |
| 5. | **Frank Carr** | c/o Patrick J. Hannon, Hartley Michon Robb Hannon LLP. | Expert |
| 6. | **Thomas Baxter** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 7. | **Henry Philip** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 8. | **Greg Mattiko** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 9. | **Ray Helfer** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |

(B)    Defendant

| No. | Name | Address | Purpose |
|-----|------|---------|---------|
| 10. | **Charles Argyle** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 11. | **Thomas Baxter** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 12. | **Henry Philip** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 13. | **Greg Mattiko** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 14. | **Ray Helfer** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 15. | **Cheryl Duckworth** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 16. | **Jean Hynes** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |

| 17. | **Erin Murphy** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
|-----|-----------------|-------------------------------------------------------|---------|
| 18. | **Bo Meunier** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 19. | **Andria Weil** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 20. | **Cavan Mok** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 21. | **Tama Donovan** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Factual |
| 22. | **Dr. Malcolm Cohen** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Expert |
| 23. | **Laura Steiner** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Expert |
| 24. | **Matthew Hoffman** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Expert |
| 25. | **Wellington Records Custodian** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Authentication |
| 26. | **Threadneedle Records Custodian** | c/o Jackson Lewis PC, 75 Park Plaza Boston, MA 02116 | Authentication |

**(11)    The Proposed Exhibits**

The parties will file a proposed list of undisputed and disputed exhibits in advance of the final pretrial conference.

The parties further reserve the right to use documents and other evidence not listed for impeachment or in response to additional documents submitted by the other party.

In addition, as stated in section (6)(B), above, Defendants anticipate filing a Motion *In Limine* To Preclude Testimony of Mina Koide or Any Evidence Regarding Her Claims.  Should the motion be denied, Defendants wish to reserve the right to offer additional exhibits on this topic. Plaintiff objects to that reservation.

Respectfully submitted,

GIGI KAI ZI CHAN

By her attorneys,

/s/ Patrick J. Hannon
Barbara A. Robb (BBO # 639976)
brobb@hmrhlaw.com
Patrick J. Hannon (BBO #664958)
phannon@hmrhlaw.com
Hampton M. Watson (BBO # 705983)
hwatson@hmrhlaw.com
HARTLEY MICHON ROBB HANNON LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
Tel:  (617) 723-8000

WELLINGTON MANAGEMENT
COMPANY LLP and CHARLES ARGYLE,

By their attorneys,

/s/ Stephen T. Paterniti
Stephen T. Paterniti, BBO# 564860
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, Massachusetts  02116
TELE: (617) 367-0025
FACSIMILE: (617) 367-2155

Beverly Garofalo
Admitted Pro Hac Vice
JACKSON LEWIS P.C.
90 State House Square
Hartford, Connecticut 06109
TELE:  (860) 331-1535
FACSIMILE:  (860) 247-1330

DATED: September 27, 2021

## CERTIFICATE OF SERVICE

This hereby certifies that on September 27, 2021, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Patrick J. Hannon

4839-2567-4492, v. 3

13