**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GIGI KAI ZI CHAN<br><br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br><br>WELLINGTON MANAGEMENT<br>COMPANY LLP AND CHARLES ARGYLE,<br><br><div align="center">Defendants.</div> | Civil Action No. 19-cv-11605-WGY |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE MINA KOIDE**
**FROM TESTIFYING OR ANY EVIDENCE REGARDING HER CLAIMS**

Defendants Wellington Management Company LLP ("Wellington")[1] and Charles Argyle[2] ("Defendants") respectfully move *in limine* to exclude any evidence of or reference to Ms. Koide's claims against Defendants and others by Plaintiff Gigi Kai Zi Chan ("Plaintiff"). This is a transparent effort by Plaintiff to bolster her own "weak case" in the Court's words[3] by inviting the jury to falsely connection between her claims and an unrelated and unproven claim of another former employee simply because they are both Asian females claiming discrimination and retaliation. Ms. Koide's lawsuit is currently pending in the Massachusetts Superior Court

---

[1] Plaintiff was employed by Wellington Management Hong Kong ("WMHK"). However, Wellington is not contesting co-employment for purposes of this litigation.

[2] Charles Argyle timely moved for summary judgment on the only count asserted against him, Count 6, which purported to allege a cause of action for tortious interference. The Court ruled as follows: "As to Counts 5 and 6 the motions are allowed insofar as they are duplicative of discrimination counts, but to the extent there is evidence of tortious interference summary judgment is denied." See Dkt. No. 77. Due to the lack of any evidence of tortious interference, the claim against Mr. Argyle should be dismissed prior to trial, but he joins in this motion because as of the date of the filing of this motion, he remains named as a Defendant on the docket.

[3] *See* Transcript of Summary Judgment Hearing, attached hereto as <u>Exhibit A</u>.

and there has been no adjudication on the merits. Indeed, not a single deposition has been taken in that case.

This is not a case involving claims of a hostile work environment or "pattern or practice" discrimination in which "me too" evidence is more commonly admitted. Rather, these are discrete claims. Ms. Koide alleges that a suggested change in her position at Wellington was tantamount to termination and that she was retaliated against after making an unambiguous discrimination complaint. In contrast, Plaintiff complained incessantly about a supposed "broken promise" to make her a portfolio manager, and other than one sentence in a 70-minute meeting with Charles Argyle about her performance and attitude problems, she did not frame her complaints to Wellington in terms of her gender, national origin, or pregnancy. It was only after her termination that her claims morphed from broken promises to discrimination and retaliation. Thus, whatever surface level similarities exist between their claims vanish upon closer inspection.

The unfair prejudice of allowing Ms. Koide to testify is almost beyond measure. Ms. Koide's claims are complex and conspiratorial. If permitted to testify, Defendant would need to rebut her testimony, which could significantly lengthen the trial and distract from the issues to be tried in this case. Litigating Ms. Koide's sprawling and dissimilar allegations would be an unnecessary and potentially profoundly prejudicial inquiry into a separate matter with little to no connection to Plaintiff and her claims. Thus, the Court should bar any evidence regarding Ms. Koide's lawsuit because such evidence is irrelevant, unfairly prejudicial, and Plaintiff lacks any evidentiary basis for its admission.

## I.     RELEVANT FACTUAL BACKGROUND

### A.     Plaintiff's Claims

Gigi Kai Zi Chan commenced this lawsuit on July 24, 2019, claiming that, in September 2017, Wellington had unlawfully terminated her employment as an Equity Research Analyst in its Hong Kong office on the basis of her gender, race/national origin, disability/pregnancy, as well as in retaliation for purportedly complaining about her discriminatory treatment.[4] Wellington hired Plaintiff as an Equity Research Analyst in 2014 in Hong Kong, reporting to Charles Argyle, Director, Global Equity Portfolio Management ("GEPM"). Mr. Argyle, who was in Boston, had minimal contact with Plaintiff. Tom Baxter, Associate Director, GEPM, located in Hong Kong, had the most day-to-day interactions with Plaintiff. Plaintiff was assigned to the Emerging Markets ("EMO") team led by portfolio manager Greg Mattiko. As an Equity Research Analyst, Plaintiff's responsibilities were to research and recommend equities for Mr. Mattiko to buy and sell as the portfolio manager of EMO.

A "mixed picture" developed concerning Plaintiff's employment, including her presentation style and communication skills, her level of engagement and collaboration and the quality and quantity of her contributions to the EMO team and to the broader investment dialogue at Wellington. Perhaps most concerning in Wellington's feedback-intensive environment was Plaintiff's unwillingness to accept constructive criticism.

Despite having accepted an Equity Research Analyst role, Plaintiff was adamant about her desire to take on portfolio management responsibilities. Although not mentioned in her offer letter, Plaintiff claims that she had been promised such responsibilities in the pre-hire process. In

---

[4] The only adverse job action within the meaning of M.G.L. c. 151B to which Plaintiff was ever subjected and/or that occurred within the applicable limitations period of 300 days, was the termination of her employment on September 12, 2017. See M.G.L. c. 151B, § 9.

2015, hoping to eliminate Plaintiff's distraction and increase her engagement at the Firm, Mr. Argyle supported the launch and seeding of the China Growth fund for Plaintiff to manage. Unfortunately, Plaintiff's attitude, level of engagement and contributions thereafter remained poor. She seemed aggrieved and dissatisfied, complaining about perceived slights such as the size of the fund, the lack of client access, etc. Plaintiff openly discussed opportunities she had to work elsewhere, prompting Wellington and Mr. Argyle to question her commitment to the Firm.

By November 2016, with Plaintiff's peer feedback ranking her amongst the lowest of more than 100 investors in GEPM and no discernible improvement, Mr. Argyle delivered a clear message to Plaintiff in her year-end review meeting (which Plaintiff secretly recorded). Mr. Argyle told Plaintiff that things were going "very" poorly. He told her she had a final opportunity to turn things around. Mr. Argyle thereafter sent Plaintiff an email identifying the specific areas in which Plaintiff's performance was lacking and directed her to acknowledge and respond to the feedback. Plaintiff never even sent a reply email.

Upon Plaintiff's return from a maternity leave in April 2017, there was no demonstrable change or improvement. Instead, in a May 31, 2017 meeting with Mr. Mattiko, which Plaintiff also secretly recorded, she remained entrenched in her grievances over alleged broken business promises, and stated that the onus was on Wellington – not her – to change. They had reached a fork in the road. Mr. Argyle, once Plaintiff's biggest supporter, had to admit defeat. Thus, in June 2017, he made the decision to terminate Plaintiff's employment, effective September 2017.

**B.      Ms. Koide's Claims**

Wellington hired Ms. Koide, a Japanese national, in 2006. She joined the firm's Japan team, a group of investment professionals who specialized in investing in Japanese equity securities for clients. In 2010, Ms. Koide became Co-Portfolio Manager with David Barnard on

two small portfolios managed in what the firm considered its "core" Japan Equity ("JE") approach.  The following year, Ms. Koide was appointed as a Managing Director of the firm.  In 2012, Ms. Koide became the sole Portfolio Manager of the two portfolios using the JE approach.

By the end of 2015, Ms. Koide's book of business remained one of the smallest at the firm, with minimal meaningful prospects of growth.  In fact, her "portfolio" consisted of a relatively small portion of a single client's funds that were tagged to invest in Japan. This is referred to as a "sleeve."  She focused on "core" Japanese equities, with moderate results. The sole client for whom she managed the Japan sleeve could have changed course and re-directed these funds out of Japan at any time, or left Wellington altogether. Ms. Koide was valued at Wellington for her insights about the Japanese market, and thus Wellington contemplated the possibility of other positions within the firm that could best utilize her talents and create a more stable long-term outlook for her career there.  This was discussed by a number of individuals, including Messrs. Argyle and Baxter.  Because they were no longer convinced that Ms. Koide would achieve the level of impact she needed to succeed as a PM, but recognized that Ms. Koide had value to the firm, they began to consider finding Ms. Koide "a more impactful role" that would ensure her long-term position within the firm.

In December 2015, Mr. Baxter approached Ms. Koide about the possibility of moving into a Macroanalyst role within the firm's Multi-Disciplinary Research team. Although the Macroanalyst role at Wellington is quite prestigious, to Mr. Argyle's and Mr. Baxter's surprise, Ms. Koide reacted very negatively and was "deeply uninterested" in the opportunity.  Mr. Argyle and Mr. Baxter abandoned the idea after observing her reaction and Ms. Koide remained in her Portfolio Manager position.

Nevertheless, on January 22, 2016, Ms. Koide sent a seven-page email to Brendan Swords, Chairman and CEO of Wellington, alleging that she was being terminated and discriminated against by Mr. Baxter and Mr. Argyle.  This was the first time she had ever complained of discrimination at Wellington.  Ms. Koide devoted nearly half the email to her contention that Wellington was so determined to favor the male portfolio managers on the Japan team that they used misleading marketing materials to sell their services, in violation of the federal securities laws.

Mr. Swords responded directly to Ms. Koide and set up an in-person meeting on February 5th between himself, Ms. Koide and Jean Hynes, another Managing Partner, to discuss Ms. Koide's concerns.  The following business day, Mr. Swords assigned Nancy Morris, WMC's Chief Compliance Officer, to investigate Ms. Koide's allegations regarding the firm's marketing materials.  He also assigned Wellington's Director of Employee Relations, Tama Donovan, to investigate Ms. Koide's complaints of discrimination.

Although Ms. Koide declined to cooperate, both the compliance and HR investigations were conducted and determined that no wrongdoing occurred. During that same two-month period, Ms. Koide sent a barrage of inflammatory emails accusing Mr. Swords and others of whitewash, cover-up and unlawful conduct. After she ignored repeated requests to direct her concerns to HR or legal and remained unwilling to meaningfully cooperate in the firm's investigations, Ms. Koide's employment was terminated on March 24, 2016.

On August 8, 2016, Ms. Koide filed a charge at the MCAD alleging  the aforementioned favoring of male portfolio managers, that Wellington sought to transition Ms. Koide from the role of Portfolio Manager to Macroananalyst in late 2015 for discriminatory reasons and then terminated her employment in retaliation for her alleged protected activity.   The MCAD

investigated and issued a lack of probable cause finding on May 31, 2017.  The MCAD found, in part, that Ms. Koide's "hostile and insubordinate email communications with M. Swords" were a legitimate nondiscriminatory reason for her termination.

Ms. Koide renewed her claims in Suffolk Superior Court (1884CV03569) on November 15, 2018.  That case is pending.  To date, no depositions have been taken in that matter.

### C.    Absence of Meaningful Discovery on Ms. Koide's Claims

In this case, Plaintiff did not identify Ms. Koide as a witness in her initial disclosures served on January 22, 2020, even though Ms. Koide's lawsuit was pending at the time.  Plaintiff also did not identify Ms. Koide in her answers to interrogatories, even though she was asked to identify all persons with knowledge of any facts relevant to this case.  At no time did Plaintiff attempt to take Ms. Koide's deposition.[5]  Plaintiff also did not propound an interrogatory seeking information about other complaints made against Defendants.  Nor did Plaintiff include among her 113 requests for production of documents a request seeking such information.  In fact, Ms. Koide was not mentioned in this case until October 28, 2020, a few weeks before discovery deadline, when Plaintiff's counsel "supplemented" Plaintiff's initial disclosures via email. Plaintiff never formally supplemented her initial disclosures.

As reflected in Ms. Koide's motion to quash the trial subpoena Plaintiff issued to her, during the time Ms. Koide was employed by Wellington, she had almost no contact with Ms. Chan whatsoever.  Indeed, Plaintiff worked in Hong Kong while Ms. Koide worked in Boston, MA.  They also had different positions on entirely different investment teams and they focused on investing in entirely different markets.  These differences may have emerged in discovery in this case, but Plaintiff never attempted to develop so-called "me too evidence."

---

[5] Had such a deposition notice been served, Defendants would have had the opportunity to move for a protective order and this issue would have been resolved long before the eve of trial.

Even in the absence of discovery, the allegations in their respective complaints are also quite dissimilar. Leaving aside Ms. Koide mistaken belief that suggest a change in position was tantamount to termination, she fundamentally asserts claim for retaliation after making an unambiguous discrimination complaint.  In contrast, while Plaintiff complained incessantly it is Wellington's position that she did not frame her complaints in terms of her gender or national origin. It was only after her termination that she came to belief that the criticisms and feedback she had received were because she was an Asian female.  Thus, whatever surface level similarities the two cases may have vanish upon closer inspection.

II.    **ARGUMENT**

    A.    **Plaintiff Cannot Establish the Relevance of Ms. Koide's Complaint.**

As a threshold matter, information designed to demonstrate a party's propensity for engaging in a certain type of conduct is classic inadmissible character evidence.  *See* Fed. R. Evid. 404(b).  Thus, Plaintiff cannot introduce evidence of other complaints from other employees or former employees to establish that discrimination or retaliation was more likely to have occurred to her because it was in keeping with a purported character trait.  *See Fecho v. Eli Lilly and Co*., 914 F. Supp. 2d 130, 137-38 (D. Mass. 2012).

While evidence of an employer's past discriminatory behavior toward other employees may under certain limited circumstances be admissible, *see Sprint v. Mendelsohn*, 552 U.S. 379, 388 (2008), such testimony "is neither *per se* admissible *nor per se* inadmissible."  *Id.* at 381. Rather, the determination of whether such testimony is relevant and more probative than prejudicial in a particular case is "fact-based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."  *Id.* at 388. "[E]vidence of discrimination can be 'too attenuated' to justify admission, *Conway v. Electro*

*Switch Co.*, 825 F.2d 593, 598 (1st Cir. 1987), and … testimony to this effect should be let in sparingly." *Cummings v. Standard Register Co.*, 265 F.3d56, 63 (1st Cir. 2001).

Ms. Koide and Plaintiff are not similarly situated.  Ms. Koide and Plaintiff did not work in the same country, let alone the same office.  They also did not hold the same position.  Ms. Koide was a Portfolio Manager and co-team leader of the Japan team who worked in Boston, while Plaintiff worked at Wellington's affiliate in Hong Kong, and was an Equity Research Analyst on the Emerging Markets Opportunities team, led by EMO team leader Greg Mattiko. Those positions require significantly different skills and entail vastly different responsibilities.

In addition, Ms. Koide was terminated on March 24, 2016. She first complained to Wellington on January 22, 2016.  This initial complaint was contained in a seven-page email covering detailed allegations.  Plaintiff's employment was terminated in September 2017 so there is a significant temporal disparity between the claims.  Thus, Ms. Koide and Plaintiff are not similarly situated.  *See Sellers v. United States DOD*, 654 F. Supp. 2d 61, 97 (D.R.I. 2009) (explaining that "past treatment towards others can be used to demonstrate intent in a race discrimination suit," but that the party advancing such evidence must 'identify and relate specific instances where persons situated similarly "in all relevant aspects" were treated differently.") (quoting *Smith v. Monsanto Chem. Co.*, 770 F.2d 7129, 723 (8th Cir. 1985)).

### B.     The Potential for Unfair Prejudice Far Outweighs the Probative Value of Ms. Koide's Complaint.

Even if the claim of Ms. Koide had some nominal relevance, which it does not, the risk of unfair prejudice far outweighs its potential probative value.  *See Adams v. Austal*, U.S.A., L.L.C., 754 F.3d 1240, 1258 (11th Cir. 2014) ("Even when 'me too' evidence is relevant under Rule 401, the district court retains the discretion to exclude that evidence, under Rule 403, if it is unduly prejudicial, confusing, misleading, or cumulative.").  Indeed, "trial courts regularly

prohibit 'me too' evidence from or about other employees who claim discriminatory treatment because it is highly prejudicial and only slightly relevant." *Andazola v. Logan's Roadhouse, Inc*., No. CV-10-S-316-NW, 2013 WL 2355350, at *2 (N.D. Ala. May 24, 2013) (quoting *Johnson v. Interstate Brands Corp*., 351 F. App'x 36, 41 (6th Cir. 2009)); *see also Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 734 (S.D. Ohio 2011), aff'd, 504 F. App'x 473 (6th Cir. 2012) ("'[M]e too' evidence is typically inadmissible under Rule 403 . . . because it prejudices the defendant by embellishing plaintiff's own evidence of alleged discrimination and typically confusing the issue of whether the plaintiff, and not others, was discriminated against."). Moreover, courts commonly exclude evidence about other lawsuits. *See In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:12-MD-02327, 2014 U.S. Dist. LEXIS 14971, at *16 (S.D. W. Va. Feb. 5, 2014) (finding "evidence of other lawsuits and the factual allegations therein is inadmissible under Rule 403 . . . Evidence of other lawsuits is likely to confuse and mislead the jury . . . and it is highly prejudicial" to the defendant); *Buckman v. Bombardier Corp.*, 893 F. Supp. 547, 553 (E.D.N.C. 1995) (finding the contents of the Complaint filed against the defendant in another matter would not pass the balancing test under Fed. R. Evid. 403); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 CIV. 7508 SAS, 2013 U.S. Dist. LEXIS 38787, at *35-36 (S.D.N.Y. Mar. 20, 2013) (excluding "[r]eferences to other lawsuits including their factual allegations and evidence").

"Me too" evidence is "often deemed unwelcome because it is at best only slightly relevant yet can be highly prejudicial." *Foster*, WL 1809816, at *3. This is because such evidence can "effectively require a mini-trial to litigate whether the witnesses were, in fact, discriminated against," offering "limited probative value regarding whether the plaintiff suffered discrimination." *Godwin v. Wellstar Health Sys., Inc.*, 2015 WL 7313399, at *4 (N.D. Ga. Nov.

19, 2015). That is because "the complaints are only relevant if the complained-of discrimination actually occurred." *Hill v. Grade*, No. 18-cv-01474-HSG, at *3-4 (N.D. Cal. Sep. 4, 2019). This is a particularly acute concern in this matter.

Here, Plaintiff did not identify Ms. Koide in her discovery responses as a person with knowledge of any facts relevant to this case or as a potential witness in her initial disclosures until the close of discovery. Nor did Plaintiff seek discovery on prior complaints made by Ms. Koide or anyone else. Rather, Plaintiff belatedly seeks to elicit Ms. Koide's trial testimony without having gone through the process in discovery of establishing a factual basis for contending she was "similarly situated." Thus, Plaintiff is functionally attempting to circumvent the discovery process in which the similarity and relevance, *vel non*, of such prior claims could be adjudicated prior to trial. This is improper and causes a substantial risk that the Court will be forced to address potentially difficult admissibility questions "on the fly."

Even assuming, *arguendo*, that Ms. Koide can offer relevant "me too" testimony, it should be excluded because it will focus the jury's attention on events and claims that have nothing to do with Plaintiff. Unfair prejudice has been defined as an undue tendency to suggest a decision on an improper basis, commonly an emotional one. *See, e.g., Wright & Graham, Federal Practice and Procedure: Evidence* § 5209. Confusion of issues generally occurs when the proffered evidence has a tendency to lead to litigation of collateral issues. *See, e.g., Caldarera v. Eastern Airlines*, 705 F.2d 778 (5th Cir. 1983). The danger that jurors will consider testimony for an improper purpose: that Defendants has a propensity to discrimination or retaliate, should be a major factor in assessing whether certain evidence is admissible.

In this case, virtually every one of these considerations counsels strongly against admission of this testimony. First, Ms. Koide's allegations are entirely unsubstantiated. The

defendants in that matter categorically dispute her claims, which were found by multiple investigations to lack merit. This includes not only two internal investigations but also the MCAD's investigation which resulted in a lack of probable cause finding.  Thus, the probative value of them is extremely limited.

Moreover, admission of testimony from Ms. Koide would cause significant confusion and an unnecessary lengthening of the trial, thus constituting an "undue delay" and "waste of time." Ms. Koide is an active litigant in a lawsuit pending in the Massachusetts Superior Court. Her Complaint alleges that she was subjected to subtle and long-lasting discrimination and then a sudden termination when she made a formal complaint. Discovery is ongoing in that matter and she has not yet been deposed.  If Ms. Koide's anticipated testimony on these issues is presented to a jury, the risk such testimony may necessitate a "trial within a trial" is acute. *Lund v. Henderson*, 807 F.3d 6, 11 (1st Cir. 2015) (affirming exclusion of evidence where its admission would have turned the trial into a series of mini-trials about other misconduct complaints against the defendant police officer).  Ms. Koide has identified 30 individuals as individuals with knowledge of her factual allegations who are not identified in the instant matter. Six of them are located in Japan.  To adequately mount a defense, Wellington may have to call many of these witnesses solely to rebut Ms. Koide's testimony, which could add a large amount of time onto the trial and further confuse the jury.  *See Godwin,* 2015 WL 7313399, at *4.[6]

Additionally, the jury would need to be instructed with respect to the law on each of Ms. Koide's claims, and would need to make a determination as to whether Defendants discriminated against her on each of them. Avoiding such "mini-trials" is a sufficient basis for barring this

---

[6] Due to the late and deficient notice of Ms. Koide as a trial witness as mentioned infra at p. 8, and the fact that no discovery was therefore taken pertaining to her alleged "me, too" claim, Defendants cannot anticipate the substance and extent of her testimony if she is permitted to take stand in this case, and thus cannot adequately identify witnesses and exhibits which may need to be offered in rebuttal.

testimony. *See Ramos-Melendez v. Valdejully*, 960 F.2d 4, 6 (1st Cir. 1992) (testimony of other employees who had pending suits against employer for discrimination properly excluded on the ground that "for their testimony to be significant it would be necessary in effect to try their cases, as well as the plaintiff's"); *Kinan v. City of Brockton*, 876 F.2d 1029, 1034-35 (1st Cir. 1989); *Hall v. Mid-State Mach. Products*, 895 F.Supp.2d 243 (D. Me. 2012).[7]

As a result, under Rule 403, Ms. Koide's testimony should be excluded.

### C.     Plaintiff's State of Mind Theory of Relevance is Rank Speculation.

To the extent that Plaintiff intends to introduce evidence of Ms. Koide's complaint for the purpose of showing that the mere filing of her complaint had an effect on a decisionmaker relevant to Ms. Chan, such a relevance theory is nothing more than idle speculation.  There is no evidence that the filing of Ms. Koide's Charge of Discrimination at the Massachusetts Commission Against Discrimination ("MCAD") on August 8, 2016 had any kind of impact on the state of mind of a decisionmaker relevant to Ms. Chan.  Certainly, Plaintiff does not plead any adverse employment events occurred in close proximity to Ms. Koide's MCAD filing. Accordingly, because there is no evidence that Ms. Koide's August 2016 MCAD Charge has any causal connection to Plaintiff's September 2017 termination, evidence of the existence of this Charge would improperly invite the jury to falsely connect the two events.

---

[7] Moreover, Ms. Koide's testimony would be entirely irrelevant to the tortious interference claim against Defendant Charles Argyle (if this claim is permitted to be presented to the jury).  The Court has already determined that in order for the tortious interference claim to lie against Mr. Argyle, Plaintiff must have evidence of tortious interference that is not simply duplicative of the discrimination claim.  Thus, "me, too" evidence pertaining to Plaintiff's discrimination claims has no probative value to the claim against Mr. Argyle, but would risk substantial jury confusion and thus prejudice to him.  In this context, a curative instruction to the jury will not be sufficient as the jury cannot "unhear" the testimony.

## III.   <u>CONCLUSION</u>

For all the above reasons, Plaintiff should be prohibited from offering any evidence at trial or making any reference to Ms. Koide's claims. Based on the foregoing, Defendants respectfully request the Court to grant its motion *in limine* to preclude such evidence.

Respectfully Submitted,

WELLINGTON MANAGEMENT COMPANY
and CHARLES ARGYLE,

By their attorneys,

*/s/ Stephen T. Paterniti*
Stephen T. Paterniti, BBO# 564860
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, Massachusetts  02116
TELE: (617) 367-0025
FACSIMILE: (617) 367-2155

Beverly Garofalo
Admitted Pro Hac Vice
JACKSON LEWIS P.C.
90 State House Square
Hartford, Connecticut 06109
TELE:  (860) 331-1535
FACSIMILE: (860) 247-1330

Dated: September 28, 2021

## <u>CERTIFICATE OF SERVICE</u>

This hereby certifies that on September 28, 2021 this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<div align="right">

*/s/ Stephen T. Paterniti*
Jackson Lewis, PC

</div>

4813-7869-5676, v. 2