# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

GIGI KAI ZI CHAN,

        Plaintiff,

v.

WELLINGTON MANAGEMENT COMPANY
LLP and CHARLES ARGYLE,

        Defendants.

Civil Action No. 19-cv-11605-WGY

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT FRANK CARR

Defendants Wellington Management Company LLP ("Wellington")[1] and Charles Argyle[2] ("Defendants") respectfully move *in limine* to preclude Frank Carr from offering testimony at trial because his opinion will not aid the jury in determining any issue before it. Mr. Carr's opinions about Plaintiff's purported back pay or front pay damages are not based on any reliable data or methodology. Rather, Mr. Carr intends to offer the totem pole speculation that: 1) two opportunities Plaintiff had discussed with potential investors would have developed into approved investment products; 2) these two products and another fund that had only received seed funding at the time of Plaintiff's departure would have all outperformed the market and 3) all three opportunities would have enjoyed meteoric growth of the assets under management ("AUM"). In essence, Plaintiff's "expert" bases his astronomical back pay and front pay

---

[1] Plaintiff was employed by Wellington Management Hong Kong ("WMHK"). However, Wellington is not contesting co-employment for purposes of this litigation.

[2] Charles Argyle timely moved for summary judgment on the only count asserted against him, Count 6, which purported to allege a cause of action for tortious interference. The Court ruled as follows: "As to Counts 5 and 6 the motions are allowed insofar as they are duplicative of discrimination counts, but to the extent there is evidence of tortious interference summary judgment is denied." See Dkt. No. 77. Due to the lack of any evidence of tortious interference, the claim against Mr. Argyle should be dismissed prior to trial, but he joins in this motion because as of the date of the filing of this motion, he remains named as a Defendant on the docket.

calculations on his baseless assumption that if Plaintiff had remained at Wellington she would have quickly risen from the Equity Research Analyst she had been for her entire 3.5 year tenure into one of the leading Portfolio Managers at Wellington. This is precisely the kind of speculation that *Daubert* forbids. Additionally, the Court should exclude Mr. Carr's opinion with respect to Wellington's compensation scheme, because that simple issue does not require any expert assistance for the trier of fact to understand and is not within Mr. Carr's personal knowledge. Finally, the Court should also exclude Mr. Carr's opinion about Plaintiff's likely replacement compensation as it is not based on reliable data or methodology.

## FACTUAL BACKGROUND

Wellington hired Plaintiff as an Equity Research Analyst in 2014 in Hong Kong, reporting to Mr. Argyle, Director, Global Equity Portfolio Management ("GEPM"). Prior to joining Wellington, Plaintiff worked as a fund manager at Columbia Threadneedle Investments ("Threadneedle") for over a decade. She had been hired in October 2000, initially as an analyst trainee fund manager, and became a fund manager in 2004. Mr. Argyle, who was in Boston, had minimal contact with Plaintiff. Tom Baxter, Associate Director, GEPM, located in Hong Kong, had the most day-to-day interactions with Plaintiff. Plaintiff was initially assigned to the Emerging Markets ("EMO") team led by portfolio manager Greg Mattiko. As an Equity Research Analyst, Plaintiff's responsibilities were to research and recommend equities for Mr. Mattiko to buy and sell as the portfolio manager of EMO.

Despite having accepted an Equity Research Analyst role, Plaintiff was adamant about her desire to take on portfolio management responsibilities. Although not mentioned in her offer letter, Plaintiff claims that she had been promised such responsibilities in the pre-hire process. In late 2015, hoping to eliminate Plaintiff's distraction and increase her engagement at the Firm,

Mr. Argyle supported the launch and seeding of a fund for Plaintiff to manage.  The China Growth Fund ("CGF") received firm approval in January 2016 and $1 million in seed fund capital in February 2016 and was officially launched in July 2016.

Unfortunately, Plaintiff's attitude, level of engagement and contributions thereafter remained poor.  She seemed aggrieved and dissatisfied, complaining about perceived slights such as lack of client access and Firm support.  By November 2016, with Plaintiff's peer feedback ranking her amongst the lowest of more than 100 investors in GEPM and no discernible improvement, Mr. Argyle delivered a clear message to Plaintiff (which Plaintiff secretly recorded).  Mr. Argyle told Plaintiff that things were going "very" poorly. He told her she had a final opportunity to turn things around.  Mr. Argyle thereafter sent Plaintiff an email identifying the specific areas in which Plaintiff's performance was lacking and directed her to acknowledge and respond to the feedback.  Plaintiff never even sent a reply email.

Upon Plaintiff's return from a maternity leave on April 5, 2017, there was no demonstrable change or improvement.  Instead, in a May 31, 2017 meeting with Mr. Mattiko, which Plaintiff also secretly recorded, she remained entrenched in her grievances over alleged broken business promises, and stated that the onus was on Wellington – not her – to change. They had reached a fork in the road.  Mr. Argyle, once Plaintiff's biggest supporter, had to admit defeat.  Thus, in June 2017, he made the decision to terminate Plaintiff's employment. Wellington notified Plaintiff of the termination on September 11, 2017.

Plaintiff admits she did not look for work for the first year after her termination.  She moved to France shortly after her termination and only returned to Hong Kong in July 2021. Plaintiff admits she did not apply to a single position until November 2018, more than a year after she was terminated from Wellington. *See* Transcript of October 6, 2020 Deposition of Gigi

Chan ("Chan Depo."), pp. 123-24, attached as Exhibit A.  While Plaintiff claims she was looking for work but there were simply "no market movements" for an entire year, in an email reply to a recruiter on October 29, 2018, she represented that she had been taking a break in looking for work.  *See* CHAN_04651, attached as Exhibit B.  After nominally beginning her job search in November 2018, there were often periods of three to six months in which Plaintiff did not apply for a single position.  *See* Plaintiff Gigi Kai Zi Chan's Answers and Objections to Defendant Wellington Management Company LLP's First Set of Interrogatories, No. 13, attached as Exhibit C.  From November 2018 until August 2020, Plaintiff only submitted a total of 9 job applications.  *Id.*  Plaintiff increased her activity in September 2020, and has applied to a total of 11 positions in the last year.  *See* Plaintiff Gigi Kai Zi Chan's Supplemental Answers and Objections to Defendant Wellington Management Company LLP's First Set of Interrogatories, No. 13, attached as Exhibit D.

Throughout the last four years, Plaintiff has opted not to focus on the same position she held at Wellington, Equity Research Analyst, and instead primarily targeted positions such as Portfolio Managers, Fund Managers, Equity Portfolio Manager, Head of China Strategy, and similar level positions. *Chan Depo*., pp. 124, 149-50.  In fact, Plaintiff has not applied to a single Equity Research Analyst position.  *Chan Depo*., p. 124.  Plaintiff also ruled out a number of employment opportunities because of their location and focused on opportunities in London and Hong Kong.  *Chan Depo*., pp. 140-45.

Plaintiff commenced this lawsuit on July 24, 2019, claiming that her termination was discriminatory on the basis of her gender, race/national origin, pregnancy, as well as in

retaliation for purportedly complaining about her discriminatory treatment.[3]   Among other categories of damages, she is seeking back pay and front pay.

## **MR. CARR'S OPINIONS**

Although Plaintiff was a highly-compensated employee, ensuring that if the jury awards her front pay damages her recovery would be substantial, she has retained Frank Carr "to perform an analysis of the economic damages sustained by Ms. Chan" that dramatically inflates her claimed damages.  *See Expert Report of Frank Carr* ("*Carr Report*"), attached as <u>Exhibit E</u>. Mr. Carr's analysis is based, in large part, on incentive compensation he believes Plaintiff would have earned if a series of unlikely events had occurred and made her a substantially better compensated employee.

At Wellington, some investors are paid incentive compensation based in significant part on fund performance, measured by AUM and "alpha" or performance above the market. Crucially, Mr. Carr's report does not discuss with any specificity how incentive compensation pools are determined at Wellington.  Instead, he appears to rely on the general deposition testimony of Mr. Mattiko that the "two main components [of the size of the incentive pool] are the alpha and the revenue."  *See Carr Report*, at 6; *See Deposition Transcript of Greg Mattiko*, p. 183, attached as <u>Exhibit F</u>.  He does not describe the weight of these two factors or what other components may exist in determining the incentive pool, almost certainly because he does not know.   Rather, he reverse engineers a generally-applicable incentive pool formula for all Wellington funds out of the incentive pool amounts that were available to Mr. Mattiko's EMO fund, again without any apparent understanding of how these amounts were derived. *See Carr Report* at 8, fn.7 and 10-11.  Mr. Carr defends the reasonableness of this approach by offering a

---

[3] The only adverse job action within the meaning of M.G.L. c. 151B to which Plaintiff was ever subjected and/or that occurred within the applicable limitations period of 300 days, was the termination of her employment on September 11, 2017.  See M.G.L. c. 151B, § 9.

non-sequitur that "the evidence strongly suggests that China Growth, based on Ms. Chan's prior track record, would have matched or exceeded the alpha generated by the EMO Fund." *See Carr Report* at 11.

From this dubious premise, Mr. Carr opines that the CGF, which was launched in July 2016 with $1,000,000 in incubation or seed money from Wellington and had no external investors at the time of her termination in September 2017, would have been the incredible success. He also opines that two potential opportunities that never existed, a Pan Asia fund that was a paper portfolio that had not been approved, launched, or funded and a sub-advisory mandate for a potential client that had not been approved at the time of Plaintiff's termination, would have been extremely successful and resulted in significant compensation to Plaintiff.

Finally, Mr. Carr opines that the mere fact of Plaintiff's departure from Wellington has permanently harmed her reputation, thus limiting her ability to mitigates her lost compensation damages. *See Carr Report* at 18-20. Nevertheless, he projects Plaintiff's potential replacement earnings using data from a single source, Institutional Investor, which he characterizes as a "news service." *Id.* at 20-21. His "methodology" is to simply average the reported compensation information for research analysts, junior portfolio managers, and senior portfolio managers and then assume Plaintiff will be hired as a research analyst in 2022, a junior portfolio manager in 2027, and a senior portfolio manager in 2032. He does not explain why he chose these positions or these dates.

## ARGUMENT

### A.    Standard for Admissibility.

The party seeking the admission of expert testimony bears the burden of establishing it is admissible. *Cook v. CTC Communs. Corp.*, 2007 U.S. Dist. LEXIS 808449, at *5 (D.N.H. Oct.

15, 2007).  Under Rule 702, expert testimony is admissible, if it is (1) based upon sufficient facts or data, (2) produced by reliable principles and methods, and (3) supported by a reliable application of the principles and methods to the facts of the case.  Fed. R. Evid. 702.  District courts act as "gatekeepers" to ensure that the expert testifies "to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).  The primary concern of the "gatekeeper" function is to ensure the "expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Expert testimony is admissible only if it "both rests on a reliable foundation and is relevant to the task at hand," *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 597 (1993), such that the opinion, if admitted, likely will assist the trier of fact to understand or determine a fact in issue. *Cipollone v. Yale Indus. Prod., Inc*., 202 F.3d 376, 380 (1st Cir. 2000); Fed. R. Evid. 702. Under this standard, Mr. Carr's report and contemplated testimony regarding back pay and front pay do not pass muster, and, thus, he should be precluded from offering such testimony.

**B.      Carr is not Qualified to Evaluate Fund Performance**

Mr. Carr claims to "have particular experience understanding, evaluating, and valuing compensation structures that include various forms of incentive compensation." *Carr Report* at 3.  Indeed, he has worked as an executive recruiter since 1997.  *Id.* at Ex. 1.  Prior to that he dabbled as an insurance agent (where he earned his FINRA licenses), the CFO of a mutual fund, a film producer, and a loan officer in the years between 1978 and 1997.  This range of experience is lacking in the one thing that matters for the opinions he seeks to offer: expertise in equity fund development.  *Id.*  Mr. Carr does not claim to have any particular experience in predicting or

projecting the performance of investment funds.  *Id*. at 3.  For this reason alone, he should not be permitted to testify.

### C. Carr's Opinions Regarding Wellington's Compensation Structure Do Not Concern Matters That Are Beyond The Understanding Of The Average Lay Person And Therefore Would Not Assist Members Of The Jury.

Mr. Carr should be excluded as an expert witness regarding the compensation Plaintiff would have received up to the date of trial because Plaintiff cannot demonstrate that his testimony would assist members of the jury in understanding the evidence or demonstrating a fact in issue in the present case.  An expert's testimony will only aid the trier of fact if the evidence about which he or she testifies 'concerns matters that are beyond the understanding of the average lay person.  *United States v. Martinez-Armestica*, 846 F.3d 436, 444 (1st Cir. 2017). Indeed, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  *U.S. v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004).

In the present case, Mr. Carr's testimony concerning the forms of compensation available to Plaintiff had she remained employed by Wellington are not so complex as to require explanation.  Indeed, Mr. Carr does not even opine in his reports that Wellington's compensation structure is difficult to understand.  This deficiency is particularly glaring where Mr. Carr has admitted that his "opinions" about Wellington's compensation structure are derived in large part from "facts" provided directly by Plaintiff, many of which are incorrect.  *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 536 (6th Cir. 2010) ("[B]ecause [the expert's] assumption . . . is not only unsupported, but contradicted by evidence in the record, his conclusions . . . are unreliable"); *United States v. City of Miami, Fla.*, 115 F.3d 870, 873 (11th Cir. 1997) ("Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a

reasonably accurate conclusion. Opinions derived from erroneous data are appropriately excluded.") (citations omitted); *Guillory v. Domtar Indus. Inc*., 95 F.3d 1320, 1331 (5th Cir. 1996) ("[A]n opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant."); *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990) (trial court properly disregarded an expert's conclusion that rested on an assumption shown contrary to fact by record).

In describing Wellington's compensation structure, Mr. Carr reviewed cherry-picked information provided to him by Plaintiff's counsel.  He appears not to have reviewed any outside economic or industry data of any kind on this issue.  Thus, in deciding how to analyze and apply the compensation information made available to him, Mr. Carr brought no independent or professional judgment to the table.  He simply did as he was told to do by Plaintiff's counsel: assume that the information provided to him was true.  This intentionally limited universe of the "facts" and "data" surrounding Plaintiffs' claims is a legally insufficient basis for expert testimony.  *See, e.g., Huey v. United Parcel Service*, 165 F.3d 1084, 1086 (7th Cir. 1999) (excluding testimony of plaintiff's proffered expert where the expert "did not do *anything* except talk to [plaintiff], read documents [plaintiff's] counsel sent, and write a letter") (emphasis in original); *Student Mktg. Group v. College P'ship*, Nos. 05-1427 and 06-1046, 2007 U.S. App. Lexis 18981, at *34 (10th Cir. Aug. 9, 2007) (upholding exclusion of expert testimony where the purported experts "[could] not vouch for the reliability of their own data").  Blind acceptance of unsupported facts or data "will not do as the work of an expert."  *Id.; see also Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) ("Relaying the plaintiff's likely testimony is not an example of expertise.").

Wellington's compensation structure will be the subject of ample lay witness testimony and, to the extent any disagreements emerge on that issue, the jury is perfectly capable of determining whom it believes to be more credible.   Thus, Mr. Carr's proffered testimony regarding Wellington's compensation structure offers nothing more than what Plaintiff's counsel introduce through exhibits, elicit in the examination of lay witnesses, and then assert in closing arguments, and therefore it should be excluded in its entirety.

### D.   Carr Does Not Base His Opinions Regarding Front Pay Damages on Reliable Data or Any Accepted Methodology.

Mr. Carr's opinions pertaining to Plaintiff's alleged front pay damages are based on his assumptions that (1) the CGF would have attracted institutional investors, beaten the market, and grown to $2 Billion AUM sometime between July 2022 and July 2024, *Carr Report* at 10 and Ex. 5 thereto; (2) a paper portfolio named the Pan Asia Fund that was never approved or funded by Wellington, would have been approved, funded and grown to $2 Billion AUM between July 2025 and July 2027, *id.* at 12-13 and Ex. 6 thereto; and (3) a potential sub-advisory opportunity that was in the discussion stage with a Chinese asset management company would have materialized, commenced in 2018, and grown to $1 Billion AUM by July 2029.  *Id.* at 14-15 and Ex. 7 thereto. Notably, Mr. Carr assumes that Plaintiff would have managed these combined $5 Billion in funds without any support from research analysts that might dilute the 70% incentive compensation fee that Mr. Carr believes Plaintiff would have kept all to herself.[4]  *Id.* at 11.

Any step an expert takes in formulating his opinion "that renders the analysis unreliable . . . renders the expert's testimony inadmissible." *United States v. Monteiro,* 407 F. Supp. 2d 351, 374 (D. Mass. 2006) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).

---

[4] Mr. Carr's report also contains a detailed factual recitation about Wellington's salary and incentive compensation structure, bonus program, housing subsidy, and pension plan, which is riddled with errors. As these matters are not the proper subject of expert testimony, there is no need address these flaws in this motion.

This means that an expert's opinion is admissible "'only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data.'"  *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006).  In other words, "'[t]alking off the cuff—deploying neither data nor analysis—is not an acceptable methodology.'"  *Id.* (quoting *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000)); *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert").

Mr. Carr's opinions regarding front pay are simply not reliable.[5]  For purposes of his analysis, Mr. Carr relies, in part, on an interview he conducted of Plaintiff but does not meaningfully describe.  *Carr Report* at 5.  He assumes, without any apparent evidentiary support, that she would have worked until age 60 or 65.[6]  *Id.*  Mr. Carr's reliance on the assumption that Plaintiff would have continued to work at Wellington until either age 60 or 65 for purposes of calculating front pay is based upon a single paper, "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape Percentile Points, and Bootstrap Standard Error" (Gary R. Skoog, James E. Ciecka, and Kurt V. Kreuger 2011) that appears entirely divorced from the facts and circumstances of this case.  This is especially dubious because Mr. Carr concedes that 65 is the 75th percentile for work life but provides no support for his apparent belief that Plaintiff would have such an unusually long work life.

Mr. Carr also asserts that she would have worked at Wellington for the remainder of her career, *id.* at 5, and that if she had continued to work at Wellington she would have continued

---

[5] For example, he assumes that the exchange rate between the United States and Hong Kong will stay fixed for the next 18 to 23 years, which is obviously not reliable data  *Id.*

[6] Mr. Carr apparently did not ask Plaintiff how long she intends to work during their interview.

working on the Emerging Markets Opportunities Fund ("EMO") led by Greg Mattiko, *id.* at 8. Mr. Carr apparently did not ask Plaintiff during his interview whether Plaintiff intended to work for Wellington for the remainder of her career or how long she expects that career to be. Because there is no record evidence that Plaintiff would have remained employed by Wellington from 2017 until 2039 or 2044, Mr. Carr's 18 to 23 year front pay calculation is nothing more than an invention that will undoubtedly confuse the jury. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (excluding testimony of economic expert who assumed, contrary to the party's prior work history, that the party would be employed full time for the remainder of his career). There is also considerable evidence that even if she had not been terminated, Plaintiff would not have continued in her role as an Equity Research Analyst for the EMO team because of her lack of contributions to EMO, especially as she increased her focus on the CGF.

### 1.     Carr's China Growth Opinion is Pure Speculation

At the time of Plaintiff's separation from employment, CGF was an incubation fund consisting of $1 million of Wellington funds, with no outside client funds. Nevertheless, Mr. Carr projects meteoric success ($2 Billion AUM within six years) on the basis one false comparison and one conclusory statement.

Mr. Carr offers no factual basis for his assumption that CGF would have attracted outside client investors. He also does not provide any analysis of the performance of any other equity funds with a similar strategy, philosophy and process to CGF, or any funds focused on the China equities market, either within Wellington or in the industry generally. He also does not rely on any evidence of market demand in a China growth fund generally. Mr. Carr also offers no statistics or other data indicating the percentage of seed funds that actually become funded by

outside client-investors, let alone grow to $2 Billion AUM, either within Wellington or the larger investment community. In fact, only four of 49 seed-funded incubation or portfolio management proposed funds approved by Wellington since 2016 have grown to $100 million AUM and none has even $750 Million let alone $2 Billion AUM.

Finally, Mr. Carr's report actually ignores some of the key data regarding the status of both China Growth, including that in May 2016, Andria Weil, one of Wellington's GRG team members, categorically stated, "She (Plaintiff) is absolutely not ready for client/consultant meetings" that could lead her to raise AUM for the CGF or that Plaintiff was told that there was "[l]imited demand for China strategies from our client base" by Investment Director Elizabeth Hogbin. *See* Bates DEF00027766, DEF00003417, attached as Exhibit G.

Even if CGF had attracted outside investors, Mr. Carr offers no support for his opinion that the Fund would have grown to $2 Billion other than his statement that those were the "plans." *Carr Report* at 8. In fact, the document he cites states that $2 Billion was the "capacity" of the planned approach. *Id.* (citing DEF00001212). In other words, Mr. Carr assumes maximum investment in Plaintiff's approach.

Mr. Carr's assumption about the rate of this AUM growth is equally dubious. Mr. Carr offers no factual basis for his statement that "the amount of AUM being raised generally accelerat[e] every two years." *Id.* at 10. He also offers no explanation for his assumption of $2 Billion AUM sometime between July 2022 and July 2024, other than the utterly anecdotal information about three other Wellington funds. *Carr Report* at 9. Mr. Carr relies on these three cherry-picked funds managed by investors he claims are "similarly situated," the Emerging Markets Opportunities Fund managed by Greg Mattiko, the Strategic European Equity Fund managed by Dirk Enderlein, and the Asian Opportunities managed by Niraj Bhagwat. *Id.* at 9.

Mr. Carr claims these three investors are comparable to Plaintiff because he is "informed" that they had all managed funds for their prior employers and "came to Wellington within the same six-year time period as Ms. Chan, and all successfully launched funds within a short period after starting at Wellington."  *Id.*  Mr. Carr's comparison is silent on facts critical to any attempted comparison of funds – the strategy, philosophy and process, performance, and market demand of the respective funds.  Mr. Carr does not even describe the China Growth strategy, other than to note that Plaintiff had used the same approach at her prior firm.  *Id.*  Nor does Mr. Carr describe the strategies used by the Emerging Markets Opportunities Fund, Strategic European Equity Fund, and Asian Opportunities Fund, and does not explain any basis upon which he finds those funds are analogous to the China Growth Fund.  *Id.*

Moreover, Mr. Carr states flatly that "the evidence strongly suggests that China Growth, based on Ms. Chan's prior track record, would have matched or exceeded the alpha generated by the EMO Fund."  He leaves it to the reader to guess what "evidence" that might be.  To the extent that Mr. Carr is relying on Plaintiff's "success" at Threadneedle, that data actually undermines his analysis. Based on the materials within Mr. Carr's report, Plaintiff's prior fund at Threadneedle actually lost AUM in the two years prior to her 2013 departure, going from £84.2 AUM in 2011 to £68.7 AUM in 2013.  *Id.*  at Appendix L & O.   Indeed, the £68.7 AUM in 2013 when Plaintiff left Threadneedle after 6 years is a far cry from the $2 Billion in AUM Mr. Carr projects would be obtained for CGF, which Plaintiff asserts is the same strategy as her Threadneedle fund.

With respect to the "methodology" employed by Mr. Carr, it seems to be no more rigorous than "if these three people did it, Plaintiff will do it too." Mr. Carr does not indicate how many other Wellington investors fit that same criteria or explain how the approaches of

three other Wellington portfolio managers, with different geographical market coverage, compared to the China Growth Fund or Pan Asia approach, or even what allowed those three individuals to successfully raise AUM. *Id.* That is because he is just relying on three cherry-picked successes provided to him by Plaintiff without any meaningful understanding of the "data" he is "offering." There is quite literally no methodology even presented for the conclusion that Plaintiff would be managing $5 Billion AUM within 6-7 years.

In sum, Mr. Carr offers nothing more than uninformed speculation about potential success of the CGF.

### 2.   Carr's Pan Asia Opinion is Pure Speculation

Similar to the CGF, Mr. Carr does not describe the Pan Asia Growth strategy, other than to acknowledge it was only a paper portfolio and note that it would have been "a growth-oriented strategy for Asia including Japan, which is a less common strategy and would have fewer competing products." *Id.* at 12. Mr. Carr opines that the nascent approach would have been launched by Wellington because "(1) Wellington wanted Ms. Chan to develop investment strategies that would be of potential interest to its clients, (2) a significant Wellington client . . . had shown serious interest in the strategy, (3) the strategy was potentially very lucrative for Wellington given the capacity such a fund would have, and (4) the strategy would have filled a gap in both Wellington's offerings and those provided by competitors." *Id.*

To support these sweeping conclusions that a paper fund would be approved, funded and launched by Wellington, Mr. Carr relies on a single memorandum created in anticipation of a November 10, 2016 meeting with an existing firm client. *Id.* (citing CHAN 358-62). The stated purpose of this meeting was to provide the head of investments of this client "a catchup/EMO portfolio review with Greg [Mattiko]" and also "for him to spend time with Gigi for an update on

her portfolios. He is more interested in the Asia Growth than China Growth strategy." *Id.* (citing CHAN 358-62). Mr. Carr apparently was not provided with a summary of the actual meeting with this client, in which he asked Plaintiff a number of questions about her general investment approach but did not express particular interest or commitment regarding her Pan Asia approach. *See* DEF00011320, attached as <u>Exhibit H</u>. Mr. Carr also does not reference any evidence of progress or follow-up from the client about this alleged "opportunity" between November 2016 and September 2017.

Mr. Carr also provides no facts upon which one could determine the client's level of interest in her paper portfolio, process for evaluating and determining which funds to invest in, and how long the client might take to make such a decision. Mr. Carr likewise fails to discuss Wellington's internal process for approving, funding, and launching funds, or any data about how many funds are proposed, approved, funded, and launched on an annual basis. Rather, based on a single document, Mr. Carr assumes nearly immediate success.

Mr. Carr also offers a backup scenario, again without any apparent basis, that if the existing client had not invested in the Pan Asia fund Wellington would have invested its own seed capital, allowed the Pan Asia fund to develop a strong 3-year track record, and attract investors. *Id.* at 12. Mr. Carr notably does not state what the 3-year track record of the Pan Asia fund would have been if, as he asserts, it was funded in 2018. *Id.* Perhaps that is because it never existed. Rather, he states that although Plaintiff "had not previously managed this strategy" it was his "understand[ing]" [the Pan Asia Fund] was analogous to a strategy that she had successfully employed at Threadneedle, which achieved 2.8% annualized outperformance." Ergo, according to Mr. Carr, "Pan Asia Growth would have performed either equal to or greater than the EMO Fund." *Id.* at 13. Mr. Carr does not explain why he believes Pan Asia was

analogous to a Threadneedle fund or his even more incredible statement that this paper portfolio would have outperformed the EMO Fund.

Mr. Carr's projected $2 Billion AUM are little more than hand waiving as he mentions, almost in passing, that Wellington prefers to develop multi-billion dollar funds. *Id.* at 13. Once again, Mr. Carr also offers no statistics or other data indicating the percentage of seed funds that actually become funded by outside client-investors, no support for his opinion that the Pan Asia fund would have grown to $2 Billion, and no support for his assumed rate of AUM growth (8 to 10 years).

In other words, Mr. Carr's opinions regarding the approval, growth, and success of the Pan-Asia approach are pure speculation.

### 3.   Carr's Sub-Advisor Opportunity Opinion is Pure Speculation

Finally, in support of his opinion that Plaintiff would have served as an investment sub-advisor to a Chinese insurance company commencing in 2018, Mr. Carr relies on a handful of emails from September 2016 and the notes from a November 9, 2016 meeting. *Carr Report* at 15. Mr. Carr apparently was not provided with emails reflecting that Wellington had put the sub-advisor opportunity "on ice" by January 2017. *See* DEF00004761, attached as <u>Exhibit I</u>.   Nor was he provided with emails indicating there were a number of potential dealbreakers for both sides with the potential relationship. *See* DEF00020462, attached as <u>Exhibit J</u>.  Thus, Mr. Carr's opinion that the sub-advisory relationship would have been consummated by 2018 is without any factual support.

Equally unreliable is Mr. Carr's opinion the sub-advisor opportunity would have grown to $1 Billion AUM by July 2029.  His only support for this pronouncement is a statement in the proposal that the potential client expected the AUM to be at $100 Million within 1 year and that

the "size will be bigger if Gigi delivers strong results." *Carr Report* at 15 (citing DEF00009513). These notes were written by a Wellington salesperson hoping to convince Wellington to pursue the opportunity.

Mr. Carr also offers no factual basis for claim that the sub-advisor opportunity would not only occur but that the funds would grow by "100MM per year until asset growth reaches 750MM." *Id.* These numbers appear plucked from the air and, once again, are not supported by the actual record which establishes that the sub-advisor opportunity was put on ice and there is no evidence that anything subsequently became of it.

**D.     Carr Does Not Base His Opinions Regarding Replacement Compensation on Reliable Data or Any Accepted Methodology.**

Finally, Mr. Carr's decision to base his opinion of Plaintiff's potential replacement earnings on a single source, Institutional Investor, has obvious flaws.  First, Mr. Carr relies on two 2018 salary surveys, the All-Asia Buy-Side Compensation (All-Asia data), and the All-America Buy-Side Compensation (All-America data), which he averages together without explanation even though the scales are different (the highest category for the All-Asia survey is $10 Billion while the lowest category for the All-America is less than $10 Billion).  Mr. Carr does not provide the sample sizes for the survey, why it is reasonable to combine such disparate surveys, or why a single year three years ago should be considered reliable.  Were salary surveys conducted for 2019 or 2020? Did he consider using data from those years? Mr. Carr's report does not say.

The "data" presented in the 2018 surveys also has obvious hallmarks of unreliability.  For instance the All-Asia survey indicates that portfolio managers earn $439,969 on average for companies of $2.5 to $4.99 Billion, but $229,865 on average for companies of $5 Billion to $9.99 Billion.  Mr. Carr offers no explanation for this confounding result.  Likewise, the survey

indicates that employees of companies of $10 billion or greater will earn $3,871,076 on average or more than 16 times the amount in the next lower range.  The "data" fares even worse with respect to research analysts and portfolio managers/research analysts.  In both cases, those employed by companies of $2.5 to $4.99 Billion earned substantially more than those employed by companies of $10 billion or greater.  These kinds of result are a signal flare for response rate differences among the various categories.

Because Mr. Carr offers no opinion on replacement compensation independent from the critically flawed Institutional Investor survey, he should not be permitted to offer testimony regarding Plaintiff's replacement earnings.

## CONCLUSION

These flaws in Mr. Carr's data and methodology go beyond mere points for cross-examination. They demonstrate a lack of reliability so profound as to render his opinions inadmissible.  *See Irvine v. Murad Skin Research Labs., Inc.,* 194 F.3d 313, 321 (1st Cir. 1999) ("Absent adequate factual data to support the expert's conclusions his testimony was unreliable.").  Accordingly, Defendants respectfully request that Mr. Carr not be permitted to offer such testimony.

Respectfully Submitted,

WELLINGTON MANAGEMENT COMPANY
and CHARLES ARGYLE,

By their attorneys,

*/s/ Stephen T. Paterniti*
Stephen T. Paterniti, BBO# 564860
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, Massachusetts  02116
TELE: (617) 367-0025
FACSIMILE: (617) 367-2155

Beverly Garofalo
Admitted Pro Hac Vice
JACKSON LEWIS P.C.
90 State House Square
Hartford, Connecticut 06109
TELE:  (860) 331-1535
FACSIMILE: (860) 247-1330

Dated: September 29, 2021

## <u>CERTIFICATE OF SERVICE</u>

  This hereby certifies that on September 28, 2021, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Stephen T. Paterniti*

Jackson Lewis P.C.

4850-3737-7533, v. 3