# EXHIBIT C

Without prejudice/subject to contract

DATED    10    October    2013

THREADNEEDLE

INVESTMENTS SINGAPORE (Pte) LIMITED

And

GIGI CHAN

---

**SETTLEMENT AGREEMENT**

---

Without prejudice/subject to contract

THIS AGREEMENT is made on the _10th day_ of _October 2013_

BETWEEN:

1.     **THREADNEEDLE INVESTMENTS SINGAPORE (Pte) LIMITED** of 3 Killiney Road, #07-07 Winsland House 1, Singapore 239519 (the Company); and

2.     GIGI CHAN (the Employee).

**NOW IT IS HEREBY AGREED** as follows:-

1.     **Meaning of terms used**

1.1     In this Agreement the following expressions have the following meanings:-

"the Acts"                           the Equal Pay Act 1970, the Employment Rights Act 1996, the Sex Discrimination Act 1975, the Race Relations Act 1976, the Trade Union and Labour Relations (Consolidation) Act 1992, the Disability Discrimination Act 1995, the Working Time Regulations 1998, the National Minimum Wage Act 1998, the Employment Rights Act 1996 as applied by Section 14 of the Employment Relations Act 1999, the Transnational Information and Consultation of Employees Regulations 1999, the Employment Rights Act 1996 as applied by Regulation 9 of the Part-time Workers (Prevention of Less Favourable Treatment) Regulations 2000, the Employment Rights Act 1996 as applied by Regulation 10 of the Fixed-term Employees (Prevention of Less Favourable Treatment) Regulations 2002, the Employment Equality (Sexual Orientation) Regulations 2003, the Employment Equality (Religion or Belief) Regulations 2003, the Information and Consultation of Employees Regulations 2004, the Occupational and Personal Pension Schemes (Consultation by Employers and Miscellaneous Amendment) Regulations 2006, the Employment Rights Act 1996 as applied by Regulation 18 of the Transfer of Undertakings (Protection of Employment) Regulations 2006, the Employment Equality (Age)

Without prejudice/subject to contract

Regulations 2006, the Equality Act (Sexual Orientation) Regulations 2007, the Pensions Act 2008 and the Equality Act 2010 all as subsequently consolidated, modified or re-enacted from time to time;

"Confidential Information"    includes, but is not limited to information (in whatever form, including, without limitation, in written, oral, visual or electronic form, or on any magnetic or optical disc or memory or wherever located), relating to the Company's, Group's or Group Company's:

- business plans, including timing and financial information relating to those plans
- proprietary information about how The Company or any Group Company runs its products
- existing or prospective clients and their requirements, including client lists
- client details, including the terms of IMAs with clients and information and reports provided to clients about their investments, such as reports of trading activity and governance reports
- investment process, including employment with the companies in which the Company invests, including details of that Company's directors' remuneration
- trading activity and any activity conducted on behalf of clients in the market
- corporate strategy, including relations between The Company and other Group Companies
- existing or prospective suppliers including any draft or existing contracts or service level agreements
- staffing or recruitment plans or plans to hire consultants
- existing or prospective products, product launches
- existing or prospective marketing programmes, including launches of new products and sponsorships

Without prejudice/subject to contract

- existing or prospective computer software applications
- passwords or computer related know how
- existing or prospective fee levels, commissions and profit share structures
- existing or prospective litigation and settlements of past disputes
- sales figures, profitability and revenue generation

Confidential Information also includes any information or document

- of a personal or confidential nature relating to fellow employees or officers of the Company or any Group Company
- given to the Employee or the Company or any Group Company in confidence by clients, suppliers, employees or other business contacts
- marked as confidential on its face or
- which has been supplied to the Employee in confidence during her employment or which the Employee has been informed is confidential or which the Employee might reasonably be aware is confidential.

"Copies"

Copies or records of any Confidential Information in whatever form (including, without limitation, in written, oral, visual or electronic form or on any magnetic or optical disk or memory and wherever located) including, without limitation, extracts, analysis, studies, plans, compilations or any other way of representing or recording and recalling information which contains, reflects or is derived or generated from Confidential Information or optical disk or memory and wherever located) including, without limitation, extracts, analysis, studies, plans, compilations or any other way of representing or recording and recalling information which contains, reflects or is derived or generated from Confidential Information.

Without prejudice/subject to contract

| | |
|---|---|
| "the Group" | The Company and its Parent Undertakings, its Subsidiary Undertakings and the Subsidiary Undertakings of its Parent Undertakings (as "Parent Undertakings" and "Subsidiary Undertakings" are defined in section 1162 of the Companies Act 2006 as amended from time to time), and "Group Company" shall be construed accordingly; |
| "the Pension Scheme" | The Company Pension Plan |
| "the Termination Date" | 10 October 2013; |
| "the Termination Payment" | the payment set out in clause 4.1. |

2.     **Basis of Agreement**

2.1    The parties have entered into this Agreement to record and implement the terms upon which they have agreed to settle all outstanding claims which the Employee has or may have arising out of or in connection with or as a consequence of her employment and/or the termination of her employment or otherwise against the Company, the Group or any Group Company or any of its or their respective officers, employees, shareholders, investors, contractors or agents including in particular those statutory complaints which the Employee has intimated and/or intimates in this Agreement.

2.2    The Company is entering into this Agreement for itself and as agent for and trustee of all Group Companies and is duly authorised to do so.  The parties intend that each Group Company should be able to enforce in its own right the terms of this Agreement which expressly or impliedly confer a benefit on that company subject to and in accordance with the Contracts (Rights of Third Parties) Act 1999.

3.     **Termination Date, Remuneration to Termination Date, Expenses, Payment in Lieu of Notice and Repatriation**

3.1    The Employee's employment with the Company will terminate on the Termination Date by reason of resignation.

3.2    The Employee shall continue to receive contractual salary and benefits up to and including the Termination Date. For the avoidance of doubt, all monies to be paid by the Company to the Employee under this Agreement (whether contractual salary or otherwise, and including without limitation, any payments by the Company under Clauses 3, 4, 5, 6, 7 and 9 of this Agreement), shall only be paid subject to any deductions the Company may be entitled to make under the laws of Singapore (including any applicable tax deductions) and after the necessary clearance from the Comptroller of Income Tax in Singapore has been obtained.

Without prejudice/subject to contract

3.3     The Employee shall be paid in lieu of 9 days' accrued outstanding holiday.

3.4     The Employee shall receive a payment in lieu of her contractual notice of SGD 57,615.33 within 30 working days of the Termination Date.

3.5     The Employee agrees that any debts or other sums owed by her to the Company, including SGD 630.20 in respect of her tenancy of the property at Emerald Hill #02-10, will be deducted from salary payments under Clause 3.2. If such salary payments are insufficient to meet all outstanding debts, the Company will deduct the remainder from the Termination Payment.

3.6     The Company will reimburse the Employee for her final expenses properly incurred up to the Termination Date within 30 days of receipt of satisfactory evidence of expenditure in accordance with the Company's current expenses policy.

3.7     Upon the cancellation of the Employee's employment pass, the Employee will leave Singapore no later than 30 days after the cancellation of her employment pass, unless she has otherwise obtained permission to remain in Singapore thereafter.

4.      **Termination Payment**

4.1     Subject to the Employee's compliance with clause 12 the Company will pay the Employee a termination payment of SGD 468,241.00 ("the Termination Payment").

5.      **Equity Incentive Plan ("EIP")**

5.1     The Trustees of the EIP are holding as nominee a number of vested E Units in Threadneedle Asset Management Holdings SÁRL ("TAMHS"), which E Units were granted under the EIP in March 2011, always subject to and in accordance with TAMHS Articles of Association ("the Articles").

5.2     The Employee will be deemed to be a "vested series good leaver" for the purposes of 83,334 EIP E Units in TAMHS and has Put Option rights (rights to sell the Vested E Series Units) during the Put Option Windows in March/April 2014.

5.3     Upon the sale of the E Units referred to in clause 5.2 the Employee will be paid the value of any E Units subject to subject to applicable statutory deductions.

5.4     The price for the E Units in TAMHS referred to in clause 5.2 of this Agreement will be set at the valuation date of 28 February 2014.

5.5     The Employee will be deemed to be a "good leaver" for the purposes of 56,075 EIP E12 Phantom Units awarded in March 2012.  The units will be sold and paid to the employee subject to applicable statutory deductions.

Without prejudice/subject to contract

5.6    The price for the E12 Phantom Units referred to in clause 5.4 of this Agreement will be set at the valuation date of 28 February 2014.

6.    **Restricted Stock Units ("RSU")**

6.1    The Compensation and Benefits Committee of Ameriprise Financial Inc. authorised the grant to the Employee of a number of Restricted Stock Units as detailed below, subject to and in accordance with the Long Term Incentive (LTIA) Programme Guide (For Non-US Employees) (the "LTIA Guide"):

6.1.1    476 shares granted on 21 March 2013.

6.2    The Employee's unvested RSUs will be treated in accordance with the terms of "Involuntary Termination Not For Cause" under the LTIA Guide, through which the RSU awards will vest on the Termination Date, subject always to the terms of the LTIA Guide.

7.    **Threadneedle Fund Deferral Plan**

7.1    In respect of the Employee's unvested awards under the Threadneedle Fund Deferral Plan, the notional holdings in the Employee's account will become 100% vested on the Termination Date.  The notional value of those awards on the Termination Date will be paid to you in a lump sum, subject to statutory deductions, as soon as reasonably practicable following the effective date of termination of your employment.

8.    **Benefits**

8.1    Other than as set out in this Agreement, the Employee's entitlement to participate in any and all employee benefits and other arrangements operated by the Company, the Group or any Group Company (including but not limited to life assurance, private medical insurance and pension) will cease on the Termination Date.

9.    **Legal fees**

9.1    The Company agrees, subject to receipt of an invoice from the Employee's legal adviser ("the Adviser") to pay up to a maximum of £750 (plus VAT) on the Employee's behalf to the Adviser (provided that the Adviser is a qualified lawyer with a current practising certificate) in respect of the Employee's legal fees incurred in connection with the termination of her employment.  Any invoice should be in the Employee's name but expressed to be payable by the Company and sent under private and confidential cover to Susannah Perry of Threadneedle's Legal team at 60 St Mary Axe, London EC3A 8JQ.

10.    **Tax**

10.1    The Employee shall indemnify the Company on a continuing basis in respect of any tax or contributions in respect of the payments and benefits paid to her under this Agreement (and any related interest, penalties, costs and expenses), whether those liabilities arise in the UK,

Without prejudice/subject to contract

Singapore or any other jurisdiction worldwide. The Company shall give the Employee reasonable notice of any demand for tax which may lead to liabilities on the Employee under this indemnity and shall provide her with reasonable access to any documentation she may reasonably require to dispute such a claim provided that nothing in this clause shall prevent the Company from complying with its legal obligations with regard to HM Revenue and Customs, the Inland Revenue of Singapore or other competent body.

11.    **Pension**

11.1   The Employee's membership of the Pension Scheme will cease with effect from the Termination Date. The Pension Scheme administrators will write to the Employee in due course to inform her of her rights and options (if any) in respect of her membership up to the Termination Date.

12.    **Company property**

12.1   The Employee warrants that as at the date of this agreement

(a) she has returned to The Company:

- all Confidential Information and Copies;
- all property belonging to the Company in satisfactory condition, including but not limited to any company credit card, keys, security pass, identity badge, mobile telephone, blackberry, laptop, other computer or fax machine; and

(b) she has deleted irretrievably any information relating to the business of The Company or any Group Company that she has stored on any magnetic or optical disk or memory and all matter derived from such sources which is in her possession or under her control outside the premises of The Company.

12.2   The Employee shall, if requested to do so by the Company, provide a signed statement that she has complied fully with her obligations under clause 12.1 and shall provide it with such reasonable evidence of compliance as may be requested.

13.    **Confidentiality and post termination restrictions**

13.1   The Employee accepts and agrees that her express and implied duties relating to confidential information and non-solicitation continue after the Termination Date.

13.2   In consideration of a single payment of SGD 200.72 the Employee agrees and undertakes not to:-

Without prejudice/subject to contract

13.2.1 divulge to any person, firm or company or use for her own benefit or the benefit of any person, firm or company any trade secret or information of a private, secret or confidential nature concerning the business, finances or affairs of the Company, the Group or any Group Company or any of their respective clients or suppliers (including but not limited to terms of contracts or arrangements, existing and potential projects, accounts, information regarding clients or suppliers, disputes, business development and/or marketing programmes and plans) which have or may have come to her knowledge during the course of her employment with the Company or any Group Company;

13.2.2 make or publish any statement to any person, firm, company or organisation whether a client, supplier, or employee of the Company, the Group or any Group Company or otherwise concerning this Agreement or the circumstances surrounding the termination of the Employee's employment;

13.2.3 make or publish any derogatory or disparaging statement or do anything in relation to the Company, the Group or any Group Company or any of its or their respective officers, employees, shareholders, investors, contractors or agents which is intended to or which might be expected to damage or lower their respective reputations,

provided that the Employee will not be prevented from making a disclosure:-

i. for the purposes of seeking legal advice in relation to this Agreement provided her professional adviser is bound by a duty of confidence;

ii. to the proper authorities as required by law;

iii. consistent with the terms of the agreed reference referred to in Clause 14 below;

iv. to her spouse or partner provided such person agrees to maintain confidentiality.

v. to a prospective employer, provided that the disclosure is limited to the fact of resignation.

13.3 The Company agrees to use reasonable endeavours to ensure that its officers or employees do not make or publish any derogatory or disparaging statement which is intended to or which might be expected to damage or lower the Employee's reputation

13.4 The Employee warrants that she has not made any statement or taken any steps prior to the date of this Agreement which would constitute a breach of Clause 13.2 and would breach her duty of confidentiality to the Company had it occurred after the date of this Agreement.

Without prejudice/subject to contract

13.5    The Company shall issue a press release in the form agreed between the parties at Schedule 4 to this Agreement.

13.6    The Employee agrees that she shall continue to observe all restrictive covenants under Clause 22 of the employment agreement dated 9 September 2011 entered between the Company and the Employee (the Employment Agreement) and all other post employment obligations, as provided under the Employment Agreement, notwithstanding the cessation of her employment hereunder or the entry into this Agreement.

14.     References

14.1    The Employee will ask prospective employers to put all requests for references in writing and address them to Steve Worrall, Head of HR, Threadneedle Asset Management, 6th Floor, 60 St Mary Axe, London EC3A 8JQ.

14.2    In connection with non-regulated roles, the Company shall respond to written requests for references about the Employee from prospective employers in the terms set out in Schedule 1 to this agreement (the Agreed Reference), provided that the request is made in writing and addressed to Steve Worrall at the address set out above.

14.3    In connection with regulated roles, the Company shall respond to written requests for references about the Employee from prospective employers in the terms set out in Schedule 2 to this agreement (the Agreed FCA Reference), provided that the request is made in writing and addressed to Steve Worrall at the address set out above.

14.4    If after the signing of this Agreement new facts come to the Company's attention which make either the Agreed Reference or the Agreed FCA Reference substantially and materially incorrect, the Company reserves the right not to give either of these references.

The Employee acknowledges that the Company may receive requests for information about the Employee from parties other than future employers, for example, HRMC or any other relevant regulatory authority. The Employee accepts that the Company is obliged to give full and accurate disclosure about the Employee to relevant regulatory authorities, the HRMC and to any court of competent jurisdiction and hereby authorises the Company to do so.

15.     Full and final settlement

The Employee agrees that the terms of this agreement are offered by the Company without any admission of liability on the part of the Company and are in full and final settlement of all and any claims or rights of action that the Employee has or may have against the Company or any Group Company or its or their officers or employees whether arising out of her employment with the Company or its termination or from events occurring after this agreement has been entered into, whether under common law, contract, statute or

Without prejudice/subject to contract

otherwise, whether in the employment tribunals, county court, high court or any other court of competent jurisdiction in any jurisdiction worldwide, including Singapore, whether such claims are, or could be, known to the parties or in their contemplation at the date of this agreement in any jurisdiction in any country worldwide and including, but not limited to, the claims listed below (each of which is hereby intimated and waived).

15.1.1   damages for breach of contract howsoever arising;

15.1.2   pay in lieu of notice or damages for termination of employment without notice or on short notice;

15.1.3   outstanding pay, holiday pay (including under the Working Time Regulations 1998), overtime, bonuses, commission and benefits in kind;

15.1.4   unlawful deductions from wages under the Employment Rights Act 1996;

15.1.5   unfair dismissal under the Employment Rights Act 1996;

15.1.6   a redundancy payment, whether statutory or other;

15.1.7   discrimination, harassment, victimisation or detriment under the Sex Discrimination Act 1975;

15.1.8   discrimination, harassment, victimisation or detriment under the Race Relations Act 1976;

15.1.9   discrimination, harassment, victimisation or detriment under the Disability Discrimination Act 1995;

15.1.10   a claim under or relying on the Equal Pay Act 1970 or Article 141 of the Treaty of Rome or Article 157 of the Treaty on the Functioning of the European Union;

15.1.11   damages or compensation for personal injury of any kind to the extent that any such claim arises out of or relies upon any act of discrimination, harassment or victimisation;

15.1.12   a claim for detriment suffered under Part V of the Employment Rights Act 1996;

15.1.13   a breach of the Part-time Workers (Prevention of Less Favourable Treatment) Regulations 2000, or action or detriment under Regulation 7 of those Regulations;

15.1.14   a breach of the Fixed-term Employees (Prevention of Less Favourable Treatment) Regulations 2002, or action or detriment under Regulation 6 of those Regulations;

15.1.15   a claim under Part VIIIA of the Employment Rights Act 1996 (flexible working);

Without prejudice/subject to contract

15.1.16   discrimination, harassment, victimisation or detriment on the grounds of sexual orientation under the Employment Equality (Sexual Orientation) Regulations 2003;

15.1.17   discrimination, harassment, victimisation or detriment on the grounds of religion or belief under the Employment Equality (Religion or Belief) Regulations 2003;

15.1.18   discrimination, harassment, victimisation or detriment on the grounds of age under the Employment Equality (Age) Regulations 2006;

15.1.19   a claim for damages for distress, anxiety or financial loss caused by harassment under section 3 of the Protection from Harassment Act 1997;

15.1.20   a breach of the Working Time Regulations 1998;

15.1.21   damages under section 13 of the Data Protection Act 1998;

15.1.22   a claim pursuant to Paragraph 11 of Schedule 6 to the Employment Equality (Age) Regulations 2006 (failure to comply with Paragraph 2 of Schedule 6: employer's duty to inform) or to Paragraph 12 of Schedule 6 to the Employment Equality (Age) Regulations 2006 (failure to comply with paragraph 9 of Schedule 6: denial of right to be accompanied);

15.1.23   a claim under Part V of the Employment Rights Act 1996 and the Public Interest Disclosure Act 1998 (protected disclosures);

15.1.24   a claim under Part VI of the Employment Rights Act 1996 (time off work);

15.1.25   a claim under Part VIA of the Employment Rights Act 1996 (study and training);

15.1.26   a claim under Part VII of the Employment Rights Act 1996 (suspension from work);

15.1.27   a claim under Part VIII of the Employment Rights Act 1996 (maternity, paternity, adoption, parental leave);

15.1.28   a claim under Part VIIIA of the Employment Rights Act 1996 (flexible working);

15.1.29   a claim under regulation 15 of the Flexible Working (Procedural Requirements) Regulations 2002;

15.1.30   breach of the obligations under the Occupational and Personal Pension Schemes (Consultation by Employers and Miscellaneous Amendment) Regulations 2006 and all accompanying Schedules to those Regulations;

15.1.31   discrimination (including victimisation) under Part 2 of the Equality Act 2006 and discrimination (including victimisation) under the Equality Act (Sexual Orientation) Regulations 2007;

Without prejudice/subject to contract

15.1.32   a claim under regulation 17 of the Employee Study and Training (Procedural Requirements) Regulations 2010;

15.1.33   a complaint under section 120 of the Equality Act 2010 relating to:

15.1.33.1   age discrimination or harassment related to age;

15.1.33.2   disability discrimination or harassment related to disability;

15.1.33.3   gender reassignment discrimination or harassment related to gender reassignment;

15.1.33.4   marriage and civil partnership discrimination;

15.1.33.5   pregnancy and maternity discrimination or discrimination because of the protected characteristic of pregnancy or maternity;

15.1.33.6   race discrimination or harassment related to race;

15.1.33.7   religious or belief-related discrimination or harassment related to religion or belief ;

15.1.33.8   sex discrimination, harassment related to sex, or sexual harassment under section 26(2);

15.1.33.9   harassment under section 26(3) (less favourable treatment because of a rejection of or submission to harassment related to sex, or gender reassignment, or sexual harassment);

15.1.33.10   sexual orientation discrimination or harassment related to sexual orientation;

15.1.33.11   victimisation;

15.1.34   a complaint relating to a breach of an equality clause under the Equality Act 2010;

15.1.35   a complaint relating to a breach of an equality rule or non-discrimination rule under the Equality Act 2010; and

15.1.36   any and all sums due to the Employee from the Company,

but excluding any claim:

15.1.37   for the sums and benefits due to her pursuant to this Agreement;

15.1.38   for personal injuries and/or industrial diseases other than arising from or in connection with any of the claims compromised by this Agreement; or

Without prejudice/subject to contract

15.1.39  in respect of accrued pension rights under the Pension Scheme.

15.2     For the avoidance of doubt the Employee forthwith withdraws the Data Subject Access Request she made to the Company on 13 September 2013 and confirms that she will not make another such request.

15.3     The Employee acknowledges that the Company is entering into this Agreement in specific reliance on the warranties, representations and waivers in Clauses 12, 13, 15 and 16. The Employee agrees that if she breaches any of these warranties or representations, without prejudice to any other rights or remedies of the Company, the Group or any Group Company arising from such action, she will repay to the Company a sum equivalent to the value of the Termination Payment after deduction of all tax and national insurance due, including any excess tax.  Further she agrees that in such circumstances the said sum is recoverable from her by the Company as a debt.

15.4     The Employee further agrees without prejudice to any other rights or remedies of the Company, the Group or any Group Company arising from such action and if and to the extent that she has not repaid the Termination Payment pursuant to Clause 15.2 that if she institutes or continues any proceedings against the Company or any Group Company of a kind set out in Clause 15.1 and if the award made to the Employee in respect of such proceedings:

15.4.1    exceeds the sum referred to in Clause 15.2, then such sum will be set off against the award in full; or

15.4.2    is less than the sum referred to in Clause 15.2, then the Employee will repay to the Company the difference between such sum and the award.

15.5     Notwithstanding any other provision of this Agreement, the Employee acknowledges and agrees that, in the event of her commencing proceedings of any kind against the Company, the Group or any Group Company (whether or not in breach of the terms of this Agreement) arising out of or in connection with her employment or its termination, the Termination Payment shall be deemed to have been accepted by her on account and in diminution of any claim for or any award of compensation or damages which might be made against the Company, the Group or any Group Company under or in connection with any such proceedings.

16.      **Employee Warranties and Acknowledgement**

16.1     The Employee confirms that she is aware of no other claim or grounds to make a claim against the Company, the Group or any Group Company in relation to any other matters howsoever arising.

16.2     The Employee represents and warrants that:

Without prejudice/subject to contract

16.2.1    she has instructed the Adviser to advise as to whether she has or may have any claims, including statutory claims, against the Company, the Group or any Group Company or any of its or their respective officers, employees, shareholders, investors, contractors or agents arising out of or in connection with her employment or its termination;

16.2.2    she has provided the Adviser with all available information which the Adviser requires or may require in order to advise whether she has any such claims; and

16.2.3    the Adviser has advised her that on the basis of the information available to the Adviser her only claims or particular complaints against the Company, the Group or any Group Company or any of its or their respective officers, employees, shareholders, investors, contractors or agents, whether statutory or otherwise, are those listed in clause 0 of this Agreement and that she has no other claim against the Company, the Group or any Group Company or any of its or their respective officers, employees, shareholders, investors, contractors or agents whether statutory or otherwise.

16.3    As at the date of this agreement, the Employee warrants and represents to the Company that there are no circumstances of which the Employee is aware or of which the Employee ought reasonably to be aware which would amount to a repudiatory breach by the Employee of any express or implied term of the Employee's contract of employment which would entitle the Company to terminate the Employee's employment without notice or payment in lieu of notice and any payment to the Employee pursuant to clause 3 or 4 is conditional on this being so. For the avoidance of doubt, the Company is not aware at the date of this Agreement of any circumstances that would amount to a repudiatory breach by the Employee of her contract of employment with the Employer.

16.4    The Employee agrees to make herself available to, and to cooperate with, the Company or Group or its or their advisers in any internal investigation or administrative, regulatory, judicial or quasi-judicial proceedings. The Employee acknowledges that this could involve, but is not limited to, responding to or defending any regulatory or legal process, providing information in relation to any such process, preparing witness statements and giving evidence in person on behalf of the Company. The Company shall reimburse any reasonable expenses incurred by the Employee as a consequence of complying with his obligations under this clause, provided that such expenses are approved in advance by the Company.

16.5    The Employee acknowledges that she is not entitled to any compensation for the loss of any rights or benefits under any share option, bonus, long-term incentive plan or other profit sharing scheme operated by the Company or any Group Company in which she may have participated, save as set out in this Agreement.

Without prejudice/subject to contract

### 17. Compliance with statutory provisions

17.1 This Agreement satisfies the conditions regulating Settlement Agreements and compromise contracts under such of the Acts as are relevant.

17.2 The Employee confirms that:

17.2.1 she has received advice from the Adviser (who is a relevant independent adviser within the meaning of the Acts) as to the terms and effect of this Agreement and in particular its effect on her ability to pursue her rights before an Employment Tribunal; and

17.2.2 she will procure that the Adviser signs the Certificate in Schedule 3.

### 18. Without Prejudice

18.1 Notwithstanding that this Agreement is marked "without prejudice and subject to contract", when the Agreement is signed and dated by the Employee and the certificate is signed by the Adviser, and both are returned to and signed by the Company, the Agreement will become open and binding.

### 19. Governing law and jurisdiction

19.1 This Agreement is governed by the law of England and Wales and any dispute is subject to the exclusive jurisdiction of the courts of England and Wales.

IN WITNESS whereof this Agreement has been signed on behalf of the Company and the Group and executed and delivered as a deed by the Employee the day and year first above written.

SIGNED by Campbell Fleming )
duly authorised for and on behalf of )
THREADNEEDLE INVESTMENTS )
SINGAPORE (Pte) LIMITED )

EXECUTED and DELIVERED AS A DEED
by GIGI CHAN

GIGI CHAN

In the presence of:

Name: Derrick Yee

Signature:

Without prejudice/subject to contract

Address:     101 Clinton St Apt 4D
             Brooklyn, N.Y. 11201
             USA

Without prejudice/subject to contract

## SCHEDULE I
## LETTER OF REFERENCE: FOR ROLES THAT ARE NOT REGULATED

**Private and Confidential**

Dear [      ]

I confirm that Gigi Chan was employed by us from 30 October 2000 to 10 October 2013.  Her position with the Company was Fund Manager.

This information is given in confidence and without liability on behalf of the Company or any of its employees.

Yours sincerely

Steve Worrall
Head of HR

Without prejudice/subject to contract

**SCHEDULE 2**

LETTER OF REFERENCE: REGULATED ROLES

**Private and Confidential**

Dear [          ]

I confirm that Gigi Chan was employed by us from 30 October 2000 to 10 October 2013.  Her position with the Company was Fund Manager.

I confirm the following in relation to his FCA approval:

| | |
|---|---|
| 1. FCA Approved Registration Number | GKC01017 - Ms Gigi Kai Zi Chan |
| 2. Performed Controlled Function and Dates of Registration | CF27 Investment Management - Threadneedle Asset Management Limited from 28/04/2004 until 31/10/2007. <br><br> CF30 Customer - Threadneedle Asset Management Limited from 01/11/2007 until 10 October 2013 <br> CF30 Customer - Threadneedle International Limited from 25/02/2008 until 10 October 2013 |
| 3. Competence and Capability | Gigi's registration process included an assessment of her competency to carry out the role as described above, by way of meeting Threadneedle's internal standards. |
| 4. Disciplinary Proceedings | There were no disciplinary proceedings against Gigi whilst in the employment of Threadneedle. |
| 5. Reason for Leaving | Gigi left Threadneedle by ~~mutual agreement~~ resignation. |

This information is given in confidence and without liability on behalf of the Company or any of its employees.

Yours sincerely

Steve Worrall

Head of HR

Without prejudice/subject to contract

### SCHEDULE 3

### ADVISER'S CERTIFICATE

I confirm that:-

1.　　I am a relevant independent adviser as defined in the Acts (as defined in the Agreement between Gigi Chan and Threadneedle Investments Singapore (Pte) Limited to which this Certificate is annexed).

2.　　I have advised Gigi Chan of the terms and the effect of the Agreement and in particular its effect on her ability to pursue a claim before an Employment Tribunal.

3.　　There is in force a contract of insurance or an indemnity provided for members of a profession or professional body covering the risk of a claim by Gigi Chan in respect of loss arising in consequence of the advice.

4.

Adviser's signature　　　　.....................................................

Adviser's name　　　　　　SARAH GLOCLKER............................
(*capitals*)

Title　　　　　　　　　　　SOLICITOR...................................

Adviser's business address　　37 – 41 Bedford Row, London WC1R 4JH

Date　　　　　　　　　　　...10..10..13.....................

Without prejudice/subject to contract

## SCHEDULE 4

### AGREED PRESS RELEASE

"Gigi Chan, Asian Equities Fund Manager, has decided to leave Threadneedle to take a career break and we wish her well. Threadneedle has a well-established Asian equities capability, with a team of seven in London headed by Vanessa Donegan. The company recently announced the addition of a team of five Asian Equities managers in Singapore, headed by Soo Nam Ng.

Vanessa Donegan will assume lead manager role for the $62m Threadneedle China Opportunities Fund".