UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GIGI KAI ZI CHAN,

     Plaintiff,

     v.

WELLINGTON MANAGEMENT COMPANY LLP,
and CHARLES ARGYLE,

     Defendants.

Civil Action No: 1:19-CV-11605-WGY

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SIXTH MOTION IN LIMINE (DOC. 105) "TO PRECLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT FRANK CARR"**

Ms. Chan's expert witness on damages, Frank Carr, is an experienced consultant in the investment management field who has advised hundreds of clients on matters such as valuing their executive compensation. His knowledge, contextual analysis, and detailed calculations are relevant and helpful to the jury's task: to decide, in spite of some uncertainty inherent in the task, how much Ms. Chan would have been compensated had she not been fired. Defining both Mr. Carr's qualifications and the issues at hand too narrowly, Wellington fails to consider that Mr. Carr is not required to be omniscient, but merely qualified and helpful in projecting Ms. Chan's losses with reasonable certainty. The vast majority of Wellington's "reliability" objections, which are rife with contradictions, mischaracterizations, and outright misrepresentations of Mr. Carr's report, are merely directed at the strength of his underlying support, an objection that goes to the weight the jury will give Mr. Carr's testimony, not its admissibility. The jury should be given the chance to hear and evaluate Mr. Carr's testimony here on its own.

## STANDARD OF REVIEW

The ultimate purpose of the Daubert inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue. McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418, 423 (D. Mass. 2008) (Young, J.). Here, Mr. Carr's opinion will help the jury ascertain Ms. Chan's back pay and front pay damages. These items of compensatory damages are properly awarded under Mass. G.L. c. 151B, § 9 to make an aggrieved party whole for the "natural and probable consequences" of illegal conduct. Conway v. Electro Switch Corp., 402 Mass. 385, 387 (1988). Massachusetts courts repeatedly uphold lengthy front pay awards to compensate plaintiffs for their loss of future earnings caused by defendants when circumstances indicate that plaintiffs would have difficulty in obtaining comparable employment. Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 102 (2009).

Setting back pay and front pay damages does not require mathematical exactitude, but only "reasonable certainty." Id. Particularly as it concerns front pay, courts uniformly recognize that "an estimate of what a plaintiff might have earned had s/he been reinstated at the conclusion of trial, is necessarily speculative." Cummings v. Standard Reg. Co., 265 F.3d 56, 66 (1st Cir. 2001). See also Boadi v. Ctr. for Hum. Dev., Inc., No. 14-CV-30162-KAR, 2017 WL 4181347, at *5 (D. Mass. Sept. 21, 2017) ("An award of front pay . . . is inherently speculative in length of time and when considering possible mitigation by reason of other employment. It is based on probabilities rather than actualities.") (quoting Mathieu v. Gopher News Co., 273 F.3d 769, 782 (8th Cir. 2001)).

But the uncertainty inherent in projecting future loss does not mean front pay damages cannot be recovered, or that they cannot supported by expert testimony. Kelley v. Airborne Freight Corp., 140 F.3d 335, 355 (1st Cir. 1998) (rejecting attempt to overturn front pay award until age 60 that was supported by expert testimony merely because plaintiff presented no "statistical

evidence or other data" supporting length of award). "Although proof of the precise amount of future damages is impossible, defendants should not be permitted to escape the consequences of their wrongful conduct that caused harm to the plaintiffs if some reasonable damages calculation can be made." Coady v. Wellfleet Marine Corp., 62 Mass. App. Ct. 237, 246 (2004) (cleaned up). "A tortfeasor may not complain that damages cannot be ascertained with precision when his wrongdoing caused the uncertainty." Id.

## ARGUMENT

### I.      Mr. Carr is Qualified to Value an Investment Manger's Compensation.

Wellington first argues that Mr. Carr is not adequately qualified due to his purported lack of experience predicting or projecting the performance of investment funds. Def. Br. at 7-8.[1] That reductive argument is unavailing, as it artificially narrows both the issue at hand and the nature of Mr. Carr's expertise, in contravention of the "liberal" qualification standard of Rule 702.[2] Rather, "the level of specialty in the field in which the expert is giving her opinion affects not the admissibility of her opinion but the weight the jury may place on it." Allen v. Martin Surfacing, 263 F.R.D. 47, 58 (D. Mass. 2009) (quoting Payton v. Abbott Labs, 780 F.2d 147, 155 (1st Cir. 1985)) (cleaned up).

Rule 702 requires that an expert be qualified by "knowledge, skill, experience, training, or education." An expert need not have "optimal qualifications" or be a "blue-ribbon practitioner." First Marblehead Corp. v. House, 541 F.3d 36, 41 (1st Cir. 2008) (holding expert with two decades of experience as a consultant in economics, finance, and strategy consulting was qualified to testify

---

[1] Wellington does not attack Mr. Carr's opinion concerning the difficulty Ms. Chan would have finding replacement employment after being fired by Wellington. Cf. Joffe v. King & Spalding LLP, No. 17-CV-3392 (VEC), 2019 WL 4673554, at *6 (S.D.N.Y. Sept. 24, 2019) (expert qualified to testify regarding same).

[2] Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6264.2 (2d ed.) (2021).

about investment diversification despite not being certified financial planner). Rather, the expert must possess some specialized knowledge of the field in which he purports to be an expert. Payton, 780 F.2d at 155.

Here, Mr. Carr has worked since 2004 as a consultant specializing in employment and compensation for executives in the financial services industry, and particularly in the investment management subsector—the field in which Ms. Chan worked. Doc. 106-5 ("Carr Rpt.") at 2. His professional work as a consultant involves analyzing, evaluating, and valuing compensation structures for the same types of professionals as Ms. Chan—investment managers. Id. at 2–3. He has advised more than 400 clients in the financial services industry on compensation matters. Id. at 3. Mr. Carr helps his clients understand the value of compensation packages, the amount of compensation they can expect or require, and moreover, how to structure compensation packages to their advantage. Id. Mr. Carr has familiarity, developed from his career experience, with the compensation practices at major investment and wealth management firms, including Wellington, which as he notes in his report, includes the customary practice of paying investors a portion of fees generated by the investments they manage. Id. at 3, 6. Mr. Carr himself has also worked as a CFO of a private investment fund. Id. at 2–3 & Ex. A (ECF 106-5 page 26–27).[3] In short, Mr. Carr has professional knowledge and experience in the subject matter of his report: projecting the compensation of an investment manager whose pay includes incentive compensation from managed investments. Cf. Cummings v. Standard Reg. Co., 265 F.3d 56, 65 (1st Cir. 2001) (expert properly testified consistent with standards of his profession.)

---

[3] Mr. Carr has also frequently been retained as an expert witness to opine on the value of lost wages and earnings capacity. Id. at 2.

To the extent Wellington takes issue with the degree of Mr. Carr's specialization in some specific sub-area discussed in his report, "[a] lack of specialization should generally go to the weight of the evidence rather than its admissibility," and is properly approached by "vigorous cross-examination." <u>United States v. Wen Chyu Liu</u>, 716 F.3d 159, 168–69 (5th Cir. 2013) (quoting <u>Daubert</u>, 509 U.S. at 596).

**II.     <u>Mr. Carr's Opinions Will Help the Jury Reasonably Assess Ms. Chan's Losses.</u>**

Second, Wellington argues that Mr. Carr's opinions are unhelpful because they do not reach beyond the understanding of the average layperson, and Wellington's compensation structure can be explained by lay testimony. Again, however, Wellington's characterization of the issue at hand is overly reductive. The jury's task is not merely to learn the "structure" of Wellington's compensation scheme, but to reasonably forecast Ms. Chan's losses. Mr. Carr's testimony will not only help the jury understand unfamiliar and sometimes counterintuitive concepts such as "alpha" and how fees are generated from "assets under management," but will provide the jury with context and analysis to project the size of the various aspects of Ms. Chan's compensation, and a framework for how they would reasonably fit together in a forecast of Ms. Chan's overall lost earnings.

First, expert testimony is helpful when it advances the jury's understanding of unfamiliar or counterintuitive concepts. <u>First Marblehead Corp. v. House</u>, 541 F.3d 36, 42 (1st Cir. 2008) (topics of "how stock options function and how an investor would think about exercising those options" were "not topics ordinarily within the knowledge of the jury and thus . . . appropriate for expert testimony"); <u>United States v. Shay</u>, 57 F.3d 126, 133 (1st Cir. 1995) (expert testimony concerning defendant's counter-intuitive mental disorder could help undermine "common myths" about evidence vital to government's case).

Here, for example, Mr. Carr explains "alpha," a vital yet counter-intuitive measure of investment performance that underlies the way that incentive pay is derived from fund management at Wellington. See Carr Rpt. at 6. Wellington's confusion in its own brief illustrates why expert testimony will be helpful to explain this concept. That is, Wellington claims that Ms. Chan's China Growth strategy would not have achieved positive "alpha" supposedly because during a two-year period at Threadneedle, her prior employer, she "lost AUM." Def. Br. at 14. But as Mr. Carr will testify (see Carr Rpt. at 6), "alpha" is a relative, not absolute, measure of investment performance. Expert testimony will assist the jury to understand that Ms. Chan´s fund could lose money at the same time she achieved positive alpha by outperforming a benchmark that loses a greater share of its money; further, such testimony could explain why Ms. Chan could thus receive a larger share of incentive compensation for having achieved positive alpha even while "losing AUM" in absolute terms. This could prevent the jury from incorrectly assuming that Ms. Chan's incentive pools would grow and shrink with the ups and downs of the overall market in Chinese stocks rather than being tied to her relative performance against a benchmark, which might well be consistently positive. [4]

Second, "testimony that provides a necessary context and framework, especially in cases involving complex or unfamiliar concepts, can be appropriate for expert testimony without improperly interfering with the jury's assessment of credibility." First Marblehead Corp. v. House, 541 F.3d 36, 42–43 (1st Cir. 2008); see also Neelon v. Krueger, No. 12-CV-11198-IT, 2015 WL

---

[4] Mr. Carr also helpfully explains other specialized matters with which the jury will not be likely to be familiar, in portions of the report that Wellington does not challenge: for example, the standard industry use of mechanisms such as the "corporate bonus" to maintain Ms. Chan's salary at a threshold level, Carr Rpt. at 6–7; and the reputation of Wellington within the field of executive recruitment and likely harm to Ms. Chan's professional reputation within the investment management field from having been fired by Wellington. See id. at 18–20, ¶¶ 22–25.

12964643, at *1 (D. Mass. Sept. 2, 2015) (finding expert testimony on compensation models and firm structures might "be of significant assistance" in calculating damages for lost compensation of law firm partner).

Here, Mr. Carr's opinion provides context and interpretation to help the trier of fact project Ms. Chan's likely earnings in incentive compensation from the funds he analyzes—not simply to understand the "formula." Contrary to Wellington's frantic characterizations, Mr. Carr's thoughtful report reflects that he applied his knowledge, experience, and judgment to a complex framework of calculations, and in fact did not simply "assume the information provided to him was true"—indeed Mr. Carr provided multiple alternative calculations so that the jury could adjust its estimates depending on how it resolves certain factual disputes. Carr Rpt. at 10, 12.

For instance, in his analysis of the China Growth and Pan-Asia Funds, Mr. Carr explains why the establishment of a prior track record with a fund having the same strategy is important to the projection of how fast the size (i.e. AUM) of the given fund would grow. Carr Rpt. at 8–10, 12–13. Mr. Carr explains that Ms. Chan had a successful prior track record in a similar strategy to China Growth while she worked at Threadneedle, her previous employer, in which she achieved +4.9% alpha, making it appropriate to project her AUM growth for her Wellington fund in line with the actual AUM-growth data of three similar Wellington investors who also established track records with funds at their prior employers before joining Wellington and re-launching similar funds. Id. at 8–10, 12–13. By contrast, the Pan-Asia strategy would not have come with a pre-existing public track record, so Mr. Carr projects two reasonable alternative scenarios: one in which that strategy would build a three-year track record before being aggressively marketed to outside investors, and one in which a key large investor would serve as an "anchor" to attract substantial investment earlier on in the Fund's life. See id. at 12. The jury is not familiar with how

or to what extent these factors affect the likely growth trajectory of different investment products. Notably, along similar lines, Mr. Carr does not "assume" Wellington would have aggressively marketed China Growth in 2017—he provides alternate calculations to allow the jury to decide when Wellington would have likely marketed Ms. Chan's China Growth fund if not for Wellington's wrongful conduct of terminating Ms. Chan. This context is helpful to the jury's exercise in reasonably reconstructing the incentive pay Ms. Chan would have received from these funds had Wellington not fired her, as it helps the jury to apply the formulas or structures of Wellington's compensation schemes to the facts these specific investment products.

Thirdly, courts in this jurisdiction[5] and beyond[6] routinely admit expert testimony to help the jury (or judge) project back and front pay damages, particularly when the expert performs calculations of complex components of these damages. See, e.g., Sparkman v. Thompson, No. 08-CV-01-KKC, 2010 WL 5094253, at *1 (E.D. Ky. Dec. 14, 2010) (expert's calculations of "numerous extra-salary components of back pay" were not just "simple math," and were helpful and admissible). While it is true that many individual pieces of Ms. Chan's compensation will be presented to the jury through exhibits or lay witnesses, Wellington is simply wrong to characterize Mr. Carr's calculations of how her especially complex compensation scheme fits together into a whole as unhelpful. Mr. Carr presents in organized and reasoned fashion the full picture of Ms. Chan's complex compensation, and explains items such as (1) the likelihood that Ms. Chan would

---

[5] See Cummings, 265 F.3d at 65; Kelley, 140 F.3d at 355; Haddad, 455 Mass. at 103.

[6] Joffe v. King & Spalding LLP, No. 17-CV-3392 (VEC), 2019 WL 4673554, at *8 (S.D.N.Y. Sept. 24, 2019) (admitting expert testimony on likely earnings of wrongfully fired senior associate, which included projections of likely date of elevation to partner); Fresquez v. BNSF Ry. Co., 421 F. Supp. 3d 1099, 1114 (D. Colo. 2019); Meinelt v. P.F. Chang's China Bistro, Inc., 787 F. Supp. 2d 643, 657 (S.D. Tex. 2011); Coleman v. Tyson Farms, Inc., No. 2:10-CV-403, 2011 WL 1833301, at *2 (E.D. Va. Apr. 13, 2011); Drago v. Aetna Plywood, Inc., No. 96 C 2398, 1998 WL 474100, at *3 (N.D. Ill. Aug. 3, 1998).

continue contributing to the EMO Fund (run by Greg Mattiko) while also managing her own funds as the portfolio manager, Carr Rpt. at 8, and (2) the fact that Ms. Chan had other potential opportunities for fund management (HKMA, Chindia, etc., see id. at 17), which serves as confirmation of the reasonableness of projecting her losses from EMO, China Growth, Pan-Asia, and Minsheng. In sum, Mr. Carr's specialized knowledge of many unfamiliar concepts, expert analysis of why certain earning levels are reasonable for different products, and complex calculations, are all helpful to the jury's task of valuing the true earning opportunity Ms. Chan lost via her termination.

### III. Wellington's Reliability Contentions Go to Weight, not Admissibility— Particularly Considering that Mr. Carr Does, in Fact, Support Each of His Opinions.

Wellington's third argument questions the reliability of Mr. Carr's opinions concerning the (1) China Growth, (2) Pan-Asia, and (3) Minsheng fund opportunities, and (4) the value of Ms. Chan's likely replacement compensation in the future.[7] Def. Br. at 10–19. Wellington's objections, however, merely question the accuracy of the support Mr. Carr cites for his projections, an objection that goes to weight and not admissibility. Wellington attempts to bolster this argument by claiming at numerous points in its brief that Mr. Carr does not rely on *any* support, which as discussed below is a false (and contradictory) misrepresentation.

"The asserted fallibility of an expert's assumptions affect the weight of his testimony, not its admissibility." Coleman v. Tyson Farms, Inc., No. 2:10-CV-403, 2011 WL 1833301, at *3 (E.D. Va. Apr. 13, 2011) (quoting Wilder Enters., Inc. v. Allied Artists Pictures Corp., 632 F.2d

---

[7] Wellington does not challenge Mr. Carr's opinions concerning the value of Ms. Chan's lost (1) salary, (2) pension, (3) housing allowance, or (4) corporate bonus, nor does it challenge his opinions as to (5) Wellington's reputation in the investment management community and the reputational harm Ms. Chan would experience due to being fired by Wellington, which would negatively affect her ability to secure replacement employment.

1135, 1144 (4th Cir. 1980)) (cleaned up); see also Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1188–89 (2d Cir.1992) (expert witness' assumptions that plaintiff would have continued to work for his employer for 17 years and would have received annual salary increases of 8.3% if not terminated went to weight, not admissibility, of the testimony). This principle is well established in the First Circuit, which has repeatedly declined to hold an expert's opinion unreliable simply because the expert relied on data or support that the *opposing party* considers to be incorrect or faulty. McMillan v. Massachusetts Soc. for Prevention of Cruelty to Animals, 140 F.3d 288, 303 (1st Cir. 1998) ("if Dr. Ash's analysis omitted what defendants argue are important variables, or was deficient in other respects, and thereby did not reflect whether Dr. Thornton's salary decisions were based at least in part on gender, it was up to defendants to exploit and discredit the analysis during cross examination."); Milward v. Acuity Specialty Prod. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011) ("So long as an expert's scientific testimony rests upon 'good grounds,' based on what is known, . . . it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities. . . . 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.') (quoting Daubert, 509 U.S. at 590).

Indeed, it is not proper to ask a Court to resolve factual questions, or to weigh the sufficiency of the evidence, in a motion in limine. Graves v. D.C., 850 F. Supp. 2d 6, 11 (D.D.C. 2011). "The emphasis in [Rule 702] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendments); accord Nna v. Am.

Standard, Inc., 630 F. Supp. 2d 115, 136 (D. Mass. 2009). "Daubert does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998).

Thus, while Wellington's individual contentions are numerous and often difficult to follow (Wellington contradictorily claims at several points in its brief that Mr. Carr has both relied on (1) no support at all and that (2) Mr. Carr did rely on support, but not the right support), the following discussion illustrates why its arguments are unavailing.

First, Wellington claims at certain points in its brief, without explanation, that underlying data relied on by Mr. Carr to project front pay is "incorrect" (Def. Br. at 8) or "riddled with errors" (id. at 10 n.2). Even if it were proper to ask the Court to adjudge which party's version of the facts was "correct," which as explained above is improper, this Court cannot simply accept it on faith from Defense counsel that Mr. Carr's report contains "errors." Wellington must address those arguments to the jury with the traditional means of offering contrary evidence and cross examining the expert. Similarly, Wellington strangely attacks Mr. Carr's source for estimating Ms. Chan's work-life, claiming such source is "divorced from the facts and circumstances of this case," Def. Br. at 11, even though the report in question is in fact a scholarly paper about work-life that is regularly relied on by experts in Mr. Carr's field, as he explains. Carr Rpt. at 5 & n.2 & Appendix A (Doc 106-5 at 41). Wellington also suggests Mr. Carr erred in projecting that Ms. Chan would take 70% of incentive pools, supposedly because Mr. Carr failed to consider that other research analysts might dilute that percentage. Def. Br. at 10. In fact, Mr. Carr relied on evidence that shows the portfolio manager customarily took 70% of the incentive pool and used the remaining 30% for

distribution to research analysts. Carr Rpt. at 11 (citing Mattiko Deposition 174–93 and Wellington's interrogatory answer 4). The jury must decide if Mr. Carr's assumption is accurate.

Turning to the China Growth Fund, Wellington attacks a large number of Mr. Carr's individual assumptions, as well as Mr. Carr's use of a comparator methodology to project the likely growth of the China Growth Fund's AUM. Yet contrary to Wellington's claim that Mr. Carr uses "quite literally no methodology" to forecast the growth of China Growth, (1) he does in fact use a comparator methodology, and (2) there is nothing unusual or inappropriate about using a comparator methodology for damages purposes. Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 954 (1st Cir. 1995) (using "arguably equivalent" male employee as proxy for what plaintiff would have earned in absence of discrimination). Wellington's true criticism of Mr. Carr's comparator approach is that Mr. Carr did not choose the *right* comparators, *i.e.*, that Mr. Mattiko, Mr. Bhagwat, and Mr. Enderlein are simply "anecdotal."  That is not true: Mr. Carr explains in his report that these comparators were chosen for relevant similar characteristics to Ms. Chan, namely that they had managed a similar strategy at a prior employer and re-launched the similar strategy at Wellington. Carr Rpt. at 9. Quite tellingly, Wellington does not dispute the accuracy of anything specific Mr. Carr says in his description of Messrs. Mattiko, Bhagwat, and Enderlein. But in any case, the strength or weakness of Mr. Carr's chosen comparators must be probed before the jury, not here. Joffe v. King & Spalding LLP, No. 17-CV-3392 (VEC), 2019 WL 4673554, at *9 (S.D.N.Y. Sept. 24, 2019) ("K&S can criticize Kucsma's methodology on cross-examination, and if the jury credits Hubbard's testimony, it can appropriately reject or adjust Kucsma's estimates"); Koninklijke Philips N.V. v. Zoll Med. Corp., 256 F. Supp. 3d 50, 53 (D. Mass. 2017) (finding defendant's disagreements with expert's choice of methodology went "to the weight but not the admissibility of his testimony.")

Wellington's further attacks on Mr. Carr's China Growth discussion rest on bald assertions that Mr. Carr offered "no factual basis" to support his assumptions or "leaves it to the reader to guess" what his support is for projecting Ms. Chan's likely alpha achievement. Def. Br. at 12–14. But these contentions are false. In projecting outside interest in the China Growth strategy, Mr. Carr relied among other things on an internal Wellington memorandum stating the case to provide Ms. Chan's fund with seed money, which explains in detail the many reasons it would attract client interest. Carr Rpt. at 9 (citing DEF 1212 (which says, e.g.: "we believe there is demand for this strategy and that the strategy could play a part in showcasing Wellington's broader China platform. In particular, Gigi's strong track record managing an almost identical strategy at her previous firm should be compelling."); DEF 4879, DEF 3496).  Mr. Carr also does not fail to cite evidence of Ms. Chan's likely alpha performance relative to the EMO Fund—rather, in his report at p. 11 n.10, he clearly compares the EMO Fund's achievement of +2.1% alpha over 2015-2017 and +1.5% alpha inception-to-date with Ms. Chan's achievement of +4.9% alpha in her similar fund at Threadneedle and +3.7% alpha in her China Growth strategy inception-to-date as of September 2017. Carr Rpt. at 11 n.10 (citing, e.g., DEF 0000001–03). In any event, to repeat, this Court's role is not to resolve underlying factual disputes on a motion in limine. Micro Chem., 317 F.3d at 1392 (citing Fed. R. Evid. 702 advisory committee's notes to 2000 amendments); Ruiz-Troche, 161 F.3d at 85. The role of fact-finder belongs to the jury.

Turning to the Pan-Asia Fund, Wellington relies on similar mischaracterizations of Mr. Carr's report, which (even if Wellington's objections were fair), at most simply quibble with the accuracy of underlying inputs chosen by the expert. For example, Wellington states that Mr. Carr's citation to an internal Wellington memorandum (CHAN 358–62) describing a major client's repeated interest in Ms. Chan's Pan-Asia strategy is (1) somehow not good enough as evidence,

and (2) contradicted by Wellington's Exhibit H (Doc. 106-8). In fact, Exhibit H **does not say** that the client "did not express particular interest or commitment" to the Pan-Asia approach—that is simply reading a notion into that document that does not exist. Mr. Carr's cited exhibit, by contrast, details no less than 5 interactions between Wellington and the major client in question (who had previously invested <u>nine figures</u> in another Wellington fund, and had just withdrawn that money, meaning he had nine figures free to invest) including that the client in November 2016 "wants to spend time with Gigi for an update on her portfolios. He is more interested in the Asia Growth than China Growth strategy. We have emailed [him] . . . Asia Growth paper portfolio historical returns." CHAN 358. Wellington also repeats the false claim that Mr. Carr doesn't cite support for his projections of alpha. In fact, Mr. Carr cites (1) the above-mentioned paper portfolio (DEF 3938) which reflects Ms. Chan achieved +1.69% alpha from June 2015 to September 2016 in her Pan-Asia Fund's paper portfolio, and (2) Ms. Chan's achievement of +2.8% annualized outperformance in an analogous fund at Threadneedle. These figures are, as Mr. Carr says, equal to or better than the EMO Fund's +1.5% alpha, inception to date. Carr Rpt. at 13. Again, Wellington's objections go entirely to weight—amounting merely to disagreements with Mr. Carr's conclusions—and must be argued to the jury. <u>Koninklijke Philips</u>, 256 F. Supp. 3d at 52–53 (Gorton, J.) ("defendant's arguments as to the speculative nature and lack of support for Mr. Jarosz's testimony amount to disagreements with his conclusions. Such disagreements are not, however, proper grounds for exclusion."); <u>Taylor v. Invacare Corp.</u>, 64 F. App'x 516, 522 (6th Cir. 2003) (affirming district court's admission of expert, which noted "In this Court's view, it is reasonable for an economist calculating damages to rely upon a plaintiff's statement of his earnings; if the plaintiff misstates his own earnings, the defendant can easily call the error to the jury's attention on cross-examination.")

Wellington's objections to Mr. Carr's projections for the Minsheng fund follow the same pattern. Confusingly, Wellington claims that Mr. Carr "relies on a handful of emails" but also that his opinion is "without any factual support." Def. Br. at 17. Those propositions cannot both be true; in any event, the evidence Mr. Carr cites (Carr Rpt. at 14, citing DEF 3911, DEF 4585, DEF 9512-15, DEF 23311) <u>does</u> support that Minsheng was seriously interested in this strategy. For example, in September 2016, Alex Qian emailed a number of Wellington personnel that "they [Minsheng] have tentatively decided to hire us as their investment advisor for this mandate . . . Well done, Gigi!" DEF 4585. Wellington's contrary evidence concerning the plan being "on ice" <u>*during Ms. Chan's maternity leave*</u> may have a number of plausible alternative explanations which will need to be probed before the jury.[8] Additionally, Wellington's claims that Mr. Carr "plucked" his figures "from the air" are wrong—for example, the projected $100 million initial investment comes directly from DEF 9513 (cited at Carr Rpt. 15), which in fact reflects that initial investment figure was estimated *by Minsheng itself*. As with the above, even if Wellington's objections had merit, "mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." <u>Joffe</u>, 2019 WL 4673554, at *8 (quoting <u>McLean v. 988011 Ontario, Ltd.</u>, 224 F.3d 797, 801 (6th Cir. 2000)).

Finally, Wellington assails Mr. Carr's estimate of Ms. Chan's likely replacement income as an offset for his front pay projection. Mr. Carr based his figures on the All-Asia Buy Side Compensation and All-America Buy-Side Compensation reports published by Institutional Investor, which he explains is a leading industry news service which he routinely relies on in making exactly these such projections. Carr Rpt. at 20. The data includes estimations of

---

[8] For example, the evidence will show that Minsheng was put "on ice" because of Wellington's concerns with Ms. Chan's commitment to the firm subsequent to her protected activity.

compensation for Research Analysts and Portfolio Managers in relevant geographies and is adjusted for inflation. Id.  Despite this, Wellington argues that Mr. Carr's use of this source is supposedly unreliable because (1) it is a "single" source and (2) the source itself is "critically flawed." Def. Br. at 17–19. The First Circuit rejected a substantially similar argument in Cummings v. Standard Reg. Co., 265 F.3d 56, 65 (1st Cir. 2001) (challenges to expert's calculations of front pay losses "went to the weight, not the admissibility, of the testimony," and defendant failed to show the assumptions relied on were not ones "that economists [make] with some frequency.") Here, too, Wellington's objections are not truly substantive criticisms of methodology, but merely attacks on the accuracy of the expert's support. Wellington must raise those arguments to the jury.

It bears repeating that the task of assessing front-pay damages, which by definition is a projection of future events, is *necessarily* speculative to some degree. Massachusetts law does not require mathematical exactitude. The vast majority of Wellington's arguments in its motion are highly fact-intensive, and amount to disagreements with the accuracy of Mr. Carr's underlying support or conclusions. Those disagreements can and should be addressed through cross examination. That is the preferred approach for probing the strength of evidence, Daubert, 509 U.S. at 596, and there is no reason these arguments should not be presented at trial, where an exercise of weighing the evidence belongs.

## CONCLUSION

Defendants' sixth Motion in Limine (Doc. 105) should be denied.

Respectfully submitted,

*/s/ Hampton M. Watson*

Patrick J. Hannon (BBO #664958)
Hampton M. Watson (BBO #705983)
Hartley Michon Robb Hannon LLP
155 Seaport Boulevard, 2nd Floor
Boston, MA 02210
phannon@hmrhlaw.com
hwatson@hmrhlaw.com
(617) 723-8000
Attorneys for Plaintiff

Date: October 11, 2021

## CERTIFICATE OF SERVICE

I, Hampton M. Watson, counsel for Plaintiff, hereby certify that on October 11, 2021, I caused a copy of the within document to be filed using the Court's CM/ECF system, which will send notification of such filing electronically to all registered participants.

*/s/ Hampton M. Watson*

Hampton M. Watson