1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS (Boston)

3                              No. 1:19-cv-11605-WGY

4

5    GIGI KAI ZI CHAN,
           Plaintiff

6

7    vs.

8

9    WELLINGTON MANAGEMENT COMPANY, LLP and CHARLES ARGYLE,
           DEFENDANTS

10

11                         * * * * * * * * *

12

13                    For Jury Trial Before:
                      Judge William G. Young

14

15                    *EXCERPT TRANSCRIPT*
                      Jury Selection Omitted

16

17                    United States District Court
                      District of Massachusetts (Boston.)
18                    One Courthouse Way
                      Boston, Massachusetts 02210
19                    Tuesday, October 12, 2021

20

21                         * * * * * * * *

22

23              REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
24                 United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
25                    bulldog@richromanow.com

```
 1                  A P P E A R A N C E S

 2

 3   PATRICK J. HANNON, ESQ.
     HAMPTON M. WATSON, ESQ.
 4       Hartley Michon Robb Hannon, LLP
         155 Seaport Boulevard, 2nd Floor
 5       Boston, MA 02210
         (617) 723-8000
 6       E-mail: Phannon@hmrhlaw.com
         For Plaintiff

 7

 8   STEPHEN T. PATERNITI, ESQ.
     BENJAMIN R. DAVIS, ESQ.
 9       Jackson Lewis, PC
         75 Park Plaza, 4th Floor
10       Boston, MA 02116
         (617) 367-0025
11       Email: Stephen.paterniti@jacksonlewis.com
     and
12   BEVERLY W. GAROFALO, ESQ.
         J.W. Carney, Jr. & Associates
13       20 Park Plaza, Suite 1405
         Boston, MA 02116
14       (860) 275-0100
         Email: Beverly.garofalo@jacksonlewis.com
15       For Defendants

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2

3        PRELIMINARIES........................................    4

4                    *JURY SELECTION OMITTED*

5

6        INTRODUCTION TO JURY................................   11

7        OPENING STATEMENT BY MR. HANNON....................   22

8        OPENING STATEMENT BY MR. PATERNITI.................   33

9

10

11

12                        E X H I B I T S

13                        (None marked.)

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2        (Begins 9:30 a.m.)

3        THE COURT:  Good morning, ladies and gentlemen.

4    Now we're ready to go, so let's just let me both explain

5    what's going to happen and also, um, I want to take some

6    time to make some indicative rulings on motions in

7    limine here.  First let's talk about mechanically how

8    this will work.

9        The jurors will be brought in, the observers will

10   have to sit off to one side, and, um, I will -- we will

11   call the case, we'll swear the venire, I will put such

12   questions as I seek to put to the jurors, they'll raise

13   their hands in response to my questions.  Then we will

14   excuse the entire venire to the adjacent courtroom.

15       We'll bring the jurors in in the order that their

16   names appear on the jury list.  So the first juror to be

17   interrogated will be Juror Number 1.  The jurors will

18   come in and sit over there in the jury box, I don't

19   particularly care where, I'll ask them their name again

20   for the record and I will say, "Did you answer 'yes' to

21   any of the questions?", they'll answer, I'll ask such

22   follow-up questions as I see fit, and then I'll make a

23   determination whether to excuse or keep the juror.

24       If I keep the juror, in order that your chart --

25   because you'll want to make a chart I think of the jury

     box, the first juror retained will sit in the second

     row, the first seat on the right, and so on and down 6

     seats, and the 7th juror picked will sit in the first

     seat in the first row to the right and then so on moving

     to the left.

          The jurors retained will go out this door to the

     jury room.  I'll instruct them not to talk about the

     case.  Once we have 12 jurors -- well before we get

     there, um, if I have retained a juror or let a juror go

     that you wish to keep, as soon as they've moved out of

     the room I'll hear you and see whether I'm going to

     revise my ruling.

          As soon as we have 12 jurors, as I've explained

     the challenges, you may exercise your peremptory

     challenges.  There are no backstrikes.  Once we have

     impaneled 12 jurors we'll take a brief break and the

     trial will get underway.

          Okay.  Then let me look at these -- and I don't

     intend to deal with all of them, but the ones I've had a

     chance to reflect on I think I can speak to.  These are

     indicative rulings, they are not final, so you may go

     ahead in these areas despite what I've said, but you

     have some idea anyway of how I expect the trial to be,

     um -- how I expect the trial to be conducted.

          First, the defense has made a request for a

1    special verdict form.  That's denied, we're going to

2    have a general verdict.

3         Then in no particular order, um -- there's a

4    motion in limine to preclude, in its entirety, the

5    testimony of the plaintiff's expert, Frank Carr.  That's

6    denied, except there's one aspect of this that has a

7    great deal of traction before this Court, um, and, um,

8    that is -- and the defense seems to have this right,

9    that, um, the expert is -- the plaintiff's expert is

10   prepared to say that the products would have

11   outperformed the market.

12        It's, um -- I just don't see, having read the

13   materials before me, a -- any basis other than his a

14   priori view, but it's my instinct not the exclude the

15   expert, but assuming that I find him qualified -- and I

16   should say about experts, we're not going from the

17   qualifications to the opinions.  As the rule permits and

18   I require, the order of examination of an expert is

19   qualifications, the basis of the opinions, and the

20   opinions, um, so I know what the opinions are based on

21   and can make more accurate rulings.

22        Now suppose Mr. Carr is satisfactory all the way

23   along the line, um, but I am correct that he can't come

24   up with figures that outperform the market, I will

25   permit questions like this, "Now, to the best of your

analysis how would the particular product have performed
relative to the market?"  And I would -- again assuming
that I think he's qualified, I'll -- I imagine I would
let him say, "It would have performed as well as the
market," and that will have whatever implications it
has.  But beyond the market I just don't see anything
here other than his a priori view.

There's a, um -- defendants' motion to exclude
testimony that she experienced emotional distress
related to her employment prior to her termination.
It's unclear how I'm going to deal with that, it's the
termination that's the job action.  So I don't see why
that's relevant.  It depends however how hostile was the
workplace because evidence that it was hostile is
certainly going to be admissible.

Um, let's see.  There's this -- to preclude
comparison evidence regarding the treatment of
nonsimilarly-situated Wellington employees.  That's
just -- that's a conclusory-type motion, of course I'll
exclude that, but I've already sought to admit someone
that I thought, at least at present, would be

To exclude now -- the defendant's motion in limine
to exclude testimony that miscarriages were causally
related to employment.  I don't see the medical support
for that.  My instinct is to allow that.

analysis how would the particular product have performed
relative to the market?"  And I would -- again assuming
that I think he's qualified, I'll -- I imagine I would
let him say, "It would have performed as well as the
market," and that will have whatever implications it
has.  But beyond the market I just don't see anything
here other than his a priori view.

To exclude now -- the defendant's motion in limine
to exclude testimony that miscarriages were causally
related to employment.  I don't see the medical support
for that.  My instinct is to allow that.

There's a, um -- defendants' motion to exclude
testimony that she experienced emotional distress
related to her employment prior to her termination.
It's unclear how I'm going to deal with that, it's the
termination that's the job action.  So I don't see why
that's relevant.  It depends however how hostile was the
workplace because evidence that it was hostile is
certainly going to be admissible.

Um, let's see.  There's this -- to preclude
comparison evidence regarding the treatment of
nonsimilarly-situated Wellington employees.  That's
just -- that's a conclusory-type motion, of course I'll
exclude that, but I've already sought to admit someone
that I thought, at least at present, would be

1  sufficiently similarly, um, situated.

2       To preclude evidence of compensation of any

3  Wellington employee other than the plaintiff.  I don't

4  see why that's relevant, this is not an Equal Pay Act

5  case.  So that would be allowed.

6       Oh, stray remarks, um, stray remarks from any

7  person not a decision-maker.  That's denied except some

8  instructions to plaintiff's counsel as to how to

9  proceed.

10      We're only going to get stray remarks once we've

11  heard the -- and I know you have to go witness by

12  witness but I imagine that it's your own plaintiff that

13  will be the source of these remarks.  I want to hear

14  from her, the conduct of the decision-makers first, and

15  remarks from them, and once I've heard that, then the

16  likelihood is I would allow stray remarks because they

17  may bear on the atmosphere that Wellington permitted.

18      Now again there's a motion to preclude the

19  testimony of Mina Koide.  That's denied.

20      And I think that's what's before me.

21      How -- let me turn to the plaintiffs here.  How

22  shall I pronounce, um, is it, um, how does your client

23  pronounce her name?

24      MR. HANNON:  Gigi Chan, your Honor.

25      THE COURT:  So the "Kai Zi" is not so -- so her

1  name is "Gigi Chan"?

2       MR. HANNON:  "Gigi Chan," correct.

3       THE COURT:  "Gigi Chan."

4       MR. HANNON:  We can dispense with the "Kai Zi,"

5  your Honor.

6       THE COURT:  Fine.

7       And you remind me -- and I think I said this

8  before and it is what I'm going to follow.  Everyone

9  must remain masked unless you're speaking.  Since you're

10  going to remain in position, if you're speaking, you may

11  take your mask off, because I think we'll be

12  sufficiently far apart.  When I have a witness on the

13  stand, the witness will understand I will never take my

14  mask off, though the witness may remove his or her mask.

15  But I will keep mine on.  And obviously Mr. Romanow and

16  Ms. Gaudet will keep our masks on and it's because of

17  our proximity to the witness.  When I don't have a

18  witness and I'm instructing the jury, I will take my

19  mask off.  But otherwise I will wear a mask throughout.

20       Now I think that's everything I wanted to say.

21  They will -- we're the first, so they'll send up the

22  jurors just as soon as they're ready.

23       Are there questions?  Yes, that would be helpful,

24  yes.

25       MR. HANNON:  Just in full disclosure, I do have a

 1    touch of a cold, I got a covid test on Saturday so I'm

 2    good to go.

 3         THE COURT:  Thank you.

 4         MR. HANNON:  I know in this day and age people

 5    might look and question, so.

 6         THE COURT:  And I appreciate it.

 7         Any other questions?

 8         MR. PATERNITI:  Your Honor, just a mechanics

 9    question.  When do we get the forms of the jury

10    profiles?

11         THE COURT:  The forms -- what you're going to get

12    is a jury list.

13         MR. PATERNITI:  Oh, okay.

14         THE COURT:  And you'll get the jury list when the

15    jurors are here.

16         MR. PATERNITI:  Okay.

17         THE COURT:  And unlike the state system, you don't

18    get the whole form, but you'll have the name, the

19    address, the occupation.

20         MR. PATERNITI:  Yes, thank you very much, your

21    Honor.

22         THE COURT:  And also -- in the hope that you will

23    continue discussions about possibly resolving this case,

24    um, I propose now to recess and as soon as the jury is

25    here we'll get going.

1             All right, we'll stand in recess.  Thank you.

2             THE CLERK:  All rise.

3             (Recess, 9:45 a.m.)

4             (Jury venire, 10:00 a.m.)

5             (*JURY SELECTION OMITTED*)

6             THE COURT:  Let's bring the jury in.

7             (Pause.)

8             THE COURT:  Here's what Ms. Gaudet and I are

9     talking about.  She's going next door to excuse the

10    other jurors.  We'll -- we'll bring the impaneled jurors

11    in any old way.  I'll appoint the foreperson.  We'll

12    swear the jury.  The next time they come in they'll be

13    seated in the order of the seats we've been talking

14    about.

15            We'll take a break that won't go beyond 12:15,

16    because we all need a break.  I will give my pretrial

17    charge, that will leave a half an hour for each of you,

18    15 minutes a side, to make your opening.  We'll get the

19    openings in before 1:00 and we'll let the jury go.

20            All right?

21            MR. HANNON:  All right, thank you, your Honor.

22            MR. PATERNITI:  Yes, thank, Judge.

23            (Pause.)

24            (Jury enters.)

25            THE COURT:  Yeah you're welcome to come in any old

```
 1   way, but when we start, Ms. Gaudet will line you up as

 2   you were picked.

 3            (Juror are seated.)

 4            THE COURT:  Now please be seated.  I think we can

 5   swear the jury.

 6            THE CLERK:  Okay.

 7            (JURY, sworn.)

 8            THE COURT:  Well now we have the jury in this

 9   case.  I will give you some more detailed instructions

10   after we take a break, but now that we're together let

11   me give you some general instructions right now.

12            First of all, now that you are picked and I've

13   told you how I'm going to do the schedule, we're going

14   to have you out of here at 1:00 today, we'll have you

15   out of here at 1:00 every day.  I need you here before

16   9:00 in that room there so that at 9:00 these doors may

17   open and the trial will start promptly, and I will take

18   a break during the morning so that everyone will have a

19   break.

20            I have three things, and they're instructions, you

21   have to follow these instructions.  And the first one is

22   to keep your mind suspended and by that I mean this.

23   We're not going to have time to start with the first

24   witness today, but we will hear from the lawyers and

25   they'll give us a road map or a guidebook of what they
```

1    expect to be coming over the days of trial.  So this

2    first witness, she is as important as the last witness,

3    or he, um, I don't know who is going to be called, and

4    the last witness, she or he is as important as the first

5    witness who we'll hear from tomorrow.  So you have to

6    keep your minds suspended.

7         When I have you back here I will explain about

8    taking notes, I'm going to let you take notes and the

9    like.  But the important thing now is you don't make

10   your mind up until you've heard the whole thing, that's

11   not fair.  Keep your minds suspended.

12        Second, no talking to anyone about the substance

13   of this case.  You 12 men and women are the judges of

14   this case, you are the judges of the facts.  No one else

15   can judge the facts except the 12 of you.

16        Now for the schedule, you can talk about the

17   schedule.  In other words at 1:00 I'm letting you go, so

18   you can go back to work, you can go home, and you can go

19   back to your life.  Naturally you want to tell people

20   what happened.  And so you say, "Yeah, I went, yeah,

21   they kept me, I'm a juror."  The very next question is

22   going to be -- because jury service, while it comes to

23   all citizens, it's relatively rare, so whoever you're

24   talking to is going to say, "Well what kind of case is

25   it, what are you a juror on?"  And you have to say, "The

1  judge told us we could not talk about it while it's

2  going on."  And that's true with your family, that's

3  true with whoever you're talking to.  Because if you do

4  talk about it, they're going to say something to you

5  back and you cannot be influenced by what anyone else

6  says.

7       Now I don't think anything about this case is

8  going to be in the papers or in the media, but I can't

9  be sure, and you're not to be affected by any of that.

10  The evidence you'll hear and see is right here in this

11  courtroom, that's where you will learn about the case.

12       Now when I say don't talk about it, that includes

13  social media, don't be twitting or tweeting or -- my

14  grandchildren understand this, no going on social media

15  and saying, "Guess what?  I'm on a jury."  You're going

16  to get things back.  No posting "I'm on a jury."  Guess

17  what?  You'll get responses back.  We're not interested

18  in any of that.  Only the 12 of you have the authority

19  and the responsibility, nobody else.

20       Now lastly, don't talk about the case -- and I'm

21  going to try to keep the time you're waiting in that

22  jury room to an absolute minimum, but we're going to

23  take a break each morning and we'll have snacks for you

24  and you'll be in the jury room and you'll, at 1:00

25  you'll all walk out together and the like, but don't

1   talk about the case among yourselves.  And that's a

2   little more subtle.  And you may say "Why not, we're the

3   jury on this case?"  And that's true, there's no

4   alternates on this jury, everyone will deliberate.  But

5   the reason not to talk about it while it's going on is

6   because it conflicts with this "keep your minds

7   suspended" business.  You can't talk about it without

8   taking a slant on what's going on and whoever responds,

9   your fellow juror has got to react to the slant that

10  you've taken.  Not right.  Keep your minds suspended.

11  Keep your thoughts to yourself.

12      Now I'm not saying don't talk, you're just what a

13  jury should be, people from all walks of life, all

14  backgrounds, of course talk, get to know each other.

15  This is direct democracy, it's a communitarian affair,

16  I'm sure you all are fascinating people, so get to know

17  each other, just don't talk about anything going on in

18  this courtroom.  And that's anything.  Don't Google us

19  or the names of anyone involved in the case.  Don't do

20  your own research.  Let the lawyers do their work.

21      I'm not going to beat that to death and we only

22  have time for about a 7-minute break because I want to

23  start at 12:15, but here's our tradition.  Every time we

24  separate, now that you're sworn, I'm going to remind you

25  of these things by saying "Keep your minds suspended, do

1  not discuss the case either among yourselves nor with

2  anyone else."  Mr. Morrissey, I appoint you as foreman

3  of this jury and when you come back you switch seats --

4  excuse me, sir, with, um, Mr. Wren, who's sitting here,

5  the two of you just switch seats, and Ms. Gaudet is

6  going to line you up.

7        So -- also our tradition is, as we have an

8  impaneled jury, everyone stands up for the jury.  So the

9  jury may now stand in recess for 5 minutes until quarter

10  after 12:00 and we'll get going.

11        THE CLERK:  All rise for the jury.

12        (Jury leaves.)

13        (Recess, 5 minutes.)

14        (Resumed, jury enters, 12:20 a.m.)

15        THE COURT:  At this time in this courtroom -- I

16  guess I can take this off, there are 13 judges.  You 12

17  men and women are the only judges of the facts.  You are

18  "judges," think of yourselves as "judges."  And you are

19  going to determine this case based solely and entirely

20  on the evidence as you see it and hear it right here

21  from the witness stand, and such exhibits -- they'll be

22  writings that you may need to review, such exhibits as

23  may be presented to you during the course of the case,

24  and on nothing else whatsoever.  No bias.  No prejudice.

25  No sympathy for anyone.

1           You'll have in mind that Ms. Chan, Wellington, and

2      Mr. Argyle, stand at the bar of justice exactly equal.

3      It makes no difference that one's a company and

4      another's an individual.  It makes no difference the

5      nationality of one or the other.  No difference at all.

6      And you -- it will fall to you to do that careful, cool,

7      sifting of the evidence so that here, in this courtroom,

8      justice may be done.  We will do everything we can to

9      empower you to do justice.

10          So you have the right to take notes, and

11     Ms. Gaudet is going to pass out to you now some

12     notebooks and pencils.  They actually look new, um, they

13     are new, well that's because of the pandemic.  They'll

14     get dog-eared over time, because we use the same

15     notebooks.  But feel free, put your name on there

16     because we pick up the notebooks at the end of each day

17     -- as a matter of fact take them out with you to the

18     jury room and they'll be locked up.

19          Now no one says you have to take notes.  A juror

20     who doesn't take notes is every bit as good as a juror

21     who does.  But if your background and life experience

22     lead you to take notes, feel free to take notes.  The

23     notes -- you'll have your notes with you in the jury

24     room at the end of the case.  Your notes aren't

25     evidence, don't pass them around, but use your notes to

1   refresh your recollection of what the witnesses had to
2   say.
3        You may ask questions.  Now I have to be a little
4   formal so there's some limitations, but the whole idea
5   is that you will understand what's going on, so if you
6   don't, if you have any questions, just write it out, rip
7   it out of your notebook, Ms. Gaudet or I will come and
8   get it, it will get to me.
9        Now I might not ask it, and I won't ask it if I
10  wouldn't let the lawyers ask it, because legally it
11  doesn't make any difference, and I wouldn't ask it if I
12  don't see how the witness who's testifying would know
13  the answer.  It may be a very interesting question, I
14  may want to know the answer, but witnesses can only
15  testify to what they know, what they saw, touched,
16  tasted, smelled, or heard, and so we'll have to wait for
17  another witness.  So I won't ask it, I'll give it to
18  Ms. Gaudet and of course anything that comes from the
19  jurors the lawyers can see it, or I may ask it.
20       Now I'll wait until such time as I think is
21  courteous and then I'll ask it.  I still know how to ask
22  questions.  I'll ask it openended, who, what, where,
23  when, how, describe, explain?  I may ask a couple of
24  follow-up questions just to see that the witness tells
25  you, in a way that I understand, the answer to that

1    question.  Juror questions are no better than the

2    questions of the lawyers and frequently they're no

3    worse.  The lawyers are prepared to try this case, they

4    are the teachers of the evidence in this case.  But you

5    may ask questions.

6        Now you can't just jaunt off on some investigation

7    of your own, your question should be to get the witness

8    to explain something the witness is testifying to in

9    more detail or, if you didn't understand, to say, "I

10   don't understand whatever."  So you may take notes.  You

11   may ask questions.

12       If you don't hear something, by all means just

13   raise your hand.  I've been trying cases with these

14   masks and we can try them, we can try them fine, but if

15   you don't -- the witness will not wear a mask while the

16   witness is testifying.  I'll keep my mask on and

17   Mr. Romanow and Ms. Gaudet will be masked for the

18   protection of the witness.  But you're going to want to

19   watch this witness very carefully so he or she will not

20   wear a mask while they're testifying.  So if you don't

21   hear anything, raise your hand, I'll have it repeated.

22       Everyone's going to stay in place so you ought to

23   be able to see everything.  If they project something,

24   we have screens here and screens in the jury box.  If

25   you can't see something on the screen or the screen

1    doesn't come up when we're using the screen again, raise

2    your hand, Ms. Gaudet, she can do everything, um, but if

3    she can't repair it, she will get the person who can

4    repair it.  So you get the full evidence.

5         Now I'm the judge of the law, you have to follow

6    the law the way I explain it to you, and because I want

7    to give the lawyers the chance to make their opening

8    statements, I'm going to cut off in just a couple of

9    minutes and we'll leave my explanation of the law,

10   that's how we'll start tomorrow morning.  But because

11   the lawyers each get 15 minutes a side, you're out of

12   here at 1:00, and so I want to give them a chance to

13   make their opening statements to you.  I will explain

14   the law to you tomorrow morning.

15        Let me leave you with this.  You're judges, more

16   important than me, yes, you have to follow the law the

17   way I explain it, and the reason is obvious, that's

18   because this case has to be tried the same as in any

19   other courtroom here in the courthouse and the same as

20   in the Northern District of California and the District

21   of New Mexico.  The case law passed by the Congress is

22   the same throughout the land.  What's different, what's

23   unique to our case is the evidence.  The evidence of

24   these people at this time interacting in the manner that

25   they have, that's for you, you are judges of the facts.

1   Now the burden of proof here is proof by what we

2 call a "fair preponderance of the evidence," and that

3 burden rests on Ms. Chan, she brought the case, she's

4 the plaintiff.  But this isn't a criminal case.  Proof

5 by a "fair preponderance of the evidence" simply means

6 making you believe those things she's going to have to

7 prove to you are more likely to be true than not true,

8 more likely to be true than something else.  If

9 something else is more likely true, she didn't prove it.

10 If on all the evidence that tends equally to two equal

11 -- it's not who puts on the most evidence, it's what you

12 believe, but if the evidence tends equally to two equal

13 but opposite conclusions, she hasn't proved it.  But so

14 long is on the evidence you think what she has to prove

15 is more likely to be true than not true, then find --

16 and your verdict must be unanimous, all 12 of you

17 agreeing, you may find that she has proved that by a

18 fair preponderance of the evidence.

19   Now the attorneys get a chance -- they're not the

20 sources of evidence, what they say now is not evidence,

21 but it will give us a road map, a guidebook of what

22 we're going to hear over the succeeding days.  But

23 because Ms. Chan has this burden of proof, she gets to

24 go first -- that's one of the reasons to keep your minds

25 suspended, she gets to call her witnesses first, and

```
 1   when she's done calling witnesses, both sides get a
 2   chance to question them, and then we hear from
 3   Wellington and Mr. Argyle.  And the same for openings,
 4   first I look to Ms. Chan's lawyers and ask them if they
 5   want to make an opening statement, after they're done,
 6   we'll see if Wellington and Mr. Argyle wish to make an
 7   opening statement at this time.
 8        So we'll turn to Ms. Chan's lawyers.
 9        MR. HANNON:  Yes, your Honor.
10        THE COURT:  You may proceed.
11        MR. HANNON:  Thank you, Judge.
12
13   OPENING STATEMENT BY MR. HANNON:
14        All right, good afternoon.  It's good to get my
15   mask off finally.
16        Members of the jury, my name is Patrick Hannon.
17   I, along with my colleague here, Hampton Watson, we
18   represent the plaintiff in this matter, Gigi Chan.
19   You're probably not going to get a chance to hear from
20   Ms. Chan for a few days, um, but you'll find out she
21   speaks with a British accent, she was born originally in
22   Hong Kong, went to school in the UK, and after finishing
23   school she embarked on a career as an investor, um,
24   someone who picked stocks and helped people manage
25   money.  That's what brought Ms. Chan to work for the
```

1  defendant in this case, um, Wellington, and as Judge

2  Young did, I'll just call them "Wellington" rather than

3  "Wellington Management Company."

4      As Judge Young mentioned to you this morning,

5  really what this case is about is this case is about

6  Ms. Chan's termination and why Ms. Chan's employment was

7  terminated by Wellington, and the dispute, as the Judge

8  said, is about whether or not there was an improper

9  purpose behind that termination.

10      Now you're going to hear over the course of the

11  next three weeks -- and I sincerely hope it's not the

12  full three weeks, but you're going to hear evidence

13  about various factors that influenced Wellington's

14  ultimate decision to terminate Ms. Chan's employment and

15  it's going to be for you, the jurors hearing the

16  evidence, to evaluate to what extent you believe that

17  those factors and those considerations ultimately

18  weighed on the decision.

19      Among the evidence you're going to hear, um, one,

20  you're going to hear that Ms. Chan, um, she became

21  pregnant during the course of her employment, in about

22  mid 2016, and that we believe you'll hear evidence that

23  there was a noticeable shift in terms of her treatment

24  at work surrounding the time of her pregnancy that would

25  have led up to her termination.

1          You'll also hear evidence that, as you can see

2     Ms. Chan is a woman, she's Asian, she's of Chinese

3     descent, and we expect you're going to hear evidence

4     that Wellington is predominantly male, predominantly

5     white, um, and that while -- from certainly from time to

6     time Wellington has made efforts to bring in some

7     diversity, but nonetheless there persisted this inherent

8     barrier for women, particularly Asian women, to succeed

9     at the same rate that men did within Wellington.  Not to

10    say that they couldn't succeed, but we expect that the

11    evidence is going to show that, for a woman like

12    Ms. Chan, a woman of Asian descent, Chinese, that it was

13    just a little bit harder, that trying to achieve --

14    trying to get a little step higher, there were more

15    barriers in her way, and that those barriers ultimately

16    played a role in her termination.

17          One thing the Judge did mention to you before,

18    which is another improper purpose that you're going to

19    hear a lot about, is retaliation, and I'm sure the Judge

20    will tell you some more about the law concerning

21    retaliation tomorrow morning.  But what we expect the

22    evidence is going to show is that over a period of time

23    Ms. Chan complained, she complained about the fact that

24    while she was doing a good job, while she was doing what

25    she was supposed to do, while she was showing that she

1   had the skill and merit to succeed, that everything she

2   did was discounted just a little bit.  Every time she

3   tried to get up to the next notch, it was just a little

4   bit harder for her to do than she saw of those around

5   her.  You're going to hear that she complained about

6   some of the sexist and what she thought somewhat racist

7   undertones in terms of the treatment that she received,

8   you'll hear that she felt as though she was being

9   treated disrespectfully by her male peers at times.

10  You'll hear that she just generally senses though that

11  she was not being treated equally and she felt as though

12  that unequal treatment had to do with her gender and her

13  race.  And we believe the evidence is going to show that

14  those complaints, they really soured her relationship

15  with Wellington and particularly soured her relationship

16  with her supervisor, Charles Argyle.

17       And we expect the evidence is going to show that,

18  um, a large part of the reason why Ms. Chan was

19  ultimately fired was because she complained about this

20  treatment that she believed was discriminatory, she

21  complained about it again and again and again and they

22  simply got sick of it.  Rather than own up to their own

23  shortcomings, what they did was they viewed Ms. Chan's

24  complaints as a shortcoming she had.  Rather than seeing

25  their own misconduct, they looked at Ms. Chan's

1    complaints and viewed her as someone who couldn't take

2    feedback, as someone who simply thought she was better

3    than them.

4         Now it's going to be for you to look at all of the

5    evidence and to decide these issues, um, and candidly

6    you're going to hear a lot of evidence.

7         Ms. Chan started her employment in early 2014, she

8    wasn't terminated until 2017, so we're talking about a

9    time span here of a little bit over three years.  We've

10   got some binders here, um, of exhibits, you're going to

11   see lots of e-mails, lots of those sort of

12   contemporaneous correspondence that was ongoing, and

13   there's going to be lots of sort of pieces to fit

14   together to kind of see this puzzle.  The e-mails show

15   this case evolving from different people's perspectives

16   and I would echo Judge Young's comments before about the

17   importance of sort of suspending your judgment because

18   ultimately there's going to be lots of different pieces

19   to fit together in order for you to decide what really

20   happened and why Wellington did what they did.

21        I only have 15 minutes so I can't paint the entire

22   picture for you, but what I thought might be helpful to

23   you would just be to identify a couple of landmarks in

24   this story, um, just so you can kind of have a

25   foundation as you start to hear some of the evidence.

 1    And the first landmark I'm going to share with you is

 2    something called the "Asian Philosophy and Process

 3    Panel."  You're going to hear this was an event that

 4    took place around the fall of 2015.  And this is an

 5    important part of the story, this is sort of where

 6    things took a significant turn for the worse for

 7    Ms. Chan.

 8        We expect you're going to hear evidence about

 9    until this point in time Ms. Chan had observed

10    deficiencies in terms of the culture of Wellington,

11    there had been various incidents along the way where the

12    culture she experienced wasn't the culture she had been

13    promised from the higher-ups, it wasn't the bastion of

14    openness and treating everybody equally and all of that,

15    she felt as though there was a boys club, um, she felt

16    as though the predominantly white and predominantly male

17    people essentially got away with whatever they wanted.

18    But you're going to hear that really that came into

19    sharp focus during this Asian Philosophy and Process

20    Panel, um, in the fall of 2015, that this is when

21    Ms. Chan, she provided the presentation to the group,

22    and during the course of the presentation she was struck

23    by disrespectful comments by one of her male Asian

24    peers, and Ms. Chan will describe for you, when she

25    testifies, what the words were and why she interpreted

1    them in the way that she did.  But you're also going to

2    hear that part of it wasn't just what was said, but what

3    the reaction of Wellington was.

4         The reaction to that meeting wasn't, "No, this is

5    inappropriate," the reaction to that meeting was

6    "Ms. Chan, you just have to listen, you just have to

7    look the other way, you just have to take it, you can't

8    stick up for yourself."  And after that Asian Philosophy

9    and Process Panel, Ms. Chan stuck up for herself and

10   you're going to hear Ms. Chan does that.  And following

11   this Asian Philosophy and Process Panel she went to

12   various folks within the company and she complained

13   about the treatment and she made the point, "No, that

14   wasn't right, it's not right the way I was treated

15   there, and this is part of a consistent trend."

16        But again rather than Wellington doing anything

17   about this, rather than Wellington acknowledging any

18   problems, they turned it back on Ms. Chan.  They said,

19   "No, you have to understand, this is the way Wellington

20   works, this is a feedback-intensive environment, you

21   have to take the feedback."  And you're going to hear

22   about the conversations Ms. Chan had subsequent to this

23   Asian Philosophy and Process Panel, you're going to hear

24   about the complaints she made -- about the complaints

25   that she made regarding feeling as though she was

1    treated -- because she was being treated differently,

2    that she wouldn't be subject to this treatment if she

3    were a man.

4          Now the next landmark I want to lay out for you is

5    November of 2016, there was a meeting at that time

6    between Ms. Chan, Mr. Argyle, and another gentleman

7    you're going to hear about named Tom Baxter.  This was a

8    meeting that Mr. Argyle arranged for the purpose of

9    sharing his words and feedback from Ms. Chan's

10   performance and things of that nature.

11         Now there's going to be a lot of dispute about a

12   lot of conversations in terms of who said what and we

13   expect Wellington's going to say on many occasions that

14   Ms. Chan never said the magic words, Ms. Chan never said

15   "gender," she never said "race," we expect they're going

16   to claim that they never heard that.  But this November

17   2016 meeting is different because there can be no

18   dispute about what was said and the reason for that is

19   Ms. Chan audio-recorded it.

20         Now Ms. Chan is going to explain to you, when she

21   testifies, the reason why she did that and what the

22   events were that led up to that, including prior

23   statements by Mr. Argyle challenging her with having no

24   proof and things of that sort.  But this is the one

25   piece, the one conversation between Ms. Chan and

1    Mr. Argyle where there's going to be no dispute about
2    what was said, and you're going to have the opportunity
3    to hear that conversation.  It's too loud and too long
4    to play right now, it's over an hour long, but at some
5    point during this trial you're going to get to hear that
6    conversation and it's going to be for you, the jurors,
7    to listen very very carefully in terms of what's said,
8    what's not said, how it's said, and a lot of the
9    evidence that you hear leading up to that conversation
10   we expect is going to be important to understand what
11   they're talking about.  So a lot of this trial we're
12   going to try to sort of fill in the gaps in terms of
13   what led up to that November 2016 meeting, which you're
14   going to hear that conversation between Mr. Argyle and
15   Ms. Chan.

16        The next significant landmark is going to be early
17   2017, um, late May, early June.  You're going to hear at
18   this time Ms. Chan, she had just returned back from
19   maternity leave, um, during that November 2016 meeting
20   that Mr. Argyle had mentioned she was about seven or
21   eight months pregnant.  So shortly after that she went
22   on maternity leave, had her child, came back to work.
23   And you're going to hear at the end of May, early June
24   time frame, that that's when discussions began in
25   earnest about whether or not to terminate Ms. Chan.  And

1    in terms of evaluating what the reasons were ultimately

2    behind Wellington's decision, we're going to ask you to

3    look very very closely in terms of that period of time

4    --

5         THE COURT:  5 more minutes, Mr. Hannon.

6         MR. HANNON:  Thank you, Judge.

7         -- the period of time between when Ms. Chan

8    returned from maternity leave and the point in time when

9    the decision was made to terminate her.  And we're going

10   to ask you to evaluate that.

11        What was Wellington doing in that time frame, what

12   were they evaluating?  Were they evaluating her

13   performance as an investor?  Were they evaluating any of

14   the various things that they're now going to claim were

15   the reasons for her employment, or was it something

16   else?  We submit that when you hear the evidence what

17   you're ultimately going to find is that it was something

18   else, that largely when Ms. Chan returned back from her

19   maternity leave, that Wellington really wanted to know

20   one thing, was Ms. Chan going to continue to view

21   Wellington as a discriminatory environment, was she

22   going to continue to view this place as a place that

23   allows bad behavior, or was she simply going to turn the

24   page, thank her lucky stars for the opportunity she had

25   and just be quiet about it?

1          Now I mentioned before this being a "puzzle" and I

2     mentioned there are lots of pieces.  As you go forward

3     and as you listen to the evidence, I'd ask you to do two

4     things related to this puzzle analogy.  One, consider

5     what pieces actually fit in this puzzle.  Again you're

6     going to hear lots of evidence from us, lots of evidence

7     from them, I would submit that part of the importance of

8     tying things together is finding out which pieces really

9     don't actually fit, which pieces really have nothing to

10    do with the story that are being told and which pieces

11    are really just sort of distractions meant to veer you

12    away from what was actually happening.

13         The other thing I would suggest you to pay

14    attention to is what -- what pieces are missing.  While

15    you're going to hear lots of evidence, you're going to

16    see at various points of time in different pieces of

17    evidence people's recollections of things that they

18    don't recall, um, whether they didn't recall whether it

19    happened, what they do recall versus the things that

20    they do choose to recall.  These are all things that you

21    as jurors, that this is part of your job in terms of

22    assessing credibility in determining what actually

23    happened.  And as you put the pieces of this puzzle

24    together and as you sort of wade through this -- this

25    long story here that we're about to tell you over the

1    following three weeks, again to repeat Judge Young, in

2    suspending your judgment.  There's a lot of evidence

3    here, um, and we expect that when you weigh all that

4    evidence and you put the pieces of the puzzle together,

5    that you are going to find that there was an improper

6    purpose behind the termination.  But again your jobs as

7    jurors, we ask you to listen to the evidence, listen to

8    the law as the judge instructs you, and at the

9    conclusion of the evidence I'll have a chance to come

10   back before you and talk to you a bit in terms of how

11   you may consider putting those pieces into the puzzle

12   again.  But for the time being I thank you, Ms. Chan

13   thanks you, and we look forward to spending some time

14   together.  Thank you.

15          THE COURT:  Does the defense wish to open now or

16   reserve?

17          MR. PATERNITI:  Now, your Honor.

18          THE COURT:  And you may.

19          MR. PATERNITI:  Thank you, your Honor.

20          Thank you, Patrick.  I'll take the facemask off

21   myself.

22

23   OPENING STATEMENT BY MR. PATERNITI:

24          Good afternoon, ladies and gentlemen.  I'm Steve

25   Paterniti, together with my colleagues, Beth Garofalo

1    and Ben Davis, we represent Wellington Management
2    Company and Charles Argyle.  Over the next 15 minutes
3    I'm going to give you the roadmap of what the evidence
4    will show in this case.
5         The evidence is going to show that Gigi Chan had a
6    tremendous opportunity to write her own successful
7    future at Wellington, but she was her own worst enemy,
8    she viewed the opportunity presented to her as an
9    obstacle and an insult, she resisted feedback, she was
10   not collaborative, and she was not patient.
11        At Wellington it's a marathon, not a sprint,
12   you're hired hoping you will be there for your entire
13   career, and there are no shortcuts, particularly when it
14   comes to managing money, Wellington's large
15   institutional clients.  Ms. Chan was given more than
16   fair notice over time with plenty of opportunity to
17   improve, but unfortunately it just never got through to
18   her and she never turned it around.
19        Who is Wellington?  Wellington is focused on
20   generating money for large institutional clients, um,
21   pension funds, hospitals, universities, mutual funds,
22   nonprofits.  Who is Charles Argyle?  Mr. Argyle is a
23   53-year old father of three recently retired from
24   Wellington, born in the UK, also a British accent, has
25   lived here for 23 years.  Mr. Argyle is most proud of

1  his work as a firm leader at Wellington globalizing

2  Wellington's investor base, especially in Asia.  He was

3  the head of Global Investor Group, approved Ms. Chan's

4  hiring as part of this global effort, and reluctantly

5  made the decision to terminate her employment.  You will

6  hear from him in this case.

7        You'll also hear from a number of highly

8  successful women at Wellington Management.  Wellington

9  is anything but a firm that limits the careers of its

10  female employees and that's most obviously reflected in

11  its current Chief Executive Officer, Jean Hynes, a

12  woman.

13        Gigi Chan is a Hong Kong citizen who recently

14  moved back to Hong Kong after spending a number of years

15  living in the French countryside, she attended private

16  school in the UK, graduated from a UK university, and

17  received a post-graduate certificate in law.  You will

18  hear a lot from Ms. Chan's own voice, not just here now

19  in the courtroom, but from recordings that she made

20  without anyone else's knowledge.  When you hear these

21  secret recordings you will be able to form your own

22  opinions and I want you to pay particular attention to

23  what she says in these recordings because you will hear

24  lots of repeated complaints, but not about

25  discrimination.

1          In 2013 Ms. Chan contacted Wellington to apply for

2     a China Equity Portfolio Manager role in its Hong Kong

3     office.  Wellington found her skill and experience not

4     to be at the level of a Portfolio Manager.  Mr. Argyle

5     ultimately closed down the external search for a China

6     Portfolio Manager and decided to make Bo Meunier the

7     cornerstone of Wellington's China strategies for

8     investments.  And here's a really important fact, ladies

9     and gentlemen, Bo Meunier is a Chinese female and

10    Mr. Argyle chose her.

11         Ms. Chan was hired by Wellington a year later, in

12    2014, but not as a Portfolio Manager, she was hired and

13    she knew she was hired as an Analyst supporting a team

14    led by a Portfolio Manager.  Wellington was looking to,

15    um, to fill out its global platform of investors and

16    despite mixed feedback from interviews and despite no

17    opening for Ms. Chan to fill, they took the risk and

18    hired her.  She joined the team called Emerging Markets,

19    the Portfolio Manager was a man named Greg Mattiko, her

20    other team member was Philip Fan, also Chinese.  This

21    remained Ms. Chan's primary job until the end of her

22    employment, Team Analyst on the EMO team.  Ms. Chan

23    worked in Hong Kong for Wellington, her day-to-day

24    manager was a man named Tom Baxter, also located in Hong

25    Kong, he reported to Mr. Argyle.  Mr. Argyle spoke to

 1    her maybe once or twice a year.

 2         I want to focus on three key events here, a couple

 3    of them are the same as my brother.  You're going to

 4    hear a lot of evidence pertaining to her Wellington

 5    tenure but I want to focus on these three because they

 6    involve the same pattern, Wellington gives Ms. Chan

 7    feedback about her performance to help her succeed,

 8    Ms. Chan rejects the feedback and Ms. Chan complains

 9    that she's been mistreated, not about discrimination,

10    just that she's been mistreated.

11         The first one is this panel in 2015, Ms. Chan

12    presented to a panel of seasoned Wellington

13    professionals, the panel asked questions and gave

14    feedback, a terrific opportunity for her to learn from

15    Wellington professionals, some of the best in the world.

16    However Ms. Chan didn't see it that way, she felt she

17    should not have even had to present to the panel in the

18    first place.

19         Her presentation did not go well, she was

20    defensive and began arguing with the panelists.  In fact

21    Cheryl Duckworth, the most senior manager in Asia and

22    also a female, will tell you that at one point she had

23    to ask Ms. Chan to stop talking and just to listen to

24    the feedback.

25         Now while Ms. Chan claims that one Asian panelist,

1    Jun Oh, made a derogatory comment to her, you will hear

2    from those present that Mr. Oh did not say anything

3    inappropriate, and they will testify here.  Ms. Chan

4    also claims now that she complained verbally to a slew

5    of people that this would not have happened to her had

6    she been a man or had she been white.  But you will see

7    what she really felt about it in 2015 because she wrote

8    it down back then, and it wasn't about that, it wasn't

9    about discrimination, she referred to the panel of

10   Wellington professionals, who gave their time for her to

11   succeed, they called them a "kangaroo court."

12        Her attitude and engagement at Wellington

13   noticeably deteriorated after this panel, however

14   Mr. Argyle stayed the course with her and made efforts

15   to turn her around, he expended his own personal capital

16   to support the launch and seeding of her China growth

17   fund, and on an accelerated basis due to concerns she

18   would leave Wellington if the fund wasn't launched.  But

19   Mr. Argyle was hearing growing negative feedback from

20   his management group and others about Ms. Chan's lack of

21   collaboration, nonresponsiveness, and resistance to

22   feedback.  He was concerned.  And as I say, he has

23   contact with her once or twice.  He's being informed by

24   a number of different sources in various places

25   throughout the firm.

1          In a meeting with Mr. Argyle in December of 2015,
2     Ms. Chan demanded that her China Growth Fund be
3     launched, she also demanded the same level of support
4     and client access that she believed Bo Meunier was
5     given.  Now she says she was simply demanding fair
6     treatment, but back then it was about "I want what Bo
7     has."  Given Ms. Chan's obvious impatience, Mr. Argyle
8     also tried to set her expectations, he told her, "Look,
9     don't expect your fund to have a bunch of money in it
10    anytime soon."  You will hear evidence that many
11    Wellington investors won't even invest a penny in a fund
12    like this until it has been in existence for at least
13    three years.
14          The next key event I want to talk about is
15    Ms. Chan's presentation to Wellington's Global Relations
16    Group, also called "GRG," and this happened in May 2016.
17    Employees in GRG managed the relationships with clients,
18    but basically the sales group, the sales and client
19    services.  Ms. Chan was impatient about getting in front
20    of clients, she said she wanted client access so she
21    could bring in money for her fund.  Well Mr. Argyle
22    doesn't make that decision, GRG makes that decision,
23    this sales and client relations group makes that
24    decision, and when she presented to them it didn't go
25    well either, and you'll hear feedback from a female

1  relationship manager in GRG who sat in that dry-run

2  meeting and said "She's nowhere close to being ready for

3  us to put in front of our sophisticated institutional

4  investors."

5       Now that relationship manager, Andria Weil, could

6  have helped Ms. Chan, but Ms. Chan never even asked.

7  Instead her reaction was to send a curt email to

8  Mr. Argyle, who had no involvement in this, complaining

9  about her supposed mistreatment by GRG and the lack of

10  professionalism at Wellington in general.  But again,

11  ladies and gentlemen, no mention of discrimination.

12       As you hear the evidence in this case, focus on

13  this inability of Ms. Chan to be able to connect those

14  dots.  My brother talked about "pieces of a puzzle."

15  It's her burden to fill in those pieces of a puzzle so

16  that you're convinced.

17       In 2016, year-end feedback is the third event I

18  want to talk about.  Mr. Argyle tried to give her

19  feedback and turn her around once again, he had

20  championed her from the start, but over time, as her

21  true colors showed, a picture was forming in his head.

22  He gets a lot of negative feedback about her, um, and

23  into the fall of 2016 he hears two things that he's

24  heard before.  One, Mr. Mattiko, her team leader, has

25  been telling him, "She's not contributing to the team,

1    she's focusing on her fund.  Her job is to contribute to

2    the team and she's not doing it."

3           THE COURT:  5 more minutes, counsel.

4           MR. PATERNITI:  The other issue is that Mr. Argyle

5    receives peer feedback from throughout the firm that

6    places her near the bottom of all investors, important

7    issues like collaboration.  I'll read you a few quotes

8    from her other peers.  "No value-add as she does not

9    communicate."  "Being unwilling to collaborate, Gigi

10   creates the impression that she does not appreciate

11   being part of the Wellington platform."  You will hear

12   her response when Mr. Argyle reads those comments to her

13   in that November 2nd, 2016 meeting he had with her

14   giving her the direct feedback and you can make your own

15   conclusions about what this case is really about.

16          Mr. Argyle ended that session by giving her very

17   direct feedback saying, "If things didn't turn around

18   with regard to her collaboration, her attitude, her

19   contribution to EMO, they would be having a very

20   different conversation in the middle of 2017."  He also

21   sent her an e-mail repeating what he told her in that

22   meeting and making it really easy for her to show that

23   she heard something.  All she had to do was respond to

24   his email.  He said "It's imperative, this is your

25   imperative, just respond."  That was three weeks before

 1     her maternity leave, in those three weeks she didn't
 2     respond.  She comes back in April, she works there from
 3     April to June, she doesn't respond.  June to September,
 4     when she's terminated, no response.  She never responded
 5     to Mr. Argyle's imperative suggesting, telling her she
 6     needed to at least respond.
 7          Even after she returned from maternity leave
 8     though Mr. Argyle was hoping for a path forward.  On May
 9     31, however, she tells Mr. Mattiko, "Nope, I'm not
10     responding to Argyle, it's Wellington's fault, it's
11     Wellington's fault I'm not collaborating, it's
12     Wellington's fault I have a bad attitude."  So
13     Mr. Argyle finally had to admit defeat and decide that
14     she needed to be separated because there was no path
15     forward.
16          I just want to talk about two other claims.  My
17     brother mentioned retaliation.  Listen to the evidence,
18     witnesses will tell you she never made these complaints,
19     there's no evidence of a single written complaint, no
20     witnesses to corroborate, plenty of evidence of the
21     legitimate reason for why she was terminated.
22          She also claims pregnancy discrimination, the fact
23     of the matter is she herself alleges she had been
24     claiming since 2014, and you will see troves of evidence
25     about the concerns about her collaboration, et cetera,

1    long before any announcement that she was pregnant.  She

2    was actually hired, and Wellington knew she was about to

3    get married, so it was no surprise that she might start

4    a family.

5          If you listen to the evidence, don't get lost in

6    the little snippets, play the full recordings,

7    Wellington has nothing to hide.  Mr. Argyle,

8    Mr. Mattiko, they didn't even know they were being

9    recorded.  But we want you to you hear every word that's

10   said on those recordings because you will conclude, the

11   evidence will show you that this is not a case about

12   discrimination and retaliation, these were not people

13   looking to move her out, they were looking to make her

14   succeed and she just wouldn't listen.

15         What this case isn't about?  It's not about a

16   broken promise, which you might hear, it's not about

17   things made quicker or easier for others, like white

18   men, except for her, it's not about things like mirrored

19   dance floors or going out late at night or being touched

20   on the lower back by somebody, none of it's relevant,

21   none of it's relevant to Mr. Argyle's decision to

22   terminate her.  Mr. Argyle didn't even know about some

23   of the things she may try to bring into this case.

24         Ladies and gentlemen, when you hear the evidence I

25   ask you to remember that Wellington and Mr. Argyle

1    created an Analyst job for Ms. Chan and they approved,

2    seeded, and launched the fund for her, they paid for a

3    communications coach to help her succeed, she

4    nevertheless was unhappy and unengaged, she couldn't

5    accept the feedback, they kept trying to turn her

6    around, and after three years and many chances they

7    finally had to admit defeat.  It had nothing whatsoever

8    to do with unlawful discrimination or retaliation.

9    We're going to come back to you at the end of the

10   evidence and bring it all together and ask you to reject

11   her claims.  Thank you so much.

12       THE COURT:  So far we haven't heard any evidence

13   at all, evidence comes from the witnesses here on the

14   witness stand and from the exhibits that you will see.

15   We're underway, we'll start taking evidence tomorrow, we

16   really need you here before 9:00, we'll start right at

17   9:00, and we'll run for an hour and 45 minutes, take a

18   half an hour break, another hour and 45 minutes, and

19   that will take us to 1:00, and we'll stop at 1:00.

20       I do want to say this.  While I will really stick

21   to the schedule, I don't want you sitting here praying

22   for the time of the break, you people are judges equal

23   to me, if you need a rest hall, just raise your hand and

24   say "We need a rest hall," and we can always take 5 or 7

25   minutes and have you go out and come right back in.  But

 1   we're right on track and we'll start taking evidence

 2   tomorrow.

 3          So keep your minds suspended, do not discuss the

 4   case either among yourselves nor with anyone else.  Take

 5   your notebooks with you.  You may stand in recess until

 6   9:00 a.m. tomorrow morning.

 7          THE CLERK:  All rise for the jury.

 8          THE COURT:  I'll remain on the bench.

 9          (Jury leaves.)

10          THE COURT:  Please be seated.

11          And since I'm keeping time, the total elapsed

12   time, each side, is 2 hours.  We'll recess until 9:00

13   tomorrow morning.  We'll recess.

14          (Adjourned, 1:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                   C E R T I F I C A T E

 2

 3

 4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 5   hereby certify that the forgoing transcript of the

 6   record is a true and accurate transcription of my

 7   stenographic notes, before Judge William G. Young, on

 8   Tuesday, October 12, 2021, to the best of my skill and

 9   ability.

10

11

12

13   /s/ Richard H. Romanow 01-06-22
     _____
14   RICHARD H. ROMANOW   Date

15

16

17

18

19

20

21

22

23

24

25
```