1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS (Boston)

3                          No. 1:19-cv-11605-WGY

4

5    GIGI KAI ZI CHAN,
          Plaintiff

6

7    vs.

8

9    WELLINGTON MANAGEMENT COMPANY, LLP and CHARLES ARGYLE,
          DEFENDANTS

10

11                        * * * * * * * * *

12

13                   For Jury Trial Before:
                     Judge William G. Young

14

15

16                   United States District Court
                     District of Massachusetts (Boston.)
17                   One Courthouse Way
                     Boston, Massachusetts 02210
18                   Wednesday, October 13, 2021

19

20                        * * * * * * * *

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
23              United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                 bulldog@richromanow.com

25

```
 1                A P P E A R A N C E S

 2

 3   PATRICK J. HANNON, ESQ.
     HAMPTON M. WATSON, ESQ.
 4       Hartley Michon Robb Hannon, LLP
         155 Seaport Boulevard, 2nd Floor
 5       Boston, MA 02210
         (617) 723-8000
 6       E-mail: Phannon@hmrhlaw.com
         For Plaintiff
 7

 8   STEPHEN T. PATERNITI, ESQ.
     BENJAMIN R. DAVIS, ESQ.
 9       Jackson Lewis, PC
         75 Park Plaza, 4th Floor
10       Boston, MA 02116
         (617) 367-0025
11       Email: Stephen.paterniti@jacksonlewis.com
     and
12   BEVERLY W. GAROFALO, ESQ.
         J.W. Carney, Jr. & Associates
13       20 Park Plaza, Suite 1405
         Boston, MA 02116
14       (860) 275-0100
         Email: Beverly.garofalo@jacksonlewis.com
15       For Defendants

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2

3    INTRODUCTION TO JURY (Continued)..................... 4

4

5    WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

6

7    BRENDAN SWORDS

8         By Mr. Hannon:      12                  53

9         By Ms. Garofalo:         37

10

11   CHARLES ARGYLE

12        By Mr. Hannon:      55

13        By Mr. Paterniti:

14

15

16                       E X H I B I T S

17                     (None marked.)

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2          (Jury enters, 9:00 a.m.)
 3          THE COURT:  Good morning, ladies and gentlemen.
 4   Let me say, and I say most sincerely, thank you so much
 5   for all being here right on time ready to go, that sets
 6   the tone of these proceedings.  They'll always be ready
 7   knowing that you're all here ready to go, no time will
 8   be lost.  I'm deeply appreciative.
 9          I said, because we wanted to fit in the roadmap,
10   the guidebook of where we would want to go in this
11   trial, that I would delay until this morning telling you
12   a few general things about the law.  The way a trial
13   works, at the end of all the evidence, I'll be back to
14   you to talk very specifically about, um, what precisely
15   has to be proved and I'll be in a position to talk more
16   specifically because like you I will have heard all the
17   evidence we're going to get.  So this morning I'm simply
18   going to take just a few minutes to talk generally about
19   the law.  And I started it yesterday.
20          We know that in a civil case like this there's a
21   plaintiff, Ms. Chan, and here there are two defendants,
22   Wellington and Argyle.  Ms. Chan, as the plaintiff,
23   she's got to do the proving so she goes first, but it's
24   a civil case so her burden of proof is proof simply by a
25   fair preponderance of the evidence, more likely to be
```

```
 1    true than not true.  So what is it that she has to
 2    prove?
 3          And you heard from the attorneys, they have quite
 4    properly focused us on what the factual dispute is here.
 5    I have nothing to say about the facts, you're the judges
 6    of the facts.  And we know because these things really
 7    aren't disputed.  Ms. Chan was an employee of Wellington
 8    and her employment came to an end because Wellington
 9    terminated her.  That's not disputed.  Now let's talk
10    about the law.  First of all, let's talk about what's
11    not your responsibility or a question that's not given
12    to you in this case.
13          As jurors in this case you are not here as some
14    superpersonnel board, you're not going to be asked,
15    "Well, was this termination fair?  Was it nice?  Did she
16    get a raw deal?"  This is not a contract case like some
17    ballplayer about whether they would get so much money
18    for so many years.  While there's -- she was working for
19    them and that's a contractual relationship, they have
20    the right to terminate her, they could let her go for
21    any one or a number of reasons.  You've heard it
22    suggested, and I make no comment on it, that they
23    thought her performance wasn't very good.  Well that's a
24    legitimate reason.  But you're not judging her -- how
25    good was her performance.  The law does restrict,
```

 1   however, the reasons that an employer may use in

 2   terminating someone and Ms. Chan says, in terminating

 3   her, Wellington violated the law.  Well that is for

 4   jurors.  And so what does the law require?

 5        As -- the law requires other things but with

 6   respect to what the law requires in the circumstances of

 7   this case, here's what the law says.  You cannot

 8   terminate someone based on their gender.  You cannot

 9   fire a person because they're a woman.  That's the law.

10   Also, and it's at issue in this case, you cannot fire a

11   person because of their ethnic heritage.  Ms. Chan is a

12   person of Asian descent, that's not disputed here.

13   Third, you cannot fire a person, terminate a person

14   because they're pregnant.  Now Ms. Chan claims that in

15   each of those respects those are the reasons that she

16   was terminated and she's got to prove that by a fair

17   preponderance of the evidence.

18        When I say the law forbids a person being

19   terminated based on their gender, upon their ethnic

20   origin, or based on pregnancy, what do I mean?  The law

21   recognizes that an employer -- and Wellington obviously

22   acts through people, Wellington is a defendant here

23   because the executives at Wellington -- and she says

24   this Mr. Argyle was the decision-maker here acting for

25   Wellington, did certain things.  Well, Wellington and

1     the people who act on Wellington's behalf, you may come
2     to find have a variety of motives.

3          You may come to find the evidence was that a
4     person or persons or Mr. Argyle or somebody didn't think
5     she was performing very well or didn't think she took
6     feedback or didn't think that she was a good learner.
7     Now all those things, those are legitimate, an employer
8     can make up its mind, but also you may come to find -- I
9     mean it's not disputed she is a woman, she is of Asian
10    descent -- and we haven't heard anything about
11    pregnancy, but I don't doubt that we're going to hear
12    some evidence about her being pregnant during some time
13    of her employment, that the issue is -- let's say those
14    things, or any one of those three forbidden things,
15    factored into it, then the test is if any one of those
16    was it the but-for reason that if it were not for the
17    fact that she was a woman that she wouldn't have been
18    terminated or if it were not for the fact that she was
19    of Asian descent, she wouldn't have been terminated, or
20    if it were not for the fact of her pregnancy, she
21    wouldn't have been terminated.  And if it was any one of
22    those three forbidden reasons and that was the thing
23    that pushed it over the edge, that that was the
24    forbidden reason that made the termination happen, and
25    she's proved it by a fair preponderance of the evidence

1    and then she's entitled to get the damages that flow

2    from that.  And you'll hear about damages.  I'm not

3    going to say anything about it now.  It's doubtless I'll

4    have something to say at the end of the case.  So that's

5    the core of the case.

6        There's two other aspects I should mention.  She

7    also says, she claims, she alleges that if you -- if a

8    person is in a protected status -- and people are

9    protected in their employment based on their gender,

10   based on their ethnic heritage, and for females based on

11   the fact of pregnancy.  If you think that if a person,

12   an employee believes, rightly or wrongly -- it doesn't

13   have to be the truth, but if she believes rightly or

14   wrongly she's been discriminated against on one of these

15   prohibited grounds, her gender, her ethnic heritage, the

16   status of her being pregnant, and she complains about

17   that, one of those protected facts, she is complaining

18   against discrimination that the law protects all

19   employees against.  If she does that, if she does that,

20   she cannot be retaliated against.

21       In other words, they can't say "Well, wait a

22   minute, this is going to be trouble, she's a loose

23   cannon, let's get rid of her because she's complaining

24   she is" -- again rightly or wrongly, "she is complaining

25   about prohibited discrimination, and we don't want

1   that."  If that is the reason she was let go, the law

2   prohibits that and she can recover damages for that, if

3   she proves it.

4        Now again, complaining, even complaining about

5   discrimination, racial discrimination based on her

6   ethnic heritage, her race, or her gender, the things

7   I've told you about, she complains about that, let's say

8   we get evidence of that, that doesn't mean suddenly she

9   is protected and she could never be terminated, she

10  could never be, um, disciplined within the workforce,

11  but the reason for it has to be something other than the

12  complaint.  The -- she cannot -- the retaliation, they

13  cannot take action against her which otherwise they

14  wouldn't have taken because she's complaining of

15  prohibiting discrimination.

16       Now there's one other claim and it's a little

17  different and really -- it didn't have to be mentioned

18  in the opening but I want you to be on the lookout for

19  it here because in the legal papers it's here.  She also

20  makes the claim that Mr. Argyle, we say, intentionally

21  interfered with the advantageous contractual relations

22  that she had with Wellington, that he interfered with

23  those contractual relations.

24       Well that only works if she proves that Mr. Argyle

25  was doing something on his own, wasn't just acting as an

1    executive, or whatever he was, an agent of Wellington.

2    If he and Wellington are one and the same really because

3    he's doing what he thinks Wellington wants, he's

4    Wellington's agent and the dispute is between Wellington

5    and Ms. Chan.  But if -- and they're entitled --

6    Ms. Chan is entitled to make this claim, we'll have to

7    see what the evidence shows.  But if you came to believe

8    that Mr. Argyle was out there on his own for some

9    reason -- we haven't heard any yet, but we may, and he

10   intentionally tried to mess up her relations -- because

11   they weren't contractual relations, even though she

12   doesn't have employment for a term of years and a

13   specific rate, there's no such contract that I've heard

14   about in this case, that that's not one of the claims,

15   but there certainly was a contractual relationship

16   between Ms. Chan and Wellington, that he intentionally

17   messed that up.  Well he doesn't have any right to do

18   that.  If he's out acting on his own and he just

19   intentionally tried to mess up her career opportunities

20   with Wellington, acting on his own, that's a separate

21   claim, a claim made against Mr. Argyle, and if she

22   proves that, she can recover damages as to him.

23         All right, I think we're ready to go.  I'm sure

24   the jury is ready to go.  You may call your first

25   witness.

1          MR. HANNON:  Thank you, your Honor.  The plaintiff

2     calls Brendan Swords to the stand.

3          THE COURT:  He may be called.

4          MS. GAROFALO:  I'll get him, your Honor.

5          THE COURT:  They usually keep the witnesses

6     outside so that one witness doesn't hear what another

7     witness is saying.  Sometimes I can't -- I just don't

8     allow deadtime.  Sometimes the person is out there but

9     they wander off and nothing happens, if that happens

10    I'll tell you stories about the courtroom.  But they

11    don't have anything to do with the case.  But there are

12    a lot of stories about this courtroom.

13         (Laughter.)

14         (BRENDAN SWORDS, sworn.)

15         THE COURT:  And, sir, you don't have to wear a

16    mask while you're testifying because the jury needs to

17    observe you very carefully.  The rest of us will all

18    remain masked.

19         THE WITNESS:  Okay, thank you.

20         THE COURT:  Okay.

21

22         * * * * * * * * * * * * * *

23         BRENDAN SWORDS

24         * * * * * * * * * * * * * *

25

```
1    DIRECT EXAMINATION BY MR. HANNON:

2    Q.     Good morning, sir.

3    A.     Good morning.

4    Q.     Would you please state your name.

5    A.     Brendan Swords.

6    Q.     And, Mr. Swords, are you currently employed?

7    A.     Um, no.

8    Q.     You retired, um, was it June of last year?

9    A.     Um, June of this year.

10   Q.     June of this year.  And would you please tell the

11   jury what you did prior to your retirement?

12   A.     I was the CEO and one of three managing partners

13   at Wellington Management.

14   Q.     Um, just to sort of orient the jury in terms of

15   what Wellington management is, I want to ask you a few

16   questions about that.

17          So during your tenure as CEO, am I right that

18   Wellington Management had a global operation?

19   A.     Yes, we had I think offices in 9 or 10 places

20   outside the Americas.

21   Q.     But the headquarter of Wellington Management,

22   during your reign as CEO, that was here in Boston,

23   right?

24   A.     Yes.

25   Q.     And how would you describe the business that
```

1    Wellington is engaged in?

2    A.    Wellington's an institutional investment manager

3    so we've run money for hospitals, endowments,

4    foundations, pension plans, um, central banks, sovereign

5    wealth funds, um, big institutions, not retail clients,

6    but we run it for them on behalf of those clients.  So

7    if we're running money for a pension plan, it might be

8    on behalf of the firefighters or the teachers or the

9    police.

10   Q.    And in terms of how Wellington manages that money,

11   um, am I right that there are different types of

12   investment vehicles?

13   A.    Um, could you elaborate on "vehicle"?

14   Q.    Well, um, for example, Wellington operates various

15   kinds of funds, right?

16   A.    Wellington, um, subadvises funds, so we are the

17   biggest subadviser in the world, we run money for

18   Vanguard.  We subadvise, um, more than 20 funds for

19   Vanguard.  But it's Vanguard's fund, we're just the

20   subadviser.  And then we'll have oftentimes what are

21   called "separate accounts" for an institution.  So if an

22   endowment or a hospital or a pension plan hires us,

23   they'd probably hire us for a separate account, not a

24   fund.

25   Q.    Okay.  But Wellington has portfolio managers,

1    right?

2    A.    Yes.

3    Q.    Okay, and within Wellington these portfolio

4    managers, many of them operate their own investment

5    strategies, correct?

6    A.    Um, every portfolio manager would have a distinct,

7    um, strategy and philosophy and process.

8    Q.    Okay.  And in terms of how these different

9    strategies are organized, um, am I right that in the

10   2014 and 2017 timeframe there was a group within

11   Wellington known as "Global Equities," um -- well why

12   don't you tell me what the acronym stands for?

13   A.    Yeah, there's a group called "GEPM," that would be

14   the "Global Equity Portfolio Manager group."  And so

15   those would be the equity portfolio managers all around

16   the world.

17   Q.    And when you say "equities," you mean stocks?

18   A.    By "equities" I mean stocks, and I'm

19   distinguishing it from another term that we might use,

20   which would be "fixed incomes," which would be bonds.

21   Q.    Okay, and just --

22        THE COURT:  So I can come up to speed, um, when

23   you say "run money," what you mean is you make

24   investment decisions to achieve profitable investment

25   goals, is that right?

1        THE WITNESS:  I would say -- yeah, I would say we

2   are managing money on behalf of our clients to try to

3   achieve a good outcome for them so that if we do a great

4   job, um, teachers are going to have a better retirement,

5   hospitals are going to be able to have more beds, um,

6   schools are going to be able to have more scholarships.

7   So we have 2,000 institutional clients but we really are

8   running money or managing money on behalf of tens of

9   millions of beneficiaries, real people with real hopes

10  and dreams.

11  Q.    And you want to make sure that those real people

12  with real hopes and dreams get the best investment

13  advice possible, right?

14  A.    Yes.

15  Q.    And so you focus on having talented investors,

16  right?

17  A.    Yes, I would say, um -- my old boss used to say

18  that the sustainable competitive advantages -- the

19  sustainable competitive advantage of Wellington was the

20  shared values of the culture, and that that -- you know

21  having a great set of shared values would attract and

22  retain and develop and motivate, um, people, and that it

23  really was a people business.

24  Q.    Let's stop there for a moment, you bring up this

25  concept of shared values.  And that's a selling point

1  that Wellington uses in order to attract talented

2  investors to its organization, isn't that right?

3  A.    I don't know that I'd use the word "selling

4  point," I would say -- when I think about the investment

5  management business, it is fundamentally, um, a people

6  business.  There's an old cliche that "All the assets go

7  out the elevators," it means it's a people business.  So

8  I'd say it's the reality of that, the shared values of

9  the culture are what attract talented people.  And it's

10 what keeps people at Wellington so long, we have -- we

11 have such low turnover and people tend to stay for a

12 very long time.  We have many people stay for 20 or 30

13 years, um, like myself.

14 Q.    Go back to my question, sir.  Is it fair to say

15 that the shared values and that the culture you've

16 referenced earlier, that this is something that

17 Wellington tells to prospective investors as a means of

18 trying to get them to join Wellington?

19 A.    Um, I would say we articulate it and I would say

20 we live it up.

21 Q.    I'm sorry, what did you say?

22 A.    I would say we articulate those values, I would

23 say this is what we believe, we're a long-term place,

24 we're a humble place, we're a client-focused place,

25 we're a collaborative place, we're a respectful place,

1    and we live that out every day.

2    Q.    You'd agree that Wellington is not perfect?

3    A.    I sure would.  One of my favorite sayings that,

4    um, my colleagues have heard me say over and over and

5    over again is "This is a very very very special place

6    and there's 100 things we could be doing better."

7    Q.    And some of those things you could do better is

8    developing female talent, right?

9    A.    Um, we could always be doing a better job

10   developing female talent, and male talent, and I would

11   say we have done a good job, we're making a lot of

12   progress, and it's never done.  And we've got a long way

13   to go.

14   Q.    Sir, is it accurate that during your tenure as

15   CEO, that there were observations made that Wellington

16   was having difficulty developing female talent within

17   the GEPM organization?

18   A.    Um, I wouldn't, um -- I wouldn't characterize

19   things that way, I would all say "We're always trying to

20   develop our female talent just like we're always trying

21   to develop our male talent."

22          THE COURT:  Here's an examination or an issue.

23   The question suggested something.  You've heard his

24   answer.  As jurors, you're the judges of the facts, so

25   you can believe everything he testifies to, you can

1    disbelieve everything he testifies to as though he

2    wasn't sitting there, you can believe some of the things

3    he testifies to and disbelieve other things he testifies

4    to, and these -- and this is a general rule for all

5    witnesses.  But you cannot believe what the question

6    suggests, unless of course he were to agree with it.

7    Because the lawyer -- none of the lawyers, they're not

8    testifying, they don't give evidence, the evidence is

9    only from the witness.  Not that the question was wrong,

10   but you heard his answer, he didn't go for it, he framed

11   it a different way.  That's what you look at.  It's up

12   to you whether you believe that.

13         Go ahead, Mr. Hannon.

14         MR. HANNON:  Thank you, Judge.

15   Q.    Just to clarify your answer, Mr. Swords.  It's

16   your position that Wellington did not have more

17   difficulty developing female talent in GEPM than it did

18   developing male talent?

19   A.    Well I'd say, um, that there is an industry-wide

20   issue with, um, trying to attract and develop female

21   talent, but I think Wellington is doing better than our

22   peers.

23   Q.    So you're saying it was not more challenging for

24   women to be developed within GEPM at Wellington than

25   men?

1   A.     I don't know.  I don't know that I agree with

2   that.  I think it depends on the individual.  So to me

3   the key to development for all of us, um, as learners is

4   the, um, the ability and the willingness to be open to

5   feedback and to be, um, to be, um, getting feedback and

6   then to act on that feedback.  So I think it very much

7   depends on the individual.

8   Q.     Let's talk about the feedback that you received.

9   During the course of -- well let me ask a few questions

10  first to orient us.

11         You know who Gigi Chan is, right?

12  A.     I do.

13  Q.     Okay.  And you know that Ms. Chan, um, she was an

14  employee of Wellington from approximately 2014 to 2017?

15  A.     Yes, I do.

16  Q.     Okay.  And during the course of her employment,

17  um, you became aware that she believed that she was

18  being treated unfairly at Wellington, is that right?

19  A.     Um, I believe that, um, that she filed a lawsuit,

20  um, after she was fired for retaliation, so I don't know

21  if that's during the course of her employment.

22  Q.     But that was my question, sir.  Did you become

23  aware, during the course of Ms. Chan's employment, that

24  she was complaining that she was being treated unfairly

25  at Wellington?

1    A.    Not to my recollection.

2    Q.    Let's see if you can refresh your recollection a

3    little bit here.  (Pause.)  Yes, this is my first time

4    using this here.

5         So I'm showing here on the screen what's been

6    marked as Exhibit 107, and just to orient us here I'm

7    going to call out here the subject line.  This is an

8    e-mail from Mr. Argyle to you, Philip Pearlmutter, Jean

9    Hynes, Stephen Carr, and Michael Boudens.  Do you see

10   that?

11   A.    I do.

12   Q.    Okay.  Can you tell the jury who those individuals

13   are?

14   A.    Sure.  Myself and Philip Pearlmuter and Jean Hynes

15   would have been the three managing partners at the time,

16   there's always three managing partners that are elected

17   among the partnership, and, um, Steve Carr, Michael

18   Boudens would have been Vice-Chairs at the time.

19   Q.    And so this email is September 20th, 2015.  So at

20   that point, sir, you were serving as the CEO of

21   Wellington, is that right?

22   A.    Yes.

23   Q.    And Mr. Argyle at that time, what was Mr. Argyle's

24   position as of that date?

25   A.    He was the head of GEPM, the Global Equity

1    Portfolio Management group.

2    Q.    Okay.  And who did Mr. Argyle report?

3    A.    He reported to me.

4    Q.    And I draw your attention to the second page.

5    A.    Right now do I scroll this?

6    Q.    (Laughs.)  I drive.

7    A.    Okay.

8    Q.    And it's best to do it in a way that you are

9    oriented.  So I'm going to flip here to the second page

10   and just increase the zoom here on the second bullet

11   point.

12        THE COURT:  You make a good point though, so if

13   you want to see more of any document, just tell him.  I

14   mean it's wonderful to have all these electronic gismos,

15   but, um, if you want to see the context or anything, you

16   have every right to say, "Can I see the whole document?"

17   "Can I read the next paragraph?"  That type of thing.

18        THE WITNESS:  Okay.

19        THE COURT:  But he does drive.  Go ahead.

20        MR. HANNON:  Thank you, your Honor.

21   Q.    So I'm directing you here to the second bullet

22   point at the top of the second page.  Do you see that

23   there?

24   A.    I do.

25   Q.    Okay.  And would you just take a moment and read

1   this to yourself.  And my question is if you recall

2   receiving this feedback from Mr. Argyle on September of

3   2015 concerning Ms. Chan?

4   A.    (Reads.)  No, I don't recall receiving this.

5   Q.    Did you ever ask Mr. Argyle, um, what he

6   understood Ms. Chan to mean when she said that, "I feel

7   as if I'm at a party where I'm not welcome"?

8   A.    Well look I've just told you I don't recall

9   receiving the e-mail, um -- my take is that, um --

10  Q.    I'm not asking you for your take, sir, I'm asking

11  you what you asked Mr. Argyle.  Did you ever ask

12  Mr. Argyle that?

13  A.    Well I just told you I don't recall the e-mail, so

14  I wouldn't have asked him about the e-mail.

15  Q.    Okay, thank you.  (Pause.)  I'm now showing you,

16  sir, what has been entered as Exhibit 126.  And to the

17  Judge's point, if you want to see any more, please speak

18  up and I'll try to hone you into it, um, if there's a

19  logical way here.  So let's start with the subject line.

20        So we have another e-mail from Mr. Argyle to you

21  on November 4th, 2014, is that right?

22  A.    Yes.

23  Q.    Okay.  And, um, let's look at the message here.

24  And actually I'll do this, I'll scroll down to the first

25  message here, um, in the chain.  (Scrolls.)  So the

1    first message we have here in the exhibit.  (Scrolls.)

2    I'm going to look at the message here at the bottom of

3    the first page and use this to orient ourselves here.

4         Do you see there's a message that results from a

5    forward from Mr. Argyle which includes a message

6    Mr. Argyle had written to Kenneth Abrams and Terrence

7    Burgess, is that right?

8    A.    Um, yes.

9    Q.    Can you tell the jury who those individuals are?

10   A.    Kenneth Abrams would be an equity portfolio

11   manager and, um, Terry Burgess would have been a manager

12   in the Global Equity Portfolio Management group.

13   Q.    Um, to whom did Mr. Abrams report at this time?

14   A.    I believe Mr. Argyle.

15   Q.    Okay.  And am I right that in or about November of

16   2015, that Mr. Abrams had agreed to go to the Hong Kong

17   office and speak to some investors about their

18   experiences at Wellington, do you recall that?

19   A.    I don't.

20   Q.    And I'm just going to highlight here the second

21   bullet in what Mr. Argyle wrote to Mr. Abrams, which was

22   ultimately forwarded to you, and the second sentence, am

23   I right it reads "In confidence she is in a tough

24   place"?

25   A.    I don't see it, you're not -- you haven't put it

1    up on my screen.

2    Q.    Oh, I'm sorry, I'm -- I'm getting warmed up still

3    on this technology.  Thank you.

4        So this is the second bullet in the e-mail that

5    Mr. Argyle had written to Mr. Abrams, and you see there

6    he's providing Mr. Abrams information concerning Gigi

7    Chan?

8    A.    I need to read it.

9    Q.    Oh, sure.

10    A.    (Reads.)  Can I see the rest of the e-mail?

11    Q.    Yes, sir.

12    A.    (On screen.)  And how do I see the --

13    Q.    The next page?

14    A.    Yes.

15    Q.    I zoomed in.

16    A.    Okay.  (Reads.)  Yeah, the next page.

17    Q.    (Turns.)

18    A.    (Reads.)  Okay.

19    Q.    And the bullet point I highlighted a moment ago.

20    (Zooms in.)

21    A.    (Reads.)

22    Q.    So this is the second bullet point, Mr. Argyle's

23    e-mail to Mr. Abrams.

24        You'll note in the fourth sentence Mr. Argyle

25    writes with respect to Ms. Chan, "Most importantly she

1  doesn't feel welcome or respected in the HK office," do

2  you see that?

3  A.    I do.

4  Q.    And would you agree with me that the "HK" office,

5  that's a reference to the Hong Kong office?

6  A.    Um, yes.

7  Q.    And do you recall, um, being informed, at any time

8  during Ms. Chan's employment at Wellington, that she

9  didn't feel welcomed and respected in the Hong Kong

10  office?

11  A.    No, I don't.

12  Q.    (Pause.)  Okay, one more here.  Sir, I'm showing

13  you Exhibit 198 and I'm just highlighting the top here.

14        It's an e-mail from Jean Hynes to you and

15  Mr. Pearlmuter on July 11th, 2016?

16  A.    (Reads.)

17  Q.    And, I'm sorry, my question is -- I'm not sure if

18  you heard it?

19  A.    I didn't hear it.

20  Q.    No worries.  This is an e-mail from Jean Hynes to

21  you and Philip Pearlmuter on July 11th, 2016, right?

22  A.    Yes.

23  Q.    And, um, again Jean Hynes, at that time, she was

24  one of your co-managing partners?

25  A.    Yes.

1   Q.    Okay.  And, um, I was going to direct your

2   attention to -- all right, so this is Ms. Hynes

3   providing feedback that she had received while on a trip

4   to Wellington's employment office?

5   A.    Yes, it looks like it.  Yes.

6   Q.    Okay.  Now I direct your attention to the second

7   page here at the bottom, you see she begins a discussion

8   regarding Greg Mattiko.  Do you see that?

9   A.    I do.

10  Q.    Can you tell me who Mr. Mattiko is?

11  A.    Mr. Mattiko is the team leader of the Emerging

12  Market Opportunities team, the lead portfolio manager

13  and team leader.

14  Q.    Okay.  And the Emerging Market Opportunities team,

15  um, that was the team to which Ms. Chan was assigned as

16  an equity research analyst, is that right?

17  A.    That's right.

18  Q.    Okay.  So I'll turn to the next page to continue

19  on with the comment from Mr. Mattiko.  (Turns.)  All

20  right.  And in terms of what Ms. Hynes reported to you

21  that Mr. Mattiko said, um, including this line I'm

22  highlighting here.  (Highlights.)

23       But do you see there where it says -- and we're

24  referring to Ms. Chan, "She thinks Wellington has not

25  respected her and not given her a fair chance.  When she

```
 1    presents internally it is almost acrimonious.  The irony
 2    is that she is wonderful with his clients and
 3    consultants."  Do you see that?
 4    A.    I do.
 5    Q.    Okay.  Do you recall receiving that feedback from
 6    Ms. Hynes?
 7    A.    I don't.  I don't.
 8    Q.    Okay.  Now you yourself, um, had an opportunity to
 9    meet with Ms., um, Ms. Chan at the end of 2015, is that
10    right?
11    A.    I believe so.
12    Q.    Um, and that was here in Boston?
13    A.    Yes.
14    Q.    And, um, prior to your meeting with Ms. Chan in
15    Boston at the end of 2015, you were aware that there had
16    been an issue with respect to Ms. Chan's presentation at
17    an Asian Philosophy and Process Panel, is that right?
18    A.    Um, I'm not sure of the timing but I was aware
19    that she had done poorly at the Asia P & P panel.
20    Q.    Who told you she had done poorly?
21    A.    Um, I think I had heard that from, um, June Oh,
22    but I don't know the timing, I don't know whether this
23    was before we met or after I met with her.
24    Q.    Well when you met with her at the end of 2015, one
25    of the topics that was discussed was this Asian
```

1    Philosophy and Process Panel, right?

2    A.    Yes.

3    Q.    And you mentioned June Oh.  Do you recall in your

4    conversation with Ms. Chan at the end of 2015, her

5    raising complaints to you about the way she had been

6    treated by Mr. Oh?

7    A.    No.

8    Q.    Do you deny that she did or you just simply don't

9    recall?

10   A.    No, she did not.  I deny that.  That's not true.

11   Q.    Okay.  And, um, Mr. Oh, um, you worked with him

12   for a extensive period of time, is that right?

13   A.    Um, I, um, certainly had known him for a long

14   time, but I don't know about us working together.  He

15   was a portfolio manager out in Hong Kong.  But I

16   certainly know him and he was a partner of the firm and

17   I had worked together with him in GEPM.

18   Q.    Who hired Mr. Oh?

19   A.    I did.

20   Q.    And just so the jury understands your testimony

21   here, your testimony is that you have a sufficient

22   recall of your conversation with Ms. Chan at the end of

23   2015 as to be able to say definitively that she did not

24   raise any complaints to you concerning Mr. Oh?

25   A.    Yes, I do.

1    Q.    Were you taking any notes at that meeting?

2    A.    Um, no.

3    Q.    Did you -- did you talk to anyone after you had

4    that meeting about the subjects that were covered?

5    A.    At some point, um -- at some point -- and again I

6    don't know if this is before or after, I spoke with both

7    June Oh and Bo Meunier to ask them, as experienced

8    investors with very strong philosophy and process, to

9    try to help Gigi Chan.  But I can't recall whether it

10   was before or after this meeting.

11   Q.    You don't recall ever talking to Mr. Argyle about

12   Ms. Chan's experience at the Philosophy and Process

13   Panel, is that right?

14   A.    I don't recall talking to him, but it wouldn't

15   surprise me if I did.

16   Q.    And one reason why it wouldn't surprise you if you

17   did was that, um, as Mr. Argyle's manager you were

18   speaking with him on a regular basis throughout the

19   course of Ms. Chan's employment, right?

20   A.    Yes.

21   Q.    You would have check-ins with him at least

22   monthly?

23   A.    Yes.

24   Q.    He'd keep you apprised of significant things going

25   on within his business unit?

1    A.    He would.

2    Q.    Okay.  You're aware that, in November of 2016,

3    that Mr. Argyle had an in-person meeting with Ms. Chan?

4    A.    Um, I don't recall that.

5    Q.    Do you recall that there was a -- well strike

6    that, let me ask this question.

7          Did Mr. Argyle ever tell you that Ms. Chan had

8    complained to him that she was being treated differently

9    based upon her gender or being Chinese?

10   A.    Absolutely not.

11   Q.    And if Ms. Chan had made that -- if Ms. Chan had

12   said that to Mr. Argyle, fair to say you would have

13   expected Mr. Argyle to bring that to your attention,

14   right?

15   A.    Um, I think he would.  Yeah.

16   Q.    Now, um, you don't recall Ms. Chan complaining --

17   you do recall, sir, that there were other female Asian

18   investors at Wellington who did raise complaints about

19   what they perceived as unfair treatment, is that right?

20         MS. GAROFALO:  Objection, your Honor, lack of --

21         THE COURT:  Sustained on that foundation.

22   Q.    Who was Mina Koide?

23   A.    Um, Mina Koide --

24         MS. GAROFALO:  Objection, your Honor.

25         THE COURT:  I didn't -- no, he may have that, who

 1    she is.
 2          Who is she?
 3    A.    Mina Koide is, um, a portfolio manager or was a
 4    portfolio manager on the Japan Equity Team.
 5    Q.    Ms. Koide is a female of Asian descent, is that
 6    right?
 7    A.    Um, yes, I believe she's a Japanese National.
 8    Q.    And, Ms. Koide, when she was a portfolio manager
 9    at, um, Wellington Management, um, her supervisor was
10    Charles Argyle, is that right?
11    A.    Um, I think that her supervisor may have been Tom
12    Baxter.
13    Q.    Okay.  So am I right that within GEPM there's
14    oftentimes sort of two supervisors for an investor, sort
15    of a local supervisor and then the head of GEPM?
16    A.    I would say there would be, um, a local
17    supervisor, an assistant director, and then the overall
18    line manager of the function, who would be Charles
19    Argyle.
20    Q.    So for Ms. Koide the local person was Tom Baxter
21    and the ultimate function manager was Charles Argyle,
22    right?
23    A.    Yes.
24    Q.    And the same was true for Ms. Chan, right?
25    A.    I believe so.

1    Q.    And, um, Ms. Koide, she was employed at Wellington
2    up through at some point in 2016, is that right?
3    A.    Yes, I think so.
4    Q.    And, um, you're aware that in 2016 Wellington
5    Management launched a, um, launched an investment
6    strategy that Ms. Chan was leading, is that right?
7         THE COURT:  Would you ask the question again.  I'm
8    sorry.
9    Q.    Are you aware that in 2016 Wellington launched a
10   new investment strategy that Ms. Chan was leading,
11   right?
12   A.    I'm aware that in 2016 there was a little
13   incubation portfolio put together for Ms. Chan.
14   Q.    And when you say a "little," it was a million
15   dollar portfolio?
16   A.    Yes.
17   Q.    Okay.  And Ms. Chan, she was the portfolio manager
18   of that -- of that strategy, is that right?
19   A.    That's right.
20   Q.    Okay.  So am I right that in, um, in January of
21   2015, Ms. Koide complained to you about Charles Argyle?
22        MS. GAROFALO:  Objection, your Honor, lack of
23   foundation, hearsay.
24        THE COURT:  Yeah, sustained, um, on that ground.
25   Q.    Let me ask the question to you a little bit

1    differently.
2         During the course of 2016 did you have any
3    discussions with Mr. Argyle aimed at determining whether
4    or not he was treating Asian female investors in his
5    organization fairly?
6         MS. GAROFALO:  Objection, your Honor.
7         THE COURT:  Overruled.
8    A.    Um, no.
9    Q.    You mentioned China Growth.  Now you weren't
10   directly involved in the decision to launch China
11   Growth, is that right?
12   A.    That's right.
13   Q.    But am I correct that it's your understanding that
14   Mr. Argyle supported the growth -- I'm sorry the launch
15   of China Growth because Wellington was trying to grow
16   its offerings in that region?
17   A.    No, I think it's more complex than that.  I think
18   we have a long-term strategy to want to have a bunch of
19   different investment approaches in Asia, that's one of
20   the reasons, but I think he was really launching it
21   because Ms. Chan was so demanding and so difficult to
22   work with.  And so I think Charles was frankly going out
23   of his way to placate her and launch something.  And my
24   recollection from, um, from talking to people was that
25   she was a flight risk at times and threatening to leave

1    and wanting -- you know demanding that we launch an

2    incubation portfolio for her.

3            MR. HANNON:  Your Honor, may I approach with

4    Mr. Swords's deposition transcript?

5            THE COURT:  Yes, you may.  And that's a better way

6    to do it.

7            (Hands to witness.)

8            THE COURT:  Now a "deposition" is something

9    lawyers use to get ready for a trial.  The person

10   goes usually to a lawyer's office, there's a

11   stenographer like our Official Court Reporter, the

12   lawyers for both sides are there, the person is placed

13   under oath, asked questions, and the questions and

14   answers are taken down.

15           Now it may be that portions of the deposition will

16   be read to you, questions and answers.  Deposition

17   answers, they are evidence and what you -- and the

18   reason they take depositions is because they want you to

19   compare those answers with the answers the witness is

20   giving on the stand to decide whether you better believe

21   the witness, whether you tend to disbelieve the witness,

22   and as evidence, just like the testimony live on the

23   stand, you can believe deposition testimony, you can

24   disbelieve it, you can believe parts of it and

25   disbelieve others.  It may back it up, it may take away

1    from it, or it may stand on its own.  You're the judges

2    of the evidence.

3         Go ahead, Mr. Hannon.

4         MR. HANNON:  Thank you, your Honor.  And, Judge,

5    just for your reference there's a small binder up on

6    your -- it's already passed up to you.

7         THE COURT:  Fine.

8    Q.    Mr. Swords, this is um -- look at the first couple

9    of pages, there's a reference here to a deposition of

10   November 2020.  Do you recall meeting me via zoom on or

11   around that date --

12   A.    I do.

13   Q.    -- to answer some questions?

14   A.    Yes, I do.

15   Q.    Okay.  And do you remember you were under oath

16   when you gave that testimony?

17   A.    Yes.

18   Q.    Okay.  And you understood, when you were under

19   oath, that that was the same kind of oath you would give

20   ultimately testifying in court, right?

21   A.    Yes.  Yes.

22   Q.    Okay.  If I could ask you to turn to Page 43,

23   please.

24   A.    (Turns.)

25   Q.    No, I'm sorry, Page 44, and we're going to start

1    with Line 7.  And if I could ask you to follow along

2    silently as I read aloud.

3    A.      Uh-huh.

4    Q.      Question, "Did you ever talk to Mr. Argyle about

5    the launch of the China Growth fund?"  Answer, "To the

6    best of my recollection, yes."  Question, "And what do

7    you recall about those communications?"  Answer, "That

8    Ms. Chan would be incubating the China Growth track

9    record?"  Question, "Anything else?"  Answer, "That she

10   would be doing it while she continued with her main job

11   of being a research analyst on the Emerging Markets

12   Opportunity group."  Question, "Did Mr. Argyle share

13   with you that he was supportive of Ms. Chan's desire to

14   launch the China Growth Fund?"  Answer, "I believe so."

15   Question, "Did he indicate to you why?"  Answer, "We

16   were -- I believe so."  Question, "And what did he share

17   with you?"  Answer, "Again I can't remember the exact

18   words but to the best of my recollection we were trying

19   to grow our product offerings in Asia pack."  Question,

20   "Why?"  Answer, "We think there's a big opportunity

21   there for growth."  Question, "Did Mr. Argyle indicate

22   to you that he believed that Ms. Chan would be

23   potentially a good person to seed that opportunity for

24   growth?"  Answer, "I believe Mr. Argyle had confidence

25   that Ms. Chan had the potential to put together a good

```
 1   product or return."
 2          Did I read that correctly, sir?
 3   A.    Yes.
 4   Q.    (Pause.)
 5          MR. HANNON:  That's all I have, your Honor.
 6          THE COURT:  Do you wish to inquire now or reserve?
 7          MS. GAROFALO:  Yes, your Honor, we're going to go
 8   ahead and inquire now.
 9          THE COURT:  And you may.
10          MS. GAROFALO:  I can take this off, your Honor?
11          THE COURT:  Yes, you may.  Just like Mr. Hannon,
12   we're getting it down.  That's just exactly right.
13          MS. GAROFALO:  All right.  All right, thank you.
14
15   CROSS-EXAMINATION BY MS. GARAFOLO:
16   Q.    Good morning, Brendan.
17   A.    Good morning.
18          THE COURT:  But please call him by -- you may know
19   him, but everyone gets called by their last name here.
20          MS. GAROFALO:  Yes.  Thank you.
21   Q.    Good morning, Mr. Swords.
22   A.    Good morning.
23   Q.    Your retirement, your recent retirement, was it
24   voluntary?
25   A.    Yes.
```

```
1    Q.    How many years were you at Wellington?

2    A.    Um, 29 years.

3    Q.    Are you married?

4    A.    Yes.

5    Q.    Do you have any children?

6    A.    Yeah, I have a boy -- an 18-year-old boy and a

7    16-year-old girl and a 12-year-old girl.

8    Q.    And where did you grow up?

9    A.    I grew up in Stamford, Connecticut.

10   Q.    Do you have any siblings?

11   A.    Yes, I am the youngest of 7 in a big Irish

12   Catholic family.

13         THE COURT:  Let's come to this case.

14         (Laughter.)

15   Q.    Did you, um -- did you go to college?

16   A.    Yes.

17   Q.    Where did you go?

18   A.    I went to Holy Cross.

19   Q.    In what year did you graduate?

20   A.    1983.

21   Q.    Did you work after college?

22   A.    Yes, I was in the Armed Forces.  I was, um -- I

23   went through college on an ROTC scholarship, an Air

24   Force scholarship, because we didn't have any money, and

25   I worked my way through school.
```

1   Q.    How long were you -- did you serve in the
2   military?
3   A.    Four years.
4   Q.    And did you pursue any education after that?
5   A.    I had a -- I went to business school.
6   Q.    And where did you go?
7   A.    I went to Harvard.
8   Q.    Did you -- if you could, um, just walk me through
9   briefly your work experience before you joined
10  Wellington?
11  A.    Oh, I worked for a consulting firm for three
12  years, um, McKinsey & Company, in addition to the four
13  years in the Air Force.
14  Q.    And how do you end up at Wellington?
15  A.    Um, I was hired by Pam Dipple, who was the partner
16  in charge of the Mutual Fund Client Group, and she was
17  my first boss and mentor, and, um, you know, an amazing
18  boss.
19  Q.    And what position were you hired into?
20  A.    I was the business manager for the Mutual Fund
21  Group.
22  Q.    All right.  Can you briefly walk us through your
23  progression at Wellington until you became CEO?
24  A.    I think at sometime in '97 I took over for Pam
25  Dipple as the head of the Mutual Fund Group.  At

1    sometime in '99 or 2000, I became the Assistant Director
2    for the U.S. Equity Portfolio Managers in the hedge fund
3    business.  At some point when by boss retired in 2002, I
4    became the head of the U.S. Equity Portfolio Management
5    Group and the head of the Hedge Fund Group.  In 2007 the
6    U.S. Equity Portfolio Management Group and the
7    International Equity Portfolio Management Group were
8    merged and I became the head of the global group.  I was
9    elected a managing partner by the partners in 2008.  I
10   became -- I was appointed President in 2012.  And, um, I
11   became CEO in 2014.
12   Q.    Okay.  And, um, I think there was testimony before
13   in 2015, '16, but who were the other two managing
14   partners?
15   A.    Jean Hynes and, um, Philip Pearlmuter.
16   Q.    And do you know when Jean Hynes became a managing
17   partner?
18   A.    She was elected in 2014.
19   Q.    And what is her role now?
20   A.    She is the CEO, she's my successor, and she also
21   runs the Vanguard Health Care Fund.  The biggest mutual
22   fund in the world runs solo by a woman.
23   Q.    Do you know how long she has been at Wellington?
24   A.    30 years.
25   Q.    About how many employees does Wellington have?

1    A.     When I left it was roughly 2750.

2    Q.     And do you have a sense of how many of those

3    offices were outside -- I mean how many of those

4    employees were outside of the United States?

5    A.     I would say roughly 750 of the 2750.

6    Q.     Okay.  And what's the organizational structure of

7    Wellington?

8    A.     Um, Wellington is an independent private

9    partnership, which is unusual.

10   Q.     So it's not a publicly-traded company?

11   A.     It's not publicly-traded, it's privately held, so

12   you don't have that conflict between clients and public

13   shareholders.  So I think -- I think the big benefit is

14   it can be much more long-term about everything,

15   including about employees.

16   Q.     Okay.  If Wellington performs poorly, who does

17   that affect?

18   A.     It affects those institutions and those

19   beneficiaries that we talked about earlier, those tens

20   of millions of beneficiaries, the hospitals and the

21   students and the doctors and the teachers and the

22   firefighters and the retirees.

23   Q.     And during your tenure as CEO, how did Wellington

24   perform for its clients?

25   A.     I think Wellington performed very well.  By the

1    time I left, um, the client assets -- and I always say

2    "client assets," because they're not ours, had grown to

3    1.3 or 1.4 trillion.

4    Q.    And to what do you attribute that to?

5    A.    I think it's the people --

6          MR. HANNON:  Objection.

7    A.    It's a people business.

8          THE COURT:  Well wait a minute.  Um, sustained.

9    Sustained.  Let's come to this case.

10         MS. GAROFALO:  All right.

11   Q.    In your testimony before you mentioned, um,

12   taking -- you mentioned "shared values," correct?

13   A.    Yes.

14   Q.    All right.  You mentioned "humility"?

15   A.    Yes.

16   Q.    And why is that one of Wellington's shared values?

17   A.    I think in the investment business, um, humility

18   is one of the most important things.  As an investor

19   you're competing against the market, you're wrong all

20   the time, you make a lot of mistakes and you have to be

21   open to feedback, you need to learn from others, you

22   need to be welcoming of, um, of people trying to help

23   you and develop you.  It's, um -- I think it's the most

24   important quality to have, for an investor be humble and

25   have a growth mindset and be open and curious to

1    feedback.

2    Q.    When you started at Wellington, how many offices

3    did it have outside of the United States?

4    A.    Um, there was one office in London with three

5    people.

6    Q.    Okay.  And how did that evolve over time?

7    A.    It was a journey, you know it was really a 30-year

8    journey to globalize the firm, and we kept trying to add

9    people outside the Americas, so that today we have 750

10   people in Europe and Asia Pacific.  And we keep trying

11   to increase the, um, you know the global niche of the

12   firm and the local representation around the globe.

13   Q.    Okay.  Were there women in leadership roles during

14   your tenure as CEO?

15   A.    Oh, absolutely.  35 percent of my team, my

16   leadership team, were women.  One of the three managing

17   partners.  Two of the five Vice-Chairs.  During my time

18   the General Counsel.  The head of HR.  The head of

19   Research.  The head of Investment Strategy.  Um, the

20   head of Hong Kong.  The head of Singapore.  The head of

21   Sidney.  The head of Frankfurt.  The head of Marketing.

22   The four big committees at Wellington, the Executive

23   Committee, the Operating Committee, the Compensation

24   Committee, the New Partner Committee, all chaired by

25   women.  So a very very robust leadership team.  And

1   amazing women.

2   Q.    Who would you say are Wellington's chief

3   competitors?

4   A.    Oh, I would say firms like Capital and --

5         MR. HANNON:  Objection.

6         THE COURT:  Wait a minute.  Wait a minute.

7   Sustained.  Beyond the scope.

8         MS. GAROFALO:  Oh, your Honor, we've listed

9   Mr. Swords on our --

10        THE COURT:  You may have, but it's beyond the

11  scope.  You may recall him.

12        MS. GAROFALO:  Okay.  Thank you, your Honor.

13  Q.    You mentioned "philosophy and process" during your

14  direct examination, can you tell us a little bit about

15  what that is?

16  A.    Yeah, investment philosophy, um, is one's deeply-

17  held beliefs about how you're going to beat the market.

18  So to me when I think about investment philosophy

19  it's -- for an investor it's a journey, it's the most--

20  it's the single most important task is to figure out a

21  rigorous, robust, and, um, a well-thought-out investment

22  philosophy and process, and the single most important

23  quality is this humility, learning, and growth mindset.

24  Q.    And how important is a track record for success?

25  A.    Well I think a track record is a data point and

1    it's, um -- it's something that then you would need to

2    examine.  And so how did you achieve the track record?

3    What are you comparing it to, are you comparing it to a

4    relevant benchmark?  Was there a tail wind or a head

5    wind?  Did you develop investment skills?  So I think a

6    track record is the start of a conversation.

7    Q.    How many times have you met Ms. Chan?

8    A.    I can remember two, but you know maybe there

9    was -- maybe there was another.  But I can recall two.

10   Q.    And what was the first?

11   A.    The first was a social occasion.  I go to Hong

12   Kong every year to try and stay in touch with people,

13   stay very connected, and I recall being out at a dinner,

14   um, with five or six people around a table, I think it

15   was at the American Club in Hong Kong.  But it was just

16   a nice social dinner.

17   Q.    And, um, the Hong Kong office, what are the

18   demographics of that office?

19   A.    Oh, it's overwhelmingly Asian, so it's, um -- the

20   vast vast majority would be Chinese.

21   Q.    And what was the second occasion, was it the

22   dinner you testified to?

23   A.    The --

24   Q.    I mean the meeting?

25   A.    Yeah, the second occasion was a meeting, a

1    catch-up meeting in my office, maybe 15 minutes long.  I

2    think it was in December of 2015.

3    Q.    Okay.  And when you say a "catch-up meeting," what

4    do you mean?

5    A.    I have a habit of, um, trying to stay connected

6    with the employees and to keep my hands on the pulse of

7    the organization, so I'm very very frequently looking at

8    the travel logs and seeing who's coming and visiting

9    Boston from either Asia Pack or Europe, and I will put

10   -- routinely put on my calendar 15-minute catch-up

11   meetings.

12   Q.    Was anyone else present for this meeting?

13   A.    No.

14   Q.    And what do you recall of the meeting?

15   A.    I recall that Ms. Chan told me she was not happy

16   with how the Asia P & P panel had gone and that she

17   disagreed with the feedback.

18         THE COURT:  Just so I'm clear, "P & P" means?

19         THE WITNESS:  Oh, I'm sorry, investment

20   "Philosophy and Process," which again we think of as the

21   most important task for an investor to develop a really

22   strong investment philosophy and process.

23         THE COURT:  Thank you.

24   Q.    All right.  Do you know the genesis, how the Asian

25   Philosophy and Process panel came about?

A.    Generally.  We had, um, had very good experience
in the U.S. with philosophy and process panels.  Really
the purpose is to help investors, to help them on this
journey where they're developing, to give them feedback
so that they're well-prepared when they go out in front
of clients.  So really it's an opportunity to help
people.  And we had very good experience with that in
the U.S.  And we're beginning to globalize overseas, we
have more investors in Asia and Europe.  And so we said
"Well let's do this overseas as well."  I think Cheryl
Duckworth, um, the head of Singapore, was the one who
started it.  But it certainly had my strong
encouragement.

Q.    Okay.  Do you recall anything else from the
meeting, do you recall anything you said?

A.    I recall, um, trying to explain the purpose of the
philosophy and process panel, that it's there to help
you, it's there for an investor on the journey becoming
a portfolio manager.  It's meant to be helpful.  So I
recall telling Ms. Chan that.  I recall, um, counseling
her on the importance of being open to feedback.  You
know one of my sayings I say over and over again is
"Feedback is a gift," we all need it, and I'm pointing
right here, everyone needs constructive feedback, and
that the big red flag is people who are resistant to

1    feedback, it's a surefire sign you're going to fail.

2    And so I recall counseling her on being open to and not

3    resistant to feedback and I recall counseling her to be

4    patient, because we're a long-term place.

5    Q.    Did she raise any concerns about gender

6    discrimination?

7    A.    Absolutely not.

8    Q.    Race discrimination?

9    A.    Absolutely, positively not.

10   Q.    National origin discrimination?

11   A.    Absolutely not.

12   Q.    Well that was almost six years ago now, so how can

13   you be so sure?

14   A.    I can be so sure because if someone raises gender

15   discrimination, race discrimination, national origin

16   discrimination, my antenna are going to go up very very

17   quickly.  Number 1, I'm not going to tolerate it because

18   it's against my personal values, and Number 2, it's not

19   something we tolerate at Wellington.  I've already

20   mentioned the leadership, you know that 35 percent of

21   the leadership team are women.  My successor as CEO is a

22   woman.  It's something I know enough, by training and

23   experience, that I would need to bring immediately to

24   the experts in HR or Legal.

25   Q.    Okay.  Thank you.  I'm going to pull up an

1   exhibit.  Do you have it, the e-mail?

2       (Pause.)

3       THE COURT:  Yeah, the Clerk is quite right, she

4   points out, um, Mr. Hannon, when he mentions an exhibit,

5   that he refer to it by number.  Well that's helpful

6   because then we know it's in evidence.

7       MS. GAROFALO:  Oh, yes.  Thank you.

8       THE COURT:  And I should tell the jury.

9       To save your time they've been working and all the

10  exhibits that they agree you may see, they have numbers.

11  And so I'll keep my mouth shut if she says "This is

12  exhibit number whatever."  If she says it's exhibit

13  lettered something, well I'll have to decide whether you

14  can see it.  But most of them have numbers.  You'll have

15  all of them in the jury room, you'll have electronic

16  access to them as well at the end of the trial.  And if

17  you want to physically see one now, you have every right

18  to.

19      Go ahead, Ms. Garofalo.  What exhibit?

20      MS. GAROFALO:  Yes, it's 147.  My apologies, your

21  Honor.

22      THE COURT:  It's quite all right.  Just we're --

23  147 in evidence.

24      MS. GAROFALO:  Thank you.

25  Q.   And just drawing your attention to it, if you

1    could just open it up, the two pages.  (On screen.)

2         Is this an e-mail that you have seen before,

3    Mr. Swords?

4    A.    Yes.

5    Q.    All right.  And it looks like -- I think it's

6    several pages long, um, it's quite a long e-mail.  It

7    looks like there was an e-mail -- if you go to the chain

8    at the bottom of the first page, that was from Ms. Chan

9    to a number of individuals, and it also includes

10   something there, an address, "Pound Investors"?

11   A.    Yes.

12   Q.    What is that?

13   A.    Well you know back to, um, the shared values of

14   Wellington, we're a very very collaborative place,

15   oftentimes we would say "the secret sauce of

16   Wellington."  It's the most collaborative place that

17   people have ever been.  And so one of the ways we try to

18   win and do well for clients is we share information a

19   lot.  And so "Pound Investors" is an e-mail distribution

20   of hundreds and hundreds of investment personnel at

21   Wellington.  And it's just -- it's just one more venue

22   for sharing investment ideas like the morning meeting or

23   like the early-morning meeting where we are constantly

24   trying to get investors to share ideas and respectfully

25   debate one another in judgment, and the key word there

1   is "respect."

2   Q.    Okay.  And you'll see that an individual named Ann

3   Gallo forwarded the e-mail chain to Jean Hynes.  So who

4   is Ann Gallo?

5   A.    Ann Gallo is a partner and portfolio manager on

6   the Health Care team.

7   Q.    All right.  And Ms. Gallo says "OMG" and forwards

8   it to Ms. Hynes.  And then looking at the next portion,

9   Ms. Hynes then you can see forwards it to you and

10  Mr. Pearlmuter.  So the three of you are the three

11  managing partners, correct?

12  A.    That's correct.

13  Q.    And Ms. Hynes states that she had the same

14  reaction when she read Ms. Chan's note, "I wanted to

15  cringe.  It could have been a great debate, but

16  completely wrong tone."

17  A.    Yes.

18  Q.    And then if you look up further you forwarded it

19  on to Charles Argyle and Mr. Burgess.  And why did you

20  do that?

21  A.    Oh, a couple of reasons.  One is I want to apprise

22  them that again Ms. Chan is not living up to the shared

23  values of the place, she's not being respectful in how

24  she engages with one another, she's being condescending,

25  her tone is bad, she's shutting down debate.  You know

1  this could have been a great conversation, it could have

2  been her saying, "Now look I have a different

3  perspective here, let me share my opinion," but instead

4  she uses words that are very condescending, using words

5  like "flawed" and "misunderstanding."  So it has a

6  personal tone to it.  So I'm sending this to her line

7  manager and another manager in Global Equity and saying,

8  "You know here's yet another example of this person not

9  living up to the shared values of respectful debate,"

10  and, um, saying then, you know, "She needs some

11  feedback."

12  Q.   Okay.  And it was Ms. Hynes who brought it to your

13  attention?

14  A.   Yes.  And it could have been a great debate, you

15  know it could have been a very respectful debate.  And I

16  think that's a shared value of culture, respect, it's

17  one of the highest marks we get in the employee survey,

18  up in the 90th percent, 2300 employees saying

19  "Wellington is a respectful place regardless of race or

20  gender."  So this is -- it's antithetical to our shared

21  values.

22  Q.   Okay.  How was it that -- what was the process

23  pursuant to which Ms. Hynes became the CEO, um, your

24  successor?

25  A.   Well I announced, um, we'd like to -- it's a very

```
 1    long-term place so we like to give a lot of notice, so I
 2    announced to the other managing partners three years
 3    ahead of time in the summer of '18 that I was planning
 4    to leave in the summer of '21.  We went out to all the
 5    partners and asked for feedback on who should be the
 6    next CEO, um, based on a number of criteria, including
 7    living up to the -- rolemodeling the shared values, and
 8    we had tremendously strong support from all the partners
 9    to appoint Jean Hynes as the next CEO.  We took that
10    recommendation to the Executive Committee and the
11    Executive Committee unanimously approved that and we
12    announced that Jean would be the next CEO in the summer
13    of 2020.
14    Q.    Thank you, Mr. Swords.
15          MS. GAROFALO:  I have no further questions.
16          THE COURT:  No redirect for this witness?
17          MR. HANNON:  Just briefly, your Honor.
18          THE COURT:  You may.
19
20    REDIRECT EXAMINATION BY MR. HANNON:
21    Q.    Mr. Swords, if you look at Exhibit 147, the
22    reaction to Ms. Chan's e-mail about the IP shop.
23          Did you talk to anybody at Wellington that
24    actually really liked her e-mail?
25    A.    No, I didn't.
```

```
 1    Q.    Did you ask around to other investors in terms of
 2    whether or not they thought her tone was actually
 3    appropriate?
 4    A.    No, I didn't.
 5    Q.    Okay.  But, sir, we can agree on one thing, which
 6    is that respectful behavior towards colleagues, that is
 7    part of the shared values that Wellington holds deeply,
 8    right?
 9    A.    We can agree that respectful behavior towards
10    colleagues is a shared value of Wellington, and -- and
11    that it's not a perfect place.
12    Q.    Respectful comments, that's part of the shared
13    values?
14    A.    Yes, it is.
15    Q.    Okay.
16          MR. HANNON:  No further questions, your Honor.
17          THE COURT:  I just want to be clear, and I think
18    you've made it clear.
19          When you've used the word "investors" to this
20    jury, whoever's asking you the question, you mean the
21    employees who in their fiduciary capacity have the
22    authority to invest the funds of the clients?
23          THE WITNESS:  That's correct.
24          THE COURT:  All right.
25          THE WITNESS:  I could use the word and maybe a
```

```
1    better description would be "investment personnel."
2         THE COURT:  All right, that's fine.  I just want
3    to be clear on it.
4         No questions in view of my question?  I hear none.
5    You may step down.  Thank you.
6         Call your next witness.
7         THE WITNESS:  Thank you.
8         MR. HANNON:  The plaintiff calls Charles Argyle,
9    your Honor.
10        THE COURT:  He may be called.
11        (Takes stand.)
12        (CHARLES ARGYLE, sworn.)
13
14        * * * * * * * * * * * * *
15        CHARLES ARGYLE
16        * * * * * * * * * * * * *
17
18   DIRECT EXAMINATION BY MR. HANNON:
19   Q.    (Takes off mask.)  Please state your name, sir.
20   A.    My name is Charles Argyle.
21   Q.    And, Mr. Argyle, am I correct that you're retired
22   as well?
23   A.    I am retired as well.
24   Q.    Okay.  And when did you retire, sir?
25   A.    Um, June 2020.
```

1    Q.    Okay.  And prior to your retirement you were

2    employed with Wellington Management, is that right?

3    A.    Yes.

4    Q.    And your role at Wellington Management, at the

5    time of your retirement, you were head of the GEPM

6    function, is that right?

7    A.    No.

8    Q.    Okay.  Well at some point prior to your retirement

9    you had served as head of the GEPM function, is that

10   right?

11   A.    That's right.

12   Q.    Okay.  During what period of time were you head of

13   GEPM?

14   A.    I became head of GEPM on the beginning of 2013, so

15   January 1st, 2013, and at the end of 2017 GEPM merged,

16   um, predominantly with another function called "Fixed

17   Income," um, and parts of a couple of other functions to

18   form a group called "Investment Boutiques," and I became

19   co-head of that function.

20   Q.    Okay, so you were the head of GEPM until GEPM

21   stopped to exist because of the merger?

22   A.    That's right.

23   Q.    Okay.  And during the time that you were the head

24   of GEPM, you reported to Mr. Swords, right?

25   A.    Um, for most of the time but not for all of the

1    time.

2    Q.    Okay.  And in fact Mr. Swords, he was the one that

3    hired you at Wellington, is that correct?

4    A.    Yes.

5    Q.    And, um, for the vast majority of your duration at

6    Wellington you reported to Mr. Swords, is that right?

7    A.    I reported to Mr. Swords for the majority of my

8    time at Wellington, yes.

9    Q.    Okay.  I want to pick up where we left off with

10   Mr. Swords.

11         Did you hear him testify on his cross-examination

12   that he was certain that Ms. Chan had not, um,

13   complained about gender or race discrimination because,

14   um, if he had heard that he would have done something

15   about it?

16   A.    I did hear him say that, yes.

17   Q.    Okay.  Does the same hold true for you?

18   A.    If I had heard a complaint from Ms. Chan about

19   gender, race discrimination, or discrimination on

20   national origin, I would have taken that to the

21   appropriate individuals, professionals in Human

22   Resources, if I believed that was a complaint, yes.

23   Q.    And who would that have been?

24   A.    Um, it would have either been Human Resources in

25   Hong Kong or, um, the head of -- in Human Resources in

1    Boston there was a dedicated individual from employee

2    relations and I honestly forget whether her

3    responsibilities were global or whether, um, employee

4    relations fell in the local function.  But one of those

5    individuals.

6    Q.    Okay.  So you would have told HR?

7    A.    Yes, I would have told HR.

8    Q.    You would have told Mr. Swords?

9    A.    Um, not necessarily because employee relations

10   complaints should -- in my recollection of our training,

11   should go to Human Resources as efficiently as possible,

12   and then it's taken -- it's taken out of the line's

13   hands and the line would include the CEO and those

14   complaints would be investigated by Human Resources.  So

15   I wouldn't necessarily have told Mr. Swords, no.

16   Q.    Okay.  In November of 2016, you met with Gigi Chan

17   in Hong Kong, right?

18   A.    In November of 2016?  Yes.

19   Q.    And you were also in that meeting with Thomas

20   Baxter?

21   A.    Yeah, Tom Baxter was also in that meeting with the

22   two of us, yes.

23   Q.    And during the course of that meeting you talked

24   about Ms. Chan's dissatisfaction at Wellington, correct?

25   A.    Um, during the course of that meeting we talked

1  about Ms. Chan being unhappy with certain factors of

2  Wellington, yes.

3  Q.    And her general dissatisfaction being there,

4  correct?

5  A.    Um, I can't remember the exact terminology but she

6  was -- it was clear that she was unhappy with various

7  things at Wellington.

8  Q.    And in the course of that meeting she referenced

9  the fact that she's a female, right?

10 A.    Um, yes, that is right, she did reference the fact

11 that she's a female.

12 Q.    And she referenced the fact that she's Chinese,

13 right?

14 A.    Um, yes.

15 Q.    And she said to you that she felt as though she

16 could not be mistreated, "Just because I'm a woman, just

17 because I'm Chinese," right?

18 A.    Um, my recollection is that there was one fraction

19 of one sentence that was 8 seconds long in a 17-minute

20 meeting, um, where in the context of the board meeting,

21 um -- but, yes, that subsegment of a sentence that

22 you've just pulled out was stated.

23 Q.    Did you not hear it?

24 A.    I -- I think I heard it.

25 Q.    Okay.

```
 1   A.     I believe I heard it.

 2   Q.     Okay.  Is it your understanding that complaints of

 3   discrimination only matter if they take 30 seconds?

 4   A.     Um, it is my understanding that --

 5          MR. PATERNITI:  Your Honor, I'm going to object to

 6   the phrasing of "complaints of discrimination."

 7          THE COURT:  No, no, no, he may have it.

 8   A.     It was my understanding, and this conversation was

 9   recorded, that in the context of that 17-minute

10   conversation, um, that segment of that sentence was not

11   a complaint.

12   Q.     Why not?

13   A.     Because during that 17-minute conversation, um,

14   there were a number of complaints, and from previous

15   conversations with Ms. Chan it was very clear that there

16   was a trait of repeating her complaints with respect to

17   the organization, and in that meeting itself, which was

18   recorded, um, her specific complaints were repeated time

19   and time and time again.  So this was 8 seconds of the

20   conversation and it was not repeated time and time

21   again.  And at the end of that conversation I asked

22   Ms. Chan what my key take-away from the conversation

23   should be?  And there was no reference back to any

24   mention of, um, a complaint on grounds of

25   discrimination.
```

1    Q.     So you thought you could just ignore it?

2    A.     Um, I can't remember what I thought.

3    Q.     Well what we can agree on is you didn't do

4    anything about it, right?

5    A.     Um, I wouldn't agree on that.

6    Q.     Did you go to HR?

7    A.     No, I sent an e-mail to Ms. Chan following up on

8    that e-mail -- following up on that meeting, a very

9    clear e-mail, quite a long e-mail, with bullet points

10   addressing, talking about the meeting, um, and providing

11   feedback and guidance, um, following the meeting, and if

12   I remember rightly -- and I don't remember the exact

13   words, but I was very clear at the end of that e-mail,

14   "Please respond and acknowledge this e-mail."  And

15   clearly if there was something that, um, one -- that she

16   felt I hadn't addressed with respect to that meeting in

17   that e-mail, she had the opportunity to do so.

18   Q.     So that summary e-mail you referenced, in there

19   you address her comment about being treated differently

20   because she's a female and because she's Chinese?

21   A.     No, I didn't address those comments.

22   Q.     You left that out entirely, didn't you?

23   A.     I -- it's not how I would characterize it, um,

24   because that implies it was an active decision to leave

25   it out.

```
1    Q.    So you didn't put it in?

2    A.    It was not in the e-mail.

3    Q.    And during the course of -- when Ms. Chan knew of

4    this comment, you didn't ask her why she felt that way,

5    right?

6    A.    Um, I don't recall.  If you will remind me when --

7    Q.    Well you've listened to the recording, sir, right?

8    A.    I have listened to the recording.

9    Q.    When was the last time you listened to it?

10   A.    Um, from beginning to end?  A couple weeks ago, a

11   week ago.

12   Q.    And you don't recall hearing in that recording

13   that you ever asked her why she felt that way, right?

14   A.    Um, no.

15   Q.    Sir, this wasn't your first conversation with Gigi

16   Chan about her concerns about mistreatment at Wellington

17   Management, was it?

18   A.    You're implying that she had concerns about

19   mistreatment at Wellington Management.  Um, I have no

20   conversation with Ms. Chan about mistreatment at

21   Wellington Management.

22   Q.    So your testimony is that Ms. Chan never

23   complained to you, at any point during the course of her

24   employment, that she felt as though she was being

25   mistreated at Wellington?
```

1   A.    Um, if your characterization of "mistreatment at
2   Wellington" is disappointment with respect to how her
3   career was progressing, if your characterization of
4   "mistreatment at Wellington" is receiving feedback that
5   she -- that she may not have, um, liked hearing, um, is
6   "mistreatment"?  Then we have those conversations.
7   That's not my characterization of "mistreatment at
8   Wellington."  So, um, I don't recall a conversation in
9   which we talked about mistreatment at Wellington.
10  Q.    Well, sir, I'm not asking about your
11  characterization of mistreatment, I'm asking about
12  Ms. Chan's characterization of mistreatment.
13        Is it fair to say that at numerous points in time
14  Ms. Chan communicated to you, during her time at
15  Wellington, that she felt as though she was being
16  mistreated?
17  A.    Um, I don't think that's fair to say.  And I don't
18  know Ms. Chan's characterization of mistreatment at
19  Wellington at the moment.
20  Q.    So --
21        THE COURT:  Wait.  Wait.  Wait.  Just so we can
22  follow.
23        His question was, um, the way I heard it was did
24  she complain to you that she felt that she was being
25  mistreated?

1           THE WITNESS:  Um, no, she complained to me that

2      she felt as if, um, we've -- we're not coming good on a

3      promise that she alleges we made with respect to her

4      taking on portfolio management responsibilities and

5      subsequently did not have appropriate access to our

6      clients.  She also, um, complained to me that she felt

7      some of the feedback she received was, um -- that she

8      didn't like some of the feedback she received.

9           So in my opinion she did not complain to me about

10     mistreatment because if she had complained to me about

11     mistreatment, I would have followed my training and I

12     would have taken that to the appropriate individuals in

13     Human Resources.

14          THE COURT:  That's the testimony.  It's up to you

15     whether you believe it, disbelieve it, believe parts of

16     it.

17          Now go ahead.

18     Q.    Sir, she told you she was being treated

19     disrespectfully, right?

20     A.    Um, I can't recall if she used those exact words.

21     Q.    Do you recall if she expressed that sentiment,

22     that people had acted disrespectfully towards her?

23     A.    I recall that that was her sentiment with respect

24     to receiving some feedback, yes.

25     Q.    Just feedback?

1   A.     To the best of my recollection right now.

2   Q.     Did she indicate to you why people were treating

3   her disrespectfully?

4   A.     Not that I recall.  Sorry.

5   Q.     Did you ask her why she felt people were treating

6   her disrespectfully?

7   A.     Um, I can't recall.

8   Q.     Did you -- did you think it was -- it was a

9   significant fact that Ms. Chan felt as though people

10  were treating her disrespectfully?

11  A.     Um, I felt it was a significant fact that there

12  was an employee in my group who I hoped would be

13  demonstrating a growth mindset, open to feedback, open

14  to receiving feedback, open to be challenged, and felt

15  that feedback, um, was not a gift.

16  Q.     I don't understand your answer.  Did you think it

17  was -- it was significant that Ms. Chan felt as though

18  she was being treated disrespectfully?

19  A.     Um, I -- I can't recall.

20  Q.     Well you heard Mr. Swords testify about the

21  importance of respectful treatment, right?

22  A.     Yes.

23  Q.     You looked at that e-mail that Ms. Chan wrote

24  where she was direct with respect to her analysis on a

25  stock and there was a strong reaction to her tone, is

1   that right?

2   A.    Yes, I saw that e-mail.  Yes.

3   Q.    Okay.  Did you ever take any steps to find out

4   whether in fact Ms. Chan was being treated

5   disrespectfully?

6   A.    Um, I was running the division so --

7   Q.    Just a "Yes" or "No" would suffice, sir.

8   A.    Um --

9         THE COURT:  Well -- he's entitled to ask questions

10  which grammatically can be answered "Yes" or "No," and

11  if an honest and complete answer is "Yes" or "No," and

12  you're under oath, you've got to answer "Yes" or "No."

13  But if you can't answer "Yes" or "No," you can always

14  say, "I can't answer 'yes' or 'no.'"  But you can't just

15  launch off and say something else.

16        THE WITNESS:  Okay, thank you, your Honor.

17        THE COURT:  It's up to him to ask the questions.

18  But when he says just a "Yes" or "No" will suffice, well

19  you're testifying and so if a "Yes" or a "No" is an

20  honest and complete answer, then you've got to so answer

21  it.  But if it won't suffice, you tell him you can't

22  answer it "Yes" or "No."

23        Go ahead, Mr. Hannon.

24  Q.    Once again, sir.  Did you take any steps to

25  determine whether or not Ms. Chan was in fact being

1    treated disrespectfully?

2    A.    (Pause.)  I honestly can't answer that "Yes" or

3    "No," um, but I'm -- I'm -- I would be constantly

4    building up a mosaic of input on all the talent that I

5    had in my group and, um, if Ms. Chan was alleging, um,

6    something, that I would try and find out if there were

7    two sides to that story.  If that -- whether that's --

8    whether it was something wonderful or something less

9    wonderful, I would be trying to find, through my mosaic,

10   constantly what's going on with individuals in my group.

11   Q.    Okay, so back to my question, sir.

12         When you understood that Ms. Chan was conveying to

13   you that she believed she was being subjected to

14   disrespectful treatment, did you do anything to

15   determine if that was true?

16   A.    Well I did not go to Human Resources and there was

17   no investigation because I didn't think it was a

18   complaint.  Um --

19   Q.    Okay, so there's one thing you didn't do.  Tell me

20   what you did do?

21   A.    Um, I -- I'm sure I spoke to her direct-line

22   manager in Asia, Tom Baxter, I'm sure I -- I had regular

23   dialogue with her team leader.  Wellington is a very

24   collaborative place so with -- with, um, others around

25   the firm.  But again I can't recall whether that was

1  specifically about, um, the topic of your question.

2  Q.    Did you ask Ms. Chan why she felt she was being

3  disrespected?

4  A.    Um, Ms. Chan made very clear that she felt -- to

5  me, and my recollection is that it was very clear, that

6  Ms. Chan felt disrespected because she had, um, these

7  years of experience as a portfolio manager at another

8  firm.  Even though she didn't join Wellington as a

9  portfolio manager, she felt as if her prior investment

10  experience was not appreciated at Wellington.

11  Q.    But she also expressed to you that part of this

12  involved people communicating to her in a disrespectful

13  fashion, right?

14  A.    Um, there were times, a couple times in

15  particular, so there was this P & P panel, um, and GRG,

16  um, GRG -- "GRG" is our "Global Relationship Group," our

17  client-facing group, our GRG panel where she felt she

18  received, um, feedback, which, um, I can't remember, I

19  can't remember her exact words, but that she may have

20  felt was disrespectfully delivered.  But I can't

21  remember her exact words.

22  Q.    When you heard Ms. Chan complain about her belief

23  that people were treating her disrespectfully, you

24  interpreted that as Ms. Chan being resistant to

25  feedback, isn't that right?

A.      (Pause.)   That's incorrect.

Q.      You did form the conclusion that she was resistant

to feedback, right?

A.      Um, I did form that conclusion based on a mosaic

of inputs from multiple individuals, yes.

Q.      Well really when you formed that opinion for the

first time was following the Asia P & P panel, right?

A.      Um, I don't recall when I formed that opinion for

the first time.

Q.      Well we'll get to that a little bit later in terms

of that, um, that sort of series of events.

        Backing up a little bit.  You mentioned a little

while ago that Ms. Chan wasn't hired as a portfolio

manager at Wellington, right?

A.      That's correct.

Q.      She was hired into the role of an equity research

analyst?

A.      Um, that's correct, the role was formally called

"equity research analyst."  I should probably point out

that over the course of this trial the term "team

analyst" might be used, which is kind of a more internal

terminology, but exactly the same role.  So if you hear

"equity research analyst" or "team analyst," those two

titles are essentially interchangeable.

Q.      But prior to coming to Wellington Ms. Chan had

1    been previously employed as a portfolio manager, is that

2    right?

3    A.    Um, that's my belief, that was on her resume.

4    Q.    All right.  And it's common, isn't it at

5    Wellington, for equity research analysts to launch their

6    own products to become portfolio managers, right?

7    A.    Um, "common" is a very broad term.  It happens.

8    Q.    Okay.  And that's sort of the ideal path for

9    development for someone like Ms. Chan, right, that they

10   come and they join Wellington, they get to know the

11   place and they develop some kind of a compelling

12   strategy that Wellington wants to get into, right?

13   A.    No.

14   Q.    You'd agree, sir, that at the time that Ms. Chan

15   joined Wellington, that part of the plan for her

16   development was that she was going to develop such

17   strategies in the hopes that she would come up with

18   something compelling?

19   A.    No, I would not agree with that.

20         MR. HANNON:  Your Honor, I'm about to go into the

21   document that would bring us beyond our 10:45 recess.

22         THE COURT:  So you think this is a good time to

23   stop?

24         MR. HANNON:  I do, Judge.

25         THE COURT:  And we shall.  We'll take the morning

1  recess at this time.

2      You have not heard all the evidence.  Please keep

3  your minds suspended, do not discuss the case either

4  among yourselves or with anyone else.  You may stand in

5  recess until quarter after 11:00.  We'll stand in

6  recess.  I'll remain on the bench.

7      THE CLERK:  All rise for the jury.

8      (Jury leaves, 10:45 a.m.)

9      THE COURT:  Please be seated.  You may step down,

10  sir.  Two matters before I take the recess.

11      If you're still going to have this other, this

12  Mina Koide testify, I don't think I made this clear and

13  I don't know that we have a problem, but since you're

14  not starting with Ms. Chan, Ms. Chan goes before you

15  call her, if you're going to call her.  It has to be

16  that way because the issue, and it remains a live issue,

17  is, is she sufficiently related?  I think so, but we'll

18  hear from Ms. Chan first and then I'll have a basis for

19  making that determination.

20      The second issue is this is a diversity case and

21  this is a limited liability partnership.  By tomorrow I

22  want a list of all the partners and their domiciles,

23  because not in the First Circuit, but in other circuits,

24  at least three, and they're all uniform, and if you've

25  got a foreign partner, not necessarily -- and you've

1    stipulated she's a citizen of the United Kingdom, she

2    was referred to as a "citizen of Hong Kong" in the

3    opening, but we'll say we'll go with the stipulation.

4    But either way, um, if you've got another foreign, um,

5    member of the partnership, um, there's a question

6    whether I have subject matter jurisdiction and, um, we'd

7    better reflect on that.

8         All right.  We'll take the recess until quarter

9    after 11:00.  We'll recess.

10         THE CLERK:  All rise.

11         MR. PATERNITI:  Your Honor, I'm sorry for bringing

12   this up two seconds ago, but counsel and I had

13   discussed, prior to the trial after the pretrial

14   conference when you said we could either take either

15   witnesses on recall or all at once, we had talked and

16   reached agreement and failed to alert the Court of that

17   obviously and we apologize for that.  But I wanted to

18   bring that to your attention now so that we could be

19   guided with regard to the rest of the direct and cross-

20   examinations.

21         THE COURT:  Well I thought of the rule.  We

22   started out with people who are adverse witnesses.  Now

23   the rule is that when you take an adverse witness, yes,

24   you can cross-examine that witness, but only within the

25   scope of the direct.  So when he objected, I thought

1    that was the objection and I ruled accordingly.  Now if
2    by agreement you're telling me that that witness does
3    not have to come back, we'll have general cross-
4    examination, and you tell me now he agrees, so I'll be
5    guided by that, you can agree to that.
6         MR. HANNON:  And I do agree, your Honor.
7         THE COURT:  Well then thank you.  Then I
8    apologize.
9         MS. GAROFALO:  No, I should have raised it, your
10   Honor.
11        THE COURT:  But I do understand and, um, if you're
12   going to alter the normal rules, and some think you can
13   -- I haven't got my mask on.  (Laughter.)  Anyway,
14   you've got to tell me what your agreements are and you
15   recognize that and I appreciate your cooperation,
16   believe me I do, and I will be guided accordingly.  And
17   I'll search for another ground for granting it.
18        (Laughter.)
19        MR. HANNON:  Thank you, Judge.
20        MS. GAROFALO:  Thank you.
21        (Short recess, 10:50 a.m.)
22        (Resumed, 11:15 a.m.)
23        THE COURT:  I believe, Mr. Hannon, you may
24   continue.
25        MR. HANNON:  Thank you, your Honor.

1    Q.    I'm going to show you, sir, what we've agreed to

2    here as Exhibit 17.

3          THE COURT:  Exhibit 17?

4          MR. HANNON:  Yes, Judge.

5          THE COURT:  Very well.

6          MR. HANNON:  I don't see it on my screen.  Oh,

7    there we go.  Thank you.  (On screen.)

8    Q.    So we're looking at what's been entered as Exhibit

9    17, I'll just show you the subject line here.  (On

10   screen.)

11         So Tom Baxter, um, and we've heard Mr. Baxter's

12   name.  What was Mr. Baxter's role at Wellington back in

13   March of 2014?

14   A.    So Mr. Baxter was an Associate Director of Global

15   Equity Portfolio Management.

16   Q.    Okay.  And am I right that Mr. Baxter was the one

17   who made the decision to hire Ms. Chan?

18   A.    Um, Mr. Baxter made the decision to recommend the

19   hiring of Ms. Chan to me.

20   Q.    So you would not say that Mr. Baxter made the

21   decision to hire Ms. Chan?

22   A.    I would say there were two decisions.  Mr. Baxter

23   made the decision to recommend Ms. Chan's hiring to me

24   and then, um, I ultimately was the one who had to

25   approve that decision, which was my decision, yes.

1   Q.    Okay.  Well here let's take a look at your
2   deposition transcript.
3           MR. HANNON:  May I approach, your Honor?
4           THE COURT:  You may.
5           (Hands to witness.)
6           THE COURT:  And I have a copy of this as well?
7           MR. HANNON:  Yes, you do, your Honor.
8           THE COURT:  Thank you.
9   Q.    If you would turn to Page 79, please, of the
10  transcript.
11  A.    (Turns.)
12  Q.    Line 8 on Page 79.  Please read along silently as
13  I read aloud.
14          Question, "So it was Mr. Baxter's decision to hire
15  her?"  And that's referring to Ms. Chan, am I right?
16  A.    Yes, it's referring to Ms. Chan.  Yes.
17  Q.    Okay.  And your answer, sir, is "That's how I
18  would describe it," right?
19  A.    That was my answer on that date, yes.
20  Q.    Well let's get back to this e-mail we were looking
21  at here from Mr. Baxter in March of 2014.
22          Now, on March of 2014, this is before Ms. Chan
23  started at Wellington, right?
24  A.    Um, I can't recall the exact start date, but, um,
25  yes, I would assume so.

1    Q.    Okay.  And we see here, in the first section here,
2    there's a discussion about continuing the interview
3    process with Ms. Chan and kind of what people think
4    about her as an applicant, right?
5    A.    (Reads.)  Sorry, I'm not sure I understand your
6    question?
7    Q.    Sure.  Just to give some context to this message,
8    you would agree this is discussing Ms. Chan's interview
9    process at Wellington, right?
10    A.    I wouldn't describe it as -- describing the
11    process, it's describing the feedback on the process,
12    um, from the interview process.
13    Q.    Okay, but it's about the interview process?
14    A.    Yeah, it's feedback on the interviews.  Yeah.
15    Q.    Great.  Okay.  Now just to look down, um, in here
16    at the end of the first paragraph, Mr. Baxter here, um,
17    he makes a proposal, is that right?  Do you see that
18    there?
19    A.    That's right.
20    Q.    And then he has various bullets kind of concerning
21    what Ms. Chan's role at Wellington would be, right?
22    A.    (Pause.)  I'm just reading it.
23    Q.    Oh, sure, take your time please.
24    A.    (Reads.)  Yes.
25    Q.    Okay.  So this is Mr. Baxter's proposal at that

1   time concerning what Ms. Chan's role at Wellington would

2   look like?

3   A.    Um, I think I would describe it more as

4   "brainstorming" at that time.

5   Q.    Okay, and, um -- well the way he describes it is

6   as a "proposal," right?

7   A.    That is how he describes it, yes.

8   Q.    Okay.  And, um, the fourth bullet on his proposal,

9   um, concerns Ms. Chan taking some time to develop a

10  process -- I'm sorry, a philosophy and process statement

11  for a "Gigi Chan managed approach," right?

12  A.    Um, that's what that bullet says.

13  Q.    Okay.  And in fact, sir, Ms. Chan was hired,

14  right?

15  A.    Ms. Chan was hired.

16  Q.    And at some point after she was hired she did

17  indeed begin working on developing the "Gigi Chan

18  managed approach," right?

19  A.    At some point after she was hired she began that,

20  yes.

21  Q.    Okay, and that was -- that was part of her job to

22  work on developing those approaches?

23  A.    I wouldn't describe that as part of her job, no.

24  Q.    You didn't -- so just to be clear, Wellington

25  didn't want her to be developing approaches, is that

```
1    your testimony, sir?
2    A.    Um, that's not what you asked me, you asked me if
3    that was her job?  And her job was to be an equity
4    research analyst working on the Emerging Market
5    Opportunities Team supporting the portfolio manager of
6    that team.
7    Q.    But Wellington also wanted Ms. Chan to do other
8    things, right?
9    A.    There was a must-have and there was a nice-to-
10   have.  The must-have would be her analyst
11   responsibilities on the Emerging Market Opportunities
12   Team.
13   Q.    What --
14   A.    If down the road other things came, then I'm sure.
15   But she was hired to be an analyst on the Emerging
16   Market Opportunities Team.
17   Q.    Well, sir, let's pause for a moment here on your
18   characterization of that role as a "must-have."
19         For how long had you been searching to fill that
20   spot on the EMO team before you hired Ms. Chan?
21   A.    We had not been searching.
22   Q.    This was a new role that you created specifically
23   for Ms. Chan, right?
24   A.    Um, the "you" being Wellington, because I don't
25   remember individually creating it.  But, um, Ms. Chan --
```

1   it was -- it was a new role, yes.

2   Q.    Okay.  And this "must-have" role that you've

3   described on the EMO team, after you fired Ms. Chan, who

4   did you hire to fill it?

5   A.    I didn't describe it as a "must-have role in the

6   Emerging Market Opportunities Team," I said that her

7   job, when she joined Wellington, was to be an analyst on

8   the Emerging Market Opportunities Team.

9   Q.    Back to my question, sir.  When you fired

10  Ms. Chan, who took over her responsibilities in the EMO?

11  A.    Um, when Ms. Chan was terminated we were going

12  through a process where we invested in -- we were

13  investing in expanding a group called "Investment

14  Science."  So Mr. Mattiko and his direct supervisor at

15  the time in Hong Kong used that as an opportunity to

16  replace Ms. Chan with, um -- if my memory is right, with

17  a research associate from our early career program and

18  an investment scientist from our Investment Science

19  program, which was a new initiative that Mr. Mattiko was

20  amongst the very first to embrace.

21  Q.    You didn't hire an equity research analyst to

22  replace Ms. Chan on the EMO team, is that fair to say?

23  A.    Um, we didn't hire an equity research analyst, we

24  hired a research associate and an investment scientist.

25  Q.    So -- okay, so back to Ms. Chan's responsibilities

1    when she joined Wellington.

2         Would you agree with me at least that Wellington

3    was excited about the prospects of Ms. Chan potentially

4    developing a Gigi Chan-focused strategy?

5    A.   Um, I think we were excited about any new employee

6    joining the firm, but I don't know if that excitement

7    was tied to -- certainly my excitement, and I can only

8    speak for myself, Wellington has 2750 employees and I

9    don't know what it was at the time.  But, um, you know

10   my excitement didn't surround the fact that, you know,

11   she might one day develop an approach for the firm or

12   not.

13   Q.   You didn't see her as a portfolio manager?

14   A.   She was hired as an equity research analyst.

15   Q.   Sure, but in terms of her potential as an investor

16   in terms of growing at Wellington, is it your testimony,

17   sir, that you didn't view her as a portfolio manager?

18   A.   It's my testimony that a year before we

19   interviewed her for an equity research analyst role, we

20   interviewed her for a portfolio management role, and she

21   was not successful in that interview process and we

22   didn't hire her, we actively didn't hire her to be an

23   equity portfolio manager, and we hired her a year later

24   as an equity research analyst on the Emerging Market

25   Opportunities Team.

1    Q.    Okay, back to my question, sir.  Is it your
2    testimony that when you hired Ms. Chan and you thought
3    about her potential future at Wellington, you did not
4    see her as becoming a portfolio manager?
5    A.    It was not a -- it was possible for her to be a
6    portfolio manager, but it wasn't necessarily a path she
7    would take.  I've hired many equity research analysts,
8    um, some of them want to be portfolio managers, some
9    become equity research analysts, remain career equity
10   research analysts, some go into our central research
11   function and become what we call "global industry
12   analysts" on central research, some go to other roles
13   internally, some don't make it.  But any one of those
14   paths, you know, is possible.  I --
15   Q.    You mentioned the prior recruitment effort of
16   Ms. Chan, so let's just touch upon that while we're
17   there.
18         The prior role you had mentioned recruiting her
19   for, that was a China Lead PM, right?
20   A.    That was a China Lead PM.
21   Q.    Okay, this wasn't just somebody you were looking
22   to be one of many portfolio managers at China, but this
23   was a person that you were looking to lead the
24   investment strategies in China, right?
25   A.    Um, to be a cornerstone of Wellington's investment

1    dialogue with respect to China, to manage a significant

2    -- in what we hoped would be a significant investment

3    approach in China to mentor and develop talent.  But I

4    don't want to imply -- you talk about "leading

5    investment products in China," um, we don't have a Chief

6    Investment Officer or Chief Investment Officers in

7    smaller areas, so they wouldn't have an overarching, um,

8    role in that context.

9    Q.    But the word "lead," that was the word that

10   Wellington used to describe this particular role, right?

11   A.    Yes.  Yes.

12   Q.    Okay.  And your assessment of Ms. Chan at the time

13   when you interviewed her for that position was that she

14   was just too green for that, right?

15   A.    Um, I don't know whether I -- I believe my

16   assessment was that she wasn't appropriately experienced

17   for that role.

18   Q.    Okay.  All right.  So let's get back to

19   Ms. Chan's, um, development of products at Wellington,

20   um, and I want to show you another e-mail here to kick

21   off, um, this bit.  So I'm going to show you what we've

22   agreed as Exhibit 52.  (On screen.)  And, um, just to

23   orient us here, this is an e-mail from Mr. Baxter to you

24   in January of 2015, is that right?

25   A.    Yes.

1    Q.    Okay.  And, um, did Mr. Baxter -- Mr. Baxter, he

2    reported to you, right?

3    A.    Mr. Baxter?  I had -- it varied over times, but

4    four to five associate directors that helped me or

5    basically had responsibility for managing the group.  So

6    the management of the team would have been me and then

7    four or five associate directors and Tom Baxter was one

8    of those associate directors.

9    Q.    Okay, so Mr. Baxter was reporting to you in

10   January of 2015?

11   A.    Yes.

12   Q.    And Mr. Baxter, from time to time, he would send

13   you updates in terms of what was going on with respect

14   to the investors in his region?

15   A.    Um, Mr. Baxter and I spoke on regularly-scheduled

16   calls, um, as a group, we spoke as a group once a week.

17   He and I would speak on one-on-one calls every couple of

18   weeks and we would have had ad-hoc calls or e-mails as

19   necessary.

20   Q.    Okay, so lots of contact you had with Mr. Baxter,

21   right?

22   A.    Yes.

23   Q.    Okay.  I want to direct your attention to the

24   second-to-last bullet here.  (On screen.)

25          And am I right there that Mr. Baxter is

1   referencing, um, Ms. Chan's efforts to develop, um, a

2   Gigi-Chan-led product at Wellington?

3   A.    Um, I believe that in her year-end review from

4   2014 he had discussed setting up what we call "paper

5   portfolios," um, and that would have been facilitated by

6   Rebecca Hardy, who's the "Rebecca" referred to here.

7   Um, sometimes those paper portfolios lead to investment

8   products, sometimes they do not.

9   Q.    Sure.  So that's part of the process though in

10  terms of developing products at Wellington is that

11  sometimes you start with a paper portfolio, right?

12  A.    That's accurate, sometimes you start with a paper

13  portfolio, sometimes you don't.

14  Q.    Okay.  And in a paper portfolio -- and I was going

15  to say so that the jury understands, but I probably

16  don't understand myself, um, but this has to do with

17  actually sort of recording trades but just not actually

18  putting the money in, is that right?

19  A.    Right, there's no underlying, um, investments.  In

20  fact nowadays we can all pretty much go online and

21  create a paper portfolio, if you want, and we can go

22  online and create a real portfolio, if we want, with our

23  own capital.  So this is a tracking mechanism for

24  hypothetical trades, um, and holdings.

25  Q.    So --

A.     For training and development purposes.

Q.     Sure.  So while there's no actual money involved, there's still considerable time and effort required to operate a paper portfolio, right?

A.     Um, I've never operated a paper portfolio.  I know what I would say to anyone who wanted to manage a paper portfolio, which is "Don't lose sight of your day job."

Q.     That's not my question, sir.  My question, sir, is --

A.     I don't know.  I don't know.  I don't know if there's time and effort with respect to managing a paper portfolio.

Q.     Okay.  Well even managing a paper portfolio, you still have to pick stocks, right?

A.     Well --

       THE COURT:  Well the way you're phrasing it, um, let me see if I understand his testimony.

       Today with computers and everything online, any knowledgeable person could create on paper a portfolio, could manage it, and then comparing it to the market, could see how it came out, correct?

       THE WITNESS:  Um, largely correct.  I would -- I might, um, be willing to debate you on your last point and to see, relative to market, how it came out, um, because investing institutionally involves putting in a

1   lot of capital work and sometimes that moves the market,

2   whereas in a paper portfolio you can just pick the price

3   on the screen right now.  But that's semantics.

4        THE COURT:  Well actually it's more than

5   semantics, it's a degree of sophistication.  You're

6   saying if you're managing a real portfolio for a

7   significant institutional client, um, the very stock

8   choices you make are going to have an effect on the

9   market?

10       THE WITNESS:  And not just the stock choices an

11  individual makes.

12       THE COURT:  All right.

13       THE WITNESS:  Sometimes an individual may be

14  making stock prices alone, sometimes there might be

15  multiple individuals across the whole firm trading in

16  the same stock.  So, um, I would always view a paper

17  portfolio as a training and development tool and

18  certainly not a tool for measurement of performance.

19       THE COURT:  Thank you.

20       Mr. Hannon, you go ahead.

21       MR. HANNON:  Thank you, Judge.

22  Q.   But go back to the question in terms of what

23  someone has to do to actually manage a paper portfolio,

24  it does require actually researching the stocks that

25  they're going to be choosing for their paper portfolio,

1    right?

2    A.    Um, it does require researching stocks they would

3    be using for the paper portfolio, if the paper portfolio

4    is going to have any meaning.  But one would hope that

5    either those stocks are synergistic with the day job,

6    that one's already looking at those stocks as part of

7    one's core responsibilities in one day's job, um, or an

8    analyst is so excited about the opportunity to put a

9    paper portfolio -- to start a paper portfolio, and in

10   those rare cases where something was outside the remit

11   of their day job, that they were willing to put in that

12   extra weekend -- that extra work on -- for lack of a

13   better phrase, on nights and weekends.

14   Q.    So I'm not sure I understand your testimony.  Is

15   your testimony that you thought that doing these paper

16   portfolios wasn't going to take away any of Ms. Chan's

17   time?

18   A.    Um, that -- the -- it would actually be different,

19   it should have been different for the two portfolios

20   discussed here, um, is my testimony.  So there's two

21   portfolios discussed here, one is called "China" only,

22   which is synergistic.  So Ms. Chan was an analyst, her

23   core responsibilities were as an analyst on the Emerging

24   Market Opportunities Team, and so one of the emerging

25   markets is China.  So, um, you know to leverage the work

1   that she did on the Emerging Opportunities Team to put

2   together a China Growth portfolio, um, should have been

3   possible.

4        Asia Growth, which is, um -- typically Asia Growth

5   would include Japan as well and Japan is not an emerging

6   market, so that -- and so the China portfolio should

7   have been synergistic with her core responsibilities,

8   um, but the addition of Japan to the Asian emerging

9   markets would have required, um, work beyond her, um --

10  yeah, work beyond her, um, core responsibilities.

11  Q.   And this Pan-Asia Growth Strategy you've

12  referenced, um, you know that wasn't Ms. Chan's idea,

13  right?

14  A.   Um, I don't know whose idea it was.

15  Q.   Do you know a -- are you familiar with, um, an

16  individual named Rich Pender?

17  A.   I am -- well I don't know Rich Pender, but I know

18  who he is.

19  Q.   You know who he is, right?

20  A.   Oh, yeah.

21  Q.   Okay.  He's one of the individuals that runs one

22  of these entities that invests money with Wellington,

23  right?

24  A.   Yeah, he runs the investment group in one of those

25  entities, but I don't know if he runs the entity itself.

1   Q.    Yeah, sure thing.  And Rich Pender, um, his group,

2   um, at least back at this time had a lot of money

3   invested in Emerging Market Opportunities, right?

4   A.    Um, I believe so, yes.

5   Q.    Okay.  Were you aware that Mr. Pender was the one

6   who suggested the Pan-Asia growth strategy that's

7   referenced here?

8   A.    Um, I'm aware that Mr. Pender was, um, perhaps

9   interested in a Pan-Asia growth portfolio.  I'm not

10  aware who initially brought that up to Mr. Pender or how

11  that got brought up.

12  Q.    Okay.  And just in terms of, um, just to close the

13  loop on this, um, this bit here we've be looking at,

14  Mr. Baxter writes with respect to the Asia growth

15  portfolio, "It is a major product gap for the firm

16  currently."  Do you see that?

17  A.    I see that.

18  Q.    Do you agree with that assessment?

19  A.    No.

20  Q.    Did you tell Mr. Baxter he was wrong about that?

21  A.    Um, I don't recall.

22  Q.    Did you tell Ms. Chan that this was a bad strategy

23  to be working on?

24  A.    Um, I don't recall.

25  Q.    Okay.  And it's in fact -- well before we get off

1    of these two strategies, um, China Growth, I don't think

2    we've talked about a lot so let's pause there, um, but

3    would you agree with me that China Growth was the same

4    strategy that Ms. Chan had managed at her prior

5    employment?

6    A.    Um, I don't know.  I have no reason to disbelieve

7    otherwise, but I don't know it for a fact.

8    Q.    Well at some point in time, sir, you recommended

9    internally at Wellington that Wellington in fact launch

10   the China Growth strategy for Ms. Chan, right?

11   A.    Yes, I did.

12   Q.    Okay.  And it's fair to say that at that time when

13   you made that recommendation you did so with the

14   understanding that it was the same strategy that she had

15   managed previously at Thread --

16   A.    Certainly sufficiently similar.

17   Q.    Okay.  Were you aware of any differences?

18   A.    I wasn't.  I wouldn't have been responsible for

19   that level of analysis.

20   Q.    Okay.  And it was also your understanding that

21   Ms. Chan's performance -- I'm sorry, that her management

22   of China Growth at her prior employer had been

23   successful, right?

24   A.    Um, certainly it looked as if she had produced

25   good returns at her prior employer.

1   Q.    Top decile?

2   A.    Um, I know that's what was claimed, I have no

3   reason to dispute it.  But I didn't do any of that

4   analysis myself.

5   Q.    Okay.  So that's -- so we've talked about

6   Pan-Asia, we've talked about China Growth.  But there

7   were also other potential investment strategies that you

8   considered having Ms. Chan operate subsequent to her

9   joining Wellington, isn't that right?

10  A.    Um, I -- other investment strategies that I was

11  part of a discussion on with respect to, um, Ms. Chan

12  potentially managing them.

13  Q.    Okay, let's take a look at one briefly.  So I'm

14  showing you now Exhibit 74.  And you'll see here, sir,

15  this is an e-mail exchange, it's a chain from May of

16  2015, is that right?

17  A.    Um, an e-mail --

18  Q.    Yeah, take your time, I don't mean to rush you.

19  A.    Yes, can I just read it?

20  Q.    Yes, please do, sir.

21  A.    (Reads.)  Okay.

22  Q.    Um, so, um -- I forget what my question was so

23  I'll just ask a new one.

24        So there's some discussion here in this e-mail

25  about, um, possibly pursuing an investment strategy

1    involving China and India, is that right?

2    A.    That seems to be what's implied, yes, a combined

3    approach that invests in both China and India.

4    Q.    Okay.  And if you look at your e-mail down at the

5    bottom, the last line here, um, you suggest to Tom and

6    Erin, "I wonder if an integrated Chindia portfolio

7    managed by Gigi is Plan C?"  Do you see that?

8    A.    Yes, I do.

9    Q.    Okay, and the "Gigi" you're referencing there is

10   "Gigi Chan," correct?

11   A.    It was Gigi Chan, yes.

12   Q.    Okay.  Now this is May of 2015, correct?

13   A.    Yes.

14   Q.    Okay.  So by this point in time Ms. Chan has been

15   at Wellington for a bit over a year, is that right?

16   A.    Um, yes.  Again I actually -- I can't remember her

17   start date, but, yes.

18   Q.    Okay, that's fine.  And, um, Ms. Chan's, um,

19   things, um, had been -- strike that, let me ask an

20   actual coherent question.

21        You've been satisfied with Ms. Chan's performance,

22   um, up through May of 2015, isn't that right?

23   A.    Um, it's -- we're going to use the word

24   "performance" a lot, um, in this trial because

25   "performance" can apply from a big-picture perspective

1    and also from a -- we measure investment returns and

2    that can be "performance" too, which is a subset of

3    overall "performance."  So, um, when we're talking about

4    "overall performance," hopefully I won't flip and flop,

5    but I'll probably use the word "impact."  So, you know,

6    it was the early days and we were still getting to know

7    Ms. Chan and, you know, a year in, but I personally

8    actually probably knew very little.

9    Q.    Well let's take a look at some documents here and

10   see if we can get a clearer picture in terms of how

11   things worked.

12   A.    Yup.

13   Q.    So I'm showing you on this screen here now Exhibit

14   54, um, and whenever you're ready, and I don't want to

15   rush you, um, please identify what this document is?

16   A.    (Looks.)  Okay.

17   Q.    So this is an e-mail from Mr. Baxter to Ms. Chan

18   copying you and bcc'ing some others, right?

19   A.    That's right, so each one of the associate

20   directors for the 150- or 120-or-so people, um,

21   investment professionals in the group, would have

22   written up a note regarding their year-end meetings.

23   Q.    And this was a sort of annual practice of

24   Mr. Baxter that at the end of each year he would sit

25   down and talk to investors and then after the talk he

1    would shoot an e-mail of a kind of a brief summary of

2    their chat?

3    A.    Um, it was hopefully an annual practice of all my

4    associate directors.

5    Q.    Okay.

6    A.    Including Mr. Baxter, yes.

7    Q.    Okay.  And just to -- well there's one bit here.

8    Mr. Baxter starts off the second paragraph, "The main

9    message is that you're off to a good start."  Do you see

10   that?

11   A.    I do see that, yes.

12   Q.    Would you agree, sir, that Ms. Chan got off to a

13   good start at least as of January of 2015 at Wellington?

14   A.    Um, I honestly don't know, I was managing a

15   department with 120 investment professionals in it.  I

16   would -- I would look to Mr. Baxter to be managing that.

17   Q.    Okay, well we can ask Mr. Baxter about that then.

18         Okay.  In terms of other input that you got

19   concerning Ms. Chan's performance, um, I'm going to show

20   you Exhibit 71 now.  (On screen.)  And I want to ask you

21   some questions, whenever you're ready, about

22   Ms. Scordato's e-mail right there in the middle of the

23   page.  So let me know when you're ready?

24   A.    Um, yes, I'm ready.

25   Q.    Okay.  So to get us all on the same message here.

1    (On screen.)  So we're looking here at a message from

2    Christine Scordato.  Can you please tell us who she is?

3    A.    Christine Scordato is, um, an experienced

4    professional in our Human Resources Group, um, and our

5    Human Resources Group had individuals dedicated to

6    usually a group of aligned functions.  So Christine was

7    the Human Resources professional who worked very

8    closely, um, with the investment functions for pretty

9    much the entirety of the time I was in that role.  So

10   from a, um -- so she was a "thought-partner" to me, so

11   to speak, from Human Resources.

12   Q.    Okay.  Where was Ms. Scordato in the sort of

13   hierarchy of the HR function, do you know?

14   A.    I don't know.

15   Q.    Okay.  But in terms of when you needed something

16   from HR, Ms. Scordato was sort of your go-to-person?

17   A.    Um, it depends on what it was from HR.  I would

18   say I would discuss more strategic matters with

19   Christine Scordato and she would have a team who I would

20   discuss more tactical matters with.  In fact I would

21   usually delegate someone to talk to Christine about more

22   tactical matters so.

23   Q.    I understand.  And did I hear you previously refer

24   to Ms. Scordato as a "thought-partner"?

25   A.    Um, she was a part of the management team, yeah,

1    who I would, um -- who I would, um, share ideas with,
2    bounce ideas off, um, brainstorm with.
3    Q.    Okay.  So let's take a look at what Ms. Scordato
4    wrote about Gigi Chan.  (On screen.)
5          Do you recall reading this feedback from
6    Ms. Scordato in May of 2015?
7    A.    Um, I don't recall that.
8    Q.    Okay.  Is this, um -- is this consistent with your
9    understanding of how things were going for Ms. Chan at
10   Wellington at least as of May of 2015?
11   A.    Um, again I -- my recollection of how things were
12   going with Ms. Chan in May of 2015 was the 10,000 foot
13   view so.
14   Q.    I'm sorry, I don't mean to cut you off, but is
15   this consistent with the 10,000 foot view you had as of
16   May of 2015?
17   A.    This was feeding the 10,000 foot view so, um, I
18   don't -- I'm not sure I would have had an independent
19   view other than what was coming from, at this point in
20   time, Ms. Scordato and others who were given or provided
21   similar feedback, such as the previous e-mail.
22   Q.    Sir, my question is, is this consistent with what
23   your view was from 10,000 feet as of May of 2015?
24   A.    I have no reason to disagree with it, I don't
25   think.

1    Q.    Okay, great.  Now, um, with respect to Ms. Chan's

2    assignment to the EMO team, um, when she first joined

3    that had been a sort of temporary assignment, right?

4    A.    Um, I wouldn't describe it as a "temporary

5    assignment," it was a rotational assignment when

6    Ms. Chan first joined.  She was under time constraints,

7    she had to make a decision, um, and we -- and we didn't

8    frankly have time to figure out, um, where her permanent

9    role might be, so we came up with what we described as a

10   "rotational role," and if all went well there it could

11   become a permanent role, and if it didn't, she was well-

12   aware that there could be another team for her to work

13   with.

14   Q.    And things did go well, right?

15   A.    Um, things did go well?

16   Q.    Well you said that if things went well, that it

17   would turn into a permanent role and things went well?

18   A.    Mr. Mattiko provided, you know, sufficient

19   feedback to us where we were comfortable, um, ceasing

20   the rotational aspects, so there was only one rotation,

21   and she became a permanent member of that team, yes.

22   Q.    Sure.  So just to save some time, would you just

23   try to answer my question, sir.

24         Would you agree with me that things went well on

25   the EMO team leading to her becoming a permanent member?

1    A.    Um, I would guess they went well-enough.  I don't

2    -- I don't know the details enough for me to say they

3    went well, but I would presume they went well, yes.

4    Q.    Okay.  You would agree with me that, um, in -- at

5    some point in 2015 she became a formal member of the EMO

6    team, right?

7    A.    Yes, I do.

8    Q.    Okay.  And do you recall there was an announcement

9    made to folks at Wellington about that fact?

10   A.    Um, I don't -- I don't recall if there was an

11   announcement, but it wouldn't surprise me if there was.

12   Q.    Okay.  In terms of, um, you mentioned before how

13   frequently you interacted with Mr. Baxter, um, did

14   Mr. Baxter tell you any of the feedback he got in

15   connection with that announcement?

16   A.    I can't -- I can't recall.

17   Q.    (Pause.)  This is Exhibit 85 here, sir.  I

18   recognize you're not a, um, you're not listed here as a

19   sender or recipient of the e-mail.  My question though

20   is whether or not the information reflected here from

21   Mr. Baxter, um, if you can tell us if he made that known

22   to you?

23   A.    I don't recall him making that known to me.

24   Q.    Okay.  Does it -- does it surprise you that

25   Mr. Baxter had received several unsolicited positive

1    comments from investors here in Boston and via e-mail

2    about the fact that Ms. Chan was joining, um, EMO?

3    A.    Um, it doesn't surprise me because Wellington is a

4    firm that, um, where people like to chime in and say,

5    "Hey, that's great."

6    Q.    And how about the next sentence, that several

7    folks had commented how they enjoyed travelling and

8    working with Gigi, was that something that Mr. Baxter

9    shared with you?

10   A.    Um, I don't recall him sharing that with me.

11   Q.    Okay.  It doesn't surprise you that people had

12   that view of Ms. Chan in June of 2015, right?

13   A.    Um, I -- I have no -- I don't know.  I mean I --

14   again I was a -- I was at the 10,000 foot level.

15   Q.    Okay.  There's just one more on this point and

16   then we'll move on.  So this is Exhibit 92.

17   And you'll see here this is an e-mail chain involving

18   yourself, Ms. Duckworth, and Mr. Mandell, is that right?

19   A.    (Looks.)  Um, yes, it is.

20   Q.    Okay.  And, um, who is Mark Mandell?

21   A.    Um, I'm not sure of his role today at Wellington

22   Management, but at that time he was the Director of

23   Global Industry Research, I believe, which is our

24   central -- I know there's a lot to digest, but Global

25   Equity Portfolio Management, um, is largely the

1    portfolio managers and dedicated analysts supporting

2    them on their specific client mandates and Global

3    Industry Research was really a sister organization to

4    Global Equity Portfolio Management, and that was our

5    central research function.  So Mark Mandell was, I

6    believe at that time, um, the Director of Global

7    Industry Research.

8    Q.    Okay.  And Cheryl Duckworth -- and I'm not sure if

9    I've introduced her to the jury yet, but what was her

10   role back in August of 2015?

11   A.    I think, um -- really she had, um, three roles

12   almost.  So, one, from a functional perspective, so

13   within that framework, as I tried to describe, she was

14   an associate director within Global Industry Research.

15   She was also head of our Singapore office, um, and she

16   was also, um, the senior-most manager of investment

17   professionals in, um, in the Asia-Pacific region.

18   Q.    Okay.  I just want to direct you to, um, the

19   e-mail here at the bottom of the page.  And to get us

20   all oriented here, there's the e-mail from

21   Ms. Duckworth, you, and Mr. Mandell, in August of 2015,

22   with the subject "Random Info for Meetings this Week in

23   HK."  Do you see that?

24   A.    Yes.

25   Q.    Great.  And then I just want to look at this one

1    here concerning Gigi Chan. (On screen.)

2         And Ms. Duckworth reports, with respect to

3    Ms. Chan, um, "Loves the role."  Do you see that?

4    A.    Um, yes.

5    Q.    Okay.  Is that consistent with respect to your

6    understanding of Ms. Chan's, um, view of her position as

7    of August of 2015?

8    A.    Um, I'm sorry to be so repetitive, but I really

9    was at the 10,000 foot view dealing with, you know,

10   hundreds of e-mails a day and 120 investment

11   professionals across 25 teams.  I can't comment on

12   whether it was consistent.

13   Q.    Fair enough.  I'll stop belaboring the point.

14        So you're up at 10,000 feet and in September of

15   2015 something happened that brought you crashing back

16   down to earth, isn't that right?

17   A.    Um --

18        MR. PATERNITI:  Objection, your Honor.

19        THE COURT:  Well I'm not sure -- that's causal but

20   I'm not sure what it means.  So why don't you ask

21   another question.

22   Q.    September of 2015, that's when the Asian, um,

23   philosophy and process panel happens, right?

24   A.    Um, I'm now aware of that, yes.

25   Q.    Okay.  And, um, when the Asian philosophy and

1    process panel happened, Ms. Chan, she had complaints

2    about what transpired at that meeting, right?

3    A.    Um, you know I believe that she was unhappy with

4    what transpired in that meeting.

5    Q.    And there was a lot of correspondence and talk

6    about Ms. Chan's dissatisfaction with what happened at

7    the philosophy and process panel meeting, right?

8    A.    Um, there was -- um, it was undoubtedly some.  I

9    don't know how you would define "a lot," but, yes.

10   Q.    Okay.  And you, despite your significant

11   responsibilities to all these other investors you told

12   us about, you had to devote serious time trying to put

13   out this fire, right?

14   A.    Um, that's incorrect.

15   Q.    Let's take a look at some documents.  (On screen.)

16   So this is Exhibit 109 and, um, this is, um, an e-mail

17   from Mr. Burgess to yourself copying several other

18   individuals.  That's the e-mail at the top of the first

19   page, right?

20   A.    Um, yes.

21   Q.    Okay.  And then looking at the second page here,

22   which is actually looking at the, um, the message is

23   below it.  Sorry, I'm trying to go two pages.  I can't

24   be that fancy.  But the messages below it are an e-mail

25   chain that also involve Brendan Swords, right?

1    A.    Yes, I mean -- is the answer to your question.

2    Q.    Okay.  And in fact this chain all starts in

3    Mr. Swords noting that he had "caught up with June."  Do

4    you see that?

5    A.    Yes.

6    Q.    And do you understand that to be "June Oh"?

7    A.    Yes.

8    Q.    Okay.  And then turning back to the first page,

9    the e-mail chain at the top, now this is a conversation

10   you're having with folks where you've taken Mr. Swords

11   off of the e-mail chain, correct?

12   A.    Um, I -- I don't see sufficient evidence that it's

13   -- but it's a conversation, Terry Burgess is sending an

14   e-mail.

15   Q.    Okay, but Mr. Swords is no longer a recipient of

16   the, um --

17   A.    That's accurate, yes.  That's accurate, yes.

18   Q.    Okay.  In terms of what Mr. Burgess wrote.  (On

19   screen.)

20        You see here that Mr. Burgess, um, he starts his

21   message talking about China Growth and Ms. Chan, right?

22   A.    Um, yes.

23   Q.    Okay.  And, um -- and he notes, at the end of this

24   paragraph we're looking at here, that there are a number

25   of things making her feel very unwelcome at Wellington.

1    Do you see that?

2    A.    He writes "Apparently the following things have

3    her feeling very unwelcome."

4    Q.    Okay, fair enough.

5    A.    Not at Wellington, in Hong Kong.

6    Q.    Um, I'm not going to go through the whole e-mail

7    with you, the jury will be able to read it, um, after

8    we're all done with this, but I just -- there's a little

9    bit here that I do want to ask you about.  My apologies

10   for my fat fingers here, I'm trying to make this work.

11   (On screen.)

12         In the second, um, bullet here, Mr. Burgess

13   reports, "She apparently had a philosophy and process

14   session that went terribly, the panel was very abrasive

15   and did not allow her to contextualize what she does."

16   Do you see that?

17   A.    Um, yes.

18   Q.    Okay.  Now this was not the first time that you

19   had heard about the events at the philosophy and process

20   panel, is that right?

21   A.    Um, I don't know.  I could have heard about it

22   before this.

23   Q.    I'm sorry?

24   A.    I don't know when the first time was I heard about

25   it, but, um --

1    Q.    Okay.  And just so we're sort of clear in terms of

2    what your understanding of the issues were with the

3    philosophy and process panel, I think you testified

4    already that you understood that part of Ms. Chan's

5    concerns, um, or part of Ms. Chan's concerns related to

6    the comments that were made and the sort of feedback she

7    was provided, is that right?

8    A.    Um, I -- I understood that Ms. Chan was unhappy

9    with the feedback she was provided at the philosophy and

10   process panel, yes.

11   Q.    Well did she -- just to understand what you

12   thought her complaints were, did she think the advice

13   she was getting about how to develop a philosophy and

14   process --

15        THE COURT:  You can't ask a question about what

16   she thinks?  He doesn't know what she thought.

17        MR. HANNON:  Understood, your Honor.  Thank you.

18   Q.    Was it your understanding that Ms. Chan thought

19   that the guidance she was getting about philosophy and

20   process was wrong?

21   A.    Um, I -- it was my understanding that she didn't

22   like receiving feedback in the philosophy and process

23   panel in Asia.  I had nothing to do with the philosophy

24   and process path in Asia.

25   Q.    Well, sir, you weren't there, but when you found

1   out there were issues involving what transpired, didn't
2   you go and try to find out what happened?
3   A.    Um, I spent a lot of time globalizing on
4   intermanagement and I felt as if it was important to
5   empower the regions, and this is the age of the
6   philosophy and process panel, there are a lot of senior
7   Wellington people in the room, and I strongly believe
8   that it was a regional, um -- it was a regional issue,
9   if there was an issue at all.
10  Q.    So you never formed an opinion, one way or the
11  other, in terms of whether Ms. Chan was right or wrong
12  in terms of her dissatisfaction of how things
13  transpired?
14  A.    Um, I don't -- I don't recall forming an opinion
15  on whether Ms. Chan was -- whether the feedback on
16  Ms. Chan was, um, on point, um, because I wasn't in the
17  room to be able to have that opinion.  I did -- I do
18  recall forming an opinion that all professionals,
19  investment professionals in this case, should be open to
20  receiving feedback no matter whether they agreed with it
21  or not.
22  Q.    And your opinion would stay the same even if the
23  feedback is provided in a disrespectful manner?
24  A.    Um, I think -- if feedback is provided in a
25  disrespectful manner, um, there are -- that is

1  unfortunate, that would be unfortunate, if it occurred.

2  Um, but there are two issues, um -- there are two issues

3  there, right, there's two distinct matters in which --

4  the manner in which the feedback is delivered and there

5  is the feedback in and of itself.

6  Q.    Agreed.  And my question concerns --

7          THE COURT:  Strike out whether you agree, you're

8  just asking questions.  Go ahead.

9          MR. HANNON:  Thank you, Judge.

10 Q.    My question to you, sir, um, your statement

11 earlier about how you believe it's the person's job to

12 take the feedback, do you feel that same view even if

13 it's disrespectful feedback, and in that instance the

14 employees could still just simply listen and not speak

15 up for themselves?

16 A.    If -- if an employee feels as if they have -- if

17 they have been disrespected, there are many avenues, um,

18 to make a complaint, if it's disrespectful, if it's, um

19 -- but, um -- they can engage in an active dialogue on

20 the feedback.

21 Q.    Okay.  In terms of the many options that you

22 referenced, one option that you'd agree an employee has

23 in terms of responding to disrespectful feedback is to

24 say that -- to say that they find that feedback to be

25 disrespectful, right?

1    A.    I'd say that's an option to say that they find

2    that feedback disrespectful.

3    Q.    And you would agree that that's appropriate,

4    right?

5    A.    If someone's providing feedback in a manner that

6    is -- that feels disrespectful, I have no argument that

7    that's appropriate to say that "I feel this feedback is

8    disrespectful."

9    Q.    Okay.  And you'd agree that if -- if somebody at

10   Wellington observes one of your colleagues being treated

11   disrespectfully, that they'd be expected to speak up,

12   right?

13   A.    Um, yes.

14   Q.    Did anyone speak up for Ms. Chan concerning what,

15   um, the treatment she received at the philosophy and

16   process panel?

17        MR. PATERNITI:  Objection, your Honor, lack of

18   foundation.

19   A.    Um --

20        THE COURT:  Wait.  Wait, there's an objection.

21   I'm not that fast.  (Laughter.)  No, overruled.

22        Now remember, whether they did or not, um, that's

23   not going to affect the liability here, but because the

24   law doesn't require that.  At the same time I'm going to

25   give him latitude so that you can best judge why the

1    Wellington people are doing precisely what they're

2    doing.

3         Now you weren't there, but were you informed

4    whether anyone spoke up on her behalf?

5         THE WITNESS:  Um, I don't recall being informed

6    that anyone spoke up on her behalf.

7    Q.   Did anybody come to you afterwards and say -- I

8    can't call you "Charles," but, "Mr. Argyle, um, you know

9    GC has actually got a point, what was said was over the

10   line"?

11   A.   Um, not that I recall.

12   Q.   Okay.  In terms of, um, what was talked about at

13   the philosophy and process panel, um, and again

14   recognizing you weren't there, is it your understanding

15   though that the actual philosophy and process that

16   Ms. Chan communicated was actually really strong?

17   A.   Um, I wasn't there.  I don't know.  I -- I don't

18   have an understanding of the matter.

19   Q.   Okay.  And you don't recall anyone providing you

20   any sort of feedback at any time in terms of the actual

21   philosophy and process and how people actually evaluated

22   that with respect to Ms. Chan?

23   A.   Um, I -- perhaps someone provided me with

24   feedback, someone may have provided me with feedback, we

25   had a constant flow of information.  But I don't recall

1    it.

2    Q.    Okay.  Um, we'll take a look at Exhibit 112.  (On

3    screen.)  And again I'm happy to show you the whole

4    document if you'd like to see it.  But I'm just going to

5    ask you questions about the top of Exhibit 112.  I'm

6    sorry, I might be showing it to you again.  But I'm

7    asking you about the e-mail here at the top of Exhibit

8    112, um, from Mr. Baxter.

9    A.    (Reads.)

10   Q.    And, um, I want to direct your attention to, um,

11   the statement by Mr. Baxter which includes the

12   parenthetical in which he describes -- in which he

13   describes her investing philosophy as "pretty

14   compelling, by the way, she definitely knows who she is

15   as an investor."  Do you see that?

16   A.    Yeah, I see it in contrast of how she reacted to

17   the feedback, yes.

18   Q.    Okay.  And then you see, um, he goes on to provide

19   you, um, with the snippet here of the philosophy and

20   process that she had shared with the panel, right?

21   A.    He's sharing that, yes.

22   Q.    Okay.  Did you ever evaluate the philosophy and

23   process to see if his assessment of that was accurate?

24   A.    Um, I don't believe so.

25   Q.    Did you ever form an opinion that Ms. Chan did not

1   have a strong philosophy or process with respect to her,
2   um, investment approach?
3   A.   I believe over the three years she was at
4   Wellington there was mixed feedback on that point.
5   Q.   Sure, but my question is not on feedback, my
6   question is about whether or not you ever formed an
7   opinion that, um, concerning her philosophy and process
8   as an investor?
9   A.   Um, I didn't form an opinion, but I did form an
10  opinion that the articulation of the philosophy and
11  process, um, based on the multiple feedback that was
12  coming to me, um, could be better articulated.  But I
13  didn't form an opinion on the philosophy and process
14  itself.
15  Q.   Did you ever ask her to articulate her philosophy
16  and process to you?
17  A.   Um, not that I recall.
18       THE COURT:  Just have in mind that no question is
19  going to be asked of you whether anyone's philosophy and
20  process was good, bad, or indifferent, it's not the
21  concern of this jury.
22       Go ahead.
23       MR. HANNON:  Thank you, Judge.
24  Q.   Ms. Chan, um, she reached out to you regarding her
25  experience at the philosophy and process panel, yes?

1    A.    Um, I can't recall if she reached out proactively.

2    I do know that at some point we talked about it.

3    Q.    Okay.  And, um, do you recall where this

4    conversation took place?

5    A.    Um, well the only conversation I recall with her,

6    um, but not the specifics -- I recall having a

7    conversation with her in Boston in December, in early

8    December of that year.

9    Q.    Would that be --

10   A.    That would have been 2015.

11   Q.    I'm sorry?

12   A.    Yeah, early December of 2015.

13   Q.    Okay.  And was that the first time you had a

14   discussion with Ms. Chan concerning the philosophy and

15   process panel?

16   A.    Um, I can't recall if that was the first time I

17   had a discussion with her regarding that, but, um, I

18   don't believe I had one before that.

19   Q.    And, um -- and you were in the courtroom when we

20   looked at that e-mail with Mr. Swords earlier where he

21   provided some information to Kenneth Abrams in advance

22   of his trip to Hong Kong.  Do you recall that?

23   A.    I recall that he -- yeah, I mean I recall he said

24   it to Brendan -- to Mr. Swords, and, um, now I see the

25   e-mail.

1   Q.    Okay.  Sure.  So this is Exhibit 126.  (On

2   screen.)  So this is the one we looked at earlier with

3   Mr. Swords, right?

4   A.    It appears to be, yes.

5   Q.    Okay.  Um, I just want to look at what you wrote

6   to Mr. Abrams on November 4th, 2015.  (On screen.)  I'm

7   going to direct your attention here to the third

8   sentence here.  You begin, "Most importantly, she

9   doesn't feel welcome or respected in the HK office."  Do

10  you see that?

11  A.    Yes, I see it now.

12  Q.    Okay.  And then in terms of what happened at the

13  philosophy and process panel, you go and you write, "As

14  always you will hear one side of the story and the truth

15  lies somewhere in the middle."  Do you see that?

16  A.    Um, yes.

17  Q.    Okay.  Why did you think it was most important

18  that Ms. Chan -- no, actually strike that.

19        What was it that led you to conclude that Ms. Chan

20  didn't feel welcome or respected in the Hong Kong

21  office?

22  A.    Um, presumably the mosaic of input I had received

23  from, um, various parties, including Mr. Baxter and

24  Ms. Duckworth, um, and you know from the feedback I had

25  received.

1   Q.    Okay.   Prior to sending this note to Mr. Abrams,
2   um, had you ever chatted with Ms. Chan about her
3   feelings about -- about feeling unwelcome and not
4   respected in the Hong Kong office?
5   A.    Um, I believe I may have had a conversation -- um,
6   with Ms. Chan.  The only thing I'm struggling with is
7   your use of the "prior," I just can't remember the
8   timeline.
9   Q.    Okay.  And did you ask Ms. Chan for examples of
10  what made her feel unwelcome or not respected?
11  A.    Um, from recollection it was clear from Ms. Chan
12  that she, um, did not feel respected because, um, she
13  had -- and this is my interpretation of her feelings and
14  what she told me, was that she had years of investment
15  experience, including as a portfolio manager at, um,
16  Threadneedle and that that wasn't -- that investment
17  experience, that investment acumen wasn't respected at
18  Wellington, or she didn't feel it was respected at
19  Wellington.
20  Q.    And you claim that's all, that's the only thing
21  she said to you?
22  A.    Um, I'm not saying that's -- I'm not testifying
23  that those are the exact words she said to me, I'm
24  surmising what she said to me in that phrase, or in that
25  response.

1    Q.    And I apologize if you said this before, but did

2    you ever share with your HR thought-partner,

3    Ms. Scordato, this assessment that Ms. Chan didn't feel

4    welcome and respected in the Hong Kong office?

5    A.    Um, I don't recall.

6    Q.    Um, so that was, um -- that was info you were

7    providing to Mr. Abrams in advance of him going to Hong

8    Kong to talk to some people, right?

9    A.    Yeah, that was information -- so that specific

10   bullet point was information I was providing Mr. Abrams

11   to help Ms. Chan on her development here at Wellington

12   Management Company, yes.

13   Q.    And then, um, when Mr. Abrams got back, um, did he

14   talk -- did you have a chance to talk to him about, um,

15   how things had gone when he was in Hong Kong?

16   A.    I can't -- I can't recall whether I did.

17   Q.    All right.

18   A.    I had many conversations -- I feel so bad saying

19   "I can't recall" to every question, but I had probably

20   40 meetings a week maybe 40-something weeks a year.  So

21   I just can't recall every one.  I'm sorry.

22   Q.    Do you recall Ms. Chan telling you that she

23   believed she was being treated differently because she

24   was a woman and because she was Asian?

25   A.    When?

1    Q.    Besides the conversation on November 6th, 2016

2    that you talked about?

3    A.    Um, not besides that, no.

4    Q.    Do you deny that it happened?

5    A.    Um, I am confident that if she said that, and if

6    it was said in the form of a -- of a complaint, that I

7    would have known and followed the procedure to take that

8    to Human Resources to investigate it.

9    Q.    So if she said it but you did not interpret that

10   as being a complaint, it's your testimony that you would

11   not have brought that to Human Resources, is that right?

12   A.    Well that's what happened on November 2nd, 2016,

13   um, so I don't recall it ever happening again.  But, um,

14   you know there were those 8 seconds on November 2nd,

15   2016 in the context of a 70-minute conversation, um,

16   where in the context of that conversation it was very

17   clear to me that this was not a discrimination

18   complaint, it was a complaint that, um, she had

19   allegedly been made promises with respect to her

20   business trajectory at Wellington that weren't being

21   fulfilled, and, um, I can't recall ever making a

22   complaint about her gender or race or national origin,

23   um, in any prior conversations.

24   Q.    And just so I understand your testimony, you're

25   confident she had never made a complaint.  Is it fair to

1    say you're not sure if she had previously uttered words

2    of the sort that she said on November 2nd, 2016

3    concerning her treatment as a Chinese woman?

4    A.    I'm not sure if there was ever any context on

5    November 2nd, 2016 backing up that conversation.  But

6    I'm confident there was no complaint or anything that

7    came to one.

8    Q.    I'm sorry, I didn't catch your answer?

9    A.    I am confident there was no complaint.  Um, I

10   don't believe there was ever any reference.  But I can't

11   remember every word that was said in every conversation.

12   Q.    When you say you "don't believe there was any

13   reference," you mean you don't --

14   A.    Any reference to her being treated differently

15   because she was a woman, because she was of, um,

16   Chinese, um -- she's of the Chinese race or that she's

17   from the Asian region of Hong Kong.

18   Q.    You claim she never said that at any point during

19   her employment?

20   A.    I can't recall, um, I mean other than November

21   2nd, 2016.

22   Q.    Okay.  Back to, um -- back to the feedback from

23   Mr. um -- Mr. Abrams.  I show you here Exhibit 131.  (On

24   screen.)  Let's start with the timing of this.

25         So this is, um -- this is an e-mail from

```
 1    Mr. Mattiko to you on November 27th, 2019?
 2    A.    I can't see anything on my screen.
 3    Q.    Oh, I'm sorry, I keep on doing that.
 4    A.    That's all right.
 5    Q.    I'll get better.
 6    A.    (Reads.)  Yes.
 7    Q.    Okay.  And just down a bit further in the third
 8    paragraph here, you see Mr. Mattiko references a long
 9    talk he had had with Kenny.  Do you see that?
10    A.    Oh, yes, I see that.  Can I read it?
11    Q.    Oh, yeah, please do.
12    A.    (Reads.)  Okay.
13    Q.    Okay.  So, um, the reference to Kenny in the first
14    sentence, "I had a good long talk with Kenny Wednesday,"
15    um, would you agree that that's Mr. Abrams?
16    A.    I would agree with that.
17    Q.    Okay.  And, um, in terms of Mattiko, Mr. Mattiko's
18    description of what Mr. um -- Mr. Abrams had reported --
19    I'm directing you here to the sentence in the third
20    line, "He also recognizes that to come into Wellington
21    as an investor, a female, in Asia, that the odds are not
22    stacked in her favor necessarily and we need to have
23    sympathy with how hard it must be for her to make it
24    work at Wellington."  Do you see that there?
25    A.    Yes, I do.
```

1    Q.    Okay.  And Mr. Mattiko goes on to say, "Once

2    again, I think you and I would agree with this

3    principle."  Do you see that?

4    A.    I see it, yes.

5    Q.    Do you agree with that principle?

6    A.    No.

7    Q.    Did you tell Mr. Mattiko you disagreed with that

8    principle?

9    A.    Um, I don't know.

10   Q.    Did you ask Mr. Mattiko what would ever cause him

11   to think that being a female investor in Asia would

12   somehow have the odds stacked against an investor at

13   Wellington?

14   A.    Not that I recall.

15   Q.    Did that sentiment that Mr. Mattiko expressed to

16   you, did that concern you?

17   A.    Um, I do not -- I don't recall if it concerned me.

18   Q.    Did you ask Mr. Abrams why he had expressed that

19   sentiment to Mr. Mattiko?

20   A.    Um, I don't recall if I asked Mr. Abrams.

21   Q.    Did you do anything to follow-up, to see if it was

22   true that for some reason, um, investors that are female

23   in Asia are somehow having the odds stacked against

24   them?

25   A.    Um, well I actually believed that I, in my role,

1    that I was a lot closer to the situation than Mr. Abrams
2    or Mr. Mattiko, they're not running divisions of the
3    firm, they were running our clients's assets, um, to
4    know, um, to have an opinion on this.
5    Q.    Were you no longer 10,000 feet high?
6    A.    This is not a 10,000 -- this is a 10,000 feet high
7    situation whether women at Wellington, um -- let me just
8    read this, um, whether women at Wellington, the odds are
9    not stacked in their favor, that is a 10,000 foot-high
10   issue, um, if we have a challenge with women in GEPM?
11   So this is exactly 10,000 feet high.  And I did not
12   believe there was an issue with respect to, um, women
13   being successful in GEPM or in making it work at
14   Wellington.  We could have done a better job and we
15   could have done better at -- I mean we were focused on
16   increasing the number of women in our group, but once
17   they were in our group, I feel very confident that their
18   odds for success were every much the same -- were equal
19   to men.
20   Q.    So you think Mr. Mattiko and Mr. Abrams were just
21   -- they were offbase on this?
22   A.    Sorry?
23   Q.    Mr. Mattiko and Mr. Abrams, they were just offbase
24   on this assessment?
25   A.    Um, I -- they were either offbase or wrong or what

1    they wrote was -- they were either off base -- I think

2    they were either offbase in their assessment, yes, um,

3    or they misstated in some way what they meant.

4    Q.    So this wasn't the first time that, um, you had

5    been confronted with somebody expressing concerns about

6    the, um, difficulties faced by female investors in GEPM,

7    was it?

8    A.    Um, I don't recall.

9    Q.    I'm showing you now what we've agreed is Exhibit

10   62.  And just to make sense of this, I'm going to start

11   with the e-mail here in the middle, and as always,

12   please feel to interrupt if I'm moving too fast.  But

13   here in the middle here, the first e-mail in this chain

14   is an e-mail from Terrence Burgess to Brendan Swords.

15   Do you see that?

16   A.    Um, yes, I do.

17   Q.    Okay.  And that's in April of 2015?

18   A.    Yes.

19   Q.    And this is regarding "A few thoughts on

20   adversity," right?

21   A.    Yes.

22   Q.    And then just to move up on the page, um, it looks

23   like Mr. Swords had forwarded the message to you and

24   then you had chimed in, um, "Brilliantly stated"?

25   A.    Yes, Mr. Swords forwarded the e-mail to me and,

1    um, that is what I said, um, in response to

2    Mr. Burgess's e-mail, which was far longer than, um,

3    just this sole page you had on the screen.

4    Q.    Now I want to direct your attention to, um -- this

5    is going to be the second-to-last bullet here and, um,

6    I'll get the author here.  This is Mr. Burgess's e-mail.

7    So this is the second-to-last bullet, let me call this

8    out here.  (Blows up.)

9         If I direct your attention to the sentence that

10   begins, "I am not quite sure why so few women have

11   succeeded in GEPM.  The lack of women worries me.  Why

12   are they not succeeding?  We should never discount how

13   much easier it is for a white male to make a connection

14   in a culture that is based on" -- and continuing onto

15   the next page, "collaboration.  It is definitely easier.

16   We have to change that."

17        Do you see that there, sir?

18   A.    Um, I see what you wrote -- what you read, yes.

19   Q.    Did you agree with that assessment?

20   A.    Um, not all of it.

21   Q.    What parts do you disagree with?  And I'm happy to

22   make certain sections larger.

23   A.    Yeah, I know, it's on two different pages.

24        Um, so -- well I don't agree with a lot of it, but

25   I do agree that the lack of women worries me, and I

1    don't know if Mr. Burgess's -- I have no idea if

2    Mr. Burgess's context in saying "I'm not quite sure why

3    so few women have succeeded" is his view, um, because it

4    is his view.  But have few women succeeded because of

5    the lack of women in the group -- because there's a lack

6    of women in his group or that the few women in the group

7    are not succeeding?  And I don't agree that it is easier

8    for white males to make a connection in a culture that

9    is based on -- whatever the word is over the page, um,

10   "collaboration," is it?

11   Q.    Okay.  And, um, despite those disagreements, um,

12   you're -- you have to let me ask the question.  You

13   didn't note any of those disagreements in your response

14   to Mr. Swords, did you?

15   A.    No, this was a very -- no, I didn't.  This was a

16   very dense e-mail, there was a lot in it.

17   Q.    Are you telling us you didn't read it?

18   A.    Am I telling you what?

19   Q.    Are you telling us you didn't read it before you

20   responded saying "Brilliantly stated"?

21   A.    No, I'm telling you there are multiple points --

22   and we just went through one small section of one bullet

23   point, so there's multiple points in this e-mail.  I --

24   I'm saying it was a brilliantly-stated e-mail, but I'm

25   not saying I agreed with every single point that was

1    made in the e-mail.

2    Q.    Um, we've talk a bit about June Oh today.  Mr. Oh,

3    um -- it's fair to say that, um, Mr. Oh has a reputation

4    at Wellington for being difficult to get along with?

5    A.    Um, that's not -- that's not my experience.

6    Q.    Okay.  Were you aware that others at Wellington

7    besides Ms. Chan had that experience?

8    A.    Um, no, I wouldn't describe him as "difficult to

9    get along with."

10   Q.    How would you describe it, in some other way?

11   A.    I would say he might be somebody who would be, for

12   some, might be difficult to create a close rapport with.

13   But I wouldn't describe it as "difficult to get along

14   with."

15   Q.    How about "unfriendly"?

16   A.    Um, he was -- he was business, right, and so if

17   you want him to, um -- if you wanted a conversation with

18   June Oh, he wanted to talk about business.  There was

19   little small talk.  And he was willing to challenge

20   perspectives and views.  If some people view that as

21   "unfriendly," that lack of small talk or that, um, the

22   fact that they might get a view that didn't agree with

23   their own, um, and some people view that as

24   "unfriendly," then that's their interpretation.

25   Q.    Um, but that style that you described for Mr. Oh,

1    you didn't view that as a deficiency, did you?

2    A.    No, I didn't view that as a deficiency.

3    Q.    Okay.  Were there ever times when you observed

4    similar behavior by Ms. Chan?

5         THE COURT:  Similar to what?

6    Q.    Similar to the conduct that you just described

7    with respect to Mr. Oh?

8    A.    I -- um, very little.  My interactions with

9    Ms. Chan were probably two times a year, um, on average.

10   So, um, I didn't observe Ms. Chan in the workplace.

11   Q.    The e-mail we saw earlier concerning "VIP shop"

12   with Mr. Swords's testimony, the one that was forwarded

13   by Jean Hynes, do you recall that one?

14   A.    Um, yes, I do.

15   Q.    Okay.  Fair to say that if Mr. Oh had written that

16   e-mail, nobody would have raised an eyebrow?

17   A.    Um, I don't think that's fair to say.

18   Q.    (Pause.)  I want to focus on some of the things

19   that you did observe.

20        So you mentioned already that, um, you -- let me

21   start all over again.

22        You were the champion of launching Ms. Chan's

23   China Growth Fund, is that right?

24   A.    Um, I was certainly a champion and probably the

25   most important champion.

1   Q.    The "most important" given your role as head of

2   GEPM?

3   A.    Yes.

4   Q.    Okay.  And there was a process within Wellington

5   of sort of what you had to do in order to launch a new

6   strategy like China Growth, right?

7   A.    Of the approvals one had to get in order to launch

8   it, yes.

9   Q.    Okay, so there was a, um -- there was a product

10   approval meeting, um, a committee?

11   A.    A product panel.

12   Q.    A product panel.  Thank you.  And then, um, if you

13   could help me out, do you recall what the various panels

14   were that had to approve of the strategy in order for it

15   to launch?

16   A.    Well to approve a strategy in order to launch only

17   requires the product panel.

18   Q.    Okay.  So China Growth, that wasn't just a

19   strategy?

20   A.    That was a fund.

21   Q.    Okay.  So what were the hoops that you had to jump

22   through in order to get the China Growth fund approved?

23   A.    Um, shall I explain the fund in this context?

24   Q.    Sure, that would be helpful.

25   A.    So a fund in this context is a vehicle that allows

```
1    for the commingling of client assets.  So if one client
2    comes to us and says, um, "We would like to participate
3    in your Emerging Market Opportunities approach or in
4    your U.S. Equity Approach," um, if they're of sufficient
5    size it might be possible to manage -- it's often
6    possible to manage a separate account for that client.
7    Smaller clients, because not all university endowments
8    are the same, not all pension plans are the same size,
9    um, smaller clients sometimes might want access to a
10   firm such as Wellington Management Company, but they're
11   not of the size where it makes sense for us to take it
12   as a separate account, and jurisdictions, various
13   jurisdictions around the world allow for those
14   commingling of assets, um, of client assets in one fund,
15   so when one fund is invested, but multiple clients are
16   investing in it.  So it's akin to a mutual fund, the
17   retail investors, but institutional.  And what's
18   important with respect to the fund is the time it --
19   versus a strategy, um, is the time it takes because
20   we're commingling client assets.  The regulatory
21   requirements, the rules that exist around the ability to
22   commingle client assets in all jurisdictions in the
23   world, that I'm aware of where it happens, are very
24   strict and require, um, us following them.  And so it
25   takes a lot longer, um, to launch a fund than solely a
```

1   strategy.

2   Q.    Okay, so launching a fund takes a lot of work,

3   right?

4   A.    Launching a fund takes a lot of work and because

5   it takes a lot of work it requires additional approvals

6   at Wellington Management.

7   Q.    Which brings us full circle.  So what were the

8   approvals that were needed for the China Growth Fund?

9   A.    The approvals that were granted were product

10  panel, which is approving a strategy.  The Fund Approval

11  Committee, which is appropriately named, which, um, is

12  the committee that approves the launch of the fund.  And

13  also once a fund is launched, we have no client assets

14  to put in it so we will put our own capital, Wellington

15  -- the firm's own capital in the fund to start the fund,

16  to incubate the fund.  So the last, um, committee would

17  have been the Capital Commitments Committee.  Some of

18  the -- the order those occur in can vary depending on

19  the timelines those committees are meeting.

20  Q.    Sure.  But am I right that one thing those

21  committees have in common is that, um, as part of the

22  process to get their approvals, there had to be a memo

23  created for the committee that sort of talked about the

24  China Growth Fund and what the expectations were for it?

25  A.    Um, there would certainly be a memo or a

1    presentation.  There would be materials for that, um,
2    put together, yes.
3    Q.    Okay.  And you would agree with me that those
4    materials that -- that it was important for Wellington
5    that those materials be accurate, right?
6    A.    Um, it was important that they weren't inaccurate,
7    yes.
8    Q.    Did you mean to draw a distinction there in saying
9    that?
10   A.    No, um, it's important they were accurate.
11   Q.    Okay.  And you'd agree with me that the materials
12   that were submitted to these various committees
13   regarding China Growth, that they were accurate?
14   A.    Um, I would say they're accurate.  Um, not
15   necessarily complete.
16   Q.    Okay.  Was there specific information, to your
17   knowledge, that was omitted from these memos?
18   A.    And so the reason I wanted to -- one of the key
19   reasons I wanted to launch a China Growth Fund was
20   because Ms. Chan was intimating to me that she was
21   getting lots of phone calls from, um, headhunters or
22   maybe directly -- I don't know, but maybe directly from
23   other asset management firms for opportunities to manage
24   funds in those other firms.  So one of the key reasons
25   why I wanted to get something up and running, um, as

1    fast as possible, um, for her was to do my best to
2    retain her to help her be successful at Wellington.
3    That is exactly an example of what I was trying to say
4    would not have been in the memo to the Product Panel,
5    that was information that should exist between Ms. Chan
6    and her line, her supervisory line, and didn't need to
7    be aired in front of, um, the Product Panel, the Capital
8    Commitments Panel, and the Fund Approval Committee, um,
9    that that was one of the driving forces for launching
10   this fund.
11   Q.    So you've kept that information from the
12   committees you were asking approval from?
13   A.    Um, I was the Director of Global Equity Portfolio
14   Management, I was a Vice-Chairman in the firm, and I
15   chose that to -- I chose to keep that -- to keep that
16   from the materials that were going to those committees,
17   yeah.  I chose -- I don't -- I don't prepare the
18   materials for any of those committees, but, um, I didn't
19   share that in my support of the launch of China Growth.
20   Q.    Okay.  But the support that you provided to the
21   various committees you were indicating that you believed
22   in the strategy, right?
23   A.    Um, yes, that was -- that was accurate.  So when I
24   said earlier, "Well it wasn't inaccurate," um, yes, I
25   supported this -- the launch of the strategy of China

1    Growth, but the support and the reasons for my support

2    were incomplete in those memos.

3    Q.    Do you have a practice of that, of providing

4    incomplete, um, statements with respect to

5    decision-makers at Wellington?

6    A.    I can't speak for other decision-makers, but as

7    the Director of Global Equity Portfolio Management, I

8    would make -- I have to make business judgments every

9    single day.  I can't remember a similar one to this

10   because I can't remember a case where someone was coming

11   to me and saying, effectively, "If you don't launch this

12   approach, I'm walking," so I didn't have a practice of,

13   um, that precisely.  But I'm sure there were times when

14   I said, "You know what?  Maybe the committee doesn't

15   need to know that," or maybe it would be inappropriate

16   for a committee of 10, 12 individuals to know that at

17   Wellington, it actually wouldn't be fair for this

18   individual's career if they go on to be successful here.

19   Q.    You indicated this was a unique circumstance.

20   Ms. Meunier, um, she was a -- she is a portfolio manager

21   at Wellington in the Hong Kong office, correct?

22   A.    Yes.

23   Q.    Um, do you recall at some point in time you made

24   the decision to give her the Portfolio Manager title?

25   A.    Um, I don't recall making that decision.  Um, I

1    don't recall whether that was a recommendation made to
2    me by Tom Baxter or I made the decision.  But that
3    occurred.
4    Q.    And am I right, sir, that at least one of the
5    reasons why you decided to give her the Portfolio
6    Manager title was that of concern that if you didn't do
7    so she might leave?
8    A.    Um, I don't recall.
9    Q.    Are you aware of any male investors at Wellington
10   within GEPM who have had to threaten to leave in order
11   to get you to back their investment strategy or fund?
12   A.    Um, I'm not aware of any that had to leave with
13   the explicit purpose of -- or threatened to leave with
14   the explicit purpose of backing that fund or --
15   Q.    Who is Jamie Rice?
16   A.    Jamie Rice is an employee at Wellington.  Jamie
17   Rice is an employee of Global Equity Portfolio
18   Management.
19   Q.    And at some point in time Mr. Rice was a Portfolio
20   Manager?
21   A.    That's correct.
22   Q.    Do you recall what his, um -- strike that.  Do you
23   recall when it happened?
24   A.    I don't recall it happened.
25   Q.    I'm sorry?

1    A.    I -- so two things.  I don't recall either.  But I
2    don't recall when he started having Portfolio Management
3    responsibilities, which may differ from when his title
4    in the internal system was changed to Portfolio Manager.
5    I don't recall either, either date.
6    Q.    Okay.  But Mr. Rice, he started out as an Equity
7    Research Analyst, right?
8    A.    Yes, that's correct.
9    Q.    And he had started out with a paper portfolio,
10   right?
11   A.    I don't know.
12   Q.    Were you the champion of his vehicle when it was
13   launched?
14   A.    Um, I -- I -- I don't recall.  I mean I think he
15   manages -- he managed a couple of different investment
16   approaches, so, um --
17   Q.    Okay.  When did you first come to suspect that
18   Ms. Chan was pregnant?
19   A.    Um, I don't think there was any difference between
20   when I just -- between suspecting it and knowing it.  I
21   believe I was informed of it at some point in August of
22   2016.  We didn't work in the same geographical region so
23   I didn't run into Ms. Chan and there was no reason to
24   suspect anything.  I knew it when I was told.
25   Q.    Let me show you Exhibit 206.  (On screen.)  And

1   you see there, sir, um, at the top of the page an e-mail

2   from Mr. Baxter to you on August 19, 2016?

3   A.    Yes, I'm just reading it.

4   Q.    Sure thing.

5   A.    (Reads.)

6   Q.    Are you ready?

7   A.    Yes.

8   Q.    Okay, great.  And I'm just going to direct you to

9   the second paragraph, Mr. Baxter wrote the second

10  sentence, um, "Gigi has confirmed our suspicions to HR

11  that she's indeed pregnant and due in December."  Do you

12  see that?

13  A.    Yes, I do.

14  Q.    Okay.  Does that refresh your recollection that

15  you had for quite sometime suspected that Ms. Chan was

16  pregnant?

17  A.    No, it doesn't.  I think Mr. Baxter here is

18  confirming our suspicions with respect to him and

19  colleagues of Ms. Chan in the Hong Kong office.  I don't

20  think it's his and my suspicions.

21  Q.    Okay, so it's your belief that Mr. Baxter had had

22  suspicions but that he hadn't shared them with you?

23  A.    Um, that is my belief and clearly Mr. Baxter --

24  clearly Mr. Baxter and someone else in Hong Kong -- I

25  think "our suspicions" there pertains to the Hong Kong

1    office, not to him or me.

2    Q.    Okay.  At some point subsequent to learning that

3    Ms. Chan was pregnant, you had a conversation with a

4    Ms. Tang in Wellington's HR, is that correct?

5    A.    That's correct, she was the head of I think Asia

6    HR, well definitely Hong Kong HR.

7    Q.    Okay.  And am I right that the reason you had

8    initially reached out to Ms. Tang was to, um, sort of

9    get some guidance in terms of, um, how you should

10   communicate with Ms. Chan relative to her maternity

11   leave?

12   A.    Um, I can't recall why I initially reached out to

13   Ms. Tang, I think she was relatively new to the

14   organization, um, Wellington, um, globally.  And I don't

15   remember the initial -- how the conversation started.

16   But part of it was "Hey, it would be great to get to

17   know you."

18   Q.    Okay.  You mentioned before that Ms. Scordato in

19   HR was your "thought-partner."  Do you have any

20   understanding as to why you had reached out to Ms. Tang

21   as opposed to Ms. Scordato?

22   A.    Because HR and many groups at Wellington operated

23   on a matrix.  There was a global functional model and

24   then there was also a regional model and the two

25   overlap, they weren't separate from each other, they

1    overlapped.  So Ms. Tang was responsible -- I think she
2    was not responsible for Asia HR, but she was definitely
3    responsible for Hong Kong HR.  And Ms. Scordato was
4    responsible for Global Equity Portfolio Management from
5    an HR perspective.  So there was an overlap there.
6    Q.    Okay.  I'm going to show you a document here, um,
7    Exhibit 121.  (On screen.)  And can you take a moment to
8    familiarize yourself with it and I'll just have a few
9    questions in the 5 minutes we have remaining here.
10   A.    (Reads.)  Okay.
11   Q.    So this is an e-mail from Ms. Tang providing
12   you -- excuse me, some speaking points for an upcoming
13   conversation you were planning to have with Ms. Chan,
14   right?
15   A.    Um, yes.
16   Q.    And the planned conversation that's referenced
17   here, this would be, um -- this would be -- it ended up
18   being the November 2nd, 2016 meeting we talked about,
19   right?
20   A.    Yes.
21   Q.    Okay.  And, um, this right here, um, am I right
22   that part of Ms. Tang's, um, advice to you on October
23   25, 2015 was "Going forward we need to insure
24   documentation is strong"?
25   A.    Um, that was her advice to me.

1    Q.    Okay.  As of October 25, 2016, had you told

2    Ms. Tang that you wanted to terminate Ms. Chan's

3    employment?

4    A.    No.

5    Q.    And then lower down here on the first page -- I'm

6    sorry, I need to get more here.  (On screen.)  In terms

7    of her summary with respect to talking points for, um,

8    performance feedback, you'll see here that -- you'll see

9    Ms. Tang writes, "Please confirm if the case -- trying

10   to build a case where the performance issues are

11   systemic and not attributable to any other life events."

12   Do you see that?

13   A.    Um, I do.

14   Q.    Do you have an understanding as to what Ms. Tang

15   meant by "trying to build a case"?

16   A.    No, I don't have an understanding of what she

17   meant by that.

18   Q.    Okay.

19         MR. HANNON:  All right, your Honor, it's 12:58,

20   this would be a good time to break.

21         THE COURT:  Very well.

22         Ladies and gentlemen, we'll stop taking testimony

23   at this time, we're moving along.  Keep your minds

24   suspended, you have not heard all the testimony.  Do not

25   discuss the case either among yourselves nor with anyone

```
 1   else.  I know I can count on you.  You may stand in
 2   recess now until 9:00 a.m. tomorrow morning.  The jury
 3   may recess.  I'll remain on the bench.
 4          THE CLERK:  All rise for the jury.
 5          (Jury leaves, 1:00 p.m.)
 6          THE COURT:  Please be seated.  You may step down,
 7   sir.
 8          The total elapsed time, the plaintiff has used up
 9   1 day, 1 hour, 30 minutes, and the defense has used up 2
10   hours and 30 minutes.  And there's a juror question.
11          (Pause.)
12          THE COURT:  Which I will ask of the witness
13   tomorrow and I'll read it to you.
14          "Can we talk about who is on the panel and how it
15   runs, the Process Philosophy Process?  Also, are most
16   people asked to present to this panel and are others
17   providing the same feedback on the panel being -- and
18   are others providing the same feedback on the panel
19   being disrespectful?"
20          I'm not going to ask that last part because he
21   wasn't there.  But he understands what the practice and
22   procedure was, so I'll ask that when we start tomorrow.
23          All right, we'll recess.
24          MS. GAROFALO:  Your Honor, if I could discuss one
25   thing?  I think you just said the defense had used 2
```

```
 1    hours and 30 minutes?

 2            THE COURT:  I did, total.

 3            MR. HANNON:  Oh, total, since your Honor is

 4    counting jury impanelment as well?

 5            THE COURT:  Exactly.  It's total.  It's not today.

 6    It's cumulative.

 7            MS. GAROFALO:  Thank you, your Honor.

 8            THE COURT:  (Laughter.)  I recognize that we've

 9    been going for 3 hours and a half.  It worked out that

10    way.  We'll recess.

11            (Adjourned, 1:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2

 3

 4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 5   hereby certify that the forgoing transcript of the

 6   record is a true and accurate transcription of my

 7   stenographic notes, before Judge William G. Young, on

 8   Wednesday, October 13, 2021, to the best of my skill and

 9   ability.

10

11

12

13   /s/ Richard H. Romanow 01-06-22

14   _____

     RICHARD H. ROMANOW   Date

15

16

17

18

19

20

21

22

23

24

25
```