1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS (Boston)

3                               No. 1:19-cv-11605-WGY

4

5    GIGI KAI ZI CHAN,
          Plaintiff

6

7    vs.

8

9    WELLINGTON MANAGEMENT COMPANY, LLP and CHARLES ARGYLE,
          DEFENDANTS

10

11                        * * * * * * * * *

12

13                      For Jury Trial Before:
                        Judge William G. Young

14

15

16                      United States District Court
                        District of Massachusetts (Boston.)
17                      One Courthouse Way
                        Boston, Massachusetts 02210
18                      Thursday, October 14, 2021

19

20                        * * * * * * * *

21

22              REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23               United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                  bulldog@richromanow.com

25

```
 1                A P P E A R A N C E S

 2

 3   PATRICK J. HANNON, ESQ.
     HAMPTON M. WATSON, ESQ.
 4       Hartley Michon Robb Hannon, LLP
         155 Seaport Boulevard, 2nd Floor
 5       Boston, MA 02210
         (617) 723-8000
 6       E-mail: Phannon@hmrhlaw.com
         For Plaintiff

 7

 8   STEPHEN T. PATERNITI, ESQ.
     BENJAMIN R. DAVIS, ESQ.
 9       Jackson Lewis, PC
         75 Park Plaza, 4th Floor
10       Boston, MA 02116
         (617) 367-0025
11       Email: Stephen.paterniti@jacksonlewis.com
     and
12   BEVERLY W. GAROFALO, ESQ.
         J.W. Carney, Jr. & Associates
13       20 Park Plaza, Suite 1405
         Boston, MA 02116
14       (860) 275-0100
         Email: Beverly.garofalo@jacksonlewis.com
15       For Defendants

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   CHARLES ARGYLE (Continued.)

 6        By Mr. Hannon:        7

 7        By Mr. Paterniti:          75

 8

 9

10

11

12                     E X H I B I T S

13                   (None marked.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1       P R O C E E D I N G S

2       (Jury enters, 9:00 a.m.)

3       THE COURT:  Good morning, ladies and gentlemen.

4  My most sincere thanks for all being here on time.

5  We're all ready to go.  Would you remind the witness

6  he's still under oath.

7       THE CLERK:  I'm going to remind you, sir, you're

8  still under oath.

9       THE WITNESS:  I understand.

10       THE COURT:  I'm going to start with a juror

11  question that was passed up at the end of the day, and

12  this question -- actually they'll be a few questions,

13  has to do with these panels on the process and procedure

14  and you've been interrogated about issues that arose out

15  of one such count.  And you weren't there, that's what I

16  get from your testimony.  But the jurors are interested

17  in how this works as a matter of procedure.  So maybe

18  you could just tell us.

19       What were these panels on process and procedure,

20  what did they do for the company?

21       THE WITNESS:  Um, the panels were philosophy and

22  process.

23       So yesterday we heard -- you heard, um, about the

24  Asian Philosophy and Process Panel.  The first

25  philosophy and process panels were in our offices here

1    in Boston and these were really opportunities for

2    experienced Portfolio Managers, Portfolio Managers who

3    were new to the role, and the individuals who weren't

4    yet Portfolio Managers, to describe their philosophy,

5    and their philosophy in this context usually began with

6    the phrase "I believe," and what followed from that is

7    "This is why I believe, I," that individual, "can

8    outperform the stock market essentially," "Why I

9    believe" -- "I," as an individual, "with the resources

10   around me, can do a good job for our clients by

11   outperforming the stock market."  Otherwise they might

12   just as well invest in an index fund, so.  And we're not

13   index fund managers.  And, um, the process part of the

14   philosophy and process conversation was, um, "Okay,

15   given that belief, how do you actually go about it?"

16   Um, so that's the short answer to the question.

17        THE COURT:  And -- well I was using the wrong

18   words, "philosophy and process."

19        THE WITNESS:  Yes.

20        THE COURT:  So when you convened one of these, how

21   many people routinely would sit on the panel?

22        THE WITNESS:  Um, I'm not sure how many were on

23   the panel.  In Asia I'm not -- I wasn't on the panel.

24   They were -- they were, um -- they weren't formal

25   committees, it was not an approval process, these were

 1    -- these were groups of typically, um, senior investors,

 2    um, a couple of other senior professionals around the

 3    firm potentially, and who -- and the aim of the -- the

 4    goal of the panel is to listen to an investor

 5    articulating their philosophy and their process and to

 6    deliver feedback to that investor about how they may --

 7    um, may have articulated that better, and to probe and

 8    push and say "What about this?" or "I didn't understand

 9    that," et cetera, and to provide feedback.  But these

10    were not any part of an approval process, that's all.

11         THE COURT:  Were any records routinely kept of

12    these panels?

13         THE WITNESS:  Um, I -- I wouldn't know.

14         THE COURT:  You wouldn't know.

15         And what again, as a matter of routine, what would

16    happen after a panel?

17         THE WITNESS:  Um, so feedback would be provided in

18    the room, um, sometimes, um, feedback would be provided

19    afterwards, and sometimes feedback would be given to,

20    um, you know potentially the manager of that individual,

21    one of my Associate Directors.  If they would -- because

22    we have multiple investment groups, but the Equity

23    Investment Group, one of my Associate Directors.  Um,

24    and, you know, that's --

25         THE COURT:  I see.  Thank you.

```
 1        Mr. Hannon.
 2        MR. HANNON:  Thank you, your Honor.
 3
 4   DIRECT EXAMINATION BY MR. HANNON:  (Continued.)
 5   Q.  Mr. Argyle, just to follow-up and close the loop
 6   with respect to the Asia Philosophy and Process Panel.
 7   You weren't involved in organizing that, correct?
 8   A.  I was not involved in organizing that.
 9   Q.  Okay.  You weren't involved in deciding who would
10   present, right?
11   A.  Nope, I was not involved.
12   Q.  Okay.
13   A.  Sorry.  Right.  Yes.
14   Q.  Okay.  No worries.  And do you know who was?
15   A.  Um --
16        THE COURT:  Well now we're talking about this
17   specific one at which issues arose, is that correct?
18        THE WITNESS:  Yes, Judge.
19        THE COURT:  All right.  Just so I understand.
20   A.  I don't -- I don't know for a fact who it was, but I
21   believe it was Cheryl Duckworth.
22   Q.  Okay.  All right.  Good.  When we had a little bit
23   -- we talked a little bit yesterday on, um, the
24   conversation you had with Ms. Chan on November 2nd,
25   2016.  And again that was you, Ms. Chan, and Mr. Baxter,
```

1   is that right?

2   A.   That's right.

3   Q.   Okay.  So I'd like to start today, um, listening to

4   that meeting, the recording of that meeting, um, and I'm

5   going to have some questions for you as we go here

6   concerning what you and Ms. Chan and Mr. Baxter

7   discussed.

8        Um, a moment here.

9        THE COURT:  And this is an exhibit?

10       MR. HANNON:  Yes, your Honor, the parties have

11  agreed that this is Exhibit 399.

12       THE COURT:  399.  How long is this going to take

13  to play?

14       MR. HANNON:  Um, so the recording itself is an

15  hour and 10 minutes.  If your Honor would prefer I can

16  skip ahead at some various parts.  I don't want the

17  parties to --

18       THE COURT:  It's your case to try, but, um, I take

19  it that we can use our time more effectively since they

20  will have the full recording and both -- and counsel for

21  both sides should jump in here.  They will have the full

22  recording, it's in evidence, so I'm content if you skip

23  around and ask him questions about it, and of course

24  defense counsel can do the same.

25       Is that how you intended to proceed?

```
 1          MR. HANNON:  I'll do some skipping with that
 2     guidance, but again I don't want to deprive the jury of
 3     context here and I don't want to be unfair to the
 4     witness in my questioning, so.
 5          THE COURT:  You try the case as you see fit.
 6          MR. HANNON:  Okay, thank you, your Honor.
 7          So let's start here at the very beginning.
 8     (Pause.)  Sorry, one moment.
 9          MR. HANNON:  Ms. Gaudet, am I on here?
10          THE CLERK:  You are.
11          MR. HANNON:  All right.  Okay.
12          THE COURT:  And so I can -- would you tell us who
13     is present and who is speaking and when this is and
14     where it is?
15          MR. HANNON:  Yes, your Honor.  But let me play the
16     first few seconds and I'll inquire of the witness
17     whether he recognizes the voices.
18          THE COURT:  Go ahead.
19          (Pause.)
20          (Plays audio recording.)
21     Q.  We'll just pause there for a moment.
22          Mr. Argyle, the voice that the jury is hearing, is
23     talking about the PSAT exams and that's Mr. Baxter,
24     correct?
25     A.  That's correct.
```

1   Q.  Okay.  And the other male voice that they're hearing
2   is you?
3   A.  Um, yes, yes, it would be.
4   Q.  Okay.
5   A.  You haven't heard much of me, but, yes.
6   Q.  Okay.  And then the female voice that they're
7   hearing, that's Ms. Chan, correct?
8   A.  Um, yes.
9   Q.  Okay.  And this meeting that we're listening to now,
10  where did it take place?
11  A.  Um, this meeting took place in Hong Kong.
12  Q.  Okay.
13  A.  And Mr. Baxter and I were not aware that this was
14  being recorded.
15  Q.  Okay.  There was -- did you hear a statement in
16  there that you brought Mr. Baxter along for
17  "continuity"?
18  A.  Yes.
19  Q.  Okay.  That wasn't true, was it?
20  A.  Um, I -- I have no reason to disbelieve that it
21  wasn't true.
22  Q.  Well the reason why you brought Mr. Baxter along was
23  because you wanted a witness there in case there was any
24  dispute regarding what was said, right?
25  A.  No, the reason I brought Mr. Baxter along was

```
 1    because he was Mr. Chan's direct manager.
 2    Q.   Okay.  Do you recall writing an e-mail in which you
 3    told Mr. Baxter that you wanted him there as a witness
 4    in case there was any dispute about what was said?
 5    A.   Um, I don't recall writing that e-mail.
 6    Q.   Do you deny that you did?
 7    A.   Um, I'd have to see the e-mail to refresh my memory.
 8    Q.   Okay.  Well let's finish with the recording first.
 9         (Plays audio.)
10         THE COURT:  Let me just interject.  When was this
11    meeting, if you recall?
12         THE WITNESS:  This meeting was on November the
13    2nd, 2016.
14         THE COURT:  Thank you.
15         THE WITNESS:  Hong Kong time.
16         THE COURT:  Thank you.
17         THE WITNESS:  If I recall it was in the morning so
18    it would have been November the 1st here.
19         (Plays audio.)
20         MR. HANNON:  I'm just going to jump ahead to the 8
21    minute part, um, just for the record.
22         (Plays audio.)
23         MR. HANNON:  Pause there for a moment, it's the 10
24    minute, 22 second mark.
25    Q.   Mr. Argyle, those numbers that you just cited for
```

1    Ms. Chan from her peer review, um, when you cited those

2    to Ms. Chan you were aware that those numbers were

3    skewed, is that right?

4    A.   That's not correct.

5    Q.   Well there was an outlier in the feedback, wasn't

6    there?

7    A.   Um, I -- everyone is allowed to provide feedback on

8    all investment professionals, um, at Wellington, so, um,

9    there were a range of views in the feedback.

10   Q.   Okay.  Let's take a look at the feedback here.  So

11   I'm showing you here, and we rotated -- so this is

12   Exhibit 221.

13        Do you recognize this, sir?

14   A.   Yes, I do, and you can see the, um, rankings, which

15   you referred to -- which you referred to on the tape on

16   this exhibit.

17   Q.   Okay.  So this is an internal Wellington report

18   that's generated based upon the peer-reviewed feedback

19   that you referenced?

20   A.   Um, yes, it is.

21   Q.   Okay.  And, um, just to move forward.  Just a moment

22   here.  (Pause.)

23        So looking here at -- here's Page 2 of the report,

24   um, and then Page 3 here, this shows different

25   individuals who identified themselves as beneficiaries

1    of Ms. Chan's input, is that right?

2    A.  Um, that's right.

3    Q.  And then scrolling forward here, um, this identifies

4    the individuals who had actually provided feedback

5    concerning Ms. Chan's performance in the given year, is

6    that right?

7    A.  Um, that's right, so a lot of people provided

8    feedback.  So just to summarize those two pages, a lot

9    of people -- a decent number of people provided

10    feedback, um, and two of them said she was a meaningful

11    contribution to their investment results.

12    Q.  Well just to go back, um, it's a "Top 5

13    contributor," right?

14    A.  Um, "Top 5"?  I'm sorry, I summed that up as

15    "meaningful," the "Top 5."

16    Q.  Okay.  All right.  But looking here on Page 4 in

17    terms of who the voters were in 2016.

18        The first name, John Boselli, do you see that?

19    A.  Um, yes, I do.

20    Q.  Now, Mr. Boselli, he had not provided Ms. Chan any

21    feedback in the year prior, is that right?

22    A.  Um, I have no idea whether he provided Ms. Chan any

23    direct feedback in the year before.

24    Q.  Well in terms of participating in the peer-reviewed

25    feedback, he hadn't done that in 2015, had he?

1    A.   Um, that appears to be an accurate statement.

2    Q.   He hadn't done it in 2014, right?

3    A.   No, only three people did it in 2014 and two of

4    those were her team members, yes.

5    Q.   Would that be a "Yes" to my question?

6    A.   Yes.

7    Q.   Okay.  And Mr. Boselli, he's a U.S.-based Portfolio

8    Manager?

9    A.   Um, at this time he was a U.S.-based Portfolio

10   Manager, but he had significant global experience.

11   Q.   He had significant what?

12   A.   He had significant global experience.

13   Q.   Oh, okay.  Did he invest in China?

14   A.   Yes, he did.

15   Q.   Okay.  Do you know how much he worked with Ms. Chan?

16   A.   Um, he certainly had the opportunity to work a lot

17   with Ms. Chan.  I don't know how much he worked with

18   Ms. Chan.  He owns a number of stocks in China.

19   Q.   Did you ever ask him if he ever worked with

20   Ms. Chan?

21   A.   I can't recall.

22   Q.   Okay.  What kind of investments did he invest in?

23   A.   He invested -- his investment philosophy -- to sum

24   up his investment philosophy, he was a growth investor.

25   Q.   Okay, for what kinds of stocks?

1   A.   He invested in global stocks all over the world.

2   Q.   Okay.   Was it limited to something like energy

3   stocks?

4   A.   No.

5   Q.   Okay.   Did it have a particular industry focus in

6   it?

7   A.   No.

8   Q.   Okay.   So your understanding of Mr. Boselli's

9   investments was anywhere in the word, any kind of

10  growth?

11  A.   He was a diversified Portfolio Manager who invested

12  in stocks all over the world.

13       THE COURT:   Let's keep our eye on the ball here.

14  This case doesn't turn on whether their performance

15  evaluation of Ms. Chan was scrupulously accurate or

16  whether they made mistakes or whether they may have

17  overlooked something or used a skewed basis in

18  evaluating her, whatever happened, none of those things

19  by themselves are in any way unlawful and you're not to

20  judge that.   So why are we getting into it?   Because

21  it's appropriate to get into it because they're going to

22  argue that because of alleged flaws in the evaluation

23  and the like, that that was just a pretext for the real

24  reasons, so Ms. Chan and her lawyers are going to say,

25  and the real reasons are one of the impermissible

1    reasons.  And I express no opinion on it.  But as we get

2    off into these -- well "Did these people know what they

3    were doing?  Were they proper evaluators?" that type of

4    thing, um, you're not judging the precision of

5    Wellington's process, what you're asked to judge is

6    whether Wellington acted for one of the impermissible

7    illegal reasons that I outlined to you.

8        Go ahead, Mr. Hannon.

9        MR. HANNON:  Thank you, your Honor, for the

10   explanation.

11   Q.  Let's jump here to Page Number 7 of the exhibit.

12   And here, am I right, sir, this shows the actual

13   rankings given by each of the individuals who

14   provided -- I'm sorry, it identifies the score that each

15   individual who provided, um, peer feedback gave Ms. Chan

16   in these various categories, is that correct?

17   A.  Um, that's pretty much correct.  So it does identify

18   the scores.  There was a qualitative component to the

19   feedback and there was a quantitative component to the

20   feedback, you can choose either one of those or both

21   when providing feedback.  So you said everyone who

22   provided feedback would have provided a score?  Not

23   necessarily.  But those are the scores that were

24   provided.

25   Q.  Okay, so folks that provided peer-review feedback as

1    part of this system, they could provide a score, they

2    could provide comments, or they could do both, is that

3    right?

4    A.  Yes.

5    Q.  And some people just provided comments, right?

6    A.  Some people did.

7    Q.  And some people sometimes just give scores?

8    A.  Sometimes, yes.

9    Q.  Okay.  So this shows the scores that were given by

10   the folks who chose to give scores?

11   A.  Um, yes.

12   Q.  Okay.  And you see there that Mr. Boselli, he ranked

13   Ms. Chan a 1 with respect to collaboration, and the next

14   category, "Skill D," do you know what that is?

15   A.  Um, "Depth of Research."

16   Q.  Okay.  And so he gave her a 3 in Depth of Research.

17   The next category, would that be "Skill in Investing"?

18   A.  Um, no, that's "Idea Generation."

19   Q.  Okay, he gave her a 1 in Idea Generation and then a

20   1 in -- what's the final category?

21   A.  "Money Making."

22   Q.  "Money Making."  Okay.  Um, so, um -- and in looking

23   at these scores -- and I asked this question before, but

24   I'm not quite sure if you answered it.

25          Would you agree with me that Mr. Boselli's scores

1    that he gave Ms. Chan here are an outlier?

2    A.  Um, they're certainly the lowest scores on the page.

3    Q.  Would you agree, sir, that Mr. Boselli's scores are

4    an outlier?

5    A.  Um, if an "outlier" is the lowest scores on the page

6    -- and they're low, they are low scores and they're the

7    lowest scores on the page.  So if that's how you wish to

8    define "outlier," um -- I'll say they're the lowest

9    scores on the page.

10   Q.  They're a lot lower by a lot, sir, aren't they?

11   A.  Sorry?

12   Q.  They're a lot lower by a lot, sir, aren't they?

13   A.  Um, I see some other 3s.  One, two, three other 3s.

14   Um, 5s, so --

15   Q.  Her skill for Money Making, um -- no, scratch that.

16   Well let me ask you this question.

17        You would agree with me though that Mr. Mattiko's

18   scores of Ms. Chan were of the greatest weight, is that

19   right?

20   A.  Um, yes.

21   Q.  Okay.  And --

22   A.  Combined with his qualitative feedback.

23   Q.  Great.  Okay.  And looking at the second category

24   here -- and, I'm sorry, that was "Depth of Research," is

25   that right?

1   A.  Yes.

2   Q.  Okay.  Mr. Mattiko had given her a 10, is that

3   right?

4   A.  Yes, Mr. Mattiko was very content -- was content

5   with the quality of her research, it was the quantity of

6   her research that he was not happy with.

7   Q.  Sir, my question is just what the score was with

8   respect to the Depth of Research and that was a 10,

9   right?

10  A.  That score is a 10.

11  Q.  Okay.  And Mr. Boselli gave her a 3?

12  A.  Yes, Mr. Boselli gave her a 3.

13  Q.  Okay.  And then in terms of the next category, um,

14  Mr. Boselli had given her a 1, is that right?

15  A.  Yes.

16  Q.  And Mr. Mattiko a 7, right?

17  A.  Yes.

18  Q.  Okay.  And in fact when you saw this information you

19  knew that Mr. Boselli had, um -- that the relevance of

20  his particular feedback was minimum, isn't that right?

21  A.  I'm sorry, I missed your last word?

22  Q.  That the relevance -- the relevance of his

23  particular feedback was minimal, is that right?

24  A.  Um, I -- I didn't -- I wouldn't describe the

25  relevance of his feedback as "minimal."

1    Q.   Well then take a look at Page 9 then.

2    A.   (Looks.)

3    Q.   Do you see here the first person listed is

4    Mr. Boselli, right?

5    A.   Yes.

6    Q.   And the reports actually contain a category that

7    judge the relevancy of a particular individual's

8    feedback, is that right?

9    A.   Um, that's right, they filled in that category

10   themselves.

11   Q.   Okay.  And Mr. Boselli himself had rated the

12   relevancy of his feedback as "Not very," correct?

13   A.   No, not correct.

14   Q.   Okay.

15   A.   He rated it as "Not very relevant."  You can see

16   that he rated it as 2, so there was obviously a 1

17   category, and also there was the opportunity not to

18   provide feedback at all in the system.  So -- and just

19   to clarify that.

20   Q.   I'm not sure what the clarification is, sir.  Did

21   Mr. Boselli rank his own feedback as to "Not very"?

22   A.   That's how Mr. Boselli ranked -- not his feedback --

23   that's not how he ranked his feedback, that's how he

24   ranked his, um -- the relevancy of his investment

25   relationship, um, with Ms. Chan.

1    Q.  Fair enough.  Sir, um, you -- this was not the first

2    time that you had learned that Mr. Boselli had an issue

3    with Ms. Chan, isn't that right?

4    A.  Um, this is not the first time that I thought

5    Mr. Boselli, um -- that this is not the first time

6    Mr. Boselli provided feedback that Ms. Chan, um, was not

7    having the appropriate impact on the firm, that's right.

8    Q.  Um, and the first time you heard it from Mr. Boselli

9    that he had an issue with Ms. Chan, that was after the

10   Asia Philosophy and Process Panel, isn't that right?

11   A.  Um, I can't remember when the first time was.

12   Q.  Did you ever ask Ms. Chan about her relationship

13   with Mr. Boselli?

14   A.  Um, I can't remember.

15   Q.  Did you ever ask her how it changed as a result of

16   the Asia Philosophy and Process Panel?

17         MR. PATERNITI:  Objection, your Honor.

18   A.  Um --

19         THE COURT:  Sustained.  Sustained.

20   Q.  But you knew, sir, when you saw this feedback that

21   Mr. Boselli wanted Ms. Chan fired, isn't that right?

22   A.  Um, I can't recall.

23   Q.  (Pause.)  Sir, I'm now showing you Exhibit 106.  And

24   to get us all on the same page here, we're looking at an

25   e-mail from Mr. Burgess to you on September 25th, 2015,

1    is that right?

2    A.  Um, yes.

3    Q.  Okay.  And, um, in the subject line, um, the

4    "Boselli" there, that's the same Mr. Boselli whose

5    feedback we're looking at?

6    A.  That is the same Mr. Boselli.

7    Q.  Okay.  And am I right here that Mr. Burgess is

8    sharing with you, um -- well let me call it out here,

9    it's about the middle of the page, "Most confidential

10   piece, the other opinions from Boselli that you might

11   find interesting."  Do you see that?

12   A.  That's what Mr. Burgess wrote, yes.

13   Q.  Okay.  And then he goes on to provide comments

14   regarding Ms. Chan -- excuse me.  (Highlights.)  And

15   that was the information that you got from Mr. Burgess

16   as to Mr. Boselli's view of Ms. Chan in September of

17   2015, is that right?

18   A.  Um, that appears to be Mr. Boselli -- I'm sorry,

19   Mr. Burgess summarizing a conversation with John Boselli

20   in which --

21   Q.  Okay.  Did you ever talk to Mr. Boselli about these

22   views?

23   A.  I can't remember.

24   Q.  Okay.  You disagreed with Mr. Boselli's views,

25   didn't you?

1   A.   Um, I may have disagreed with some of his views, I

2   certainly disagreed with, at this point in time, with

3   his headline view, I wanted Ms. Chan to be successful.

4   But I don't know -- I don't know all his views.  I'm

5   sure I agreed with some and disagreed with others.

6   Q.   But you never talked to him about it?

7   A.   Um, I don't recall whether I talked to him about it.

8   I talked to Mr. Boselli a lot, so -- so I don't recall

9   whether I talked to him about his views.

10  Q.   How often did you talk to Mr. Boselli in the 2015,

11  2016 --

12  A.   Probably once every month or so, once every couple

13  of months.

14  Q.   So you probably talked about Gigi Chan then, is that

15  right?

16  A.   I don't recall.  We had a lot of things to talk

17  about, he was running a lot of our client assets.

18  Q.   (Pause.)  Mr. Boselli's name was also brought up to

19  you towards the end of 2016, isn't that right?

20  A.   Um, Mr. Boselli's name was brought up to me probably

21  many times every week in many contexts.

22  Q.   But, um, Mr. Swords provided you a performance

23  review at the end of 2016, is that right?

24  A.   Um, at some point in the fourth quarter of 2016,

25  yes.

1   Q.   Okay.  And that performance review that you got from

2   Mr. Swords, that included a message that Ms. Chan was a

3   -- was a problem, right?

4   A.   It was not a message from Mr. Swords.

5   Q.   Whoever it was from, the performance review you got

6   from Mr. Swords, part of the message there was that

7   Ms. Chan was a problem, right?

8   A.   The performance review from Mr. Swords, just like

9   the quotes I gave to Ms. Chan, included many quotes --

10  many quotes presumably Mr. Swords received from all the

11  people he got feedback from, and one of those quotes,

12  whether Mr. Swords agreed with it or not or I agreed

13  with it or not, said, um -- and you probably, you know,

14  however you just articulated it.

15  Q.   But you had a problem in Hong Kong that needed to be

16  dealt with, right?

17  A.   Okay, um, if it -- I don't -- I don't see the -- I

18  don't see the exact words, I don't recall the exact

19  words.

20  Q.   But was the sentiment that he was expressing was

21  that he thought you needed to get rid of Gigi Chan?

22  A.   Um, I believe so, yes.

23  Q.   (Pause.)  All right, let's get back to the "tape,"

24  as they say.

25       We'll pick up back here at the -- where we left

1    off, at the -- I'll do the 10.26 mark -- the 10.23 mark.

2         (Plays audio.)

3         MR. HANNON:  Just pause there at 12.50.

4    Q.  In reference in terms of what she said to you, what

5    did you understand her to mean by that?

6    A.  Um, I'm not entirely sure.

7    Q.  Do you -- is it that you don't recall now or you

8    think you didn't know back then when she said it?

9    A.  Um, it's I think I didn't know back then when she

10   said it.

11   Q.  Okay.  In terms of the meetings you had had with

12   Ms. Chan prior to this November 2nd, 2016 meeting, there

13   had been one earlier in 2016 around -- was it around

14   Investor Palluza?

15   A.  Um, I believe I met with her around Investor

16   Palluza, yes.

17   Q.  Okay.

18   A.  "Investor Palluza" was an internal seminar that we

19   had where we brought all of our investors from around

20   the world to Boston.

21   Q.  Okay.  And the time prior to that when you had met

22   with her, that was at the end of 2015, right?

23   A.  Um, that's right.

24   Q.  And that was subsequent to the dust-up regarding the

25   Asia Philosophy and Process Panel?

```
1   A.  I wouldn't describe it as a "dust-up," but that was
2   -- you know we have timeline in front of us, that was
3   after the Asia Philosophy and Process Panel.
4   Q.  And that was one of the subjects you and Ms. Chan
5   had discussed at the end of 2015, yes?
6   A.  Um, I don't recall, um, but in all likelihood.
7   Q.  Okay.  And do you recall at some point Ms. Chan
8   making the comment about, um, feeling as though she was
9   at a party to which she wasn't invited?
10  A.  Um, I -- I don't recall her making that comment.
11  Q.  Okay.  But you recall seeing the e-mails where you
12  repeat that, sir, to Mr. Swords?
13  A.  Um, I -- I recall an e-mail where I -- you know it
14  was full of bullet points on a lot of things, but that
15  was one of them, yes, or one sentence in one bullet
16  point.
17  Q.  So you don't recall where you heard that from?
18  A.  Um, I recall that I heard it from Ms. Chan.  I don't
19  recall -- I know that I heard it from Ms. Chan, but I
20  don't recall hearing it from Ms. Chan.
21  Q.  Okay.  So let's pick up here at the 12. -- just cut
22  back a little bit just so we know where we are, um, it's
23  12.47.  Sorry, hang on.  (Plays audio.)  Okay, so we're
24  back at 12.40.  (Plays audio.)  Now Pause please at 22.
25  46.
```

1          Mr. Argyle, there were lots of feedback that you

2     left out in terms of the comments you provided to

3     Ms. Chan, is that right?

4     A.  Um, I can't recall.

5     Q.  Okay.  Well there are also lots of positive feedback

6     in terms of Ms. Chan's interaction with her colleague,

7     wasn't there?

8     A.  Um, I can't recall.  I certainly -- well I'm sure I

9     didn't provide every single comment.

10    Q.  Okay.  And in terms of the positive feedback

11    regarding Ms. Chan, that was predominantly from the

12    folks that worked in the Hong Kong office, isn't that

13    right?

14    A.  I don't recall.

15    Q.  (Pause.)  With respect to the comments, um, from

16    Mr. Mattiko, we heard a comment about Mr. Mattiko having

17    tested Ms. Chan.  To your knowledge this was the first

18    time that Ms. Chan was learning that she had been tested

19    by him?

20    A.  Um, I don't know.  But Mr. Mattiko's comments are

21    incredibly relevant because that was her job, her job

22    was supporting the EMO team.  Everything we heard

23    earlier on in the tape, which you didn't ask any

24    questions about, was about the launch of China Growth.

25    That was not her data.  All right?  So she was paid

1    hundreds of thousands of dollars to support Mr. Mattiko.

2    Q.  I'm sorry, sir, isn't your testimony she wasn't

3    being paid to develop products?

4    A.  That's my testimony.

5    Q.  She wasn't being paid to launch the China Growth

6    fund?

7    A.  Um, she --

8    Q.  "Yes" or "No" sir.  Or if you can't answer "Yes" or

9    "No" then.

10   A.  I think she was -- if she wasn't launching the China

11   Growth Fund, her compensation would have been just the

12   same.

13   Q.  Okay.  Did you want her to launch the China Growth

14   Fund or were you just doing that to placate her?

15   A.  Um, I wanted her to be successful at Wellington

16   Management Company.

17   Q.  My question though, sir, is did you actually want

18   the China Growth product to launch or was this just

19   something you were doing just to placate the issues she

20   had raised?

21   A.  I thought by launching the China Growth Fund, um,

22   there was more chance -- there was a higher probability

23   that Ms. Chan would be successful at Wellington

24   Management Company.  I also thought, you know, if China

25   Growth was successful, it could be a decent project,

1    unlike Asia Growth, which we discussed briefly

2    yesterday.

3    Q.    Okay.  But in terms of why you thought it would

4    make her more successful, was your only thinking there

5    that "I need to do this in order to get her to stop

6    complaining"?

7    A.  Um, no.

8    Q.  Did you think it was important that she got access

9    to clients in order to be able to develop the China

10   Growth Fund?

11   A.  Not at this stage.

12   Q.  Did you think it was important that she get access

13   to clients so that she could build trust with clients?

14   A.  Um, not at this stage.

15   Q.  Do you recall speaking to Ms. Chan, at the end of

16   2015, and telling her that, yes, that Wellington was

17   going to be behind her in launching the China Growth

18   Fund?

19   A.  Um, I told her that I was going to be behind her in

20   launching the China Growth Fund and that there would be

21   various committees to go through as part of that

22   process, in which we'd find out if Wellington was

23   supportive of it.

24   Q.  And that you'd be behind her in terms of being able

25   to market her fund as well, right?

1    A.   Um, no, I recall telling her that it would -- that

2    in an institutional asset manager it takes years to

3    market a fund.  Um, I think I may have told her, in that

4    meeting, that some of our clients -- that she already

5    knew because she was in conversations with clients and

6    Greg Mattiko, um, that sometimes clients were interested

7    in talking about China generally and the Chinese capital

8    markets generally and that perhaps there would be an

9    opportunity to talk to clients in that regard.  But with

10   respect to the marketing of her specific product, that

11   was highly unlikely in the next few years.

12   Q.   Sir, do you have any explanation as to how you can

13   remember all of that but you can't remember about the

14   complaints that she raised to you at the end of 2015?

15   A.   Um, I -- well I remember -- I've had that

16   conversation with many investors at a similar stage and

17   I've worked in the investment management industry for 23

18   years and I understand when institutional clients become

19   engaged, um, and interested, generally speaking, and

20   there are exceptions, but generally speaking interested

21   in, um, in investing in investment approaches and

22   allocating their client's capital to an approach managed

23   by Wellington and I assume by many other institutional

24   investment firms.

25   Q.   Let's follow up on that while we're on the subject,

1    um, and that -- in your judgment in terms of when

2    institutional investors being interested, it's after the

3    strategy has developed a three-year track record, is

4    that right?

5    A.    Um, generally once a strategy -- um, many clients

6    use investment consultants and many investment

7    consultants won't look at an investment product unless

8    it's got a -- it's coming up on the three-year track

9    record, sometimes longer than that, and many clients

10   follow similar rules.  Whether that's unofficially or

11   officially, some literally have policies that prevent

12   them from doing so, because that three-year track record

13   essentially is, you know, is a snapshot into the

14   performance of the fund.  We could all argue whether

15   it's a relevant snapshot or not or whether that's the

16   right approach, but it is the approach institutional

17   clients tend to take generally.

18   Q.   And Ms. Chan's China Growth strategy, that already

19   had a preexisting track record, didn't it?

20   A.   Um, it had a preexisting track record in a different

21   Asset Manager where the resources, um, were different.

22   Q.   You say "when the resources were different."  You

23   mean it was at -- it was at Ms. Chan's prior employer,

24   Threadneedle, right?

25   A.   It's not -- I mean it wasn't Ms. Chan's prior

1    employer, Threadneedle, but, um -- that's not what I
2    meant by the resources -- I mean the resources at
3    Threadneedle.
4        If you take one Portfolio Manager and all they're
5    doing is deciding -- and they have 0 inputs from
6    elsewhere and they're in Environment A, okay, and then
7    you move them to Environment B and they have 0 inputs
8    from elsewhere, then I think that's a fair comparison,
9    right?  But if you have one Portfolio Manager in one
10   firm where their surrounding environments and their
11   inputs are different to the another environment, then
12   it's not necessarily fair.  And that's how institutional
13   clients tend to see it, generally speaking.  They want
14   --
15   Q.  They want what?
16   A.  They want -- you know that's how they tend to see
17   it.
18   Q.  But you view Wellington as having greater resources
19   than Threadneedle, right?
20   A.  I --
21       THE COURT:  I didn't understand the question?
22   Q.  You view Wellington as having greater resources than
23   Threadneedle, right?
24   A.  Um, I'm not familiar with Threadneedle's resources.
25   Q.  Wasn't that part of the pitch that Wellington was

1    planning to make to prospective investors that you'd

2    have a Portfolio Manager who had all this success

3    previously at a different shop and now she had come to

4    Wellington with even better resources?

5    A.   It wasn't my job to put together the pitch, I don't

6    know what the pitch was.

7    Q.   Didn't Wellington approve the China Growth strategy

8    for marketing?

9    A.   Um, to be approved as a fund, and Ms. Chan wanted

10   China Growth to launch as a fund, and we discussed what

11   a "fund" is yesterday, it had to be approved for

12   marketing by the Product Panel.  We had hundreds of

13   investment approaches, not all of them are marketed at

14   any one time.

15   Q.   But in terms of the marketing approval, there are

16   different levels of marketing approval, right?

17   A.   Um, I don't recall or I'm not familiar with the

18   different levels of marketing approval.

19   Q.   You're not aware that there's limited marketing

20   approval and then broad marketing approval?

21   A.   No.

22   Q.   Were you aware that the China Growth Fund had been

23   approved by the panel for broad marketing?

24   A.   Um, I don't know if I was ever aware.  I don't

25   recall.

1    Q.  We'll pick back up here around the 22.46 spot.  From

2    the 22.44 -- no, sorry, 22.40.  (Plays audio.)  22.41.

3    (Plays audio.)  27.16.

4        During the course of this meeting when Ms. Chan

5    referenced the "Wellington integrity" and the

6    "Wellington culture," did you know what she was talking

7    about?

8    A.  Um, I think she was referring to our shared values

9    of which integrity would be a subset.

10   Q.  And had Ms. Chan previously communicated to you her

11   concern that Wellington didn't actually live up to its

12   claimed integrity and its claimed values?

13   A.  Um, Ms. Chan complained at length that we had not

14   launched a fund -- well hadn't launched a fund fast

15   enough that apparently was promised to her in her

16   interview process, that was a repeated complaint, as was

17   the fact that she didn't get access to our clients once

18   that fund was launched.  Certainly relative to those

19   complaints.  I can't remember.

20   Q.  So you can't remember if she previously complained

21   about Wellington's integrity or values?

22   A.  Um, I clearly don't remember it, if she complained

23   about integrity, I don't recall, and I don't recall if

24   she complained about Wellington's values or her

25   interpretation of those values.

```
 1   Q.  I'm picking up here at 27.12 -- excuse me, jump up a
 2   bit, 27.14.  (Plays audio.)  37.17.
 3        You referenced to her "coming back," and that was
 4   in reference to her maternity leave, right?
 5   A.  Yes, we referenced it in the first part of the tape,
 6   the first 8 minutes of the tape, which you didn't play.
 7   Q.  Okay, so Ms. Chan, she was 8 months pregnant during
 8   this conversation?
 9   A.  Um, I don't know how pregnant she was during the
10   conversation.  I know when she went out on maternity
11   leave, which would have indicated that she was 7 to 8
12   months pregnant during this conversation.
13   Q.  Okay.  Picking back up here at 37.13.  (Plays
14   audio.)
15        The 44-second mark you heard Ms. Chan reference
16   "promises that were made."  Was that accurate?
17   A.  Um, I don't know whether I used the word "promise,"
18   but as we discussed a year earlier, I told her that I
19   was going to back the launch of her China Growth Fund.
20   Q.  So that was your understanding when she said,
21   "promises had been made," it was the China Growth
22   launch?
23   A.  Um, it was not the -- the China launch -- she
24   obviously believes promises were made in the
25   interviewing process.  I was the only one with the
```

1   authority to make those promises in the interviewing

2   process and I didn't make them in the interviewing

3   process.  But I did say, in the December 2015 meeting,

4   that I would be behind -- I don't know if I used the

5   word "promise" or not, but I would be behind the launch

6   of her China Growth Fund.

7   Q.  And what were the promises that Ms. Chan had made in

8   that December 2015 meeting?

9   A.  I don't recall.

10   Q.  So when you hear her say that she had made some

11   promises, did you have an understanding as to what she

12   meant?

13   A.  Um, I can't recall.

14   Q.  Meeting up at 45. -- at 47.4.  (Plays audio.)

15       Why did you make that reference to feedback from

16   women?

17   A.  Why?  Because there was the, um -- thinking about it

18   now -- and when we heard the tape subsequently, um, I

19   think I made it because, you know, I let her carry on

20   after the comment earlier, but it had registered with

21   me, um, and so I wanted to loop back and say, um, that

22   actually as I look at the feedback here, um, women are

23   not, um -- um, women are fairly distributed across the

24   feedback, that people in Asia are fairly distributed

25   across the feedback and to the upside, that's what I

1    said.  In fact "not fairly distributed across the

2    feedback," I'm actually saying no, that actually it's to

3    the upside that's skewed, um, or they -- skewed through

4    their own abilities or through their own -- the

5    perception of those abilities and the feedback is to the

6    upside.

7    Q.  What comment had registered with you?

8    A.  Um, I'm not remembering -- as my wife tells me, I'm

9    not good at remembering the exact words, but that

10   8-second clip, "Just because I'm a women, just because

11   I'm" --

12   Q.  What's that?

13   A.  The comment she made that you referenced yesterday,

14   um, I can't remember the exact words.

15   Q.  "Just because I'm a woman," "Just because I'm

16   Chinese," that comment?

17   A.  I -- that had registered with me the moment she said

18   it and I felt it necessary to come back and just

19   highlight, in my opinion, that actually this feedback is

20   not.

21   Q.  So when you say that it "registered with you," that

22   means that you understood, when you heard that, that she

23   was claiming that she was being treated differently in

24   some respect, is that right?

25   A.  No, I'm saying it registered with me, um, in the

1    moment, um, it was clearly not the overall picture of

2    the conversation, um, and I didn't treat it as a

3    complaint.

4    Q.  And I think you testified yesterday that in fact you

5    never -- you never informed HR about that comment, is

6    that your testimony?

7    A.  Yeah, it's my testimony that that was an 8 second,

8    um -- well now I know, it was 8 seconds of a 70-minute

9    conversation where clearly the complaint or the concern

10   from Ms. Chan was that we had broken promises that in my

11   opinion we didn't make -- in my knowledge we didn't make

12   -- because I could have been the only one who could have

13   made that promise, um, about launching a fund, and that

14   she had not gotten appropriate access to our clients,

15   um, and that that was the -- that that was what was the

16   take-away from the meeting, um, and, um, I'm not sure

17   whether, you know, after that -- by the time I had other

18   meetings that day or even after I left the room, whether

19   that specific 8-second comment remained with me.

20   Q.  You think you just forgot about it?

21   A.  I don't know.

22   Q.  (Pause.)  This wasn't the first time that you were

23   aware of a female Portfolio Manager at Wellington

24   complaining that she was being treated differently

25   because she was a woman and she was Asian, was it?

1      MR. PATERNITI:  Objection, your Honor.

2      THE COURT:  Overruled.

3  A.  Um, I -- I don't remember when all the timings were.

4      MR. HANNON:  Judge, I'm about to ask a question

5  that I'm not sure if you're going to let me ask and I

6  don't want to overstep my bounds.

7      THE COURT:  Then why don't you hold it off until

8  after the recess.

9      MR. HANNON:  I will do, your Honor.

10  Q.  Well let's look at a document here.  So I'm showing

11  you here Exhibit 247.

12      And, sir, um, I recognize you're not listed as a

13  sender or recipient of this e-mail, but, um, this e-mail

14  chain involves Karen Tang, right?

15  A.  Yes.

16  Q.  Okay.  And Ms. Tang, um, she is the, um, the HR

17  person that we saw yesterday who had communications with

18  you in advance of your meeting with Ms. Chan, right?

19  A.  Yes, I think she had recently started, yes.

20  Q.  Okay.  I just want to point out this message down

21  here at the bottom.  And you see here "Ms. Tang reaches

22  out to Mr. Henry," and this is November 9th, 2016.

23      This is one week after your meeting with Ms. Chan,

24  right?

25  A.  Yes, that would have been.

1    Q.   Okay.   And you see that she's asking Mr. Henry
2    whether any harassment training had ever been done in
3    Wellington's Asian offices.   Do you see that?
4    A.   I can see that, yes.
5    Q.   Okay.   Do you have any understanding as to what
6    prompted Ms. Tang to make an inquiry in early November
7    of 2016 concerning harassment training in Wellington's
8    Asian offices?
9    A.   Um, I have no understanding of that.   She's new to
10   the firm, perhaps she was getting acquainted with the
11   firm's policies.
12   Q.   Okay.   But to the best of your knowledge it had
13   nothing to do with what Ms. Chan told you during your
14   November 2nd, 2016 meeting?
15   A.   I didn't hear anything that pertained to harassment,
16   um, any claims of harassment, which is, to the best of
17   my knowledge, different, different from discrimination.
18   I didn't hear any claims of that at all.   So I very much
19   doubt that it was precipitated by that meeting.
20   Q.   Sir, have you ever had any harassment training?
21   A.   Have I had any harassment training?
22   Q.   Yes.
23   A.   Um, yes.
24   Q.   Okay.   And you understand that harassment comes in
25   various forms?

1    A.   I understand it comes in various forms.

2    Q.   And you understand that harassment doesn't just have

3    to be based upon sex, for example, it's not just sexual

4    harassment, right?

5    A.   I totally understand that, yes.

6    Q.   Okay.  And it could also be harassment based upon

7    someone's ethnicity, right?

8    A.   Yes.

9    Q.   Okay.  And you know that harassment doesn't just

10   include physical touching, right?

11   A.   Yes, I do.

12   Q.   Okay.  (Pause.)  Before we finish this point, which

13   we'll do after the break, let me just try to knock out a

14   couple of other sort of matters here that I have on my

15   list to talk to you about, um, and this is going to come

16   out of left field or so.

17        We talked a bit about the compensation structure

18   with respect to how Wellington works.  Wellington, in

19   compensating Portfolio Managers, Portfolio Managers

20   receive a, um, something called "incentive

21   compensation," is that right?

22   A.   Um, Portfolio Managers, they do.  A portion of their

23   compensation is incentive compensation, yes.

24   Q.   Okay.  And, um, not just Portfolio Managers, but

25   also other investors can also earn incentive

1  compensation based upon money generated by particular

2  vehicles, right?

3  A.  That's correct.

4  Q.  So just to use Ms. Chan as an example, she was a

5  member of the Emerging Market Opportunities team run by

6  Mr. Mattiko, right?

7  A.  That is correct.

8  Q.  So on the EMO team you had Mr. Mattiko as the

9  Portfolio Manager and then there were two Research

10  Analysts on that, Ms. Chan and Mr. Fayet, right?

11  A.  That's correct, at that time, during the time of the

12  discussion, yeah.

13  Q.  Okay.  And in terms of how that incentive

14  compensation got determined, there was a formula that

15  Wellington used, you know, to determine kind of a

16  compensation pool for each, um, fund, is that right?

17  A.  There was a formula that was used to determine the

18  pool, yes.

19  Q.  Okay.  And then -- and that pool was sort of decided

20  for each fund, right?

21  A.  The pool was decided for each strategy, not --

22  Q.  Okay.  And in EMO's case that was a fund, right?

23  A.  Um, yeah, I believe so.  It could have been a couple

24  of funds, but --

25  Q.  Okay.  So that would be twice a year there would be

1  this, um, determination concerning incentive

2  compensation for EMO?

3  A.  Um, at that time, yes.  I don't know if it's

4  changed, but, yes.

5  Q.  Okay, so that they'd counted the pool and then once

6  the pool was made, then the Portfolio Manager, that

7  individual gets to decide how to divvy up that pool,

8  right?

9  A.  Um, they get to decide what the recommendation is

10  with respect to how that pool is divided up.

11  Q.  Okay, so they make a recommendation in terms of how

12  much they keep, right?

13  A.  Um, they, um -- sure, yeah.  There is a -- there is

14  a maximum they can keep.  So the -- they can't choose to

15  keep it all.  So if my memory is right, um, that maximum

16  is 70 percent of the pool.  So the Portfolio Manager can

17  only keep 70 percent of the pool.

18  Q.  Okay.  And then the rest of the pool, the Portfolio

19  Manager would make recommendations in terms of who else

20  to give that to, is that right?

21  A.  That's right.

22  Q.  Okay.  And, um, with respect to the, um -- well in

23  addition to the incentive compensation, did you -- I

24  think you mentioned there were multiple, um, sort of

25  buckets, is that fair to say?

1    A.   Um, that's fair to say.

2    Q.   Okay.  So let's just talk a bit more about Ms. Chan

3    in particular.

4         So Ms. Chan had a base salary, right?

5    A.   Yes, she had a base salary.

6    Q.   And in addition to her base salary, she also earned,

7    um, or she had the opportunity to receive incentive

8    compensation based upon any of the different strategies

9    that she contributed to during the course of the year,

10   right?

11   A.   Um, yes.

12   Q.   And to be clear, she wasn't limited to just EMO,

13   right, if she provided a good idea to some different

14   strategy, she had the opportunity to receive, um, at the

15   Portfolio's Manager's discretion, some incentives for

16   that, right?

17   A.   Um, that's right.

18   Q.   Okay.  And there was also another component called

19   "corporate bonus," right?

20   A.   That's right.

21   Q.   And the "corporate bonus," that was, um, an amount

22   determined by Wellington kind of on an individual by

23   individual basis, right?

24   A.   Um, for most investment -- for most investment

25   professionals, um, the goal was to get the corporate

1    bonus to 0 and for their compensation to be structured.

2    So it was just salary and incentives.

3    Q.   Okay.  And when you say that was the goal was to

4    get the corporate bonus to 0, am I right that the

5    corporate bonus was sort of used as a -- as a sort of

6    make-whole for people whose incentive, for whatever

7    reason, wasn't bringing them up to a sort of market

8    salary, that the corporate bonus was sort of used as a

9    filler to pump them up?

10   A.   Um, yeah, we wanted our employees to feel motivated,

11   appropriately motivated, and clearly we wanted to make

12   sure that their total comp -- Wellington talks a lot

13   about total compensation, that their total compensation

14   was fairly motivational.  But it's important to realize

15   that in most firms, if they have a corporate bonus

16   structure, employees want to see their bonus go up.  In

17   my group, Global Equity Portfolio Management -- not for

18   the firm, but in my group, you actually wanted to see

19   your corporate bonus go down, um, that was typically --

20   not always, but typically a sign of success because it

21   meant your incentives were going up.

22   Q.   And just to develop on that.  You sort of typically

23   would work backwards in order to get to the corporate

24   bonus in terms of, you know, first sort of starting

25   "Okay, where should the total comp land?" and then

1    determining whether or not there was some corporate
2    bonus that needed to be used to get it there?
3    A.  Um, I don't know whether I work backwards or
4    forwards honestly, I mean --
5    Q.  Okay.
6    A.  I haven't done it for a couple of years.
7    Q.  Fair enough.  But when you did do it, the sort of
8    guiding mark that you used was sort of total
9    compensation, that the goal was to get to a total
10   compensation number that was, you know, something to
11   keep the employee satisfied and motivated, et cetera?
12   A.  Our goal is to get to a fair and motivational total
13   compensation.
14   Q.  And the corporate bonus was used as a tool to get
15   there, right?
16   A.  For those people where we didn't think incentives
17   was sufficient, yes.
18   Q.  Okay.
19        MR. HANNON:  I think I have time here for this.
20   I'm going to be showing a letter, Ms. Gaudet, just as a
21   heads-up.  And I saved it.
22        THE CLERK:  This has not been admitted?
23        MR. HANNON:  It has not been admitted, correct, so
24   it shouldn't be shown to the jury yet.
25        THE COURT:  And the letters?

1          MR. HANNON:  GO.

2          THE COURT:  Thank you.  GO for identification.

3          MR. HANNON:  May I display it?  Okay, thank you.

4    All right.  (On screen.)

5    Q.  So, Mr. Argyle, you should have that document on

6    your screen, but the jury doesn't because it's not yet

7    in evidence?

8    A.  Yes, I do.

9    Q.  Okay.  We talked earlier about, um, the formula for,

10   um, that incentive pool.  That was -- Wellington, during

11   the time we're talking about, had an incentive

12   compensation, is that right?  I'm sorry, an Incentive

13   Compensation Committee, is that right?

14   A.  Yes.

15   Q.  Okay.  And, um, I'm just showing you here -- does

16   this appear to be an overview of the Incentive

17   Compensation Committee?

18   A.  I can't --

19   Q.  Do you see it, sir?

20   A.  No, I just see the blue screen -- the blue header

21   page.

22   Q.  Oh, okay, I'll show you the rest of the document

23   here and, um, really what I'm interested in here is, and

24   I'll just move ahead here, um, you see here it shows a

25   formula for determining, um, the, um, incentive pool, is

1  that right?

2  A.  Um, yes.

3  Q.  Okay.  And then the pages that follow -- sorry, the

4  next -- so this is -- included here on Pages 4 and 5,

5  those both show the, um, formula for determining the

6  incentive pools, right?

7  A.  My only hesitation is I don't see a date.

8  Q.  Okay.

9  A.  On any of these slides.  Um, the -- at some point in

10  time this was the formula for determining the

11  incentive --

12  Q.  Okay.  During the time that, um -- well let me ask

13  the question this way.

14      Page 4 here, this shows the formula for

15  determining the equity incentive pool with respect to

16  equity, right?

17  A.  Um, it would appear to.  It's based on my memory.

18  Certainly the -- the main numbers on the screen resonate

19  with me.  I can't perfectly validate every number in

20  every cell.

21  Q.  Okay.  Thank you.  Did you have any -- well strike

22  that.

23      In your role at GEPM, um, were you involved in

24  talking with Portfolio Managers about their incentive

25  comp?

1    A.   Um, about?  Yes.

2    Q.   Okay.  About how it was calculated?

3    A.   About how it was calculated?  Um, it wasn't a -- how

4    it was calculated was not a -- was not a typical

5    conversation, but if they approached me about how it

6    was -- if the Portfolio Manager approached me about how

7    it was calculated -- um, and by that I mean a Portfolio

8    Manager, a team-leader Portfolio Manager approached me

9    about how it was calculated, we'd certainly have that

10   conversation.

11   Q.   Fair enough.

12        MR. HANNON:  Your Honor, I offer Exhibit GO into

13   evidence.

14        THE COURT:  Any objection?

15        MR. PATERNITI:  Your Honor, the only objection is

16   there's no foundation as to the date.

17        THE COURT:  Well it's -- for now I'll sustain it

18   on that ground.  We'll see if we can fill that in.

19        Anything else before the break?

20        MR. HANNON:  This would be a good time to stop,

21   your Honor.

22        THE COURT:  Very well.

23        Ladies and gentlemen, you've not heard all the

24   evidence, please therefore keep your minds suspended, do

25   not discuss the case either among yourselves nor with

1    anyone else.  The jury may stand in recess for one half

2    hour.  I'll remain on the bench.

3         THE CLERK:  All rise for the jury.

4         (Jury leaves, 10:45 a.m.)

5         THE COURT:  Please be seated.  You may step down,

6    sir.

7         I've received this motion to dismiss on the

8    grounds of subject matter jurisdiction.  This is a

9    serious motion.  Here's how we're going to handle it.

10   We're not going to throw away this trial.  The motion is

11   going to be heard, um, at -- or just as soon as I send

12   the jury out.

13        Now, um, I'm just throwing this out.  There's a

14   lot of things you can do here.  I mean, first of all,

15   you can settle it, which seems to me to make sense.

16   Even if you -- you could agree that this trial would be

17   the resolution of the case, but that would forego

18   appellate rights.  But treating it analogous to a motion

19   for a directed verdict, we're going to let the jury go

20   out and opine, since you've all made this significant

21   investment, and once the jury has opined, then I will

22   decide the motion, which you will argue at that time, if

23   the case hasn't earlier settled.

24        All right.  Mr. Hannon, what's the evidentiary

25   issue here?

1          MR. HANNON:  With respect to the Ms. Koide

2    complaint, um, given the witness's testimony about his

3    sort of state of mind and what he understood from

4    hearing Ms. Chan's words on November 2nd, 2016, we have

5    evidence in the record that Ms. Koide's MCAD charge had

6    been filed in August, um, and we have that as an agreed

7    exhibit, and I would intend to show him that and to

8    inquire or confirm that in fact he had received that

9    MCAD charge prior to his November 2nd, 2016 meeting with

10   Ms. Chan.

11         THE COURT:  I'll allow those questions.  We're not

12   going any further than that.

13         MR. HANNON:  Understood.

14         THE COURT:  All right.  We'll recess, 1 half hour.

15         MR. PATERNITI:  Thank you, your Honor.

16         THE CLERK:  All rise.

17         (Recess, 10:40 a.m.)

18         (Resumed, Jury enters, 11:20 a.m.)

19         THE COURT:  You may continue.

20         MR. HANNON:  Thank you.

21   Q.  Mr. Argyle, I want to circle back before the break

22   to the question about what had registered to you in your

23   November 2nd, 2016 conversation with Ms. Chan, um, and

24   I'm going to show you here what the parties have agreed

25   is Exhibit 203.  I'm just going to show you the first

1    page of this document.  But here --

2        Well you've seen this before, right?

3    A.  Um, I mean I must have.

4    Q.  I'm sorry?

5    A.  I must have.  I certainly had the opportunity to see

6    it.  I don't recall seeing it.

7    Q.  Okay.  Do you recognize this as being a, um, charge

8    that was filed against you by Mina Koide?

9    A.  Um, again I don't recognize the page, I -- just

10   reading -- I'm just reading it.  This looks like the

11   charge that was filed at the MCAD that was subsequently

12   rejected, or denied, or whatever.

13   Q.  We're going to get into all that later, don't you

14   worry.

15   A.  Okay.

16   Q.  My question now is just if you recognize this as

17   being the charge that Ms. Koide filed against you?

18   A.  I don't recognize the piece of paper, I recognize

19   the fact that there was a charge.

20   Q.  Okay, now let's take a look at the date.  Do you see

21   there that it shows the filing date of August 8th, 2016?

22   A.  Um, yes, I do.

23   Q.  Okay.  Is that consistent with your recollection in

24   terms of when Ms. Koide filed the charge against you?

25   A.  Um, I don't recall the date she filed it.  I don't

1    have any recollection.  So I have no reason to dispute
2    that.
3    Q.  Okay.  And would this at all help refresh your
4    recollection in terms of whether or not you were aware
5    of Ms. Koide's complaint at the time that you had your
6    November 2nd, 2016 meeting with Ms. Chan?
7    A.  Um, I clearly would have been aware of the
8    complaint.
9    Q.  Okay.  So, um, following your November 2nd, 2016
10   meeting with Ms. Chan that we've listened to part of the
11   recording of, um, you subsequently worked with HR in
12   order to set up a purported summary of that meeting, is
13   that right?
14   A.  Um, I -- it's not how I would characterize it, I
15   sent HR -- I worked up, myself, um, an e-mail that I
16   would send to Ms. Chan, I sent it to HR for feedback on,
17   um, how they -- you know what they thought of it before
18   I hit "send."
19   Q.  Okay.
20   A.  But working with them on that summary?  I embraced
21   them, I incorporated some of that feedback, but I think
22   the bulk of it was in my words.
23   Q.  Okay.  Do you recall Ms. Tang nudging you to send
24   that recap?
25   A.  Um, I don't recall.

1   Q.  All right, let's take a quick look here.  I'm

2   showing you what we've agreed to as Exhibit 251.  (On

3   screen.)  I'm just looking here at the top.  And as

4   always, feel free to let me know if you want to see

5   more.

6        But do you see there it's an e-mail from Ms. Tang

7   to you, November 11th?

8   A.  I see that.

9   Q.  Okay.  Um, and she notes, um, "I wanted to follow up

10  on our conversation last week and provide that gentle

11  nudge to send a recap in writing to Gigi on your

12  discussion."  Do you see that?

13  A.  I see it.

14  Q.  Okay.  And you subsequently did in fact send that,

15  um, recap, is that right?

16  A.  Yeah, I mean that was entirely consistent, as you

17  showed earlier, um, you know with a recap from a

18  previous year from Tom Baxter after he had had a

19  discussion with her.  So it was common practice.  I mean

20  it was important to deliver -- to make sure the feedback

21  was -- obviously I had no idea the meeting had been

22  recorded so I thought it would be -- on an audio basis,

23  so I thought it important to record essentially or to

24  note down the important feedback that needed to be

25  delivered and acted upon, um, in writing.

1   Q.  So you thought it was important to have an accurate

2   recap of your meeting with Ms. Chan, right?

3   A.  I thought it -- the point of my e-mail was not to

4   provide a verbatim recap of my meeting with Ms. Chan,

5   the point of my e-mail was to provide action points that

6   she needed to -- feedback, actual feedback that she

7   could act upon, um, and should act upon, and to give her

8   the opportunity to respond to that e-mail.

9   Q.  My question wasn't about a verbatim recap, my

10  question was about an accurate recap.  Did you think it

11  was important to provide an accurate recap as to what

12  had transpired at that meeting?

13  A.  I thought it was important to provide feedback and

14  actual feedback in that e-mail.

15  Q.  And by the time you got, um -- you got around to

16  sending that, that was late November, is that right?

17  A.  Um, I'd -- if memory serves me correctly, I met with

18  Ms. Chan at the beginning of a roughly two-week tour

19  through our Asian offices and by the time I got back to

20  Boston and essentially back to my to-do list, um, that

21  was a couple of weeks later, yes.

22  Q.  Okay.  So you had had other more important pressing

23  matters to get to before sending the following e-mail,

24  right?

25  A.  Um, I was responsible for a large group of

1    investors, running hundreds of billions of dollars for

2    our clients, and matters came up every single day.

3    Q.  So that's a "Yes"?

4    A.  Um, I don't remember the specific matters so it's

5    impossible for me to say whether it was "Yes" or "No."

6    I know that every day and every week I would be dealing

7    with important matters.

8    Q.  Okay.  And you know Ms. Chan was dealing with some

9    important matters at that time too, right?

10   A.  I don't know -- I know -- I don't know how you

11   characterize "important matters."

12   Q.  Well, um, she was getting ready to have her first

13   child, right?

14   A.  She was.

15   Q.  Okay.  And she was trying to wrap up things at work

16   before she left on maternity leave, right?

17   A.  I -- I wouldn't be involved in the details of

18   "wrapping things up at work before she left for

19   maternity leave."

20   Q.  Okay.  Your, um -- the e-mail that you eventually

21   sent at the end of November had, um, indicated to

22   Ms. Chan that you looked forward to her acknowledgement

23   and reply, is that right?

24   A.  I believe that's accurate.

25                  (Interruption, person coughing loudly on

1  zoom.)

2          MR. HANNON:  Let's just be thankful that

3  person is not here in the courtroom.

4          (Laughter.)

5  Q.   Mr. Argyle, um -- and then that e-mail from, you

6  said in late November, um, you never got a response from

7  Ms. Chan before she left work for her maternity leave,

8  right?

9  A.  Um, that's correct.

10  Q.  Okay.  And she came back from maternity leave on,

11  um, I believe it's April 5th, is that right?

12  A.  I -- I -- I don't know the exact date she came back

13  from maternity leave.

14  Q.  Well let's take a quick look at a document here just

15  so we can sort of orient ourselves on the date.  Um, I'm

16  going to show you what we've agreed is Exhibit 270.

17          So you see there this is an e-mail from Ms. Chan,

18  um, advising that she'll be returning to work on April

19  5th.  Do you see that?

20  A.  Yes.  Obviously I wasn't on that e-mail chain, but,

21  yes.

22  Q.  Okay.  Now, um, fair to say you weren't expecting

23  Ms. Chan to do any work while she was on maternity

24  leave, right?

25  A.  That's -- that is completely fair.

1    Q.  Okay.  Great.  And, um, when she came back from
2    work, did you reach out at all to welcome her back or
3    check in or anything?
4    A.  Um, I didn't.  I wasn't a direct supervisor and I
5    wasn't her Team Leader, so, no, I didn't.
6    Q.  Okay.  Did you send her any kind of reminder that
7    you had been looking for some kind of a response to your
8    late November e-mail?
9    A.  Um, I didn't send her a reminder, the ball was in
10   her court.
11   Q.  So, no, you didn't send her a reminder?
12   A.  No, I did not.
13   Q.  Okay.  Um, but eventually what you did was, um, you
14   dispatched, um, Mr. Mattiko to go and speak with
15   Ms. Chan, isn't that right?
16   A.  Um, I'm struggling with the use of your word
17   "dispatched," but I don't remember.  But Mr. Mattiko
18   spoke to Ms. Chan.
19   Q.  Okay.  And am I right that you had asked Mr. Mattiko
20   to go and speak to Ms. Chan?
21   A.  I can't remember whether I asked or he volunteered,
22   but Mr. Mattiko spoke to Ms. Chan.
23   Q.  And there was a specific goal in this conversation
24   that was to take place between Mr. Mattiko and Ms. Chan,
25   right?

1    A.  Um, I -- one of the goals -- and there was a -- if

2    there was a goal it was to find -- she had failed to

3    respond to me, um, she had my direct report in the

4    region, which had changed -- it had changed, um, and it

5    was, um -- I tried to have a conversation with her but

6    she had rebuffed, and Mr. Mattiko, um, then had a

7    conversation with her and one of the things he talked

8    about was, you know, what were her thoughts on the

9    e-mail I sent to her, that's my understanding.

10   Q.  Who did she rebuff?

11   A.  Henry Philip.

12   Q.  When did Mr. Philip tell you that she had rebuffed

13   him?

14   A.  I doubt he used the word "rebuffed," it was my word,

15   but, um, he -- I know he had a conversation with her

16   where he felt shut down and there was no reason to

17   engage.  There was no engagement.

18   Q.  Let's take a look to see what he wrote.  (On

19   screen.)

20        So, um, this here is Mr. Philip's e-mail from May

21   25th, 2017, right?

22   A.  Um, that's right.

23   Q.  Okay.  And I'm going to ask you some questions about

24   the person on the cc, but first let's just take a look

25   in terms of what Mr. Philip wrote in terms of his

1   conversation with Ms. Chan.

2        "Not much to report, she pretty much stonewalled

3   me.  I can fill you in in more detail when we catch up

4   next."  He says he asked her directly where her head was

5   at particularly in the context of your conversation with

6   her prior to her maternity leave.  She said "I'm fine."

7   "It was a pretty abrupt dialogue, so not really the

8   road-to-Damascus change you were hoping for, but not

9   totally negative either."  Right?

10  A.  That's right.

11  Q.  Okay.  Is that consistent with what Mr. Philip told

12  you in your verbal conservations -- I'm sorry, your oral

13  conversations concerning that meeting?

14  A.  I can't remember if I had oral conversations with

15  him or if I had oral conversations with -- I can't -- I

16  can't recall.

17  Q.  Okay.  And, um, the reference to the "road to

18  Damascus change" -- actually strike that.  Let me ask a

19  different question.

20        In the reference before the cc line you've got a

21  new name here that I'm not sure the jury has heard

22  before, "Adam Puritz."  Do you see that?

23  A.  Yes.

24  Q.  Now Mr. Puritz, um, he was, at this point in time in

25  May of 2017, he was in line to come to Hong Kong and

1  take over the Hong Kong office, is that right?

2  A.  Um, yes, he went out to Hong Kong later that year to

3  become head of the Hong Kong office.

4  Q.  Okay.  And in fact when Ms. Chan returned from

5  maternity leave you were eager to resolve her situation

6  because you didn't want to leave a mess there for

7  Mr. Puritz to deal with, isn't that right?

8  A.  Um, that's -- I was eager to resolve a situation of

9  an underperforming employee who had been given -- sorry,

10  an underimpacting employee -- apropos to my comment

11  yesterday, who had been given very clear feedback on how

12  to improve her impact and, um, hadn't chosen to take

13  that feedback onboard.

14  Q.  Um, well since, um, between the time that Ms. Chan

15  returned from maternity leave in April of 2015 and, um,

16  Mr. Henry's e-mail here on May 25th of 2015, um, had you

17  done anything to track Ms. Chan's performance?

18  A.  So again as per yesterday we're going to use

19  "performance" in different ways in talking about

20  investment professionals.  There is the performance of

21  the specific -- the investments they make, and there is

22  the performance in aggregate in their role, in their

23  primary role.  So I don't know which "performance"

24  you're talking about in this context.

25  Q.  Okay, in any context, is there anything to track and

1    sort of objectively measure how do we compare, has there
2    been -- has there been an objective change here in terms
3    of what she's doing in --
4    A.   Um, that was one of the things Mr. Philip was
5    hoping to figure out and, um, similarly, um, in the
6    conversations with Mr. Mattiko, that was going to be
7    very very important input, um, because her job was to be
8    an analyst on the Emerging Market Opportunities team.
9    And in fact in the e-mail, um, at the end of November I
10   had made it very clear that that was her job.  And what
11   we were looking for was increased engagement, um -- at
12   the very least what we were looking for is increased
13   engagement with Mr. Mattiko.
14   Q.   Back to my question, sir.  My question, again, was
15   what if anything you had done to objectively measure any
16   changes in terms of Ms. Chan's performance?  Define it
17   as broadly as you like, um, subsequent to her return
18   from maternity leave.
19   A.   Um, that's not an -- her interaction with
20   Mr. Mattiko is not objectively measurable, no.
21   Q.   And, um, in fact a significant, um, concern you had
22   with Ms. Chan when she returned from maternity leave was
23   simply what she was feeling, right?
24   A.   Um, what -- I wanted to -- how she felt about the
25   feedback she received in November, both in the tape

1   you've heard some of, and, um, in writing, the e-mail,

2   um, how she felt in response to that feedback, how was

3   she going to respond to that feedback?

4   Q.  You wanted to know if she was -- if she was going to

5   satisfied with her position at Wellington, right?

6   A.  I had no interest if she was satisfied in her

7   position at Wellington, I wanted to know whether she was

8   going to respond to the feedback in a way that would

9   have impact on the Emerging Market Opportunities

10  position -- sorry, on the Emerging Market Opportunities

11  team and our clients.

12  Q.  And you conveyed -- your testimony, sir, is that you

13  conveyed to Mr. Mattiko that that's what you wanted him

14  to talk to her about?

15  A.  I can't recall what I talked to Mr. Mattiko about.

16  Q.  You, yourself, subsequent to Ms. Chan returning from

17  her maternity leave, you never reached out to her to

18  discuss that topic, correct?

19  A.  I didn't, I had 120 employees roughly in my

20  organization managing it, a lot of client money with a

21  lot of priorities going on, and I had an Associate

22  Director in the region whose job that was.

23  Q.  You're referring to Mr. Philip?

24  A.  Yup.

25  Q.  Okay.  And was there anything else that Mr. Philip

1   shared with you subsequent to Ms. Chan returning from

2   maternity leave that you can recall besides that e-mail

3   we just saw concerning her post-maternity performance?

4   A.  Um, I -- I -- I can -- I can recall an e-mail saying

5   that, you know, the office, the Hong Kong office, that

6   things are going reasonably well in the Hong Kong

7   office, or something like that.  I don't actually -- I

8   wouldn't recall that, but I recall seeing that in

9   preparation.

10  Q.  Anything else?

11  A.  Um, not here right now.

12  Q.  Okay.  I'm going to show you what's agreed as

13  Exhibit 275 and, um, if I may, sir, I was going to start

14  with the first e-mail in the chain and then we'll look

15  at the top one after that.  (On screen.)

16       So we have here the e-mail from Henry Philip to

17  you and Mr. Baxter on May 4th, 2017, yes?

18  A.  Um, yes.

19  Q.  Okay.  And he notes in the second sentence that

20  "There have been a couple of occasions recently where

21  Gigi's strategy has been a potential interest to

22  prospects."  Do you see that?

23  A.  Yes, I do.

24  Q.  Do you recall the fact that in early 2017, that

25  there were a number of prospects that had potential

1   interest in Ms. Chan's, um, strategy?

2   A.   Um, I don't recall that there have been a number

3   of prospects interested in the China Growth strategy, I

4   recall that there were -- um, the "Alex" here pertains

5   to our then business developer in Mainland China, um,

6   and I recall that there was some, um, potential, um,

7   bespoke opportunities from Chinese clients who he was

8   hoping we could find a Portfolio Manager for, and he

9   believed Ms. Chan might be an appropriate Portfolio

10  Manager for those approaches.  I think those are the

11  prospects that are referred to here.

12  Q.  Okay.  And just to unpack that a little bit.  Are

13  you familiar with a potential opportunity with an

14  insurance company called Ming Sheng?

15  A.  Um, yes, I am.

16  Q.  Okay.  And that had been an opportunity that the

17  "Alex," who's referenced here, that he brought to

18  Wellington, is that right?

19  A.  Well he didn't bring it to Wellington, he worked for

20  Wellington, it was his job, he's a business developer.

21  Um, so, yeah, that was an opportunity he brought to

22  Wellington.

23  Q.  And he had introduced them to Ms. Chan, right?

24  A.  Um, I don't know if -- I can't remember if he had

25  introduced them to Ms. Chan, he should not have

1    introduced them to Ms. Chan without GEPM's lines behind

2    him.  Business developers can't introduce their clients

3    to Portfolio Managers on -- business developers can't

4    introduce their clients to Portfolio Managers on bespoke

5    opportunities, right?  Not China Growth, but bespoke

6    opportunities.  Unless they're engaging with the

7    function.

8         THE COURT:  Excuse me, just so I'm clear, what is

9    a "bespoke opportunity"?

10        THE WITNESS:  So China Growth --

11        THE COURT:  No, tell the jury.

12        THE WITNESS:  Oh, I'm sorry.  China Growth would

13   have been a product that had gone through Product Panel

14   and, um, and so forth.  This was a client and they were

15   bringing an idea for an investment approach to us rather

16   than us developing an investment approach.  And so this

17   was not something that anyone -- anyone at Wellington

18   was doing at this time and it was, um, very niche.

19   Q.  I'm sorry, you said nobody at Wellington was

20   interested in doing it at this time?

21        THE COURT:  No, he said this was something that

22   nobody at Wellington was doing at that time.

23        MR. HANNON:  Oh, thank you, Judge.

24   Q.  But Wellington was interested in the opportunity,

25   right?

1    A.   Nope.

2    Q.   Okay.  You spent time investigating the opportunity,

3    right?

4    A.   Um, that is one of the things that led to me, being

5    a senior executive, and others, not being interested in

6    the opportunity, yes.

7    Q.   Isn't it true, Mr. Argyle, that the reason why you

8    decided not to pursue the Ming Sheng opportunity was

9    because you weren't sure whether or not Ms. Chan was

10   going to stay at Wellington?

11   A.   Um, the reason I decided not to pursue the Ming

12   Sheng opportunity is in the November, um, whatever it

13   was, 20-something e-mail, um, to Ms. Chan, I wrote that

14   she was struggling to balance her China Growth

15   responsibilities or China Growth Fund with her

16   responsibilities on the Emerging Market Opportunities

17   Fund and if she carried on struggling to balance those

18   opportunities, the China Growth Fund would no longer be

19   tenable and would no longer exist.  So adding another, a

20   third effective responsibility, um, made no sense.  And

21   there was no other, um -- there was no other person who,

22   in my group, who I thought we should pursue that with

23   and that is why, um -- that is why I believe we

24   shouldn't pursue that from a talent perspective, from a

25   personnel perspective.

1          And there were other reasons not to pursue the

2     Ming Sheng opportunity.  The asset management was a

3     business that's built on scale.  So we like to have a

4     product, we have resources to manage that product, and

5     even if we can get subsequent clients into that product

6     and have the product grow and by and large use the same

7     resources, that's a profitable business cycle.  This was

8     one client bringing one idea that was convoluted from an

9     operations perspective.  And I don't believe it was

10    personal, based on my experience -- and I may be wrong,

11    but I don't believe, based on my experience, that this

12    actually -- that even if we had the, um -- a talented

13    individual who would balance this with his or her other

14    responsibilities, I don't believe that this would have

15    been necessarily good business for the firm.

16    Q.  How much were they looking to have Ms. Chan manage

17    for?

18    A.  Um, so I don't recall, but I do recall my thoughts

19    on the business.

20    Q.  Do you recall them indicating that they thought it

21    would be $100 million in the first year?

22    A.  Um, we -- there were a lot of numbers thrown around.

23    I saw nothing directly from them.  Business developers

24    were always dangling numbers on a hook.  But this is

25    going to be potentially hard to hear.  We manage over, I

1   think you heard Mr. Swords say, over $1 trillion as a

2   firm, $1.3 trillion, I think he said.  $100 million is a

3   lot of money, it's a lot of money to everybody, but in

4   our business a $100 million assignment didn't make it

5   necessarily, um, good business unless it could

6   potentially go to be a -- and I'm making up this number,

7   a billion dollar assignment or something like that.  And

8   I don't have the business metrics in front of me, so

9   don't quote me on the exact numbers.  I'm just trying to

10  explain that just because it's a large number, $100

11  million is a large number in this world, doesn't mean it

12  is a large number in the context of Wellington's

13  business.

14        And also business developers pitched business

15  internally, business developers were incentived based on

16  the business that they brought in.  It wasn't -- you

17  know, they were incentived to make a big piece of

18  business sound attractive, especially if it was bespoke

19  to the business "executives," for lack of a better word,

20  that's how I refer to myself, who were making that

21  decision.

22  Q.  So back to the e-mail that we still have on our

23  screen here, um, the reference here, um, to the

24  "prospects."

25        Did you understand that to include Ming Sheng,

1   that Ming Sheng was still a potential prospect as of

2   this time?

3   A.  Um, I can't remember if that entity was a potential

4   prospect still at this time.

5   Q.  Okay.  Do you recall who the other prospects were?

6   A.  Um, no.

7   Q.  Do you know what "HKMA" stands for?

8   A.  Yes, I do.

9   Q.  And what's that?

10  A.  The "Hong Kong Monetary Authority."

11  Q.  At some point in time had the Hong Kong Monetary

12  Authority, was there some interest in potentially having

13  Ms. Chan work with them?

14  A.  Um, I don't know.

15  Q.  (Pause.)  I'm showing you now Exhibit 290.  To get

16  us oriented here, um, so this is an e-mail exchange from

17  Mr. Philip to Ms. Duckworth and yourself on June 8th,

18  2017, um, and you see here -- Henry is indicating that,

19  um -- no, let me ask a different question.

20      There's an "Astor" referenced here in the first

21  sentence.  Who is "Astor"?

22  A.  That -- I believe it would have been Astor -- it's

23  Astor Cook who is on the relationship team in Hong Kong.

24  Q.  Okay.  Um, in GRG?

25  A.  Yes.

1    Q.   Okay.   So this is someone whose responsibilities are

2    out there trying to get business, so to speak?

3    A.   I don't know exactly what -- we have relationship

4    managers and business developers, sometimes they work

5    hybrid.   I don't remember specifically where she fell

6    along that spectrum.   But even our relationship managers

7    were hoping to grow business with existing clients, so.

8    Q.   Okay.   And when you indicate -- I'm sorry, when

9    Mr. Philip indicated, um, "specifically as it relates to

10   Gigi," do you have an understanding as to why he meant

11   "specifically with respect to Gigi"?

12   A.   Um, I don't know whether I did at the time, but I

13   can't remember now.

14   Q.   Okay.   (Pause.)   You were the one who decided to

15   terminate Ms. Chan's employment, is that right?

16   A.   Yes, I was.

17   Q.   And, um, why did you decide to terminate her

18   employment?

19   A.   Um, I decided to terminate her employment because

20   she was, and her title was, "Equity Research Analyst,"

21   she was on the Emerging Market Opportunities team, and

22   she was not having the appropriate impact on that team.

23   Her role on that team was untenable.   By that time she

24   had also, um -- so that's the first part of the

25   decision.

1    The second part of the decision is that by that
2    point in time she had also been managing, um, the China
3    Growth Fund for a few months, so I had to make a
4    decision.  As a steward of the firm's resources, as a
5    division manager within the budgets that I had, um --
6    and at Wellington we had head-count budgets, you're
7    allowed to have X number of people in your group, um, is
8    it a good use of my resources, of my firm's resources,
9    to actually say "This individual hasn't worked out on
10   this team over here, on the Emerging Market
11   Opportunities team over here, to let a good use of my
12   resources actually back out at this stage, on her own,
13   effectively for a job that she had applied for years
14   previously and not got."
15   Q.  So, um, you decided that she wasn't worth her --
16   worth her compensation, so to speak, just to do China
17   Growth, is that right?
18   A.  Decided?  I decided that -- I just explained what I
19   decided.  I decided that it wasn't working out in the
20   Emerging Market Opportunities, and as a business manager
21   and steward of the firm's resources, um, it wasn't worth
22   effectively making her a team of 1.
23   Q.  What is the potential value to, um, Wellington of
24   the China Growth Fund?
25   A.  There's absolutely no way to predict that.

1    Q.  Had there been any analysis done?

2    A.  Um, I am not sure.

3    Q.  Before you made the decision that Ms. Chan wasn't

4    worth it as a team of 1, did you go and ask anybody to

5    crunch the numbers?

6    A.  Um, no.

7    Q.  Did you go to GRG and say, "Hey, you guys have had

8    this strategy for a while, what's the real interest in

9    terms of our institutional clients of how much money can

10   we actually raise with this thing?"  Did you do that?

11   A.  No.

12        THE COURT:  You're talking the China Growth Fund?

13        MR. HANNON:  Correct, your Honor.

14   Q.  Did you do that, sir?

15   A.  No, I did not.

16   Q.  (Pause.)  With respect to the other opportunities

17   that we looked at in that last e-mail, had you asked

18   anyone to perform a similar analysis before determining

19   that Ms. Chan didn't have value as a -- didn't have

20   sufficient value as a team of 1?

21   A.  Um, I don't recall, but I don't think so.

22   Q.  (Pause.)  There's another opportunity that we had

23   talked about previously, um, the Pan-Asia -- what's

24   called the Pan-Asia.  Do you recall that discussion?

25   A.  Yes, I do.

```
1    Q.   And I apologize, I don't recall if you testified

2    yesterday that you did recall Rich Pender having some

3    interest in that.  Did you?

4    A.   I said I recalled there was some interest in that,

5    but I couldn't recall whether the interest was generated

6    by us.  I know Ms. Chan met Mr. Pender sometimes in her

7    role as a Team Analyst on the Emerging Market

8    Opportunities team, or if actually this Mr. Pender

9    brought that -- or had that idea himself.  I have no

10   knowledge.  I don't think I -- I have no recollection.

11   I don't think I actually had any knowledge of which

12   direction that interest came from.

13   Q.   Okay.  But you did intercede to effectively, um, put

14   the breaks on any kind of Asia Growth strategy that

15   Ms. Chan might launch in connection with Mr. Pender,

16   isn't that right?

17   A.   Um, I -- I don't recall.  What I do recall is that,

18   um, I did not want Ms. Chan -- following November, I did

19   not want Ms. Chan focused on anything other than

20   Emerging Market Opportunities, and if she could balance

21   the responsibilities, her China Growth approach.

22        (Pause.)

23        MR. HANNON:  That's all I have, your Honor.

24        THE COURT:  Do you wish to inquire now or reserve?

25        MR. PATERNITI:  Now, your Honor.
```

1        THE COURT:  You may.

2        MR. PATERNITI:  Thank you.

3

4    CROSS-EXAMINATION BY MR. PATERNITI:

5    Q.  Oh, it's still morning, so I'll say "Good morning."

6    A.  Good morning.

7    Q.  Mr. Argyle, just some brief questions here before we

8    get into the meat of it.

9        Where do you live?

10   A.  Dover, Massachusetts.

11   Q.  And you're originally from the UK?

12   A.  Yes, I am.

13   Q.  If you could briefly just tell us where did you go

14   to college?

15   A.  I went to Oxford University in England.

16   Q.  And you, um -- strike that.  Do you have family?

17   A.  Um, yes, I do.

18   Q.  Married?  Kids?

19   A.  I'm married, been married for 25 years, and I have

20   three children.

21   Q.  Okay.  Let's get a little bit into your work

22   background before Wellington.  And if you could just

23   summarize very briefly for the jury, in a couple

24   sentences, what did you do before you got to Wellington,

25   um, after you graduated from Oxford?

1    A.   After graduating from Oxford, um, I was a middle

2    school teacher for two years, I taught math in middle

3    school.  You know that first level that the kids get

4    from having one classroom teacher to individual subject

5    teachers?  That was me for two years.  And then by a

6    circuitous -- by a roundabout route somehow, um, I ended

7    up in an entry-level role at Goldman Sachs in London,

8    um, as an Operations Analyst.  And, um -- and I spent

9    roughly three years at Goldman Sachs in London, and

10   about halfway through I was moved into a risk -- kind of

11   a proprietary risk position.

12   Q.   How long were you at Goldman Sachs total?

13   A.   Three years roughly.

14   Q.   Okay.  And then after that you joined Wellington?

15   A.   Yes, I did.

16   Q.   It was May of 1997?

17   A.   Yes, it was.

18   Q.   And just briefly, I know we've had a lot of

19   description about what Wellington is, but there was some

20   reference you made to an "index fund," I think you said

21   an index fund --

22   A.   Yes.

23   Q.   You said something about how somebody would just

24   choose an index fund over a Wellington product if --

25   under certain circumstances.

1          Could you just explain to the jury, again briefly,
2     hopefully in as simple terms as possible, but what an
3     "index fund" is and the difference between that and the
4     active management of Wellington?
5     A.   Certainly.  I'll try.  So to just talk about stocks
6     and generalizing greatly, so with no precision.  Um,
7     let's just say there are two ways for, um, investors,
8     institutional or retail, um, to have exposure to the
9     stock market.  So one way is essentially just to buy a
10    fund that replicates the stock market, exactly what you
11    see on the news everyday, those are called "index
12    funds."  There's no decision, um, made as to what stocks
13    are bought or sold in those funds, it's just trying to
14    replicate the stock market itself.  It's gotten a little
15    more nuanced over the last few decades, you can now do
16    that with slivers of the stock market, but that would be
17    an "index fund."
18         Wellington is an active manager.  We believe we
19    can add value through, um, through what we call "active
20    investment management," and in the selection of stocks,
21    we can add value.  So again simplifying, the returns we
22    provide to our clients are better than those of just
23    simply buying aggregate exposure to the stock market.
24         It's a little bit more complicated than that, but
25    hopefully that answered your question.

1   Q.  That's perfect.  And the, um -- is it fair to say

2   that the index fund price for a client is cheaper than

3   the active management model?

4   A.  Certainly, that's, um -- if I was here marketing an

5   index fund, that would be exactly, you know I would say,

6   you know, there is no talent involved with researching

7   stocks or picking stocks, it's just "Okay, we're going

8   to replicate the stock market," and that can be done

9   much cheaper than, um, hiring the requisite talent --

10  and it is a talent business, um, to try and beat the

11  stock market.

12  Q.  And in your group, GEPM, um, you mention that there

13  was a research department.  Is one of the ways that

14  Wellington, um, believes that it can perform better than

15  an index fund, um, is by research?

16  A.  It's the primary way we believe we can perform

17  better than an index fund is through proprietary

18  research, um, at a -- at a stock-by-stock level, and we

19  also have analysts who work in economies and countries

20  and currencies.  But primarily what we call "fundamental

21  research," really understanding the companies in a deep

22  way and really what do we understand about this company

23  that others don't.  Because, um, it's not just about

24  understanding the company, it's then looking at the

25  company's stock price and saying, "Okay, given

1    everything we understand about the company, is the stock

2    price cheap or is the stock price expensive?"

3    Q.  And when we -- when you referred to Ms. Chan's title

4    as an "Equity Research Analyst," but you referred to her

5    as a "Team Analyst," is there a significance to the word

6    "research" in that title?

7    A.  Um, there is significance to the word "research,"

8    that was -- the role, um, was to be a Research Analyst

9    on the Emerging Market Opportunities team, to conduct

10   that research on individual companies to provide, um,

11   those insights, even buy-and-sell recommendations, and

12   to Mr. -- to Mr. Mattiko on both the holdings in his

13   portfolio or in his clients's portfolios, and

14   prospective holdings that he might want to buy.

15   Q.  And Mr. Mattiko again was the Team Leader?

16   A.  Yes, Mr. Mattiko was the Team Leader.  Greg Mattiko.

17   Q.  Thank you for that explanation.  Let's just go back

18   to your Wellington career.  And I'm going to try to

19   again shortcut it up to the time that you start working

20   in GEPM.  Can you just give the jury a brief background

21   of that?

22   A.  Yeah, I joined Wellington in one of the client

23   service groups that worked with our mutual fund clients,

24   I joined as a Relationship Analyst and was a

25   Relationship Manager, but led kind of the interface with

1    our existing clients.  And then I joined as a

2    Relationship Analyst working alongside Relationship

3    Managers in helping in that client service, essentially

4    Institutional Client Services.  And then after a couple

5    of years I became a Relationship Manager.  So that was

6    between mid 1997 and mid 2003, actually May both years.

7         And in May of 2003, um, I took a role becoming the

8    Business Manager of the U.S. Equity Portfolio Manager,

9    um, working with Mr. -- working with Mr. Swords, who was

10   head of that group.  And you may remember that, at the

11   beginning of 2007, um, he mentioned that U.S. Equity

12   Portfolio Management and International Equity Portfolio

13   Management were merged to form Global Equity Portfolio

14   Management, which is the acronym "GEPM," which we've all

15   heard a lot, and I became the Associate Director of

16   Global Equity Portfolio Management in 2008.

17        And I can't remember exactly where you wanted me

18   to go to, and I may have passed it, so I apologize.

19   Q.  And that's perfect.  And my next question is, as

20   Associate Director of GEPM, starting in 2008, what were

21   your duties and responsibilities?

22   A.  Um, so our duties -- the duties and responsibilities

23   of the management team, which is the Director and

24   Associate Director, I started working with -- I started,

25   I would be working very closely in what was now GEPM,

1    with James and Team Leaders and Portfolio Managers and
2    their Team Analysts, um, in making sure that, um, we
3    could do everything we could for our clients.
4          And also I'd say the, um, the other
5    responsibility, um, was we weren't the only organization
6    at Wellington, we had kind of our sister organization,
7    um, the Central Research Group, we had, um -- there were
8    many other groups that do the -- the Client Servicing
9    Group, the Human Resources Group, importantly our
10   Technology Group, and we were thinking about where are
11   we going, where are we going 5 to 10 years from now and
12   how are we going to do it as a department and how are we
13   going to work together with other departments to get
14   there?
15   Q.  The, um -- at some point I think you testified you
16   became head of Global Equity Portfolio Management,
17   correct?
18   A.  Yes, I did.
19   Q.  And that would be head of all Equity Portfolio
20   Managers and Analysts on those teams?
21   A.  Um, pretty much.  Our Central Research Group did
22   manage some assets, but the great preponderance of the
23   Equity Portfolio Managers and their teams at Wellington
24   --
25              MR. PATERNITI:  Your Honor, I've forgotten the

```
 1    mask rule, I've been talking with a mask.  May I take

 2    mine off?

 3            THE COURT:  You may.

 4            MR. PATERNITI:  Thank you.

 5            (Takes off mask.)

 6    Q.  How long were you in the role of head of GEPM?

 7    A.  Um, well from 13, 14, 15, 16 -- um, five years.

 8    Q.  Okay.

 9    A.  And then, as asked, then GEPM merged with Fixed

10    Income and I became co-head of Investment Boutiques, but

11    I don't know if that was --

12    Q.  Right, I think we heard testimony earlier that

13    Investment Boutiques was a combination of GEPM and some

14    other fixed-income groups?

15    A.  Fixed Income and a couple of other teams, yeah.

16    Q.  Okay.  And was that your position, the co-head of

17    Investment Boutiques and Vice-Chair, was that your

18    position as of the time you retired?

19    A.  Um, yes, it was.

20    Q.  And when did you retire?

21    A.  I retired at the end of June, 2020.

22    Q.  Why did you retire?

23    A.  Um, I had -- I was very proud of my career, I had

24    achieved a lot, um, but I felt a little bit as if I had

25    other priorities that I needed to focus on in my life,
```

1   um, including any family, including my parents in

2   England, um, including my health, um, and importantly I

3   also had a tremendous, um, team of individuals who

4   could -- it was going to be seamless for the

5   organization.

6   Q.  At Wellington a term we have heard, I think maybe

7   from you, is "Line Manager"?

8   A.  Yes.

9   Q.  Could you just explain what that means?

10  A.  "Line Manager," in Wellington terminology, is the

11  head of a department, of a function, we call them -- we

12  would call them "functions," um, and it could be a

13  division in some firm or whatever it might be, so.

14  Q.  So you were the Line Manager of GEPM, is that right?

15  A.  Yes.

16  Q.  Okay.  I want to -- my questions are largely going

17  to focus on the time period from 2013 to 2017 here in --

18  or "here out" I should say, so unless I indicate

19  otherwise, answer the questions based upon that

20  timeframe.  Okay?

21  A.  Understood.

22  Q.  Okay.  Did you have direct reports to GEPM?  I think

23  you already testified you had Mr. Baxter.

24  A.  Yes, I did.

25  Q.  And he was located in Hong Kong?

1   A.   Um, the whole time Mr. Baxter worked for me in GEPM

2   he was located in Hong Kong, yes.

3   Q.   Okay.  Did you have other direct reports?

4   A.   Um, yes, I did.

5   Q.   Could you just run through their names real quickly?

6   A.   Um, Terry Burgess.  Erin Murphy.  Maureen Pederossi.

7   Ellen Chay.

8   Q.   Where was Terry Burgess located in that time period,

9   2013 to 2017?

10   A.   2013 to 2017?  I forget when he came back from

11   London, but either he was just coming back from London,

12   but predominantly in Boston.

13   Q.   Erin Murphy, is that a female?

14   A.   Erin Murphy is a female, yes.

15   Q.   Where did she work?

16   A.   She worked in Boston and then in London.

17   Q.   Maureen Pederossi, where did she work?

18   A.   Um, Maureen Pederossi worked entirely in Boston.

19   Q.   Ellen Chay?

20   A.   She worked entirely in Boston.

21   Q.   With regard to these women, Erin Murphy, Maureen

22   Pederossi, Ellen Chay, did you hire them?

23   A.   Um, I didn't hire them to Wellington but I found

24   them within Wellington and somehow persuaded them to

25   join my team.  But I -- they were internal hires.  One

1    caveat.  Erin Murphy, um, I think I was still Associate

2    Director when Erin Murphy was hired into the role, um,

3    so kind of it probably felt to her as if Brendan and I

4    were both hiring her.  I'm not sure.  Brendan and I both

5    knew I was going to be his successor as head of GEPM,

6    but I'm not sure if it was clear to her.

7    Q.  Who made the choice?

8    A.  Me.

9    Q.  Ellen Chay, you chose to have her work for you as

10   your direct report?

11   A.  Yes, I did.

12   Q.  And what is her ethnicity?

13   A.  Um, Korean.

14   Q.  I think you've testified earlier that the total

15   number of investors in GEPM in this timeframe, meaning

16   Portfolio Managers and Team Analysts, was about 115, did

17   you say, 120?

18   A.  I think it was about 115 to 120.

19   Q.  And you testified a little bit about the 10,000 foot

20   view versus the day-to-day stuff.  What was your

21   involvement generally in the day-to-day management of

22   these 115 to 120 investors?

23   A.  I generally left the day-to-day management of the

24   investment professionals in the group to my Associate

25   Directors who were a talented group.  We've already seen

1    some of the mosaic of information that was coming my

2    way, it was pretty much impossible to digest it all

3    because there was other firm-wide stuff coming too.  Um,

4    you know firm-level stuff coming too.  But there was

5    kind of a constant flow of information from them.  But

6    they ran the day-to-day management of the investors in

7    the group.

8    Q.   Okay.  As part of your duties did you communicate,

9    um, regularly with your direct reports about the

10   investment talent?

11   A.   Um, yeah, we would all meet together once a week,

12   um, and we would discuss a number of things, and it

13   could be investment talent, and I would each meet

14   one-on-one with them, sometimes weekly, but at least

15   every other week, um, and my door was always open -- and

16   whether that was my literal door or metaphorically my

17   e-mail inbox, um, whatever it might be.

18   Q.   We've seen a number of e-mails with some of those

19   names on them.  Did you frequently communicate, um,

20   about investment talent to build what you've called a

21   "mosaic" or picture of each investor in your mind?

22   A.   Um, yes, I mean that's -- I was -- we were a talent

23   business.  I -- if the investment professionals ran a

24   portfolio of stocks, I ran a portfolio of talent.

25   Q.   In addition to the input feedback you received from

1   your direct report that helped you like form this mosaic

2   of each investor and what they're all about, did you

3   receive input or feedback from others that helped, um,

4   again form that mosaic?

5   A.  Yeah, I -- Wellington is a very open structure with

6   respect to sharing feedback so, um -- other business

7   professionals might share feedback, other investment

8   professionals might share feedback, feedback was shared

9   beyond the formal year-end process.

10  Q.  So, um, I think you've already testified fairly

11  clearly about the fact that the, um, in GEPM it's a

12  team-based, um, group or department?

13  A.  Yeah, I would actually say, you know, we had to kind

14  of set the example with respect to collaboration.

15  Q.  Any -- and so each team had a Portfolio Manager as a

16  Team Leader and then a Team Analyst working on that

17  team?

18  A.  I'm sorry I misunderstood, I thought you were still

19  talking about my team.

20  Q.  No.

21  A.  Okay.  Um, each -- simplifying it, each team had a

22  Portfolio Manager, a Team Leader, and then Team Analysts

23  -- um, a number of Team Analysts varied across teams.

24  Q.  Okay.  And, um, how was it -- I just want to make

25  sure that it's clear to the jury.  For instance

1   you've -- you've testified quite a bit about the

2   Emerging Markets Opportunities team, the EMO headed by

3   Greg Mattiko and of which Ms. Chan was a Team Analyst.

4   So how was it determined -- strike that.

5        Are these teams just arbitrarily determined by

6   GEPM management?

7   A.  No, it's in heavy consultation with the Team Leader,

8   um, and -- you know with the team leader, um, and, um,

9   they would be saying, "I need more Team Analysts,

10  Central Research isn't covering these tiny stocks

11  somewhere and I need a Team Analyst to do that, Central

12  Research isn't doing a good job in this region, Central

13  research doesn't think the same way we do, our

14  investment philosophy is different, I need somebody with

15  a similar investment philosophy to me."  So one of the

16  things we'd regularly be engaging with, um, Team Leaders

17  on was, um, the resources, um, they required and wanted

18  on their team.

19  Q.  And just to make sure I close the loop on the team.

20  Each individual team is guided by or follows a specific

21  philosophy and process, is that right?

22  A.  Um, I think that's right.

23  Q.  Generally?

24  A.  Generally, right.

25  Q.  Okay.  And that philosophy and process is determined

1   by, and it is the brain-child if you will of that

2   Portfolio Manager or Team Leader?

3   A.   Um, for simplicity sake, yes.

4   Q.   Okay.  Mr. Argyle, why aren't the Team Leaders the

5   managers of the analysts on their team?

6   A.   Um, so I would -- I would -- I would point to a

7   couple of reasons.  So the first reason, I would say, is

8   we are Team Leaders and Portfolio Managers and the

9   primary thing we needed to be is phenomenal

10  stock-pickers, um, that's -- and phenomenal stock-

11  pickers, in my opinion, world-class stock-pickers are

12  rare.  But unfortunately not every world-class stock-

13  picker is going to be a really good people manager.  So

14  if a prerequisite for a Team Leader is to be a good

15  people manager as well as a really good stock-picker,

16  um, then -- then that's a -- then that would be taken

17  away from "We need world-class stock-pickers," and not

18  every world-class stock-picker, not every Team Leader is

19  a good people manager.

20        Secondly, I would say, and unrelated to the first

21  point, that Portfolio Managers, Team Leaders are, in my

22  opinion, maybe not all world-class -- some of them were,

23  but really talented individuals, and I want their time

24  spent on what that talent is, which is picking stocks

25  for our clients, putting together portfolios for our

1   clients, that's where their time should be spent.  And

2   management and leadership of a group is a -- I'm biased

3   but a full-time job in and of itself.

4        And then the third reason, I would say, is, um, a

5   big part of our role is to look across the group and to

6   measure that, the analyst across the group, to be

7   thinking about, um, each one of those individuals and to

8   think about how is this individual doing relative to

9   that individual?  And many, um, if many Team Analysts

10  were saying how well that -- sorry, if many Team Leaders

11  were saying how well that Team Analyst was doing, um,

12  there really are processes at work where we actually had

13  to decide well who's actually doing better than others?

14  And Team Leaders usually were very, um, focused on the

15  today and what can this analyst do for you now and we

16  tended to be focused on what's this person going to do a

17  few years from now?

18  Q.  You mentioned briefly, I think it was either

19  yesterday or this morning, a little bit about

20  Wellington's values and we heard Mr. Swords earlier

21  talking about those.  Can you just run through, in your

22  mind, what were the major Wellington sort of shared

23  values?

24  A.  Um, I would start with our clients, the clients

25  interests at the firm, everything at Wellington was

1    driven by what's the right thing for our clients?  We

2    strongly believed that if we got it right for the

3    clients, that would be great for the business.  I would

4    say, um, talking about that, but talking about the

5    business, I mean we are long-term oriented.

6         So, um, Brendan testified that we're a private

7    partnership -- sorry, Mr. Swords testified that we're a

8    private partnership, we didn't have to put out quarterly

9    earnings or annual earnings, we could use that for our

10   benefit, we could be long-term oriented as a firm and we

11   could hopefully have, um, our employees be long-term

12   oriented and think about them with a long-term focus.

13        We expected individuals to have a growth mindset.

14   I think the firm as a whole has a growth mindset.  We're

15   a very collaborative organization.  And excellence,

16   excellence was part of our shared values, um, and

17   striving for excellence.

18   Q.  What do you mean by a "growth mindset"?

19   A.  Um, I would -- um, well if I was asked that in an

20   interview, um, what I would typically say is, um,

21   generalizing, there are two types of -- um, let's just

22   say there's two types of smart people in the world, but

23   one isn't as smart.  One person walks into the room and

24   wants to prove they're the smartest person in the room.

25   The other one walks into the room and is hoping there's

1    people in the room even smarter than them so they could

2    learn from them.  Wellington's full of the latter.

3    Q.   Why is "growth mindset" relevant to investing?

4    A.   Because investing is never a finished product,

5    learning as an investor, um, one -- I don't know but I

6    was told this by someone and every now and again

7    somebody reports something -- well I don't know if

8    there's many jobs for someone's who's wrong so often.

9    To be a world-class investor like at Wellington, one is

10   right only about 55 to 60 percent of the time, so one

11   makes a lot of mistakes.  Learning from one's mistakes,

12   being receptive to the feedback of others, um, about

13   how, um, one might evolve as an investor -- the markets

14   evolve, so investors have to evolve with the market.

15   Those index funds I was talking about, they didn't exist

16   30 years ago, now they have a huge impact on the market.

17   So all of that, with this constant need to -- need to

18   recognize that one is not a finished product, um, is an

19   essential characteristic of an investor.

20   Q.   I'm going to spend a brief couple of minutes going

21   over some vocabulary words that I think will help make

22   things easier to understand as we go forward, okay?

23   It's not meant to be a test.  Let me just try it for

24   you.

25        "Portfolio."  So just briefly explain what that

1    is?

2    A.   All right.   So clients didn't hire us to buy

3    individual stocks, they hired us to buy a portfolio

4    that, um, hopefully, um, of multiple stocks, and we

5    selected, on behalf of the clients, the stocks in there.

6    So there could be 40 stocks in a portfolio, there could

7    be 100 stocks in one portfolio.   But a portfolio is a

8    collection of individual investment ideas of individual

9    stocks.

10   Q.   We've heard the words "approach" and "strategy" as

11   well, what do those two words mean in this context?

12   A.   Yeah, I think an "approach" and "strategy," I

13   believe are interchangeable, those two words in this

14   context, and I would say, um, just generalizing again,

15   um, clients didn't -- I've simplified things but they

16   didn't just say "Hey, here's our money, beat the stock

17   market," they're sophisticated institutional investors

18   working for exposure to a specific area of the market.

19   So an "approach" and "strategy," I'm just going to

20   simplify them on three axes very quickly.

21        So the first axis would just be geographic, you

22   know is this a U.S. approach, is it a global approach,

23   is it an Emerging Markets approach, is it a China

24   approach?   So that would be geographic.   Another

25   approach might be the size of the companies the client

```
 1    wants to invest in.  Do they want us to invest in, on
 2    their behalf, of large companies that maybe many of us
 3    have heard of in this room or small companies that many
 4    times I've never heard of despite having been in the
 5    financial services industry for decades?  And then the
 6    third category is a little bit more nuanced and it gets
 7    into a question of philosophy and process, but it
 8    describes how an investor tends to take advantage of the
 9    market.  Um, are they -- and these would have words like
10    "value," "growth," "contrarian."
11         So when you package that up all together a
12    strategy might be a U.S. Small Cap Value Strategy or a,
13    um, an emerging markets strategy with no market cap
14    guidelines, or a China Growth strategy.  So that would
15    be, um -- and I don't know if that's what you're looking
16    for?
17    Q.  Yes.  You also testified at a little bit more length
18    yesterday about a fund and you talked a little bit about
19    how it -- the involvement and time it would take to
20    launch a fund.  Can an "approach" be launched without
21    having to be a "fund"?
22    A.  Yes, an "approach" can be launched.
23    Q.  Well let me just set the table a little bit better
24    on that question.  I think you said yesterday a "fund"
25    is the "pooling of multiple clients' money," is that
```

1   right?

2   A.  Um, very quickly, yes.  Yes.

3   Q.  And an "approach," does that have to be multiple

4   clients or could it be one client's money?

5   A.  An "approach" could be one client's money.

6   Q.  And does it take longer or shorter to launch an

7   "approach" versus a "fund"?

8   A.  I could -- I could get an "approach" launched very

9   very quickly.

10  Q.  All right.  Could you get a "fund" launched very

11  quickly?

12  A.  No.

13  Q.  Okay.  Some questions about Wellington's

14  globalization efforts.

15      In around 2006 I believe there's some testimony

16  that there were globalization efforts made with regard

17  to the investment platform, um, the investment talent,

18  is that right?

19  A.  Um, I wasn't part of the decision but I know in

20  2006, um, the then CEO, based on input and presumably

21  some group that he had assembled, um, made the decision

22  to globalize where our investment professionals sit.  So

23  we've been investing globally as a firm in global stock

24  markets as a firm for decades and we've been doing it

25  from here in Boston and actually a small office we have

1    outside Philadelphia.  But that this decision was
2    actually the decision to locate investment professionals
3    in Europe and in Asia and that decision was made, um,
4    certainly communicated internally in 2006.
5    Q.  What was the goal of this globalization of having
6    local investors in wherever you were investing in the
7    world?
8    A.  Um, the ultimate goal was to be generating ideas
9    from anywhere around the world and finding money-making
10   ideas for our clients from anywhere around in the world,
11   and those ideas finding their ways into portfolios
12   managed by Portfolio Managers anywhere around the world.
13   And if we believed we could do that, um, again we
14   believed it would be good for the clients and would be
15   good for the firm.
16   Q.  What was the plan for where you would find these --
17   these investors, these Team Leaders, analysts, to
18   actually hire and work on the platform?
19        MR. HANNON:  Objection, your Honor.
20        THE COURT:  Would you ask the question again.
21   That's my fault.
22        MR. PATERNITI:  Sure.  Well let me ask a better
23   question, that was probably not well-worded.
24   Q.  Are you aware of what Wellington's plan was with
25   regard to the globalization of investors pertaining to

1    where the investment talent would come from?

2    A.  Um, yes, I am because it was effectively my

3    responsibility.  It became my responsibility.

4    Q.  When did it become your responsibility?

5    A.  Well in the beginning of, um, early 2007 with

6    respect to Asia specifically.

7    Q.  Did you develop that plan for globalizing Asia

8    specifically?

9    A.  Um, yes, I did.

10   Q.  And, by the way, were you in Boston at that time?

11   A.  In early 2007, I was, yes.

12   Q.  And at some point you moved to Asia?

13   A.  Yes, I did, with my family.

14   Q.  Where did you move to?

15   A.  Sorry?

16   Q.  Where did you move to?

17   A.  Myself, my wife, and three kids from Boston --

18   actually we lived in Milton, we went from Milton to

19   Singapore.

20   Q.  How long did you live in Singapore?

21   A.  We lived there for five years.

22   Q.  Do you remember what were the years?

23   A.  Sorry?

24   Q.  What years?

25   A.  Oh, um, the middle of 2008 to the middle of 2013.

1    Q.   And you were -- I believe you had testified earlier

2    that you were in GEPM during that entire time?

3    A.   Yes, I was functioning there.  Yes.

4    Q.   Back to this globalization of the investment

5    platform.  The, um -- did Wellington originally move its

6    investors in Boston and outside Philly over to various

7    offices across the world?

8    A.   Um, we didn't just take them -- I mentioned there

9    were investors here who were invested in the global

10   stockmarkets, we didn't just take them and move them

11   around the world.  Um --

12   Q.   Well how did you staff -- how did you execute the

13   globalization with regard to staffing?

14   A.   So my plan was, um -- I always thought about it as

15   three legs, kind of three legs of a stool, and the first

16   leg was to find individuals here, um, in Boston who had

17   worked in Boston who were willing to move permanently or

18   temporarily to Asia for a meaningful period of time.

19   Um, so we have the first leg was experienced Wellington

20   investors.  At the same time, um, I was looking to make

21   some key lateral hires of experienced investment

22   professionals, um, in those local markets, um, local

23   talent markets, if you will.  And the third leg of the

24   stool was can we develop our own talent in London and

25   then our Asian offices?

1    Q.   With regard to the second and third legs of those,

2    um, I think you said one is hiring experienced lateral

3    hires in the region.  Why did you find that to be

4    important?

5    A.   Um, yeah, we were really looking for people who

6    could bring different perspectives to the dialogue and

7    debate, people who had been in -- investing in those

8    markets for, um, years, but also people who understood

9    the local environment and, um, could make our internal

10   culture of collaboration richer.  You know richer

11   dialogue.

12   Q.   Did your time in Singapore give you an opportunity

13   to become familiar with GEPM personnel in Asia?

14   A.   Um, yes.

15   Q.   How much travelling did you do during that period?

16   A.   In that time period we're talking about?

17   Q.   Yes.

18   A.   A lot.  So you mentioned why I retired, that was one

19   of the bundle of sticks.

20   Q.   By the way, how much time, um, do Team Analysts

21   spend travelling and researching companies?

22   A.   Um, it can vary.

23   Q.   Okay.  If you're in Hong Kong but you're a Team

24   Analyst particularly or specifically researching mainly

25   Chinese companies, would that, um -- would that involve

1    significant travel?

2    A.  Um, it honestly varies.

3    Q.  Okay.  As part of the globalization effort, was

4    there a plan to hire any new Team Leaders?

5    A.  Um, yes, there was.

6    Q.  And what was your specific plan with regard to

7    hiring of these Team Leaders?

8    A.  Well initially, um, we, um, in GEPM we identified

9    four areas where we wanted to try and hire Team Leaders.

10   The most important thing was that they were Team

11   Leaders, we really wanted that role in our -- in our

12   offices where we were hoping to put investors.  But we

13   also identified -- obviously we had to do a search for

14   the talent, so we identified four approaches, and

15   obviously they would define the nuance of the approach,

16   but certainly regional approaches.

17        So one was, um, European Equity, um, which we

18   looked for in Europe -- and I might switch between

19   Europe and London, but all our investment professionals

20   at that time were in Europe.  So one was European

21   Equities, one was, um, Emerging Markets.  We already had

22   an Emerging Markets approach out of Boston, but given

23   what I think about different philosophies and different

24   styles, we felt there was room for another Emerging

25   Markets approach, um, and so we were looking for that,

1    and we were indifferent whether it ended up being London

2    or Asia.

3         In Asia we were looking for an Asia-Pack Ex-Japan

4    Portfolio Manager.  So yesterday I mentioned how Japan

5    is actually a develop market for the rest of Asia

6    really, it's considered emerging, um, and, um, we were

7    looking for that Portfolio Manager.  And then we were

8    looking for a China Portfolio Manager Team Leader too,

9    as was referenced yesterday.

10   Q.  And there was testimony yesterday about interviewing

11   Ms. Chan in 2013, and was it initially for that China PM

12   role you're talking about?

13   A.  Yeah, the first time I met Ms. Chan was when she was

14   interviewing for that China PM Team Leader role in early

15   2013.

16   Q.  Okay.  And ultimately did you fill that China PM

17   Team Lead role with, um, with any external candidate?

18   A.  Um, we did not fill that role with any external

19   candidate.

20   Q.  For how long did you look?

21   A.  Um, years.  Um, you know we really did believe this

22   was a talent business and we really did believe that

23   when people joined us -- sorry, I keep on doing that,

24   when people joined us they would be joining us hopefully

25   for the rest of their careers.  So we were willing to

```
1    take a long time looking for talent and we had a very
2    high bar.
3    Q.  And with regard to the decision -- or ultimately you
4    didn't fill it with an external candidate, so what did
5    you do about your plan with regard to the globalization
6    specifically related to this China Team Lead position?
7    A.  We identified -- I identified that, um, there was an
8    investment professional internally that would, um, was
9    exhibiting all the right characteristics to really be
10   the cornerstone of what we wanted from that China PM to
11   --
12   Q.  Who was that person?
13   A.  That person was -- her name is Bo Meunier.
14   Q.  Is Bo Meunier a female?
15   A.  Yes, she is.
16   Q.  Is she Chinese?
17   A.  Yes, she is.
18   Q.  You made that decision?
19   A.  Yes, I did.
20   Q.  With regard to the, um -- with regard to Ms. Chan,
21   um, I want to direct your attention first of all to the
22   team and then I'll back up and we'll talk about the
23   hiring.
24        We talked about the EMO team a little bit.
25   Was obviously -- the Team Leader was Greg Mattiko?
```

1    A.   Um, yes.

2    Q.   Do you know whether there were other team members?

3    A.   Yes.

4    Q.   Who else was on the team?

5    A.   Philip Fan.

6    Q.   When Ms. Chan joined Wellington she was located in

7    Hong Kong, correct?

8    A.   Um, that's correct -- well, yes, I mean she moved to

9    Hong Kong as part of the process of accepting a job in

10   Hong Kong, at Wellington Hong Kong.

11   Q.   Where was Mr. Mattiko located?

12   A.   Mr. Mattiko was located in London.

13   Q.   Where was Mr. Fan located?

14   A.   He was located in London.

15   Q.   By the way, Philip Fan, is he -- do you know his

16   ethnicity?

17   A.   Um, he's Chinese.

18   Q.   Okay, let's back up to the hiring of Ms. Chan.  You

19   said you first met her in 2013 interviewing her for the

20   China Portfolio Manager role?

21   A.   The PM, Team Leader role, yes.

22   Q.   Um, the, um -- what if anything do you recall from

23   the interview?

24   A.   Um, I don't recall very much from the interview, um,

25   I do recall that -- that it's rare to meet people who,

1    um, talk about having been on television, um, and, um,

2    Ms. Chan talked about how she had been on television as

3    part of her role at Threadneedle, and I recall being

4    surprised by, um -- because I didn't think her

5    communication was effective in that interview.

6    Q.   Okay.  Can we take a look at Exhibit 391, please.

7    (On screen.)  I'm showing you what the parties have

8    agreed is Exhibit 391, Ms. Chan's resume, and I want to

9    direct your attention to -- bear with me here this is

10   the first time I've used this particular, um, tool.  If

11   we could blow up "Threadneedle Investments."  (Blows

12   up.)  Okay, there it is.

13          Are you familiar with Threadneedle investments?

14   A.   Not very.

15   Q.   At the time in January of 2013 when she was

16   interviewing for the China PM role, were you aware that

17   she was working at Threadneedle?

18   A.   Um, yes.

19   Q.   And with regard to this, um, resume, this entry, it

20   indicates that, um, she was -- that she had a title of

21   "Fund Manager," do you see that?

22   A.   Yes, I do.

23   Q.   The -- is "Fund Manager" in your mind -- "fund" and

24   "portfolio" are interchangeable, correct?

25   A.   In this context, um, "fund" and "portfolio" are

1    interchangeable, um, generalizing greatly, but "Fund

2    Manager" would seem to be a more common phraseology in

3    the UK, um, in particular.

4    Q.   Okay.

5    A.   But in this context it meant "Portfolio Manager."

6    Q.   Okay.  Did the fact that her title was "Fund

7    Manager" at Threadneedle provide you with helpful

8    information as to whether she was at a Portfolio Manager

9    level at Wellington?

10   A.   Um, not really.

11   Q.   Why not?

12   A.   Because across different asset management firms

13   there are -- there are many different structures.  So,

14   um, for example at Wellington, investment professionals

15   tend to spend years and years and years in deep analysis

16   of individual stocks, um, before they start the process

17   of becoming a Portfolio Manager.  Some Asset Managers

18   actually make portfolio management, um, more of an

19   apprentice-level track in and of itself, um, so they

20   come in for a couple of years and say, "Okay, now you

21   can learn to be a Portfolio Manager."  And, um, so it

22   doesn't really speak to overall, um, investment

23   experience.

24   Q.   Okay.  So --

25   A.   And just one other thing.  Sorry.  The other thing

1    that's very important is Wellington doesn't have a Chief

2    Investment Officer, so many Asset Managers have someone

3    start up here, um, often actually with the

4    responsibilities of mine, but I didn't have those

5    responsibilities, saying "This is what we think as a

6    firm, we think Portfolio Managers should be overweight

7    in biotechnology stocks, we think Portfolio Managers

8    should be overweight in Europe."  So there was kind of a

9    hierarchy to how investment decisions were made and

10   passed through the organization and Portfolio Managers

11   in those organizations would often have to act within

12   that hierarchy.  So there's nothing wrong with any of

13   those models but what it did mean was that we couldn't

14   compare titles and investment experience based on

15   titles.

16   Q.  So the fact that she was a Fund Manager, did it

17   inform you that she had a strong philosophy and process?

18   A.  Um, no, I've seen many Portfolio Managers without

19   strong philosophies and processes.

20   Q.  Did it inform you that she had any team under her of

21   Team Analysts?

22   A.  It did not inform me whether she had a team under

23   her or any Team Analysts.

24   Q.  And with regard to Threadneedle and the fact that

25   she had been a Fund Manager since 2004, did that lead

1   you to reach any conclusions as to whether Threadneedle

2   had more of this apprentice Portfolio Manager model that

3   you were talking about?

4   A.  Yeah, ultimately --

5          MR. HANNON:  Objection.

6          THE COURT:  No overruled, you may have it.

7   A.  Just to be clear, those are my terms, not an

8   industry description for the model, but they clearly

9   were taking individuals earlier on in their career than

10  we would typically and, um, have them embark on -- on

11  this portfolio management track.

12  Q.  So if an investor's prior title isn't that

13  informative, what are the more informative data points

14  you consider when looking at a candidate to determine if

15  they're suitable for either a Portfolio Manager or an

16  analyst position at Wellington?

17  A.  So to the extent possible I'm looking to -- for the

18  process to identify is this person a skilled investor?

19  Um, that's -- that's not easy, but we try.  We also are

20  looking for people who really really want to embrace the

21  core values of the firm, who truly want to collaborate

22  with their peers and feel strongly that they're not a

23  finished product, but who are open to feedback, who are

24  open to, um, to have a growth mindset, who are excited

25  to be part of the dialogue and debate at Wellington

1    Management Company because they feel that's going to

2    make them a better investor.

3    Q.  Okay.

4        MR. PATERNITI:  Can we pull up Exhibit 2, please.

5        (On screen.)

6    Q.  Now I'm showing you, Mr. Argyle, on your screen what

7    the parties have agreed to mark as Exhibit 2.  This is

8    an e-mail from you, on February 26th of 2013, to, at the

9    time, um, Henry Philip and Tom Baxter, um, copied to

10   Terrence Burgess.

11       Now you've already testified about Mr. Baxter and

12   Mr. Burgess.  At the time were they two of your direct

13   reports?

14   A.  Um, at that time, yes.

15   Q.  At the time, um, what was Henry Philip's role?

16   A.  Henry Philip, um, he was either Head of Human

17   Resources in Asia Pacific or he was Head of Recruiting

18   in Asia Pacific, which is the role he was in before Head

19   of Resources in Asia Pacific.  I can't remember or I

20   don't know if I ever knew when those roles changed.

21   Q.  If we go to the bottom e-mail, it's the one from

22   Gigi Chan to the three of you.  She's, um, reaching out

23   on February 27th of 2013.  And then if we go to the next

24   e-mail it appears to be yours and you said a little --

25   I'm sorry, my apologies, I missed -- let's jump up to

1    Mr. Argyle.  Thank you.  (On screen.)

2         The first line you write "A little short in

3    experience for the China Team Leader role, but we should

4    explore whether she might be interested in interviewing

5    for a terrific opportunity as a Team Analyst role

6    focused on China working with a new London-based

7    Emerging Markets PM who we expect to be managing a few

8    billion dollars in a few years time."

9         Who were you referring to when you mentioned this

10   "Emerging Markets PM"?

11   A.  Greg Mattiko.

12   Q.  Okay.  When you wrote that you felt Ms. Chan was "a

13   little short in experience for the China Team Leader

14   role," do you remember any details as to why you came to

15   that conclusion?

16   A.  Um, I can't remember any details.

17   Q.  Okay.  Did you discuss it with Mr. Philip or

18   Mr. Baxter?

19   A.  Um, not clearly in this e-mail but I don't know how

20   much discussion we had beyond the e-mail.

21   Q.  Okay.

22        MR. PATERNITI:  If we could pull up Exhibit 327.

23   (On screen).  And scroll to the last page.  (Scrolls.)

24   Q.  Do you see in the upper left corner where it says

25   "Candidate Name" and it indicates Ms. Chan's name?

1    A.   Yes.

2    Q.   Okay.   Woops.   Okay.

3         MR. PATERNITI:   You can take that back down.

4    Sorry.

5    Q.   The next -- under the interviewers, the first one is

6    Tom Baxter, and if we could just blow up the detail

7    comments.   (Blows up.)   Great.   Now Mr. Baxter provided

8    written comments in this feedback form.

9         And, by the way, was this typical at Wellington

10   that you would fill out a feedback form like this when

11   you were interviewing candidates?

12   A.   Well after interviewing the candidate the process

13   was they would fill out the feedback form, provide

14   feedback.   This -- it was anonymous so only someone -- I

15   mean only the manager would get to see who it was.   But

16   this was the output of that form.

17   Q.   With regard to the hiring process in general at

18   Wellington given the long-term view and hopes for talent

19   when they join, um, tell us a little bit about that

20   process?

21   A.   The hiring process at Wellington?   Um, it's -- it's

22   a long-term process, it's, um -- we actually have

23   in-house recruiters, we don't want to go to a

24   recruitment firm and say, "Hey, we're looking for a

25   Japan Portfolio Manager" and the next person walking in

1   and saying "We are too" and we'd be competing against

2   them, so we actually have expert recruitment

3   professionals in-house.  And unfortunately the talent

4   we're looking for is usually not looking to move.  We're

5   trying to pull investment talent from organizations

6   where they may be incredibly happy.  Um, as I've

7   explained, our industry, our business, it's not just

8   that Wellington is a talent business.  So, um, I don't

9   know if that's what you were --

10  Q.  That's helpful.  Approximately how many interviews

11  would somebody have, um, prospective talent coming in?

12  A.  Um, like 20 to 40.

13  Q.  Okay.  The, um, feedback forms, would you have

14  access to the feedback forms at some point, the

15  interview feedback forms?

16  A.  Um, I don't know if it's direct or I have to ask HR

17  to generate it for me, but, yes.

18  Q.  Okay.  So Ms. Chan was hired by Wellington in 2014,

19  correct?

20  A.  Correct.

21  Q.  And that was for the Team Analyst position?

22  A.  Right, yes, and for Research Analyst, yes.

23  Q.  And at the time was there an opening on the EMO team

24  for a Team Analyst?

25  A.  There was no specific opening, there was no what we

1    would call a "search in process."  There was no search
2    in process.
3    Q.  So why was she hired?
4    A.  So we were looking -- as part of our, um,
5    globalization journey, um, as part of our strategic
6    initiative to globalize the investment platform, um, we
7    were looking, um, "opportunistically," as we called it,
8    it was an "opportunistic hire," um, I believe.  I don't
9    know if Mr. Mattiko kept in touch with her, but at least
10   he remembered her, um, and he identified her as someone
11   who he thought we should interview potentially for a
12   role in the Hong Kong office as an Equity Research
13   Analyst.  And we would talk about -- and we would talk
14   about what team it might fit, that might fit.  But it
15   was an opportunistic -- it was an interview process for
16   an opportunistic hire.
17   Q.  Okay.  Now you talked a little bit a couple of
18   minutes ago about the title of "Fund Manager" or
19   "Portfolio Manager" not necessarily being terribly
20   informative in this process.  Has Wellington hired other
21   folks with "Portfolio Manager" or "Fund Manager" titles,
22   but at Wellington they were hired into the Team Analyst
23   position?
24   A.  Yes.
25   Q.  And, um, why is that?

1  A.  Um, presumably they want to join Wellington.  They

2  want to join Wellington.  Um, I always had a phrase,

3  "talent attracts talent," and this is, um -- and that

4  talented investment professionals really like working

5  around other talented investment professionals, they

6  like that constant dialogue and debate -- well all the

7  ones at Wellington did anyway, with their peers, they

8  liked being challenged, they like being told, "Hey I

9  don't think that's a good stock because of this reason."

10  Even if it's something they like, they want to hear the

11  other side of the argument.

12  Q.  When Wellington hires an analyst who had some title

13  of "Portfolio Manager" or "Fund Manager," what if any

14  timeframe is there for when that person might be

15  managing money at Wellington?

16  A.  Um, there is no timeframe, there's no -- I know some

17  organizations and some industries, you know after two

18  years this happens, after four years that happens, but

19  that doesn't exist at Wellington, certainly not in my

20  group.  In my group, as I have 120 individuals, I have

21  120 journeys.

22  Q.  Um, can we --

23       MR. PATERNITI:  Can we pull up Exhibit 327,

24  please.

25       (On screen.)

1   Q.   You interviewed her in 2014 for the Analyst

2   position, correct?

3   A.   Yes.

4   Q.   Let me show you what the parties have agreed as

5   Exhibit 327, this is, um, the same interview feedback

6   form, and let's take a look, if we can, at the Charles

7   Argyle feedback in 2014.  I think it's on the next page.

8   Nope, the page after that.  (On screen.)  There it is.

9   Okay, if we could just blow up the narrative section.

10  (Blows up.)  Thank you.

11       Mr. Argyle, I'll just sort of back you through

12  parts of this.  You said "We were very glad we asked her

13  to come in one more time."  Um, what did you mean by

14  that?

15  A.   Um, I believe she was -- my recollection is that she

16  was under time constraints, she said she had another

17  offer from another firm, um, and she wasn't in Boston at

18  the time, um, and I can't remember but it was, um, we

19  said, "Can you come in quickly for another round of

20  interviews?"

21  Q.   Okay.  On the third line down it says, "We did talk

22  a lot about what she is looking for as she thinks about

23  the next stage of her career and I was impressed by her

24  thought process."  And then you go on to say "She talked

25  a lot about developing an investment philosophy and

1    developing it through working with more different

2    investors rather than the throw-in-the-deep-end

3    experience at Threadneedle."

4         Did I read that accurately?

5    A.  You read that accurately, yes.

6    Q.  Okay.  And what did you understand her to mean when

7    she told you, she talked a lot about "developing an

8    investment philosophy"?

9    A.  Um --

10        MR. HANNON:  Objection, that misstates the

11   exhibit, Judge.

12        THE COURT:  Put the question again?

13   Q.  What is it you understood when she talked a lot

14   about "developing any investment philosophy"?

15        MR. HANNON:  I have no objection to that question,

16   your Honor.

17        THE COURT:  You withdraw?

18        MR. HANNON:  Not to that question, your Honor.

19        THE COURT:  Understood.

20        You may answer.

21   A.  Um, I don't recall at the time, my thoughts at the

22   time, but looking at this exhibit here and having

23   thought about it since I think she was -- she was, um,

24   basically saying that she had -- she had investment

25   philosophy that required development.

1  Q.  At the bottom, um, the very last sentence you said

2  "She asked a lot of good questions."  Do you remember

3  what specific questions she asked?

4  A.  I don't remember the specific questions she asked.

5  Q.  Do you remember in this interview whether the issue

6  of the China PM role came up that she had interviewed

7  for a year earlier?

8  A.  Um, I'd -- I don't know if that came up.

9  Q.  Okay.

10  A.  I know that I asked her if she wanted to be a China

11  PM?  6 to 12 months from now she wouldn't have gotten

12  the job as an Equity Research Analyst.

13  Q.  Okay.  Do you recall any discussions about when she

14  might be managing money if she took this job as a team

15  analyst?

16  A.  I don't recall any discussions.

17  Q.  Okay.  Did you promise her that she would be

18  managing money on any specific timeframe?

19  A.  Um, no, and I was the only one in the interview

20  process who had the authority to have done so.

21  Q.  Did you make any promises that she would ever be

22  managing money?

23  A.  Um, not to my recollection.  I don't think so.

24  Q.  Um, now there's some talk of "track record" and a

25  "prior track record" that she had at Threadneedle.

1    What's a "track record"?

2    A.  Um, a "track record" is, um -- you use these terms,

3    it's one's investment performance, it's, you know, how

4    one has done relative to the stock market effectively.

5    Q.  Okay.  Was her -- was her track record at

6    Threadneedle a significant consideration of yours in her

7    candidacy as Team Analyst?

8    A.  It wasn't a significant consideration of mine.

9    Q.  Why not?

10   A.  Because we didn't have time to dig into it.  We had

11   this very tight timeline to make this decision on

12   whether to hire Ms. Chan or not, so that was one reason.

13   But why would we have wanted to dig into it?  Again, um,

14   was the track record generated, um, in an environment

15   that was conducive, um, to a Portfolio Manager's

16   specific style or philosophy?  Um, was a -- what was the

17   surrounding environment the track record was created in?

18   Was there a Chief Investments Officer?  Some firms have

19   approved lists of investments that Portfolio Managers

20   have to take their ideas from.  Actually I don't know

21   what the situation was here, um, but I do know that we

22   didn't have time to dig into that.  And in particular,

23   that the style question, um, you know sometimes

24   Portfolio Managers have headwinds and sometimes they

25   have tailwinds, um, and the analogy I always use is

1    "World records are swimming out in the ocean because one

2    never knows if someone is swimming with the tide or

3    against the tide."  But, um, we just didn't have time to

4    dig into any of that, so it couldn't have been a

5    consideration in the hiring persons.

6        MR. PATERNITI:  Your Honor, this is a good time to

7    stop, I'm moving on to another topic.

8        THE COURT:  All right, we will stop.

9        Ladies and gentlemen, we are moving along, but you

10   have not heard all the evidence, so keep your minds

11   suspended, do not discuss the case either among

12   yourselves or with anyone else.  You may stand in recess

13   until 9:00 a.m. tomorrow morning.  The jury may recess.

14   I'll remain on the bench.

15       THE CLERK:  All rise for the jury.

16       (Jury leaves, 1:00 p.m.)

17       THE COURT:  Please be seated.  You may step down,

18   sir.

19       The total elapsed time?  The plaintiff has used up

20   2 days, 25 minutes, the defense has used up 1 day, 5

21   minutes.  It worked out a little longer than the three

22   days we've used because I work on 3 1/2 hour days and we

23   took no recess during the first day.

24       You're reminded that should you accord your

25   differences, a simple phone call to Ms. Gaudet is all

1    that's required, we'll call the jury off.  Otherwise

2    we'll start 9:00 tomorrow morning.

3            (Pause.)

4            THE COURT:  We'll recess.

5            THE CLERK:  All rise.

6            (Adjourned, 1:00 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3

 4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 5   hereby certify that the forgoing transcript of the

 6   record is a true and accurate transcription of my

 7   stenographic notes, before Judge William G. Young, on

 8   Thursday, October 14, 2021, to the best of my skill and

 9   ability.

10

11

12

13   /s/ Richard H. Romanow 01-06-22
     _____
14   RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25
```