1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS (Boston)

3                         No. 1:19-cv-11605-WGY

4

5    GIGI KAI ZI CHAN,
          Plaintiff

6

7    vs.

8

9    WELLINGTON MANAGEMENT COMPANY, LLP and CHARLES ARGYLE,
          DEFENDANTS

10

11                     * * * * * * * * *

12

13                  For Jury Trial Before:
                    Judge William G. Young

14

15

16                  United States District Court
                    District of Massachusetts (Boston.)
17                  One Courthouse Way
                    Boston, Massachusetts 02210
18                  Friday, October 15, 2021

19

20                     * * * * * * * *

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23                United States District Court
            One Courthouse Way, Room 5510, Boston, MA 02210
24                  bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3   PATRICK J. HANNON, ESQ.
     HAMPTON M. WATSON, ESQ.
 4       Hartley Michon Robb Hannon, LLP
         155 Seaport Boulevard, 2nd Floor
 5       Boston, MA 02210
         (617) 723-8000
 6       E-mail: Phannon@hmrhlaw.com
         For Plaintiff
 7

 8   STEPHEN T. PATERNITI, ESQ.
     BENJAMIN R. DAVIS, ESQ.
 9       Jackson Lewis, PC
         75 Park Plaza, 4th Floor
10       Boston, MA 02116
         (617) 367-0025
11       Email: Stephen.paterniti@jacksonlewis.com
     and
12   BEVERLY W. GAROFALO, ESQ.
         J.W. Carney, Jr. & Associates
13       20 Park Plaza, Suite 1405
         Boston, MA 02116
14       (860) 275-0100
         Email: Beverly.garofalo@jacksonlewis.com
15       For Defendants

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2

3   WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

4

5   CHARLES ARGYLE (Continued.)

6       By Mr. Hannon:

7       By Mr. Paterniti:            5

8

9

10

11
                          E X H I B I T S
12

13      EXHIBIT 409........................... 18

14      EXHIBIT 410........................... 78

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Jury enters, 9:00 a.m.)
 3          THE COURT:  Good morning, ladies and gentlemen.
 4   You know I thank you every morning, but it's so sincere,
 5   you're setting just the right tone for -- (Loud
 6   interference with zoom.)  That's never happened before.
 7   (Laughter.)   (Loud interference.)  I can't resist this
 8   story.
 9          The lights -- I have -- along with Ms. Gaudet, I
10   have some control of the lights and once I was
11   explaining "fair preponderance of the evidence" to the
12   jury and I get myself over here and lean against the
13   right panel, and just as I was doing this and intoning
14   "fair preponderance of the evidence," all the lights
15   went out, including the exit lights, and from the jury
16   box came this voice, "The Second Coming."
17          (Laughter.)
18          So this will add to it.  But I am sincere, I'm so
19   grateful, you're setting just the right tone.
20          Would you remind the witness that he remains under
21   oath.
22          THE CLERK:  I'd like to remind you, sir, you're
23   still under oath.  Do you understand?
24          THE WITNESS:  Yes, I do.
25          THE COURT:  And, counsel, you may continue.
```

1        MR. PATERNITI:  Thank you, your Honor.

2

3    CROSS-EXAMINATION BY MR. PATERNITI:  (Continued.)

4    Q.    Good morning, Mr. Argyle.

5    A.    Good morning.

6    Q.    I'm going to ask you questions starting where we

7    left off yesterday.

8        There's been testimony that Ms. Chan, upon hire,

9    ended up on the Emerging Markets Opportunity team, which

10   I'm going to refer to as "EMO."

11       How was it determined that she would start on the

12   EMO team?

13   A.    Um, I believe that was -- if memory serves me

14   right it was a consultive process, um, and I think I

15   explained yesterday that when Ms. Chan was interviewing

16   with us the second time for that Equity Research Analyst

17   position there were time constraints, and that's not

18   unprecedented, but there were time constraints in this

19   particular situation and it was an opportunistic hire.

20   So we were looking to hire -- we were looking to hire --

21   the opportunistic part was we were looking to hire an

22   analyst in Hong Kong and then we were trying to think

23   about, "Okay, where might this analyst fit given her,

24   um, experience?"  And, um, she met with a number of

25   investors in the interview process, I believe, um,

1    Mr. Mattiko had said that he knew her a little bit from

2    the Emerging Markets conference circuit and so forth and

3    he had met her in the interview, and as we were thinking

4    about this rotational aspect of her responsibilities he

5    said, "I'd be willing to have her for her first

6    rotation, as an Analyst," um, join his team for -- I

7    don't know what, but for 9 to 12 months, or whatever it

8    was, and then see how things go from there.

9    Q.    And Mr. Mattiko is the individual you referred to

10   yesterday who was hired to be the Team Leader for

11   Emerging Markets in that globalization effort?

12   A.    Um, that's right, for Emerging Market

13   Opportunities.  We already had another Emerging Market

14   approach out of Boston.

15   Q.    Do you remember Mr. Mattiko's, um, prior employer

16   before he came to Wellington?

17   A.    Um, Mr. Mattiko was employed at JP Morgan Asset

18   Management.

19   Q.    As a Portfolio Manager?

20   A.    As a Portfolio Manager.

21   Q.    Once he joined, do you recall how quickly the

22   funds grew in his EMO fund?

23   A.    Um, I do.  Not for every Portfolio Manager at

24   Wellington, but I don't think any funds have grown

25   quicker than Mr. Mattiko's.  It was almost

1    unprecedented.

2    Q.    And how was it that the funds in his EMO fund grew

3    so quickly?

4    A.    Um --

5         MR. HANNON:  Objection, lack of foundation.

6         THE COURT:  Well he can give us his opinion, he's

7    his supervisor.  One question.  He may answer.

8         Why do you think?  No, you can answer, "Why do you

9    think?"

10   A.    Um, Mr. Mattiko had institutional clients from JP

11   Morgan Asset Management who expressed interest very

12   quickly, after him joining Wellington, that they wanted

13   to essentially follow Mr. Mattiko and have him continue

14   to manage their assets at Wellington, and the reason I

15   remember that is it actually created a little bit of a

16   problem because Mr. Mattiko joined Wellington with a

17   noncompete.  He could join Wellington but his clients

18   can't actually follow him for a certain period of time.

19   So we had to have a little bit of a back and forth, um,

20   if my memory serves me right, between us and JP Morgan

21   whether, um, that was -- you know basically that we can

22   let the clients do what they wanted to do.

23        THE COURT:  A "noncompete" is a type of contract

24   that, if you believe this witness's testimony and you

25   can or you can disbelieve it or believe it in part, but

1    if you believe it, a "noncompete" is a contract that

2    this Mr. Mattiko had with his prior employer, JP Morgan,

3    and the witness is telling us what he thought that

4    contract provided.

5         All right.  Go ahead.

6    Q.    Ms. Chan, once placed on the EMO team as a Team

7    Analyst, um, she obviously remained on that team through

8    the duration of her employment, correct?

9    A.    Um, that's correct.

10   Q.    When if ever did Ms. Chan's primary duties and

11   responsibilities as a Team Analyst contributing to EMO

12   change?

13   A.    They never changed, that was for the duration of

14   her employment, that was her primary responsibility.

15   Q.    With regard to Team Analysts, can they also run a

16   portfolio or a fund while they're also a Team Analyst?

17   A.    Um, yes.

18   Q.    And how often does this happen at Wellington?

19   A.    Um, it happens reasonably frequently.  It doesn't

20   happen for every Team Analyst, but, um, a number of Team

21   Analysts, um, start managing an approach while they're

22   also -- while their primary responsibility as Team

23   Analyst for the main approach of that team.

24   Q.    And once a Team Analyst begins to manage a fund or

25   an approach, is there a reduction in their, um, need to

1    contribute to the team they're on?

2    A.    Um, typically not.  Pretty much always not.  And

3    I -- and it would be something that I would very much

4    enforce with a Team Analyst that, um, and I can remember

5    the exact words I would use, which was on each and every

6    occasion, um, which is "Don't forget where your bread is

7    buttered," and "Don't take your eye off the ball with

8    respect to your main responsibility."

9    Q.    You testified a bit about paper portfolios.  Is

10   there an average length of time that somebody might run

11   a paper portfolio before seeking approval from the firm

12   to launch a fund or an approach?

13   A.    Um, there is -- Wellington is a very bottom-up

14   organization, so there is no average length of time.

15   Some paper portfolios, um, are managed for a relatively

16   short period of time, measured in, um, months, some

17   paper portfolios are managed for years.  Some analysts

18   start managing paper portfolios and realize, um, two

19   months in, "This is a mistake, I'm not going to do it

20   anymore," and some paper portfolios never make it to

21   approval irrespective of how they're managed.

22   Q.    Now there's been testimony that, um, at some point

23   Ms. Chan, um, was managing a fund called "China Growth

24   Fund."  Are you aware of whether that fund ever had any

25   external client money invested in it?

1   A.    China Growth never had any external client or

2   capital.

3   Q.    Are you aware of whether, um, Ms. Chan had any

4   former clients from her prior employer seeking to invest

5   in her fund?

6   A.    I'm not aware of any former clients of hers from a

7   former employer who reached out.

8   Q.    Yesterday you had mentioned -- and this is another

9   vocabulary thing that I forgot to ask you yesterday.

10  Yesterday you mentioned "incubation fund."  What does

11  "incubation" mean in that context?

12  A.    "Incubation," um -- an "incubation fund," if I

13  used the phrase "incubation fund," I shouldn't have used

14  the word "fund" because it wouldn't have been a proper

15  vehicle, but an "incubation" account would be basically

16  how we -- the scenario you just described, that if a

17  Team Analyst decided to go launch their approach, um, we

18  would incubate that approach with seed capital, um, and,

19  um -- I think the reason we call it "incubation" is

20  because we didn't expect any client in trust for years

21  potentially.

22  Q.    Um, and then there was some testimony, I think

23  yesterday, that you said that, um, external clients or

24  consultants usually want a track record of some amount

25  of time.

1        When you referenced "consultants," what did you

2    mean, what do "consultants" do in this context?

3        THE COURT:  You've gone back to his testimony but

4    it's been too vague.  You can ask a more precise

5    question.

6        MR. PATERNITI:  Sure.

7    Q.    I believe that yesterday you testified to the

8    effect that some clients have consultants that assist in

9    their decisions about investments, is that accurate?

10   A.    That's correct.

11   Q.    Okay.  Can you just explain briefly to the jury

12   why a consultant would be needed for certain companies?

13   A.    Um, I'll try.  Um, so very briefly.  So let's just

14   take one hypothetical client.  You've heard all the

15   different types of clients we have, but let's take a

16   university endowment fund.

17        Obviously we all know what the main business of

18   the university is, but inside, somewhere in that

19   university of teaching students will be a Chief

20   Investment Officer who's responsible for managing the

21   endowment and he or she will have a, um, small staff,

22   usually a small staff.  There's a couple of exceptions,

23   but usually a small staff.  They're very smart and

24   intelligent investment professionals, but they don't

25   have the ability or the resources to work at every

1    single -- in many cases they don't, um, every single

2    institutional Asset Manager, um, really around the world

3    these days.  So they might decide that "You know what?

4    We want more exposure to real estate" or "We want more

5    exposure to Australian equities."  Then they might work

6    with the consultants to say, "Who are the really good

7    investment consultants, who are the really good Asset

8    Managers for real estate or, for Australian Equities, or

9    for whatever it might be?  Some of those consultants

10   also work at an even higher level, but that's the

11   overall picture.

12        And so those consultants, we would view them as

13   clients, because in many ways, for a large number of our

14   institutional investors, the institutional investors

15   wouldn't invest in the Wellington approaches, the

16   underlying Wellington approaches, unless the consultant

17   said, you know, "We rate these approaches at a certain

18   level," usually, you know, "buy" or something.

19   Q.   Okay, let me jump forward to some of your

20   testimony about this Philosophy and Process Panel in the

21   fall of 2015.  Now, um, I believe, and I don't want to

22   go over all of your testimony, I just want to ask you

23   some questions about your knowledge.

24        I believe you testified yesterday that you were

25   not involved in that Philosophy and Process Panel, is

1    that right?

2    A.     I was not involved in it, right.

3    Q.     Were you involved in setting up the Asia

4    Philosophy and Process Panel program?

5    A.     Um, no.

6    Q.     Were you involved in identifying Ms. Chan as one

7    of the investors invited to present at the Asian

8    Philosophy and Process Panel?

9    A.     No.

10   Q.     You didn't attend it, I believe you said, correct?

11   A.     No, I did not attend it.

12   Q.     Did you have any responsibilities related to it?

13   A.     I had no responsibilities related to it.

14   Q.     Did you have any impact or influence over it?

15   A.     I had no impact or influence over it.

16   Q.     Were you even aware it was happening?

17   A.     Um, I was not aware that Ms. Chan was presenting

18   to the Asia Philosophy and Process Panel at whatever

19   time and date she did.

20   Q.     Okay.

21          MR. PATERNITI:  If we could look at Exhibit 112,

22   please.

23          (On screen.)

24   Q.     Now yesterday you were shown this document and you

25   were asked about the bottom part of the -- sorry, the

1     top e-mail and the investment philosophy and process set

2     forth in it.  I want to direct your attention to the

3     first paragraph.

4          This is an e-mail, um, again from Tom Baxter, and

5     he was your direct report at the time?

6     A.    That's right, he was the direct report responsible

7     for investors in Asia.

8     Q.    And this was, um, if you look at the first

9     sentence it says "Definitely multiple sides to the

10    recent Asia P & P discussion presentation with Gigi."

11    Um, Mr. Baxter -- and were you aware that Mr. Baxter had

12    attended?

13    A.    Um, I don't recall if I was aware if Mr. Baxter

14    attended.

15    Q.    Okay.  So if we jump down to the second line

16    Mr. Baxter wrote, "I could definitely see Gigi took the

17    criticism badly, though in all cases it was meant very

18    constructively and the content of it was all very

19    useful."

20         Did I read that accurately?

21    A.    Yes.

22    Q.    Okay.  Um, in your relationship with Mr. Baxter,

23    did you rely on him for this kind of input?

24    A.    Yeah, I worked with Mr. Baxter, um, on and off in

25    various roles for at least 15 years by this point, so

1      this is -- and you know in his current role here this is
2      exactly the type of, um, input and perspective I relied
3      on.
4      Q.    The next line says "Part of what will make this
5      work is Gigi adopting a growth mindset to go along with
6      her growth investing philosophy, which is pretty
7      compelling, by the way, she definitely knows who she is
8      as an investor.  Details attached below."
9           Did you -- what did you understand Mr. Baxter to
10     mean in this sentence about Gigi "adopting a growth
11     mindset"?
12     A.    I, um -- I understood that to mean that, um, it
13     was necessary for Ms. Chan to be more receptive to
14     receiving feedback.
15     Q.    Okay.
16     A.    Which is importantly different to actually agree
17     with it, the feedback.  You don't have to agree with the
18     feedback.  But actually accepting the feedback and being
19     open to receiving feedback is a critically important
20     component of having a growth mindset.
21     Q.    Okay.
22          MR. PATERNITI:  I'm going to show you another
23     document, Ms. Gaudet, and this is a letter document.  So
24     -- yes, thank you so much.
25          (On screen.)

```
 1   Q.    Do you have that in front of you, Mr. Argyle?
 2   A.    I can't see anything on my screen currently.
 3   Q.    Oh, I'm sorry, Exhibit BR.  I apologize.  (On
 4   screen.)
 5   A.    Okay.
 6   Q.    Now, shortly after the Asia Philosophy and Process
 7   Panel, did you receive communication from Ms. Chan?
 8   A.    Um, I don't recall.
 9   Q.    Okay.  At some point do you recall speaking with
10   her about the Asia Philosophy and Process Panel
11   experience she had?
12   A.    Um, I don't recall the -- um, the precise
13   conversation, but, um, I think later on that year we
14   talked.
15   Q.    Was that in early December of 2015?
16   A.    Um, well that was the next time we met in person,
17   so most likely, yes.
18   Q.    Okay.  And, um, with regard to that conversation
19   -- why don't you take a look at Exhibit BR for just a
20   minute and review it and then I'll ask you some
21   questions.
22   A.    (Looks.)  Okay.
23   Q.    Okay.  Does that refresh your recollection as to
24   your discussion with Ms. Chan about the Asia P & P
25   process -- I'm sorry, the Asia P & P panel?
```

```
1    A.     Yes, um, some of it.  Yes.

2    Q.     And does it, um, reflect the points that she made

3    to you in that discussion?

4    A.     Um, yeah, it does.  I can't remember if she made

5    every single one of those points, but it certainly

6    reflects the tenor of the conversation.

7           MR. PATERNITI:  Your Honor, I would ask that this

8    be admitted into evidence.

9           THE COURT:  No objection?

10          MR. HANNON:  No objection, your Honor.

11          THE COURT:  And what would the next number be?

12          THE CLERK:  I think 400.

13          THE COURT:  400?

14          MR. WATSON:  Your Honor, I believe the audio tapes

15   were numbered already, so it should be Number 410.

16          THE COURT:  All right.  And say again the letters?

17          MR. PATERNITI:  BR.

18          THE COURT:  BR is admitted in evidence, Exhibit

19   410.

20          (Pause.)

21          MR. PATERNITI:  And, Ms. Gaudet, as soon as it's

22   published to the jury, um -- Oh, it is.

23          MR. WATSON:  No, I apologize, I think it was 409.

24          THE COURT:  409.

25          MR. WATSON:  Yes, thank you.
```

1              (Exhibit 409, marked.)

2     Q.    All right.  Mr. Baxter -- no, Mr. Argyle, I'm

3     sorry.  We're looking at an e-mail from Ms. Chan, dated

4     October 7th, 2015, sent to her gmail account but it says

5     "Hi, Charles."  I want to run through the, um, the

6     e-mail and ask you your understanding -- your

7     recollections of the conversation.

8              So obviously we're referring to the Asian -- where

9     she says "Process and Philosophy Session, several things

10    wrong with it," um, under Number 1.  "The fact that it

11    happened at all, my understanding is that they are for

12    young investors to help them find their feet, I am a

13    fully-fledged PM with a decade of experience managing

14    money."

15             Do you agree with that sentence?

16    A.    I don't --

17             THE COURT:  Does he agree with her

18    characterization of her experience?

19             MR. PATERNITI:  Correct.

20             THE COURT:  All right.

21    A.    Um, I don't agree with the characterization of the

22    Philosophy and Process Panel.  Um --

23    Q.    Okay, and I apologize, the judge was more

24    articulate than I was in terms of breaking down the

25    sentence, there's a couple of things here, let me break

1    it down a little bit more.

2          Her sentence, "I am a fully-fledged PM with a

3    decade of experience managing money."  Was she a

4    fully-fledged PM at Wellington?

5    A.    Um, as of October 2015 she was not a PM at

6    Wellington, she was an Analyst at Wellington.

7    Q.    Okay.  And did that ever change?

8    A.    Um, no.

9    Q.    Um, she said that -- she says -- right after the

10   yellow highlights she continues and says, "Longer than

11   some others who are giving advice on the panel."

12         Is that -- again in your mind is that a relevant,

13   um, concern to express about a panelist on a philosophy

14   and process panel?

15         MR. HANNON:  Objection.

16         THE COURT:  No, overruled, he can express his

17   view.

18   A.    Um, no.  The point of the philosophy and process

19   panel was to provide feedback and to get feedback from,

20   um, experienced investment professionals and business

21   professionals, but there was no, um, criteria for how

22   long, um, anyone had been, um, managing money or was a

23   PM or --

24   Q.    Okay.  Number 2, it says "Misunderstanding of the

25   participants of the task at hand."  She goes on to say,

1   "The spirit of it was supposed to be to help people

2   develop their investment thinking, instead a lot of the

3   feedback was marketing-based, could be construed as

4   constructive criticism, but not relevant.  Also, a few

5   of the participants were fairly patronizing, they failed

6   to listen to what I was saying and kept insisting on

7   something that missed the point, i.e. why I should not

8   underperform in a down market.  Differences in opinion

9   were dressed up as advice as to how I should manage

10  money more like themselves."

11       Now did you form any opinion as to whether, um,

12  there was any issues or concerns with the feedback she

13  was given?

14  A.   Wellington was a feedback-intensive culture with a

15  very open dialogue of it.  Just because a panel was

16  meant to provide feedback on philosophy and process --

17  and it sounds like there was feedback on philosophy and

18  process because it talks about, um, "underperforming in

19  a down market" and stuff like that, it doesn't mean that

20  it's not an environment -- if a fellow professional

21  thinks it's appropriate to do so, to provide feedback on

22  the style of the presentation, on the presentation

23  skills -- and I wasn't in the room, but that would be

24  highly consistent with Wellington as a firm.  Just

25  because one meeting is set up for another purpose, it

1    doesn't -- for one purpose, it doesn't mean that another

2    purpose might be brought up.

3    Q.    Let's go to Paragraph 3.  Ms. Chan writes, "The

4    fact that I was unable to respond to feedback, this

5    works where the feedback is constructive, but let me

6    read you some examples of some of the feedback that was

7    given."  The next sentence, "If I were you, have you

8    ever watched yourself present in a video?"  The next

9    line, "You put in too many words before your point like

10   'I suppose,' which makes your points not very

11   effective."  The next bullet point, "Do you really

12   expect clients to give you money on the basis of these

13   few sentences?"  And the next bullet point, "I mean you

14   just say what every single growth manager says, saying

15   you do it better than anyone else is just not convincing

16   unless you plan on having a good track record."  And

17   then she goes on to say, "The effect was that of a

18   kangaroo court."

19        Now in your opinion is that feedback emblematic of

20   what she calls a "kangaroo court"?

21   A.    Um, that feedback is -- I'm not entirely sure what

22   a "kangaroo court" is, but that feedback is, I don't

23   think, emblematic of a "kangaroo court," um, assuming

24   there's a negative connotation of a "kangaroo court."

25   Q.    Okay, let's scroll down a bit more.  Um, yeah.

```
 1    (Scrolls.)   The paragraph starts, "But that is precisely
 2    what this incident has illustrated."   "The people and
 3    culture in HK are not on par with that of elsewhere in
 4    Wellington and this process was open to abuse.   I
 5    understand that insecure people will sometimes behave
 6    unprofessionally and disrespectfully to others to
 7    bolster their own self-confidence, but what I find
 8    unacceptable is that the system within which I worked is
 9    one which tolerates such behavior, one that does not
10    ensure that I worked in a respectful environment."
11         Did I read that accurately?
12    A.    You read that accurately, yes.
13    Q.    Okay.  Did you ever receive feedback from anybody
14    who was on that panel that indicated to you that there
15    was any disrespectful conduct by any of the panelists?
16    A.    Um, I did not.
17    Q.    The next line down, "I joined Wellington on two
18    assumptions, Wellington Asia China is subscale and that
19    Wellington was serious about growing it now."
20         What did you understand that to mean, "subscale"?
21    A.    Um, that relative to some other Asset Managers out
22    there, um, maybe we didn't have as many clients, as many
23    assets in China, um, as them.
24    Q.    Okay.  Let's go down to the bottom.  (Scrolls.)
25    No, I'm sorry, the second page.  My apologies.
```

1  (Scrolls.)  Yes.  Okay.

2       Do you see the line "If there are

3  misunderstandings?"

4  A.    Yes.

5  Q.    "If there are misunderstandings that cannot be

6  reconciled, then it's better for us not to waste each

7  other's time any longer."

8       What did you understand that to mean?

9  A.    Um, I understood it to be a threat, that she would

10 no longer be at Wellington Management Company.

11 Q.    She then goes on, at the very bottom, she says,

12 "At the very least I need for you to ensure that, one,

13 nothing like this ever happens again, and, two, I have a

14 real and proper role commensurate to my skill set and

15 achievements to date, a Fund Manager of a China Fund

16 seeded and with full support of the firm to grow it."

17      Did I read that accurately?

18 A.    You read that accurately.

19 Q.    Okay.  With regard to, um -- with regard to again

20 this reference to her as a "fund manager."  Was it ever

21 your intent -- or strike that.  Was it ever your hope

22 that she would become a Portfolio Manager someday at

23 Wellington?

24 A.    Um, by this point in her time at Wellington it was

25 very clear that she aspired to be -- it was very clear

1    that she aspired to be a Fund Manager or what we call a

2    "Portfolio Manager" during her time at Wellington, and I

3    was hopeful, um, that one day Ms. Chan would be a

4    successful Portfolio Manager at Wellington.

5    Q.    Okay, thank you.

6          MR. PATERNITI:   You can take the exhibit down.

7    Thank you.

8          (Takes down.)

9    Q.    Up to the, um -- I'm sorry, strike that.

10         MR. PATERNITI:   Let's pull up Exhibit 107, please.

11         (On screen.)

12   Q.    You were shown this exhibit yesterday, this is

13   from you to, um, the managing partners and Steve Klarr

14   and Michael Boudens, um, and this is the e-mail that

15   talks about, um, the reference to, um, being at a party

16   where Ms. Chan's feeling she's at a party where she's

17   not invited.

18         Do you see that?

19   A.    It's not what's blown up on the screen at the

20   moment.

21   Q.    Okay.  Let me see.  Hold on.  Um, just bear with

22   me.  (Pause.)  I think it's on the second page of this

23   document.  I apologize.  The second bullet point down.

24   Yes, there it is.  (On screen.)

25         This is, um, the document -- this is the point

1    that was made that she felt she was at a party where

2    she's not welcome and "There's no recognition at

3    Wellington for what has been achieved before," and that

4    "She was concerned about the value of her previous China

5    track record going stale."

6         What did that mean, her concern about her previous

7    track record going stale?

8    A.    Um, when she had a -- when she was a Fund Manager

9    at Threadneedle, um, and she had a track record, her

10   investment performance at Threadneedle, and she was

11   worried that that would be going more and more "out of

12   date," so to speak, that it would be less and less

13   relevant to potential clients because it would be

14   further and further ago.  Well I'm not saying that very

15   well, but I think you know what I mean.

16   Q.    Okay.  Um -- and, um, you go on to say, "It was

17   clear to me that if we don't launch an approach in the

18   next 6 to 12 months, we will lose her."  And then it

19   says, parentheses, "(The phone rings all the time in

20   HK," closed parentheses.

21        What did you mean by the parenthetical?

22   A.    Um, less about the parenthetical but more about

23   the quote marks.  I personally tended to use quote

24   marks, as we've seen a few times before, to embody

25   actual quotes.  So that would have been a quote from

1   her, "(The phone rings all the time in Hong Kong)," and

2   again -- again a threat that there were opportunities to

3   go elsewhere, um, if this didn't happen.

4   Q.    Okay.  If we could go back to, um, Document 112.

5   (On screen.)  Now this is again an e-mail, it's in the

6   same timeframe, it's October 1st and 2nd.

7         MR. PATERNITI:  If we could turn to, um, the

8   second page of this.  (On screen.)   I'm sorry, strike

9   that, the third page.  (On screen.)

10  Q.    This is an e-mail from Terry Burgess.  And again,

11  he was your direct report at the time?

12  A.    Um, he was my direct report at the time, yes.

13  Q.    And it's to you and it's copied to Erin Murphy and

14  Tom Baxter, and those are two of your other direct

15  reports?

16  A.    That's correct.

17  Q.    Okay.  And in this part of the e-mail you say

18  "Regarding China Growth and Chan."  "China Growth" is

19  the China Growth Fund, is that right?

20  A.    Um, that's correct.  Terry Burgess said that.

21  Q.    Oh, I'm sorry.  I'm sorry.  Right.  And then he

22  says he had a "short catch-up with Greg Mattiko today."

23  And then he goes on to say, "Erin is already on top of

24  this, so it would be redundant for her and possibly all

25  of you."  But that he's very concerned about Gigi and is

1    asking for "our help collectively in getting Gigi and

2    her integration with HK to a better place."  "Apparently

3    the following things have her feeling very unwelcome

4    here.  First, one, is not a lot of engagement with Bo."

5           And "Bo" is?  Who is that?

6    A.     Um, Bo Meunier, um, was a, um, an investment

7    professional in our Hong Kong office, um, who was the,

8    um -- by this point kind of the cornerstone of our China

9    investment platform approach.  Um, way forward.

10   Q.     And she's, um, I think you testified before, she's

11   a Chinese female?

12   A.     She's a Chinese female, yes.

13   Q.     Did you have any opinions about whether there was,

14   um, an issue or a conflict between Ms. Meunier and

15   Ms. Chan?

16   A.     Um, I'm not sure what you mean by "conflict"?

17   Q.     Well on the fourth line down -- um, on the fourth

18   line down it says, "Bo has a territorial streak.  Seems

19   like a message from any of you to follow up with Bo

20   would be great.  Tom is leading the HK effort, Erin is

21   closest to the team, Charles is our fearless leader.

22   Someone needs to get her more engaged with Gigi in a

23   positive way."

24          Did I read that accurately?

25   A.     Yes.

1    Q.    Okay.  Was, um, with regard to this "territorial

2    streak," did you, um -- did you have any reason to

3    disbelieve Mr. Burgess's comment?

4    A.    Um, I don't believe I had any reason to disbelieve

5    Mr. Burgess's comment.

6    Q.    Okay.  And then if you --

7    MR. PATERNITI:  If we could just scroll down that

8    page, please.  Thank you.

9    (On screen.)

10    Q.    Mr. Burgess then comments that she had a, um, a

11    philosophy and process panel that went terribly, and I

12    think we've covered that enough.  Um, the next line --

13    the next paragraph, Number 3, "No one is giving her

14    credit for her experience as a PM."

15    Is that something that, um -- well, first of all,

16    what do you understand "PM" to mean?

17    A.    "Portfolio Manager."

18    Q.    Okay.  The fourth paragraph says "She has broken

19    down with Greg a few times, very disappointed and down."

20    And, um, in the second line he says, um -- it says that

21    "Greg asked for Erin's guidance and any help we

22    collectively could give.  He would rather not deal with

23    what is becoming an HR personnel headache."

24    Did I read that accurately?

25    A.    Yes, you read that accurately.

1   Q.    Okay.  So this is the Team Leader of EMO saying he

2   would rather not deal with what's becoming an "HR

3   personnel headache."

4         What's GEPM's role in a situation like this?

5   A.    Um, I think it -- it says it in the e-mail

6   somewhere, I read it, um, and then you know there's two

7   sides to every story.  So let's, um, you know -- "Let's

8   dig into it."

9   Q.    And with regard to --

10  A.    I don't just -- I -- Mr. Mattiko's an investment

11  professional, he's a Portfolio Manager.  I -- you know

12  it wasn't an HR headache, it was a management headache,

13  um, from his perspective, and it was our role to get

14  into it.

15  Q.    To alleviate him from that?

16  A.    Um, if we could alleviate him from it.

17  Q.    Okay.  And I just want to ask you one question,

18  um, on the --

19        MR. PATERNITI:  If we could pull up Exhibit 409

20  one more time.

21        (On screen.)

22  Q.    When Ms. Chan gave you feedback in Paragraph --

23  the second Paragraph Number 1, "the fact that it

24  happened at all."

25        What if any concerns did you have that Ms. Chan

1    was complaining that she was asked to present at the

2    philosophy and process panel?

3    A.    Um, I was concerned that she was demonstrating a

4    lack of a growth mindset.  Um, the fact that --

5    philosophies and process panels were for experienced

6    investors, investors, um, you know midway through their

7    journey, and for some just beginning their journey.

8    Actually, no, probably less who were just beginning

9    their journey.  And so -- because Wellington wants

10   investors, no matter where they are in that journey, to

11   know that there's always room to improve and there's

12   always room to get better and there's always -- and the

13   opportunity to get feedback from one's peers is, you

14   know, always welcome.

15   Q.    Okay.  So at this point, um -- and we're now still

16   talking about the -- this is the fall of 2015.

17         What if any picture was forming in your mind about

18   Ms. Chan?

19   A.    Um, so I would -- so I would, um, boil it down to

20   three things, um, in my mind obviously, I've explained

21   about the 10,000 foot view, but, um, there seems to be a

22   lack of a growth mindset -- there is a lack of a growth

23   mindset, um, and there is a -- um, some discontent to

24   the fact -- well leading her to be threatening multiple

25   times that maybe she wants to leave the firm.  But there

1    is a glimmer of a flame that this individual, um, might

2    be a talented investment professional who, if we could

3    get on the right course, could add value to our clients

4    and to Wellington.

5    Q.    And did you want that to happen?

6    A.    Absolutely I wanted that to happen.

7    Q.    At this point were your concerns about her

8    influencing your support of the launch of the China

9    Growth Fund?

10   A.    Um, they were influencing my support for the

11   launch of the China Growth Fund in that I wanted to

12   launch the China Growth Fund.  I actually believed the

13   China Growth Fund would help me, um, alleviate some of

14   Gigi's concerns and it would actually help her integrate

15   into the firm better.

16   Q.    Okay.  So I want to ask you a couple other

17   questions.  There was testimony yesterday again about

18   this, um, comment that Ms. Chan felt that she was at a

19   party where she's not invited.

20         MR. PATERNITI:  Can you pull up Exhibit 384,

21   please.

22         (On screen.)

23         MR. PATERNITI:  Okay.

24   Q.    Exhibit 384 is a partial organization chart, at

25   least this page of the Hong Kong office, um, as of -- do

```
1   you see on the bottom it says as of February 2016?
2   A.    Yes.
3   Q.    Okay.  And if any of my questions -- I'm going to
4   ask questions related to 2015.  If any of my questions,
5   um, if you need to correct any dates, please do.  Okay?
6   A.    Yes.
7   Q.    And so if we look at this, um --
8         MR. PATERNITI:  Can we go to Page 2, please.
9         (On screen.)
10        MR. PATERNITI:  Okay.
11  Q.    "Portfolio Management and Research."  Is that a
12  combination of the GEPM folks in the Hong Kong office
13  and the research folks?
14  A.    Yes, that's right, they sat right next to each
15  other.
16  Q.    And so if we look at the top line we look at Tom
17  Baxter, um, Bo Meunier, June Oh, and Steve Richter.  And
18  if we go down a level of the rest of them we have
19  Ms. Chan on the line with a number of other Equity
20  Research Analysts.
21        Would the Equity Research Analysts all be on some
22  sort of equity team?
23  A.    Um, Ms. Chan.  Mr. Chin.  Mr. Jung.  Mr. Tian.
24  Um, Bo, yes.
25  Q.    Okay, and then the rest of those folks, Santiago
```

1    Millian, Edwin Pine, and the other two are they, um --

2    well they're not Equity Analysts so they're not on the

3    team?

4    A.    No, they're -- yes, they're not Equity Research

5    Analysts, they're more on our research, our Central

6    Research side.

7    Q.    Okay.  Now this org chart --

8         MR. PATERNITI:  If we could pull back to the full

9    org chart please.

10         (On screen.)

11    Q.    This org chart in our Portfolio Management does

12    not show Mr. Mattiko, do you know why?

13    A.    Um, because Mr. Mattiko wasn't in Hong Kong.

14    Q.    Where was he located?

15    A.    He was located in London.

16    Q.    So when Ms. Chan was hired and placed on the EMO

17    team, she was in Hong Kong and Mr. Mattiko was in

18    London?

19    A.    That's correct.

20    Q.    And the other Team Analyst, Philip Fan, where was

21    he located?

22    A.    He was in London.

23    Q.    And the other Team Analysts we're looking at on

24    this -- on this org chart, were their, um -- were their

25    PMs, their Team Leaders located in Hong Kong?

1    A.    Um, Ben Chin and Jon Jung, their Team Leader was

2    June Oh, so he was in Hong Kong obviously, it's right

3    there above.  Mr. Tian, Terry Tian, his Team Leader on

4    this date was in Boston.

5    Q.    Okay.  What if any concerns or thoughts did you

6    give to, um, whether Ms. Chan's, um, part of the

7    sentiment she had that she was at a party where she

8    didn't feel invited, um, related to the fact that her

9    Team Leader and Team Analyst on her team were located in

10   London while she was in Hong Kong?

11   A.    Um, I don't recall that being part of what I was

12   thinking.

13   Q.    Were you ever in touch with Mr. Mattiko, the team

14   leader, about this distance issue?

15   A.    Um, over time we talked about the distance and she

16   was -- yes, we talked about the distance.

17   Q.    Okay.

18         MR. PATERNITI:  Let's go back to Exhibit 107, if

19   we could.

20         (On screen.)

21   Q.    In this exhibit, um, there is mention, um --

22         MR. PATERNITI:  If we could go to the, um, next

23   page.  (On screen.)  And the next page after that, I'm

24   sorry.  (On screen.)

25   Q.    And There's mention in this exhibit -- and I

1    apologize, I'm not seeing it right now, of the statement

2    regarding your intention to have the China Growth Fund

3    launched.

4         Was that, um -- without your support, would that

5    have launched?

6    A.    Um, no.

7    Q.    Why not?

8    A.    Because if, um, support -- if an investment

9    approach was going to be launched by an investment

10   professional in Global Equity Portfolio Management, then

11   my support was required.

12   Q.    Okay.

13        MR. PATERNITI:  Let's go to Exhibit 116, if we

14   could.

15        (On screen.)

16   Q.    Exhibit 116 is an e-mail again in this fall

17   timeframe, 2015, from Mr. Baxter to you.

18        And Mr. Baxter again is your direct report in Hong

19   Kong, correct?

20   A.    Um, yes.

21   Q.    And he is Ms. Chan's day-to-day manager at the

22   time?

23   A.    Yes.

24   Q.    Okay.

25        MR. PATERNITI:  If we could go to the first bullet

1    point.

2         (On screen.)

3         MR. PATERNITI:   Great.

4    Q.    Mr. Baxter says that he had "a lengthy convo with

5    Gigi, mostly listening.  She's sort of on a war-footing

6    these days and I have very strong doubts whether we can

7    turn her around, she feels attacked and belittled and

8    disrespected and believes that Jun, Bo, and Steve, feel

9    threatened by her."

10        Did you understand what Mr. Baxter meant by

11   Ms. Chan believing that "Jun, Bo, and Steve, feel

12   threatened by her"?

13   A.    No, I -- I don't understand what he was referring

14   to there.

15   Q.    Okay.  "She gave as examples the June P & P

16   commentary and a brief episode where she was huddling

17   with April Wong on logistics and Steve Richter

18   interrupted with an admin task for April to do for him."

19        Who is April Wong?

20   A.    April Wong was an administrative assistant in the,

21   um, Hong Kong office -- or was at the time, I don't know

22   if she's still there, um, supporting the investment

23   professionals, or some of the investment professionals.

24   Q.    And I think we saw on the org chart Steve Richter

25   was on that top line with Bo Meunier and Tom Baxter and

1    June Oh.  What did he do?

2    A.    He was, um -- every now and again I referred

3    briefly to our Central Research Group and he was an

4    Analyst in that Central Research Group.

5    Q.    Did Ms. Chan ever complain to you about Steve

6    Richter?

7    A.    Um, not that I recall.

8    Q.    In the next line Mr. Baxter writes, "As would

9    having her run a portfolio mollify these feelings?"

10         What did you understand Mr. Baxter meant by that

11   question?

12   A.    Um, he and I or he knew that -- he was aware, he

13   would have been the one person I was talking to about,

14   you know, do we launch a portfolio to kind of assuage

15   Ms. Chan's feelings and hopefully try and make things

16   better?

17   Q.    Okay.  And then he responds, "On some level, yes,

18   but on a deeper level the picture I'm forming is of

19   someone who does not have a growth mindset despite the

20   growth philosophy."

21         Did I read that accurately?

22   A.    Yes, clearly it's a little play on words.

23   Q.    Did you reply on Mr. Baxter's feedback about

24   personnel?

25   A.    Um, I -- I relied -- um, I took it -- I took it

1    very very seriously.  We agreed a lot of the time, but

2    not 100 percent of the time.

3    Q.    Okay.  Did you, about this time in October 2015,

4    have a, um -- was a picture forming in your mind of

5    Ms. Chan as someone who does not have a growth mindset?

6    A.    I think that was one of the things we would have

7    agreed on.

8    Q.    Um, so let's go a little further down, three lines

9    down, "The entire conversation can be summed up by our

10   final exchange where I said something along the lines of

11   'The P & P feedback was directed at you so naturally

12   your reaction to it is the most germane.'  But I was in

13   the room too and I've worked with June for a long time,

14   and I can't speak for him, but I believe that his

15   comments were meant to be constructive and would make

16   you better."  To which she said, "That's exactly my

17   point, if that's him trying to be constructive, then

18   it's clear that he disrespects me.  There's a lot more

19   but my enthusiasm to creatively look for China Growth

20   seed funding is waning."

21         What did you understand Mr. Baxter to be telling

22   you when he said that his "enthusiasm to creatively look

23   for China Growth seed funding was waning"?

24   A.    Mr. Baxter was telling me that, um, that he was

25   beginning to think that it wasn't an appropriate path

1  forward to launch China Growth.

2  Q.    And did you, um, follow his input on that?

3  A.    No, I did not follow his input on that.  As I

4  said, we agreed on a lot of things, but not everything,

5  and I decided that we would continue to proceed with

6  launching China Growth.

7  Q.    Okay.

8  A.    And hope that, um, that would be a way to, um,

9  help Ms. Chan be more successful at Wellington.

10  Q.    Okay.

11      MR. PATERNITI:  Let's go to Exhibit 118, please.

12      (On screen.)

13  Q.    This is an e-mail from you, um, a day later, to

14  your -- it looks like all your direct reports, um, with

15  a copy to Henry Philip.

16      I think you testified he was the head of HR and

17  Asia at the time?

18  A.    Yes, that's right.

19  Q.    The first line says "We've all been spending time

20  on this one and are pretty much all in the loop, I

21  think, so just a couple of lines.  I spoke to Greg

22  Mattiko yesterday who was somewhere between irritated --

23  not with us, concerned, and exacerbated.  He completely

24  recognizes that he has only heard one side of the story

25  and shares our common frustration, I believe, with

1    respect to the apparent hubris, impatience, and lack of

2    willingness to embrace feedback, although he did

3    speculate that the hubris might be more defensive than

4    anything else.  But what is most important is that he

5    has very little appetite for there to be -- being any

6    drama on his team."

7         Did it concern you that Ms. Chan's Team Leader was

8    providing you this input in mid October of 2015?

9    A.    Um, it certainly concerned me.

10   Q.    Why?

11   A.    Because she was a Team Analyst on the Emerging

12   Markets Opportunities team and, um, there were clearly

13   -- um, I didn't want Mr. Mattiko, um, he was -- we

14   talked about how fast what we call our "book of

15   business" had grown and the fact that he was distracted

16   by one of his Team Analysts, with hubris and impatience

17   and lack of willingness to embrace feedback, was not

18   particularly conducive to his focus on our clients.

19   Q.    Okay.  And you wrote at the very bottom, um --

20   well not the very bottom, the next paragraph, the last

21   sentence, "I did share with him that I have seen a few

22   similar situations in the group over the years and it's

23   hard to think of an example where it has ended well.  He

24   totally understands."

25        What did you mean by that sentence?

1   A.    Um, Mr. Mattiko was an optimist, I'm also an

2   optimist, um, and we agreed that, you know we were going

3   to, um, try and figure this out.  But I also wanted us

4   to have a dose of realism in that it might not because

5   --

6   Q.    Okay.

7   A.    -- because I've seen it before, um, in similar

8   situations.

9   Q.    You testified, um, I think two days ago now --

10  well maybe it was yesterday, about an individual by the

11  name of Kenny Abrams.  Mr. Abrams, I think you said, is

12  a Portfolio Manager at Wellington?

13  A.    Mr. Abrams has been a Portfolio Manager at

14  Wellington for at least three decades.

15  Q.    And is he still at Wellington?

16  A.    Um, I believe so.  I think I would have found out

17  if he left or retired.  But I don't know.

18  Q.    Um, so Mr. Abrams became involved, in this

19  timeframe, in this fall of 2015, um, with regard to, um

20  -- I'm sorry, strike that.

21        Mr. Abrams, in October of 2015, I think you

22  testified, was on a trip to Asia and, um, had a meeting

23  with Ms. Chan, correct?

24  A.    Um, yeah, Mr. Abrams, um, used to try and go out

25  to Asia and visit our offices, our investment

1    professionals in our offices, and he was trying to meet

2    with all our investment professionals who were present

3    in both Hong Kong, Singapore, and sometimes Tokyo.

4    Q.    Well why would he do that, why would he go to an

5    Asia meeting with investment professionals?

6    A.    Um, because -- because at some point in 2011 he

7    and I had a chat and I said, you know, "So many people

8    go through Asia to meet with companies, why don't

9    instead" -- and I'm trying to build up the investment

10   platform.  "So instead of going through Asia and meeting

11   companies, why don't you go to our offices and talk to

12   the investment professionals, some of whom are in

13   Wellington, talk to the investment professionals who

14   know these companies really really well and visit them

15   in their backyard, so to speak."  And he said, "Well,

16   that's really good advice."  And from that point on, um,

17   he, um, he nearly every year, um, would do exactly that.

18   Q.    Okay.

19   A.    "Collaboration" in a word.

20   Q.    Okay.

21         MR. PATERNITI:  If we could pull up Exhibit 126.

22         (On screen.)

23   Q.    So, um, I believe you were shown this a couple of

24   days ago, and this is an e-mail in which --

25         MR. PATERNITI:  And if we scroll down to the

1    Charles Argyle November 4th section.

2         (On screen.)

3    Q.    Um, November 4th, the subject line is "Hong Kong

4    Itinerary," which I assume relates to Mr. Abrams

5    itinerary, is that to your knowledge?

6    A.    I think if we scroll through the e-mail the e-mail

7    chain would have started with him saying, "Hey, this is

8    where I'm going to be in Hong Kong, this is where I'm

9    going to be in Singapore," something like that.

10   Q.    Okay.  So the second bullet point down you say, "A

11   couple of quick points, you asked for them," the second

12   bullet point down.  "I am glad you are having a dinner

13   with Gigi, I recall you were a fan in the interview

14   process.  In confidence, she is in a tough place.  Do

15   not be surprised if she complains a lot."

16        Now this was about almost two months after that

17   Asia Philosophy and Process panel, correct?

18   A.    Um, that's correct.

19   Q.    And let's go back into this e-mail.  "To cut to

20   the chase, she feels as if her prior experience counts

21   for nothing at Wellington, she has to start all over

22   again here and believes if her biggest asset is

23   diminishing in value, which is her track record from

24   Threadneedle, most importantly she doesn't feel welcome

25   or respected in the Hong Kong office."

1        And when you said she didn't feel "respected in
2   the Hong Kong office," were you referring specifically
3   to the Asia P & P panel?
4   A.    Um, again that would have been definitely, um,
5   definitely the bulk of it.  And I think in general she
6   didn't feel respected as, um -- you know that comment
7   about starting all over again here, that -- respected as
8   an investment professional with 10 years of experience,
9   or whatever it was, 10-plus, um, over a decade.
10  Q.    All right, let me ask a broader question.  When
11  someone comes into Wellington with a terrific resume and
12  experience as an investor, leaving aside whether they're
13  bringing clients with them to start a fund, um, does
14  their prior experience or track record automatically
15  confer some sort of status on them?
16  A.    No.
17  Q.    Tell us about at Wellington, um, how people are
18  taken in the door and how they are evaluated going
19  forward?
20  A.    Um, well I would evaluate people along three axes,
21  but people come into Wellington and -- investment
22  professionals a lot, but people coming in with different
23  roles.  But investment professionals coming into
24  Wellington, um, I want to -- I want -- I want impact, I
25  want to understand what their impact is.  So how I would

1    evaluate investment professionals and how I would

2    actually evaluate any professional or any

3    nonprofessional would be thinking about their impact.

4    And naturally I would think about impact on three

5    dimensions.  I would think about what is this

6    individual's impact in their day job?  What are we

7    paying them to do?  And how effectively are they doing

8    it?

9          The second thing I mentioned is how are they

10   having an impact on this organization beyond their day

11   job, what are they doing to make this enterprise, to

12   make this firm, to make this community stronger?

13   Stronger as a community, it's better for our clients.

14         And the third thing I would think about in

15   evaluating talent would be how excited am I about this

16   individual's future impact?  When I think about how

17   impactful they're going to be on this organization over

18   the years -- hopefully decades ahead, hopefully the rest

19   of their career, um, how -- so for me personally that's

20   how I would, um, think about, um, evaluating an

21   individual and, um, obviously a lot of that was built up

22   through tiles of the mosaic.  It wasn't just me sitting

23   there and thinking, "Okay, what do I think?" it's

24   building through tiles in the mosaic.

25   Q.    Okay.  And you said that, generally speaking, when

1    someone comes into Wellington, um -- strike that.

2         With regard to a prior track record that Ms. Chan

3    apparently felt was not given due respect, um, is that

4    common at Wellington for, um, an individual's track

5    record not necessarily to, um, dictate how they are

6    viewed as an investor when they come in the door?

7    A.    Um, I think what is far more common at Wellington

8    is how people engage in the dialogue and debate around

9    investments, and there's many different ways of

10   investing and one doesn't have to feel -- and there's

11   many different ways of contributing to the dialogue and

12   debate.  But how would -- you know that's pretty quickly

13   how, um, someone's, um, someone's evaluated.

14   Q.    Their engagement in the debate that's going on at

15   Wellington?

16   A.    There's a set of eyes on that -- many many many

17   set of eyes on that individual and many many many

18   different perspectives on that individual.  Um, on

19   pretty much on any individual, um, different

20   perspectives on them.  But that creates this rich

21   picture, um, for management.

22   Q.    Okay, let's go back into this e-mail of Kenny

23   Abrams.  Let's take a look at the next bullet point.

24         "Once we do get China Growth up and running, she

25   will need to be patient, institutional clients and their

```
 1   consultants are circumspect, they want to see multiyear
 2   track records and take a long time to evaluate
 3   approaches.  She's going to be judged on a track record
 4   here, in the intermediate term at least, and not her
 5   assets, and don't lose sight of helping Greg Mattiko in
 6   the meantime."
 7        So when you said "She's going to be judged on her
 8   track record here and not her assets," what did that
 9   mean?
10   A.   Um, and then with respect to that, um -- so that
11   bullet point is referring to China Growth and what I'm
12   saying there is, um -- essentially what I've said a few
13   times here which is that -- and Kenny knew, that it
14   takes a long time to build up a book of business.
15   "Alpha" -- do I use that term here?  Sorry, "track
16   record."  I mean that's the investment performance.  The
17   size of the assets that one's running doesn't change the
18   investment performance.  So you can have investment
19   performance on a million dollars or on a billion
20   dollars, but the actual track record of those assets
21   don't determine that.  So what I'm saying here is "Just
22   tell her to be patient."
23   Q.   Okay.  The next bullet point you wrote "What
24   bothers me most about Gigi is that when she talks about
25   her own experience there's a strong element of 'Why does
```

1   no one realize that I have this all figured out, my
2   prior track record speaks for itself?'"
3          Did I read that accurately?
4   A.    Yes.
5   Q.    And again was it your opinion that hers or anyone
6   else's prior track record spoke for itself?
7   A.    It's --
8          THE COURT:  I don't understand the question, could
9   you ask it again.
10         MR. PATERNITI:  Yeah.
11  Q.    Was it your opinion that Ms. Chan's prior track
12  record spoke for itself?
13  A.    No one's prior track record speaks for itself.
14  Q.    Okay.
15         MR. PATERNITI:  Okay, if we could scroll down.
16  (Scrolls.)  Yeah, thank you very much.
17  Q.    The second-to-last bullet point, "You will likely
18  hear that Gigi travels a lot, she's never here.  Not
19  good enough, she is there enough."
20         What were you referencing there?
21  A.    Um, well I think I'm referencing that the -- I'm
22  talking -- I'm also saying to Kenny, "Speak to the other
23  investors in the office and ask them to help Gigi
24  assimilate into the office."  And the refrain we got
25  back a lot was "Gigi's never here, she's always

1    traveling."  And I'm saying "That's not good enough,

2    you've got to help her assimilate."

3    Q.    Um -- and then you went on, in your last bullet

4    point to say that "It's important for me to note that

5    I'm giving Gigi the benefit of the doubt in almost all

6    of the above.  She has a lot of the complainer in her.

7    But your independent view of the situation will be

8    valuable."

9         What was it you were trying to achieve by asking

10   Mr. Abrams to speak to Ms. Chan and giving him this

11   background?

12   A.    I was trying to help Ms. Chan be more successful

13   at Wellington Management.

14   Q.    Okay.  With regard to -- did you ever get feedback

15   from Mr. Abrams about that meeting?

16   A.    Um, I can't recall.

17   Q.    Did you ever get feedback from Ms. Chan about the

18   meeting?

19   A.    I can't recall.

20   Q.    The next document that I want pulled up -- just

21   give me one minute here.

22        MR. PATERNITI:  This, Ms. Gaudet, is another

23   letter document, BT.

24        (On screen.)

25   Q.    Mr. Argyle, I'm showing you a document marked BT.

1   Do you have it in front of you?

2   A.    Yes, I do.

3   Q.    Okay.  If you would just take a look at it

4   yourself and don't respond and just let me know when

5   you're done?

6   A.    (Reads.)  Yes.

7   Q.    And this is an e-mail from Erin Murphy, correct?

8   A.    Yes.

9   Q.    Again, she's your direct report at the time based

10  in London?

11  A.    That's correct.

12  Q.    And was she involved with the -- with the GEPM

13  management issue pertaining to Ms. Chan because Greg

14  Mattiko was also in London?

15  A.    Greg Mattiko and Philip Fan were in London so Erin

16  Murphy worked closely with them.

17  Q.    So she's the GEPM manager in London managing Greg

18  Mattiko and Philip Fan, Ms. Chan's team members?

19  A.    If I remember correctly, yes.

20  Q.    And, um, did this e-mail contribute to the picture

21  forming in your mind of Ms. Chan?

22  A.    Um, yes, this e-mail would have been at the time

23  another tile in the mosaic of -- you know that would

24  build up the picture in my mind, yes.

25        MR. PATERNITI:  Your Honor, I would ask that this

```
 1   be admitted.

 2        MR. HANNON:  I do object to this one on hearsay

 3   grounds, your Honor.

 4        (Pause.)

 5        THE COURT:  Sustained on that ground.

 6        MR. PATERNITI:  Exhibit 131.

 7        (On screen.)

 8   Q.   This is an e-mail I believe that you were shown a

 9   couple of days ago, it's an mail from Mr. Mattiko to you

10   dated November 27th, 2015, do you see that?

11   A.   Yes, I do.

12   Q.   Okay.  And the subject is "Gigi Thoughts"?

13   A.   Yes.

14   Q.   And --

15        MR. PATERNITI:  And if we could, and bear with me

16   here, I want to be efficient with this one.

17        (On screen.)

18   Q.   The fifth paragraph down, "I must admit."  And

19   Mr. Mattiko is Ms. Chan's Team Leader, correct?

20   A.   That's correct.

21   Q.   "I must admit that I am frustrated by a lack of

22   can-do attitude, she still seems to want to blame her

23   perceived misfortunes on the firm and does not seem to

24   have much in the way of patience.  She gets set-off by

25   what I would think are the smallest things.  For
```

1   example, this week's drama centered around her learning

2   that June Oh is launching a China Contrarian Fund."

3        Did I read that accurately?

4   A.    You read that accurately.

5   Q.    And do you have any recollection of what this

6   China Contrarian Fund was?

7   A.    No, I have a recollection that it wasn't a "fund"

8   in how we define a "fund" in the context here, so this

9   was actually an approach, it was, um -- it was a -- he

10  already managed an Asia Contrarian Fund and he was

11  taking a sleeve of that, essentially of, um -- that held

12  the Chinese securities in that.  And so it wasn't

13  anything new.  And we were just going to start measuring

14  that sleeve, which after appropriate due diligence

15  internally, um, I thought to represent a China

16  Contrarian Fund.  It could be set up in a day.

17  Q.    Okay.  Now before I go further with the e-mail, do

18  you or did you at the time have any, um, reason to think

19  that the launching of the China Contrarian Approach

20  would be of concern to Ms. Chan?

21  A.    Um, both yes and no.  So, um, on the "yes" side,

22  any time you -- you know many times a Portfolio Manager

23  heard about a portfolio -- everywhere, all around the

24  world, heard about another portfolio, that we'd be close

25  to that approach, you know what is, um, what is GRG

going to focus on whenever they focus on it?  But that's
our client-facing side.  I actually didn't view that was
a client for himself, but we're all human.

     But actually I thought this was a really good
thing because if you -- if you think about actually what
our China platform would have been then, we have Bo
Meunier running China Opportunities, which was
essentially a core-China product, and that was just -- I
know it's very technical to us, and then Ms. Chan's
Approach was China Growth, on the other side, that
invested in growth companies in China, and Mr. Oh's
Approach that's referenced here is China Contrarian,
which would actually have been on the opposite side of
China opportunities to, um, to Ms. Chan's China Growth
Approach.

     And so what this effectively would allow us
eventually, one day would allow our client-facing
professionals to do with our clients would be to say,
"Hey, here's our China platform, what are you looking
for, are you looking for a Growth Approach, a Core
Approach, or a contrarian approach?" and actually engage
in that level of conversations with our clients.
So actually I thought this was additive to our broader
China platform and would actually benefit, um, Ms. Chan,
Ms. Meunier, and Mr. Oh.

```
1   Q.    Okay.  So let's go to the next sentence, it says,
2   "She somehow sees this as a terrible outcome because she
3   feels that there's a high risk that Wellington will
4   determine that we have too many China products being
5   launched in a short window and that hers will be
6   sidelined/delayed."
7        Did I read that accurately?
8   A.    Yes.
9   Q.    Okay.  "Perhaps more disturbing is she also
10  believes that June Oh is launching this strategy in some
11  way to spite or block Gigi in particular.  I pushed back
12  on this asking if she genuinely thinks that June has
13  nothing better to do than to plot against Gigi, and she
14  still seemed convinced that it is a distinct
15  possibility."
16       Did I read that accurately?
17  A.    Um, yes.
18  Q.    "I have a hard time deciding if this is just the
19  irrationality of raw emotion rearing its head or the
20  basis of a dangerous mindset.  I'm sure she feels that
21  she has told me this in confidence so I wouldn't expect
22  you to do anything with this information, I simply feel
23  it is a relevant piece to the puzzle."
24       Did I read that accurately?
25  A.    Yes, you did.
```

1    Q.    Okay.  So, Mr. Argyle, was this input from

2    Mr. Mattiko a relevant piece to the puzzle forming in

3    your mind about Ms. Chan?

4    A.    Um, yes, every piece is relevant and this piece is

5    undoubtedly relevant.

6    Q.    Did you find disturbing this notion that Ms. Chan

7    genuinely thought that Mr. Oh was launching China

8    Contrarian simply to block her?

9    A.    Um, I can't recollect whether I found it

10   disturbing, but I found it unrealistic.

11   Q.    Why unrealistic?

12   A.    I don't agree with -- you know June Oh has -- you

13   know he wouldn't be able to block it basically, I mean

14   that would -- I was -- I was the decision-maker here so

15   I mean it wasn't -- this was no one or the other.  This

16   was an approach, um, that was very easy to -- June Oh's

17   China Contrarian was an approach that was very easy to

18   set up operationally and the other one was a fund.  You

19   know they're really different.  There was no way of one

20   blocking the other.

21   Q.    Let's jump down to the second-to-last paragraph,

22   "Although I tell her."  And this is again Mr. Mattiko

23   writing to you in November of 2015.

24          "Although I tell her I am her Number 1 fan, I will

25   admit to you that my enthusiasm is beginning to wane.  I

1    know it has been difficult for her, but the lack of

2    humility, tenacity, optimism, and thankfulness, is

3    beginning to take its toll on me.  I am still convinced

4    that she is an excellent investor and I think she will

5    resonate with the clients.  The hard part for us is

6    figuring out if her attitude is something that will

7    shift in time as things settle down or a permanent

8    feature we will be stuck dealing with for as long as

9    she's here."

10       Did you ultimately conclude whether her attitude

11   was something that would shift in time as things settle

12   down or whether it was a permanent feature that

13   Wellington was stuck dealing with for as long as she was

14   there?

15       THE COURT:  Well in that form how can he answer it

16   because that's a choice or two opposite views?  Did he

17   ultimately conclude the two opposite views?  I think

18   what you're asking is did you come to one of those two

19   views or some other view?

20       MR. PATERNITI:  Thank you, your Honor.

21   A.    I concluded that her attitude was a permanent

22   feature that we would be stuck dealing with for as long

23   as she's here.

24   Q.    Okay.  Now, Mr. Argyle, let's go to Exhibit 132,

25   which I believe is your response to that e-mail from

1   Mr. Mattiko.  Do you see up top it's November 30th, you

2   writing to Mr. Argyle?

3   A.    To Mr. Mattiko.

4   Q.    Yes, sorry.  Thank you for the correction.

5         So you say on the second line down, "I'm meeting

6   with Gigi tomorrow so your e-mail is definitely timely."

7   And it does say "You had a long chat with Kenny."  And I

8   assume that means Kenny Abrams?

9   A.    Yes.

10  Q.    But you can't recall now the feedback Kenny might

11  have given you?

12  A.    I can't recall, um, I can't recall the

13  conversation.  But I clearly had it.

14  Q.    Okay.  So you then lay out a bunch of bullet

15  points for a conversation that you intend to have with

16  Ms. Chan the next day.

17        Do you see that?

18  A.    Yes.

19  Q.    Okay.  And if you would -- and maybe we can do

20  this more quickly if you would read that to yourself and

21  then I will ask you a few questions.

22  A.    (Reads.)  Thank you.

23  Q.    Okay.  And you say "You think your conversation

24  with her will be along the following lines" -- well,

25  sorry, let me back up.

1          The conversation you had with her the next day,
2    did you make these points that are laid out in the
3    bullet points in this e-mail?
4    A.    Um, I believe so.
5    Q.    And, um, let me take you to the second bullet
6    point.
7          "Wellington may not be for everybody.  If we are
8    not in alignment, then we owe it to ourselves to be
9    honest with ourselves and one another.  But you have a
10   competitive compensation package, a coveted role in a
11   highly-regarded portfolio management team, and the
12   backing of this firm to launch a new investment
13   approach.  These are all decisions I personally will be
14   evaluated on."
15         What did you mean by that, why would you be
16   personally evaluated on these decisions?
17   A.    Because my job is, I think I used the phrase
18   yesterday, "managing a portfolio of talent," and the
19   outcomes with respect to that talent, um, were owned by
20   me.
21   Q.    Okay.
22   A.    So I was -- that was my job, my job is managing
23   talent.
24   Q.    So when you say "So I have skin in the game here,"
25   is that what you meant?

1    A.    Well what I specifically meant by "I have skin in

2    the game here," is "I'm backing you, I'm wanting you to

3    be successful, and I'm going to do everything I possibly

4    can to help you be successful," including launching

5    China Growth.

6    Q.    Okay.  So I'll skip the next line because that's

7    what it says in the e-mail.

8          The next bullet point talks about "Wellington

9    being a firm where giving and receiving feedback is part

10   of the package."  And the last sentence in that line

11   says "Are you willing to embrace this?"

12         Why did you feel you needed to raise that and ask

13   that of her in this meeting?

14   A.    Um, because it's -- at this point and probably

15   with knowledge of the feedback from the philosophy and

16   process panel -- and I say I wasn't there but, um, I

17   heard the feedback with respect to Ms. Chan's growth

18   mindset or lack thereof, um, that I felt that this was a

19   critical question.  It felt as if she wasn't willing to

20   embrace this.

21   Q.    Okay.  The next bullet point says, "For example,

22   there's a tone from you that comes across as 'I have

23   demonstrated that I have investing all figured out, why

24   does no one appreciate this?'  This all-figured out

25   approach is completely counterproductive here.  I

1    presume this is not what you intend, but it comes across

2    as lacking a key criteria for long term success in this

3    business, humility."

4         Did I read that accurately?

5    A.    Yes.

6    Q.    Okay.  The last bullet point says, "We're

7    launching China Growth, but based on previous

8    conversations with you I still struggle with whether you

9    truly have the patience for how an institutional

10   approach typically evolves."

11        What is -- what did you mean by "how an

12   institutional approach typically evolves"?

13   A.    I meant that there is very little growth in

14   assets, there's very little client interest in the first

15   two to three years, and that it could be three to five

16   years before client interest, you know, really picks up,

17   if then.

18   Q.    In the next line you say, "I don't want complaints

19   in 6 to 12 months, even 24."

20        What did you mean by "I don't want complaints in 6

21   to 12 or 24 months"?

22   A.    There were no assets and no traction with our

23   clients.

24   Q.    With the China Growth Fund?

25   A.    With respect to the China Growth Fund.

1   Q.    And then you said "The focus should be on Alpha in

2   China Growth and EMO."  Could you explain to the jury

3   what "Alpha" means?

4   A.    Yeah, "Alpha" is, um, it's another word for

5   investment performance, it's actually the difference

6   between the -- yesterday I actually tried to explain

7   what an index fund was, um, and what we do is active

8   management, we think we can add value, we believe we can

9   add value, um, over an index fund through picking

10  stocks.  An "Alpha" is the measurement of that value

11  that's used in the industry.  So that's an industry term

12  to measure the value that we add or any other Asset

13  Manager adds over the broader, um, stock market.

14  Q.    And then you continue in this, um, bullet point

15  saying "We are a firm that is way more focused on your

16  long-term success rather than any short-term vagaries

17  the market or business might throw up, which most

18  investors here find reassuring and differentiated."

19        Did I read that accurately?

20  A.    Yes.

21  Q.    And the last bullet point says "If this is not

22  good enough, I understand, but if this is the case,

23  let's not waste anyone's time."

24        What did you mean by that?

25  A.    I mean this is Wellington, if this is not the

1    environment you want to be a part of, um, you know let's

2    recognize that and, um --

3    Q.    Okay.

4          MR. PATERNITI:  And can we take that blowup down,

5    Josh.  Thanks.  Terrific.  Thank you.

6          (Off screen.)

7    Q.    With regard to, um -- I'm sorry.  So those bullet

8    points were made in the meeting you had with her in

9    early December of 2015.

10         You testified earlier where that meeting was, but

11   I don't remember what you said?

12   A.    With respect to where it was?

13   Q.    Yes, where it was.

14   A.    It was in Boston.

15   Q.    Okay, Ms. Chan was visiting from Hong Kong?

16   A.    Yeah, Ms. Chan was visiting from Hong Kong.

17   Q.    Okay.  And in that meeting do you recall how she

18   responded?

19   A.    Um, she, um -- she was agitated in the meeting, um

20   -- I can't remember whether she was agitated through the

21   whole meeting, but she was certainly agitated with

22   respect to client access, client growth, and she

23   demanded that she be given the same access to clients

24   and -- well to our GRG group and to clients as

25   Ms. Meunier.

1    Q.    As Bo Meunier?

2    A.    As Bo Meunier.

3    Q.    The China PM in Hong Kong?

4    A.    The China PM in Hong Kong.

5    Q.    Okay.  And you said "access to GRG," and I'm not

6    sure at this point whether we've adequately explained to

7    the jury what that is.  It stands for "Global Relations

8    Group," correct?

9    A.    "Global Relationship Group," it's our client-

10   facing and business development.  It's about clients and

11   prospects.

12   Q.    Basically the sales and client services?

13   A.    Um, relationship management and sales.

14   Q.    Okay.  Do you decide who gets access to this sales

15   and client services group?

16   A.    Um, I -- I can tell with client service -- I would

17   have regular updates, um, with -- certainly with the

18   leadership team of the relationship management group

19   about -- well I can answer any of their questions and

20   what new products were being launched, um, at a high

21   level, but, um, I wouldn't -- I wouldn't tell them what

22   to look at and what not to look at.

23   Q.    With regard to her demand, um, did you have any

24   concern that she was demanding the same marketing

25   support and client access as the China PM you put in

1    place as your centerpiece of the China platform?

2    A.    Um, so there was relative concern and absolute

3    concern.  Um, so, yes, both relative to her saying "Well

4    I want the same as that other employee over there,"

5    which on a relative basis didn't make sense given where

6    the two were in their time at Wellington, and then there

7    was the absolute concern which is that this product

8    really isn't going to, um, generate much traction with

9    clients, um, for two or three years and Bo Meunier has

10   been managing China Opportunities for, um, 2015, yes, 7

11   years or something at this point.

12   Q.    Okay.

13   A.    So, um, she wasn't hearing me.  She wasn't --

14   Q.    Who wasn't hearing you?

15   A.    Ms. Chan wasn't hearing me.

16         MR. PATERNITI:  Exhibit 138, please.

17         (On screen.)

18   Q.    This is an e-mail from Mr. Baxter to Ms. Chan and

19   it says "Follow-up from YE discussion."  What's "YE"?

20   A.    "Year-end."

21   Q.    Okay.  Typically at Wellington, um, would there be

22   a year-end discussion with investment talent?

23   A.    Um, yes, my Associate Directors.

24   Q.    So your direct reports would generally meet with

25   investment talent and summarize the year, is that what

1    you're saying?  Their performance is --

2    A.    That was a formal part of our year-end -- of our

3    management process --

4    Q.    Okay.

5    A.    -- to have a year-end review.  So that meeting --

6    my meeting with Ms. Chan was not the year-end review,

7    this is a write-up of the year-end review.

8    Q.    I understand.  So this is the year-end -- a

9    summary of the year-end meeting that Mr. Baxter had with

10   Ms. Chan, is that what you're saying?

11   A.    Yes.

12   Q.    And this is December 8th of 2015.

13         MR. PATERNITI:  And if we could just go down to

14   the second paragraph.

15         (On screen.)

16   Q.    Mr. Baxter says "The main message is that you have

17   a lot of support here, I have lots of company in wanting

18   to help you succeed here."  And he goes on and provides

19   some compliments about her investing, he says "Here are

20   a few things other investors are saying," they're "very

21   pleased she has joined the firm," "Adds depth in China,"

22   "Enthusiastic, brings new perspective, deep knowledge,

23   and experience in China," et cetera.

24         And then if we can scroll down a little bit to "On

25   collaboration," and we're halfway down that paragraph.

1  "On collaboration there's room for improvement.  One

2  theme I heard a few times was regarding responsiveness,

3  'Wish she could be more approachable via e-mails' was

4  one quote, and I heard directly from a few other folks

5  with similar comments.  'Not always easy when

6  traveling,' of course, but even dashing off a simple

7  e-mail reply like 'Sorry I'm on the road this week, let

8  me collect my thoughts and get back to you,' or

9  something like that, would go a long way towards

10  changing this perception that some investors have."

11       Did I read that accurately?

12  A.    Yes.

13  Q.    Okay.  The second paragraph I want to focus a

14  little more on.  "The other area of constructive

15  feedback for you relates to communication.  I do need to

16  stress that this feedback is nearly universal and

17  strikingly consistent.  When Gigi shares her ideas her

18  thoughts can sometimes seem disorganized and I wonder if

19  she can try to work on tightening up her communication a

20  bit.  People have approached me on this topic often in

21  multiple contexts, EMM client-facing interactions,

22  one-on-one idea-sharing discussions, et cetera."

23       Now let me just stop there.  What's "EMM"?

24  A.    "EMM" stood for the daily meeting, um, it now

25  stands for "Eurasian-Wide Meeting."  It used to stand

1    for "Early Morning Meeting."  Um, I can't remember when

2    the acronym changed.  And, um, all our investment

3    professionals across Asia and London would meet by

4    pretty cool video technology, um, and discuss investment

5    ideas for half an hour everyday, um, if they were

6    available.

7    Q.    Okay.  And the, um -- the next line talks about

8    Ms. Chan's interview and passion being a strength and

9    then it says "But you often get your own way when

10   communicating verbally in a way that requires the

11   audience to work very hard to hear the content.  I know

12   we had organized a couple sessions with Scott Clark to

13   address some of these tendencies."

14         Do you know who Scott Clark was?

15   A.    Um, I believe that Scott Clark -- I know Scott

16   Clark -- because we've used him for a long time, is a

17   presentation training coach.

18   Q.    Is he a Wellington employee?

19   A.    Um, no.

20   Q.    So it's a third-party professional?

21   A.    Um, I don't know whether -- we've used him a long

22   time.  He worked for a company called Rogen.  I don't

23   know if he changed companies, but I think I have him

24   working for Rogen.

25   Q.    And then if we skip a sentence it says, "We can

1    certainly organize more training sessions in 2016,

2    however the coaching is only going to be effective if

3    you open yourself up to the feedback and embrace the

4    opportunity to improve yourself in this area.  At times

5    you have come across as resistant or closed off to

6    feedback.  Wellington is a feedback-intensive

7    environment.  Not all the feedback you will hear will be

8    on point, some of it won't resonate, and it is always in

9    the hands of the feedback recipient to do what they will

10   with it.  But we have found that investors who open

11   themselves up to feedback, hear people out, and actively

12   embrace the opportunity to learn from others's

13   observations of them are the ones who thrive here.  We

14   all have areas of strength and weakness and everyone of

15   us can get better."

16          Did I read that all accurately?

17   A.    Um, yes, you did.

18   Q.    What was your understanding of the message that

19   GEPM management was trying to give Ms. Chan, um, with

20   regard to feedback?

21   A.    Um, that feedback's a gift, feedback is -- you

22   know even if you don't like what you're hearing,

23   feedback is -- you know you don't have to agree with it,

24   but listen to it.  Self-development is important,

25   development as a professional is important.  We are in a

1    very -- we are in an industry that's evolving fast.  The

2    observation of peers, of professionals, whether they

3    have more experience than you or less experience than

4    you, all those observations are important pieces of the

5    puzzle, so take it in.  Do with it what you will, but at

6    least take them in.

7    Q.    Okay.

8         MR. PATERNITI:  You can drop down that blow-up if

9    you would.  Thank you so much.

10        I'm sorry, was that Document 131?  (On screen.)

11   I'm sorry, 138.  Thank you.

12   Q.    Okay.  Um --

13        MR. PATERNITI:  Your Honor, I'm about to switch

14   into a different topic and we're very close to that

15   mid-morning break.

16        THE COURT:  All right, we'll take the break at

17   this time.

18        Ladies and gentlemen, you have not heard all the

19   evidence, please therefore keep your minds suspended, do

20   not discuss the case either among yourselves nor with

21   anyone else.  We'll stand in recess for one half hour,

22   I'll remain on the bench.  The jury may recess.

23        THE CLERK:  All rise for the jury.

24        (Jury leaves, 10:40 a.m.)

25        THE COURT:  Please be seated.  You may step down.

1        I would like to see one lawyer from each side back

2   in the lobby.  I say only one because the lobby is small

3   and we're going to have to wear masks.  But I -- I won't

4   take much of your break, but I would like to meet with

5   one lawyer from each side.  We'll recess.

6        THE CLERK:  All rise.

7        (Recess, 10:45 a.m.)

8        (Resumed, jury enters, 11:15 a.m.)

9        THE COURT:  And, Mr. Paterniti, you may continue.

10        MR. PATERNITI:  Thank you, your Honor.

11   Q.   Mr. Argyle, I want to direct your attention to,

12   um, the China Growth Fund, I have some questions about

13   that.

14        Do you recall when the China Growth Fund

15   officially launched?

16   A.   Um, I believe it launched in the summer of 2016,

17   June or July, something like that.

18   Q.   And in this context "launch" means that the fund

19   can actually start trading using the seed money that

20   Wellington put into it?

21   A.   Um, that's right.  That, um, Ms. Chan could

22   actually begin buying and selling securities, investing

23   in securities using the seed capital that Wellington put

24   into it.

25   Q.   Okay.  Now this is a bit over two years after she

1    was hired as a Team Analyst by Wellington.  Was this

2    time frame, from hire date as a Team Analyst to fund

3    launch, unusual for team members?

4    A.    I would say it was, um, it was quick.

5    Q.    Did you have any role in the timetable for the

6    fund launch?

7    A.    Um, once the support was -- once my support was

8    behind me and once it was going through the committee

9    process, I couldn't control how fast it went from that.

10   Q.    Okay, so earlier you testified that the fund

11   wouldn't be launched without your support.  So what does

12   that mean, your support to get it through the

13   committees?

14   A.    Um, yeah, and a number of those committees -- well

15   there were three committees, um, would have required,

16   um, either written approval or my approval in the room,

17   um, saying "I support this."

18   Q.    Okay.  And so who was it that made the decision to

19   put it to the committees at that time?

20   A.    Um, well using "at that time" in a general sense,

21   it was my decision to say "You know let's get this thing

22   done."

23   Q.    Okay.  Ms. Chan has -- we've heard in her words

24   and we've seen in e-mails that she wanted "client

25   access."  What did you understand that to mean?

1   A.    I understood it to mean that she wanted the

2   ability to talk to clients about the approach, the China

3   Growth Approach, with the aim of hopefully getting them

4   interested in investing in it.

5   Q.    Okay, and I just want to try to be precise here,

6   you said "China Growth Approach" and "China Growth

7   Fund," was it a fund or an approach?

8   A.    Um -- it was a fund.

9   Q.    Okay.  Do you know when she wanted client access?

10  A.    She wanted client access, I believe, even before

11  the fund had launched.

12  Q.    Okay.  Was that a reasonable expectation in your

13  mind?

14  A.    No.

15  Q.    Why not?

16  A.    Because, um, clients and their consultants usually

17  are interested in -- it usually takes two to three years

18  to -- for clients and their consultants to be interested

19  in an institutional investment approach, and even with

20  the usually, generally, typically, um, for a client to

21  be interested prelaunch, even if there was an occasional

22  client who would go less than those two or three years,

23  a prelaunch would be, um, very uncommon.

24  Q.    A couple of questions for you related to this

25  Global Relationship Group, and I know we're just

1   building on these acronyms, but I'm going to use "GRG,"

2   okay?

3   A.     Yup.

4   Q.     So the "GRG" is the sales and client services

5   group at Wellington?

6   A.     Sure.

7          MR. PATERNITI:  Thank you.  (Laughs.)

8   Q.     What role does GRG play in determining when

9   Wellington investors were ready to go and have this

10  client access?

11  A.     Well GRG controls the client access, or actually

12  the clients control the client access, but GRG controls,

13  um, the conversations with the client, "Hey, would you

14  like to, um, talk about X, Y, or Z."  So, um, that's --

15  I don't know, I could go on and on and on, as everyone

16  has realized.

17  Q.     Well let me ask you this.  Did you have any

18  authority or role in determining when or if an investor

19  was ready for client access?

20  A.     Um, I did not have.

21  Q.     Okay.  Did you know why Ms. Chan presented to GRG

22  in May or June of 2016?

23  A.     Um, I -- I'm not sure if I knew then.  I could

24  presume but --

25  Q.     Well I don't want you to presume.  Did you learn

1  that she had presented to GRG?

2  A.    Um, I did learn that she presented to GRG.

3  Q.    Okay.  And at the time that you -- how many times,

4  do you know, in this May, June, 2016 timeframe?

5  A.    Well I learned after the first time that she had

6  presented and then I -- but in total she presented

7  twice.

8  Q.    Okay.

9  A.    I think at least twice.  Twice that I'm aware of.

10  Q.    Okay.  And after the first meeting -- strike that.

11  Do you know what type of a meeting, what was it, a

12  presentation to GRG?

13  A.    Um, I'm not entirely sure.  It was just a form of

14  a presentation, um, to GRG -- to some of GRG.

15  Q.    And did you become aware of the feedback from GRG

16  after the first meeting?

17  A.    I think the feedback -- I'm aware that the

18  feedback was, um -- there was feedback, but it could

19  have gone better.

20  Q.    Okay.  And did you learn whether or not GRG had

21  made an assessment, after that first meeting, as to

22  whether or not she was ready to go in front of clients?

23  A.    Um, I'm not sure if, after that first meeting, I'm

24  aware of any absolute assessment, but I know they had

25  concerns.

1    Q.    Do you recall any other concerns GRG might have

2    had about Ms. Chan at that point?

3    A.    Um --

4          MR. HANNON:  Objection, your Honor, hearsay.

5          THE COURT:  No -- well if you're going to object

6    on that basis, I'll sustain it.

7    Q.    Did you learn of anything else, um, that, um,

8    GRG -- strike that.

9          Did you learn of any other concerns that GRG had

10   pertaining to Ms. Chan, in the spring 2016, that in any

11   way informed your opinion of Ms. Chan?

12         MR. HANNON:  The same objection.

13         THE COURT:  Sustained on those grounds.

14         MR. PATERNITI:  On hearsay grounds, your Honor?

15         THE COURT:  Yes.

16   Q.    Did you have, um, any concerns about Ms. Chan's

17   commitment to staying at Wellington at that point?

18   A.    Um, yes, I did.

19   Q.    What were your concerns?

20   A.    Um, well I had -- no different than it had been

21   for a while now, which is that she was getting a lot of

22   phone calls from, um, either -- I don't know as I would

23   specify directly from firms in Hong Kong or from

24   whatever recruitment agencies they might have used.  But

25   at some point she might take one of those phone calls,

1   so-to-speak.

2   Q.    The second GRG meeting, um, did you attend that?

3   A.    Um, yes, I did.

4   Q.    And that was Ms. Chan again presenting to GRG?

5   A.    Um, yes, a subset of GRG.  Yes.

6   Q.    Yeah, obviously.  GRG is probably hundreds of

7   employees, right?

8   A.    Hundreds of employees, yes.

9   Q.    And so this second meeting that you attended, why

10  did you attend this meeting where she presented to GRG?

11  A.    Um, I attended to, um, observe because I heard the

12  first meeting had, um -- had, um, not gone too well.

13  Q.    Okay.  And do you recall your observations from

14  that meeting?  Well strike that.  Strike that.

15        Did you learn whether Ms. Chan had some sort of a

16  marketing trip she had hoped to go on in this timeframe,

17  June of 2016?

18  A.    I'm aware that Ms. Chan hoped to go on a marketing

19  trip in June of 2016.

20  Q.    Did she tell you that?

21  A.    Um, I can't recall how I found out.

22  Q.    And do you know whether GRG made any decisions as

23  to whether to green-light that marketing trip?

24  A.    Um, that marketing trip never happened, so that

25  would have been a GRG decision.  So, um -- I don't know

```
 1   who made that decision, but it wasn't me.
 2        MR. PATERNITI:  Ms. Gaudet, I have Exhibit CS just
 3   for the witness.  Thank you.
 4        (On witness screen.)
 5   Q.    Mr. Argyle, I'm showing you what's been marked
 6   Exhibit CS, I don't want you to read from it to the jury
 7   or say anything about it yet, but, um, do you see that
 8   document, it's an e-mail from June 10th of 2016,
 9   correct?
10   A.    Yes, it is.
11   Q.    And who is Elizabeth Hogbin?
12   A.    Um, Elizabeth Hogbin was, um -- this role has
13   changed titles over the years, but I believe at this
14   time it was called "Investment Director" in what we
15   called, I think, "Product Management" at this time,
16   which was a group that sat between, um, our GRG group,
17   our client-facing group, and our investment
18   professionals, um, who played various roles, but
19   importantly one of them was to, um, help our investment
20   professionals interface with GRG and provide materials.
21   I mean they were investment professionals in their own
22   light, but their expertise was in -- I always thought
23   of -- sorry.  GRG is one big cog at Wellington,
24   investment professionals are another big cog at
25   Wellington, and Elizabeth Hogbin was in this Product
```

 1    Management Group, which I always described as the "oil"

 2    between those two cogs.

 3    Q.    So she was working with Ms. Chan on the China

 4    Growth Fund?

 5    A.    Um, yes.

 6    Q.    And again, having read this e-mail from

 7    Ms. Hogbin, did this contribute in any way to the

 8    picture forming in your mind of Ms. Chan?

 9    A.    Um, let me just read it quickly.

10    Q.    Yes, read the whole thing.  Take your time.

11    A.    (Reads.)  Um, yes, it did.

12    Q.    Okay.

13         MR. PATERNITI:  Your Honor, I would offer this as

14    Exhibit 410, I believe.

15         MR. HANNON:  No objection, your Honor.

16         THE COURT:  It may be admitted G -- say again the

17    letters?

18         MR. PATERNITI:  CS.

19         THE COURT:  CS is admitted in evidence, Exhibit

20    410.

21         (Exhibit 410, marked.)

22         MR. PATERNITI:  Okay, terrific.

23    Q.    So, Mr. Argyle, let's take a look at this e-mail

24    now and I'll ask you some questions about it.

25         So Ms. Hogbin was writing to you and Mr. Baxter,

1    um, and saying -- on the top, I'm sorry, on the top, um

2    -- you know what?  Back out of there.  Let me start over

3    again.  Let's start with the first e-mail.

4         June 8th, 2016, 11:44 a.m., Ms. Hogbin to you and

5    Tom Baxter, Subject, "Update on Gigi."  "Both just

6    wanted to let you know that I am planning to speak with

7    Gigi tomorrow and let her know that we have been unable

8    to schedule any marketing meetings in the U.S. or

9    London/EMEA in June for China Growth."

10        When it says "London/EMEA," what does that mean,

11   Mr. Argyle?

12   A.    Um, "EMEA" stands for "Europe," "Middle East," and

13   "Africa," and so it's -- we think of that time zone

14   basically, or it's obviously a few time zones.  But, um,

15   that region.

16   Q.    Okay.  And, Ms. Hogbin, um, I think you just

17   explained with your "cogs in the oil."  She didn't work

18   for GEPM, right?

19   A.    No.

20   Q.    She didn't work for you?

21   A.    No.

22   Q.    You didn't manage her?

23   A.    No.

24   Q.    You didn't have any authority over her?

25   A.    No.

1   Q.    So her next sentence is "I expect she will be

2   upset/surprised.  I plan to convey that the reason for

3   not being able to get marketing meetings is twofold.

4   One, limited demand for China strategies from our client

5   base at this point in time given the negative headlines,

6   et cetera, and, two, GRG perception that her

7   presentation skills need some polishing before they are

8   comfortable taking her on the road."

9        So let's break that down.  Number 1, "Limited

10   demand for China strategies from our client base at this

11   point in time."  What does that mean in simple English?

12   A.    Um, in an earlier e-mail -- and I'm not sure if I

13   can say that, but there was a reference to "vagaries of

14   the business cycles."  Our clients have, um, limited

15   resources, as I explained earlier, and they were looking

16   at a variety of things.  If they were looking at

17   allocating capital to, um, a private equity fund or a

18   venture capital fund or a hedge fund or a real estate,

19   um, you might -- talking to Wellington about an

20   investment approach with folks in China just may not

21   have been a priority for them at that time.  And, um, we

22   weren't going to barge in there, we were going to say,

23   "Yeah, totally understand," and we know that, if you

24   listen carefully and say "Yes, we have a good real

25   estate fund."  But, um, that's the nature.

1          Ours was a relationship business, we were tied to

2    our clients.  It wasn't a transaction business.  We

3    weren't just trying to get the transaction done, we were

4    trying to build relationships with our clients over time

5    about what they were interested in at any given point in

6    time.

7    Q.    And at the end of that line it says "given the

8    negative headlines."  I'm going to ask you if you have

9    any knowledge or recollection of what negative headlines

10   there might have been about China back then?

11   A.    I -- I cannot remember what the negative headlines

12   were about China at that time.

13   Q.    Okay.  Number 2, "GRG perception that her

14   presentation skills need some polishing before they are

15   comfortable taking her on the road."  Was that conveyed

16   to you by anyone in GRG?

17   A.    Um, it was totally conveyed to me, it was conveyed

18   to me here.  I -- I would have thought it was conveyed

19   to me by someone in GRG, but I can't -- I can't recall

20   it.

21   Q.    Okay.  Um, if we go down to the next paragraph,

22   indeed there is a -- at the parenthetical it says

23   "Charles:  In case you have not heard, Round 1 dry-run

24   went poorly from a presentation skills-inspiring

25   confidence in GRG perspective."

1          Did I read that accurately?

2   A.    Yes, you did.

3   Q.    And right above that it indicates that there was

4   going to be another Round 2 dry-run, do you see that?

5   A.    Yes.

6   Q.    Is that the one you think you went to?

7   A.    It is the one I think I went to.

8   Q.    Okay.

9          MR. PATERNITI:  I think I'm done with that

10  exhibit.

11         (Takes off screen.)

12         MR. PATERNITI:  Let's pull up Exhibit 192.

13         (On screen.)

14  Q.    Mr. Argyle, I'm showing you an e-mail from

15  Ms. Chan in the mid June of 2016, June 14th, Subject

16  "China Growth Fund."  Do you see that?

17  A.    Yes, I do.

18  Q.    Okay.  It says "Hi, Charles, during our last

19  meeting you told me to let you know if there was

20  anything I was unhappy with."  Did I read that

21  accurately?

22  A.    Um, yes, you did.

23  Q.    And when she's referring to "last meeting," do you

24  happen to know if that was the December 2015 meeting or

25  some other meeting since then?

1   A.    I believe that was the December 2015 meeting.

2   Q.    She goes on to say "I just wanted to share my

3   disappointment in the poor handling around the launch of

4   the China Growth fund.  (1) lack of professionalism and

5   disrespect.  To help the launch I had told Liz" --

6        And is that Liz Hogbin, do you think?

7   A.    Um, that would be Liz Hogbin.

8   Q.    "I told Liz very early on that I would be

9   available any time to come and market in U.S. and

10  Europe.  The result is that I had to insist to Liz to

11  only tell me 24 hours before my departure that there

12  would be no meeting in the U.S. and in Europe.  Whatever

13  the reasons -- and I am happy to go through them one by

14  one, I could have been told earlier than one day before

15  my departure from our Hong Kong office."

16        Did I read that accurately?

17  A.    Yes.

18  Q.    And again this decision not to go forward with the

19  marketing trip, what if any involvement did you have in

20  it?

21  A.    Zero involvement.

22  Q.    "(2) Waste of time and resources."  Um -- I don't

23  think we need to go through that.  But let's look at the

24  bottom paragraph, she writes you, "While I told you I

25  would not make Wellington responsible for not raising

```
 1    money, I certainly would make Wellington responsible for
 2    handling the process internally very poorly and not
 3    putting me in front of clients.  At this stage I still
 4    do not have confirmation of the launch date."
 5         Did I read that accurately?
 6    A.    Yes, you did.
 7    Q.    Do you remember what if anything you, um, thought,
 8    um, when you received this e-mail from Ms. Chan?
 9    A.    Um, I -- I don't remember -- I don't remember
10    precisely what I thought, but, um, I would have been
11    shocked by the tone.
12    Q.    And this picture that I keep asking you about
13    that's forming in your head, what does it look like now?
14    A.    Um --
15         MR. HANNON:  Objection.  Foundation.
16         THE COURT:  No, I think there's enough of a
17    reference point.
18         What was your view at that point in time?
19    A.    I think my view at that point in time is, um, I
20    thought of, you know, the constant refrain of "What can
21    Wellington do for Ms. Chan?" rather than "What can
22    Ms. Chan do for Wellington and ultimately our clients?"
23    Q.    At this point, um, what if any concerns did you
24    have about turning this around?
25    A.    Um, I'm becoming a little more concerned about
```

1    turning it around, but I'm an optimist.

2    Q.    Okay.  Mr. Argyle, had you heard anything from

3    Ms. Chan, from the time she was hired until this date,

4    referencing anything you recently believed could have

5    been a complaint by her, um, about mistreatment or

6    "disrespect," as she puts it, due to the fact that she's

7    Asian or a female?

8    A.    No, and, um, you know let's go back to the first

9    line of this e-mail, I had to ask Ms. Chan to let me

10   know if there was anything that she was unhappy with and

11   I don't recall ever receiving any e-mail similar to

12   this.

13   Q.    So --

14   A.    Um, based on these lines.

15   Q.    Sorry, I just talked right over you.  I apologize.

16         So you said you were an optimist at this point.

17   And let me ask you, um, given all of the feedback you're

18   getting, um, that you've testified about, did you

19   consider termination at this point?

20   A.    Um, I didn't consider termination at this point.

21   Q.    And on this date, June 14th, 2016, I think you

22   testified that the China Growth Fund was launching or

23   about to launch right in this timeframe, is that right?

24   A.    I -- I believe it launched in, I mean, in the

25   summer of 2016, um, June, July, I think that's what I

1    said, but it clearly hadn't launched as of this date

2    because Ms. Chan's expressing her concern on that, about

3    not knowing the launch date.

4    Q.    Mr. Argyle, um, what if any feedback were you

5    receiving from Mr. Mattiko about Ms. Chan's

6    contributions to the EMO team by this point?

7    A.    By this point, um, to sum it up, um, briefly, he

8    was -- he believed the quality of Ms. Chan's investment

9    or research into investment, um, ideas was good, was

10    sound, um, but the quantity was severely lacking.  So he

11    was, um, not happy with the breathe of her contribution,

12    how frequently she was contributing to him and the team.

13    But, um, said, you know, that in those rare occasions

14    when she did, the investment content was sound.

15    Q.    Did you and Mr. Mattiko discuss, um, how to --

16    what to do about Ms. Chan?

17    A.    Um, that's a -- I don't know what timeframe you're

18    referring to?

19    Q.    No, that's a really good point, I apologize for

20    such a broad question.

21    As part of your job, as the head of GEPM, did you

22    engage in discussions over time with Mr. Mattiko, the

23    Team Leader, about how to manage Ms. Chan?

24    A.    Oh, yes, I did.

25    Q.    Was it your understanding that Mr. Mattiko no

1  longer wanted her on his team as of June of 2016?

2  A.    Um, I mean I -- I cannot recall.

3  Q.    Do you know, um -- well strike that, I'll follow

4  up on that later.

5        Mr. Mattiko moved to the Hong Kong office in July

6  of 2016, isn't that right?

7  A.    Um, that summer, yes, in between school years for

8  his children.

9  Q.    And what if any conversations did you have with

10 him about that move in relationship to addressing

11 Ms. Chan's attitude or engagement with EMO?

12 A.    So, um, Mr. Mattiko and I were both supporters of

13 Ms. Chan, we wanted her to be successful at Wellington,

14 and Mr. Mattiko had -- was disappointed, um, with, um,

15 Ms. Chan's impact on the Emerging Market Opportunities,

16 with her impact in her job, and as I think has come up

17 Mr. Mattiko for a while was in London and Ms. Chan was

18 in Hong Kong, um, certainly when she joined and up until

19 this date, um, and there was, um, hope, maybe even

20 belief from Mr. Mattiko that made me think that once he

21 got to Hong Kong, um, and relocated to Hong Kong and

22 started working from the Hong Kong office essentially,

23 um, and sat as close as we are, um, very close, um, to

24 Ms. Chan on a daily basis, that that interaction, that

25 that flow of ideas, and the challenges that had been

1    facing the team with respect to the flow of ideas, um,

2    that that would rectify itself.

3    Q.    But other than Mr. Mattiko, did Mr. Philip Fan,

4    the other Team Analyst on EMO, did he provide you with

5    any feedback regarding Ms. Chan's contribution to EMO?

6    A.    Um, Mr. Fan provided me with very similar feedback

7    to Mr. Mattiko, obviously from his perspective, which

8    was that, um, Ms. Chan's investment insights were sound,

9    but far too infrequent.

10   Q.    And with regard to Mr. Fan, was this feedback in

11   one conversation or in multiple conversations?

12   A.    Um, I don't recall whether it was in multiple

13   conversations or multiple e-mails.  I don't recall.

14   Q.    Okay.  There's been mention earlier of Cheryl

15   Duckworth, the most senior Investment Manager in Asia at

16   the time.  I'd like to show you a few e-mails relating

17   to her.

18         MR. PATERNITI:  Exhibit 207.

19         (On screen.)

20   Q.    This is an e-mail dated August 26th, now of 2016,

21   to -- from Cheryl Duckworth, and to you, Mr. Baxter, and

22   Mr. Philip.

23         You had testified earlier that there was a

24   transition between Mr. Baxter and Mr. Philip Fan in

25   2016, is that right?

1   A.    Um, I can't recall if I testified to that, but

2   there was, um, at the end of 2016.

3   Q.    Mr. Philip was stepping into a role in your group

4   as one of your Associate Directors?

5   A.    He was actually filling in -- he was, um -- of

6   course everything is complicated.  Functionally he sat

7   in research because he could only functionally sit in

8   one department as an Associate Director, but he played

9   the Associate Director role across both research and

10  GEPM.

11  Q.    Okay, so for our purposes does that mean he was

12  going to be stepping into the role of managing Team

13  Analysts and Team Portfolio Managers?

14  A.    That's my recollection.

15  Q.    All right.  Let's take a look at this one.  This

16  one is from Cheryl Duckworth.

17        How long did you work with Cheryl Duckworth?

18  A.    At Wellington?

19  Q.    Uh-huh.

20  A.    Well I joined Wellington in 1997 and Cheryl was at

21  Wellington and I worked with Cheryl very closely.  She

22  succeeded me as head of our Singapore office.  And she

23  succeeded me in that role and I was a big part of

24  persuading her to move her family to Singapore, um,

25  closely.

```
 1    Q.     Did you find her to be honest and trustworthy?

 2    A.     Yes, I did.

 3    Q.     Okay.  So she wrote to you and Tom Baxter and

 4    Henry Philip on August 26th of 2016, "Just a bit of an

 5    update, nothing surprising, but I continue to think her

 6    time at Wellington is challenged due to her attitude."

 7           Did I read that accurately?

 8    A.     Um, yes, you did.

 9    Q.     Okay.  And she goes on to say, "I had asked her to

10    lunch, but she had declined, so we caught up for 30

11    minutes instead.  She never acknowledged she was

12    pregnant and she didn't offer, so that topic wasn't

13    discussed, which was a shame because I think I could

14    have been helpful, but I don't know her well and it's

15    not my place to intrude on personal issues."

16    Q.     Do you know if Ms. Duckworth has children?

17    A.     Oh, yes, she has two daughters.

18    Q.     "I kept the conversation to her new fund, her

19    coverage, working as Analyst and PM, etc.  It was an

20    unfortunate list of complaints, exasperation with

21    services, and nothing really that good.  She wasn't

22    unpleasant, but clearly feels underappreciated still."

23    Under that, "Number 1," "Her fund took forever to

24    launch, was promised it when she arrived, and now she

25    can't make all the decisions she wants."  And it goes
```

1    from there and just some technical stuff.

2          Let me ask you a question with regard to that

3    sentence.  "Her fund took forever to launch, was

4    promised it when she arrived."

5          Do you agree with that?

6    A.    Um, well there are two statements there, but I

7    don't agree with either of them.

8    Q.    Sorry, you're right.  (Laughs.)

9          The next paragraph, "2," if you would just read

10   it, it looks like it's talking about operational issues

11   with regard to what kind of stocks can be purchased, is

12   that right?

13   A.    I'm reading it.  (Reads.)  Yeah, it's a

14   conversation about, um -- it's very technical but, um --

15   Q.    You don't have to get into the technical stuff.

16   A.    There are Chinese securities listed in Hong Kong

17   and there are Chinese securities listed in mainland

18   China, and this is about the Chinese securities listed

19   in mainland China.

20   Q.    Okay.  And then we go on down towards the bottom,

21   it says "She didn't lay the complaints out like this and

22   the conversation was much longer, but I fear the big

23   chip on her shoulder is still there.  I'll continue to

24   touch base with her."

25          Did I read that accurately?

```
1    A.    Um, yes.

2    Q.    Okay.  Why would Cheryl Duckworth be touching base

3    with a GEPM investor?

4          MR. HANNON:  Objection.

5          THE COURT:  Well, um, sustained on that

6    foundation.

7    Q.    Um, what group was Cheryl Duckworth working in?

8    A.    Cheryl Duckworth was, um -- functionally she was

9    the Associate Director of Global Industry Research.

10   Q.    Did she have responsibility over any other

11   investors in Asia?

12   A.    Um, Cheryl Duckworth, as I mentioned, was Global

13   Industry Research, which is what we call "Central

14   Research," was the "sister organization," that's my

15   term, of GEPM.  So when I was the CEO -- when I was in

16   GEPM, in Asia, my job was to decide where we were going

17   with respect to our investment presence in Asia, um, and

18   including Global Industry Research, and when she took

19   over, even though she was in Global Industry Research,

20   her views, observations, perspectives, on the board of

21   the investment platform in Asia, were the most important

22   for the timeframe she was out there.

23   Q.    And is Cheryl Duckworth someone that you

24   collaborated with with regard to performing your job

25   managing investors in GEPM?
```

1   A.    Yes, by this point in time I was in Boston and,

2   um, I would talk to her regularly, every couple of

3   weeks, um, about her observations of investors in Asia,

4   the GEPM investors in Asia, or if she had any

5   observations of GEPM investors anywhere else in the

6   world.

7   Q.    Thank you.

8         MR. PATERNITI:   Let's go to Exhibit 209.

9         (On screen.)

10  Q.    Exhibit 209 is an e-mail on September 1st, 2016

11  from Mr. Mattiko to you, um, and, um, he indicated that,

12  um, in the first sentence -- actually it's not the first

13  sentence, the first paragraph, he references that "He

14  came in early this morning to do dozens of 360 reviews."

15        Do you see that?

16  A.    Yes, I do.

17  Q.    He says "Obviously I had to do one for Gigi,

18  wanted to give you a preview of what I wrote."  And then

19  he provides you what he wrote in the italics.  And I'm

20  just going to ask you to read that and I'm going to ask

21  a few brief questions about it.

22  A.    (Reads.)  Thank you.

23  Q.    Are you done?

24  A.    Sorry, I think you missed my earlier --

25  Q.    Oh, yes.  I'm sorry.

1          In the first line it says "Despite Gigi's leading

2     understanding of all things related to the China market,

3     she finds integrating into the Wellington culture

4     difficult.  I used to be of the opinion this had to do

5     with issues relating to the HK office, but now I am

6     convinced that it has more to do with the lens through

7     which Gigi views the firm and I believe the world in

8     general."

9          Did I read that accurately?

10    A.    Um, yes, you did.

11    Q.    And there's -- I apologize in his answer, some

12    random letters in there that I don't think were intended

13    to be in there, so I'm going to skip those As, Capital

14    As.

15          "Gigi, for some reason, believes that Wellington,

16    and the people who work here, do not want her to

17    succeed.  This attitude or pessimism prevents her from

18    integrating into the Wellington culture.  I fear that

19    unless she makes a 180-degree change and accepts the

20    firm for what it is, she will continue to be

21    dissatisfied.  This is really unfortunate because Gigi

22    herself is a very pleasant person and I enjoy working

23    with her.  I also am convinced that she will add value

24    for our clients, but if her view of Wellington does not

25    shift, I don't know how long she will either be willing

1   to say or will be tolerated by others."

2        Did I read that accurately?

3   A.    You read it accurately, yes.

4   Q.    Okay.  So I guess my first question is, with his

5   sentence where Mr. Mattiko says "I am convinced that it

6   has more to do with the lens through which Gigi views

7   the firm, and I believe the world in general," and then

8   he goes on to state "Gigi, for some reason, believes

9   that Wellington and the people who work here do not want

10  her to succeed."

11       Was that your personal opinion?

12  A.    Um, was that my personal opinion of what Gigi

13  thought or with what --

14  Q.    At the time, yes.

15  A.    Um, I'm not sure what my opinion was of Gigi at

16  the time, um, we're collecting feedback here.

17  Q.    Okay.  Well let me ask you this.  Did it concern

18  you that her Team Leader was providing this -- feedback

19  of this nature?

20  A.    Um, yes.

21       MR. PATERNITI:  Can we scroll down to the bullet

22  points.

23       (Scrolls.)

24  Q.    Mr. Mattiko, at the sentence at the top of this

25  blowup, says "I also wanted to give you a few updates of

1   Gigi-related conversations I have had."  The first

2   bullet point, "June Oh requested to speak with Tom and I

3   earlier this week, he was disturbed/annoyed at the way

4   Gigi treats him in the last several months, he wanted to

5   know from me if I knew what was behind this?  I said all

6   I know is the run-in she had with him over a year ago at

7   the now-famous philosophy and process meeting.  He

8   thinks her attitude towards him, for instance scowling,

9   ignoring, et cetera, is disruptive and unprofessional.

10  I agreed with him."

11       Did I read that all accurately?

12  A.    Yes, you did.

13  Q.    Okay.  And, um, you're familiar with June Oh,

14  correct?

15  A.    Yes.

16  Q.    Did you find him to be honest and trustworthy?

17  A.    I do find him -- I don't know when I spoke to him

18  but I do find him to be honest and trustworthy.  I did

19  then.

20  Q.    And the next bullet point says, "I had a chat with

21  Gigi to find out her plan during maternity leave and I

22  asked her how things have been going lately.  Perhaps I

23  am too optimistic or just plain naive" -- I don't know

24  what that word is, "naive" maybe.  "But I thought just

25  maybe, since she has her fund and some assets, that she

1    might flash a hint of optimism about the future.  I was

2    completely wrong, she still bangs on about how slow

3    Wellington moves, that she doesn't have access to

4    products yet, that GRG is ignoring her, that her efforts

5    are only benefiting Bo, et cetera, et cetera."

6         Did you know what Mr. Mattiko was referring to

7    when he said that Ms. Chan felt that her efforts were

8    only benefiting Bo?

9    A.    Um, I -- I don't think I did.

10   Q.    Did you take that as a reference to Bo Meunier?

11   A.    Yes.

12   Q.    Were there any other Bos in the Hong Kong office?

13   A.    No.

14   Q.    Were there any other Bos that you're aware of at

15   Wellington?

16   A.    No.

17   Q.    Um, and the last bullet point, "I had a catch-up

18   with Ray Helfer yesterday."

19        Now Ray Helfer was the head of the Hong Kong

20   office at the time, correct?

21   A.    Yeah, Ray Helfer was the head of the Hong Kong

22   office and the head of Asia GRG, Pan-Asia across the

23   region.

24   Q.    So you say he was the head of the Asia sales and

25   client services --

1    A.    Yes, he was.

2    Q.    -- and the head of the Hong Kong office?

3    A.    Yes, he was.

4    Q.    Okay.  "He too was asking about the Gigi

5    situation.  We discussed it at some length.  He was kind

6    enough to offer, as the head of the office, to have a

7    heart-to-heart about how she is being perceived and the

8    danger of continuing to go down the path that she is on.

9    He only suggested this because he was unsure if you were

10   going to be in HK in the coming months and we both

11   thought it would be only fair to her to get this message

12   before she goes off on maternity leave."

13         Did I read that accurately?

14   A.    Yes.

15   Q.    Okay.  And then it goes on to say that, um, the

16   next paragraph I think, "No matter what happens we're in

17   a holding pattern until she comes back from maternity

18   leave, which Mr. Mattiko estimated to be in mid March."

19   And the next sentence, um, we're going to need you to

20   explain, it says, "You and I should also discuss what

21   happens to her China Growth strategy under various

22   scenarios."

23         What does that mean?

24   A.    Um, I'm -- I'm -- I can't be certain but if the

25   portfolio -- and we have a Portfolio Manager who goes

1    out on maternity leave, and we don't expect anyone to be

2    working on maternity leave, so, um, clearly the

3    underlying stocks are still moving, um, and we need to

4    discuss, um, who is going to take responsibility for the

5    fund in that situation.

6    Q.    Okay.

7    A.    Um, during those months.

8    Q.    Okay.

9          MR. PATERNITI:  Terrific, we can take that one

10   down.

11         What was the exhibit number there?  It was 209?

12   Okay, thank you so much.

13         (Takes down.)

14         MR. PATERNITI:  Let's take a look at Exhibit 225,

15   please.

16         (On screen.)

17   Q.    Mr. Argyle, I'm showing you Exhibit 225, an

18   October 19th, 2016 e-mail from Mr. Baxter to you.

19         Now at this point this is still -- I think this is

20   the timeframe where Mr. Baxter is transitioning out of

21   GEPM?

22   A.    That's right.

23   Q.    Okay.  And let's just take a look at Mr. Baxter's

24   e-mail to you at the top.  He says, "Hi, Charles, for

25   what it's worth I'm finding it more and more difficult

1    to see how Gigi can make it here.  Are you also struck
2    by the tone of this short note below?"  And the short
3    note below, just to take a look at it, it looks like
4    it's from Ms. Chan to Tom Baxter and, um, the content is
5    what Mr. Baxter's commenting on, correct?
6    A.    Um, it appears to be, yes.
7    Q.    So if we go back up to Mr. Baxter, he says "To me
8    it's needlessly confrontational and presumes a certain
9    level of secondrateness on our behalf, or maybe just my
10   behalf.  Whatever.  But do you think I'm more or less
11   eager to offer up helpful suggestions in the future
12   after being on the receiving end of this note?"  And
13   then he goes on to say, "I'm sorry I missed this one.  I
14   truly don't recall any inklings of this sort of attitude
15   in the interview process and I'm a little dismayed that
16   this is where we've come to."
17         What did you understand Mr. Baxter to be saying to
18   you right there in those two sentences?
19   A.    Mr. Baxter was a strong advocate of hiring
20   Ms. Chan in the interview process, as I said yesterday
21   or perhaps the day before, that, um, there were two
22   decisions.  He decided to recommend -- in his role in
23   Hong Kong, he decided to recommend her hiring to me and
24   I think he's saying, "We shouldn't have hired her."
25         MR. PATERNITI:  Okay, let's pull up, if we could,

1    Exhibit 121.

2         (On screen.)

3    Q.    Okay, I think you were shown this a couple of days

4    ago.  This is an e-mail from Karen Tang, she's the Human

5    Resources professional in the Hong Kong office, correct?

6    A.    Um, yes.

7    Q.    Is she an Asian female?

8    A.    Yes, she's an Asian female.

9    Q.    And she writes the letter to you with some rough

10   speaking points, she says "To guide your conversation

11   with Gigi."

12        Did you engage HR on this issue of your

13   conversation with Ms. Chan?

14   A.    Um, I can't recall.

15   Q.    Do you know why HR was involved?

16   A.    Um, well they must have got involved because -- I

17   can't recall if I directly engaged, whether it was

18   Ms. Tang or Ms. Scordato, who I think you know, who was

19   the functional HR manager, but, um, I had -- I can't

20   actually recall how HR got involved, um, the specifics

21   of how HR got involved.

22   Q.    Okay.

23        MR. PATERNITI:  Now let's go down, if we could

24   scroll down on this e-mail to the next one down.

25   Q.    Yeah, I'm not going to go through the speaking

1    points, but let me just ask you briefly.

2         MR. PATERNITI:  No, it's okay, if you could draw

3    that down, Josh, that would be great.  And then let's

4    just go down to the section, "On performance."

5         (On screen.)

6    Q.    So this meeting you were going to have with

7    Ms. Chan in November of 2016, um, was it planned to be a

8    meeting to discuss in part her performance or her

9    impact?

10   A.    Um, you know it was -- that's -- it was a meeting

11   that was planned to discuss her impact, yes.

12   Q.    And why you instead of Mr. Baxter or Mr. Philip

13   who was stepping in for Mr. Baxter?

14   A.    Um, while -- precisely because of that change, was

15   one of the reasons, and the other reason was I was in

16   the region and, um, I wanted to make sure I delivered a

17   clear message.

18   Q.    Okay.

19        MR. PATERNITI:  Let's move on, if we can, to

20   Exhibit 388.

21        (On screen.)

22   Q.    Now, it's fair to say -- well strike that.

23   What was the clear message that you were hoping to

24   deliver?  And generally, I'm not asking you to go

25   through the whole long list of it.  But generally

1    speaking, what was the message you were hoping to

2    deliver to Ms. Chan in this upcoming meeting?

3    A.    "Things are not going well.  These are the things

4    that have to change, and if they don't change, we're

5    going to be having a very different conversation in the

6    middle of next year."

7    Q.    Okay.  So right after that series of e-mails we

8    just looked at, um, do you recall receiving Ms. Chan's

9    self-review of her perception of her performance in

10   2016?

11   A.    Um, I've already forgotten the date of the

12   previous e-mail, but I do recall receiving the

13   self-review.

14   Q.    And this would have been, again, in that fall of

15   2016 timeframe?

16   A.    Um, I think it was -- and I remember it was the

17   last one that came in, it was well after the due date.

18   Q.    Um, she rates herself as having an "Exceptional

19   Year."  Did you agree with that?

20   A.    Um, absolutely not.

21   Q.    Okay.

22         MR. PATERNITI:  Scroll down to "Impact and Skill."

23         (Scrolls.)

24   Q.    This section asks for "The impact achieved this

25   year.  Consider specific accomplishments against goals,"

```
 1    et cetera.  Ms. Chan's comments, "It took me two years

 2    of hard work to launch the Wellington China Growth Fund

 3    despite joining the firm with a 7-year top-decile track

 4    record."

 5         Now by this point had you spoken to her about the

 6    fact that her prior track record was not as significant

 7    as she seemed to think it might be?

 8    A.    Um, I can't remember.

 9    Q.    "I had to overcome internal resistance and

10    procedural complexity in the process of approval,

11    seeding, and launch of the fund."

12         Were you aware of any internal resistance or

13    procedural complexity that Ms. Chan faced with regard to

14    the launch of the fund?

15    A.    Um, I'm -- I'm not sure I would have known about

16    that procedural complexity, but I wasn't aware of -- no,

17    I wasn't aware of any.

18    Q.    You weren't aware of any internal resistance?

19    A.    Um, if I'm aware of the fact -- if there was any

20    internal resistance, um, I helped push it through.  I

21    can't recall.

22    Q.    "I worked on customized product launches for

23    Chinese clients helping with business development in

24    China."

25         Does that refer to the Alex Qian testimony or
```

1    topic that you testified about a couple of days ago?

2    A.    Yeah, Alex Qian worked for Ray Helfer in his job

3    as Business Development in China, so it must have

4    presumed what he does.

5    Q.    Okay, and then she goes on from there.

6          MR. PATERNITI:   Let's scroll down to the next

7    page.  (Scrolls.)   The section I want to go to is

8    "Personal Development."

9    Q.    Her comment on "Progress made this year on your

10   own personal development goals," she says "This past

11   year has been very frustrating for the amount of effort

12   required in such a large firm such as Wellington to push

13   through the launch of a new fund, which was agreed prior

14   to me joining."

15         I think I've asked you this before, but do you

16   agree that the launch of a new fund was agreed prior to

17   her joining?

18   A.    Um, I do not, because the only person who could

19   have agreed to it, prior to her joining, was me and I

20   did not.

21   Q.    "There have been resistance and delays every step

22   of the way, not a single client meeting was set up in

23   Boston and in London despite all the hard work that went

24   into preparing marketing materials.  Allegedly some were

25   set up and then cancelled and I was only notified one

1    week before my scheduled departure."

2         To your knowledge is she referring to that GRG

3    timeframe and that potential trip that was canceled?

4    A.    To my knowledge, yes.

5    Q.    "Work done by other teams to support the fund

6    launch was often inaccurate or untimely and required

7    checking and pushing on my part, which wasted a lot of

8    time and effort on my part."  So as a result of -- "As a

9    result, my personal goals of being able to effectively

10   generate Alpha and raise assets for the firm have not

11   progressed much despite all the effort I have made in

12   the quality of the output, i.e. model portfolio

13   significantly outperforming index and peers."

14        Did I read that accurately?

15   A.    Yes.

16   Q.    Okay.  When you read this comment on her progress,

17   um, her response to the inquiry about what progress she

18   believed she had made this year, did you have any

19   concerns?

20   A.    Yes.

21   Q.    What were your concerns?

22   A.    Um, well the first and biggest concern was that

23   there was no mention of any impact whatsoever with

24   respect to helping our clients in the Emerging Market

25   Opportunities --

1          THE COURT:  I'm sorry, keep your voice up, sir.

2          THE WITNESS:  Sorry.

3          THE COURT:  Just keep it up.

4     A.    There was no mention of progress made this year in

5     her personal development, there was no mention on having

6     any impact on the Emerging Market Opportunities team,

7     there was just a brief sentence in one of the earlier,

8     um, paragraphs.  But this is all about China Growth,

9     it's all about disappointments, and some of it's

10    inaccurate, um, and, um -- and she talks about "raising

11    assets," which we've talked about, which would in all

12    likelihood never happen.  It's very much, you know,

13    "What can Wellington do for me?" not "What can

14    Wellington do for our clients?"  And, um, it's

15    incredibly disappointing to read.

16    Q.    Let's go down to the next section, "What two to

17    three specific behavior skills would help you improve

18    your performance?"  Ms. Chan comments, "(1) be more

19    discerning in the feedback that I should take on-board."

20          Did you believe, um, she was -- at this point she

21    was taking feedback on-board at all?

22    A.    There was certain, I -- I don't know every time

23    Ms. Chan got feedback, but there were certainly a lot of

24    times that she was receiving feedback that she was not

25    taking it on-board.

1    Q.    And her second comment about "A behavior or skill
2    that would improve her performance" is "To network more
3    to learn how to overcome organizational inertia."
4         Do you have any idea what she meant by
5    "organizational inertia"?
6    A.    Um, I don't know what she meant with respect to
7    "organizational inertia," um, the slogan, but my, um,
8    experience would tell me that, um, once again she was
9    referring to the length of time it took to launch her
10   fund.
11   Q.    Okay.  And then the last section, "What supports
12   do you need from your manager, et cetera?"  The comment
13   is, "(1) Support from top management down to the sales
14   force to meet Wellington clients and raise AUM for the
15   Wellington China Growth Fund.  (2) Firm commitment from
16   top management and key investors that Wellington cares
17   about China and Chinese clients."
18        Did it concern you that, um, in this section she
19   also did not reference the EMO fund?
20   A.    Um, the EMO fund is mentioned briefly once, in one
21   section, in multiple sections here so.  In this section
22   in particular, I don't know whether I was concerned or
23   just simply not surprised.
24   Q.    Okay.  Now, Mr. Argyle, after reviewing Ms. Chan's
25   2016 self-review, what if any concerns did you have at

1    this point with regard to Ms. Chan's status, um, and

2    engagement at Wellington?

3    A.    Um, Ms. Chan seemed very engaged in -- in her

4    success as it related to the China Growth Fund, um, but

5    she was demonstrating a lack of a growth mindset, she

6    was demonstrating a -- we have this phrase that just

7    permeates Wellington, "client-firm-self," those are the

8    priorities, and this was "self-firm-client."  I don't

9    know what else is stacked up in that, but "self-client,"

10   um, first, "self" was at the top.  And I guess that just

11   sums it up.

12   Q.    Okay.

13        MR. PATERNITI:  Can we take a look at Exhibit 237,

14   please.

15        (On screen.)

16   Q.    Now, um, if we go to the bottom, um, or I should

17   say -- yeah, if we go to the bottom.

18        And so this is an e-mail from Katherine Curtis,

19   and that was your assistant, right?

20   A.    Yes.

21   Q.    Okay, and she forwarded to you, on October 28th,

22   Ms. Chan's self-review, right?

23   A.    Yes.  Yes.

24   Q.    Why did she forward that to you?

25   A.    Because it was missing, it was well after the due

 1    date and she knew I was -- well it wasn't "missing," you

 2    know.

 3         MR. PATERNITI:  Let's go back to the e-mail, if we

 4    could.

 5         (On screen.)

 6    Q.   You then reach out to Henry Philip and Tom Baxter,

 7    again your folks that report to you, and you say, "I

 8    would be very interested in your thoughts on this,

 9    especially your recollection with respect to what was

10    agreed prior to her joining the firm with respect to a

11    new product.  Any e-mails on that front would be

12    especially helpful, though I understand if there are

13    none."

14         Now you already testified that you know you didn't

15    promise her any fund.  What were you thinking when you

16    reached out to Henry Philip and Tom Baxter and asked

17    them this question?

18    A.   I was thinking, as I said earlier, as an

19    experienced manager, there are two sides to every story.

20    What's the other side to this story?  She's saying I

21    promised it.  I know I didn't promise it.  I also know

22    it actually could not have happened without my promise.

23    But did anyone else say anything that I'm, you know --

24    where did this narrative come from?

25    Q.   And did you hear back from, um -- I'm sorry,

1    strike that.

2         Did you ever learn from Mr. Baxter or Mr. Philip

3    that any such promises -- that they believed any such

4    promises were made by them?

5    A.    They don't believe any promises were made by them.

6    Q.    Okay.

7         MR. PATERNITI:  Let's move on to Exhibit 239.

8         (On screen.)

9    Q.    This is another e-mail from Mr. Mattiko, the EMO

10   Team Leader, providing you notes, correct?

11   A.    Yes.

12   Q.    And he says, um, he's talking about some mutual

13   travel and then the third line is -- the third sentence

14   is "Wanted to get the notes on Gigi below out to you.

15   In short I think she's a good Portfolio Manager that

16   needs to change some very fundamental things about her

17   attitude if she's going to survive here.  Changing some

18   of the things I've listed below will be very difficult

19   and will require a lot of soul searching.  Without

20   changes though, I don't know how we can move forward."

21        And so at this point, October 31 of 2016, were you

22   of the mindset as well that, to quote Mr. Mattiko, that

23   without changes you didn't know how you could move

24   forward with Ms. Chan?

25   A.    Um, yeah, that would -- there was feedback that

1   needed to be delivered to Ms. Chan and she needed to act

2   upon it.

3   Q.    Okay.

4   A.    Otherwise, um, without her acting upon it, without

5   changes it would be very difficult to move forward.

6   Q.    Okay.

7        MR. PATERNITI:  And scroll down a bit, I just want

8   to touch on a couple of these without reading the whole

9   thing in detail.

10       (Scrolls.)

11   Q.    Mr. Mattiko provided you with a number of

12   positives and the third bullet point I'm particularly

13   interested in, and it says "She communicates well with

14   clients," and then it says "When she's talking about

15   stocks, the market, or China in particular, she comes

16   across as competent and passionate, many of the verbal

17   crutches she stumbles upon, when speaking in the morning

18   meeting or supposedly in internal dry-run pitches are

19   not there.  The one time a client did ask about her

20   strategy in a meeting I attended, it was clear to me

21   that she had more difficulty speaking about her strategy

22   than she did about stocks or markets."

23       Help us understand.  What's the difference, if

24   any, in communicating about a stock or a market versus

25   your investment philosophy or strategy?

1    A.    Um, so talking about a stock or -- it's my

2    understanding Ms. Chan would sometimes attend meetings

3    with Mr. Mattiko or with clients related to Emerging

4    Market Opportunities --

5         MR. HANNON:  Objection, your Honor, it's

6    nonresponsive.

7         THE COURT:  I think that's right.  Put your

8    question again.  I -- I -- actually I got the question.

9         What's the difference between commenting on your

10   strategy and commenting on stocks and the markets?

11   Q.    With specific regard to presenting to a client or

12   meeting with a client.

13        THE COURT:  And of course it's his question, so go

14   ahead.

15   A.    Commenting on a stock is like saying, you know,

16   "Tell me why Amazon is in your portfolio, the stock

17   Amazon is in your portfolio?  Explain to me why that one

18   stock is in your portfolio?  What's attractive about

19   Amazon?"  Um, and few analysts and, um, pretty much

20   anyone in the investment platform, if they covered

21   stocks, is expected to be able to do that, and did that

22   if they talk to clients.

23        Talking about an investment strategy is "Tell me

24   how you can put together this collection of stocks and

25   beat the stock market?"  Um, and that, um, is a far more

1   nuanced, and I would argue, um, sophisticated -- the
2   former conversation can be very sophisticated too, but
3   it has more dimensions to it than the former.  Put it
4   that way.
5   Q.    Is it possible for someone to be good at talking
6   to a client about a stock, but not about talking to a
7   client about their strategy?
8   A.    Um, yes, that's possible.
9       MR. PATERNITI:  Let's keep going down, if we can,
10   on this page.
11       (Scrolls down.)
12   Q.    Mr. Mattiko then talks about "improvements," and
13   I'm just going to summarize with the bold highlights.
14   "Improvements," (1) is "Client for himself."  And the
15   next one is "Work ethic."  And with "Work ethic," he
16   wrote, "The hours she works seem light and the amount of
17   holiday time she has taken seems at the upper end of the
18   boundaries.  I realize this is a bit of a nebulous area,
19   because Wellington doesn't track either, so no way to
20   prove, that said, my perception is that she is not
21   putting an enormous amount of effort into the job."
22       Were you aware of that at the time you received
23   this from Mr. Mattiko?
24   A.    Um, I can't recall if I was aware of that.
25   Q.    Okay.

1   A.    It -- in the context of putting it -- um, I was

2   aware of the quality versus quantity issue, but, um,

3   this is -- but I'm not aware if I was a -- in this exact

4   phraseology, I'm not sure.

5   Q.    Okay.

6         MR. PATERNITI:  Let's continue, finish out the

7   bullet points.

8         (Scrolls.)

9   Q.    "Contribution to team," it says "with Philip."

10  And that's Philip Fan, right?

11  A.    Yes.

12  Q.    "As the only other benchmark, I could say that

13  Gigi's relative contribution to the EMO team is low.

14  She rarely, if ever, proactively reaches out with new

15  ideas, something Philip does regularly, nor does she

16  provide written commentary about her views on companies,

17  even ones we own, once again something Philip does

18  consistently."  And then he writes that "At the end of

19  last year he tested how long it would take for Gigi to

20  proactively reach out to me about anything.  It was

21  several weeks of silence before I eventually reached out

22  to her."

23        Does that, um, I'm not asking you -- well, first

24  of all, did you believe what Mr. Mattiko wrote there?

25  A.    Oh, yes, I did.

1   Q.     And did that cause you any concern?

2   A.     Um, I would say it set off alarm bells.

3   Q.     Why?

4   A.     Um, because her job was to be an analyst on the

5   Emerging Market Opportunities team, that was her

6   responsibility.

7   Q.     The next one is "Contribution to the firm."  And

8   you had talked previously about the levels of impact

9   that you look at, one is the impact on your team, and

10  the other one is impact more broadly on the firm.

11  He mentions "Contributions to Pound ILP, Pound

12  Investors, and morning meetings," and he says that "her

13  contributions are anemic."

14        What are those three things, "Pound ILP," "Pound

15  Investors," and I know you talked about the "morning

16  meetings."  So what are the other two?

17  A.     Well this is "morning meetings," um, plural.  So

18  we talked about the early-morning meeting, but there was

19  also a "morning meeting," um, which happened at

20  7:30 a.m. every morning Boston time, and all investors

21  in Boston and, um -- in this case the other one was all

22  investors in London and Asia, this was all investors in

23  Boston and London.  But once a week we expected our

24  Asian investors, um, to participate.

25        "Pound Investors" is an e-mail distribution list.

1    I think actually Brendan talked about this, um, Brendan

2    -- Mr. Swords, sorry, talked about the Pound Investor

3    distribution list.  It was just part of our open

4    collaboration.  You'd send an e-mail if you had an

5    investment idea that you wanted to take, it could be on

6    Pound Investors.

7         And "Pound ILP" is actually, um, feeds up a

8    technology called "ILP," which was our library of

9    investment dialogue and debate and ideas, um, and maybe,

10   um -- well everything that went to Pound Investors, went

11   to Pound ILP, but maybe if we thought something was more

12   appropriate for a narrow audience, because not everyone

13   was going to be interested in this idea in Brazil, um,

14   for example.  And so you might copy Pound ILP, um, so

15   people got the e-mail, and if anyone ever wanted to look

16   up that stock, they could go to that "library," so to

17   speak, and they could would find the note.  But not

18   everyone was bombarded with their note.  It was kind of

19   our way of trying, of trying to get around this constant

20   flow of e-mails that we all get, um, probably all the

21   time.

22   Q.   Okay.  The, um -- the next bullet point,

23   "Acceptance within the firm."  It says "Speaking to

24   Philip last week he told me that several people

25   approached him unexpectedly and unsolicited to tell him

```
 1    that" -- I think that's a typo, "there's a problem" or
 2    "they have a problem with Gigi."  "I have also been
 3    approached by several people over time that have done
 4    the same thing.  Gigi clearly did not have this
 5    perception before she joined the firm and this is
 6    something that she has created since her arrival.  If
 7    she is going to survive at this collaborative firm, she
 8    is going to need to turn around people's perception of
 9    her.  She may claim to not care about how others
10    perceive her, but I feel very strongly that there's no
11    way around it if she's going to be successful here.
12    Once again I think this is of particular importance at
13    Wellington, it places so much emphasis on collaboration.
14    Nobody's going to collaborate with someone they don't
15    respect."
16         My question to you, Mr. Argyle, is were you aware
17    of -- that there were several people, um, who felt that
18    there was some problem that they had or that Ms. Chan
19    had with them, um, presumably in the Hong Kong office?
20    A.    Um, I'm -- I was aware that there were several
21    people who were providing constructive feedback areas
22    for development, um, areas of concern with respect to
23    Ms. Chan.  Whether they were the same people?  I have no
24    idea.
25    Q.    Okay.  All right.
```

1        MR. PATERNITI:  We can move on from this.

2        (Takes off screen.)

3   Q.    Now, after, um --

4        MR. PATERNITI:  Oh, I'm sorry, Exhibit 240.  I

5   missed one.  Thank you.

6        (On screen.)

7   Q.    So, um -- oh, my apologies, no wonder I got it

8   wrong, it's the same e-mail.

9        Mr. Argyle, at this point when you're hearing from

10  the Team Leader with this kind of feedback, um, were you

11  considering whether or not to terminate Ms. Chan?

12  A.    At this point was I considering whether or not to

13  terminate Ms. Chan?

14  Q.    Yes.

15  A.    At this point I was collecting feedback on

16  Ms. Chan.

17  Q.    So you recall I think you testified about meeting

18  with her -- you did testify because we listened to the

19  recording.

20  A.    Yup.

21  Q.    Some portion of it on November 2nd of 2016,

22  correct?

23  A.    Yes.

24  Q.    And, um, did you have any hopes at that point, um,

25  that you could turn the situation around with Ms. Chan?

1   A.    Um, yes, I hoped I could turn around the situation

2   with Ms. Chan, that was the purpose of -- I wanted to --

3   I wanted to help Ms. Chan be successful at Wellington.

4   Q.    Okay.

5         MR. PATERNITI:  Let's take a look at Exhibit 387.

6         (On screen.)

7         MR. PATERNITI:  Is there a way to rotate it?

8         (Turns on screen.)

9   Q.    Mr. Argyle, you were asked questions about this a

10  few days ago, this is the, um, peer feedback, um, data,

11  correct?

12  A.    Um, yeah, this is the output of the, um, 2016 peer

13  feedback process that -- the quantitative aspect of that

14  process.

15  Q.    And is this data that you reviewed back in

16  October, November, of 2016?

17  A.    Yes.

18  Q.    You had access to it?

19  A.    Um, yes.

20  Q.    Okay.  You were asked a number of questions --

21        MR. PATERNITI:  If we could go to page, um, I

22  think it was Page 9 where we had the individual, um,

23  scores.  (On screen.)  Nope, I'm sorry, it's Page 7.

24        (On screen.)

25  Q.    You were asked a number of questions about the

1   person on the top line there, Mr. Boselli?

2   A.    John Boselli, yeah.

3   Q.    And his scores that he gave for Ms. Chan?

4   A.    Um, yes.

5   Q.    Okay.  And would he have interacted with her for

6   work purposes?

7   A.    Um, he had the opportunity to do it, he was a

8   Global Manager and he managed portfolios also,

9   international portfolios, which is everything except the

10  United States, and he owned a number of stocks in China.

11  Q.    Do you happen to know what his style was?

12  A.    Um, in a word "growth."

13  Q.    And what was Ms. Chan's style?

14  A.    In a word "growth."

15  Q.    Okay.  With regard to this chart you were asked if

16  Boselli's numbers skewed the results of the total, um,

17  of the total ratings.

18        MR. PATERNITI:  So let's go back to Page 1 of this

19  document, if we could.  (On screen.)  That's Page 2.

20  Sorry.

21        (On screen.)

22  Q.    You had read a bunch of numbers off to Ms. Chan in

23  that recording we heard about her rankings, and if you

24  could direct us to that.  I believe it's under "All

25  investor votes on skill," is that right?

1   A.    Right, so if you look under "All investor votes on

2   skill," um, and you see the rank, "GEPM," which is about

3   in the middle there, um, and if you go all the way to

4   the right-hand side, 2016, and you see these three

5   columns, "Skill debt," "Skill ideas," "Skill money," and

6   you see that, um, she ranked 95, 95th out of 114 with

7   respect to depth, investment depth, 111 out of 114 with

8   respect to idea generation, um, and 109 out of 113 with

9   respect to money making, how did those ideas work out.

10  Q.    And these numbers, these ratings were generated

11  from the ratings provided by those peers, whoever chose

12  to submit their ratings of Ms. Chan, is that right?

13  A.    Um, you know that's what -- that's, um -- that's

14  where those numbers came from.

15  Q.    Okay.

16  A.    And there's a collaboration section, which you

17  didn't blow up, but that would -- if you remember I

18  referred to four rankings?

19  Q.    Yes.

20  A.    So this is the all-investor votes on skill and

21  below is collaboration.

22       MR. PATERNITI:  So why don't we do that, why don't

23  we just blow that up so the jury can see it.

24       (Enlarged.)

25  Q.    Is this what you're talking about?

```
 1    A.      Right, so there's the rank.  So 110 out of 114.
 2    Q.      Oh, I see, in 2016, yes.  Okay.
 3            Now, with regard to these individual rating
 4    numbers or ranking numbers, um, did Mr. Boselli's
 5    rankings or ratings of Ms. Chan feed into those numbers?
 6    A.      No, they didn't.
 7    Q.      They did not?
 8    A.      They did not.
 9    Q.      Could you explain to the jury how that happened?
10    A.      Um, I don't know if I'm allowed to ask you to zoom
11    in on a portion of this page?
12            THE COURT:  You are.
13            THE WITNESS:  Oh, I am?
14            THE COURT:  Yes.
15    A.      So if you go to the top left where it says
16    "Adjusted Normalized Scores."
17    Q.      (Zooms in.)
18    A.      You don't even need the whole box.  I think
19    everyone can probably read it, it says "Adjusted
20    Normalized Scores."
21    Q.      Yeah, "Period-over-Period Summary, Adjusted
22    Normalized Scores."
23    A.      Right.  So we didn't take the raw scores from
24    every single investor because we're human and people --
25    so I have a mathematics degree, I'm a mathematician.  I
```

1    guess we came up with this 10 years ago.  We can argue

2    with the methodology, but this was the methodology in

3    coming up with adjusted normalized scores.

4         So we did two big things in adjusting the

5    normalized scores.  So the first thing we did was say

6    "What ranges do human beings use?"  A little different.

7    When you ask people to rate on a scale from 1 to 10,

8    some people rate on a scale of 1 to 10, some people rate

9    on a scale from 3 to 8, some people rate on a scale from

10   6 to 10.  All right?  So we adjusted all of that and

11   said "This person here, let's look at everyone they

12   rated and let's see what their distribution is and

13   let's, um, adjust for that," which is not necessarily

14   relevant for this conversation.

15        But the second thing we did is say, "Let's look at

16   actually the core, what is really the message here?

17   Let's not try and be disrupted by details."  So we

18   actually, for every single individual, for all 114

19   individuals, we eliminate the highest scores and the

20   lowest scores, and they don't even go into the rankings.

21   So that's why Mr. Boselli's scores were not in the

22   rankings, his scores weren't included, because as we

23   saw, his were the lowest scores.  So his, but they

24   weren't included, we eliminated them, and we also

25   eliminated the highest scores, and we did that for all

1    114 investment professionals.

2         So Mr. Boselli's scores did not feed into these

3    rankings using adjusted normalized score methodology.

4    Q.    Thank you, Mr. Argyle.

5         You are here just before your meeting on November

6    2nd, 2016 with Ms. Chan.  You've received a self-review

7    in which she rates herself "exceptional," you've

8    received peer-review numbers that put her in the 109,

9    110, 113 area out of 114.

10        As head of GEPM management, what is your

11   responsibility when you have a situation like this?

12   A.    My responsibility is, um, to deliver -- to make a

13   decision on what I'm going to do.  I can't do nothing.

14   And so my decision was to deliver clear and actionable

15   feedback, "This is what you need to do to, um, improve

16   your impact at Wellington on behalf of our clients."

17   Q.    And is that what you went into the November 2nd

18   meeting intending to do?

19   A.    Um, that was one of the things and the principal

20   thing I intended to do in the November 2nd meeting, yes.

21   Q.    Okay.  Now, if we could -- and I know we heard

22   quite a bit of the tape and we stopped it at, um, 47.10,

23   I think was the last segment that you were asked any

24   questions about.  And that meeting went on for another

25   20 some-odd minutes and I want to just direct your

1    attention to some of that.

2         MR. PATERNITI:  So if we could start at 47.10.

3         (Plays audio.)

4         MR. PATERNITI:  And it stopped at 53.42 seconds in

5    this conversation.

6    Q.   Mr. Argyle, what were you hoping to hear from

7    Ms. Chan as a take-away from this meeting?

8    A.   I was hoping to hear that -- that she had just

9    heard something -- that there was some receptive

10   activity to the feedback that was given, um, across the

11   whole -- I don't know how many minutes we are into the

12   tape, including yesterday and today.  Now I was hoping

13   to hear some demonstration of growth mindset, um, and

14   some recognition of what her co-responsibilities were.

15   Q.   Okay.

16        MR. PATERNITI:  Let's go ahead, start it again at

17   53.40.

18        (Plays audio.)

19        MR. PATERNITI:  And stop right there.

20   Q.   When you are referring there to "multiple other

21   opportunities there that will make you happy," what are

22   you talking about?

23   A.   This constant refrain that the phone is always

24   ringing with opportunities to join other asset managers.

25        MR. PATERNITI:  And let's jump, if we could, to

1   the last clip, 103.58, and that should take us to the

2   end.

3           (Plays audio.)

4           MR. PATERNITI:  And timing-wise, um, that stopped

5   at 1 hour and 10.

6   Q.    Mr. Argyle, after that 78-minute meeting, was it

7   your perception that Ms. Chan had on-boarded any of the

8   feedback you gave her over those 78 minutes?

9   A.    It was not my perception that she'd on-boarded any

10  of the feedback I gave.

11  Q.    And what was your perception of her -- whether she

12  had a growth mindset at the end of that conversation?

13  A.    I left the conversation even more convinced that

14  she didn't have a growth mindset than I did when I went

15  in.

16          MR. PATERNITI:  Your Honor, this would be a good

17  place to stop.

18          THE COURT:  We will stop.

19          Ladies and gentlemen --

20          And you may step down.

21          THE WITNESS:  Thank you.

22          THE COURT:  Now we're going to stop and the

23  weekend is coming up and I wish you a very good weekend,

24  and naturally you may see people that you don't see

25  during the week.  It's all right to say you're serving

1    on a jury, so long as you say immediately, "And the

2    judge has said we can't say anything at all about the

3    case."  And we'll start promptly, and I know I can count

4    on you, at 9:00 on Monday morning.

5        Have a very good weekend.  Keep your minds

6    suspended, do not discuss this case either among

7    yourselves, nor with anyone else.  The jury may stand in

8    recess.  I'll remain on the bench.

9        THE CLERK:  All rise for the jury.

10       (Jury leaves, 1:00 p.m.)

11       THE COURT:  Please be seated.

12       The total elapsed time, plaintiff has used up 2

13   days and 25 minutes, the defense has used up 2 days and

14   5 minutes.  I reiterate, if this case were to resolve at

15   any time, a phone call to Ms. Gaudet or a communication

16   with Ms. Gaudet is in order and no one need return or

17   involve yourselves further, we'll take care of the jury.

18       Have a very good weekend.  We'll recess.

19       (Adjourned, 1:00 p.m.)

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3

 4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

 5    hereby certify that the forgoing transcript of the

 6    record is a true and accurate transcription of my

 7    stenographic notes, before Judge William G. Young, on

 8    Friday, October 15, 2021, to the best of my skill and

 9    ability.

10

11

12

13   /s/ Richard H. Romanow 01-06-22
     _____
14   RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25
```