```
1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS (Boston)

3                                  No. 1:19-cv-11605-WGY

4

5    GIGI KAI ZI CHAN,
          Plaintiff
6

7    vs.

8

9    WELLINGTON MANAGEMENT COMPANY, LLP and CHARLES ARGYLE,
          DEFENDANTS
10

11                            *********

12

13                      For Jury Trial Before:
                        Judge William G. Young
14

15

16                      United States District Court
                        District of Massachusetts (Boston.)
17                      One Courthouse Way
                        Boston, Massachusetts 02210
18                      Monday, October 18, 2021

19

20                            ********

21

22              REPORTER: RICHARD H. ROMANOW, RPR
                        Official Court Reporter
23                    United States District Court
              One Courthouse Way, Room 5510, Boston, MA 02210
24                        bulldog@richromanow.com

25
```

```
 1              A P P E A R A N C E S

 2

 3   PATRICK J. HANNON, ESQ.
     HAMPTON M. WATSON, ESQ.
 4      Hartley Michon Robb Hannon, LLP
        155 Seaport Boulevard, 2nd Floor
 5      Boston, MA 02210
        (617) 723-8000
 6      E-mail: Phannon@hmrhlaw.com
        For Plaintiff
 7

 8   STEPHEN T. PATERNITI, ESQ.
     BENJAMIN R. DAVIS, ESQ.
 9      Jackson Lewis, PC
        75 Park Plaza, 4th Floor
10      Boston, MA 02116
        (617) 367-0025
11      Email: Stephen.paterniti@jacksonlewis.com
     and
12   BEVERLY W. GAROFALO, ESQ.
        J.W. Carney, Jr. & Associates
13      20 Park Plaza, Suite 1405
        Boston, MA 02116
14      (860) 275-0100
        Email: Beverly.garofalo@jacksonlewis.com
15      For Defendants

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2

3   WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

4

5   THOMAS BAXTER (By zoom video.)

6       By Mr. Hannon:        5                54

7       By Mr. Paterniti:          19                    68

8

9   CHARLES ARGYLE (Continued.)

10      By Mr. Hannon:                        100

11      By Mr. Paterniti:          73

12

13

14

15                         E X H I B I T S

16

17                      (None marked.)

18

19

20

21

22

23

24

25

```
 1          P R O C E E D I N G S
 2          (Jury enters, 9:00 a.m.)
 3          THE COURT:  Good morning, ladies and gentlemen,
 4     welcome back.  Thank you.  And without the echo, I wish
 5     to sincerely thank you for being so prompt.
 6          We're all ready to go, but you see Mr. Argyle is
 7     not on the stand, and that, um, Ms. Gaudet tells me
 8     we're going to take a witness out of order, and we can
 9     do that, you can get your minds around it.  We're not
10     done with Mr. Argyle, defense counsel was questioning
11     him and they haven't finished their questions.  But to
12     accommodate peoples schedules and to move the case
13     along, we're going to call another witness.
14          And if I have this wrong, feel free to correct me.
15          Now this witness we're going to see, he's
16     somewhere else, but we're going to see him through a
17     video.
18          And with that done, Counsel, you may proceed.
19          MR. HANNON:  Thank you, your Honor.  The plaintiff
20     calls Mr. Thomas Baxter via zoom.
21          THE COURT:  Mr. Baxter may be called.
22          (Zoom activated.)
23          THE CLERK:  Yes, we can hear you.
24          (Pause.)
25          THE COURT:  I should say, um, while we're doing
```

1    the electronic trick here, that this of course is

2    evidence and like every other witness you can believe

3    everything he testifies to, you can disbelieve

4    everything he testifies to, as though he never appeared,

5    you can believe parts of what he says and disbelieve

6    other parts.  It makes no difference now, in today's

7    world, that electronically he's somewhere else, and

8    we'll find out where, and he's appearing here by zoom.

9          Now I can see him and I take it you can too.

10          MR. HANNON:  Your Honor, given that he's on my

11    screen, would it be okay if I conducted the examination

12    sitting down?

13          THE COURT:  It would, but let's start though by

14    having the Clerk swear him.

15          THE CLERK:  Can you please raise your right hand.

16          (THOMAS BAXTER, sworn.)

17          THE COURT:  Proceed.

18          MR. HANNON:  Thank you, your Honor.

19

20          * * * * * * * * * * * * *

21          THOMAS BAXTER

22          * * * * * * * * * * * * *

23

24    DIRECT EXAMINATION BY MR. HANNON:

25    Q.    Would you please state your full name, sir.

1   A.     I'm Thomas Baxter.

2   Q.     Okay, Mr. Baxter, I'm not sure if you can see me,

3   but I'm Patrick Hannon, I'm counsel for Ms. Chan.

4   You've seen me before.  You're not missing much.

5          But can you tell us where you are right now?

6   A.     Sure.  I'm in London right now.

7   Q.     Okay, very good.  And, um, you were formerly

8   employed by Wellington Management, is that right?

9   A.     That's right.

10  Q.     And, um, prior to, um, leaving Wellington

11  Management, what was your last position there?

12  A.     It was a Business Manager for the Asia-Pack GRG,

13  Global Relationship Group team.

14  Q.     So "GRG," that was the group within Wellington,

15  um, that interacted with clients, is that right?

16  A.     That's right.

17  Q.     Okay.  And you left Wellington in 2019?

18  A.     Yes.

19  Q.     Before going into that GRG role, you had been

20  employed in the Global Equities Portfolio Management

21  section of Wellington, is that right?

22  A.     That's right.

23  Q.     For how long had you -- did you work in GEPM?

24  A.     Um, we located the Hong Kong office in January of

25  2012, so I worked in GEPM in Hong Kong from January 2012

1    until I transitioned to the other department.  I worked

2    in Global Equity Portfolio Management in Boston from

3    December of 2008 until -- I'm sorry, until when I

4    located to Hong Kong.

5    Q.    Okay.  And when you relocated to Hong Kong, am I

6    right that your position at that time was as a Business

7    Manager?

8    A.    That's right.

9    Q.    And can you explain to the members of the jury, um

10   -- and I don't think you can see, but I assure you that

11   they're here, um, can you share with them what you did

12   as a Business Manager?

13   A.    I was -- again based in Hong Kong we had teams of

14   Equity Portfolio Managers, Analysts, and Research

15   Associates, across Asia-Pack.  So through Wellington, in

16   those days, that meant Hong Kong, Singapore, and Tokyo.

17   And my job was to oversee those individuals in those

18   positions, um, and to support their needs in a variety

19   of ways as a manager.

20   Q.    Am I right that at some point, while you were in

21   this GEPM role in Hong Kong, your title changed?

22   A.    Yes, my title changed to Associate Director of

23   Global Equity Portfolio Management at some point during

24   that time.

25   Q.    Okay, but am I right that your duties and

1    responsibilities were essentially the same both in the

2    Business Manager and the Associate Director role?

3    A.    That's right, they're essentially the same.

4    Q.    Okay.  And during the time you were in this

5    Business Manager and later the Associate Director role,

6    to whom did you report?

7    A.    So initially, um, Brendan Swords was head of

8    Global Equity Portfolio Management, so I reported to

9    Brendan Swords at some point.  Very soon after, um,

10   Charles Argyle was named the head of Global Equity

11   Portfolio Management, so I changed and reported to him.

12   Q.    So first you reported to Mr. Swords and

13   subsequently reported to Mr. Argyle?

14   A.    Yes.

15   Q.    Okay.  Um, now you interviewed Gigi Chan prior to

16   her being hired at Wellington, is that right?

17   A.    Yes.

18   Q.    Okay.  And am I right that, during the course of

19   your interview of Ms. Chan, you thought that she was

20   very high-energy?

21   A.    That's right.

22   Q.    You thought she was outgoing?

23   A.    Yes.

24   Q.    And you thought she was charismatic, right?

25   A.    Right.

Q.    Okay.  The jury has heard some testimony about a

philosophy and process panel that took place, um, in

2015 at which Ms. Chan presented.  You were actually

there, is that right?

A.    I was at that meeting, yes.

Q.    Okay.  And you were one of the individuals

actually physically in the room, is that right?

A.    Yes.

Q.    Okay.  Now as of that time, um -- strike that.

Another person who was in the room that day was a

gentleman named June Oh, is that right?

A.    Yes.

Q.    You had worked with June Oh for some time?

A.    I had, yes.

Q.    And, um, subsequent to that philosophy and process

panel, Ms. Chan, um, she raised some concerns with you

regarding the way she had been treating by Mr. Oh at

that meeting, is that right?

A.    Um, I believe so.

Q.    She told you that, um, she thought he had been

rude to her?

A.    I don't know the exact words she used.

Q.    Okay.  Was that the sentiment that she felt as

though his manner of communicating with her had been

rude?

1    A.    Um, yeah, that's the sentiment that was conveyed.

2    Q.    Did she indicate to you that she believed that he

3    had talked down to her?

4    A.    Again I don't know if she used those words or, um

5    -- or how she exactly phrased it.

6    Q.    Was that the sentiment though?

7    A.    Yeah, I think she felt he was, um, very direct.

8    Q.    Well -- but did she express to you that she felt

9    as though he was talking down to her?

10   A.    She may have.  I don't know.

11   Q.    I'm going to try and put something on your screen

12   here, and when I say "try," it's because there's a

13   chance it may not work.  But let's give this a shot.

14         (On screen.)

15         Are you able to see there the front page here,

16   what appears to be a transcript of your deposition

17   testimony in this matter?

18   A.    Um, yes.

19   Q.    Okay.  And do you recall, um, that we had a zoom

20   session, um, sometime ago at which you answered some

21   questions under oath?

22   A.    Yes.

23   Q.    Okay.  I'm going to direct your attention to Page

24   84 here of the transcript.  (On screen.)  And I'm going

25   to blow it up here.  (Enlarges.)  Starting on Page 84,

```
 1   Line 5.
 2        Are you able to see that, sir?
 3   A.    If you could zoom in, it would be better for me.
 4   It's hard to see.
 5   Q.    All right.  (Zooms.)  Is that better, sir?
 6   A.    That's better, yes.
 7   Q.    Okay.  Just read along as I read out loud starting
 8   at Page 84, Line 5.
 9        "During the time that you managed Mr. Oh, did
10   anyone -- did any females ever complain about how they
11   were treated by Mr. Oh?"  Answer, "So Gigi Chan was the
12   only person that approached me about that."  Question,
13   "And when did Ms. Chan first approach you about that?"
14   Answer, "I don't exactly know the date of when that
15   was."  Question, "Can you describe for us what the
16   context was?"  Answer, "It was subsequent to an internal
17   meeting where Gigi was discussing her philosophy and
18   process to a panel of colleagues."  Question, "And what
19   was Ms. Chan's complaint to you?"  "I don't recall the
20   exact wording but she was -- she expressed concern that
21   he was rude and talked down to her."
22        Did I read that correctly, sir?
23   A.    Yes.
24   Q.    Okay.  Now, um, to be fair, sir, you didn't think
25   there was anything inappropriate in the way that Mr. Oh
```

1  had communicated with Ms. Chan during that meeting, is

2  that right?

3  A.    That's right.

4  Q.    Your general assessment was that Ms. Chan was

5  overreacting?

6  A.    Mr. Oh is very direct, he's always been that way,

7  to me and to everybody else, that's how it works, and,

8  um, he was that way in that meeting.

9  Q.    So you felt that she was overreacting, is that

10  right?

11  A.    Yeah, I felt that she was overreacting to the

12  e-mail.

13  Q.    Okay.  But you did make a point to speak to Mr. Oh

14  about his conduct in the meeting, right?

15  A.    I did follow up with that at some point

16  afterwards.

17  Q.    Okay.  And you expressed to him that, um, that his

18  comments had caused his colleague to feel uncomfortable,

19  is that right?

20  A.    Yeah, something to that effect.  Yes.

21  Q.    Okay.  With respect to this philosophy and process

22  panel, um, to your knowledge did Mr. Oh ever present to

23  a philosophy and process panel?

24  A.    Um, I don't know if he did.

25  Q.    And from your perspective Ms. Chan's participation

1   in that panel, you believe that was voluntary, right?

2   A.    That's right.

3   Q.    Okay.  And as part of the philosophy and process

4   panel, you were able to actually review a sort of

5   written copy of Ms. Chan's philosophy and process,

6   right?

7   A.    Yeah, that's how those meetings would work is the

8   person who was presenting would distribute their outline

9   in advance of the meeting and then discuss it during the

10  meeting.

11  Q.    Okay.  And you can't recall any reaction that you

12  had to Ms. Chan's written philosophy and process, is

13  that right?

14  A.    I don't have any specific recollection of it at

15  this point.

16  Q.    Okay.  Um, after the philosophy and process panel,

17  besides Mr. Oh and Ms. Chan, you also had an opportunity

18  to speak with, um, Ms. Duckworth concerning what had

19  transpired, right?

20  A.    Yes.

21  Q.    Now, Ms. Duckworth, she was also in the room, is

22  that correct?

23  A.    I believe she was on video for that meeting.

24  Q.    Okay.  And Ms. Duckworth at that time, um, what

25  was her position at Wellington?

1    A.    She is -- she's a manager in the Singapore office

2    and had a senior position in the Global Industry

3    Research Department.

4    Q.    Okay.  And you and Ms. Duckworth had a difference

5    of opinion concerning the appropriateness of Mr. Oh's

6    comments, is that right?

7    A.    We had a discussion about the comments, yes.

8    Q.    And you had a difference of opinion about whether

9    or not Mr. Oh's comments were appropriate for that

10   particular forum, right?

11   A.    Yes.  Um, Cheryl felt as if, um, the comments in

12   the philosophy and process panel should be exclusively

13   focused on the bullet points in the page, the actual

14   elements of the philosophy and process.  I felt as if

15   the discussion also was inclusive of the presentation

16   style and how these philosophy and process points were

17   conveyed, um, was also important.

18   Q.    So that was a point that you and Ms. Duckworth

19   disagreed on, correct?

20   A.    Yes.

21   Q.    Um, as -- and just I'm not sure I asked you this

22   question already, but you were Ms. Chan's Business

23   Manager, right?

24   A.    Yes.

25   Q.    And as Ms. Chan's Business Manager, you were

1    supportive of launching China Growth, is that right?

2    A.    Yes, strictly speaking, um, I was supportive of

3    it.

4    Q.    And in terms of the reasons why you were

5    supportive of China Growth, am I right, um, that one of

6    the reasons is because you viewed China as an important

7    market?

8    A.    Yes, it's a large and growing part of the

9    investable universe for our company.

10   Q.    You also viewed this as an opportunity to untap

11   some of Ms. Chan's potential, right?

12   A.    Yes, she had, um, a differentiated investment

13   approach, she was, um, what we call a "growth investor,"

14   um, and my personal feeling was that investing in the

15   stock market in China was, um, you know a fruitful place

16   for growth investors to look at, China was, generally

17   speaking, a growth-oriented market.

18   Q.    And when you say that she was a "differentiated

19   investor," what do you mean by that?

20   A.    There's different styles in investing, um, you

21   know specifically to the stock market there's different

22   styles.  So there are some investors who are into the

23   value styles, the stocks that pay high dividends or have

24   a low price generally, and other investors prefer to

25   invest in growth stocks, the stocks that will grow fast.

1    And so there's different ways to invest even within the

2    same market.  And at that time Wellington did not have

3    any growth-oriented investors focused on China, so that

4    was a market niche that we could, um, just exploit.

5    Q.    Now you mentioned before, um, that at some point

6    in time you moved out of your GEPM role to your GRG

7    role, right?

8    A.    Right.

9    Q.    Am I right there was sort of an overlap period

10   where you kind of were still performing some

11   responsibilities for GEPM and some for GRG?

12   A.    Yes, there's a window of time where I had, um, a

13   bit of a hybrid role.

14   Q.    Okay.  Now you were present, um, at a meeting in

15   Hong Kong on November 2nd, 2016 with Mr. Argyle and

16   Ms. Chan, is that right?

17   A.    Was that the year-end review meeting?

18   Q.    Well I can't answer that question, but you do --

19   well let me ask you a different question.

20         You recall being at a meeting with Mr. Argyle and

21   Ms. Chan in late 2016 that was intended to talk about

22   her performance?

23   A.    Yes.

24   Q.    Okay.  And, um, have you subsequently come to

25   learn that that conversation was recorded?

1    A.     So I -- I think I was told that after the fact,

2    but, um, yeah, at the time it was not known to me, that

3    it was recorded.  And I think it even came up in a

4    deposition with you or from, um, a briefing with some of

5    the lawyers.

6    Q.     Have you ever actually listened to that recording?

7    A.     No.

8    Q.     Now at the time of that conversation, um, were you

9    still serving as Ms. Chan's Business Manager?

10   A.     Um, I don't know.

11   Q.     Okay.  But your -- is it your recollection that,

12   um, sometime after that meeting Ms. Chan went on

13   maternity leave?

14   A.     Yes.

15   Q.     And am I right that at least when she came back

16   from maternity leave, you were no longer serving as her

17   Business Manager, is that right?

18   A.     That's right.

19   Q.     Okay.  In terms of that conversation at the end of

20   2016 with yourself, Mr. Argyle, and Ms. Chan, um, am I

21   right that you don't have any recollection of Ms. Chan

22   making a comment about, um, being treated differently

23   based upon the fact that she was a woman or because she

24   was Chinese?

25   A.     No, I never got into her personal life.

1   Q.    Okay.  And after you had that meeting with

2   Ms. Chan, you had a meeting with Mr. Argyle, right?

3   A.    I think so.

4   Q.    And you don't recall anything about that meeting

5   with Mr. Argyle, do you?

6   A.    No, not specifically.

7   Q.    Um, you, at some point, became aware that Ms. Chan

8   was going to be terminated, is that right?

9   A.    Um, I learned about her termination a week after

10  the fact.

11  Q.    Okay.  So you weren't involved in the decision to

12  terminate her employment?

13  A.    I was not, no.

14  Q.    Am I right that no one came to you and told you

15  they were considering that and asked you for your input?

16  A.    No.

17  Q.    No, they did not?

18  A.    They did not come to me.

19  Q.    Okay.

20        MR. HANNON:  That's all I have, your Honor.

21        THE COURT:  Any questions for this witness or do

22  you wish to reserve?

23        MR. PATERNITI:  I have questions for this witness,

24  your Honor.

25        THE COURT:  And you may.

1

2    CROSS-EXAMINATION BY MR. PATERNITI:

3    Q.    Mr. Baxter, this is Steve Paterniti, I don't know

4    if you can see me, um, but hopefully you can hear me.

5    A.    Yes, I can.

6    Q.    Great.  Okay.  Where do you work now?

7    A.    I work in London for T Rowe Price International,

8    which is the UK office of TR Price, which is another

9    U.S.-based investment firm.

10   Q.    Is it an institutional investor like Wellington?

11   A.    Yeah, it's quite similar.  It's been more focused

12   on the retail investor as it relates to TR price funds,

13   but we have a similar client base, um, institutionally

14   as well.

15   Q.    Okay.  And just to touch on your Wellington

16   background.  You said that it's, um -- I believe you

17   said you transitioned into the GRG or the sales group

18   management in the beginning of 2016, but you retained

19   some transitional responsibilities over investors in

20   2016, is that right?

21   A.    That's right.

22   Q.    Um, during the time that you were in GEPM

23   management, um, managing portfolio management teams, you

24   reported directly to Mr. Argyle?

25   A.    For most of that time.

```
 1   Q.    During the time that Ms. Chan worked there, did

 2   you report directly to Mr. Argyle?

 3   A.    Yes.

 4   Q.    Okay.  And, um, over the course of the time that

 5   Ms. Chan worked at Wellington, um, did you, um,

 6   formulate opinions about her based upon personal

 7   observations and interactions?

 8   A.    Yes.

 9   Q.    Did you formulate opinions about her based on

10   feedback from others?

11   A.    Yes.

12   Q.    And, um, in your role as Associate Director of

13   GEPM, did you communicate those opinions of yours and

14   the feedback from others to your supervisor, Charles

15   Argyle?

16   A.    Yes.

17   Q.    How frequently did you communicate with Mr. Argyle

18   about investment talent during that period?

19   A.    We had regular meetings, we had a group meeting

20   one a week, there were one-on-one calls.  You know

21   whether he was in Hong Kong and I was in Boston, we

22   would meet in person.  So quite frequently.

23   Q.    Okay.  I'm going to, um, ask you just a few

24   questions about your recollections of how Ms. Chan came

25   to Wellington.
```

1        Do you remember her -- do you remember

2    interviewing her in the early 2013 timeframe for the

3    China PM position?

4    A.    Yes, we had a position open for a Portfolio

5    Manager for China Growth and we interviewed a number of

6    candidates and she was one of them.

7    Q.    Okay.  And what became of that, um, process

8    whereby you were interviewing her for a China PM in

9    2013?

10   A.    Well ultimately we didn't end up hiring anybody

11   for that role and instead we effectively, um, promoted a

12   colleague into that position.  So, um, Bo Meunier, she

13   took the position of China Portfolio Manager with the

14   duties as an Analyst over major markets too.  So when

15   she took over that additional assignment, we decided to

16   close that position.  So in other words we didn't fill

17   the position with an outside hire.

18   Q.    Okay.  In the interview process for the China PM,

19   when you interviewed Ms. Chan, do you remember, um, your

20   impressions of whether you thought she was a suitable

21   fit for that job?

22   A.    So I thought she had potential as an investor and

23   so I had a positive impression from the interview, but,

24   um, I thought her experience fell short with being a

25   candidate for the Portfolio Manager role at that time.

1    Q.    Okay.  Um, the audio here is a little bit fuzzy so

2    I'm just going to ask you to slow down a tiny bit, um,

3    so that we can hear.  It's not your fault, it's more the

4    audio here.

5         Do you have the exhibits in front of you?

6    A.    I do.

7    Q.    Okay.  I have Exhibit 327.

8         MR. PATERNITI:  And, your Honor, I have all the

9    paper copies of that so as not to put them on the

10   screen.

11        THE COURT:  So long as he can respond, you can

12   proceed.

13        MR. PATERNITI:  Okay.  And for the jury to see

14   that exhibit, I have paper copies for the jury as well

15   or we could do it however as Ms. Gaudet suggests.

16        THE COURT:  What, do you want to just pass out

17   that exhibit now?

18        MR. PATERNITI:  I wasn't sure if the technology

19   could show the exhibit on the screen.

20        THE COURT:  The answer is no.

21        MR. PATERNITI:  All right, so I'd like to pass out

22   the exhibit, if I could?

23        THE COURT:  No objection to that, is there?

24        MR. HANNON:  No, your Honor, not at all.

25        THE COURT:  The Clerk will pass it out.  You

1    proceed while that's going on.

2         MR. PATERNITI:  Yes, thank you, your Honor.

3    Q.    Now, Mr. Baxter, um, you provided feedback as part

4    of Wellington's feedback process, um, regarding that

5    interview in January of 2013 and I'm going to ask you to

6    take a look at that.

7    A.    (Pause.)

8    Q.    Do you see it?

9    A.    I --

10   Q.    We're on the last page of the exhibit.  Let me

11   know when you find it?

12   A.    (Looks.)

13   Q.    Are you there?

14   A.    Yes, sir.  The list only goes up to Exhibit 225.

15   I don't see anything beyond that.

16   Q.    Well I can't see it on my screen.  But it's, um --

17   do you see where your name is on the -- on the feedback

18   in January of 2013?

19   A.    I see the yellow highlight.

20   Q.    Okay, there it is.

21   A.    Yes, there we go.

22   Q.    Okay.  And if we could take a look at the

23   narrative.  I just want to ask you one question about

24   the narrative.

25         You mentioned somewhere in there that she's "green

1    as a PM," do you see that?

2    A.    (Reads.)  Yes, I see that.

3    Q.    Can you summarize for the jury what your thoughts

4    were, back in January of 2013, about Ms. Chan being

5    "green as a PM" versus her suitability for an Analyst?

6    A.    So "green" for it was being, um, she was really

7    lacking the requisite experience, um, and so I thought

8    at the time that she would benefit from having more time

9    as an Analyst.

10   Q.    Okay.  Were you, um -- were you the point person

11   in the hiring of Ms. Chan in terms of the prehire

12   process?

13   A.    Yes.

14   Q.    Okay.  Um, and let me show you Exhibit 11, it's an

15   e-mail, um, dated January 23rd, 2014.

16         MR. PATERNITI:  Yes, thank you, Ms. Gaudet.

17   A.    This one has, um, you can see on the side a second

18   screen here with the exhibit, it was an E-mail earlier.

19   So I can see it fine.

20   Q.    You can see it?

21   A.    Yes.

22   Q.    Okay.  And so this is an e-mail from you to Henry

23   Philip.  And do you remember Mr. Philip?

24   A.    Yes.

25   Q.    At the time he was in Human Resources in Asia,

```
 1    correct?
 2    A.     Yes, based in Singapore, yes.
 3    Q.     Okay.  And the -- the, um -- this e-mail -- and
 4    the subject matter is "Catch-up call with Gigi Chan."
 5    Do you see that?
 6    A.     Yes.
 7    Q.     At the time do you remember that she was in the
 8    New York?
 9    A.     Yes.
10    Q.     Was she working?
11    A.     I believe she was not working.
12    Q.     You believe she was not working?
13    A.     That's right.
14    Q.     Okay.  And you indicate here, on the fifth line
15    down, "As you know we are interested in having
16    Asia-based team members for global teams."  Did I read
17    that accurately?
18    A.     Yes.
19    Q.     Was that part of the, um, Wellington's
20    globalization of the investment platform effort?
21    A.     Yes.
22    Q.     Okay.  And the next sentence is, did you say, "I
23    ran the idea of being a Team Analyst by her and she was
24    very open to it."
25           Do you recall any further discussion you had with
```

1   her about a Team Analyst position in January of 2014?

2   A.    Yeah, so that was after we had closed out that

3   position that we did not hire for the China Portfolio

4   Manager, and I recall Gigi reached out to me directly,

5   um, reconnecting and inquiring as to whether there might

6   be other roles at Wellington.  And so we

7   opportunistically thought about ways to create a role to

8   bring her onboard.

9   Q.    Right.  Okay, I'm going to jump ahead and go to

10  Exhibit 18.  If you could pull that up in front of you?

11  A.    I have it.

12  Q.    Okay.  This is an e-mail a little bit later on and

13  this is now March 27th of 2014.  And the subject line is

14  "RE: Gigi Chan, Next steps."  Do you see that?

15  A.    Yes.

16  Q.    All right.  Now if I could just have you jump down

17  to, um, to the last page of this e-mail, I think it's a

18  two-page e-mail.

19  A.    (Looks.)

20  Q.    You wrote on March 27th of 2014 at 6:45 p.m., do

21  you see where I am?

22  A.    Yes.

23  Q.    Okay.  You wrote, and I'm just going to paraphrase

24  here, um, the second line, "Feedback has been positive,

25  not universally positive, definite signs of nerves,

1    talkativeness, scattered thinking in the pitch today,

2    but, no, outright no from anyone I've seen feedback

3    from."

4          Now, um, ultimately after you hired her and time

5    wore on, did you personally observe any issues with

6    regard to Ms. Chan's presentation style consistent with

7    that feedback?

8    A.    Yes, I did.  Um, she was quite scattered, um, used

9    a lot of filler words when she presented, and, um, was

10   quite hard to follow as, um -- so we missed a bit of

11   what she was saying.  I know we ultimately got her some

12   one-on-one training for that to try and help and coach

13   her to improve her presentation skills.

14   Q.    Okay.  And then you underline here in that

15   paragraph, "I say we make an offer."  Obviously it

16   sounds like you were positive enough on Ms. Chan to make

17   an offer for a Team Analyst position, is that correct?

18   A.    Yes, that's right.

19   Q.    And then if we run through the bullet points very

20   quickly.  It looks like you introduced the bullet points

21   by saying "Here's what I propose," and then you run

22   through what appear to be a number of options for how

23   Ms. Chan might start at Wellington, is that right?

24   A.    Yes.

25   Q.    All right.  And when we -- "If we look to hybrid

1    GIA GEPM role to start with," um --

2         We've already heard some testimony about "GIA,"

3    that's -- what is that, a "Global Industry Analyst"?

4    A.    That's right.

5    Q.    And that's under the Research Section of your

6    group?

7    A.    Yes.

8    Q.    Okay.  So these -- are these bullet points just

9    your thoughts about how to bring her in because she

10   wasn't being -- she wasn't coming into a specific open

11   position?

12   A.    Right, we didn't have an explicitly-defined role

13   that we were trying to fill at that time.

14   Q.    Okay.  And the last --

15   A.    That was part of my job in Asia, we were always

16   trying to find talented people to bring onboard.  So I

17   guess it was my attempt to creatively think how we could

18   bring somebody onboard when there was not a well-defined

19   role that was open.

20   Q.    The last bullet point says, "While she is

21   interacting with teams and catching up on coverage, also

22   ask her to take some time to develop a philosophy and

23   process statement for a Gigi-managed approach and give

24   her small seed capital if/when she's developed something

25   compelling."

1        Did I read that accurately?

2   A.    Yes.

3   Q.    Okay.  Is that something that you would commonly

4   do with somebody who's had money management experience

5   but coming in as an analyst?

6   A.    Yeah, that's typically what we would do.

7   Q.    Okay.  And then the last line down, I just want to

8   ask you a question.  It says, "We need to start taking

9   chances on good talent."

10       Do you remember why you felt you were taking a

11  chance here with Ms. Chan?

12  A.    Yes, again there was not a straightforward open

13  position that we were trying to fill.  Um, we were

14  trying to be creative about finding a good fit within

15  the firm for her, um, external talent.

16  Q.    Okay.  During the interview process did you have

17  any discussion with Ms. Chan about how soon she might be

18  looking at possibility managing money with a portfolio?

19  A.    We never discussed anything explicit about timing.

20  Q.    Okay.

21  A.    But I do recall that -- I recall that she was, um

22  -- she mentioned that her -- she had a competing job

23  offer from a firm that was, um, looking to hire her as a

24  Portfolio Manager.

25  Q.    Uh-huh.  Do you recall any discussion with

1    Ms. Chan about a timetable for when she might have

2    access to clients?

3    A.    Um, no, I wouldn't have discussed any timetables.

4    Q.    All right.  Now with regard to the hiring

5    exercise, um, you summarized that information and

6    provided it to Mr. Argyle, correct?

7    A.    Yes.

8    Q.    And after your recommendation for her to be hired,

9    did he approve it?

10   A.    Um, yes.

11   Q.    Okay.  Now she was placed on the Emerging Markets

12   Opportunities team when she came in, correct?

13   A.    Yes, that's right.

14   Q.    And did you understand that to be -- or strike

15   that.

16          Was there any discussion that you recall of a

17   possible rotation that she might do, um, rotating

18   through various Portfolio Management teams?

19   A.    I recall we had discussed some options around, um,

20   a more flexible role where she would work with different

21   teams all the time.

22   Q.    Okay.

23   A.    But I don't recall the specifics of that.

24   Q.    Okay.  Um, so let me ask you, um, in the, um,

25   timeframe of 2015, if we roll forward, the, um -- you

1   were asked -- well strike that.  Strike that.  Take a

2   look at Exhibit 385 before I ask you questions about the

3   philosophy and process panel.  Exhibit 385 is a resume

4   of Gigi Chan.

5        Do you have that in front of you?

6   A.   Um, I don't have that.  No.

7   Q.   You don't have that exhibit?

8   A.   No.

9   Q.   Okay.  Can you see it on the screen?

10  A.   Oh, yes.  Yes.

11  Q.   Okay.  I'm directing your attention to where she

12  has identified her experience at Wellington Management

13  from the years 2014 to 2017.  Do you see that?

14  A.   Yeah, I can see it now.

15  Q.   Okay.  She's identified her title as a "Portfolio

16  Manager," um, and under that she says, "Portfolio

17  Management, relaunched the China Opportunities Fund,"

18  um, and was, um --

19       There wasn't a fund at Wellington called "China

20  Opportunities Fund" that she launched, is that right?

21  A.   Um, no, I believe it was called "China Growth."

22  Q.   "China Growth Fund," okay.  But was your

23  recollection that she said it was similar to the China

24  Opportunities Fund she had run at Threadneedle?

25  A.   Um, I don't recall that specifically.

1    Q.    Okay.  The next line down says "Deputy on a USD $3
2    billion Emerging Markets Fund."  Now that presumably is
3    the Emerging Markets Opportunities Fund, Team Leader of
4    Greg Mattiko, is that accurate?
5    A.    So Greg Mattiko's Emerging Markets Opportunities
6    isn't necessarily a fund, but it's an overall
7    investment.  And the business was roughly $3 billion, I
8    believe.
9    Q.    Okay.  And this phrase, "Deputy," um, is that a
10   title used at Wellington?
11   A.    No.
12   Q.    Is it accurate for Ms. Chan to have said that she
13   was a "Deputy" on this fund?
14   A.    No, I wouldn't say that that's how you would
15   describe her role.
16   Q.    Why is that not accurate?
17   A.    Her role was a Team Analyst.  I mean, "Deputy,"
18   that sort of connotates that it's someone who would be
19   "deputized" to take over if the Portfolio Manager was
20   not available.  That would not be the case.
21   Q.    Okay.  Let's jump to the philosophy and process
22   panel.
23         You were a panelist, I think you just said, right?
24   A.    Yes.
25   Q.    And you have been a panelist on other philosophy

1   and process panels?

2   A.    I have.

3   Q.    Okay.  And do you recall Ms. Chan's presentation

4   at the philosophy and process panel?

5   A.    I do.

6   Q.    What do you recall about it?

7   A.    So I recall it was, um, a presentation about her

8   growth investing philosophy, um, and so she made some

9   points about how she invests in growth stocks and, um, I

10  know there was some back and forth questions from the

11  panelists.

12  Q.    Do you recall how she responded to the questions

13  from the panelists?

14  A.    Yes, she was quite confrontational, um, when given

15  feedback from panelists.

16  Q.    Um, do you recall specific feedback that you gave

17  her?

18  A.    I don't recall specific feedback in the meeting.

19  Q.    Okay.  Do you recall any feedback that anybody

20  else gave her -- and I'll ask you about June Oh in a

21  minute, but anybody else other than June Oh?

22  A.    So there was a broad range of feedback, I think,

23  we made a point for every one -- every panelist in those

24  meetings to be able to give feedback, and so everyone

25  present would have given some piece of feedback.  So it

1   was quite a wide range of feedback and advice.

2   Q.    Okay.  With regard to Mr. Oh, now you've been on

3   other panels with him?

4   A.    Yes.

5   Q.    And you've interacted with him in other business

6   settings?

7   A.    Yes.

8   Q.    How would you describe his communication style?

9   A.    Um, he's very blunt.  He's very direct.

10  Q.    Okay.  Was there anything about the comments he

11  made to Ms. Chan, in tone or tenor, that was any

12  different than his normal communication style as you

13  observed?

14  A.    No, he was communicating as he always does.

15  Q.    Okay.  Do you recall the feedback that he gave

16  her?

17  A.    It was regarding the -- again, roughly speaking,

18  the distracting nature of her communication style and,

19  um, her presentation style.

20  Q.    Did you agree with Mr. Oh's comments?

21  A.    I did.

22  Q.    What do you think -- well, strike that.

23        Did you find anything he said in his feedback to

24  Ms. Chan to be inappropriate?

25  A.    No.

1  Q.     Did you find anything he said in his feedback to

2  Ms. Chan to be disrespectful?

3  A.     No.

4  Q.     With regard to, um, the issue of whether or not

5  her presentation style was a relevant topic to discuss

6  at the philosophy and process panel, I know you had just

7  testified that there was a difference of opinion amongst

8  folks as to the relevance of that.  Why do you think

9  it's relevant?

10  A.     So I think the ability to communicate about your

11  investing approach is important, I think it's, um -- as

12  someone who might potentially invest in your fund, I

13  would want to understand how you think, that I would

14  want to walk away reassured that your thought process

15  sounds rational and repeatable.  So a communication

16  style that is rambling or scattered or feels unpolished

17  to me would be a warning sign that the investing

18  philosophy approach might not be rigorously followed.

19  Q.     Mr. Baxter, um, I believe you said you were in the

20  Hong Kong office when Ms. Chan worked there?

21  A.     Yes.

22  Q.     How did she -- from your observations, how did she

23  get along with the others in the office?

24  A.     So that changed over time.  Initially she was

25  welcomed in, um, but as the months and years moved on

1    she was more and more distant.

2    Q.    What is it that you observed?

3    A.    I observed her, um, being out of the office quite

4    a bit.  I mean it's typical for analysts to be out of

5    the office, but she was out more than most.  She was not

6    customer-friendly around the office and, um, in one

7    instance June Oh himself actually came to me and said,

8    "I just saw Gigi in the hall and she completely avoids

9    me, I don't understand what's going on there?"  So there

10   was a distance and a standoffishness that evolved and

11   developed over time.

12   Q.    Okay.  Did you observe, um, Ms. Chan, um,

13   collaborating or engaging with others in the office?

14   A.    Um, from time to time, but it was infrequent.

15   Q.    Okay.  Other than the complaints she had about

16   June Oh, did she ever complain to you about anybody else

17   in the office?

18   A.    I recall one complaint, um, about another, um,

19   fellow, an employee called Steve Richter.

20   Q.    What did she say about Steve Richter?

21   A.    She said he was rude towards her.

22   Q.    Do you remember the details?

23   A.    So I heard, um, that Steve and Gigi had shared an

24   administrative assistant and I was told that Gigi talked

25   with the assistant one day and Steve interrupted because

1   he had a time-sensitive travel issue that he needed

2   to talk to her about.

3   Q.    Did Ms. Chan say that she felt disrespected by

4   Steve Richter in that episode?

5   A.    I think she felt he was being rude, but I didn't,

6   um -- at the time it didn't, um, resonate as a

7   meaningful interaction, it was just an everyday office

8   interaction.

9   Q.    Okay.  Let's take a look at Exhibit 116, if you

10  could pull that in front of you.

11  A.    Okay.  (On screen.)

12  Q.    Exhibit 116 is an e-mail dated October 15th, 2015

13  from you to Charles Argyle.  And the subject line is

14  "Quick Update."  The first bullet point I want to direct

15  your attention to says "I had a lengthy convo with Gigi,

16  mostly listening."

17        That's referring to Ms. Chan, correct?

18  A.    Yes.

19  Q.    And then in your next sentence you say, "She's

20  sort of on a war-footing these days and I have very

21  strong doubts whether we can turn her around."

22        What did you mean by "war-footing"?

23  A.    Just a confrontational attitude and mindset.

24  Q.    And then you go on, "That she feels attacked and

25  belittled and disrespected and believes that June, Bo,

1    and Steve, feel threatened by her."

2         Do you remember any details about her comment to

3    you that June Oh, Bo Meunier, and Steve Richter, feel

4    threatened by her?

5    A.    Yeah, that's how she conveyed it to me.  These are

6    all three senior people at the firm and, um, yeah, she,

7    um, in her way of thinking they felt threatened by her

8    being there.  That's how she, um -- she, um -- that's

9    how she viewed it.  That was not what I observed, um,

10   but that was her perception.

11   Q.    And then you go on to say that "She gave as

12   examples the June Oh philosophy and process panel

13   commentary and a brief episode where she was huddling

14   with April Wong on trip logistics and Steve Richter

15   interrupted."

16        Was April Wong the admin that you were talking

17   about that they shared?

18   A.    Yes.

19   Q.    Okay.  You go on to say, you asked the question,

20   "Would having her run a portfolio mollify these

21   feelings?"  And then you answer your own question, "On

22   some level, yes, but on a deeper level the picture I'm

23   forming is someone who does not have a growth mindset."

24        What did you mean by all of this, posing the

25   question about satisfying her by giving her a portfolio,

1    but her not having a growth mindset?

2    A.    So a "growth mindset" refers to someone who's

3    willing and able to take on feedback and learn from

4    mistakes, and so would improve and get better.  So it

5    was the lack of that that I was seeing in her at the

6    time.  From the standpoint of what I observed to be her

7    -- her feelings, her mindset, um, that in a world where

8    she thought that these people were threatened by her, I

9    couldn't quite understand that.  But maybe I was

10   thinking that she had, um -- that she was in a mindset

11   where she -- if she were to be given a Portfolio Manager

12   title, that that would give her enough confidence to

13   feel less, you know, slighted or less confrontational

14   with her colleagues.

15   Q.    Okay.  So towards the end of that bullet point,

16   um, you say, um, you summarize your exchange with her

17   about June Oh's comments, um, and then you say, "There's

18   a lot more but my enthusiasm to creatively look for

19   China Growth seed funding is waning."

20         China Growth again was the fund that she was going

21   to be launching and launched in 2016, correct?

22   A.    Yes.

23   Q.    And, um, you're conveying now to Charles Argyle

24   that "your enthusiasm to look for funding, seed funding,

25   was waning."  What does that mean exactly?

1    A.    So, yeah, seed funding is where a client of the

2    firm or a prospective client, um, would be willing to,

3    um, be the first investor in that new fund.  It would

4    allow the company then to create a fund, as they call

5    them, and build a business around it.  And so to sort of

6    actively engage in that process would mean to sort of

7    reach out to GRG, which is the relationship group, which

8    is basically the sales staff of the firm, and we have

9    support there, the ability to kind of work on it, this

10   new potential product to outside clients.  But at that

11   point I was a little less sure on whether that was a

12   good idea.

13   Q.    With regard to, um -- well let's move on to the

14   next exhibit, 138.

15   A.    Okay.  (On screen.)

16   Q.    That is an e-mail dated December 8th, 2015 to

17   Ms. Chan from you, copying Charles Argyle and

18   backcopying Henry Philip.  Do you see that?

19   A.    Yes.

20   Q.    And the subject line says "Follow-up from YE

21   discussion."  Is that "Year-End discussion"?

22   A.    "Year-end," yes.

23   Q.    Was it generally your practice to send e-mails to

24   the investment talent after you had a year-end meeting

25   summarizing their performance over the year?

A.     Exactly, that's right.

Q.     Okay.  All right.  So let's jump down to the
second paragraph, about two-thirds of way down, it says,
"One theme I heard a few times was regarding
responsiveness, 'I wish she could be more approachable
via e-mails,' was one quote, and I heard directly from a
few other folks with similar comments."

       Why would you include that in an investor's
year-end review?

A.     So Wellington as a firm values collaboration, you
know sharing ideas, um, not only does it help the
clients by getting more ideas into portfolios, but it
also helps to develop talent by reaching out and sharing
ideas, asking questions.  So, um, to be responsive to
being asked or to be interacted with or to ask questions
of others, that's a big part of the investment process.
So you'd want to be fostering that in your Analysts.

Q.     Okay.  Terrific.  Okay.  With regard to that, um,
second paragraph -- I'm sorry, the third paragraph, "The
only consistent area of constructive feedback for you
relates to communication."  And then you go on to say,
"I do need to stress that this feedback is nearly
universal and strikingly consistent."

       Do you remember where that feedback was coming
from?

1  A.    So there's, um, a process where it appears other

2  investors, other analysts, other PMs would, um, put out,

3  you know, something digital, um, and also it's where

4  others could just list things directly and make

5  observations as well.

6  Q.    Okay.  And with regard to your own observations,

7  did you attend the Asia summit in November of 2015?

8  A.    I did.

9  Q.    What was that?

10  A.    That was a showcase for our clients, um, many of

11  them were U.S.-based clients that actually flew out to

12  the Hong Kong office and spent a couple of days, um, in

13  our office, um, sharing with our investment teams that

14  were based in Asia, and I believe there was sort of a

15  field trip related to that, and then these clients would

16  then go off to China or Tiawan or somewhere else for

17  another day or so of meetings.  So I attended the Hong

18  Kong-based part of that, so.

19  Q.    Do you recall Mr. Mattiko presenting at the Asia

20  summit?

21  A.    So I attended a meeting where Mr. Mattiko and

22  Ms. Chan co-presented to this group of 50-or-so clients.

23  Q.    Okay.  And what was your opinion of her

24  presentation style to that group of clients?

25  A.    Yeah, it was, um, consistent with my previous

1    experience with her presenting, I felt she was quite

2    scattered, I think she rambled, used a lot of filler

3    words.  It was striking that she was presenting or

4    co-presenting with Mr. Mattiko because the style

5    differences were quite stark, he was very concise and

6    authoritative, she was rambling and was, um, not clear.

7    Q.    Okay.  With regard to your comments, jumping back

8    to the year-end e-mail, you say, um, about the middle of

9    the way down, you say, "As you spend more time pitching

10   China Growth" --

11        And that's the fund that she was going to launch

12   the following year, right?

13   A.    Yeah.

14   Q.    -- "clear and succinct communication will be even

15   more important.  We can certainly organize more training

16   sessions in 2016, however the coaching is only going to

17   be effective if you open yourself up to the feedback and

18   embrace the opportunity to improve yourself in this

19   area.  At times you have come off as resistant or

20   closed-off to feedback."

21        Did I read that accurately?

22   A.    Yes.

23   Q.    Okay.  And what is it that led you to conclude

24   that at times she came off as resistant or closed to

25   feedback?

1    A.    It's based on my observations, it's based on, um

2    -- you know I don't know the dates exactly, but I

3    believe we would have had some, um -- this professional

4    presentation skills consultant, um, he would have

5    already met with her at that point.  But, yeah, I sat in

6    on the part of that session between Ms. Chan and this

7    external consultant and I thought that she was closed

8    off to the feedback there, um, and with that philosophy

9    and process panel that had been discussed earlier.

10   Again the whole point of that meeting is to deliver

11   feedback to help our investors, um, learn from their

12   peers and get better and she was quite closed off to

13   that feedback.  So it was a consistent point.

14   Q.    Mr. Baxter, were you aware of -- well, strike

15   that.

16        Well just to pinpoint us in time, at the end of

17   2015 you moved into your job with GRG, right, as a

18   Business Manager on the GRG side?

19   A.    I don't recall the exact timing but, um, at some

20   point.

21   Q.    Okay.  But -- so in this transition period --

22   well, by the way, who was taking your place as the GEPM

23   Associate Director?

24   A.    So there is, um, a body of work transitioning, I

25   think I was transitioning to an internal role within

1    Hong Kong and Cheryl Duckworth, who I mentioned earlier,
2    she was transitioning from Singapore back to the Boston
3    office.  So the body of work that the two of us had done
4    was basically being observed by Adam Jerrits, who was
5    relocating to Boston, and Henry Philip, who was
6    transitioning to a new role in Singapore.
7    Q.    Okay.  Do you recall in 2016 at some point, um,
8    Ms. Chan doing some dry-runs of presentations, client
9    presentations for the GRG group in Boston?
10   A.    Yes, I recall that.
11   Q.    And do you recall -- well, first of all, let me
12   ask you this.  Do you remember Liz Hogbin?
13   A.    Yes.
14   Q.    What was her role at that time?
15   A.    So she was the Investment Director for the
16   Emerging Markets suite of products, which basically
17   means she's the internal business person that, um, sort
18   of oversees the product integrity for our Emerging
19   Markets portfolios, and also as part of that role she
20   would speak to clients about our Emerging Markets
21   equities and capabilities.
22   Q.    Okay.  Exhibit CN, which is a letter exhibit, um,
23   is the next document I'd like for you to take a look at.
24   A.    (Looks.)
25   Q.    Let me know when you have it?

1    A.    I have it, yes.

2    Q.    Okay.  Now in May of 2016, um, Ms. Hogbin provided

3    you with feedback regarding those GRG dry-runs -- at

4    least one GRG dry-run that Ms. Chan had, correct?

5    A.    Yes.

6    Q.    And did you communicate that on to Mr. Argyle as

7    part of your duties and responsibilities?

8    A.    Um, I don't specifically recall.

9    Q.    Okay.  Is this something in your general meetings

10   with Mr. Argyle that you would have addressed with him,

11   the issue of Ms. Chan's status with regard to, um, her

12   presentation style or any marketing that she was hoping

13   to do?

14   A.    Yes, that would go -- it was a topic consistently

15   that we discussed.

16   Q.    And who was, um -- who was Andria Weil?

17   A.    Andria Weil was a Relationship Manager based in

18   Boston, um, and her client base, I believe, was, um,

19   sort of university endowments and donations, that sort

20   of thing.  So it would have been, um, the type of client

21   that would sort of invest potentially in regional or

22   specific funds including China funds.

23   Q.    Okay.  Based upon what you, um, heard from

24   Ms. Weil through Ms. Hogbin, did you reach any

25   conclusions as to, um, Ms. Chan's, um, readiness for

1   getting in front of clients to pitch her product?

2   A.    So this type of feedback from sort of a frontline

3   client or person was very important because these are

4   the people that would make -- actually do the work to

5   reach out to clients and would put their reputation on

6   the line by having someone come in and speak to that

7   client.  So for someone who is in that position to say

8   that --

9        MR. HANNON:  Objection, your Honor.

10        THE COURT:  Wait.  Wait.  Wait a minute.  Wait a

11   minute.  Excuse me.

12        You object?

13        MR. HANNON:  I object to the hearsay based on the

14   witness's --

15        THE COURT:  Yes.  I have to do my -- this is the

16   judge and I have to do my part here.  He's objecting to

17   your saying what other people said to you, and at that

18   point I'm going to sustain that.  And so you've

19   completed your answer.

20        Go ahead, Mr. Paterniti.

21   Q.    Without getting into what Ms. Weil stated, what if

22   any conclusions did you reach about whether Ms. Chan was

23   ready for presenting to clients based upon all of your

24   observations and feedback you had received?

25        MR. HANNON:  Objection.

1        THE COURT:  Well sustained because it's in part
2   based upon the hearsay.
3   Q.    Did you personally come to any conclusions as to
4   whether or not Ms. Chan's presentation style was at a
5   point where she was ready to go in front of clients?
6   A.    So I had occasion to be in the room for several
7   client events.  We talked about the client forum, but
8   there were a number of other small group meetings with
9   Mr. Mattiko and Ms. Chan as representatives of
10  Mr. Mattiko's approach.  I had seen Ms. Chan in front of
11  clients on more than one occasion.  Again I'm not sure
12  of the dates of these, but it was closer to the end of,
13  um, my time in GEPM and more so during my time in GRG,
14  so it would have been 2015, 2016, sort of in that
15  timeframe.  And my personal observation was that her
16  presentation style to clients was, um, not at the
17  standard that would have been, um, expected of a
18  Portfolio Manager.
19  Q.    Okay.  Let's turn to, um, Exhibit 207.  You
20  mentioned Ms. Duckworth before.
21        When you were in your position in GEPM as an
22  Associate Director, did you communicate, um, with some
23  frequency with Ms. Duckworth about investment talent in
24  Asia-Pack, Asia-Pacific?
25  A.    Yes, we would meet regularly, usually by video or

1    by phone, because she was based in Singapore and I was

2    based in Hong Kong.

3    Q.    Okay.  This is an e-mail she sent you on August

4    26th of 2016 and she sent it also to Mr. Argyle and

5    Mr. Philip, and she starts by saying a bit of an update,

6    "Nothing surprising, but I continue to think that her

7    time at Wellington is challenged due to her attitude,"

8    and the subject line is "Gigi meeting."

9         Did you understand that to be referencing

10   Ms. Chan?

11   A.    Yes.

12   Q.    Okay.  And then she goes on and explains the basis

13   for her opinion.

14        Do you recall having more than one communication

15   with Ms. Duckworth about Ms. Chan's attitude?

16   A.    Yes, we spoke about her attitude on multiple

17   occasions.

18   Q.    Okay.  The next document is 225, it's an e-mail

19   dated October 19th, 2016 from you to Mr. Argyle, and you

20   start it by saying, "Hi, Charles, for what's it's worth

21   I'm finding it more and more difficult to see how Gigi

22   can make it here."  And then you refer to, um, you refer

23   to, um, the below e-mail chain.  And instead of just

24   reading it all, do you have any recollection such that

25   you can summarize for the jury why it is you felt that

1    you were finding it more and more difficult to see how
2    she -- how Gigi makes it at Wellington?
3    A.    Sure.  One of the key aspects of the firm's
4    culture was collaboration, as we've discussed earlier,
5    and so people get to share knowledge and information
6    that they have to help others, and that is the
7    cornerstone of how the firm operates, it's sort of the
8    grease to the wheels in that place.  So to have somebody
9    be so, um -- to respond in an e-mail in this way, um,
10   basically to say, "No, I can't help you," um, it struck
11   me as against the culture of the firm, and it was an
12   indication that, um, she's not really embracing the
13   firm's culture, and, um, that was an unusual type of
14   message to receive.
15   Q.    Okay.  And you -- in the second line you say, "To
16   me it's needlessly confrontational and presumes a
17   certain level of secondrateness on our behalf."
18        Do you remember why you thought it was needlessly
19   confrontational and presumed this level of
20   secondrateness?
21   A.    I'll reread the -- it was -- (Reads,)  Yeah, it's
22   just, um -- it just reads as quite abrupt and, um -- and
23   the fact that "It's not worth these people's time to
24   connect with us" means that -- I took it to mean that
25   she just didn't feel that she wanted to, you know, share

1    or help out others in the firm.

2    Q.    Okay.  Now the second paragraph, um, it reads,

3    "I'm sorry I missed this one, I truly don't recall any

4    inklings of this sort of attitude in the interview

5    process and I'm a little dismayed that this is where

6    we've come to."

7          When you say that you were "a little dismayed that

8    this is where we've come to," do you remember what you

9    were meaning to convey to Mr. Argyle at that point?

10   A.    So the sort of weight of the feedback and the

11   weight of my internal, um, observations, um, sort of --

12   that was evidence that Ms. Chan did not have, um, the

13   backing to succeed, and the feedback was increasingly

14   negative and my views were increasingly pessimistic.

15   And so this is sort of the -- that unless this gets

16   turned around, this is the sort of thing that happens

17   when people are asked to leave the firm.

18   Q.    Um, the, um -- by the way the subject line says,

19   "Heads-up for another potential HK-connect advisory

20   opportunity."

21         Do you remember an HK connect -- first of all, can

22   you just explain to the jury, very briefly, what an "HK

23   Connect advisory opportunity" means?

24   A.    So there was a government scheme between Hong Kong

25   and one of the Chinese governments to allow investors in

1    Hong Kong and Mainland China to invest in the stock

2    markets of each other's cities, so between Hong Kong and

3    Sheng Hai there was a scheme where Hong Kong-based

4    investors can invest in stocks and vice-versa.  Um, it

5    was part of the Chinese government's opening up over

6    time and, um -- and so a window there provided business

7    opportunity for some institutions that wanted to create

8    a fund to exploit those new linkages between, um, their

9    jurisdictions and Hong Kong and Mainland China.

10    Q.    Okay.  Do you remember one of those potential

11    opportunities, advisory opportunities being referred to

12    as "Ming Sheng" or "Ming Sheng Tongwee"?

13    A.    I have a recollection of speaking with Dr. Alex

14    Qian, who was the China sort of business developer.  So

15    that name rings a bell a lot.  That was probably what he

16    was referencing.

17    Q.    Okay.  Let's move on to the next exhibit, which is

18    -- bear with me here.  (Pause.)  Oh, I think I might be

19    done, if not close to being done with exhibits and with

20    my questions to you.

21        Mr. Baxter, let me ask you this.  In all the time

22    that you were in the Hong Kong office, with Ms. Chan

23    also in that office, did she ever complain to you that

24    she felt she was being treated differently due to her

25    gender?

```
 1   A.     No.
 2   Q.     Did she ever complain to you that she felt she was
 3   being treated differently due to the fact that she's
 4   Asian?
 5   A.     No.
 6   Q.     Did she ever complain to you, in any way, shape,
 7   or form, that suggested to you that she was alleging
 8   that something was happening, um, relating to
 9   discrimination against her?
10   A.     No.
11   Q.     Did she ever complain to you about Bo Meunier?
12   A.     She referenced at one point that she thought Bo
13   was, um, intimidated by her, um, as it was referenced
14   earlier.  Well that's the one thing I can recall.
15   Q.     Okay.  Now just bear with me.  (Pause.)
16          Oh, you mentioned before that Mr. Oh, June Oh, um,
17   being an -- he was an investor, right, he was a
18   Portfolio Manager?
19   A.     Yes.
20   Q.     He had no management responsibilities over
21   Ms. Chan, correct?
22   A.     That's correct.
23   Q.     Okay.
24          MR. PATERNITI:  I have nothing further.
25          THE COURT:  Mr. Hannon, nothing further for this
```

 1    witness?

 2            MR. HANNON:  I do have some questions, your Honor.

 3            THE COURT:  You may.

 4            MR. HANNON:  Thank you, Judge.

 5

 6    REDIRECT EXAMINATION BY MR. HANNON:

 7    Q.    Mr. Baxter, you testified on -- in response to

 8    Mr. Paterniti's questions, that you essentially thought

 9    as though Ms. Chan was closed-off to accepting feedback,

10    is that fair?

11    A.    That's fair.

12    Q.    Were you open to accepting Ms. Chan's feedback?

13    A.    Yes.

14    Q.    Um, when Ms. Chan told you that she felt belittled

15    and disrespected, did you inquire of her as to precisely

16    why she felt that way?

17    A.    I don't recall.

18    Q.    When she provided you specific examples of conduct

19    that she thought were inappropriate, did you ask her why

20    those examples made her feel that way?

21    A.    So the example that she discussed with me was with

22    regard to that meeting that was discussed at the

23    philosophy and process panel, which I was in the room so

24    I had my own opinions about the appropriateness of it.

25    Q.    Sure, you had your opinions, but in terms of

1    understanding Ms. Chan's feedback from that meeting, did

2    you ask her why she felt the way she felt?

3    A.    I don't recall.

4    Q.    Did you ever consider that maybe from her

5    perspective the comments were inappropriate?

6    A.    No.

7    Q.    So we looked a few moments ago, Mr. Paterniti

8    showed you an e-mail from, um, from late 2016 in which I

9    think you said your reaction was that you felt as

10   though, um, it suggested sort of a secondratedness of

11   you.  Do you recall that?

12   A.    Yes.

13   Q.    Okay.  If Mr. Oh had sent you that same e-mail,

14   would you have had the same reaction?

15   A.    Yes.

16   Q.    Did Mr. Oh ever communicate with you in a direct

17   style?

18   A.    Um, yes, frequently.

19   Q.    Was he blunt in his communications?

20   A.    Yes.

21   Q.    Did you ever infer from Mr. Oh's direct and blunt

22   style that he meant you disrespect?

23   A.    No.

24   Q.    Um, we looked at some e-mails from 2015, um,

25   where, um, you were expressing the conclusion that you

1    felt as though Ms. Chan was closed-off to feedback,

2    right?

3    A.    Right.

4    Q.    As of that 2015 time period, am I right that you

5    had -- you had two sources of information from which you

6    were concluding she was closed-off to feedback, right?

7    A.    I -- I don't know about two.

8    Q.    Well let's spell them out.  So one was the

9    philosophy and process panel, right?

10    A.    Okay.

11    Q.    That was one of your sources of information that

12    caused you to conclude, in 2015, that Ms. Chan was

13    closed-off to feedback?

14    A.    Yes, that's right.

15    Q.    And the other data point you had was the Scott

16    Clark training you testified about earlier, right?

17    A.    Yes.

18    Q.    And that's all you can recall, right?

19    A.    Um, well there are my own observations as well and

20    they're --

21    Q.    But in terms of the observations -- sorry, I

22    didn't mean to cut you off.  Are you done?

23    A.    I'm sorry.  And also feedback that we received

24    through, um, you know other investors through our

25    internal feedback process.

1   Q.    Do you recall any such feedback that you received

2   as of 2015 that led you to conclude that Ms. Chan was

3   closed-off to feedback?

4   A.    Um, I believe there was, um, reference in the

5   exhibit.

6   Q.    Okay.  Aside from anything that's in any exhibit

7   that the jury has seen, do you recall anything else?

8   A.    Um, not at this time.

9   Q.    So drilling down a bit further on those data

10  points.  The Scott Clark trainings, that was a single

11  training session that you had observed, is that right?

12  A.    Yes.

13  Q.    And your characterization of that training session

14  now, sir, is that you felt as though she was somehow

15  closed-off?

16  A.    Yes.

17  Q.    Am I right that you can't provide any specific

18  details of anything that she actually said or did that

19  gave you the impression she was closed-off to that

20  feedback?

21  A.    Yeah, I can't recall the specific conversations.

22  Q.    And then with respect to the philosophy and

23  process panel, so there were some comments regarding, um

24  -- actually strike that.

25        In response to Mr. Paterniti's questioning, I

```
 1    think you used the word "confrontational" to describe

 2    Ms. Chan's behavior at the philosophy and process panel,

 3    is that right?

 4    A.    Right.

 5    Q.    And, um, there were some comments that she pushed

 6    back on, right?

 7    A.    Right.

 8    Q.    Am I right, sir, that you thought some of the

 9    pushback that she provided at the philosophy and process

10    panel was good?

11    A.    Um, what do you mean by "good"?

12    Q.    Well part of the discussion at the philosophy and

13    process panel actually concerned her philosophy and

14    process, right?

15    A.    Yes.

16    Q.    And when people challenged Ms. Chan on her

17    philosophy and process as an investor, she stuck to her

18    guns, didn't she?

19    A.    Yes, there was a discussion about growth investing

20    and there were some panelists who were partial to value

21    investing or other types of investing, so there was a

22    back and forth about the merits of growth investing.

23    Q.    And when that back and forth was happening

24    concerning Ms. Chan's philosophy and process, she stuck

25    to her guns, yes?
```

1    A.    Yes, that was my impression.

2    Q.    And you thought that was good, didn't you?

3    A.    Yes, it was a demonstration of her growth

4    investing philosophy.

5    Q.    And in fact you had a communication with

6    Ms. Duckworth about the fact that when it came to

7    Ms. Chan's philosophy and process, she stuck to her

8    guns, right?

9    A.    That would -- I don't specifically recall that but

10   --

11   Q.    Do you recall Ms. Duckworth telling you that that

12   part was "perfect"?

13   A.    Um, I don't recall that.

14   Q.    (Pause.)  You testified about some observations

15   you say you have that occurred in that 2015 Asia summit,

16   do you recall that testimony?

17   A.    The Asia forum?

18   Q.    Is that the one you were testifying about where

19   you --

20   A.    I think that's what we called it.

21   Q.    Okay.  So that was the one where you said that you

22   attended a presentation that both Mr. Mattiko and

23   Ms. Chan were at, is that right?

24   A.    Yes, that's the one.

25   Q.    Okay.  Did you ever record any of those

1  observations that you said you made down anywhere?

2  A.    I don't recall.

3  Q.    You're not sure if there's an e-mail you wrote to

4  anyone, you know, advising them of any serious concerns

5  that you had with respect to that summit?

6  A.    I don't recall.

7  Q.    Um, in terms of timing, um, Mr. Paterniti showed

8  you an e-mail with respect to, um -- strike that.

9  Mr. Paterniti showed you an e-mail where you had made

10  reference to Ms. Chan being on a "war-footing," do you

11  recall that?

12  A.    Yes.

13  Q.    And I think one of the things that you wrote in

14  that e-mail is you were questioning whether or not the

15  launch of China Growth might help mollify some of those

16  feelings, is that right?

17  A.    Yes.

18  Q.    Am I right, sir, that by the time you wrote that

19  e-mail, Charles Argyle had already told you that he was

20  planning to launch the China Growth Fund?

21  A.    I don't recall.

22  Q.    All right.  You mentioned Ms. Chan's comments

23  regarding a Mr. Richter in the Hong Kong office.  Do you

24  recall Ms. Chan indicating to you that she felt

25  physically intimidated by the way that he had treated

1    her?

2    A.    Yes, I do recall that.

3    Q.    Um, I think you indicated that your observations

4    of Ms. Chan was that you -- you thought she wasn't

5    friendly around the office, is that right?

6    A.    Yes, that's right.

7    Q.    Am I right that the only person from the Hong Kong

8    office to ever complain to you about Ms. Chan was June

9    Oh?

10   A.    Um, June Oh, um, Bo Meunier, um -- yeah, there

11   was -- there was more than just June Oh.

12   Q.    Who else?

13   A.    Well Bo Meunier mentioned as well that she

14   struggled to connect with Gigi.

15   Q.    Besides Mr. Oh and, I'm sorry, Ms. Meunier, did

16   anyone else ever complain about Ms. Chan in the Hong

17   Kong office?

18   A.    Um, not that I recall.

19   Q.    How did Ms. Meunier complain about Ms. Chan?

20   A.    She was encouraged to reach out and connect as,

21   um, another person focused on investing in China and,

22   um, she expressed frustration at how hard it was to

23   connect.

24   Q.    We saw a reference in one of your e-mails that

25   Ms. Chan had communicated to you that Ms. Meunier felt

1    threatened by her, do you recall that?

2    A.    Yes.

3    Q.    Did Charles Argyle tell you that he agreed with

4    that assessment?

5    A.    He wouldn't have agreed with that assessment, no.

6    Q.    So if you wrote down in an e-mail --

7          THE COURT:  Have in mind that the questions aren't

8    evidence of anything, the answers are the evidence.

9    It's up to you whether you believe it or disbelieve it.

10          And go ahead, Mr. Hannon.

11          MR. HANNON:  Thank you, your Honor.

12    Q.    So you never asked Ms. Meunier as to why she might

13    have felt threatened about Ms. Chan?

14    A.    I felt it was ludicrous to think that she would

15    feel threatened by Ms. Chan, so I wouldn't have had that

16    conversation with her.

17    Q.    You were asked some questions about Ms. Chan, um,

18    referring to herself as "Deputy" on the EMO fund.  Were

19    you familiar with what Wellington was telling clients

20    about Ms. Chan's role in the EMO fund?

21    A.    I was in a few meetings, as I mentioned, with some

22    clients that I was familiar with, specific instances of

23    how she was described as a Team Member for the fund.

24    Q.    Well not just as a Team Member, sir, wasn't she

25    being described as a seasoned PM?

1    A.    Um, I don't recall those words.

2    Q.    (Pause.)  I think you said -- well strike that.

3          Am I right that you answered Mr. Paterniti's

4    questioning earlier indicating you felt as though

5    Ms. Chan's prior experience as a Portfolio Manager was

6    not -- was not sufficient for Wellington's purposes, is

7    that a fair characterization?

8    A.    Yes, that's fair.

9    Q.    Okay.  Do you recall for how long Ms. Chan had

10   been working as a Portfolio Manager before she joined

11   Wellington?

12   A.    So I think it was something like 6 years.

13   Q.    Okay.  So it wasn't the fact that she had done it

14   for 6 years that led you to believe it was not

15   sufficient, right?

16   A.    Right.

17   Q.    Wellington, even at that point in time, had plenty

18   of Portfolio Managers who hadn't been Portfolio Managers

19   for 6 years, right?

20   A.    That's right.

21   Q.    Bo Meunier had not been a Portfolio Manager as of

22   that time for 6 years, right?

23   A.    That's right.

24   Q.    Okay.  So if it wasn't the -- if it wasn't the

25   length of time, um, did you do some investigation in

1   order to determine what the actual circumstances were

2   surrounding Ms. Chan's PM responsibilities at a prior

3   employer?

4   A.   So the CV mentioned she had been an Analyst for a

5   number of years, I believe it was 4 or so, which in

6   context would be a very very short amount of experience

7   as an Analyst upon which to be then named a Portfolio

8   Manager.  At Wellington somebody who's got 4 years of

9   experience would typically have those experiences be as

10  an Associate in the Research Team or as kind of a Junior

11  Analyst, and then after the 4 years or thereabouts, at

12  Wellington, that person would become an Analyst.

13       And I was familiar with some UK-based firms and

14  how they did things differently, I had worked in London

15  in 2007, 2008, so I was familiar with firms like

16  Threadneedle, although I did not know Threadneedle

17  intimately myself.  But I was familiar that U.S.-based

18  firms often used the "Portfolio Manager" title earlier

19  in one's career than Wellington would use it.

20  Q.   I'm not sure I understand your answer, sir.  So

21  you knew that Ms. Chan had started earlier in her career

22  as a Portfolio Manager, yes?

23  A.   Yes.

24  Q.   Okay.  But in terms of the actual experience that

25  she had in that role, those 6 years, did you gain any

1   information that led you to believe that the work she

2   actually did in that 6 years somehow was not Portfolio

3   Manager work?

4   A.   As I referenced, the amount of experience she had

5   leading up to being named a Portfolio Manager was not,

6   um, at the level that, um, that a typical Portfolio

7   Manager at Wellington would have had.  So I formed an

8   opinion that her foundational work as an Analyst, um,

9   was less solid than a typical Portfolio Manager at

10  Wellington.

11  Q.   And how about her actual performance as a

12  Portfolio Manager, did you look at that in trying to

13  assess Ms. Chan's experience?

14  A.   So we received some information about her prior

15  performance when she was being interviewed and in the

16  process of hiring her, um, she provided some information

17  about her past performance.  There was also a public

18  record of the fund, because it was publicly sold, so we

19  were able to get some information about her track record

20  as well.

21  Q.   And when you looked at the public information

22  concerning her track record as a PM, it was really

23  really good, wasn't it?

24  A.   Well her public track record was not as good as

25  what she told us the record was.  We actually did some

```
 1    work, um, in 2015 and found that she overinflated her
 2    performance.  But to your question, um, she had
 3    outperformed the market based on, um, our calculations
 4    of her performance during that period of time.
 5    Q.    Her performance as a PM in her prior employer was
 6    really really good according to her public track record,
 7    yes?
 8    A.    Um, I wouldn't characterize it as "really really
 9    good," but she had outperformed the market.
10    Q.    Do you recall by how much?
11    A.    I don't recall.
12    Q.    So your statement a moment ago about your belief
13    that she had somehow inflated her numbers, um, there was
14    some math that had to be done in order to account for
15    different fees, um, being charged by the fund in order
16    to determine actual performance, right?
17    A.    Um, yeah, typically you would account for fees and
18    that sort of thing.
19    Q.    And doing those calculations took some work,
20    right?
21    A.    Um, yes.
22    Q.    And there was some -- and as China Growth was
23    being launched, there was some back and forth within
24    Wellington about what the best way was to sort of
25    calculate that performance, right?
```

1    A.    I recall some back and forth on that, yes.

2    Q.    And that back and forth resulted in Wellington

3    concluding that the track record was -- was a bit lower

4    than Ms. Chan had believed, is that right?

5    A.    That's right.

6    Q.    Okay.  And lastly, with respect to Ms. Meunier,

7    um, am I right that Ms. Meunier's progression within

8    Wellington was very slow?

9    A.    Um, I wouldn't characterize it as that, no.

10   Q.    Well you said that Wellington, um, effectively

11   promoted Ms. Meunier when it decided to close this Team

12   Lead opening, is that right?

13   A.    Yes.

14   Q.    Ms. Meunier had been managing money as a Portfolio

15   Manager since 2010, right?

16   A.    So again you say "managing money as a Portfolio

17   Manager."  I believe from 2010 she would have been, um,

18   part of the Emerging Markets team and she was the China

19   expert on that team.  Prior to that I believe she had

20   invested in real estate and did research on real estate

21   stocks.

22   Q.    Do you recall when Ms. Meunier finally started

23   managing money on her own?

24   A.    So she became a major Portfolio Manager of China's

25   opportunities portfolio, and I don't know the exact

1    dates, but sometime around 2012 or thereabouts.

2    Q.    But am I right that she was actually managing that

3    fund for sometime before Wellington gave her the title?

4    A.    Um, I don't -- I don't believe that she was

5    managing the fund, um, I'd say she was a -- that she

6    worked with the Emerging Markets Fund and was a strong

7    person in the China stocks Emerging Markets Fund for a

8    number of years.  I don't believe she was running a

9    China fund until, you know, the 2013 timeframe.

10   Q.    Sir, do you recall being involved in an e-mail

11   communication concerning the need to change

12   Ms. Meunier's title so she wouldn't leave Wellington?

13   A.    The characterization that she wouldn't leave

14   Wellington?  I do not recall that.  I do recall having

15   an exchange with her about her title being changed.

16         MR. HANNON:  Okay, that's all I have, your Honor.

17         THE COURT:  Nothing further for this witness.

18         MR. PATERNITI:  I only have two questions, your

19   Honor.

20         THE COURT:  Go ahead.

21

22   RECROSS-EXAMINATION BY MR. PATERNITI:

23   Q.    With regard to your opinion that Ms. Chan was a

24   little "green" for Portfolio Management, what if any,

25   um, impact did your actual interview of her have on

1    forming that opinion?

2    A.    Well that was the basis of it.  We talked about,

3    um, investing, we talked about a couple of stocks she

4    invested in, and so the only question was -- I was

5    getting it from our conversation about her investing

6    ability, her ability to express and describe, um, the

7    investment process.

8    Q.    And just to clear up a potential confusion point,

9    there was testimony from you a couple of -- a minute ago

10   that Bo Meunier was a supportive Team Analyst on an

11   Emerging Markets team.  That's not the same Emerging

12   Markets team as Greg Mattiko, correct?

13   A.    Correct, it's a different team.  But we're a team-

14   based environment so there were multiple teams invested

15   in the investment process.

16   Q.  Okay.

17        MR. PATERNITI:  Nothing further, your Honor.

18        THE COURT:  Nothing further, Mr. Hannon?

19        MR. HANNON:  No, your Honor.

20        THE COURT:  Very well.

21        We'll take the morning recess at this time.

22   Ladies and gentlemen, you have not heard all the

23   evidence, so please therefore keep your minds suspended,

24   do not discuss the case either among yourselves nor with

25   anyone else.

1          The jury may stand in recess for one half hour.

2     I'll remain on the bench.

3          THE CLERK:  All rise for the jury.

4          (Jury leaves, 10:45 a.m..)

5          THE COURT:  All right.  In view of the odd

6     procedural posture of this case, I want to get all the

7     evidence I can, all the evidence the plaintiff has, in

8     support of the liability of Mr. Argyle for, um, the

9     intentional interference with advantageous contractual

10    relations.  So at 1:00 today, Mr. Hannon, I'm going to

11    ask you who, among your remaining witnesses, is going to

12    contribute to that, who's going to tell me any

13    additional evidence as to Mr. Argyle's liability for

14    intentionally interfering with Ms. Chan's advantageous

15    contractual relations?  That would not include Ms. Koide

16    and it would not include Mr. Carr.  We haven't heard

17    from Ms. Chan, Mr. Philip, Mr. Mattiko, Mr. Helfer.  At

18    1:00, you tell me who has evidence of those things and,

19    um, I want that evidence this week, in the next three

20    days.

21          As soon as we've got that evidence in, that is as

22    soon as you've finished your direct examination -- and

23    I'm not saying it's got to be confined to that, you can

24    try your case as smoothly and as persuasively as you

25    can, but as soon as you finish the direct examination of

```
 1    any of those witnesses who you're going to tell me has

 2    such evidence, I'm going to entertain a motion for

 3    directed verdict.  Understand now, my mind is completely

 4    open as to that and the plaintiff gets to put in all her

 5    evidence as to liability, um, of Mr. Argyle on the count

 6    against him.  But that day, that afternoon, we'll hear

 7    the motion for a directed verdict.  If the plaintiff

 8    survives that, so be it.  If the plaintiff does not

 9    survive that, then I'm going to hear the motion to

10    dismiss the remainder, not on the merits, but on the

11    ground that I don't have subject matter jurisdiction

12    over the remainder.

13         So at 1:00, and it's fair warning, tell me which

14    of these witnesses has anything to say about his

15    liability, um, on that tort as alleged against him, and

16    then I want to hear that evidence this week.

17         We'll take the recess for one half hour.

18         MR. HANNON:  Your Honor, if I could just make one

19    point with regard to trial process?  We had an agreement

20    before that the witness would only come up one-and-done.

21    We may want to reserve the right to cross Ms. Chan in

22    our case in chief.  I just wanted to give fair warning

23    of that.

24         THE COURT:  You may want to cross her in your case

25    in chief?
```

```
 1          MR. PATERNITI:  I'm going to recall her.

 2          THE COURT:  I understand that.

 3          MR. HANNON:  Okay.

 4          THE COURT:  We'll recess.

 5          THE CLERK:  All rise.

 6          (Short recess, 10:50 a.m.)

 7          (Resumed, 11:15 a.m.)

 8          THE COURT:  And we have to get Mr. Argyle back.

 9          (Pause.)

10          THE COURT:  And in view of the break,

11     Mr. Paterniti, I wonder if you want to suspend with him

12     and then call him as part of your case?  It's your call.

13          MR. PATERNITI:  Um, that is a good question, your

14     Honor.  Let me consult for a moment.

15          (Pause.)

16          MR. PATERNITI:  I think we will proceed with

17     Mr. Argyle now, your Honor.

18          THE COURT:  That's fine.

19          Let's remind the witness he's still under oath.

20          THE CLERK:  I would like to remind you, sir,

21     you're still under oath.

22          THE WITNESS:  Yes, I am.

23          THE COURT:  And you may.

24          MR. PATERNITI:  Thank you, your Honor.

25
```

1    CROSS-EXAMINATION BY MR. PATERNITI:   (Continued.)

2    Q.    Mr. Argyle, when we last left you we were

3    finishing up the recording from November 2nd of 2016,

4    and again during that meeting, or at any time before

5    that, had you been put on notice that Ms. Chan was going

6    to be recording you?

7    A.    Um, I had no idea that she was going to be

8    recording me.

9    Q.    Did she alert you to the fact that she recorded

10   you after the fact?

11   A.    Um, nope, she did not tell me after the fact that

12   she recorded me.

13   Q.    With regard to events that transpired after that,

14   I want to ask you some questions about the follow-up.

15         MR. PATERNITI:   And let's take a look at Exhibit

16   257.

17         (On screen.)

18   Q.    Do you see it there in front of you, Mr. Argyle?

19   A.    Yes, I do.

20   Q.    Exhibit 257 is an e-mail that you sent to Ms. Chan

21   20 days after the November 2nd meeting, correct?

22   A.    Um, yes.

23   Q.    And it indicates, in the subject line, "Follow-up

24   from November 2 conversation in Hong Kong."

25         THE CLERK:   The jurors aren't seeing this yet,

1     your Honor.
2          THE COURT:  The jurors aren't seeing it,
3     Ms. Gaudet let's us know.
4          (Pause.)
5          THE COURT:  Can you continue without it?
6          MR. PATERNITI:  Absolutely, your Honor.
7     Q.    The e-mail that you're looking at, Mr. Argyle, is
8     from November 22nd, 20 days after this November 2nd
9     meeting, correct?
10    A.    Um, that's correct.
11    Q.    Okay.
12          THE COURT:  And just so -- because we may want to
13    go back to it, it's in evidence as --
14          MR. PATERNITI:  257.
15          THE COURT:  257.  Thank you.
16          MR. PATERNITI:  Thank you, your Honor.
17    Q.    Now, Mr. Argyle, were you provided any --
18          MR. PATERNITI:  Oh, it's up there now?  All right.
19          (On screen.)
20    Q.    Mr. Argyle, were you provided any support from
21    Human Resources in drafting this?
22    A.    Um, I wouldn't describe it as "support in drafting
23    it," I did send it to Human Resources for their thoughts
24    on it, um, just for the input of fellow professionals
25    who may have seen a broad number of these situations.

1    Q.    As a standard practice you provided it to Human

2    Resources?

3    A.    Um, yes.

4    Q.    Okay.  And, um, what was the purpose that you had

5    in sending this e-mail to Ms. Chan after the November

6    2nd conversation?

7    A.    I would say to her, um, you know a couple of

8    purposes.  So, one, was to put in writing very clearly

9    feedback on areas that Ms. Chan needed to improve upon,

10   um, and act upon, um, if she was going to be successful

11   at Wellington.

12         The November 2nd meeting went in many different

13   directions, um, and even though it lasted for 70

14   minutes, there were things we didn't talk about at all

15   or we didn't talk enough about, I wanted to make sure

16   those points were clarified in this e-mail.  And I

17   wanted to restate how serious the situation was in this

18   e-mail.

19   Q.    Okay.  What were your thoughts about providing

20   Ms. Chan with an opportunity to further respond in

21   addition to the opportunity she had on November 2nd?

22   A.    I very clearly stated -- um, you can't see it on

23   the screen here, it's only on the second page.

24   Q.    Page 2?

25   A.    I very clearly stated to Ms. Chan that I expected

1    acknowledgement and a response, "Your reply and

2    acknowledgement," "I look forward to receiving your

3    reply and acknowledgement."

4    Q.    Okay.  So let's go back to Page 1, briefly.

5    A.    (Looks.)

6    Q.    The first bullet point you evoke the -- or invoke

7    the firm's ethos of "Client, Firm, Self," and indicate

8    that she has put herself first in those situations.  And

9    then you highlight the conversation from December of

10   2015 in which she even began a sentence with the phrase

11   "I demand."

12         Were you referring to the demand she made in that

13   meeting about getting the same client access as Bo

14   Meunier?

15   A.    Um --

16         MR. HANNON:  Objection, leading.

17         THE COURT:  Yeah, this is beyond the scope, so I'm

18   going to sustain it.  The fact that it's beyond the

19   scope doesn't trouble me in light of your agreement.

20   But sustained, don't lead the witness.

21         MR. HANNON:  Okay.

22   Q.  What were you referring to when you referenced the,

23   quote, "I demand" sentence that Ms. Chan had conveyed to

24   you the year prior?

25   A.    Well in December 2015, as we ascertained, Ms. Chan

1    and I met in Boston, and during that conversation she

2    demanded access to GRG, she demanded access to our

3    clients, and she demanded that she be given the

4    equivalent level of access to GRG and our clients as Bo

5    Meunier.

6    Q.    Okay.

7    A.    And that word, "I demand," was used, it's in

8    quotes here.  So that's not a euphemism that she

9    demanded it, she used the words, "I demand."

10   Q.    Okay.  The second page, the top paragraph, you

11   reference "Disappointment."  Why don't you just take a

12   minute to read it.

13   A.    (Reads.)  Yes, I've read it.

14   Q.    Okay.  Now you've expressed in this paragraph your

15   disappointment about what, um, your impression of her

16   lack of acknowledgement of these areas in the November

17   2nd meeting.

18        With regard to that issue, um, you include

19   "contributions to EMO team" and then you say "Let alone

20   broader collaboration."

21        In this situation, um, when an analyst is

22   struggling to perform their primary function as a Team

23   Analyst, um, because they are -- either have a paper

24   portfolio or are managing money for another portfolio,

25   um, is that -- is that a concern that you have?

1    A.    Um, I'll be very concerned if an analyst who we

2    were moving along that path, so to speak, could not

3    balance their responsibilities as a Team Analyst on the

4    team they were on.

5    Q.    And the -- I'm sorry, did I talk over you?

6    A.    Nope.

7    Q.    I just heard an echo.

8          "I have seen many portfolios launched," you wrote,

9    "at Wellington during my time here and I find it very

10   difficult to see this argument."

11         And let me just ask you, what exactly did you mean

12   by "difficult to see this argument"?

13   A.    Well to me it seemed that she acknowledged in the

14   recording on November 2nd that, um, she actually hadn't

15   focused as much on her responsibilities as she should

16   have done, she said that was because of the distraction

17   of launching China Growth.  I've seen many many

18   different approaches launched at Wellington Management

19   Company over the 17 years that I was managing investment

20   professionals and I know how complicated it is or not to

21   launch a fund, to do everything entailed in that

22   process.  I know what Wellington does and I know what

23   the Portfolio Manager does.  And even if Wellington

24   doesn't do everything right, I have a rough feel for how

25   much the extra burden is on the Portfolio Manager, and

1    it should not be a distraction from one's day-to-day

2    responsibilities.

3    Q.    Okay.  Do you have the authority to close a fund?

4    A.    Yes, I do.

5    Q.    And in a situation where a Team Analyst is not

6    doing their analyst job because they're focused all on

7    their fund, you would have the authority to shut that

8    fund down so they focus on their day job?

9    A.    Yeah, I would have the authority to shut that fund

10   down, I would have the authority to shut a fund down if

11   I had a billion dollars in client's assets, if the

12   person wasn't following their responsibilities.  Yes.

13   Q.    The next paragraph you say you -- you mention

14   that, um -- that she referenced -- the first sentence

15   says "You referenced exasperation that underlies some of

16   the behavior above as a function of miscommunication

17   with regard to career expectations."  And then you go on

18   to reference, "The offer letter being clear that she

19   joined as an Equity Research Analyst."  And, quote,

20   "There seems to be no supporting evidence of a

21   conversation with you committing definitively to a

22   Portfolio Manager role in your first couple of years

23   here."

24          What if anything did you do to try to determine

25   whether any such conversations or representations were

1    made to her?

2    A.    I -- at least on one occasion, but I believe on

3    more than one occasion I reached out to Mr. Baxter and,

4    um, Henry Philip, um, with respect to saying, "What did

5    you guys say?"  Because I knew that I hadn't made any

6    assertions.

7    Q.    Okay.

8         MR. PATERNITI:  Let's go to Exhibit 258, please.

9         (On screen.)

10   Q.    Now, this is, um -- the first e-mail is the same

11   e-mail you sent to Ms. Chan and then you forwarded it to

12   her Team Leader, Mr. Mattiko, as well as Mr. Baxter, do

13   you see that?

14   A.    Um, yes, I do.

15   Q.    Okay.  And then Mr. Mattiko responds to you

16   indicating that, um, "Ms. Chan proactively came over and

17   discussed stocks with me this afternoon, something

18   reasonably rare, a good sign, let's see where it goes

19   from here."

20        Now Ms. Chan began her maternity leave in mid

21   December, I believe is -- we've already established,

22   correct?

23   A.    Um, yeah, I don't know the exact date, but in mid

24   December, yes.

25   Q.    Do you recall hearing anything from Mr. Mattiko

1    further in that time period about whether Ms. Chan had

2    engaged in any more collaboration or --

3    A.    No.  No.  No.  Sorry.

4    Q.    I'll stop it there.

5    A.    I don't recall, um, Mr. Mattiko saying that she

6    had engaged in any further collaboration after this

7    e-mail.

8    Q.    All right.  And between November 22nd when you

9    e-mailed Ms. Chan and the time that she went out on

10   maternity leave, did you hear from Ms. Chan

11   acknowledging the e-mail that you sent?

12   A.    Um, no, I did not, which I found surprising given

13   her expectations of responsiveness from colleagues.

14   Q.    And if we could go back to, um -- actually it's in

15   front of me.  If you could scroll down to that e-mail,

16   please, to Page 2, the paragraph under the paragraph

17   that starts "To set expectations going forward."

18   A.    (On screen.)

19   Q.    You indicated that "The short-to-immediate term

20   imperative is for her to respond to the feedback shared

21   in person and in writing here and hoping that she would

22   embrace it, especially the requirement to have more

23   impact on EMO and be more positive and collaborate, et

24   cetera."  You say "If there was no sustained improvement

25   in this respect, then we will need to have a more

1    difficult conversation later next year."

2         What did you mean by that?

3    A.    Um, if there was no sustained improvement, then

4    Ms. Chan's -- the difficult conversation pertaining to

5    the cessation of the end of Ms. Chan's employment at

6    Wellington.

7    Q.    Okay.  And so, um, and I'm sorry if I just asked

8    you this, but you didn't hear from Ms. Chan between this

9    time and the time she went on maternity leave?

10   A.    No, I did not.

11   Q.    Did you hear from her upon her return from

12   maternity leave in early April 2017 through June 9th of

13   2017?

14   A.    No, I did not.

15   Q.    Did you ever hear from Ms. Chan in response to

16   this imperative that she respond?

17   A.    I never heard from Ms. Chan.

18        MR. PATERNITI:  Let's take a look at Exhibit 273.

19        (On screen.)

20   Q.    With regard to Mr. Mattiko, you did hear from him,

21   correct, in terms of his feedback on Ms. Chan's

22   collaboration with the EMO after she returned from

23   maternity leave?

24   A.    Yes, I did.

25   Q.    And this is a May 2nd, 2017 e-mail from

1   Mr. Mattiko to you regarding Ms. Chan, correct?

2   A.    Yes, it is.

3   Q.    And in this e-mail, um, he indicates that he had

4   had a brief chat with Ms. Chan, but, um, directing your

5   attention to the fourth single-lined paragraph, "She has

6   not increased her contribution to the EMO team at all

7   and seems solely focused on her China Growth portfolio."

8         Do you see that?

9   A.    Yes, I do.

10  Q.    Did you believe Mr. Mattiko when he provided you

11  this feedback?

12  A.    Um, yes, I did.

13  Q.    And what if any concerns did you have when you

14  received that feedback from Mr. Mattiko?

15  A.    Um, I was incredibly concerned because I had made

16  -- I had spent the last three years -- three years

17  trying to help an investment professional be successful

18  at Wellington Management Company and it was becoming

19  undebatable that that wasn't going to happen.

20        And the other thing is we were asking Ms. Chan to

21  collaborate more with her Team Leader.  Most Team

22  Managers are speaking to their Team Leaders every single

23  day.  We weren't asking her to pick stocks that doubled

24  in three weeks, we weren't asking her to pick -- to

25  identify -- seeking to measure her performance with

1    respect to her investments over a discrete three weeks,

2    we were asking her to engage in conversations that would

3    impact our clients' portfolios on a day-to-day basis.

4    This could have been corrected in 24 hours, this is not

5    something that should have been -- that should have

6    taken this length of time to rectify.

7    Q.    Let me ask you a question, I just want to switch

8    gears for a minute and I'll come back to our timeline.

9          But you had testified about, um, this advisory

10   opportunity with a potential client called Ming Sheng,

11   do you remember that?

12   A.    Um, yes, I do.

13   Q.    In this timeframe do you remember the status of

14   that potential opportunity or the discussions with Ming

15   Sheng?

16   A.    Um, I don't, um, fully recall the status, I

17   believe the conversations are over.

18   Q.    And why did you believe they were over?

19   A.    Because I had, um, instructed GRG that, um, as the

20   head of GEPM, I believe they should be over.  And that

21   was at the end of 2016.

22   Q.    Now, Mr. Alex Qian, he was the GRG sales person or

23   business developer who had been pursuing that, correct?

24   A.    Um, that's correct.

25   Q.    Do you recall whether you had any conversations

1    with his supervisor, Ray Helfer, about it?

2    A.    I -- I don't recall.  Um, possibly.  I know I

3    spoke to -- Mr. Helfer was the head of the Hong Kong

4    office so in a kind of matrix function he was head of

5    Hong Kong and, um, I was obviously head of the Equity

6    Portfolio Management function and, um, I know I talked

7    to Mr. Helfer about, um, Mr. Qian -- not Mr. Qian, but

8    Ms. Chan.

9    Q.    When you testified about Ming Sheng, I think you

10   said something to the effect that "They thought they

11   could get the fund up to $100 million," and I just want

12   to explore that a little bit.

13         When you're talking about $100 million, are you

14   talking about money invested by third-parties into the

15   fund, would that be the $100 million that they

16   projected?

17   A.    Um, I can't remember the specifics of the Ming

18   Sheng opportunity.  If it was a fund, if it was a

19   subadvisory fund, um, then usually they launch it with

20   seed capital themselves and they assert, usually very

21   optimistically, about what their growth trajectory might

22   look like because they want to attract an Asset Manager

23   of the quality of Wellington, um, very often those

24   growth trajectories pan out, um, even if we end up with

25   a situation where Wellington's managing it.

1    Q.    So the -- but the 100 -- I just want to make

2    clear, the $100 million wasn't $100 million coming to

3    Wellington?

4    A.    The firm?

5    Q.    Yes.

6    A.    All the -- every time we're managing money, that's

7    our client's money, that's not Wellington's money.  So,

8    yes, that $100 million is our client's money.

9    Q.    So when Ms. Chan returned from maternity leave,

10   um, prior to your receiving this May 2nd e-mail or even

11   after, had you made up your mind about whether she

12   should be terminated?

13   A.    When she returned from maternity leave?

14   Q.    Yes.

15   A.    No, I hadn't.

16   Q.    Okay.

17         MR. PATERNITI:  Let's take a look at Exhibit 275.

18         (On screen.)

19   Q.    Exhibit 275 is an e-mail that you sent to Henry

20   Philip.  At the time now Mr. Philip is in a GEPM

21   management role, is that right?

22   A.    Um, he's -- um, sorry, I know this is complicated.

23   Q.    Well let me make it --

24   A.    Mr. Baxter, he was -- we were asking him to serve

25   in that role even though -- in parallel to the role.  He

```
 1   functionally sat in research, but in Asia we'd share
 2   resources.
 3   Q.    Okay, sorry to make it so complicated.
 4         You sent an e-mail to Mr. Philip, copying
 5   Mr. Baxter and Adam Puritz, indicating, um -- I'm sorry,
 6   strike that, let's go to the -- let's start from the
 7   beginning.
 8         Mr. Henry -- Mr. Philip sent you an e-mail on May
 9   4th saying that, um, "This topic has come up a couple of
10   times recently, is obviously quite sensitive.  There's
11   been a couple of occasions recently whereby Gigi's
12   strategy has been a potential interest to prospects.
13   Alex" --
14         And again that's "Alex Qian," the salesman?
15   A.    Um, I would assume so, yes.
16   Q.    -- "came to me the other day on this and Tom again
17   on a separate opportunity today.  I would think they are
18   necessarily definitive mandates at this time" --
19         Now what does that mean, "definitive mandates"?
20   A.    Um, it's so much -- business developers, they go
21   out on the road and they try and talk to our clients
22   about why they might be interested investing their
23   money.  So much doesn't pan out.  I've only ever been
24   deep-sea fishing once, I got a lot of bites, I didn't
25   catch any fish.
```

```
1    Q.    So a "definitive mandate" would be catching a
2    fish?
3    A.    I would even say it that a "definitive mandate" is
4    the act of reeling in the fish, but whether you actually
5    get it in the boat?  Who knows.
6    Q.    Okay.  So it says, "How do we feel about having
7    prospects engage with her at this stage?"  And then you
8    respond indicating that "Somebody needs to sit down with
9    her and, quote, 'ascertain where her head is at'."
10         What did you mean by that?
11   A.    I meant that I had absolutely no response from my
12   e-mail from November 22nd.
13   Q.    Okay.
14   A.    And, you know, I hoped that that could be handled
15   locally.
16   Q.    And then in the next paragraph you go on and say,
17   "Realistically I doubt there is a long-term home for her
18   on the EMO team other than the vaguest of affiliations
19   perhaps.  Greg deserves clarity here from her and us so
20   he can move on one way or the other."
21         Is that referring to Greg Mattiko?
22   A.    Yes, that refers to Greg Mattiko.
23   Q.    You then go on to say, "Then the key question with
24   respect to Gigi becomes 'Are we willing to put that
25   disappointment aside?'  I could get there."
```

1          Okay.  When you say "Are we willing to put that
2     disappointment aside and you could get there," what did
3     that mean?
4     A.    Um, are we willing to put the disappointment that
5     this isn't going to work on Emerging Market
6     Opportunities, are we willing to put that aside, the
7     concept of Ms. Chan being a Team Analyst on the Emerging
8     Market Opportunities?  Um, that isn't going to happen.
9     Q.    Okay.
10    A.    That's the disappointment.  Um, are we willing to
11    put that aside?  Maybe.  It could get there if someone
12    makes the case for it.
13    Q.    Well what do you mean by "putting it aside," do
14    you mean terminate or keep her employed?
15    A.    I meant terminating her role on the Emerging
16    Markets Opportunities team.
17    Q.    Okay.  And then the next sentence says, "If so are
18    we confident enough that there has been a genuine
19    response to the other areas of feedback identified in
20    the November meeting and subsequent e-mail to back her
21    if we proceed on a standalone basis with China Growth
22    and related?"  And then you say "I have no idea.  This
23    is key."
24          What did you mean by that?
25    A.    Um, would we effectively make her a team of 1, are

1  we willing to do that?  Um, that's what proceeding on a

2  standalone basis with China Growth would have been.  Um,

3  and she'd been provided feedback in two different ways

4  in November, one in the meeting we've all heard the

5  recording of and one by the e-mail which we've now all

6  seen.  And has she -- and has there been a genuine

7  response to that feedback?  I want to know the answer to

8  that question.  Even though I haven't heard it myself,

9  what do others see?

10 Q.   Okay.  And then the last paragraph, um, you start

11 by saying, it sounds like you were saying, "With regard

12 to Alex Qian's prospects, if they're truly just

13 exploratory conversations, then" -- then it sounds like

14 you had no problem allowing those to proceed.

15       Is that accurate?

16 A.   Yes, that's accurate.

17 Q.   And then you say that, um, "I think the more we do

18 to make her feel part of the firm is when we higher the

19 odds of a successful outcome."

20       What was your -- what were you thinking at that

21 moment when you wrote that with regard to Ms. Chan and

22 her future at Wellington?

23 A.   Um, I'm an optimist, I'm trying to pull a rabbit

24 out of a hat here.

25 Q.   Okay.  And then you finally say, "But if, when we

1    are at a final stage, we unambiguously need more clarity

2    on the 2nd bullet above."

3         And what was the 2nd bullet above that you were

4    referring to?

5    A.    Well I didn't seem to actually use bullets, but I

6    think it's fair to say that it was, um, "Are we

7    confident enough that there has been a genuine response

8    to the other areas of feedback identified in the

9    November meeting and the subsequent email?"

10   Q.    Okay.

11   A.    And that, um, before we actually have serious

12   conversations with our clients, the final stage is, you

13   know, going to -- the fish is -- now she's seen the fish

14   now.  (Laughter.)  So, um, you know if we're at that

15   stage, I don't want to be talking to clients and

16   stringing them along, um, that this might not work out.

17   Q.    Yeah, and when you're referring to "clients," you

18   mean --

19   A.    "Prospects."

20   Q.    You mean "prospects" or "clients"?

21   A.    Yes.

22   Q.    Okay.

23         MR. PATERNITI:  Let's turn to Exhibit 277.

24         (On screen.)

25   Q.    This is on May 25th, later in the month of May,

1    2017, an e-mail from Henry Philip to you.  And Mr. --
2    you can take a minute to read it.  Just let me know when
3    you're done.
4    A.    (Reads.)  Thank you.
5    Q.    Okay.  So where he mentions that he was
6    "stonewalled," "She pretty much stonewalled me," what
7    did you understand that to mean?
8    A.    Um, similar to when I used the term "Ms. Chan
9    rebuffed Henry Philip" earlier on in my testimony.  So
10   that, you know, she, um, had very little interest in
11   engaging in a meaningful conversation with him.
12   Q.    Okay.
13         MR. PATERNITI:  If we could turn to Exhibit 280.
14         (On screen.)
15   Q.    Now this exhibit is, um, a couple of days later,
16   another e-mail from you to Henry and Adam Puritz.
17         And why is Adam Puritz showing up on these
18   e-mails?
19   A.    Um, Adam Puritz is showing up on these e-mails
20   prospectively, um, because in a few months time Adam
21   Puritz is moving to Asia to be head of our Hong Kong
22   office and actually to be the senior-most manager in
23   investment professionals in Asia, um, eventually, and,
24   um, prospectively he would have become Ms. Chan's direct
25   supervisor, um, in September of 2017.

1  Q.    Okay.  So let's start from the bottom here.  This

2  is again Alex Qian's, um, May 26th e-mail to you and

3  Greg Mattiko, coping Ray Helfer.

4       And Ray Helfer was Alex Qian's supervisor,

5  correct?

6  A.    Um, Ray Helfer -- yeah, was Alex Qian's

7  supervisor.  I don't know if there was a line between

8  them but -- I'd have to ask Ray.

9  Q.    Mr. Qian is mentioning the potential advisory

10 mandate he'd spoken with you before about --

11      And again, did you understand that to be Ming

12 Sheng?

13 A.    Um, I think so.  I can't fully recall.

14 Q.    Okay.  He states, um, that, um, in short he was

15 suggesting that the opportunity was -- that the prospect

16 was still interested, correct?

17 A.    Um, it appears so, yes.

18 Q.    Or at least let's take a look at the second-to-

19 last paragraph.  "Ray and I met with the CEO yesterday

20 in Sheng Hai, the relationship between our two

21 institutions remains very strong.  Although this

22 particular mandate opportunity was not discussed at the

23 meeting."

24      So did you understand that to mean that Mr. Qian

25 was asking you, um, for how he might proceed?

1    A.    Um, I -- I want to say I can't recall.

2    Q.    Okay.  Let's take a look at your e-mail response

3    above.  "Adam and Henry, any thoughts here given more

4    recent interactions with Gigi than I have had?"

5          Do you recall what -- why you put it to Mr. Puritz

6    and Mr. Philip if they had any thoughts about this?

7    A.    Um, why I would put it to Mr. Philip?  Um, they

8    were on the ground, I believe Mr. Puritz was -- he

9    wasn't located in Hong Kong yet, but he was probably

10   preparing to go there so.  Um, I think I said it a

11   couple of times, I value the thoughts of my team with

12   their local perspective.

13   Q.    Okay.

14         MR. PATERNITI:  So let's take a look at Exhibit

15   281.

16         (On screen.)

17   Q.    Now, Mr. Mattiko joined this conversation at some

18   level, um, if you see the top e-mail, he seems to be

19   responding to your e-mail about inquiring for feedback

20   -- you were seeking feedback about their thoughts on

21   this opportunity.  And Mr. Mattiko responds to you that

22   he had "spoken with Henry today, I have time scheduled

23   with her Wednesday, going to tell her we are still

24   expecting a response from November's e-mail."

25         What did you understand that reference to be,

1    November's e-mail?

2    A.    The reference to the November 22nd e-mail that I

3    sent, um, with areas of, um -- areas she had to engage

4    in to, you know, improve her impact at Wellington.

5    Q.    And then Mr. Mattiko continues, "This will get her

6    talking about her status, something she has been

7    reluctant to do."

8          So at that point, other than Henry Philip getting,

9    as you said, "rebuffed," um, you had not received any

10   other feedback as to Ms. Chan's response, correct?

11   A.    Um, no other feedback, unless you count the lack

12   of feedback -- you count the lack of response as

13   feedback itself.

14   Q.    Yup.  Along those lines, um, why is it that you

15   didn't reach out to her?

16   A.    Um, multiple -- a couple of reasons.  One, I'm

17   dealing with a lot of different things and, um, very

18   honestly I had a team on the ground that I believed in

19   and a strong Team Leader whose views I value greatly, a

20   strong Team Leader with respect to people as well as,

21   um, our clients' money.  And, um, also this whole thing

22   has been about what can Wellington do for Gigi,

23   Ms. Chan, versus what can Gigi do for Wellington?  And

24   her actively responding -- she had the opportunity to

25   respond, um, in our -- in our conversation on November

1    2nd, which she actually pretty much never did, she never

2    acknowledged any of the feedback, and she had an

3    opportunity to respond to the e-mail, which she never

4    did.  So the ball was in her court.

5    Q.    Okay.  And did you find out whether Mr. Mattiko

6    had indeed had that conversation with her about where

7    her head was at?

8    A.    Um, I did find out that he did have that

9    conversation with her.

10         MR. PATERNITI:  And let's turn to Exhibit 286.

11         (On screen.)

12   Q.    This is just an e-mail chain and the top -- the

13   top e-mail is on May 31st.  Mr. Argyle is responding to

14   Henry Philip indicating that he had just spoke to her on

15   a call with Jawan at the moment.

16         Was it your understanding that Mr. Mattiko spoke

17   to Ms. Chan on May 31st of 2017?

18   A.    That was my understanding, yes.

19   Q.    Okay.

20         MR. PATERNITI:  Exhibit 288, please.

21         (On screen.)

22   Q.    Did you have a chance to speak to -- well strike

23   that.

24         This e-mail from May 31st, the top e-mail seems to

25   indicate that you did in fact connect with Mr. Mattiko

1    after his meeting with Ms. Chan, correct?

2    A.    Um, yes.

3    Q.    And it indicates that you spoke to Mr. Mattiko and

4    that you said, and I quote, "Next steps seem pretty

5    clear to me, but we'll let dust settle over the weekend

6    and see if we remain in alignment in the middle of next

7    week."

8         So what is it that you heard from Mr. Mattiko as a

9    result of this conversation with Ms. Chan on May 31st?

10   A.    That absolutely nothing had changed.

11   Q.    Nothing had changed with regard to what?

12   A.    Nothing had changed with respect to, um, how --

13   well with respect to the engagement of Ms. Chan and the

14   Emerging Marketing Opportunities team, but also with

15   respect to, um, her views on the firm, on my e-mail, um,

16   she didn't agree with it.

17   Q.    Okay.  And is it your knowledge, um, or awareness

18   as to whether she made any representations to Greg that

19   she was intending to respond to your e-mail even

20   disagreeing with it?

21   A.    Um, I -- to the best of my knowledge there was no

22   reference to Greg saying that she intended to respond to

23   my e-mail in any way.

24   Q.    Okay.  So at that point what happens next?

25   A.    Is that a specific question or a general question?

1    Q.    Well let me make it more specific for you.

2          After the May 31st conversation with Mr. Mattiko,

3    had you reached a decision as to Ms. Chan?

4    A.    The -- certainly the, um -- it takes these -- you

5    know if you assign probabilities to the possible

6    outcomes here, um, those probabilities are getting

7    higher.  I -- I've always believed in, um, and not

8    necessarily using this phrase, but in "Letting the dust

9    settle over the weekend," and I think it's -- the

10   emotions -- um, I'm trying to take the emotions out of

11   the decision.  I was very disappointed myself, again

12   this is something I'd -- I'd failed, and, um, the

13   decision, um, was clearly going to be the next week.

14   Q.    Okay.  And, um, ultimately and obviously the

15   decision was made to separate Ms. Chan from employment

16   with Wellington, correct?

17   A.    Yes.

18   Q.    And that was made -- was it made that following

19   week?

20   A.    Um, it was made in early June.  I can't remember

21   if it was that following week.

22   Q.    Do you remember the circumstances, was it in a

23   meeting or did you make it alone?

24   A.    I don't remember the specific circumstances, um, I

25   know that every couple of years all our managing

1    directors and partners as a firm, um, come to Boston,

2    and I know Mr. Mattiko and Mr. Philip were both in

3    Boston in early June.  So, um, there was an opportunity

4    for us to meet in person.  Which, um, is not necessarily

5    a relevant fact, but it was -- it helped given, you

6    know, the situation we were in.

7    Q.    Okay.  And you had testified that, um, with regard

8    to the termination -- well strike that.

9          Tell us, um, in that meeting -- and, I'm sorry,

10   who was at the meeting?

11   A.    I can't actually recall who was at the meeting,

12   whether it was -- I -- I actually cannot recall the

13   meeting.

14   Q.    Do you remember anybody who was there?

15   A.    I assume Henry was there -- I assume Mr. Philip.

16   I assume Mr. Mattiko was there.  But I actually don't

17   recall the meeting.

18   Q.    Okay.  And so let's take it away from that

19   specific meeting and get into your head.

20         What exactly was it that led you to conclude that

21   Ms. Chan should be separated?

22   A.    Um --

23         MR. HANNON:  Objection, asked and answered.

24         THE COURT:  No, he may have it.  He may have it.

25   I assume he's coming to the end of his examination.

1    A.    Um, Ms. Chan had been hired to be an Equity

2    Research Analyst on the Emerging Markets Opportunities

3    Team.  Over the three years the compensation varied, but

4    it was close to three-quarters of a million dollars, um,

5    in that role.  She was not, um, fulfilling her duties in

6    that role.  And it was -- and it was unclear to me, or

7    actually it was very clear to me, um, that she wouldn't

8    be successful in any other role at Wellington

9    Management.

10   Q.    Did the lack of response to the -- to your

11   November 22nd e-mail play any role in that general

12   decision?

13   A.    Um, the lack of an e-mail in response to my

14   November 22nd e-mail, I hoped played no role in my

15   decision.  The lack of response with respect to

16   actionable feedback and actually acting on what was in

17   my November 22nd e-mail, um, played a meaningful

18   response in my decision, a part in my decision.

19            MR. PATERNITI:  Nothing further, your Honor.

20            THE COURT:  Any further questions?

21            MR. HANNON:  Yes, your Honor.

22            THE COURT:  You may.

23

24   REDIRECT EXAMINATION BY MR. HANNON:

25   Q.    Mr. Argyle, did I hear correctly a moment ago that

1    you said that you concluded that Ms. Chan was not going

2    to be able to be successful in any other roles at

3    Wellington?

4    A.    Um, yes, I did given her -- the lack of alignment

5    on the core values of the firm, the lack of her growth

6    mindset, the, um, the -- this constant need to put

7    herself first and her own career first above our

8    clients.  It is my professional opinion, based on 17

9    years managing -- and sometimes managing-out

10    professionals at Wellington Management, that Ms. Chan

11    would not have been successful at Wellington Management.

12    Q.    You thought she was too selfish?

13    A.    That's not what I said.

14    Q.    It's a question.  You thought she was too selfish?

15    A.    Um, I don't think I ever -- I don't recall ever

16    believing or thinking about whether Ms. Chan was selfish

17    or not.

18    Q.    Well you thought that she put herself first before

19    the firm, right?

20    A.    Um, yeah, I think she had a significant ego, I

21    think she had significant hubris, but I don't ever

22    recall talking anything about her selfishness.

23    Q.    Back to my question, sir.  Part of what led you to

24    the conclusion you reached was that you thought that

25    Ms. Chan put herself before the firm, yes?

A.     Um, her attitude seemed to be more often -- well

far too often -- you know these aren't binary things for

every single situation, you know that every single

situation she puts herself in front or before the firm,

you know the range of possibilities -- in the range of

events over three years here, right, she put her own

interests ahead of the interests of the firm, um, and

far more importantly than that, ahead of the interests

of the firm's clients?  Yes, way too often.

Q.     When did she put her own interests ahead of the

firm's clients?

A.     Um, she was hired, and as I mentioned, paid a lot

of money to be an Analyst on the Emerging Market

Opportunities team, a team that managed billions of

dollars of our client's assets, a team that deserved the

attention of Ms. Chan in managing those assets.

Q.     And, sir, how did the EMO fund do while Ms. Chan

was a member of that team?

A.     I can't recall how the EMO fund team did.

Q.     Did you ever look?

A.     Um, I'm sure -- (Laughs.)  Did I look how the EMO

fund was doing?

Q.     Yeah.

A.     I'm sure I looked how the EMO fund was doing.

Q.     Okay, you just don't remember what the answer was?

```
 1   A.    I had 25 teams reporting to me and across those 25
 2   teams there are a number of different approaches, um,
 3   probably close to over 100 investment approaches.  I
 4   can't recall the investment performance of every single
 5   investment approach probably if they were yesterday, let
 6   alone years ago.
 7   Q.    Did I hear correctly, sir, that you thought that
 8   Ms. Chan was unlikely to be successful because of her
 9   ego?
10   A.    No, you didn't, that's -- you're putting words in
11   my mouth.  I said that was one, um, one aspect of why
12   she might not be successful at Wellington.
13   Q.    Do the Portfolio Managers at Wellington not have
14   big egos?
15   A.    The Portfolio Managers -- if you were to take any
16   characteristic Portfolio Manager at Wellington, it's a
17   range of -- just like any human beings in any, um, path
18   of life, it ranges across the spectrum.
19   Q.    You've got --
20   A.    But generally speaking, compared to the investment
21   management industry as a whole, um, based on hiring
22   individuals, many many individuals from other firms, um,
23   the ego of Wellington Portfolio Managers would appear to
24   be, um, meaningfully less than in some other
25   environments.
```

1   Q.    Do you have a system for tracking that, sir?

2   A.    What was that?

3         THE COURT:  A system for tracking ego?

4         MR. HANNON:  Yes, he just testified that he

5   believed that --

6         THE COURT:  I'm listening.  I just wondered what

7   your question was.

8         You said that.  Do you have a system for tracking

9   it?

10  A.    A numerical system for tracking ego or just --

11  Q.    Any type of system.

12  A.    -- or just feedback?

13  Q.    In terms of comparing the egos of PMs at

14  Wellington versus your peers?

15  A.    Um, no, that would be professional experience.

16  Q.    Okay.  With respect to, um, the other

17  opportunities you alluded to, I think you used the, um,

18  analogy of deep-sea fishing in terms of these other

19  potential mandates out there.

20        Do you recall that testimony?

21  A.    I do.  I have no idea if it's a good analogy, but

22  I did use it.

23  Q.    Okay.  But it's fair to say you never actually did

24  any research in terms of what the likelihood was of

25  those mandates coming through, did you?

```
1    A.    Um, personally?

2    Q.    Yes.

3    A.    I don't -- I don't recall -- well actually I do

4    recall, I do recall speaking to Mr. Helfer and, um, it's

5    not just about whether the mandates become good, it's

6    about whether the mandates become good business.  Right?

7    Because a mandate could become good and still not be

8    good business.

9          So I do recall actually, um, not necessarily

10   ascertaining about whether the probability of those

11   mandates coming -- that we would be rewarded those

12   mandates, but I do recall conversations about whether or

13   not those mandates would be good business and I do

14   remember reaching the conclusion that they would not be

15   necessarily good business.

16   Q.    What led you to believe these mandates would not

17   be good business?

18   A.    Um, what -- I think you asked some of that, um,

19   earlier on when we were talking Wednesday perhaps.  But,

20   um, I talked about -- if I remember rightly, because I

21   remember your Honor correcting me, I talked about

22   "bespoke opportunities," um, and I was asked to explain

23   "bespoke" and I talked about how the asset management --

24   the business model of an asset management firm is the

25   ability to scale.  And that, um, rightly or wrongly it
```

1    was my belief that these mandates didn't necessarily

2    afford the ability to scale for them to be good

3    business.

4         Additionally, if my memory is correct, um, and I

5    know this, um, I found -- 99 -- and don't quote me on

6    the number, but 99.-something percent of our clients

7    actually say, "Here's our account, here's our bank, you

8    have authority to trade."

9         If I remember rightly, in the account, so it's no

10   back and forth, we don't talk -- we literally have the

11   authority to make the transactions in the account.  If I

12   remember rightly, um, these were advisory -- Ming Sheng

13   was an advisory opportunity, which meant we wouldn't be

14   doing that, which meant that they wanted us actually --

15   instead of saying "Here's our account, we want you to

16   trade in it," they actually said, "We want you to send

17   us an e-mail every time you want to do something in our

18   account and we'll do it.  So we'll control our account

19   and you" -- well that actually causes a lot of stress in

20   the system because if we have multiple clients trading

21   the right stock and we have discretion over 99 clients'

22   accounts and how we trade those stocks and when we trade

23   those stocks and how we share the allocation of those

24   trades across the stocks, and we have one account over

25   here where they just want us to send them an e-mail and

1   they're going to trade it however they want, um,
2   possibly in front of those other clients we're working
3   with, possibly behind those clients, that makes it a
4   very unattractive piece of business.
5   Q.    And when did you tell Mr. Qian that?
6   A.    Mr. Qian?
7   Q.    Yes.
8   A.    I can't recall when I told Mr. Qian that, but it
9   would have been, um -- I can't recall when I told
10  Mr. Qian that.
11  Q.    You never told Mr. Helfer that, did you?
12  A.    Um, I can't remember whether Mr. Helfer told me
13  that or I told Mr. Helfer that.
14  Q.    Sir, am I correct that the only objection you ever
15  raised to anyone at Wellington about pursuing that
16  mandate was that you were unsure as to whether or not
17  Gigi Chan was going to have a long-term future at the
18  firm?
19  A.    Um, I don't recall, um, that.  No.
20  Q.    (Pause.)  You were, um -- towards the end of your
21  examination with Mr. Paterniti, you were asked questions
22  about a conversation you had with Greg Mattiko and it
23  was on or about May 31st, 2017.
24        Do you recall those questions?
25  A.    Um, yes.

```
1    Q.    Sir, do you recall what Mr. Mattiko actually said
2    to you during that conversation?
3    A.    Um, no, I don't.
4    Q.    Are you aware of -- well strike that.
5          Is it your recollection though that Mr. Mattiko
6    was informing you of a conversation he had recently had
7    with Gigi Chan?
8    A.    Um, yeah, he was informing me of the conversation
9    he had recently had with Gigi Chan, um, yes.
10   Q.    Okay.  And are you aware that -- are you aware now
11   that that conversation was recorded?
12   A.    I am aware that that conversation was recorded
13   without Mr. Mattiko knowing it at the time.  It seems to
14   be a pattern there.
15   Q.    Excuse me?
16   A.    It seems to be a pattern there.
17   Q.    A pattern of what?
18   A.    Secret recordings.
19   Q.    Do you have any understanding as to why Ms. Chan
20   recorded it?
21   A.    Um, I have no understanding of why Ms. Chan
22   recorded it.
23   Q.    Okay, we'll get back to that in a moment.  But
24   back to your conversation with Mr. Mattiko.
25          Have you listened to that recording of Ms. Chan's
```

1    conversation with --

2    A.    No, I have never listened to that recording, no,

3    not in full or in part.

4    Q.    Sir, do you have any reason to believe that when

5    Mr. Mattiko informed you of the substance of that

6    conversation, he misled you?

7    A.    I have no reason to believe that Mr. Mattiko

8    misled me.

9    Q.    You were asked questions about the, um, about the

10   e-mail that you sent Ms. Chan following your, um, your

11   meeting on November 2nd, 2016.  So I want to ask you

12   some questions about that.  (Pause.)  A moment here.

13        I think you testified on direct that you were --

14   you were looking for some kind of a response to that

15   e-mail, is that right?

16   A.    I was looking for a response to that e-mail, yes.

17   Q.    And I think I heard you say, a moment ago, that

18   Ms. Chan had never responded to your feedback on

19   November 2nd, 2016, did I hear that correctly?

20   A.    Um, I can't remember.  I can barely remember.  I

21   can't remember what I said.

22   Q.    Okay.  But it's fair to say that on November 2nd,

23   2016, Ms. Chan spent over an hour responding to your

24   feedback, didn't she?

25   A.    No, I don't think that's fair to say.  I think

1    Ms. Chan spent over an hour telling me why her feedback

2    was how it was.  But I don't think she spent any time

3    responding to my feedback.

4    Q.    When you say "responding to feedback," you mean

5    agreeing with it?

6    A.    No, I mean hearing it.  I mean actually --

7    actually -- not the, um, physiological, um, hearing it,

8    but I actually mean digesting it, understanding, um,

9    what was said, recognizing that this was feedback, that

10   this was serious feedback.  Not all feedback has to be

11   agreed with, but I think we all benefit -- each one of

12   us as an individual benefits from receiving feedback,

13   whether one agrees with it or not.

14   Q.    Sir, you don't think she found it serious?

15   A.    Um, I don't know.

16   Q.    Did you hear her voice, sir?

17   A.    Um, I heard her voice.

18   Q.    Did you hear her difficulty breathing?

19   A.    I didn't hear any difficulty breathing, that's not

20   my recollection with the meeting.

21   Q.    You didn't think that she found that to be a very

22   serious situation with you and Mr. Baxter sitting across

23   the table from her?

24   A.    No.  I think she found it a very serious situation

25   perhaps because of what was said, but I don't think just

1    me and her sitting across the table -- we actually got

2    along quite well.

3    Q.    How much of Ms. Chan's feedback did you take in?

4    A.    In general?

5    Q.    During that meeting, how much of her feedback did

6    you take in?

7    A.    That we had done a lousy job with respect to the

8    launch of the China Growth Fund, that it had been a

9    massive distraction for her over the course of the year,

10   um, I think I took that in and I think I acknowledged

11   that in my e-mails, and I had heard actually some of

12   what she said, and I have heard it.  But I didn't

13   necessarily agree with it, as for any other feedback.

14   Q.    Is that all you heard during that

15   1-hour-and-10-minutes-long conversation?

16   A.    Um, that was my recollection.  That's my

17   recollection now, now having listened to the

18   conversation, we know everything, every single word that

19   was said in that conversation.  But that was my

20   recollection at the time.

21        MR. HANNON:  Let's take a look at another document

22   you looked at on cross-examination.

23        (On screen.)

24   Q.    So, sir, this is Exhibit 275.  So this, um -- this

25   was the e-mail with the three bullets, they aren't

1    actually really bullets.

2         But do you recall being asked questions about this

3    on cross-examination?

4    A.    Yes, I do.

5    Q.    Okay.  There was one little bit Mr. Paterniti

6    didn't cover with you and I just wanted to ask you about

7    this.  It would be a bit -- yes.  Okay.

8         So you write, "With respect to speaking to Alex's

9    prospects, if they were truly just exploratory

10   conversations at this stage, then why not?  We know she

11   can be effective in these settings."

12        Do you see that, sir?

13   A.    Um, yes, I do.

14   Q.    What did you mean when you wrote, "We know she can

15   be effective in these settings"?

16   A.    Um, it was -- Alex Qian clearly thought that she

17   could be effective in front of clients.  I think I was

18   trying to be balanced.

19   Q.    Sir, you didn't write "Alex Qian," you wrote "we,"

20   right?

21   A.    Um, I wrote "we."  But where that input came into

22   "we"?  We've heard it at length what a

23   feedback-intensive culture Wellington has, so, um, where

24   that feedback comes from?  But, um, who knows.

25   Q.    Sir, "we" includes you, yes?

1    A.    "We" includes me.

2          (Pause.)

3          MR. HANNON:  Here's Exhibit 277.

4          (On screen.)

5    Q.    So this was the e-mail you saw on cross-

6    examination alleging that Ms. Chan had "stonewalled"

7    Mr. Philip.

8          Did Mr. Philip ever tell you that he had asked

9    Ms. Chan a question that she refused to answer?

10   A.    Um, I cannot recall.

11   Q.    Did you ask him?

12   A.    I cannot recall.

13   Q.    Okay.  Is it fair to say that after your meeting

14   with Ms. Chan on November 2nd, 2016, you didn't want her

15   to complain anymore, right?

16   A.    Um --

17         THE COURT:  Would you ask the question again?

18   Q.    After meeting with Ms. Chan on November 2nd, 2016,

19   you didn't want her to complain anymore?

20   A.    Um, I don't think that's fair to say.

21   Q.    Well you didn't want her going on about why she

22   felt Wellington was a bad place, right?

23   A.    No, actually if you went back to the recording of

24   November 22nd, 2016, I think you'll recall -- sorry,

25   November 2nd, the e-mail was November 22nd, November

1   2nd, you'd actually recall a specific point in the

2   e-mail where I highlighted that there's two very

3   different ways to complain.  I took a quick snippet and

4   said, "You can complain like this or you can complain

5   like this."  I actually highlighted to her an

6   appropriate way to complain, which actually counters the

7   perspective that I didn't want her to complain.

8        So it was again more about -- it's perfectly valid

9   to provide feedback on Wellington and on one's peers,

10  but how one does it is key.  And I think I actually

11  highlighted that in the November 2nd recording.

12  Q.    Why didn't you put that in your summary

13  afterwards?

14  A.    Because it was a summary.

15  Q.    You didn't think that was critical enough to put

16  in your summary?

17  A.    Um, there was a lot already in the summary and I

18  thought it was important to keep to the key points.  I

19  don't think my summary said "Please don't complain."

20  Q.    Well you certainly didn't want Ms. Chan, in

21  speaking with Henry Philip, to start bringing up the

22  past incidences where she felt as though she had been

23  disrespected and mistreated, right?

24  A.    I'm not sure what you're referring to?

25  Q.    Well, sir, your refrain to Ms. Chan, back in the

1    end of 2015, had been "Look forward, don't look back,"

2    right?

3    A.    Um, I don't recall.

4    Q.    I'm sorry?

5    A.    I don't recall.

6    Q.    Is that what you wanted her to do, at the end of

7    2016, to look forward in terms of her opportunities at

8    Wellington and not to look backwards at what had

9    transpired up to that point?

10   A.    Um, I don't recall.  I don't.

11   Q.    Did Ms. Chan ever complain to you again after

12   November 2nd, 2016?

13   A.    Um, to me, Charles Argyle?

14   Q.    To you, yes.

15   A.    Um, Ms. Chan never complained to me again after

16   November 2nd, 2016.

17   Q.    Did Ms. Chan ever complain to Mr. Mattiko again

18   after November 2nd, 2016?

19   A.    I don't -- I would have absolutely no way of

20   knowing that.

21   Q.    Well he could have told you, right?

22   A.    Yeah, he could have told me.  I don't recall.  I

23   don't recall.

24   Q.    Okay.  Did she ever complain to Mr. Philip again

25   after November 2nd, 2016?

1   A.     Um, I don't recall.  Um, if I ever knew.

2   Q.     Did she ever complain to you about a lack of

3   access to clients after November 2nd, 2016?

4   A.     Well we've ascertained that she never complained

5   to me after that, no.

6   Q.     To your knowledge did she -- was she complaining

7   to folks at GRG after November 2nd, 2016 about a lack of

8   client access?

9   A.     No, I -- I -- I wouldn't know.  But to my

10  knowledge, no.

11  Q.     In fact, sir, the only time that Ms. Chan raised

12  the lack of client access issue after November 2nd, 2016

13  was when Mr. Mattiko approached her, you know that,

14  right?

15  A.     Um, I'm not sure I know that, no.

16  Q.     I think you said before that -- when Ms. Chan

17  returned from maternity leave, that you were of the

18  opinion that she could have increased her contributions

19  to the EMO team right away, did I hear that correctly?

20  A.     Um, I think she could have increased her

21  contributions to the EMO team on the afternoon of

22  November 2nd.

23  Q.     Okay.  Are you familiar with how the EMO team

24  functioned?

25  A.     Um, not in great detail.

1    Q.    In any detail?

2    A.    Um, no, not as I sit here.

3    Q.    Did you know they had a weekly meeting?

4    A.    Um, it doesn't surprise me, many teams have weekly

5    meetings.  But it wasn't my job to get into the minutiae

6    of how teams operate.

7    Q.    But you formed an opinion regarding Ms. Chan's

8    contributions to the EMO team, right?

9    A.    Um, yes, I did.

10   Q.    And in forming that opinion did you ask any

11   questions about the pattern of communications and what

12   the expectations were of what she would do?

13   A.    Um, I don't recall specifically what I talked

14   to -- what I talked to Mr. Mattiko about and what the

15   form of those conversations were that took place.  There

16   were multiple, um, interactions with Mr. Mattiko over

17   many months.

18   Q.    Well those interactions with Mr. Mattiko

19   concerning dissatisfaction with Ms. Chan's contributions

20   to EMO, that didn't happen until after she announced her

21   pregnancy, isn't that right?

22   A.    Um, it's not my recollection.

23   Q.    So you recall Mr. Mattiko raising concerns about

24   her contributions prior to her announcing her pregnancy?

25   A.    Um, yes, I do.

1   Q.    And what do you recall about that?

2   A.    I recall conversations with Mr. Mattiko before he

3   left for Hong Kong, um, in London, saying that he hoped,

4   um, the -- this quality versus, um, quantity -- I'm

5   simplifying it greatly but, um -- no one's disputing

6   Ms. Chan's investment acumen.  But the breathe of

7   contribution was insufficient.  And I recall speaking to

8   Mr. Mattiko on more than one occasion in London, um,

9   that he hoped, when he had moved to Hong Kong, that

10  there would be an opportunity to, um, essentially bridge

11  that gap and rectify that situation.

12       And so given my knowledge of the timing of events,

13  that those conversations would have occurred before

14  Ms. Chan's pregnancy and certainly before we knew of

15  Ms. Chan's pregnancy.

16  Q.    Sir, did I hear you right to say that no one's,

17  um, questioning Ms. Chan's investment acumen?

18  A.    No, I don't -- I don't know if no one's

19  questioning her investment acumen, but it was never part

20  of, um -- it was never some -- I -- I don't question her

21  investment acumen.

22  Q.    In fact the feedback that you consistently

23  received throughout her tenure at Wellington was that

24  her investment acumen was impressive, right?

25  A.    Um, "impressive" is a subjective word, um, and it

1    wasn't from a large breathe of employees.  But, um, I

2    don't question whether or not Ms. Chan was, um, a

3    talented investment professional, I question whether or

4    not she wanted to be a talented investment professional

5    at Wellington, um, and on the Emerging Markets

6    Opportunities team.

7    Q.    And let's talk about why you questioned whether

8    she wanted to be an investment professional at

9    Wellington.

10          It was clear from your interactions with Ms. Chan

11    that she had a negative view of the culture of

12    Wellington, right?

13    A.    Um, I don't recall.

14    Q.    So you're not sure if she had a negative view of

15    the Wellington culture?

16    A.    She had a negative view of Wellington and our

17    ability to launch a product and get her access to her

18    clients -- sorry, to our clients, to benefit, um,

19    ultimately her, but I don't know if that translated to a

20    negative view of the Wellington culture.

21    Q.    Ms. Chan had never expressed any dissatisfaction

22    concerning Wellington to you until after the Asia P & P

23    panel, right?

24    A.    Um, I cannot recall.

25    Q.    So you don't have any recollection of her

1    expressing dissatisfaction with Wellington prior to the

2    Asia P & P panel, is that fair to say?

3    A.    As I say, I can't recall.

4    Q.    Okay.  I think I heard you on cross-examination

5    say that you didn't really have much of a say with

6    respect to what GRG did relative to pitching, um,

7    strategies to clients.  Did I hear that right?

8    A.    Um, that's -- that's right.

9    Q.    Okay.  Did I also hear you say correctly, sir,

10   that you had the ability to shut down any fund that you

11   wanted?

12   A.    Yeah, I could -- I could -- I have the authority

13   to, um, shut down approaches, um, essentially.  Or I

14   actually have the authority to determine, to make

15   actions with respect to the personnel in my group that

16   would leave no choice for approaches to be shut down.

17   Um, but I didn't have the authority -- yeah.  Yes.

18   Q.    I think you used that as an example that you were

19   so powerful that you could have shut down a billion

20   dollar fund, is that what you said?

21   A.    That's not what I said, I didn't use the term "so

22   powerful."

23   Q.    But a billion dollar fund, you could have shut

24   that down?  (Snaps fingers.)

25   A.    Um, it's not quite as simple as snapping your

1   fingers, but, yes, I would have had the authority to
2   shut that down.
3   Q.    Um, you made a few comments regarding Ms. Chan
4   recording the conversation on November 2nd, 2016.  I
5   want to follow-up on that.
6         Sir, didn't you think it was important to have an
7   accurate record of what was said during that
8   conversation?
9   A.    Um, not to the extent that it was recorded.  But,
10  um, it's always helpful to write down and summarize and
11  we've seen that in the Wellington context.
12        MR. HANNON:  Let's take a look at a document here.
13        (On screen.)
14  Q.    I'm showing you what we've agreed to as Exhibit
15  234, and I want to direct your attention to the e-mail
16  at the bottom of this chain here.
17        Oh, actually before I do that, so this is an
18  e-mail exchange between yourself and Mr. Mattiko?
19  A.    Yes.
20  Q.    And this is, um, October of -- October 27th of
21  2016, yes?
22  A.    Um, yes.
23  Q.    Okay.  And, um, the subject line is "Gigi and I
24  are meeting next Wednesday at 3:00 p.m.," right?
25  A.    Yes.

1    Q.    Okay, so that's a reference to the upcoming -- the

2    meeting that ultimately took place on November 2nd,

3    2016?

4    A.    Yes.

5    Q.    Okay.

6          MR. HANNON:  So take a look here at the e-mail at

7    the bottom.

8          (On screen.)

9    Q.    And in the 2nd sentence you write, "May bring

10   someone else in like Tom to simply make sure there is no

11   subsequent dispute about what was said."

12         Do you see that?

13   A.    Yes.

14   Q.    Okay.  Now when you first arrived at the meeting

15   on November 2nd, 2016, you actually told Ms. Chan there

16   was a different reason for Mr. Baxter being present,

17   right?

18   A.    An additive reason perhaps.

19   Q.    Did you tell her that you had brought Mr. Baxter

20   there because you wanted a witness and there'd be no

21   dispute about what was said?

22   A.    No, I told her that I wanted Mr. Baxter there for

23   continuity given the fact that he had been her manager

24   for the last three years, well two-years-and-something

25   months.

1    Q.    Was there a reason why you didn't tell her that

2    you had Mr. Baxter there as a witness?

3    A.    Um, I don't -- I don't -- you know I don't know if

4    it was -- if my intent was for him to be there as a

5    witness, but there was, um, no reason.

6          (Pause.)

7          MR. HANNON:  Another document here.  This is --

8    I'm showing you Exhibit 209.

9          (On screen.)

10   Q.    So this is one of the documents that Mr. Paterniti

11   covered with you in his examination and so, um, this is

12   the e-mail from Mr. Mattiko to you on, um, September

13   1st, 2016, is that right?

14   A.    Um, yes.

15   Q.    Okay.  And, um, it's fair to say that, um,

16   Mr. Mattiko, um, in the italicized portion here he

17   expresses some concerns that Ms. Chan's view of

18   Wellington may have with respect to her, um, ability to,

19   um, remain employed there, is that right?

20   A.    (Pause.)  Sorry, I'm just --

21   Q.    Sure.

22   A.    (Reads.)  Yeah, I think it's Mr. Mattiko's --

23   (Reads.)  It seems fair to say that this is

24   Mr. Mattiko's feedback.

25   Q.    Okay.  But even with that feedback, Mr. Mattiko

1  had some positive things to say about Ms. Chan, is that

2  right?

3  A.   Well I haven't read the whole e-mail, but --

4  (Reads.)  But Mr. Mattiko, like me, remained optimistic

5  with respect to Ms. Chan's, um, path at Wellington for,

6  you know, a long time.

7       MR. HANNON:  Let's look at some of the things that

8  he said.

9       (On screen.)

10  Q.   He noticed that "This is really unfortunate

11  because Gigi herself is a very pleasant person and I

12  enjoy working with her."

13       Do you see that?

14  A.   Yes, I do.

15  Q.   Is that consistent with the feedback you got from

16  Mr. Mattiko throughout the time of Ms. Chan's

17  employment?

18  A.   Um, well it's -- there's a lot of feedback in this

19  e-mail that, um -- it gives mixed feedback.  So -- but

20  on this one line, um, I don't ever remember Mr. Mattiko

21  saying she was an unpleasant person, nor did I ever feel

22  that myself.

23  Q.   You always felt she was pleasant?

24  A.   Um, I felt as if -- like I said I don't think she

25  was unpleasant, um, she had areas she needed to work on.

1   Um, it has nothing to do with her as a -- as a -- as a

2   person.

3   Q.    Okay.  And in terms of Mr. Mattiko's comment, "I

4   enjoy working with her."  Was that consistent with the

5   feedback that you got from Mr. Mattiko throughout the

6   time of Ms. Chan's employment?

7   A.    Um, well sometimes, sometimes he was very

8   frustrated.

9   Q.    Like around the Asia Philosophy and Process panel?

10  A.    Um, I cannot recall.

11        MR. HANNON:  And if you go to the next sentence.

12        (Scrolls.)

13  Q.    He writes, "I am also convinced that she will add

14  value for our clients."  Do you see that?

15  A.    Um, yes.

16  Q.    Okay.  And what did you understand Mr. Mattiko to

17  mean by that?

18  A.    That if, um, Ms. Chan engaged with him more on the

19  Emerging Market Opportunities Fund, if she played her

20  role as an Equity Research Analyst on the Emerging

21  Market Opportunities team, it would add value for our

22  clients -- his clients, or for Wellington's clients

23  invested in the Emerging Markets Opportunities.

24  Q.    So you thought he was only thinking that her

25  skills would add value for the EMO?

1    A.    Well I can't remember what I was thinking at the

2    time.

3    Q.    Okay.  Did you ever ask Mr. Mattiko specifically

4    what he meant in terms of her -- the fact that -- his

5    view that she would add value for the clients?

6    A.    Um, I can't recall if I asked Mr. Mattiko that.

7    Q.    Did you agree with Mr. Mattiko's assessment that

8    Ms. Chan could add value to the firm's clients?

9    A.    Um, I didn't necessarily agree or disagree with

10   that assessment.

11   Q.    You were asked some questions -- well while we're

12   on the topic of Mr. Mattiko, we saw some e-mails in your

13   examination by Mr. Paterniti concerning, um, Ms. Chan

14   communicating her issues with the philosophy and process

15   panel to Mr. Mattiko, do you recall those e-mails?

16   A.    No, I don't recall those e-mails.

17   Q.    Do you recall the e-mail that Mr. Mattiko made

18   reference to this becoming an "HR headache"?

19   A.    Um, not really.  Maybe we could pull it up?

20   Q.    So you don't recall him referencing Ms. Chan's

21   complaints of an HR headache?

22   A.    I don't recall that.

23   Q.    Was Ms. Chan's complaints concerning the

24   philosophy and process panel, did you ever take those to

25   Human Resources?

A.     No, I am strongly of the opinion that this was a
local issue which should be resolved in Asia, it's the
Asia Philosophy and Process Panel.

Q.     You did not want Human Resources to get involved?

A.     It had nothing to do with whether or not I wanted
Human Resources to be involved, I -- there were senior
professionals from Wellington in the room and, um, they
were more than capable of assessing the situation.

        You know I -- I was dealing with a very large
group with lots of responsibilities.  The Asia P & P
panel was barely on my radar screen.

Q.     But you knew it was on other people's radar
screens, right?

A.     Um, I was aware it was on other people's radar
screens, yes.

Q.     Including Mr. Baxter?

A.     Um, yes.

Q.     Mr. Mattiko?

A.     Um, you just reminded me of that, but I don't --
well, yes.

Q.     And you knew they were all very frustrated by the
situation, right?

A.     I can't remember what emotions they were
expressing.

Q.     Mr. Paterniti, when he was asking you questions,

1   um, he showed you an e-mail that Ms. Chan had written to

2   herself in late 2015.  Do you recall that?

3   A.    I do recall that.

4   Q.    Okay.  And, um, was it -- was it your testimony,

5   sir, that, um, Ms. Chan had threatened to leave

6   Wellington in 2015 if she did not get a fund?

7   A.    Um, Ms. Chan threatened to leave Wellington on a

8   number of occasions.  Um, I don't recall if she tied one

9   to the other.  She was clearly unhappy that she didn't

10  have a fund and she was clearly threatening to leave

11  Wellington on a number of occasions.  I don't recall if

12  she ever threatened to leave Wellington because she

13  didn't have a fund.  I do recall thinking "Maybe if we

14  launched a fund, she would stop the threats to leave

15  Wellington."

16  Q.    Okay.  You had already decided to support the

17  launch of Ms. Chan's fund prior to your meeting with her

18  at the end of 2015, isn't that right?

19  A.    Um, that's right, but she had been making threats

20  to leave Wellington for -- since before then.

21  Q.    Well when did Ms. Chan start threatening to leave

22  Wellington?

23  A.    I can't -- I can't recall, but it was a common

24  refrain.

25  Q.    How did you first find out about these common

1    refrains?

2    A.     Um, well she would tell me.

3    Q.     When did she tell you?

4    A.     Um, I can't recall.

5    Q.     Well how many meetings did you have with Ms. Chan

6    in 2015?

7    A.     Um, I can't recall, usually two or three a year,

8    um, depending on where we overlap.

9    Q.     Was Ms. Chan -- strike that.

10         One of the things you said on cross-examination,

11   am I right, was that Ms. Meunier had been managing money

12   as a PM since 2010?

13   A.     One of the things I said?

14   Q.     I'll reask the question.  Did I hear you correctly

15   that --

16   A.     Wait a minute, please.  Just start again.

17   Q.     Sure thing.  Let me just ask you then in plain

18   English.

19   A.     Okay.

20   Q.     Am I right that Ms. Meunier first started managing

21   money in 2010?

22   A.     That's not my recollection.

23   Q.     Okay, what is your recollection, sir?

24   A.     Um, so my recollection was that in 2008 we had a

25   China Opportunities Fund, it was already up and running,

1    um, that was co-managed, um, and one of the co-managers,

2    um, left the firm, and, um, Vera Trojan, who was the

3    leader of the Emerging Market Opportunities Fund, um,

4    and the Portfolio Manager in charge of that team, the

5    Team Leader, was the other named Portfolio Manager on

6    the fund.  And that she saw that as a good opportunity

7    to, um, have, um -- bring Bo Meunier in, who had been

8    covering, as a Team Analyst, Chinese stocks for her on

9    -- sorry about that, Emerging Market Equities,

10   which Vera turned to --

11        Can I just back up and explain the landscape?

12        We said that when we hired Mr. Mattiko, we had

13   another Emerging Markets team, that team was called

14   "Emerging Markets Equity," "EME" versus "EMO."  Vera

15   Trojan was the lady, the Portfolio Manager, who was the

16   Team Leader of that team.  One of her Team Analysts, um,

17   was a lady called, um, Bo Meunier, and her coverage, her

18   responsibility on that team, in particular, was China,

19   and she did play that role as a Team Analyst.

20        In 2008, um, Vera Trojan was co-managing this fund

21   with someone who was on the Asia-Pacific team, the

22   person on the Asia-Pacific team left, Vera Trojan, um,

23   who co-managed the fund, said, "I would like Bo Meunier

24   to come in on this fund and" -- and this is my

25   recollection, "co-manage it with me," um, and -- and

1    that Bo started doing that with Vera from 2008.

2    Q.     Okay.  So Ms. Meunier started serving as a

3    Co-Portfolio Manager in 2008, right?

4    A.     Um, that's my recollection, yes.

5    Q.     Okay.  It took her 5 years though to get the title

6    of "Portfolio Manager," right?

7    A.     Yeah, because I've testified that it takes a long

8    time to generate client assets in our business.  It

9    could take a long time for a -- for an investment

10   approach to gain traction with institutional clients and

11   with their consultants, and this is a great example of

12   that.  And I've also testified that internally we've

13   changed the title -- we've changed the title of Equity

14   Research Analysts, um, to Portfolio Manager when we

15   first got external client assets.

16        So if I remember rightly, the China Opportunities

17   Fund, where it existed, was actually -- one of the pools

18   -- one of the clients we managed assets for was our own

19   retirement plan, as you might imagine, and the one

20   place, um, China Opportunities was was in our own

21   retirement plan.

22        So, um, it was about 5 years later, as Mr. Hannon

23   reminded me, that Bo Meunier would have gotten her first

24   external client which would have led to me being

25   comfortable with her title being changed in the system

1    to "Portfolio Manager."

2    Q.    Okay, so it's your testimony, sir, that

3    Ms. Meunier's title changed because she had gotten

4    external investment in the China Opportunities Fund?

5    A.    That was the typical reason for a Portfolio

6    Manager's title changing.  I can't remember exactly.

7    There were -- there were exceptions, but I can't

8    remember if there was one here.

9    Q.    Well I'm not asking what was typical, I'm asking

10   with respect to Ms. Meunier.  And is your testimony now

11   that you're not sure why her title was changed?

12   A.    I'm -- I'm -- I can't remember.  It was my team

13   that was changing the titles, not me specifically.

14        THE COURT:  Have in mind this is redirect,

15   Mr. Hannon, we have been over these things.

16        MR. HANNON:  This is a little bit different, your

17   Honor.

18        THE COURT:  I'm not commenting.

19   Q.    Your testimony though, sir, on redirect, to get

20   back to Mr. Paterniti's cross, um, you indicated that,

21   um, Ms. Meunier, in your view, had all the attributes

22   that Wellington wanted, right?

23   A.    I can't remember exactly what I said.

24   Q.    Okay.  Regardless what you told Mr. Paterniti, you

25   would agree that your testimony here is that

1    Ms. Meunier, she was really really great?

2    A.    I -- I -- I don't remember using any of the words

3    "really really great."  Everyone -- I apologize for

4    repeating myself, but everybody has areas that they can

5    work on, everyone has strengths, everyone has

6    weaknesses, and what's important is the ability to be

7    able to hear about those strengths and weaknesses and

8    work on them.

9         So, um, you know you're asking a binary question

10   on a spectrum topic.  Was she really really great at

11   some things?  Yeah.  Were there other areas she had to

12   work on?  Yes.

13   Q.    Was your testimony, sir, that Ms. Meunier filled

14   your Team Lead role that you had been searching for that

15   Ms. Chan got passed over on?

16   A.    It's my testimony that -- I think it was my

17   testimony, that we closed down the Team Lead search, um,

18   and Ms. Meunier became the cornerstone of our China

19   Equity investment approach.  I believe that's what I

20   said the other day and I believe I said words to that

21   effect.

22        I remember the conversation with Ms. Meunier and

23   with her Team Leader, um, Ms. Trojan, about whether we

24   thought, um, Ms. Meunier could balance her team

25   responsibilities to our EME clients with her

1   responsibilities that we were asking her to be, the

2   cornerstone of our China approach.  I remember

3   Ms. Meunier very clearly communicating to me that she

4   believed that she could do both, and I remember

5   Ms. Trojan communicating to me that Ms. Meunier was so

6   essential to her and her role managing EME, that she

7   hoped she could do both, and it was my business

8   assessment that it was possible to do both.

9   Q.    So that's a "No" to my question?

10  A.    Um --

11        THE COURT:  I don't understand that question in

12  light of his answer.

13        MR. HANNON:  Oh, I'm sorry, your Honor.

14  Q.    Did you make Ms. Meunier the Team Lead, that role

15  you've been searching for that Ms. Chan got passed over

16  on?

17  A.    I think I said -- as I said, there was no separate

18  team developed for the -- that she would have led the

19  team.  What I actually have described, she ended up

20  leading a team within a team -- she had dedicated

21  resources for China, but she remained part of the EME

22  team.

23  Q.    So she actually became the Team Leader?

24  A.    She became the lead of a team within a team.

25  Q.    Okay.  Who was she leading?

A.    Um, I can't remember the name of the Analyst that
was, um -- there was one called Jerry Pang.  I can't
remember the name of -- and she also worked very closely
with research associates.  I think as I talked earlier,
we had three -- you know I talked about our talent
development strategy, if you remember I said the third
leg of our talent development strategy was developing
local talent, um, and Ms. Meunier worked closely with
some earlier career individuals who joined.  And they
actually sat functionally in a different group at
Wellington, um, but they were essentially allocated out
to investment professionals to work closely with and
Ms. Meunier worked closely with a number of those.  I
don't remember their exact names.

Q.    I'm a little bit confused, sir.  June Oh, um, he
was a Portfolio Manager in Hong Kong, right?

A.    Yes.

Q.    And he had Research Analysts on his team, right?

A.    I'm not sure it's exactly the same situation.  So
June Oh was actually a member of the Global Contrarian
Equity Team.  The Team Lead for the Global Contrarian
Equity was Greg Pool, so that would be akin to Vera
Trojan in, um, in the Emerging Markets Equity team.  And
then June Oh had, um -- June Oh was Greg Pool's, um,
resource in Asia and then Greg -- and June Oh actually

1    led a team within a team.  So of all the situations that

2    were most analogous to Bo Meunier, that would be the

3    one, yes.

4    Q.    June Oh is most analogous to Bo Meunier?

5    A.    Um, with respect to managing a team within a team,

6    yes.

7    Q.    Mr. Oh, he had, um, Equity Research Analysts

8    assigned to his portfolio, yes?

9    A.    Um, Equity Research Analysts were assigned to

10   teams, not to portfolios, but, um --

11   Q.    To his team, right?

12   A.    To his team within a team.  If you want to look at

13   our org chart, those Team Analysts would have been with

14   the Global Contrarian Equity team, which was led by Greg

15   Pool.

16   Q.    So -- but in terms of Mr. Oh's team within a team,

17   Mr. Oh had Equity Research Analysts specifically

18   assigned to support his approach, correct?

19   A.    Um, to his approach in the Global -- Mr. Oh was

20   managing Asia Contrarian, um, and over time China

21   Contrarian, um, Japan Contrarian, um, so his Team

22   Analysts certainly supported Mr. Oh in Mr. Oh's capacity

23   as Portfolio Manager of that team.  Mr. Pool, if I

24   remember rightly, was definitely managing Global

25   Contrarian, and he was managing a product called

1   "International Contrarian," and those same Team Analysts

2   would have been supporting Mr. Pool in the management of

3   those portfolios.

4   Q.    Okay, just to cut to the chase here.  Ray Helfer,

5   he was the head of Hong Kong, the Hong Kong office

6   during the time that Ms. Chan was employed at

7   Wellington, yes?

8   A.    Yes.

9   Q.    Okay.  Would you agree that Mr. Helfer could

10  probably shed some light for the jury in terms of who

11  had Research Analysts in Hong Kong?

12  A.    Um, Mr. Helfer was head of GRG, so I actually

13  believe I would have a clearer picture than Mr. Helfer

14  of exactly how those teams worked.

15  Q.    Okay.  So who were the Research Analysts that were

16  assigned to Mr. Oh's approach?

17  A.    Um, it varied over the years, but, um -- for

18  example in the org charts someone flashed up at some

19  point, it was John Jin and Ben Chin.

20  Q.    Okay.  And for Ms. Meunier, who were the Research

21  Analysts assigned to her approach?

22  A.    I mentioned Jerry Pang, um, and I can't recall but

23  we specifically used Ms. Meunier to work with some of

24  our Research Associates from our early career program.

25  Q.    Were those Research Associates that were assigned

1    to her approach?

2    A.    Um, they were Research Associates that were

3    assigned to her for the management of her approach.  And

4    to the extent that that feedback fed through the team,

5    it fed back through the EME team.

6    Q.    Did you ever hear Ms. Meunier, um, raising

7    concerns that she wanted to manage people?

8    A.    Um, I can't -- to manage people like I manage

9    people or not manage portfolios anymore or in what

10   context?

11   Q.    Just that she wanted to have some people under her

12   to manage?

13   A.    Um, well, no -- we manage -- myself and the

14   Associate Directors managed everyone in the group.

15   Q.    Okay, so, no, you never heard that?

16   A.    No, I'm just saying that I did hear it -- I don't

17   believe I heard it, but if I did, it wouldn't make

18   sense, so that's why I didn't think I heard it.

19   Q.    Okay.  Mr. Oh, um, did you ever hear Mr. Oh

20   complain, um, about a lack of, um, support trying to

21   raise AUM?

22   A.    Um, a lot of Portfolio Managers highlighted that

23   they wished they got more support from GRG to go raise

24   AUM.

25   Q.    My question, sir, wasn't about a --

1    A.    Yes.  Yes.

2    Q.    My question was about Mr. Oh.

3    A.    Yes.  Yes.

4    Q.    You did?

5    A.    Yes.

6    Q.    Okay, what were his complaints?

7    A.    He just wished he got more support from GRG

8    growing his AUM.

9    Q.    Did he specify why he felt as though he wasn't

10   getting enough support?

11   A.    Um, his AUM was growing fast enough, it wasn't

12   growing in a way he felt was, um -- yeah, it just wasn't

13   growing fast enough.

14   Q.    Ms. Meunier, she complained, right?

15   A.    Um, I don't remember Ms. Meunier complaining about

16   the growth of her AUM.

17   Q.    But she complained about GRG, right?

18   A.    Ms. Meunier's, um, principal concern with respect

19   to GRG is, um, that she was in Hong Kong, um, GRG had a

20   lot of demands for Ms. Meunier's time and, um, had --

21   were asking her to go all over the world to talk to

22   clients, and the principal complaint was, and what we

23   had to kind of get to the bottom of was -- and I don't

24   know if we ever did, was -- was GRG using Ms. Meunier to

25   talk to clients about China, what's going on in China,

1    or are we specifically -- that this is a specific

2    opportunity for Ms. Meunier to talk about the China

3    Opportunities approach?

4         So the concern was that, um, GRG was saying, "Hey,

5    here's someone who's really effective at talking -- and

6    is going to tell you what's going on in China," um, and

7    honestly Ms. Meunier was spread so thin, especially

8    given all her responsibilities that she's fulfilling as

9    a Team Analyst on the EME team, that her

10   responsibilities were so thin that we just wanted to

11   target the opportunities, where there was an

12   opportunity, to essentially get that fish on the hook

13   for China Opportunities.

14   Q.    Did I hear you right, sir, that you said that, um,

15   "What we needed to get to the bottom of, but we never

16   did"?

17   A.    Um, I don't remember if we ever did, we had a lot

18   on our to-do list.

19   Q.    (Pause.)  Do you recall testifying, in response to

20   one of Mr. Paterniti's questions, that "you determined

21   that Ms. Chan's attitude was a permanent feature"?

22   A.    Um, I don't recall the specific words I used.

23   Q.    Okay.  Is that an accurate statement though that

24   at some point you determined Ms. Chan's attitude was "a

25   permanent feature"?

A.    Um, I -- I think it's an accurate statement to say
that, um, certainly with respect to, um, based on what I
have seen directly and the input that was -- that had
been provided to me, the feedback that I had seen, all
those tiles in the mosaic that I've seen, um, that a
lack of a growth mindset, um, was -- didn't seem to be
evolving in a meaningful way.

Q.    Is that a "Yes"?

A.    Yeah, it's one of those questions where you ask
me, you know, a specific question on a "yes" or "no,"
but there's a range of different attributes.  We saw on
our feedback to where we ask about four different things
-- we don't say is somebody a good investor?  We say is
he or she good at money management?  How about breathe?
Depth?  I mean we could have carved that into other
things.  I mean -- so some questions are not possible to
answer with "yes" or "no" answers.

Q.    Well, sir, I'm just asking if you made the
specific determination.  Did you specifically determine
that Ms. Chan's attitude was a permanent feature?

A.    Um, I determined that it was unlikely that her
attitude would show meaningful -- that there was going
to be a meaningful, um, change in her attitude.

Q.    And when did you reach that determination, sir?

A.    When did I reach that determination?  In the

 1    summer of 2017.

 2    Q.    You referenced a moment ago, um, your belief that

 3    Ms. Chan did not have a "growth mindset," did I hear

 4    that right?

 5    A.    Um, words to that effect.

 6    Q.    And I think you articulated, um, quite well on

 7    cross-examination the importance of having a growth

 8    mindset because that's how investors become good, right?

 9    A.    That's one way investors become good.  Most

10    investors never probably believe they're good, they're

11    just constantly trying to get better.

12    Q.    You think most investors don't think they're good?

13    A.    I think, um -- I -- it's not that they think

14    they're bad, it's that they don't actually think --

15    they just want to develop, they don't -- they -- they

16    just want to get better.  They're in a constant battle

17    to beat the markets.

18    Q.    And part of what investors want to do is they want

19    to make money, right?

20    A.    Um, there's a lot of investors all over the world

21    in a lot of different firms and --

22          THE COURT:  This really is beyond the scope here.

23          MR. HANNON:  Just one question, your Honor.

24          THE COURT:  You're talking about investors

25    generally?

1          Anything else that has to do with the cross-

2     examination of this witness?

3          MR. HANNON:  Yes, your Honor.

4     Q.    You testified on cross-examination that, um,

5     Wellington judges investors based upon Alpha, not based

6     upon assets under management, is that right?

7     A.    Um, that's one of the ways Wellington judges --

8     um, evaluates investors, yes.

9     Q.    Okay.  But in terms of how Wellington pays

10    investors, um, assets under management is an important

11    part of the criteria, isn't it?

12    A.    Um, I think as you ascertained yourself, when you

13    were talking to me earlier, that assets under management

14    can be an important -- is an important criteria in our

15    calculation of the investment formula, but we have

16    compensation -- if I -- if I don't believe the

17    compensation is fair and motivational, we have the

18    opportunity to supplement incentive compensation with a

19    corporate bonus.

20    Q.    There's the opportunity to, right?

21    A.    The opportunity to do what?

22    Q.    To supplement with a corporate bonus, right?

23    A.    I would have had that opportunity to make that

24    recommendation to the firm's compensation committees,

25    yes.

1    Q.    Okay.  But putting aside your sort of generosity,

2    so to speak, in terms of providing corporate bonuses --

3    A.    It's not my generosity, it's my business judgment.

4    Q.    Okay, your business judgment.

5    A.    No, my team's business judgment.

6    Q.    Sure thing.  But in terms of how Portfolio

7    Managers earn money, aside from relying upon your

8    business judgment, the incentive fees rely largely upon

9    assets under management, right?

10   A.    On -- the incentive fees do, yes.

11   Q.    Okay.  (Pause.)  Um, just a couple of quick

12   preemptive questions because we're almost done here.

13        I think you testified on cross-examination that

14   you thought that Ms. Chan's time at Threadneedle was

15   more of an apprenticeship, did I hear that right?

16   A.    No, you didn't hear that right.

17   Q.    Okay.  You understand that she really was a

18   Portfolio Manager at Threadneedle, right?

19   A.    Um, I understood that was her title and I didn't

20   understand, um -- I still don't know exactly -- as

21   Mr. Baxter testified, and I testified, there are many

22   different structures, um, with respect to the Fund

23   Management role and how those Fund Management roles

24   operate in different investment organizations.

25   Q.    She worked for you for three years, right?

A.    Yes.

Q.    Did you ask her how her time at Threadneedle as a

Portfolio Manager really functioned?

A.    Um, not that I recall.

Q.    (Pause.)  I think I heard you say, on cross-

examination, that someone can't be a good investor

without taking in feedback, did I hear that right?

A.    Um, I don't know if you heard it right.

Q.    Is that a true statement?

A.    Um, it's a -- it might be possible to be a good

investor for someone out there, but I think for the vast

preponderance of investors the ability to take in

feedback is very important.

Q.    At least in your experience that's how you become

a good investor is by taking in feedback, right?

A.    I don't think that's the only way one becomes a

good investor, but it is one way and it certainly is,

um, how -- yeah, it's one way.

Q.    Have you seen any others?

A.    Um, I haven't seen any others, but I spent 23

years at Wellington Management and that's how --

Q.    Did the fact that Ms. Chan was a good investor,

did that at any time cause you to conclude that maybe it

wasn't the fact that she wasn't good in taking in

feedback, but maybe it was the way the feedback was

1   being delivered at Wellington that was the issue?

2   A.    Um, over time I didn't reach that conclusion.

3   Feedback was delivered in many different ways and I

4   received feedback from many different perspectives and

5   that's not a conclusion I would reach.

6           MR. HANNON:  That's all I have, your Honor.

7           THE COURT:  Nothing further for this witness?

8           MR. PATERNITI:  Nothing.

9           THE COURT:  You may step down.  Thank you.

10          THE WITNESS:  Thank you.

11          (Steps down.)

12          THE COURT:  Now, ladies and gentlemen, we'll stop

13   taking testimony at this time.  We'll start tomorrow at

14   9:00.

15          Let me just say a word about these paper exhibits

16   that have been passed out.  We did that because we had a

17   witness testifying via zoom and we couldn't both see the

18   documents on the screen and see the witness.  That

19   doesn't make those documents any more important, that

20   they were passed to you, nor does it make them less

21   important than the documents that are, um, shown to you

22   during the course of the trial.  Every document that has

23   a number will be available to you when it comes your

24   time to deliberate about the case.

25          So the short of it is, if you want to keep those

1    and carry them around, fine.  If you don't, leave them

2    on your chairs there.

3        So keep your minds suspended, you have not heard

4    all the testimony in the case.  We are moving on.  Do

5    not discuss the case either among yourselves nor with

6    anyone else.  We'll start promptly at 9:00 tomorrow

7    morning.  And you'll understand that this week,

8    Wednesday, it really is my responsibility, I have to go

9    to the doctor's, so we don't sit.  So tomorrow we sit.

10   Thursday we sit.  Friday we sit.

11       So I'll see you tomorrow, 9:00 a.m.  The jury may

12   retire.  I'm remain on the bench.

13           THE CLERK:  All rise for the jury.

14           (Jury leaves, 1:00 p.m.)

15           THE COURT:  Please be seated.

16       The total elapsed time, the plaintiff, 2 days, 2

17   hours, 20 minutes.  The defense, 2 days, 1 hour, 40

18   minutes.

19       And, Mr. Hannon, before we recess, what's the

20   answer to my question?

21       MR. HANNON:  Your Honor, four additional

22   witnesses, um, three of whom I expect to be brief.  The

23   three brief ones are Ray Helfer, Henry Philip, and Greg

24   Mattiko, and the long one will be Ms. Chan.

25           THE COURT:  All right, that all makes sense.

1    That's fine.  I'd like to get through that this week.

2         Very well, we'll recess until 9:00 a.m. tomorrow.

3    We'll recess.

4         (Adjourned, 1:00 p.m.)

1               C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5    hereby certify that the forgoing transcript of the

6    record is a true and accurate transcription of my

7    stenographic notes, before Judge William G. Young, on

8    Monday, October 18, 2021, to the best of my skill and

9    ability.

10

11

12

13    /s/ Richard H. Romanow 01-06-22

14    _____
     RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25