```
1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS (Boston)

3                            No. 1:19-cv-11605-WGY

4

5    GIGI KAI ZI CHAN,
          Plaintiff
6

7    vs.

8

9    WELLINGTON MANAGEMENT COMPANY, LLP and CHARLES ARGYLE,
          DEFENDANTS
10

11                        * * * * * * * * *

12

13                    For Jury Trial Before:
                      Judge William G. Young
14

15

16                    United States District Court
                      District of Massachusetts (Boston.)
17                    One Courthouse Way
                      Boston, Massachusetts 02210
18                    Tuesday, October 19, 2021

19

20                        * * * * * * * *

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23               United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                  bulldog@richromanow.com

25
```

```
 1                  A P P E A R A N C E S

 2

 3   PATRICK J. HANNON, ESQ.
     HAMPTON M. WATSON, ESQ.
 4       Hartley Michon Robb Hannon, LLP
         155 Seaport Boulevard, 2nd Floor
 5       Boston, MA 02210
         (617) 723-8000
 6       E-mail: Phannon@hmrhlaw.com
         For Plaintiff
 7

 8   STEPHEN T. PATERNITI, ESQ.
     BENJAMIN R. DAVIS, ESQ.
 9       Jackson Lewis, PC
         75 Park Plaza, 4th Floor
10       Boston, MA 02116
         (617) 367-0025
11       Email: Stephen.paterniti@jacksonlewis.com
     and
12   BEVERLY W. GAROFALO, ESQ.
         J.W. Carney, Jr. & Associates
13       20 Park Plaza, Suite 1405
         Boston, MA 02116
14       (860) 275-0100
         Email: Beverly.garofalo@jacksonlewis.com
15       For Defendants

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   RAY HELFER

 6        By Mr. Hannon:        4                  49

 7        By Mr. Paterniti:          32

 8

 9   GREG MATTIKO

10        By Mr. Hannon:       57

11        By Mr. Paterniti:         150

12

13

14

15                       E X H I B I T S

16

17                      (None marked.)

18

19

20

21

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Jury enters 9:10 a.m.)
 3          THE COURT:  Good morning, ladies and gentlemen,
 4    and again thank you for being here right on time.  They
 5    were all here right ready to go.  I was greeting this
 6    week's jurors on other cases.  That's what's delayed us
 7    for these 10 minutes, but we're moving right along.
 8          The next witness is on the stand and he may be
 9    sworn.
10          (RAY HELFER, sworn.)
11          THE COURT:  And, sir, you may take your mask off
12    while you testify, the jury needs to observe you.
13          THE WITNESS:  Great, now I can see through my
14    glasses.  Thank you.
15
16          * * * * * * * * *
17          RAY HELFER
18          * * * * * * * * *
19
20    DIRECT EXAMINATION BY MR. HANNON:
21    Q.    Good morning, sir.  Would you please state your
22    name.
23    A.    Ray Helfer.
24    Q.    And, Mr. Helfer, am I right you were formerly
25    employed by Wellington?
```

1    A.     That is correct.

2    Q.     And when did your employment with Wellington end?

3    A.     I retired at the end of 2020, December 31st last

4    year.

5    Q.     Okay.  At the time of your retirement, how were

6    you employed at Wellington?

7    A.     I was a partner of Wellington Management Company.

8    At the time of my retirement I had spent the last three

9    years, 2017 through 2020, managing the Product

10   Development Group out of London and the New Product

11   Development organization.

12   Q.     Okay, so those were your positions from 2017 to

13   2020?

14   A.     That's what I retired from, yes.

15   Q.     Okay.  And could you explain to the jury what you

16   did for Wellington prior to 2017?

17   A.     So I joined Wellington in 2003, I was hired by

18   Wellington to develop an insurance practice managing

19   assets on behalf of various types of insurance

20   companies, I did that till 2010, and at that time I was

21   asked to move to Asia to manage the external focus, the

22   client service and the Business Development Group across

23   Asia-Pacific, um, and my family and I moved to Hong

24   Kong.  And from 2010 to 2017 I had two roles, one was

25   the head of the Global Relationship Group, "GRG," as

1    it's called, across all of Asia-Pacific, managing sales

2    and claim service, the other was I was the head of the

3    Hong Kong office as well within Hong Kong.

4    Q.    Okay, so it sounds like while you were in Hong

5    Kong you were sort of wearing two hats, so to speak?

6    A.    That is correct.

7    Q.    And one of those hats was a role within GRG?

8    A.    Yes, I worked as the head of GRG across all of

9    Asia-Pacific and we had five offices throughout Asia.

10   Q.    Okay.  And in terms of GRG in Asia-Pacific, would

11   that be focusing on efforts to work with clients in that

12   geography?

13   A.    Yes.  So my role was to manage a group that worked

14   with clients and prospects, hopefully future clients, to

15   evaluate their investment needs and see if there were

16   appropriate strategies of Wellington Management,

17   wherever they were managed, that might fit those

18   clients.  So it was geographic in terms of our coverage

19   of the claims and prospects across Asia-Pacific.

20   Q.    Okay.  And the other half that you said that you

21   were, that was as the head of the Hong Kong office, is

22   that right?

23   A.    Yes. So Wellington Management Hong Kong, our legal

24   entity, it's required by the regulator, um, that someone

25   is the head of the company and responsible for making

1    sure that everyone undertaking their activities is doing

2    so within the regulations and the requirements of the

3    financial regulator in Hong Kong, that was my

4    responsibility primarily as well as helping develop the

5    culture of the office.

6    Q.    Okay.  And how did you first, um -- well strike

7    that.

8          Do you know Gigi Chan?

9    A.    Yes, I do.

10   Q.    And you actually interviewed Ms. Chan, is that

11   right?

12   A.    That is correct.

13   Q.    Okay.  Sir, do you recall, during the course of

14   that interview, Ms. Chan asked you questions about how

15   she would be evaluated at Wellington?

16   A.    Um, she did ask me questions about how she would

17   be evaluated as an investor and analyst on a team at

18   Wellington.

19   Q.    Okay.  And do you recall what you told her?

20   A.    I told her that, um, I was surprised that that

21   wasn't fully discussed, since I was a very late

22   interview, but that it is something that she should have

23   clarified and that I would provide feedback on that

24   topic to my colleagues to make sure that everyone

25   understood roles and responsibilities moving forward.

1  Q.    Okay.  Were you at all involved in the decision to

2  hire Ms. Chan?

3  A.    I was not.

4  Q.    But you were present at a philosophy and process

5  panel at which Ms. Chan presented, is that right?

6  A.    That is correct.

7  Q.    Okay.  And do you recall who else was present for

8  that?

9  A.    So present, um, there were some process panel

10  participants on video and some in the room.  I believe

11  on video, if my memory serves me right, they had Anidia

12  Killian from Tokyo and had, um, Cheryl Duckworth from

13  Singapore in the room.  I believe it was myself, um,

14  Mr. Tom Baxter, Mr. June Oh, and Mr. Juwan Parker, who

15  was visiting -- he actually works in Singapore, but I

16  recall him being in Hong Kong for this meeting, um, as

17  well as Ms. Chan.

18  Q.    Okay.  Now prior to that meeting you had worked

19  with Mr. Oh for sometime, is that right?

20  A.    That is correct.

21  Q.    For how long?

22  A.    Mr. Oh was working at Wellington prior to me

23  moving to Asia, I believe he either moved to Asia

24  shortly after I did or shortly before.  But my

25  recollection is we worked together pretty much the whole

1    time that I was in Asia-Pacific.

2    Q.    Okay.  And, um, as of the time of the Asia

3    Philosophy and Process Panel, um, you had an

4    understanding concerning Mr. Oh's communication style,

5    right?

6    A.    Actually, no, I didn't have a concern about

7    Mr. Oh's communication style, I was aware of his

8    communication style and I received feedback from him

9    many times over the years.

10   Q.    Okay.  You understood that Mr. Oh had a style that

11   you would describe as "quick, abrupt, and extremely

12   straightforward," is that right?

13   A.    That is correct.

14   Q.    Okay.  Now during the course of the Asia

15   Philosophy and Process Panel, you saw that Ms. Chan was,

16   um, she was bothered by some of the comments that were

17   made, is that right?

18   A.    That is correct.

19   Q.    And would you agree, sir, that the feedback that

20   bothered Ms. Chan concerned her presentation style and

21   body language?

22   A.    I believe it, um -- that it correctly concerned

23   her presentation style, body language, but I can take

24   back to my own feedback and it also concerned the

25   content of her presentation, the organization of the

1    material.

2    Q.    Okay, but in terms of the feedback that bothered

3    her, would you agree that what bothered her were the

4    comments concerning presentation style and body

5    language?

6    A.    It's -- so, yes, I believe that concerned her.  I

7    actually can't speak to whether she was also concerned

8    about feedback on the content itself, I would have no

9    knowledge of it.

10   Q.    Okay.  But observing that Ms. Chan had been

11   bothered by some of the comments, you actually made a

12   point to seek Ms. Chan out after the meetings, is that

13   right?

14   A.    That is correct.

15   Q.    Okay.  And Ms. Chan did indeed confirm to you that

16   she had been bothered by the comments, is that right?

17   A.    Yes, she did.

18   Q.    Okay.  Now, with respect to the actual content of

19   Ms. Chan's presentation, is it fair to say that you had

20   a favorable view of Ms. Chan's process and philosophy?

21   A.    The feedback that I provided was that I believe

22   she had all of the makings of a thoughtful philosophy

23   and process, but it needed to be organized and presented

24   in a way that was more forceful, more direct, and easier

25   to understand, particularly with respect to thinking

1    about our clients and prospects in the region, which is

2    what I was responsible for.

3    Q.    Sure.  But putting aside how it was presented, am

4    I correct that you had a favorable view of Ms. Chan's

5    process and philosophy?

6    A.    Yes, I did.

7    Q.    Who is Alex Qian?

8    A.    Alex Qian was a direct report of mine, he was a

9    business developer in Mainland China.

10   Q.    Okay.  And I think I've been pronouncing his name

11   five different ways for the last several years.  Am I

12   right that his last name is spelled Q-I-A-N?

13   A.    That is correct.

14   Q.    Okay, but it's pronounced "Chin"?

15   A.    It would be the easiest English pronunciation,

16   yes, would be "Chin."

17   Q.    Okay.  Great.  And, Mr. Qian, he worked for you

18   when you were wearing your GRG hat, is that right?

19   A.    That is correct.

20   Q.    Okay.  And what was Mr. Qian's job?

21   A.    So Mr. Qian, when I moved in 2010, actually worked

22   in Hong Kong and was responsible for business

23   development across Greater China, by that I mean

24   Mainland China, Hong Kong, and Taiwan.  However, um,

25   over the course of his employment, Mr. Qian, for family

1    and personal reasons, chose to move back to Beijing, um,

2    which required we revise his role.  And so he focused in

3    a much more narrower role, specifically in Mainline

4    China, working to develop a strategy where we would

5    manage assets on behalf of large asset managers in China

6    for their clients in China.  So it was a smaller role,

7    but something he believed could be grown substantially

8    over time.  So the last several years he worked for me

9    out of our Beijing office.

10   Q.    And given the, um, the sort of structure of China,

11   so to speak, in terms of the opportunities Mr. Qian was

12   looking for, were these subadvisory roles he was

13   primarily searching for?

14   A.    They, um, technically weren't subadvisory because

15   the regulations required an advisory role, meaning we

16   wouldn't be managing the actual assets in the portfolio,

17   we would be informing the Asset Manager in China what

18   they should buy and sell, but the decisions would be

19   theirs, because the regulations were not such that we

20   could directly subadvise the management of the

21   portfolio.  Um, it's a complicated structure.

22   Q.    Okay.  So, um, just to try and unpack that a

23   little bit, am I right that in terms of the type of

24   opportunities Mr. Qian was looking for in China, these

25   were the opportunities where Wellington's not -- doesn't

1    actually possess the client's funds, right?

2    A.    Well we'd never possess the client's funds, but we

3    wouldn't have the authority to instruct the purchases

4    and sales directly of the client's assets through their

5    custodian.

6    Q.    Okay, so Wellington is just advising the folks in

7    Mainland China in terms of how Wellington is suggesting

8    they should be buying and selling, is that right?

9    A.    That is correct.

10   Q.    Okay.  Am I right, those were the types of

11   opportunities that it was Mr. Qian's job to look for in

12   China?

13   A.    Um, that is correct.

14   Q.    Were there any other opportunities in China that

15   Mr. Qian was being paid to look for?

16   A.    Yes, everything outside of the direct government

17   institutions, Sovereign fund, Central Bank, things of

18   that sort, so he also, um, spoke with insurance

19   companies and a few other private institutions.  But

20   predominantly that was what he was looking for.

21   Q.    When you say "that was what he was looking for"?

22   A.    The advisory business working with large Asset

23   Managers.  It's a vision that he had that this business

24   can develop.  Not necessarily a vision that I shared.

25   Q.    Did you tell him not to look for those

1    opportunities?

2    A.    No, but when Alex Qian wished to move that to

3    Beijing, that is what was available.  So while guarded

4    and direct with him, I told him I would give him a

5    chance to see if that could grow into a substantial

6    business, and we agreed to see how it worked over a

7    period of time.  It ended up not developing in the way

8    that he had expected.

9    Q.    And let's talk about why it didn't develop.

10          So Mr. Qian, um, he did identify some such

11   advisory opportunities in Mainland China, correct?

12   A.    That is correct.

13   Q.    And one of those advisory opportunities involved a

14   company called Ming Sheng?

15   A.    That is correct.

16   Q.    And Ming Sheng -- is that an insurance company, to

17   your knowledge?

18   A.    Um, it's an Asset Management conglomerate.  So we

19   were talking to the Asset Management arm of Ming Sheng

20   and they're one of the larger Asset Managers

21   domestically in Mainland China.

22   Q.    How large?

23   A.    Um, I -- top 10.  But I don't recall their assets

24   in U.S. dollars or --

25   Q.    Are you talking millions?  Billions?

1    A.    Billions.

2    Q.    You say "billions"?

3    A.    "Billions" in assets managed locally in China,

4    yes.

5    Q.    Okay.  And this was a potential new client for

6    Wellington, right?

7    A.    That is correct.

8    Q.    Okay.  And, um, am I right that at some point

9    Mr. Qian advised you that he was interested in having

10   Ms. Chan pursue this advisory opportunity with Ming

11   Sheng?

12   A.    Um, yes, he had first to look to work with one of

13   the other Portfolio Managers, um, in Hong Kong, but she

14   declined to look at this mandate given its complexity

15   and its high level of customization.  And he did inform

16   me he was speaking with Ms. Chan about it.

17   Q.    Okay.  Did he keep you apprised of conversations

18   that Ms. Chan had had directly with Ming Sheng?

19   A.    Um, he did not.  He -- when I reached out to him

20   to ask for an update, he provided me an update.  But I

21   was not advised of conversations in advance.

22   Q.    Okay.  And at some point did Mr. Qian inform you

23   that it was Ms. Chan's managers who were not supportive

24   of Ms. Chan working on this assignment?

25         THE COURT:  Ask that question again?

1    Q.    At some point in time did Mr. Qian advise you that

2    it was Ms. Chan's, um, Gigi Chan's managers, were not

3    supportive of her working on this assignment?

4    A.    Um, yes, he did, but the reason he reached out to

5    their managers is under my instruction.

6    Q.    Okay.

7    A.    It would be normal practice at Wellington that,

8    um, the management team was involved in conversations

9    about the roles and responsibilities of a Portfolio

10   Manager, particularly with a new and highly-customized

11   assignment, and when it came to my attention he had not

12   done that, um, I instructed him to do so.

13   Q.    And did he tell you why they didn't want her to

14   pursue that?

15   A.    Um, it was expected to be highly customized, it

16   wasn't directly related to the fund that Wellington had

17   provided seed money for Ms. Chan to manage as a

18   development opportunity of a new strategy over time, and

19   it was advisory and highly complicated from a technical

20   standpoint, and I didn't expect that it would grow

21   substantially.  Even if it would get our foot in the

22   door with a large Asset Manager, the mandate itself I

23   did not think would be of significant sales.

24   Q.    Back to my question, sir.  Did Mr. Qian tell you

25   what the reason was given by Ms. Chan's managers as to

1    why they did not want to pursue it with her?

2    A.    Yes, he told me that it would be small and it

3    would be highly customized and complex and not aligned

4    with what she was working on.

5    Q.    That's what Mr. Qian told you?

6    A.    Yes.

7    Q.    When did he tell you that?

8    A.    Um, I would say sometime in 2016, 2017.  I don't

9    recall.

10   Q.    How small did he say it was going to be?

11   A.    He told me that it would grow to be 50 to 100

12   million dollars in the first year.  I didn't necessarily

13   agree with that, but as a salesperson he was optimistic.

14   Q.    Well did you do any research or analysis to

15   determine if he was wrong about that estimate?

16   A.    I found that other advisory mandates, including

17   one that he had brought in the year before, which grew

18   to be no larger than 10 million U.S. dollars over the

19   course of the first year, that they're complicated and

20   they take a long time to grow, and while it might be an

21   opportunity with Ming Sheng, I didn't think it was a

22   significant opportunity relative to the resources we

23   would have to put into the assignment.

24   Q.    Who was the prior mandate with?

25   A.    Credit Ease.

```
 1   Q.    I'm sorry?
 2   A.    "Credit Ease" is the name of the firm.
 3   Q.    Was that a billion dollar Asset Manager in
 4   Mainland China?
 5   A.    A multibillion dollar Asset Manager, yes.
 6   Q.    Top 10?
 7   A.    Yes.
 8   Q.    And, um, was that similar in structure in terms of
 9   Wellington being in an advisory role?
10   A.    It was a -- it was a, um, similar advisory-tapered
11   role, but it was in the S-allocation area, it wasn't all
12   equities like this one was going to be.
13   Q.    And who was the advisor on that project?
14   A.    It was the Asset Allocation team in Boston.
15   Q.    Do you recall who in Boston?
16   A.    No, I think it was a team effort.  I forget
17   exactly.
18   Q.    And was that focused on investing in China stocks?
19   A.    No, actually it was investing globally in other
20   areas, but raising money with the, um, client base being
21   in Mainland China.  It was not investing in China at
22   all.
23   Q.    Back to the Ming Sheng opportunity.  You could
24   only recall having one conversation with Mr. Qian --
25   strike that.  You could only recall having one
```

1    conversation with the folks at Ming Sheng about this

2    opportunity, correct?

3    A.    I think I met with them twice.

4    Q.    Okay.  What do you recall about the first meeting?

5    A.    The first meeting was, um, an education about both

6    of our companies and a general fact-sharing about a

7    general interest of potentially developing some

8    opportunities.  The second -- I'm sorry, so the first

9    meeting was more introductory, is my recollection, and

10   it was in Sheng Hai.

11   Q.    The first meeting you would describe as being very

12   "high-level," is that right?

13   A.    That's correct.

14   Q.    And despite your stated concerns today about the

15   opportunity, you never instructed Mr. Qian not to pursue

16   it, correct?

17   A.    That is correct.

18   Q.    And in terms of your conversations with Ming Sheng

19   that you've described, none of those concerned who the

20   manager would be, is that correct?

21   A.    Excuse me?

22   Q.    In terms of your two meetings with Ming Sheng that

23   you've described, neither of those meetings did you

24   discuss with them who the manager of that mandate would

25   be, correct?

A.    That is correct.

Q.    Okay.  Let's go back to this issue concerning the size of the opportunity.

So did I hear you right that your understanding from Mr. Qian would be that the Ming Sheng opportunity would be -- it was estimated to be 50 to 100 million dollars in the first year?

A.    That was his estimate working with -- I assume his conversations with people at Ming Sheng.

Q.    Okay.  And understand, um -- in Wellington dollars, is that a significant amount of money in terms of first-year investment in a mandate?

A.    Um, it would be a reasonable start for the mandate, it certainly wouldn't be a significant client assignment at that size.

Q.    Okay.  What would be a significant client assignment at Wellington?

A.    The -- I would say 300 to 500 million dollars over time would be a reasonable assignment, um, given the resources put into most of the portfolios in our management.

Q.    And would that just be for a mandate or would that also apply to a fund?

A.    The -- I would say both would be similar because there's resources and costs that go into both

1    strategies.

2    Q.    Okay.  Well am I right that there's actually more

3    resources required for a fund than there would be for a

4    mandate like the Ming Sheng opportunity?

5    A.    Um, I wouldn't agree with that in that many

6    separate accounts, which are not funds, are highly

7    customized to each client, so they are complicated.  One

8    of the positives of actually us managing a fund is that

9    it is a standardized structure, um, without further

10   complexity.

11   Q.    But in terms of the cost of actually setting up,

12   with a fund there are significant startup costs, is that

13   right?

14   A.    That is correct, but there also are for an

15   advisory assignment in terms of communication channels

16   and IT and things we have to send them and compliance

17   and other things that are complicated.

18   Q.    What would have been the setup costs required for

19   the Ming Sheng mandate?

20   A.    I don't know an actual dollar amount, I do know

21   that there's complexities involved in doing so for an

22   advisory mandate because we had done that for some other

23   opportunities at the firm in different parts of the

24   world.

25   Q.    What complexities?

A.    For example, um, we need to provide a regular file
of what we recommend buying and selling.  However, if we
are actually purchasing or selling that stock in other
client portfolios, we can't communicate externally to a
third-party that we are selling a security or buying a
security because it could create a front-running
situation of them selling or buying it in advance of our
other clients.  So we have to have technology in place
to know whether we completed the activity we are
undertaking before we communicate.  We have to also make
sure that what the strategy is meets the compliance
requirements that Ming Sheng tells us so that we're not
recommending that they purchase or sell securities that
are outside of the guidelines of their own fund.

Q.    Anything else?

A.    No.

Q.    Okay.  In terms of the, um -- how to inform them
of your buy/sell recommendations, that's an issue that
Wellington has worked out with other mandates, right?

A.    That is correct.

Q.    Okay.  And with respect to the issue about
compliance requirements, Wellington oftentimes has to
deal with what particular compliance requirements are
for an investment strategy, right?

A.    That is correct.

1    Q.    Okay.  Did anyone ever tell you that part of the

2    reason why Ms. Chan, Gigi Chan's managers did not want

3    to pursue the Ming Sheng opportunity was because of

4    their concern about her commitment to Wellington?

5    A.    Yes.

6    Q.    Who told you that?

7    A.    Mr. Argyle.

8    Q.    What did he tell you?

9    A.    He told me that, um, it may be challenging to get

10   a new assignment particularly externally focused with

11   marketing road shows and other things, um, if there are

12   challenges or whether Ms. Chan actually will be with the

13   firm longer-term.

14   Q.    Now in terms of your personal interactions with

15   Ms. Chan, am I right that you had very limited

16   opportunities to actually see her performance?

17   A.    That is correct.

18   Q.    And, um, at some point in time it's your

19   recollection that Mr. Mattiko, um, the Team Lead for the

20   EMO fund strategy, that he communicated to you that he

21   had dissatisfaction with Ms. Chan, is that right?

22   A.    On more than one occasion, yes, he communicated

23   that to me.

24   Q.    In fact at some point Mr. Mattiko communicated to

25   you that he no longer wanted Ms. Chan on his team, is

1    that right?

2    A.    Yes, Mr. Mattiko communicated to me that he had

3    communicated to his leadership team, i.e. Tom Baxter and

4    Charles Argyle, that he no longer wanted Ms. Chan on his

5    EMO team going forward.

6    Q.    Okay.  But in terms of your communications with

7    Mr. Mattiko about his dissatisfaction, am I right that

8    you can't recall Mr. Mattiko ever expressing to you any

9    dissatisfaction concerning Ms. Chan prior to the

10   philosophy and process panel?

11   A.    No, I believe his dissatisfaction was expressed

12   prior to that and was growing over time.  I don't have

13   any linkage between the two topics which you just

14   referenced in my mind.

15   Q.    Sir, do you recall being, um -- sitting for a

16   deposition in this case?

17   A.    I do.

18   Q.    Okay.  And that was done via zoom, is that right?

19   A.    Correct.

20   Q.    Okay.  So, sir, you have a binder in front of you?

21   A.    Yes.

22   Q.    And if you could turn to, um, Page 88, Line 20,

23   please.

24   A.    (Turns.)  Are you there, sir?

25   A.    Yes, I am.

1  Q.    Just read along silently as I read aloud please,

2  um, starting on Line 20.

3        Question, "Sure, as of the time that Ms. Chan

4  presented to the philosophy and process panel, what was

5  the feedback you had received from Mr. Mattiko

6  concerning Ms. Chan's work performance?"  Answer, "My

7  recollection as time progressed was that Mr. Mattiko was

8  increasingly concerned about the working relationship,

9  her impact as a member of his team, and he was in

10  conversation at times with Charles and others as to how

11  to improve those dynamics."  Question, "When did those

12  concerns start?"  Answer, "I actually don't recall when

13  I first learned of these concerns or he shared them with

14  me."  Question, "Okay, can you say definitively that you

15  learned of those concerns prior to the philosophy and

16  process panel as opposed to after?"  Answer, "I cannot

17  say that definitively, no."

18        Do you see that, sir?

19  A.    Yes, I do.

20  Q.    Did I read that correctly?

21  A.    You did.

22  Q.    Okay.  And am I also right that you can't recall

23  Mr. Argyle ever expressing to you any concerns with

24  Ms. Chan's performance prior to the philosophy and

25  process panel?

```
1    A.    That is correct, the feedback from both
2    Mr. Mattiko and Mr. Argyle, with respect to concerns
3    about Ms. Chan, I can't put before or after the
4    philosophy and process panel and connect them that way.
5    Q.    Okay.  Um, as the head of the Hong Kong office,
6    um, besides Mr. Argyle, Mr. Mattiko, and some folks in
7    Human Resources, am I right that you never received any
8    complaints about Ms. Chan?
9    A.    Um, given your caveats, correct, yes.
10   Q.    Okay.  And in fact, sir, your personal working
11   relationship with Ms. Chan was quite good, wasn't it?
12   A.    I would define it as we had a thoughtful
13   professional relationship.  I'm not sure "quite good" is
14   the words I would use.  We didn't work closely together.
15   Q.    Would you refer to it as "generally good"?
16   A.    Yes, I would.
17   Q.    Okay.  And, um, am I right that you were not
18   consulted in connection with the decision to terminate
19   Ms. Chan's employment?
20   A.    That is correct.
21   Q.    Um, Ms. -- strike that.  Bo Meunier, she was
22   another Portfolio Manager in the Hong Kong office while
23   you were serving as its head, is that right?
24   A.    That is correct.
25   Q.    And am I right that when she first moved to Hong
```

1    Kong, she was a Research Analyst?

2    A.    She was a Team Analyst on a larger global equity

3    assignment, that is correct.

4    Q.    Okay.  And at some point in time she started to

5    take on responsibilities as a Portfolio Manager, is that

6    right?

7    A.    That is correct.

8    Q.    Do you recall how long it took Ms. Meunier to get

9    portfolio management responsibilities at Wellington?

10   A.    I do not recall how long from her journey to

11   Wellington to when she started managing her own

12   portfolios, the timeframe involved.  Sorry.

13   Q.    Were you at all involved in the decision to give

14   her Portfolio Manager responsibilities?

15   A.    I was not.

16   Q.    Did Ms. Meunier ever express any frustration to

17   you about anything -- anything that she observed at

18   Wellington?

19   A.    Um, Ms. Meunier expressed frustration, as do many

20   investors, that we, in the sales and client service,

21   which was my day job as we talked about earlier, weren't

22   necessarily putting her strategies front and foremost in

23   trying to raise assets as aggressively as she thought we

24   could within the products, but that would be the normal

25   case.  So, yeah, she had her own concerns that she would

1   express from time to time, as would other investors, in

2   the normal course of our work.

3   Q.    And in terms of who she was, um, expressing those

4   frustrations about, am I right that that would be the

5   GRG teams in the U.S.?

6   A.    It would be the teams in the U.S. as well as the

7   teams in Asia-Pacific.  We were working to find clients

8   and prospects to invest in the strategies that Bo, as

9   the Portfolio Manager, opened on a global basis.

10  Q.    And when you say that those kinds of frustrations

11  would be common, do you recall Mr. Oh ever expressing

12  similar frustrations?

13  A.    Yes, I do.

14  Q.    If you could turn back to your deposition

15  transcript, please, sir.  If you could turn to Page 109.

16  A.    Sorry, I broke my binder.  (Pause.)  Yes, sir.

17  Q.    And, um, do you see here on Page 109, um, I asked

18  you some questions regarding Ms. Meunier's frustrations

19  that she expressed to you, is that right?

20  A.    That is correct.

21  Q.    And then starting on Line 21, and if you could

22  read along silently, "Did you ever hear Mr. Oh express

23  similar frustrations?"  Answer, "I did not.  Well let me

24  take that back.  I don't recall him expressing similar

25  frustrations, but I know he did periodically spend time

1    in the U.S. and do various meetings from time to time.

2    But I don't recall a direct conversation and about

3    feedback of his experience meeting with prospects in the

4    U.S."

5         Did I read that correctly, sir?

6    A.    You did.

7    Q.    And, um, in terms of your experience being head of

8    GRG in Asia, was it your understanding that when

9    Wellington launches a fund its typical practice is to

10   market it?

11   A.    Um, no, the -- in essence so many funds are funded

12   with seed money of the firm's capital to develop a track

13   record over time.  Most of our clients and prospects

14   would require a three-year actual track record before

15   considering any strategy.  So it isn't necessarily

16   marketed immediately.

17   Q.    Not immediately, but, um, the plan is to

18   eventually market it, is that right?

19   A.    If we actually develop the appropriate returns

20   with the appropriate risk metrics, yes, that is our

21   objective over time.  Yes.

22   Q.    Well didn't Wellington have an approval process in

23   terms of deciding whether or not a particular approach

24   should be marketed?

25   A.    That is correct.

1    Q.    And in fact there were different levels of

2    marketing approval, right?

3    A.    That is correct.

4    Q.    Okay.  What were the levels?

5    A.    In essence some things were put in incubation

6    meaning the firm would put capital behind a new idea and

7    we would see how it develops, but that wouldn't be

8    marketed to third-party prospects and clients.  If there

9    was a reverse inquiry where someone asked about that

10   specific idea, we would have conversations on whether it

11   was ready to be put forward to an actual client.

12        The next level where things are available, let's

13   call them "products on the shelf," um, would be for our

14   business developers to talk to prospects and clients

15   where they think it would be a good fit.

16        The third level would be something that we have

17   identified as having an exceptional track record, having

18   the right time in the marketplace given what clients and

19   prospects are interested in, and we would actually put

20   marketing effort and materials behind going-on-the-road,

21   if you will, in trying to drum up interest in a

22   particular strategy.

23        Those would be the three.

24   Q.    And, sir, that last level that you referred to,

25   would that be known in Wellington's terms as "broad

1    marketing approval"?

2    A.    That is correct.

3    Q.    Sir, do you know whether or not China Growth --

4    Ms. Chan's China Growth Fund was approved for broad

5    marketing approval?

6    A.    I do not.

7    Q.    You mentioned "track record," sir.  Is a -- is the

8    track record of an investment strategy important?

9    A.    Um, yes, it is.

10   Q.    And could you explain to the jury why?

11   A.    In essence the clients and prospects we work with

12   would always have the opportunity to use a passive

13   strategy where you just follow a market and you don't

14   have to, in essence, pay a fee to an Asset Manager to

15   manage the assets.  So for us to earn our keep over time

16   it is our goal to outperform the general market with a

17   particular strategy.  So we would put forward our

18   expertise and a track record outperforming the

19   appropriate part of the market that we're trying to

20   "beat," so to speak, is very important to convince our

21   clients and prospects that they should be willing to pay

22   us a management fee to execute a strategy on their

23   behalf.

24   Q.  Sir, do you recall Wellington having done an

25   engagement survey in late 2016 or early 2017?

```
 1   A.     Yes, I do.
 2   Q.     And, sir, do you recall the feedback of that
 3   engagement survey reflecting that there was a feeling
 4   that career development and advancement opportunities
 5   were less positive for women relative to men?
 6   A.     The feedback of female colleagues was that they
 7   felt that their advancement opportunities were, um --
 8   they had a "lesser score," if you will, than male
 9   colleagues, if I recall.
10          MR. HANNON:  That's all I have, your Honor.  Thank
11   you.
12          THE COURT:  Do you wish to examine this witness
13   now or recall?
14          MR. PATERNITI:  I'll examine now, your Honor.
15          THE COURT:  You may.
16          MR. PATERNITI:  Thank you for asking.
17
18   CROSS-EXAMINATION BY MR. PATERNITI:
19   Q.     Good morning, Mr. Helfer?
20   A.     Good morning.
21   Q.     I just want to cover some of the areas that you
22   testified about here, um, a couple of minutes ago.
23          With regard to this, um, testimony you had that
24   many investors had complaints that GRG was not
25   supporting them sufficiently, why is that?
```

1    A.    The, um --

2          MR. HANNON:  Objection.

3          THE COURT:  He's being asked his view.  No,

4    overruled, he may give his view.

5    A.    Working in the sales and client service management

6    for many years at Wellington, the challenge is always

7    that we had over 200 different investment strategies

8    available for clients and prospects and so there is

9    always a creative tension with the investment teams with

10   respect to "shelf space," to think of it that way, that

11   are we putting forth their strategy, are we looking to

12   provide opportunities for them to get into finals

13   presentations for them to be retained by clients, and

14   the challenge of the business developers and the

15   management team is to make sure that we are evaluating

16   the clients' needs and we are looking for the strategy

17   at the firm that best meets their requirements and their

18   risk tolerances and then we reach out to the investment

19   team, as opposed to the other way around.  So this

20   creative tension of "Why aren't you putting my strategy

21   forward?" is something that was a management challenge,

22   but I would say part of my job description my entire

23   time at Wellington.

24   Q.    And you asked, um -- well you might not have been

25   asked, but are you familiar with this term "marketing

1    swing"?

2    A.    Yes, I am.

3    Q.    Is it unusual for "marketing swing" to be explored

4    but not actually happen?

5    A.    Um, it is not unusual, it was part of developing a

6    strategy for a product.

7    Q.    And what are the reasons why a marketing swing

8    might not happen?

9    A.    The two primary reasons are time of the investor,

10   meaning that a marketing swing requires a lot of

11   investor time to be on the road and talk to clients and

12   prospects.  The second is, is the product or strategy

13   itself ready for a marketing swing in terms of

14   performance, in terms of track record, in terms of, you

15   know, assets already in the fund, and in terms of aren't

16   we working with a prospect that we believe can help

17   raise significant assets?

18   Q.    Would an investor, a Wellington investor with an

19   incubation fund with seed money in it, typically be

20   included in a marketing swing?

21   A.    That would not be typical, no.

22   Q.    Have you ever heard of a Team Analyst being

23   promised client access at the prehire stage?

24   A.    Um, no, I have not.  I, in fact, have not heard of

25   any investor, whether it be a team analyst, a research

1  analyst, or a Portfolio Manager, being promised client

2  access as part of their interview process.

3  Q.    What group decides when a Wellington investor is

4  ready for client access?

5  A.    The Global Relationship Group.  We are responsible

6  for developing prospects in client relationships, we are

7  responsible for our relationships with the individuals

8  at our clients and prospects, and we put our reputation

9  on the line with everyone we're bringing in the door.

10  So the individual sales persons and the management team,

11  in essence my role, um, making sure that we have the

12  right fit for every meeting.

13  Q.    In your opinion, as the head of all of Asia-

14  Pacific GRG or sales and client services, when is an

15  investor ready to be put in front of clients, to have

16  client access?

17  A.    The, um -- I would focus on three things when

18  thinking an investor being ready.  The first being do

19  they have a convincing, thoughtful, well-prepared and

20  very-strongly articulated philosophy and process that

21  can be understood quickly by a prospecting client?  Do

22  they have the ability to answer questions, particularly

23  at client meetings, in a thoughtful and forceful way

24  that allows us to increase the level of commitment and

25  conviction on behalf of the clients and prospects?  And

1    third, is the strategy itself ready for a marketing

2    meeting, do we have a track record that's long enough

3    and robust enough to back up a convincing investment

4    process and philosophy?

5    Q.    Let me direct your attention now to Ms. Chan, and

6    you testified a little bit about an interview that you

7    had with her.

8         Do you remember any impressions from that

9    interview about her presentation style?

10   A.    Um, I believe I interviewed her sometime in the

11   spring of 2014, and, yes, I do recall my conversation

12   with Ms. Chan, um, reasonably clearly.

13   Q.    What do you recall about her presentation style?

14   A.    My recollection was that I was quite surprised.

15   You know I interview a lot of people and I was quite

16   taken aback by her lack of focus.  My recollection is

17   she spent the first several minutes complaining to me

18   that apps on her new iphone were not working properly.

19   I don't believe I even had an iphone and I didn't

20   understand why we were talking about that.  Her ability

21   to make eye contact with me, as I tried to ask

22   questions, was difficult, I recall more than once

23   looking over my shoulder in the conference room to see

24   what was behind me.  It was a bit surreal in terms of

25   our conversation and I found it difficult to follow how

1    she both asked and addressed questions.

2    Q.    So based upon your impressions of her presentation

3    style from that interview, is that somebody that you, as

4    GRG head of Asia-Pacific, would have put in front of a

5    client at Wellington?

6    A.    Um, not at that time, no.

7    Q.    Okay.  Now she was hired and based in the Hong

8    Kong office and you were the head of the office,

9    correct?

10   A.    That is correct.

11   Q.    That you were the head of GRG, the sales and

12   client services, and she was working in the portfolio

13   management investment side, GEPM, correct?

14   A.    Yes.  So I was the head of the office, but I did

15   not manage the investment team that Ms. Chan was hired

16   onto.

17   Q.    And her direct manager for a time was Tom Baxter

18   in Hong Kong, right?

19   A.    That is correct.

20   Q.    With regard to just your general observations and

21   feedback you received, do you recall, um, any details

22   about Ms. Chan's integration into the Hong Kong office

23   with colleagues?

24   A.    Um, based on my role as the head of the office, I

25   would stay in touch with people over time.  I became

1   increasingly concerned about Ms. Chan's integration,

2   collaboration, and general behavior with colleagues in

3   the office.  In essence I came to the understanding that

4   she was quite -- could be quite testy, had a sense of a

5   bit of a persecution complex and felt disrespected

6   easily, and I was of the opinion people tiptoed around

7   her and the relationships, both on the team and in the

8   office, were not developing in a way that I would view

9   as highly supportive of both her career in the firm and

10  our clients over time.

11  Q.   I'll direct your attention to this philosophy and

12  process panel.  You testified about the panel that

13  Ms. Chan presented at.  Did you serve as a panelist on

14  any others?

15  A.   I did, I was a member of the panel since its

16  inception, so I believe we met 3 or 4 times a year.

17  Q.   Okay.  And, um, from your perspective -- well

18  strike that.

19       You were a panelist on Ms. Chan's panel?

20  A.   Yes, I was.

21  Q.   Okay.  From your perspective is presentation style

22  a relevant topic to discuss at a philosophy and process

23  panel?

24  A.   From my perspective, yes, it is highly relevant.

25  In fact, as the head of sales and client services for

1    all of Asia-Pacific, if it wasn't something we were

2    evaluating, then I'm not sure why I would have been on

3    the panel.  I looked at every presenter as to their

4    effectiveness, their ability to organize their thoughts,

5    their ability to answer questions, and I was always

6    thinking, "Would I want to take this person on the road

7    to meet our prospects and clients?" throughout every

8    process panel that I ever attended.

9    Q.    Okay.  And let me ask you -- woops, I'm sorry.

10   Let me ask you what your answer to that question was

11   after seeing Ms. Chan's presentation at the philosophy

12   and process panel, did you conclude you would take her

13   on the road and put her in front of clients?

14   A.    I had significant concerns.  I would not recommend

15   to any of my salespeople that they take her on the road

16   to make a presentation on the strategy that was

17   discussed at the panel.

18   Q.    Why is that?

19   A.    Because I found the information to be

20   disorganized, I found her presentation style to be

21   distracting, I found her ability to answer questions to

22   be confusing, and it isn't the type of presentation or

23   the level of a presentation I would expect in the

24   marketplace to a client or a prospect of our firm.

25   Q.    In the panel, um, itself, um, the panelists give

1    feedback, correct?

2    A.      That is correct.

3    Q.      Did you generally find her to be receptive to that

4    feedback?

5    A.      I found as the feedback was given, um -- she was

6    becoming noticeably disappointed and increasingly

7    defensive as the feedback was given by the various

8    panels.

9    Q.      You were asked about Mr. Oh's feedback.  Let me

10   ask you about your feedback.  What do you remember

11   telling her?

12   A.      My recollection is that I was the first to give

13   feedback.  Maybe somebody on video went before me, I

14   don't recall, but I was sitting to Ms. Chan's left and

15   we went clockwise around the room.  The feedback I

16   provided was, as already stated, that I found that she

17   had the elements of a philosophy and process, but it

18   needed to be better organized and more clearly

19   presented.  I gave feedback that she needed to answer

20   questions more distinctly and more directly and that her

21   body language was distracting from what she was trying

22   to say.

23   Q.      Okay.  Mr. Oh gave his feedback after you?

24   A.      Um, I believe Mr. Baxter went next and then

25   Mr. Oh, in terms of people in the room.

1  Q.    Do you recall any details about Mr. Baxter's
2  feedback?
3  A.    I believe his, um -- my recollection is
4  Mr. Baxter's feedback generally echoed mine, he chose
5  different words, but I'm not sure he introduced any new
6  or different topics.
7  Q.    And then we come to Mr. Oh.  What do you recall
8  Mr. Oh saying to Ms. Chan, what feedback do you recall
9  him giving?
10  A.    I recall the beginning of the feedback was he
11  recommended that "Gigi, you should do that over again
12  and videotape it and watch it, you would learn a lot
13  from that."  He expressed that her body language was
14  distracting, the general approach was not particularly
15  effective -- and I forget the exact words he used, but I
16  do recall him specifically recommending that she
17  videotape it and that she would learn a lot from
18  watching it herself.
19  Q.    Now you mentioned that you had experience with
20  Mr. Oh providing feedback to you and others in other
21  settings, correct?
22  A.    Yes, we put forward Mr. Oh's strategies for
23  clients and prospects so I conducted various meetings
24  with June Oh with clients and prospects both in the Hong
25  Kong office and on the road.

Q.    And were you ever on any other philosophy and

process panels where Mr. Oh was a panelist?

A.    Yes.

Q.    Was there any difference in tone, tenor, or

content, to the type of feedback he gave Ms. Chan to any

other presenter at a philosophy and process panel?

A.    It was not.  I may also highlight that, when he

gave positive feedback in settings, his approach and

demeanor was equally concrete, both in the positive and

on the concerning side.

Q.    Was there anything about the feedback he gave to

Ms. Chan that you thought was different in any way than

his general, um, feedback that he gives others?

A.    No, it was not.

Q.    Um, after the philosophy and process panel, you

said you met with Ms. Chan, correct?

A.    That is correct.

Q.    And, um, when you met with her, tell the jury what

you said?

A.    So I reached out to Ms. Chan after the philosophy

and process panel, because she was clearly concerned,

and asked would it be okay for me to put a meeting on

our calendar, which she agreed and I did.  Three things

took place at the meeting.

      First, I acknowledged that she seemed disappointed

1    with the feedback at the philosophy and process panel,

2    she concurred and agreed with that assessment, and then

3    I emphasized to her that I believed she had the elements

4    of a good presentation but it needed work.  I expressed

5    to her that I had spent over 30 years giving client

6    presentations in the investment management business and

7    I would be happy to work with her directly, one-on-one,

8    to help improve her style and her presentation ability

9    to talk to clients and prospects.  I also offered that

10   if she would prefer, there were many investors at

11   Wellington that used third-party external presentation

12   coaches to hone their philosophy process and their

13   ability to present their strategy in external

14   environments, and I told her if she would be more

15   comfortable I would be happy to work with her management

16   team to get her a presentation coach.

17   Q.    Were you aware at the time that she had already

18   had a third-party presentation coach provided by

19   Wellington from Rosian?

20   A.    I was not aware of that at the time.

21   Q.    Do you know a fellow named Scott Clark?

22   A.    I do not.

23   Q.    Okay.  Let me ask you this, Mr. Helfer.  After you

24   made that offer to Ms. Chan, did she ever follow-up with

25   you to take you up on your 30 years of experience to

1    provide her with coaching?

2    A.    Um, at the close of the meeting she said she would

3    think about it and get back to me.  But, no, she did

4    not.

5    Q.    When you spoke with her about the philosophy and

6    process panel, did she state to you that she would not

7    have been treated that way by Mr. Oh if she was a man?

8    A.    She did not.

9    Q.    Did she complain that any of the feedback she

10   received in the philosophy and process panel was due in

11   any way to the fact that she was Asian or female?

12   A.    She did not.

13   Q.    You testified a little bit about this Ming Sheng

14   potential opportunity that Alex Qian brought in?

15   A.    I did.

16   Q.    Now I think you said you supervised him?

17   A.    Yes, he was a direct report of mine.

18   Q.    Okay.  So he's in Beijing working on these

19   advisory opportunities, um, and I think you mentioned a

20   little bit about an opportunity presented from Mr. Qian

21   from an entity called "Credit Ease"?

22   A.    That is correct.

23   Q.    When it was presented to you by Mr. Qian, do you

24   remember what he told you he expected the assets under

25   management to be?

1    A.    Um, he expected that it would grow to 50 to 100

2    million dollars over the first year.  It also was the

3    first of potentially many assignments with Credit Ease

4    over time.

5    Q.    And in fact, in the first year, how much did it

6    grow to?

7    A.    I believe 4 to 5 million dollars and the

8    complexity was very high.

9    Q.    Was it a money-loser for Wellington?

10   A.    Yes, it was.

11   Q.    Did you do any more business with Credit Ease?

12   A.    We did not.

13   Q.    Did that influence in any way your opinion about

14   these advisory opportunities in China?

15   A.    Um, I believed it affirmed my opinion.  I was

16   always quite concerned about the resources versus the

17   revenue potential.  But it was a dot-point of

18   confirmation.

19   Q.    Why did you give Mr. Qian this opportunity to

20   pursue this experiment?

21   A.    In essence as the manager of the group, Alex Qian

22   was a professional and personal friend of mine, also a

23   partner of the firm.  He, for personal and family

24   reasons, decided to move back to Beijing, and it's

25   really all we could do in Mainland China since I already

1    had someone else covering the government entities who

2    were clients of the firm, um, and so it was

3    experimental.  But I thought as a partner of the firm

4    and him having a vision for how to develop the business,

5    that he deserved the opportunity to give it a try.

6    Q.    And, by the way, these business developers, are

7    they incentivised, are they personally paid effectively

8    commissions for bringing in opportunities like this?

9    A.    Yes, they are.

10   Q.    So it's in his best interest to -- to have

11   Wellington pursue it?

12   A.    Um, it is definitely in his best interest, and it

13   also gave him the opportunity to move his family back to

14   Beijing because it was what was available.

15   Q.    And if Wellington were told that in the first year

16   an opportunity like this would result in 4 or 5 million

17   dollars in assets collected, to invest, would Wellington

18   have pursued it?

19   A.    We would not have --

20         MR. HANNON:  Objection, your Honor.

21   A.    -- pursued it.

22         THE COURT:  Wait a minute, there's an objection.

23         THE WITNESS:  I'm sorry.

24         THE COURT:  The objection is sustained.

25   Hypothetically.

1  Q.    With regard to, um, this Ming Sheng advisory

2  relationship, did you believe that it was a viable

3  business opportunity for Wellington?

4  A.    I believed, given the scope of Ming Sheng as an

5  organization, that it was possible that doing this

6  business made it a broader relationship with Ming Sheng,

7  but I did not believe this assignment, unto itself,

8  would stand on its own two feet from a profitability

9  standpoint to our firm.

10  Q.    Okay.  And did you express that to Mr. Qian?

11  A.    I did.

12  Q.    By the way, is Mr. Qian still at Wellington?

13  A.    He is not.

14  Q.    When did he separate?

15  A.    He left, he withdrew from the partnership, he was

16  a partner at the firm in June of 2017.

17  Q.    In June of 2017.  Okay.  Why did he separate?

18  A.    I asked him to leave.

19  Q.    Why?

20  A.    I found that, um, as a partner of the firm, we had

21  given several years to this idea of developing the

22  advisory business in Mainland China and unfortunately,

23  not for lack of effort on his part, the regulatory

24  environment in China, which he and we expected would

25  change in our favor such that we could do more business

1    and be more creative, was very slow in changing, and I

2    felt that his efforts were not successful, and that as

3    this experiment of him working on this out of Beijing

4    was not a good use of the firm's resources, I asked him

5    to either move back to Hong Kong or elsewhere to take on

6    a much larger business development territory, but if he

7    wished to stay in Beijing for personal reasons, he

8    needed to leave.  And he did.

9    Q.    Okay.  And so when he left, did he immediately go

10   to another job?

11   A.    He did not have another role at that time.

12   Q.    Do you know if he ended up reemployed?

13   A.    I believe he is now employed with Alliance

14   Bernstein, um, in their Mainland China business, and I

15   believe he started 6 to 9 months after leaving

16   Wellington.

17        MR. PATERNITI:  Okay.  Your Honor, bear with me, I

18   may be done.

19        (Pause.)

20   Q.    Mr. Qian, when he first looked into this Ming

21   Sheng opportunity, you said that he looked to work with

22   another Portfolio Manager, who is that?

23   A.    Um, he first spoke with Bo Meunier, because she

24   was a Portfolio Manager managing China strategies.

25   Q.    Okay.  You mentioned levels of marketing support

1    and broad marketing approval being the highest level of

2    support available at Wellington, is that correct?

3    A.    That is correct.

4    Q.    So if Ms. Chan's China Growth Fund were given

5    broad marketing approval, that would have been the

6    highest level of support Wellington offers, correct?

7    A.    Um, let me phrase it this way.  That it being

8    approved for broad marketing means that a business

9    developer can use it to develop their business.  So

10   whether they choose to focus on it and do a marketing

11   swing and put resources behind it would be at their

12   discretion, but broad marketing support would make it

13   available to be sold broadly.

14           MR. PATERNITI:  Nothing further, your Honor.

15           THE COURT:  Nothing further for this witness?

16           MR. HANNON:  I do have a few questions, your

17   Honor.

18           THE COURT:  You may.

19

20   REDIRECT EXAMINATION BY MR. HANNON:

21   Q.    So, Mr. Helfer, you indicated on cross-examination

22   that Ms. Chan did not take you up on your offer to help

23   her improve her presentation skills, is that right?

24   A.    That is correct.

25   Q.    Sir, do you know whether or not she actually did

1   work with other folks in GRG subsequent to your offer to

2   improve her presentation skills?

3   A.    I do not know that.

4   Q.    Do you know if she got additional training from

5   the outside consultant that Mr. Paterniti referenced?

6   A.    Not until that reference moments ago.

7   Q.    Okay.  (Pause.)  In terms of your observations of

8   Ms. Chan at the philosophy and process panel, um, am I

9   right that, um, Ms. Chan, in response to some of the

10  feedback that she received, um, she provided some

11  pushback, is that right?

12  A.    Um, that is correct.

13  Q.    Okay.  Not all of that pushback was bad, am I

14  right?

15  A.    I don't recall.

16  Q.    Well do you recall observing Ms. Chan sticking to

17  her "investment guns," so to speak, during the course of

18  that philosophy and process panel?

19  A.    I do.

20  Q.    Okay.  And am I right that, um, in doing that, um,

21  that was good?

22  A.    Um, as I've testified, I do believe I shared with

23  her that I believe she had the elements of a good

24  philosophy and process and it was the organization and

25  presentation that I was concerned about.  So, yes, I

1    agree.

2    Q.    Okay.  And turning to the, um, the presentation

3    issues.

4          Am I right that the purpose of the philosophy and

5    process panel was not to judge a presenter's performance

6    abilities, am I right?

7    A.    Um, I disagree.  I believe I was there for that

8    purpose as the head of business development and client

9    service in the room.

10         MR. HANNON:  Let's take a look at an exhibit here.

11   (On screen.)  So I'm showing you what we've agreed as

12   Exhibit 69.

13         I'm HDMI-1.

14         (Pause.)

15         MR. HANNON:  HDMI-1, right?

16         THE CLERK:  It's showing.

17         MR. HANNON:  I'm sorry, it's not showing here.

18   Q.    Is it showing on your screen, sir?

19   A.    No, sir.

20   Q.    (Adjusts.)  Yes, there we are.

21   A.    Yes.

22   Q.    All right.  So I'm showing you here Exhibit 61 --

23   I'm sorry, 69.  Excuse me.  And I want to direct your

24   attention to the e-mail here at the bottom of the first

25   page.

1    Do you see that this was an e-mail from Cheryl

2  Duckworth in April of 2015, is that right?

3  A.    That is correct.

4  Q.    Okay.  And the subject line is "Start of Asian

5  Philosophy and Process."  Do you see that, sir?

6  A.    I do.

7  Q.    Okay.  This was the start of the philosophy and

8  process panel in Asia, is that right?

9  A.    Correct.

10  Q.    Okay.  And, um -- and I direct you further down

11  here in the e-mail.

12    (On screen.)

13    Ms. Duckworth, she goes on here to talk about what

14  the philosophy and process panel is, is that right?

15  A.    That is correct.

16  Q.    Okay.  And, um, you see there in the second

17  sentence she notes that, "The goal is to help investors

18  not yet managing the portfolio to start to develop,

19  refine, and articulate a philosophy to better work with

20  other investors, improve stock picking, and build a

21  foundation for managing money someday, or better support

22  those who do," is that right?

23  A.    That is correct.

24  Q.    Okay.  And then if you look down here in terms of,

25  um, she has a -- she notes down here a few points to

```
 1    emphasize.  And then the last bullet here -- let me blow
 2    that up for you.  (Enlarges.)  The last bullet, "We are
 3    there to ask questions, have a discussion, encourage
 4    them and leave them with food for thought.  This is not
 5    a formal exercise, a test, or a review group, we want
 6    them to view this as a group with whom they are
 7    comfortable and to which they can repeatedly reach out,"
 8    is that right?
 9    A.    Yes.
10    Q.    So is that your understanding of the purpose of
11    the philosophy and process panel to which Ms. Chan
12    presented?
13    A.    It is.
14    Q.    Now you mentioned on cross-examination, um,
15    observations that you recall making of Ms. Chan during
16    her interview.  Do you recall that testimony?
17    A.    I do recall, yes.
18    Q.    Am I right, sir, that as part of the interview
19    process you're actually required to submit written
20    feedback?
21    A.    Yes, I provided written and verbal feedback in
22    this case.
23    Q.    Okay.  And the written feedback is -- is that
24    supposed to be complete?
25    A.    Um, it is -- the written feedback is what I viewed
```

1    as constructive to move the process forward based on my

2    interview.

3    Q.    Okay.  And fair to say that in providing that

4    written feedback concerning your observations of

5    Ms. Chan at her interview, you wouldn't have left

6    anything important out, right?

7    A.    Um, I disagree, no.

8    Q.    Okay, so your testimony, sir, is you may have left

9    important things out of your written interview feedback?

10   A.    I chose to write some feedback verbally, um, and

11   then, given what I was told, given the verbal feedback,

12   I focused on the nature of the job and the need to

13   confirm certain aspects of her, um, methodologies with

14   teams and things of that sort, on my written feedback.

15   Q.    So do Research Analysts need to be able to be

16   focused?

17   A.    Excuse me?

18   Q.    Do Research Analysts need to be able to focus?

19   A.    Yes, sir.

20   Q.    Do Research Analysts need to be able to carry on a

21   conversation?

22   A.    That is correct.

23   Q.    (Pause.)  You indicated on cross-examination that

24   you had an impression that people in the Hong Kong

25   office "tiptoed around Ms. Chan," did I hear that

1   correctly?

2   A.    Yes, you did.

3   Q.    In terms of the folks that ever actually expressed

4   concerns to you about Ms. Chan, am I right that that was

5   only Mr. Mattiko, Mr. Argyle, and folks in Human

6   Resources?

7   A.    Mostly Human Resources, to be specific, yes.

8   Q.    Okay.  Did you ever talk to Mr. Mattiko about how

9   he got along with Ms. Chan personally?

10  A.    Personally?  No.

11  Q.    Did he ever tell you he actually liked working

12  with Ms. Chan?

13  A.    He did not.

14        THE COURT:  We're way beyond the scope here.

15        MR. HANNON:  Just one last point, your Honor.

16  Q.    You testified on cross-examination about your

17  belief as to the appropriateness of providing feedback

18  concerning style of the philosophy and process panel, do

19  you recall that testimony?

20  A.    Yes, I did.

21  Q.    Okay.  Am I right that Wellington, um, makes clear

22  to all of its employees an importance of being

23  respectful in terms of communications with colleagues?

24  A.    Certainly.

25  Q.    And, sir, you would agree that whatever feedback

```
 1   that Ms. Chan received at the philosophy and process
 2   panel, whether it was regarding her style or her body
 3   language or her philosophy and process, that it should
 4   have been delivered respectfully?
 5   A.    Yes, I agree.
 6         MR. HANNON:  That's all I have, your Honor.
 7         THE COURT:  Nothing further, Mr. Paterniti?
 8         MR. PATERNITI:  Nothing, your Honor.
 9         THE COURT:  You may step down.  Thank you.  Call
10   your next witness.
11         (Steps down.)
12         MR. HANNON:  Your Honor, the plaintiff calls Greg
13   Mattiko.
14         THE COURT:  He may be called.
15         (Pause.)
16         THE COURT:  Well now we'll see if he's wandered
17   off.  If so, I'll tell you stories about the courtroom.
18   I guess not.
19         (Witness enters.)
20         (GREG MATTIKO, sworn.)
21         THE COURT:  You're not on the witness stand, sir,
22   so you may take your mask off.
23         THE WITNESS:  Thank you, sir.
24
25
```

```
 1      * * * * * * * * * * * * * * * * * *

 2      GREGORY A. MATTIKO

 3      * * * * * * * * * * * * * * * * * *

 4

 5   DIRECT EXAMINATION BY MR. HANNON:

 6   Q.    Good morning, sir.

 7   A.    Good morning.

 8   Q.    Would you please state your name?

 9   A.    Um, Gregory A. Mattiko.

10   Q.    And, Mr. Mattiko, are you currently employed?

11   A.    Yes.

12   Q.    What do you do for work?

13   A.    I work at Wellington Management in Hong Kong.  I'm

14   a Portfolio Manager on the Emerging Markets

15   Opportunities team.

16   Q.    Okay.  Um, aside from being a Portfolio Manager on

17   the Emerging Markets Opportunities team, do you have any

18   other roles at Wellington currently?

19   A.    Um, that's my primary job.

20   Q.    Okay.  Do you have any other jobs at Wellington

21   besides that?

22   A.    No other jobs, no.  I'm on various committees, but

23   no other jobs.

24   Q.    Okay.  For how long have you worked for

25   Wellington?
```

1   A.     I started Wellington in 2012.

2   Q.     And, um, at the time that, um -- I'm sorry, strike

3   that.

4          How were you employed prior to joining Wellington?

5   A.     Prior to Wellington I was at JP Morgan Asset

6   Management in London.

7   Q.     And, um, what did you do for JP Morgan Asset

8   Management?

9   A.     Effectively the same job, I was a Portfolio

10  Manager for JP Morgan in two different strategies.

11  Q.     Okay.  Was one of the strategies that you managed

12  at JP Morgan, um, essentially the same as the Emerging

13  Markets Opportunities strategy you came to manage at

14  Wellington?

15  A.     It's effectively the same, yes.

16  Q.     Okay.  Any differences?

17  A.     Other than it being, um, on a different team and a

18  different firm, um, more or less the same.

19  Q.     Okay.  Can you think of any differences?

20  A.     Differences in what manner?

21  Q.     In terms of the strategy.

22  A.     No, the strategy was effectively the same.  But as

23  I said, I managed two different strategies while at JP

24  Morgan, while at Wellington I only managed one strategy.

25  Q.     Okay.  And just to save us some words, "Emerging

1  Markets Opportunities," um, if I refer to that as "EMO,"
2  would that be okay?
3  A.    That's perfectly fine.  I prefer it.  Thanks.
4  Q.    Okay.  Great.
5        Why did you go from JP Morgan to Wellington?
6  A.    That's a good question.  I went from JP Morgan to
7  Wellington, um -- as I was approached by Wellington in
8  late 2011, they asked me whether I would be interested
9  in coming in and discussing the possibility of working
10 for a different employer.  At the time I was not
11 interested in changing jobs, I was perfectly happy at JP
12 Morgan Asset Management, um, but, um, I guess you could
13 say thankfully that I took the bait and went in and had
14 a few initial conversations with some of the key people
15 in London and, um, as a result I came to the realization
16 that, um, in my capacity as a fiduciary for clients in
17 managing Emerging Market stocks, that the opportunity at
18 Wellington was superior to what I had at JP Morgan Asset
19 Management, or was hopefully superior.
20 Q.    And what were you told in this recruitment process
21 that leads you to conclude that Wellington would be
22 superior in that respect?
23 A.    Well if you think about it, my position is to
24 generate, um, sufficient returns for the client base
25 that has entrusted their assets with me.  So you could

1    think of, um, either JP Morgan Asset Management or

2    Wellington as a platform by which I could perform those

3    duties.  So I was comparing the platform I was at at JP

4    Morgan Asset Management with the platform I would

5    potentially go to at Wellington.

6         Now, whether it actually worked out to what I had

7    -- to what I had surmised it might work out to?  I

8    didn't know that ahead of time.  But, um, suffices to

9    say that I deemed at that point the platform to be

10   superior at Wellington.

11   Q.    And what was it about the Wellington platform that

12   made it stand out to you?

13   A.    Well JP Morgan, as a lot of us know, is a -- is a,

14   um, what some might call a "financial supermarket," so

15   asset management is simply one of many different

16   businesses that they have, um, investment banking or

17   mortgages or, you know, retail banking, whereas in

18   contrast Wellington does one thing and one thing only,

19   which is institutional money management.  So that sliver

20   of JP Morgan that I operated in, that was in the broader

21   context of the whole financial supermarket, was one

22   thing, whereas Wellington was a pure play in the sense

23   that all it does is that discipline that I was used to

24   doing, which is institutional asset management.  And so

25   I took the position that working for a company that had

1    a pure-play role in institutional asset management was

2    better, and, if you want, I can go into details.

3         In addition, the other main component was the

4    ownership structure.  So JP Morgan is a publicly-traded

5    company, it has hundreds of thousands of shareholders,

6    and Wellington, in contrast, is a private partnership

7    where 100 percent of the ownership is in current

8    partners who are currently managing their business.  And

9    as an investor who scrutinizes ownership structures for

10   a living and trying to understand where vested interests

11   lie, um, I took once again the view that a private

12   partnership would have a superior long-term, um,

13   "attractiveness," I guess is the best word, or

14   "alignment," than a company that has -- that is publicly

15   traded.

16   Q.    Sir, as part of your recruitment at Wellington,

17   were any representations made to you concerning

18   Wellington's culture?

19   A.    Um, I'm not sure I understand the question.

20   Q.    Well, you've heard of the Wellington ethos of

21   "client for himself," is that right?

22   A.    Yes, correct.

23   Q.    Was that a big selling point during your interview

24   process?

25   A.    Well I would say that it goes hand and hand with

1    what I was describing of the pure-play Asset Manager

2    versus a more of a kind of conglomerate or a financial

3    supermarket, but certainly JP Morgan valued its clients

4    very highly.  So the -- the, um, orientation of "client

5    for himself" was certainly something that was

6    reassuring, but I wouldn't necessarily chalk it up as

7    to, you know, the reason why I made the switch.

8    Q.    Did you find there was anything unique about

9    Wellington's description of its firm ethos of "Client

10   for himself"?

11   A.    The main unique quality is that it was quite

12   explicit about that.  So, um, once again JP Morgan --

13   we're contrasting JP Morgan and Wellington.  JP Morgan

14   has a lot of different businesses and a lot of

15   different, um -- and is in fact a -- you know the result

16   of a lot of different mergers and acquisitions, so it's

17   a lot of different companies that are cobbled together,

18   and Wellington, in contrast once again, was not put

19   together through mergers and acquisitions, it has been,

20   you know, a single entity for an extended period of

21   time.  And so because of that, this "ethos," so to

22   speak, of the "Client for himself" or that orientation

23   that the client is first and foremost in your mind and

24   then the firm in itself, that was relatively clean and

25   straightforward as opposed to a larger more complex

1    organization that was built through a lot of -- a lot

2    of, um, cobbling together of other businesses.  And so

3    that's --

4         Yes?

5         THE COURT:  No, go ahead, finish your answer.

6    A.    And I would say that's the primary difference in

7    my mind.

8         THE COURT:  Let's come more precisely to this

9    case.

10        MR. HANNON:  Thank you, your Honor.

11   Q.    Sir, for how long have you been managing money

12   prior to joining Wellington?

13   A.    Prior to joining Wellington?  The first

14   institutional portfolio I, um, I was assigned to was

15   probably in 1998 at a company called Value Management &

16   Research.

17   Q.    Were you a Portfolio Manager?

18   A.    Yes.

19   Q.    Okay.  And, um, in terms of that, um, that

20   particular assignment, um, for how long had you been --

21   strike that.

22        Had you been a Research Analyst before taking on

23   those Portfolio Manager responsibilities?

24   A.    I was, yes.

25   Q.    For how long had you been a Research Analyst?

1    A.    It's going back aways, but I was probably a

2    Research Analyst for one and a half to two years before

3    becoming a Portfolio Manager.

4         THE COURT:  Now let's come to this case involving

5    Ms. Chan.  Now maybe you can go back and get these times

6    and the like.  But this case.

7         MR. HANNON:  Sure, let me just ask one question,

8    if I may?

9    Q.    Did anyone at Wellington ever express to you that

10   they felt that you had taken on Portfolio Manager

11   responsibilities too early in your career?

12   A.    No, never.

13   Q.    Okay.  You established a track record at JP

14   Morgan, is that right?

15        THE COURT:  Really, Mr. Hannon, I don't speak

16   because I'm so amused by the sound of my voice.  Let's

17   get to something about Ms. Chan.

18   Q.    Well, um, Ms. Chan -- you were part of the team

19   that interviewed Ms. Chan, is that right?

20   A.    I was one of the people who interviewed Ms. Chan,

21   correct.

22   Q.    Okay.  And at the time you interviewed Ms. Chan,

23   you didn't have an actual -- well strike that.

24        When was the first time you interviewed Ms. Chan?

25   A.    I don't remember the exact date, but it would have

1   been in the same process where -- shortly before she

2   joined the firm.

3   Q.    Do you recall what role you were interviewing her

4   for?

5   A.    To my recollection it was for an Analyst role.

6   Q.    Okay.  Now at the time that Ms. Chan was

7   interviewed for an Analyst role, um, were you looking

8   for one for the EMO team?

9   A.    I was not actually looking for an Analyst on the

10  EMO team, no.

11  Q.    Okay.  And in fact you had somewhat recently hired

12  an Analyst for the team, is that right?

13  A.    Um, not exactly.  So I -- Philip Fan has been the

14  only -- well at the time Philip Fan was the only Analyst

15  on the team, he and I were working together as a team.

16  Um, technically you would be correct because Philip and

17  I worked together when we were at JP Morgan Asset

18  Management, and as part of the terms of my employment

19  with JP Morgan Asset Management, when I left in 2012, he

20  was not able to come and work for me for a period of 12

21  months until after I had left.  So technically Philip

22  and I worked together for a long period of time at JP

23  Morgan, and then there was a year cooling-off period,

24  and then he was working with me again at Wellington.

25  Q.    Okay.  And that was -- and that happened just

1   recently before you were interviewing Ms. Chan for an

2   Analyst position, is that right?

3   A.    I guess it depends on how you define "recently."

4   So if I left in 2012 and, um, we had to wait a year,

5   that would have been mid 2013 probably is when he

6   joined, um, between 2013 and 2015.  And if you call that

7   "recent"?

8   Q.    Okay.  Do you recall when Ms. Chan was hired to

9   Wellington?

10  A.    I don't remember the date, no.

11  Q.    Okay.  But you had actually known Ms. Chan before

12  you interviewed her, right?

13  A.    I had come across Ms. Chan for sure before I

14  interviewed her, yes.

15  Q.    And could you describe for the jury how you first

16  met her?

17  A.    I don't recall first meeting her, I know that I

18  had made acquaintance with her at some point along the

19  way through various industry events.  So we, as

20  investors in Emerging Markets, it's a reasonably small

21  cohort of people, and when you attend, for instance, a

22  conference, you may bump into other managers of Emerging

23  Market strategies, or more similar strategies, and

24  that's how I would have gotten to know Gigi.

25  Q.    And from getting to know her through bumping into

1  her in these contexts, you formed a positive opinion of

2  her, is that right?

3  A.    I didn't have either a positive or negative

4  opinion at that point.

5  Q.    Okay.  Do you recall telling anyone at Wellington

6  that you had a positive opinion of Ms. Chan based upon

7  your prior interactions with her?

8  A.    Um, it's possible I did, but I don't remember any

9  specific instances.

10  Q.    Okay.  Your interview with Ms. Chan, what do you

11  recall about that?

12  A.    Um, I interview dozens of people every year, so I

13  don't remember any specifics about that interview.

14  Q.    Okay.  Do you recall anything generally?

15  A.    I recall that, you know, that I was satisfied

16  enough with her experience that I thought that she

17  should -- that the firm should consider her for

18  employment.

19  Q.    Um, now you knew as of that time that Ms. Chan,

20  um, had worked for an extended period of time as a

21  Portfolio Manager, is that right?

22  A.    That's what I was made aware of, yes.

23  Q.    Okay.  Do you recall how long she had been a

24  Portfolio Manager before you interviewed her?

25  A.    I do not.

1    Q.    Okay.  A period of years, is that fair to say?

2    A.    It's probably fair to say, yes.

3    Q.    Okay.  Did you ask her about her experience as a

4    Portfolio Manager in terms of what those

5    responsibilities entailed?

6    A.    I'm sure I would have asked her that question,

7    yes.

8    Q.    Okay.  Did she indicate at any time to you that

9    she was something less than a real Portfolio Manager in

10   her prior --

11          MR. PATERNITI:  Objection.

12          THE COURT:  If you understand that question, you

13   may answer it.

14          THE WITNESS:  I understand it.

15          No, sorry, could you repeat it for me just so I

16   make sure I get it right.

17          THE COURT:  Did she indicate at any time that she

18   was something less than a real Portfolio Manager?

19   A.    No, not to my recollection.

20   Q.    And am I right that Ms. Chan's time -- actually

21   strike that.

22          And as part of your consideration of Ms. Chan in

23   the hiring process, um, were you also made aware that

24   she was considering another offer she had to serve as a

25   Portfolio Manager at another company?

1    A.    Um, I saw that in the notes afterwards.  But, um,

2    it was not discussed, as far as I remember, in my

3    interview with her.

4    Q.    Okay.  And you understood though that the position

5    that Ms. Chan was interviewing for at Wellington was a

6    Research Analyst position, is that right?

7    A.    100 percent, yes.

8    Q.    Um, fair to say on the hierarchy, Portfolio

9    Manager is higher than Research Analyst?

10   A.    It depends on the organization and the client

11   base, so those titles could be quite -- they differ from

12   organization to organization and circumstance to

13   circumstance.  But in general, you know, you would -- in

14   theory the job function of a Portfolio Manager is

15   different than that of an Analyst.

16   Q.    Do you have an understanding as to why Ms. Chan,

17   if she worked as a Portfolio Manager elsewhere, was

18   applying for a Research Analyst position at Wellington?

19   A.    I didn't pursue that line of questioning with her,

20   um, but it was not a big surprise to me.

21   Q.    Sir, was it your understanding as part of this

22   hiring process for Ms. Chan, that she intended to

23   hopefully become a Portfolio Manager at Wellington?

24   A.    Um, I think that if you go back and look at, um,

25   the notes that I wrote post the interview, it was

1    actually quite the opposite, that I was -- that my

2    Number 1 concern was that she would not be satisfied in

3    the role as an Analyst for -- and that would be a

4    distraction for her potentially.

5    Q.    I'm not sure I understand your answer.  So are you

6    saying you did not understand it if she is hired to be a

7    Portfolio Manager at Wellington?

8    A.    No, I did not understand that.  So -- and she was

9    applying for a job as an Analyst.

10   Q.    And, um, were you aware at that time that, um,

11   oftentimes Research Analysts at Wellington also have

12   Portfolio Manager responsibilities?

13   A.    That is one path you can take, but there are

14   plenty of Analysts that come to Wellington that want to

15   remain career Analysts.

16   Q.    So is that your understanding, that Ms. Chan

17   wanted to be a career Analyst?

18   A.    I had no opinion one way or the other.

19   Q.    You didn't give any thought, in terms of her

20   career projection, when you were considering hiring her?

21   A.    Um, as I stated, I was concerned that if she came

22   in as an Analyst, she would -- she would eventually not

23   be satisfied with just being an Analyst.

24   Q.    Why not?

25   A.    Because I've seen in the past where -- where

1    people come in as Analysts, and the job is an Analyst,

2    and eventually they want to progress potentially on to

3    being a Portfolio Manager, and if it doesn't progress

4    with the speed or the timing of which they have those

5    expectations, then there could -- it could result in

6    disappointment.

7    Q.    You've seen that before?

8    A.    I've seen it before, yeah.

9    Q.    Where?

10   A.    I've seen it -- well I've seen it before in my

11   capacity in the various Asset Managers I've worked for

12   over time.

13   Q.    Now getting back to Ms. Chan's interview.  Am I

14   right that you shared with her your personal experience

15   at Wellington?

16   A.    Once again I don't recall the details of the

17   interview, but in most interviews, when asked, I will

18   share what my personal experiences are at Wellington,

19   yes.

20   Q.    So let's talk about that for a moment.

21   Now when you first joined Wellington, there was no, um,

22   existing strategy for you to manage, right?

23   A.    I'm not sure I understand the question.

24         THE COURT:  He doesn't understand that, and we're

25   going to stick to Ms. Chan here.  If he said something

1   to her in that interaction, you may have that.  But just

2   about Ms. Chan.

3        Go ahead.

4   Q.   Well did you tell Ms. Chan that when you first

5   joined Wellington, that you did not have a fund to

6   manage when you first got there?

7   A.   I don't recall ever telling her that.  But it

8   doesn't mean I didn't.

9   Q.   Okay.  Did you tell Ms. Chan that, when you first

10  joined Wellington, you were managing a paper portfolio?

11  A.   I don't remember ever telling her that.  I

12  don't -- and frankly I don't see a reason why I would

13  tell her something like that, and I'm not sure that that

14  was even indeed the case.

15  Q.   You're not sure if you managed a paper portfolio

16  before you got to Wellington?

17  A.   It's possible.  I don't recall.

18  Q.   Okay.  Did you tell Ms. Chan that you were able to

19  launch your strategy at Wellington approximately 3 to 6

20  months after you had joined?

21  A.   Um, once again I don't think that I would have had

22  that conversation with her at the interview.

23  Q.   Okay.  Would that have been truthful if you told

24  her that?

25  A.   Sorry, could you repeat what would be truthful?

1  Q.    That you would launch your strategy approximately

2  3 to 6 months after joining Wellington?

3  A.    My strategy was launched in a period of time

4  probably within the 3-to-6 month range after I joined

5  Wellington, yes.

6  Q.    Okay.  Did you talk to Ms. Chan, while in her

7  interview, about how you would obtain seed funding for

8  that launch?

9        MR. PATERNITI:  Your Honor, I object to this line

10  of questioning.

11        THE COURT:  So long as he sticks to communications

12  with Ms. Chan, he may have it.  But that's all.

13  A.    I don't think I would have mentioned that in the

14  interview, that goes beyond the scope of a 30-minute

15  interview.

16  Q.    Um, we'll try to come back to that, um, a little

17  bit later.

18        But am I right that, um, there was a decision made

19  to hire Ms. Chan?

20  A.    Yes.

21  Q.    Okay.  That was one of the easy ones.

22  A.    Yes, it was.  (Laughs.)

23  Q.    Okay.  Um, but you weren't actually formally

24  involved in the decision to hire her, right?

25  A.    No.

1   Q.    Okay.  But there was a question in terms of where

2   she was going to, um, sort of reside within Wellington,

3   right?

4   A.    I think either before or after the hiring there's

5   probably that consideration.

6   Q.    And you were consulted with respect to that

7   question, right?

8   A.    I was eventually, yes.

9   Q.    Okay.  And you indicated that you would be happy

10  to have her as a member of your EMO team, is that right?

11  A.    Indeed I did, yes.

12  Q.    Okay.  Um, fair to say that when you made that

13  decision, that you viewed Ms. Chan as a seasoned

14  Portfolio Manager, yes?

15  A.    I'm not sure I understand the question.

16        THE COURT:  When she was hired, did you view her

17  as a seasoned Portfolio Manager?

18  A.    I knew that she had been a Portfolio Manager.

19  Q.    The word "seasoned" is kind of important to my

20  question.  Did you view her as a "seasoned" Portfolio

21  Manager?

22  A.    "Seasoned" is a very subjective word.  So in my

23  personal opinion, "seasoned" would mean managing

24  portfolios through many different cycles and, um, given

25  the amount of time that she had been given managing a

1    portfolio, "seasoned" might be a stretch.  But it's a

2    quite arbitrary term.

3    Q.    Okay.  Do you recall communicating to your clients

4    that Ms. Chan was a "seasoned Portfolio Manager"?

5    A.    Um, I don't recall any instances of that.

6    Q.    Okay, but it's fair to say that if you did do

7    that, you certainly wouldn't have been lying to them,

8    right?

9    A.    Um, once again I'm struggling with what the

10   question is.

11   Q.    If you did communicate to your clients that you

12   viewed her as a "seasoned Portfolio Manager," then we

13   can take that to mean that's what you actually felt at

14   the time?

15   A.    Right, I'm not in the habit of lying to my

16   clients, no.

17   Q.    Okay.  Great.

18        So Ms. Chan, um, she joined the EMO team and, um,

19   it's fair to say that you had a fairly informal

20   structure in terms of how your team operated?

21   A.    Could you let me know what you mean by "informal

22   structure"?

23   Q.    Well would you describe the structure of how you

24   operated the EMO team as "informal"?

25   A.    I wouldn't describe it as "informal," no.

1    Q.    Okay.  Well let's talk about what the structure
2    was.
3         So you would have, um, a weekly meeting with the
4    team members?
5    A.    We would generally have a weekly meeting with the
6    team members, yes.
7    Q.    So when you say "generally," it didn't happen
8    every week, right?
9    A.    Well it -- before covid -- and we need to kind of
10   cast a line back, there was a lot of travel and there
11   was a lot of other things going on, and when everyone
12   was available, we would have a regular team meeting.
13   But as you probably know, um, that, um, back in those
14   days, um, there were periods of time where people
15   weren't available.
16   Q.    And, um, you, at least back in the time when
17   Ms. Chan -- before covid and the world turned upside
18   down and back when Ms. Chan worked for Wellington, you
19   were one of the most prolific travelers at Wellington,
20   is that right?
21   A.    I traveled quite a bit, it's part of my job, I
22   cover 26 different countries.  So it requires traveling.
23   Q.    Okay.  So in terms of going back to this sort of
24   structure of how you ran the EMO team, um, am I right
25   that a lot of the discussions you had with your team

1    members happened on these travel trips?

2    A.    Um, I'd rather phrase it in the sense that the

3    discussion -- the investment discussion happened both

4    while we were on the road travelling as well as, um, in

5    the more formal formats of e-mail or scheduled team

6    meetings.

7    Q.    And you didn't have any particular occasions in

8    terms of how often you directed your team members to

9    report back to you on things, is that right?

10   A.    There was no formal requirement.

11   Q.    You weren't in the habit of setting deadlines, for

12   example?

13   A.    No.

14   Q.    You were not?

15   A.    No, I was not.

16   Q.    Okay.  Am I right it was more of a consultive

17   approach amongst team members?

18   A.    Well it's a small-enough time, right, it's one

19   Portfolio Manager and two Analysts, um, and we, you

20   know, the expectation was that we would have kind of a

21   fluid communication between the three of us.

22   Q.    Um, but amongst your three members, um, geography

23   was one thing that differed for Ms. Chan, right?

24        THE COURT:  I don't understand that question.

25        MR. HANNON:  Um, good point, your Honor.

1    Q.    You and Mr. Fan, you were in London, right?

2    A.    We -- part of my career has been in London and at

3    times it overlapped with Philip being in London and at

4    times it didn't.

5    Q.    Okay, but at least when Ms. Chan started you were

6    in London along with Mr. Fan, right?

7    A.    I believe so, yes.

8    Q.    Okay, and she was in Hong Kong, right?

9    A.    She was hired in Hong Kong, correct.

10   Q.    All right.  Now, am I right that in terms of your

11   personal interactions with Ms. Chan, that you enjoy

12   working with her?

13   A.    I think it's safe to say that, yes.

14   Q.    Okay.  And in terms of her investment skill and

15   her acumen, um, what's your view of that?

16   A.    I thought that she was a good investor.

17   Q.    Um, with respect to her knowledge of the China

18   market, um, do you recall forming an opinion in terms of

19   how Ms. Chan's knowledge of that market compared to

20   Ms. Meunier?

21   A.    I don't remember a specific comparison, no.

22   Q.    Do you recall forming the opinion that Ms. Chan's

23   knowledge of the China market was either as good as or

24   better than Ms. Meunier's knowledge?

25   A.    Once again I don't remember anything specific to

1    that, um, no.

2    Q.    Would you agree with that?

3    A.    Well, right now?

4    Q.    Sure.

5    A.    So at this particular moment?

6    Q.    Well I'm not asking you to speculate in terms of

7    what Ms. Chan's knowledge is now since she departed

8    Wellington, but in terms of what you knew about her

9    knowledge back when she was there, would you agree with

10   that assessment?

11        THE COURT:  During the time that both of those

12   individuals were working at Wellington?

13        MR. HANNON:  Correct, your Honor.

14        THE COURT:  If you understand that, you can answer

15   it.

16        THE WITNESS:  I understand it, but just if I could

17   go back and ask what I'm comparing.

18   A.    So are you asking whether I thought Gigi's

19   knowledge was superior or on par or what are you --

20   Q.    On par or better than.

21   A.    Well there's no way to know exactly, but they both

22   had a -- obviously a deep knowledge of what was

23   happening in China.

24   Q.    But you're not sure if you would judge it on par

25   or better than Ms. Meunier's?

```
1    A.    I would say it's in the same ballpark, but it's

2    impossible to know.

3    Q.    Now when Ms. Chan was added to your team, that was

4    a temporary assignment, isn't that right?

5    A.    Initially it was for a one-year period.

6    Q.    Okay.  And, um, at some point in time, um, there

7    was discussion as to whether or not to make that a

8    permanent assignment, correct?

9    A.    That's correct.

10   Q.    Okay.  And were you supportive of making Ms. Chan

11   a permanent member of your team?

12   A.    I was.

13   Q.    Why?

14   A.    Well I thought that based on -- once again we

15   discussed her deep knowledge of the Chinese market and

16   her ability to evaluate companies, that as an Analyst on

17   the team she, um -- she could be additive to client

18   outcomes.

19   Q.    Well when you were supportive of this she had been

20   there for a year, right?

21   A.    Yes.

22   Q.    Okay.  And in terms of your experience over that

23   year, in terms of Ms. Chan adding value, it's fair to

24   say you were satisfied?

25   A.    I was satisfied enough to make her a permanent
```

1    member of the team, yes.

2    Q.    Okay.

3         MR. HANNON:  Your Honor, this is a good time to

4    take the morning break.

5         THE COURT:  Very well.

6         Ladies and gentlemen, we'll take the morning

7    recess at this time.  You have not heard all the

8    evidence, please keep your minds suspended, do not

9    discuss the case either among yourselves nor with anyone

10   else.  You may stand in recess for one half hour.  I'll

11   remain on the bench.

12        THE CLERK:  All rise for the jury.

13        (Jury leaves, 10:45 a.m.)

14        THE COURT:  Please be seated.  You may step down,

15   sir.

16        THE WITNESS:  Oh, thank you, your Honor.

17        THE COURT:  And, Mr. Paterniti, you told

18   Ms. Gaudet you wanted to see the Court?

19        MR. PATERNITI:  Indeed, your Honor.  I wanted to

20   address the subject matter --

21        (Interruption in courtroom.)

22        THE COURT:  Well I don't think you're required to

23   leave, but you're free to step down.

24        MR. PATERNITI:  We forgot about you, sorry.

25        THE COURT:  But don't go too far though.

1           Yes?

2           MR. PATERNITI:  On the issue of subject matter

3    jurisdiction, your Honor, we, um, just want to make sure

4    that we understand sort of the, um, you know the

5    boundaries of the evidence and the claims at this point,

6    and while we're proceeding with them I'm struggling a

7    little bit even understanding what to ask the witnesses.

8           Let me just start by saying, that our position

9    with regard to this is in alignment with the Court,

10   which is that there is subject matter jurisdiction over

11   Mr. Mattiko, that's a little bit different than the --

12          THE COURT:  Mr. Argyle, you mean.

13          MR. PATERNITI:  I'm sorry, Mr. Argyle, um, which

14   is a little bit different than the motion that we filed.

15   In terms of our position with regard to Mr. Argyle, um,

16   that the Rule 21 would allow the Court to dismiss the

17   nondiverse party, um, at any time, even after, just as

18   you have proposed, and that we, um -- that we can

19   proceed to judgment and binding judgment, one way or the

20   other, with regard to the claim against Mr. Argyle.  The

21   challenge here is our understanding of what the scope of

22   the evidence is at this point.

23          If the claim -- if the discrimination and

24   retaliation claims are not going to survive because of

25   subject matter jurisdiction or lack thereof, then these

1   witnesses continue to be asked questions that seem to be

2   primarily, if not exclusively, about the discrimination

3   and retaliation claims.

4       THE COURT:  Well of course, but you're a little

5   previous and I'm not giving any advisory opinions.  The

6   claim against Mr. Argyle is framed as a claim for

7   tortious interference with advantageous contractual

8   relations.  I am -- I'm really very transparent, though

9   I must be cautious as to what I say.  I am obviously

10  eager to tee that claim up against your expected motion

11  for a judgment as a matter of law at the close of the

12  plaintiff's case.  To that end I am both authorized and

13  it is fair -- and I believe I've told Mr. Hannon, I want

14  all the evidence as to liability on that claim in my

15  hands by Friday.  And then I stopped.  And I'm stopping

16  now.

17      Now if such a motion were to succeed, I see no

18  reason to go on in the case because I have not yet

19  heard, though I'm obviously going to have argument, as

20  to why there would be subject matter jurisdiction over

21  Wellington.  If that motion, um, fails, which doesn't

22  mean it wouldn't be renewed at the close of all the

23  evidence, obviously the plaintiff gets to put on her

24  evidence of damages as well, and then we'll see where we

25  are.

1          One of the things I'm wrestling with is how most

2     fairly to let the case, if it's going to proceed, go

3     smoothly on only as against Mr. Argyle?  But I can't, um

4     -- it's parsing it too fine to answer your question.

5     That's not fair, the plaintiff has an -- I've cabined

6     the plaintiff in as much as I properly can, I've said

7     you've got to give me all the liability as to Argyle and

8     then in essence rest, reserving your rights to put on

9     damages and the like, and I'll hear that.  I want to

10    hear that no later than Friday afternoon, um,

11    recognizing I can't sit tomorrow.  And he seems to be

12    going along.

13         I can conceive that you would make it go faster if

14    you reserved rather than taking these witnesses on

15    cross-examination as he calls them, but you have various

16    tactical decisions to make as to what presents a

17    persuasive case to the jury.  The Argyle case is a jury

18    case.  I can only -- if you agree I have subject matter

19    jurisdiction, I only make rulings of law, and I try to

20    make them fairly.

21         Now I'm guilty of overspeaking and now I've spoken

22    as much as I'm going to.  Does that answer your

23    question?

24         MR. PATERNITI:  It does, your Honor, I'm just

25    mindful of the fact that one possible outcome could be

1   that the, um, case proceeds against Mr. Argyle beyond a

2   directed verdict or a judgment as a matter of law and

3   then the jury has continued to hear a bunch of

4   irrelevant evidence about discrimination when the law of

5   the case, as per the summary judgment order, is that the

6   tortious interference claim must be -- must not be

7   duplicative of the discrimination counts and must be

8   something other than discrimination.

9        THE COURT:  I don't hear you objecting.

10       Mr. Hannon, does my explanation raise any

11  questions in your mind?  It's not the time for argument,

12  we'll -- I don't think I've said anything now that's

13  different than what I've already said, I've simply

14  explicated it more.

15       MR. HANNON:  I think you're being consistent, your

16  Honor, but there is one issue I'd like to raise and I

17  did raise this with Mr. Paterniti earlier, um, which is,

18  um, respectfully this sort of middle-ground approach

19  that the Court has proposed to pursue doesn't work given

20  the jurisdictional argument that they've made.  Their

21  argument is, um, by virtue of having Wellington in this

22  case, we've destroyed complete diversity and if you have

23  destruction of complete diversity, you have jurisdiction

24  over nobody, um, and you can't sort of just pick and

25  choose.  There is this sort of theoretical possibility

1  that we could dismiss out Wellington -- we don't think

2  that's appropriate or possible because from our

3  perspective Wellington is a necessary party here, um, in

4  part because, as your Honor pointed out --

5       THE COURT:  Is it your position -- is it your

6  position that I should dismiss the whole thing?

7       MR. HANNON:  If you find that Wellington is an

8  alien and that having an alien on both sides destroys

9  diversity, then, yes, the correct answer is you have to

10  knock out the whole thing.

11       THE COURT:  Then when will you be prepared to

12  argue that?

13       MR. HANNON:  I'll be prepared at 1:00, your Honor.

14       THE COURT:  Well 1:00 won't work but we'll

15  entertain it at 2:00.

16       MR. HANNON:  Very good.

17       THE COURT:  I mean simply for my schedule.  Very

18  well, we'll entertain it at 2:00 p.m.  We'll stand in

19  recess.

20       (Short recess, 10:50 a.m.)

21       (Jury returns, 11:15 a.m.)

22       THE COURT:  Mr. Hannon, you may continue.

23       MR. HANNON:  Thank you, your Honor.

24  Q.   So, Mr. Mattiko, before the break we were talking

25  about Ms. Chan becoming a permanent member of your EMO

1    team.  Am I right that when that decision was made,

2    there was a formal announcement that was sent around

3    Wellington?

4    A.    I'm not sure whether it was sent around

5    Wellington, but there was a formal announcement made,

6    I'm sure, to a -- maybe a smaller cohort.

7    Q.    Did you play any role in drafting that

8    announcement?

9    A.    Not that I recall, no.

10   Q.    Do you recall using the announcement as a sort of

11   means of reintroducing Ms. Chan to the investors of

12   Wellington?

13   A.    I don't recall doing that, no.

14   Q.    Do you recall having discussions with Ms. Chan

15   about, um, her belief that she hadn't been sort of

16   properly introduced to the investors at Wellington?

17   A.    No, I don't remember any discussion like that.

18   Q.    Okay.  In terms of, um, the announcement that did

19   go out, do you recall getting any feedback from folks

20   regarding that announcement?

21   A.    I don't recall any specific feedback, no.

22   Q.    Do you recall people congratulating you in terms

23   of having Ms. Chan joining your team permanently?

24   A.    I don't recall anyone congratulating me, no.

25   Q.    Okay.  Who is John Boselli?

1    A.    John Boselli is a Portfolio Manager at Wellington.

2    Q.    Okay, um, he was a Portfolio Manager back in 2015,

3    is that right?

4    A.    Yes.

5    Q.    And, um, did you ever have any conversations with

6    Mr. Boselli about Ms. Chan?

7    A.    None that I specifically recall.

8    Q.    Any that you generally recall?

9    A.    No.

10   Q.    Do you recall him ever expressing any positive

11   views of Ms. Chan?

12   A.    If I don't recall any specific conversations,

13   then, no, I would not recall that.

14   Q.    Okay.

15         MR. HANNON:  Let's take a look at a document here.

16         (On screen.)

17   Q.    So I'm showing you here, sir, what the parties

18   have agreed is Exhibit 80.

19   A.    Excuse me, I don't have anything on my screen.

20   Oh, here it is.  Thanks.

21   Q.    So the parties have agreed this is Exhibit 80, um,

22   and let's start with the -- with the first e-mail in the

23   chain.

24   A.    Yup.

25   Q.    And you see here there's an e-mail from Mr. Baxter

1   in June of 2015, the subject line being "Formalization

2   of Gigi Chan's role on the EMO team."  Do you see that,

3   sir?

4   A.     I do see that, yes.

5   Q.     And would you agree, sir, that this was the

6   announcement you referenced earlier in terms of telling

7   the investors that Gigi was being made an official

8   member of EMO?

9   A.     It appears to be, yes.

10  Q.     Okay.  And I direct your attention here now to the

11  top -- (Enlarges on screen.)  That's an e-mail from John

12  Boselli to you, correct?

13  A.     Correct.

14  Q.     And his response is "Great news."  Do you see

15  that?

16  A.     I see that.

17  Q.     Okay.  Did you ever have any discussion with

18  Mr. Boselli concerning why he thought it was great news

19  that Ms. Chan was joining your team?

20  A.     No, I don't.

21  Q.     Okay.  Am I right that there were other investors

22  who likewise congratulated you in terms of having

23  Ms. Chan formally join your team?

24  A.     As I said before, I don't recall having any of

25  those conversations.

1   Q.     Okay.  Now June of 2015, um, the jury has heard

2   some testimony about an Asia Philosophy and Process

3   Panel at which Ms. Chan presented.  Are you familiar

4   with that presentation?

5   A.     Am I familiar with the presentation in what sense?

6   Q.     Well are you familiar with the fact that there was

7   an Asia Philosophy and Process Panel at which Ms. Chan

8   spoke at?

9   A.     Yes.

10  Q.     Okay.  And would you agree with me that, um --

11  that the announcement of Ms. Chan joining your team,

12  that that took place before the Asia Philosophy and

13  Process panel?

14  A.     I'm not -- I'm not -- I don't have that chronology

15  in my mind, I don't know whether it was before or after.

16  Q.     Okay.  With respect to, um, Ms. Chan's

17  responsibilities, um, I asked you some questions before

18  about, um, about the possibility of her becoming a

19  Portfolio Manager when you were having the interview

20  discussions.  The same subject, but I want to bring it

21  forward a bit.

22         After Ms. Chan joined Wellington, am I right that

23  there were discussions that you were a part of

24  concerning Ms. Chan taking on Portfolio Manager

25  responsibilities?

1        MR. PATERNITI:  Objection, relevance.

2        THE COURT:  Sustained.

3   Q.    Well at some point in time Ms. Chan became a

4   Portfolio Manager, is that right?

5   A.    As far as I'm aware she maintained her position as

6   Analyst on my team through the end of her employment.

7   Q.    Did she at some point also take on Portfolio

8   Manager responsibilities?

9   A.    There was a portfolio that was seeded with

10  Wellington capital that she managed at some point, yes.

11  But her primary duty was as an Analyst on the Emerging

12  Markets Opportunities team.

13  Q.    Okay.  When you say it was her "primary duty" --

14  A.    Yes.

15  Q.    -- was it your decision in terms of what was more

16  important for Ms. Chan in terms of China Growth versus

17  EMO?

18        MR. PATERNITI:  Objection, relevance.

19        THE COURT:  Sustained.

20  Q.    Um --

21        THE COURT:  Actually I'm going to reverse myself,

22  I misspoke.  You may answer that question.

23        THE WITNESS:  Would you mind repeating the

24  question?

25        THE COURT:  The way I got the question was, um,

1   from your perspective, what was -- I'll ask it a little

2   different.  From your perspective, what was the relative

3   importance of her two roles?  And always tell the jury.

4          THE WITNESS:  Okay.

5   A.     So from my perspective, um, Gigi was hired, first

6   and foremost, as an Analyst on the EMO team and that was

7   throughout her employment her primary responsibility.

8   As it works out sometimes at Wellington and JP Morgan

9   and other Asset Managers, um, Analysts along the way are

10  offered an opportunity to be able to, um, potentially

11  display their skills as a future Portfolio Manager.  But

12  at Wellington, um, if you do get given that opportunity,

13  it is always in -- in addition or "secondary," so to

14  speak, to your primary responsibility, which is, in this

15  case, being an Analyst on the EMO team.

16  Q.     Sir, am I right that it was -- that you were not

17  Ms. Chan's boss?

18  A.     Technically I was not Ms. Chan's boss, no.

19  Q.     That was Mr. Argyle, right?

20  A.     Throughout her employment she might have had a few

21  different direct bosses.

22  Q.     Okay.  But it's fair to say in terms of

23  determining the relative importance between her EMO

24  responsibilities and her China Growth responsibilities,

25  that wasn't your call, right?

1    A.    It was not, um -- it wasn't my call to determine

2    what her priorities are, but it's general conventions at

3    the firm.

4    Q.    Well you were consulted though in connection with

5    the decision to give her Portfolio Manager

6    responsibilities, right?

7    A.    What do you mean by "consulted"?

8    Q.    You were consulted, people asked you --

9    A.    Consulted about what though?

10   Q.    About whether or not she should be given Portfolio

11   Manager responsibilities, right?

12   A.    It's very likely that I was asked whether she

13   should be given the China Growth portfolio, yes.

14   Q.    Okay, you say it's "very likely," do you not

15   recall?

16   A.    I don't recall a specific example, but I -- in

17   general I would have been asked, yes.

18   Q.    Okay.  And am I right that you were supportive of

19   Ms. Chan taking on responsibilities as a Portfolio

20   Manager?

21   A.    I was supportive of her managing the China Growth

22   strategy to see how it would work out.

23   Q.    Okay.  And when you were supportive, sir, you

24   understood that there would necessarily be, um, some

25   impact on Ms. Chan's contributions to EMO, isn't that

1   right?

2   A.     Not necessarily, no.

3   Q.     Okay.

4          MR. HANNON:  Um, let's take a look at a document

5   here.

6          (On screen.)

7   Q.     So, sir, I'm showing you now what the parties have

8   agreed as Exhibit 169.  And just to get us oriented

9   here, I'm just going to enlarge the header of the

10  e-mail.  (Enlarged.)

11         And you see, sir, this is an e-mail from Lee

12  Cohen?

13  A.     Yes.

14  Q.     And can you tell the jury who Lee Cohen is?

15  A.     Um, Lee Cohen is a Relationship Manager at

16  Wellington.

17  Q.     When you say a "Relationship Manager," what do you

18  mean by that?

19  A.     So to my understanding a Relationship Manager at

20  Wellington maintains the relationship with existing

21  clients of the firm.

22  Q.     Okay.  And there's a reference here in the subject

23  line to a "Penn."  Would that be one of Wellington's

24  clients?

25  A.     Yes, "Penn" was one of its clients.

```
 1   Q.    And would that be a client who has invested in the
 2   EMO fund?
 3   A.    Yes.
 4   Q.    Okay.  So I'm just going back to the e-mail here
 5   and, um, just as always, whenever I ask you a question,
 6   if you need time to look at the whole thing or see
 7   additional pages, feel free to speak up?
 8   A.    Yeah, I wouldn't mind reading the whole thing if
 9   we're going to --
10   Q.    Yes, I don't want to rush you, so.
11   A.    All right.  Yes.  (Reads.)
12   A.    Okay.
13   Q.    Okay?
14   A.    Yup, I'm fine, I read it.
15   Q.    Okay, great.  I just want to direct you here to --
16   to the third paragraph here in the document.  (Blows
17   up.)  And, um, you see the second sentence that begins,
18   "Phil continues to think."
19         Would I be right that the reference to "Phil"
20   here, that would be a representative of Penn?
21   A.    I think that's probably safe to say, yes.
22   Q.    Okay.  And then the reference to "Gigi's new
23   strategy," would you understand that to be China Growth?
24   A.    Once again I would assume that's what it refers
25   to.
```

```
 1    Q.    Okay.  And then I'm just going to highlight here a
 2    section that references "He liked having two seasoned
 3    PMs on the strategy."
 4        Would you agree with me that's a reference to
 5    yourself and Ms. Chan?
 6    A.    It seems to be, yes.
 7    Q.    Okay.  Had Mr. Fan ever served as a Portfolio
 8    Manager?
 9    A.    No.
10    Q.    Okay.  And then you see a little bit further down
11    here he writes, "Even I acknowledge that there has to be
12    some reduced time to EMO."  Do you see that?
13    A.    I do see that, yes.
14    Q.    All right.  Do you agree with that assessment?
15    A.    Agree with which assessment?
16    Q.    The assessment that Ms. Chan's work on her new
17    strategy would have to result in some reduced time to
18    EMO?
19    A.    It seems like it's referring here to a
20    conversation that Lee and Phil were having about a
21    potentially-reduced impact, so it's not anything I would
22    agree with necessarily, no.
23    Q.    What do you mean by "necessarily"?
24    A.    Well my expectation in having a Team Analyst is
25    that they -- that they are contributing to the outcome
```

1    of the EMO strategy, and if they, um, want to try their

2    hand at Portfolio Management, that that shouldn't

3    necessarily have a negative impact on -- on the

4    principal job, once again, of managing EMO for our

5    clients.

6    Q.    Okay, so you think what Mr. Cohen told Phil, from

7    Penn, was wrong?

8    A.    Not that it's wrong, but it's view, not

9    necessarily mine.

10   Q.    Well let's take a look at your view.  Do you

11   recall, um, being deposed in this matter?

12   A.    Not specifically.

13   Q.    Okay.  Do you recall having a chat with me via

14   zoom?

15   A.    I do, yes.

16   Q.    Okay.

17   A.    It's nice to see you in the flesh, not on the

18   screen.

19   Q.    Nobody ever says that.

20   A.    (Laughs.)

21   Q.    Um, was that, um -- we actually did that in two

22   sessions, right?

23   A.    Yes.

24   Q.    And that was because, um, you were in Hong Kong,

25   right?

```
 1   A.     Correct.
 2   Q.     Okay.  So you have a binder in front of you, um,
 3   and if you would turn to Tab 1, that's going to be your
 4   transcript from the first day, and if you could turn to
 5   Page 81, please, um, and I'll direct you to a line in
 6   just a moment.
 7   A.     (Turns.)
 8   Q.     So do you see there on Line -- on Page 81, Line 2,
 9   I'm asking you about the China Growth Fund?
10   A.     I see that, yes.
11   Q.     Okay.  I ask you to turn to Line 12 on that page
12   and please read along silently as I read out loud.
13          "Did anyone, you know, reach out and sort of ask
14   you your opinion or how you would feel about it if she
15   got some additional responsibilities?"
16          And you'd agree with me, sir, that the "she" there
17   is Ms. Chan?
18   A.     I would agree, yes.
19   Q.     Yes?
20   A.     Yes.  I'm sorry.
21   Q.     No, I'm sorry, I didn't hear you, sir.  And let's
22   look at the answer.
23          Answer, "As a Team Leader of the Emerging Markets
24   Opportunities team, I would imagine that it was
25   discussed, yes, with me, but I don't remember in what
```

1   form or with whom or when."

2         Question, "Why would you imagine that it would

3   have been discussed with you as the Team Leader?"

4         Answer, "I would imagine because it's a

5   meaningful-enough draw on her time that it could

6   potentially impact how she interacts with the team, and

7   therefore Wellington generally does a pretty good job of

8   making sure that the team dynamics with regards to

9   things like this and additional responsibilities are

10  discussed with a Team Leader."

11        Did I read that correctly?

12  A.    Correct, yes.  Thanks.

13  Q.    Um, and in addition to, um -- well strike that.

14        There's been some testimony here regarding

15  Ms. Chan's abilities to interact with clients.  I'd like

16  to ask you about your observations on that.

17  A.    Sure.  Are we done with this?

18  Q.    Yes, we are.  Thank you.

19  A.    All right.

20  Q.    With respect to Ms. Chan's EMO responsibilities,

21  she did from time to time speak to your clients, right?

22  A.    She was in meetings with clients in which she

23  spoke, yes.

24  Q.    Okay, and she would answer client questions?

25  A.    Generally that's what we do in client meetings,

1  yes.

2  Q.    And in terms of the clients that we're talking

3  about, we're talking about institutional clients, right?

4  A.    Yes, we only manage institutional client money.

5  Q.    Okay.  And, um, did you have any hesitation about

6  having Ms. Chan speak with your institutional clients?

7  A.    I don't remember having any hesitation, no.

8  Q.    Okay.  Do you recall making observations of how

9  well she spoke with your institutional clients?

10  A.    I don't remember specific observations, but I

11  don't also remember any problems necessarily.

12  Q.    Okay.  Do you recall generally that she did a good

13  job in terms of speaking with your clients?

14  A.    I guess as it pertains to the last question, I

15  don't recall anything that stood out that would indicate

16  that she did not do a good job.

17  Q.    Okay, my question is a little bit different

18  though, I'm not asking if there was any negative

19  feedback, I'm asking if there was positive feedback?

20  A.    Whether I got positive feedback from clients or

21  whether I gave positive feedback?

22  Q.    Either.

23  A.    I don't recall any positive feedback necessarily

24  from clients.  I would imagine that somewhere along the

25  line I might have said that she did a fine job in front

1    of clients.

2    Q.    And you would imagine that because she did, right?

3    A.    Um, like I said, generally devoid of any major

4    problems, it's a good working assumption that she did a

5    sufficiently-good job in front of her clients, yes.

6    Q.    Who is Rich Pender?

7    A.    Rich Pender is a -- um, he works for a client of

8    the firm.

9    Q.    Okay.  And, um, in terms of the client that

10   Mr. Pender is associated, um, would it be fair to say

11   that's one of your most important clients?

12   A.    Um, I don't rank the importance of clients, um,

13   but he is an important client.

14   Q.    Okay.  And he, um -- do you recall Mr. Pender

15   expressing to you a positive view of Ms. Chan?

16   A.    I don't remember any specifics, no.

17   Q.    Okay.  Generally do you recall him expressing a

18   positive view of Ms. Chan?

19   A.    I revert back to what I said before, I don't

20   remember him saying anything negative, but I don't

21   either remember him saying anything overtly positive.

22   Q.    Do you recall Mr. Pender having discussions with

23   Ms. Chan concerning a new strategy that Mr. Pender

24   expressed some interest in?

25   A.    I remember discussions about a potential new

1    strategy.  I don't remember specifics about the

2    discussions at this point, um, years on.

3    Q.    Okay, this was a Pan-Asia strategy, is that right?

4    A.    I'm not -- once again I don't remember specifics

5    of the discussions.  But it could have been a Pan-Asia

6    strategy, yes.

7    Q.    It could have been?

8    A.    Yes.

9    Q.    All right.  Well putting aside whatever the

10   strategy was, is it your recollection that this was a

11   strategy that Ms. Chan started running a paper portfolio

12   for?

13   A.    Sorry, I'm not sure I understand the question in

14   the context, um, specifically what you're asking.

15   Q.    I'm asking about the strategy -- you don't

16   remember the name of it or where it was, but the

17   strategy that had to do with Mr. Pender, do you recall

18   Ms. Chan was operating a paper portfolio?

19   A.    So the reason I'm a little bit hesitant is that

20   Mr. Pender, um, over the years that I've known him, has

21   on more than one occasion, um, asked about potential

22   strategies being run by individuals at Wellington.  So,

23   um, on that, you know, over the years and having

24   mentioned a lot of these strategies, it's definitely

25   possible that, um -- and what did you refer to it as?

1      That "Pan-Asia growth" was a strategy that was launched

2      -- it was launched in kind of a paper format?  Um, maybe

3      in response to one of Rich Pender's requests.

4      Q.    Maybe?  You're not sure if that was in response to

5      Mr. Pender's request?

6      A.    Most likely.  But what I'm trying to say to you is

7      I don't recall specifically these conversations of why

8      that -- you know whether the chicken and the egg

9      proverbially, whether that started first and Rich Pender

10     was interested in it or Rich Pender was interested in

11     that and it was started, um, in paper format.

12     Q.    Okay.  Do you recall, um, informing Mr. Pender

13     that you thought Ms. Chan should not pursue that

14     strategy at some point?

15     A.    Please repeat the question?

16     Q.    Do you recall informing Mr. Pender that you

17     thought Ms. Chan should not be pursuing that strategy at

18     some point?

19     A.    No, I don't recall ever saying that.

20         MR. HANNON:  And just to close the loop here with

21     respect to your observations of Ms. Chan and your

22     clients, I'm going to show you another document,

23     hopefully.

24         (On screen.)

25     Q.    Sir, I'm showing you what we've agreed as Exhibit

1    127.   And you take as long as you want to familiarize

2    yourself with it.  Whenever you're ready my question is

3    do you recognize it?

4    A.    I recognize it as an e-mail that I wrote, yes.

5    Q.    Okay.  And so you write, um --

6        MR. HANNON:  And I'll enlarge this a little bit,

7    make it easier for us all to read.  And this is to

8    Ms. Chan.

9        (Enlarged.)

10    Q.    "Thanks for participating, late notice, in the

11    meeting today, you did an outstanding job as usual."  Do

12    you see that?

13    A.    I do see that.

14    Q.    Then you go on to note, "That that incidentally is

15    our largest client at 400 million U.S. Dollars."  Yes?

16    A.    I do see that, yes.

17    Q.    Do you recall which client that was referring to?

18    A.    Not at all.

19    Q.    Okay.  Do you recall that meeting you're

20    referencing?

21    A.    Not at all.

22    Q.    Okay.  Was it fair to say that, at least as of

23    November of 2015, your observations of Ms. Chan in terms

24    of meeting with clients, was that she usually did an

25    outstanding job?

1    A.    It would imply that, yes, it would.

2    Q.    Okay.  Do you deny that implication?

3    A.    Do I deny the implication?

4    Q.    Yeah.

5    A.    I don't understand?

6    Q.    Is that right?

7    A.    It's what I wrote, yes.

8    Q.    Okay.  And back to the -- as we referenced a bit

9    earlier, this Asia Philosophy and Process Panel.

10         How did you come to learn that Ms. Chan was

11   meeting with the philosophy and process folks?

12   A.    Yeah, I don't recall when I learned that she was

13   meeting with the philosophy and process panel.

14   Q.    Do you recall if you knew it before she met or

15   only after?

16   A.    I don't know whether it was before or after.

17         MR. PATERNITI:  Your Honor, I object to the

18   relevance of this line of questioning.

19         THE COURT:  No, overruled.

20   Q.    In terms of your understanding of the purpose of

21   Ms. Chan presenting at the philosophy and process panel,

22   um, is it fair to say that was -- it was your

23   understanding that that was part of her developing a

24   potential strategy for launch?

25   A.    I would say that it is a normal part of developing

1    a strategy for launch, yes.

2    Q.    Okay.  Did you attend a philosophy and process

3    panel before you launched your strategy?

4    A.    I would have attended many meetings at which my

5    philosophy and process was vetted.

6    Q.    Was it a philosophy and process panel?

7    A.    Whether it formally called a philosophy and

8    process panel in my circumstance?  I don't remember.

9    But in essence it's the same thing.

10   Q.    Did you ever attend the -- Ms. -- sorry.  You

11   weren't present for Ms. Chan's Asia Philosophy and

12   Process Panel, right?

13   A.    Sadly not.

14   Q.    Why do you say "sadly"?

15   A.    Well because, um, as we've all heard, there was a

16   lot of debate as to, um, the circumstances surrounding

17   it and it would have been -- I would have had interest

18   to have been there, yeah.

19   Q.    Okay.  After it took place, um, Ms. Chan

20   complained to you, right?

21   A.    After it took place I had a conversation with

22   Ms. Chan in which she was upset about the outcome.

23   Q.    Okay.  Well when you say the "outcome," there

24   wasn't any kind of, you know, vote taken in terms of

25   "proceed with this strategy" or not, right?

1   A.    No, but the philosophy and process panel, the

2   purpose of it is to have an investor present their

3   philosophy and process and then receive direct feedback

4   about the good and bad elements of that philosophy and

5   process.  So though there is no vote, there is certainly

6   feedback.

7   Q.    And, um, Ms. Chan, she complained to you about the

8   feedback she got from one person in particular, isn't

9   that right?

10  A.    To my recollection she was upset about a few

11  different elements of the process.

12  Q.    Well one thing she complained about in particular

13  was comments made by June Oh, isn't that right?

14  A.    I recall her mentioning June Oh as being one of

15  the trigger points for her, um -- her state.

16  Q.    Okay.  And do you recall what she said in terms of

17  what, um, what caused that to be a trigger point?

18  A.    Not other than June Oh, um, expressing views that

19  she didn't really like.

20  Q.    Do you recall her, Ms. Chan, telling you that he

21  had behaved disrespectfully?

22  A.    Not specifically, no.

23  Q.    Do you recall her telling you that he had talked

24  down to her?

25  A.    Once again not specifically.  I don't really

1    recall the specific conversations, this is 5 years ago.

2    Q.    Okay.  So, um -- but you observed from Ms. Chan,

3    um, she was very upset about this, right?

4    A.    Indeed.

5    Q.    And in fact there were a number of times when you

6    spoke to Ms. Chan about her experiences at Wellington

7    where she -- she broke down in tears, right?

8    A.    There were a number of times, yes.

9    Q.    How many times did she break down in tears with

10    you?

11    A.    I couldn't tell you.  I wasn't keeping track.

12    Q.    Okay.  More than once?

13    A.    Safe to say more than once.

14    Q.    More than twice?

15    A.    Probably more than twice.

16    Q.    More than three times?

17    A.    I'm not sure more than three times.  We're

18    probably reaching that.  So give or take three probably.

19    Q.    Am I right that it happened so frequently or so

20    often that when Mr. Argyle told you he was going to be

21    talking to Ms. Chan, you advised him to bring a box of

22    tissues with him, right?

23    A.    I'm -- I might have said that to him, yes.

24    Q.    Um, the concerns that Ms. Chan raised with you on

25    these various occasions when she broke down crying --

1    A.     Uh-huh.

2    Q.     -- had to do with the way she was being treated at

3    Wellington, is that right?

4    A.     So could you repeat the question, please?

5    Q.     The concerns that Ms. Chan was raising with you on

6    these various occasions when she broke down crying had

7    to do with the way she was being treated at Wellington,

8    correct?

9    A.     Among other things but a lot of it had to do with

10   her perception about how -- how -- her perception about

11   how Wellington valued, for the most part, her

12   experience.

13   Q.     Well not just her experience, but also, um, the,

14   um, the ability for her to grow in her position, isn't

15   that right?

16   A.     Um, I'm not sure I would agree with that.

17   Q.     Okay.  Would you agree that Ms. Chan expressed to

18   you that she thought that she should be getting more

19   responsibilities at Wellington?

20   A.     Um, I don't remember a conversation about that

21   specifically.

22   Q.     You don't recall it specifically, is that your

23   testimony?

24   A.     Or even generally.

25   Q.     Okay.  Do you recall her telling you that she

1   thought she was being treated unfairly?

2   A.   My perception was that she had problems with the

3   perception which she had within the firm and mostly as

4   it pertained to her previous employer and her track

5   record.

6   Q.   If you would open back up your transcript, please,

7   and turn to Page 79.

8   A.   (Turns.)  Okay.

9   Q.   And turn to Line 9, please, and please read along

10  silently as I read allowed.

11      Question, "Besides with respect to the feedback,

12  was there anything else that Ms. Chan ever complained to

13  you about that you would interpret as her perceiving as

14  unfair?"

15      Answer, "Sure."

16      Question, "Okay.  Do you recall any specific

17  subjects?"

18      Answer, "So a few, right?  So if we think about it

19  generally, one of the kind of overarching views that she

20  maintained was that Wellington investors did not value

21  her previous investment career highly enough, and it was

22  kind of a constant refrain, and she -- and it was my

23  perception that that was one of the things that she

24  would have thought would have been unfair.  Once again I

25  don't recall her ever using the specific word 'unfair,'

1  but it's my view that she would have thought that it was

2  unfair that she is not -- she is not getting the respect

3  which she thought she deserved.  She probably also

4  perceived the speed with which she was given additional

5  responsibility as not being up to her expectations.  And

6  I could, you know, guess that she felt that -- that was

7  that was unfair as well."

8       Did I read that correctly?

9  A.    Yes, you did.

10 Q.    Okay.  Sir, would you agree with me that, um, it

11 was -- that the fact that Ms. Chan was a woman in Asia,

12 um, presented difficulties in terms of her advancement

13 at Wellington?

14 A.    No, I wouldn't say that.

15      MR. HANNON:  I'm going to show you now what the

16 parties have agreed is Exhibit 131.

17      (On screen.)

18      MR. HANNON:  Here we are.  And, um --

19 Q.    Would you like to take a moment to review this

20 before I ask you a few questions?

21 A.    I'm going to go through the whole thing.

22 Q.    So I'm going to ask you questions about the

23 context of this and then specifically some comments you

24 make in this paragraph here.  Um --

25 A.    I wouldn't mind having a moment to kind of skim

1   through it to be absolutely sure I'm in the right

2   context, if you don't mind?

3   Q.    Absolutely.

4   A.    Thank you.  (Reads.)  Okay.

5   Q.    Do you want to see the next page as well?

6   A.    I'd love to see how much is on the next page.

7   (Looks.)  I think I need to write shorter e-mails.

8   (Reads.)  Okay.

9   Q.    Great.  So going back here to the first page, this

10  is an e-mail you wrote to Charles Argyle, is that right?

11  A.    That's correct.

12  Q.    Okay.  Um, now Mr. Argyle, he, um -- was he your

13  supervisor?

14  A.    At one point along my career at Wellington he

15  would have been, but at this particular juncture I don't

16  know.

17  Q.    Okay.  All right.

18        MR. HANNON:  So let us go back to that paragraph

19  that I told you I was going to ask you about, I'll make

20  good on that promise here.

21        (On screen.)

22  Q.    So this is the third paragraph in Exhibit 131 and

23  you begin "First off, I had a good long talk with Kenny,

24  Wednesday."

25        That would be Kenny Abrams, is that right?

1  A.   I presume so, yes.

2  Q.   Okay.  Do you remember this conversation?

3  A.   No.

4  Q.   Okay.  Do you remember any conversation you ever

5  had with Mr. Abrams concerning Gigi Chan?

6  A.   I remember only insofar as that I've had

7  conversations with Mr. Abrams around Gigi, but I don't

8  remember specifics around these conversations.  Once

9  again it's 5 or 6 years ago.

10  Q.   Okay.  And then, um, the line here, and I'll try

11  to highlight it.  (Highlights.)  Great.  "He sees the

12  same talent and potential in her that I think you and I

13  do."  Do you see that?

14  A.   I do see that.

15  Q.   All right.  So am I right that as of November

16  27th, 2015, that you and Mr. Argyle had talked about

17  Ms. Chan's talent and potential?

18  A.   Are you asking me that because this is in here

19  it's safe to assume that I would have talked to him

20  about that?

21  Q.   I'm not asking you to make any assumptions, sir,

22  I'm just asking you if I'm correct that as of the date

23  of this e-mail, November 27th, 2015, you and Mr. Argyle

24  had a discussion or some communication about Ms. Chan's

25  talent and potential?

1   A.   We would have had many conversations along those

2   lines for sure, yes.

3   Q.   Okay.  And you had expressed to him that you saw,

4   um, talent and potential, right?

5   A.   I think I maintained that the entire time, yes.

6   Q.   Okay.  And he expressed to you that he believed

7   there was talent and potential, yes?

8   A.   I don't remember any specific conversations with

9   Charles, um, regarding that matter.  In other words, I'm

10  not comfortable saying that I remember him specifically

11  saying this.

12  Q.   Okay, fair enough.

13       MR. HANNON:  Let's go to the next sentence.

14       (On screen.)

15  Q.   "He also recognizes that to come into Wellington

16  as an investor, a female in Asia, that the odds are not

17  stacked in her favor necessarily."  Do you see that?

18  A.   I do see that.

19  Q.   Okay.  What do you understand Mr. Abrams to mean

20  when he said that?

21  A.   Well it's hard to get into Mr. Abrams's mind, but

22  what I understand from your question is that, um, first

23  of all, it's difficult for an investor in Asia because

24  at the time Hong Kong was a small satellite office of a

25  much larger organization of Wellington here and

1    predominantly in Boston, and it's the opposite end of

2    the clock, so when it's 12:00 noon here, it's midnight

3    in Hong Kong.  So because of the size of the office at

4    the time, because of the dislocation from the "mother

5    ship," so to speak, here in Boston, it's by definition

6    difficult -- more difficult for an investor in Asia.

7          With regards to a female, um, it's my

8    understanding that he means here that, um, the number of

9    female investors in our industry in general -- um, sadly

10   females are underrepresented in our industry, and I

11   presume what he means here is that that makes it

12   difficult to be a female within our industry.

13   Q.    So your understanding was he was communicating to

14   you that being a female in your industry is tough?

15   A.    Once again I -- it's hard for me to get into

16   Kenny's mind, but that's what I read here, yes.

17   Q.    Okay.  And, um, whatever Mr. Abrams indicated, um,

18   did you agree with it?

19   A.    I think it says here that, um, you know as you can

20   read it, "Once again you and I would agree with this in

21   principle."

22   Q.    Did you agree with Mr. Abrams's sentiment that to

23   come into Wellington as an investor, a female, in Asia,

24   that the odds are not stacked in her favor necessarily?

25   A.    So -- as it says here, "In principle," and as I

1    describe in my own experience as an investor for

2    Wellington in Asia, it's more difficult to be an

3    investor in Asia than -- well that's my view, than it is

4    to be an investor in Boston, because of the time zone

5    and size, the relative size.  So, yes, in that context,

6    in principle, I would agree with those two statements as

7    I described them.

8    Q.    When you say "in principle," are you suggesting to

9    us that there's some piece of it you might not agree to?

10   A.    No, I'm suggesting that, um, as I'm reporting here

11   to Mr. Argyle something that someone else has said, that

12   based on that reporting, that in principle I would agree

13   with the sentiment.  Um, I presume that's why I wrote

14   what I wrote.

15   Q.    You say you "presume," so you don't recall why you

16   wrote that?

17   A.    No, not specifically.

18   Q.    Okay.  Um, fair to say that this e-mail here on

19   November 27th, 2015, this was -- this was after the Asia

20   Philosophy and Process Panel, is that right?

21   A.    Um, I don't have the timeline in my head, so I

22   don't know.

23   Q.    Okay.  Whatever it was, um, you'd agree, sir, that

24   you were frustrated by the fact that Ms. Chan was

25   complaining to you about, um, her dissatisfaction at

```
 1   Wellington?
 2   A.    Um, I wouldn't describe it as that, no.
 3   Q.    Okay.  Did you find that, um, it was a distraction
 4   to you?
 5   A.    What was a distraction?
 6   Q.    Ms. Chan's complaints to you where she would come
 7   and complain and break down crying, you found all of
 8   that to be a distraction, yes?
 9   A.    I wouldn't necessarily say that, no.
10   Q.    Okay.  Do you recall telling folks you didn't want
11   "drama" on your team?
12   A.    It's potential that I -- that I potentially have
13   said that I don't enjoy a lot of drama on the team.
14   Q.    Did you view Ms. Chan's interactions with you as
15   bringing "drama" to your team?
16   A.    Not necessarily, no.
17   Q.    Did you view Ms. Chan as an "HR headache"?
18   A.    No, not necessarily.
19   Q.    Did you ever talk to anyone in HR about Ms. Chan's
20   complaints to you?
21   A.    No, I didn't.  Not until, you know, the very end.
22   Q.    What do you mean "the very end"?
23   A.    Well, when, um -- towards the end of her
24   employment at Wellington, um, I would have had
25   discussions with HR but --
```

1    Q.    Who in HR did you speak to?

2    A.    Karen Tang maybe in Hong Kong.

3    Q.    And how did that conversation come about?

4    A.    Well in the normal course of discussing issues

5    with people at Wellington, in the normal course of

6    business.

7    Q.    Did you tell Ms. Tang about those conversations

8    you had with Gigi Chan where she had broken down crying

9    with you?

10   A.    I don't recall that, no, not specifically.

11   Q.    Did Ms. Tang ask you whether or not Ms. Chan ever

12   complained to you?

13   A.    I don't recall her asking me that, no.

14   Q.    Did Ms. Tang ask whether or not Ms. Chan's ever

15   referenced her sex or national origin as part of her

16   complaints?

17   A.    I'm sorry, could you repeat that?

18   Q.    Did Ms. Tang ever ask you whether Ms. Chan cited

19   her sex or national origin as part of her complaints?

20   A.    I don't ever remember her asking me that question,

21   no.

22        MR. HANNON:  I direct you to -- this is still

23   Exhibit 131, but I want to look here at the second page

24   here.

25        (On screen.)

1      MR. HANNON:  I'm just going to call this part out.

2      (Enlarged.)

3  Q.    You note here, um, to Mr. Argyle that you were

4  "telling Ms. Chan that you were her Number 1 fan," is

5  that right?

6  A.    That's what it says, yeah.

7  Q.    When you told her that, were you telling the

8  truth?

9  A.    I think I was, yes.

10  Q.    And why were you such a fan of Ms. Chan's?

11  A.    Because I enjoyed working with Gigi and I wanted

12  to see her, above anything else, succeed.

13  Q.    But as of November of 2015, your enthusiasm for

14  working with Ms. Chan was beginning to "wane," is that

15  right?

16  A.    That's what it says here, yes.

17  Q.    Is that a truthful statement, what it says here?

18  A.    Well if I wrote it, then, yes, it's truthful.

19  Q.    Okay.  And in terms of why it was beginning to

20  wane.  Is it true that as of November you were

21  perceiving her as "having a lack of humility, tenacity,

22  optimism, and thankfulness"?

23  A.    Sorry, could you repeat the question?

24  Q.    Is it true, sir, that the reason why your

25  enthusiasm for Ms. Chan was beginning to wane was

1  because, as of November 2015, you were perceiving her as
2  having a lack of humility, tenacity, optimism, and
3  thankfulness?
4  A.    No, I think you're connecting two different
5  sentences.  So, um, clearly some of those traits would
6  have been part of the reason why my enthusiasm was
7  starting to wane, but it's a broader picture.
8  Q.    Okay.  Were some of these traits not part of the
9  reason why your enthusiasm was starting to wane?
10 A.    I'm not sure I understand your question.
11 Q.    Sure.  It was all of these traits that you were
12 perceiving that was causing your enthusiasm to wane,
13 yes?
14 A.    What I'm saying is that, among other things, these
15 traits probably would have contributed to my enthusiasm
16 beginning to wane.
17 Q.    In terms of Ms. Chan's "thankfulness," what was it
18 that caused you to believe that she had a lack of
19 thankfulness?
20 A.    Well I don't remember specifically why I put that
21 word in there.
22 Q.    Prior to the Asia P & P panel, um, had you ever
23 expressed to Mr. Argyle that you believed Ms. Chan had a
24 lack of humility, tenacity, optimism, or thankfulness?
25 A.    So once again I don't -- it's hard for me to put

1   this in the timeline.  So you're asking me when in the

2   timeline I would have expressed this?  I think, as we

3   discussed earlier, that I don't know where this falls

4   within that timeline.

5   Q.    Fair enough.  As the timeline perceived and into

6   2016, you were aware, sir, that Ms. Chan was working on

7   launching her China Growth Fund, is that right?

8   A.    Well I hate to do this, but I don't really

9   understand the question.

10  Q.    Sure.  So we just saw an e-mail from November of

11  2015, right?

12  A.    Yes.

13  Q.    Okay.  And after November 2015 and you got to the

14  start of 2016, were you aware at that point in time,

15  sir, that Ms. Chan was working on launching her fund?

16  A.    Once again you're asking me about the timeline of

17  when these specific things happened, for instance her

18  launch of the fund, and I'm going to say again that I

19  don't remember specifically when that fund was launched,

20  and so it's hard for me to say whether it was before or

21  after.  Just like the philosophy and process panel.

22  Q.    Okay, let's take the specific time reference out

23  of the question.

24        At some point you were aware Ms. Chan was working

25  on launching the fund, yes?

```
1    A.     Yes.
2    Q.     And having launched a fund yourself, you were
3    aware of how much work that it takes, right?
4    A.     Um, well I know how much work it takes to launch a
5    strategy, yes.
6    Q.     You used the word "strategy"?
7    A.     Yes.
8    Q.     Have you launched a fund at Wellington?
9    A.     So it's an interesting question because -- and
10   it's probably worth explaining.  A "strategy" is a way
11   of managing money.  A "fund" is a vehicle that is used
12   to manifest that investment strategy.  So when I came
13   into Wellington, I had a strategy, an investment
14   strategy, and eventually when that gets funded, it gets
15   funded in a fund.
16   Q.     Okay.  So back to my question then, I'm trying to
17   figure out whether you've ever launched a fund at
18   Wellington.  Have you?
19   A.     Well, a fund?  A fund is necessary if you're going
20   to get assets from clients.  So insofar as I have assets
21   from clients in the EMO strategy, that some of those
22   assets are in various funds, yes.
23   Q.     Okay, so you've launched multiple funds at
24   Wellington?
25   A.     I've launched one strategy and within that
```

1    strategy there's different vehicles where those assets

2    reside.  It's more of a technical thing than anything

3    else.

4    Q.    All right.  Stepping back on the technical stuff,

5    it's a lot of work, can we agree on that?

6    A.    What's a lot of work?

7    Q.    Launching a fund.

8    A.    So I never launched the fund.  Launching a fund is

9    a lot of back-office work, it's a lot of technology

10   work.  So launching a legal vehicle to hold the assets

11   of the client is a lot of work for, you know, the 2,700

12   people that work at Wellington.

13   Q.    So when you launched your fund, the various grunt

14   work involved in that, none of that fell to you, is that

15   right?

16   A.    The actual job of creating the legal entity and

17   the custodian ship to hold the assets is not part of my

18   responsibility, no.

19   Q.    Well there's also work in terms of setting up the

20   marketing materials, right?

21   A.    There's definitely work in setting up the

22   marketing materials, yes.

23   Q.    And a part of -- a big part of that is going back

24   and forth with compliance people to make sure that what

25   you're saying is something that you can say, right?

1    A.    Well maybe it helps if I explain it a little bit.

2    There are -- there's a big support network at a place

3    like Wellington that helps investors, um, create

4    marketing materials that are appropriate and legal and

5    comply with Wellington's codes of ethics.

6    Q.    And when you launched your fund, that big support

7    network that you've referenced, um, they significantly

8    helped you, right?

9    A.    So once again I want to be clear, we're talking

10   about launching a fund or a strategy?  Because I didn't

11   launch a fund per se, I had a -- I came with an

12   investment strategy and once again the fund is the

13   necessary vehicle.  So when a client comes to us and

14   says, "I'm interested in trusting EMO with my assets,"

15   then the job of creating a vehicle to take those assets

16   starts.  And in that a -- oftentimes a fund is created.

17        THE COURT:  So, um, picking up on your

18   explanation.  You've testified to this jury, um, you

19   came to Wellington with a strategy?

20        THE WITNESS:  Correct.

21        THE COURT:  And over time there, um, I guess

22   through marketing, you attracted or some clients came

23   with you who were willing to entrust their funds to your

24   strategy of money management, is that fair?

25        THE WITNESS:  That's correct, your Honor.

1          THE COURT:  And once that happened, then, because

2      there's all the regulatory requirements to, um,

3      safeguard clients' funds and Wellington's own ethics,

4      the back office goes into work to get this such that it

5      is in compliance, since you're worldwide, with those

6      places where the money is even invested or where it

7      comes from, is that correct?

8          THE WITNESS:  That's correct, yes.

9          THE COURT:  All right.  So now that we have all of

10     that, I think he's talked -- back off for a moment with

11     your experience.

12         THE WITNESS:  Okay.

13         THE COURT:  You're also familiar with, um, a

14     person, an "investor" you call him within Wellington,

15     having a -- making a philosophy and presentation --

16         THE WITNESS:  Yes.

17         THE COURT:  -- that's sufficiently intriguing --

18     sufficiently may result in money-making, that Wellington

19     will put some seed money into that investor to work with

20     and grow to see whether this, in your word "strategy,"

21     but in words of these philosophy and practice panels,

22     um, whether that will work with real money and real

23     investment vehicles.

24         Have I got that right?

25         THE WITNESS:  Yes, and whether or not the -- it

```
 1    will resonate with Wellington's clients.
 2         THE COURT:  Oh, okay.  Now -- when you've got your
 3    own seed money in there, we'll call that a paper fund.
 4         THE WITNESS:  No, no, so a paper fund, if I could
 5    --
 6         THE COURT:  Well you correct me.  You tell me.
 7         THE WITNESS:  All right.  Sorry.  So a paper fund
 8    is -- is almost exactly as it, um, as it sounds, it's a
 9    theoretical fund.
10         THE COURT:  Okay.
11         THE WITNESS:  So there's no actual assets.
12         THE COURT:  All right, I stand corrected.
13         So what do you call it when you put your own money
14    out there, um, Wellington's money?
15         THE WITNESS:  So Wellington's money?  A fund would
16    be "seeded," so the technical term is it would be
17    "seeded."  Or a "strategy" would be seeded.
18         THE COURT:  All right.
19         THE WITNESS:  Now it could be seeded in a fund and
20    most likely it's seeded in a fund, and the fund being
21    the vehicle.
22         THE COURT:  I see.
23         THE WITNESS:  So the seeding -- the seeding is
24    when Wellington puts its own capital at risk.
25         THE COURT:  I see.
```

1          And we'll let him ask the questions, Mr. Hannon,

2     but he seems to be asking about the work in getting such

3     a vehicle -- I want to be careful in my terms --

4          THE WITNESS:  Yes.

5          THE COURT:  -- going.

6          THE WITNESS:  Yes.

7          THE COURT:  So with that in mind, Mr. Hannon, go

8     ahead, ask your questions.

9     Q.    It's a lot of work launching a fund at Wellington,

10    yes?

11    A.    I hate to do this, but a lot of work for who?

12    Q.    For the Portfolio Manager.

13    A.    The -- the job of launching the legal vehicle of a

14    fund is more middle-and-back office.  The job of

15    establishing a strategy, a philosophy and process that,

16    um, that may eventually resonate with clients, there is

17    work involved in articulating and creating, you could

18    say "documentation," that is able to express what your

19    philosophy and process is.  There's definitely work

20    involved in creating that documentation.

21    Q.    Well you've left out marketing, right?

22    A.    Well, so the way it works is that generally you

23    create this documentation internally in order for it to

24    be seeded by Wellington and Wellington's capital with

25    the hopes that once it's established and once Wellington

1  is comfortable with this strategy, that they will

2  eventually take it to Wellington's client base and see

3  whether or not it resonates with the clients.  So it's

4  almost a two-step process where you start with the seed

5  capital and you manage it and when the performance is

6  sufficient and when the firm is comfortable with it,

7  then the second part of that is, okay, now it's time to

8  go and potentially talk to clients about it.

9  Q.    Was that your experience at Wellington?

10 A.    Yes, it was.

11 Q.    And how long was it between -- well strike that.

12 Wellington seeded your fund, right?

13 A.    No, I --

14 Q.    Oh, sorry, I didn't mean to use the word "fund."

15 Wellington seeded your strategy shortly after you

16 arrived, yes?

17 A.    Wellington did not seed it, no.

18 Q.    Well it was a Wellington investor who had

19 discretion to invest someone else's money that provided

20 your seed capital, yes?

21 A.    That was the initial investment, yes.

22 Q.    Okay, and it's your testimony, sir, that after

23 that initial investment, that there was some period of

24 time thereafter where Wellington monitored its

25 performance before marketing it?

1    A.    In my case it's not how it went.

2    Q.    How did it go in your case?

3    A.    So in my case, when I came in with a specific

4    strategy in mind, already with an established client

5    base that I had at JP Morgan Asset Management, um, the

6    strategy was acknowledged and, as you stated, there

7    were, um, investors within Wellington that understood

8    the philosophy and process and I was allocated a small

9    piece of capital from another larger portfolio, um,

10   after which time clients that I had had previously at JP

11   Morgan Asset Management decided that they would still

12   trust me at Wellington the same way they trusted me at

13   JP Morgan Asset Management, and some of that client

14   money came over to Wellington.

15   Q.    And, um, but part of that process was you also had

16   to get approved for marketing to Wellington's clients,

17   right?

18   A.    Approved in what sense?

19   Q.    Well there were different levels of marketing

20   approval in terms of reactive marketing, limited

21   marketing, and broad marketing, right?

22   A.    No, I don't think that Wellington classifies that

23   in those three areas.  But I'm not entirely sure.

24   Q.    Fair enough.  It's not your experience.  Let me

25   get back to Ms. Chan, I've got Judge Young's voice

1    echoing in my years right now.

2         Putting aside what your experience was, you were

3    aware at some point, sir, that Ms. Chan was doing a lot

4    of work in order to get her fund launched, yes?

5    A.    I know -- once again I know that there's work

6    involved in, you know, getting the materials together

7    when you launch a strategy, yes.

8    Q.    Okay, I'm not just asking generally though, I'm

9    asking about Ms. Chan in particular.

10   A.    Yes.

11   Q.    At some point in time you were aware that she --

12   A.    She would have had to do additional work to --

13   certainly to launch the strategy internally at

14   Wellington.

15   Q.    And she was keeping you apprised of that, right?

16   A.    Not that I remember, no, not specifically.

17   Q.    Um, you spoke with Ms. Chan, um, when you weren't

18   traveling, at least on a weekly basis, is that right?

19   A.    Um, I think we testified earlier that that would

20   have been the normal cadence.

21   A.    Okay.

22   Q.    And, um, if I understand, um -- well, strike that.

23   It's -- it's your view, sir, that at some point you

24   formed the conclusion that Ms. Chan's performance on EMO

25   was declining, is that right?

1    A.     Sorry, could you repeat the question again just so
2    I --
3           THE COURT:  At some point you formed the opinion
4    that Ms. Chan's performance on EMO was declining?
5           THE WITNESS:  Thank you, your Honor.
6    A.     Yes.
7    Q.     Okay.  And am I right that you can't tell us when
8    in time you formed that opinion?
9    A.     Well I think that, um, it was a steady decline
10   over time.
11   Q.     But in terms of when the decline started, you
12   can't tell us when it started?
13   A.     I can't give you a specific date, no.
14   Q.     Can you tell us relative to other events that were
15   ongoing in terms of philosophy and process, the launch
16   of China Growth, any other sort of --
17   A.     Well I don't think those events -- well let's put
18   it this way, I don't think all those events impacted
19   that.  It's a confluence of a lot of different things.
20   But one thing that I would say is that, um, in
21   retrospect, um, the launch of China Growth probably saw
22   an acceleration of the, I guess we could say, the "lack
23   of engagement."
24   Q.     Do you have, um -- well strike that.
25           At some point you found out that Ms. Chan was

1   pregnant?

2   A.      Correct.

3   Q.      How did you find that out?

4   A.      As far as I recall it was a telephone conversation

5   I had with her.

6   Q.      And, um, were you surprised?

7   A.      (Laughs.)  I don't recall being surprised.

8   Q.      Okay.  Had you suspected that she was pregnant?

9   A.      I don't recall suspecting that she was pregnant,

10  No.

11  Q.      Had you had any discussions previously with

12  Ms. Chan concerning her intention to have kids?

13  A.      Not that I remember, no.

14  Q.      Am I right that one of the things you enjoyed

15  doing with Ms. Chan was, um, talking shop over alcoholic

16  beverages?

17  A.      So if you're asking whether we would talk shop

18  over alcoholic beverages?  We occasionally did that,

19  yes.

20  Q.      Was that sort of a frequent occurrence on trips?

21  A.      How do you define "frequent"?

22  Q.      However you would define it, sir.  Would you

23  describe it as a "frequent occurrence"?

24  A.      It would be frequent insofar as we were -- if we

25  had the time to unwind after a hard day of travel and

1   intense meetings, then, you know, it was -- it was -- I

2   would say it was a normal course of our travel, yes.

3   Q.    And after Ms. Chan advised you that she was

4   pregnant, her sort of habits of traveling decreased, is

5   that right?

6   A.    No, I didn't recognize that.  I don't know.

7   Q.    And when she did travel, she didn't then join you

8   for alcoholic beverages, right?

9   A.    I don't remember anything like that, no.  I didn't

10  notice anything like that.

11  Q.    Sir, at some point in time you expressed to

12  Charles Argyle, um, that you had -- well let me ask a

13  different question.

14        At some point in time did you express to

15  Mr. Argyle that you no longer wanted Gigi Chan on the

16  EMO team?

17  A.    At some point I would have, yes, given that view.

18  Q.    Okay.  And can you tell us when?

19  A.    To the best of my knowledge it was, um -- you know

20  once again, because I've seen a lot of the documentation

21  and through the deposition, that it would have been --

22  um, I believe it was in June of 2017.

23  Q.    And, um, what was it, um -- well strike that.

24        So June of '17.  So prior to communicating that

25  view to Mr. Argyle, do you recall having a conversation

1  with Ms. Chan, um, in or about May of 2017, concerning

2  the feedback she had gotten before leaving on maternity

3  leave?

4  A.    Um, this is the one that was secretly recorded?

5  Q.    That's the one.

6  A.    Yes.

7  Q.    Okay.  Have you listened to the recording?

8  A.    I have.

9  Q.    How many times?

10 A.    Twice.

11 Q.    When was the most recent?

12 A.    Um, the complete recording?

13 Q.    Either.

14 A.    I listened to parts of it last night.

15 Q.    Any particular parts you listened to?

16 A.    (Laughs.)  Um, snippets, but I'm not sure -- I

17 can't classify where they stood in the -- you know the

18 full 20-minute conversation.

19 Q.    Anything you were looking for when you were

20 listening to it?

21 A.    I wasn't looking for anything.

22 Q.    Um, that meeting you had with Ms. Chan that she

23 recorded, um, how did that meeting come about?

24 A.    To my recollection, um, Wellington wanted to

25 understand where Gigi stood with regards to, um, in

1    particular discussions she had with Mr. Argyle and a

2    memo that was given to her that asked her to acknowledge

3    and respond to some of the feedback, and because we were

4    getting nowhere with regards to any response over the

5    extended period of time, because I was located in close

6    proximity to her in Hong Kong and I had a

7    sufficient-enough relationship with her, that I

8    volunteered to "take her temperature," so to speak, with

9    regards to how she intended or not intended to respond

10   to the request that Wellington had put in front of her.

11   Q.    So when you say you were there to "take her

12   temperature"?

13   A.    Yes.

14   Q.    Um, what were you, um -- what were you

15   "measuring," so to speak, with respect to "taking her

16   temperature"?

17   A.    Well I think if you listen to the recording, which

18   I'm not sure we're going to do it or not, but if you

19   listen to the recording that was made, what I was trying

20   to ascertain was whether or not she intended to, as

21   requested, respond to Mr. Argyle and to Wellington and

22   whether or not she was generally happy at Wellington,

23   because once again, you know, you can go back to -- and

24   I think it's consistent throughout, and I think it's

25   once again in the secret recording, that you can hear it

1    again, that I expressed that I wanted it to work out for

2    her, I enjoyed working with her.

3    Q.    So you're measuring whether she intended to

4    respond to the feedback, um, measuring whether she was

5    happy at Wellington.  Anything else you were seeking to

6    "measure" in this conversation in your efforts to "take

7    her temperature"?

8    A.    Well those were the primary things that I was

9    trying to get on top of.

10   Q.    Anything else?

11   A.    Not specifically.

12   Q.    With respect to whether she intended to respond to

13   the feedback, did you mean that literally in terms of

14   whether or not she intended to write Mr. Argyle an

15   e-mail back?

16   A.    Well if you go back and look at the memo that was

17   written, it was very explicit that in order for us to

18   move forward sufficiently we would want a response or

19   Wellington would want a response from Gigi as to how she

20   viewed the feedback and what if anything was going to be

21   done to address some of the concerns.

22   Q.    So back to my question, sir.  Is that what you

23   were looking for, you were literally trying to ascertain

24   whether or not she was going to write Mr. Argyle back?

25   A.    It didn't have to be in writing, but I was trying

1    to ascertain whether or not she intended to respond to

2    this memo that was written a number of months

3    previously.

4    Q.    So when you say "respond," you mean to speak to

5    Mr. Argyle about it?

6    A.    It didn't matter to me how she responded.

7    Q.    "Actions," that was a possible response, right?

8    A.    I think it -- the request was a specific response.

9    Um, whether "actions" were sufficient for Mr. Argyle or

10   the rest at Wellington?  I'm not sure.  But in my

11   opinion "actions" help.  I think that it was my view

12   that Wellington was looking for an actual response as

13   you and I would understand a response to normally be.

14   Q.    So during this conversation you told Ms. Chan that

15   Mr. Argyle wanted her to respond to the e-mail?

16   A.    I reminded her that that was a request, yes, I

17   believe.

18   Q.    And how did she -- what was her reaction?

19   A.    Once again we can listen to the tape, but when you

20   listen to it, um, in general terms her reaction was that

21   she does not owe Wellington a response, in fact

22   Wellington owes her a response.  That was what I took

23   away from the conversation in general.

24   Q.    That was your interpretation?

25   A.    That was my interpretation, yes.

1   Q.    So you actually ended the conversation by telling

2   Ms. Chan that you were going to go back and talk to

3   management, isn't that right?

4   A.    I don't remember how the conversation ended, but

5   once again we can listen to it if you want.

6   Q.    Okay.  Is it fair to say that was -- as you did,

7   that after your conversation with Ms. Chan, that you

8   went back and spoke to management in terms of what had

9   transpired?

10  A.    It's safe to say that, yes.

11  Q.    Now one of the things, um, that you did not raise

12  with Ms. Chan during this recorded conversation

13  concerned her contributions to EMO, isn't that right?

14  A.    Well, yeah, we didn't discuss any of the specific

15  feedback, no.

16  Q.    And, um, you didn't ask her about whether or not

17  she was trying to contribute more to EMO, correct?

18  A.    That was not the point of the conversation.

19  Q.    Sir, I'm not asking what the point was, I'm asking

20  you if you asked her that.  Did you?

21  A.    I did not ask her that, no.

22  Q.    And nowhere in that conversation did you ever

23  express to Ms. Chan that you had concerns about her

24  contributions to EMO, isn't that right?

25  A.    That's correct.

1   Q.    In fact, sir, you never, at any point during the

2   course of Ms. Chan's employment, ever express to her any

3   dissatisfaction you had with respect to her

4   contributions to EMO, isn't that right?

5   A.    So the way Wellington is set up and the way that

6   Wellington works is that that feedback is channeled

7   through managers of investors, so the way that I would

8   give feedback like that would not be directly from other

9   investors, it would be through the Wellington management

10  team.  So it is -- it is -- I abide by the way that

11  Wellington is structured and the way that Wellington is

12  structured is that I would give feedback -- and I think

13  that the record shows that I gave plenty of feedback to

14  the Wellington management structure, and that in turn

15  gets relayed to Gigi.

16  Q.    So that's a "no," you never did?

17  A.    I never did what?

18  Q.    My question, sir, was whether, during the course

19  of Ms. Chan's employment, you ever communicated to her,

20  directly to her, that you had any dissatisfaction with

21  respect to her contributions in EMO?

22  A.    Well I think that that's too specific, I think

23  that, um, once again whether I conveyed the sentiment at

24  some point?  I don't recall.  Do I recall specific

25  conversations to that regard?  No, I don't.  Once again

1    I'll remind you that I don't because I stayed true to

2    the way that Wellington is structured insofar as

3    feedback like that, which, by the way, is extremely

4    important, um, especially for the client experience,

5    that that feedback needs to be given, but the feedback

6    needs to be given in a way that it's intended to be

7    given, which is through the management structure.

8    Q.    So was there some kind of written rule that said

9    that you weren't permitted to ask Ms. Chan to contact

10   you more frequently?

11   A.    Not at all.  Not at all.

12   Q.    So there was no rule prohibiting you from telling

13   Ms. Chan that, you know, you'd appreciate it if she

14   contacted you once a week, right?

15   A.    There's no written rule prohibiting that, no.

16   Q.    There's no unwritten rule prohibiting that, fair

17   to say?

18   A.    I don't understand what you mean?

19   Q.    There was no rule, period, whether written or

20   unwritten, that prohibited you from telling Ms. Chan, if

21   you want to, "Hey, Gigi, I'd like you to contact me at

22   least once a week to talk about some stocks"?

23   A.    Insofar as that I respect the structure that

24   Wellington has put in place, then there is an unwritten

25   rule in essence that feedback gets directed in a certain

1  manner, right, in a formal manner, and I abided by those

2  formal, you can say, "conventions" that Wellington has

3  in place.

4  Q.    So you thought you couldn't tell her that you

5  wanted her to speak to you more frequently?

6  A.    I could have addressed that specifically with her,

7  I guess if I wanted to, but I chose to do it through the

8  way that Wellington had established.

9  Q.    If you thought it was important, sir, to

10 safeguarding the money of your clients --

11 A.    It certainly was important.

12 Q.    -- you would have had that conversation, wouldn't

13 you?

14 A.    I did have a conversation with the management

15 structure at Wellington with the appropriate channels

16 knowing that that feedback would get to her.  And I

17 think that, once again if you look at the memos and you

18 look at, you know, some of a lot of what we heard here,

19 that that feedback did get to Ms. Chan.

20 Q.    Was that effective in terms of talking to

21 management about your perceived dissatisfaction?

22        MR. PATERNITI:  Objection.

23        THE COURT:  The objection is sustained.

24 Q.    Am I right, sir, that you never replaced Gigi Chan

25 on your team?

1   A.    No, I did not.

2   Q.    Am I right that part of the reason why you never

3   replaced her was because you didn't think you needed

4   anybody?

5   A.    There's a lot of reasons.  So Mr. Fan and I have

6   been managing the portfolio together for over a decade

7   now and we are in constant discussion with one another

8   as to how we resource the team, how big should the team

9   be?  What do we need?  Does it help?  Does it not help?

10  To what extent does it help?  So we're constantly having

11  these discussions.  And since Ms. Chan left Wellington,

12  we've, up until this point, not decided to add another

13  Analyst to the team.

14  Q.    So, um, just to unpack that a little bit.  You

15  felt as though there was, um -- that you didn't need

16  anybody else?

17  A.    Well I guess the best way to say it is that we

18  felt that, um, between Philip and I, um, that the

19  performance and the coverage of our -- of our universe

20  was sufficient enough to generate the returns that the

21  clients expected.

22  Q.    And, um, having another person added to the mix,

23  that would have impacted, um, either yours or Mr. Fan's

24  compensation, isn't that right?

25  A.    Not necessarily, no.

1   Q.    Um, well when Ms. Chan was a member of your team,

2   you were expected to distribute some of the incentive

3   pool to her, right?

4   A.    What do you mean by "expected"?

5   Q.    I mean "expected," that you understood that was an

6   expectation that, since she was a member of your team,

7   part of the incentive pool should be going to her?

8   A.    Well there was an expectation that if someone adds

9   value -- that the point of an incentive pool is to

10  reward -- um, to reward contribution.  So if someone's

11  contributing, then, yes, you're correct, the expectation

12  would be that they would get part of that incentive

13  pool.

14  Q.    Am I right that up through 2016, Ms. Chan's share

15  of the incentive pool was actually ticking upwards?

16  A.    So I think that it's important to point out that

17  the, um, that the amount that gets paid to the Analyst

18  depends on a formula where the percentage may or may not

19  make a difference.  Let me explain.

20        So if there's a period of time where the pool is X

21  and you get a certain percentage of X, and then in the

22  subsequent period that pool shrinks, because the pool

23  depends on how good your performance is as a team, that

24  pool can shrink and you can still get even a higher

25  percentage of that pool, but because the pool is smaller

1    in actual dollar amounts, you get less.

2          So, um -- so it's possible, yes, that her

3    percentage had gone up over time.

4    Q.    Sir, I'm not talking about her total dollar

5    amount, I mean her size of the pool.

6    A.    Her percent of the pool.

7    Q.    It was going up, yes?

8    A.    Um, I don't know how many observations we're

9    talking about, but I don't know specifically whether it

10   was going up.  There were probably times where it went

11   up and maybe times where it went down.

12   Q.    And am I right, sir, that during the course of --

13   during the time that Ms. Chan was on your EMO team, you

14   were actually lobbying for Wellington to allow you to

15   take more than 70 percent, is that right?

16   A.    No, that's not correct.

17         THE COURT:  I don't understand the question, 70

18   percent of that pool?

19         MR. HANNON:  Correct, your Honor.

20         THE COURT:  For him?

21         MR. HANNON:  Correct.

22         THE COURT:  All right, well now I understand.

23         THE WITNESS:  I can explain it if you would like?

24         MR. PATERNITI:  Objection.

25         THE COURT:  And your answer was that that is not

1    correct?

2           THE WITNESS:  Yeah, it's not correct.

3           THE COURT:  So unless he asks some other question,

4    there's no evidence of that.

5           THE WITNESS:  Okay.  Yeah.

6           THE COURT:  Now that I understand what the

7    question is.  But he denies that.

8           It's up to you what you believe.  You can believe

9    it, disbelieve it, or believe parts of what he says.

10          Go ahead.

11          MR. HANNON:  Thank you, your Honor.

12          (Pause.)

13   Q.    The jury's heard some testimony here about

14   Ms. Chan making reference to the "headhunters" during

15   the course of her employment.  Did you ever hear that?

16   A.    No, I don't remember specifically hearing that.

17   No.

18   Q.    Okay.  Do you recall, um, having any

19   communications with Charles Argyle concerning that

20   subject?

21   A.    I don't recall specific conversations about that

22   subject, no.

23          MR. HANNON:  Let me show you a document here.

24          (On screen.)

25   Q.    And, um, would you like a moment to look at it

```
 1    before I ask you any questions?
 2    A.    I wouldn't mind, yeah.
 3    Q.    Okay.
 4    A.    (Reads.)  Okay.
 5    Q.    Okay.  Great.  So, um, now do you recognize this
 6    e-mail at all?
 7    A.    I don't recognize it insofar as remembering
 8    writing it.  Although what do you mean by "recognize"?
 9    I recognize that it's here, yes.
10    Q.    Okay.  Do you recall this exchange or the subject
11    matter of this exchange at all?
12    A.    No, this is the first time I've seen it in many
13    years.
14    Q.    Okay, so that would be a "No"?
15    A.    That would be a "No," yes.
16    Q.    Okay, then I'll be brief then.
17          THE COURT:  Maybe you ought to identify it by
18    number.
19          MR. HANNON:  Oh, I apologize, your Honor, it's
20    Exhibit 197.
21          THE COURT:  Okay.  Thank you.
22    Q.    So I've just enlarged the second e-mail here on
23    the page, this is the one from Mr. Argyle to you on June
24    28th, 2016.
25          Do you see that?
```

1   A.     I see it, yes.

2   Q.     Okay.  And, um, you see here, um, Mr. Argyle, um,

3   he's noting, um, a reference that Ms. Chan had

4   apparently made concerning "inbound calls from

5   headhunters."  Do you see that?

6   A.     I see that, yes.

7   Q.     Okay.  And you see here Mr. Argyle, um, he's

8   expressing to you, at least in his e-mail, that at least

9   at that time, um, he wasn't interpreting that to mean

10  that she's a "leaver."  Do you see that?

11  A.     I see that, yes.

12  Q.     Okay.  Did Mr. Argyle ever express anything

13  different to you on this subject concerning his

14  interpretation of any comments Ms. Chan had made about

15  headhunter calls?

16  A.     Not that I recall, no.

17  Q.     Okay.  And you see here, in your e-mail back to

18  Mr. Argyle, you note that "Gigi had mentioned to you

19  that it played out exactly as he described below."  Do

20  you see that?

21  A.     I see that, yes.

22  Q.     Um, so you had a conversation with Ms. Chan about

23  the events that are the subject of this chain?

24  A.     That's what it implied, yes.

25  Q.     Is it accurate?

1    A.    Once again I don't remember the specific
2    conversation, but I'm comfortable in saying that if I
3    wrote that, then I'm probably pretty sure I had a
4    conversation with her.
5    Q.    Okay.  And then after the comma there's a
6    reference to "Erin" and "Liz."  Do you see that?
7    A.    Yeah, I see that.
8    Q.    Who are they?
9    A.    That would have been probably Erin Murphy and Liz
10   Hogbin.
11   Q.    Um, the e-mail indicates that you had -- in
12   addition to speaking to Ms. Chan about the subject, you
13   had also spoken to those two individuals, is that right?
14   A.    Yeah, it would -- it would seem to me that that
15   would be the case, yes.
16   Q.    Do you have any understanding as to why that was?
17   A.    No.
18   Q.    In terms of the actual, um, decision to terminate,
19   um, Ms. Chan's employment, um, do you recall attending a
20   meeting here in Boston with Charles Argyle and Henry
21   Philip?
22   A.    I do.
23   Q.    And am I right that, um, that was a meeting that
24   took place shortly after the May 2017 conversation you
25   had with Ms. Chan that was recorded?

1    A.    It would make sense that it was shortly

2    thereafter, yes.

3    Q.    Okay.  And am I right that there was a -- there

4    was a consensus reached in that meeting to terminate

5    Ms. Chan's employment?

6    A.    Yeah, I'm not sure that the purpose of the meeting

7    was to generate a consensus, it was -- but Gigi was

8    certainly a subject of the meeting.

9    Q.    Okay.  Tell us what was discussed at that meeting?

10   A.    Well I don't remember everything that was

11   discussed, but, um, from my recollection I was asked

12   whether or not I thought that, um, that Gigi should

13   remain on the EMO team.

14   Q.    And what was your answer?

15   A.    My answer was that after many conversations and

16   observing the, um, observing the decline in her

17   participation, that we probably, the EMO team, would be

18   -- would be better off without her on the team.

19   Q.    And what else was discussed at this meeting?

20   A.    That, to my recollection, is the most sentiment of

21   what I remember of the meeting.

22   Q.    Do you recall anything else?

23   A.    No, not specifically.

24   Q.    Um, do you recall any discussion about, um,

25   whether or not Ms. Chan would be able to succeed in

1    Wellington as a "Team of 1"?

2    A.    I don't remember that specific conversation, no.

3    Q.    At any time did Charles Argyle ever ask you about

4    that possibility of whether or not you thought Ms. Chan

5    brought sufficient value to Wellington even if she

6    wasn't a member of EMO?

7    A.    And once again I don't remember that specific

8    conversation, no.

9    Q.    Did you have a view on that subject?

10   A.    Um, no, not necessarily.

11        (Pause.)

12        MR. HANNON:  That's all I have, your Honor.

13        THE COURT:  Do you wish to examine now or reserve?

14        MR. PATERNITI:  I'm going to examine now, your

15   Honor, the witness is available, um, although briefly.

16        THE COURT:  Okay, proceed.

17

18   CROSS-EXAMINATION BY MR. PATERNITI:

19   Q.    Good afternoon, Mr. Mattiko.

20   A.    Good afternoon.

21   Q.    I'm going to go quickly through just a couple

22   questions about your background.

23        You testified about when you started portfolio

24   management, um -- I want to go back and ask you, when

25   did you start working in the asset management industry?

1    A.    In the industry?  Um, shortly after I graduated

2    from the university, it would have probably been the

3    early '90s, maybe '92.

4    Q.    And you held various positions in the industry

5    before you were a Portfolio Manager?

6    A.    Um, yes.  Yes.  So from -- if I started the

7    industry in say 1992 and I started managing money in

8    '98, then, yes, in that period I would have various

9    other positions.

10   Q.    Okay.  And when you first -- in your first

11   position I think the company was called Valuation

12   Management & Research?

13   A.    That was the first place where I started managing

14   institutional money, yes.

15   Q.    Where was that?  Where were you located?

16   A.    Um, the company is based in a town just outside of

17   Frankfurt called, um, Kronberg, and I was based, um,

18   actually just outside of Frankfurt, Germany.

19   Q.    Over the course of time that you worked with that,

20   um, asset manager, do you recall how much money you

21   managed, um, client money?

22   A.    Yeah, that's a long time ago.  Um, it was not a

23   large asset manager, so it wasn't on the scale of JP

24   Morgan or Wellington, so it was probably in the ballpark

25   of anywhere from 50 to 150 million to start with.

1    Q.    Okay.  And by the time you ended there, do you

2    remember how much you had in assets under management?

3    A.    Oh, I had the pleasure of working there through

4    the, you know, the internet bubble where everything had

5    gone up and then, um, on the backside of it where

6    everything came back down again.  So when I left it was

7    probably, um, 200, 250 million dollars.

8    Q.    Okay.  And jumping ahead.

9          When you left JP Morgan -- and we've already heard

10   testimony about, um, about your clients that you had at

11   JP Morgan.  Did you believe they would follow you?

12   A.    No, I didn't know whether they would or not.

13   Q.    And how quickly after you went to Wellington did

14   they follow you?

15   A.    So I was very fortunate that, um, one or two of

16   them followed within, I would say, 6 months.

17   Q.    Okay.  Did you ever become aware of whether

18   Ms. Chan ever had a single client looking to follow her

19   from her prior employer to Wellington?

20   A.    No, I don't know anything about that.

21   Q.    With regard to Portfolio Manager, um, tell us, um,

22   just briefly the "primary," if you will, responsibility

23   of a Portfolio Manager at Wellington?

24   A.    At Wellington.  So the primary responsibility of a

25   Portfolio Manager is that they are, um, the fiduciary or

1    I guess you could say the "gatekeeper" of client assets.

2    So clients entrust Wellington and a team of investors

3    with their assets, whether it's a pension fund or an

4    endowment, and the Portfolio Manager is the one who

5    decides how that portfolio is constructed, in other

6    words which securities, or in my case stocks, are

7    included in that portfolio.  And the distinction here as

8    a fiduciary is that, um, the Portfolio Manager needs to

9    make sure that that money is invested in a prudent

10   manner that is in the best wishes and the best

11   intentions of what the client, um, what the client

12   wants.  And you effectively live and die by the

13   performance of those positions that you put in the

14   portfolio.

15   Q.    Okay.  We've heard a lot of testimony about

16   philosophy and process, I'm not going to ask you to

17   explain what it is, I'm going to ask you to provide the

18   jury with a concrete example, take a stock that they

19   would know and explain to them how philosophy and

20   process works?

21   A.    Okay.  Well I'll try and be brief, but sometimes

22   this can run on very long.  But for the matter of the

23   Court, I'll be brief.

24        So effectively the stock market is made up of

25   literally thousands and thousands of stocks and clients

1    have the ability to either buy the market as a whole,

2    very cheaply, or they can hire a firm like Wellington

3    that says "There's no need to buy all the stocks in the

4    market, we'll give you a, um, subset of these stocks

5    that we think will do better than the market as a whole,

6    and for that they pay you a fee.  But my job as a

7    fiduciary or as someone who is responsible as a

8    Portfolio Manager is to try to identify what is the best

9    subset of stocks to own within the market, and in order

10   to do so I need to be able to understand, um, why it is

11   that I think that this portfolio is the optimal

12   portfolio?  And that's where the "philosophy" comes

13   from, the "philosophy" states that, um, this is why I

14   think there is a mispricing, this is why I think these

15   stocks are mispriced relative to others.

16          And maybe if we use an example to which we say, um

17   -- if we use maybe Netflix, everybody's aware of

18   Netflix.  So at any given time the price of Netflix as a

19   stock is determined by buyers and sellers in the

20   marketplace, and I need to generate an idea about

21   whether or not -- let say if it's at 200 today, whether

22   or not, over my holding period, which for me is 5 years,

23   whether that $200 is appropriate or not?  And if I think

24   that it's appropriate, then it's probably not

25   interesting.  But if I think that the market is either

1    overvaluing it or undervaluing it, then I become

2    interested, all right, and that's the basis of

3    philosophy and process.

4        And a lot of times those mispricings can result

5    from, um, different investor timelines.  So let's go

6    back to the Netflix example.  And, I don't know, um, my

7    kids are all watching this "Squid Games" on Netflix and

8    it's -- it came out of nowhere, it's a big social

9    phenomenon, and what's happened is that it's the biggest

10   TV series ever and, you know, probably two or three

11   months ago nobody ever heard of it.  That has a big

12   impact on the Netflix share price.  But as we all know,

13   that's a short-term impact.  And so if I were an

14   investor, as an investor I'm trying to differentiate

15   between something that is -- that is maybe overreacting

16   to short-term news or short-term indicators versus what

17   the long-term value of that business is.

18       So for clients in EMO, what we're trying to do is

19   find situations where, once again the market has one

20   view about what it is and we have a different view, and

21   in this case we're trying to buy things where the market

22   is underappreciating what the long-term value is.

23   Although in the Netflix example -- and I probably should

24   have picked a different one, it's the opposite where the

25   -- where it's implied that there's too much value placed

```
 1   on the short term.
 2         It's a very abridged version, but hopefully it
 3   will give you at least a small appreciation.
 4   Q.    So when you talk about a "holding period," you
 5   care about how long -- that once you buy a stock you
 6   hold onto it before you think about selling it?
 7   A.    Correct.
 8   Q.    Um, and is that -- is that your specific
 9   philosophy generally?
10   A.    So my philosophy is differentiated from others in
11   the marketplace so far as that, um, we are -- we feel
12   that it's easier to, um, have a differentiated view if
13   you are holding that security for a longer period of
14   time.  So you can look at the turnover or the number of
15   names that change in a portfolio and you can back out
16   what that implies of how long you actually hold a stock.
17   So for us it's in excess of 6 years.  So on average
18   every stock that comes into the portfolio lasts at least
19   6 years.
20   Q.    Okay, and --
21         THE COURT:  And when you say "for us," are you
22   talking about you and Mr. Fan or are you talking about
23   --
24         THE WITNESS:  Yes, Emerging Markets Opportunities.
25   Sorry.
```

1          THE COURT:  Thank you.

2     Q.    (Pause.)  With regard to Analysts, do they have a

3     fiduciary duty to the client?

4     A.    The fiduciary responsibility lies primarily with

5     the Portfolio Manager because the Portfolio Manager is

6     the so-called "trigger puller."  In other words, the

7     Portfolio Manager, at the end of the day the buck stops

8     with them, him or her, insofar as they decide what the

9     composition of that portfolio is.  They do that with

10    input from Analysts.  But the Portfolio Manager, when --

11    let's use a bad example.  When the portfolio

12    underperforms or performs less than client expectations,

13    it's the Portfolio Manager that's on the hook because

14    the Portfolio Manager is the fiduciary that made the

15    decision about the composition of that portfolio.

16    Q.    And so just using your Netflix analogy, would the

17    Team Analyst be out there and, um, researching that

18    specific -- like Netflix and how they operate and what

19    their CEO's philosophy is, et cetera, and then bring it

20    back to you as the Team Leader?

21    A.    So typically, yes, the Analyst would do, um,

22    perform a few functions, but one of the primary

23    functions is to, as the name implies, to analyze

24    companies, um, and the second part of an Analyst's job

25    is to make recommendations.  So in the Netflix example

1   -- now Netflix is outside of my scope, but if Netflix

2   were in my scope, an Analyst would come up with a thesis

3   as to what Netflix is worth and they would come to me

4   and say "This is why I believe Netflix is worth this or

5   that and I recommend that you either buy this stock or

6   avoid this stock."  But by the end of the day the

7   Portfolio Manager is the one that decides whether or not

8   it gets included in the portfolio.

9   Q.    Okay.  Is there a rule at Wellington that Team

10  Analysts need to be told to engage with their Team

11  Leader?

12  A.    Um, I think Mr. Hannon asked the same question.

13  But, no, there's no --

14  Q.    I'm asking you the reverse question.

15  A.    Okay.

16  Q.    He asked if there was a rule at Wellington that

17  Team Leaders, um -- that -- well I'm not sure what we

18  asked.

19  A.    Okay.

20  Q.    But I'm asking you, um, is there a rule at

21  Wellington that Analysts need to be told -- strike that.

22       Is there a rule at Wellington that Analysts don't

23  need to communicate with their Team Leader unless

24  they're asked?

25  A.    No.

1  Q.    What is the Team Analyst's job in its essence?

2  A.    The Team Analyst's job is to contribute to a

3  portfolio that will create client outcomes that are

4  expected that the clients pay us for.

5  Q.    Is it possible to do that job without engaging

6  with the Team Leader?

7  A.    I don't think it's possible, no.

8  Q.    With regard to, um -- let's jump ahead.

9        Ms. Chan joined the EMO team after -- shortly

10  after she was hired.  What were your thoughts about how

11  long you would hope that, um, that she remain on your

12  team?

13  A.    Well I don't think I had specific expectations in

14  mind, but, um, suffices to say that, you know, given the

15  length of time that we typically invest in stocks within

16  our portfolio and the long-term orientation at

17  Wellington, um, and the fact that above many other

18  things our clients value team stability, that it would

19  have -- that it's safe to say that, um, the longer that

20  Gigi had intended to be an Analyst on the team, the

21  better.  So I didn't have a specific date in mind, but I

22  most certainly wanted it to be a long period of time,

23  um, just because of that stability and because of the

24  impact on a long-term portfolio.

25  Q.    When you say that "clients like stability," are

1    there risks that you believe, um, are involved, um, if

2    you -- as a Team Leader when you are either adding or

3    subtracting team members?

4    A.    With regard to the clients?

5    Q.    Yes.

6    A.    Yes, for sure.

7    Q.    What are those risks?

8    A.    Well the risks are that if there was -- I think we

9    can go back to -- you know we looked to the memo from,

10   um, from Phil Kligman at UPenn where it was implied in

11   that e-mail that he was concerned about Team Members'

12   contribution to the team.  So I mean that's a good

13   illustration that if a client perceives a team to have

14   instability, then it diminishes their trust in the

15   long-term prospects of that team.  And anything that

16   diminishes client trust of course is not good.

17   Q.    Um, so in June of 2015 you named Ms. Chan as a

18   permanent member of the team, correct?

19   A.    Yes.

20   Q.    Okay.  With regard to the time-period thereafter,

21   you had talked about the fact that you did not object

22   to, um, her going forward and trying to have this China

23   Growth Fund launched.  If you had said, "No," would that

24   have caused any concerns with you with regard to your

25   team stability?

1   A.    So if I had said -- if I had said that I was

2   uncomfortable with her starting China Growth?

3   Q.    Correct.

4   A.    I think that if I would have stood up and said "I

5   object to her launching China Growth," then I think it

6   would have jeopardized team stability, yes.

7   Q.    Okay.

8        THE COURT:  There's 5 minutes left and there's a

9   legal matter that I want to raise, so I think we'll stop

10  at this time.

11       MR. PATERNITI:  Thank you, your Honor.

12       THE COURT:  Ladies and gentlemen, you have not

13  heard all the evidence, please therefore keep your minds

14  suspended, do not discuss the case either among

15  yourselves, nor with anyone else.

16       Keep this nondiscussion very much in mind because

17  tomorrow I have to be at the doctor's, you'll go about

18  your affairs, you'll see other people, and so be guarded

19  that you do not talk about the substance of this case.

20       We'll resume again at 9:00 a.m. on Thursday

21  morning and I know I can count on you.  We'll stand in

22  recess until that time.  I'll remain on the bench.

23       THE CLERK:  All rise for the jury.

24       (Jury leaves, 12:55 p.m.)

25       THE COURT:  Please be seated.

1          And you may step down, sir.

2          I just want to take a moment, because my schedule

3     is tight, to tee up this issue.

4          And, Mr. Hannon, what you said during the recess

5     has caused me to think.  On that point, on the point

6     that I -- that I cannot create jurisdiction if none

7     existed at the time of the filing of the case, both you

8     and the defense are in agreement, and so it's either up

9     or down as to subject matter jurisdiction as to the

10    whole case.

11         Now other than -- and I'm not holding you to

12    anything other than remarks made in the lobby, you

13    haven't had a chance to argue it, the motion to dismiss

14    on the grounds of subject matter jurisdiction.  But I

15    see there's three points.  The third is this issue of

16    whether I could dismiss as to Wellington and go forward

17    as to Mr. Argyle?  You both are agreed I cannot.  So the

18    first point is what are the facts?

19         It's undisputed that Ms. Chan is not a citizen of

20    the United States, she's a citizen of Hong Kong and the

21    United Kingdom.  I am accepting, because it's

22    represented by counsel with affidavit, the Wellington

23    organization, as stated on the last full paragraph of

24    their memorandum at Page 5 and going over to Page 6, um,

25    which points out that there are four partners who are,

1    um, Foreign Nationals -- um, rather 6 are Foreign

2    Nationals, 4 being citizens of the United Kingdom.  I

3    accept that.  But I'll hear argument on that.

4         And then lastly, there is the issue, um, if those

5    are the facts and we have, um, Foreign Nationals on both

6    sides of the versus, it appears to me, though it's a

7    matter of statutory interpretation that the First

8    Circuit hasn't spoken to -- though my colleague, Judge

9    Talwani has, it appears to me that I have no subject

10   matter jurisdiction.  If those things are correct, I am

11   prepared to dismiss the case on the ground that there is

12   no subject matter jurisdiction, without prejudice, and

13   without any expression of opinion as to the merits.

14        So trying to save time, Mr. Hannon, do you want to

15   argue in opposition to either of the other two points at

16   2:00?

17        MR. HANNON:  Um, no, your Honor, it's just the

18   second point you identified.  We don't challenge the

19   facts, we've done some --

20        THE COURT:  I understand.  So is it the law as

21   I've stated it?

22        MR. HANNON:  Um, well it's accurate that the First

23   Circuit has not weighed in and we have some arguments in

24   terms of why it --

25        THE COURT:  And you'd like to be heard on this?

```
 1          MR. HANNON:  I would, your Honor.
 2          THE COURT:  Of course.  All right.  So, thank you,
 3     that's such a responsive answer and I appreciate it.
 4     2:00 for that.
 5          MR. DAVIS:  Your Honor, if I might briefly
 6     clarify?  Defendants' position is not that the Court has
 7     no authority --
 8          THE COURT:  Yes, it is, that was your brief.
 9          MR. DAVIS:  That was the position under 28 U.S.C.
10     1653, the statute which permits amendments to the
11     complaint to correct jurisdictional pleadings.
12          THE COURT:  All right.
13          MR. DAVIS:  You still have authority, under Rule
14     21, to drop a party.  And we submit --
15          THE COURT:  Your brief says the contrary.  I'll
16     review it over lunch.  But you're not going to argue
17     different positions.
18          We'll recess.  I'll hear you at 2:00.
19          THE CLERK:  All rise.
20          (Lunch recess, 1:00 p.m.)
21          (Resumed, no jury, 2:00 p.m.)
22          THE COURT:  We'll call the next case.
23          THE CLERK:  Now hearing Civil Matter 19-11605,
24     Chan versus Wellington, et al.
25          THE COURT:  And I think I'm prepared for argument
```

1    here, no more than 5 minutes.  We'll start with you,

2    Mr. Hannon.

3        MR. HANNON:  Thank you, your Honor.  Good

4    afternoon.

5        Let me start with a confession, just so the record

6    is clear.  We have not been able to locate any decision

7    report or otherwise which construes the statute in which

8    we're advocating for the Court to construe them here in

9    this case.  Really our argument here, your Honor, um,

10   and I think really the two paths in front of the judge

11   -- in front of the Court rather, um, one, is uniform

12   case law from other circuits and from some other

13   district courts in this one versus what I would suggest

14   is an absurd result in terms of considering whether or

15   not parties of this nature or a dispute of this nature

16   and whether or not this is a type of a dispute that

17   Congress, in enacting the jurisdiction provisions,

18   intended to exclude from this Court's reach.

19       Even the cases that have passed upon this discrete

20   issue have often remarked that the somewhat archaic

21   rules that have sort of been stacked one on top of

22   another on top of another have led to a situation where

23   none of this seems to make a great deal of sense.  And

24   I would suggest that the Court's duty in terms of

25   interpreting the statute begins with the statute, that

1   A(2) does not specifically require complete diversity,

2   that the requirement for complete diversity, that dates

3   back to the *Sturbridge* case back in the 1800s, that

4   deals with interstate diversity, um, and what we're

5   really dealing with here is whether or not there's a

6   similar requirement with respect to complete diversity

7   amongst aliens, and not just any aliens, but the

8   particular alien at issue here is essentially a dual

9   citizen.  You have a disregarded entity that has the

10  majority of its partners are citizens of Massachusetts,

11  however it does have some foreign partners.  And for

12  that reason, in the usual jurisdiction analysis, the

13  Supreme Court, a divided Supreme Court has held that you

14  look at the foreign partners to determine alienage.

15       None of those decisions address the question here,

16  which concerns whether complete diversity is required.

17  And I point out that the modern trend is to allow

18  minimal diversity with respect to alienage, that's

19  reflected in A(3) under the statute that specifically

20  recognizes that minimal diversity is sufficient with

21  respect to allowing disputes like this to come into

22  federal court.

23       And lastly recognizing -- I've been alloted 5

24  minutes, your Honor, um, I would just reiterate a

25  comment that I think I made previously and I'm not sure

1    on the record, that this case really exemplifies why the

2    archaic scheme this has arisen in a somewhat patchwork

3    fashion is simply unworkable and not consistent with

4    Congressional intent as reflected in the statute, that

5    you have disputes coming into federal court where

6    jurisdiction is not easily ascertained and there is much

7    room for many foot faults along the way.  And this is,

8    um, if the Court does find there's a lack of subject

9    matter jurisdiction, it's an unfortunate result and one

10   that I would suggest is avoidable based upon a better

11   reading of the statute.

12            THE COURT:  Thank you.

13            MR. HANNON:  Thank you, your Honor.

14            MR. DAVIS:  Thank you, your Honor.  Very briefly.

15       I heard my brother to concede that there is no

16   authority adopting his points of view of the diversity

17   statute --

18            THE COURT:  But there's no contrary authority in

19   the First Circuit.

20            MR. DAVIS:  Well, your Honor, I --

21            THE COURT:  But there's no authority in the First

22   Circuit that would foreclose the interpretation for

23   which he argues?

24            MR. DAVIS:  Well, your Honor, I would point to,

25   um, *Yolara Star Health vs. Allied Insurance*, 2014, this

1   district, um --

2        THE COURT:  Of course, and I hold great respect,

3   indeed I made mention before the break of Judge

4   Talwani's decision in *Yolara,* yes, that's persuasive,

5   but it's not controlling.

6        MR. DAVIS:  Yes, your Honor.

7        THE COURT:  This is my responsibility.

8        MR. DAVIS:  Yes, your Honor.  And I would say,

9   stepping back briefly, that the U.S. Supreme Court has

10  lamented on various occasions -- I believe including in

11  the *Carden* decision, that there are, um -- there are

12  constructions that apply to partnerships that don't

13  apply to corporations, and they have said that this --

14  this diversity scheme may not make intuitive sense, but

15  it is the providence of Congress to clarify and to

16  correct any result which, in my brother's words, are

17  "absurd."  And the overwhelming authority of other

18  circuits and in the district courts in this jurisdiction

19  hold that a foreign citizen on one side of the "V" and a

20  foreign citizen on the other side of the "V," with a

21  single, um, a U.S. citizen does not import diversity,

22  does not confer diversity jurisdiction.  And of course

23  it bears repeating that the federal courts are courts of

24  limited jurisdiction in which, um, the Court must always

25  strictly scrutinize whether it has jurisdiction to hear

1    this matter.

2         THE COURT:  All right.  I understand the argument.

3    You made mention before the break that I had some

4    discretion under Rule 21, but your position is, and this

5    is the last sentence of your brief, "This lawsuit must

6    be dismissed in its entirety."  Are you shifting your

7    ground?

8         MR. DAVIS:  No, your Honor, um, we're not.

9         THE COURT:  All right.  Thank you.

10        I think I must dismiss it in its entirety.  I'll

11   say only that the argument made by plaintiff here, by

12   Mr. Hannon, is well-articulated and were I writing on

13   anything like a clean slate, it commends itself to the

14   Court, especially in these circumstances.  But as the

15   Supreme Court has said, these are matters for the

16   Congress and I must respect -- this is a

17   Congressionally-created court, I must respect the limits

18   of the Court's subject matter jurisdiction and I do so

19   here.

20        This case is dismissed, it's dismissed without

21   prejudice, without addressing the merits in any respect,

22   solely because the Court has uncovered and the parties

23   then have reflected and aided the Court that I do not

24   have subject matter jurisdiction over this dispute

25   because it involves aliens, nonU.S. citizens on both

1    sides of the "Versus."   That's the order of the Court.

2    Thank you very much.   We'll be in recess until naturally

3    2:30.   We'll recess until 2:30.

4         THE CLERK:   All rise.

5         THE COURT:   I might say parenthetically that this

6    is -- and counsel and I have taken time both to reflect

7    on this and really to see if we couldn't keep going.

8    It's been a pleasure having you appear in this court.

9    I'm actually sorry.   This has been well-prepared and as

10   officers of the court you have all done a very fine job

11   and I appreciate it.   We'll stand in recess.

12        (Ends, 2:10 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                   C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5   hereby certify that the forgoing transcript of the

6   record is a true and accurate transcription of my

7   stenographic notes, before Judge William G. Young, on

8   Tuesday, October 19, 2021, to the best of my skill and

9   ability.

10

11

12

13   /s/ Richard H. Romanow 01-06-22
     _____
14   RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25
```